1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF ARIZONA
2

3    UNITED STATES OF AMERICA,     ) Case No. CR 11-01751-TUC-CKJ (HCE)
                                    )
4                     Plaintiff,    )
                                    )
5         v.                        ) Tucson, Arizona
                                    ) Thursday, May 19, 2011
6    TODD RUSSELL FRIES,            ) 3:31 p.m.
                                    )
7                     Defendant.    )
     _____)
8

9        TRANSCRIPT RE: DETENTION HEARING RE: DANGEROUSNESS
              BEFORE THE HONORABLE HECTOR C. ESTRADA
10               UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiff:      BEVERLY K. ANDERSON, ESQ.
                             DAVID PIMSNER, ESQ.
13                           U.S. Attorneys Office
                             405 W. Congress Street, Suite 4800
14                           Tucson, Arizona 85701
                             (520) 620-7300
15
     For the Defendant:      RICHARD C. BOCK, ESQ.
16                           Lingeman & Bock
                             100 N. Stone Avenue, Suite 801
17                           Tucson, Arizona 85701
                             (520) 792-4940
18

19   Court Recorder:         Courtsmart

20   Transcription Service:  Verbatim Reporting & Transcription
                             11115 N. La Canada, Suite 275
21                           Tucson, Arizona 85701
                             (520) 861-0711
22

23
     Proceedings recorded by electronic sound recording;
24          transcript produced by transcription service.

25

2

1                               INDEX

2                      DIRECT   CROSS   REDIRECT   RECROSS

3   WITNESSES FOR THE
      GOVERNMENT:
4
    BRIAN NOWAK            10      46       64         68
5
    DAVID LOOS            70     73/75     --         --
6
    JAY HENZE            77      --        --         --
7
    WITNESSES FOR THE
8     DEFENDANT:

9   None

10  EXHIBITS:                                    Received

11  FOR THE GOVERNMENT:

12  1 and 2 - Photographs                           37

13  3 - Photograph                                  37
    4 and 5  Photographs                            38
14  6 and 7 - Photographs                           38

15  8 - Photograph                                  40

16  9 - DPS report                                  40
    10 and 11 - Photographs                         26
17  12 and 13 - Photographs                         27

18  14 and 15 - Photographs                         28

19  16 and 17 - Photographs                         30
    18 - Photograph                                 31
20  19 - Rooney Report                              31

21  20 - Latent print report                        32

22  21 and 22 - Photographs                         80
    23 through 25 Photographs                       84
23  26 - Photograph                                 85

24  FOR THE DEFENDANT:

25  None

3

P R O C E E D I N G S

1

2          THE CLERK:  Criminal case 11-1751-CKJ, USA versus Todd

3    Russell Fries, on for detention hearing.

4          Counsel, please state your appearances.

5          MS. ANDERSON:  Beverly Anderson and -- and David

6    Pimsner for the United States.  Good afternoon.

7          THE COURT:  Good afternoon.

8          MR. BOCK:  Judge, good afternoon.  Richard Bock on

9    behalf of Todd Fries, and he's in custody, and I filed a general

10   notice of appearance.

11         THE COURT:  All right.  Thank you, sir.  Do either

12   counsel wish to make an opening statement?

13         MS. ANDERSON:  Just briefly, Your Honor.

14         Your Honor, the Government is seeking to detain the

15   Defendant on the basis that he is a danger to the community, and

16   furthermore, that he is a flight risk.  Your Honor, the

17   Government has approximately 29 exhibits that we will be

18   submitting to the Court in support of our position for detention.

19         The crimes for which the Defendant is indicted is a --

20   is a incident that occurred in August of 2009.  In support of

21   detention, the Government will be presenting evidence briefly

22   regarding a 2008 incident which is -- which was similar to the

23   2009 incident, in addition to another incident that occurred

24   approximately two weeks ago against a completely different

25   victim.  And after hearing the evidence, the Government is -- is

VERBATIM REPORTING & TRANSCRIPTION, LLC   *   (520) 861-0711

4

1   confident that the Court will see that the Defendant is not only

2   a danger to the community, but is also a flight risk.

3           THE COURT:  All right.  Thank you.  Mr. Bock, do you

4   wish to make a statement, sir?

5           MR. BOCK:  Thank you.  Judge, initially, preliminarily,

6   the Government has filed no written motion regarding their

7   request for detention.  Secondly, the Government has provided me

8   with the disclosure which I received yesterday and the disclosure

9   involves testimony regarding an event of October 31st of '08, and

10  the event which is the basis of this allegation, the two count

11  indictment.

12          I have not received any disclosure regarding a

13  situation, unless it's regarding the interview of a witness; is

14  that what you're -- I don't -- I don't know the -- what the two

15  week ago claim is from the disclosure that I received.

16          THE COURT:  Ms. Anderson, what do you have regarding

17  that?

18          MS. ANDERSON:  Your Honor, we have a statement of the

19  victim of that incident that occurred approximately two weeks

20  ago.  We intend on presenting hearsay evidence regarding what

21  that witness told Special Agent Ryan Nowak who is the case agent

22  on the case.

23          MR. BOCK:  Is that the witness Castro; is that --

24          MS. ANDERSON:  No, this is Marguerite Brown.

25          MR. BOCK:  Okay.  This is --

1          MS. ANDERSON:  Who --

2          MR. BOCK:  I'm sorry, go ahead.

3          MS. ANDERSON:  Marguerite Brown who was the victim of a

4   similar incident approximately two weeks ago.

5          MR. BOCK:  Well, that hasn't been provided to me

6   through any Jencks material or I believe Rule 26.

7          Also, Judge, I don't believe -- I think clear and

8   convincing evidence, Your Honor, is the burden.  As you've done

9   many of these, obviously, and you know obviously the detention

10  rules in and out and the burdens of proof, and, you know, the

11  weight of evidence is one factor, but it's really the least

12  significant factor according to a Ninth Circuit case, <u>U.S. v.</u>

13  <u>Townsend</u>, at 897 F.2d 989.

14         This client received a very positive presentence report

15  in which pretrial services, which serves a very valuable asset to

16  the Federal Court System, and through an experienced pretrial

17  service investigator, has recommended that there are a

18  combination of -- of conditions that will ensure not only

19  attendance but also the -- any claims or allegations regarding

20  dangerousness.  And I would also add, Judge, that if the Court

21  feels that a surety bond is required, we will be in a position to

22  make a -- an offer with respect to not only the conditions

23  imposed by pretrial, but also as to a bond.

24         And so, I don't know how much that -- it's whether or

25  not I believe that he's a danger to the community is one of -- or

6

1   a flight risk, so I don't know if we're going to try the case

2   here or what we're going to do necessarily with all of the facts

3   that the State -- that the Government wants to go forward with.

4           THE COURT:  Well, before you sit down, sir.  Ms.

5   Anderson, what about the information that you have in that -- in

6   the form of that statement from the two week ago incident, are

7   you going to be disclosing that to Mr. Bock?

8           MS. ANDERSON:  Your Honor, we can run upstairs and --

9   and get her statement and make copies for Mr. Bock so that he can

10  have a copy of the victim's statement prior to the hearing or

11  prior before we present that particular testimony.

12          THE COURT:  Well, why wasn't it disclosed before?

13          MS. ANDERSON:  I didn't think it was all that necessary

14  for the witness', the victim's statement to be presented to the

15  defense.  It -- the testimony is going to be coming in through

16  the FBI agent and Mr. Bock is going to be free to cross examine

17  the Special Agent.  The matter is still under investigation by

18  the FBI and all we have at this point is the victim's statement.

19          THE COURT:  Well, I mean, how can he effectively cross

20  examine anyone if he doesn't have the complete statement?  I

21  mean, you, I presume through your witness, would simply pull out

22  those salient facts that you deemed appropriate or necessary to

23  present to the Court for purposes of that determination without

24  giving defense counsel an opportunity to see the complete and

25  comprehensive statement made so he can figure out whether or not

1   there might be contradictions within, nuancing of some sort,

2   minimizing of certain things said.  I mean, how can he

3   effectively cross examine if he doesn't have that statement?

4          MS. ANDERSON:  Your Honor, I'd be happy to -- to

5   provide that statement to Mr. Bock so that he can adequately

6   cross examine the case agent on that particular incident.

7          THE COURT:  Well, how long have you had that statement,

8   ma'am?

9          MS. ANDERSON:  Well, the incident occurred maybe two

10  weeks ago.  I've had it shortly thereafter.

11         THE COURT:  Shortly thereafter meaning what?

12         MS. ANDERSON:  Shortly thereafter, the incident

13  occurred on April 28th of this year.

14         THE COURT:  Well, what -- then now happens is this, is

15  Mr. Bock, you know, is going to be giving this thing on short

16  notice and it may end up delaying this particular hearing a

17  couple of more days.

18         MS. ANDERSON:  Your Honor, the statement is --

19         THE COURT:  Certainly --

20         MS. ANDERSON:  -- maybe a page long.

21         THE COURT:  Okay.

22         MS. ANDERSON:  It'll take him maybe two minutes to read

23  it.  I'd also point out to the Court that yesterday, last night,

24  I produced for Mr. Bock a great deal of disclosure that I didn't

25  really have to disclose to him until maybe today.

1          THE COURT:  All right.

2          MS. ANDERSON:  But out of courtesy, I went ahead and

3     produced for him many pictures, many statements, many lab

4     reports, so that he would be adequately prepared to cross examine

5     the case agent today.

6          THE COURT:  All right.

7          MS. ANDERSON:  This is merely an oversight on behalf of

8     the Government and I would ask for permission to be able to

9     produce that statement for Mr. Bock before he cross examines the

10    case agent.

11         THE COURT:  Well, do you have it with you right now?

12         MS. ANDERSON:  No, but it's upstairs on the fourth

13    floor and can be obtained fairly quickly.

14         THE COURT:  All right.  Is your first witness going to

15    testify regarding that statement?

16         MS. ANDERSON:  He is, but after about 20 minutes of

17    getting into the other two incidents, the 2008 incident and the

18    2009 incident.  And Your Honor, it's the Government's position

19    that the 2011 incident is -- is relevant because it goes to the

20    dangerousness of the Defendant.

21         THE COURT:  I'm just more concerned with trying to move

22    this hearing along without having to cause a -- any interruption

23    in the flow of evidence and in -- to having to take breaks to get

24    the report, to make a copy, to have him look at it, and then come

25    back and, you know, you had stated a couple days ago that this

1  matter would take about an hour, you've got three witnesses.

2  You've got some 20-some exhibits, we've got cross examination.

3  It's not going to get done in an hour I don't think.

4          All right.  Well, what I'd like you to do then is call

5  your first witness then, we'll proceed forward with whatever is

6  going to be offered, but when we get to that point where you're

7  going to be introducing the information from two weeks ago, we'll

8  take a quick break right then and you can go retrieve it and make

9  a copy.

10          MS. ANDERSON:  Sure.

11          THE COURT:  All right.

12          MS. ANDERSON:  Sure.

13          THE COURT:  Call your first witness then.

14          MS. ANDERSON:  Government calls Special Agent Brian

15  Nowak.

16      (Oath administered)

17          THE COURT:  And just for purposes of focus as to what

18  we're doing here, it seems to me that the major areas of inquiry

19  is are these or are these not dangerous weapons.  And secondly,

20  is Mr. Fries or not the individual that's involved.  And so

21  obviously, you -- besides just simply bringing in information

22  about whatever these things are that might cause harm to people,

23  I would imagine you have something that would tie him into it.

24          MS. ANDERSON:  Absolutely.

25          THE COURT:  All right.  All right.

10

1          BRIAN NOWAK, GOVERNMENT'S WITNESS, SWORN

2                       DIRECT EXAMINATION

3    BY MS. ANDERSON:

4        Q    Could you tell us your name, please?

5        A    Special Agent Brian Nowak.

6        Q    What do you do for a living?

7        A    I'm a Special Agent with the FBI in Tucson, Arizona.

8        Q    How long have you been so employed?

9        A    About nine years.

10       Q    Are you assigned to any unit in particular?

11       A    I work domestic terrorism, weapons of mass destruction,

12   WMD.

13       Q    How long have you been assigned to that -- that

14   particular area?

15       A    Almost nine years.

16       Q    Do you have any kind of special expertise that enables

17   you to work in that area?

18       A    Through the FBI training in what's called WMD or CBRN,

19   chemical, biological, radiological, nuclear.

20            MR. BOCK:  Judge, I don't mean to interrupt, but I just

21   have a little problem hearing.  Could he speak into the

22   microphone?  Is that okay?

23            THE COURT:  Oh, sorry about that.

24            MR. BOCK:  Thank you, sir.

25            THE COURT:  Thank you.

1        THE WITNESS:  As well as certification as a hazardous

2   materials operation level operator and hazardous materials

3   technician.

4   BY MS. ANDERSON:

5        Q    Overall, how many hours of special training have you

6   received?

7        A    It would be in the hundreds.

8        Q    Now, are you the case agent assigned to investigate the

9   events that occurred on August 2nd, 2009 at the Levines'

10  residence here in Tucson which is the subject of the indictment

11  11-1751?

12       A    I am.

13       Q    And were you called to the scene on August 2nd, 2009

14  when this event occurred?

15       A    Yes, I was.

16       Q    What time did you arrive at the scene?

17       A    I arrived around 10:00 a.m.

18       Q    When you arrived there at 10:00 were there other law

19  enforcement agencies there?

20       A    There was a multitude of agencies to include Northwest

21  Fire, Pima County Sheriffs Department, and ourselves.

22       Q    What time was the initial call received by law

23  enforcement plus the Hazmat units as you've described?

24       A    Around 5:00 a.m.

25       Q    Now, when you arrived at the scene at about 10:00 a.m.,

12

1  did you have a chance to speak with the first responders that

2  were there at the scene at around 5:00 a.m.?

3       A    Yes, I did.  I spoke with most of the responders and

4  fire department people personnel.

5       Q    Did they describe for you what they experienced when

6  they arrived at the scene?

7       A    They did.  First responding units reported that there

8  was a large cloud in the area near the address in question, 2870

9  West Magee.  They described the cloud as being about the size of

10 a football field laying on its side, hanging over the -- the

11 area.

12      Q    Did they describe for you what kind of physical

13 symptoms they experienced when they got out of their vehicles?

14      A    The first responding units upon exiting their vehicles

15 noticed a heavy scent of what they believed to be chlorine at the

16 time.  They also noticed that their eyes, their mouth and their

17 throat began to burn as soon as they came out of the vehicles.

18 And the responding deputies at the scene had to don protective

19 breathing apparatus in order to be able to evacuate the

20 neighborhood.

21      Q    Did they ultimately follow the cloud to a certain

22 residence?

23      A    The police and fire both followed the cloud.  The cloud

24 traveled in a low area along the washes, where about a half mile

25 until it dissipated around the Ina Road area.

1    Q    And were they able to determine at which house the

2  cloud was centered around?

3    A    They had traced back the cloud to 2870 West Magee as

4  its originating point.

5    Q    Now, describe for us what you saw when you arrived at

6  the scene at 10:00.

7    A    Upon arrival at the scene, I noticed that the front of

8  the home at 2870 West Magee, which is a single story townhome, it

9  had -- shares common walls with the homes on either side, has a

10  front and rear exit, and upon arrival, the front garage door had

11  a v-pattern burn mark on it.  The driveway leading up to the

12  house had a multitude of a oily type substance along with foam

13  peanuts that was strung along the front.  There was graffiti on

14  the house to include male genitalia, swastika, and other names

15  and things.

16       The -- at the center of the two-door closed garage

17  door, we had a large pile of a brown sludge type material which

18  at the time was -- had the -- just the semblance of coming up a

19  little bit down towards the door.

20    Q    And was that one of several devices at the scene?

21    A    Yes, it was.

22    Q    And did the scene include the backyard?

23    A    Yes, it involved the patio.  We described it as being

24  device one, which is at the front of the garage door in the

25  center.  And then at the front of the home, as you look towards

14

1   the front of the house, if you went along the front of the house,

2   along the sidewalk, and continued to be a large amount of the

3   oily substance along with the foam peanuts in it.  As you

4   approached the front door of the home, you then started

5   encountering dead animals, to include woodpeckers, rabbits, and

6   some other type of animals, that had been dead and soaked in oily

7   type substance.

8          There's also feces strewn around the area and the front

9   door, the front window, and the front garage door, were all

10  sealed with a orange type construction foam adhesive preventing

11  it from being opened.

12      Q    Were there any dead animals in the back?

13      A    There were no dead animals in the back.  As we went

14  around the back, there was on the rear of the home more graffiti

15  along the wall.  There was also at the back of the house located

16  a partially activated bucket.  The bucket was a five gallon

17  bucket with a green type, white bucket, saying chlorine tablets

18  in it, and that also had the identical brown sludge material that

19  was in the front of the house as well.

20      Q    Now, did you find any identification at the scene?

21      A    Located right near the house in a wash area we located

22  a black dayplanner which also had an envelope attached to it that

23  -- which included a myriad of various forms of ID.  It had a

24  checkbook enclosed with it and some multitude of pictures.

25      Q    And the checkbook was -- was preprinted checks I take

1  it --

2      A    Correct.

3      Q    -- correct?

4      A    Yes.

5      Q    And whose name was on the preprinted checks?

6      A    On the preprinted checks was Michelle Fuentes.

7      Q    Were -- was there any other identification belonging to

8  Michelle Fuentes at the scene?

9      A    There was a other license, there was other forms of ID

10 for her, photographs of her in there, and then there was another

11 ID for a subject of Joaquin Navarette (ph).

12     Q    And was that a driver's license or what kind of ID was

13 that?

14     A    It was a card involving your immigration status.

15     Q    Let's talk about the devices, particularly the first

16 device.  Again, that was in -- in the front of the house,

17 correct?

18     A    It was located in the center of the garage door, yes.

19     Q    Okay.  And what did you observe when you looked at --

20 more closely at the device?

21     A    It looked to be resembling somewhere between two to

22 four bucket outlines once we were able to clear away the initial

23 amounts of the sludge.  It had a brownish tinge to it and also

24 has a very chemical smell, almost resembling what can be

25 perceived as chlorine.

1     Q    Chlorine?

2     A    Uh-huh (affirmative).

3     Q    Did you say chlorine?

4     A    Chlorine, yes.

5     Q    Did you smell chlorine when you approached the house?

6     A    Yes, there was a heavy chemical smell of chlorine in

7 the air.

8     Q    Did first responders describe something unusual about

9 this -- this first device when they approached the house?

10    A    The initial -- when they had approached the house is

11 that it was still smoking and still off-gassing some materials

12 when they had initially arrived.

13    Q    How about the second device, could you describe that

14 for us?

15    A    The second device in the rear of the house was a five

16 gallon bucket.  It was again white in color with a green top.  It

17 was pool time three inch chlorine tablets.  The device looked

18 like it had only partially functioned because it had not burned

19 all the way down as the devices in the front of the house had.

20       The rear device at the rear of the home also had

21 stopped smoking at the time when I was there, but it was just the

22 brown sludge material along the sides of it and down the ends of

23 it.

24    Q    Did first responders describe that the second device

25 was in fact burning when they arrived?

1     A     Yes, the device was smoking and still in activation

2 stage when the first responders had shown up.

3     Q     Was there a third device?

4     A     There was in terms of there was we also had an unknown

5 type white powder in the rear of the yard, which we were not sure

6 what it was, that was contained in a blue mesh bag.  And then

7 there's also another overturned bucket in the front of the house

8 which we had -- at the time did not know what it contained.

9     Q     Now, did Northwest Fire Hazmat show up at the scene?

10     A     Yes.

11     Q     What were they doing there?

12     A     They were doing a full hazmat response.  They had

13 donned level 8 protective gear because of the dangerousness of

14 chlorine and the chemical smells what they were having.

15     Q     Did they have occasion to take any kind of readings

16 regarding any of the air at that scene?

17     A     They did try to take a reading --

18           MR. BOCK:  I'm going to object to this, Your Honor.

19 This is like three levels of hearsay.

20           THE COURT:  Overruled.

21 BY MS. ANDERSON:

22     Q     You can go ahead.

23     A     They had a -- what they called a MultiRAE gas monitor

24 to detect levels of different types of materials.  The chlorine

25 reading on the monitor showed a level of high then in the garage.

1    Q    And that was in the enclosed garage; is that right?

2    A    Yes, that was in the enclosed garage, and that was done

3 a few hours after the incident took place, around 7:30 a.m.

4    Q    Okay.  And they received a reading of high?

5    A    They received a reading of high on the material.

6    Q    Did you talk to the folks at Northwest Fire?

7    A    I did.  I spoke with the battalion chief and the hazmat

8 commander there.

9    Q    You were there for hours, were you not?

10    A    I was there the entire day.

11    Q    And did you have occasion to ask them what a reading of

12 high means?

13    A    Reading of high means at least at the very minimum a

14 reading of five parts per million.

15    Q    Five?

16    A    Five parts per million, yes.

17    Q    And --

18         THE COURT:  I'm sorry, I can't make out what you just

19 said, sir.  A reading of high means what?

20         THE WITNESS:  A reading of high on the monitor means at

21 least five parts per million in the level of chlorine.

22         THE COURT:  Thank you.

23 BY MS. ANDERSON:

24    Q    It could be -- it could have been ten, correct?

25         MR. BOCK:  Objection what it could have been, Judge.

1           THE COURT:  Sustained.

2   BY MS. ANDERSON:

3       Q    Tell us what a reading of fi -- a reading of five parts

4   per million means?

5       A    That it is a very minimum of five.  It could be higher,

6   they don't know the exact amount.  It could have been anywheres

7   from five, eight, ten, 12.

8           MR. BOCK:  Well, I object; I mean, I objected to that.

9           THE COURT:  I'm sorry, your objection?

10          MR. BOCK:  The objection was that it was conjecture.

11  He didn't -- said could have been ten, and you sustained the

12  objection.  Now he's going back into the same dialogue.

13          MS. ANDERSON:  May I provide some additional

14  foundation?

15          THE COURT:  Certainly.

16  BY MS. ANDERSON:

17      Q    Now you spoke with the folks from Northwest Fire, did

18  you not?

19      A    I did.

20      Q    You -- well, you have training yourself, correct?

21      A    I do.

22      Q    And did they explain to you the kind of device that

23  they used?

24      A    Yes.

25      Q    And they explained to you that -- what a reading of

1    high on their device means; is that correct?

2        A    Correct.

3        Q    And what does that reading of high mean?

4        A    That at lea -- that the reading's at least five parts

5    per million of chlorine.

6        Q    Did they also explain to you that it could have been

7    much higher than five parts per million?

8        A    Yes, they did.

9            MR. BOCK:  I object to that, Judge.

10           THE COURT:  Overruled.

11   BY MS. ANDERSON:

12       Q    What is the industry standard in terms of lethalness or

13   lethfulness of -- of chlorine gas?

14       A    Anything above ten parts per million could be

15   considered a lethal dose.

16       Q    With one breath?

17       A    Yes.

18       Q    Now let's talk a little bit more about the

19   identification documents that -- that were found at the scene.

20   Could you tell us a little bit more about the preprinted checks?

21       A    Yeah, the check was written out for $450 to Karen

22   Levine, the -- who was the victim homeowner.  It had on the line

23   said DBA Debbie's Cleaning Service.  And then on the signature

24   line, the name appearing on the signature line was Michelle

25   Fuentes.

1    Q    And was there something on the memo section?

2    A    That had a DBA, doing business as Debbie's Cleaning.

3    Q    Was there something about a memo for services rendered?

4    A    It had said cleaning, customer unhappy, refund.

5    Q    Did you have occasion to speak with Michelle Fuentes?

6    A    We spoke with Michelle Fuentes that day, yes.

7    Q    Did you go talk to her in person?

8    A    Yes.  We had an interview with her.

9    Q    Did you ask her about the fact that her -- her

10   checkbook was at the -- the scene on -- earlier that day?

11   A    We asked her about it, yes, the checkbook and the

12   dayplanner, and she had said that both -- all those items,

13   including her purse, were stolen from Apollo College earlier that

14   year.

15          THE COURT:  Was stolen from where?

16          THE WITNESS:  Apollo College.

17          THE COURT:  Okay.

18          THE WITNESS:  Where she was a student at the time

19   earlier that year.

20          THE COURT:  All right.  Thank you.

21   BY MS. ANDERSON:

22   Q    Did she indicate to you that she had closed her

23   checking account?

24   A    Yes.

25   Q    And did you confirm that?

22

1      A      Yes, we did.  She also claimed to us that she never

2  wrote the check, she never knew any of the Levines, and never had

3  any contact with either Todd Fries, Karen or Myles Levine, and

4  does not do any type of cleaning.

5      Q      You also said that there was some identification from

6  Joaquin Navarette?

7      A      Yes.

8      Q      And did you go speak with Mr. Navarette?

9      A      We interviewed Mr. Navarette in the following days and

10 he had stated that his vehicle was stolen from the Fry's lot over

11 on Grant Road.

12     Q      Fry's grocery --

13     A      Fry's grocery store, yes.

14     Q      Earlier -- earlier when?

15     A      Earlier that year, when he had lost his identification

16 along with some uniform shirts and some other forms of ID.

17     Q      Was the evidence from the scene sent to the FBI lab for

18 analysis?

19     A      Yes.  We sent the check and we sent the dayplanner to

20 the FBI lab for latent print analysis.

21     Q      And who analyzed the devices, do you recall?

22     A      The FBI lab.

23     Q      Do you remember the name of the individual that

24 analyzed the devices?

25     A      I would have to refer to my notes.  I do not.

23

1    Q    Was that Bob Rooney (ph)?

2    A    Possibly.  Yes.

3    Q    Have you talked to Mr. Rooney regarding his opinions?

4    A    Involving the?

5    Q    The devices, the two devices; device one in front of

6  the house and device two in the back?

7    A    Yes.  I thought we were talking about the check.

8    Q    Oh, I'm sorry.

9    A    Okay.

10   Q    The devices were sent off for analysis as well,

11  correct?

12   A    Yes.

13   Q    Okay.  Let's talk about the devices first.

14   A    Okay.

15   Q    And Bob Rooney analyzed --

16   A    Bob Rooney is the FBI scientist who analyzed the

17  devices that were sent.

18   Q    Do you know what unit he's assigned to at the FBI lab?

19   A    The scientific laboratory.

20   Q    Is he in the explosives unit?

21   A    Yes, he is.

22   Q    And do you know what his opinions are regarding the two

23  devices that -- one that was in the front and one that was in the

24  backyard?

25   A    Upon his analysis, they had said that the device

1    contains cyanuric acid.

2         Q    And did he explain to you what cyanuric acid is?

3         A    Cyanuric acid is a byproduct of when you take

4    chlorinated -- such things as chlorinating tablets and you

5    combine them with another material of an organic nature.  It can

6    be a host of things.  And the chemical reaction that exists and

7    reacts, causing a lot of heat and a lot of combustion, causing a

8    fire and a lot of off-gas and smoke, is then left with cyanuric

9    acid.

10        Q    Was it his opinion that it was some kind of

11   chlorinating agent that was combined with another substance to

12   create this chemical reaction?

13        A    Yes.  He felt that it was the chlorine tablets or some

14   form of -- version of a chlorine.

15        Q    Did he explain to you what kind of chemical reaction

16   took place and what the result of that chemical reaction would

17   be?

18        A    By combining the two chemicals you exert a very high

19   temperature type chemical reaction which formulates chlorine gas

20   as an off-gassing from it, and then creates a high temperature

21   and a burning, and then you're left with the cyanuric acid.

22        Q    Did he explain to you that that's his opinion for the

23   melting buckets --

24        A    Yes.

25        Q    -- that -- that the pool of -- of sludge that was

1  device number one?

2      A    Yes, he did.

3      Q    Let's next talk about the check.  That too was sent off

4  for analysis to the FBI lab; is that correct?

5      A    It was sent -- the check was sent off for latent print

6  analysis, yes.

7      Q    And in addition to the check being sent for latent

8  print examination, did you also submit the known fingerprints of

9  Todd Fries?

10     A    Yes, we did.

11     Q    And what were the results of that analysis?

12     A    That there was a fingerprint on the check and it did

13  come back as belonging to Todd Fries.

14     Q    And that was on the check that was left at the scene,

15  correct?

16     A    Left at the scene, right, from Michelle Fuentes, made

17  out to Karen Levine.

18     Q    Let's take a look at the exhibits.  Let's start with

19  Government's Exhibit Number 10.  Do you recognize Government's

20  Exhibit Number 10?

21     A    Yes, I do.

22     Q    And what is that?

23     A    That's 2870 West Magee.

24     Q    And is that as it appeared as -- when you showed up at

25  10:00 in the morning?

1      A      Yes, it was.

2      Q      Next is Government's Exhibit Number 11.  And again, is

3  that another view of the Levines' house?

4      A      It's a front shot of the home.

5      Q      And in that picture, we see the sludge where device

6  number one was; is that correct?

7      A      Yes, correct, it -- the device was placed at the center

8  of the garage door.  You have that v-pattern burn.

9      Q      We also see the oil and the foam peanuts, correct?

10     A      Yes.

11     Q      And the graffiti?

12     A      Correct.

13     Q      And that's how -- and that's what you saw when you --

14  when you arrived at the scene at that -- that morning, correct?

15     A      Correct.

16          MS. ANDERSON:  Government moves for admission of

17  Exhibits 10 and 11.

18          THE COURT:  Any objection, Mr. Bock?

19          MR. BOCK:  No objection.

20          THE COURT:  All right.  So admitted.

21                    (Government's Exhibits 10 and 11 admitted)

22  BY MS. ANDERSON:

23     Q      Let's look at 12 and 13.  12 is a closeup of some of

24  the -- what you described as a slimy substance on the driveway,

25  correct?

1    A    Correct.

2    Q    And we can see the foam peanuts there as well, correct?

3    A    Yes.

4    Q    We also see an orange substance around the outline of

5  the garage door, correct?

6    A    Yes.

7    Q    And what was that?

8    A    That was a material that prevented the garage door from

9  being able to be opened as well as the front door.

10   Q    Was that also around the windows at the front of the

11 house?

12   A    The front door, the front window, and the garage door.

13   Q    Take a look at Government's Exhibit Number 13, that's a

14 closeup view of the front door, correct?

15   A    Yes.

16   Q    Is that the same substance that was used to seal shut

17 the front door?

18   A    Yes, it was.

19        MS. ANDERSON:  Government moves for admission of

20 Exhibits 12 and 13.

21        THE COURT:  Any objection, Mr. Bock?

22        MR. BOCK:  No objection.

23        THE COURT:  All right.  So admitted.

24               (Government's Exhibits 12 and 13 admitted)

25 BY MS. ANDERSON:

1      Q     Let's take a look at Government's Exhibits 14 and 15.

2  I believe that's the back porch area, is it not?

3      A     Yes, it's the back patio, 2870 West Magee.

4      Q     And we can see the back door, we can also see a bucket

5  that has a green top towards the right-hand corner.  Is that

6  device number two?

7      A     Yes, it is.

8      Q     And then Government's Exhibit Number 15 is a closeup of

9  device number two, correct?

10     A     Correct.

11     Q     Now, we see this brown looking ooze that's surrounded

12 by the device, in addition to some spray on the color that's

13 right next to the device.  Do you see that?

14     A     I do.

15     Q     Is the spray some of the ooze that -- similar to the

16 ooze that's around the bucket?

17     A     Yes, it is.

18           MS. ANDERSON:  Government moves for admission of

19 Exhibits 14 and 15.

20           THE COURT:  Any objection, Mr. Bock?

21           MR. BOCK:  No objection.

22           THE COURT:  So admitted.

23                     (Government's Exhibits 14 and 15 admitted)

24 BY MS. ANDERSON:

25     Q     Let's take a look at Government's Exhibits 16 and 17.

1    Government's Exhibit 16 appears to be some kind of a dead -- dead
2    bird?
3         A    Yes.  The one veterinarian had found those to be
4    woodpeckers.
5         Q    Okay.  And were those in the front yard or the back?
6         A    These were strewn around by the front door.
7              MR. BOCK:  Judge, this really isn't relevant to
8    anything.
9              THE COURT:  Mr. Bock, I can't hear what you're saying.
10   You're too far away from that microphone, sir.  Thank you.
11             MR. BOCK:  Judge, this really isn't relevant, you know,
12   pictures of dead animals, unless, you know, there's going to be
13   some claim that this cloud was the -- was the reason for these
14   animals' deaths.  So, there's no evidence of that that's been
15   presented to me, so I don't see what this -- how this is
16   relevant.
17             THE COURT:  Well, it might be relevant, sir, in that we
18   have one part of -- of the presentation which deals with what I
19   presume to be -- what the Government's alleging to be a dangerous
20   in its nature, but we're also talking about the alleged
21   dangerousness of this gentleman to the community or any one
22   particular individual.  And these particular kinds of -- of
23   things done here, perhaps if it's tied into him, might suggest
24   his intent to terrorize and to create an aura of danger to these
25   individuals, so -- and fear and concern, so I'm going to overrule

1  your objection.

2  BY MS. ANDERSON:

3      Q    Let's take a look at Government's Exhibit Number 17.

4  What -- is that a --

5      A    That is a dead rabbit placed by the front door.

6           MS. ANDERSON:  Government moves for admission of

7  Exhibits 16 and 17.

8           THE COURT:  Objection, Mr. Bock?

9           MR. BOCK:  Subject to my record.

10          THE COURT:  Very well.  I'll overrule your objection

11 then, it's going to be admitted.

12                         (Government's Exhibits 16 and 17 admitted)

13 BY MS. ANDERSON:

14     Q    And let's take a look at Government's Exhibit 18.  What

15 is that?

16     A    That is the black dayplanner and identification for

17 Michelle Fuentes and Joaquin Navarette that were found near the

18 house.

19     Q    And that's where Mr. Fries' fingerprint was found,

20 correct, on a check?

21     A    Contained inside of that, yes.

22     Q    And it -- as depicted in Exhibit 18, correct?

23     A    Correct.

24     Q    Now we see a gate there off to the left of the

25 dayplanner, what does that gate lead to?

1     A     That gate leads to the front driveway of -- and front

2  parking area, for the homes.

3         MS. ANDERSON:  Government moves for admission of

4  Exhibit 18.

5         MR. BOCK:  No objection.

6         THE COURT:  Admitted.  Thank you.

7                    (Government's Exhibit 18 admitted)

8  BY MS. ANDERSON:

9     Q     Let's look at Government's Exhibit Number 19.  That's a

10  lab report from the FBI laboratory at Quantico, Virginia,

11  correct?

12     A     Yes, it is.

13     Q     And it's authored by Robert Rooney, Ph.D., of the

14  explosives unit; is that right?

15     A     Correct.

16     Q     And is this the report that was generated by Dr. Rooney

17  that sets forth his opinions regarding the device and the

18  cyanuric acid?

19     A     Yes, it is.

20         MS. ANDERSON:  Government moves for admission of

21  Exhibit 19.

22         MR. BOCK:  Objection based on foundation, other than --

23         THE COURT:  Overruled.  It'll be admitted.

24                    (Government's Exhibit 19 admitted)

25  BY MS. ANDERSON:

1     Q    Let's take a look at Government's Exhibit Number 20.

2  That also is a laboratory report from FBI in Quantico, Virginia,

3  and it sets forth the results of the fingerprint analysis and the

4  fact that a latent print belonging to Todd Fries was found on a

5  check found at the scene on August 2nd, 2009, correct?

6     A    Correct.

7     Q    And that is a report by Andrew Seitz (ph) who's a

8  latent print examiner, correct?

9     A    Yes, it is.

10         MS. ANDERSON:  Government moves for admission of

11  Exhibit 20.

12         MR. BOCK:  Same objection, foundation, Your Honor.

13         THE COURT:  Overruled.  So admitted.

14                        (Government's Exhibit 20 admitted)

15  BY MS. ANDERSON:

16     Q    Let's talk about the 2008 incident.  In talking to

17  Karen and Myles Levine, did you learn that they had business

18  dealings with Todd Fries?

19     A    I did.

20     Q    Could you describe those for us?

21     A    They had originally contracted with Mr. Fries in 2008

22  to be able to have some work done on their driveway.

23     Q    Do you recall when it was that they contracted with Mr.

24  Fries to do the work?

25     A    They were having a recoating of their front driveway

1  because they were not happy with some previous work that had been

2  done.

3      Q    Do you recall when it was that they had contracted or

4  hired him to do the work?  Do you recall what time of the year or

5  what month?

6      A    If I can refer to my notes.  I believe it was February

7  2008.

8      Q    And were they happy with the work that he had done?

9      A    No, they were not.

10     Q    What kind of work was it that they hired him to do?

11     A    It was recoating the front driveway, changing the

12  color.

13     Q    Did they ask Mr. Fries to redo the work or somehow make

14  it right?

15     A    Yes, they did.

16     Q    And did he -- did he attempt to do so?

17     A    He did.

18     Q    Were the Levines ever happy with the quality of the

19  work that he had done?

20     A    No, they were not.

21     Q    And what did the Levines do in response?

22     A    They had stopped payment on a check for $200 in July of

23  2008.

24     Q    Now, on October 31st and into the morning hours of

25  November 1st, 2008, did the Levines wake up to find that they had

34

1   been a victim of what originally was thought to be a hate crime?

2       A    Yes, they did.

3       Q    Let's talk about that.  Were you involved in that

4   investigation?

5       A    I was not involved in the original 2008 investigation,

6   no.

7       Q    But did you ultimately become involved?

8       A    Yes, I did.  Once we started learning about the facts

9   of the case and started doing some research on the investigation,

10  we found that the similarities between the 2008 and 2009 were

11  very like -- alike in their nature.

12      Q    Very?

13      A    Alike in their nature, they were very similar.

14      Q    Let's talk about the evidence at the scene of the 2008

15  incident.  Could you describe for us what that was?

16      A    The 2008 incident they had graffiti strewn around the

17  driveway and on the house.  They had a lot of swastikas, some

18  anti-Semitic type material placed on both the door and the

19  driveway.  There were overturned buckets, there was also an oily

20  type material along with foam peanuts that were strewn around the

21  front and the side of the house.  And on -- there were also dead

22  animals present, to include a coyote that was in the backyard

23  area, also covered in the same oily substance.

24           Along with that, we also had an ID left at the scene

25  for a -- a female.

1    Q    Let's -- let's talk about the garage door.  Was that

2 sealed shut as well?

3    A    The garage door had a type of adhesive on the door that

4 prevented it from being opened.

5    Q    Where was the ID or the identification found at the

6 scene in the '08 incident?

7    A    The ID was found towards the side of the house.

8    Q    And what was it, do you recall?

9    A    It was a driver's license and wallet belonging to a

10 subject by the name of Kaylyn Hovey.

11         THE COURT:  Kaylyn who?

12         THE WITNESS:  Kaylyn Hovey.

13 BY MS. ANDERSON:

14    Q    That's H-o-v-e-y, first name is K-a-y-l-y-n I believe?

15    A    I would have to look at my notes, but that sounds about

16 right.

17    Q    Did you talk to Ms. Hovey?

18    A    We did interview her at a later time.

19    Q    And what did she tell you?

20    A    She had lost her ID, I wouldn't say lost, but she was

21 involved in a motor vehicle accident on Camino del Cerro in 2005

22 and she -- during the accident she'd become unconscious.  When

23 she awoke, noticed that her ID and her wallet were stolen from

24 the car.

25    Q    Did she -- did she tell you when her -- when she had

1  lost her identification?

2       A    In 2005.

3       Q    Okay.  Now, was the evidence from the 2008 incident

4  sent -- sent for analysis?

5       A    Originally it had not been sent for analysis but I had

6  asked Marana PD to submit the items for latent print and DNA

7  analysis.

8       Q    What items were sent off for analysis?

9       A    A multitude of items to include some paint cans and

10 some things that were left at the scene that Marana had in

11 evidence.

12      Q    Which lab analyzed the material?

13      A    Arizona DPS lab.

14      Q    And ultimately did you receive some reports regarding

15 the analysis of those items?

16      A    I did.

17      Q    And what were the conclusions of that analysis?

18      A    On one of the cans there was a -- that was left at the

19 scene there was a fingerprint found on it that belonged to Todd

20 Fries.

21      Q    Let's take a look at Government's Exhibit Number 1 and

22 Government's Exhibit Number 2.  Could you explain to us what's

23 shown in those photos?

24      A    1 and 2 are both shots of the front of the home of

25 Karen and Myles Levine at -- that are up in Dove Mountain at

37

1    Tearblanket Place.

2            MS. ANDERSON:  Government moves for admission of

3    Exhibits 1 and 2.

4            THE COURT:  Mr. Bock, any objection?

5            MR. BOCK:  No objection, Your Honor.

6            THE COURT:  Okay.  So admitted.

7                        (Government's Exhibits 1 and 2 admitted)

8    BY MS. ANDERSON:

9        Q    Let's take a look at 3 and 4.  3 is also a picture of

10   the front of the house, correct?

11       A    Yes, it is.

12       Q    And it shows the graffiti more closely, isn't that

13   right?

14       A    Yes, it does.

15           MS. ANDERSON:  Government moves for admission of

16   Exhibit Number 3.

17           THE COURT:  Any objection, Mr. Bock?

18           MR. BOCK:  No objection.

19           THE COURT:  So admitted.

20                        (Government's Exhibit 3 admitted)

21   BY MS. ANDERSON:

22       Q    The Levines are Jewish; is that correct?

23       A    Yes, they are.

24       Q    Let's take a look at Government's Exhibit Number 4 and

25   Number 5.

1          MR. BOCK:  No objection.

2          THE COURT:  All right.  So admitted.

3                    (Government's Exhibits 4 and 5 admitted)

4   BY MS. ANDERSON:

5      Q    And 6?

6          MR. BOCK:  No objection.

7   BY MS. ANDERSON:

8      Q    And Number 7.

9          MR. BOCK:  No objection.

10         MS. ANDERSON:  Government moves for admission of those

11  exhibits, Your Honor.

12         THE COURT:  All right.

13                    (Government's Exhibits 6 and 7 admitted)

14         THE COURT:  For purposes of the record, though, it may

15  be helpful to know what they're -- what's in them.

16         MS. ANDERSON:  Would you like me to go back and explain

17  those?

18         THE COURT:  Yes.

19  BY MS. ANDERSON:

20     Q    Government's Exhibit Number 4 and 5, could you explain

21  to us what's shown in those exhibits?

22     A    Those are the pictures of the dead coyote on the back

23  patio, the home on Tearblanket Place in Dove Mountain.

24     Q    Okay.  5 is a closeup view of the dead coyote, correct?

25     A    Yes, it is.  And 6 is the front walkway leading to the

1   front door of the home on Tearblanket Place.

2        Q    And that's -- looks to be an oily substance in addition

3   to foam peanuts, correct?

4        A    Correct.  Along with feces was also in there, too.

5        Q    Let's look at Government's Exhibit Number 7.  Now, you

6   -- you testified that there was some identification belong to

7   Kaylyn Hovey there at the scene.  Is that what's shown in

8   Government's Exhibit 7?

9        A    Yes, it was.

10            MS. ANDERSON:  Government moves for its admission.

11            THE COURT:  I think Mr. Bock didn't have any objection

12   on that.

13            MS. ANDERSON:  Okay.

14   BY MS. ANDERSON:

15        Q    And then finally as Government's Exhibit Number 8,

16   could you tell us what's depicted in that photo?

17        A    Number 8 is a picture of the spray can of the adhesive

18   that they believed was used to secure the garage door, the

19   concrete for the home on Tearblanket Place.

20        Q    And that was left at the scene, correct?

21        A    Yes, it was.

22        Q    Finally, let's take a look at Government's --

23            MS. ANDERSON:  Well, Government moves for admission of

24   Exhibit 8.

25            THE COURT:  Any objection, Mr. Bock?

40

1          MR. BOCK:  No objection.

2          THE COURT:  All right.  So admitted.

3                              (Government's Exhibit 8 admitted)

4  BY MS. ANDERSON:

5     Q    Let's take a look at Government's Exhibit Number 9,

6  which is a Arizona DPS scientific examination report from John

7  Jolly (ph) who's a latent print examiner.  Does that relate the

8  results of the fingerprint analysis as you previously testified?

9     A    Yes, it does.

10         MS. ANDERSON:  Government moves for admission of

11  Exhibit Number 9.

12         MR. BOCK:  Same objection as to foundation as to

13  anything to do with prints, Your Honor.

14         THE COURT:  Overruled. It'll be admitted.

15                              (Government's Exhibit 9 admitted)

16         MS. ANDERSON:  Your Honor, this is the point at which I

17  would be asking this witness about the April 28th, '11 incident.

18  And I might say that I have maybe five more minutes of testimony

19  from this witness, so we're moving along pretty quickly.

20         THE COURT:  All right.

21         MS. ANDERSON:  Would you like to take a break so the

22  witness can -- I'm sorry, so Mr. Bock --

23         THE COURT:  No, just go ahead -- go ahead with it,

24  we'll take a break, we'll get the statement and then have it over

25  to Mr. Bock.

1  BY MS. ANDERSON:

2      Q    Did you learn of another incident that occurred on

3  April 28th of this year that was similar to these -- or that

4  appeared similar to these two previous incidents?

5      A    I did.

6      Q    FBI -- is the FBI involved in this investigation that

7  you're about to describe for us?

8      A    Yes, they are.

9      Q    Could you describe for us what happened?

10     A    We were -- had been contacted because there was an

11  individual, a female, that lives up in the Sabino Canyon area.

12  She had contracted with Mr. Fries for some work to be done

13  originally in May of 2010.  The work was not done up to her

14  satisfaction.  At the end of 2010, she had noticed that vehicles

15  had been glued that were in her driveway.

16         Mr. Fries had told her prior to that to leave the

17  vehicles in the yard because he had done the garage floor coating

18  prior to that.

19     Q    When was that incident regarding the glue?

20     A    The glue was originally in May -- May 31st, 2010.

21     Q    Okay.

22     A    Her windshield -- windshield wipers were glued to the

23  vehicle, it was poured also in her gas tanks of the two vehicles

24  parked in the yard.  Then, on April 28th of 2011, she had come

25  out of her house and there was an oil substance poured around the

1   driveway in her home, there was feces and dead animals around the

2   area, and then there was also an ID left at the scene.

3       Q     And the ID belonged to what individual?

4       A     ID belonged to a female that was a Korean nursing

5   student and had no association with either the homeowner, Mr.

6   Fries, or didn't even know anything about the Sabino Canyon area.

7       Q     Did you speak with that nursing student?

8       A     We interviewed her face to face, yes.

9       Q     And did she explain to you that she had lost her

10  identification some --

11      A     She stated she had lost her wallet -- not lost her

12  wallet, but misplaced her ID while at the Tucson Mall around

13  Christmastime.

14      Q     Of what year?

15      A     Of 2010.

16      Q     Changing subjects, there is a search warrant that was

17  executed on Mr. Fries' house last Friday, correct?

18      A     Yes, there was.

19      Q     And were there any firearms found in his house?

20      A     Yes, we are -- yes, there were.

21      Q     About how many firearms were found there?

22      A     We found 37.

23      Q     Could you describe briefly --

24            MR. BOCK:  Objection to that, Judge.

25            THE COURT:  Relevance, Ms. Anderson?

1          MS. ANDERSON:  Your Honor, it goes to the issue of

2   dangerousness.  It's the Government's position that Mr. Fries is

3   extremely revengeful.  The Court has heard testimony that over

4   $200 Mr. Fries went ahead and decided to attack the Levines with

5   the devices that he did and the Government is extremely concerned

6   about the fact that he has 37 firearms in his house, and we

7   believe it's relevant on the issue of dangerousness.

8          THE COURT:  I'll allow this testimony to come in.

9   BY MS. ANDERSON:

10       Q    Could you describe briefly for us the nature of the 37

11   weapons?

12       A    They entail both rifles and handguns.

13       Q    Any with any kind of scopes on them?

14       A    There were some -- some rifles with some what looked to

15   be like high-powered scopes on them.

16       Q    Did you find any cash in Mr. Fries' home?

17       A    We found $40,000 in cash.

18       Q    And the Defendant had a passport as well, correct?

19       A    Yes, he had a passport.

20       Q    Did you find any identification documents belonging to

21   people other than Mr. Fries?

22       A    We found to a girlfriend as well.  And then we also

23   found identification involving another female and then we were

24   trying -- making contact with right now.

25       Q    And you also found some improvised explosive devices as

44

1   well, correct?

2       A    Yes, we found some explosive material and then we also

3   found numerous books based on revenge, to include such things The

4   Anarchist Cookbook.

5           MR. BOCK:  Objection, Your Honor.

6           THE COURT:  Hold on.  Hold on.  What was the objection?

7           MR. BOCK:  Objection on relevance and materiality.  A

8   person has books, anybody can have books.

9           THE COURT:  Well, I'll expect the Government to tie

10  that up.  And what was the nature of the book, sir?

11          THE WITNESS:  Anarchist Cookbooks, books based on

12  revenge, how to get back at people, how to do basically dirty

13  tricks, formulate different types of things such as explosives,

14  and --

15          THE COURT:  All right.

16          THE WITNESS:  -- various natures.

17  BY MS. ANDERSON:

18      Q    Were they how-to books?

19      A    Yes, they were.

20      Q    And did we -- did agents look through those books?

21      A    Yes, we did.

22      Q    And we found some recipes for some devices that seemed

23  similar to the devices that Mr. Fries had in his home, correct?

24      A    Yes, we did.

25      Q    And when these devices were found in Mr. Fries' home,

45

1  what did -- what did you all do as -- as folks that were

2  searching his home?

3       A    When the initial evidence response team was in there,

4  they found those type of explosives, they had to back out, we

5  notified the special agent bomb technician that was on scene

6  there.

7       Q    And he went into the house, correct?

8       A    Right.  Correct.

9            MS. ANDERSON:  And Your Honor, we've got Special Agent

10 Jay Henze who is here to testify more particularity regarding

11 these devices that were found at Mr. Fries' house.

12           But these are all the questions that I have for Special

13 Agent Nowak at this time.  If I could just check with my co-

14 counsel, see if I've left anything out and then we can give Mr.

15 Bock a copy of the report of Marguerite Brown.

16           THE COURT:  All right.

17           MR. BOCK:  I don't need a break, Judge.

18           THE COURT:  I'm sorry?

19           MR. BOCK:  I don't need a break.

20           THE COURT:  Do you want the statement?

21           MR. BOCK:  Sorry?

22           THE COURT:  Do you have the statement?

23           MR. BOCK:  Yeah, I have it.  I'm ready to go.

24           THE COURT:  All right.  Very well.

25           MS. ANDERSON:  If I could just have a -- a moment, Your

1    Honor?

2           THE COURT:  Sure.

3        (Pause)

4           MS. ANDERSON:  That's all I have, Your Honor.

5           THE COURT:  All right.  Thank you.

6           MR. BOCK:  Thank you, Your Honor.

7           THE COURT:  Thank you, Mr. Bock.

8                         CROSS EXAMINATION

9    BY MR. BOCK:

10       Q    You have the -- the exhibits in front of you, Agent?

11       A    I do.

12       Q    Okay.  So you have familiarity with certain chemicals;

13   is that correct?

14       A    I do.

15       Q    You have a chemical background?

16       A    I do not.

17       Q    Okay.  Let's talk first about my client.  You know he

18   has an honorable discharge from the Marines?

19       A    I know that he did serve time in the Marines.

20       Q    And you also know that he has an ongoing business in

21   the Tucson community, Burns Power Cleaning; is that correct?

22       A    Correct.

23       Q    You also know that he spoke with you after he was

24   arrested; is that correct?

25       A    He did.

47

1      Q     And he spoke with you and what was the other agent who
2 he spoke with?

3      A     At the time of arrest?

4      Q     At the time you interviewed him.

5      A     Well, we interviewed him twice.

6      Q     Okay.  So the first time you interviewed him, where was
7 he?

8      A     We interviewed him at his home.

9      Q     Okay.  And how long did that take?

10     A     The interview itself?

11     Q     Yes.

12     A     Roughly maybe 45 minutes.

13     Q     Was it tape recorded?

14     A     No, it was not.

15     Q     And then you interviewed him a subsequent time; is that
16 correct, sir?

17     A     At the time of arrest.

18     Q     And at the time of arrest, where was he taken to be
19 interviewed?

20     A     At the FBI office.

21     Q     The one here downtown?

22     A     In Tucson.

23     Q     And you and another agent participated in the
24 interview?

25     A     Yes, we did.

1    Q    And what was the other agent's name?

2    A    Chris Westbrook (ph).

3    Q    And how long did that interview take place?

4    A    Probably about two hours.

5    Q    And was that videotaped and tape recorded?

6    A    No.

7    Q    Was it tape recorded?

8    A    No.

9    Q    So the report that I have a copy of which memorialized

10   your conversation with Mr. Burns is the extent of anything you've

11   authored --

12   A    Yes.

13   Q    -- reference that -- that discussion?

14   A    Correct.

15   Q    And you -- you challenged him on the -- the check that

16   was written by -- or the check that was found at the scene,

17   Michelle Fuentes, did you not?

18   A    Correct.

19   Q    And he told you what you've put in your report, that it

20   was either someone was jealous of him or someone set him up; is

21   that correct?

22   A    That's what Mr. Fries stated, yes.

23   Q    And he spoke with you freely and voluntarily I guess,

24   right?

25   A    Correct.

49

1    Q    That's the only way someone would -- would want to

2  participate when an FBI agent is talking to them, right?

3    A    I would hope so.

4    Q    And he didn't have an attorney at that time, did he?

5    A    No, he did not.

6    Q    And he never asked for an attorney?

7    A    No.

8    Q    Now, the -- did you question him, sir, about the

9  devices that you have called M -- I think M-80s or M-100s or M-

10  1000s, did you ever specifically question him about those?

11   A    No, we did not, because that was still going on at the

12  time.

13   Q    Okay.  And do you know M-80 is kind of like a glorified

14  cherry bomb?

15   A    I'm not an explosives expert, so I can't answer that.

16   Q    You ever buy firecrackers or --

17   A    Yes, I have.

18   Q    Okay.  So you don't know anything about this explosive

19  device?

20   A    I was not the agent on scene dealing with the

21  explosives.

22   Q    And you don't know if someone has been plagued with

23  gophers, whether or not they may want to put a device down to get

24  rid of a gopher in a gopher hole, do you?

25   A    I do not know that.

1          MS. ANDERSON:  Objection, Your Honor, speculation, lack

2  of foundation.

3          MR. BOCK:  Well, Judge, there's been some inference

4  about the -- the dangerousness of, you know, this -- this M-80 or

5  whatever it is and I'm just attempting to have a dialogue with

6  the FBI Agent about the potential uses that are -- of the -- that

7  can be explained.

8          MS. ANDERSON:  Your Honor, I believe this witness said

9  that he doesn't have the technical expertise to answer these

10  questions.

11          THE COURT:  Well, objection's sustained.

12          MR. BOCK:  Okay.  All right.

13  BY MR. BOCK:

14      Q    Then let's talk about the October 31st, 2008 claim.

15  You -- when did you first become involved in -- or when did you

16  have knowledge of that claim?

17      A    Ri -- shortly after the 2009 attack.

18      Q    Okay.  And do you know if the -- if -- if the Levines

19  had contacted the Pima County Sheriffs Department?

20      A    It was Marana Police.

21      Q    Marana Police.  And they lived in Marana; is that

22  correct?

23      A    They did.

24      Q    And they lived in Dove Mountain; is that correct?

25      A    Correct.

51

1    Q    And that's a gated community; is that correct?

2    A    It is.

3    Q    And you have reviewed the Marana Police reports that

4    were authored as a result of that case, have you not?

5    A    I have.

6    Q    And there was no vehicle that went through that gated

7    community associated in any way, shape or form with Mr. Fries on

8    October 31st of 2008, was there?

9    A    Well, we don't know that yet.  We have evidence that

10   states that there could have been his pickup truck that was

11   there.

12   Q    Okay.  So you have evidence that that could have been.

13   Is that in some -- in a report that -- that I don't have at this

14   point in time?

15   A    That is in some initial reporting.  I don't believe, I

16   don't know exactly where it is, but we do have that.

17   Q    And in the -- and that was Halloween; is that correct?

18   A    It was on Halloween night.

19   Q    Okay.  And where were the -- where were the residents

20   of the -- where were they -- the residents of this home?

21   A    They were home.

22   Q    Okay.  And what did they see?

23   A    They didn't see anything.

24   Q    Okay.  Were there -- and animals were strewed in the

25   front of their house?

1    A    There's a coyote in the back and then I believe that

2  there was some animals on the side.

3    Q    So there was a coyote in the back, I imagine someone

4  would have had to carry the coyote; is that correct?

5    A    Yes.

6    Q    And I imagine someone would have had to carry all these

7  other materials that you have described on direct; is that

8  correct?

9    A    Correct.

10    Q    So I imagine there'd be some footprints that would be

11  associated with an individual carrying this -- these -- the

12  animals and materials, right?

13    A    There could have been, but Marana did not -- only had a

14  few shots of some finger --

15    Q    Sorry?

16    A    -- some footprints.  Marana had a couple of shots of

17  footprints, but they did not have an overwhelming amount of them.

18    Q    And you knew because you've testified to that, that

19  there was a dispute over payment between the Levines and my

20  client; is that correct?

21    A    Correct.

22    Q    So you knew he had been up at the premises?

23    A    Correct.

24    Q    So it would not be unusual if his fingerprint was on a

25  bucket, in fact, that he may have touched a bucket while he was

53

1   up there doing their driveway; is that correct?

2       A    The bucket that the material was found on was

3   overturned, and had some recent paint on it.

4       Q    Okay.  But you don't know if that bucket had been there

5   for what extent of time, do you?

6       A    I do not.

7       Q    And it's possible that he could have touched that

8   bucket when he was doing the work for the Levines?

9       A    Could be.

10      Q    The situation now involving spray paint, you have --

11  have made a statement about the similarity between October 31st

12  of '08 and August 2nd of '09, with respect to spray paint and

13  derogatory terms about people's religion and a swastika, correct?

14      A    Correct.

15      Q    You didn't see any books or anything when you did this

16  search warrant about anything to do with Germany, any German

17  flags or anything, in Mr. Fries residence; is that correct?

18      A    No, I do not.

19      Q    Also, the -- did you ever ask for a handwriting

20  exemplar or did you ever ask Mr. Fries when you had him for this

21  period of time when you inves -- when you were interviewing him,

22  did you ever ask him for a handwriting exemplar?

23      A    No, we did not.

24      Q    Okay.  And a handwriting exemplar is a good piece of

25  evidence to see whether or nor a person actually would have

1  written something or it was -- could have been -- you could have

2  made a comparison; is that correct?  The FBI's good at that,

3  right?

4       A    Correct.

5       Q    And the -- so the situation now that is the basis of

6  this indictment, which is August 2nd of 2009, do we have a time

7  of the allegations?  Do we have a time frame?

8       A    The initial call was sent out at around 5:00 a.m.

9       Q    5:00 a.m.

10      A    Uh-huh (affirmative).

11      Q    And do you know if you take these items and you put

12  them in a bucket together, what is the -- do they combust right

13  away?

14      A    No, there's a short delay usually.

15      Q    There would -- how long is the short delay?

16      A    I can't --

17      Q    So you don't know if it could have been a second or a

18  minute or two minutes?

19      A    It could have been short or long, that's something that

20  the --

21      Q    So if --

22      A    -- FBI experts --

23      Q    -- a person --

24      A    -- are going to have to answer.

25           MS. ANDERSON:  Excuse me, the witness hasn't finished

1   his answer before defense counsel asked the next question.

2   BY MR. BOCK:

3        Q    I'm sorry, go ahead.

4        A    That's something more for the FBI scientists to

5   determine.

6        Q    So you -- you didn't think Mr. Rooney would have been

7   helpful to you in determining whether or not an individual that

8   would have done this may have had some trace evidence if a person

9   is putting this bucket down and mixing these chemicals and the --

10  the expl -- it combusts, it -- wouldn't a person have some trace

11  evidence on them, their clothing or anything?

12       A    Not necessarily.

13       Q    And you asked Mr. Rooney this?

14       A    Yes.

15       Q    And you're claiming that there were three to five

16  buckets that were placed in the front of the home and three to

17  five buckets that were placed in the back of the home; is --

18       A    No, there was a single bucket in the rear of the home

19  and anywheres between two to five buckets placed in the front of

20  the home.

21       Q    Okay.  And so, a person would have to go around to each

22  of these buckets to do this, right?

23       A    Correct.

24       Q    And a person would have to also be carrying dead

25  animals and strewing them around the -- the property; is that

56

1  correct?

2      A     Yes.

3      Q     A person would also have to be spray painting; is that

4  correct?

5      A     Correct.

6      Q     And a person would also have to be taking these things

7  that look like peanut shells, packing -- what are they called,

8  help me out.  You know, what's the --

9      A     They're peanut -- they're called -- they're foam

10 peanuts.

11     Q     Foam peanuts.  And a person would have to have a lot of

12 oil, be carrying oil with them, too, right?

13     A     Correct.

14     Q     So was there any tire tracks, was there anything to

15 suggest the type of vehicle that may have been involved in this

16 episode?

17     A     Investigation had showed that it was Tom Fries' blue

18 pickup truck that he drove to the scene.

19     Q     Okay.  And where is that -- what part of the

20 investigation is -- is that, that I might be missing?  Where does

21 it show that in the investigation?

22     A     It's in the case file.

23     Q     Sorry?

24     A     It's in the case file.

25     Q     Okay.  Something that I have not been disclosed?

1      A      Correct.

2      Q      And why have I not been able to take a look at that?

3  You don't know, do you?

4      A      I'm not the attorney, so --

5          MR. BOCK:  Well, Judge, you know, I'm -- here I am and

6  so I thought we had, you know, a basic understanding.  I, you

7  know, again, the county -- county attorney -- excuse me, the U.S.

8  Attorney was good enough to give me these things and she gave

9  them to me last night for preparation, but, you know, I ask

10  questions and there's documents and I'm not provided them.  So --

11          THE COURT:  I think --

12          MR. BOCK:  -- I'll go forward, but --

13  BY MR. BOCK:

14      Q      So are you --

15          MS. ANDERSON:  Your Honor, may I address that, please?

16          THE COURT:  Sure.

17          MS. ANDERSON:  The Government produced the Jencks

18  statements as we're required to do under the rules.  You'll

19  notice on direct, I did not ask the witness any kind of

20  particulars about Mr. Fries' blue truck that was at the scene of

21  the '09 incident.  It's only on cross that Mr. Bock brought this

22  up.

23          MR. BOCK:  Well, I don't think I would be in an

24  effective cross examiner if I didn't raise some areas of concern

25  regarding whether or not as the Court said, one of the Court's

58

1    considerations was whether or not my client can -- it's been

2    shown by clear and convincing evidence was connected to this

3    event.  So, you know, I'm darned if I do, darned if I don't.  But

4    I've made my record and I'll move on.

5           THE COURT:  Okay.

6    BY MR. BOCK:

7        Q    And the Tucson National -- you know, Tucson National

8    have you -- don't you?  Do you know that area?

9        A    Yes.

10       Q    You play golf out there ever?

11       A    No.  I have not.

12       Q    You know it's a gated area?

13       A    Yes, it is.

14       Q    Okay.  Is the Magee area within the gated area?

15       A    Yes, it is.

16       Q    Okay.  There's 27 holes, is -- where is the property in

17   relation if you go to the clubhouse?

18       A    I'm not familiar with where the clubhouse is, so --

19       Q    Okay.  And Magee --

20       A    -- I wouldn't know that.

21       Q    -- intersects Shannon?

22       A    Yes.

23       Q    So if I go north on Shannon I run into Magee, which is

24   Tucson National?

25       A    Uh-huh (affirmative).

59

1    Q    You're with me?

2    A    Yes.

3    Q    And if I make a left to go up the hill, that's the way

4    to get to the entrance, because then you make a right at the top

5    of the hill.

6    A    Uh-huh (affirmative).

7    Q    Is the property down in the valley?

8    A    It's down towards the valley, yes.

9    Q    Okay.  And a lot of the property that's retaining wall

10   and it goes along Magee; is that correct?

11   A    Correct.

12   Q    And is this property is the back of this property on --

13   up against or near the retaining wall?

14   A    The back of the property's actually up against the golf

15   course hole.

16   Q    Up against the golf course wall.

17   A    Hole.

18   Q    So someone would have to -- have either driven in there

19   through the guard; is that correct or scaled the -- scaled the

20   wall to get into the property?

21   A    The materials were placed there the night before.

22   Q    Placed there the night before.

23   A    Uh-huh (affirmative).

24   Q    Now, the -- so if it was placed there the night before,

25   is it your theory then that it was combusted at 5:00 the next

1   morning?

2        A    No.  They -- the materials had been staged there prior

3   to the incident.  And then the night of the incident they were

4   moved to the house location.

5        Q    Okay.  I'm sorry.  Run that by me one more time?

6        A    The -- the night of the incident it was -- the

7   materials had been pre-staged there the night before.

8        Q    Okay.  Pre-staged there means that they were left

9   there, is that what that means?

10       A    They were left there, yes.

11       Q    Okay.  So then someone would have to come back the next

12  morning; is that correct?

13       A    Yes.

14       Q    Okay.  And is your -- and my question to you, is it

15  your theory that someone drove through the front gate or someone

16  scaled the back wall, in order to combust these materials?

17       A    They were actually placed in the wash area by coming in

18  the other entrance.

19       Q    Okay.  Well, how did they get from the wash area to the

20  property?

21       A    Through the wash.

22       Q    Okay.  And do you have footprints?  Were there any

23  footprints or any trace evidence to suggest that -- any shoe

24  prints or anything?

25       A    We do not have shoe prints, no.

1    Q    And this was -- this was a situation in which the -- a

2  -- Northwest Fire was called out; is that correct?

3    A    Yes, a multitude of agencies.

4    Q    Were you called out on August the 2nd?

5    A    Yes, I was.

6    Q    Okay.  And you didn't look for any footprints to see

7  what type of trace --

8    A    We did look for footprints, but we did not see any at

9  the time.  It was a dry day and there was really nothing to be

10 seen.

11   Q    Now, the -- was there any gas associated -- what I mean

12 gas, this cloud, was there any cloud associated with the interior

13 of the residence?

14   A    The only -- the cloud and the gas had seeped into the

15 garage.

16   Q    Okay.  And there was no -- nobody in the garage?

17   A    No.

18   Q    And the number 8, the Exhibit number 8, this is the

19 glue that you are -- testified to was used to seal what, the

20 garage door?

21   A    The Exhibit 8 deals with the Dove Mountain incident.

22   Q    The Dove Mountain.  Anything --

23   A    That was the -- what was sprayed on the garage door and

24 on the cement.

25   Q    Any fingerprints on that to -- any fingerprints on that

1    exhibit?

2        A    Not that I was aware of, no.

3        Q    Okay.  There was no forced entry to the property at --

4    on Magee, was there?

5        A    No.

6        Q    And the firearms that were taken, were some of the

7    pellet guns?

8        A    Some of them were, yes.

9        Q    Well, but they were inventoried?

10       A    Yes.

11       Q    You didn't -- you didn't seize the weapons?

12       A    We did not seize the weapons, no.

13       Q    Okay.

14            MR. BOCK:  May I have one minute, Your Honor?

15            THE COURT:  Certainly.

16       (Pause)

17   BY MR. BOCK:

18       Q    Of the pellet gun, how many -- how many scopes?

19       A    I don't recall at this time.

20       Q    Okay.  Let me talk to you very briefly then about this

21   situation involving Ms. Brown, this four page report.

22       A    Yes.

23       Q    Did Ms. Brown make a complaint to law enforcement?

24       A    She did.

25       Q    What agency?

1    A    Pima County Sheriffs Office.

2    Q    And have you talked to any Pima County Sheriffs to see

3  what the extent of their investigation was prior to you becoming

4  involved in these allegations?

5    A    I did.

6    Q    Okay.  There are no pending charges; is that correct?

7    A    There are pending charges, yes.

8    Q    There are pending charges in this case?

9    A    I don't know if they are doing anything with the

10  charges.  All I know is that from the initial attack in 2010

11  there was some police reports that were filed.

12    Q    Okay.  Well, you would have wanted to see what they

13  were if there were any pending charges if a person is alleged to

14  commit a new offense, which you have alleged, wouldn't you want

15  to see if there were any prior pending charges to determine if

16  that person --

17    A    There was nothing in 2010.

18    Q    Okay.  And there was -- there's still nothing on this

19  case; is that correct?

20    A    Correct.

21    Q    And do you know how many customers a year Mr. Todd

22  Fries services?

23    A    Did I -- pardon me?

24    Q    Do you know if -- do you know if he has 500 customers

25  that -- that he --

64

1      A    I did not know that, no.

2           MR. BOCK:  I don't have anything further.  Thank you.

3           THE COURT:  All right.  Ms. Anderson, any redirect?

4           MS. ANDERSON:  Just briefly, Your Honor.  Oh, thank

5  you.

6                        REDIRECT EXAMINATION

7  BY MS. ANDERSON:

8      Q    When did you first speak with Mr. Fries regarding the

9  '09 incident?

10     A    It was shortly after the incident took place.  I don't

11  recall the exact date.

12     Q    Was he treated as a suspect at that point?

13     A    No, we had a casual interview.

14     Q    And then very briefly about the 2011 incident with Apr

15  -- the one that occurred on April 28th, 2011.  That customer had

16  a dispute with Mr. Fries over the work that he did at her house,

17  correct?

18     A    Correct.

19     Q    Do you recall what the total amount was that was in

20  dispute?

21     A    I believe that he claimed he owed her 1800 and she

22  thought he only owed 1100.

23          MS. ANDERSON:  That's all I have, thank you.

24          THE COURT:  I'm going to ask you some questions, sir.

25                        VOIR DIRE EXAMINATION

1   BY THE COURT:

2       Q    On the August 2, '09 incident, at the Levine residence,

3   and that's on Magee; is that correct?

4       A    Yes.

5       Q    And in the house were there any other windows or doors

6   in the front of the house that were not sealed?

7       A    All the wind -- the front doors, the front window, and

8   the front garage door, were all sealed.  Those were the only exit

9   routes out of the house.

10      Q    Okay.  And were any windows on the side or the back of

11  that house sealed in any way?

12      A    The -- yeah the sides had shared common walls, there

13  was no way to get in or out of the sides.

14      Q    So the only in -- pardon me.  So the only ingress and

15  egress in the house is through the front and through the back?

16      A    Correct.

17      Q    And all of the ingress and egress in the front were

18  sealed?

19      A    Correct.

20      Q    All right.  There was a gate near where I believe the

21  Michelle Fuentes ID and dayplanner were at.  Did you ever

22  determine whether or not that particular gate was locked or ever

23  locked by the residents?

24      A    The gate was open and that led to the wash.

25      Q    I mean, did they normally keep a -- a lock there or --

1    A    No, it was a -- it was allowed open because people from

2  the community would use that to gain access to the wash.

3    Q    Okay.  And you say that -- that at -- at a wash nearby

4  there -- those materials had been staged there?

5    A    Yes.

6    Q    How close does that wash run to that residence?

7    A    It is very close.  I would say probably maybe a

8  distance of a house or two.

9    Q    All right.  Is that wash walled off or fenced off in

10  any way?

11    A    The wash has a wall, yes.

12    Q    Okay.

13    A    And it has a gate and then it opens up into the rear

14  area of the home.

15    Q    A -- opens up to the what now?

16    A    It opens up into the rear of the home which the wash

17  ends at the one house and then it proceeds onto the golf course.

18  And then the rear of the golf course is where the -- you have the

19  access to the rear of the homes.

20    Q    Okay.  Did you ever determine whether there was any

21  connection between a -- Mr. Joaquin Navarette and Ms. Michelle

22  Fuentes?

23    A    There was no connection.  They did not know -- either

24  one of them, had no idea.

25    Q    Okay.  And in the materials regarding Ms. Michelle

1    Fuentes were -- were found, Joaquin Navarette's, some -- some

2    paper that -- associated to him?

3        A    Were found together.

4        Q    Okay.  And did you ever determine whether there was any

5    connection between Ms. Michelle Fuentes and Mr. -- Mr. Fries?

6        A    There's no connection.

7        Q    Any connection between Mr. Navarette and Mr. Fries?

8        A    No connection.

9        (Pause)

10       Q    Now, on one of the checks that was associated with this

11   Michelle Fuentes in the amount of $450, who was that check made

12   out to?

13       A    Check was made out to Karen Levine.  It was the victim

14   at the 2870 West Magee.

15       Q    Did you ever determine whether there was a connection

16   between Ms. Fuentes and Ms. Levine?

17       A    There was no connection between them.

18       Q    Or Mr. Levine?

19       A    No connection.

20       Q    And on that check you say there was a fingerprint

21   found?

22       A    Yes, of Mr. Fries.

23       Q    Did you ever determine whether or not in any of the

24   locations -- well, the location I guess -- what college was it

25   that Ms. Fuentes had had those materials taken from?

68

1    A    Apollo College.

2    Q    Apollo College.  Did you ever make any determination

3  whether or not the -- Mr. Fries had any association with that

4  particular place doing whatever --

5    A    We were not able to because the college changed names

6  and ownership.

7    Q    Okay.

8         THE COURT:  All right.  Thank you.  Do either counsel

9  have any questions relative to what I asked?

10        MR. BOCK:  Can I reopen just to ask him one more

11  question on the four -- the report I just got?

12        THE COURT:  Sure.

13                    RECROSS EXAMINATION

14  BY MR. BOCK:

15    Q    Agent, on the report that I got this afternoon, the

16  4/28 report, there was a -- the woman's name is Marguerite Brown;

17  is that correct?

18    A    Correct.

19    Q    And she had a daughter?

20    A    Yes.

21    Q    And her name?

22    A    I would have to refer to the report, but I believe it's

23  --

24    Q    How about Anna Gabriella?

25    A    Yes.

1    Q    Does that help you?  Okay.  And you spoke with her,

2  too?

3    A    I did not speak with her, no.

4    Q    I'm sorry?

5    A    I did not speak with her, no.

6    Q    But you read this report though, right?

7    A    I read the report, yes.

8    Q    Okay.  And there was an identification that she made of

9  the individual that was the culprit of this situation involving

10 the car; is that correct?

11   A    There was a -- when she was at the University of

12 Arizona that someone had taken a picture of her.

13   Q    And was the -- she described the person as a fat

14 Hispanic driving a ghetto van; is that correct?

15   A    Correct.

16   Q    Okay.  Thank you.

17        THE COURT:  All right.  Other than that, do either

18 counsel have any questions relative to what I asked earlier?

19        MS. ANDERSON:  No, Your Honor.

20        MR. BOCK:  No, Your Honor.

21        THE COURT:  All right.  Thank you, sir.

22        THE WITNESS:  Thank you.

23        THE COURT:  Any other witnesses, Ms. Anderson?

24        MS. ANDERSON:  Yes, Your Honor.

25        MR. PIMSNER:  Yes, Your Honor.  Government would call

70

1   Special Agent David Loos.

2        (Oath administered)

3            THE WITNESS:  I do, ma'am.

4            THE COURT:  And counsel, please keep in mind it's about

5   13 until 5:00.  We'll probably have to come back and finish this

6   up.

7            MR. PIMSNER:  I'll be -- this witness will be brief,

8   Your Honor.  May I proceed?

9            THE COURT:  Certainly.

10               DAVID LOOS, GOVERNMENT'S WITNESS, SWORN

11                        DIRECT EXAMINATION

12  BY MR. PIMSNER:

13       Q    Please state your name for the record.

14       A    David C. Loos.

15       Q    Your occupation?

16       A    I'm a Special Agent with the FBI.

17       Q    For how long?

18       A    Almost a year.

19       Q    And what are your current duties?

20       A    I am assigned to the joint terrorism task force.  I

21  investigate domestic terrorism matters.

22       Q    Were you involved in an investigation which led to the

23  indictment of Todd Russell Fries?

24       A    Yes.

25       Q    And as part of your investigation, did you interview an

1   employee of Todd Fries named Jonathan Alexander Castro (ph)?

2       A    Yes.

3       Q    And did that interview take place on May 13th of 2011?

4       A    Yes, it did.

5       Q    And did Mr. Castro agree to voluntarily speak to you?

6       A    He did.

7       Q    And is he avai -- living in Tucson and available to

8   testify at trial if necessary?

9       A    Yes.

10      Q    And did Mr. Alexander Castro advise you that he had

11  been an employee of Mr. Fries for approximately four months?

12      A    Yes.

13      Q    And during the course of your interview, did you ask

14  Mr. Alexander Castro if Mr. Fries had ever asked him to do

15  anything that made him feel uncomfortable?

16      A    Yes.

17      Q    And what was Mr. Alexander Castro's response?

18      A    He said that he was asked to do something that he felt

19  uncomfortable doing.  Said that he was asked to defecate and

20  urinate in a bucket.

21      Q    And did Mr. Fries tell Mr. Alexander Castro as to why

22  he was asking him to do that?

23      A    Yes.

24      Q    And what was Mr. -- what did Mr. Fries tell Mr. Castro?

25      A    He told him it was to -- to get back at a non-paying

1    female customer.

2        Q    And did he describe the -- anything about the non-

3    paying customer to Mr. Castro?

4        A    Just basically that the customer -- he had done some

5    work for the customer about a year ago, some coating work, and

6    the customer had failed to pay him.

7        Q    And was it a coating job for approximately $1800 --

8        A    Yes.

9        Q    -- according to Mr. Castro?

10       A    Yes.

11       Q    And did Mr. Castro agree to comply with Mr. Fries'

12   request?

13       A    No.

14       Q    And did Mr. Castro see the bucket that Mr. Fries wanted

15   him to use?

16       A    Yes.

17       Q    Did he describe what happened to the bucket?

18       A    He just described that it was an off-white colored

19   bucket and that it had disappeared.

20       Q    And approximately when did that bucket disappear

21   according to Mr. Castro?

22       A    Roughly two to three weeks prior to the -- the

23   interview.

24       Q    And so that would have been consistent in the time

25   frame of the May 13th interview with just prior to the April

1  28th, 2011 event; is that correct?

2      A    Yes.

3           MR. PIMSNER:  I have nothing further, Your Honor.

4           THE COURT:  Mr. Bock.

5                        CROSS EXAMINATION

6  BY MR. BOCK:

7      Q    Now, you talked to Mr. Castro is what you testified to;

8  is that correct, Agent?

9      A    Yes.

10     Q    And did you tape record his interview?

11     A    No.

12     Q    How long did -- had he worked for Mr. Fries?

13     A    Approximately four months.

14     Q    Okay.  And how many other employees did -- did my

15 client employ in that four month period of time?

16     A    I don't know.

17     Q    Did you talk to any of the other employees to see if

18 such a request had previously been made?

19     A    You know, I didn't.  Not at that time.

20     Q    And you -- did you ask this guy if maybe this was just

21 a joke?

22     A    No.

23     Q    Pulling the guy's leg?

24     A    No, he -- he thought that --

25     Q    No, did you ask him that?

74

1    A    No.

2    Q    Okay.  Thank you.

3         THE COURT:  Any follow-up, sir?

4         MR. PIMSNER:  No, Your Honor.

5                    VOIR DIRE EXAMINATION

6    BY THE COURT:

7    Q    So you interviewed this gentleman, Mr. Castro, when?

8    A    On May 13th.

9    Q    Of this year?

10   A    Correct.

11   Q    And how is it that this person came forward?

12   A    We were out at the residence, Mr. Fries' residence, and

13   then the employee pulled up in the work truck.

14   Q    And when was it you were at that residence that this

15   gentleman pulled up in a truck?

16   A    Well, we were there in the morning.  I don't know the

17   exact time, you know, the employee pulled up.  If I had to

18   estimate, it'd be between 9:30 and 11:30.

19   Q    And what date was that?

20   A    That was on May 13th.

21   Q    And the purpose for being there on May 13th at Mr.

22   Fries' residence was what?

23   A    My purpose?

24   Q    Yes.

25   A    My purpose, I -- I helped clear the home and then I was

1    helping the ER -- the evidence response team set up.

2        Q    All right.  But was it there at that -- at the

3    residence when Mr. Castro drove up in a truck, was it a company

4    truck?

5        A    Yes.

6        Q    And -- and how was it that the subject came up at --

7    about this defecating and urinating into a bucket?  I mean, how

8    did -- how did it even come about?

9        A    Well, as we were talking to the employee, Mr. Alexander

10   Castro, we asked him if Mr. Fries had asked him to do anything

11   that he had felt uncomfortable doing, and that is when he came

12   forward with that information.

13       Q    All right.

14            THE COURT:  Either counsel have any questions to

15   follow-up?

16            MR. PIMSNER:  No, Your Honor.

17            MR. BOCK:  I do.

18            THE COURT:  All right.

19                      CROSS EXAMINATION CONTINUED

20   BY MR. BOCK:

21       Q    And again, then you would have asked if -- you asked

22   Mr. Castro, how many -- well, let me backtrack.  How many

23   employees came up to the house?

24       A    I don't know exactly.  I know of two for sure.

25       Q    Maybe more?

1    A    Well, I know that there was a -- a girlfriend of one of

2    the employees or a wife, I'm not exactly sure if she was

3    affiliated with the business or not.

4    Q    So the two that came up, one would have been Mr. Castro

5    or two and that would have made Mr. Castro the third?

6    A    I -- I believe Mr. -- I don't know.  I mean, I -- I

7    don't know how many employees were at the home.

8    Q    And if -- if --

9    A    I think two, but I don't know.

10   Q    If employees were asked if Mr. Fries, if this specific

11   employee was asked if Mr. Fries made them do anything that they

12   felt uncomfortable, I guess other employees that were at the

13   scene would have been asked the same question; is that correct?

14   A    I -- I can't speak to that, I did not interview the

15   other employee.

16   Q    Okay.

17        MR. BOCK:  Thank you.

18        THE COURT:  All right.  Any follow-up, Ms. Anderson?

19        MR. PIMSNER:  No, Your Honor.

20        THE COURT:  Oh, I'm sorry.  Pardon me.

21        MR. PIMSNER:  No problem.

22        THE COURT:  Thank you.  Thank you, sir.  Do we have a

23   wit --

24        MR. PIMSNER:  Your Honor, we would call Special Agent

25   Jay Henze.

1          THE COURT:  All right.

2      (Oath administered)

3          THE WITNESS:  Yes.

4          MR. PIMSNER:  May I proceed, Your Honor?

5          THE COURT:  Please.  Thank you.

6              JAY HENZE, GOVERNMENT'S WITNESS, SWORN

7                       DIRECT EXAMINATION

8  BY MR. PIMSNER:

9      Q    Would you state your name for the record?

10     A    Jay Henze.

11     Q    Your occupation?

12     A    I'm a Special Agent with the FBI.

13     Q    And how long have you been with the FBI?

14     A    Eight years.

15     Q    What are your current duties?

16     A    I am a bomb technician with them.

17     Q    And what kind of specialized training or experience do

18  you have regarding bomb -- bombs and other items and such?

19     A    Prior to my Bureau career I was a Tucson Police

20  Department officer.  I was on the bomb squad there for three

21  years.  When I -- before getting into the Bureau, to get on the

22  bomb squad, I went to the FBI Hazardous Devices school.

23          After getting into the Bureau, I recertified as a bomb

24  technician.  During that time, I attended multiple training

25  schools to include large vehicle bomb school, post-blast school.

1          MR. BOCK:  I'll stipulate, Judge.

2          MR. PIMSNER:  I'm sorry?

3          THE COURT:  What was the objection, Mr. Bock?

4          MR. BOCK:  To his qualifications, yes.

5          THE COURT:  All right.

6          MR. PIMSNER:  Okay.  Thank you.

7   BY MR. PIMSNER:

8          Q    Were you involved in the execution of the search

9   warrant at the residence of Todd Russell Fries on May 13th of

10  2011?

11         A    Yes.

12         Q    And what -- was that the residence on West El Camino

13  del Cerro?

14         A    Yes, I was.

15         Q    And what was your role in the execution of the warrant?

16         A    I was the entry team leader into the house.

17         Q    And what was your -- as the entry team leader, what was

18  your purpose?

19         A    My main purpose was to direct other agents into the

20  house and to look for any human threats or any explosive threats.

21         Q    And in the -- and any threats that would be in plain

22  view, correct?

23         A    Yes.

24         Q    And what time did you make entry approximately?

25         A    It was approximately 9:50.

79

1     Q    And what time -- did you clear the residence of any

2  plain view threats?

3     A    That is correct.

4     Q    And what time did you turn the search over to the

5  search team?

6     A    Approximately 10:40.

7     Q    Okay.  And at that point did you exit the residence?

8     A    Yes, I did.

9     Q    And what did you do at that point?

10    A    I went up to the front of the residence in the driveway

11  and I maintained security there.

12    Q    And at some point were you re-summonsed into -- inside

13  the residence?

14    A    Yes, I was.

15    Q    And approximately when was that?

16    A    Approximately 1:00.

17    Q    All right.  And why were you called into the residence?

18    A    One of the searchers had found what he thought was an

19  explosive threat.

20    Q    Okay.  And when you went into the residence, what room

21  did you go into?

22    A    As you go into the kitchen down the main hallway, the

23  first bedroom on the right is where I went.

24    Q    Okay.  And what did you see when you got to that room?

25    A    The agent pointed out a dresser drawer and in that

80

1   dresser drawer I saw a box.

2   Q    And let me ask you to look at exhibits -- Exhibit 21

3   and Exhibit 22.  Do those photographs accurately depict that

4   dresser drawer that you saw when you entered that room?

5   A    Yes.

6   Q    And in fact, did you take those photographs?

7   A    Yes, I did.

8   Q    And were these the devices that were believed to be

9   explosive devices that were found at that residence?

10  A    Yes.

11       MR. PIMSNER:  I'd move to admit Exhibit 21 and 22, Your

12  Honor.

13       THE COURT:  Mr. Bock?

14       MR. BOCK:  No objection, Your Honor.

15       THE COURT:  All right.  So admitted.

16                   (Government's Exhibits 21 and 22 admitted)

17  BY MR. PIMSNER:

18  Q    Upon seeing these items, what -- what did you do?

19  A    After seeing these items, I made a determination that I

20  thought they were an explosive threat or possibly an IED,

21  improvised explosive device, so I evacuated the interior of the

22  home of any agents and the garage area of any agents.

23  Q    And what -- what gave you concern about these items

24  upon first inspection?

25  A    One concern is I had seen these before and also there

81

1   was fragmentation there on top of these.

2       Q    Okay.  And you're referring to the copper BB's that

3   were on -- on -- connected to some of these devices?

4       A    Yes.  The copper BB's affixed to three of these items.

5       Q    And why did you order an evacuation at that point?

6       A    Based on my experience, I felt that they were an

7   explosive threat of danger to anybody in the home.

8       Q    Okay.  And after you exi -- did you exit the home at

9   that time?

10      A    Once everybody evacuated, yes.

11      Q    And what did you do?

12      A    At that point I noticed the Pima Regional Bomb Squad to

13  come out and assist me.

14      Q    Okay.  And did you participate in removing those items

15  from the home?

16      A    Yes, I did.

17      Q    Did you take any protection prior to completing that

18  task?

19      A    Yes, I did.  I put on a EOD 9 bomb suit, full bomb

20  suit.

21      Q    Okay.  And when you went into the room, I take it the

22  drawer was still open and the box was in its original position,

23  correct?

24      A    That's correct.

25      Q    And what did -- what steps did you do at that time?

82

1    A    Once I got in the room, I took several photographs of

2 the box and I also took two radiographs or x-rays of the items in

3 question.

4    Q    And did the radiographs or x-rays show anything that

5 caused you concern?

6    A    Yes, they did.

7    Q    And what was that?

8    A    Well, it showed that the BB's were affixed to several

9 of the items that I had concern with.  It also showed that some

10 of the spherical items had powder in them.

11    Q    Okay.  And did it -- did these items also appear to

12 have fusing systems?

13    A    Yes.

14    Q    Okay.  And so what did you -- how did you remove these

15 items from the residence?

16    A    In a full bomb suit I used a pick-up stick to give me

17 distance with them.  The items were individually -- the three

18 individual items were placed into a fragmentation bag and they

19 were loaded into a bomb squad truck in the back and then the bag,

20 both of the two bags of the items, were also put into a

21 fragmentation bag and loaded into the back of the bomb squad

22 truck.

23    Q    And the fragmentation bags protects it from detonation

24 or protects people around from the detonation; is that correct?

25    A    That's what it's designed for, yes.

1    Q    And were the items that were found in that drawer moved

2  to the bomb range?

3    A    Yes.

4    Q    And were you subsequently involved in the inspection of

5  these items at the bomb range?

6    A    Yes, I was.

7    Q    And let me ask you to look at Exhibit 23, 24 and 25.

8  Do you recognize those exhibits?

9    A    Yes, I do.

10    Q    Could you describe what they are?

11    A    Exhibit 23 is a spherical item that has a fuse and

12  fragmentation.  It is placed in a rubber glove.

13    Q    Now the purpose of the fragmentation were those copper

14  BB's that we saw, correct?  Similar --

15    A    Yes.

16    Q    -- to copper BB's?

17    A    Yes, correct.

18    Q    And how -- were they affixed to that device?

19    A    Yes, they were.

20    Q    And could you tell how they were affixed?

21    A    I -- I couldn't tell if they were glued or what type of

22  glue, but it appeared that they were glued or they were stuck

23  onto the -- the item.

24    Q    And in the original drawer that they came from in that

25  box, was there not a jar of glue along with the BB's?

84

1      A     Yes, that's shown in Exhibit 21.

2      Q     Okay.  Exhibit 24 and 25, were those the -- the

3  cylinder type devices that had the shrapnel or fragmentation

4  attached?

5      A     24 and 25, yes.

6      Q     And these were again, fused?

7      A     Yes, they both had fuses.

8      Q     And the fragmentation was attached to these devices and

9  they were inside a glove, correct?

10     A     That's correct.

11           MR. PIMSNER:  Move to admit Exhibits 23, 24 and 25,

12  Your Honor.

13           MR. BOCK:  No objection.

14           THE COURT:  So admitted.

15                   (Government's Exhibits 23 through 25 admitted)

16  BY MR. PIMSNER:

17     Q     Now, there were other devices in the drawer that al --

18  that did not have fragmentation, correct?

19     A     That's correct.

20     Q     And in one bag there were some spherical devices; is

21  that accurate?

22     A     Yes.

23     Q     And how many were there?

24     A     There were six in a bag.

25     Q     Okay.  And Exhibit 26 does that accurately depict what

85

1  was inside one of those bags?

2      A    Yes, five red in color and one black in color.

3      Q    And could you describe to give us context, the -- the

4  size of these devices?

5      A    They were approximately two to three inches in

6  diameter.

7      Q    And they were fused, correct?

8      A    Yes.

9      Q    And in -- on your x-rays that you took of these

10 devices, you could see powder inside these devices, correct?

11     A    That's correct.

12          MS. ANDERSON:  Move to admit Exhibit 26.

13          MR. BOCK:  No objection.

14          THE COURT:  All right.  So admitted.

15                              (Government's Exhibit 26 admitted)

16 BY MR. PIMSNER:

17     Q    And let me ask you to look at Exhibit 27.  Were these

18 -- could you describe Exhibit 27 and tell us where you found

19 these initially?

20     A    These were also in a bag in the -- the box that was in

21 the drawer and there were 15 of them.

22     Q    Okay.  And again, these had either some type of caps or

23 sealants on the ends?

24     A    It appeared it looks like there was some type of plugs

25 on each end.

1  Q And they were fused?

2  A Yes, they had a fusing.

3  Q Okay.  And did you take steps to try to examine the

4 contents of -- did you -- to preserve the contents of some of

5 these devices so they can be examined by the lab?

6  A Yes, we did.

7  Q And tell us what steps you took.

8  A The -- out of the 15, five were randomly selected and

9 we utilized a robot to cut the -- the items in half over a -- a

10 paint can, an empty paint can, to dump the contents into the

11 paint can.  The contents and the cylindrical tubes themselves

12 were collected as evidence.

13  Q And of the five that you randomly chose, did each of

14 those five cylinder objects contain a powder?

15  A Yes.

16  Q And they all contained fuses, correct?

17  A That's correct.

18  Q And they were all sealed?

19  A Yes.

20  Q Did you attempt to preserve any of the cylinder -- or

21 the spherical items?

22  A Yes, we did.  The -- in Exhibit 26, the spherical items

23 we tried to robotically cut those, which did not work, and then

24 we tried to break them open, which did not work, and then we

25 tried to crush them to see if they would break apart and that did

87

1   not work robotically.

2       Q    And that was all done robotically.  You weren't out

3   there hands on with this, correct?

4       A    Absolutely not, no.  Those were all done robotically.

5       Q    And what was done with the -- the spheres and the

6   remaining ten cylinder items at that point to render the

7   situation safe?

8       A    Those items were later counter-charged.

9       Q    Meaning they were destroyed?

10      A    They were destroyed.

11      Q    All right.  Is that something that these type of items

12  you wouldn't just preserve in evidence?

13      A    No, absolutely not.

14      Q    Why is that?

15      A    Well, there's -- there's a lot of reasons.  First of

16  all, there's unknown amount of powder, explosive powder

17  potentially in these items.

18          Based on my experience, those could range from two to

19  five grams of -- of what we've seen as photo flash powder.

20  There's no marking on there.  There's no markings of safety.

21  Those are the main reasons.

22      Q    So these -- these aren't commercially produced

23  firecrackers?

24      A    Absolutely not.

25      Q    These -- okay.  Thank you.  Did you test one of these,

88

1   one of the cylindrical objects that have the fragmentation

2   attached, to determine whether they would function as they were

3   designed?

4         A    Yes, we did.

5         Q    And tell us how you did that.

6         A    Okay.  We had a bomb technician go down range.  He dug

7   a small hole.  FBI agents collected a sample from that hole of

8   the dirt, preserved that.  Bomb technician had protection on.

9              He moved the cylindrical item with the fragmentation

10  into the hole.  From there we constructed a -- a safety fuse

11  system and that safety fuse system is a fusing mechanism that

12  burns.

13             That strand of safety fuse goes down into -- if you'll

14  look at Exhibit 28, excuse me, a bag of black powder that is

15  ours.  We collected a sample of that black powder as evidence.

16             That bag was affixed to the safety fuse and that bag

17  was set next to the fusing system of that item in the hole.

18        Q    And did you put some kind of containment vessel over

19  that item to try to secure any fragments it may dispel based on

20  the explosion?

21        A    Yes, we did.

22        Q    And would you briefly describe what that containment

23  vessel was?

24             MR. BOCK:  Objection, Judge.

25             THE WITNESS:  We made a four by four --

1          MR. BOCK:  Objection, Your Honor.  Objection to all of

2     this testimony now, it's --

3          THE COURT:  It's --

4          MR. BOCK:  I don't think this is relevant.  It's

5     material he's testified now about these things and --

6          MR. PIMSNER:  This is the first time we've had an

7     opportunity to -- to detonate one to show that they are in fact a

8     working device that will issue shrapnel.

9          THE COURT:  Well, I'm looking at this; counsel are you

10    going to be much longer?

11         MR. PIMSNER:  No, I -- he's just going to describe the

12    explosion and then I have just two or follow-up questions.

13         MR. BOCK:  Judge, and with all due respect, I think,

14    you know, we -- there should -- there's going to be argument.

15    Are you inclined for us to come back tomorrow then?

16         THE COURT:  Yeah, I think we should come back tomorrow

17    at approximately 3:15.

18         MR. BOCK:  3:15 tomorrow?

19         THE COURT:  Yes.

20         MR. BOCK:  That'd be fine.

21         THE COURT:  All right.  All right, sir?

22         MR. PIMSNER:  Yes, Your Honor.

23         THE COURT:  All right.  Then we'll see counsel back

24    then at 3:15 tomorrow.

25              And Mr. Loos (sic), you're still under -- under oath

1   and the only individuals you're to discuss this case with our

2   respective counsel.

3            THE WITNESS:  Yes, Your Honor.

4            THE COURT:  All right.

5       (Proceedings concluded at 5:05 p.m.)

6                        * * * * * *

7                        CERTIFICATE

8            I certify that the foregoing is a correct transcript

9   from the electronic sound recording of the proceedings in the

10  above-entitled matter.

11       Dated May 24, 2011

12                    s/ Kimberly C. McCright

13                 KIMBERLY C. McCRIGHT, CET

14

15

16

17

18

19

20

21

22

23

24

25