1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF ARIZONA
2

3  UNITED STATES OF AMERICA,    ) Case No. CR 11-01751-TUC-CKJ (HCE)
                                )
4                  Plaintiff,   )
                                )
5       v.                      ) Tucson, Arizona
                                ) Friday, May 20, 2011
6  TODD RUSSELL FRIES,          ) 3:20 p.m.
                                )
7                  Defendant.   )
   _____)
8

9        TRANSCRIPT RE: DETENTION HEARING RE: DANGEROUSNESS
             BEFORE THE HONORABLE HECTOR C. ESTRADA
10                UNITED STATES MAGISTRATE JUDGE

11 APPEARANCES:

12 For the Plaintiff:      BEVERLY K. ANDERSON, ESQ.
                           DAVID PIMSNER, ESQ.
13                         U.S. Attorneys Office
                           405 W. Congress Street, Suite 4800
14                         Tucson, Arizona 85701
                           (520) 620-7300
15

16 For the Defendant:      RICHARD C. BOCK, ESQ.
                           Lingeman & Bock
17                         100 N. Stone Avenue, Suite 801
                           Tucson, Arizona 85701
18                         (520) 792-4940

19 Court Recorder:         Courtsmart

20 Transcription Service:  Verbatim Reporting & Transcription
                           11115 N. La Canada, Suite 275
21                         Tucson, Arizona 85701
                           (520) 861-0711
22

23
   Proceedings recorded by electronic sound recording;
24        transcript produced by transcription service.

25

2

INDEX

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESSES FOR THE GOVERNMENT: | | | | |
| JAY HENZE | 3 | 7 | 14 | 17 |
| BRIAN NOWAK | -- | -- | 20 | 20 |

WITNESSES FOR THE DEFENDANT:

None

| EXHIBITS: | Received |
|---|---|
| FOR THE GOVERNMENT: | |
| 28   Photograph | 6 |
| 29   Victim Statement | 24 |
| FOR THE DEFENDANT: | |

P R O C E E D I N G S

THE CLERK:  CR11-01751, USA versus Todd Russell Fries, on for a continued detention hearing.  Counsel, please state your appearances.

MS. ANDERSON:  Beverly Anderson and David Pimsner for the United States.  Good afternoon.

THE COURT:  Good afternoon.

MR. BOCK:  Good afternoon.  Richard Bock on behalf of Todd Fries, present, in custody.

THE COURT:  Good afternoon.  And, Mr. Bock, how do you pronounce last name?

MR. BOCK:  Fries.

THE COURT:  Fries.  Okay.  Thank you, sir.  I think we had one witness on the stand still yesterday.

MR. HENZE:  Yes, Your Honor.  It was Special Agent Jay Henze, FBI.

THE COURT:  All right, very well.  Sir, will you take the stand again, sir?

MR. PIMSNER:  May I proceed, Your Honor?

THE COURT:  Please.  Thank you, sir.

JAY HENZE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION CONTINUED

BY MR. PIMSNER:

Q    Agent Henze, where we left off last time, I believe it's -- I was asking you -- beginning to ask you questions

4

1   regarding whether or not you tested one of the explosive devices

2   with the fragmentation to determine whether it functioned as

3   designed.  Do you recall those quest -- that question?

4        A    Yes.

5        Q    And did it -- did you in fact test that -- test the

6   actual device?

7        A    Yes, we did.

8        Q    And briefly describe how you tested that device.

9        A    We were to -- we were able to initiate this device you

10  see in Exhibit 28.  We were able to light the fuse remotely from

11  a distance and that -- that fusing -- our system was set right up

12  against the suspect device fuse itself.  From there, we

13  constructed a containment vessel which was made of foam, a 4 by 4

14  containment vessel that had four sides and a top.  That was

15  placed over the suspect device in the hole.  Once the -- once we

16  started the burning process on our end, we were able to start his

17  fuse and then we heard an explosion.  And then we were able to go

18  down later and check the inside of the containment vessel.

19       Q    And what did you discover as a result of your test?

20       A    We were able to see that the fragmentation from this

21  device had impacted itself into the foam container, as well as

22  parts and pieces of the device itself.

23       Q    So the device actually exploded sending out

24  fragmentation?

25       A    Yes, it did.

1     Q     And that included the copper balls that were glued onto

2 the device?

3     A     That's correct.

4     Q     And based on your training and experience, what's the

5 significance of the added fragmentation to that explosive device?

6     A     Well, the significance is it adds lethality to this

7 device and the fragmentation could cause injury or maim somebody

8 or kill somebody.

9     Q     And based on your training and experience, had that

10 device with the fragmentation exploded with an individual in the

11 near -- in its vicinity, could that have caused serious physical

12 injury or even death?

13     A     Absolutely.

14          MR. BOCK:  Judge, this is all immaterial to the scope

15 of this hearing.

16          MR. PIMSNER:  I -- this is all about dangerousness and

17 the Defendant's possession of a dangerous destructive device with

18 added fragmentation.

19          THE COURT:  Well, under 3142(g)(4), the Court must

20 consider the nature and seriousness of the danger to any person

21 or the community that would be posed by that person's release.

22 And so I think that this is well encompassed in what I have to

23 consider.  So objection is overruled.

24 BY MR. PIMSNER:

25     Q     And, Agent, you discussed -- you referenced Exhibit 28.

6

1  That was a picture of the device, correct, prior to detonation?

2      A    That's correct.

3      Q    All right.

4          MR. PIMSNER:  And at this time the Government would

5  move for admission of Exhibit 28.

6          THE COURT:  Any objection, Mr. Bock?

7          MR. BOCK:  Subject to the statement I just made, I

8  would object, Your Honor.

9          THE COURT:  Very well.  Objection overruled.  It will

10  be admitted.

11                              (Government's Exhibit 28 admitted)

12  BY MR. PIMSNER:

13      Q    The -- can you legitimately purchase a device with the

14  added fragmentation that you just previously discussed?

15      A    No, you cannot.

16      Q    Is there any legitimate purpose to possess or use such

17  a device?

18      A    No, there is not.

19      Q    And based on your training and experience, would you

20  consider that device with the added fragmentation inherently

21  dangerous?

22      A    Yes, I would.

23          MR. PIMSNER:  I have nothing further at this time, Your

24  Honor.

25          THE COURT:  All right.  Mr. Bock?

1        MR. BOCK:  Thank you.

2                    CROSS EXAMINATION

3  BY MR. BOCK:

4        Q    Now, Agent, do you have the exhibits in front of you?

5        A    Yes.

6        Q    All right.  Why don't you first look at Exhibit 26.

7  And does 26 appear to you to be what -- it commonly is called a

8  cherry bomb?

9        A    That is one name that's used on the street, yes.

10        Q    Okay.  Does that look like it was home manufactured or

11  it was manufactured by a fireworks corporation or business?

12        A    I -- I don't know.

13        Q    Okay.  Are you -- have you -- do you know of your own

14  knowledge that there are more liberal -- there is a more liberal

15  attitude in the state of New Mexico towards the purchase of

16  firecrackers and things like that?

17        A    Commercial fireworks can be purchased there, yes.

18        Q    And have you ever been in New Mexico?

19        A    Yes, I've to New Mexico.

20        Q    And have you ever looked at what can be purchased,

21  considering what your expertise is, from a retailer?

22        A    Yes, I have.

23        Q    Okay.  And is this something that could be purchased

24  from a retailer in New Mexico?

25        A    When I was there in New Mexico, I never saw these items

8

1   there.

2       Q    Okay.  Did you take a look at these items and check to

3   see if in fact there are any commercial realtors (sic) that sell

4   these types of things which you categorized as one of the names

5   being a cherry bomb?

6       A    I looked at these items.  I didn't see any indicate --

7   indicators that they were made by a manufacturer.

8       Q    Okay.  Did you -- so that's all did you did.  Did you

9   consult with anybody else about these?

10      A    I spoke to three bomb technicians on the scene.

11      Q    Okay.  But you didn't speak to any people that

12  manufacture fireworks?

13      A    I did not speak to any manufacturer, no.

14      Q    And now look at Exhibit Number 27.  And is Exhibit 27

15  --

16           MR. BOCK:  Sorry?  I have Exhibit 27.

17           MR. PIMSNER:  Nobody said anything.

18           MR. BOCK:  Oh, I thought you were --

19           THE CLERK:  Somebody coughed.

20  BY MR. BOCK:

21      Q    On Exhibit Number 27, these are pictures of what are

22  commonly called M-80s?

23      A    That's one name for them, yes.

24      Q    And can they be purchased through a commercial dealer

25  that -- for fireworks --

1    A    No.

2    Q    -- in New Mexico?

3    A    No.

4    Q    How do you know that?

5    A    Well, because New Mexico will sell any commercial

6  regulated fireworks.  These are not those.

7    Q    Well, you're telling me that a person can't by an M-80

8  as a huge firecracker?

9    A    They might be able to illegally, yes.

10    Q    Okay.  So what's a violation for having one of these

11  firecrackers?

12    A    Like a federal violation or --

13    Q    Yeah, is there a federal violation?

14    A    It's consumer -- these are regulated by Department of

15  Transportation, normal fireworks, regulated fireworks.

16    Q    So this is an unregulated firework?

17    A    That is correct.  The Consumer Product Safety

18  Commission also regulates fireworks and there are many standards

19  that are in -- placed on commercially manufactured fireworks.

20    Q    Do these look like they were home manufactured to you

21  based upon your experience?

22    A    Based on my experience of what I've seen, I've seen

23  them manufactured in homes, I've seen them manufactured in

24  illegal factories.

25    Q    Okay.  And what is the -- what discerns the difference

1   between a home manufacture and a illegal factory manufacture?

2        A    Well, the first thing that differentiates them is the

3   amount of powder that is inside these things.  The Consumer

4   Product Safety Commission regulates this by having 50 milligrams

5   of powder.  That's the most that you can have in a commercially

6   manufactured device.

7        Q    And was one of the -- one of these have more than 50

8   milligrams of powder in it?

9        A    Absolutely.

10       Q    Okay.  Did you notice if there was anything that Mr.

11  Fries had purchased in terms of gunpowder or in terms of any

12  materials to suggest that he had manufactured these?

13       A    There was guns in the house and ammunition in the

14  house, but I didn't see any of these construction materials in

15  the house.

16       Q    Well, let's talk about the guns in the house since it

17  made the front page of the article in the newspaper.  The -- of

18  the 37 guns that were in the house, do you know how many of those

19  had actually been fired or how many of those were actually just

20  collector's items?

21       A    I -- I don't know.  I didn't deal with those.

22       Q    Do you know if there were any antique guns in the

23  house?

24       A    As I said, I didn't deal with the guns.

25       Q    Okay.  Now, you also -- are you -- is there any claim

1   that the fragmentation device that you have described, which is

2   in Exhibit 28, had anything to do with the investigation

3   regarding the ignition of chemicals?

4        A    No.  This is a separate thing.

5        Q    So this has nothing to do with any chemical ignition;

6   that's your testimony, is that correct?

7        A    Chemical ignition for --

8        Q    For what you've heard.  You heard the testimony

9   yesterday as to how they claim this cloud was produced, right?

10       A    That's correct.

11       Q    Okay.  This had nothing to do with this device, right?

12       A    I don't -- he did not testify to the fact that these

13  were at the scene when they collected the items.

14       Q    I'm sorry?

15       A    There was no testimony that these items were collected

16  at the scene at the time.

17       Q    Right, at the scene on October 31st of 2008, correct?

18       A    Either -- either of those scenes, yes.

19       Q    All right.  Now, the -- do you know whether or not Mr.

20  Fries has problems with pack rats or gophers?

21       A    I -- I wouldn't know that.

22       Q    And would you know if a person was tormented by a

23  gopher or a pack rat and he wanted to get rid of them and he

24  wanted to put something like this down a pack rat hole, that's a

25  -- that might be a device to rid those type of rodents; is that

1    correct?

2        A    No.

3            MR. PIMSNER:  Objection; speculation.

4            THE COURT:  I'll overrule.

5    BY MR. BOCK:

6        Q    Is that correct?

7        A    No, absolutely not.

8        Q    And why do you say that, sir?

9        A    Because this construction of this device is a

10   destructive device --

11       Q    Well, it would be to --

12       A    -- which is illegal.

13       Q    If it was meant to destruct a gopher or a pack rat,

14   that's what the purpose might be; is that correct, sir?

15       A    If -- if it does, then they've -- they've committed a

16   violation of law.

17       Q    Okay.  And the violation of the law would be blowing up

18   a pack rat or a gopher with a --

19       A    No.

20       Q    -- destructive device; is that correct?

21       A    It would be constructing a detruc -- a destructive

22   device that has fragmentation to it.

23       Q    Okay.  And do you know if in fact any of these devices

24   had ever been used by my client; do you know if he ever ignited

25   one of these?

13

1    A    I -- I have no idea.

2    Q    Okay.  And you don't know how long some of these were

3  -- existed in the area in which they were found pursuant to the

4  search warrant; is that correct?

5    A    There were no warning labels or manufacturing dates on

6  these; no, I wouldn't know.

7    Q    Okay.  And the weapons which we talked about, none were

8  modified; is that correct?

9    A    I didn't look at the weapons.

10   Q    None were illegal; is that correct?

11       MR. PIMSNER:  Objection, Your Honor; he's already

12  established he has no foundation to answer this line of

13  questioning.

14       THE COURT:  Sustained.

15       MR. BOCK:  I'll withdraw the question.

16 BY MR. BOCK:

17   Q    And there are no charges here regarding anything to do

18  with any type of explosive devices that you're aware of; is that

19  correct?

20   A    That's -- I'm not aware of those.  That's not up to me

21  right now.

22   Q    Okay.

23       MR. BOCK:  Thank you, Judge.

24       THE COURT:  Thank you.  Any --

25       MR. PIMSNER:  Just briefly, Your Honor.

1          THE COURT:  -- redirect?

2                    REDIRECT EXAMINATION

3   BY MR. PIMSNER:

4       Q    Based on your training and experience, the items that

5   you seized from the home from the drawer, the spherical and this

6   -- the cylinder devices, are they illegal on their face?

7       A    Yes, they are.

8       Q    And you testified that one of the differences on cross

9   examination was that these devices had more powder in them than

10  what's permissible pursuant to the Code of Federal Regulations,

11  correct?

12      A    Absolutely they did.

13      Q    And approximately, based on your training and

14  experience and your observation at the scene, how much powder was

15  contained in these cylinder devices?

16      A    I estimated about three --

17           MR. BOCK:  Objection as --

18           THE WITNESS:  -- to four grams.

19           MR. BOCK:  -- to foundation.  Objection as to

20  foundation, Judge.  We don't know what cylinder we're talking

21  about.

22  BY MR. PIMSNER:

23      Q    You testified yesterday that you actually had the

24  robotic remote robot remotely cut and save the pieces of five of

25  these devices; is that correct?

1       A       That's correct.

2       Q       And did you examine the contents of those devices after

3  they were rendered safe?

4       A       Yes, I did.

5       Q       And you were able to examine the amount of powder that

6  was in those five devices that were cut?

7       A       I visually looked at it, yes.

8       Q       And were you able to give an estimate as to how much

9  powder was in each one of those items?

10      A       Yes.

11      Q       And how much was that?

12      A       I guessed it about three --

13              MR. BOCK:  No, he's guessing --

14              THE WITNESS:  -- to four grams.

15              MR. BOCK:  -- Judge.  He's guessing.  Objection.  He's

16  not --

17  BY MR. PIMSNER:

18      Q       Is that an estimate based on your training and

19  experience --

20      A       Yes.

21      Q       -- in other investigations involving the removal of

22  powder?

23      A       Yes.

24      Q       And so three to four grams, is that your testimony?

25      A       Yes.

1      Q     And the legal amount of fireworks -- or powder that can

2  be inside a firework is 50 milligrams?

3      A     That is correct.

4      Q     Was it fair to say then that these fire --

5           MR. BOCK:  Leading, Judge.  I'd object to the leading.

6           THE COURT:  I can barely hear you, Mr. Bock.

7           MR. BOCK:  My objection is leading now.

8           THE COURT:  Sustained.

9  BY MR. PIMSNER:

10     Q     Do you -- can you say -- can you give us an estimate as

11 to how much more powder was in the devices that you rendered safe

12 found in Mr. Fries' home than was permitted pursuant to federal

13 regulations?

14     A     Yes.  A gram contains a thousand milligrams.  So if

15 it's -- let's just say it was three grams, then you're looking at

16 3,000 milligrams.  The -- the amount that's allowable is 50

17 milligrams.  So we're talking anywhere from 50 to 80 times more

18 of the amount.

19     Q     So these devices from Mr. Fries' home contained a

20 substantial amount of powder that would cause these items to

21 detonate; is that correct?

22     A     That's correct.

23     Q     And the fact that if these items -- an additional

24 fragmentation was placed on these items would make them more

25 inherently dangerous?

1      A     That's correct.

2            MR. PIMSNER:  Nothing further, Your Honor.

3            THE COURT:  Any follow-up, Mr. Bock?

4                         RECROSS EXAMINATION

5      BY MR. BOCK:

6      Q     Did you find powder in Mr. Fries' home?

7      A     I did not find any powder in his home.

8      Q     Thank you.

9            THE COURT:  Very well.  Thank you, sir.  Would you

10     please have seat.  Thank you, sir.

11           THE WITNESS:  Thank you.

12           THE COURT:  I have some questions for Mr. Nowak.  Mr.

13     Nowak, if you could take the stand again.  You are still under

14     oath, sir.

15        BRIAN NOWAK, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

16     VOIR DIRE BY THE COURT:

17     Q     I'm just trying to get some clarity on some issues

18     here.  The first incident that we're dealing with is on the 31st

19     of October of 2008?

20     A     Correct.

21     Q     And those are the Levines; is that correct?

22     A     Yes, it is.

23     Q     And the address that we're referring to, is that the

24     West Magee address?

25     A     No, that's the 2009 address.

18

1    Q    Okay.

2    A    50 -- I believe it's Tearblanket Place was the 2008

3  address.

4    Q    Okay.  And then do you know when in August of 2009 the

5  Magee Road residence of the Levine was --

6    A    That was August 2nd.

7    Q    August 2nd?

8    A    Yes.

9    Q    All right.  And then there was an incident just as

10  recently as the 28th of --

11    A    April.

12    Q    -- April of this year, 2011.

13    A    Correct.

14    Q    Now, at those three residences involving the two

15  victims, were there -- was that -- were there ID or any of that,

16  checks or identification or other forms of ID left at those three

17  residences?

18    A    There are IDs left at all three scenes.  The check was

19  left at the second scene in 2009.

20    Q    All right.  And that is at the Magee residence?

21    A    Correct.

22    Q    And you'd state I think in testimony yesterday that at

23  one of the locations there was allegedly a fingerprint of Mr.

24  Fries' found on one of the plastic five-gallon containers that

25  had been tipped over?

1      A     That was 2008.

2      Q     That was in the 2008?

3      A     Uh-huh (affirmative).   2009 was the check.

4      Q     The incident involving the 28th of April of this year,

5  was the victim there Jewish by any chance?

6      A     No, she was not.

7      Q     Okay.   Was the ID or other ID type of documents at the

8  Levine residence on the 31st of October, '08 different from the

9  ID that was left at the Levines' on the second of August of '09?

10     A     Yes.   The -- they're all female IDs left at all three

11 scenes.   The one in '08 involved a white female.   The one in '09

12 involved a Hispanic female and Hispanic male.   And the one left

13 in 2011 involved a Korean female.

14     Q     And both victims had work done allegedly by Mr. Fries

15 --

16     A     Yes.

17     Q     -- and his business concern?

18     A     Yes.

19     Q     All right.   And both victims had some issue regarding

20 whether or not the work done by Mr. Fries' business concern was

21 done properly?

22     A     They were both unhappy with the work and they both had

23 discrepancies over the billing.

24     Q     All right.   All right, thank you.

25           THE COURT:   Counsel, do either counsel have any

1    questions of this gentleman relative to what I just brought out?

2         MS. ANDERSON:  Just one point of clarification.

3                     FURTHER REDIRECT EXAMINATION

4    BY MS. ANDERSON:

5         Q    And that's that there is a fingerprint found on the

6    check that was located at the 2009 incident, correct?

7         A    Correct.

8         Q    Fingerprint on a bucket on the 2008 incident,

9    fingerprint belonging to Mr. Fries on the check at the 2009

10   incident?

11        A    Correct.

12        Q    All right.  Thank you.

13             THE COURT:  Mr. Bock?

14                     FURTHER RECROSS EXAMINATION

15   BY MR. BOCK:

16        Q    No fingerprints on Mr. Navarette's immigration card,

17   correct?

18        A    Correct.

19        Q    No fingerprints on the claim of -- I guess was it Ms.

20   Brown on April 28th, is that her name?

21        A    We have an unknown fingerprint on a wallet left at the

22   scene.

23        Q    Okay.  Well, I feel confident you probably would have

24   attempted to make a comparison on that, right?

25        A    We did.

1      Q     All right.  And the -- no, that's it.  Thank you.

2           THE COURT:  So again, just so that I'm clear, the

3    identification documents at -- on the 31st of October, '08 at the

4    Levines' was to a white female?

5           THE WITNESS:  A white female, yes.

6           THE COURT:  And do you recall the name of that

7    individual?

8           THE WITNESS:  Kaylyn Hovey.

9           THE COURT:  What was it again?

10          THE WITNESS:  Kaylyn Hovey.

11          THE COURT:  Kaylyn Hovey.

12          THE WITNESS:  Yes.

13          THE COURT:  And on the 2nd of August, '09 it was a

14   Hispanic female and that was Michelle --

15          THE WITNESS:  Fuentes.

16          THE COURT:  -- Fuentes.  And what was Mr. -- was that

17   also Mr. Navarette's --

18          THE WITNESS:  Yes.

19          THE COURT:  -- left there?

20          THE WITNESS:  Yes.  They were together, the IDs,

21   Joaquin Navarette and Michelle Fuentes.

22          THE COURT:  Okay.  All right, then.  Thank you, sir.

23   Please have a seat.  Any other witnesses, Ms. Anderson?

24          MS. ANDERSON:  No other witnesses, Your Honor.  Your

25   Honor, I do have a statement to read to the Court from the

22

1   victims in this case that I'd like to present since it is part of

2   the material that the Government is presenting.

3           THE COURT:  All right.

4           MS. ANDERSON:  May I do so?

5           THE COURT:  Please.

6           MS. ANDERSON:  Your Honor, as you know, this is a

7   victim case and the victims, Karen and Myles Levine, are here in

8   court today.  They were here in court yesterday.  And they have a

9   statement that they would like the Court to consider when the

10  Court considers detention or release in this matter.

11          THE COURT:  All right.  Just let me interrupt you

12  briefly.  Mr. Bock, are you going to be calling any witnesses?

13          MR. BOCK:  No witnesses.

14          THE COURT:  All right then.  Thank you.  Please

15  proceed, Ms. An --

16          MR. BOCK:  I was not provided a copy of the statement

17  either.  I don't know --

18          MS. ANDERSON:  It's Government's Exhibit Number 29.

19          MR. BOCK:  Oh, 29?  I'm sorry.

20          THE COURT:  All right.

21          MR. BOCK:  Oh, okay.  Thank you.

22          MS. ANDERSON:  After living in constant fear for our

23  safety for more than two years, it was heart lifting to hear that

24  an arrest had finally been made.  We have constantly wondered how

25  anyone could be so mean as to want to seriously harm or even kill

another person on purpose; also, what we could have possibly done

to warrant such vicious acts.  These crimes of violence were not

only done against us, but our entire neighborhood.

      We could only wonder what his mental state can be and

what other mean and unlawful capabilities we possesses.  We have

already had to move out of two peaceful communities because of

this man.  We no longer have our own identities.  We no longer

have any friends.  We must constantly look over our shoulder when

we're out of the house and watch to see if anyone is following us

home.  We have been forced to live behind high walls and have

home alarms.  We do not feel safe anywhere in this city.

      We have been told this man has a business and strong

ties to the community.  What strong ties could he possibly have

when he tried to destroy people who live in it?  We feel he is a

strong flight risk as he has the money and an easy way to flee.

He always brags about his helicopter and could fly it anywhere.

His business won't mean anything when he is convicted of these

terrible crimes, so why would it mean anything to him now?

      He has been laughing at us, our city, and the police

for over two years now thinking he got any (sic) with these

terrible acts.  It's about time he starts living in fear like he

has made us do.  Please do not let him go free now so he may flee

or even worse, by doing more damage to us or our city.

      THE COURT:  All right.  Thank you.

      MS. ANDERSON:  And, Your Honor, just for purposes of

1  the record, the Government would move to admit Exhibit Number 29,

2  which is the statement that I just read.

3          THE COURT:  Any objection, Mr. Bock?

4          MR. BOCK:  I do object to it, yes, Judge.

5          THE COURT:  Pardon?

6          MR. BOCK:  I do object to it.

7          THE COURT:  What's the basis?

8          MR. BOCK:  (No audible response)

9          THE COURT:  What's the basis?

10          MR. BOCK:  Well, again, I think it's -- it really is

11  beyond again the scope of the -- it's the scope of the hearing.

12  You know, it's a Court determination based upon sworn testimony

13  and exhibits and, you know, I'm certainly familiar with victim

14  impact statements, but I don't think it should be considered as a

15  -- as part of the real issues involved here.

16          THE COURT:  Well, again, under 3142(g)(4), it's the

17  nature and the seriousness of the danger to any person or the

18  community that would be posed by the person's release.  And I

19  think that the statement directs itself to that very thing

20  itself, the nature and the seriousness of the danger that the

21  victims believe that this Defendant has posed to them, should he

22  be released.  So the objection is overruled.  Does the Government

23  wish to make any argument at this time?

24                    (Government's Exhibit 29 admitted)

25          MS. ANDERSON:  Yes, Your Honor.  Your Honor, I would

1   also add that under the victim statutes, the victims have the

2   right to be heard regarding issues of detention and release.

3   First of all, Your Honor, I would like to point out that there is

4   a presumption in favor of detention this case.  It's the

5   Government's position that there is -- there is a rebuttable

6   position -- presumption, excuse me, that no condition or a

7   combination of conditions of release will reasonably assure the

8   appearance of the Defendant or the safety of any person in the

9   community.  And that's pursuant to 18 U.S.C. 3142(e).

10       The presumption in this case arises pursuant to

11  3142(f)(1)(E), Your Honor, because the weapon that Mr. Fries used

12  in this case, the two separate devices, are both dangerous

13  weapons under the definition of the statute.  I'd like to talk

14  briefly about those weapons.

15       You heard testimony from Special Agent Nowak that these

16  were five-gallon buckets that were placed -- about three or four

17  five-gallon buckets that were placed in front of the closed

18  garage of the Levine house on August 2nd of 2009.  In the

19  backyard, there was one five-gallon bucket that was the second

20  device.

21       And according to the first responders that came to the

22  scene, when they immediately got out of their vehicles, they

23  experienced the results of this dangerous weapon.  And what this

24  dangerous weapon was was a combination of some kind of chlorine

25  and another substance that when combined created this chlorine

1  cloud that wafted all over the neighborhood the size of a

2  football field.

3          And when first responders got out of their car, they

4  immediately felt the symptoms or the physical symptoms of this

5  cloud.  Their noses and their lungs began to burn.  Their eyes

6  began to burn.  Their throats began to burn.  They had to don

7  emergency gear in order to approach the house and deal with the

8  devices.

9          Additionally, Your Honor, there is testimony that the

10  heat that was generated by this chemical reaction was so great

11  that it completely melted these four or five plastic buckets and

12  it created a fire that caught the front garage door in fire, into

13  flames.  And I would submit to the Court that because of the

14  Levines' proximity to the other houses or the other townhomes

15  that it was situated next to, this was tremendously dangerous

16  because the fire could have ignited the other homes that were on

17  either side.

18          So not only do we have a dangerous weapon because of

19  the chemical composition and the chlorine that was wafting

20  through the neighborhood, but we also have a serious situation

21  and potential dangerous situation because of the fire that was

22  created by this weapon.

23          Next, Your Honor, not only is there a rebuttable

24  presumption in favor of detention, but what you -- when you look

25  at the factors, the four factors that are set forth in 3142(g),

1    you'll see that when you weigh each of these factors, the

2    Defendant should be detained.

3         The first factor is, number one, the nature and

4    seriousness of the offense charged, including whether the offense

5    is a federal crime of terrorism.  And I would point out to the

6    Court that this chemical weapon statute which the Defendant has

7    been indicted under is a federal crime of terrorism according to

8    18 U.S.C. 232(b)(G)(5).

9         Next is the weight of the evidence against the

10   Defendant in this case, Mr. Fries.  In this case, we have his

11   fingerprints on evidence at each of the scenes.  We have his

12   fingerprint on the check in the '09 incident and we also have his

13   fingerprint on one of the buckets in the '08 incident, although

14   the Defendant is not presently charged with the '08 incident.

15        Next is the history and the characteristics of the

16   Defendant and fourth is the nature and the seriousness of the

17   danger to any person or the community that would be posed by the

18   Defendant's release.

19        Now, when we started the case, defense counsel pointed

20   out to the Court that Pretrial Services is recommending detention

21   (sic).  However, Your Honor, when you look at what Pretrial

22   Services considered when they made their recommendation of a

23   release in this case, you'll see that they didn't have the

24   complete story.  What Pretrial Services was looking at is a

25   sterile indictment with no facts.  They have no facts regarding

28

the circumstances of the crime. They have no facts regarding the

past history, criminal conduct of the Defendant. All they have

is the sterile indictment and the fact that he has a business and

his criminal history shows no convictions.

But when you look at the information that Pretrial

Services did not have when they made their recommendation, you'll

see that detention is the appropriate ruling by the Court in this

case. Number one, when you look at the Defendant's crimes, Your

Honor, they're motivated by revenge. Everything -- all of the

acts against the Levines, all of the crimes that he committed,

the 2008 crime, the 2009 crime, is because the Levines were

dissatisfied with his work and they withheld $200 of payment to

Mr. Fries. All of this was over 200 bucks.

Based on the evidence, you can see the Defendant's

revenge was not just isolated to the Levines, but also we have

another incident in April of 2011 against another victim here in

town.

Furthermore, Pretrial Services didn't have the benefit

of the -- of knowing what evidence was seized at the Defendant's

house during the course of the search warrant. Pretrial Services

didn't hear about the 37 weapons that the Defendant had.

Pretrial Services didn't hear about the $40,000 that the

Defendant had in his house. And more importantly, Pretrial

Services didn't have any information regarding the IEDs that the

Defendant had in his house at the time when the search warrant

1  was executed.

2       Finally, Your Honor, it's the potential harm to the

3  community based on the facts of the case.  The Defendant put the

4  whole community at risk when he committed these crimes.  It

5  wasn't just the Levines.  It wasn't just the Levines that were

6  terrorized during the 2008 and the 2009 incident.  It was their

7  neighbors, it was the folks in their neighborhood that had to be

8  evacuated, and it was also the first responders that came to

9  assist the Levines when this happened.

10      It's the Government's position that the Defendant is a

11 flight risk based on the fact that he had $40,000 in cash, just

12 in cash in his home, he also had a passport; and also, Your

13 Honor, the amount of time that he's looking at serving in the

14 present case.

15      Finally, on the issue of dangerousness, I would like

16 the Court to consider again that these crimes were committed just

17 out of revenge, revenge against the Levines over $200.  Not only

18 did he spread the motor oil all over their driveway, but he put

19 dead animals, feces on the driveway, all over $200.

20      But that's not it, that's not the end, Your Honor.

21 What he also did, which is particularly sinister, is he sealed

22 the garage -- in the '09 incident, he sealed the garage -- he did

23 this in the '08 incident, too; he sealed the garage shut.  He

24 sealed the front windows shut, which in essence is forcing the

25 Levines if they were to escape, which they did, they had to go

1   out the back door.  And right there on the back porch is another

2   device.  And, Your Honor, the Government finds that particularly

3   sinister in this case.

4          It demonstrates that Mr. Fries' intent was more than

5   just to terrorize, more than just to harass.  It was to hurt and

6   injure the Levines.  And based on all of the evidence, Your

7   Honor, the Government would request that the Defendant be

8   detained.

9          THE COURT:  All right.  Thank you.  Mr. Bock?

10         MR. BOCK:  Judge, we're not here to try the whole case

11  in two afternoons.  Pretrial Service has spoken to the client,

12  certainly was -- obviously has an awareness of what the

13  allegations are, and has come up with a number of conditions of

14  release which would adequately protect and monitor Mr. Fries.  We

15  rely heavily on Pretrial Service reports.  I feel confident if

16  this was a negative report, the Government would be saying that

17  the Pretrial Services report should be given significant weight.

18         He's a flight risk.  Hasn't been in -- out of the

19  country, I don't believe -- I told Pretrial Services last time he

20  was in Mexico in five years.  Has a business here.  Served our

21  country with an honorable discharge he has shared with me from

22  the Marine Corps.  Has a good business.  Has a number of

23  customers.  And again, I'm not here to -- you know, to try the

24  whole case.

25         The -- some things that strike me as to the facts of

1   the case were there -- and again, I hope this isn't taken in the

2   wrong manner, but there's no evidence that anyone needed any type

3   of medical attention, evidence that this cloud was in the wash

4   area and dissipated fairly quickly, evidence that there was no --

5   nothing within the residence of the Levines.  I specifically

6   asked an agent, was there anything in the -- inside the

7   residence, any gas or anything.

8           And as to a dangerousness, I think that case law, only

9   when there is a strong possibility that a person will commit

10  additional crimes if released is the community interest and

11  safety sufficiently compelling to overcome the criminal

12  defendant's right to liberty.  The statute requires that you find

13  that there are no conditions or combinations of conditions which

14  will reasonably assure the safety of any other person and the

15  community shall be supported by clear and convincing evidence.

16          So that -- there are any number -- he's presumed

17  innocent.  Again, this is only the genesis of the case.  And he

18  is presumed innocent.  He is willing to post a bond in addition

19  to the conditions that Pretrial feels are appropriate, which

20  would be electronic monitoring through a GPS system.  All of the

21  weapons will be -- are out of the home and his mother will have

22  them in a secure shed that will be locked that he will not have

23  access to.

24          These explosive devices -- so people -- if the facts

25  play out that someone is frustrated by gophers and pack rats and

1   they make an explosive device, there's no evidence whatsoever

2   that he is -- that anything to do with these allegations involves

3   explosive devices.  There's no evidence.  And you've seen the

4   pictures here, what looks to me like cherry bombs.  Again, I'm

5   not here to overstep the expertise of the one agent that

6   testified as to, you know, fireworks, if they're manufactured at

7   home or if they're manufactured at -- or sold at some -- a vendor

8   on the side of the road as you go through New Mexico or someplace

9   where the laws involving the commercial distribution of

10  fireworks.  There may be -- you know, maybe someone turns their

11  head and they're allowed to do that.  But they look like -- just

12  like firecrackers and cherry bombs that a person could buy.

13          It doesn't look to me -- and there's no powder in his

14  home.  If you -- if there was some suggestion that, you know,

15  he's putting these things together, I'm certain that the

16  Government would have proffered that.  So there's little BBs that

17  are put on this thing and if they're stuck down a gopher hole,

18  that's what they're intended to do.  But there's no suggestion

19  whatsoever that these things were used or even went outside the

20  perimeter of his property.

21          So, Judge, the -- in terms of a bond and in terms of

22  his mother's willing to take third-party custody along with

23  Pretrial Services, he's willing -- he has a job, he has

24  responsibilities.  Just because a person has money doesn't mean

25  that they're necessarily going to be a flight risk.  The guns, I

1    think the guns are a red herring.  People collect guns, people

2    have guns.  But again, this was -- of course, this was thrown out

3    -- in the article in today's newspaper, the first thing is Mr.

4    Fries and then the next thing is 37 weapons.

5          So, Judge, he is -- they have not proved by clear and

6    convincing evidence that he is a danger.  He certainly is not a

7    flight risk.  The statute that they talk about is very

8    interesting.  It says the penalty, which is under 229, any person

9    who violates Section 229 of this Title shall be fined under this

10   Title or imprisoned for any term or both.  So that's what the

11   penalty is, 229(a), criminal penalties.

12         He has -- he got a -- Pretrial Services is comfortable

13   with him, Judge.  There are a number of conditions here that are

14   not just going to be lip service.  And I would respectfully ask

15   that you impose conditions that you feel are appropriate.  And

16   also, like I say, he's prepared to post a bond up to $25,000, a

17   surety bond.  And so I would ask, Judge, that he not be detained.

18   Thank you.

19         THE COURT:  Thank you.

20         MS. ANDERSON:  Your Honor, I would just remind the

21   Court that the devices that Mr. Fries had in his home were not

22   just firecrackers.  They were 50 to 80 times -- they had 50 to 80

23   times more powder than a normal firecracker.  They were a

24   improvised explosive device and they were dangerous on their

25   face.  The FBI agents recognized that immediately when they saw

1    them.

2           Finally, Your Honor, the Defendant engaged in a series

3    of acts of revenge over $200.  Can you imagine what kind of

4    revenge he would engage in as a result of being indicted on these

5    charges --

6           MR. BOCK:  I object to that argument, Your Honor.

7           MS. ANDERSON:  Your Honor, there is no set of

8    conditions that will assure the safety of this community and the

9    Government would ask that the Defendant be detained.

10          THE COURT:  All right.  Thank you.  Well, one of the

11   things I'm going to do, counsel, is I'm going to order a

12   transcript of the testimony that was offered in the course of

13   this hearing and fashion a more detailed order so that counsel

14   have some basis for appealing it to the District Court if counsel

15   feels that the order that I'll be entering is not what they

16   wanted the Court to do.

17          But what we have here is this situation.  We have two

18   victims and three different residences.  And these things

19   happened at these three different residences and one would think,

20   well, obviously someone must either be -- I would say that on the

21   31st of October, 2008 one might say that the Levines have their

22   home on Tearblanket randomly vandalized.  But when on the 2nd of

23   August of 2009, just less than a year later at another location

24   that they live in, again their house is vandalized and then one

25   has to wonder what are the chances that this is another random

1   vandalization of their home.

2          And then again on the 28th of April of this year

3   somewhere in the Sabino Canyon area, a third home gets vandalized

4   and one thinks, well, what possibly is the chain that connects

5   one residence to the next or one victim to the next.

6          And the commonality is that both of these victims had

7   work done for them by Mr. Fries and his business concern, Burns

8   Power Washing.  And both of these victims had some difference of

9   opinion as to whether or not the work had been done to their

10  satisfaction and thus, serving for the motivation perhaps for why

11  they were being vandalized, because the Government only need

12  prove this by clear and convincing evidence, but I think that

13  they presented considerably more than just simply clear and

14  convincing evidence.

15         And you see the commonality of things that were done

16  from one residence to the next, such as the sealing of doors or

17  windows, the sealing of windshield wipers.  And what's really

18  troubling is the Levines home, having their windows and doors in

19  front of their home, their only egress and ingress on that side

20  of the house, forcing them to go out through the back where there

21  was this five-gallon device there.  It's hard for me to imagine

22  that one wouldn't have some other ulterior motive.  This is not

23  just simply a breathing in some chili powder into the lungs and

24  coughing it out.  This is real serious, serious chemical things

25  going on out there that can seriously hurt someone out there.

1        And you see the commonality of some of the things that

2   were done out there to these three homes, the fecal matter being

3   thrown and strewn out there, again indicates a common modus

4   operandi.  You see the popcorn foam out there.  Again, a common

5   modus operandi.  You see that chlorine tablet chemical mixture

6   that's out there.  Again, a common modus operandi out there.

7        And I have no idea how it is that Mr. Fries was able to

8   get a hold of a white woman's ID and documents.  I have no idea

9   how he was able to get a Hispanic woman's ID and documents,

10  including checks.  I have no idea how he was able to get Mr.

11  Navarette's documents from his vehicle.  I have no idea how he

12  was able to get a young Korean woman's ID.

13       But it's really hard for me to imagine for the life of

14  me what a white woman, what a Hispanic woman, and what a Korean

15  woman would want to seek vengeance on any of these victims such

16  that they're thinking to themselves, well, you know, I think I'll

17  go out to these people's homes and I think I'll carry this bag or

18  this purse or this wallet with me while I'm doing all of these

19  scurrilous things out there; and, oh my goodness, I dropped my ID

20  there at the house.  I would think that somebody who was a little

21  bit more thoughtful about it would have simply left those things

22  in a car up the street or maybe even left them at home.

23       But it is so transparent, it is so transparent what

24  you've done here, Mr. Fries, by misdirect and cast direction

25  elsewhere.  And perhaps, not only victimize the people in this

1   case in those three incidences, but victimize others that have

2   got nothing to do with them and have got nothing to do with you.

3            And so I don't see that you have any sense of boundary,

4   any sense of self control.  You are going to do whatever it is

5   you feel that you need to do to try to accomplish your goal,

6   which was to terrorize these individuals.

7            And if that wasn't enough, in one of the checks made

8   out to one of the victims, allegedly signed by the owner of the

9   check and they have no connection to that victim whatsoever, just

10  conveniently happens to be left there in the backyard and it has

11  your fingerprint on it.  Maybe someone's trying to set you up,

12  maybe somebody's jealous of you.  I don't see how that would be

13  the case.

14           And perhaps you left your fingerprint on one of those

15  plastic buckets, maybe you left it there while you were working

16  there.  But I don't have any evidence of to that end, sir.  I

17  have an attorney asking questions of someone whether that's

18  possible.  I imagine it is.  But I don't have evidence that

19  that's what happened here.

20           And what's of particular concern, and it may not seem

21  to have anything to do with these incidences here, sir, but when

22  you see the nature of the vandalism that was carried out in these

23  three residences, you see the commonality of things that were

24  done at the three residences, you see the commonality of one

25  circumstance, your having done work for these two victims, you

1   see the commonality of their not being satisfied with the work,

2   and then you start seeing the commonality of a fingerprint,

3   yours, found in two different locations, indicates to me that as

4   things were being pieced together, they started slowly pointing

5   and focusing on your, sir, because it seems to me, at least in my

6   mind, there's no doubt that you have something to do with this.

7          And what's particularly disconcerting is when that

8   warrant is served on your residence, no, I didn't hear anything

9   that any of those firearms that were found in your home, sir, are

10  against the law, I didn't hear anything that there were silencers

11  on them.  I didn't hear anything that there were shotguns there

12  with shortened barrels that are against the law.  I didn't hear

13  anything that said that you had automatic weapons, which are

14  against the law.

15         But what was of concern to me are those explosive

16  devices there, I heard questions about is it possible that it

17  might be used to kill gophers or pack rats?  I don't have

18  evidence to that effect.  All I have are questions that it's

19  possible that that might have been the reason for it, but I don't

20  know.  I don't have anything from you and you're not obligated to

21  testify and give me any of that information because it's not your

22  burden.  It's the Government's burden to show me by clear and

23  convincing evidence that you are a danger to the community.

24         But given the behavior ascribed to you, sir, by more

25  than clear and convincing evidence as far as I'm concerned, those

1  explosive devices with fragmentation on it, with nothing else but

2  to consider your conduct here tells me that it might have been

3  just simply a question before you started to escalate and perhaps

4  use the same kind of modus operandi and try to ascribe it to

5  somebody else.

6          You are a danger to the Levines and you were a danger

7  to the residents there in Sabino Canyon area.  You were a danger

8  to the surrounding community at both the Levines' residences.

9  And you are a danger to the Levines and the residents of Sabino

10 Canyon, not only as victims, but as witnesses in this case.  And

11 I'm going to make a finding that by more than clear and

12 convincing evidence, sir, that you are the individual responsible

13 for these things and that you should be detained without benefit

14 of a bond pending resolution of this case.

15         And as I said, counsel, I'll order that a transcription

16 be made of the testimony offered in this case and I'll issue a

17 more detailed order.  And counsel can review it and appeal my

18 decision.  Counsel have anything further at this time?

19         MS. ANDERSON:  No, Your Honor.

20         MR. BOCK:  No, Your Honor.

21         THE COURT:  Thank you, counsel, for your time.

22         MR. BOCK:  Your Honor?

23         THE COURT:  Yes, sir.

24         MR. BOCK:  What is the usual turnaround on the

25 availability of the transcript?

1          THE COURT:  Given that it was a real shortened period

2    of testimony being given, I can probably get it done in a week.

3          MR. BOCK:  Okay.

4          THE COURT:  And it'll be available -- if you look on

5    the docket, it will indicate on there that it's been delivered

6    and filed with the Court and you should be able to pull it up.

7          MR. BOCK:  Okay.  Thank you, Judge.

8          THE COURT:  Thank you, sir.

9          (The proceedings concluded at 4:15 p.m.)

10                        * * * * * *

11                        CERTIFICATE

12          I certify that the foregoing is a correct transcript

13    from the electronic sound recording of the proceedings in the

14    above-entitled matter.

15          Dated May 24, 2011

16                     s/ Kimberly C. McCright

17                     KIMBERLY C. McCRIGHT, CET

18

19

20

21

22

23

24

25