1          UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3    ---------------------------------)
                                       )
4                                      )
     UNITED STATES OF AMERICA,         )
5                   Plaintiff,         ) No. CA 11-10340 9th Circuit
                                       )
6           vs.                        ) No. CR 11-01751 TUC-CKJ
                                       )
7    TODD RUSSELL FRIES,               )      Tucson, Arizona
                    Defendant.         )      June 29, 2011
8                                      )
     ---------------------------------)
9
      TRANSCRIPT OF HEARING ON APPEAL OF MAGISTRATE'S DETENTION ORDER
10

11          BEFORE THE HONORABLE CINDY K. JORGENSON
                 UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14   For the Plaintiff:   By:   Beverly K. Anderson
                                U.S. Attorney's Office
15                              405 W. Congress St., Suite 4800
                                Tucson, AZ   85701
16
                                David A. Pimsner
17                              U.S. Attorney's Office
                                2 Renaissance Square
18                              40 N. Central Ave., Suite 1200
                                Phoenix, AZ   85004
19
     For the Defendant:   By:   Richard C. Bock
20                              Lingeman & Bock
                                100 N. Stone Ave., Suite 801
21                              Tucson, AZ   85701

22
     Mary A. Riley, RMR, FCRR
23   United States Court Reporter
     U.S. District Court
24   405 W. Congress St.
     Tucson, AZ   85750
25
          Proceedings produced by computer-aided transcription

1                        INDEX OF WITNESSES

2    MICHAEL WIEGAND

3    Direct Examination by Mr. Bock               Page  7

4    Cross-Examination by Mr. Pimsner             Page 11

5    Redirect Examination by Mr. Bock             Page 14

6

7    JAMES WHITE

8    Direct Examination by Mr. Bock               Page 15

9    Cross-Examination by Mr. Pimsner             Page 18

10

11   CARMEN WILSON

12   Direct Examination by Mr. Bock               Page 20

13   Cross-Examination by Mr. Pimsner             Page 29

14   Redirect Examination by Mr. Bock             Page 33

15

16   BRAD CAMPBELL

17   Direct Examination by Mr. Bock               Page 35

18   Cross-Examination by Mr. Pimsner             Page 38

19

20                        INDEX OF EXHIBITS

21   Exhibit Number 38 through 45                 Page 35

22

23   ARGUMENT BY MR. BOCK                         Page 41, 55

24   ARGUMENT BY MS. ANDERSON                     Page 47

25   RULING BY THE COURT                          Page 57

```
 1                        TRANSCRIPT OF PROCEEDINGS

 2     (2:37 p.m.)

 3              MS. ANDERSON:  Beverly Anderson and David Pimsner for

 4     the United States.

 5              Good afternoon.

 6              THE COURT:  Good afternoon.

 7              MR. BOCK:  Good afternoon, your Honor.  Richard Bock on

 8     behalf of Todd Fries, in custody standing, acknowledging his

 9     presence.

10              THE COURT:  All right, good afternoon, Mr. Bock.

11              And this is actually the time set for the appeal of the

12     detention order from the magistrate judge.

13              I have reviewed that order, which was a -- an oral

14     pronouncement from the bench, and also a written order, which is

15     Document 25, and I've also reviewed the transcript from that

16     hearing.  Numerous witnesses testified at that hearing.

17              Then I have what counsel have filed since that time,

18     which is -- Mr. Bock, you filed a -- obviously, your appeal

19     notice with your exhibit list, and your list of potential

20     witnesses.

21              The government has responded in opposition.  That's

22     Document 27.

23              And then you've obviously replied to that, Document 30.

24              So this is the time set for that appeal of the

25     magistrate judge's order of detention.
```

1           And do either side want to make any brief opening

2   remarks before we start with the hearing?

3           Let's see, Mr. Bock, it's your appeal, but

4   Ms. Anderson, do you want to go first?

5           MS. ANDERSON:  I'll let Mr. Bock --

6           THE COURT:  Okay.

7           Go ahead, Mr. Bock.

8           MR. BOCK:  Judge, I would waive any opening remarks,

9   and put on my -- my four witnesses, and then obviously ask you to

10  be allowed to make an argument.

11          THE COURT:  Sure.

12          All right, and Ms. Anderson, do you want to make any

13  opening remarks before we start with testimony?

14          MS. ANDERSON:  I'll just be real brief, your Honor.

15          First of all, has the Court reviewed the exhibits in

16  the case?

17          THE COURT:  Yes, I do have the --

18          MS. ANDERSON:  Okay.

19          THE COURT:  -- exhibits.  Those were provided to me

20  along with the transcripts of the previous hearing.

21          MS. ANDERSON:  Your Honor, I know that the Court is

22  familiar with the facts, having read the transcript, having read

23  the respective pleadings from the parties.  As the Court is

24  aware, the government has the burden of proving that the

25  defendant -- in terms of dangerousness, the government must prove

1    that by clear and convincing evidence; and as far as a flight

2    risk, the government must prove that by a preponderance of the

3    evidence.

4            It's the government's belief that we have made such a

5    showing, your Honor, as to both dangerousness and flight risk.

6            The -- the government urges the Court to look at not

7    only the underlying facts regarding the -- which led to the

8    indictment of Mr. Fries, but also to the other incidents, the

9    2008 incident, in addition to the 2011 incident on Ms. Brown.

10           Also, your Honor, it's the government's position that

11   Mr. Fries on -- on August 9th presented a dangerous situation out

12   at the Levine's house.  He jeopardized the life and the safety of

13   the Levines, the first responders, the folks that lived in the

14   neighborhood, and because of that, the government is seeking an

15   order of detention.

16           Thank you.

17           THE COURT:  Thank you, counsel.

18           And Mr. Bock, you may call your first witness.

19           MR. BOCK:  Judge, I have four witnesses.

20           THE COURT:  All right.  Why don't we have you all come

21   up, folks -- the people who are going to testify, come on up to

22   the clerk.  Let's get all of your names at one time, and I'll

23   swear you all in as witnesses.

24           MS. ANDERSON:  Your Honor, the government would invoke

25   the rule.

1          THE COURT:  All right, so let's have you all come right
2    up to this lady right in front of me, and she'll take down your
3    names, we'll swear you in as witnesses, and then I'll have each
4    of you step outside until we need you to testify.
5          (James White, Carmen Wilson, Michael Wiegand, and Brad
6    Campbell were duly sworn by the clerk.)
7          THE COURT:  All right.  Let me talk to all of you for a
8    minute.
9          The rule relating to witnesses has been invoked in this
10   case for purposes of this hearing.  What that means is that
11   you'll need to remain outside of the courtroom until you're
12   called in to testify.  Once you're finished testifying, if it's
13   acceptable to the lawyers you may remain in the courtroom for the
14   rest of the proceedings, but you'll need to check with the
15   lawyers about that.
16         And please, while this hearing is pending this
17   afternoon don't talk among yourselves about the case.  Once the
18   hearing is over, you're free to do that.
19         While this hearing is pending, you are free to talk to
20   the lawyers about the case.
21         So let's see, Mr. Bock, who is your first witness?
22         MR. BOCK:  Mr. Wiegand.
23         THE COURT:  Okay.
24         Mr. Wiegand, sir, if you could come on up on the
25   witness stand.

```
 1              If the three of you could please step outside.  There's
 2    a waiting room.  We'll call you in when we need you to testify.
 3              And sir, if you could speak into the microphone for us,
 4    please.
 5              THE WITNESS:  Okay.
 6              THE COURT:  And Mr. Bock, you may proceed.
 7              MR. BOCK:  Thank you, your Honor.
 8                        MICHAEL WIEGAND
 9                       DIRECT EXAMINATION
10    BY MR. BOCK:
11    Q    Sir, could you state your name, and spell your last name for
12         the Court, please?
13    A    Michael Wiegand.  Last name, W-I-E-G-A-N-D.
14    Q    And sir, what do you do for a living?
15    A    I'm a commercial truck dealer, sell new and used commercial
16         trucks.
17    Q    And where is your business?
18    A    I've got two locations.  One's at the corner of Glenn and
19         Stone, 2761 North Stone.  The other one is about a mile west
20         of there, service compound.  We do service work, 1251 West
21         Florence.
22    Q    And how long have you had that business, sir?
23    A    I've been in business in Tucson since 1989.
24    Q    And do you know Todd Fries?
25    A    Yes.
```

```
 1   Q    And how do you know Todd?

 2   A    Through business.

 3   Q    And --

 4   A    We sold him -- we sold him a couple of new trucks, and we've

 5        done his service work ever since.

 6   Q    Do you see Todd in the courtroom today?

 7   A    Yes.

 8   Q    And could you point him out for the Court?

 9   A    Right there.  Right there.

10   Q    And what is he wearing?

11   A    He's wearing an orange suit.

12             MR. BOCK:  Can we stipulate to identification?

13             MS. ANDERSON:  Yes, your Honor.

14             THE COURT:  And I'll accept that stipulation.

15   BY MR. BOCK:

16   Q    All right.  Could you tell the Court a little bit about your

17        interaction with Todd?

18   A    Primarily, just business -- business.  Like I say, we sold

19        him a couple of new trucks.  I consider him a friend.  We've

20        talked on numerous occasions, not just specifically about me

21        servicing his trucks, but about his business, and -- and

22        mine.

23   Q    And what business did you know him to own?

24   A    Burns Power Washing.

25   Q    And how many times a year do you -- would you come into
```

1        contact with him?

2    A   Oh, probably a half a dozen at a minimum, and probably

3        talked to him a few more times than that.

4    Q   And some of the discussions were about business?

5    A   Uh-huh.

6    Q   Were there social discussions too?

7    A   Sometimes.

8    Q   Now, did you ever refer any -- knowing what Mr. Fries does

9        for a living, did you ever refer any -- any people that you

10       knew to him?

11   A   You know, none that comes to mind, but I certainly wouldn't

12       hesitate to.  In fact, I've -- I wrote a recommendation on

13       Google as far as his business is concerned based on the

14       character.

15   Q   Did you ever hear of people talk about him that -- that

16       might have come into your business, or about the type of

17       work he did, or the quality of work?

18   A   Yes.  He referred a number of people to my business, and

19       they spoke highly of him, and said he did a good job.  He

20       was engaged, and involved in making sure that the job was

21       done right.

22   Q   And the -- did you also service trucks for him, or --

23   A   Yes.  Um-um.

24   Q   And the -- was he timely on any bills that he incurred as a

25       result of --

1  A  I wish I had more people like him.

2  Q  Did he ever say to you that -- anything anti-religious,

3     or -- or --

4  A  No.

5  Q  -- any -- did -- do you feel you can give an opinion as to

6     his character for truthfulness and honesty?

7  A  As far as I can tell from my interaction with Todd, I was

8     completely shocked and amazed that this is something that

9     has come up in his life.  I'm totally surprised by it.  I

10    don't -- I don't believe -- I think it's -- unfortunately, I

11    think it's a misunderstanding of some sort.  I -- he's --

12    he's the kind of person I would trust immensely.

13 Q  Do you know him to have a temper, or be mean-spirited in any

14    way, shape, or form?

15 A  Not really, no.  He's a high energy person.  I mean, he's --

16    he's a little different in that respect.  I suppose that

17    could be misinterpreted.

18 Q  Do you know if -- what his reputation is in the business

19    community?

20 A  You know, to be honest with you, I spend most of my time in

21    the business, so I don't get out too much, so -- the people

22    that I have had interaction with have never said anything

23    negative.  I've only heard positive things about him.

24 Q  So has -- in his dealings has he always been honest and

25    truthful with you?

```
 1   A    Yes.

 2   Q    Has he always been up-front?

 3   A    Yes.

 4   Q    Has he always been timely in responsibilities with --

 5   A    Absolutely.

 6   Q    -- respect to your company?

 7   A    Absolutely.

 8   Q    And he's never done anything untoward in your presence, is

 9        that correct?

10   A    That's correct.

11             MR. BOCK:  Thank you.

12             THE COURT:  Cross-examination?

13             MR. PIMSNER:  Yes, your Honor, thank you.

14                         CROSS-EXAMINATION

15   BY MR. PIMSNER:

16   Q    Mr. Wiegand, you indicated that you know of Mr. Fries since

17        approximately 1989, correct?

18   A    No.  That's how long I've been in business.

19   Q    Oh, that's how long you've been in business.  How long have

20        you known Mr. Fries?

21   A    Since about 2006.  He bought -- like I said, he bought a

22        couple of new trucks for us.

23   Q    So you have a business relationship with --

24   A    Yes --

25   Q    -- Mr. Fries?
```

1   A    -- that's correct.

2           THE COURT:  Sir, if you could just wait until the

3   lawyer finishes asking the question --

4           THE WITNESS:  Okay.

5           THE COURT:  -- so the court reporter --

6           THE WITNESS:  All right.

7           THE COURT:  -- can get down the question and answer.

8           THE WITNESS:  Um-um.

9           THE COURT:  Thank you, sir.

10  BY MR. PIMSNER:

11  Q    So it's fair to say you have a business relationship with

12       him?

13  A    Yes.

14  Q    And it sounds like an extensive business relationship?

15  A    Over the period of time, yes.

16  Q    And that you -- you benefit financially through your

17       business dealings --

18  A    Certainly.

19  Q    -- with Mr. Fries?

20  A    Yeah.  I don't know too many business that are philanthropic

21       in that respect.

22  Q    And you testified that -- in your opinion that Mr. Fries was

23       a -- an honest person?

24  A    Yes.

25  Q    Do you -- are you aware that back on September 27th, 2008,

1       he was charged with shoplifting?

2               MR. BOCK:  Objection to that, your Honor.

3               THE WITNESS:  No.

4               MR. BOCK:  Objection -- just objection to the --

5               THE COURT:  Wait -- Mr. Bock, if you could stand.

6               All right.  Yes, what's your objection?

7               MR. BOCK:  Objection to the -- to the -- there's not a

8   conviction, your Honor, and it's -- that's an improper question.

9               THE COURT:  No, I'll allow it.  I think that goes more

10  to the weight than the admissibility.

11              So sir, you can answer that question.

12              Go ahead.

13              THE WITNESS:  I did.

14              THE COURT:  And what was the answer?

15              THE WITNESS:  I wasn't aware of it, no.

16              THE COURT:  All right, thank you.

17  BY MR. PIMSNER:

18  Q    And you were also asked questions about whether Mr. Fries

19       had a temper, or was --

20  A    Uh-huh.

21  Q    -- mean spirited.  Do you recall?

22  A    Yes.

23  Q    Did -- are you aware that back on September 27, 2008,

24       Mr. Fries was also charged with assault?

25  A    No.

1    Q    Were you aware that the allegations in the indictment

2         against Mr. Fries alleges that he produced and detonated a

3         chemical weapon which caused a -- a chlorine cloud the size

4         of a football field?

5    A    I read the accounts in the paper.

6    Q    Are you also aware that as part of this crime, that dead

7         animals, oil, and graffiti were --

8    A    Yeah, I --

9    Q    -- strewn about?

10   A    -- believe that was in the paper as well.  I find that hard

11        to believe, but -- that he was involved in that.

12   Q    But you don't know for a fact --

13   A    No, I --

14   Q    -- whether he was involved or not?

15   A    -- have no --

16             THE COURT:  Sir, you need to --

17             THE WITNESS:  Okay.

18             THE COURT:  -- wait for the --

19             THE WITNESS:  No, I wouldn't know for a fact.

20             MR. PIMSNER:  I have nothing further, your Honor.

21             THE COURT:  Any redirect, Mr. Bock?

22             MR. BOCK:  Just one.

23             THE COURT:  Sure.

24                          REDIRECT EXAMINATION

25   BY MR. BOCK:

```
 1   Q     You came here without a subpoena, of your own free will

 2         today, is that correct?

 3   A     Absolutely.

 4   Q     To give testimony and support on behalf of Mr. Fries?

 5   A     Correct.

 6               MR. BOCK:  Thank you, sir.

 7               THE COURT:  All right, thank you.

 8               May this witness step down and be excused?

 9               MR. BOCK:  Yes, your Honor.

10               THE COURT:  And may he now remain in the courtroom?

11               MR. BOCK:  I think he wants to go back to work.

12               THE COURT:  All right.

13               Sir, you may be excused.

14               And Mr. Bock, you may call your next witness.

15               MR. BOCK:  I would call Mr. James White, your Honor.

16               THE COURT:  Mr. White, if you can come on up to the

17   witness stand, please, and have a seat.

18               And if you could speak right into the microphone for

19   us, please.

20               THE WITNESS:  Yes, your Honor.

21               THE COURT:  All right.  I don't think we'll have any

22   problems with hearing you -- hearing your voice so far.

23               All right.  Go ahead, Mr. Bock.

24                         JAMES WILLIAM WHITE

25                         DIRECT EXAMINATION
```

BY MR. BOCK:

Q    Afternoon, sir.  Could you state your name and spell your last name for the Court, please?

A    James William White, W-H-I-T-E.

Q    Sir, can you tell the Court a little bit about your background?

A    I have a bachelor of science, master of science, and doctorate in chemical engineering.  I've had ten years experience at the University of Arizona.  I'm currently chairman of the board of Modular Mining Systems in Tucson, Arizona.

Q    And sir, how did you come to know Todd Fries?

A    He was recommended by ServiceMagic.

Q    And you see Todd in the courtroom today?

A    Beg your pardon?

Q    Do you see Todd in the courtroom today?

A    Yes.

Q    What is he wearing?

A    The gentleman over there with the nice mustache.

        MR. BOCK:  Can the record show he's identified the defendant, your Honor?

        THE COURT:  Yes, the record may so reflect.

BY MR. BOCK:

Q    Can you tell the Court when you made Mr. Fries' acquaintance?

| | | |
|---|---|---|
| 1 | A | I think it was sometime -- oh, I don't know, last fall. |
| 2 | Q | And what -- |
| 3 | A | I decided -- I decided to have some work done on my garage. |
| 4 | | I went online, searched.  ServiceMagic recommended several |
| 5 | | contractors.  I interviewed them all.  I negotiated with all |
| 6 | | of them. |
| 7 | Q | And who did you decide to employ? |
| 8 | A | Mr. Fries offered me the best deal, and did an excellent |
| 9 | | job. |
| 10 | Q | And can you tell the Court what Mr. Fries did for you? |
| 11 | A | Had a three car garage with a 12 year old botched epoxy poor |
| 12 | | coating.  He removed it, which is no small feat, and |
| 13 | | prepared the substrate from seven in the morning until seven |
| 14 | | at night with two foremen, two workers.  They came back the |
| 15 | | next day to finish the work.  Excellent.  A plus.  I was |
| 16 | | very impressed. |
| 17 | Q | And you have read some of the accounts in the newspaper |
| 18 | | regarding the government's accusations against Mr. Fries, is |
| 19 | | that correct? |
| 20 | A | That is correct. |
| 21 | Q | Did Mr. Fries -- was your interaction with Mr. Fries clearly |
| 22 | | professional? |
| 23 | A | Not purely, no.  He did an excellent job, and after it was |
| 24 | | over I invited him to go with me to Primo, and we had a very |
| 25 | | enjoyable conversation.  Then he invited me to visit his |

| | | |
|---|---|---|
| 1 | | home, which I did, and had, you know, some food and drinks, |
| 2 | | and he showed me -- showed me around.  He basically helped |
| 3 | | me correct a major defect in the golf cart that we were |
| 4 | | using, which frankly, I think, saved my life.  So I was |
| 5 | | pretty impressed. |
| 6 | Q | And he did that -- he volunteered that, is that correct? |
| 7 | A | That's correct.  He volunteered that. |
| 8 | Q | And so how would you characterize Mr -- would you |
| 9 | | characterize him as a regular guy? |
| 10 | A | Very. |
| 11 | Q | Okay. |
| 12 | A | I read in the paper that he has X firearms.  I have about |
| 13 | | half X firearms, and so I didn't find that unusual. |
| 14 | | MR. BOCK:  Okay.  Thank you, sir. |
| 15 | | THE WITNESS:  Are you done? |
| 16 | | MR. BOCK:  She gets to ask -- |
| 17 | | THE WITNESS:  Oh -- oh, I see.  I'm sorry. |
| 18 | | THE COURT:  Cross-examination? |
| 19 | | MR. PIMSNER:  Just briefly, your Honor. |
| 20 | | CROSS-EXAMINATION |
| 21 | BY MR. PIMSNER: | |
| 22 | Q | So you were a customer of Mr. Fries back in -- last fall? |
| 23 | A | Correct. |
| 24 | Q | And other than the contact you've described with Mr. Fries, |
| 25 | | have you -- I guess, when was the last time you had contact |

1             with him, other than today?

2    A     Oh, I don't know.  A couple months, three months.

3    Q     Were you aware -- are you aware of the nature and

4          circumstances of the allegations against Mr. Fries?

5    A     Just what I've seen in the Daily Star.

6               MR. PIMSNER:  I have nothing further, your Honor.

7               THE COURT:  Any redirect, Mr. Bock?

8               MR. BOCK:  No.  No, your Honor.

9               THE COURT:  All right.  May this witness step down and

10   be excused?

11              MR. BOCK:  Where's my exhibits?

12              Yes, your Honor.

13              THE COURT:  All right.

14              Thank you, sir.  You may step down and be excused.

15              THE WITNESS:  Thank you, your Honor.

16              THE COURT:  Yes.

17              And Mr. Bock, you may call your next witness.

18              MR. BOCK:  Thank you.

19              I would, your Honor, call Patty Wilson.

20              Judge, I have a number of exhibits that the government

21   has no objection to.

22              THE COURT:  All right.  Let me have Ms. Wilson --

23   direct her up here.

24              Ms. Wilson, if you could just have a seat right in the

25   witness chair there.

| | |
|---|---|
| 1 | And go ahead, Mr. Bock. |
| 2 | MR. BOCK:  After this witness, I can give you these |
| 3 | exhibits. |
| 4 | THE COURT:  All right. |
| 5 | CARMEN WILSON |
| 6 | DIRECT EXAMINATION |
| 7 | BY MR. BOCK: |
| 8 | Q    State your name, please. |
| 9 | A    Carmen Wilson, otherwise known as Patty Wilson. |
| 10 | Q    And you know Todd Fries? |
| 11 | A    Yes, I do. |
| 12 | Q    And how long have you known Todd for? |
| 13 | A    About 11 years. |
| 14 | Q    And what are the circumstances that you know Todd, and |
| 15 | continuing -- and continue to know Todd? |
| 16 | A    I met him when he was -- first started his business, when he |
| 17 | was doing some work at the hospital where I was at.  And he |
| 18 | introduced himself as I was leaving, and showed me what he |
| 19 | was doing with a swimming pool, and he was quite proud of -- |
| 20 | of the work that he was doing.  And we started talking, and |
| 21 | we exchanged phone numbers.  And he called me later, and we |
| 22 | started dating for a few years, and we were engaged for |
| 23 | about four or five years.  And then during that time he had |
| 24 | a bookkeeper that left, and so he got someone else but he |
| 25 | asked me to do it.  I told him I couldn't, so he found |

1    someone else.  And as we were engaged, he came back to me

2    and he said would I please do his books for him?  And I

3    agreed as his fiance and good friend I would do that, and

4    started out on spreadsheets, and about shot myself.  It

5    was just more than I could do.  So I moved on, and

6    learned -- went to Pima College, took a class in QuickBooks

7    and learned how to take care of the books that way, and

8    worked with his accountant so that I would know how to track

9    things, and then present it to his accountant so his

10   accountant would do his taxes.

11 Q  So you have a -- would you say you have a detailed

12   understanding of the workings of his business?

13 A  Yes, I do.

14 Q  Can you explain what his business is, and how many employees

15   he has at -- at times?

16 A  Yes, his business is a power washing, and garage coating,

17   and window washing services, and he's had as many as six

18   employees over the years at one time, and he has -- I -- I

19   have been participating with him not only as -- taking care

20   of his books, but also been out in the field with him,

21   helped him work at times, and I've also observed his

22   interaction with some of his customers, and friends.

23 Q  And how many vehicles does the company own?

24 A  The company owns four vehicles.

25 Q  And he is a licensed contractor?

1   A   Yes, he is.

2   Q   And he also has websites under Burns Power Washing Service,

3       LLC?

4   A   That's correct.

5   Q   And have you visited those websites?

6   A   Yes, I have.

7   Q   And do customers go ahead and put blogs, or comments on

8       those websites?

9   A   Yes.

10  Q   Now, have you been out on jobs where Todd has interacted

11      with customers?

12  A   Yes, I have.

13  Q   Have you specifically been on jobs, or know of your own

14      knowledge where a customer might have been dissatisfied with

15      the work that was done?

16  A   Yes, I have.

17  Q   And how did -- of your own knowledge -- did you go with Todd

18      on occasions like that?

19  A   Yes.  I know of five or six that I could recall right away

20      that I was --

21  Q   And what time span -- what time span does that cover?

22  A   Approximately back six or seven years, maybe eight years

23      ago, up through maybe three or four years ago.

24  Q   And how many customers was Todd servicing in a -- in a year?

25  A   Oh, over 100.  Maybe 150.  Maybe even 200.  I'm sorry, I

1      don't know the exact number, but --

2  Q   And roughly what was the business grossing in a year?

3  A   The business would gross approximately 300 to $350,000.

4  Q   Now, I want you to focus back on customers that were -- that

5      had some complaints where you were present.  I'd like you

6      to -- to focus, if you could, on specific instances, and

7      share with the Court and the government how Todd interacted

8      with those customers.

9  A   Yes.  I -- I can recall at least five, perhaps six, and

10     there were two in Green Valley, one in the far east side of

11     Tucson, one in Phoenix.  And I was involved with him when he

12     sold his -- or when he thought he had sold his Mini 500,

13     little helicopter.

14         So the job in -- one job in Green Valley where I went

15     with him, and so did my son, that the customer was unhappy.

16     There were paint chips that were inside the leaves of cactus

17     and trees that had little thorns and -- like, cactus trees.

18     And my son and I went with Todd down to Green Valley, and we

19     spent several hours cleaning up all those paint chips out

20     from in between all the cactus thorns.  And the owners came

21     out a few times, and went back in, and finally they came out

22     and they started offering us water.  And we began chatting

23     with them, and they were quite happy, and said that, you

24     know, they could see it was a lot of work, and they

25     appreciated that we came and took care of it all, and they

1       were quite satisfied when we left.

2   Q    What were some other instances where Todd responded to

3       complaints by customers that you were present at?

4   A    Another situation in Green Valley where a customer was not

5       happy, and Todd was going to drive down and visit with them

6       and asked me to ride along.  And we got there, and I stayed

7       in the car but we were parked close to the doorway.  So he

8       went to the door, and they -- they were expecting him

9       because he had called, and so as they chatted, he tried to

10      offer anything he could do to make things right.  And they

11      really didn't want him to do any more work, so he agreed to

12      return their money.  So we had brought a check, and he did

13      take the check up to them, and -- and I observed them

14      talking, and they were friendly, and they shook hands, and

15      Todd gave them the check.

16  Q    Was there a job on the east side that you -- that you

17      indicated?

18  A    Yes, on the far east side.  The company had done a coating

19      on a patio, and again, they were some unhappy customers, so

20      he asked if I would ride along.  We got there, and he asked

21      me to go in with him.  And he introduced me to the couple

22      that lived in the house.  And we went outside and looked at

23      the coating on the floor that his workers had done, and

24      there were some bubbles that Todd observed, and he said he

25      would take care of it all, or he could refund their money.

```
 1          The couple didn't want their money back.  They really wanted
 2          the job done right.  So Todd agreed to do that.  And we sat
 3          and chatted for a while, and when we left it was a very
 4          friendly departing.  And they came back, Todd himself, the
 5          next day, and they took care of all the bubbles, and made
 6          a -- made a satisfied customer.
 7     Q    And was there a Phoenix --
 8     A    Yes.
 9     Q    -- a Phoenix job also?
10     A    I went with Todd and his crew to Phoenix, and they did a --
11          a coating on a gentleman's patio.  And the gentleman wasn't
12          home, which he expected him not to be home, so he had told
13          us how to get into the back yard.  And the workers and Todd
14          were doing the coating, and the gentleman came home just as
15          we were finished, and he came out and looked, and said,
16          well, he was not real happy with a couple of things.  We got
17          some paint on the wall of the house, and -- I don't
18          remember.  A few other things.  But Todd offered to take
19          care of it, whatever it would be.  And we drove over to a
20          hardware store, and he purchased some more products, and we
21          went back to the gentleman's house and worked until
22          everything was to the customer's satisfaction.  And he was
23          pleased -- the customer was pleased, and thanked Todd for
24          being customer service oriented and focused on doing a
25          quality job.
```

1   Q   Do you know -- you know Todd very well, obviously?

2   A   Yes, I do.

3   Q   Do you know him to have a temper, or is he a pretty even --

4   A   Well, he does not have a temper.  I would say in my

5       relationship, in the time that I've known him, I probably

6       have more temper than he does.  And I will tell you there

7       was an incident that I was in a -- quite a bad way

8       emotionally for a lot of things, and he was at my home with

9       me, and I slapped his face, and he did nothing.  He just

10      looked at me, and did nothing.  And I reached out and held

11      him, and I was so sorry that I did that.  And he looked at

12      me, and he said, "Wow, that's -- nobody's ever done that to

13      me before."  But he was as gentle as anybody could be, and I

14      was the one that was tempered.

15  Q   Do you know him to be vindictive at all?

16  A   Never.

17  Q   Do you know him to be revengeful?

18  A   Never.

19  Q   Do you know him to be retaliatory in any way?

20  A   No.

21  Q   You mentioned that the helicopter -- did he have a

22      helicopter's license?

23  A   No.

24  Q   Okay, he had a helicopter, though?

25  A   Yes, he had a Mini 500.

```
 1   Q    And when was that helicopter sold?
 2   A    Well, he sold it twice.  I wanted to tell you about the
 3        first time he sold it to a -- a gentleman from another part
 4        of the country, back east, I believe, and the gentleman sent
 5        $20,000 to Todd in a cashier's check, and it was several
 6        weeks later the gentleman called, and he had changed his
 7        mind.  And Todd and I talked about it.  You know, he could
 8        have kept all or part of the money, but Todd returned the
 9        entire amount of money to the gentleman who did not want to
10        come take that helicopter.
11             MR. BOCK:  May I approach --
12             THE WITNESS:  So --
13             MR. BOCK:  May I approach the witness, your Honor?
14             THE COURT:  Yes.
15             THE WITNESS:  -- as a consequence, Todd had another
16   year and a half before he was able to sell that helicopter.
17   BY MR. BOCK:
18   Q    Let me show you what's been marked as Defendant's Exhibit
19        Number 43.
20             Does that look familiar to you?
21   A    Yes, it does.
22   Q    And in fact, did you provide that to me?
23   A    Yes, I did.
24   Q    And is that the bill of sale regarding the helicopter?
25   A    Yes, it is.
```

```
 1   Q    He doesn't own any other helicopters, is that correct?

 2   A    No, he does not.

 3             MR. BOCK:  May I retrieve that, your Honor?

 4             THE COURT:  Yes.

 5   BY MR. BOCK:

 6   Q    Do you know him to have any anti-Semitic attitudes, or

 7        thoughts?

 8   A    None.

 9   Q    Do you know -- are you familiar -- are you familiar with his

10        property?

11   A    Yes, I am.

12   Q    And how big -- how big a lot does he have?

13   A    Oh, I believe it's an acre.

14   Q    He lives on the west side of town?

15   A    Yes, he does.

16   Q    Has he expressed to you his dismay with his pack rat

17        problem?

18   A    Oh, yes.

19   Q    And has he also discussed with you efforts to eradicate the

20        pack rats?

21   A    Yes.

22   Q    And is it a constant problem that he faces?

23   A    He talks about it all the time.

24             MR. BOCK:  May I have one minute, your Honor?

25             THE COURT:  Yes, take your time.
```

1            MR. BOCK:  Nothing further.

2            Thank you, your Honor.

3            THE COURT:  All right.

4            Cross-examination?

5                        CROSS-EXAMINATION

6    BY MR. PIMSNER:

7    Q    Ms. Wilson, you've known Mr. Fries approximately 11 years,

8         is that correct?

9    A    Yes, that's correct.

10   Q    And you indicated that you were engaged.  You said it past

11        tense, so the engagement ended at some point?

12   A    That's correct.

13   Q    And when was that?

14   A    I'm sorry, I don't remember the year.  It's been two or

15        three, maybe four years since we've no longer been engaged.

16   Q    And -- so you have -- you would consider yourself -- you

17        still have feelings for Mr. Fries, correct?

18   A    Yes.

19   Q    And you maintain contact with him?

20   A    Absolutely.

21   Q    And what do you -- do you continue to work on his books?

22   A    Yes, I do.

23   Q    And do you have any other type of employment?

24   A    Yes.

25   Q    And what -- where do you work?

```
 1   A    I work for Carondelet Health Network.

 2   Q    And what are your hours for that?

 3   A    I'm an exempt associate, so my hours are pretty heavy.

 4   Q    So fair to say you probably work 10, 12 hours a day, is that

 5        correct?

 6   A    At least.

 7   Q    And when do you do Mr. Fries' books?

 8   A    On the weekends.

 9   Q    And so you don't regularly interact with Mr. Fries

10        throughout the week, correct?

11   A    He comes over once or twice a week, and just spends time

12        with me.

13   Q    Do you get paid for doing his books?

14   A    I do get paid to the degree of -- there are some expenses

15        that I incur, and Todd helps me with that, but he also pays

16        me in other ways of helping around the house with me, help

17        with my car, and --

18   Q    So you rely on Mr. Fries for a lot of things, correct?

19   A    Yes, I do.

20   Q    Now, you testified that approximately three or four years

21        ago you had gone out on a number of occasions with

22        dissatisfied -- regarding dissatisfied customers, correct?

23   A    That's correct.

24   Q    But that would have been back in, what, 2007 timeframe, or

25        earlier?
```

1    A    Earlier.

2    Q    So it's fair to say you haven't had any contact with

3         dissatisfied customers of Mr. Fries since -- since that

4         time?

5    A    No.  Personal contact, no.

6    Q    And has Mr. Fries ever talked to you about his issue that he

7         had with the Levines?

8    A    No, sir.

9    Q    About the -- that dissatisfied customer?

10   A    No.

11   Q    You testified that Mr. Fries -- I believe your statement was

12        not -- that he did not have a temper.  Are you aware that he

13        was charged with assault back in September of 2008?

14   A    No.

15   Q    Are you aware that the allegations against Mr. Fries is that

16        he produced a chemical weapon that created a chlorine cloud

17        the size of a football field that endangered a community?

18   A    That's what I read in the newspaper, and heard on the news.

19   Q    Are you aware that at the same time graffiti, and dead

20        animals, and oil were strewn around?

21   A    That's what I saw in the newspaper, and on the news.

22             (Government counsel conferred off the record.)

23   BY MR. PIMSNER:

24   Q    And do you have -- you've been to his house, correct?

25   A    Yes, I have.

```
 1   Q    And you're aware that Mr. Fries regularly kills woodpeckers
 2        that are in and around his yard?
 3               MR. BOCK:  Objection, your Honor.
 4               THE WITNESS:  Yes, I am.
 5               THE COURT:  Well, I'll allow the answer to stand.
 6               Go ahead.
 7   BY MR. PIMSNER:
 8   Q    And that he hangs up those dead woodpeckers throughout the
 9        yard?  Have you seen those?
10   A    No, I have not seen those.
11   Q    The helicopter that you discussed, when was that sale -- the
12        final sale?
13   A    The final sale was in 2009.
14   Q    Okay.  And are you aware that since 2009 Mr. Fries has
15        gotten another helicopter?
16   A    No.
17   Q    Did he ever discuss that with you?
18   A    No.
19               THE COURT:  Excuse me, Mr. Bock.  That microphone's
20   right there.  When you're speaking to your client, do you want to
21   push that microphone away?
22               MR. BOCK:  Oh --
23               THE COURT:  Yes, that microphone is very powerful, so
24   just push that away when you -- there you go.
25               MR. BOCK:  Sorry, your Honor.
```

1                    THE COURT:  Thank you.

2    BY MR. PIMSNER:

3    Q    Are you aware that his -- you said he does not possess any

4         type of a license to fly a helicopter?

5    A    No.

6                    MR. PIMSNER:  I have no further questions.

7                    THE COURT:  Any redirect?

8                    MR. BOCK:  Just some follow-up.

9                    THE COURT:  Go ahead.

10                   MR. BOCK:  Thank you.

11                        REDIRECT EXAMINATION

12   BY MR. BOCK:

13   Q    Are you aware of his commercial where he was in a

14        helicopter?

15   A    Yes.

16   Q    Could you explain to the government that -- what the

17        circumstances of that was, and when that took place?

18   A    Yes.  Todd took flight -- helicopter flying lessons at

19        Silver State Flight School.  I don't remember the year.  But

20        I used to go watch him when he would fly, first with his

21        flight instructor, and he graduated up to where he could fly

22        solo, and I believe he flew to Benson solo and back.  And so

23        he did ask his flight instructor if he could fly solo and

24        meet Channel 9 at a particular spot, and his flight

25        instructor gave him permission.  So he did do that.  He flew

1      to a spot, and Channel 9 was there, and they did film a

2      commercial with Todd flying off in his helicopter, which

3      was -- belonged --

4   Q   And the helicopter belonged to who?

5   A   Belonged to Silver State Helicopter Flight School.  As a

6      matter of fact, Todd and the flight instructor both got in

7      trouble for using the helicopter for a commercial, which

8      neither one of them knew was an issue.  But that was not

9      his -- his helicopter.  It belonged to Silver State.

10  Q   And do you know when that commercial was filmed, roughly?

11  A   I'm sorry, I can't remember when it was filmed.  It's been a

12     few years.

13  Q   Was it before he got his helicopter --

14  A   Yes, it was.

15  Q   -- that you talked about --

16  A   Yes, it was.

17  Q   -- that he sold?

18  A   Yes.

19  Q   Okay.  Thank you, then.

20  A   He enjoyed flying that.  It was an R22 for Silver State.  He

21     enjoyed flying so much that he looked until he found his

22     little Mini 500.  And then I told you the story about that.

23  Q   Do you think Todd's a flight risk?

24  A   Oh, no.

25  Q   Do you think Todd's a danger to the community?

1    A     No.

2              MR. BOCK:  Thank you.

3              THE COURT:  Thank you, ma'am.  You may step down and be

4    excused.

5              And Mr. Bock, you may call your next witness.

6              MR. BOCK:  My last witness, your Honor, is

7    Mr. Campbell.

8              And if I may approach your clerk, I have Exhibits 38

9    through 45.

10             THE COURT:  All right.

11             Any objection by the government for the admissibility

12   of these documents for the purposes of this hearing?

13             MR. PIMSNER:  No, your Honor.

14             THE COURT:  All right, 38 through 45 are admitted into

15   evidence for purposes of this hearing.

16             And sir, if you could come on up and have a seat on the

17   witness stand, please.

18             (The Court and clerk conferred off the record.)

19             THE COURT:  Go ahead, Mr. Bock.

20                            BRAD CAMPBELL

21                          DIRECT EXAMINATION

22   BY MR. BOCK:

23   Q    State your name, please.

24   A    Brad Campbell.

25   Q    And sir, what do you do for a living?

```
 1   A     I own a Honda and Acura service center.

 2   Q     Do you know Mr. Fries?

 3   A     Yes, I do.

 4   Q     Is he in the courtroom today?

 5   A     Yes, he is.

 6   Q     How long have you known him for?

 7   A     About 36, 37 years.

 8         MR. BOCK:  Stipulate to identification?

 9         MR. PIMSNER:  Yes, your Honor.

10   BY MR. BOCK:

11   Q     Tell the Court how you -- the length of time, what -- what

12         that includes with respect to Mr. Fries and yourself.

13   A     Well, we -- we met each other, like, in 1974 in junior high

14         school, and then we just went through high school.  We've

15         always hung out, and, you know, just -- you know, we've

16         always been friends.

17   Q     And you continue to be friends?

18   A     Yes.

19   Q     And what is your line of work, sir?

20   A     I service Honda and Acura automobiles.

21   Q     And do you work at -- do you have a -- is it a shop, or the

22         dealership?

23   A     It's a shop.

24   Q     Okay.  Now, I think I've asked you this, but did you ever

25         see Todd on a work assignment through his company?
```

1   A   Sure.  I'd get texts, and stuff like that, and -- you know,

2       he takes pictures of, you know -- of work, dangerous work,

3       and stuff like that.

4   Q   Is he proud of his business?

5   A   Yes, he is, very.

6   Q   Do you consider him one of your best friends?

7   A   He's a real good friend, yes.

8   Q   Do you socialize with him?

9   A   Yes.

10  Q   Have you ever seen him in any shape or form proclaim himself

11      to be an anti-Semite, or have -- anything in those terms?

12  A   No, he's always been a happy-go-lucky guy.

13  Q   Did you ever know him to be revenge -- revenge oriented?

14  A   Never.

15  Q   Have you ever known him to be vindictive?

16  A   Nope.

17  Q   Do you known him to have a temper?

18  A   I've never seen him mad in my life.

19  Q   Do you have an opinion as to whether or not he's truthful

20      and honest?

21  A   I would say yes, he is.

22  Q   What's your opinion based upon?

23  A   Just -- I've known the guy, and he's -- you know, he's never

24      lied to me.  And if I needed him, I know I could call him,

25      and he would help.  That's why I'm here today.

```
 1   Q    Did he ever complain about his business going under, or
 2        anything like that?
 3   A    Never.
 4   Q    Did you know him to have a -- a -- a good business?
 5   A    Yes.
 6   Q    A growing business?
 7   A    Yes.
 8   Q    Do you think he's a danger to the community?
 9   A    Not a chance.
10   Q    Do you think he's a flight risk?
11   A    Not a chance.
12             MR. BOCK:  Thank you.
13             THE COURT:  Okay.
14             Cross-examination?
15                         CROSS-EXAMINATION
16   BY MR. PIMSNER:
17   Q    Mr. Campbell, so you -- fair to say you've been childhood
18        friends?
19   A    Yes.
20   Q    So you have a very close relationship with Mr. Fries?
21   A    Yeah.  I would say so, yes.
22   Q    And you have -- you would do whatever you can to help him?
23   A    Yes.
24   Q    Do you -- you've been asked some questions regarding whether
25        Mr. Fries has -- has a temper.  Are you familiar with his
```

1           criminal history?

2     A     No.  As far as I know, he's never been in trouble for

3           anything.

4     Q     Are you aware that back on September 27, 2008, he was

5           charged with assault?

6     A     No.

7     Q     You testified that he was an honest person.  Are you aware

8           that back on September 27, 2008, he was also charged with

9           shoplifting?

10    A     Nope.

11    Q     Are you familiar with the allegations against Mr. Fries?

12    A     A little bit, but not really, just what, you know, I've read

13          on the news, and stuff like that.

14    Q     Are you aware that Mr. Fries is charged with detonating a

15          chemical weapon that -- that caused a football sized field

16          chlorine cloud to mask a neighborhood?

17    A     That's -- that's what I read, yes.

18    Q     Which required the evacuation of the neighborhood?

19    A     That's what I read.

20    Q     Are you aware also that dead animals, and oil, and graffiti

21          was placed all over the property involved?

22    A     That's what I read, yeah.

23              MR. PIMSNER:  I have nothing further, your Honor.

24              THE COURT:  Any redirect?

25              MR. BOCK:  No.  No thank you, your Honor.

1          THE COURT:  All right.

2          Thank you, sir.  You may step down and be excused, or

3     remain in the courtroom.

4          MR. BOCK:  Judge, this concludes the witnesses on

5     behalf of Mr. Fries.

6          THE COURT:  All right.

7          And has the government been able to see the exhibits

8     that Mr. Bock has offered?

9          MR. PIMSNER:  Yes, your Honor.

10         THE COURT:  All right, so let me just take a quick look

11    at your exhibits, and then -- oh, go ahead.

12         MR. BOCK:  One exhibit, Judge, is receipts from, I

13    think, Home Depot, and it kind of -- it shows that some of the

14    purchases were insect and rodent related.  That's the purpose of

15    that exhibit.

16         THE COURT:  That's Exhibit 41, I believe.

17         MR. BOCK:  Right, yes.  Thank you, your Honor.

18         THE COURT:  And let me just finish -- there are some

19    character reference letters here, so let me just finish reading

20    your exhibits.

21         All right, I've reviewed the exhibits.  And if there's

22    anything in particular, Mr. Bock, you want to refer me to in the

23    exhibits, I'm certain you will do that in your argument, but I've

24    reviewed the exhibits.

25         And then, Mr. Bock, any additional witnesses that you

1    would like to present?

2            MR. BOCK:  No, your Honor.

3            THE COURT:  Any rebuttal witnesses on behalf of the

4    government?

5            MS. ANDERSON:  No, your Honor.

6            THE COURT:  All right.

7            So Mr. Bock, do you want to be heard, then, regarding

8    your motion to vacate the detention order?

9            MR. BOCK:  Thank you.

10           Judge, we had a -- we -- as you know, we had a two day

11   hearing in front of the Honorable Judge Estrada, and at the very

12   end of the hearing the Honorable Judge said the following, and

13   I -- I wrote it word-for-word from the -- from the transcript.

14   He said:  *And I'm going to make a finding that by more than clear*

15   *and convincing evidence, sir, that you are the individual*

16   *responsible for these things, and that you should be detained*

17   *without benefit of a bond pending resolution of this case.*

18           Now --

19           THE COURT:  What page -- I have the transcript here.

20   Do you have a page and a line, just in case the government wants

21   to respond?

22           Page 34, I think the Court starts talking -- the judge

23   starts talking --

24           MR. BOCK:  Okay, Judge.  That would be on the

25   transcript of May the 20th, and it would be on page 39.

1                    THE COURT:  All right.

2                    MR. BOCK:  And it would be on line 12, and --

3                    THE COURT:  All right.

4                    MR. BOCK:  -- excuse me, line 11 -- well, 10 says and.

5       That's where I started.  So it would be 10, 11, through 14.

6                    THE COURT:  Yes.  All right, I see that.  Thank you.

7                    MR. BOCK:  Now, it was my impression after the hearing

8       that the Court had made a finding of dangerousness, because the

9       Court really didn't say anything about flight risk.  But when I

10      looked at the -- the order of detention, the -- the Honorable

11      Judge had checked serious risk not to appear.

12                   And then in the Court's order of June the 10th, the

13      Court found by a preponderance of the evidence the fact that he

14      had a helicopter, and a certain amount of cash.

15                   First of all, he doesn't own the helicopter anymore.

16      The helicopter had been sold some time ago.  If there was any

17      misconception, it was a helicopter that Ms. Wilson has testified

18      to that was the product of a -- a commercial that was not his

19      helicopter, but used to promote his business.  So he has no

20      helicopter.

21                   He has no warrants.

22                   He has no failures to appear.

23                   They talk about assault conviction -- they talk about

24      assault, but they don't talk about convictions.

25                   I represented him on the matters in City Court, and he

1    completed diversion.  Those were the City Court matters.

2          He has substantial ties to the community.

3          He's a businessman.

4          He owns his own property.

5          He has his own residence.

6          And he's a citizen.

7          So Judge, I don't think from my perspective that a

8    flight risk has been shown by a preponderance of the evidence.

9          Now, as to dangerousness, I'm not here to try the whole

10   case.  Obviously, the state -- excuse me, the government has

11   talked about other acts.  It's talked about an act that's even

12   subsequent to the -- to the timeframe of the indictment, an act

13   involving an individual that took place in April of 2010 -- or

14   May of 2010, and April of 2011.

15         The first act that the government wants to use as other

16   act evidence was an act of October 31st, on a Halloween, of 2008.

17   No claim that that involves any type of federal situation, nor

18   the events subsequent to the -- to the timeframe of the

19   indictment.

20         The -- there are issues as to whether or not this cloud

21   was actually a toxic cloud, or a -- just a cloud that would cause

22   irritation.  Those are going to be issues that are going to be

23   litigated; issues regarding the search warrant, issues regarding

24   jurisdiction, federal jurisdiction as to the nature of this

25   offense.  But again, that's for a later time.

1            But Pretrial Services, Judge, gave him a very positive

2    report, and I do believe, your Honor, that there are a

3    combination of factors that would satisfy, and I use the word

4    assure, his appearance, and safety to the community, which would

5    include -- and we're willing to include a GPS; ankle bracelet; a

6    curfew, if the Court feels a curfew is necessary; a third party

7    custodian; and a personal appearance and/or surety bond.

8            His mother's here.

9            If you would stand up?

10           And his fiance is here, who lives on his property.

11           The government -- thank you.

12           THE COURT:  Thank you.  You may be seated.

13           MR. BOCK:  The government is talking about -- and they

14    gave me some document on these explosive devices.  There's no

15    claim that explosive devices were ever used in any of the

16    allegations, and I proffered to the -- to the Honorable Judge

17    Estrada that these devices were no more than a means to try and

18    eradicate pack rats.  And the government has put their spin on

19    this, that these things are devices that fragment.  And he's had

20    these devices.  There's no showing that these things were ever

21    exploded anyplace, other than, perhaps, in a pack rat hole.

22           So I know the government's going to talk about that in

23    terms of some type of dangerousness, but the pictures that were

24    submitted, these look like big firecrackers and cherry bombs.

25    And they had an expert come in and say, well, the powder is more

1    than you can normally buy.  I don't buy fireworks, but if you go

2    to New Mexico, you buy fireworks all over the place.

3            So Judge, I do think that this case, too, has generated

4    a lot of publicity.  In fact, the search warrant -- when the

5    search warrant was released on this case, it was on the 6:00

6    news, the lead story, and it was next to the search warrant that

7    was released by the sheriff's department on that individual where

8    there was a claim that he was shot 22 times or something by

9    the -- by the SWAT team.  So the case has generated a lot of

10   publicity.

11           But this -- where's this individual going to go?  He's

12   not going to go anyplace.  And there are a combination, as I

13   indicated -- and I'm not going to start to be repetitive because

14   we appreciate the time you've given us for this appeal, but there

15   are certainly conditions, Judge, that would ensure any concerns

16   that -- that the Court may have to -- not only in terms of the

17   safety to the community, but also as to all court appearances.

18           Thank you.

19           THE COURT:  All right, Mr. Bock.  Let me just ask you,

20   in your reply you indicated that you felt that the Court can't

21   consider uncharged conduct, or other acts or circumstances in

22   evaluating whether or not detention's appropriate, and it seems

23   that the statute clearly says that the Court should look to past

24   conduct.  I mean, it says past conduct right in the statute.

25           So would you -- do you still feel that I can only

1    consider conduct that's charged in an indictment?  Obviously,

2    hopefully, the evidence that's presented to the Court is

3    reliable.  And there may be disputes about the weight of the

4    evidence, or the quality of the evidence, but you're not really

5    saying that the Court can only look at the indictment and nothing

6    else about your client, good or bad, in evaluating the magistrate

7    judge's detention order?

8           MR. BOCK:  Well, I hear what you're saying, so I don't

9    want to disagree with you now, but --

10           THE COURT:  Well, you say in your motion that *the*

11    *government offers no authority for the proposition that the Court*

12    *may consider uncharged conduct in making a pretrial detention*

13    *determination.*  I mean, is that what you're really saying, or --

14           MR. BOCK:  Well, I guess I -- I might backtrack on that

15    a little bit, then, your Honor --

16           THE COURT:  Okay.

17           MR. BOCK:  -- but what I was trying to say, though, is

18    that the -- the other conduct is outside the timeframe of the

19    indictment, and the earlier conduct that's alleged of the -- of

20    October 31st, and conduct that's alleged of the 2010 and 2011

21    situation did not involve a situation that is embodied within the

22    indictment.  So I don't know how much weight, you know, is to be

23    applied to that or not.

24           And of course, again, I think, obviously, the

25    government is going to complain that my client had some type of

1    vendetta, or whatever, but this is not the time to try the case.

2    This is just the time to try to see whether or not conditions of

3    release can be offered by a defendant that would satisfy the

4    Court, and I think, Judge, we -- with all due respect to the

5    Court, have put on a presentation that satisfies the fact that he

6    would not go anyplace, and that he would not be a danger to the

7    community.

8          Of course, we're denying the allegations, but like I

9    say, this is a preliminary matter regarding release, and that's

10   why I pointed out with -- what the Judge said that, you know,

11   you're the individual responsible for these things.  And like I

12   say, it's not a trial.  It's just to -- you know, to see whether

13   or not he's going to show up, and any claims of the type of

14   conduct will not be repeated.

15         Again, we're not admitting or conceding to anything,

16   but, you know, I do think that he's amenable to Pretrial Service,

17   and a bond, and whatever other conditions the Court feels would

18   be appropriate.

19         THE COURT:  All right.  Thank you, Mr. Bock.

20         MR. BOCK:  Thank you, your Honor.

21         THE COURT:  Let's see, for the government --

22   Ms. Anderson?

23         MS. ANDERSON:  Your Honor, obviously the government

24   disagrees with Mr. Bock's assessment.  The defendant's been

25   indicted on two counts of prohibition against chemical weapon in

1    violation of 18 U.S.C. 229, and 18 U.S.C. 2.

2            Now, the events -- or what's alleged in the indictment

3    are the events that occurred in August of 2009.  However, all of

4    these events began, your Honor, in February of 2008 when the

5    Levines hired the defendant to come to their home in Dove

6    Mountain and resurface their driveway.  And Mr. Fries did the

7    work.  The Levines were unhappy with the work that he did.  He

8    redid the work, the Levines were still unhappy with the quality

9    of the work, and the Levines refused to pay the total amount that

10   was due Mr. Fries based on their unhappiness.  They withheld $200

11   in the installment payments that were due.

12           The next event that occurred, your Honor, was on

13   October 31st, 2008, when the Levines woke up to find that they

14   had been the victim of what appeared at that time to be a hate

15   crime.

16           And your Honor, if you look at the exhibits that the

17   government presented at the original detention hearing, you'll

18   see that these photographs that pertain to the '08 incident are

19   Exhibits 1 through 8.  The Levines came out that morning to find

20   that motor oil, plastic peanuts, feces, dead animals,

21   woodpeckers, had been strewn all over their driveway.  In

22   addition, your Honor, there had been some anti-Semitic graffiti

23   that was sprayed on their -- on their driveway, in addition to

24   their garage door, which by the way had -- was sealed shut.  And

25   also, on their front door -- some graffiti had been spray painted

1    on their door as well.

2              The Levines actually moved from that residence to

3    another location near Omni National Golf Course -- but let me

4    back up, first.  There was some identification belonging to a

5    woman named Kalyn Hovey that was found at the scene.  Kalyn Hovey

6    was interviewed.  She had absolutely nothing to do with

7    Mr. Fries, nothing to do with the Levines, nothing to do with

8    this incident whatsoever.  In fact, her identification had been

9    stolen from her vehicle when she was in a car accident earlier.

10             Then the next event that occurred, your Honor, was the

11   2009 incident, and this was almost an identical repeat of the '08

12   incident, except for the chemical weapons that Mr. Fries planted

13   at the Levine's residence.  But let me back up again to the '08

14   incident.  Mr. Fries' fingerprints were found on a bucket that

15   was left at the scene of the Levine's residence.

16             Back again to the '09 incident, at 5:00 in the morning

17   the first responders, the Pima County Sheriff's Department

18   received 9-1-1 calls about what appeared to be some kind of a

19   pesticide, or some kind of a chemical that was released in the

20   neighborhood.  They responded to that particular neighborhood.

21   They got out of their vehicles, and they immediately smelled the

22   strong chlorine smell.  They immediately felt the effects of the

23   chlorine.  Their noses started to burn.  Their throats started to

24   burn.  Their eyes started to burn.

25             In order to do their jobs, the first responders had to

1    put on emergency gear just so that they could breathe, and

2    help -- help others evacuate the neighborhood.

3              There was this cloud that was hovering over the

4    neighborhood, a chlorine cloud, and it was the size of a football

5    field.  And they traced it back to the Levine's residence.

6              And when they got to the Levine's residence what they

7    found, your Honor, is what's shown in Government's Exhibits

8    Number 10 through 18.  And once again, similar to the '08

9    incident what they found was motor oil that was spread all over

10   the driveway.  They found these foam peanuts that were on the

11   driveway.  They found buckets that were overturned.  They found

12   feces.  They found dead woodpeckers, dead animals.  They found,

13   once again, the graffiti that was spray painted on the Levine's

14   garage door, on the house itself, and on the door.  And once

15   again, every single point of escape for the Levines in the front

16   of the house was sealed up.  The door was sealed up.  The windows

17   were sealed up.  The only way that the Levines could escape from

18   their house was through the back door.

19             First responders also found two chemical weapon devices

20   at the Levine's.  The first one was directly in front of the

21   garage door, and it consisted of three to four buckets.  It

22   appeared to be three to four buckets that had completely

23   disintegrated, your Honor, based on the heat and the chemical

24   reaction that occurred.

25             If you look at Government's Exhibit Number 11, you can

1    see that there was a fire that also took place as a result of

2    device number -- number one.  It endangered not only the Levines

3    in their home, but it endangered the neighbors -- the Levine's

4    neighbors, and everybody else in the community.

5              In the back of the Levine's house on the back porch was

6    device number two, and device number two was similar to device

7    number one, however device number two did not completely melt.

8    It melted probably about two thirds of the way.  And you can see

9    that device in Government's Exhibit Number 15.

10             Now, items -- portions of these two devices were sent

11   off to the lab to be analyzed, and Bob Rooney from the -- from

12   the F.B.I. Firearms Lab concluded that the components of the

13   chemical device was, in fact, a chlorine type product which was

14   mixed with another component that created this chemical reaction

15   that started a fire, and created this cloud that wafted all over

16   the neighborhood.

17             And it's fortunate, your Honor, that the Levines were

18   able to get out of their house through the assistance of the

19   sheriff's department, and the whole neighborhood was evacuated.

20   And based on the fact that the wind was blowing in a certain

21   direction, your Honor, the cloud went off into a wash, and it

22   dissipated.

23             And there were some folks that were taken to the

24   hospital, but fortunately, nobody was seriously injured.

25             Your Honor, at the detention hearing the government

1    also presented evidence regarding an incident that had occurred

2    in 2010 with another woman who also had hired Mr. Fries to do

3    some work on her house, and she was not happy with the quality of

4    the work that was done, and she too refused to pay Mr. Fries the

5    total amount for the job.  And back in 0 -- in 2009 she came out

6    and found that some glue had been poured on her windshield, some

7    glue had been poured into her gasoline tanks.  And also in 2011,

8    your Honor, she came out, and she found a scene similar to what

9    the Levines discovered in 2008, and also 2009.

10           THE COURT:  Let me just -- Ms. Brown's first incident

11    was 2010?  I thought you said 2009.

12           MS. ANDERSON:  Actually, I believe it was 2010, your

13    Honor, and actually, the event -- the event occurred in 2011 with

14    the oil on her --

15           THE COURT:  April 28th of 2011?

16           MS. ANDERSON:  Correct.  That's correct, your Honor.

17           Your Honor, we executed a search warrant on Mr. Fries'

18    house on May 13th of 2011, and we found -- the F.B.I. found 37

19    weapons, $40,000 in cash, a passport, and your Honor, they also

20    found numerous books on how to get revenge against people.  And

21    in flipping through some of these books on revenge, a couple of

22    recipes were located in the book that appeared to be similar to

23    the 24 IED's that were found in Mr. Fries' dresser.  And once

24    again, these were 24 IED's.  Three of those 24 IED's were devices

25    that contained BBs on them.  They had shrapnel on them.  And we

1    had Special Agent Jay Henze, who's a bomb technician, testify at

2    the detention hearing regarding not only all of the IED's, but in

3    particular these three IED's that were located during the search

4    warrant.

5              Based on Special Agent Henze's opinions, his training

6    and experience, there is no legitimate or lawful reason to have

7    these IED's.  They're illegal, they're unlawful, and they're

8    dangerous.

9              Furthermore, your Honor, we sent one of the devices off

10   to the F.B.I. Lab for analysis, and we recently -- in fact, I

11   believe it was yesterday we got a report back from the F.B.I.

12   Lab, and I provided defense counsel with a copy of that report

13   before we began the hearing today.

14             And your Honor, I have this marked as an exhibit, and I

15   can provide a copy to the Court, but their conclusion after

16   analyzing this IED, your Honor, that was found in the defendant's

17   home, *the* -- if I could read it to the Court?

18             THE COURT:  Sure.  Go ahead.

19             MS. ANDERSON:  *The IED consists of the disassembled*

20   *remains of a cardboard tube, low explosive mixture, hobby type*

21   *fuse, and copper plated metal balls.  The IED is designed to*

22   *function by igniting the fuse.  When a fuse in this instance is*

23   *ignited, initiating the firing train, the spit of flame from the*

24   *burning fuse would reach the low explosive mixture causing it to*

25   *ignite.  The gases generated by the ignition of the low explosive*

1   *mixture would cause a pressure build-up as a result of the*

2   *confinement within the cardboard tube.  This pressure would*

3   *overcome the strength of the cardboard tube and cause an*

4   *explosion.  This explosion would cause the copper plated metal*

5   *balls to travel outwards with great velocity.  This action could*

6   *result in personal property damage, injuries to personnel, and*

7   *even death.*

8           And your Honor, based on these 24 IED's that were found

9   in the defendant's house, the defendant is potentially facing new

10  charges, new federal charges being added.

11          Next I'd like to turn to the statutes that pertain to

12  the issue of detention.  Your Honor, there is a presumption --

13  actually, there's a presumption three times over that favors

14  detention in this matter.

15          Number one, this is a crime of violence pursuant to

16  3142(f)(1)(A).  Next, it involved a dangerous weapon pursuant to

17  3142(f)(1)(E).  And finally, this is a federal crime of terrorism

18  pursuant to 3142(e).

19          Again, the government has the burden of proving

20  dangerousness by clear and convincing, and flight by a

21  preponderance of the evidence.

22          The government is not convinced that Mr. Fries does not

23  have a -- a helicopter at this point.  But your Honor, helicopter

24  aside, Mr. Fries -- we obviously live very close to the border.

25  Mr. Fries had $40,000 in cash in his home when we executed the

1    search warrant.  He had 37 weapons in his homes -- in his home,

2    and he had a passport.  The government believes that we have

3    proven by a preponderance of the evidence that he is a flight

4    risk.

5              Finally, as to dangerousness, your Honor, this is an

6    individual who engaged in these extremely serious actions, and

7    endangered the Levines, the neighborhood, the community, the

8    first responders all over a matter in a dispute over $200, which

9    is -- is terribly minimal.  And I think that speaks volumes

10   regarding the kind of individual that we're dealing with here.

11   We're dealing with an individual who's extremely vengeful.  We

12   know that based on his actions, but also based on all of the

13   books that he had in his home when we executed the search

14   warrant, all of the revenge books that he had in his home.

15             Your Honor, based on all of the evidence, and all of

16   the exhibits, and the pleadings it's the government's belief that

17   there are no set of conditions, no set of -- of conditions that

18   could be imposed to ensure Mr. Fries' attendance at future court

19   hearings, or the safety of this community.

20             Thank you.

21             THE COURT:  Thank you, Ms. Anderson.

22             Any rebuttal, Mr. Bock?

23             MR. BOCK:  Yes, thank you, your Honor.

24             First of all, again, my initial motion to vacate

25   decision on page 4, I said:  *Initially, an allegation of*

1    *dangerous unrelated to the federal charges is not a sufficient*

2    *basis for detention.*  I cited two cases.  Also, *the weight of the*

3    *evidence against the accused is one factor to be considered at*

4    *the detention hearing*, citing cases, *but it is the least*

5    *significant factor.*

6                Judge --

7                THE COURT:  So you don't think under the statute that

8    there's a presumption of detention?

9                MR. BOCK:  I'm sorry?

10               THE COURT:  You don't think under the statute, 3142(f),

11   that there's a presumption of detention, which can certainly be

12   overcome, but -- you don't think this is one of those cases given

13   the nature of the charges of a presumption of detention?

14               MR. BOCK:  No, I don't think there is a presumption.  I

15   looked at the penalties, it says a year, or fine.  I don't -- I

16   don't think there's a mandatory -- mandatory time.

17               THE COURT:  No, it's not -- the time doesn't have to be

18   mandatory.

19               MR. BOCK:  Right, I -- and Judge, here's a person --

20   the government is painting this picture against this -- against

21   this person of all of these acts.  Here's a person that has a

22   good business; an ongoing business; has people working for him;

23   has owned weapons; no allegations that he's used weapons; no

24   allegation that he's ever exploded these weapons now that the

25   government is -- is proffering.  And the whole situation is the

1    Levines apparently stopped payment on a check of a couple hundred
2    dollars.  Makes sense that this individual is going to risk all
3    of these things over a couple hundred dollars?
4            I know the -- what the government's position is, but
5    Pretrial, again, Judge -- and we rely on Pretrial.  Certainly, if
6    the government got a report from Pretrial that said that there
7    are no conditions that are favorable to any type of release, the
8    government would be -- that would be one of the cornerstones of
9    their argument, but that's not the case.
10           And I do think, Judge, that you can afford conditions,
11   again, that will protect the community from the allegations the
12   government is making, just allegations, and ensure that he will
13   be present at all his court appearances.
14           I will tell you that when I represented him in City
15   Court, he was -- had -- I had good contact with him, and there
16   was never any -- any issues whatsoever.
17           So again, Judge, I would ask that you -- that you
18   vacate the order of the Honorable Judge Estrada, and go ahead and
19   formulate a combination of conditions.
20           Thank you.
21           THE COURT:  All right, thank you, Mr. Bock.
22           The Court has considered the testimony presented today,
23   the argument of counsel, the exhibits, the Pretrial Services
24   report which was prepared, the Court notes, prior to the
25   evidentiary hearing before the magistrate judge, and obviously

1    does not and cannot include all the underlying facts and details

2    that were presented by the government based on the government's

3    information of the case.

4            Further, the Court notes the charges, and the exhibits,

5    and testimony, and argument presented at the previous hearing.

6            This is, obviously, a de novo, or new review of the

7    previous judge's order which was a -- stated in court, but it's a

8    12 page order, Document 25, filed by the -- Magistrate Judge

9    Estrada.  So the Court notes that order.

10           This Court needs to review it de novo, and determine

11   whether there are conditions of release that will reasonably

12   assure the appearance of the person, of the defendant, and the

13   safety of any other person, and the community.

14           I think that -- I agree with the government that there

15   is a presumption of detention in this case for the reasons stated

16   by the government.  This obviously -- because of the nature of

17   the charges themselves as outlined by the government.  Certainly,

18   this is, as alleged in 3142(f)(1)(E) if it's not as charged a

19   crime of violence, then it involves, certainly, a destructive

20   device, or any other dangerous weapon as alleged in the

21   indictment.  So the Court finds that the presumption of detention

22   given the nature of the charges does exist.

23           The Court looks to the nature and circumstances of the

24   offense charged.  Obviously, the defendant is presumed innocent,

25   and is not presumed guilty of anything until a jury finds beyond

1    a reasonable doubt that the government has met its burden of

2    proof at a trial.  Nonetheless, the Court needs -- for purposes

3    of this analysis, the Court needs to look at the nature and

4    circumstances of the offense, and the evidence that the

5    government has to support that.  The statute says the Court's to

6    look to the weight of the evidence against the person.

7            The Court has considered that.  The Court finds that

8    the weight of the evidence presented by the government --

9    obviously, not here today, but previously at the -- at the

10   previous hearing, that there is substantial weight of evidence

11   against the defendant in this case.  I'm not going to go through

12   all of it.  It's thoroughly outlined in the previous transcript,

13   and the magistrate judge's order, Document 25, which was docketed

14   on June 13th of 2011.

15           Further, the Court needs to note the nature and

16   circumstances of the offense charged.  These are obviously very,

17   very serious allegations, very dangerous, potentially --

18   potentially very dangerous allegations as listed in the

19   indictment, and as presented at the hearing.

20           So the Court looks to those factors, and the Court

21   finds that the weight of the evidence against the defendant, as

22   well as the nature and circumstances of the offenses charged

23   militate in favor of detention.

24           The history and characteristics of the person, of the

25   defendant, including all of his history and characteristics.

1    Obviously, the defendant has substantial community ties.  He has

2    a business here, people testifying on his behalf at this hearing.

3    He lives here.  The Court notes all of that.

4              Further, the negatives relating to history and his

5    characteristics are the criminal history, which has been outlined

6    in the Pretrial Services report.  There is -- the Court doesn't

7    find that to be an overwhelmingly important factor.  Although

8    there is some criminal history, there are no felony convictions

9    here, however.  So the defendant -- there's no question he has

10   strong financial ties, and strong personal ties to Tucson.  So

11   the Court notes that.

12             Further, however, the Court needs to look at the other

13   factors, including other conduct of the defendant which the Court

14   notes was presented by the government extensively, other

15   incidents not charged in the indictment, but clearly this

16   defendant is linked to those other incidents as outlined in the

17   previous testimony, and again, I'm not going to go over those

18   details.  Ms. Anderson has covered some of that today.  That's

19   very thoroughly covered in Magistrate Judge Estrada's order.

20             So the Court looks at not only the defendant's very

21   strong ties to the community, which is a positive thing for

22   purposes of evaluating whether there are conditions of release

23   the Court can set, but further, the Court looks to other conduct

24   which has been -- the Court finds that the government has met its

25   burden of proof to show that there is other very negative conduct

1    which militates against a finding that there are conditions which

2    this Court can set that can reasonably assure his appearance, and

3    also the safety of the community.

4            So the Court has looked at all of the defendant's ties,

5    and also the other acts surrounding these incidents that the

6    government has presented through testimony at the previous

7    hearing.

8            Further, the Court looks at the nature and seriousness

9    of the danger to any person or the community that would be posed

10   by the person's release.  Obviously, we have the allegations

11   presented by the government.  The testimony presented by the

12   government are very serious incidents that could have either

13   seriously injured or killed the intended recipients of the

14   conduct.

15           So the Court finds that the nature of the allegations

16   and the incidents that were presented by the government at the

17   previous hearing do present a very serious danger to the

18   individuals and to the community at large due to the nature of

19   the materials, the gas cloud that was described by the government

20   at the previous hearing.  So it's not just the intended victims,

21   but also anybody in the surrounding area was at great risk due to

22   the nature of the chemical products as described previously.

23           So the Court -- counsel have properly outlined the

24   burden of proof.  The Court in its discretion finds that the

25   government has met its burden of proof, and -- to find that there

1    are -- and the Court finds that there are no conditions of

2    release that can reasonably assure the appearance of this

3    defendant for the reasons stated by the magistrate judge, or the

4    safety of the community if the defendant were to be released.

5              So the Court finds that there -- the presumption of

6    detention which exists due to the nature of these charges has not

7    been overcome by the defendant, and further, that the government

8    has otherwise met its burden of proof supporting the magistrate

9    judge's previous order of detention.

10             So the Court will affirm that order of detention.

11             So is there anything further, Mr. Bock, from your

12   perspective at this time?

13             MR. BOCK:  No, your Honor.

14             THE COURT:  Anything further from the government?

15             MS. ANDERSON:  No, your Honor.

16             THE COURT:  All right, then we'll stand at recess on

17   this matter.

18   (3:57 p.m.)

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2          I, Mary A. Riley, do hereby certify that I

3    stenographically reported the foregoing proceedings to the best

4    of my skill and ability, and that the same was transcribed by me

5    via computer-aided transcription, and that the foregoing pages of

6    typewritten matter are a true, correct and complete transcript of

7    all the proceedings had, as set forth in the title page hereto.

8          Dated this 9th day of July, 2011.

9

10                                        s/ Mary A. Riley

11                                United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25