# EXHIBIT #1

# UNITED STATES DISTRICT COURT

## *District of Arizona*

### In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

**SEARCH WARRANT**

•A single-story residence and associated buildings, garages and sheds located at 5560 West El Camino Del Cerro, Tucson, Arizona;
•See attached sheet for vehicle descriptions, license plate numbers and vehicle identification numbers

Case Number: **11 - 0 0 5 0 9 M**

TO:   Federal Bureau of Investigation and any Authorized Officer of the United States

Affidavit(s) having been made before me by affiant, Brian C. Nowak, who has reason to believe that /_ / on the person of or /X/ on the premises known as:

### See Attachment "A" incorporated by reference herein

In the District of Arizona there is now concealed a certain person or property, namely (describe the person or property)

### See Attachment "B" incorporated by reference herein

which is (give alleged grounds for search and seizure under Rule 41(c) of the Federal Rules of Criminal Procedure)

XX  evidence of a crime;
  XX    contraband, the fruits of crime, or other items illegally possessed;
  XX    property designed or intended for use or used in committing a crime; or
_____ a person to be arrested or a person who is unlawfully restrained.

in violation of Title(s) 18, United States Code, Section(s) 229(a) and 2.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before ___MM 23,2011___
                                                                    Date
(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime 6:00 a.m. to 10:00 p.m.) (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to __HECTOR C. ESTRADA__ as required by law.
                            United States Judge or Magistrate Judge

___5-12-11 @___                    at    ___Tucson, Arizona___
Date and Time Issued                      City and State

U.S. MAGISTRATE JUDGE
HECTOR C. ESTRADA                         __Hector C. Estrada__
Name and Title of Judicial Officer        Signature of Judicial Officer

63

| RETURN | | |
|---|---|---|
| DATE WARRANT RECEIVED<br>5/12/2011 | DATE AND TIME WARRANT EXECUTED<br>5/13/2011 | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH<br>*Copy left in kitchen of residence* |

**INVENTORY MADE IN THE PRESENCE OF**

*SA Shannon Gonzalez ; SA Scott Hunter.*

**INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT**

*See attached 10 sheets of FBI form FD-597 documenting items taken.*

## CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____    _____
U.S. JUDGE OR MAGISTRATE JUDGE         DATE

SEARCH WARRANT

Case Number     11-00509M

## VEHICLE DESCRIPTIONS, LICENSE PLATE NUMBERS AND VEHICLE IDENTIFICATION NUMBERS

- 1972 Ford Pickup truck, license plate 474RPM; VIN F10YLM80820

- 1995 Oldsmobile, license plate ABY2124; VIN 1G3AJ55MXS6389241

- 2006 Nissan pickup truck, license plate PWRWSH; VIN 1N6AA07A36N510254

- 2006 Nissan pickup truck, license plate PWRWSH3; VIN 1N6AA06A16N501229

- 1972 Ford Mustang Mach I, license plate 72MCH1; VIN 2F02F234992

- 2007 Mitsubishi Fuso, license plate CE81589; VIN JL6BBG1S77K016830.

- 2007 Mitsubishi Fuso, license plate; CE60745; VIN JL6BDH1SX7K000217

- 2004 Ford F250 pickup truck, license plate CG46360; VIN 1FTNW21PO4EB73716

FD-597 (Rev 8-11-94)                                                Page _1_ of _3_

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _279A-PX-84038_

On (date) _05/13/2011_                          item(s) listed below were:
                                                ☐ Received From
                                                ☐ Returned To
                                                ☐ Released To
                                                ☒ Seized

(Name)_ Todd Russell Fries_

(Street Address) _5560 West El Camino del Cerro, Tucson, AZ_

(City)_ Tucson_

Description of Item(s): 1) Compaq Presario 2100 laptop s/n CNF4241J563 with
power cord and wifi card

   2) HP mini 110 computer  s/n CNU9378DMW

   3) Black generic computer tower, no serial number

4a) Az DL for Linda A. Motta; car insurance card for Motta; BCBS
   insurance card for Motta; costco card for Motta; safeway card;
   black pouch

4b) Wells Fargo Security badge #4416; security special officer
   badge

4c) Samsung cell phone in case; imei #352244/00/114736/0
   s/n R8WW968129V

4d) Sony icd-B120 ic recorder

4e) Bank of America visa debit card for Linda A. Motta;
   intelligent laundry systems cash card

5) Sandisk 4GB compact Flashcard

6) Gila woodpecker carcasses

7) Sony ic recorder ICDB300

8) (1) loose media

9) Dell PP08L; service tag #3CLBF61

10) (2) loose media

Received By: _(Signature)_        Received From: _____
           (Signature)                        (Signature)

FD-597 (Rev 8-11-94)

Page __2__ of __3__

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # __279A-PX-84038__

On (date) __5/13/2011__

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) Todd Russell Fries

(Street Address) 5560 West El Camino del Cerro

(City) Tucson

Description of Item(s):

11) Spoofcard - $10

12) Boss voice Transformer VT-1 with headset and AC adapter

13) The Anarchist Black Book

14) LG cell phone, silver and maroon, HEX # 1F5ECADB

15) LG cell phone, silver and maroon, HEX # 23A689E3

16) Encyclopedia of Revenge

17) Book titled "Up Yours Guide to Advanced Revenge Techniques"

18) (16) Spoofcards

19) Refinancing paperwork for 515 E. Grant, Burns Power Washing

20) (1) loose media in sleeve

21) (1) loose media titled "Burns artwork" in sleeve

22) (8) miscellaneous revenge titled books

23) business reciepts for Burns Power Washing

24) business reciepts for Burns Power Washing

25) (6) miscellaneous books about lock picking, revenge, ID theft, explosives and demolitions

26) (not taken)

27) (2) Home Depot charge cards for Todd Fries and Burns Power Washing

28) sony MP120 tape found in video camera

Received By: _(signature)_    Received From: _____

(Signature)                                    (Signature)

67

FD-597 (Rev 8-11-94)                                                    Page __3__ of __3__

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # __279A-PX-84038__

On (date) __5/13/2011__                           item(s) listed below were:
                                                  ☐ Received From
                                                  ☐ Returned To
                                                  ☐ Released To
                                                  ☐ Seized

(Name) Todd Russell Fries

(Street Address) 5560 West El Camino del Cerro

(City) Tucson

Description of Item(s): 29) Residue coated BB's

30) reciepts for chemical purchases

31) business reciepts for Burns Power Washing

32) copies of AZ Driver's Licenses

33) copy of AZ Driver's License

34) suspected marijuana rolled in paper in cigarette box

35) calendar documents with handwritten notes

36) motorola cell phone, FCC ID # IHDT6BC1

37) (2) pictures of birds and (1) printed cartoon with handwritten
notes

38) (2) swabs of xylene

39) (1) Spoof card

Received By: _____    Received From: _____
                    (Signature)                                    (Signature)

68

FD-597 (Rev 8-11-94)

Page ___1___ of ___1___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # __279A-PX-84038__

On (date) __5/13/2011__

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) _Todd Russell Fries_

(Street Address) _5560 West El Camino del Cerro; silver Nissan Titan AZ plate_
_PWRWSH3_

(City) _Tucson_

Description of Item(s): _1) Home Depot credit card for Burns Power Washing_
_2) motorola cell phone, HEX ME ID # A00000015F757D7__

_5/13/11 8:00 pm_

Received By: _[signature]_
(Signature)

Received From: _____
(Signature)

69

FD-597 (Rev 8-11-94)

Page ____1____ of ____1____

## UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # __279A - PX - 84038__

On (date) __5/13/2011__

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) __Todd Randall Fries__

(Street Address) __5560 West El Camino del Cerro;__

(City) __Tucson__

Description of Item(s): __1) Mastercard for Burns Power Washing__

Received By: __[Signature]__ (Signature)    Received From: _____ (Signature)

70

FD-597 (Rev 8-11-94)

Page _1_ of _1_

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # 279A-PX-84038

On (date) 5/13/2011

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name) Todd Russell Fries

(Street Address) 5560 West El Camino del Cerro ; Blue Ford F250 AZ plate CGH6360

(City) Tucson

Description of Item(s): 1) AZ vehicle registration for WB Recovery LLC, Todd Russell Fries ; Temp registration (exp 12/13/2011) Todd Russell Fries, William Douglas Horton Sr.; insurance cards.

5/14/11 SMCG

Received By: _[signature]_ Shannon M. Gonzalez
(Signature)

Received From: _____
(Signature)

71

FD-597 (Rev 8-11-94)                                                          Page ___1___ of ___1___

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # 279A-PX-84038

On (date) 5/13/2011

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☑ Seized

(Name) Todd Russell Fries

(Street Address) 5560 West El camino del Cerro ; 1995 oldsmobile AZ ABY 2124

(City) Tucson

Description of Item(s): 1) vehicle registration and proof of insurance
2) pink motorola razor; HEX # 14A59064G4J

Received By: _[signature]_ Shannon L Gonzales
(Signature)

Received From: _____
(Signature)

72

FD-597 (Rev 8-11-94)

Page _1_ of _1_

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File #  279A-PX-84038

On (date)  5/13/2011

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☒ Seized

(Name)  Todd Randall Fries

(Street Address) 5560 West El Camino del Cerro; Mitsubishi Fuso AZ plate CE81589

(City)  Tucson

Description of Item(s):  1) Gas credit card for Todd R. Fries
2) (1) cell phone samsung verizon, FCC ID # A3LSCHU640
3) (1) samsung verizon cell phone, MEID # A000001D90C453

Received By: _[signature]_
(Signature)

Received From: _____
(Signature)

73

FD-597 (Rev 8-11-94)

Page ___1___ of ___1___

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # __279A-PX-84038__

On (date) __5/13/2011__

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name) Todd Russell Fries

(Street Address) 5560 West El Camino del Cerro ; 1972 Ford pickup AZ plate 474 RPM

(City) Tucson

Description of Item(s):  1) AZ vehicle registration and insurance ID cards for Todd Russell Fries

Received By: _[signature]_
(Signature)

Received From: _____
(Signature)

74

FD-597 (Rev 8-11-94)

Page ___/___ of ___/___

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # 279A-PX-84038

On (date)  5/13/2011

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☒ Seized

(Name)  Todd Russell Fries

(Street Address) 5560 West El Camino del Cerro ; Silver Nissan Titan AZ plate PWRWSH

(City) Tucson

Description of Item(s):  1) business reciepts

Received By: _Shaun M. Gonzale_
(Signature)

Received From: _____
(Signature)

75

# UNITED STATES DISTRICT COURT
## *District of Arizona*

### In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

• A single-story residence and associated buildings, garages and sheds located at 5560 West El Camino Del Cerro, Tucson, Arizona;
• See attached sheet for vehicle descriptions, license plate numbers and vehicle identification numbers

### APPLICATION AND AFFIDAVIT
### FOR SEARCH WARRANT

Case Number: **11-00509M**

---

I, Special Agent Brian C. Nowak, being duly sworn, depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe that /_/ on the person of or /X/ on the premises known as (name, description and/or location)

**See Attachment A made a part hereof.**

in the District of Arizona there is now concealed a certain person or property, namely (describe the person or property)

**See Attachment B made a part hereof.**

which is (give alleged grounds for search and seizure under Rule 41(c) of the Federal Rules of Criminal Procedure)

XX evidence of a crime;

XX contraband, the fruits of crime, or other items illegally possessed;

XX property designed or intended for use or used in committing a crime; or

____ a person to be arrested or a person who is unlawfully restrained.

in violation of Title 18, United States Code, §§229(a) and 2. The facts to support the issuance of a Search Warrant are as follows:

**See attached Affidavit incorporated by reference herein.**

Continued on the attached sheet and made a part hereof.    _X_ Yes    __ No

Reviewed by AUSA _____

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

5-12-11
_____    at    Tucson, Arizona
Date                                           City and State

U.S. MAGISTRATE JUDGE
HÉCTOR C. ESTRADA
_____        _____
Name and Title of Judicial Officer              Signature of Judicial Officer

**SEARCH WARRANT**

Case Number **11-00509M**

## VEHICLE DESCRIPTIONS, LICENSE PLATE NUMBERS AND VEHICLE IDENTIFICATION NUMBERS

- 1972 Ford Pickup truck, license plate 474RPM; VIN F10YLM80820

- 1995 Oldsmobile, license plate ABY2124; VIN 1G3AJ55MXS6389241

- 2006 Nissan pickup truck, license plate PWRWSH; VIN 1N6AA07A36N510254

- 2006 Nissan pickup truck, license plate PWRWSH3; VIN 1N6AA06A16N501229

- 1972 Ford Mustang Mach I, license plate 72MCH1; VIN 2F02F234992

- 2007 Mitsubishi Fuso, license plate CE81589; VIN JL6BBG1S77K016830.

- 2007 Mitsubishi Fuso, license plate; CE60745; VIN JL6BDH1SX7K000217

- 2004 Ford F250 pickup truck, license plate CG46360; VIN 1FTNW21PO4EB73716

## AFFIDAVIT

I, Brian C. Nowak, Special Agent of the Federal Bureau of Investigation, being first duly sworn, hereby depose and say:

## I. INTRODUCTION

1.    Your affiant, Brian Nowak, is a Special Agent (SA) of the Federal Bureau of Investigation (FBI) having been employed by the FBI since September 2002. I am currently assigned to the FBI Tucson Office, Resident Agency of the Phoenix division of the FBI. I have been involved with investigating domestic terrorism cases and crimes involving Weapons of Mass Destruction (WMD) for the past seven years. I have attended multiple WMD training courses during the nine years I've been in the FBI including Biological Weapons, Chemical Weapons and Nuclear Weapons courses. I am also the Assistant Team Leader for the Phoenix Hazardous Materials Response Team and am certified under the International Fire Service Accreditation Congress[1] as a Hazardous Materials Operator and a Hazardous Materials Technician. Both positions required the completion of courses pertaining to the proper response, mitigation and packaging of biological, chemical and nuclear materials. Prior to working with the FBI, I served as a Police Officer in New York, an Emergency Medical Technician, a Firefighter and held several command positions in the United States Army.

2.    The facts in this affidavit come from my personal observations, my training and

---

[1]IFSAC provides standardized training and certification in the area of hazardous materials and fire fighting.

1

11-00509M

experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about his matter.

      3.    Your affiant makes this affidavit in support of an application for the following: a criminal search warrant for the premises and vehicles, more particularly described and identified in Attachment A. Based on the following facts, I submit that there is probable cause to believe that a search of the premises and vehicles listed in Attachment A will lead to the instrumentalities and evidence of violations of federal law, including Title 18, United States Code, Section 229 (a), Prohibition Against Chemical Weapon.

## II. FACTS

      4.    Todd Russell Fries, also known as Todd Burns, is the sole owner and operator of Burns Power Washing and has owned the business since October, 1999. He provides a number of painting and cleaning services including power washing, resurfacing concrete driveways and pool decks. His residence and business office is located at 5560 W. El Camino Del Cerro, Tucson, Arizona.

      5.    In February, 2008 Myles and Karen Levine contracted with Todd Fries to re-surface the front driveway of their residence located at 5372 W. Tearblanket Place in Marana. Fries and his employees performed the work, but the Levine's were dissatisfied with the quality of the work. Fries attempted to correct the issues identified by the Levine's, however the couple remained dissatisfied. The Levine's ultimately stopped payment on a

2

check made payable to Fries in the amount of $200.00.

### III.   AUGUST 2009, INCIDENT - TUCSON NATIONAL

6.    On August 2, 2009, at approximately 5:00 a.m., the Pima County Sheriff's Department received several emergency calls that reported a strong chemical smell, possibly a pesticide, in a residential area, near the Omni National Golf Course in Tucson. The Sheriff's Department responded as did Northwest Fire Department, plus the FBI. First responders reported a strong chlorine smell as they stepped out of their vehicles and also described that their eyes, throat, lungs and faces burned. They donned emergency breathing equipment immediately after arriving on the scene. Emergency personnel also reported there was a huge white cloud that had enveloped the neighborhood. The cloud which hung close to the ground was described as 100-150 yards long by 50-60 yards high and moving slowly. Emergency personnel traced the cloud back to 2870 W. Magee Road, the residence of Myles and Karen Levine. The residence is a town home, centered in between two other homes, that shares common walls with these homes on either side.

7.    Investigators found a large pile of burning, gas emitting debris in front of the closed garage door at the front of the Levine's home, and a bucket containing burning, oozing debris on the back patio. The two burning devices together created a very large, thick plume of grayish, white colored cloud. Spread throughout the front driveway, sidewalk and walkway leading to the front door was a thick, viscous, slimy material, which appeared to be a combination of paint and motor oil, plus foam peanuts. Also strewn in the front of the

home were dead animal carcasses including a rabbit, cat, coyote and numerous woodpeckers. Graffiti, such as "Puta," "Puto,"."M-13"[2] and a drawing of male genitals was spray painted on the front of the home.  An improperly drawn swastika was also spray-painted on the house, which led investigators to believe it was possibly a hate crime.  The front door, windows and garage door of the Levine's home were all sealed shut with a foam expanding seal, thereby preventing the Levine's from escaping through the front of the house.

8. .   Based on physical evidence from the scene, investigators conclude that device 1, in front of the closed garage, consisted of three or four, 5-gallon buckets, placed close together in the front driveway.  This device disintegrated completely leaving only a pile of brown sludge; however the outline of three or four buckets was visible within the sludge. First responders reported that this device was burning when they arrived at the scene. Device 2, located on the back patio near the sliding glass door,  was a single 5-gallon bucket labeled "Pool Time" chlorine tablets.  This device also burned but did not disintegrate completely, leaving approximately 2/3 of the bucket remaining plus a thick foam residue on the side and top of the bucket.   Device #3 was a mesh bag on the back patio near the sliding glass door which contained a white powder. This device was not ignited. The word "PUTA" was spray painted on the back wall.  First responders wearing protective gear, evacuated the Levine's through the back porch door, again because the front door was sealed shut.

9.     Investigation revealed the source of the chlorine cloud was devices 1 and 2

---

[2]This was most likely a reference to the mexican gang MS-13

4

described above, both of which ignited as a result of a chemical reaction caused by the mixing of several components that an FBI expert believes included chlorine and another unknown substance.   Air samples taken from inside the enclosed garage at approximately 7:30 a.m., by the Northwest Fire Department HazMat unit, registered a reading of HIGH for chlorine.   A reading of "HIGH", according to Northwest Fire personnel indicates a level of chlorine greater than 5 ppm (parts per million).[3]   According to industry standards, a reading of 10 ppm or greater can be lethal.   Investigators believe the chlorine gas in the garage came from device #1.

    10.   A black day planner, change purse and several forms of identification belonging to Michele Fuentes and Joaquin Navarette were found approximately 30 feet from the Levine's residence.   Inside the day planner was a Bank of America pre-printed check belonging to Michele L. Fuentes.   The check dated July 3, 2009 was written for $450.00 and made payable to Karen Levine.   The memo on the check stated "DBA Debbie's Cleaning Service refund customer unhappy."   Handwriting on one of the pages read "July 3rd Karen Levine Magee 2780 clean house 450."   The check was submitted to the FBI Laboratory for fingerprint and handwriting analysis.   A latent fingerprint detected on the check was identified as belonging to Todd Fries. Fuentes was interviewed by agents and stated that her purse, along with her checkbook had been stolen earlier in 2009. Agents confirmed the bank account had been closed. Fuentes denied knowing the Levine's. Also found at the scene was

---

[3]How much above 5 ppm is unknown.

11-00500

identification belonging to Joaquin Navarrete. According to Navarrete, his vehicle, along with his identification was stolen in 2007.

11.    On August 4, 2009, two days after the incident, a person who claimed to be Michele Fuentes, contacted the FBI Tucson RA complaint desk claiming to have information regarding the recent crime involving the Levine family in Tucson. She stated she was currently residing in Nogales, Arizona illegally, and that she had worked for Mickey and Karen Levine cleaning their residence for approximately two (2) days on or about July 3, 2009. She accurately described where the Levine's lived and stated that on the final day she worked for the Levine's, she was approached by Mickey, while Karen was away and was asked to engage in sex acts. Fuentes claimed she declined Mickey's proposition and advised Karen of the situation upon her return. She stated that Karen became upset with Fuentes and threatened to call Immigration Services due to Fuentes' illegal status. She also stated the Levine's failed to pay her for the cleaning work she had performed at their residence, which she estimated to be approximately $400.00. Fuentes claimed she was upset with the Levine's and told her cousin Joaquin Navarrete of the situation. She added that Joaquin is an extremely violent person, and that Joaquin admitted stealing a large amount of chlorine tablets, which he placed in buckets near the front door and rear of the Levine's residence.

12.    The duty agent asked Fuentes several times if she was willing to be further interviewed in person at the Tucson FBI office. Fuentes repeatedly declined indicating she was fearful Joaquin would find out and harm her. At the end of the conversation, Fuentes

11-00509M

indicated she would think about the in person interview and re-contact the duty agent later in the day, which never occurred.

13.    Although Fuentes claimed to be a Mexican National, the agent noted she spoke perfect English without any accent. Moreover during the conversation, the agent believed the person who claimed to be Fuentes was a man attempting to disguise his voice as a female. Before hanging up, Fuentes provided her contact number as (801) 299-8484.[4]  Caller ID indicated the call was originating from (520) 546-3800, which was traced back to Avalon Health Center located at 1400 N. Wilmot in Tucson. Agents quickly responded to Avalon Health Center and made contact with several employees of the facility. One of the nurses told agents she heard the stairwell alarm go off and went into the hallway to check it out and saw a male, wearing a tan shirt with a white tag who she did not recognize. She said he appeared to be a maintenance worker and when asked what he was doing, he stated he was doing "inspections." Other employees in the facility told agents they heard a door alarm go off and shortly thereafter saw a man they did not recognize, seated in their computer/charting room, using the phone. Agents were able to retrieve the last two (2) numbers dialed on the phone used by the individual. Those numbers were positively identified as belonging to the Tucson FBI office in Tucson.   Latent finger prints were lifted from the telephone handset and positively identified as being the right index finger of Todd Fries.

---

[4]This number was assigned to Ann and Stanley Smedley in Salt Lake, Utah.

11-00509

## IV. EXPERT TESTIMONY

14.    According to Robert Rooney, Ph.D from the FBI Explosives Unit in Quantico, Virginia, the major component of the brown residue recovered from both devices was cyanuric acid, a non-toxic by product of chlorine. Dr. Rooney opines a chemical reaction occurred due to the mixing of a chlorinating agent, most likely pool chlorine and another unknown component such as water or rubbing alcohol. According to Dr. Rooney, the heat generated by the chemical reaction and the resulting fire was so great that the plastic buckets which together comprised devices #1 and #2 melted, leaving only the brown sludge.[5] According to Dr. Rooney, chlorine gas meets the definition of a "toxic chemical" as set forth in 18 U.S.C. §229F(8) which states: (A) "The term "toxic chemical" means any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals."

## V. NOVEMBER 1, 2008 INCIDENT - MARANA (DOVE MOUNTAIN)

15.    A nearly identical attack occurred on November 1, 2008. On that date the Levine's woke up and discovered that motor oil, paint, grease, feces, dead animals and foam packing peanuts had been strewn on the driveway leading up to the front door of their home at 5372 W. Tearblanket Place, in Marana. Upside down paint buckets had been placed over the driveway perimeter lights and empty buckets were spread throughout the yard. The words "Jew whore" with swastikas were spray painted on the curb area and "die Juden bitch"

---

[5]Device #2 partially melted.

8

and "fuk u" were spray painted on the garage door. Male genitalia, a swastika and a naked female body were painted on the front door and the garage door was damaged on top. A woman's wallet, covered with paint, was found next to the driveway. Inside was a drivers license issued to Kayln Hovey, in addition to photographs and other personal items. Investigators interviewed Hovey who stated the wallet was not hers but that the drivers license and the other items did belong to her. According to Hovey her wallet was stolen in October, 2005, which was confirmed by agents.

16.     When asked about potential suspects, Karen Levine identified Fries and another individual who also had done work for the Levine's.

17.     Evidence from the 2008 Marana (Dove Mountain) incident has been analyzed for fingerprints. A fingerprint belonging to Todd Fries was identified on one of the buckets seized at the scene. A vehicle seen by neighbors the night before the incident also matched the description of a vehicle owned by Fries.

## VI.    APRIL 28, 2011 INCIDENT

18.     On April 28, 2011, an attack similar to the 2008 and 2009 attack on the Levine's was performed on another former customer of Fries. In March, 2010, the victim of the April 28, 2011 attack, hired Todd Fries to perform power washing services on the back porch of the home. Fries performed the work, but the customer was dissatisfied and asked Fries to re-do the work. Fries and the homeowner ultimately entered into a new agreement wherein Fries would re-do the porch project and also re-surface the garage floor. Fries and

9

11-00509M

his employees performed the work, however the homeowner was displeased with the quality of Fries work and refused to pay him.   Shortly thereafter, on May 31, 2010 the homeowner discovered that glue had been poured into the gas tank, on the tires and windshield of one of their vehicles.  It also appeared as if the person responsible, had tried to glue the garage door shut.  On June 6, 2010, the homeowners daughter, who lives at the residence, received a phone call and the caller stated "Sorry my son did something to your house."   On April 28, 2011, the homeowner woke up to find that motor oil had been poured on her driveway and a five gallon bucket filled with animal or human feces and a dead lizard was strewn on the driveway.  Also present was a small black wallet with miscellaneous business cards and a driver's license belonging to a female. Agents interviewed the female whose identification was found at the scene and learned that she had lost her drivers license and a credit card in December, 2010.   Neither item had been recovered.  She denied knowing the victim homeowner or Todd Fries.  The FBI is currently investigating this incident.

19.    Confidential Sources 1-3 (CS) provided information regarding Fries.  CS #1 who worked for Fries from March, 2006 to October, 2008, stated that Fries has a laptop that he carries with him at all times and uses frequently.  CS #1 also described that Fries will stockpile buckets, used oil, feces and dead animals at his home for future attacks similar to those described above. CS #1 stated that Fries uses muriatic acid and paint thinner in his business, but not chlorine.   CS # 2 worked for Fries from May or June, 2006 until August or September, 2009.  This CS stated that Fries has a computer at his home that he uses very

11-0050-y

87

frequently and also a laptop that he carries with him at all times and uses frequently. CS #2 also described that Fries will stockpile items at his residence such as buckets to be used for future attacks. CS #3 worked for Fries from 2006 until 2008. This CS described that Fries had a laptop that he would use all the time. CS #3 also stated that Fries would collect dead animals, including woodpeckers, and that Fries always had chemicals in his garage, including chlorine tablets and liquid chlorine even though these chemicals were not used in his business.

## VII. COMPUTER EVIDENCE

20.     Based on the information provided in this affidavit, it was revealed that at least several computers are located at the locations listed in Attachment A and said computers contain evidence relative to the crime outlined in this affidavit.

DEFINITIONS

21.     The term "computer," as used herein, is defined pursuant to Title 18, United States Code, section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

22.     Your affiant knows that computer hardware and computer software may be utilized to store records which include but are not limited to those relating to business activities, criminal activities, associate names and addresses, and evidence in the form of

11

11-00509M

directions and recipes for making chemical weapons, such as the one utilized in the present case.

23.    <u>Hardware</u>: Hardware includes the following equipment: (1) data-processing devices containing central processing units, such as "desktop," "tower," "laptop" and "notebook" computers, hand-held electronic organizers, "personal digital assistants," iPods, Zunes, video game systems, and cellular telephones that are capable of storing information and/or connecting to the internet; (2) internal and external storage devices, including magnetic storage devices such as hard disk drives, diskette drives, tape drives, and optical storage drives such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices such as memory card readers.

24.    <u>Storage Media</u>: Storage media includes any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information. Examples of storage media include diskettes, CD-ROM's, CD-R's, CD-RW's, DVD's, DVD-R's, DVD-RW's, magnetic tapes, ZIP disks, JAZ disks, smart cards, EPROMS, and digital memory media such as CompactFlash, SD cards, Sony Memory Sticks, and USB "thumb" or "key" drives.

25.    <u>Peripherals</u>: Peripherals are equipment that send data to, or receive data from, computer hardware, but do not normally store user data. Keyboards, mice, printers, scanners, plotters, video display monitors, modems, cables, and certain types of facsimile machines are examples of peripherals.

11-00509

26.    Software: Software is digital information that can be interpreted by computer hardware to direct the way hardware works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems (like Microsoft Windows), applications (like word-processing, graphics, or spreadsheet programs), utilities, communications programs and logs to document electronic events that occur on computers.

27.    Security Devices: Security devices include physical keys, encryption devices, "dongles," and similar physical items needed to gain access to associated computer hardware.

28.    Passwords: Passwords include alphanumeric strings, pass-phrases, password files, and similar decryption codes necessary to access data that is encrypted or otherwise inaccessible.

29.    Log Files:  computer files, commonly referred to as "logs," that contain information regarding the activities of computer users and processes running on a computer, and the activity of computer resources such as networks, modems, and printers. Log files can be used to identify unauthorized uses of computer resources or the times and dates that an e-mail account has been accessed.

30.    Internet Service Providers (ISP's) and the Store of ISP Records: Internet Service Providers are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISP's provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, online auction and sales

13

11-00509M

services, and co-location of computers and other communications equipment. ISP's can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISP's typically charge a fee based upon the type of connection and volume of data called bandwidth that the connection supports. Many ISP's assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By means of a modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password. ISP's maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISP's reserve and/or maintain computer disk storage space on their computer system for subscribers' use. This service by ISP's allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.

31.  Documentation: The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, including the originals and all

11-00509M

nonidentical copies thereof, whether different from the original by reason of any notation made on such copies or otherwise, including, but not limited to the following:

a.    Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items;

b.    Written or printed matter of any kind, correspondence, memoranda, notes, diaries, statistics, letters, telephone toll records, telegrams, contracts, reports, checks, statements, receipts, returns, summaries, pamphlets, books, ledgers, journals, registers, records, vouchers, slips, bills, calendars, pads, notebooks, files, logs, lists, bulletins, credit materials, data bases, teletypes, telefaxes, invoices, worksheets;

c.    Graphic records or representations, photographs, slides, drawings, designs, graphs, charts, pictures, sketches, images, films, videotapes; and aural records or representations, tapes, records, discs;

d.    The terms "records," "documents," and "materials" include all of the foregoing in whatever form and by whatever means the records, documents, or materials, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such

15

11-00509M

as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as printouts or readouts from any magnetic storage device).

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

32.    Based upon your affiant's knowledge, training and experience, and the experience of other law enforcement personnel, your affiant knows that searches and seizures of evidence from computers commonly require agents to seize most or all computer items (hardware, software, and instructions) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Digital storage devices (such as hard disks, floppy disks, tapes, zip disks, CDs, DVDs, memory cards, and other devices capable of storing information in an electronic format) can store the equivalent of thousands of pages of information. Searching authorities must examine all the stored data to determine what files are evidence of the crime being investigated, and can be seized in accordance with the warrant. Some files may not contain direct evidence of the crime, but may contain indirect or circumstantial evidence. For example, text documents, photographs, e-mails, log files, etc. may indicate who has used the computer, or when it was used. The process of evaluating, sorting, and segregating computer files can take weeks or months, depending on the volume of data. It would be impractical

16

11-00509M

to attempt this kind of data search on site.

      b.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.

      c.    Computer evidence is extremely vulnerable to alteration or destruction. The controlled environment of a laboratory is essential to its complete and accurate analysis. The process of forensically searching a computer is designed to protect the integrity of the evidence. The first and most important step a forensics examiner takes in preserving evidence is to create a forensic copy, or "image," of the data on a separate hard drive. Subsequent examination is performed on the forensic image, thus preserving the original evidence.

      d.    It is possible for computer experts to recover files that have been hidden, deleted, compressed, password-protected or encrypted, but doing so requires a significant investment of time. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files or remnants of deleted files may reside in free space or slack space-that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space-for long

11-00509M

periods of time before they are overwritten. Thus, the ability to retrieve residue of an electronic file is time consuming and is dependant upon several factors.

e.     In order to fully retrieve data from a computer system, the analyst needs all or most of a computer system's equipment, and may be required to seize hardware, peripherals, software, documentation, security devices and passwords. In addition, the examiner needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create or display the data (whether stored on hard drives or on external media). Instruction manuals for any hardware and software, and passwords, are also helpful to retrieve data/information.

f.     Computer file names may not be indicative of, or accurately describe the contents of a file. Therefore, all files contained on digital storage devices must be accessed and evaluated. During this process, it is possible that evidence of other crimes, unknown to investigators at the time the search warrant order was obtained, may be found in plain sight. Under these circumstances, an additional court order will be sought requesting authority to seize evidence pertaining to the other crimes.

## VIII.   TITLE 18 U.S.C. § 229(a)

33.     Title 18 U.S.C. §229 makes it unlawful for any person to knowingly develop, produce or otherwise acquire, transfer directly or indirectly, receive, stockpile, own, retain, possess or use or threaten to use, any chemical weapon.

34.     Definition of Chemical Weapon. A "chemical weapon" means the following,

18

together or separately: (A) A toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose.

35.     Definition of a toxic chemical.  The term "toxic chemical mans any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals.

## IX.  INDICTMENT

36.     On May 11, 2011, a federal grand jury returned an indictment for two counts Prohibition Against Chemical Weapons in violation of 18 U.S.C. § 229(a) against Todd Fries.  The Indictment is currently under seal.

## X.  PROTOCOL FOR EVIDENCE OF OTHER CRIMES

37.     The search methodology for this matter will be formulated to provide for the search and seizure of evidence related to the crimes set forth in the warrant, Affidavit and warrant.  In the course of that examination, the examining agent(s) may discover evidence of other crimes.  If an examiner discovers information during the course of the authorized search that is evidence of a crime not set forth in the warrant, Affidavit or any Attachments:

a.     The government will not waive its ability to seize and, with appropriate legal process, may investigate evidence of other crimes that are inadvertently discovered during the course of a search authorized by the federal warrant.

b.     The examining agent will continue with the authorized search pursuant

11-00509M

96

to the grant of authority in the warrant, that search being designed to discover evidence of the crimes as authorized by the warrant, but exclude the inadvertently discovered information from the authorized search. The examining agent will not amend or expand the search criteria to include the inadvertently discovered information.

    c.    Because evidence discovered inadvertently during the course of a search is constitutionally obtained evidence of a crime, the examining agent will seize the inadvertently discovered evidence, and immediately inform the investigating agents and prosecutors involved in the investigation of the inadvertent discover and provide that inadvertently discovered evidence to the investigating agents and prosecutors involved in the investigation.

    d.    If the government decides to investigate crimes related to the inadvertently discovered information, it will submit an application for a separate search warrant that authorizes a search for evidence of that criminal activity.

## XI. PLACE TO BE SEARCHED
### RESIDENCE AND BUSINESS OF TODD FRIES

38.    This affidavit is submitted in support of an application to search the residence of Todd Fries located at 5560 West El Camino Del Cerro, Tucson, Arizona, 85745. This residence is more fully described in Attachment A. I know that Todd Fries resides at 5560 West El Camino Del Cerro. Agents have observed him at the residence. Also, vehicles registered in his name and used in his business are parked at the residence. Those vehicles are also included within Attachment A.

11-0050GW

## XII. ITEMS TO BE SEIZED

39.    As more fully described in Attachment B, I am seeking authorization to seize items which may contain evidence of violations of: Title 18 United States Code, Section 229 Prohibition Against Chemical Weapon.

## XIII. CONCLUSION

40.    Based on the above facts, coupled with my training and experience, I have probable cause to believe that Todd Fries engaged in unlawful conduct in violation of 18 U.S.C. §229(a) on August 2, 2009 and that instruments, evidence, and fruits of criminal activities are likely retained at the premises and in the vehicles described in Attachment A. I seek permission to search these premises for the items described in Attachment B.

41.    In addition, it is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, affidavit, and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into criminal activity. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation

21

11-00509M

and may severely jeopardize its effectiveness.

FURTHER AFFIANT SAYETH NOT

Brian C. Nowak
Special Agent, FBI
Tucson, Arizona

Subscribed and sworn to before me this 12th day of May, 2011.

Honorable Hector C. Estrada
United States Magistrate Judge

22

11-005092

## ATTACHMENT A

## PREMISES TO BE SEARCHED

1.    A residence and associated buildings, garages and sheds located at 5560 West El Camino Del Cerro, Tucson, Arizona.  This residence is more fully described as a single story residence located, on West El Camino Del Cerro located next to 5530 West El Camino Del Cerro The residence at 5560 West El Camino Del Cerro consists of a large single story home with attached dual carports and two attached garages along with another large garage housing work vehicles. A color copy of a photograph of the residence is attached along with an aerial view.

2.    The following vehicles, all registered to Todd Fries, which are parked at his residence. The vehicles listed below in (a) through (g), we're owned by Fries at the time of the 2008 and 2009 incidents.  The vehicle listed below in item (h) was purchased by Fries in 2011.

a.    1972 Ford Pickup truck, license plate 474RPM; VIN F10YLM80820

b.    1995 Oldsmobile, license plate ABY2124; VIN 1G3AJ55MXS6389241

c.    2006 Nissan pickup truck, license plate PWRWSH;
       VIN 1N6AA07A36N510254

d.    2006 Nissan pickup truck, license plate PWRWSH3;
       VIN 1N6AA06A16N501229

e.    1972 Ford Mustang Mach I, license plate 72MCH1;

23                    11-00509M

VIN 2F02F234992

f.    2007 Mitsubishi Fuso, license plate CE81589;

VIN JL6BBG1S77K016830.

g.    2007 Mitsubishi Fuso, license plate; CE60745;

VIN JL6BDH1SX7K000217

h.    2004 Ford F250 pickup truck, license plate CG46360;

VIN 1FTNW21PO4EB73716

11-00509M

## ATTACHMENT B

## ITEMS TO BE SEIZED

1.    Books, newspaper or magazine articles, or other written material concerning revenge, anarchy and any other materials which reflect, refer, relate to or are for use in chemical attacks, bomb making, or conspiracy to commit an act of revenge, plus the identity of chemical attack conspirators, and/or the distribution of information relating to destructive devices and /or chemical weapons

2.    Any written material that describes how to produce, make or manufacture bombs, chemical weapons or destructive devices, including recipes, cookbooks and/or how-to manuals describing the ingredients or quantities of the substances to be used.

3.    Chemicals such as Chlorine, muriatic acid, motor oil or other substances which could be used to make chemical weapons or destructive devices.

4.    Unknown or stockpiled materials stored in 5 gallon buckets such as used oil, dead animal carcasses and feces.

5.    Foam peanuts

6.    Identification documents belonging to other individuals, including Social security cards, passports, state issued identification cards or drivers licenses, birth records, plus financial or banking items/documents such as checks, debit cards or other items commonly kept in a purse or wallet.

7.    Any wallets, purses, photos, which may belong to other persons.

25

11-00509M

8.     Credit card applications or bills, account receipt books for the business, receipts or items involved with charge accounts for businesses that sell construction materials and pool related items such as Home Depot, Lowes etc.

9.     Vehicle ownership records, telephone/address books; photographs and telephone toll records.

10.     Any and all security devices, to include physical keys, encryption devices, "dongles" and similar physical items needed to gain access to computer hardware. Any material associated with or involved in the process of "Spoofing" numbers on phone lines.

11.     Any and all computer hardware, to include data-processing devices containing central processing units, such as "desktop", "tower", "laptop" and "notebook" computers, hand-held electronic organizers, and "personal digital assistants"; "routers", "switchers" or any similar device which facilitates communication by sending transmissions to intended recipients and has the capability of creating logs; internal and external storage devices, including magnetic storage devices such as hard disk drives, diskette drives, and tape drives, optical storage devices such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices such as smart-card readers. In addition, peripherals, equipment that send data to, or receive data from, computer hardware, but do not normally store user data, such as keyboards, mice, printers, scanners, plotters, video display monitors, modems, cables, and certain types of facsimile machines.

12.     Any and all computer software and storage media to include any material

11-00509M

capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information, such as diskettes, CD-ROM's, CD-R's, CD-W's, DVD's, DVD-R's, DVD-RW's, magnetic tapes, ZIP disks, JAZ disks, Peerless disks, SparQ disks, ORB disks, optical disks, smart-cards, EPROMS, and digital memory media such as CompactFlash, SmartMedia, Sony Memory Sticks, and USB "thumb" or "key" drives, in addition to computer photographs, Graphic Interchange formats and/or photographs, digital cameras, slides, scanners or other visual depictions of such Graphic Interchange format equipment.

13.     Any and all computer-related documentation to include written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.  In addition, passwords, to include alphanumeric strings, pass-phrases, password files, and similar decryption codes necessary to access data that is encrypted or otherwise inaccessible.

14.     Documents and items evidencing dominion and control of the premises to be searched, including utility bills, rental agreements, photographs,  property acquisition records, telephone bills, canceled mail envelopes, correspondence, vehicle records, paging devices, cellular telephones, answering machine and answering machine tapes, and documents containing handwriting samples for Todd Fries.

15.     Closed circuit television video tapes and/or surveillance from Fries home which could have recorded his preparation for the events described in the present affidavit.

27

11-00509M

28

11-00509M