UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
-----------------------------)
                             )
                             )
UNITED STATES OF AMERICA,     )
               Plaintiff,     ) No. CA 13-10116 9th Circuit
                             )
       vs.                    ) No. CR 11-01751 TUC-CKJ
                             )
                             )     Tucson, Arizona
TODD FRIES,                   )     September 18, 2012
               Defendant.     )
                             )
-----------------------------)
```

TRANSCRIPT OF TESTIMONY
JURY TRIAL DAY ONE

BEFORE THE HONORABLE CINDY K. JORGENSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:    By:  Beverly K. Anderson, and
                           David A. Pimsner
                           U.S. Attorney's Office
                           405 W. Congress St., Suite 4800
                           Tucson, AZ   85701

For the Defendant:    By:  Richard C. Bock
                           100 N. Stone Ave., Suite 801
                           Tucson, AZ   85701


Mary A. Riley, RMR, FCRR
United States Court Reporter
U.S. District Court
405 W. Congress St.
Tucson, AZ   85750


        Proceedings produced by computer-aided transcription

1

# INDEX OF TESTIMONY

2

3

4  EDWARD MUZOLA

5  Direct Examination by Mr. Pimsner         Page  3

6  Cross-Examination by Mr. Bock             Page 25

7  Redirect Examination by Mr. Pimsner       Page 33

8

9  MYLES LEVINE

10  Direct Examination by Ms. Anderson        Page 36

11  Voir Dire Examination by Mr. Bock         Page 50

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      TRANSCRIPT OF PROCEEDINGS

2          (Edward Muszala was duly sworn by the clerk.)

3          THE COURT:  And you may proceed.

4          MR. PIMSNER:  Thank you, your Honor.

5                      EDWARD MUSZALA

6                    DIRECT EXAMINATION

7   BY MR. PIMSNER:

8   Q    Mr. Muszala, could you tell us what your occupation is?

9   A    I'm currently employed by the Pinal County Sheriff's Office

10       as a deputy sheriff.  I'm currently assigned to the aviation

11       support unit.

12  Q    And could you pull your microphone just a little bit closer,

13       please?

14            Thank you.

15            How long have you been with the Pinal County sheriff's

16  Department?

17  A    Just under two years.

18  Q    And you said you work in their aviation department?

19  A    Yes.

20  Q    And have you had any other -- held any other responsibility

21       for Pinal County Sheriff?

22  A    Yes.  When I was first employed there, I was a patrol

23       deputy.

24  Q    And prior to working at the Pinal County Sheriff's

25       Department, did you have any prior law enforcement

1    experience?

2 A   Yes, prior to that I was employed by the Marana Police

3    Department from January, 2005 until October, 2010.

4 Q   And you would have gone from -- from Marana, then, to the

5    Pinal County Sheriff?

6 A   Yes.

7 Q   And what were your duties when you were at Marana?

8 A   First, I was assigned as a patrol officer, and then after

9    that I was assigned to the mounted unit, which was a horse

10    patrol which I was assigned to during this day.

11 Q  Now, back on November 1st, 2008, were you on duty that day?

12 A  Yes.

13 Q  Were you in a patrol car?

14 A  Yes.

15 Q  And were you on your own?

16 A  Yes.

17 Q  And did you have an opportunity -- or a reason to be in the

18    general vicinity of the Heritage Highlands housing

19    development up in Dove Mountain -- near Dove Mountain?

20 A  Yes.

21 Q  And why were you at that location?

22 A  I responded to assist another patrol officer with a criminal

23    damage call.  One of the gates -- it's a gated community.

24    It was pushed open deliberately.

25 Q  And could you describe the Highland Heritage community

1    briefly?

2  A   Yes, Heritage Highlands is in the northern part of Marana.

3    It's in a gated community, seniors, like 55 year old plus

4    community.  It's in the Dove Mountain development, but it's

5    a specific senior community.

6  Q   And does that have a main entryway where there's actually a

7    guard shack?

8  A   Yes.

9  Q   Now, the gate that you responded to, was that a gate that

10    had a guard?

11  A   No.

12  Q   And what -- and what was the reason that you were at -- at

13    that gate?

14  A   Well, when myself and another officer arrived we -- we

15    observed that the gate itself, which is -- has a key pad and

16    I believe it's primarily used for residential access was --

17    one of the gates was pushed open intentionally by a vehicle,

18    or somebody pushing on it where it was actually broken.

19  Q   And so the gate was actually in an open or partially opened

20    position?

21  A   Yes.

22  Q   And did you notice damage to the gate?

23  A   Yeah.  From what I recall, the gate itself was actually --

24    there's an opening mechanism that's on the side of it, and

25    the arm was broken.

1         MR. PIMSNER:  May the witness be shown Exhibit 1, your

2   Honor?

3         THE COURT:  Yes.

4   BY MR. PIMSNER:

5   Q    Now, do you recognize Exhibit 1, Officer?

6   A    Yes.

7   Q    And is that the gate that you were at back on November 1st,

8       2008?

9   A    Yes.

10  Q    Now, the picture of that gate, the gate is currently closed;

11      is that correct?

12  A    Yes.

13  Q    Was that how the -- was the gate in that position when you

14      first observed it?

15  A    No.  When I arrived on scene, the gate actually -- there's

16      two gates shown in the picture, ingoing and outgoing.  The

17      ingoing gate is the one we're talking about, and it was

18      actually opened.

19  Q    And does that photograph accurately depict the gate area

20      that you responded to that day?

21  A    Yes.

22        MR. PIMSNER:  At this point I would move to admit

23  Exhibit 1 and request that the photo be published to the jury.

24        THE COURT:  Any objection?

25        MR. BOCK:  No objection.

1          THE COURT:  Exhibit 1 is admitted, and may be

2     published.

3     BY MR. PIMSNER:

4     Q    Agent, I believe if you -- I think you can touch with your

5          finger on the screen, could you point to the gate that was

6          broken?

7     A    Yeah, it was the ingoing one.

8     Q    And -- and so that gate would have been partially open at

9          the time that you were responding?

10    A    Yes.

11    Q    And let me ask the witness to look at Exhibit 2.

12         THE COURT:  And sir, you can clear that screen by

13    touching the left-hand corner -- I'm sorry, the lower left-hand.

14         There you go.

15    BY MR. PIMSNER:

16    Q    And is that -- do you recognize that photograph?

17    A    Yes, I do.

18    Q    And is that taken from the other angle of the gate that you

19         saw on Exhibit 1?

20    A    Yeah, this would be inside the community.

21    Q    And what does that photograph depict?

22    A    This photograph depicts the gate opening mechanism's

23         actually broken or disconnected, and it shows the gate is in

24         a closed position.

25    Q    And that shows accurately the -- the issue with the gate

1    back on November 1st?

2  A    Yes.

3         MR. PIMSNER:  May this -- may this be admitted and

4  published, your Honor?

5         THE COURT:  Any objection?

6         MR. BOCK:  No.

7         THE COURT:  2 is admitted, and may be published.

8  BY MR. PIMSNER:

9  Q    Now, during the course of your assisting the other officer

10      regarding the broken gate, did you receive another duty

11      call?

12 A    Yes.

13 Q    And what was that?

14 A    The call was an additional one referencing criminal damage

15      to somebody's residence inside Heritage Highlands.

16 Q    So it was already in the -- at the -- it was inside the

17      community where you were already present, correct?

18 A    (No verbal response.)

19 Q    And what was the address; do you recall?

20 A    I don't recall the physical address, but the name of the

21      street was Tear Blanket.

22 Q    Would 5372 West Tear Blanket sound correct to you?

23 A    That sounds correct.

24 Q    And when you -- did you immediately travel to that location?

25 A    Yes.

1   **Q**   What did you observe when you arrived at that location?

2   **A**   When I arrived at the location, I was -- it's kind of a

3   T-intersection, small housing area with duplexes.  I noticed

4   that the house that -- that is -- was on the right as I came

5   up to it was damaged by -- it had motor oil and, you know,

6   packing peanuts.  It had a -- a graffiti on the curb as I

7   arrived.  The driveway -- entire driveway was covered with

8   what appeared to be motor oil with packing peanuts stuck on

9   it.  It had paint container buckets actually turned over.

10   **Q**   And we'll get into that in a little more detail.  I'm just

11   trying to identify what you generally observed when you

12   first arrived.

13   **A**   Criminal damage.

14   **Q**   And did you make contact with the residents of that

15   location?

16   **A**   Yes.

17   **Q**   And who were they?

18   **A**   They were Myles and Karen Levine.

19   **Q**   And could you describe their demeanor at the time?

20   **A**   Yes.  Mr. Levine was calm, and he was explaining the

21   situation.  And then also Mrs. Levine was very excited.  She

22   was using, you know, big hand gestures, and making a lot of

23   statements without me asking questions, spontaneously.

24   **Q**   Fair to say she was upset?

25   **A**   Yes.

1    Q    Now, let me ask you to look --

2         MR. PIMSNER:  May the witness be shown Exhibit 7, your

3    Honor?

4         THE COURT:  Yes.

5    BY MR. PIMSNER:

6    Q    And do you recognize that photograph?

7    A    Yes.

8    Q    And what does that photograph depict?

9    A    It depicts the Levine's driveway.

10   Q    Is that the entrance to their driveway?

11   A    Yes.

12   Q    And do they have, like, an L shaped, slightly curved

13        driveway?

14   A    Yes.

15   Q    And is that an accurate depiction of the way the driveway

16        looked when you arrived at the Levine's residence back on

17        November 1st?

18   A    Yes, it is.

19        MR. PIMSNER:  May the exhibit be admitted and

20   published, your Honor?

21        MR. BOCK:  Subject to my previous record, your Honor.

22        THE COURT:  Yes, subject to that Exhibit 7 is admitted,

23   and may be published.

24   BY MR. PIMSNER:

25   Q    Could you please describe what you initially saw at the

1    entrance to the driveway?

2  A  Well, the first thing I noticed was the graffiti with the

3     swastika, and the Jew whores spray painted on the curb area.

4     The white items in the picture are packing peanuts, and then

5     also used motor oil, and paint, and other items were spread

6     on the driveway.

7  Q  When you saw the extent of the damage, did you contact --

8     did you call in for back-up assistance?

9  A  Yeah, I contacted my own duty supervisor that day and asked

10    him to -- to have the detectives respond, plus a crime scene

11    unit.

12 Q  And who would have been the detective that responded?

13 A  Jim Paul from the Marana Police Department.

14 Q  Detective Paul at the time?

15 A  (No verbal response.)

16 Q  And who was the trial scene specialist?

17 A  His name was Jim Bradley.

18 Q  Now, let me -- did you continue to explore or investigate

19    the location of that driveway or the house to see the extent

20    of the damage?

21 A  Yes.

22 Q  Let me ask you to look at Exhibit A -- or 8, excuse me.

23       Could you describe what Exhibit 8 depicts?

24 A  This -- it shows an additional picture of the Levine's

25    driveway from a little different angle, showing the garage

1     door with additional graffiti, plus racially biased -- you

2     know, spray painting, male and female genitals, plus the

3     swastikas and anarchy sign.

4  Q    Now the anarchy sign, could you point to that on your

5     screen?

6  A    Sure.

7  Q    And does that -- does that photograph also depict the

8     buckets that were placed over the lighting that surrounded

9     the Levine's driveway?

10  A    Yes.

11       MR. PIMSNER:  Now, at this point I would move to admit

12  and publish Exhibit 8, your Honor.

13       MR. BOCK:  Subject to my previous record, your Honor.

14       THE COURT:  Yes, subject to that Exhibit 8 is admitted

15  and may be published.

16  BY MR. PIMSNER:

17  Q    Now, could you point to -- you have a white dot where the --

18     you have described it as an anarchy symbol?

19  A    Yes.

20  Q    And what is an anarchy single?

21  A    An anarchy symbol's usually associated with persons who are

22     wishing to overthrow the government.

23       MR. BOCK:  Objection to this, your Honor.  Objection.

24  Reserve a motion at this time.

25       THE COURT:  No, I'll allow the answer to stand.

BY MR. PIMSNER:

Q   And what else did you see on the garage?

A   There was a -- it appeared to be motor oil or some other materials thrown onto the garage door itself, plus the graffiti.

Q   And what were the words on the garage door?

A   Die Juden.

Q   And was there a word to the right of that?  Could you read that?

A   If you could pull it up.

        It appears to say bitch.

Q   And to the right of that were there other words that appeared to be used?

A   Yes, fuck you, misspelled.

Q   And then you indicated earlier that there was genitalia, both female and male on the garage door?

A   Yes.

Q   And did you notice any paint in that -- in that scene?

A   There's a blue paint on the driveway itself.

Q   Is there any paint on the house, other than graffiti?

A   Yes, below the anarchy sign, and then also on the lighting itself.

Q   Now, let me ask -- ask --

        MR. PIMSNER:  May the witness be shown Exhibit 9, your Honor?

1          THE COURT:  Yes.

2          MR. PIMSNER:  Thank you.

3   BY MR. PIMSNER:

4   Q    Does this -- what does this exhibit depict?

5   A    This is a close-up of the Levine's driveway showing the

6        packing peanuts, and the motor oil, paint, plus the upside

7        down paint buckets that covered their lighting.

8   Q    And does this show a closer -- or a -- a fuller picture of

9        the extent of the oil that was placed -- paint and oil that

10       was placed on that driveway?

11  A    Yeah.  It shows it at a better angle, yes.

12         MR. PIMSNER:  Move to admit and publish, your Honor.

13         MR. BOCK:  Subject to my previous --

14         THE COURT:  And that's 9, counsel?

15         MR. PIMSNER:  Yes, your Honor.

16         THE COURT:  Subject to the objection, Exhibit 9 is

17  admitted and may be published.

18  BY MR. PIMSNER:

19  Q    Now, did you notice -- you noticed the visual effect,

20       obviously.  Did you notice anything else unusual when you

21       were at that scene?

22  A    Yes.  Especially around the entranceway to the house there

23       was a very bad smell of dead animals, and motor oil, and a

24       combination of things.

25  Q    And could you -- were you able to describe that any further?

1    A    It was -- it was almost to the point of where I almost

2         became nauseous, because it was such a strong smell and --

3         even though we were outside.

4    Q    Now, so you went up and looked towards the front of the

5         Levine's residence leading up to their front door?

6    A    Yes.

7    Q    And let me show you --

8              MR. PIMSNER:  If the Court would allow the witness to

9    see Exhibit 13?

10             THE COURT:  Yes.

11             MR. PIMSNER:  Excuse me.  Let me backtrack again.

12   BY MR. PIMSNER:

13   Q    This is Exhibit 13.  Is this another view of the driveway

14        from the other side?

15   A    Yes.

16   Q    And does that accurately depict how the scene looked at the

17        time at the Levine's on November 1st?

18   A    Yes.

19             MR. PIMSNER:  May this witness be -- or may this

20   exhibit be admitted and published, your Honor?

21             MR. BOCK:  Subject to my previous record, your Honor.

22             THE COURT:  Yes, subject to that -- and I'm sorry, what

23   number?

24             MR. PIMSNER:  13, your Honor.

25             THE COURT:  13 is admitted, and may be published.

1  BY MR. PIMSNER:

2  Q    Now, what was on the driveway towards the curbed part of

3       driveway?

4  A    It was the combination of -- of oily substances before, plus

5       the graffiti was at the very curb edge right as you pull off

6       the street onto the driveway.

7  Q    And the graffiti in that photograph, what does that depict?

8  A    If I could refer back to this?

9  Q    On -- on Exhibit 13.

10 A    Oh, I'm sorry.  It shows the die Juden --

11 Q    I'm talking on the driveway, sir.

12 A    On the driveway would be the swastikas.  Additional

13      swastikas.

14 Q    Now, again, going back, did you have an opportunity to

15      conduct further investigation or observation of their front

16      walkway?

17 A    Yes.

18 Q    And let me show you what's been marked as Exhibit 18.

19          Does that accurately reflect how their back -- or their

20      front walkway looked at the time that you first examined it?

21 A    Yes.

22 Q    Could you --

23          MR. PIMSNER:  At this point I would move to admit 18

24 and publish it, your Honor.

25          MR. BOCK:  No objection.

1   THE COURT:  18 is admitted, and may be published.

2   BY MR. PIMSNER:

3   Q    Could you describe what you observed on the front walkway?

4   A    Yeah.  As I observed the front door, I observed more packing

5        peanuts, more of the oily substances, feces, and as you

6        approach closer to the front door there was a pile of dead

7        animals.

8   Q    And was there also paint thrown on the walkway?

9   A    Yes.

10       MR. PIMSNER:  May the witness see Exhibit 22, your

11  Honor?

12       THE COURT:  Yes.

13  BY MR. PIMSNER:

14  Q    Does this photograph better depict the area where you

15       observed the dead animals?

16  A    Yes, it does.

17  Q    And is that an accurate picture from November 1st?

18  A    Yes.

19       MR. PIMSNER:  May this be admitted and published, your

20  Honor?

21       MR. BOCK:  Subject to my previous record, your Honor.

22       THE COURT:  Yes, the exhibit may be admitted and

23  published.

24  BY MR. PIMSNER:

25  Q    Could you please describe what you -- what the jury is

1       seeing on this photograph?

2   A   Yes, the -- it's a pile of various colors of paint, but also

3       the large brown spot -- as I recall it's feces, but if you

4       look a little bit towards the front of the house where -- if

5       you could see in the corner of the picture, there's a lawn

6       chair legs or something, that pile is actually dead animals.

7           MR. BOCK:  Your Honor, that was -- this was subject to

8   my previous record, this exhibit.

9           THE COURT:  Do you want the record to reflect that, or

10  --

11          MR. BOCK:  Yes.

12          THE COURT:  All right, the record may so reflect.

13          MR. PIMSNER:  And let me -- may the witness be shown

14  Exhibit 24?

15          THE COURT:  Yes.

16  BY MR. PIMSNER:

17  Q   Does this give a better view of the -- the pile of dead

18      animals that you previously described?

19  A   Yes, it does.

20          MR. PIMSNER:  May this be admitted and published, your

21  Honor?

22          MR. BOCK:  Subject to my previous record, your Honor.

23          THE COURT:  Yes, subject to previous objection the

24  exhibit is admitted, and may be published.

25  BY MR. PIMSNER:

1  Q   And could you tell what type of animals those were?

2  A   I couldn't get the exact -- what type of animal they were.

3      They were desert type animals.  One was a rodent, and then

4      there were birds.  You could pick out feathers, and you

5      could tell that they were desert creatures, though.  They

6      didn't appear to be domesticated animals.

7  Q   Now, did they -- did the animals appear to have been soaked

8      in some type of fluid?

9          MR. BOCK:  Objection to that, your Honor.

10         THE COURT:  No, overruled.

11  BY MR. PIMSNER:

12  Q   You may answer.

13  A   Yeah, they appeared to be soaked in a motor type oil

14      substance.  Also, it almost smelled like a -- a soy sauce

15      type.  I mean, it was a very pungent smell.

16  Q   Now, do the Levine's have a seating area near their front

17      door -- next to their front door?

18  A   Yes.

19  Q   What did that seating area consists of?

20  A   The seating area had a couple of chairs, and a small table.

21  Q   And did you examine that area also?

22  A   Yes.

23  Q   And did you observe anything unusual?

24  A   Yes, I observed a dead coyote that was partially decomposed

25      that was kind of in a plastic bag, that -- it was placed

1       underneath -- or in the area of those.

2              MR. PIMSNER:  May the witness be shown Exhibit 26, your

3       Honor?

4              THE COURT:  Yes.

5       BY MR. PIMSNER:

6       Q    Does that accurately depict the coyote that you observed on

7            November 1st?

8       A    Yes, it does.

9              MR. PIMSNER:  May this exhibit be admitted and

10      published, your Honor?

11             MR. BOCK:  Subject --

12             THE COURT:  Subject to previous objection, 26 is

13      admitted and published.

14      BY MR. PIMSNER:

15      Q    Now, you indicated there was some plastic on the coyote.

16           Could you point to that area?

17             It would have been towards the head area?

18      A    Yes.

19      Q    Besides the -- the -- the acts, the conduct, the oils, and

20           the animals that you -- and the graffiti that you observed

21           at the Levine's, does that community -- do they share a

22           community kind of mailbox section, or does each house have

23           its own individual mailbox at the home?

24      A    They have a -- they're pretty common in the Tucson area

25           where it's probably 15 or 20 individual boxes and a large

| | |
|---|---|
| 1 | mailbox that's kind of on a common area. |
| 2 | Q   And did you have an opportunity to view that mailbox area? |
| 3 | A   Yes, I did. |
| 4 | Q   Did you notice any damage to any of those mailboxes? |
| 5 | A   All the mailboxes in this certain bank of them were -- were |
| 6 | complete and un-messed with, except for the Levine's mailbox |
| 7 | which had been vandalized. |
| 8 | Q   And how -- how was it vandalized? |
| 9 | A   It was -- the door was pried open, and the contents were |
| 10 | spray painted. |
| 11 | Q   And that was the only mailbox that was touched at -- on that |
| 12 | bank of mailboxes, correct? |
| 13 | A   Yes. |
| 14 | MR. PIMSNER:  May the witness be shown Exhibit 4 and |
| 15 | then Exhibit 5? |
| 16 | THE COURT:  And sir, you can clear that screen again, |
| 17 | the left-hand corner. |
| 18 | There you go. |
| 19 | BY MR. PIMSNER: |
| 20 | Q   Now, first of all, going back to Exhibit 4, does that -- is |
| 21 | that a photograph of the Levine's mailbox? |
| 22 | A   Yes. |
| 23 | Q   And does that depict the damage to the front door? |
| 24 | A   Yes. |
| 25 | MR. PIMSNER:  And may this be published and admitted, |

1    your Honor?

2              MR. BOCK:  Same.

3              THE COURT:  Yes, subject to same objection, 4 is

4    admitted and may be published.

5    BY MR. PIMSNER:

6    Q    And could you point out the damage to the mailbox?

7    A    Yeah, the door itself is damaged here.  See, it's deformed.

8         And then also, the contents are discolored.

9    Q    Let me show you Exhibit 5.  Does that exhibit show the

10        contents of that mailbox?

11   A    Yes.

12   Q    And was there paint sprayed on the contents?

13   A    I can't tell for sure.

14   Q    But do the contents look like they're damaged?

15   A    Yes.

16             MR. BOCK:  Objection to that, your Honor.

17             THE COURT:  No, overruled.

18   BY MR. PIMSNER:

19   Q    And does that accurately depict the contents back on

20        November 1st?

21   A    Yes.

22             MR. PIMSNER:  Again, your Honor, I'd move to admit and

23   publish.

24             MR. BOCK:  Same.

25             THE COURT:  Exhibit 5 is admitted and published over

1   the objection of defense counsel.

2   BY MR. PIMSNER:

3   Q   Now, would you have turned the scene over to the detective

4       and the crime scene specialist once they arrived?

5   A   Yes.  Once Detective Paul arrived, I would give him a

6       summary of what I had.  And then once the crime scene

7       specialist showed up, I would point out some items of

8       evidence that I had observed, but also assist with evidence

9       gathering if necessary.

10  Q   And did you remain -- did you -- so you would have assisted

11      in some of the collection of the evidence by pointing things

12      out for the crime tech -- crime scene tech?

13  A   Yes.

14  Q   And who would have been responsible for actually seizing

15      those items of evidence and placing them in evidence?

16  A   That would be the crime scene tech.

17  Q   So you would not have been in that chain of custody?

18  A   Not for this case.

19  Q   And who was that in this case?

20  A   Jim Bradley.

21  Q   Was it Jim --

22  A   Or --

23  Q   -- or John?

24  A   -- John Bradley.

25  Q   Did you assist in removing the dead animals that were found

1       at the scene?

2    A  Yes, we did.

3    Q  And what did you do with those?

4    A  We got one of our patrol vehicles, a truck, and we got some

5       plastic bags, and we -- after the evidence was photographed

6       and there wasn't any further evidentiary value for them, we

7       bagged them up and we took them to the landfill.

8    Q  And when you were collecting the animals, were you able to

9       give a better quantity or -- or identify these animals any

10      further?

11   A  The coyote was definitely something I observed.  The other

12      bird -- there were a couple of birds, and then at least one

13      rodent, but I can't tell exactly what type of animals they

14      were.

15   Q  Could you tell what type of birds they were?

16         MR. BOCK:  He just answered that, Judge.  Asked and

17   answered.

18         THE COURT:  I believe that's been asked and answered.

19         MR. PIMSNER:  Thank you.

20         May I have one moment?

21         THE COURT:  Yes.

22   BY MR. PIMSNER:

23   Q  Based on your training and experience as an officer

24      throughout the years, how would you compare that smell to

25      maybe other smells that you would have encountered during

1       the course of your employment?

2              MR. BOCK:  Objection, that's immaterial.

3              THE COURT:  No, overruled.

4              Go ahead.

5              THE WITNESS:  It was comparable to -- to other dead

6       bodies that I've encountered in my career.  You know, anything

7       from livestock to, unfortunately, people.

8              MR. PIMSNER:  I -- at this time the government has

9       nothing further, your Honor.

10             THE COURT:  All right.

11             Cross-examination?

12                         CROSS-EXAMINATION

13      BY MR. BOCK:

14      Q    What time did you get to the -- to the gate at the -- at

15           the -- the Tear Blanket property?

16      A    I'm sorry, the Tear Blanket property itself, or the gate

17           from the original call?

18      Q    The gate on the original call.

19      A    I was -- I don't have my report in front of me, but it was

20           approximately 8:15 or so in the morning.

21      Q    Would you be more comfortable if I showed you your report?

22      A    Sure.

23             MR. BOCK:  May I approach the witness?

24             THE COURT:  Yes.

25             MR. BOCK:  Shall I mark this?

```
 1              THE COURT:  Technically, yes.

 2              MR. BOCK:  We marked this 406, your Honor.

 3              THE COURT:  All right.  And you may approach the

 4    witness.

 5              MR. BOCK:  Thank you.

 6              THE WITNESS:  Thank you.

 7              MR. BOCK:  There you go.

 8              THE COURT:  Did you want to refer him to a particular

 9    part of the report, or read the whole thing, or --

10    BY MR. BOCK:

11    Q    Did you see where you put the time on, where your -- the

12         time you arrived?

13    A    Let's see.  I'm looking for it.  This is -- this is the

14         narrative portion.  Usually, the time of arrival is a couple

15         pages back.

16              MR. BOCK:  I have more pages.

17              THE COURT:  Take your time.

18              MR. BOCK:  I can go back and get them.

19              THE COURT:  Oh, you -- all right.

20              MR. BOCK:  I'll use this as Exhibit 6, also Exhibit

21    406.

22              THE COURT:  All right, that will be a made part of 406.

23    BY MR. PIMSNER:

24    Q    Does that help you, that page?

25    A    Yes, this would show my arrival time at Tear Blanket.
```

```
1   Q   Okay, so what time did you arrive?

2   A   It shows 8:37.

3   Q   Okay.  8:37 in the morning?

4   A   Yes.

5   Q   And that was -- on what day -- what day of the month?

6           November 1st?

7   A   Well, if you'd --

8   Q   Was that November 1st?

9   A   Sorry.  If I could refer to my report, please, because I

10      don't want to get this incorrect.

11  Q   Okay.  Here you go.

12          THE COURT:  You may approach the witness.

13          MR. BOCK:  May I?

14          THE COURT:  Yes.

15          THE WITNESS:  Thank you.

16          Yes, November 1st, 2008.

17  BY MR. BOCK:

18  Q   Okay.  All right, so you said when you were being examined

19      by the government that you noticed the gate looked like it

20      had some damage to it; is that correct?

21  A   Yes.

22  Q   And did it look like the damage was caused by a vehicle, or

23      was it -- do you have a feel for whether or not it was done

24      by a vehicle, or somebody with an instrument?

25  A   I couldn't tell for sure.  I just noticed that it was
```

1    damaged.

2  Q  Okay.  And you said there wasn't a guard on duty when you

3     were there; is that correct?

4  A  The -- the gate that I responded to is -- is not attended by

5     a guard.

6  Q  Is there a guard house at the main entrance?

7  A  Yes.

8  Q  And there's a guard at the main entrance?

9  A  Yes.

10 Q  The -- when you got at the scene, you noticed a -- a lot of

11    graffiti, is that correct?

12 A  Yes.

13 Q  What was the height of some of the graffiti on the house?

14 A  It was approximately a foot and a half or so.

15 Q  What about on the top?  One of those pictures on the garage.

16 A  I don't know exactly, because I did not measure it.

17 Q  Okay.  Could you have reached it with your hand?

18 A  Yes.

19 Q  Okay, at shoulder length, or -- or higher?

20 A  Well, considering I'm six-one, and at the edge of the

21    garage, if that's what you're referring to, it would

22    probably be above my head.

23 Q  Okay.  Now, there was a number of writing that was depicted

24    in those pictures, is that correct?

25 A  Yes.

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  | Q | Writing is always a good law enforcement tool, is it not?   |
| 2  | A | It could be.                                                 |
| 3  | Q | Also, you indicated that you saw footprints, did you not?   |
| 4  | A | I don't refer -- or especially remember as far as my report |
| 5  |   | as to whether I reported footprints or not, but I observed  |
| 6  |   | footprints on the scene.                                     |
| 7  | Q | Okay.  Let me read you one paragraph, and if you disagree   |
| 8  |   | with this I'll bring up the report.  It says:  Upon arrival |
| 9  |   | of J. Bradley I assisted with the photography, and then the |
| 10 |   | last sentence of that paragraph is multiple footprints were |
| 11 |   | observed on the scene and on the driveway of the vacant     |
| 12 |   | house?                                                       |
| 13 | A | Yes.                                                         |
| 14 | Q | Does that refresh your recollection?                        |
| 15 | A | Yes.                                                         |
| 16 | Q | So what did the footprints look like?                       |
| 17 | A | They were various footprints which -- which were            |
| 18 |   | photographed and documented, and put into evidence.         |
| 19 | Q | And are you -- you're a uniformed officer, then, or are you |
| 20 |   | a detective?                                                 |
| 21 | A | No, I'm a uniformed officer.                                 |
| 22 | Q | Okay.  And you understand the importance of preserving the  |
| 23 |   | scene, right?                                                |
| 24 | A | Yes.                                                         |
| 25 | Q | And you understand the significance of footprints --        |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | -- right? |
| 3 | | They can be used to compare shoes that individuals may |
| 4 | | have worn? |
| 5 | A | Yes. |
| 6 | Q | Did the footprints -- were they on top of the paint, or on |
| 7 | | top of the substances that you -- that you saw? |
| 8 | A | They would be either on the driveway themselves, which could |
| 9 | | have been marked, or actually in -- within the materials as |
| 10 | | well. |
| 11 | Q | And when you say multiple footprints, is that five |
| 12 | | footprints, ten footprints?  What do you -- |
| 13 | A | Multiple just means more than one. |
| 14 | Q | Were the footprints of different size and different width? |
| 15 | A | Very possible.  That's why -- this photograph, for |
| 16 | | documentation purposes. |
| 17 | Q | Now, the amount of -- of time that was spent at the house, |
| 18 | | were the Levines in the house when -- when this occurred? |
| 19 | A | When the -- when the actual act happened, they -- the |
| 20 | | Levines both told me they were at the residence. |
| 21 | Q | And the amount of time would have been to take a large |
| 22 | | amount of oil, is that correct? |
| 23 | A | Large amount of oil to -- |
| 24 | Q | To make these oil stains? |
| 25 | A | Yeah, it wasn't a quick act.  I don't know.  I can't |

1      speculate how long it took, but it was more than just a
2      minute.
3  Q  Could have been an hour or more?
4  A  I don't -- can't tell you for sure.
5  Q  And the mailbox was how far from the residence?
6  A  It was approximately 50 to 75 feet.
7  Q  Could you see any footprints or anything that went from the
8      residence to the mailbox?
9  A  I don't recall any.
10 Q  Did you look for them?
11 A  I don't recall.
12 Q  Did you see any tire tracks associated with the residence?
13 A  I -- I don't recall for sure.  It wasn't in my report, but
14     it could have been documented by Detective Paul or somebody
15     else.
16 Q  Now, how far was this gate from the main gate?
17 A  You're speaking of the gate -- or the gate that was pushed
18     open?
19 Q  Yes, sir.
20 A  It's approximately three quarters of a mile to a mile up
21     Dove Mountain Boulevard.
22 Q  Does the gate have any type of alarm if it's pushed open?
23 A  I have no idea.
24 Q  So you don't know if there was an alarm associated with a
25     forced entry into a gated property?

1    A    No.

2    Q    Did you associate a vehicle with the -- one of -- did you

3         talk to a resident that associated a vehicle parked near the

4         residence?

5    A    There was a -- directly adjacent to the Levine's residence

6         there was a -- a truck backed into a house that -- because

7         this was a large scene, the neighbors were out and -- and as

8         I recall, one or two neighbors pointed out that -- vehicles

9         not belonging to the neighborhood, because it's a very close

10        neighborhood.

11   Q    But that vehicle was there when you were there?

12   A    Yes.

13   Q    And did you make any inquiries about the vehicle, or the

14        owner of the vehicle?

15   A    I do not recall, but I would have pointed it out to

16        Detective Paul.

17   Q    So you don't know if the vehicle had been abandoned, or it

18        was there legitimately?

19   A    I did not know at that point.

20   Q    You didn't go inside the Levine residence, did you?

21   A    I did.

22   Q    And you met with both Mr -- is it Levine or Levine?

23   A    I don't know for sure.

24   Q    You met with both Mr. Levine and Mrs. Levine at that time,

25        is that correct?

1    A    Yes.

2    Q    So how long did you stay there?

3    A    I was on scene approximately two to three hours.

4    Q    And you were investigating a state crime, is that correct?

5    A    At that point, yes.

6    Q    And the crime you were investigating would have been what,

7         criminal damage?

8    A    Yes.

9              MR. BOCK:  May I have a second, your Honor?

10             THE COURT:  Yes.

11             MR. BOCK:  Nothing further.  Thank you.

12             THE COURT:  Any redirect?

13             MR. PIMSNER:  Very briefly.

14                     REDIRECT EXAMINATION

15   BY MR. PIMSNER:

16   Q    Officer Muszala, you were asked about a vehicle that was

17        described in the general vicinity of the Levine's residence

18        that a resident didn't recognize, is that correct?

19   A    Yes.

20   Q    And is that a -- a resident by the name of James Moore?

21   A    I don't recall the name of the person.

22   Q    And do you have your report in front of you?

23             Would that help refresh your recollection?

24   A    It would, but I don't have it in front of me.

25             MR. PIMSNER:  May I approach the witness with the

1  defense exhibit?

2          THE COURT:  Yes.

3          THE WITNESS:  Thank you.

4  BY MR. PIMSNER:

5  Q    Let me ask you to turn to the top of page 4 of 4 of your

6       report.

7  A    Yeah, it does say I spoke with resident James Moore.

8  Q    And did he describe the truck that he observed?

9  A    Yes.

10 Q    And what was it?

11 A    Mid 70's green Ford truck.

12 Q    And did he say what time he observed that truck?

13 A    He said approximately 2300 hours, 11:00 p.m. the previous

14      evening is when he said he saw it.

15 Q    That would have been on Halloween, or October 31st, 2008?

16 A    Yes.

17 Q    Now, was that truck that you said you saw present -- was

18      that the same truck described by resident James Moore?

19 A    Yes.

20 Q    And it was still present at the time?

21 A    Yes.

22 Q    Okay.  All right.  And when the -- when you reviewed the

23      scene, there were -- there was a house, like, attached to

24      the Levine's house, correct?

25 A    Yes, it's a duplex.

| | |
|---|---|
| 1 | Q    And then there was one directly across from their front, is |
| 2 | that correct? |
| 3 | A    Yes. |
| 4 | Q    And next door on the opposite side? |
| 5 | A    Yes. |
| 6 | Q    There were multiple homes within very close proximity; is |
| 7 | that fair to say? |
| 8 | A    Yes. |
| 9 | Q    Were any other homes hit with any graffiti or any type of -- |
| 10 | MR. BOCK:  Judge, this is -- I'm going to object as to |
| 11 | improper redirect. |
| 12 | THE COURT:  No, overruled. |
| 13 | Go ahead. |
| 14 | BY MR. PIMSNER: |
| 15 | Q    Were any homes -- other homes, other than the Levine's |
| 16 | either graffitied or attacked with oil, dead animals, or any |
| 17 | of the other substances you described? |
| 18 | A    No. |
| 19 | MR. PIMSNER:  Nothing further, your Honor. |
| 20 | THE COURT:  Any questions from the jury for this |
| 21 | witness? |
| 22 | All right, may this witness step down and be excused? |
| 23 | MR. PIMSNER:  Yes, I'm sorry. |
| 24 | THE COURT:  All right. |
| 25 | Thank you.  You may step down and be excused.  You can |

1  just hand that to the lawyers, or -- Mr. Book.

2          And members of the jury, let's go ahead and take a ten

3  minute afternoon recess.  You can leave the things on your

4  chairs, or take them back with you to the jury room if you'd

5  like.

6          ------------------------

7          (Myles Levine was duly sworn by the clerk.)

8          THE COURT:  Ms. Anderson, you may proceed.

9          MS. ANDERSON:  Thank you, Judge.

10                        MYLES LEVINE

11                     DIRECT EXAMINATION

12  BY MS. ANDERSON:

13  Q    Mr. Levine, sir, do you -- do you work?

14  A    I do some part-time work, not really public work, yes.

15  Q    And how long have you done that?

16  A    Six or seven years.

17  Q    Here in Tucson?

18  A    Yes.

19  Q    Now, prior to doing that, were you retired?

20  A    I retired in 1999.

21  Q    What kind of work did you do before you retired in 1999?

22  A    Basically I was teaching automobile dealers, and employees

23       business ethics.

24  Q    Where did you do that?

25  A    In the Chicago area.

1    Q    Was that where you lived prior to moving here to Tucson?

2    A    Yes.

3    Q    And before we talk about your move here to Tucson, let's

4        talk about -- do you have any kind of formal education?

5    A    I have bachelor of science degree, University of Chicago.  I

6        have an MBA from the University of Chicago.  I have a Ph.D

7        from the University of Chicago.

8    Q    And what did you obtain those degrees in?

9    A    Business administration, and my dissertation was business

10        ethics and corporate responsibilities.

11    Q    When did you move here to Tucson?

12    A    2002.

13    Q    Okay, you and your wife Karen?

14    A    Yes.

15    Q    Where here in Tucson did you move to?

16    A    To Heritage Highlands in Dove Mountain.

17    Q    And could you describe that community for us?

18    A    It's basically a 55 and over community, retiree, golf course

19        type setting, about 1,000 to 2,000 homes.

20    Q    Are the homes connected?

21    A    Some are, yes.

22    Q    But some are not connected?

23    A    That is correct.

24    Q    Where did -- what was the address that you lived at, you and

25        your wife Karen?  Where did you live in Heritage Highlands?

1   A    5372 West Tear Blanket Place.

2   Q    Was that home connected to your -- to your neighbor?

3   A    Yes, it was.

4   Q    I'm going to show you Government's Exhibit Number 8.

5          Could you take a look at it?

6          This has already been admitted into evidence.

7          Sir, do you recognize that?

8   A    Yes, that was --

9   Q    What do you recognize that as being?

10  A    My home.

11  Q    That was your home in Dove Mountain, was it not?

12  A    Correct.

13  Q    Now, do you know the defendant in this case, Todd Fries?

14  A    Yes, I do.

15  Q    Do you see him here in the courtroom?

16  A    Yes, I do.

17  Q    Could you point to him and tell us what he's wearing?

18  A    He's sitting over there wearing a suit, and looks like a

19      white shirt and a reddish tie.

20  Q    Is he sitting next to Mr. Bock?

21  A    Yes, he is.

22      MS. ANDERSON:  May the record reflect the

23  identification of the defendant?

24      THE COURT:  Yes, the record may so reflect.

25  BY MS. ANDERSON:

| | | |
|---|---|---|
| 1 | Q | Sir, how is it that you know the defendant Todd Fries? |
| 2 | A | He basically was hired to resurface my driveway. |
| 3 | Q | When was it that you hired Mr. Fries? |
| 4 | A | I'm sorry? |
| 5 | Q | Well, let me ask you a different question. |
| 6 | | What did you hire Mr. Fries to do to your driveway? |
| 7 | A | To sand it down and resurface it, to take the old coating |
| 8 | | off because it couldn't be cleaned, and recoat it. |
| 9 | Q | Were you and your wife experiencing problems with your |
| 10 | | driveway before you hired Mr. Fries? |
| 11 | A | Yes. |
| 12 | Q | Could explain that to us? |
| 13 | A | Basically, you couldn't clean it.  It had a lot of tire |
| 14 | | marks on it, everything else.  My wife was out there every |
| 15 | | day with a heavy broom and water sweeping it down to clean |
| 16 | | the driveway. |
| 17 | Q | And that was the condition of your driveway when you moved |
| 18 | | in, correct? |
| 19 | A | No, we had that surfaced like that. |
| 20 | Q | You had it what? |
| 21 | A | We had the surface put on it after we moved in. |
| 22 | Q | All right, so this was work that somebody else had done |
| 23 | | prior -- or after you purchased the house, correct? |
| 24 | A | Correct.  Yes. |
| 25 | Q | Do you -- do you remember when it was that you had that work |

1          done?

2     A    That would have been late 2002, early 2003.

3     Q    What kind of work did you have done to the driveway, if you

4          recall?

5     A    There was a base coat, color coat put on it.  There was two

6          types of cement.  I want to say spackling.  I don't know a

7          better word, it was spots of different colored cement.  And

8          then there was clear coating put over it.

9     Q    And this was work done by another contractor, correct?

10    A    Correct.

11    Q    In 2002, is that correct?

12    A    Correct.

13    Q    Now, in Heritage Highlands where you were living at the

14         time, do they have any kind of restrictions regarding the

15         color of driveways, or colors of your homes?

16    A    The driveway coatings had to match one of the two colors of

17         the home.

18    Q    Okay.  So back in 2002 when you hired somebody else to do

19         it, did they use a color that matched your home?

20    A    Actually, they used both colors to match the homes.

21    Q    So you weren't concerned about the color.  It was the

22         surfacing, correct?

23    A    Correct.  Yes.

24    Q    Now, were you satisfied with the quality of the work that

25         was done by that contractor?

1  A   Well, other than after a while being very difficult to
2      clean, yes, I was.
3  Q   So as a result of -- of your unhappiness with having to
4      clean it all the time, what did you do?
5  A   We decided to go ahead and find out about having it
6      refinished so it would be easier to clean.
7  Q   And was that when you found Mr. Fries?
8  A   That's when Mr. Fries was first brought into the picture,
9      yes.
10 Q   And do you recall when that was?
11 A   I want to say mid 2005.
12 Q   How did you find Mr. Fries?
13 A   I did not do it.  My wife found him.
14 Q   And did Mr. Fries come out to your house?
15 A   Yes.
16 Q   And take look at it?
17 A   Yes.
18 Q   And you explained to him what you wanted?
19 A   He was told, yeah, the problem we were having was making
20     it -- keeping it clean, because there were, I guess, too
21     many ridges in the clear coat, so it wasn't smooth, and just
22     too hard to clean it up.
23 Q   Did -- did you and your wife and the defendant arrive at a
24     price?
25 A   My wife did the dealings with the defendant.

```
 1    Q    You don't recall -- or you weren't aware of the price, is

 2         that right?

 3    A    I wasn't aware of it.

 4    Q    Okay.  Did Mr. Fries indicate that he wanted cash only?

 5    A    My wife told me that he wanted cash only, yes.

 6              MR. BOCK:  Objection.  I'm going to object to

 7    statements attributed to his wife as hearsay.

 8              THE COURT:  Yes, sustained.

 9              MS. ANDERSON:  I'll be mindful of that, your Honor, as

10    it goes along.

11    BY MR. PIMSNER:

12    Q    Now, did you do the negotiations with the defendant, or did

13         your wife do most of the negotiations?

14    A    My wife did.

15    Q    But were you aware of what the terms were, and what was

16         being done on the driveway?

17    A    I was aware of the terms, yes.

18    Q    All right.  So back in 2000 -- was it 2005 at this point

19         that Mr. Fries did some work on your driveway?

20    A    He -- no, the work wasn't done until late 2006, possibly

21         early 2007.

22    Q    And do you recall what -- what Mr. Fries was asked to do to

23         the driveway?

24    A    Basically, grind down what was on it, and recoat it.

25    Q    And did he send a crew out?
```

1   A    I'm sorry?

2   Q    Did Mr. Fries do the work himself, or did he send a crew out

3         to do the work?

4   A    He brought a crew out to do it.

5   Q    Do you recall how many men were in the crew -- or women

6         also?

7   A    I believe there was two workers working on the driveway.

8   Q    Do you recall their names?

9   A    No, I don't.

10   Q    And do you know what they did to the driveway?

11   A    Well, they started to try to rough up, I guess, the coating

12         with -- I guess the type of buffer you'd use on a floor

13         to -- to rough it up.  No other reason, I was told.  It

14         didn't work.

15   Q    And then what did they do?

16   A    Contact Mr. Fries, and the next thing they tried was belt

17         sanders.

18   Q    And did that work?

19   A    No, it didn't.  Couldn't -- they still couldn't, you know,

20         get the surface off.

21   Q    Okay, and did they try something else?

22   A    Yeah, they finally ended up using -- I want to say

23         commercial but I can't tell for sure, but it was grinders

24         that were handheld, so they were on their hands and knees

25         with grinders moving back and forth to grind the top coat

1    off.

2  Q   And did that work?

3  A   That finally worked, yes.

4  Q   Did they paint the surface?

5  A   Yes, after it was all ground down.

6  Q   How long did it take them to do the work?

7  A   It -- to the best of my knowledge, it was over about a two

8      week period.

9  Q   After the end of the two weeks, were you satisfied with

10     the -- with the job?

11 A   It seemed okay.  We weren't on the driveway, you know, for a

12     while.

13 Q   How about the color?  Was the color accurate, or was the

14     color right?

15 A   The color was a little blotchy.  It wasn't even.

16 Q   How about the surface itself?

17 A   The surface was slippery.

18 Q   Tell us about that.

19 A   When there was water on the driveway, you'd walk on the

20     driveway and basically fall.

21 Q   Did you fall?

22 A   Yes, I did.

23 Q   Did your wife fall?

24 A   A number of times.

25 Q   Was that a concern for you?

1  A   Yes, it was.

2  Q   So what did you do?

3  A   We contacted Mr. Fries again about, you know, fixing it.

4      There was something wrong.

5  Q   Do you have an idea of when it was that you contacted

6      Mr. Fries a second time?

7  A   It was probably late in 2007.  2007, late 2007.

8  Q   And you explained the situation to Mr. Fries?

9  A   The -- my wife had a number of times explained the situation

10     to Mr. Fries.  Again, the first issue was the paint

11     coloring, and then it became the issue of both the paint

12     coloring and the slipperiness.

13 Q   Did Mr. Fries agree to -- to try and fix it?

14 A   It ended up yes, to saying, well, yeah, I can fix it.  It's

15     going to cost you again.

16 Q   So you were asked to pay additional funds, is that right?

17 A   Correct.

18 Q   Did you and Karen agree to do so?

19 A   Yes.

20 Q   How about the paint?  Were you asked to buy the paint

21     yourself?

22 A   That was part of the agreement, that he would do the labor

23     but we had to buy the paint, because the paint coloring was

24     an issue.

25 Q   And did you go ahead and buy the paint yourself?

1  A    Yes, we did.  We went to Sherwin Williams to buy the paint.

2  Q    And did Mr. Fries do the work himself, or did he send a crew

3       out?

4  A    He sent a crew out.

5  Q    How many were in the crew?

6  A    I think at that time there was three.

7            MR. BOCK:  Could we have some foundation, Judge?

8            THE COURT:  Could you just lay some foundation for that

9  number?

10 BY MS. ANDERSON:

11 Q    Now, you told us that you believe there were three in the

12      crew that came out to your home the second time.  Did you

13      actually see them?

14 A    Yes, I did.  I -- it -- to the best of my knowledge, there

15      was two actual workers and a manager or a supervisor trying

16      to tell them what had to be done.

17           MR. BOCK:  Judge, could we have a date and time?

18           MS. ANDERSON:  I believe he said it was late 2007 to

19 the best of his recollection.

20 BY MS. ANDERSON:

21 Q    Is that correct?

22 A    Actually, I think the work was done the -- in early 2008.

23 Q    Do you have any recollection of when in 2008 it might have

24      been done?

25 A    February.

1  Q  All right.  Now, how long did it take the crew this time to
2     complete the job?
3  A  It basically took them a day.
4  Q  And did you see what they did to the --
5  A  Re-painted it.
6  Q  Did they -- did you see that they attempted to do anything
7     to repair the slipperiness?
8  A  I think they put a little bit of sand in it, because that's
9     what it basically needed.
10 Q  Now, do you recall negotiating or agreeing on an additional
11    fee for this work?
12 A  There was additional work that had to be done because the
13    paint color was correct, but the slipperiness was still
14    there.
15 Q  All right.  And do you know how much the negotiated price
16    was?
17 A  The next price was $400 to put sand and clear coat on top of
18    the painted surface.
19 Q  And, now, did you and Mr. Fries arrive at some kind of a --
20    an arrangement where you would pay for half of the -- of the
21    price up-front, and then half at a later time?
22 A  Yes.
23 Q  Could you explain that to us?
24 A  There were two checks written, the one for $200, and then
25    the second one for $200 to be good 30 days after the job was

1    done, as long as nobody slipped.

2 Q  Because that was a concern of yours, correct?

3 A  It was a big concern.

4 Q  After they completed the job, which I believe you told us

5    one day, were you satisfied with the color?

6 A  The color looked fine.  Yeah.

7 Q  Were you satisfied with the surface itself?

8 A  Yes.

9 Q  Did it continue to be slippery?

10 A  It did not continue to be slippery.

11 Q  So you gave Mr. Fries a check for 200, is that correct?

12 A  I -- I gave his manager, again, or supervisor both checks

13    when they did the job.

14 Q  At the same time?

15 A  At the same time.

16 Q  But did you convey that he could cash the first check?

17 A  Correct.

18 Q  All right.  And based on your review of your own bank

19    records, did you determine that he in fact cashed that

20    check?

21 A  The second check, no.

22 Q  No, I'm talking about the first check.

23 A  The first check was cashed.

24 Q  Now, did you ever convey to Mr. Fries that the quality of

25    the job was -- was satisfactory to you, and that he could

1    cash the second check?

2  A  No.

3  Q  You never conveyed that to him?

4  A  No.

5  Q  How much time -- well, was it understood between the two of

6     you that he would cash the check if he didn't hear from you?

7  A  Correct.

8  Q  So you never called Mr. Fries, which was part of your

9     understanding that the two of you had that unless he heard

10    from you, he could cash the second check?

11 A  That is correct.  If nobody slipped, the check was good.

12 Q  Did you explain to him how long he needed to wait before

13    cashing the second check?

14 A  It was one month.

15 Q  Do you recall the date of the -- of the first check?

16 A  The first check, I believe, was for the end of April.  The

17    second check would have been for the end of May.

18 Q  If we could take a look at Government's Exhibit Number 244,

19    sir, do you recognize that?

20 A  Yes.

21 Q  What do you recognize that as being?

22 A  That was the first check that I wrote when the -- for

23    finishing the job that was good right away.

24       MS. ANDERSON:  All right, the government moves for

25 admission of Exhibit 244.

1          THE COURT:  Any objection?

2          MR. BOCK:  Could you just -- can you just blow it up a

3   little?

4          May I voir dire the witness as to one question?

5          THE COURT:  Yes.  Go ahead, Mr. Bock.

6                    VOIR DIRE EXAMINATION

7   BY MR. BOCK:

8   Q    Mr --

9          THE COURT:  Why don't you stand when you -- I know the

10  microphone's a little further away from you, but you could maybe

11  hold up that microphone.  There you go.

12         Go ahead.

13  BY MR. BOCK:

14  Q    Mr. Levine, on the memo on the -- Exhibit 244, you have the

15       date of May the 30th of 2008, and then you say not valid

16       until April 30th of 2008, and you wrote that in the

17       beginning of April?

18  A    I wrote -- actually wrote the checks in February.

19  Q    You wrote both checks?

20  A    The end -- both checks the end of February.  I'm on

21       disability.  I'm on a limited income, so I have a very tight

22       budget.

23         MR. BOCK:  Okay.  Thank you, then.

24         THE COURT:  So any objection to the exhibit?

25         MR. BOCK:  No objection.

1          THE COURT:  All right, the exhibit is admitted, and may

2   be published.

3   BY MS. ANDERSON:

4   Q    I notice that it's made payable to Todd Fries.  Do you see

5        that there?

6   A    Yes, I do.

7   Q    Now, did Mr. Fries ask that it be made payable, to him or to

8        his business?

9          MR. BOCK:  Objection.  That's immaterial, Judge.

10          THE COURT:  No, overruled.

11          Go ahead, you may answer -- do you know the answer,

12   sir?

13          THE WITNESS:  Yes, I do.

14          THE COURT:  All right, go ahead.

15          THE WITNESS:  The -- I had originally written two

16   checks, both out to Burns Power Washing.  I was told that they

17   wouldn't accept them.  They had to be made out to Todd Fries.  I

18   had to void out the two checks I originally wrote, and wrote the

19   second two checks.

20   BY MS. ANDERSON:

21   Q    In fact, let's take a look at -- let's take a look at

22        Government's Exhibit 250 -- let's take a look at 249.

23          Do you see that?

24   A    Yes, I can.

25   Q    What do you see that as being?

1  A    That's one of the original checks that were written.

2  Q    That's the check register, is it not?

3  A    That is correct.

4  Q    Okay, and a check register memorializes the checks that are

5       written, right?

6  A    Correct.

7  Q    So is this -- is this something that you would have filled

8       out yourself?

9  A    Yes, it is.

10 Q    And it pertains to check number 1070, is that right?

11 A    That is correct.

12          MS. ANDERSON:  All right.  The government moves for

13 admission of Exhibit 249.

14          MR. BOCK:  Judge, I have an objection, and I also would

15 want to reserve a motion at this time.

16          May I have a side --

17          THE COURT:  Yes, come on up to sidebar.

18                          BENCH CONFERENCE

19          MR. BOCK:  Judge, I'm going to move for a mistrial.  I

20 think the implication here is that the check is to be written to

21 my client, so he's going to put the money in his pocket and not

22 declare it.  So I think that's an inference that the government

23 is attempting to draw in this case.  I don't think it's proper.

24 And so I think it's prejudicial talking about, oh, it was a

25 company check, now it's made out to him.  It's pretty clear

1  they're trying to paint the picture that he's putting the money

2  in his pocket.

3          THE COURT:  Ms. Anderson?

4          MS. ANDERSON:  Well, he -- absolutely not.  That's not

5  my intention.  If he -- if it's made out to him, he still has to

6  declare it.  By the fact -- by virtue of the fact that the check

7  is written out to him doesn't mean he's trying to just stick it

8  in his pocket and not declare it, because he would still have to

9  declare it.

10          THE COURT:  He is the owner of the business, right?

11          MR. BOCK:  He's the owner of the business.  What's the

12  purpose of getting into the fact it was made out to Burns --

13          MR. PIMSNER:  The second check he made out in the later

14  date, it's in his name.  So that's all part and parcel --

15          THE COURT:  So you're not trying to infer that he was

16  doing anything underhanded?

17          MS. ANDERSON:  No.

18          MR. PIMSNER:  That he was evading taxes?  No.

19          THE COURT:  All right, so I think that you're being

20  extra cautious, but it just sounds like it's a way of explaining

21  these transactions, the relationship between the parties --

22          MR. BOCK:  All right.

23          THE COURT:  -- how the money changes hands.  If you

24  want me to give the jury a cautionary instruction --

25          MR. BOCK:  I don't think -- I made my record.

1    THE COURT:  Okay.  Thank you.

2    MR. BOCK:  Thanks.

3    (The bench conference was concluded.)

4    THE COURT:  All right.  Ms. Anderson, you may proceed.

5    MS. ANDERSON:  Thank you, Judge.

6    The government moves for admission of Exhibit 249.

7    THE COURT:  249 is admitted, and may be published to

8    the jury.

9    And members of the jury, you will have hard copies.  I

10   have those right on the bench here.  And I would say this hard

11   copy is much clearer than what's shown on the screen.  I don't

12   know if there's a way to show it a little more clearly?

13   MS. ANDERSON:  Perhaps on the ELMO.

14   THE COURT:  Is it pretty clear to the jury?  Maybe it's

15   just not clear on mine.

16   Okay, great.

17   Okay.  Go ahead, Ms. Anderson.

18   BY MS. ANDERSON:

19   Q    All right.  So Mr. Levine, we see that according to your

20        check register the check was written on April 4th, is that

21        right?

22   A    Yes.

23   Q    Okay.  But it was payable to Burns Power Washing, and it

24        was -- we see the word void?

25   A    Correct.

1    Q    And why is that?

2    A    Because again, they wouldn't take the checks that were made

3         out to Burns Power Washing.  They insisted on checks made

4         out to Todd Fries.

5    Q    All right.  So let's take a look at Government's Exhibit

6         245.

7              Do you recognize that?

8    A    That's also a voided check, and -- that my wife had started

9         to write to Burns Power Washing.

10             MR. BOCK:  Objection.  His wife should be --

11   BY MS. ANDERSON:

12   Q    We'll save that for when your wife testifies.

13             Let's take a look at Government's Exhibit Number 252 --

14        252.  Okay.

15             Do you recognize that?

16   A    That's the second check that was issued to Mr. Fries for the

17        second $200.

18   Q    All right.  And that was for $200.  That would have been the

19        second check that you postdated, is that right?

20   A    Correct.

21   Q    And it would have been postdated May 31st, correct?

22   A    Correct.

23             MS. ANDERSON:  Government moves for admission of

24   Exhibit 252.

25             THE COURT:  So that's, Ms. Anderson, actually a check

register?

           MS. ANDERSON:  You're right.  I apologize, your Honor.
It is a check register.

           THE COURT:  All right.

           Any objection, Mr. Bock, other than your previous
objection?

           MR. BOCK:  No.

           THE COURT:  All right, 252 is admitted, and may be
published.

BY MS. ANDERSON:

Q    And let's take a look at Government's Exhibit Number 251.

     Do you recognize that?

A    That would have been the first check that I had written to
     Mr. Fries.

Q    Well, that's the check register, is it not?

A    Well, it's the check register, yes, but the -- I believe
     that's the first one.

Q    And it's dated April 30th, correct?

A    Correct.

Q    And it's made payable to Todd Fries?

A    Correct.

Q    According to his own instructions, correct?

A    That is correct.

Q    Now, we see on the bottom it says May 16th.  Do you see
     that?

1    A    That's when the check went through the bank.

2    Q    Would you have written that on there yourself?

3    A    I -- that's my handwriting, yes.

4           MS. ANDERSON:  Government moves for admission of 251,

5    which is the check register.

6           THE COURT:  251 is admitted, and may be published.

7    BY MS. ANDERSON:

8    Q    Let's take a look at Government's Exhibit Number 250.

9           Do you recognize that?

10    A    That's one of the voided checks that I had written, made out

11        to Burns Power Washing from my check register.

12    Q    And the -- that's the check register for check number 1071,

13        correct?

14    A    That is correct.

15           MS. ANDERSON:  And the government moves for admission

16    of Exhibit 250.

17           MR. BOCK:  Subject to the --

18           THE COURT:  Previous objection, 250 is admitted and

19    made be published.

20    BY MS. ANDERSON:

21    Q    All right, so because you didn't call Mr. Fries back, he was

22        free to cash the second check, is that right?

23    A    That is correct.

24    Q    Did you notice at some point in time that he hadn't cashed

25        that check?

1   A   Well, constantly, because I had to keep carrying it over in
2       my ledger because it wasn't cashed.
3   Q   Do you recall how long of a period of time it was that the
4       defendant actually held on to that second check for 200?
5   A   July.
6   Q   Well, the check was written in -- in April, correct?  And --
7       yes?
8   A   Yes.
9   Q   You need to answer audibly.
10          And you were told that he could cash at the end of --
11  A   May.  May 31st.
12  Q   Of May?
13  A   Correct.
14  Q   All right.  So up until -- to the point of July he still
15      hadn't cashed it, is that correct?
16  A   That's correct.
17  Q   Now, what did you do?  What steps did you take to try and
18      ask him, or talk to him to get him to cash the check?
19  A   I called once and left a message to have him call me.
20  Q   And did he call you back?
21  A   No, he did not.
22  Q   So -- so what did you do?
23          What's the next thing you did?
24  A   I finally decided to stop payment on the check.
25  Q   Why did you decide to do that?

1    A    Old habit, I guess.  I don't like having checks out there

2          that I don't know who, what, where, when, our how.  It

3          wasn't cashed.  I didn't know where it was.  I can't keep

4          that good of a record.  And I just got sick of carrying it

5          over, and carrying it over, and carrying it over.

6    Q    Did you consider sending him a new check for $200?

7    A    Not at that point.

8    Q    Why not?

9    A    I guess I was mad enough that -- with everything else that

10         led up to the checks, so I just decided, well, he hasn't

11         cashed the check.  I guess he doesn't want the money.  And I

12         stopped payment on it.

13    Q    And did he call you back?

14    A    Not at that time, no.

15    Q    At some point in time did you receive a phone call from the

16         bank?

17    A    The very next day that I -- after I stopped the check.

18    Q    Tell us about that phone call.

19            MR. BOCK:  Objection.

20    A    I received a phone call --

21            MR. BOCK:  I'm going to object to the words of the

22    phone call as hearsay.

23            THE COURT:  Well, I'm not sure it's being offered for

24    the truth of the matter, but I guess I need to see counsel at

25    sidebar, then.

1                            BENCH CONFERENCE

2          THE COURT:  So what's he going to say?

3          MS. ANDERSON:  He's going say that he received a phone

4    call.  The caller ID came up as being identified as his bank.  It

5    was a female on the phone who claimed that she had made a

6    mistake, and that she had inadvertently cashed the check for

7    Mr. Fries because he had come in to try to cash it.

8          We're not offering it for the truth of the matter

9    asserted.

10         She said that she ran out into the parking lot and then

11   tried to stop Mr. Fries, but she couldn't stop him.

12         Mr. Levine said this doesn't add up, so he hung up,

13   called the bank back, and the bank said we never called you.  We

14   never called you.  And so Mr. Levine called the police and said

15   meet me at the bank.  I want to make a report.

16         So they all went to the bank and made a report, and

17   sure -- and in fact, the check -- the check had a stop payment on

18   it, and it had not been cashed.

19         MR. BOCK:  Well, I think she's trying to offer it for

20   the truth that there was a phoney phone call made, and so that's

21   what she's offering it for, and it's all hearsay.

22         MR. PIMSNER:  The truth is what was said.

23         MR. BOCK:  When we have sidebar conferences, we should

24   only have -- it's two against one, with all due respect, so --

25         THE COURT:  Well, why don't we -- instead of getting

1    into the details of the conversation, why don't we just have him

2    say that he received a phone call and became concerned and then

3    contacted the bank, rather than going into the contents of the

4    call.  And then follow-up with what he actually did with the

5    bank, that he just received it -- you can ask him a leading

6    question, did you receive a phone call regarding this check, was

7    it a woman's voice --

8              MS. ANDERSON:  It was a woman.

9              THE COURT:  -- and then go into after you received that

10   call, what did you do?

11             MS. ANDERSON:  All right.

12             THE COURT:  Let's do it that way.

13             (The bench conference was concluded.)

14             THE COURT:  All right, Ms. Anderson, you may proceed.

15             MS. ANDERSON:  Thank you, Judge.

16   BY MS. ANDERSON:

17   Q    You received a phone call from the bank, is that right?

18   A    That is correct.

19   Q    And -- well, let me -- let me back up.  There -- do you have

20        caller ID on your phone?

21   A    I do have caller ID, yes.

22   Q    And when you received this phone call, did caller ID pop-up?

23   A    The caller ID did pop-up with the bank in the Oro Valley

24        branch.

25   Q    Okay.  And you had a conversation with a female, correct?

1  A    Yes, I did.

2  Q    And that female gave you some information, is that right?

3  A    Yes, she did.  She said --

4  Q    Let me --

5          MR. BOCK:  Objection.

6          THE COURT:  Not what she said, but that you got some

7  information from her.

8          Go ahead, Ms. Anderson.

9  BY MS. ANDERSON:

10 Q    Let me stop you there.  So after you received some

11      information, did you decide to hang up and confirm that the

12      bank had in fact called you?

13 A    I did after speaking with the female, yes.

14 Q    Okay, and tell us why you needed to confirm -- don't tell us

15      what she said, but tell us why it is that you needed to

16      confirm that that phone call was from the bank?

17 A    Well, it -- it rang up on my caller ID with the bank's

18      number and the name, and the story was getting too

19      complicated, and too many names and people involved, and I

20      just said, you know, I'm going to slow down, call back, and

21      start all over again.

22 Q    So you hung up the phone, correct?

23 A    Yes, I did.

24 Q    And you called the bank, did you not?

25 A    Yes, I did.

1   Q   And you did that for what purpose?

2   A   To make sure that the phone call was coming from the bank

3       branch.

4   Q   And what did you find when you called the bank?

5   A   It was the bank branch.

6   Q   And did you ask them if they in fact had just called you and

7       had a conversation with you?

8   A   Yes, I did.  I asked for this female by name, and I spoke to

9       her.

10  Q   Okay, and you confirmed that the bank had in fact not called

11      you, correct?

12  A   Correct.

13  Q   So what did you do when you saw that -- or when you realized

14      this?

15  A   I called the Oro Valley Police Department, and asked them to

16      have an officer meet me at the bank.

17  Q   And why is that?

18  A   Because again, I couldn't understand how I got the first

19      phone call from the bank, then made the second call back to

20      the bank and be told the totally opposite thing.  I was very

21      confused with it, but I knew something was wrong.

22  Q   When you went to the bank, did you confirm that in fact your

23      check had a stop payment on it?

24  A   That is correct.

25  Q   Were you advised that Mr. Fries had tried to cash that --

1      MR. BOCK:  Objection to that, your Honor.

2      THE COURT:  Well, I don't know what the question's

3  going to be so I have to see counsel at sidebar.

4                    BENCH CONFERENCE

5      THE COURT:  So let's see, what's the proposed question?

6      MS. ANDERSON:  I was going ask did you confirm that

7  Mr. Fries had tried to cash that the check?

8      MR. BOCK:  Judge, that's --

9      THE COURT:  Do we have any evidence that -- that's --

10  are you going to present evidence during the trial that he went

11  to the bank and tried to --

12      MS. ANDERSON:  We have a witness that we could call.

13      THE COURT:  Okay, so why -- why does it matter what he

14  confirmed or not?

15      MS. ANDERSON:  I was just trying to move along, try to

16  avoid calling one more witness.

17      THE COURT:  Okay.  Well, I'll sustain the objection.

18      MS. ANDERSON:  Okay.

19      (The bench conference was concluded.)

20      THE COURT:  All right.  Ms. Anderson, you may proceed.

21      MS. ANDERSON:  Thank you, Judge.

22  BY MS. ANDERSON:

23  Q    Sometime a couple of weeks later did you receive a phone

24       call from the defendant?

25  A    I believe so, yes, because it -- he said it was Todd Fries.

```
 1  Q   Do you recall when this was?

 2  A   It was a few weeks after that incident.

 3  Q   And -- and you had a conversation with the defendant, did

 4      you not?

 5  A   I did.

 6  Q   What did he say?

 7  A   Basically, he said thank you very much for honoring that

 8      check.

 9  Q   And did that seem odd to you?

10  A   Very odd.  And I told him that the check was stop payment.

11  Q   What did he say?

12  A   He didn't.  He hung up.

13  Q   Let's move to October 31st of 2008, and into the morning of

14      November 1st, 2008.

15          Were you and your wife home that night?

16  A   Yes, we were.

17  Q   That was Halloween night, correct?

18  A   Correct.

19  Q   What were the two of you doing at home?

20  A   Just watching television.

21  Q   Okay.  Did you notice anything unusual that night?

22  A   Nothing.

23  Q   Do you recall what time you went to bed?

24  A   I went to bed approximately 12:30.

25  Q   And you -- were you awoken the next morning by a phone call?
```

1  A    Yes, I was.

2  Q    By one of your neighbors, is that right?

3  A    Correct.

4  Q    And as a result of the phone call from your neighbor, you

5       took a look outside?

6  A    That is correct.

7  Q    And tell us what you saw.

8  A    I looked out our front door through the screen.  I saw oil,

9       and paint, and junk on my sidewalk, a dead animal right

10      outside my front door, stuff hanging in my tree.

11 Q    What was hanging?

12 A    Just a mess.

13 Q    What was hanging in your tree?

14 A    I wasn't sure at the time.  It was some type of bag and

15      material in it.  I didn't know at the time.

16 Q    Did the police arrive?

17 A    The police were called, yes.

18 Q    Let's take a look at Government's Exhibit Number 10.

19      Do you recognize that?

20 A    That's the front of my garage.

21      MS. ANDERSON:  Government moves for admission of

22 Exhibit 10.

23      MR. BOCK:  Subject to my previous record.

24      THE COURT:  Yes, 10 is admitted, and may be published.

25 BY MS. ANDERSON:

1  Q   Mr. Levine, are you and your wife both Jewish?

2  A   Yes, we are.

3  Q   Did you have any idea at the time who could have done this?

4  A   Not right away.  At the time, I just was too upset.

5  Q   Just what?

6  A   I was too upset.

7  Q   Did you and your wife move from that residence shortly

8      thereafter?

9  A   We did shortly after we cleaned -- had it cleaned up, yes.

10 Q   Let's move to the events of 2009.

11         Did -- you and your wife moved out of the Dove Mountain

12     residence, correct?

13 A   Correct.

14 Q   And where did you move to?

15 A   We moved to Tucson National on Magee.

16 Q   Magee and what?

17 A   East of Shannon and Magee.

18 Q   Why did you choose that area?

19         Any reason in particular?

20 A   It was another gated community, and we liked the view.

21 Q   Did you feel secure there?

22 A   Somewhat, yes.

23         MR. BOCK:  Objection.  That's immaterial, Judge.

24         THE COURT:  All right --

25 BY MS. ANDERSON:

1    Q    What was the condition of your health like at that time?

2    A    Right at the time of the -- when I -- after I moved I was on

3         kidney dialysis, I just had some lower back surgery, and

4         spinal fushion in my neck.

5    Q    Back on August 2nd of 2009 -- well, let's talk about the

6         night before on August 1st, 2009, do you recall what time

7         you went to bed?

8    A    I -- I'm going to guess this because I had dialysis on that

9         day, and I normally went to bed around 6:00 p.m.

10    Q    Sometime the next morning do you recall your wife screaming?

11    A    Yes, I do.

12    Q    Tell us about -- tell us about what you discovered.

13    A    She was just screaming hysterically, woke me out of a sleep,

14         and same deja vu -- this happened again.  Something's wrong.

15             MR. BOCK:  Objection -- objection, Judge.

16             THE COURT:  No, overruled.

17             THE WITNESS:  And of course, I got up to see what it

18    was.

19    BY MS. ANDERSON:

20    Q    And what did you see?

21    A    I -- I -- my wife told me that she had seen something on the

22         front sidewalk that didn't look right, and we had, of

23         course, walk lights and everything on, and it looked to me

24         through the window like it was a liquid.

25    Q    Liquid where?

1    A    On the sidewalk.

2    Q    What else did you see when you looked out the window?

3    A    Saw some more of the popcorn -- foam popcorn things that

4         were at Dove Mountain, and something lumpy in the sidewalk.

5    Q    What did you do when you saw that?

6    A    Basically, after trying to get out of the front door I

7         called the sheriff's department.

8    Q    Were you able to get out the front door?

9    A    No, I was not.

10   Q    When you called the sheriff's department what did you say?

11   A    I told them who I was, my address.  I told them what was

12        going on.  I was unable to get out of the front door.  There

13        was a smell -- or some type of odor in the house.  While I

14        was on the phone with the sheriff's department, I also went

15        to my hallway where the garage was to go out to the garage

16        door to open the garage door, and it would not open.

17   Q    Now -- so you went through the -- through the door into the

18        garage, correct?

19   A    Correct.

20   Q    Okay.  And then how was it that you -- you tried to open the

21        garage door?

22   A    My electric garage door opener, which was right on the wall

23        by the door.

24   Q    Did you press a button?

25   A    Yes, ma'am.

```
1   Q    It didn't open, is that right?

2   A    It did not.

3   Q    Did you see anything unusual in the garage?

4   A    I did not.

5   Q    Did you see any ooze from underneath the garage door?

6   A    I didn't get that far to the garage door.

7   Q    Did you smell anything unusual in the garage itself?

8   A    Yes.  Again, I did smell an oily smell that was -- brought

9        back some mind from the -- Marana, and I still had the

10       chemical smell.

11  Q    So what did you do?

12  A    The young lady that I was talking to from the sheriff's

13       department said --

14           MR. BOCK:  Objection.

15  A    -- there's a couple squad cars.

16           THE COURT:  No, overruled.

17           You may answer.  Go ahead.

18           THE WITNESS:  There were a couple squad cars behind my
```

house in the -- on the road, and I should leave the house.  And I

basically told her that I could not get out over the wall -- my

back wall.  I needed assistance.  So she told me that they were

there.  They would come to the house to help me.

So we started to go out through the back, the french

doors.  The smell was getting greater, and I opened the door and

I saw something burning on my back patio.

BY MS. ANDERSON:

Q    Let's talk about your back patio.  First of all, you
     mentioned the wall.  You told the 9-1-1 dispatcher that you
     couldn't get over the wall, is that correct?

A    Correct.

Q    How high was that wall?

A    Three feet.

Q    And you couldn't get over it due to your condition, is that
     correct?

A    Correct.

          MR. BOCK:  She's leading, Judge.

          THE COURT:  Well, no, I'll allow limited leading.

          Go ahead, Ms. Anderson.

BY MS. ANDERSON:

Q    So let's -- you've got your back porch, and is there a gate
     from your back porch leading into the -- the portion
     behind -- behind your back porch area?

A    There is a gate connected to that back wall.  It didn't
     open, so you couldn't get out of it.

Q    All right, but you mentioned that there was a device in the
     way between your back door and the gate to the back --

A    Correct, but --

Q    Okay.

A    -- it was over to the left of my french doors.

Q    To the -- to the west side, correct?

1   A   I don't know if that's basically to the west, or it's to the
2       northwest.
3   Q   Anyhow, you -- to get through that gate, you couldn't
4       because there was a device, is that right?
5   A   There was a device.  You couldn't get through the gate.
6   Q   Describe --
7   A   You had to go over the wall.
8   Q   Describe that device for us.
9   A   Some type of bucket with something fuming.  That's as much
10      as I really knew about.  It was sparkling, fuming, stunk.
11      The chemical smell was definitely coming from that.
12  Q   Let's take a look at Government's Exhibit Number 86.
13          How about 84.
14          THE COURT:  This is 84?
15          MS. ANDERSON:  Yes.
16  BY MS. ANDERSON:
17  Q   Do you recognize that?
18  A   That was the back patio of the home.
19          MS. ANDERSON:  The government moves for admission of
20  Exhibit 84.
21          MR. BOCK:  Subject to the -- my previous record, your
22  Honor.
23          THE COURT:  Yes, subject to that 84 is admitted, and
24  may be published.
25  BY MS. ANDERSON:

```
 1   Q    Let's take a look at 78.
 2              Now, we see -- you recognize that, do you not?
 3   A    Yes, that's the rear of the home.
 4   Q    That's the rear portion of the home, and those are the
 5        french doors that you were talking about?
 6   A    That is correct.
 7   Q    And to the right -- on the right side of the photograph
 8        would be the gate, is that right?
 9   A    Correct.
10              MS. ANDERSON:  Government moves for admission of
11   Exhibit 78.
12              MR. BOCK:  No objection, Judge.
13              THE COURT:  78 is admitted, may be published.
14   BY MS. ANDERSON:
15   Q    Let's take a look at Government's 76.
16              Do you recognize that?
17   A    That's also the back patio.
18   Q    And we can see the back gate, can we not?
19              The back gate portion --
20   A    Yes.
21   Q    -- right?
22              Okay, it's in the -- sort of the right side of the
23        photograph, correct?
24   A    Correct.
25              MS. ANDERSON:  Government moves for admission of
```

1  Exhibit 76.

2          THE COURT:  Any objection, Mr. Bock, to that one?

3          MR. BOCK:  No.

4          THE COURT:  76 is admitted.

5  BY MS. ANDERSON:

6  Q    Let's take a look at Government's Exhibit Number 103.

7          Do you recognize that?

8  A    Well, it looks like the bucket that was fuming.

9  Q    In the back?

10  A    Correct.

11          MR. BOCK:  Well, Judge, she's implying the answers to

12  him.  It's really -- I need to object as to the --

13          THE COURT:  All right, your objection's leading, is

14  that right?

15          MR. BOCK:  Yes.

16          THE COURT:  All right, I'll sustain the objection.

17          Go ahead, Ms. Anderson.

18  BY MS. ANDERSON:

19  Q    That was a device -- or tell us what you see in Government's

20          Exhibit Number 103?

21  A    I see what's -- looks like the -- what was left of the

22          bucket that was on my back patio.

23          MS. ANDERSON:  Government moves for admission of

24  Exhibit 103.

25          MR. BOCK:  No objection.

1              THE COURT:  103 is admitted.

2              Ms. Anderson, at some point we need to break for the

3    evening.  I don't know if now is a good time, or if you want to

4    ask a few questions and then we can break.

5              MS. ANDERSON:  This is as good a time as any, your

6    Honor.

7              THE COURT:  All right.  Sir, you can step down.  We'll

8    have you come back tomorrow.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2               I, Mary A. Riley, do hereby certify that I

3      stenographically reported the foregoing proceedings to the best

4      of my skill and ability, and that the same was transcribed by me

5      via computer-aided transcription, and that the foregoing pages of

6      typewritten matter are a true, correct and complete transcript of

7      all the proceedings had, as set forth in the title page hereto.

8               Dated this 11th day of April, 2013.

9

10                                        s/ Mary A. Riley

11                                        United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25