1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3    ----------------------------)
                                 )
4                                )
     UNITED STATES OF AMERICA,    )
5                    Plaintiff,   ) No. CA 13-10116 9th Circuit
                                 )
6            vs.                  ) No. CR 11-01751 TUC-CKJ
                                 )
7                                )        Tucson, Arizona
     TODD FRIES,                  )        September 19, 2012
8                    Defendant.   )
                                 )
9    ----------------------------)

10                     TRANSCRIPT OF TESTIMONY
                       JURY TRIAL DAY TWO
11
                BEFORE THE HONORABLE CINDY K. JORGENSON
12                 UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15
     For the Plaintiff:    By:  Beverly K. Anderson, and
16                              David A. Pimsner
                                U.S. Attorney's Office
17                              405 W. Congress St., Suite 4800
                                Tucson, AZ   85701
18
     For the Defendant:    By:  Richard C. Bock
19                              100 N. Stone Ave., Suite 801
                                Tucson, AZ   85701
20

21
     Mary A. Riley, RMR, FCRR
22   United States Court Reporter
     U.S. District Court
23   405 W. Congress St.
     Tucson, AZ   85750
24

25        Proceedings produced by computer-aided transcription

1                              INDEX OF TESTIMONY

2

3

4      MYLES LEVINE (Continued)

5      Direct Examination by Ms. Anderson       Page    4

6      Cross-Examination by Mr. Bock            Page   14

7      Redirect Examination by Ms. Anderson     Page   42

8      JURY QUESTION

9      Examination by the Court                 Page   49

10

11     JOHN DANIEL BRADLEY

12     Direct Examination by Mr. Pimsner        Page   49

13     Cross-Examination by Mr. Bock            Page   96

14     Redirect Examination by Mr. Pimsner      Page  109

15     Recross Examination by Mr. Bock          Page  113

16

17     KAREN LEVINE

18     Direct Examination by Ms. Anderson       Page  113

19     Cross-Examination by Mr. Bock            Page  147

20     Redirect Examination by Ms. Anderson     Page  157

21     JURY QUESTION

22     Examination by the Court                 Page  160

23     Examination by Mr. Bock                  Page  161

24

25

1   JAMES PAUL

2   Direct Examination by Ms. Anderson        Page 161

3   Cross-Examination by Mr. Bock             Page 190

4   JURY QUESTION

5   Examination by the Ms. Anderson           Page 202

6

7   KALYN HOVEY

8   Direct Examination by Ms. Anderson        Page 203

9   Cross-Examination by Mr. Bock             Page 216

10

11   CHAVAR DOLLARD

12   Direct Examination by Mr. Pimsner         Page 224

13   Cross-Examination by Mr. Bock             Page 228

14

15

16

17

18

19

20

21

22

23

24

25

1                  TRANSCRIPT OF PROCEEDINGS

2          (Myles Levine resumed the witness stand.)

3           CONTINUED DIRECT EXAMINATION

4   BY MS. ANDERSON:

5   Q    Good morning, Mr. Levine.

6   A    Good morning.

7   Q    I want to -- I want go back just a little bit and tie up

8        some lose ends we were talking about, the checks yesterday.

9        Now, your wife Karen is going to be testifying shortly after

10       you're done this morning, however I wanted -- since you're

11       on the stand now, I wanted to ask you about a couple of

12       things.

13           First of all, in February of 2008 you and your wife

14       negotiated with the defendant for him to re-do the driveway

15       for a cost of 500, is that correct?

16   A    Yes.

17   Q    And you believe that your wife mostly negotiated with

18       Mr. Fries for that?

19   A    Yes.

20   Q    Is that correct?

21   A    Yes.

22   Q    All right.  Now, this was time number two that the defendant

23       had come out to fix your driveway, is that correct?

24   A    Correct.

25   Q    And at that time Karen, your wife, Mrs. Levine, wrote the

1        defendant two separate checks, correct?

2    A    Correct.

3    Q    The first check was check number 1042, which is Exhibit

4        Number 242.  Let's take a look at Exhibit Number 242.

5            The first check was check number 1042, which we see

6        here, correct?

7    A    Correct.

8    Q    Okay.  And it was payable to Burns Power Washing for 250,

9        correct?

10   A    That's correct.

11   Q    And we see on the check that she wrote don't deposit until

12       after February 11th of 2008, correct?

13   A    Correct.

14   Q    However, based on your recollection and having gone back and

15       reviewed these checks, you're aware that the check was

16       cashed on February 24th of 2008, correct?

17   A    I believe so.

18   Q    So that was -- that was fine.  There was no problem with

19       that, correct?

20   A    Right.

21   Q    Okay.  The second check that your wife wrote was check

22       number 1043, which is Exhibit 243.

23           If we could see that.

24           And that particular check says don't deposit until

25       after April 1st, 2008, correct?

```
 1    A    That's correct.
 2    Q    However, based on your recollection and having reviewed the
 3         evidence, you know that Mr. Fries cashed the check on
 4         February 21st, 2008, correct?
 5    A    I believe that was the date.  It would be stamped on the
 6         check.
 7    Q    But you do know that he cashed it early?
 8    A    Correct.
 9    Q    Okay.  So let's talk about that, because you actually took
10         over for your wife after Mr. Fries cashed the check early,
11         is that right?
12    A    That is correct.
13    Q    All right.  Now, were there any consequences to the fact
14         that Mr. Fries cashed the check early?
15    A    There were.  Some other checks that we had written bounced.
16    Q    Okay, and was that a problem for you and your wife?
17    A    Absolutely, a problem.
18    Q    And so what -- what did you do when you realized that --
19         that several of your checks had bounced?
20    A    I called Mr. Fries up and basically asked him why did you
21         cash that check?  You weren't supposed to.  You agreed not
22         to.
23    Q    Could you tell us -- do you have a sense of when this was --
24         when this conversation was that you had with Mr. Fries?
25    A    I'm sorry?
```

1    Q    When did you have this conversation with Mr. Fries?

2    A    Right after that check was cashed, because of the -- the

3         bouncing of the other checks.

4    Q    So based on records that you've reviewed, that would have

5         been sometime in February of 2008 --

6    A    That's correct.

7    Q    -- right?

8         And what did Mr. Fries say when you asked him about why

9         he cashed that check early?

10   A    He was very apologetic.  He said that his office manager

11        mistakenly cashed the check.

12   Q    And did Mr. Fries agree to make right the fact --

13   A    Yes -- yes, he paid for the bounced check fees.

14   Q    And you certainly appreciated that, correct?

15   A    Absolutely.

16   Q    You handled the last transaction for the defendant that

17        we've already talked about yesterday, and I want to just go

18        over a few odds and ends.

19        You told us about the two checks for $200, correct?

20   A    Correct.

21   Q    Now, the first check was 1072, which is Exhibit Number 244.

22        If we could take look at that.

23             THE COURT:  And is that already in evidence --

24             THE CLERK:  Yes.

25             THE COURT:  -- Ms. Anderson?  I think it is, so

1    everybody can see.

2              MS. ANDERSON:  Yes.  If we could publish that to the

3    jury?

4              THE COURT:  Yes, it is.

5              MS. ANDERSON:  Okay.  Thank you.

6    BY MS. ANDERSON:

7    Q    And the second check was check number 1073, also for $200,

8         correct?

9    A    Correct.

10   Q    But we don't have that check, right?

11   A    We do not.

12   Q    Could you tell us why?

13   A    That check was stopped payment, and it was never cashed.

14   Q    All right.  But we do have the register for that particular

15        check, is that right?

16   A    Correct.

17   Q    And that's Government's Exhibit Number 252.

18             If we could take a look at that -- and this has already

19        been admitted into evidence.  If we could publish this to

20        the jury.

21             All right.  So moving on, now, where we left your

22        testimony yesterday, Mr. Levine, is that I believe the

23        deputies were helping you and your wife get over the -- the

24        wall in the back of your residence, is that right?

25   A    That is correct.

1    Q    Now, let's take a look at Government's Exhibit Number 107.

2         Do you recognize that?

3    A    Yes, that's the patio to the rear of our home on Magee.

4    Q    Now, yesterday you were talking about the -- the french

5         doors.  Are those the french doors that you were talking

6         about?

7    A    Yes, they were.

8         MS. ANDERSON:  Government moves for admission of

9    Exhibit 107.

10        MR. BOCK:  Subject to the previous record.

11        THE COURT:  All right, 107 is admitted.

12   BY MS. ANDERSON:

13   Q    Now, let's take a look at Government's Exhibit Number 89.

14        That's another view of -- of the patio and the back

15        doors, correct?

16   A    That is correct.

17   Q    But in the lower right-hand corner we see something else.

18        Do you see that there, the white bucket?

19   A    Yes, the bucket.

20   Q    Could you tell us what that is?

21   A    That, I believe, is the bucket that was burning in the back

22        of the home on the patio.

23        MS. ANDERSON:  Government moves for admission of

24   Exhibit 89.

25        MR. BOCK:  No objection.

1            THE COURT:  89 is admitted.

2    BY MS. ANDERSON:

3    Q    Now, could you describe for us what you saw when you exited

4         your residence, and that you saw this device?  What else did

5         you see?

6    A    Well, there was smoke billowing from it, grayish white smoke

7         billowing up.  Also, there was sparking from the bucket.

8         And I -- I couldn't see this green top, though, on it.

9         There was too much smoke and everything.

10   Q    Describe -- describe for us how -- how fast it was smoking?

11        Was it just -- was it a little bit of smoke, just easing

12        out?

13   A    No, it was quite a bit of smoke.

14   Q    Could you describe that for us?

15   A    Just a cloud of smoke billowing up from that bucket.

16   Q    Was it coming out fast?  Was it coming out slow?

17   A    Yes.  Yes.

18   Q    And what color was it?

19   A    A white, grayish white.

20   Q    What was the smoke doing?  Was it staying right there?  Was

21        it wafting all over.  Tell us --

22   A    It was pretty much underneath the overhang that's there, and

23        going up.

24   Q    Let's take a look at Government's Exhibit Number 88.

25             You recognize that, do you not?

1   A    Yes.

2   Q    What is that?  What's depicted there?

3   A    That's the gate out of our patio, and of course, the bucket

4        and the wall.

5   Q    All right.

6             MS. ANDERSON:  Government moves for admission of

7   Exhibit 88.

8             MR. BOCK:  No objection.

9             THE COURT:  88 is admitted.

10  BY MS. ANDERSON:

11  Q    Now, is that the only gate that's in your back yard -- that

12       was in your back yard?

13  A    That's correct.

14  Q    So unless somebody climbed over the wall, the only exit from

15       your back yard would have been through that gate, is that

16       right?

17  A    Correct.

18  Q    Now, if somebody were to leave the residence and walk toward

19       the gate, they'd be walking in the direction of the device,

20       is that correct?

21  A    That's correct, right along those stones.

22            MR. BOCK:  Objection, leading.

23            THE COURT:  Yes, if you could ask a little more

24  open-ended questions.

25            MS. ANDERSON:  All right, I will.

```
 1              Would you like me to go back over that question?
 2              THE COURT:  No, that's all right.  That answer can
 3  stand.
 4              MS. ANDERSON:  All right.
 5  BY MS. ANDERSON:
 6  Q    Now, did the deputies take you to the gate?
 7  A    No, they did not.
 8  Q    Where did you exit your -- your back yard?
 9  A    Over the wall, more to -- well, what I'll say is to the left
10       side of that picture -- that's not showing, but it wasn't
11       anywhere near the bucket.
12  Q    Did you smell anything unusual as you were being evacuated
13       by the deputies?
14  A    Yes.  Again, the heavy chemical smell.
15  Q    Where did the deputies take you?
16  A    They took us basically over the wall, across the green, and
17       across the road that was there, up until a slight hill that
18       was on the next green, at -- at the golf course.
19  Q    As you were being evacuated by the deputies, did you see
20       something unusual occur in the front of your house?
21  A    Yes.  When we got up to the -- this incline that they were
22       bringing us to, there was a -- a cloud of black smoke in the
23       front of the house.
24  Q    Could you describe that for us?
25  A    It looked like something had blown up, or on fire, or just
```

1          big poof, black smoke.

2     Q    What did the black smoke do?

3     A    It dissipated into the -- into the air.  It didn't hang

4          around or anything.  It just -- it was up there, and it went

5          up.  I believe I said to my wife -- I said "The front of our

6          house is on fire."

7     Q    Did that surprise you to see that?

8     A    At that point?  No.

9     Q    Why not?

10    A    Well, the back of the house was on fire, why not the front

11         of the house?

12    Q    Now, while you were there at your home after the deputies

13         evacuated, did you experience any kind of adverse physical

14         effects?

15    A    While we were in the home and afterwards, my eyes were

16         slightly burning, my throat was sore or raspy.  I had some

17         running of my nose.

18    Q    Did you seek any kind of medical attention after this

19         incident?

20    A    Yes, we were taken to Northwest Community Hospital.

21    Q    Mr. Levine, when was it that you were able to ultimately

22         move back into your house?

23    A    I believe that we were allowed in the next evening, to come

24         back to live there.

25    Q    When you returned to your house, did it still smell?

1    A    A lot.

2    Q    Now, at some point did you and your wife move out of that

3         house?

4    A    Yes.  We moved out approximately a month and a half later.

5         It -- the smell never left the house.  And again, you know,

6         it happened to us again.  We didn't know what was going to

7         happen at that point.

8              MS. ANDERSON:  All right.

9              Judge, may I have just a moment?

10             THE COURT:  Yes.

11             MS. ANDERSON:  Your Honor, that's all I have.

12             THE COURT:  Cross-examination?

13                          CROSS-EXAMINATION

14   BY MR. BOCK:

15   Q    Mr. Levine, when you were living at the Dove Mountain

16        property, when did you move into that property?

17   A    2002.

18   Q    And the first time you contacted Burns Power Washing was

19        when, sir?

20   A    In 2005.

21   Q    And in 2005 just briefly summarize what the purpose of the

22        contact was, and what was accomplished.

23   A    My wife contacted him to -- for quotes on resurfacing our

24        driveway, re-doing it.

25   Q    And that was done, according to your testimony, is that

1           correct?

2    A      Later, yes.

3    Q      What year was that?

4    A      That was 2006, early 2007.

5    Q      And you -- and you described in some detail some of the

6           problems that you had with your driveway, is that correct?

7    A      He was told what we wanted done on the driveway, and the

8           reasons why, yes.

9    Q      And you testified to that earlier?

10   A      Correct.

11   Q      Now, when did the Burns Power Washing -- when did they start

12          to resurface the driveway?

13   A      Again, it was late 2006, early 2007.

14   Q      And your testimony was that it was -- the problem still

15          existed?

16   A      A different problem occurred after he resurfaced it.

17   Q      And the problem that occurred after he resurfaced it was --

18          was what, sir?

19   A      Twofold.  One, the color was blotchy; and two, mostly

20          important was whenever the driveway was wet, you'd fall on

21          it.

22   Q      Okay, and that was a problem that you had previous?

23   A      No, it was not.

24   Q      Okay, so this was a new problem?

25   A      This was a new problem.

1   Q    Okay.  The -- so how long did you live with that -- that

2        situation before you re-contacted my client?

3   A    My wife contacted him a couple times.

4   Q    Did he respond?

5   A    He responded to her.  I'm not sure of exactly what he told

6        her.

7   Q    When did he come back up to remedy what -- what you thought

8        was a new problem?

9   A    I'm sorry?

10  Q    When did he come back up to your property to remedy what you

11       thought was a new problem?

12  A    To remedy it?

13  Q    Yes.

14  A    2000 -- late 2007.

15  Q    And how long did this process take?

16  A    Probably a week, total.

17  Q    Okay.  You -- and then after that, was the situation

18       remedied or not?

19  A    It was not.

20  Q    Okay.  Was he bringing up supplies?

21  A    Not at that time.

22  Q    Did he have any cans, or any paint cans that he was bringing

23       up to remedy the situation?

24  A    Not the first time, no.

25  Q    But he was up there physically, is that correct?

1    A    He came up to look at it, correct.

2    Q    That was the first time?

3    A    Correct.

4    Q    And the first time his -- when the problem arose, it was a

5         work crew that he had sent up, is that correct?

6    A    He -- to fix it, yes.

7    Q    Was he actually doing the work himself?

8    A    No, he was not.

9    Q    So then the -- as you said, there's now a -- you're unhappy

10        with the -- the situation, because now there's a new

11        problem, the driveway's slippery?

12   A    It was still slippery, yes.

13   Q    Okay, so your wife is making some calls.  And then does

14        Mr. Fries come up a second time?

15   A    Yes, he did.

16   Q    Okay.  And do you know if he's going through the main gate?

17        Do you know if he's going through the -- he would have to go

18        through the main gate to get to your property, is that

19        correct?

20   A    Well, that's where the guard house is.

21   Q    Right.

22   A    The guard, and other gates.

23   Q    But do you need an access code to get into the gate?

24   A    Unless somebody came in before you, you needed a

25        transponder.

1    Q    Okay.  You mean somebody coming in before you, you could

2         kind of tailgate them, beat the gate?

3    A    Exactly.

4    Q    Do you know what type of vehicle he was driving throughout

5         the time that he was coming up to the Tear Blanket property?

6    A    Ford pickup.

7    Q    Do you know what color the vehicle was?

8    A    I don't remember.

9    Q    Was it the same vehicle at all times?

10   A    No.

11   Q    So there were different vehicles he came up in.  You said a

12        Ford pickup.  What were the other vehicles you remember?

13   A    Some type of Ford truck.

14   Q    Okay.  Different color?

15   A    I don't remember.

16   Q    So the second time he comes up is to remedy the situation

17        because the driveway is slippery now, is that correct?

18   A    The second time is when I called him to come back and remedy

19        the problem, because it was not corrected properly.

20   Q    Okay, and that would have been in what month and what year,

21        sir?

22   A    That was February, 2008.

23   Q    Of '08.  And he responds to that call?

24   A    He responded, yes.

25   Q    Is he cordial to you?

1   A    Pardon?

2   Q    Is he cordial to you?

3   A    Somewhat.

4   Q    And the response to the call was him physically coming up?

5   A    Yes.

6   Q    With -- what, looking at the -- looking at the complaint?

7   A    Well, he basically looked at it, yes.

8   Q    And then what's -- what's the next significant thing that

9        happens after that?

10  A    He said he wanted another $400 to put the sand in it that he

11       did not put in the first two times so it wouldn't be

12       slippery.

13  Q    And so how did you respond to that?

14  A    I said "I can't have somebody slipping on my driveway.  It

15       wasn't done right.  It has to be done."

16  Q    So you agreed to do the 400?

17  A    That's right.

18  Q    And those are the checks that we -- that the prosecutor was

19       talking to you about?

20  A    The last two checks.

21  Q    So you give him the checks.  I believe you said you wrote

22       the checks in February?

23  A    I believe I gave him the checks in February.  It might have

24       been the beginning of March.  I'm not positive.

25  Q    So one check is good right away.  The other one is not to be

| 1 | | cashed until April? |
|---|---|---|
| 2 | A | Right.  One check was good the date we agreed to it, because |
| 3 | | I'm on a limited income, disability, and that's the way we |
| 4 | | had to do it.  The other check was to be cashed as long as |
| 5 | | nobody fell on the driveway. |
| 6 | Q | And the other check was cashed too soon? |
| 7 | A | No.  The second check was never cashed. |
| 8 | Q | Okay.  I thought there was a check that you talked about |
| 9 | | that caused you to -- to have insufficient funds? |
| 10 | A | Those checks my wife wrote him for $250 a piece. |
| 11 | Q | Oh, that was earlier? |
| 12 | A | That was on the second -- the first re-doing of the driveway |
| 13 | | that he also charged us again for what -- to fix the problem |
| 14 | | that he should have done in the first place. |
| 15 | Q | This -- this had something to do with the sand, or is this |
| 16 | | after the sand? |
| 17 | A | It had both.  It had something do with the color of the |
| 18 | | paint, and the slipperiness. |
| 19 | Q | The $250 checks, so I'm clear in my a mind, were those |
| 20 | | written after the $200 checks, or before? |
| 21 | A | No, those were written before the $200 checks. |
| 22 | Q | And he paid for the -- as you said on direct, he paid for |
| 23 | | the -- any fees that you incurred, right? |
| 24 | A | For the bounced checks he paid the overdraft fees. |
| 25 | Q | And those are, what, 30, $35? |

1    A    It was about a total of $160.

2    Q    And he didn't complain about that?  He did it right away?

3    A    Well, I guess he did it right away.  He asked for my bank

4         account numbers, and deposited it into my account.

5    Q    And you knew he did that?

6    A    And he did it, yeah.

7    Q    Okay.  And so now we have a situation where the sand -- he's

8         talking to you about the sand which is going to be the

9         remedy for the slipperiness, correct?

10   A    I -- correct.

11   Q    And is this in fact accomplished?

12   A    Last time he was up it was accomplished.

13   Q    Okay, and is this what you were describing where the workers

14        were going ahead and actually grinding the -- sanding down,

15        or is this at another time?

16   A    That's the original time that he did the work.

17   Q    Okay.  So how many times total does he come out to your

18        property?

19   A    Well, physically to look at the work that was being done?

20        Three times.

21   Q    And how many times does he bring supplies out to the

22        property?

23   A    He brought supplies the first time.

24   Q    Okay.

25   A    No, I'm sorry.  He brought supplies the first time, and the

1   last time.

2   Q   And those would be buckets, and things like that, right?

3   A   Possibly.

4   Q   Possibly, yeah.  Okay.  Now, did you have to deal with

5       Sherwin Williams, or did -- what was --

6   A   The second time we -- the deal he made was he would repair

7       it and repair the color, but we had to buy the paint.

8   Q   And did you have any issues with Sherwin Williams?

9   A   Well, the issue before that, just checking to see why our

10      paint was blotchy, Sherwin Williams came out and double

11      checked that the paint was good Sherwin Williams paint, so

12      that dealing we had.  And then, of course, the dealings

13      that -- when we had to go back and buy more paint.

14  Q   Were there some tire marks on your driveway that your wife

15      attempted to clean with a chemical -- some tire tracks?

16  A   Never a chemical.  My wife -- in the original problem we had

17      were using -- was using water from the hose, and a brush.

18  Q   For the tire tracks?

19  A   From the tire tracks.  Correct.

20  Q   So when was the last time you physically saw my client at

21      your property?

22  A   Before the final work was done.

23  Q   But what month do you think that might have been?

24  A   February.

25  Q   February?

1   A   End of February, beginning -- somewhere in March.

2   Q   Okay.  You had no contact with him after that other than --

3       you had no contact with him, is that correct?

4   A   None.  Correct.

5   Q   So the next event is a disturbing event October 31st,

6       November 1st of 2008 at that property, right?

7   A   I think the next event was the problem I had with the phone

8       calls from the bank.

9   Q   Okay.  You had phone calls from the bank.  You testified to

10      that, is that correct?

11  A   Correct.

12  Q   Okay.  And then the next event is a -- the situation on

13      October 31st?

14  A   That's correct.

15  Q   Now, it's a retirement community?

16  A   Yes, it is.

17  Q   And I don't mean this as snide question, but you don't have

18      children coming around, or young adults doing trick or

19      treating, is that correct?

20  A   That's correct.

21  Q   All right.  So the -- what time do you go to bed that night?

22  A   I went to bed about 12:30.

23  Q   And what about your wife, is she --

24  A   She goes to bed earlier than that.

25  Q   And do you have any alarms around your property or anything?

1   A    No, we do not.

2   Q    So what time do you wake up in the morning?

3   A    We were woken up probably around 6:00 by a phone call.

4   Q    And it -- was it a law enforcement phone call?

5   A    It was my neighbor.

6   Q    Across the street?

7   A    Next to me, up the hill.

8   Q    And so you dress and go outside.  Is that the next thing you

9        do?

10  A    No, I basically looked outside.  I didn't get dressed.  The

11       call -- the call basically said I don't want to alarm you,

12       but something happened to your house.

13  Q    So when you look outside, what are you able to see?

14  A    I was able to see oil, paint, some graffiti on the side,

15       dead animals on my sidewalk.  Immediately in front of my

16       door I saw a dead coyote.  I then went out the back of the

17       house.

18  Q    A lot of oil?

19  A    Oil and paint.

20  Q    A lot of oil?

21  A    A lot of oil.

22  Q    The graffiti even on the top of the -- on the top of the

23       garage?

24  A    There was graffiti on the eave of the garage.  There was

25       graffiti on the house.  There was graffiti on the sidewalk,

```
 1              the driveway.  The pictures are in evidence.
 2    Q    Pardon?
 3    A    The pictures are in evidence.
 4    Q    Yes, they are.
 5              The graffiti on the top of the garage.  You've lived
 6         there, did a person do that, or do you think they would need
 7         some type of stepladder to do that type of wording, and at
 8         that height?
 9              MS. ANDERSON:  Objection.
10    A    I would assume so.
11              MS. ANDERSON:  That's speculation, your Honor.
12              THE COURT:  Well, I'll allow the answer to stand.
13              Go ahead.
14    BY MR. BOCK:
15    Q    I didn't -- what was your answer?
16    A    I said I would assume that they couldn't do that.
17    Q    Did you reach up there to see how high it was after?
18    A    Some of it, yes.
19    Q    Did you have to put your hand all the way up, or do you
20         remember?
21    A    Not all of it.  I'm short.
22    Q    Okay.  Then Marana police come out, is that correct?
23    A    That's correct.
24    Q    And you had insurance pay for the damage -- or pay to clean
25         up the property?
```

1   A     The insurance.

2             MS. ANDERSON:  Objection, relevancy.

3             THE COURT:  Well, I'll allow -- sustained.

4             MR. BOCK:  Okay.

5             THE COURT:  But I'll allow the answer to stand.

6             Go ahead, Mr. Bock.

7   BY MR. BOCK:

8   Q     So the property was -- was at some point, obviously,

9         cleaned?

10  A     I'm sorry?

11  Q     The property was cleaned?

12  A     It was, yes.

13  Q     And how long did that process take?

14  A     The process took a couple months.

15  Q     Did the -- in the -- when the police came and they went

16        ahead and viewed the scene, were you part of that?

17            Did they ask you -- or show you certain things?

18  A     I was at the scene.  They didn't really have to ask me to

19        show them anything.

20  Q     Well, maybe that wasn't a very artful question.  I

21        apologize.

22            Did they show you footprints, tire tracks, anything

23        that they -- that might have been of evidentiary value?

24  A     I saw the footprints on the paint in the driveway.  I

25        mentioned it to the Marana police detectives.

1    Q    Did you see multiple foot prints?

2    A    Yes.

3    Q    Did they seem to be of different size?

4    A    Yes.

5    Q    Suggested that there was more than one person that

6         vandalized your home?

7    A    That's what you would assume from the footprints.

8    Q    Did you see any tire tracks?

9    A    On my driveway, no.  There were some tire tracks on the next

10        door neighbor's, the vacant house's driveway.

11   Q    So did you then -- you went ahead and you moved out of that

12        property, is that correct?

13   A    That is correct.

14   Q    And you have moved to Tucson Omni?

15   A    That's correct.

16   Q    And what time did you -- what month did you actually move

17        over to Tucson Omni?

18   A    We moved to Tucson National -- I believe it was the

19        beginning of December.

20   Q    Are you a golfer?

21   A    No.

22   Q    The -- for people that live in Tucson, you take Shannon

23        north to Magee, is that correct?

24   A    That's one way to go, yes.

25   Q    And is there a gate that I could go into the golf course on

```
1          Magee?

2    A     There is a gate to go into the golf course on our property,

3          on Magee.

4    Q     Also, I can go up Magee and make a right turn to the

5          clubhouse, and come into the front of it?

6    A     That's the other gate.

7    Q     And that usually is -- has a person that is sitting at the

8          gate?

9    A     I'm sorry?

10   Q     Usually has a -- usually is occupied by somebody, right, at

11         the gate?

12   A     There is 24 hour security supposedly at both gates.

13   Q     Okay, so there's supposed to be 24 hour security at the gate

14         off of Magee?

15   A     Correct.

16   Q     Now, is your property -- there's a wall -- a wall too, is

17         there not, a concrete wall kind of --

18   A     Behind the property, yes.

19   Q     Behind the property on Magee?

20   A     Well, no, because we weren't facing Magee.  We were in a --

21         like, a -- a courtyard, cul de sac.

22   Q     Do you what -- do you know what hole you were on at Tucson

23         Omni?

24   A     I'm not a golfer.  I don't really know.  I always said the

25         13th, but I don't know.
```

```
1    Q    Do you get golf balls in your back yard?
2    A    Never.
3    Q    Okay.  So what do you -- do you face any -- do you face the
4         golf course?
5    A    We face the golf course, yes.
6    Q    All right.  So if someone were not invited to your home, I
7         imagine they would have to go through one of the gates, is
8         that correct?
9    A    That's what we presumed, yes.
10   Q    But there would be some -- presumably, there would be
11        somebody at the gate to challenge a person that shouldn't be
12        there?
13   A    That's correct.
14   Q    Or I guess a person could go over the wall, the -- the Magee
15        wall to get to your property?
16   A    That's correct.
17   Q    Do you -- and how far is the Magee wall to your property?
18   A    Three houses.
19   Q    Three houses.  So if you were to walk out your front door
20        and you wanted to touch that wall, that boundary, Magee
21        Road, would you walk 200 feet, 300 feet?
22   A    Maybe 300 feet.
23   Q    And do you know how tall that wall is?
24   A    No, I do not.
25   Q    Would it come up to your chest?
```

1    A    Probably higher than that.

2    Q    Higher than the back wall of your home at --

3    A    Yes.

4    Q    Okay.  Did you talk to any of the guards at -- at the golf

5         course to see if they had any --

6    A    I myself did not.

7    Q    You left that up to law enforcement?

8    A    Correct.

9    Q    Now, you -- the day of August the 2nd to the best of your

10        ability what time do you feel that you were alerted to

11        the -- I imagine, the cloud?  Is that what alerted you?

12   A    No.

13   Q    What alerted you?

14   A    What alerted me was my wife who had gotten up from -- during

15        the night.  It was about 5:00.  She went into the living

16        room hallway to turn the air conditioning colder because it

17        was too warm in the house, and she's the one that alerted me

18        because for some reason she looked out the window, the

19        front -- from the hallway, and saw this, again, mess on the

20        sidewalk, and started screaming.

21   Q    Do you keep your lights on, or --

22   A    There is lights on in the walkway.

23   Q    And those lights were illuminating the walkway, I imagine,

24        for your wife?

25   A    There was enough illumination that when I finally got up and

| | | |
|---|---|---|
| 1 | | went out there, that I could see there was a problem too. |
| 2 | | And honestly, I don't remember if those lights were on at |
| 3 | | that point or not. |
| 4 | Q | So do you feel fairly confident that the time was five-ish? |
| 5 | A | Yes. |
| 6 | Q | Could it have been ten after five? |
| 7 | A | It could have been anywhere near 5:00, because I'm just |
| 8 | | saying -- I'm sorry, but I didn't write down the time on my |
| 9 | | hand and say this is when it happened. |
| 10 | Q | I'm not challenging you on that.  Just trying to get -- 5:00 |
| 11 | | is an estimate, though, right? |
| 12 | A | Correct. |
| 13 | Q | So let me take you through this situation, then.  The front |
| 14 | | is what you have looked at originally, is that correct? |
| 15 | A | I'm sorry? |
| 16 | Q | The front of the house is what you looked at -- |
| 17 | A | I -- what I originally looked at was my sidewalk from -- |
| 18 | | excuse me, from the front window that was next to our front |
| 19 | | door. |
| 20 | Q | Can you see your garage or your driveway from the -- |
| 21 | A | No, you could not. |
| 22 | Q | Okay.  Did you see any smoke billowing from the front of the |
| 23 | | house? |
| 24 | A | No, I did not. |
| 25 | Q | When did you first notice smoke billowing from the front of |

```
 1           the house?
 2   A    When I was told to go out the back of the house.
 3   Q    Who told you that?
 4   A    The sheriff's department.
 5   Q    And what time would that have been?
 6   A    At -- sometime after that.
 7   Q    Okay, so you actually go out the back of the house, is
 8        that -- well, you try to get out -- tell me -- you tell me
 9        what you're trying to do.
10   A    Okay.  Two things, basically, happened before we even got to
11        try and go out the back of the house.  The officer on the
12        phone was asking me what I was looking at, what I saw.
13        While I was explaining to her what I saw, I went again to
14        the -- the kitchen hallway leading to the garage.  I tried
15        to -- I went -- opened the door.  I pressed the button for
16        the garage door to open.  That wouldn't open.  I'm
17        explaining this to the lady.  She said there is a couple
18        squad cars out in the back of your property.  Please leave
19        the property.
20   Q    So do you -- someone called 9-1-1?
21   A    Oh, I called 9-1-1 right away.
22   Q    9-1-1?
23   A    Actually, I was on the phone with 9-1-1.  I'm not sure if
24        I'm the one who originally called them or my wife called
25        them while I was looking out the door, but I was talking to
```

```
 1           the 9-1-1 operator.
 2   Q    And the 9-1-1 call is after you looked out the front of the
 3        house?
 4   A    Correct.
 5   Q    And so you're still on 9-1-1, and you're kind of
 6        contemplating the whole situation?
 7   A    Well, I'm looking around enough.
 8   Q    And you went to try and open the garage door?
 9   A    That is correct.
10   Q    And your garage door worked before that?
11   A    Absolutely.
12   Q    Okay.  And so once the garage door doesn't work, you're told
13        that there are squad cars coming to your assistance, or
14        already there?
15   A    Well, I guess I looked -- at tried to open the garage door
16        because I couldn't open the front door.
17   Q    You tried to open the front door?
18   A    Yes, couldn't open the front door.  Couldn't open the window
19        next to the front door, and that's when I went to open the
20        garage door.
21   Q    Okay.  Does your garage door have vents in it?
22   A    Have what?
23   Q    Vents?
24   A    Vents?
25   Q    V-E-N -- yeah, vents?
```

```
 1   A   No.
 2   Q   Did you know that there was some measurements made of the
 3       inside of your garage?
 4   A   I had no idea.
 5   Q   You don't know what part of that investigation -- or you
 6       never shared that part of the investigation by either the
 7       government, or any law enforcement?
 8   A   No, I did not.
 9   Q   So you don't know if there was any -- any chlorine or any
10       type of gas within the garage as we speak now?
11   A   Excuse me, are you talking about measurements as in feet, or
12       measurements as in gas?
13   Q   Measurements as in gas.
14   A   I know we had it done after we were let back in the house,
15       because it was unbearable.  So I would assume the government
16       did it also, because they wouldn't let us back in the house.
17   Q   So my question to you is -- and if you don't know, do you
18       have any idea how any type of -- of gas or a cloud might
19       have got into the garage?
20   A   Through the house.
21   Q   Through the house.  So did you open a door into the garage?
22   A   Yes.
23   Q   Okay.  When did you go into the garage?
24   A   I just went -- reached in the wall.
25   Q   Sorry?
```

| | | |
|---|---|---|
| 1 | A | I just reached in the wall at that point.  I didn't go into |
| 2 | | the garage until we were allowed back in the house. |
| 3 | Q | So did you open the door from your house into the -- and |
| 4 | | leave that door open? |
| 5 | A | I don't believe I left it open. |
| 6 | Q | Okay.  Now, the -- so how long was it -- so you go, then, |
| 7 | | into the back yard, is that correct? |
| 8 | A | Okay, so then after this and the conversation that I'm still |
| 9 | | on the phone with the officer on the emergency, she told me |
| 10 | | there's two squad cars out in the back of my home.  Please |
| 11 | | exit the rear of my home.  I went to the back door and told |
| 12 | | the officer I can't, there's something burning. |
| 13 | Q | That's -- and that was a -- what you testified -- |
| 14 | A | That was this cloud, pale -- fuming on the back of the door. |
| 15 | | I also told the officer that I was unable to get over the |
| 16 | | wall of the home physically. |
| 17 | Q | Where's your wife at this point in time?  Do you have a |
| 18 | | sense where she is? |
| 19 | A | She was with me, with the dog. |
| 20 | Q | Okay, what type of dog did you have? |
| 21 | A | Shiba Inu. |
| 22 | Q | Smaller breed? |
| 23 | A | About 35 pounds. |
| 24 | Q | So how do you ultimately exit -- how do you ultimately exit |
| 25 | | your property? |

1   A    I'm sorry?

2   Q    How do you ultimately exit your property?

3   A    The sheriff's deputies help me over the wall.

4   Q    Do the sheriffs have any type of gas masks on or anything?

5   A    I don't remember.

6   Q    Is the cloud a vertical cloud in the back yard?

7   A    It's mainly vertical, but it was going both because you

8        could see smoke underneath the overhang, plus it was going

9        up.

10  Q    Is the smoke going in towards the house?

11  A    Well, I guess so.  You've got an open french door, so it

12       would have to be going into the house.

13  Q    And then you are interviewed, is that -- is that the next

14       step -- the process once you're away from the property?

15  A    Very briefly.  They mostly said please sit here for a while.

16       We're going to get you some water.  The fire department --

17       we were sitting next to one of the fire trucks.  We weren't

18       interviewed for a while, other than people coming up and

19       asking -- you know, saying "What's going on?  How do you

20       feel?"  Eventually, they took us into the command unit that

21       they had brought in, the Tucson police van unit -- I believe

22       it was Tucson police.  It could have been the sheriff's

23       department, but it was a big van vehicle that they brought

24       into the property, and we were brought into there.

25  Q    Now, was it -- when you went out, was it still dark out?  Is

```
 1        it dark, or is it --
 2  A    No, it was light.
 3  Q    It's light.  Okay.  So at some point in time you go to the
 4        hospital, is that correct?
 5  A    That's correct.
 6  Q    Do you know what time you got to the hospital?
 7  A    I do not.
 8  Q    Have you looked at any of your medical reports that were
 9        generated as a result of going to the hospital?
10  A    I looked at multiple medical reports.
11            MR. BOCK:  May I approach the witness, your Honor?
12            THE COURT:  Yes.
13  BY MR. BOCK:
14  Q    Let me show you what's been marked as Exhibit 407.
15            Would you take a look at this, sir?
16  A    I have to get my glasses out.
17            Okay.
18  Q    Does that have a -- on the -- 407 has a number of pages
19        attached.  Does it have a time that -- on the top that you
20        arrived at the hospital?
21  A    8 -- 2 -- C -- not that I see anywhere.
22  Q    Let me --
23            THE COURT:  Yes, you may approach the witness and the
24  exhibit.
25            MR. BOCK:  Do I have to keep asking?  Is that okay?
```

```
 1    Should I just approach him if I need to, or shall I --
 2              THE COURT:  That's fine.  You can approach.
 3              MR. BOCK:  Okay.
 4    BY MR. BOCK:
 5    Q    Let me show you this, Mr. Levine.  See where it says
 6         transport time?
 7    A    Okay.
 8              MR. PIMSNER:  I'm sorry, your Honor.  I can't hear.
 9              THE COURT:  If you're going to wander from the
10    microphone, we have a handheld mike.  So can you repeat that
11    question that you had of the witness -- of Mr. Levine?
12              MR. BOCK:  Yes.
13    BY MR. BOCK:
14    Q    Did you see transport time on that?
15    A    Yes, I do.
16    Q    And what time is that?
17    A    Seen time, 11:30, transport time 11:24, arrive at the
18         hospital 11:30.
19    Q    And how long did you stay at the hospital?
20    A    Probably an hour, hour and a half all totaled.
21    Q    And do you see some of the notes that are on that page about
22         the complaints?
23    A    Clinical ambulatory complaints -- okay.
24    Q    You really had no complaints when you were at the hospital,
25         is that correct?
```

1    A    My complaints pretty much were I didn't have my medications.

2    Q    And --

3    A    I was quite ill at the time.

4    Q    You were diabetic, and you had --

5    A    I just had dialysis Saturday.  When I have dialysis three

6         times a week, the rest of the day and a half after that

7         between dialysis you're basically a vegetable.  My

8         complaints are so numerous, and my health conditions, that I

9         wouldn't have one for the other.  I was mostly concerned

10        about not having my medications with me.

11   Q    Okay, that made you anxious, obviously?

12   A    Obviously.

13   Q    But you had no pulmonary problems, is that correct?

14   A    Other than my normal ones, no.

15   Q    And you had no clinical or medical needs for

16        hospitalization, is that correct?

17   A    Well, that was actually a question that we discussed.

18   Q    But you would agree with me you had no physical complaints,

19        and no need for hospitalization?

20   A    Basically, at the time I was more concerned about what was

21        happening, getting my medications.

22   Q    And in fact, you would have -- you wanted to stay at the

23        hospital rather than go home because of the environment of

24        the hospital, right?

25   A    Well, it's the environment of the hospital.  I'm on

```
 1           dialysis.  I'm not feeling well.  I have no medications.
 2           There's a multitude of reasons why.
 3    Q      You needed your insulin?
 4    A      I needed all my medications.  I had -- I was on an insulin
 5           pump.
 6    Q      Okay, but you had no symptoms that were as a result of this
 7           situation?
 8    A      Other than minor tearing of eyes, and throat bothering me,
 9           and runny nose.  I was more concerned about my medication.
10    Q      And you walked out of the hospital, is that correct?
11    A      No, I was wheel-chaired out of the hospital.
12    Q      But then you -- how did you get home?
13    A      My mother-in-law drove us to her house.
14    Q      Okay.  Let me ask you this.  Are you contemplating a civil
15           lawsuit against Todd Fries?
16               MS. ANDERSON:  Objection, relevancy, your Honor.
17               THE COURT:  Well, let me see counsel at sidebar.
18                              BENCH CONFERENCE
19               THE COURT:  So let's see, how would that be relevant?
20               MR. BOCK:  He's got -- if he's got a money thing, I
21    think that's a fair line of inquiry.  I don't think that's
22    inappropriate to ask if he's going to sue him.
23               THE COURT:  Hasn't the statute of limitations run for
24    that?
25               MR. BOCK:  Well, I think the statute of limitations
```

1    would have been when -- when he was arrested, when he was -- you

2    know, which would have been 2011.

3            MS. ANDERSON:  Judge, if there's a civil suit pending,

4    that might be a different issue, but this is completely

5    irrelevant to the criminal charges that are pending.

6            THE COURT:  Yes, I think the fact that there's nothing

7    --

8            MR. PIMSNER:  I think it's irrelevant.

9            THE COURT:  If there's nothing pending -- do you have

10   any reason to believe --

11           MR. BOCK:  No, I don't know if he's going to sue him or

12   not.

13           THE COURT:  All right.  Well, I'll let him ask the

14   question.  I'll overrule the objection, and let him ask that

15   question.

16           (The bench conference was concluded.)

17           THE COURT:  All right, Mr. Bock, you may proceed.

18   BY MR. BOCK:

19   Q    Are you contemplating a civil suit against Mr. Fries?

20   A    If Mr. Fries is convicted, I'm required by the county to

21        file a civil suit.

22           MR. BOCK:  Okay.  May I have a second, your Honor?

23           THE COURT:  Yes, take your time.

24   BY MR. BOCK:

25   Q    And did you rent the property or own the property at -- at

```
 1          Tucson Omni -- Tucson National?
 2   A    Rented.
 3               MR. BOCK:  Okay.  I don't have anything further.
 4               Thank you.
 5               THE COURT:  Okay.  And Mr. Bock, for the sake of
 6   organization, Exhibit 47 -- that's actually medical records from
 7   --
 8               MR. BOCK:  From the hospital.
 9               THE COURT:  All right, so that the clerk can keep track
10   of that.
11               MR. BOCK:  Can I retrieve that from the witness?
12               THE COURT:  Yes, you may.
13               All right, and any redirect examination of the witness?
14                         REDIRECT EXAMINATION
15   BY MS. ANDERSON:
16   Q    Mr. Levine, you told us that when you were at the scene you
17        were experiencing the sore throat, the runny nose, and I
18        think some irritated eyes, is that correct?
19   A    That's correct.
20   Q    Once you got -- left the scene and got to the hospital, did
21        those symptoms resolve?
22   A    I think they did to a degree.  It wasn't a concern to me at
23        that point.
24   Q    Now, on cross Mr. Bock asked you about when the check was
25        written, the last two checks that were written for $200, and
```

1      I believe you told Mr. Bock that it was in February or March

2      of 2008, correct?

3  A   Correct.

4  Q   The register that we've already looked at says April 4th,

5      correct?

6  A   That's correct.

7  Q   So does that refresh your recollection about when the checks

8      were written?

9  A   They may have been written closer to that date.

10 Q   Closer to April?

11 A   Yes.

12 Q   Prior to the -- the attack on November 1st, 2008 when was

13     the last time that you saw the defendant at your house?

14 A   Before they did the last work was the last time I saw him,

15     and again, that was roughly February.

16 Q   Of 2008?

17 A   Of 2008, yes.

18 Q   So a good ten months passed between when the defendant

19     finished the work at your house, and when the attack

20     occurred, is that right?

21 A   That's correct.

22         MR. BOCK:  Objection.  She's continuing to lead, your

23 Honor.

24         THE COURT:  No, I'll allow some limited leading.  I'll

25 allow the answer to stand.

1    BY MS. ANDERSON:

2    Q    When Mr. Fries and his crew left your house in February of

3         2008, did he leave any buckets at your house?

4    A    No.

5    Q    Everything was cleared?

6    A    Yes.  They were very, very nice about making sure everything

7         was clean every time they left my home.

8    Q    Now, you told defense counsel on cross that there was no

9         contact with the defendant between February and March, 2008,

10        and also October 31st, 2008, but you and Mr. Fries spoke

11        over the phone, correct?

12   A    We had spoke over the phone because of the bounced checks.

13        We spoke over the phone because it wasn't done right.  There

14        was contact between that time and the actual occurrence in

15        October --

16   Q    I'm going to --

17   A    -- on the phone.

18   Q    Do you recall when Mr. Fries -- do you recall when you got

19        the phone call from the bank?

20   A    That was on a Saturday in July.

21   Q    Now, sometime after that Mr. Fries called you, did he not?

22   A    Yes, he did.

23   Q    Okay.  And -- and when was that?

24   A    About two weeks after the thing at the bank happened.

25   Q    So you did have contact with Mr. Fries between the time he

1       finished the work, and when the attack occurred?

2   A   That's correct, by phone.

3   Q   Okay.  And tell us again about that conversation you had

4       with the defendant at that time?

5   A   The conversation was basically he said thank you very much

6       for honoring the $200 check.  I said, you know, I stopped

7       payment on it, and he hung up on me.

8   Q   Let's talk a little bit about the -- your house at Tucson

9       National.  Mr. Bock asked you about the configuration of the

10      guard shack and its proximity to your house.

11  A   Um-um.

12  Q   Do you recall that?

13  A   I recall he was asking about the guard shacks, yeah.

14  Q   Okay.

15  A   He was talking about the proximity to the wall.

16  Q   Now, from your house can you see the guard shack?

17  A   Barely, if you're in the back, because -- because there's

18      other homes next to it in between our house and the guard

19      shack.

20  Q   Were there guards at the guard shack 24 hours, seven days a

21      week?

22  A   There was supposed to be.

23  Q   So if there was something taking place at your house, could

24      the guards necessarily see your house?

25  A   Not necessarily.

```
 1              MR. BOCK:  Objection to the --
 2              THE COURT:  No, I'll allow the answer to stand.
 3   BY MS. ANDERSON:.
 4   Q    Now, your -- your house in 2009 in Tucson National, it was
 5        actually connected to other houses, is that right?
 6   A    That's correct.
 7   Q    Could you explain that to us?
 8   A    There was a -- three -- I want you to call them town homes.
 9        They were attached walls.  The one to the south of us was a
10        single floor house.  The one to the north of us was a
11        multiple floored house.
12   Q    So there were, what, three houses --
13   A    Three houses in our little piece, yes.
14   Q    And where did your house sit in the --
15   A    In the middle.
16   Q    In the middle.  So you were connected on either side by
17        another town home, correct?
18   A    Correct.
19   Q    What was next to the -- to the house to your immediate west?
20        Was there a wash there?
21   A    All right, so that would be the two story house you're
22        referring to that I'm -- actually to the --
23   Q    Correct.
24   A    -- to the west.  On their house there's a wash behind it.
25        There's a gate to that wall he was talking about leading
```

1    out, and to the back to the wash, and then a road.

2  Q  What's the distance between the wash and your house?

3  A  Without the wall?

4  Q  Sure.

5  A  Without the wall's probably 75 feet.

6  Q  Now, when -- when Karen, your wife, woke up on August 2nd,

7     2009, the first thing that you recall is she was screaming,

8     correct?

9  A  She was hysterical.

10  Q  Was she already on the phone with 9-1-1?

11  A  That's what I really don't remember, because I was woken up

12     out of a dead sleep, so I don't know if she was on the phone

13     with 9-1-1 and handed me the phone, or if I asked her to

14     phone, or if I called 9-1-1.

15  Q  How soon after you got up were you talking to 9-1-1?

16  A  Pretty much right away.

17  Q  Did you keep chlorine in your garage?

18  A  No reason to.

19  Q  When was it that you saw the first -- the device that was in

20     the front of your house, when was it that you saw that

21     device smoking?

22  A  The -- the device in the front of our house?

23  Q  Yes.

24  A  We never basically saw the front of our house, so all I saw

25     was this black cloud from -- coming from the front of the

| | | |
|---|---|---|
| 1 | | house.  I don't know what caused it. |
| 2 | Q | And where were you when you saw that smoking coming from the |
| 3 | | front of your house? |
| 4 | A | We were on the rise on the green, back over the road.  So we |
| 5 | | were behind the house and above it. |
| 6 | Q | You had already been evacuated, correct? |
| 7 | A | Yes. |
| 8 | Q | Do you recall seeing liquid ooze in your garage when you |
| 9 | | returned, ooze that had come in from -- |
| 10 | A | When we returned?  Yes. |
| 11 | Q | That had come in from the front of the garage? |
| 12 | A | Underneath the garage door, yes.  It was pretty much all |
| 13 | | over the garage floor there. |
| 14 | | MS. ANDERSON:  Judge, may I have just a moment? |
| 15 | | THE COURT:  Yes. |
| 16 | | MS. ANDERSON:  Judge, that's all I have. |
| 17 | | Thank you. |
| 18 | | THE COURT:  All right. |
| 19 | | Any questions from the jury for this witness? |
| 20 | | All right, ma'am, if you could write it out. |
| 21 | | And if I could see counsel at sidebar, please. |
| 22 | | BENCH CONFERENCE |
| 23 | | THE COURT:  Okay, seems like a good question. |
| 24 | | MR. BOCK:  No objection. |
| 25 | | MS. ANDERSON:  Yeah. |

1              THE COURT:  Do you want me to ask the question?

2              MS. ANDERSON:  That's fine, your Honor.  Yeah.

3              THE COURT:  All right.

4              (The bench conference was concluded.)

5              THE COURT:  All right, sir, a question from one of the

6        jurors.

7              Could you please describe the weather on the day of the

8        incident at Magee?

9              THE WITNESS:  The weather on the day of the incident

10       was sunny, warm.  Basically, no clouds in the sky that -- you

11       know, other -- other than the smoke.

12             THE COURT:  All right, thank you.

13             Any additional questions from the jury for the witness?

14             All right, may this witness step down?

15             MS. ANDERSON:  Yes, your Honor.  Thank you.

16             THE COURT:  All right.

17             Thank you, sir.  You may step down.

18                      --------------------

19             (John Daniel Bradley was duly sworn by the clerk.)

20             THE COURT:  All right, and Mr. Pimsner, you may

21       proceed.

22                         JOHN DANIEL BRADLEY

23                         DIRECT EXAMINATION

24       BY MR. PIMSNER:

25       Q    Mr. Bradley, are you currently employed?

1    A    No, sir.

2    Q    And are you retired?

3    A    Yes, sir.

4    Q    And have you previously been employed by a law enforcement

5         agency?

6    A    Yes.

7    Q    And what was the last agency you worked for?

8    A    The Marana Police Department.

9    Q    And what capacity did you work at -- at Marana PD?

10   A    I was in the position described as a crime scene specialist.

11   Q    And what were your duties as a crime scene specialist?

12   A    We were the custodian of property and evidence turned in.

13        We responded to crime scenes, and to help the investigating

14        officers process the scene, take forensic evidence that we

15        collected.  We were the specialists in collecting more of

16        the forensic -- excuse me, forensic evidence and regular

17        physical evidence.

18   Q    When you say forensic evidence, does that include

19        fingerprints?

20   A    Yes, sir.

21   Q    Now, do you have any other prior law enforcement experience

22        other than as a crime scene specialist at Marana Police

23        Department?

24   A    Yes.

25   Q    And what was that?

```
 1   A      I was a police officer and sergeant for the Tucson Police
 2          Department for 12 and a half years.
 3   Q      And when did you -- when did you start at the Tucson Police
 4          Department?
 5   A      February of 1984.
 6   Q      And when did you leave?
 7   A      September of 1996.
 8   Q      And what was the rank that you left -- when you left Tucson
 9          PD, what rank did you hold?
10   A      I was a sergeant in patrol.
11   Q      Now, why did you leave in '96?
12   A      I had to leave due to a medical condition that occurred on
13          the job, and they classified it as a medical retirement.
14   Q      And as part of your training and experience that you
15          received as a police officer and then a sergeant for the
16          Tucson Police Department, did you receive training or any
17          kind of experience in evidence collection?
18              MR. BOCK:  Objection.
19   A      Yes, sir.
20              MR. BOCK:  I'll stipulate to that.
21              THE COURT:  All right.  The government can either
22   accept the stipulation, or establish the qualifications in the
23   presence of the jury, however you'd like to proceed.
24              MR. PIMSNER:  Thank you, your Honor.
25   BY MR. PIMSNER:
```

1    Q    Did that include fingerprints -- lifting fingerprints,
2         items -- from items of evidence?
3    A    Yes, sir.
4    Q    And was it common during your tenure at Tucson Police
5         Department to actually pull or lift prints from crime scenes
6         looking for latent prints?
7    A    Yes, sir.
8    Q    And is that -- I mean, was it a fairly common experience, or
9         was it on a rare occasion you would -- you would conduct the
10        lifting of prints?
11   A    It was a very common experience with the Tucson Police
12        Department.
13   Q    What type of cases would you routinely do that on?
14   A    Well, we would do it on -- well, personally I would do it on
15        burglaries, criminal damages, car thefts, car theft
16        recoveries, anywhere where a fingerprint might be important
17        to the case.  Mostly those property type crimes.
18   Q    So when you got hired on at Marana PD, you already had a
19        vast amount of experience in evidence collection, correct?
20   A    Yes, sir.
21   Q    Now, did you continue to receive training while you were at
22        Marana PD in regards to evidence collections, and
23        specifically for latent prints?
24   A    Yes, sir.
25   Q    And what kind of training did you receive?

| | | |
|---|---|---|
| 1 | A | Well, we did in-house training with my supervisors and my |
| 2 | | partners, but I was sent to a week long class in Florence, |
| 3 | | Arizona, and a week long class -- I believe it was in |
| 4 | | Chandler, Arizona.  And we went over different techniques of |
| 5 | | lifting different types of latent prints and impressions, |
| 6 | | including shoe impressions, but there was different |
| 7 | | surfaces.  There's different chemicals you can use now, |
| 8 | | like, to get prints off of oranges and stuff.  So, I mean, |
| 9 | | it's much more advanced than when I started as a police |
| 10 | | officer. |
| 11 | Q | And just briefly describe what a usable latent print would |
| 12 | | be. |
| 13 | A | A usable latent print from my training is something that |
| 14 | | shows enough lines and swirls and whorls of the print that |
| 15 | | will lead to the ability for someone to analyze them to |
| 16 | | compare to someone's print that they have in the system. |
| 17 | Q | And so you started in Marana in what year? |
| 18 | A | 2006. |
| 19 | Q | And were you still employed as a crime scene specialist on |
| 20 | | November 1st, 2008? |
| 21 | A | Yes, sir. |
| 22 | Q | And do you recall what day of the week that was? |
| 23 | A | November 1st was a Saturday. |
| 24 | Q | And were you on duty that day, or were you -- were you on |
| 25 | | leave or off duty? |

| | | |
|---|---|---|
| 1 | A | I was off duty, on call. |
| 2 | Q | And did you -- were you called out to a certain crime scene? |
| 3 | A | Yes, sir. |
| 4 | Q | And what time did you get called out? |
| 5 | A | I believe I received a call at 8:55 a.m. on that morning. |
| 6 | Q | And how long would it -- and where were you called out to? |
| 7 | | What location? |
| 8 | A | Location in Dove Mountain, on Tear Branch Road -- or Place. |
| 9 | Q | Could that have been Tear Blanket? |
| 10 | A | Tear Blanket, correct. |
| 11 | Q | Is that in the Heritage Highlands 55 and older community? |
| 12 | A | I can't -- I can't say to that. |
| 13 | Q | Okay.  And what was the nature of the call that you got -- |
| 14 | | you were brought out on? |
| 15 | A | I was advised there was a extensive criminal damage scene by |
| 16 | | the communication dispatcher who called me. |
| 17 | Q | And did you learn whose home -- and was it a home that was |
| 18 | | affected by this damage? |
| 19 | A | Yes, sir. |
| 20 | Q | And did you subsequently learn whose home it was? |
| 21 | A | Yes, sir. |
| 22 | Q | And who was that? |
| 23 | A | I -- |
| 24 | Q | Do you recall their last name? |
| 25 | A | -- don't recall their last name.  I was only involved in -- |

1    strictly interacting with them because I was the

2    investigating lead officer's job, but I believe her first

3    name was Karen.

4  Q  And when you arrived at the scene, where did you -- where

5    did you arrive at specifically -- what part of that

6    location?

7  A  Well, the scene was in a cul de sac.  I pulled up to the --

8    as close as I could get, that the officer would allow me to

9    get to.  It was -- I actually on Tear Blanket turned right

10    onto it, the way I came in, and probably went about ten feet

11    and stopped close to the driveway of the vacant house.

12  Q  Now, what was the first thing that you observed when you

13    arrived at the scene?

14  A  The huge mess of this -- I mean, just stuff everywhere in

15    his driveway.  Just a lot of paint, and oils, and

16    five-gallon buckets, and just all over strewn.

17  Q  And was there any kind of unusual odor that you smelled?

18  A  Eventually, yes.  At my first arrival, the odor wasn't that

19    strong.

20  Q  And did the odor get stronger as you got -- completed your

21    tasks?

22  A  Yes, it did.

23  Q  And how would you describe that odor?

24  A  In my experience, the worst odor I've smelled.

25  Q  And who did you contact when you arrived?

1   A   Officer Quackenbush, and Officer Muszula.

2   Q   And was Officer Muszula the initial responder?

3   A   As it turned out at that time -- when I first got there,

4       yes, he was the initial responder.

5   Q   Did Officer Muszula assist you in your job as evidence

6       collection?

7   A   Yes, he did.

8   Q   And in what manner?

9   A   He did a lot of -- with Officer Quackenbush, but Officer

10      Muszula did a lot of the tent marking of objects of interest

11      throughout this scene.

12  Q   When you --

13  A   The buckets, and different items.

14  Q   When you say tent marking, is that identifying it with

15      numbers or letters, certain items that may be evidentiary?

16  A   Yes.  In this case we started out with letters, because we

17      didn't know what we would be collecting.  Later we used

18      numbers if we collected it.

19  Q   Now, generally describe the method that you use when you

20      process a crime scene.

21  A   Basically, what I do to start a crime scene after I get the

22      initial briefing from the officers involved, is I start with

23      photographs, and I start with an overview, trying to show

24      the location as best I can with some landmarking.  In this

25      case I started with the street sign.

1          After that, I moved up to the house and tried to get

2     the house number, which I was able to do but it was

3     partially -- not -- it was covered with a substance, but not

4     concealed so it did show through.

5          Then I went back and I started to walk in a

6     counterclockwise manner of the crime scene, doing overview

7     pictures to try to give the person viewing the pictures a

8     sense of walking through the scene.

9          After the overview pictures are done, then I would go

10    back and take closeups, and -- of -- pictures of specific

11    items of interest according to what the investigating

12    officer advised me of, or we determined during discussions.

13         And then lastly, the items that we would collect as

14    evidence.

15         Not necessarily in that order, but if we came to a

16    piece that was evidence, we would get up closer and take

17    pictures of it.

18  Q    Now, the tenting you just described where you would mark it

19    with an evidentiary number or letter, that would have been

20    done prior to you going back and doing closeups of these

21    different items?

22  A    Yes.  In this case because I had assistance with other

23    officers, they were doing that while I was doing the

24    overview pictures so I didn't have to go back and do that

25    myself.  So they had gone out and used the tent markers I

1          had on my crime scene unit that had letters on it and put

2          them besides items that we wanted to look at closer as we

3          processed the scene.

4    Q    And ultimately you're responsible for seizing items of

5          evidence from that location, or from a crime scene?

6    A    Ultimately, I'm responsible to make sure it's seized

7          correctly.  Some of the officers might see something and

8          package it, but I make sure it's -- we keep the number

9          sequence in order.  That's part of the package.  And that it

10         is done correctly.

11   Q    And in this case were you involved in the actual seizure of

12         the evidence?

13   A    Yes, sir.

14   Q    Now, let me --

15         MR. PIMSNER:  May the witness be shown Exhibit 20, your

16   Honor?

17         THE COURT:  Yes.

18   BY MR. PIMSNER:

19   Q    Does that photograph accurately depict the scene at Tear

20         Blanket with an evidence marker A D?

21   A    Yes, sir.

22   Q    Let me ask the witness to look at 28.

23         And does that photograph accurately depict the scene on

24         November 1st showing evidence item 2?

25   A    Yes, sir.

```
 1   Q   Let me ask the witness to look at Exhibit 30.
 2           And does that photograph accurately depict the scene
 3       identifying item A S?
 4   A   Did you say A S, as in Sam?
 5   Q   Yes, I'm sorry.  A S?
 6   A   Yes, sir.
 7   Q   May the witness look at Exhibit 35.
 8           Is that another photograph that has an evidence
 9       marker -- it's a little hard to read in this -- this shot.
10   A   Yeah, I believe it's a Q, as in queen.
11   Q   May the witness look at 33.
12           And is that a -- these are items that you saw at the
13       scene that day?
14   A   Yes, sir.
15   Q   And that's in the original position?
16   A   Yes, sir.
17   Q   Let me ask the witness to look at 34.
18           Now, is that a paint can that you observed near the
19       scene on that -- on November 1st?
20   A   Yes, sir.
21   Q   In its original location?
22   A   Yes, sir.
23   Q   May the witness look at 40.
24           Is that the same can that you just described but with
25       an evidence marker A U?
```

1   A   Yes, sir.

2   Q   May the witness be seen -- shown 43.

3           Does that depict an evidence item 3 and H A -- in

4       evidence A H?

5   A   Yes, sir.

6   Q   May the witness be shown 46.

7           Is that a -- a closeup of item 3 after it had been

8       opened up?

9   A   Yes, sir.

10  Q   May the witness be shown 48.

11          And is that another item that was observed across the

12      street from the Levine's?

13  A   Yes, sir.

14  Q   And may the witness be shown 60, then 61.

15          And then 61.

16          Are these the same footprint that was observed at the

17      scene on that day?

18  A   Yes, sir.

19  Q   Let me ask the witness to look at 54 and 50.

20          Is this another -- 54 and then 50.

21          50 -- I'm sorry 52 -- 54 and 55.  I apologize.

22          And do those pictures represent another footprint

23      located at the scene?

24  A   Yes, sir.

25  Q   And lastly, may the witness see 51 and 52.

1           And is that still yet another photograph located at the

2      scene on November 1st?

3  A    Yes, sir.

4           MR. PIMSNER:  At this time I'd move to admit the

5  exhibits I just discussed subject to Mr. Bock's -- Mr. Bock's

6  continuing objection.

7           THE COURT:  Any additional objections, Mr. Bock?

8           MR. BOCK:  No, but -- Judge, I have no objection as to

9  46, 60, 61, 54, 55, 51 and 52.

10           THE COURT:  All right.

11           MR. BOCK:  And the other ones were subject to my

12  previous record.

13           THE COURT:  Let's see if I get all these numbers right.

14  So 20, 28, 30, 35, 33, 34, 43, 46, 48, 60, 61, 54, 55, 51 and 52

15  are admitted into evidence.

16           MR. PIMSNER:  Right.  And I may have neglected to ask

17  him to look at 40, your Honor.

18  BY MR. PIMSNER:

19  Q    If I may ask the witness to see Exhibit 40 -- no, we did see

20      that.  So 40 was --

21           THE COURT:  And 40 are admitted.

22           MR. PIMSNER:  Thank you, your Honor.

23           And as we go through this -- may they be published to

24  the jury as we go through these?

25           THE COURT:  Yes.

```
 1   BY MR. PIMSNER:

 2   Q    Now, Officer --

 3             MR. PIMSNER:  You said you want me to use the mike if I

 4   --

 5             THE COURT:  Yes, we have a handheld mike.  If -- you

 6   could get that from Jill if you wander from the microphone.

 7             There you go.

 8   BY MR. PIMSNER:

 9   Q    Let me show you outside the view of the jury Exhibit Number

10        291.

11             Can you describe what 291 is?

12   A    It looks like an overview of the area including the victim

13        residence and the houses immediately surrounding it.

14   Q    And does that represent -- is that the victims' house, 5372

15        West Tear Blanket?

16   A    Yes.

17   Q    And is that consistent with the cul de sac that you

18        observed, and the area that you examined?

19   A    Yes, sir.

20             MR. PIMSNER:  At this time I would move the admission

21   of Exhibit 291.

22             THE COURT:  291 is admitted, and may be published.

23   BY MR. PIMSNER:

24   Q    Mr. Bradley, let me ask you to look at Exhibit 9, which is

25        already in evidence.
```

| | |
|---|---|
| 1 | Could you describe the -- were these the items that you |
| 2 | or the detective or the responding officer thought were |
| 3 | evidentiary in nature, or some of the items? |
| 4 | A   Yes, sir. |
| 5 | Q   And what are the items that are marked in that photograph? |
| 6 | A   We have some buckets marked, and then we have a -- what |
| 7 | turns out to be item number 3, which is the wallet.  I |
| 8 | believe we have the gray bucket, A as in Adam, H as in |
| 9 | Henry, and the white bucket in the foreground marked as A as |
| 10 | in Adam, I as in Ida. |
| 11 | Q   Now, were these buckets over anything that you observed? |
| 12 | A   Once we removed the buckets, yes, they were over, like, |
| 13 | lighting fixtures along the driveway. |
| 14 | Q   So the -- |
| 15 | A   At the time -- I didn't know it at this point, but once we |
| 16 | removed them, yes. |
| 17 | Q   After you removed them you have realized that the driveway |
| 18 | would have been illuminated? |
| 19 | A   Yes, sir. |
| 20 | Q   Let me ask you to look at Exhibit 20.  That's been listed |
| 21 | as -- as evidentiary item A D. |
| 22 | What was the significance of that photograph? |
| 23 | A   The significance of this photograph was to show the oil and |
| 24 | other substances that had stained the sidewalk, and then |
| 25 | somebody had taken the time to dump styrofoam on it to make |

1          it a much messier environment.  It was an item of interest,

2          so they marked -- the officer marked it as A D, but it

3          wasn't something we were going to collect.  He just wanted a

4          photograph of it.

5      Q   So the items that you marked with letters were items of

6          interest but not necessarily seized, and the items that

7          were -- that were -- you believed were evidentiary were

8          marked 1 -- were marked numerically, correct?

9      A   The ones that became evidentiary we marked numerically.

10         That's correct.

11     Q   Let me ask you to look at Exhibit 28 -- now, that shows

12         Exhibit Number 2.  What is Exhibit Number 2?

13     A   Exhibit Number 2 was a link of chain with a padlock on the

14         end of it.  And they had already determined upon my arrival

15         that we were going to collect it, so we immediately marked

16         it as -- with a tent marker with a number on it that I would

17         photograph, and then we would collect it after photographing

18         to a proper storage bay or box.  In this case I used a brown

19         paper bag.

20              MR. PIMSNER:  And your Honor, maybe if I push the easel

21     to the side of the witness, then he can then point to the

22     different locations and everybody can see it.

23              THE COURT:  Yes.  He can step down and also use the

24     microphone if you'd like him to be closer to the easel.

25     BY MR. PIMSNER:

1   Q   Could you point on -- on Exhibit 91 where that padlock would

2       have been --

3           THE COURT:  Now, he needs to have the microphone.

4           MR. PIMSNER:  Oh, right.

5   BY MR. PIMSNER:

6   Q   -- in connection with the victim's house?

7   A   The padlock would have basically been where you see here,

8       this tree going into the slight curve straightening before

9       you actually get to the driveway of the victim's house,

10      which is located right here.  So it was basically right in

11      this area of the roadway before you get to the driveway

12      alongside the curb, which would be the east curb as we're

13      looking at it.

14  Q   So the victim's house is the house just below the address

15      that's given on that -- that -- area?

16  A   Yes, it's below the typed in information, the name, address.

17      This house right here.

18  Q   Now, during the course of your investigation did you

19      determine whether anybody was living at that house directly

20      in front of the -- the Levine's?

21  A   I was advised that this house here was vacant.  Right here.

22  Q   Now, in that --

23  A   This driveway -- I guess there's a duplex or something, but

24      it was this part that I was advised was vacant.

25  Q   Now, in the same -- you can step down or sit -- go back for

1    now.  Just hang on to that because I'll probably ask you to

2    come down again.

3        In that same exhibit, 28, was there anything else of

4    evidentiary interest that is also shown in that picture?

5  A  Yes, if you look at the -- basically, upper middle part of

6    the photo above the electrical box of the residence that was

7    vacant, there was a can sitting on top of it.

8  Q  Okay, and you later photographed that can close up?

9  A  Yes, sir.

10 Q  Now, let me ask you to look at Exhibit 30.

11     Could you describe what Exhibit 30 is?

12 A  Exhibit 30 was a picture -- as I was going counter

13   clockwise, I had -- had moved north past the driveway and I

14   was taking a picture towards the front to give you a -- a

15   look from that location, that shows where a couple of

16   five-gallon buckets were stacked, one white and gray, by a

17   tree, and how it was associated and relevant to the resident

18   driveway, and garage, and front door.

19 Q  So would that have been basically right out in front of

20   their house?

21 A  Yeah, it's very close.  It's not far away.

22 Q  Let me ask you to look at Exhibit 35.

23     Are those -- is that an additional bucket and an

24   additional plastic that you observed at the scene?

25 A  Yes, sir.

1  Q    And where is that located?

2  A    This is just north and a little bit east of the front door.

3       It's -- the sidewalk would be just to the south or to the

4       left in the view of this picture that leads to the front

5       door.  I believe you can see the front door screen there up

6       in the upper left that has the -- looks like a winging type

7       of symbol on it.

8  Q    And so if you look behind the bucket, is that direction

9       their back yard -- the Levine's back yard?

10 A    Yes, that would be -- I'm sorry, yes, sir.

11 Q    Now, what was the significance of that bucket that you saw?

12 A    There was still a lot of fluids left in it, and it was

13      believed that some of the items that were dumped on the

14      sidewalk area had come from that bucket because the fluids

15      were similar.

16 Q    And the fluids are -- that you saw in that bucket were

17      consistent with what was strewn around the driveway and

18      home?

19 A    Yes.  Specifically, not right close to it, but on the

20      sidewalk that had some dead animals in it.

21 Q    Now, let me ask you to look at Exhibit 33, please.

22        What were these items?

23 A    These were five-gallon bucket lids that we discovered under

24      some Texas rangers that were north and east of the house.

25      As you went north and east of the house -- this is on a side

1     hill.  It's a small, little hill.  They were about 10 to

2     15 feet, estimate, from those buckets that we saw that were

3     stacked together that were white and gray.

4          MR. PIMSNER:  Your Honor, may I approach the witness

5  with an exhibit?

6          THE COURT:  Yes.  And that exhibit number, just for the

7  record?

8          MR. PIMSNER:  315.

9          THE COURT:  315.

10          MR. PIMSNER:  And this is the general area of where

11  Exhibit 33 depicts.

12  BY MR. PIMSNER:

13  Q    Could you describe that photograph for us?

14  A    Yes, sir.  It's -- this photograph I took basically standing

15       where that gray and white bucket stacked together were by

16       the tree.  I'm looking north and slightly east.  It shows

17       the end of the Texas rangers that have the lids under it.

18       On the very bottom corner of the Texas rangers you can see

19       one of the white lids.

20  Q    So the lids in Exhibit 33 are actually -- that's a farther

21       away shot that shows the bushes that they were under, is

22       that correct?

23  A    Yes, sir.

24  Q    And that accurately depicts the scene on November 1st?

25  A    Yes, sir.

```
 1              MR. PIMSNER:  And I would move to admit Exhibit 315.
 2              MR. BOCK:  No objection.
 3              THE COURT:  315 is admitted.
 4              MR. PIMSNER:  If I could put this on the overhead?
 5              THE COURT:  Yes.
 6    BY MR. PIMSNER:
 7    Q    Now, sir, is that picture taken from below, heading up a
 8         hill -- up the hill?
 9    A    Yes, sir.
10    Q    And could you come down and -- again, with your microphone,
11         point to the area in connection -- in relationship to the
12         Levine's home where those lids were found.
13    A    Basically, as you walked up through here, these were
14         oleanders alongside the vacant residence, and there's a path
15         up here that isn't well seen with this foliage, but it's
16         basically right here you can see the different color.  And
17         these are the Texas rangers.  And they were basically right
18         underneath the Texas rangers in the corner.
19    Q    And why did you think those lids were associated with the
20         crime scene?
21    A    They had substances on them very similar to the substances
22         we found in the driveway and the crime scene, and they were
23         lids that matched the types of buckets that were left
24         behind.
25    Q    Thank you.
```

1            If you can look at Exhibit 34.

2            Is that an item that you saw near the scene of the

3       Levine's home that morning?

4   A    I don't have an item showing on my screen, sir.

5   Q    Nothing showing?

6   A    Now I do.

7            Yes, this is an item that was shown in the -- or found

8       in the area of the crime scene.

9   Q    And that was when you photographed it before it was marked

10      with an evidence tag?

11  A    I photographed before it was marked with a -- actually, the

12      first time it was marked with a letter tent, yes.

13  Q    And let me ask you to look at Exhibit 40.

14           Is that the same paint can that -- in the previous

15      exhibit, 34?

16  A    Yes, it is.

17  Q    And could you -- and I'm sorry to keep making you get up,

18      but could you show the jury where that paint can was located

19      in relationship to the Levine's home?

20  A    The paint can was located approximately right here by this

21      foliage.  I had come up through -- I came up this way, and

22      that was found there underneath the bougavilla bush.

23  Q    And why did you think it may have been connected to the

24      Levine's damage, and attack?

25  A    Because it was similar to numerous other cans.  We had

1       another can of the same size right by the garage door on the

2       driveway berm with the -- the rocks that was very similar.

3   Q   Did -- and -- and just for clarification, I believe your

4       report indicates it's a quart can.  Is that a quart can?

5   A   No, sir.  That was a typographical error on my part.  It's a

6       gallon can.

7   Q   All right.  You may be seated.

8           Now, let me ask you to look at Exhibit 43.

9           THE COURT:  And Mr. Pimsner, at some point we'll need

10  to take a midmorning recess, so whenever it's --

11          MR. PIMSNER:  This is fine.

12          THE COURT:  This is a good time?

13          MR. PIMSNER:  Sure.

14          THE COURT:  All right.

15          Let's go ahead and take a 15 minute midmorning recess.

16          (The Court recessed at 10:51 a.m., and reconvened at

17  11:07 a.m.)

18          THE COURT:  The record may reflect the presence of

19  counsel, the defendant.

20          And Jill, if you could get the jury.

21          (The jury was entered the courtroom.)

22          THE COURT:  And everyone may be seated.

23          The record may reflect that the jury has returned.

24          And counsel, you may continue with your questioning.

25          MR. PIMSNER:  Thank you, your Honor.

1    BY MR. PIMSNER:

2    Q    May the witness please look at Exhibit 48?

3              And what does that exhibit represent?

4    A    It's the 3M multi purpose adhesive can that was found on the

5         top of the electrical meter box of the vacant residence just

6         to the east of the Levine's.

7    Q    And that shows that it is some type of a spray adhesive?

8    A    Yes, sir.

9    Q    Now, please look at Exhibit 43.

10             What does Exhibit 43 represent?

11   A    Well, what the essence of this picture was to capture was a

12        wallet covered in white paint with the tent marker number 3

13        beside it.  It was beside a gray bucket that was marked A H,

14        Adam, Henry.

15   Q    And where in relationship to the Levine's home was that

16        wallet located?

17   A    In the picture you can see the driveway to the right side of

18        the picture.  It's about -- within six feet of the actual

19        building structure with the garage being just behind it, or

20        would be to the upper side of the picture in this case.

21   Q    So that wallet was left in a -- in near proximity to the

22        Levine's home?

23   A    Yes, sir.

24   Q    No efforts to conceal -- did it appear to conceal that

25        wallet?

1    A    No, sir.  It was found as the picture depicts.

2    Q    Let me ask you to look at Exhibit 46.

3              And what does that exhibit represent?

4    A    This is after the wallet was opened to take a photograph to

5         show the ID, the drivers license of the -- that was inside

6         the wallet at that time.

7    Q    Now, let me show --

8              MR. PIMSNER:  If I may approach the witness, your

9    Honor?

10              THE COURT:  Yes.

11   BY MR. PIMSNER:

12   Q    Let me show you what's been marked Exhibits 317 and 316.

13             Can you describe what 316 is?

14   A    316 has multiple cards in it.  The one that I recognize is

15        the ID that was inside the wallet, the Arizona drivers

16        license.

17   Q    And who does that ID belong to?

18   A    The name on the drivers license is Kalyn Nicole Hovey.

19   Q    Would you spell the first and last name?

20   A    Yes, sir.  Kalyn's spelled K-A-Y-L-N.  Hovey H-O-V as in

21        Victor, E-Y.

22   Q    Now, you didn't at that point examine the contents of the

23        wallet, is that correct?

24   A    That's correct, sir.

25   Q    Did you -- and let me ask you to look at the other exhibit,

```
1              was it 317?
2    A    Yes, sir.
3    Q    And what is that exhibit?
4    A    This is the wallet that at least this drivers license and
5         the cards apparently were found in that were photographed in
6         the picture we have here that's open, and in the previous
7         pictures it was closed.
8    Q    Now, does that -- is that wallet what was depicted as
9         Exhibit -- or evidence item number 3 in the previous
10        exhibit?
11   A    Yes, sir.
12   Q    And that was the wallet that was found near the driveway to
13        the Levine's home?
14   A    Yes, sir.
15            MR. PIMSNER:  At this time I would move to admit 316
16   and 317, your Honor.
17            MR. BOCK:  No objection.
18            THE COURT:  316 and 317 are admitted.
19   BY MR. PIMSNER:
20   Q    Sir, during the processing of the scene did you notice
21        various shoe prints located in the area near or around the
22        Levine's residence?
23   A    Yes, sir.
24   Q    And were those shoe prints visible because of the type of
25        material that was spread around the residence?
```

1    A    Yes, sir.

2    Q    Did you actually photograph the shoe prints?

3    A    Yes, sir.

4    Q    And when you photograph a shoe print, do you do anything to

5         try to measure its scale?

6    A    Yes, sir.  We have standard issued scales that have

7         increments or measurements both in meters, centimeters, and

8         in inches.

9    Q    Now, the -- the prints that you saw, what were they

10        basically made of?

11   A    The shoe prints you're referring to?

12   Q    Right.

13   A    They were the soles of shoes that had gone through what

14        appeared to be debris similar to what was at the scene.  It

15        wasn't always a full shoe.  It might have been a partial,

16        the heel.  Some of it was in pictures in different

17        locations.  As they moved, some of the debris faded so they

18        weren't as distinct.

19   Q    Were you able to take any kind of molds from any of those

20        shoe prints that you observed?

21   A    No, I was -- not any technique that I could lift it on a

22        hard surface like that.  That's why I photographed it.

23   Q    And was it just because of the hard surface, or were there

24        other issues too?

25   A    The main reason was because it was a hard surface, and

1    that -- the other issues were because of the debris that was

2    involved.  I was not trained in any technique that we could

3    lift that, or had any equipment that I know of.  We have

4    things that we can lift, like, dust type shoe prints off of

5    wooden or tile floors, but this wasn't dust.  This was

6    actually paints, and grease, and rocks, and I was not

7    trained in any method -- or had been made aware of any

8    techniques we had available to us in our evidence lab to be

9    able to get them.

10   Q    So if there was a shoe print, say in mud, now, that -- would

11        that have been conducive to taking some kind of mold, a

12        hardened shoe print?

13   A    Yes.  We could use, like, a plaster type mold because that

14        would pour into the depression made in the mud, and fill in

15        the crevices.  And when it's lifted after it's hardened, you

16        have the impression on the mold.

17   Q    Is it fair to say because these were hard surfaces, these

18        impressions weren't available?

19   A    Yes, sir.

20   Q    Now, let me ask you to look at first Exhibit 60.

21            And is that a shoe print that you found at the Levine's

22        residence?

23   A    Yes, sir.

24   Q    And where was that located, approximately?

25   A    It was in the driveway.  Most of the shoe prints were close

1       to the edge of the driveway, slash, road where the driveway

2       begins, as you drive into it towards the eastern edge.

3    Q  Now, what was significant about that shoe print?

4    A  Well, it -- what showed on this shoe print was the size of

5       the heel, and the heel was pretty distinct.  You can see

6       some faintness at the front end of where the toe or the ball

7       of the foot would be, but the most distinct part was you

8       could see some pretty distinct identification marks of the

9       sole of the shoe with that wedge type pattern with little

10      slits in them as it goes around a heel.

11   Q  So it was a distinct pattern in the heel of the shoe?

12   A  Yes, sir.

13   Q  Now, does that impression appear to be made with some type

14      of an oily substance?

15   A  That's what I would classify -- the substance of this heel

16      was in some type of oil, or liquid form substances could

17      have been mixed with other fluids, but an oil/fluid type of

18      substance more than a paint.

19   Q  Was that consistent with the types -- or with the oil that

20      you saw at the Levine's home?

21   A  Yes, sir.

22   Q  Let me ask you to also look at Exhibit 61.

23         Is that a closer view of that same shoe print?

24   A  Yes.  I was taking these photos from my tripod, and I just

25      zoomed in on the same print to make the heel more distinct

1           in this picture.

2    Q    Now, the purpose of your scale there, does that help you

3          measure kind of width and length, say, of the heel?

4    A    Yes.  And if available, print the whole print.  But in this

5          case what we were really looking at -- what we could

6          identify is the heel.  That shows you how wide the heel is,

7          and basically up until the crack in the concrete how long

8          the heel is.

9    Q    And as far as this print is concerned, can you tell us

10         approximately how -- what the width of that heel was?

11   A    Going from the corner of zero, because the edge is pretty

12         close of the heel print there --

13   Q    Sir, I think if you point on the screen -- it will leave a

14         mark if you touch the screen where you're referring to.

15             THE WITNESS:  Okay.  A little bit more over there.

16             THE COURT:  And you can actually draw circles.

17             THE WITNESS:  Oh, okay.

18             THE COURT:  And you can clear the screen by touching

19   the left corner of the screen -- I'm sorry, lower corner.

20             THE WITNESS:  So if you basically start -- I'll have --

21   my fingers too fat.  In the --

22   BY MR. PIMSNER:

23   Q    Upper left corner?

24   A    Upper left corner of the scale at the zero, a little left of

25         the green mark, and go straight down you can see that the

1    heel's pretty close to that zero, but slightly off of it.

2    So in deference to the space, we'll say we start at 5 and it

3    comes out to approximately 115, so I would say it's 100 on

4    this scale wide.

5  Q  Well, if I was 115 from 5 --

6  A  110, I'm sorry.

7  Q  110?

8        And do you do similar type measurements for the length

9    of that heel?

10 A  Yes.  That's, again, pretty close to zero, but I would say

11   with that first green dot in the upper left-hand corner,

12   that's 5 also where it starts and ends approximately where

13   that other dot along that line is, so 105 in this case.

14   That would make that 100.

15 Q  Would be the length?

16 A  Would be the length.

17 Q  Let me ask you to look at Exhibit 40 -- I'm sorry 54.

18   Excuse me.

19        And was that another shoe print that you found at the

20   scene?

21 A  Yes, sir.

22 Q  Do you recall -- was that located near the same proximity as

23   the other shoe print?

24 A  In the same proximity, but I believe it was actually closer

25   to the white paint spill, and that's why you see all the

1          white paint spattered around.

2    Q    Now, let me ask you to also look at 54 -- or 55.  Excuse me.

3          Is that a closeup of the same heel?

4    A    Yes, sir.

5    Q    And is that heel different based on your training and

6          experience than the heel that was represented in 60 and 61?

7    A    Yes, sir.

8    Q    And how so?

9    A    Well, if you look at it, you can see that it doesn't have

10         that wedge type pattern all the way around that had the --

11         and each triangular wedge kind of had a little split in it.

12         The actual end of the heel or the back of the heel looks

13         like it's one solid impression.  And the other impressions

14         don't match the other heel.  Then looking at it closer,

15         again if we look at the measurements, starting at the -- the

16         zero mark, and in deference to the space we'll say we start

17         at 5, it goes out to approximately 90, which would make that

18         heel the length of 85.  And if we look at the width, say it

19         starts around 7, and we go out to approximately 77 at the

20         very outer edge up here, you're looking at approximately a

21         width of 70.  So those are different measurements than the

22         picture -- or the heels depicted in the previous picture.

23   Q    So Exhibit 54 and 55, the shoe prints are narrower than 60

24         and 61, is that correct?

25   A    Yes, sir.

1    Q    And also not as -- not as long?

2    A    The heel is not as long, yes, sir.

3    Q    And in addition to the distinct difference in pattern?

4    A    Yes, sir.

5    Q    And what does that mean to you pursuant to your training and

6         experience as a crime scene specialist?

7    A    These are different -- these impressions were made by two

8         different shoes.

9    Q    Now, this impression is made -- what was the type of

10        material that -- that made this impression?

11   A    This looks to me to be a white type of a paint, or coating

12        type of material.

13   Q    And was that type of material or paint also found spread

14        around the Levine's home?

15   A    Yes, sir.

16   Q    And is that white color similar to the white paint you

17        identified as A U that was found up the hill from the

18        Levine's home?

19   A    The colors of both substances were very similar, yes.

20   Q    Let me ask you to look at Exhibit 51, and -- and then also

21        52.

22             And is 52 a closeup of 51?

23   A    Yes, sir.

24   Q    And what's the significance of this exhibit?

25   A    The significance of this exhibit is, first of all, we had a

1       full, basically, shoe print.  It was also located in the

2       Levine driveway.  As you can see, it has multiple types of

3       debris, looks like it's been through the oil in the center

4       or arch type area with the black marks.  It also has whites

5       that are similar to the paint but maybe have been walked

6       through some dirt and stuff too that are mixed in.  The

7       pattern is completely different than the other two shoe

8       prints we've previously seen.  You have a diamond type of

9       pattern that goes through the ball and sole of the foot,

10      what looks like a circular pattern that's not as distinct in

11      the heel -- right in the middle of the heel.  So it's a

12      completely different shoe print than the previous two we've

13      seen.

14   Q  And based on your training and experience, that is a

15      different shoe than both the prior two shoe prints that you

16      previously observed?

17   A  Yes, sir.

18   Q  Were those the extent of the number of footprints that you

19      observed at the scene -- the different types of footprints?

20   A  The different types, yes.

21   Q  There may have been other footprints that may have been made

22      by the same shoe, but as far as the types of footprints,

23      there were three; is that accurate?

24   A  Yes, sir.

25   Q  Thank you.

1          Now, we discussed that you actually photographed the

2     scene, and -- and then you photographed it again with the

3     items of interest and the evidence number, and did you then

4     go back and seize the items -- some certain items from that

5     location?

6   A  Yes, sir.

7   Q  And did that include item 3, which is the exhibit of the

8     wallet and its contents that have been admitted?

9   A  Yes, sir.

10  Q  What did you do with item 3 when you seized it?

11  A  Actually, you can see in one of the photos I have a

12    pre-prepared box that -- our boxes are flat.  We tape them

13    together.  And I had it already labeled with the case number

14    and the item number on it so when we picked it up, we could

15    put it directly into it.  Because it had a damp or liquid on

16    it, in most cases we don't seal these items so they can

17    continue to dry properly and not mold.  So it was left

18    unsealed in the box once it was placed in the box, then I

19    put it in the back of my crime scene unit.  By putting it in

20    the back of my crime scene unit I had to unlock my back

21    door, place inside, and then I do lock it to make sure it's

22    secured so nobody else has access to it while I continue

23    with the scene.

24  Q  So you would have actually -- you would have picked up the

25    item.  I take it you were wearing some type of gloves,

1          correct?

2    A     Yes, I was wearing latex gloves.

3    Q     And you placed it in a box, and then secured that box inside

4          your locked vehicle?

5    A     Yes, sir.

6    Q     And describe just what your locked vehicle that you use as a

7          crime scene specialist?

8    A     The vehicle we use -- if you've seen the plumber type

9          vehicles that drive around that have the type of top that

10         looks like on the back of a stop sign, and it has multiple

11         all side access for where we keep items that we need to use

12         for evidence collection.  The back door is key locked, and

13         you can open that and it has an area inside that we can

14         access to walk in, place items, have backup.  We have a

15         backup generator, things like that in there if we get to a

16         scene where we need those type items.  And the front looks

17         like a van.  The front stays locked while I'm at the scene.

18         There is a sliding door that goes from the front to the

19         back.  Because of the way the seats turn, you cannot use it

20         so it's always locked.

21   Q     So you place an item of evidence in the back, and then you

22         lock the back of your truck.  It's not accessible to anyone,

23         correct?

24   A     That's correct.

25   Q     Now, what about the buckets, lids, and paint cans that

1     you've described and that we've looked through during the

2     course of the exhibits today?  What did you do with those?

3  A  What we did with those, one of the officers had responded to

4     the town's maintenance lot and picked up a pickup truck with

5     an open bed so we could place those in them.  There was too

6     many to fit in the area that I had in the back of the van.

7     We took the ones that we were going -- or later, actually, I

8     was going to process for possible latent prints and/or other

9     biological evidence to our impound yard at 5100 West Ina.

10    That yard is locked with a padlock.  That is accessible to

11    everybody who's a commissioned officer and a crime scene

12    unit technician, but inside the yard it is alarmed.  The

13    officers cannot go past the alarmed area.  Only an evidence

14    technician can.  I had to go down, unlock the -- I followed

15    this truck down once we loaded it up, unlocked the gate,

16    disarmed the alarm, and inside the alarm area is a shed,

17    approximately 200 square feet, that has a locked door and a

18    garage door, but the garage door is only openable from the

19    inside after you enter through the locked door.  The door is

20    a dead bolted and handle lock.  I had the keys for that --

21    or evidence technicians do, our crime scene unit

22    technicians.  I entered through that door, opened the garage

23    door.  We unloaded all these items that I was going to

24    process at a later date into the bay, closed the garage

25    door, and I relocked and secured the alarm in the impound

1          yard as we left.

2     Q    Now, that included the buckets, lids, paint cans, correct?

3     A    (No verbal response.)

4     Q    Did you maintain control over your evidence item 3, the

5          wallet and the contents?

6     A    Yes, sir.

7     Q    Now, did you receive a call later that day regarding that

8          wallet?

9     A    Yes, sir.

10    Q    From whom?

11    A    Detective Paul of the Marana Police Department.

12    Q    And approximately when was that?

13    A    I believe it was approximately -- I secured the original

14         scene around 2:30, and I think it was later, about a little

15         after 4:00 p.m. that I got the call from actually the

16         communications center to contact Detective Paul.  And when I

17         did, he asked to see that item number 3 for an interview he

18         was going to be doing.

19    Q    And that was the -- the wallet?

20    A    Yes, sir.

21    Q    And so what did you do at that point?

22    A    At that point it was secured still in my crime scene unit.

23         I drove my crime scene unit over to 5100 West Ina where

24         Detective Paul was going to do this interview.  I handed it

25         over to him with the understanding that he would secure it

1      in the evidence locker at that location when he was done.

2      He did this.  I picked it up on Monday morning during my

3      normal routine job of picking up evidence from the evidence

4      locker there.

5 Q   Okay.  So Detective Paul would have secured it, but you

6      would have retrieved it from the evidence locker on Monday?

7 A   Yes, sir.

8 Q   And did you then return to the impound yard into that locked

9      alarmed shed area to process the buckets and the paint cans?

10 A   Yes, on November 3rd, which was the Monday.

11 Q   And tell us what you did to process those items?

12 A   I had taken a couple other items that were still in my crime

13      scene unit, items number -- I believe 4 and 5 -- or 5 and 6,

14      I'd have to look at my report, down with me too because I

15      was going to process those, and they were cans.  And then I

16      got inside the impound yard the same way, deactivating the

17      alarm.  I set up my crime scene unit next to the building,

18      because it had the materials I needed to process these

19      items.

20         I would take a bucket as I came to them, and I actually

21      processed the ones I brought with me first looking for

22      fingerprints first, and this I would use the fingerprint kit

23      with a graphite based dust.  I would apply the dust.  If I

24      saw markings, I would examine them to see if they were

25      what's called APIS, as we call it, quality or latent prints

1    that could be later examined by a trained technician to

2    determine if they could match it to someone.

3         If they were not of that quality, then what I would do

4    is use cotton swabs and distilled water and swab this area

5    with the attempt if it existed on this area to collect what

6    they call touch DNA.

7         Each of these items when I did the touch DNA I would

8    pre-prepare the box, it's a long rectangular box that the

9    cotton swabs fit into, with the case number, the description

10   of what I was putting in it, which were the cotton swab

11   tips, and what item it came from or what object they came

12   from.  Having the box prepared I would open the cotton

13   swabs, which are sealed in a paper type container that you

14   can peal open, wet the end of the cotton swab tips, rub the

15   area in question with those cotton swabs, place them inside

16   the box, and then the box would be sealed in this little

17   long rectangular box inside.  They would be sealed inside

18   the box, and I'd put the box into its own envelope, because

19   I would later put all of these into a larger envelope, I

20   didn't want cross-contamination.

21  Q    Now, let's talk about the prints.  Did you identify what you

22       thought were usable latent prints on any of the items?

23  A    Yes, sir.

24  Q    And would that have been specifically the item that you had

25       labeled A U -- you were the detective that labeled A U?

1  A    Yes, sir.

2  Q    And let me look -- ask you to look at Exhibit 43 --

3       actually, 41.  I apologize, 41.

4            Is that the paint can that you analyzed -- one of the

5       paint cans that you looked for latent prints on?

6  A    Yes, sir.

7  Q    And did you in fact believe you -- you may have found three

8       latents of value?

9  A    Yes, sir.

10 Q    Now, you don't do a comparison or -- or anything -- further

11      analysis, is that correct?

12 A    No, sir.

13 Q    Your -- your job is to what?

14 A    My job is, of course, first to find them, and then I seize

15      them or lift them for evidence examination later.

16 Q    And this photograph represents the can that was up the hill

17      from the -- the Levine's residence?

18 A    Yes, sir.

19 Q    And does this photograph represent when -- at the time you

20      were processing is it a couple of days later?

21 A    Yes, sir.  This was at the impound yard.

22           MR. PIMSNER:  I move to admit 41, your Honor.

23           MR. BOCK:  No objection.

24           THE COURT:  41 is admitted.

25 BY MR. PIMSNER:

1    Q    Now, when you -- when -- and so describe the process that

2         you're trying to locate prints, say, on a -- on a paint can,

3         like Number 41 -- Exhibit 41?

4    A    Yes, sir.  The fingerprint kit we use has a brush in it.

5         The brush -- what I would do is put some graphite based

6         dusting powder into a bowl.  Then I would take the brush.

7         On the end I would tap that powder, but then I would spin it

8         or swirl it to shake loose, and that's called loading the

9         brush to get that material into the brush so you can

10        transfer it onto another surface.

11             Once that was done, I would use basically that same

12        technique of the twirling, swirling type motion, not swiping

13        but back and forth to dust an area.  That's a technique

14        that's supposed to maintain the integrity of any prints you

15        find better with the graphite type dusting agent.

16             Once I had dusted the area, I examine it.  And if I saw

17        that the print or area that was of interest showed a print

18        that had ridges, and whorls, or swirls that are similar to a

19        fingerprint, palm print, or ear print, but in this case

20        fingerprints, then I would photograph it, marking it as the

21        next item in sequence using a scale beside the print, and

22        then after that was done I would use a clear tape and lift

23        it off of the item that I found it on, put that clear tape

24        on the back of a card that we are issued for that specific

25        purpose.

1    Q    So you would have -- that card, you would have pre-printed
2         it to indicate what you're dusting, or what you're trying to
3         lift so you don't affect the quality of the lift, is that
4         right?
5    A    Yes.  Every piece of paperwork I pre-fill out if evidence is
6         involved in it.
7    Q    And when you use the lifting tape, and I'm not sure that's
8         the correct term, but it actually will take a full
9         impression of the latent that you discovered?
10   A    Yes, sir.
11   Q    And then you transfer that onto a -- a card -- a back of a
12        card that would preserve that latent?
13   A    Yes, sir.
14             MR. PIMSNER:  If I may I approach the witness?
15             THE COURT:  Yes.
16   BY MR. PIMSNER:
17   Q    Did you do that -- let me show you Exhibit 314.
18             Could you describe 314, please?
19   A    What I have on Exhibit 314 are three cards, what we refer to
20        as latent print or fingerprint cards that I have filled out
21        reference this incident.  It's my handwriting on the front.
22        Then on the back of each one there is a piece of tape with
23        an impression on the tape affixed to the back.
24   Q    And those are the original cards that you would have taken
25        on approximately November 3rd -- or on November 3rd, 2008?

1  A    Yes, sir.

2  Q    And those were removed from evidence item A U --

3  A    Yes, sir.

4  Q    -- the paint can?

5        MR. PIMSNER:  I would move for admission of --

6  BY MR. PIMSNER:

7  Q    I believe that's 314, sir?

8  A    Items number -- or yeah, Exhibit 314.

9        MR. PIMSNER:  Exhibit 314.

10       THE COURT:  Any objection?

11       MR. BOCK:  Those are the latent cards?

12       MR. PIMSNER:  The lifts.

13       MR. BOCK:  All three of them in one exhibit?

14       MR. PIMSNER:  All -- yes.

15       MR. BOCK:  No objection.

16       THE COURT:  314 is admitted into evidence.

17       MR. PIMSNER:  Your Honor, I have copies.  If I can just

18  put them on the overhead instead of trying to pull those --

19       THE COURT:  Yes, that's fine.

20  BY MR. PIMSNER:

21  Q    Now, let's start with the general information that you put

22       on this type of card.

23            Could you describe it, please?

24  A    Yes.  The area of officer is the area that the person that's

25       taking the prints.  In this case that's me, and my ID

1   number, 356.

2       Process for.  In this case I was doing it for the

3   investigating lead detective, Detective Paul, and I have his

4   ID number or badge number there.

5       It has a block for the case number, which I enter the

6   case number from this case in.

7       Date and time I took the prints.  I put the date on --

8   16.  I did not put a time, but our photographs show the

9   times we photograph them.

10      And then the type of crime, criminal damage.

11      Address of location of where the prints were obtained

12  was 5100 West Ina.  That's not always the same as the

13  address of the incident -- of the crime.

14      Then I draw a little picture at the bottom, of which I

15  am not an artist, to kind of give you a general idea of what

16  area the print was lifted from.

17  Q   So item 16 would have been lifted from that part of the

18      paint can, is that correct?

19  A   Yeah, I'm trying to depict -- it's the bottom labeled area

20      of the paint can.

21  Q   And again, I think you testified earlier that that was a

22      mistake when you put quart.  You meant gallon paint can?

23  A   Yes, sir.

24  Q   Now, the back of that card, would the actual lift be

25      retained under tape?

1    A    Yes, it's retained under the tape.  You can't access it by

2          touching it or anything.

3    Q    And can -- is it possible just to remove that tape without

4          destroying the print?

5    A    Not to my knowledge.  You're going to destroy the print and

6          at least the card, probably.

7    Q    Now, as for your item of evidence number 17, is that another

8          lift that you took from that same paint can labeled A U?

9    A    Yes, it is.

10   Q    And where was that print located -- or that latent --

11         partial latent located?

12   A    It was again in the labeled area, but more central as you're

13         going vertical on the can.

14   Q    And again, the -- the lift would have been on -- attached to

15         the back of that card?

16   A    Yes, sir.

17   Q    And then finally, let me show you Exhibit -- or your exhibit

18         18.

19              Where was that print lifted from?

20   A    That was actually from the very bottom of the can.  If you

21         flipped it upside down, it was from the bottom surface.

22   Q    Now, does Marana PD have somebody in-house that normally

23         does your print comparisons, or do you send it out to

24         another agency?

25   A    It would be sent out to the Department of Public Safety.

1    Q    So once you prepared these cards, what would you do with

2         these cards?

3    A    What I do is I would just submit them into evidence.

4    Q    Let me just -- again, I didn't show you the back of 18, but

5         that would have been the lift associated with that exhibit,

6         correct?

7    A    Yes, it is.

8    Q    And, now, the writing on the back, I take it that's somebody

9         else that may have been involved in the actual analysis, is

10        that correct?

11   A    Yes, sir.  Actually, in our training we were told not to

12        write on the back because people that analyze it need to use

13        the back, and you want to keep it very clear for their

14        analysis.

15   Q    So for comparison -- so for your purpose, you submitted it

16        into evidence to keep it secure.  At some point in the

17        future there may be a request that a comparison be done with

18        those prints?

19   A    That is possible, yes.

20   Q    And if that is requested, it would be done through the

21        Department of -- Arizona Department of Public Safety?

22   A    Yes.  Evidence that we get requests to have analyzed,

23        whatever it is, for biological nature, or latent prints like

24        that, we all send all that to the Department of Public

25        Safety unless it's directed to go to a different lab for

```
1          analysis.
2              MR. PIMSNER:  May I have one moment, your Honor?
3              THE COURT:  Yes.
4              MR. PIMSNER:  I have nothing further at this time.
5              THE COURT:  Cross examination?
6                         CROSS-EXAMINATION
7   BY MR. BOCK:
8   Q    You went ahead and did a report in this case, is that
9        correct?
10  A    Yes, I did a supplement to the main report.
11  Q    And did you review your report before you came to court?
12  A    Yes, sir.
13  Q    So --
14             MR. PIMSNER:  Your Honor, I don't mean to interrupt,
15  but can I move the easel?
16             THE COURT:  Yes.
17             Let's see, has Exhibit 38 been admitted, Mr. Bock?
18             MR. PIMSNER:  I don't believe so, but I have no
19  objection, your Honor.
20             MR. BOCK:  I thought it was admitted, Judge.
21             THE COURT:  I'm sorry.
22             MR. BOCK:  I thought it was admitted.
23             THE COURT:  No.  But in any event, there's no
24  objection, so do you want me to admit it so you can show it to
25  the jury if you're going to ask the witness about the exhibit?
```

```
 1            MR. BOCK:  Right.
 2            THE COURT:  All right.  Well, Exhibit 38 is admitted,
 3    and may be shown to the jury.
 4    BY MR. BOCK:
 5    Q    So how many crime scenes did you process in your law
 6         enforcement career up and including the -- your work you did
 7         on November 4th of 2008?
 8    A    I couldn't put a specific number on it.  I mean, I was
 9         involved in numerous crime scenes.  Actually processing like
10         this, most of this type of processing outside of burglary or
11         property crimes with the police department would have been
12         done with the Marana Police Department.
13    Q    Now, how many -- am I talking too loud?
14            THE COURT:  No, you're fine.
15            MR. BOCK:  Okay.
16    BY MR. BOCK:
17    Q    How long were you at the scene for?
18    A    Probably about four and a half hours.
19    Q    An you were -- you had the assistance of two other officers
20         from the Marana Police Department, is that correct?
21    A    I believe -- yes, sir.
22    Q    Okay.  And this seemed to you to be a criminal damage scene?
23    A    At that time, yes, sir.  Possibly from my experience a hate
24         crime due to the swastikas.
25    Q    Okay.  The number of items that you found during the course
```

1          of your processing, you had markers on them, is that

2          correct?  You called them tent markers?

3     A    Yes, sir.

4     Q    So what -- what specific markers did you swab and touch for

5          DNA?

6     A    I would have to look at my report.  It would be too

7          difficult for me to remember all the different ones in

8          order.  Mostly what they were, I mean, if you want a generic

9          answer, not specific, were the five-gallon paint cans,

10         one-gallon paint cans, I believe the lids that were taken

11         from the original crime scene and stored into the impound

12         yard.  The only ones I swabbed were after I dusted for

13         fingerprints and I saw that smudge mark that indicated

14         somebody might have rubbed their hand, or thumb, or finger

15         against it, and since I couldn't get a latent print in the

16         intent of -- if they left any sweat, or cells behind in that

17         smear, I swabbed them if that was there.

18    Q    And that's possible, right?

19    A    Yes, sir.

20    Q    And so -- and you went ahead and preserved those swabs, and

21         they were directed towards the DPS Crime Lab for analysis?

22    A    I do not know if they were ever directed towards the DPS Lab

23         for analysis.  That would not be my involvement in that

24         procedure.

25    Q    So -- but they would certainly have been at the Marana --

```
 1            you went through all of the safeguards.  They certainly
 2            would have been in the custody of the Marana Police
 3            Department?
 4    A       Yes, they were placed in our evidence section.  Yes, sir.
 5    Q       So for purposes of investigating this event on October 31st
 6            of 2008, a decision would have been made somewhere up the
 7            chain of command by the Marana Police Department whether or
 8            not to have these swabbings tested for DNA or not, is that
 9            correct?
10    A       Yes, basically.  I -- I wouldn't have made that decision.
11    Q       I understand that.
12    A       Somebody else would, whether they were aware of it or not.
13    Q       And based upon your experience, even if a decision hadn't
14            been made these items of evidence since this case was not
15            closed would have been preserved by the Marana Police
16            Department, is that correct?
17    A       From my experience, yes.
18    Q       They would not have been destroyed?
19    A       They should not have been destroyed, correct.
20    Q       How many total latent prints did you lift?
21    A       I was able to find three, sir.
22    Q       And the -- and the shoe prints that the government talked to
23            you about, suggested to you that there were in fact perhaps
24            at least three different shoes?
25    A       Yes, sir.
```

| | | |
|---|---|---|
| 1 | Q | And you would agree with me that the -- the photographs you |
| 2 | | took could have been used -- if a shoe in fact had been |
| 3 | | seized by law enforcement, that photograph or those |
| 4 | | photographs were good enough to look at a shoe to determine |
| 5 | | whether or not it came from a particular shoe? |
| 6 | A | Yes, sir. |
| 7 | Q | And there are experts that can talk about tread design, and |
| 8 | | wear on shoes, is that correct? |
| 9 | A | Yes, sir. |
| 10 | Q | And from those photographs if the police had a shoe, they |
| 11 | | could say whether or not that matched a specific shoe, is |
| 12 | | that correct? |
| 13 | A | It's probable they could.  I can't say what the person -- |
| 14 | | examiner would say, but that's the intent of taking the |
| 15 | | photographs so they could compare it. |
| 16 | Q | And you had some good photographs, did you not? |
| 17 | A | I felt they were good, yes. |
| 18 | Q | Some individual identifying marks on the -- on the |
| 19 | | photographs? |
| 20 | A | Yes, sir. |
| 21 | | MR. BOCK:  Your Honor, may I approach for a second? |
| 22 | | THE COURT:  Yes. |
| 23 | | BENCH CONFERENCE |
| 24 | | MR. BOCK:  I thought that one juror looked like she was |
| 25 | | sleeping. |

1          THE COURT:  Here talk into --

2          MR. BOCK:  I thought that one juror looked like she was

3     sleeping.

4          MS. ANDERSON:  We noticed that too, Judge.  She's in

5     the back row.

6          MR. BOCK:  She's in the back row.

7          MR. PIMSNER:  Yesterday her eyes were covered.  I

8     didn't know if she didn't want to see the pictures -- the agent

9     pointed it out to me.

10         And if you recall, when the -- Judge, when you called

11    her number, she didn't respond a couple of times, and then kind

12    of responded -- startled.  So I think during jury selection she

13    wasn't all there.

14         THE COURT:  Do you want me to have a chat with her?

15         MR. BOCK:  I think that might be --

16         THE COURT:  Maybe before we take --

17         MR. BOCK:  I don't want --

18         THE COURT:  I'll save -- it's all your fault.  Why

19    don't -- at the lunch break why don't I ask her to remain, excuse

20    the others.

21         MR. BOCK:  Shall I continue my examination now?

22         THE COURT:  Is now a good time to break?

23         MR. BOCK:  Yeah, probably.

24         THE COURT:  Are you going to be able to finish?

25         MR. BOCK:  Probably by 12:00.

```
1              THE COURT:  All right.  Okay, why don't you finish and
2    then we'll take a break, and I'll talk with her.
3              MR. BOCK:  Okay.
4              (The bench conference was concluded.)
5              THE COURT:  All right, Mr. Bock, you may continue.
6    BY MR. BOCK:
7    Q    Okay, we talked a little bit about the shoe prints, and
8         again, based upon your experience they would have -- they
9         could be used for comparative purposes if in fact you had a
10        shoe to compare the two.  They were that quality, were they
11        not?
12   A    Yes, sir.
13   Q    Okay, thank you.
14             And you've testified before in cases, have you not?
15   A    Yes, sir.
16   Q    And you know there are people that can testify as to tread
17        design and things like that, that have an expertise?
18   A    That actually do the math, yes, sir.  I just collect at the
19        scene.
20   Q    I understand.  Now, did you ever check with the owner of the
21        property, Mr. Levine, if he had made any of those shoe
22        prints?
23   A    That would not be in the parameter of my responsibilities as
24        a crime scene unit, so no, sir.
25   Q    Okay.  What about tire tracks?  Did you see any tire tracks?
```

```
1   A    I was directed to some tire tracks and took photos of them,
2        yes, sir.
3   Q    And the photographs that you took, do you think they would
4        have had good evidentiary value if in fact the government
5        had a tire or a vehicle with the wear, or the tread?  Do you
6        think the quality of your photograph could have assisted in
7        that method -- in that manner?
8   A    From my point, that was my intent.  I mean, I don't have the
9        experience of saying my photographs would have, because I've
10       never had a situation where they were compared.  So I
11       don't -- that was my intent.  I believe they were.  I've had
12       no feedback.
13  Q    And you, again, know that that's a law enforcement tool?
14  A    Yes, sir.
15  Q    And you know that there are law enforcement experts that can
16       in fact testify to tread marks that are left and compare
17       them in fact to a tire that may be on a vehicle?
18  A    Yes, sir, if they have the proper stuff to work with.
19  Q    And normally the Department of Public Safety would have
20       those -- those abilities, would they not?
21  A    That's my understanding, sir, yes.
22  Q    And the Department of Public Safety is a statewide agency,
23       correct?
24  A    Yes, sir.
25  Q    With a huge crime lab?
```

1    A    Multiple, from my understanding.

2    Q    Now, let me talk to you about what's been admitted as

3         Exhibit 38.

4             Can you see that?

5    A    Yes, sir.

6    Q    Now, it's very suggestive that the contents of A G made that

7         stain, is that a -- is that a -- a suggestion of mine that

8         you would agree with?

9    A    That's a suggestion that could be drawn from this picture,

10        yes, sir.

11   Q    Okay.  Did it appear that the can was stuck to the paint?

12        In other words, do you --

13   A    It looks like it might be inside the paint on the very

14        outside edges.  That's the way from -- the angle I took the

15        picture, yes, sir.

16   Q    When you picked the can up, was there any resistance like,

17        you know, it might have been stuck to something that had

18        dried?

19   A    I honestly can't tell you I remember that one way or the

20        other.

21   Q    So how many buckets off the top of your head did you -- did

22        you collect?

23   A    Without looking at my report, 15-ish.

24   Q    Do you want to look at your report?

25   A    I could, if you want an exact number of the ones that were

1     processed.

2          MR. BOCK:  May I approach the witness, your Honor?

3          THE COURT:  Yes.

4          MR. BOCK:  Judge, I believe my next exhibit is 407.

5          THE COURT:  All right.

6          MR. BOCK:  Let me approach --

7          THE CLERK:  408.

8          THE COURT:  408, I think, Mr. Bock.

9          MR. BOCK:  I'm sorry, 408.

10          THE COURT:  And just for the record, what is it?

11          MR. BOCK:  It's the supplemental report of John Bradley

12     dated on 11/4 2008.

13          THE COURT:  All right, great.

14          THE WITNESS:  I believe it was 15 or 16 that I

15     processed -- actually, 17, but one was a lid, and I think one of

16     the other ones that was lettered as Adam John were three lids.

17     BY MR. BOCK:

18     Q     So three lids -- 15 buckets, then?

19     A     I believe that -- well, 15 buckets are paint cans.

20     Q     Paint cans?

21     A     Yes, sir.

22     Q     And of those 15 buckets or paint cans, you just -- you saw

23           the -- you saw Exhibit Number 38.  Of the 15, how many other

24           buckets were close to areas where there were spills?

25     A     Without looking at the pictures, I couldn't say.  Basically,

1       all the buckets were on the driveway, like the ones around

2       the trees, the two that were stacked -- there wasn't too

3       much spillage there.

4   Q   Well --

5   A   I mean, I guess -- okay.

6   Q   Bucket A U, which is in Exhibit 40 --

7   A   Yes, sir.

8   Q   -- which has already been admitted, that was not associated

9       with any spillage, was it?

10  A   No, sir.  Not near spillage.

11  Q   Wasn't associated with any spillage?

12  A   I don't know if it was or not, it's not near any spillage.

13      I don't know if it was associated at any time.

14  Q   The other buckets and the other paint cans were near

15      spillage, is that correct?

16  A   Most of them.  Like I said, the two that were underneath the

17      tree weren't that close to a spillage.

18  Q   Did buckets have debris in them -- when you looked at the

19      buckets, did you still see debris in them?

20  A   Substances or -- of liquid fluid or debris, yes, sir.

21          THE COURT:  Mr. Bock, has Exhibit 40 been admitted?

22          MR. BOCK:  I thought it was admitted.

23          THE COURT:  Jill, do you have --

24          THE CLERK:  Yes.

25          THE COURT:  Okay, that's fine.  I just wanted to check.

1    Thank you.

2              Go ahead.

3    BY MR. BOCK:

4    Q    The -- the amount of oil, what does that suggest of -- a

5         couple buckets filled with that oil, or one bucket?

6    A    I never experimented dumping oil out, so I couldn't say.

7         They were just spread out in a large space.

8    Q    A lot of oil?

9    A    There was quite a bit of oil, yes, sir.

10   Q    Now, on A U you found a print on the bottom -- you lifted a

11        print on the bottom of A U, is that correct?

12   A    Yes, sir.

13   Q    So --

14             MR. BOCK:  42's been admitted, right?

15             THE CLERK:  No.

16             MR. PIMSNER:  No.

17             THE COURT:  Do you want to move to admit 42?

18             MR. BOCK:  Move to admit 42.

19             MR. PIMSNER:  No objection.

20             THE COURT:  42 is admitted.

21   BY MR. BOCK:

22   Q    So here's a -- here's a picture of the can on its side that

23        you took, is that correct?

24   A    Yes, sir.

25   Q    So why don't you point -- because they didn't take a picture

1        of the bottom of the can, but if you could just put your

2        finger where -- where the bottom of the can is?

3    A   I -- I --

4    Q   Well, you see the top, right?

5    A   Yes.  I mean, the bottom would be at this end, but I did

6        take a picture of the bottom.

7    Q   Oh, you did?

8    A   Yes.

9    Q   Okay.  So when you were processing that A -- A U, the paint

10       can, you in fact had to put that graphite on the bottom of

11       the can to see the print was that your testimony?

12   A   Yes, sir.

13   Q   So there was no oil associated with the bottom of the can,

14       is that correct?

15   A   Not to my recollection, no, sir.

16   Q   And there was no paint associated with the bottom of the

17       can, is that correct?

18   A   Yes, sir.

19   Q   And also, when you lift a print, you certainly can't tell

20       the age of the print, can you?

21   A   No, sir.

22   Q   Could be there for six months, could it not?

23   A   Again, I can't determine age, correct.

24   Q   Okay, so you're not an expert to determine --

25   A   No, sir.

1  Q    -- the age of the print?

2  A    That's correct.

3          MR. BOCK:  May I have a second, your Honor?

4          THE COURT:  Yes.

5          MR. BOCK:  Nothing further of this gentleman, your

6  Honor.

7          THE COURT:  All right.

8          Any redirect?  And would you rather do it now or after

9  lunch?

10         MR. PIMSNER:  We can wait if it's -- yeah, it's going

11 to be brief, but we can wait until after.

12         THE COURT:  All right.  Let's go ahead and take a lunch

13 break until 1:15.

14                  *******************

15                  REDIRECT EXAMINATION

16 BY MR. PIMSNER:

17 Q    Mr. Bradley, just to clarify, when you do your -- when you

18      look for possibly -- possible usable latent prints and then

19      you do a lift card, does that necessarily mean that you will

20      actually get a usable print from that way?

21 A    No, sir.

22 Q    And you were asked some questions on cross by Mr. Bock about

23      DNA.  Do you recall those questions?

24 A    Yes, sir.

25 Q    Now, you first processed all those items that were -- all

1          those buckets and lids by brushing them with the fingerprint

2          dust, correct?

3     A    Yes, sir.

4     Q    And so once who had already covered those items with the

5          dust, and then you tried to see whether there were any --

6          what appeared to be smear marks, correct?

7     A    Yes.

8     Q    And it was those smear marks that you would have taken some

9          kind of a cotton swab to, correct?

10    A    That's correct.

11    Q    Now, just the fact that you went over the smear mark with --

12             THE COURT:  Wait -- hold on, Mr. Pimsner.  Just a

13    minute.  Apparently we have a -- juror number 21, did you forget

14    something, ma'am.

15             A JUROR:  I did.  She's getting it for me.

16             THE COURT:  Okay, great.  All right.

17             Go ahead.  Carry on.

18             MR. PIMSNER:  Yes, no problem.

19             THE COURT:  Oh -- go ahead.

20             MR. PIMSNER:  Thank you.

21    BY MR. PIMSNER:

22    Q    The fact that you would have swabbed -- now, first of all,

23         you called it, I think, in your testimony a touch DNA?

24    A    Yes, sir.

25    Q    And was that a relatively new technology at the time of the

1        2008 event?

2     A  Yes, sir.

3     Q  And -- now, you talked about the fact that you swabbed it.

4        Just the fact that you swabbed something where you had

5        already brushed the fingerprint powder -- just because you

6        swabbed that area doesn't mean you would have collected any

7        DNA, does it?

8     A  No, sir.

9     Q  Now, if you can -- the defense showed you Exhibit 38.  Do

10       you recall that exhibit?

11    A  Yes, sir.

12    Q  And then he was asking questions regarding were there any

13       other buckets that were not associated -- or all the other

14       buckets were associated with spillage, something to that

15       effect, correct?

16    A  Yes, I believe so.

17    Q  Did you find other buckets that weren't directly near some

18       type of spreading of paint, oils, or other substances?

19    A  Yes, I would say so.  Not directly in it.

20    Q  And let me show you what's marked as Exhibit -- what's

21       admitted as Exhibit 30.

22           Would you say that these are examples where the buckets

23       were not in or at the spill sites?

24    A  Yes, they would.

25    Q  Now, going back to Exhibit 38, the defense suggests that

1        that bucket was responsible for that white paint.

2            Could you please blow up the picture of the bucket?

3            And did you examine that bucket any -- any closer at

4        some point?

5    A   Yes, I did.

6    Q   And was that a white paint bucket?

7    A   I believe the paint was more of a blue.

8    Q   Now, asking to look at 40.  That's been admitted.  That's

9        the bucket that had the fingerprint, correct?

10   A   Yes, sir.

11   Q   And that bucket is the consistent color as the spillage that

12       was on the driveway, is it not?

13   A   Yes, it's very similar, white.

14   Q   And that bucket was empty, correct?

15   A   Yes, sir.

16           MR. PIMSNER:  I have nothing further, your Honor.

17           THE COURT:  Any questions from the jury for this

18   witness?

19           All right, Mr. Bock, did you have some additional

20   questions?

21           MR. BOCK:  I did.  May I ask him a few questions?

22           THE COURT:  Yes.  Go ahead, you -- I'll allow limited

23   recross, and give the government an opportunity to respond if

24   they'd like.

25           Go ahead, Mr. Bock.

```
 1                          RECROSS EXAMINATION
 2    BY MR. BOCK:
 3    Q     The bucket that the government is now attempting to suggest
 4          was consistent in color with the spillage that you just
 5          saw -- do you remember that question?
 6    A     Yes, sir.
 7    Q     Was there any gravel or any dirt associated with that
 8          bucket?
 9    A     No, sir.
10    Q     Was the paint dry on the bucket?
11    A     It's my recollection at the time that I found it, yes, sir.
12              MR. BOCK:  Thank you.
13              THE COURT:  Any follow-up questions from the
14    government?
15              MR. PIMSNER:  No, your Honor.
16              THE COURT:  All right.  May this witness step down?
17              MR. PIMSNER:  Yes, your Honor.
18              THE COURT:  All right.
19              Thank you, sir.  You may step down.
20                     ------------------------
21              (Karen Levine was duly sworn by the clerk.)
22                             KAREN LEVINE
23                          DIRECT EXAMINATION
24    BY MS. ANDERSON:
25    Q     Mrs. Levine, are you married?
```

1   A    Yes, I am.

2   Q    And you're married to Myles, correct?

3   A    Yes.

4   Q    And are you employed?

5   A    Yes, I am.

6   Q    What do you do for a living?

7   A    I work for a barter exchange in Chicago, Illinois.  I work

8        for them here.

9   Q    Could tell us what a barter exchange is?

10  A    It's a company that trades goods and services on the

11       exchange.

12  Q    How long have you done that kind of work?

13  A    27 years.

14  Q    You may want to pull the microphone a little bit closer to

15       you.

16  A    Sure.

17  Q    You've done it for 27 years?

18  A    Yes.

19  Q    Now, I know that you and your husband lived in Chicago

20       before you moved to Arizona, is that correct?

21  A    Yes.

22  Q    When did you all move to Arizona?

23  A    2002.

24  Q    So did you continue with your employment here in Arizona

25       after you moved?

```
1   A   Yes.
2   Q   Where did you and your husband move to when you -- when you
3       moved here to Tucson?
4   A   To Dove Mountain, Heritage Highlands Country Club.
5   Q   And is that a 55 and older residential area?
6   A   Yes, it is.
7   Q   Shortly after you moved into that particular location, did
8       you decide to resurface your driveway?
9   A   Yes.
10  Q   Could you tell us why you wanted to resurface it?
11  A   Because it wasn't cleaning up.  It was dirty.
12  Q   Could you explain to us a little bit more?
13  A   Okay.  When -- when cars used to go up and down, it used to
14      leave tire marks, and it was just not a clean driveway so I
15      wanted to resurface it.
16  Q   So it used to leave marks on the driveway itself, is that
17      right?
18  A   Yes.
19  Q   Did you hire somebody to help you make those changes?
20  A   Yes, I did.
21  Q   Who did you hire?
22  A   The first time?
23  Q   Yes, ma'am.
24  A   A contractor that I knew from the barter exchange in Tucson,
25      and he -- he -- he did it, and he didn't do it right.  He
```

1    Pebble Tec'd it, and Pebble Tec is supposed to be around a

2    swimming pool, but he put that material on my driveway so

3    that's why it wasn't able to be cleaned up properly.

4  Q  Now, what's your best estimate of when that work was done?

5  A  It was about 2003.

6  Q  All right.  And you weren't satisfied with the work?

7  A  I wasn't satisfied, because it wasn't the right material on

8    the driveway.

9  Q  So what did you do when you when you discovered --

10 A  Well, I called -- I called them up, and unfortunately, he

11   moved away and he wasn't in business here.

12 Q  So what did you do next?

13 A  I -- well, I said to my husband I need to get, you know,

14   this done because it doesn't look good, and he said, well,

15   try to find another contractor.  So I heard Burns Power

16   Washing on the radio, so I called them up.

17 Q  What's your best estimate of when you called them up?  Can

18   you tell us that?

19 A  Around 2005.

20 Q  And did he come out and give you an estimate?

21 A  Yes, he did.

22 Q  What did you tell him you wanted done to the driveway?

23 A  To have it so I could clean it and the tire marks wouldn't

24   be on the driveway.  And when he came out, he said he

25   could -- he looked at the driveway, and he said he could get

| | | |
|---|---|---|
| 1 | | it -- he could do anything, actually.  And then he said he |
| 2 | | overseed {sic} the driveway, and then he said if I paid him |
| 3 | | cash, he could give me a very good price. |
| 4 | Q | Did -- did you and he negotiate a price? |
| 5 | A | Yes. |
| 6 | Q | And what price was that? |
| 7 | A | Between 1,500 and $2,000. |
| 8 | Q | Now, you say between those two amounts -- |
| 9 | A | I'm not exactly sure how much it actually was, but I |
| 10 | | remember 1,500 to 2,000. |
| 11 | Q | So if I understand correctly, the two of you set an |
| 12 | | established price, but you just don't recall right now what |
| 13 | | it was? |
| 14 | A | Yes. |
| 15 | Q | It was somewhere between 1,500 to 2,000? |
| 16 | A | Yes, it was. |
| 17 | Q | Okay.  All right.  And how about the color?  Was the color |
| 18 | | wrong? |
| 19 | A | Yeah, it was the whole thing he had to re-do.  He said he |
| 20 | | could do it.  He knew what I wanted, and he said it would be |
| 21 | | no problem. |
| 22 | Q | Did he have any additional terms of your agreement? |
| 23 | | Did he want to be paid up-front?  Did he want a check? |
| 24 | A | He wanted to be paid initially half of it when he first |
| 25 | | started, and then at the end of the job I would pay him the |

1        rest.

2    Q   And -- and did you do that?

3    A   Yes, I did.

4    Q   So at some point in time did one of the crews come out to do

5        the work?

6    A   I believe it was -- I had -- had to save up the money,

7        because my husband was ill, so I told him I couldn't do it

8        right away, so about a month later.

9    Q   Did Mr. Fries do the work himself --

10   A   No.

11   Q   -- or did he send a crew out?

12   A   He sent a crew out.

13   Q   How many were in that crew, do you recall?

14   A   No, I do not.

15   Q   Do you remember any names of those individuals?

16   A   No, I do not.

17   Q   How long did it take him to do the work?

18   A   Well, he told me it would take a couple of days initially

19       when he overlooked the driveway, but for some reason the

20       equipment that he had wasn't working, so -- I guess he had a

21       foreman who called him.  So then he called me then that day

22       and said they'd have to rent a piece of equipment to take

23       the top layer off, so it would probably take a little

24       longer, and I agreed.

25   Q   Because you wanted it done right?

1  A   Yes, of course.

2  Q   All right.  So how long did it take his crew to do the job?

3  A   Two weeks.

4  Q   Were you satisfied with the job after it was completed?

5  A   Well, I couldn't look at it.  I mean, I looked at it, but I

6      couldn't step on it for about five days.  Our cars -- you

7      know, we had to park our cars -- not on the driveway, of

8      course.  But after it dried, the color wasn't -- it was like

9      a -- it was fading.  It was blotchy.

10 Q   So the color was --

11 A   The color wasn't even, and it was very slippery when it was

12     wet.

13 Q   Tell us about the slipperiness.

14 A   Okay.  It rained one day after I could step on it, and when

15     I went out to walk my dog, I fell.

16 Q   How many times did you fall after he had done the work that

17     first time?

18 A   About three or four times.  My husband fell once, and then

19     my mother comes to visit quite a bit, was very, very

20     careful.  So we would help her to come into the house.  And

21     I called him about that.

22 Q   Okay.  And how much later -- how much time elapsed before

23     you called him the second time -- or you called him about

24     the fact that the work wasn't right?

25 A   About four -- about four months later.

1    Q    Okay.  And what did you tell him?

2    A    I told him I was trying to -- well, first of all, I told him

3         it was slippery.  And he said, well, it doesn't really rain

4         that much here in Arizona.  And then when it was blotchy, he

5         said that that it would even itself out.

6    Q    And was that acceptable to you?

7    A    No, it wasn't, but I said okay.  It doesn't -- it doesn't

8         rain that much here in Arizona, but I don't -- you know, I

9         don't want to slip and fall.  So he said he's really busy on

10        some jobs, and he'll come and look at it.

11   Q    And did he ultimately do that?

12   A    Yes, he did.

13   Q    How much time elapsed before he came out to look at it

14        again?

15   A    Maybe three weeks.

16   Q    And what happened when he came out to look at the -- at the

17        work again?

18   A    He said that I would have to pay him $500, and I would get

19        the paint.

20   Q    And did you agree to that?

21   A    Yes, I agreed to it, but I said I just paid you recently, so

22        I'd have to postdate a couple checks --

23   Q    And why is --

24   A    -- but I wanted -- pardon me.

25   Q    Sorry.  Go ahead and finish your answer.

| | | |
|---|---|---|
| 1 | A | Well, my -- first of all, my husband's on a limited -- is on |
| 2 | | still a limited income, and I had to get it done and he was |
| 3 | | the only one that would do it, so -- |
| 4 | Q | So you agreed to the additional $500 -- |
| 5 | A | Yes. |
| 6 | Q | -- correct? |
| 7 | A | Yes. |
| 8 | Q | And were -- were there any other conditions attached? |
| 9 | | Did you have to buy the paint? |
| 10 | A | Yeah, I had to buy the paint.  He wanted me to buy the paint |
| 11 | | too, so I went to Sherwin Williams and got the paint. |
| 12 | Q | And did Mr. Fries do the work, or did he send a crew out? |
| 13 | A | He sent a crew out. |
| 14 | Q | And this time how many were in the crew, do you recall? |
| 15 | A | About four. |
| 16 | Q | Men and women? |
| 17 | A | Men and women, yes. |
| 18 | Q | How long did it take him the second time to do the work? |
| 19 | A | He did it -- two days. |
| 20 | Q | Okay.  Now, let's talk about the checks.  Let's take a look |
| 21 | | at Government's Exhibit Number 246. |
| 22 | | Do you recognize that? |
| 23 | A | Okay, that's $50 that I initially gave him after he gave me |
| 24 | | a sample of the paint, and I had to get it approved by the |
| 25 | | association where I lived. |

1   Q    And what's the date of that -- that's actually a receipt.

2        It's not a check, correct?

3   A    Correct.  July 1st, '05.  That was before he started the job

4        the first time.

5   Q    And the receipt was to you.  You paid him $50, correct?

6   A    Correct.

7            MS. ANDERSON:  Government moves for admission of

8   Exhibit 246.

9            MR. BOCK:  No objection.

10           THE COURT:  246 is admitted.

11  BY MS. ANDERSON:

12  Q    So let's look at Government's Exhibit 242.  I believe this

13       has already been admitted -- oh, no, it hasn't.  I'm sorry.

14       I apologize.

15           This is Government's Exhibit 242.  Mrs. Levine, do you

16       recognize this exhibit?

17  A    Yes, I do.

18  Q    What is this?

19  A    A postdated check for the 5 -- part of the $500.

20  Q    Well, let me ask you some more questions.  It's made payable

21       to whom?

22  A    Burns Power Washing.

23  Q    For what amount?

24  A    $250.

25  Q    And it's signed by you, is it not?

1   A    Yes, it is.

2   Q    And this is the check that you would have given Mr. Fries

3        up-front, is that right?

4   A    Yes.

5             MS. ANDERSON:  Government moves for admission of

6   Exhibit 242.

7             MR. BOCK:  No objection.

8             THE COURT:  242 is admitted.

9   BY MS. ANDERSON:

10  Q    Now, let's -- let's talk about the notation that's at the

11       top.  Do you see that in the upper right-hand corner it says

12       don't deposit until --

13  A    Until then.

14  Q    Okay.  And what's the date on that check?

15  A    February 11th, '08.

16  Q    So in other -- in other words, you didn't want Mr. Fries to

17       cash that check until February 11th, '08, is that right?

18  A    Yeah, that's right.

19  Q    Now, do you have any estimate of when it was that you would

20       have written this check but dated it February 11th?

21            MR. BOCK:  Judge, I'm going to object.  This is

22  cumulative.

23            THE COURT:  No, overruled.

24            THE WITNESS:  Thank you.  January.

25  BY MS. ANDERSON:

```
 1   Q    January of '08?

 2   A    Yes.

 3   Q    Okay.  Let's look at Government's Exhibit Number 247.

 4        Do you recognize that?

 5   A    Yes, I do.

 6   Q    And what do you recognize that as being?

 7   A    To Burns Power Washing, $250.  That was another check.

 8   Q    Now, that's a check register, is it not?

 9   A    Oh, the check -- yes, it is.  I'm sorry.

10   Q    And did you and your husband have a practice of filling out

11        the check register whenever you would --

12   A    Yes.

13   Q    -- write a check?

14   A    Yes.

15   Q    And that particular check register is for which check?

16   A    The last -- the first check of the $250.

17   Q    Which was check number 1042 --

18   A    42, yes.

19   Q    -- correct?

20   A    Yes.

21        MS. ANDERSON:  Okay.  Government moves for admission of

22   Government Exhibit 247.

23        MR. BOCK:  No objection.

24        THE COURT:  247 is admitted.

25   BY MS. ANDERSON:
```

1    Q    All right.  So after Mr. Fries did the work or his crew did
2         the work, I should say, did you pay him or did you give him
3         the two checks at the same time?
4    A    Yes -- yes, I did.
5    Q    All right, so let's look at Government's Exhibit Number 243.
6              Do you recognize that?
7    A    Yes, I do.
8    Q    What do you recognize that as -- as being?
9    A    As another postdated check.
10   Q    And what's the check number?
11   A    1043.
12   Q    And it's made payable to whom?
13   A    Burns Power Washing.
14   Q    Signed by?
15   A    Myself.
16   Q    In the amount of how much?
17   A    $250.  The remainder.
18             MS. ANDERSON:  Government moves for admission of
19   Exhibit 1043.
20             MR. BOCK:  No objection.
21             THE COURT:  243 is admitted.
22   BY MS. ANDERSON:
23   Q    Let's take a look at this.  I notice in the upper right-hand
24        corner there's some writing, and what's that say?
25   A    Don't deposit until April 1st.

1    Q    2008, correct?

2    A    Yes.  Sorry, yes.

3    Q    Now, do you have any recollection of when it was that you

4         would have written this check?

5    A    I wrote it at the same time I wrote the other check.

6    Q    Which would have been sometime --

7    A    In February.

8    Q    -- in February of --

9    A    Or January, I should say.

10   Q    January of '08?

11   A    Yes.  Uh-huh.

12   Q    Now, when you were -- when you gave Mr. Fries the checks,

13        did you talk to him about postdating the checks like you

14        did?

15   A    Yes, and he was agreeable.

16   Q    He was okay with that?

17   A    Um-um.

18   Q    Yes?

19   A    Yes, he was.

20   Q    So let's look at Government's Exhibit Number 248.

21             What is that -- that -- in Government's Exhibit 248?

22   A    That's our check register.

23   Q    Which you would have --

24   A    Which I filled out.

25   Q    Okay.  And it's -- it indicates a check 1043 payable to

```
 1          Burns --
 2   A      Power Washing, yes.
 3   Q      All right, and that would have also accompanied check 243,
 4          correct?
 5   A      Correct.
 6              MS. ANDERSON:  Government moves for admission of
 7   Exhibit 248.
 8              MR. BOCK:  No objection.
 9              THE COURT:  248 is admitted.
10   BY MS. ANDERSON:
11   Q      All right, so let's -- let's talk about after Mr. Fries had
12          done the work the second time -- or I should say his crew
13          did the work, were you satisfied with the quality of the --
14          of the product?
15   A      The color was right this time, but it was still slippery.
16   Q      Could you explain that to us?
17   A      Like, when -- it's -- it was -- if I sprayed it down to wash
18          it, I had to really be careful.  I'd fall on my butt.  Or if
19          it started raining -- because it still rained, of course, it
20          was very slippery, just -- I fell.
21   Q      How many times did you fall?
22   A      Maybe two or three times, every --
23   Q      How about your husband?
24   A      My husband fell once.
25   Q      So it was still a concern.  It was --
```

| | | |
|---|---|---|
| 1 | A | Yes, it was still very slippery to walk on. |
| 2 | Q | All right, so what did you do? |
| 3 | A | Well, I called another company to come out and asked them |
| 4 | | why is it like this?  And they said it wasn't done properly. |
| 5 | | He didn't put sand in it, which -- you know, I didn't know. |
| 6 | | I'm not a contractor, so -- I thought he did that, so |
| 7 | | that's -- |
| 8 | Q | So what did -- |
| 9 | A | -- that was the problem. |
| 10 | Q | -- you do? |
| 11 | A | I called them up, and I told -- |
| 12 | Q | Him, meaning? |
| 13 | A | I called Todd Fries, Burns Power Washing.  I talked to him |
| 14 | | personally.  He always answered the phone.  And I told him |
| 15 | | that he'd have to come back and re-do the driveway -- |
| 16 | Q | And -- |
| 17 | A | -- and put sand in it this time.  My husband got involved. |
| 18 | | He got on the phone at that time -- because this was going |
| 19 | | on, and on, and on.  If he did it -- you know, did it right |
| 20 | | the first time, we wouldn't have these conversations. |
| 21 | Q | Was Mr. Fries upset about this fact? |
| 22 | A | Yes, he was.  He said I'm taking a lot of his time away from |
| 23 | | his other clients that he has scheduled contracts with. |
| 24 | Q | And did he ultimately come out? |
| 25 | A | He had -- he sent, I believe, a foreman -- another gentleman |

1         out.

2    Q    And did the -- did you and this other individual discuss

3         what needed to be done?

4    A    Yes.

5    Q    Do you remember who that was?  The name of that foreman?

6    A    I'm not sure of his name.  I'm sorry.

7    Q    So --

8    A    So they -- oh, okay.

9    Q    Did Mr. Fries or his -- his agent agree to once again

10        resurface your driveway?

11   A    Yes, but we have to pay him now $400.

12   Q    And did your husband take over from there?

13   A    Yes, he did.

14   Q    Is it fair to say that you were frustrated at that point?

15   A    We were very frustrated, because I'd paid him.  I keep

16        paying him, and he -- you know, just -- it was -- I was very

17        upset.

18   Q    Now, do you see Mr. Fries in the courtroom here today?

19   A    Yes, I do.

20   Q    Could you point to him and tell us what he's wearing?

21   A    He's right there, and he's wearing a gray suit with a gray,

22        you know, multi-colored tie.

23   Q    Is he sitting next to Mr. Bock?

24   A    Yes, he is.

25             MS. ANDERSON:  May the record reflect identification of

1    the defendant?

2           THE COURT:  Yes, it may.

3    BY MS. ANDERSON:

4    Q    So was the driveway repaired again a third time?

5    A    Yes -- yes, they came out with a clear coat and sand -- a

6         bag of sand.

7    Q    And this time was the driveway acceptable?

8    A    Yes, it was.

9    Q    Was the color right?

10   A    Yes, the color was right.  Finally.

11   Q    Did you slip anymore on the driveway?

12   A    No, we did not.

13   Q    When would you estimate the last time it was that Mr. Fries

14        was physically at your -- your house?

15            When did he complete the work that he had done to your

16        house in the Dove Mountain area?

17   A    I would -- I would say April of '08.

18   Q    And was that the last time that his crew would have been at

19        your house doing any kind of work?

20   A    Yes.

21   Q    When they completed the work, did they leave any buckets

22        there?

23   A    Not that I know of.

24   Q    You didn't see any buckets?

25   A    No, I did not.

1    Q    Did you see any other kind of machinery there at your house?

2    A    No, I did not.

3    Q    Now, during the time -- you had numerous conversations with

4         Mr. Fries, did you not?

5    A    Yes, I did.

6    Q    And these were in person?

7    A    Over the phone, or a couple times in person, yes.

8    Q    Did you and Mr. Fries ever discuss the fact that you and

9         your husband were of the Jewish faith?

10   A    Yes, he saw that I had a Jewish star on, so he said "Are you

11        Jewish?"  I said "Yes, I'm Jewish."

12   Q    And did he -- anything else regarding the fact that you were

13        Jewish?

14   A    No, that he would make us -- build a fish sometime.

15   Q    What is that?

16   A    For people that don't know, on Passover we have gifilte

17        fish.  It's a fish that you eat before the main course.

18   Q    So he volunteered to make that for you, correct?

19   A    Yes.

20   Q    So it's -- it appeared to you very clear that he knew that

21        you and your husband were Jewish, correct?

22   A    Yes.

23   Q    Did you have any more dealings with Mr. Fries before

24        November 1st, 2008?

25   A    No, I did not.

1   Q    Do you remember that -- that morning, November 1st, 2008?

2   A    Yes, I do.

3   Q    Let's talk about the night before, which would have been

4        Halloween, is that correct?

5   A    Yes.

6   Q    Were you and your husband at home?

7   A    I went out with my mother for dinner.

8   Q    Do you recall what time you got home?

9   A    I got home around 10:30.

10  Q    And did Myles, your husband --

11  A    Myles -- he didn't come because he didn't feel well.  He

12       wasn't feeling well.

13  Q    Do you recall what time you went to bed that night?

14  A    I went to bed about 11.  It was Halloween.  I went to bed

15       about 11, and Myles I believe stayed up and watched

16       television in the living room.

17  Q    Now, did the two of you typically sleep with the doors open,

18       or shut, or locked, or --

19  A    I -- I recall this very -- you know, it was very warm that

20       night, and we had the air conditioning on.

21  Q    So does that mean that the doors would have been shut?

22  A    Yeah, the doors were shut.  Yes.

23  Q    All right.  And you woke up the next morning.  How was it

24       that you -- that you were awoken?

25  A    My neighbor called me from next door around 6:00 in the

1       morning.  He was getting his paper, and he --

2   Q   And he gave you some information regarding your house, did

3       he not?

4   A   Yes.  He said, "Karen, I don't want you to be shocked when

5       you go outside, but there's something really bad in front of

6       your driveway."

7   Q   And so you went outside?

8   A   Yeah, I got my jean shorts.  I had my little t-shirt on.  I

9       put my flip-flops on quickly, and I went outside.  When I

10      opened the door, I saw a dead animal.  At first I thought it

11      was my dog.  And it smelled really bad.  And I continued

12      then to yell.  I was hysterical, because this whole -- my

13      whole front yard was a disaster.

14  Q   Describe for us what you saw.

15  A   Popcorn balls all over with sludge oil -- sludge oil, I

16      found out what that is.  Sludge oil.  And blue paint smeared

17      up and down the driveway and the sidewalk.  The garage door

18      was sealed.  Graffiti all over the garage door.  Nasty

19      words, Die Juden, just -- swastikas on the curb.  When I

20      went out -- down the driveway I saw again die Jew whore, and

21      I had a lot of dead animals, birds.

22  Q   Any feces?

23  A   Feces.  It smelled terrible.  The feces, urine all over.

24      They said it too was mixed in with a bunch of other stuff --

25      I -- I really don't know.  They tried to take me away.  My

1      neighbors -- they were very upset, as I was.

2  Q    Was there paint all over --

3  A    Yeah, paint -- blue paint all over the -- all over the

4      driveway and the sidewalk.  He -- like he had a bucket of

5      paint and he just threw it all over.  And he sealed the

6      garage doors so we couldn't get our cars out.

7           MR. BOCK:  Objection.  Objection to the response he,

8  your Honor, ask that that be stricken.

9           THE COURT:  Yes, I'll direct the jury to disregard the

10  he part of the answer.

11          Go ahead.

12          THE WITNESS:  Sorry.

13          THE COURT:  That's all right.

14  BY MS. ANDERSON:

15  Q    The garage door was sealed shut, correct?

16  A    Right.

17  Q    All right, so the police responded, did they not?

18  A    Yes.

19  Q    And did you and your husband clean up the mess there at the

20      house?

21  A    Before the -- well, the police came right away.  My neighbor

22      called as soon as he saw that.  And then all the neighbors

23      came out.  And then I went over to a neighbors, and I did in

24      the middle of the day -- they helped me in the phone book

25      look for some type of service that could clean this type of

```
 1        mess.
 2   Q    Let's take a look at Government's Exhibit Number 8.
 3             Do you recognize that?
 4   A    Yes.
 5   Q    Is that what your house looked like on November 1st, 2008?
 6   A    Yes.
 7   Q    Were there foam peanuts spread around as well?
 8   A    Yes, on the stones, within the sludge oil.
 9   Q    Now, did you and your husband live there much longer after
10        that?
11   A    No, I didn't really want to be there.  I wasn't --
12   Q    Why is that?
13   A    -- I wasn't sure if he wasn't going to come back and kill
14        me, because he said --
15             MR. BOCK:  Objection, your Honor.  Ask that that be
16   stricken.
17             THE WITNESS:  I'm sorry about that.
18             MS. ANDERSON:  Your Honor --
19             THE COURT:  Yes, I'll order that the jury disregard the
20   he portion, but the rest of the answer may remain.
21             Go ahead, Ms. Anderson.
22             MS. ANDERSON:  I was going to say I was going to move
23   on --
24             THE WITNESS:  I wasn't sure if the person was going to
25   come in and kill me.
```

```
 1   BY MS. ANDERSON:
 2   Q    It was upsetting to you, is that right?
 3   A    Yes, it was.
 4   Q    So you and your husband moved to another area?
 5   A    Yes, we did.
 6   Q    Where did you move to?
 7   A    Tucson National.
 8   Q    And where is Tucson National?  Can you describe that for us?
 9   A    It's around Magee and Shannon.  It's a country club type of
10        area there -- golf course, I should say.
11   Q    Did your home back up to a golf course?
12   A    Yes, I -- yes, it did.
13   Q    Which portion of your house backed up to the golf course?
14        Was it the front of the house, or the back of the house?
15   A    The back of the house.
16   Q    All right.  And when -- when do you estimate that you and
17        your husband moved to that location?
18   A    We moved in November.  The middle of November.
19   Q    Do you remember the address at that location?
20   A    2070 West Magee Road.
21   Q    And did another event that seemed very similar to the '08
22        incident occur on August 2nd, 2009?
23   A    Yes.
24   Q    Let's talk about the night before, which would have been
25        August 1st, 2009.
```

1           Do you recall what you were doing that night?

2   A    Again, I went out with my mother.  We go out once a week,

3        like girls night out, and that was a Saturday night.

4        Usually we go out Friday night, but we picked Saturday

5        night.  My husband -- again, he was just recently on

6        dialysis, so he wasn't feeling well after he had a treatment

7        that day.  It was a Saturday.  So my mom and I went out to

8        dinner, and I got home around, again, 11:00.

9   Q    Actually, I got a little bit ahead of myself.  Prior to the

10       August 2nd, 2009 incident you had seen Mr. Fries?

11  A    Yes.

12  Q    Shortly before that, correct?

13  A    Yes, I did.  I saw him in May.  I remember the month very

14       well.

15  Q    And where had you seen Mr. Fries?

16  A    Bluepoint Oyster Bar.

17  Q    And what is that?

18  A    It's a restaurant that -- used to be a restaurant in La

19       Encantada off of Sunrise.

20  Q    What was Mr. Fries doing there, if you could -- if you could

21       tell?

22  A    Well, I was sitting with my mom, and he walked in, I

23       believe, and -- I don't know if he got there first or I did,

24       but I just saw him.  He was sitting at the bar with a lady

25       friend -- or with a woman.  And he -- we had eye contact.  I

1          was sitting on a high top stool in the bar, and he was

2          sitting around the bar.

3    Q     And that was in May of '09?

4    A     Yes, it was.

5    Q     So that was about three months before the August incident,

6          correct?

7    A     That's right.

8    Q     At some point in time you -- you left the restaurant that

9          night, correct?

10   A     Yes.

11   Q     Did you leave before Mr. Fries, or after --

12   A     After Mr. Fries.

13   Q     Now, let's go back to August 1st, 2009.  I think you told us

14         that you had gone out to dinner with your mom, is that

15         correct?

16   A     Yes.

17   Q     Do you recall what time you got home?

18   A     Around 11:00.

19   Q     And your husband, was he -- did he stay at home?

20   A     Yes.  He was -- he was sleeping then, and then I --

21   Q     Did he -- I'm sorry.

22   A     -- and then I went to bed shortly after I got home.

23   Q     And was your husband still awake when -- when you went to

24         bed?

25   A     No, he was sleeping.

1   Q    All right.  And what's the next thing that you recall

2        happening?

3   A    When I got up -- well, I -- it was very warm that night, and

4        we had the air conditioning on.  It was in August, really

5        hot night.  And that morning very early, about 5:30, 6:00 I

6        turned up the air conditioner.  And I walked past the

7        window, because there were no windows in the front but they

8        had a long window near the door, a thin window, and I

9        thought I saw something very funny, like white little balls.

10       So I went to get my glasses, and I wanted to -- then I tried

11       to open the door also to see what else was going on out

12       there, and I couldn't open the door.  So I screamed to my

13       husband, and I said "I think it's happening all over again."

14  Q    Do you recall what time or what approximate time this was?

15       Do you have any idea?

16  A    It was about 6:00 a.m.

17  Q    Are you sure about that?

18  A    It was pretty early -- yes, I'm not exactly sure, but I know

19       it's around 6, 6:30 in the morning.

20  Q    It was early, correct?

21  A    Yes, it was.

22            MR. BOCK:  Objection, your Honor.  The witness gave an

23  answer, and the prosecutor -- may I approach?

24            THE COURT:  Yes.

25                        BENCH CONFERENCE

1          MR. BOCK:  I don't know what the appropriate objection

2    would be, so I didn't want to make a speaking objection, but she

3    gives a time, the prosecutor doesn't like the answer, and then

4    tries to rephrase it to have her agree with what the prosecutor's

5    saying.  Like, she gave a time.  She thought it was 6:00, 5:00,

6    and then the prosecutor said it was early.  I just don't think

7    that's an appropriate examination, Judge.  The witness is the one

8    that should be giving the responses as to -- not the examiner.

9          THE COURT:  Well, that might supplement the answer.

10   It's also early --

11         MR. BOCK:  Okay.

12         MS. ANDERSON:  I didn't say it was 5:00, right?  I

13   didn't ask that question.  I said it was early, and she agreed.

14   In fact, actually, she said it was 6 or 6:30, and I said it was

15   early, right?  So I disagree.

16         THE COURT:  I think we're okay, Mr. Bock.

17         MR. BOCK:  Okay.  I'm sorry to come up, then.

18         (The bench conference was concluded.)

19         THE COURT:  All right, Ms. Anderson, you may continue.

20         MS. ANDERSON:  Thank you.

21   BY MS. ANDERSON:

22   Q    It was early in the morning, correct?

23   A    Yes, it was.

24   Q    And what did you do?  What did you do when you saw this --

25        when you saw this out your window?

| | | |
|---|---|---|
| 1 | A | I grabbed the phone first, and called 9-1-1. |
| 2 | Q | How long after you saw what was taking place or what was on |
| 3 | | your front porch area did you call 9-1-1? |
| 4 | A | Right away.  I couldn't open the door, so I didn't know what |
| 5 | | was out there but it smelled funny.  It started smelling |
| 6 | | funny too in my house.  So I -- I said to my husband -- I |
| 7 | | screamed for him, and then I -- I handed the phone to him, |
| 8 | | and he continued with them. |
| 9 | Q | Did you call 9-1-1 before you handed him the phone? |
| 10 | A | Yes, I did. |
| 11 | Q | Did you talk to the 9-1-1 operator at all? |
| 12 | A | Yes, I did. |
| 13 | Q | And what did you tell her? |
| 14 | A | I told her that there's something wrong, and I've had this |
| 15 | | situation before, and I think it's happening all over again. |
| 16 | | And she asked me where I lived, and she said there have been |
| 17 | | calls in the morning before myself that they've received |
| 18 | | some calls stating there's something funny smelling in the |
| 19 | | area. |
| 20 | Q | And what did you do after you handed the phone to your |
| 21 | | husband? |
| 22 | A | I went to get my shorts on again, and I had the same t -- |
| 23 | | night shirt I had on in the '08 incident.  And I put my |
| 24 | | flip-flops on, and my husband said just let's get ready, get |
| 25 | | the dog, and we're -- you know, let's go out the back.  They |

|    |   |                                                                               |
|----|---|-------------------------------------------------------------------------------|
| 1  |   | said -- I guess the operator said there's somebody that's                     |
| 2  |   | going to meet you in the back of your house.                                  |
| 3  | Q | Did your husband speak with the 9-1-1 operator at all?                         |
| 4  | A | Yes.  Yes, he was speaking with her when he told me what to                    |
| 5  |   | do.                                                                            |
| 6  | Q | And did your husband try any other doors in the house?                         |
| 7  | A | He tried the garage door.  That was sealed.  So everything                     |
| 8  |   | in the front was sealed --                                                     |
| 9  | Q | So --                                                                          |
| 10 | A | -- so we could get out the back sliding glass door.                           |
| 11 | Q | And did you and your husband do that?                                          |
| 12 | A | Yes, we did.                                                                   |
| 13 | Q | When you -- when you went outside, did you smell something                     |
| 14 |   | that was odd or strange?                                                       |
| 15 | A | Yes.                                                                           |
| 16 | Q | What did you smell?                                                            |
| 17 | A | Something was fuming on the left side of the back patio, and                  |
| 18 |   | it smelled like chlorine.  It was chlorine.                                    |
| 19 | Q | When you opened up the back door, did you see deputies                         |
| 20 |   | waiting out there?                                                            |
| 21 | A | Yes.  Yes.  They were walking up.                                              |
| 22 | Q | How far away were they from you when you saw them?                            |
| 23 | A | About three feet.                                                             |
| 24 | Q | Did you scream?                                                               |
| 25 | A | I was hysterical, yes.  I was -- I was -- I kind of lost it.                  |

1              I was --

2    Q    Do you recall what you said to the deputies?

3    A    I said that we had to get over -- I said we had to get out

4         of here, because I just -- I don't know what I said, to be

5         honest with you.  I was very upset.

6    Q    Did they help you get over the wall?

7    A    Yes, they did.

8    Q    Now, there is -- there is a gate in your back porch area, is

9         that right?

10   A    Yes, that's right.

11   Q    Did you and the deputies go towards the gate?

12   A    They said don't go near the gate, because --

13   Q    And why was that?

14   A    -- the bucket was right there near the gate, and it was

15        fuming with this chlorinated odor, with smoke.  And also, my

16        throat was starting to burn, and my eyes were burning, and I

17        have really bad sinuses so they were plugging up.  I was in

18        a bad state then.

19   Q    Let's look at Government's Exhibit Number 88.  I believe

20        this has already been admitted.

21             Do you recognize that?

22   A    Yes.

23   Q    What's shown in the photograph?  What -- what is that?

24   A    The back patio.

25   Q    The back -- your back --

```
1    A    Back of the house.

2    Q    Okay, and --

3    A    Tucson National.

4    Q    We see a gate there on the right side of the photograph,

5         correct?

6    A    Yes.

7    Q    Is that the only gate in your back yard?

8    A    The gate's more in the front.  I don't know where the

9         gate -- that's my neighbor's gate.  The gate -- oh, this

10        gate that's opened -- I'm sorry, this is the gate, the white

11        gate right there.

12   Q    Correct?

13   A    Yes, that's the only gate.  I'm sorry.

14   Q    So if somebody wanted to go out -- out your back patio and

15        to the golf course and they wanted to go out the gate, what

16        direction would they head?

17   A    They had to go past that bucket.

18   Q    Past the device?

19   A    Device, yes.

20   Q    All right.  And what direction did you head with the

21        deputies?

22   A    We went to the -- they told us to stay to the right, and

23        they had to help us over the brick wall.

24   Q    How high is that brick wall?

25   A    About four and a half, five feet.
```

```
 1   Q    Where did the deputies take you to?
 2   A    They took us to the middle of the area of Tucson National
 3        where about -- I would say 100 people were standing there
 4        early in the morning.
 5   Q    Now, did you happen to get a look at this -- at this device
 6        here, this white bucket --
 7   A    Yes.
 8   Q    -- as you were leaving your -- your home?
 9   A    Yes, I -- I looked -- I didn't look at, but I saw -- just
10        fumes.  It was fuming.
11   Q    Could you describe that for us?
12   A    It was sizzling and fuming.  Something odd was coming out of
13        it, but it smelled like chlorine.
14   Q    What color was it?
15   A    It was grayish white.
16   Q    And once the deputies got you to a safe space away from your
17        house, did you see something unusual occur in your front
18        yard?
19   A    I saw a black cloud in front of my house.
20   Q    Did you and your husband say something to each other at that
21        point?
22   A    Well, we thought the house was going to blow up.
23   Q    Did you and your husband seek any kind of medical attention?
24   A    Yeah, after they calmed me down a little bit and asked me
25        questions, the -- this ambulance or truck came to take us to
```

1          the hospital.

2     Q    What hospital was that?

3     A    Northwest.

4     Q    Did you receive treatment at Northwest Hospital?

5     A    Yes, I did.

6     Q    What kind of treatment?

7     A    They just checked me over.  They took an EKG.  The doctor

8          just did a general, and then they thought it would be

9          advisable if I took some medication.

10    Q    Now, you told us that when you were at your -- at your home,

11         you were experiencing some of these symptoms that were

12         consistent with smelling chlorine, or breathing chlorine, is

13         that right?

14    A    Yes.

15    Q    And what were those again?

16    A    Burning of my eyes, my sinuses -- I couldn't breath

17         properly, and my chest felt heavy.

18    Q    Did those symptoms subside once you got to the hospital?

19    A    After they gave me a medication, tranquilizer to settle me

20         down.

21              MS. ANDERSON:  Your Honor, may I have a moment?

22              THE COURT:  Yes.

23              MS. ANDERSON:  That's all I have.

24              THE COURT:  All right.

25              Cross-examination?

1                        CROSS-EXAMINATION

2    BY MR. BOCK:

3    Q    Can you see me, okay?

4    A    Yeah.

5    Q    Okay.

6    A    You just kept staring at me.

7    Q    Well, I thought you couldn't see me because of the screen.

8    A    I can see you, sir.

9    Q    Okay.  So you testified about contacts you had with Todd, is

10        that correct?

11   A    Correct.

12   Q    And the first contact you had with him was 2005, I believe

13        you said?

14   A    Yes.

15   Q    And the last contact you had with him was, what, April of

16        2008?

17   A    Yes.

18   Q    Now, the number of times that he himself would have been up

19        there between 2005 and 2008, half a dozen?

20   A    Mostly his workers came.

21   Q    Okay, but he came on occasion too, didn't he?

22   A    A couple times.

23   Q    And do you remember him dropping off paint rags, and paint

24        brushes?

25   A    No, I do not.

```
 1   Q    Is it possible that -- that you don't remember that, and
 2        that could have happened?
 3   A    Paint rags and paint brushes?
 4   Q    Would it be possible that they dropped off paint and paint
 5        cans to you when they were doing the jobs?
 6   A    They came with the equipment.
 7   Q    Okay.  Did -- some of that equipment would have been paint
 8        cans?
 9   A    Yeah, the paint's in the can.
10   Q    Okay.  Paint brushes -- did they bring paint brushes?
11   A    I don't remember paint brushes.  I remember, you know,
12        rollers.
13   Q    But you remember paint cans, though, right?
14   A    Paint cans, yes.
15   Q    Now, did the -- and you went on -- you were recommended to
16        him, or you went online?  How did you find --
17   A    I found him on the radio or TV.  I believe it was the radio,
18        though.
19   Q    And you knew he was a licensed contractor, is that correct?
20   A    Yes, his commercial said he was.
21   Q    Okay, you don't doubt that, do you?
22   A    I -- you know, I never checked him out, but the commercial
23        said it was.
24   Q    Okay.  So the -- his commercial said that he was a licensed
25        contractor in the State of Arizona?
```

1    A    Right.

2    Q    And you know licensed contractors have to be bonded?

3    A    Okay.

4    Q    When you deal with someone that's licensed, you have -- you

5         know that there are more protections than when you deal with

6         people that are unlicensed that may be doing repairs on your

7         home or repairs on your car, right?

8    A    That's true.

9    Q    Okay.  Now, the -- were there tire marks on your driveway on

10        Tear Blanket -- tire marks, tire tracks?

11   A    Yes.

12   Q    Did you attempt to remedy those yourself?

13            Did you ever try to put any type of solvent or anything

14        yourself to try and get those tire marks off the driveway?

15   A    No, I just used soap.

16   Q    Just soap.  And you bought -- did you buy the paint from --

17        did you buy some paint from Sherwin Williams?

18   A    For the second time.  Sherwin Williams, yes.

19   Q    Did you have any issues with the Sherwin Williams over the

20        paint?

21            Did you call them about any of the purchases you made

22        from them?

23   A    No, I -- I did ask them, though, if Todd came in to buy the

24        paint from them, and they said yes.

25   Q    Okay.  Now, we've gone over in some detail the events of

1           October 31st and November 1st of 2008, is that correct?

2    A      Yes.

3    Q      You've testified to them, is that correct?

4    A      Yes, I did.

5    Q      And you heard your husband testify to the events in 2008, is

6           that correct?

7    A      I didn't hear my husband.  I was not in the room.

8    Q      Oh, you -- neither you nor your husband went outside and

9           walked in any of the oil or anything like that where your --

10          or your husband's shoe print could have been placed, is that

11          a fair statement?

12   A      I don't understand what you're saying, sir.

13   Q      Some -- some shoe impressions were found on October 31st,

14          November 1st at the Tear Blanket property.  Did you know

15          that?

16   A      Yes.

17   Q      Okay.  My question to you is your husband didn't go out

18          walking around there and place any of those shoe prints to

19          the best of your knowledge, did he?

20   A      No, we were very careful.

21   Q      Right.  Okay.  Now, on the -- the November -- the

22          August 2nd, 2009 situation, the -- was it dark out when you

23          made the call, or was it -- was it light?

24   A      It was light.

25   Q      And you made the 9-1-1 call after you discovered what

1    happened to the front of your home, is that correct?

2  A  I couldn't see the front of my home.  I couldn't get out of

3    the door.  But I made the call because something was wrong.

4  Q  But did you look out the window, or see something --

5  A  Yeah, I saw -- yeah, as I told -- told you, I looked out

6    that window and I saw something that wasn't right, little

7    balls of popcorn.  I could see that, but I couldn't see

8    anything else.

9  Q  When you say popcorn, would --

10  A  The popcorn balls.

11  Q  -- foam peanuts?

12  A  Foam peanuts, yes.  Um-um.

13  Q  So then you called 9-1-1, is that correct?

14  A  Yes.

15  Q  And how soon before someone in a law enforcement capacity

16    responded to your home?

17  A  Within five minutes.

18  Q  And within that five minute period of time before law

19    enforcement responded to your home, you also went back into

20    the back patio area, is that correct?

21  A  Not before they came.

22  Q  Okay, so it was the police that took you into the back patio

23    area?

24  A  They didn't take us.  We met them.  We had to climb over --

25    they were on one side of the brick wall, and we were on the

1        other side.

2    Q   Okay, and this is during the time that there is some smoke

3        coming from a bucket?

4    A   Yes.

5    Q   And is the smoke covering in the back yard, or is it going

6        into the --

7    A   It's all -- it was billowing.

8    Q   And you have an overhang?

9    A   We have a small overhang, but it was out more than the

10       overhang, so --

11   Q   So there really --

12   A   It was out -- it was out near the gate.

13   Q   So there really wasn't any smoke close to the -- to the back

14       where you would enter or exit your home to come right into

15       the patio?

16   A   Yes, it was.  There was smoke right there near the gate.

17   Q   It was there too?  Okay.

18   A   Um-um.

19   Q   And so the -- your husband is -- you go over the --

20   A   The wall.

21   Q   -- you go over first, or your husband goes over first, or do

22       you remember -- or both of you go over the same time?

23   A   I think I helped my husband because he had a neck brace.  He

24       just had surgery that past week, and he was on dialysis.

25   Q   Who's -- who's holding the dog?

1    A    I'm holding the dog, and I helped the dog over.

2    Q    And your husband said the dog was about 35 pounds?

3    A    Yes.

4    Q    Is that right?

5    A    Yeah, I -- I -- they helped me.  I mean, the firemen -- or

6         the police, I should say, grabbed my dog, and I pushed my

7         dog up.

8    Q    Okay.  Now, don't take this as a silly question, but you

9         didn't take your dog to the vet after this situation, did

10        you?

11   A    No, I did not take my dog to the vet.

12   Q    Okay.  But you did say that you went to the -- that you went

13        to the hospital, is that correct?

14   A    Yes, I did.

15   Q    Okay.  So from the time that you went over your back wall

16        until the time that you went to the hospital, what were you

17        doing?  Do you remember?

18   A    I was trying -- people were trying to calm me down in the

19        area of Tucson National where we had to sit on the grass.

20   Q    So you were sitting on a green, or were you sitting on a

21        fairway?

22   A    No, before the green.  It was grass, and then there's the

23        golf course.  So they have a little grassy area.  We weren't

24        right on -- we weren't on the golf course.

25   Q    And so how long did you remain in that position for?

1    A    I would say half hour.

2    Q    Okay.  And then after that what -- where did you go?  Do you

3         remember?

4    A    I -- we stayed with the paramedics.  They came.  We were in

5         their truck -- or their van, you know, their facility they

6         had, and they were taking all our vitals, and trying just to

7         calm me down.  I was just hysterical.

8    Q    Did you go to some command center that was set up?

9    A    That's -- that's what I meant, a command center.

10   Q    Was it an indoor facility, or was it a tent?  What do you

11        remember?

12   A    The command center was a truck.

13   Q    A truck?

14   A    Uh-huh.

15   Q    Okay, and your husband was in there with you?

16   A    Yes.

17   Q    And any other people in there with you?

18   A    No.  Nobody else was there.

19   Q    Now --

20             MR. BOCK:  May I approach the witness, your Honor?

21             THE COURT:  Yes.

22             MR. BOCK:  I'm going to show her what's been marked as

23   Exhibit 409.

24             THE COURT:  All right.

25             MR. BOCK:  And these are medical reports.

```
 1   BY MR. BOCK:
 2   Q    Have you seen your medical reports before?
 3   A    Yes.
 4   Q    Okay.  So you're conversant with them?
 5   A    I'm -- excuse me, I didn't understand the question.
 6   Q    Are you conversant with the reports?  In other words, if I
 7        took the reports back and I asked you questions, do you have
 8        a recollection of what's in the reports, or would you be
 9        more comfortable keeping the reports?
10   A    Doesn't matter to me, if you want to keep them.
11   Q    Okay.  Thank you.
12   A    Sure.
13   Q    Okay, the report says -- Exhibit 409, it has a transport
14        time of 11:24.  Do you disagree with that, that you were
15        transported from the Tucson Omni to the Northwest Hospital
16        at 11:24 on August the 2nd?
17   A    Sir, to be honest with you, time was -- I didn't have a
18        watch.  I didn't know what time it was.  I was -- I was in a
19        hysteria.
20   Q    Now, they said that -- in the report, that you were
21        concerned about not being able to get your meds from your
22        home, and you had no complaints, is that accurate?
23   A    I have blood pressure medication, other medications I wanted
24        to, you know, take, and my husband also.  I had complaints.
25        I told them I wasn't feeling well.
```

1    Q    In your report they have you stating that you felt a little

2         tight in your chest and anxious earlier, but that you

3         thought it was mostly anxiety as she has had problems with

4         anxiety in the past.

5              Is that an accurate statement?

6    A    Okay.

7    Q    Does okay mean that's an accurate statement?

8    A    That's an accurate statement.

9    Q    And said she now feels fine except she still feels a little

10        anxious.  There is no shortness of breath, no chest pains or

11        tightness, no physical complaints at all.

12             Accurate statement?

13   A    Okay.

14   Q    Does that mean --

15   A    That's -- yes.

16   Q    Okay.  Now, they were recommending Ativan?

17   A    Yes.

18   Q    And is that a prescription medication?

19   A    I believe so.  Yes, it is.

20   Q    And did you get a prescription for Ativan?

21   A    They gave me a prescription.

22   Q    And is that for anxiety?

23   A    Yes, it is.

24   Q    Okay.  Mr. Fries was not -- when you saw him at the

25        Bluepoint Oyster Bar, he didn't do anything untoward towards

1       you, did he?

2   A   No, he just glared at me.

3   Q   Well, glared -- did he just knowledge you?

4   A   He just looked.  He was just looking at me.

5   Q   Okay.  You didn't -- did you put any evil design on that or

6       anything?

7   A   No.

8   Q   Okay.

9           MR. BOCK:  May I have a minute, your Honor?

10          THE COURT:  Yes.

11          MR. BOCK:  I have no further questions of Ms. Levine.

12          THE COURT:  All right.

13          Any redirect?

14          MS. ANDERSON:  Yes, your Honor, just real briefly.

15          Thank you.

16                      REDIRECT EXAMINATION

17  BY MS. ANDERSON:

18  Q   Now, Mr. Bock asked you if -- in the '08 incident if you --

19      if the -- if any of the footprints found at the scene could

20      have belonged to you or your husband.  Now, did the police

21      advise you not to disturb any of the evidence?

22  A   My husband did, because he said -- you know, my husband

23      knows not to step into any evidence, so he didn't -- my

24      husband just told me to be careful, so we stepped -- tried

25      to step on the stones that were -- with that sledge oil on

1          it.

2     Q    When you saw what -- when you saw what had happened to your

3          house, did you stick around there or did you go to a

4          neighbor's house, or where did you go?

5     A    I went to a neighbor's house.  And people were just talking

6          to me, and trying to -- they just couldn't believe it,

7          just -- you know.

8     Q    Could you describe the smell for us?

9     A    It -- like I said, it's a sludge oil.  If you ever smell

10         sludge --

11             MR. BOCK:  Objection.

12             THE COURT:  Hold on a second.

13             Yes, Mr. Bock?

14             MR. BOCK:  As to improper redirect.

15             THE COURT:  Yes, sustained.

16             Go ahead.

17    BY MS. ANDERSON:

18    Q    Well, it wasn't -- is it a situation where you wanted to get

19         away from your house?

20    A    Yes.

21    Q    Why is that?

22    A    Because the smell was terrible.  It was ghastly.

23    Q    Talking about the '09 incident, Mr. Bock asked you if you

24         took your dog to the vet.  Did it appear that your dog had

25         any kind of problems breathing?

```
 1   A     No.  We went over the wall so fast -- I mean, everything
 2         happened -- if we -- if we -- I believe if we stayed there
 3         any longer --
 4              MR. BOCK:  Objection to that any longer.
 5              THE COURT:  Yes, I -- go ahead and ask another
 6   question.
 7   BY MS. ANDERSON:
 8   Q     How long after you evacuated your house did you go to the
 9         hospital?  What's your best estimate?
10   A     I really don't recall now, because I don't have a watch.
11         It's --
12   Q     Was it a number of hours?
13   A     It could have been maybe an hour and a half, two hours maybe
14         as I was sitting there being consoled by people.
15   Q     Now, as soon as you got away from your house, did you notice
16         that your -- your -- your -- the tightness in your chest and
17         your breathing problems and your eyes watering -- did you
18         notice that those signs and symptoms got better?
19   A     Not while I was at Tucson National.  Even there I -- I kept
20         telling my husband I can't swallow very well.
21   Q     But as time went on --
22   A     Oh, time went on.
23   Q     -- and you went to the command post and ultimately to the
24         hospital, did you find that your symptoms improved?
25   A     Yes.
```

1          MS. ANDERSON:  That's all I have.

2          THE COURT:  All right.

3          Any questions from the jury for this witness?

4          All right, ma'am, if you could -- all right, go ahead

5    and write them out.

6          And if I could see counsel at sidebar.

7                        BENCH CONFERENCE

8          THE COURT:  There's 2, and 3.

9          MR. BOCK:  I don't have any objection to either of

10   those.

11         MS. ANDERSON:  I don't either.

12         (The bench conference was concluded.)

13         THE COURT:  All right, ma'am, a couple of more

14   questions from the jury.

15         THE WITNESS:  Okay.

16         THE COURT:  Do you have any new health issues due to

17   the 2009 house attack?

18         THE WITNESS:  My sinuses now are chronic sinusitis.  I

19   have chronic sinusitis.

20         THE COURT:  All right.  And what was the location --

21   where was your dog while you were sleeping?

22         THE WITNESS:  Under the bed.

23         THE COURT:  Under the bed.  All right.

24         Any follow-up questions from counsel to the jury

25   questions?

1              MS. ANDERSON:  No, your Honor.

2              THE COURT:  Go ahead, Mr. Bock.

3                          EXAMINATION

4    BY MR. BOCK:

5    Q    You had this sinus situation before August 2nd of 2009,

6         right?

7    A    Not as -- quite this bad.

8    Q    But you had a sinus problem, though, right?

9    A    Yeah, but not chronic sinusitis.

10   Q    You weren't treated for any sinus problems when you went to

11        the hospital on August 2nd of 2009, were you?

12   A    No.

13             MR. BOCK:  Okay, thank you.

14             THE COURT:  Any additional questions from the jury for

15   this witness?

16             All right, may this witness step down, Ms. Anderson?

17             MS. ANDERSON:  Yes.  May she be excused, your Honor?

18             THE COURT:  Yes.

19             Thank you, ma'am.  You may step down and be excused.

20             ------------------------

21        (James Paul was duly sworn by the clerk.)

22                         JAMES PAUL

23                     DIRECT EXAMINATION

24   BY MS. ANDERSON:

25   Q    Sir, what do you do for a living?

1   A    I'm a police officer with the Marana Police Department.

2   Q    How long have you been so employed?

3   A    With the Marana Police Department just over ten years.

4   Q    When did you begin with the Marana PD?

5   A    2002.

6   Q    In order to become a police officer with Marana, were you

7        required to attend any kind of training?

8   A    Yes, ma'am.  I actually came from another agency prior to

9        that.

10  Q    What agency was that?

11  A    Gila River Indian Community.

12  Q    I'm sorry?

13  A    Gila River Indian Community.

14  Q    When did you begin with them?

15  A    1999.

16  Q    Until when?

17  A    Until 2002.

18  Q    When you began with Marana?

19  A    Yes, ma'am.

20  Q    Now, when you first became a police officer here in Arizona,

21       did you attend any kind of courses or training?

22  A    Yes, ma'am.  I went to the police academy in Phoenix.

23  Q    And how long was that?

24  A    Approximately three months.

25  Q    And did you graduate or obtain any kind of certifications

```
 1           after that?
 2   A   Yeah.  I graduated as a certified police officer.
 3   Q   So then when you joined with Marana PD, were you required to
 4           take any kind of additional training?
 5   A   No, just continuous training that's required by Arizona
 6           Post.
 7   Q   What kind of -- what is Arizona Post?
 8   A   Arizona Post is the governing board for all certified
 9           officers within the State of Arizona.
10   Q   Now, you said that you're required to take some kind of
11           continuing training programs with Post?
12   A   Yes.
13   Q   What kind of continuing courses do you take?  Give us an
14           example.
15   A   They vary from updates to the legal statutes for the State
16           of Arizona.  It also includes updated information in
17           reference to briefs of court decisions made throughout the
18           state.  Also deals with tactics, and additional information
19           on certain investigative protocols.
20   Q   Are you -- are you required to take a certain number of
21           hours of, say, continuing education per year?
22   A   Yes, ma'am.
23   Q   How many hours?
24   A   It's eight hours continuous.
25   Q   Now, let's talk about when you are working specifically with
```

| | | |
|---|---|---|
| 1 | | Marana PD.  You said you started in 2002, correct? |
| 2 | A | Yes, ma'am. |
| 3 | Q | What are some of the assignments that you've held with |
| 4 | | Marana over those ten years? |
| 5 | A | I started out as a patrol officer with Marana Police |
| 6 | | Department, 2002.  Spent a year on patrol, at which point I |
| 7 | | went to be the training coordinator for the department where |
| 8 | | I spent three years there.  Once I was -- completed with |
| 9 | | that assignment, I was actually assigned -- or actually |
| 10 | | gained the distinction as a detective, and I spent three |
| 11 | | years as a detective.  And currently, I'm a patrol |
| 12 | | supervisor and have been for the last three, three and a |
| 13 | | half years. |
| 14 | Q | So you were employed by Marana PD and on duty on |
| 15 | | November 1st, 2008, is that correct? |
| 16 | A | Yes, ma'am. |
| 17 | Q | What was your assignment on that particular day? |
| 18 | A | I was the on call detective for that particular day. |
| 19 | Q | What does it mean to be the on call detective? |
| 20 | A | Basically, the detectives assigned to the department are |
| 21 | | required to be on call during certain periods of the month. |
| 22 | | This happened to be my particular timeframe. |
| 23 | Q | So what that means is at any time when you're on call, you |
| 24 | | could get a call and you have to respond and -- and do your |
| 25 | | job, correct? |

```
 1   A    Yes, ma'am.
 2   Q    All right.  Do you recall what day of the week November 1st,
 3        2008 was?
 4   A    If I remember correctly, it was the -- it was a Saturday, if
 5        I remember correctly.
 6   Q    And of course, it was the morning after Halloween, correct?
 7   A    Yes, ma'am.
 8   Q    Now, were you assigned to investigate the attack on the
 9        Levine's on November 1st, 2008?
10   A    Yes, I was.
11   Q    Do you recall what time it was that you responded to the
12        scene?
13   A    I -- I believe it was close to noon when I finally got to
14        the scene.
15   Q    And what did you do when you got to the scene?
16   A    Upon arriving at the scene -- I had actually talked to two
17        officers prior to getting to the scene.  Once on the scene
18        at the residence, I began to just do a survey of the
19        particular incident.
20   Q    Where did you go before you arrived at -- when we're talking
21        about the scene, we're talking about the Levine residence,
22        correct?
23   A    Yes, ma'am.
24   Q    Now, where was the first place that you went, if not the
25        Levine residence?
```

1  A    I actually tried to go through the south gate for the gated
2       community that the residence was located in, but that gate
3       had been damaged the night before.  One of the officers
4       assigned to that particular call had given me basic -- or
5       brief information in reference to the incident at the
6       Levine's.
7  Q    And which officer was that, do you recall?
8  A    That was Officer Robert Quackenbush.
9  Q    So you had a discussion with him at the gate, correct?
10 A    Yes, ma'am.
11 Q    And at some point later are you sent to the Levine
12      residence?
13 A    Yes.  Once I finished there, real brief, only a couple
14      minutes, I went to the main gate to go through so I can get
15      to the residence, and at which point I actually met Officer
16      Muszula in at the gate.
17 Q    And he gave you some information about what he found,
18      correct?
19 A    Yes, ma'am.
20 Q    What time would you estimate you actually got to the Levine
21      residence?
22 A    Right at noon, or just shortly after.
23 Q    What did you do at the Levine residence?
24 A    Once I got to the address, took a -- basically a survey of
25      the scene.  I looked at what was going on, tried to

| | | |
|---|---|---|
| 1 | | determine what house belonged to whom, mailboxes.  That way |
| 2 | | I was more familiar with what I was looking at. |
| 3 | Q | And what kind of residence -- what kind of homes are in that |
| 4 | | particular area? |
| 5 | A | This particular area has residents that are older than 50. |
| 6 | | They're generally single family residents.  Most of these |
| 7 | | home are all single level stucco style homes.  This -- this |
| 8 | | particular one was off of a small T cul de sac, per se. |
| 9 | Q | When you got to the Levine residence, was the -- were the |
| 10 | | items of evidence already gone from the scene? |
| 11 | A | Yes, they were. |
| 12 | Q | Let's look at Government's Exhibit Number 8. |
| 13 | | Do you recognize that? |
| 14 | A | Yes, that's the Levine's residence. |
| 15 | Q | Now, you -- you just said that some of the items of evidence |
| 16 | | were already gone when you arrived at the scene, is that |
| 17 | | right? |
| 18 | A | Yes, ma'am. |
| 19 | Q | Okay, but was the stuff -- the stuff -- oily stuff still on |
| 20 | | the driveway, like we see it there? |
| 21 | A | Yes, it was. |
| 22 | Q | Was the graffiti still on the -- on the driveway portion, or |
| 23 | | the sidewalk of sorts? |
| 24 | A | Yes, it was. |
| 25 | Q | And the graffiti was also still on the garage door, is that |

1          right?

2    A     Yes.

3    Q     Now, we see buckets there on Government's Exhibit Number 8.

4          Were those buckets still there at the scene?

5    A     Not when I arrived, no, ma'am.

6    Q     How about the white foam peanuts?  Were they still there at

7          the scene?

8    A     Yes, they were.

9    Q     And there was another item of evidence that was there at the

10         scene, and that was a wallet, is that correct?

11   A     Yes, ma'am.

12   Q     Now, what was your task as the detective?

13   A     My task as the detective is to investigate the scene.  When

14         I say survey, I looked at the scene, took into consideration

15         and made notes of what type of graffiti was on the -- not

16         only the residence, but on the sidewalk itself or the curb

17         in this particular case, items that were used for damage to

18         the driveway, which was indicated there was paint, used oil,

19         and then the popcorn itself.  And from that point I go into

20         interviews with the victims, and any other witnesses that

21         were available or may have seen something.

22   Q     You talked with Mr. and Mrs. Levine, did you not?

23   A     Yes, I did.

24   Q     An safe to say they were upset, is that correct?

25   A     Yes, they were.

1    Q    All right.  Now, at some point it -- it was brought to your

2         attention that there was a wallet found at the scene,

3         correct?

4    A    Yes, ma'am.

5    Q    And did you get that wallet from somebody else that

6         retrieved it from the scene, or was it still there?

7    A    No, I -- I was actually given the wallet.  I don't remember

8         by whom specifically, but I was given the wallet while I was

9         on scene, and we -- I had actually went through briefly at

10        that point.

11   Q    Did somebody tell you or show you where the wallet had been

12        found?

13   A    They had told me.  It was indicated being located within the

14        white paint, just to the -- I would say to the south side of

15        the driveway or garage door itself.

16   Q    Did they point that area out to you?

17   A    Yes, ma'am.

18   Q    And was that -- would that have been near one of the buckets

19        by the garage door?

20   A    Yes, ma'am.

21             MS. ANDERSON:  Your Honor, may I approach the witness?

22             THE COURT:  Yes.

23   BY MS. ANDERSON:

24   Q    Sir, this is Government's Exhibit Number 317.  I'm going to

25        ask you to take a look at that, if you would.

1              Do you recognize that?

2   A    Yes, ma'am.  This is the wallet that was found on scene.

3              MS. ANDERSON:  And I believe that's already been

4   admitted.

5   BY MS. ANDERSON:

6   Q    This is Government's Exhibit Number 316.

7              Sir, do you recognize what's contained within that bag?

8   A    Yes, ma'am.  This is the content of the wallet itself that

9        was located on scene.

10  Q    Specifically, Government's Exhibit Number 316 contains some

11       identification, does it not?

12  A    Yes, ma'am, it does.

13  Q    And one piece of evidence is a driver's license belonging to

14       a woman named Kalyn Nicole Hovey, is that right?

15  A    Yes, ma'am.

16  Q    And also there's some photographs of some individuals, some

17       family photos it appears, correct?

18  A    There are several photos, yes, ma'am.

19  Q    Now, you said you went through the contents of the wallet,

20       is that right?

21  A    Yes, ma'am.

22  Q    Do you recall there being any kind of cash in the wallet?

23  A    If I recall correctly, there was $8 that was retrieved from

24       the wallet itself.

25             MS. ANDERSON:  May I approach, your Honor?

1                THE COURT:  Yes.

2  BY MS. ANDERSON:

3  Q    That's Government's Exhibit Number 318.

4        Do you --

5  A    Yes, ma'am.  That's -- I believe it to be the content of the

6      money that was in the wallet.

7  Q    Now, I'm going to leave that with you and then --

8  A    Yes, ma'am.

9  Q    -- head back here and ask you some more questions.

10       Now, Government's Exhibit Number 318 is the -- is the

11      Ziplock baggy with the money inside of it, correct?

12  A    Yes, ma'am, it is.

13  Q    Are there any kind of markings on that envelope indicating

14      who would have taken it into evidence?

15  A    There's usually initials on there, which I see in the back,

16      and I don't -- I don't recognize the initials off the top of

17      my head, ma'am.

18  Q    Now, would the individual that processed the scene have

19      actually put them in the Ziplock baggy?

20  A    Yes, ma'am.

21  Q    When you -- when you were handed the wallet, was the money

22      still in the wallet?

23  A    I believe it was.

24  Q    All right, so it wouldn't have necessarily yet been put in a

25      bag and stored for evidence, correct?

1   A   No, in this particular case the paint had to dry on the

2       wallet before they could actually seal it.

3   Q   All right.  So you don't recognize those initials on the

4       cash, is that correct?

5   A   I don't know.

6   Q   Okay.  All right.  Now, one -- one of the pieces of

7       identification that was in the wallet belonged, like I said,

8       to the woman named Kalyn Hovey, correct?

9   A   Yes, ma'am.

10  Q   Did you have occasion to go talk with Ms. Hovey?

11  A   Yes, I did.

12  Q   When did you talk with her?

13  A   I spoke to her later on the same afternoon I was out at the

14      residence.

15  Q   Did you actually go to see her in person?

16  A   She met with me at our substation in on Ina Road.

17  Q   Okay, so you didn't just talk to her over the phone.  You

18      met with her in person?

19  A   Yes, ma'am.

20  Q   What was your purpose in talking to her?

21  A   To find out if the wallet belonged to her.  To find out if

22      the contents that were in the wallet beyond just the

23      identification card or divers license was hers, and to find

24      out where she was at the night before.

25  Q   And did she tell you where she was at the night before?

```
1    A    Yes, she did.

2    Q    And did she recognize the wallet?

3    A    No, she did not recognize the wallet.

4    Q    Did she recognize the contents of the wallet?

5    A    Some of the contents, yes.

6    Q    Specifically do you recall what she recognized in the wallet

7         itself?

8    A    She recognized the Arizona drivers license.

9              MR. BOCK:  Judge, objection --

10             THE COURT:  Hold on a second.

11             MR. BOCK:  I'm going to object to hearsay.

12             THE COURT:  Yes, sustained.

13   BY MS. ANDERSON:

14   Q    So at some point -- well, you went over the contents of the

15        wallet with her, did you not?

16   A    Yes, I did.

17   Q    How long did you spend speaking with Ms. Hovey at that

18        point?

19   A    I believe it was 35 to 40 minutes that I was with her.

20   Q    And that was actually a tape recorded conversation, correct?

21   A    Yes, it was.

22   Q    Now, sometime later did you -- did you -- when you were at

23        Marana PD receive a phone call from an individual who

24        identified herself as Kalyn Hovey?

25   A    Yes, I did.
```

1   Q   Tell us about that.

2   A   The telephone call was a 9-1-1, came in through our police

3       dispatch.  I was actually at my desk within the building

4       itself, and they requested me to dispatch for this

5       particular call.

6   Q   And did you do that?

7   A   Yes, I did.

8   Q   So what did that mean, you just walked to --

9   A   I walked up to dispatch or over to dispatch into the room,

10      and they provided me the telephone where I began to speak to

11      the female that was on the phone.

12  Q   And this female identified herself as what?

13  A   She identified herself as Kalyn Hovey.

14  Q   Now, you had just talked to Kalyn Hovey the day before, or a

15      couple of days before, correct?

16  A   Yes, ma'am, about two days prior.

17  Q   So the incident occurred on November 1st, 2008, or it was

18      discovered, that is.  When was it that this phone call came

19      into Marana PD?

20  A   I believe it was a Monday, so it would be the 3rd of

21      October -- or November.

22  Q   November?

23  A   I'm sorry, yes.

24  Q   Okay.  All right.  And so you spoke with this person,

25      correct?

1    A    Yes.

2    Q    And when you spoke to this person, did you recognize that

3         person's voice as belonging to the female that you had spent

4         time with, and actually talked to two days previously?

5    A    It did not sound like her, no.

6    Q    How long did you speak with that -- that female that

7         identified -- or that person that identified themself as

8         Kalyn Hovey?

9    A    I tried to keep her on the phone as long as I could to get

10        as much information as possible, and I think it ran anywhere

11        from between seven to ten minutes, maybe.

12   Q    And was that tape recorded?

13   A    Yes, it was.

14   Q    Now, I'm going show you -- may I approach?

15        THE COURT:  Yes.

16   BY MS. ANDERSON:

17   Q    This is Government's Exhibit 73.  I'd ask you to take a look

18        at that.

19        Do you recognize that?

20   A    It looks like a CD that would have been a recording we

21        placed on it.

22   Q    And did you listen to that this morning?

23   A    Yes, ma'am, I did.

24   Q    After having listened to this, Government's Exhibit 73, did

25        you recognize it as being the conversation that you had with

1          the individual that called in and claimed to be Kalyn Hovey?

2    A    Yes, it was.

3    Q    You heard your own voice on Government's Exhibit 73, did you

4          not?

5    A    Yes, I did.

6              MS. ANDERSON:  Government moves for admission of

7    Exhibit 73.

8              MR. BOCK:  No objection.

9              THE COURT:  73 is admitted.

10             MS. ANDERSON:  We'd like to play this, your Honor.  We

11   also have a transcript, and that's Government's Exhibit 74.  And

12   I believe we -- we can provide that to the court reporter so she

13   doesn't have to take down from the transcript.

14             THE COURT:  Well, can the exhibit just be admitted into

15   evidence without the court reporter taking down the contents of

16   Exhibit 73?

17             MS. ANDERSON:  You mean the transcript?

18             THE COURT:  Right, the transcript can be -- do you want

19   the transcript to be shown to the jury, or just admitted?

20             MS. ANDERSON:  Well, we'd like to play the tape.

21             THE COURT:  Right, but the court reporter normally

22   doesn't take down tape recordings that are played in court.

23             MS. ANDERSON:  Exactly, so that's why we have Exhibit

24   74, the transcript.

25             THE COURT:  All right.

1          MS. ANDERSON:  If that's all right.

2          THE COURT:  That's fine.  And so do you have the

3    equipment to play that, or do you want to use the Court's

4    equipment?  Do we need a minute to set that up, or -- we could

5    take a short break to give you time to --

6          MS. ANDERSON:  I think we need that.

7          THE COURT:  All right, let's take an afternoon break.

8    Let's take a 15 minute afternoon break.

9          MS. ANDERSON:  Thank you.

10          THE COURT:  You can step down, sir.

11          THE WITNESS:  Thank you, your Honor.

12          (The jury left the courtroom.)

13          THE COURT:  So if I could see counsel at sidebar off

14    the record for a minute.

15          (The Court recessed at 2:46 p.m., and reconvened at

16    3:06 p.m.)

17          THE COURT:  The record may reflect the presence of

18    counsel, the defendant, the absence of the jury.

19          And are we ready to play the tape, Ms. Anderson, with

20    your equipment?

21          MS. ANDERSON:  The government's ready.

22          THE COURT:  Okay, great.

23          Mr. Bock -- yes?

24          MR. BOCK:  Judge, I think I want to withdraw my no

25    objection to the disk, because that was part of my motion in

1  limine.  So for purposes of the record, I am going to object to

2  this subject.

3         THE COURT:  Which motion in limine was that?

4         MR. BOCK:  That was the motion in limine that listed

5  all the spoof calls and things like that, the shotgun,

6  everything, because I think this is a claim -- they're going to

7  make claim at the end of their case that my client made this

8  call -- spoofing call, or changed his voice or something.  So I

9  think that it's -- I think I should be cautious, and -- Judge,

10  and I'm going to withdraw my no objection, and object to Number

11  73.

12         THE COURT:  And the basis of the objection is?

13         MR. BOCK:  The -- it's --

14         THE COURT:  Other act evidence?

15         MR. BOCK:  Other act evidence, yes.

16         THE COURT:  All right.

17         So Ms. Anderson, do you want to be heard on Mr. Bock's

18  objection?

19         MS. ANDERSON:  Your Honor, the government believes it's

20  relevant.  It's part of the facts of the case, and it has direct

21  bearing on the investigation that was conducted by Marana PD.

22  And the -- excuse me, the '08 incident was designated as a other

23  act, and this is part and parcel of the '08 incident which this

24  Court has previously ruled on.

25         So I -- I really don't see that there's much for

1    defense counsel to argue about.  It's already been completely

2    litigated.

3            THE COURT:  All right, and is it -- the tape -- the

4    conversation being admitted for the truth of the matter, or --

5            MS. ANDERSON:  No, it's not being admitted for the

6    truth of the matter because it wasn't the truth, your Honor.  It

7    was somebody impersonating Kalyn Hovey.  And the person who

8    called in claiming to be Kalyn Hovey made some allegations

9    regarding Mrs. Levine hiring somebody to trash the driveway so

10   that she could make an insurance claim.  And so this is part and

11   parcel of the Court's previous ruling on the 2008 incident.

12           THE COURT:  All right, thank you.

13           I'm going to allow this -- the tape recording -- which

14   is Exhibit 73, Ms. Anderson --

15           MS. ANDERSON:  Yes, your Honor.

16           THE COURT:  -- to be played consistent with the Court's

17   previous ruling.  I think it's part, Mr. Bock, of the other act

18   evidence, and is admissible for the reasons that the Court

19   previously stated, but your objection is noted for the record.

20           MR. BOCK:  And my no objection is withdrawn for the

21   record?

22           THE COURT:  And your no objection is withdrawn.

23           MR. BOCK:  Thank you.

24           THE COURT:  And Jill, if you could get the jury.

25           Mr. Bock, have you seen the transcript of the phone

1    call?

2            MR. BOCK:  The transcript of the phone call had been

3    originally disclosed to me, yes.

4            THE COURT:  Do you have any objection to the jury using

5    the transcript just while they listen to the call, and then we'll

6    collect up the transcripts from the jury?

7            MR. BOCK:  I've seen it done both ways, and again, I

8    would -- to be cautious, I would object for purposes of the

9    record as it may put undue weight on this type of situation.  The

10   Court earlier instructed the jury that they would not receive any

11   transcripts as part of the case.  It was generic, obviously, and

12   I think it was directed towards anything from the court reporter,

13   but I -- my -- I always have a concern when they get something

14   how much significance they're going to put on it because it is

15   provided to them by the Court.  And of course, this evidence is

16   going to be used affirmatively against my client.  I -- we're

17   going to hear it in closing argument, and they're going to claim

18   that this is part of his M O.

19           THE COURT:  All right, so you're objecting not -- you

20   agree that it's an accurate transcript?

21           MR. BOCK:  Yes, I --

22           THE COURT:  But your objecting to the jury using it

23   while the tape is being played?

24           MR. BOCK:  That's my objection, yes, your Honor.

25           THE COURT:  All right.

1          So Ms. Anderson, any thoughts about Mr. Bock's

2  objection to the use of the transcript?  Do you still want the

3  jury to have the transcript during the playing of the tape?

4          MS. ANDERSON:  Yes, your Honor.  I believe it could be

5  helpful for the jury, and that's why we got a transcript -- well,

6  we actually got the transcript for the court reporter, but anyhow

7  we made copies for the jury so that they could follow along as

8  they're listening to the tape.  I think it would be helpful to

9  them.  The tape is obviously going to be in evidence, but the

10  transcript, as the Court said, is not going to go back with the

11  jury.  It's just a tool to assist them while they're listening to

12  the evidence.

13          THE COURT:  All right.  We do this routinely in other

14  types of cases where we have -- usually, we use actually the

15  screen.  We use the screen where we play, for example, a

16  videotape deposition -- well, that's more testimony than a tape,

17  but -- so I'm going to go ahead.  I think it will assist the jury

18  in listening -- following the tape of the phone conversation.  So

19  I'm going to go ahead and direct the clerk to pass out copies of

20  the transcript of the tape to the jury, and then we'll collect

21  them up after the tape is played.

22          Oh, we can have the detective brought back up,

23  Detective Paul, or if he wants to sit in the back of the

24  courtroom.

25          (The jury returned to the courtroom.)

1              THE COURT:  Everyone may be seated.

2              The record may reflect the presence of the jury.

3              And Jill is passing out to you a transcript of the

4    telephone call that's about to be played, and this is to assist

5    you while you listen to the call.

6              Does everybody have one?

7              All right, so go ahead, Ms. Anderson.  This is Exhibit

8    73.

9              MS. ANDERSON:  Yes, your Honor, the -- the tape

10   recording is Exhibit 73.  The transcript is Exhibit 74.

11             And if I could just ask my witness a couple of more

12   questions?

13             THE COURT:  Yes, go ahead.

14   BY MS. ANDERSON:

15   Q    Detective Paul, have you had a chance to compare the tape

16        itself with the transcript of the -- of the tape?

17   A    Yes, I did.

18   Q    And you did that this morning, correct?

19   A    Yes, ma'am.

20   Q    And in your opinion, is it a fair and accurate

21        representation of what's on the tape?

22   A    Yes, ma'am.

23             MS. ANDERSON:  And so at this time, your Honor, the

24   government would like to play Government's Exhibit Number 73 with

25   the assistance of the transcript, 74.

1              THE COURT:  Yes, you may do so.

2              (Government's Exhibit 73 was played for the jury.)

3              THE COURT:  All right, members of the jury, if you

4    could just pass the transcripts down -- let's see, I guess over

5    towards my end, and then Jill can pick them up.

6              Thank you.

7              And Ms. Anderson, you may continue with questioning the

8    witness.

9              MS. ANDERSON:  Thank you.

10   BY MS. ANDERSON:

11   Q    Detective Paul, while you were speaking with this person who

12        claimed to be Kalyn Hovey, did you have doubts about whether

13        this really was the same Kalyn Hovey that you had talked to

14        two days previously?

15   A    Yes, I did.

16   Q    Why is that?

17   A    The voice was the first thing.  It's understandable that

18        sometimes the cellphone receptions are bad, but you can

19        generally tell who the voice is on the other end.

20            The second thing that kind of popped up is she had to

21        introduce herself as Kalyn Hovey to me, although we've

22        already talked and we talked at length at one time.  And

23        when I just said hi, it was kind of one of those questions

24        or statements to her to see if she would respond in more of

25        a familiar type of voice than, you know, as Kalyn Hovey.

1   Q   Also, I noticed that you asked her several questions

2       regarding her identification, like her date of birth, and so

3       on, and so forth, is that right?

4   A   Yes, I did.

5   Q   Why did you do that?

6   A   Just to confirm information that was already provided to me

7       previously.

8   Q   Now, did you send somebody to try and find the Circle K

9       where she claimed to be?

10  A   Right.  We had actually sent out an attempt to locate to the

11      agencies within that area, which was Tucson PD.  There's

12      only one Circle K along Oracle near Rudasill, but nothing

13      ever came of that.

14  Q   Was it in the location that she claimed it was?

15  A   Yes.

16  Q   Now, she mentioned an individual by the name of Mr. Van

17      Brocklin.  Do you recall that?

18  A   Yes, I do.

19  Q   Did you do further investigation on the whereabouts of

20      Mr. Van Brocklin at the time of the November 1st incident?

21  A   Yes, I did.

22  Q   Okay.  And let's look at Government's Exhibit Number 255.

23          Have you seen this exhibit before?

24  A   Ma'am, I don't have anything on my screen.

25          There we go.

1          MS. ANDERSON:  All right, thank you.

2    BY MS. ANDERSON:

3    Q    Do you recognize that?

4    A    Yes, I do.

5    Q    And what do you recognize that as being?

6    A    This is a basic printout from a database that we pull

7         information from.

8    Q    And is this something that you obtained when you were trying

9         to figure out the whereabouts of Mr. Van Brocklin on the day

10        of the incident?

11   A    Yes, I did.

12   Q    What does this exhibit demonstrate regarding Mr. Van

13        Brocklin's whereabouts as of November 1st or October 31st,

14        2008?

15   A    This indicates from reading the information here that he

16        had -- actually was arrested and was in jail, and had been

17        in jail since about the 22nd.

18   Q    Of?

19   A    October.

20   Q    2008 --

21   A    Yes, ma'am.

22   Q    -- correct?

23        MS. ANDERSON:  Government moves for the admission of

24   Exhibit 255.

25        MR. BOCK:  No objection.

1            THE COURT:  255 is admitted.

2            MR. BOCK:  Subject to my -- I'm sorry.

3            THE COURT:  Subject to your --

4            MR. BOCK:  Let me withdraw that.  Subject to my

5    previous objection.

6            THE COURT:  All right, yes.

7            Can I just see counsel at sidebar about this exhibit,

8    please?

9                         BENCH CONFERENCE

10           THE COURT:  So is that a police report?

11           MS. ANDERSON:  I don't think so.

12           THE COURT:  What is it?

13           MS. ANDERSON:  It's some kind of database he can pull

14   up, Pima County Jail records.

15           THE COURT:  So you think it's sufficiently

16   authenticated as being --

17           MR. PIMSNER:  Well he agreed to foundation.

18           MR. BOCK:  I don't have any problem with the

19   foundation, but if I could just have the objection as to --

20           THE COURT:  You do.  So you feel there's adequate

21   foundation?

22           MR. BOCK:  Yes.

23           MS. ANDERSON:  Otherwise, we were going to bring in a

24   custodian of records.

25           THE COURT:  All right.  I just wanted to clarify that.

```
1              All right, thank you.
2              (The bench conference was concluded.)
3              THE COURT:  All right, the exhibit is admitted, and may
4    be published to the jury.
5    BY MS. ANDERSON:
6    Q    And again, this indicates that Mr. Van Brocklin was in
7         custody as of October 22nd, 2008, right?
8    A    Yes, ma'am.
9    Q    As of the date you ran this report, correct?
10   A    Yes, ma'am.
11   Q    Which was when?
12   A    It should be -- well, the date on the top says it was ran in
13        2010.  I don't know -- I can't see the month in particular
14        on this.  So you know, it was ran several -- several months
15        after the fact.
16   Q    It would have been after the 2009 incident, correct?
17   A    Yes, ma'am.
18   Q    Let's look at Government's Exhibit Number 47 and 48.
19             Do you recognize what's shown in this photograph?
20   A    Yes, I do.
21   Q    And what is that?
22   A    It is a spray adhesive can.
23   Q    And did you actually find that at the scene?
24   A    Yes, ma'am, I did.
25   Q    All right, and did you point it out to -- I guess it would
```

```
 1          be Officer Bradley.
 2   A      The crime scene tech, yes.
 3   Q      Where did you find this spray can?
 4   A      This was located on the utility box on the residence just
 5          east of the Levine's residence.
 6               MS. ANDERSON:  Government moves for admission of
 7   Government's Exhibit 47.
 8               MR. BOCK:  Subject to my previous record.
 9               THE COURT:  All right, 47 is admitted.
10   BY MS. ANDERSON:
11   Q      Let's take a look at Government's Exhibit 48.
12               That's a closer up photograph, is it not?
13   A      Yes, it is.
14   Q      And I'm sorry, where did you find this?
15   A      The utility box, which was located on a vacant home -- west
16          side of a vacant home just east of the Levine's address.
17               MS. ANDERSON:  The government moves for the admission
18   of Exhibit 48.
19               MR. BOCK:  Subject --
20               THE COURT:  All right, 48 is admitted subject to the
21   previous objection.
22               MS. ANDERSON:  May I have just a moment?
23               THE COURT:  Yes.
24   BY MS. ANDERSON:
25   Q      Let's look at Government's Exhibit Number 8 again.
```

1              Now, when you were at the scene, did you notice --

2         other than the graffiti, did you notice something unusual

3         about the garage itself?

4    A    Well, the door to the garage had been stuck to the concrete,

5         was one thing that was odd.  And then, again, there's some

6         issues with the graffiti being out of place too.

7    Q    What do you mean by that?

8    A    Besides the reference to Jewish persons and then the

9         swastikas, the anarchy sign that's located just below the

10        left-hand side swastika is kind of out of place.

11             MR. BOCK:  I'm going to object to this testimony,

12   Judge, as speculative.

13             THE COURT:  No, overruled.

14             Go ahead.

15             THE WITNESS:  It's kind of out of place for that

16   particular type of graffiti.

17   BY MS. ANDERSON:

18   Q    What do you mean by that?

19   A    Normally, I haven't seen an anarchy sign in conjunction with

20        the German word jude, or swastikas in this manner.

21   Q    Have you spent some time in Germany?

22   A    Yes, ma'am.

23   Q    How much time did you spend in Germany?

24   A    I spent two years living in Germany.

25   Q    Let's talk again about the seal.  You said that the garage

1              door was sealed, or stuck shut?

2    A    Yes, ma'am.

3    Q    Did you take a look at that?

4    A    I did not take a real close look at it.  I just know that

5         the door was stuck shut where it wouldn't open.  It was very

6         difficult for it to be opened.

7              MS. ANDERSON:  All right.  That's all I have.

8              THE COURT:  All right.

9              Cross-examination?

10             MR. BOCK:  Thank you, your Honor.

11             MS. ANDERSON:  Ma'am, what was the exhibit number for

12   the Van Brocklin document?

13             THE CLERK:  I don't remember.

14             MR. BOCK:  Do you have that exhibit number?

15             MS. ANDERSON:  265.

16             MR. BOCK:  Thank you.

17                        CROSS-EXAMINATION

18   BY MR. BOCK:

19   Q    Now, Sergeant, you're still with the Marana Police

20        Department?

21   A    Yes, sir.

22   Q    Are you a lieutenant now, or are you still --

23   A    I'm a patrol supervisor, a sergeant.

24   Q    Okay.  So back in 2008 were you a detective also?

25   A    Yes, I was.

1    Q    And so were you considered the lead detective in this case?

2    A    Yes, sir.

3    Q    Just tell the jury what -- what that nomenclature means?

4    A    The nomenclature of lead detective or assigned detective is

5         basically the individual that runs the investigation or is

6         responsible for the investigation of the case that they're

7         assigned.

8    Q    And you wrote a narrative in this case, did you not?

9    A    Yes, sir, I did.

10   Q    And it -- the narrative covered a number of events over a

11        period of time, did it not?

12   A    Yes, it did.

13   Q    Did you read the narrative before you came to court today?

14   A    Yes, I did.

15   Q    If I asked you questions -- would you like a copy of it?

16   A    Sure.

17   Q    Okay.

18             MR. BOCK:  May I approach him, your Honor?

19             THE COURT:  Yes.

20             MR. BOCK:  It's Number 410.  It's the report of

21   Sergeant James Paul, and the -- on the top left it says

22   February 28, 2009.

23   BY MR. BOCK:

24   Q    Does that look familiar to you other than some of my

25        checkmarks?

1    A    Yes, sir.  This looks like the report that I had completed.

2    Q    All right.  So you went out to the scene, and there were a

3         couple other uniformed officers there, is that correct, that

4         had preceded you?

5    A    Yes, sir.

6    Q    And when did the ID tech come?  He's testified earlier,

7         Mr. Bradley.

8    A    He was already there and gone before I got on scene.

9    Q    Okay.  That's right, because you were asked if evidence had

10        already been removed.

11   A    Yes, sir.

12   Q    Now, when did you get the wallet?

13   A    The wallet was provided to me by one of the patrol officers

14        that was on the scene.

15   Q    And the paint on the wallet was still wet?

16   A    Yes, sir.

17   Q    So if you had touched that, you would have -- touched that

18        wallet, you would have gotten paint transferred to your

19        hand, correct?

20   A    To a glove, yes, sir.

21   Q    Which would suggest to you that -- obviously, you don't need

22        Sherlock Holmes to tell you that paint recently came into

23        contact with the wallet?

24   A    Yes, sir.

25   Q    It takes paint, what, a couple of hours to dry?

1    A    It varies on the weather conditions --
2            MS. ANDERSON:  Foundation.
3    A    -- and the type of paint.
4            MS. ANDERSON:  Objection, your Honor, foundation.
5            THE COURT:  Well, I'll allow that answer to stand.
6    BY MR. BOCK:
7    Q    There was some testimony that there were some DNA swabs that
8        were taken and placed into Marana -- safekeeping of the
9        Marana Police Department.  Were you aware of that as the
10       lead detective?
11   A    No, sir.
12   Q    As a lead detective if you were aware of that, would you
13       have directed the -- any DNA swabs to have been sent to the
14       DPS Crime Lab?
15   A    Yes, sir.
16   Q    Are you surprised that there has been previous testimony
17       that there was an attempt to get DNA, and there are
18       swabbings apparently that were processed and are in the
19       property of the Marana Police Department?
20   A    Am I surprised?
21   Q    Yes.
22   A    No.
23   Q    Okay.  You don't think that that's something that the lead
24       detective should have been apprized?
25   A    Should have been, yes, sir.

1    Q    Okay.  Did you look at the property -- did you go into the

2         evidence room and look at the property involved in this

3         case?

4    A    No, sir.

5    Q    Now, this case occurred within Pima County, clearly?

6    A    Yes, sir.

7    Q    And you're familiar with our state criminal code, Title 13,

8         are you not?

9    A    Yes, sir.

10   Q    Would you agree with me that it was a crime involving

11        criminal damage?

12   A    Yes, sir.

13             MS. ANDERSON:  Objection, relevancy.

14             THE COURT:  Well, I'll allow the answer to stand.

15             Go ahead, Mr. Bock.

16             MR. BOCK:  Okay.

17   BY MR. BOCK:

18   Q    And the -- so you stayed at the scene.  You were aware that

19        there were footprints at the scene?

20   A    Yes, sir.

21   Q    And I believe that in your report you felt that there may

22        have been as many as three people that left footprints.  Is

23        that a fair statement?

24   A    Yes, sir.

25   Q    Tire tracks there?

1    A    There were tire tracks on the house just to the east, yes.

2    Q    Did you know that photos were taken both of the footprints

3         and of the tire tracks?

4    A    I was advised of that, yes.

5    Q    You spoke to both Mr. and Mrs. Levine?

6    A    Yes, I did.

7    Q    Now, then the next thing is that you get a call

8         sequentially, I guess, is the next thing -- well, you spoke

9         to Ms. Hovey, is that correct?

10   A    Yes, sir.

11   Q    And you met with her.  Was that your testimony?

12   A    Yes, I did.

13   Q    And you met with her -- you were at the scene on November

14        the 1st of '08, and you met with her the next day?

15   A    No, sir, it was that -- later that afternoon, early evening.

16   Q    Okay.  What part of town did she live in?

17   A    She had indicated that she was coming from the Northwest

18        side of town.

19   Q    Where did you meet her at?

20   A    Our substation on Ina Road.

21   Q    Okay.  You had conversation with her?

22   A    Yes, sir.

23   Q    I forget.  Was it recorded, the conversation?

24   A    Yes, it was.

25   Q    Okay.  And then you -- a phone call comes in that was -- has

1      just been played, which is Exhibit 73.  What was the date of

2      this phone call?

3  A   That should have been the 3rd, which was the following

4      Monday, if I remember correctly.

5  Q   What time did the phone call come in?

6  A   I don't remember the time, sir.  I know I was at work and

7      they pulled me from my desk to take the call.

8  Q   Okay, is it in your report?

9  A   No, sir, it's not.

10 Q   What were your working hours on Monday?

11 A   At that time we were working, I think, an eight to five

12     schedule.

13 Q   The 9-1-1 -- do they have the ability to track the number?

14 A   If it's called into 9-1-1, yes.

15 Q   Okay.  And was there a 9-1-1 number -- did 9-1-1 in fact

16     give you a number that was associated with this call?

17 A   Not that I was aware of, no.

18 Q   Did you ever try to track that down?

19 A   I did not, no.

20 Q   A lot of information came from this caller, is that correct?

21 A   Yes, sir.

22 Q   And there were -- appeared to be two voices.  There appeared

23     to be a voice that had a long conversation with you

24     purporting to be Ms. Hovey, and then at the very end it says

25     "What are you doing on the phone?  Hey, Kalyn."  And then

1          something -- Kalyn says something indiscernibly, and then an

2          unknown person says "Get over here."

3               Do you remember that part of the conversation?

4     A    Yes, sir.

5     Q    You heard it -- you just heard it?

6     A    Yes, sir.

7     Q    Two different voices?

8     A    Yes, sir.

9     Q    Now, the information you also got was about someone named --

10         a Mr. Van Brocklin, is that correct?

11    A    Yes, sir.

12    Q    And in fact, in the transcript you asked Kalyn Hovey to

13         spell Mr. Van Brocklin's name, is that correct?

14    A    Yes, I did.

15    Q    Do you know how she spelled it?

16    A    I'd have to look in the transcript to be exact.

17              MR. BOCK:  May I approach the witness?

18              THE COURT:  Yes.

19              MR. BOCK:  This has been marked as Exhibit 34.

20    BY MR. BOCK:

21    Q    Why don't you look at what's been marked as page 4 of the

22         transcript, line 12, sir.

23    A    Do you want me to read it off, sir?

24    Q    Yes, just read off how she spells the name of Richard -- or

25         Ronald or Ron Van Brocklin?

1   A      She spells it V-A-N-B-R, there was a pause, and then she

2          again states B-R-O-C-K-Y-N.

3   Q      And the exhibit that was admitted as Exhibit 265 was a jail

4          document.  Do you remember seeing that?

5   A      Yes, sir.

6   Q      And do you remember how the name was spelled on the jail

7          document?

8   A      I believe there was an L added to the last name.

9   Q      It is it possible the name was spelled B-R-O-C-K-L-I-N?

10  A      It's possible.

11  Q      Okay?

12             MR. BOCK:  Can we bring that exhibit up, or do I have

13  it in my book, Exhibit 265?

14             Just give me a second, your Honor.

15             THE COURT:  255 -- it's up on the screen if you want to

16  see it there, Mr. Bock.  Is that the one you're referring to?

17             MR. BOCK:  Judge, my exhibit book doesn't have the

18  same -- oh, it's brought up.  I appreciate that.

19             THE COURT:  Yes, there it is.

20             MR. BOCK:  Okay.

21  BY MR. BOCK:

22  Q      This document that's in front of you spells the name Ronald

23         Alan Van Brocklin, V-A-N B-R-O-C-K-L-I-N, is that correct?

24  A      That's what it says there, yes, sir.

25  Q      So it was not -- the spelling of Van Brocklin that this

| | | |
|---|---|---|
| 1 | | person purportedly gave you in the 9-1-1 call, is that |
| 2 | | correct? |
| 3 | A | No, it is not. |
| 4 | Q | And what about this other name, Richard -- that would be on, |
| 5 | | again, Exhibit 74.  I circled that name. |
| 6 | | Do you see that name, sir? |
| 7 | A | Yes, sir. |
| 8 | Q | Did you do any -- did you do any follow-up on that name? |
| 9 | A | On that particular name, no, sir. |
| 10 | Q | Okay.  And that was a name in the 9-1-1 call that the person |
| 11 | | purporting to be Kalyn Hovey said was a person of interest, |
| 12 | | correct? |
| 13 | A | Yes, it was. |
| 14 | Q | Okay.  Did you ever ask Kalyn Hovey -- because I believe in |
| 15 | | this call she refers to the name of her father as Jim? |
| 16 | A | Yes, she did. |
| 17 | Q | Did you ever find out if in fact her father was named Jim? |
| 18 | A | During my initial interview with her, she stated her dad's |
| 19 | | name was Dan. |
| 20 | Q | Okay.  So that's some information that you did follow-up on. |
| 21 | | Do you have those reports in front of you? |
| 22 | | Now, before I take these away from you, when would be |
| 23 | | the last time you did anything on this case? |
| 24 | A | Well, the date on the top of the report is the indication of |
| 25 | | when the report was closed out. |

```
 1   Q   And at the end of the report you say this case is closed

 2       pending further -- I imagine you were going to use the word

 3       investigation, is that correct?

 4   A   Yes, sir.

 5   Q   And you say at this time all available leads have been

 6       exhausted, and no new ones have been developed.

 7           Is that what you put in your report?

 8   A   Yes.

 9   Q   Is that correct?

10           And that was on February 28th of 2009?

11   A   Yes, sir.

12   Q   And you had that case from November 1st of 2008?

13   A   Yes, sir.

14   Q   So that's about -- December, January, February -- about

15       three months?

16   A   Yes, sir.

17   Q   And nothing else was done after that, is that correct?

18   A   Not to my knowledge, no.

19   Q   Okay.  But you were the lead detective, though?

20   A   Yes, sir.

21   Q   And you don't -- if a case changes hands, it would be

22       courtesy for you as the lead detective to be told that,

23       would it not?

24   A   No, sir.

25   Q   You could lose a case to another detective and you wouldn't
```

1         even know that as the lead detective?

2    A    Yes, sir.

3    Q    Okay.  Did you make any inquiries as to what was going on

4         with this case after February of 2009?

5    A    No, sir.

6              MR. BOCK:  Nothing further.

7              THE COURT:  All right.

8              Any redirect?

9              MS. ANDERSON:  May I have just a second, Judge?

10             THE COURT:  Yes.

11             MS. ANDERSON:  We have nothing further, your Honor.

12             THE COURT:  All right.

13             Any questions from the jury for this witness?

14             All right, ma'am, if you can -- you've already written

15   it out, so you can hand it to the clerk.

16             And if I could see counsel at sidebar, please.

17                         BENCH CONFERENCE

18             MR. PIMSNER:  Does she mean the identification

19   document?  Is that what she's asking?

20             THE COURT:  ID of -- is it for a person -- I'm assuming

21   is the driver's license the only ID.

22             MS. ANDERSON:  It's in evidence.

23             MR. PIMSNER:  It's in evidence.

24             MS. ANDERSON:  Kalyn Hovey is going to be testifying

25   next, and she can identify it.

1          THE COURT:  Do you want to have him go ahead and look

2    at it and answer this question for the witness?

3          MS. ANDERSON:  Sure.

4          THE COURT:  Just to cover it now.  I know it's going to

5    be covered later -- or the other option is I can just tell the

6    jury this issue is going to be covered later by another witness.

7          MS. ANDERSON:  I'll ask him.

8          THE COURT:  Okay.

9          (The bench conference was concluded.)

10          THE COURT:  All right, Ms. Anderson, you can proceed

11   with the juror's question.

12                          EXAMINATION

13   BY MS. ANDERSON:

14   Q    Detective Paul, I have a follow-up question for you, and

15        before I do that I'm going show you an exhibit --

16          MS. ANDERSON:  May I approach the witness, your Honor?

17          THE COURT:  Yes.

18   BY MS. ANDERSON:

19   Q    Detective Paul, that's Government's Exhibit Number 316,

20        which has already been admitted.

21          I'm going call your attention to the drivers license

22        for Ms. Hovey, and my question is the ID of Kalyn, is it for

23        a person under the age of 21?

24   A    Yes, it is.

25          THE COURT:  All right.  Any additional questions from

1    the jury for this witness, or any follow-up questions from

2    counsel?

3              All right, may this witness step down and be excused?

4              MS. ANDERSON:  Yes, your Honor.

5              THE COURT:  All right.

6              Thank you, sir.  You may step down and be excused.

7                    -------------------------

8              (Kalyn Hovey was duly sworn by the clerk.)

9                          KALYN HOVEY

10                      DIRECT EXAMINATION

11   BY MS. ANDERSON:

12   Q    Ms -- is it Hovey or Hovey?

13   A    Hovey.

14   Q    Hovey.  Do you go to school, or do you work here in town?

15   A    I work in Tucson, yes, at the Splendido.

16   Q    I'm sorry?

17   A    At Splendido.

18   Q    Let's back up just a little bit.  Did you grow up here in

19        Tucson?

20   A    Yes.

21   Q    All right, and did you graduate from high school here in

22        Tucson?

23   A    Yes.

24   Q    What school?

25   A    Mountain View High School.

1    Q    What year did you graduate?

2    A    2004.

3    Q    At some time did you go to school beyond what you already

4         obtained in high school?

5    A    Yes.

6    Q    Where did you go?

7    A    I attended Scottsdale Community College, Pima Community

8         College, and Caregiver Training Institute.

9    Q    Could you tell us about Caregiver Training Institute?

10   A    Yes.  It's a program here in Tucson which offers your

11        certified nursing assistant's license, and your caregiver's

12        certificate.  It's a dual certification program.  I did the

13        ten week program that they offered.  Started in January of

14        this year, and ended in March of this year.

15   Q    And did you get your certification?

16   A    I graduated, yes, and completed.

17   Q    And you were telling us that you worked in a couple

18        different places, correct?

19   A    Um-um.

20   Q    And you mentioned Splendido?

21   A    Splendido at Rancho Vistoso.

22   Q    Could you tell us what that is?

23   A    It's a retirement home which includes assisted living and

24        skilled nursing facility.

25   Q    What where do work in the facility?

1    A    Currently, a server.

2    Q    Like, in the kitchen or dining room?

3    A    In the kitchen, mainly just for the skilled nursing area.

4    Q    Okay, and how long have you worked there?

5    A    It would be a year and five months.

6    Q    All right.  And do you work somewhere in addition to

7         Splendido?

8    A    Yes.  I'm employed through Precision Shooting Equipment.

9    Q    And what do you -- what kind of a business is that?

10   A    It's an archery.  It's PSE archery.  I work for the

11        cofounder at his own home exercising his horses.

12   Q    Okay.  And how -- how often do you exercise his horses?

13   A    About three or four times a week for about three hours day.

14   Q    So total how many hours do you work a week?

15   A    About 12 to 15.

16   Q    Okay.

17   A    Just that job.

18   Q    At -- at some point in time were you involved in a car

19        accident in 2005?

20   A    Yes.

21   Q    Was that in October?

22   A    Yes, October 22nd, 2005.

23   Q    Okay, and was that one car accident, or a two car accident?

24   A    One car, myself.

25   Q    Do you remember where you were when you had the accident?

1   A    I don't know the exact address, but it was the west side of
2        I-10 or El Camino Del Cerro.
3   Q    Do you recall what time of the day it was?
4   A    It was about 2:30 a.m.
5   Q    All right.  Now, with you in the car, you had some of your
6        personal possessions, did you not?
7   A    I did.
8   Q    What did you have?
9   A    My purse, some CD's, whatnot.  Inside my purse was my
10       cellphone, my wallet, and miscellaneous items, lip gloss and
11       whatnot.
12  Q    What kind of wallet did you have, do you recall?
13  A    I had a black and orange leopard print wallet.
14  Q    Okay.  And inside your wallet do you recall what you had?
15  A    My drivers license, my AAA card, photos of my friends, my
16       Social Security card.  That's all I can recall.
17  Q    Now, you were transported from the accident scene to the
18       hospital, is that correct?
19  A    Yes, to UMC Hospital.
20  Q    And when you woke up the next day, did you have your purse?
21  A    My purse, yes.
22  Q    How about your wallet?
23  A    No.
24  Q    You didn't have your wallet?
25  A    No.

1    Q    Did you ever see your wallet again?

2    A    No.

3    Q    Did you ever see the contents of your wallet again?

4    A    No.

5    Q    How about your cellphone that was in your purse?

6    A    I had my cellphone, yes.

7    Q    Was your wallet the only thing that was missing?

8    A    Yes.

9             MS. ANDERSON:  May I approach the witness, your Honor?

10            THE COURT:  Yes.

11   BY MS. ANDERSON:

12   Q    This is Government's Exhibit Number 316, which is a baggy

13        which contains numerous items.  I'm going to -- actually,

14        this is already admitted, so I'm going to open up the

15        exhibit?

16            MS. ANDERSON:  Could I have a pair of scissors?

17            Thank you.

18            May I approach the witness again?

19            THE COURT:  Yes.

20            MS. ANDERSON:  I'll clean that up.  I promise.

21            THE COURT:  Clean that later.

22   BY MS. ANDERSON:

23   Q    We're going to look at these contents -- the contents of

24        this bag here.

25   A    Okay.

```
 1   Q   And I'm going to spread them out here in front of you, and
 2       all of these contents have been admitted into evidence.
 3           Now, do you recognize some of these items here?
 4   A   Some of them, yes.
 5   Q   Okay.  Let's go through them one-by-one.
 6           Could you point to the documents that you recognize --
 7       I'm going to get the handheld microphone, if I could.
 8           Thank you.
 9           Let's go over these documents one-by-one.
10           Could you point to the first document that you
11       recognize?
12           Okay, and for the record, that's an Arizona drivers
13       license.  The number is DO1694628, correct?
14   A   Yes.
15   Q   Okay.  And is that your drivers license?
16   A   Yes.
17   Q   Is that the picture of you on that drivers license?
18   A   (No verbal response.)
19   Q   Is that the drivers license that was in your wallet just at
20       the time of the accident?
21   A   Yes.
22   Q   All right.  Next is a photograph of a -- two of your
23       friends?
24   A   That's my best friend, and her date.
25   Q   Okay, a personal picture of two friends of yours, correct?
```

```
 1   A    Yes.

 2   Q    And it looks like they're dancing?

 3   A    They're at the prom.

 4   Q    Okay.  And was that in your wallet at the time of your

 5        accident?

 6   A    Yes.

 7   Q    Okay.  We'll put that off to the side.

 8        Do you see any other items that you recognize?

 9   A    The AAA card.

10   Q    Okay a AAA gold card, and who's the name of the subscriber?

11   A    Kalyn.

12   Q    Kalyn -- that's you correct?

13   A    Yeah.

14   Q    So that was your AAA card?

15   A    Yes.

16   Q    And that was in your wallet at the time?

17   A    Yes.

18   Q    Any other photos or items?

19   A    These two here.  Not this but, these two.

20   Q    Okay.  Next is a Visa card, and it's in whose name?

21   A    Kalyn.  Mine.

22   Q    Your name, correct?

23   A    Um-um.

24   Q    Okay, and that was in your wallet again?

25   A    Yes.
```

1    Q    And finally, there's another picture of a female?

2    A    Yes, that's my friend Leesa.

3    Q    Okay, we've got Leesa's picture here?

4    A    Uh-huh.

5    Q    And that also was in your wallet?

6    A    Yes.

7    Q    Okay.  We'll put that off to the side.

8    A    I don't know -- I don't -- I'm not positive if this is mine.

9         That's about it.

10   Q    Okay, so you don't recognize any other of the photographs?

11   A    No.

12   Q    Thank you.

13   A    Um-um.

14        MS. ANDERSON:  Could I use the ELMO?

15        THE COURT:  Yes.

16   BY MS. ANDERSON:

17   Q    Okay, here's the first one, which is your Visa card, is that

18        correct -- let me see if I can do this.

19   A    Yes.

20   Q    Okay, there's your name, Kalyn Hovey, correct?

21   A    Yes.

22   Q    Okay.  Next is your friend Leesa?

23   A    Yes.

24   Q    Here's your AAA card, correct?

25   A    Yes.

```
1    Q    Here's your drivers license?

2    A    Yes.

3    Q    And here's your friend and her boyfriend at the prom?

4    A    Yes.

5    Q    All right, thank you.

6              I'm going to ask you the names of some individuals, and

7         could you let me know if you recognize the names of these

8         people.

9    A    Okay.

10   Q    Do you know an individual by the name of Ron Van Brocklin?

11   A    No.

12   Q    How about Ron Van Brockyn, B-R-O-C-K-Y-N?

13   A    No.

14   Q    Do you know that individual?

15   A    No.

16   Q    Do you know Todd Fries?

17   A    No.

18   Q    Burns Power Washing?

19   A    No.

20   Q    How about Myles or Karen Levine?

21   A    No.

22   Q    Have you ever been to 5372 West Tear Blanket Drive --

23   A    No.

24   Q    -- in Marana?

25   A    Uh-uh.   No.
```

```
 1   Q    Dove Mountain?

 2   A    No.

 3   Q    Do you know where Dove Mountain is?

 4   A    I know were it's at, but I've never been there.

 5   Q    How about Richard Andrade?

 6   A    No.

 7   Q    What's your dad's name?

 8   A    Dan Hovey.

 9   Q    Dan?

10   A    (No verbal response.)

11   Q    Were you ever at the home of Karen and Myles Levine on the

12        night of October 31st, 2008 --

13   A    No.

14   Q    -- into the morning of November 1st --

15   A    No.

16   Q    -- 2008?

17   A    Nope.

18   Q    Do you recall where you were that night?

19   A    I do not.

20   Q    But you don't know those people?

21   A    I don't know those people.

22   Q    On November 3rd, 2008 did you ever call Marana PD and speak

23        with a Detective Paul?

24   A    No.

25   Q    Do you recall doing that?
```

```
1    A    No.
2    Q    I'm going to play a tape for you, and I'm going ask you if
3         you recognize the voice on --
4    A    Okay.
5    Q    -- the tape.
6              THE COURT:  And just for the record, that's Exhibit
7    Number --
8              MS. ANDERSON:  73, your Honor.
9              THE COURT:  73.
10             MS. ANDERSON:  If we could have a couple of minutes of
11   that tape played?
12             THE COURT:  Yes.
13   BY MS. ANDERSON:
14   Q    I'm going to ask you to listen to the voice?
15             (Exhibit Number 73 was played.)
16             MS. ANDERSON:  Could we stop it right there?
17   BY MS. ANDERSON:
18   Q    Did you hear that?
19   A    Um-um.
20   Q    You heard a voice that said my name is Kalyn Hovey?
21   A    Right.
22   Q    Did you hear that?
23   A    I did.
24   Q    Was that you?
25   A    No.
```

1    Q    That wasn't your voice?

2    A    Nope.

3              MS. ANDERSON:  May I have just a moment, your Honor?

4              THE COURT:  Yes.

5              MS. ANDERSON:  May I approach?

6              THE COURT:  Yes.

7    BY MS. ANDERSON:

8    Q    This is Government's Exhibit Number 317.

9              Do you recognize that?

10   A    No.

11   Q    Let me turn it over for you.

12             You don't recognize that at all?

13   A    No.

14   Q    Here's another photograph that was in the contents of the --

15        of the baggy.

16             You don't recognize the people in that photo, do you?

17   A    No.

18             MS. ANDERSON:  Could I have the ELMO up again, please?

19             Thank you.

20   BY MS. ANDERSON:

21   Q    Here's the photograph that's already been admitted, but you

22        don't recognize the folks in that photo, do you?

23   A    No.

24   Q    At some point in time did you meet with Detective Paul from

25        Marana PD?

1    A    I did.

2    Q    Do you recall the date of that?

3    A    I don't.

4    Q    If I told you November 1st, 2008, would that refresh your --

5         your memory?

6    A    I -- I don't remember the day.  I just remember which job he

7         came to, to speak with me.

8    Q    And did you go to meet him somewhere?

9    A    He came to my work.

10   Q    And did the two of you talk about the fact that your

11        personal possessions had been found at -- at the scene of an

12        attack in Dove Mountain --

13   A    Yes.

14   Q    -- previously?

15   A    Um-um.

16   Q    And he asked you some questions regarding the circumstances

17        under which your -- your purse -- or your wallet was stolen,

18        isn't that correct?

19   A    Yes.

20   Q    I'm going to ask you to look around the courtroom here

21        today.

22             Do you -- do you see anybody here in the courtroom that

23        you recognize?

24   A    Maybe the woman -- the two women in the back.  I think they

25        may look like customers.  I don't know if you guys had ever

```
 1          come into -- they have familiar faces, but I think -- I
 2          don't know their names.
 3   Q      Customers of --
 4   A      Risky Business, when I worked there.
 5   Q      Okay, which Risky Business did you work at?
 6   A      In Oro Valley, when it was open.
 7   Q      How about the people from the -- from the benches up here
 8          forward.  Do you recognize anybody?
 9   A      No.
10              MS. ANDERSON:  That's all I have, Judge.
11          Thank you.
12              THE COURT:  All right.
13          Cross-examination?
14                          CROSS-EXAMINATION
15   BY MR. BOCK:
16   Q      Now, you had this car accident on October 21st, 2005?
17   A      October 22nd, 2005.
18   Q      And that date sticks out in your mind because of the
19          accident?
20   A      Yes.
21   Q      Now, I read your statement that you gave to the detective,
22          and you said you'd been to a couple parties?
23   A      Uh-huh.
24   Q      I'm assuming that there was no alcohol at the parties, is
25          that correct?
```

```
1   A     No, there was alcohol.

2   Q     Was this accident alcohol related --

3   A     Yes.

4   Q     -- or -- okay.  Did you get prosecuted for this?

5   A     I did.

6   Q     Draw blood -- they drew blood from you?

7   A     Yes.

8              MS. ANDERSON:  Objection, relevancy, your Honor.

9              THE COURT:  Yes.  Can I see counsel at sidebar, please?

10                         BENCH CONFERENCE

11             THE COURT:  So how much further are you going?

12             MR. BOCK:  That was it.

13             THE COURT:  That was it?  Okay, moving on?

14             MR. BOCK:  As soon as we came up here -- that was it.

15             THE COURT:  Okay, you're done.  Great.

16             MR. BOCK:  Oh Judge, could I ask her what her blood

17   alcohol was?

18             MS. ANDERSON:  No.

19             MR. PIMSNER:  It's not relevant.  The conviction wasn't

20   relevant.  It's not impeachment.

21             MR. BOCK:  Yeah, you don't -- she had a lot of alcohol.

22             THE COURT:  The answer is no to that question.  You

23   can't ask her alcohol level.

24             (The bench conference was concluded.)

25   BY MR. BOCK:
```

```
 1   Q    All right.  Now, what was the dynamics of the alcohol -- I
 2        didn't mean that.  I meant to say the accident.  What was
 3        the dynamics of the accident?
 4             MS. ANDERSON:  Objection, relevancy.
 5             THE COURT:  No, go ahead, ma'am.  You can answer that
 6   if you know.
 7   BY MR. BOCK:
 8   Q    Did you strike something, or --
 9   A    A telephone pole.
10   Q    The front of the car?
11   A    Yeah, the right.
12   Q    Now -- and this was about 3:00 in the morning?
13   A    Um-um.  Yes.
14   Q    And you're certain you had your purse with you at that time?
15   A    Yes.
16   Q    No question in your mind?
17   A    Right.
18   Q    And what type of vehicle was this?
19   A    94 Nissan Sentra.
20   Q    And would this have had bench seats, or would this --
21   A    It was a four door.
22   Q    It was a four door?
23   A    Uh-huh.
24   Q    And the seats in the front of the vehicle, were they
25        bench --
```

```
 1   A     Separated.

 2   Q     -- separate --

 3            MS. ANDERSON:  Objection, relevancy.

 4            THE COURT:  Well, I'm not sure -- I'll allow the

 5   questioning.

 6            Go ahead, Mr. Bock.  So they were separated.

 7            MR. BOCK:  I'm trying to establish where the purse was.

 8            THE COURT:  All right.

 9            THE WITNESS:  It was right next to my seat.

10   BY MR. BOCK:

11   Q     Next to your seat.  Is there a console between the seats?

12   A     Just a little space where the emergency brake is.

13   Q     Okay.  Now, do you know when your car was -- do you have

14         any -- did anyone tell you -- or did your insurance company

15         or anybody tell you when your car was removed from the

16         scene?

17   A     The next -- I think the night of, I believe.

18   Q     Okay, were there police there right away?

19   A     As soon as the accident happened, there was police.

20   Q     Police?

21   A     Um-um.

22   Q     And --

23   A     An ambulance.

24   Q     -- an ambulance.  And then your car was -- was there?

25   A     Um-um.
```

1    Q    Was there a police presence around your car?

2    A    Yes.

3    Q    Okay.  So do you have any idea how your purse was removed

4         from your car?

5    A    I assumed that the police took it, because it was with me

6         the next morning at the hospital.

7    Q    Okay.  At the hospital the next morning?

8    A    Um-um.

9    Q    Was your wallet still with you?

10   A    No.

11   Q    So your wallet was removed from your purse.  Are you

12        assuming that it was removed from your purse after the

13        accident?

14   A    I can't recall.

15   Q    So you think it might have been lost before the accident?

16   A    Possibly.

17   Q    So tell me where you were subsequent to the accident/what

18        locations you were at.

19   A    Before?

20   Q    Yes.

21   A    The last place I was at before the accident was at my

22        friend's house on Old Father.

23   Q    Old Father.

24   A    Uh-huh.

25   Q    Do you remember having your wallet and your license?

1   A      Um—um.

2   Q      And do you remember having it with you at that point in

3          time?

4   A      Uh-huh.

5   Q      Okay.

6              THE COURT:  You have to say yes, ma'am.

7              THE WITNESS:  Yes.

8              THE COURT:  Thank you.

9   BY MR. BOCK:

10  Q      Okay, and how -- what's your -- how do you remember that?

11  A      I just know I had it -- my purse.  I guess I can't remember

12         if my wallet was in my purse or not.  I didn't double check,

13         but I know I had my purse with me all night.

14  Q      And the place before your friend's house at Old Father,

15         where was that at?

16  A      We were at a party downtown.  I can't recall the exact

17         address.

18  Q      Okay, and your wallet would have been in your purse at that

19         time?

20  A      Yes.

21  Q      Would you have left your purse unattended, perhaps?

22  A      No.

23  Q      You think your wallet might have been removed when you were

24         downtown?

25  A      Possibly.

| | | |
|---|---|---|
| 1 | Q | Okay.  If you say you weren't -- how could that have -- |
| 2 | | what -- did you leave your purse, or how do you think the |
| 3 | | dynamics of that might have occurred? |
| 4 | A | I can't recall.  I just know that my wallet is always in my |
| 5 | | purse, and I always had my purse with me that night. |
| 6 | Q | Okay, so your wallet could have been removed at the scene |
| 7 | | from your purse? |
| 8 | A | Right. |
| 9 | Q | It could have been removed at your friend's house at Old |
| 10 | | Father? |
| 11 | A | Right.  I called them the next morning, and they didn't have |
| 12 | | it. |
| 13 | Q | But that's probably pretty unlikely, because they're your |
| 14 | | friends? |
| 15 | A | Right. |
| 16 | Q | And it could have been removed when you're downtown with a |
| 17 | | lot of different people? |
| 18 | A | Possibly. |
| 19 | Q | Okay.  And prior to being downtown, where were you before |
| 20 | | then? |
| 21 | A | Home, getting ready. |
| 22 | Q | Okay, and you're sure you had your wallet -- |
| 23 | A | Yes. |
| 24 | Q | -- and your identification at that point in time? |
| 25 | A | Yes. |

```
1    Q    And what was the name of the -- do you remember the name of
2         the establishment you were when you were downtown?
3    A    Just a frat party from the college, bunch of college people.
4    Q    Was it at a -- is it a downtown establishment, or was it --
5    A    It was somebody's house.
6    Q    Oh, was it a frat house?
7    A    Not a frat house, just a frat member, I believe.
8    Q    How many people were there?
9              MS. ANDERSON:  Judge, I'm going to object.  This is --
10   it's irrelevant.
11             THE COURT:  Well, no.  Overruled.
12             Go ahead.  You can answer that question.
13             THE WITNESS:  I would remember about 50 or so.
14             MR. BOCK:  50 people.
15             Okay.  Thank you, Judge.
16             THE COURT:  All right.
17             Any redirect?
18             MS. ANDERSON:  No, your Honor.
19             THE COURT:  All right.
20             Any questions from the jury for this witness?
21             All right, Ms. Anderson, may this witness step down and
22   be excused?
23             MS. ANDERSON:  Yes, your Honor.
24             THE COURT:  Thank you, ma'am.  You may step down and be
25   excused.
```

```
 1                    ------------------------
 2            (Chavar Dollard was duly sworn by the clerk.)
 3                          CHAVAR DOLLARD
 4                        DIRECT EXAMINATION
 5    BY MR. PIMSNER:
 6    Q    And Mr. Dollard, are you a special agent with the F.B.I.?
 7    A    Yes, I am.
 8    Q    And how long have you been with the F.B.I.?
 9    A    I've been with the F.B.I. two years.
10    Q    Okay, and where are you currently stationed?
11    A    Tucson, Arizona.
12    Q    And was that your first station out of the academy?
13    A    Yes.
14    Q    And as part of your training as an F.B.I. agent, do you get
15         trained in taking fingerprints from individuals?
16    A    Yes, we do.
17    Q    And as part of being a -- one of the newer agents, is that a
18         task that you get asked to do on occasion?
19    A    Yes, it is.
20    Q    And let me bring your attention back to May of 2011.  Were
21         you aware that Mr. Fries was pending charges for a case
22         involving a chemical -- alleged chemical weapon?
23    A    Yes, I was.
24    Q    And were you involved in the process -- in processing the
25         defendant at that time?
```

1    A    Yes.

2    Q    And what -- do you recall the date that was?

3    A    Yes, I do.

4    Q    Okay, what date was that?

5    A    It was May 13th, 2011.

6    Q    Now, did that processing include transporting Mr. Fries to

7         the F.B.I. office located in Tucson?

8    A    Yes, it did.

9    Q    And do you -- and at the F.B.I. office, what type of

10        information did you get from Mr. Fries?

11   A    I took biographical data, which would include name, height,

12        weight, birthdate, location of where he lives, things of

13        that nature.

14   Q    Okay, so basically just general information regarding his --

15        his background, correct?

16   A    Yes, that is correct.

17   Q    Okay.  Now, as part of that biographical data that you would

18        have taken, did you have an opportunity to take prints from

19        Mr. Fries?

20   A    Yes, I did.

21             MR. PIMSNER:  And if I could approach the witness, your

22   Honor?

23             THE COURT:  Yes.

24             MR. BOCK:  Judge, we'll stipulate to this, and no

25   objection to the admission of the -- no objection to the

1    admission of the --

2              THE COURT:  Of the proposed exhibit?  All right.

3              MR. PIMSNER:  I just have a couple of questions for the

4    witness, though, I'd like to follow-up on, your Honor.

5              THE COURT:  Yes, go ahead.

6    BY MR. PIMSNER:

7    Q    Now, do you recognize that exhibit?

8    A    Yes, I do.

9    Q    And are those -- what does that exhibit represent?

10   A    This exhibit represents a fingerprint card.

11   Q    And who does it belong to?

12   A    It belongs to Todd Fries.

13   Q    And did you actually roll those prints yourself with

14        Mr. Fries?

15   A    Yes, I did.

16   Q    And what does that mean, rolling prints?

17   A    Rolling prints means I put ink on Mr. Fries' hands, and I

18        printed his fingerprints.  So you actually take it and you

19        roll it from left to right to create an imprint on the

20        fingerprint card.

21             MR. PIMSNER:  And is that admissible at this point,

22   your Honor?

23             THE COURT:  Yes.

24             MR. PIMSNER:  Thank you.

25             THE COURT:  And that's Exhibit Number?

```
1              MR. PIMSNER:  71, I believe.

2              THE WITNESS:  Yes.

3              MR. PIMSNER:  71.

4              THE COURT:  All right, 71 is admitted into evidence.

5    BY MR. PIMSNER:

6    Q    And this is -- are these the original fingerprints that you

7         rolled back on May 13th, 2011?

8    A    Yes, they are.

9    Q    And is that the name -- the name of Todd Russell Fries, or

10        Fries?

11   A    Yes, it is.

12   Q    With a date of birth of March 16th, 1963?

13   A    Yes, that is correct.

14   Q    And would you have signed the back of that card --

15   A    Yes, I did.

16   Q    -- as the person responsible for taking the fingerprints?

17   A    Yes.

18   Q    And do you see the person in the courtroom today that you

19        actually took these fingerprints from back on May 13th,

20        2011?

21   A    Yes, I do.

22   Q    Could you point to where he is sitting, and describe --

23   A    The gentleman right there.

24   Q    -- what he's wearing, please?

25   A    He's wearing a blue jacket, white shirt, and stripped tie.
```

```
 1           MR. PIMSNER:  May the record reflect the identification
 2    of the defendant, your Honor?
 3           THE COURT:  Yes, the record may so reflect.
 4           MR. PIMSNER:  That's all I have.
 5           THE COURT:  Any cross-examination?
 6           MR. BOCK:  Briefly.
 7                        CROSS-EXAMINATION
 8    BY MR. BOCK:
 9    Q    Is it possible that he lives at 50 -- 5560 West El Camino?
10    A    Is it possible, sir?
11    Q    Yes.  Do you know that street to run east/west rather than
12         north/south?
13    A    I've only been to that location one time.
14    Q    Okay.  And do you remember if you -- do you remember when
15         you printed him that he -- that he had a work shirt on?
16         Does that -- do you remember that?
17    A    Yes, I do.
18    Q    And do you remember it said Burns Power Washing?
19    A    I don't recall what it said exactly.
20    Q    But you remember a work shirt with a logo?
21    A    Yes, I do.
22    Q    And he was cooperative, was he not?
23    A    Yes.
24           MR. BOCK:  Okay.  Thank you, sir.
25           THE COURT:  Any redirect?
```

 1               MR. PIMSNER:  No, your Honor.

 2               THE COURT:  Any questions from the jury for this

 3     witness?

 4               All right, may this witness step down and be excused?

 5               MR. PIMSNER:  Yes, your Honor.  Thank you.

 6               THE COURT:  Thank you, sir.  You may step down and be

 7     excused.

 8               THE WITNESS:  Thank you, ma'am.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2              I, Mary A. Riley, do hereby certify that I

3    stenographically reported the foregoing proceedings to the best

4    of my skill and ability, and that the same was transcribed by me

5    via computer-aided transcription, and that the foregoing pages of

6    typewritten matter are a true, correct and complete transcript of

7    all the proceedings had, as set forth in the title page hereto.

8              Dated this 15th day of April, 2013.

9

10                                      s/ Mary A. Riley

11                                 United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25