1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3    ----------------------------)
                                 )
4                                )
     UNITED STATES OF AMERICA,   )
5                    Plaintiff,  ) No. CA 13-10116 9th Circuit
                                 )
6              vs.               ) No. CR 11-01751 TUC-CKJ
                                 )
7                                )     Tucson, Arizona
     TODD FRIES,                 )     September 20, 2012
8                    Defendant.  )
                                 )
9    ----------------------------)

10                    TRANSCRIPT OF TESTIMONY
                     JURY TRIAL DAY THREE
11
             BEFORE THE HONORABLE CINDY K. JORGENSON
12              UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15
     For the Plaintiff:    By:  Beverly K. Anderson, and
16                              David A. Pimsner
                                U.S. Attorney's Office
17                              405 W. Congress St., Suite 4800
                                Tucson, AZ   85701
18
     For the Defendant:    By:  Richard C. Bock
19                              100 N. Stone Ave., Suite 801
                                Tucson, AZ   85701
20

21
     Mary A. Riley, RMR, FCRR
22   United States Court Reporter
     U.S. District Court
23   405 W. Congress St.
     Tucson, AZ   85750
24

25        Proceedings produced by computer-aided transcription

1                           INDEX OF TESTIMONY

2

3

4    JOHN JOLLY

5    Direct Examination by Mr. Pimsner        Page    4

6    Cross-Examination by Mr. Bock            Page   21

7    Redirect Examination by Mr. Pimsner      Page   29

8

9    STEPHEN CARPENTER

10   Direct Examination by Mr. Pimsner        Page   30

11   Cross-Examination by Mr. Bock            Page   51

12   Redirect Examination by Mr. Pimsner      Page   57

13

14   FRANK WALTER, M.D.

15   Direct Examination by Ms. Anderson       Page   58

16   Cross-Examination by Mr. Bock            Page   84

17   Redirect Examination by Ms. Anderson     Page  103

18   Recross Examination by Mr. Bock          Page  110

19   JURY QUESTION

20   Examination by Ms. Anderson              Page  112

21   Examination by Mr. Bock                  Page  113

22

23   CHRISTOPHER MCCRACKEN

24   Direct Examination by Mr. Pimsner        Page  115

25   Cross-Examination by Mr. Bock            Page  130

Redirect Examination by Mr. Pimsner      Page 136

JURY QUESTION

Examination by Mr. Pimsner              Page 141, 143

Examination by Mr. Bock                 Page 142


RYAN O'CONNOR

Direct Examination by Ms. Anderson      Page 144


DONALD ANDERSON

Direct Examination by Ms. Anderson      Page 152

Cross-Examination by Mr. Bock           Page 158


BERT RUCKER

Direct Examination by Mr. Pimsner       Page 159

Cross-Examination by Mr. Bock           Page 182

Redirect Examination by Mr. Pimsner     Page 191

Recross Examination by Mr. Bock         Page 203

JURY QUESTION

Examination by Mr. Pimsner              Page 204

Examination by Mr. Bock                 Page 206


LEVI CRANFORD

Direct Examination by Mr. Pimsner       Page 208

Cross-Examination by Mr. Bock           Page 235

TRANSCRIPT OF PROCEEDINGS

(John Jolly was duly sworn by the clerk.)

JOHN JOLLY

DIRECT EXAMINATION

BY MR. PIMSNER:

Q     And Mr. Jolly, are you currently employed?

A     Yes, I am.

Q     By whom?

A     I'm currently employed by a private firm called Ideal
      Innovations Incorporated.  They are a contract firm that
      does Department of Defense contract work in the forensics
      field in a number of areas throughout the world.  I also am
      what is called an intermittent employee at DPS.  The reason
      I have that intermittent status is I retired from full time
      employment with the department back in November of 2010, and
      when we work in the crime laboratory in order to accommodate
      ongoing court cases and things like that, we typically are
      granted that intermittent status.

Q     Just briefly about your current employment, it has to do
      with forensics, correct?

A     Yes, it does.  My employment with Ideal Innovations involves
      a number of different projects.  My first project was in
      West Virginia from November of 2010 to about March of 2011.
      We dealt with digital imaging of internationally submitted
      latent print images from different locations throughout the

1       world.  We processed those images, searched them -- through

2       a number of databases searched them, made a number of

3       evaluations, submitted them to the reporting agency.  My

4       most recent assignment I was in Kabul, Afghanistan for about

5       six weeks.  I've been back five months now.  My position was

6       as an analyst support manager.  That position includes a

7       number of things.  I had oversight and training of the

8       employees.  My specialty there is in fingerprints, in latent

9       prints.  The system in Afghanistan also involves facial

10      recognition and iris recognition.  As part of that manager

11      position I also had oversight of the program audits, program

12      reviews, program enhancements and changes, and things like

13      that.

14  Q   And -- and so -- but a significant part of your work, at

15      least your last assignment, had to do with training

16      regarding the use of fingerprint techniques, that type of

17      information?

18  A   Yes, it did.

19  Q   And is it fair to say that the majority of your career was

20      spent as a latent printed examiner?

21  A   Yes, it is.

22  Q   And just briefly, when did you first become a latent print

23      examiner?

24  A   My initial involvement as a latent print examiner actually

25      began in January of 1981 when I was promoted at the Phoenix

1      Police Department to a police identification technician

2      training or training position, which was about a two year

3      apprenticeship program.  We learned -- I learned crime scene

4      photograph response evidence recognition collection

5      preservation latent print processes comparison techniques

6      things along those lines.  I was with the Phoenix Police

7      Department a total of seven and a half years.  The last four

8      and a half were either the identification technician

9      trainee, or I promoted to the police identification

10     technician position.

11  Q   Now, did you leave the Phoenix Police Department and become

12     employed, then, at the Arizona Department of Public Safety?

13  A   Yes, I did.  In October of 1985 I accepted appointment with

14     the Department of Public Safety as a latent print examiner,

15     attended a broad range of latent print specific schools over

16     the 25 or 26 years I was there, and retired as a latent

17     print examiner with the department.

18  Q   And did you receive any type of certification when you began

19     as a latent print examiner for the Department of Public

20     Safety?

21  A   The Department of Public Safety for the latent print

22     examiner position requires latent print examiner

23     certification by the International Association for

24     Identification.  I was certified under that program in the

25     early part of 1988, I believe.

1    Q    And what does that -- and have you maintained that

2         certification over the years?

3    A    Yes.

4    Q    And what does that -- what are the requirements to maintain

5         the certification through that organization?

6    A    The requirements to maintain that ongoing certification

7         include ongoing training requirements, ongoing case work,

8         ongoing court testimony, and at the time of recertification

9         there's actually a proficiency comparison test which is

10        given.

11   Q    And when you worked for DPS, what were your general duties?

12   A    As a latent print examiner with the Department of Public

13        Safety, the latent print examiner position duties included a

14        fairly broad range of things.  We would respond to crime

15        scenes when requested to assist the investigator mainly in

16        the forensic area.  My area of specialization, again, is

17        latent prints and fingerprints, so we would assist them with

18        evidence recognition and submission at the crime scene.  We

19        would also process those crime scenes and evidence items for

20        latent print evidence.  We would compare that latent print

21        evidence to known prints of individuals that needed to be

22        compared.  We would do automated system searches and things

23        along those lines.  In the laboratory environment at DPS we

24        would do essentially the same thing, only it was housed in a

25        laboratory environment as opposed to the remote scene

1        location.

2    Q   Now, you have had an occasion to testify in court regarding

3        fingerprint comparisons that you've made?

4    A   Yes, I have.  In Arizona I've testified in U.S -- United

5        States District Courts both in Tucson and Phoenix.  I've

6        testified dozens of times in the superior court systems of 7

7        of the 15 counties in Arizona.  In California I've testified

8        in Los Angeles County Superior Court, and San Bernadino

9        County Superior Court.

10   Q   Now -- so have you had occasion during your career to

11       identify a -- an individual by comparing a latent

12       fingerprint to a known fingerprint of that individual?

13   A   Yes.

14   Q   Has that been on numerous occasions?

15   A   Yes.  We don't keep statistics on that type of work that we

16       do.  I have over my career compared literally thousands of

17       latent prints and known prints.  I've made multiple hundreds

18       of identifications.

19   Q   Now, could tell us what is a known inked print, or an inked

20       print?

21   A   A known print or an inked print is a recording of the

22       friction ridge detail normally on the fingers, or sometimes

23       the palms, or sometimes the feet if we have latents along

24       those lines.  The recording of that ridge detail on the

25       fingers is typically made one of two ways -- or one of

1       several ways.  We can use an inking method where fingerprint

2       ink is applied to that finger and then the finger is rolled

3       onto a fingerprint card.  The other method that is -- is now

4       in use is what's known as a Live Scan, or a computer

5       capture.  That's where a finger is either rolled across a

6       glass platen that has a camera under it, or it's placed on

7       the glass and the camera scans that ridge detail.  And then

8       that can either be printed out on an actual fingerprint

9       card, or it can go into an electronic database.

10      Fingerprints -- known prints are typically complete

11      recordings of that ridge detail.  They're not fragmentary.

12      They're not partial.  Typically, they're taken under

13      controlled circumstances, and normally they're taken for

14      either record keeping purposes, or comparison to something.

15  Q   And so inked prints are basically taken, as you said, by

16      someone of an individual where their -- actually, there's

17      ink placed on their finger, and a complete impression is

18      made on, say, a card?

19  A   That's correct.

20  Q   Now, what is a latent print?

21  A   A latent print is also a recording of that friction ridge

22      detail.  Latent prints are usually made by a transfer of

23      perspiration, salts, amino acids, other contaminates,

24      various body oils from that ridge detail to an object when

25      it is touched.  Kind of like a rubber stamp where you have

1    ink on it, and when you place that stamp on an object, you

2    usually have a transfer of that -- that stamp to the item.

3    Latent prints tend to be fragmentary or partial impressions.

4    They're subject to smudging and things like that.  They are

5    typically left under controlled circumstances.  Latent

6    prints are normally invisible and need to be developed with

7    some method to make them visible so they can be lifted, or

8    they can be photographed and then worked with later on.

9    Q    Now, the types of ways you would lift an unknown latent

10   print, are they -- do they vary?

11   A    Within the realm of latent print processing, there are three

12   basic types of surfaces that we work with.  There's a porous

13   surface, such as a document, piece of paper, piece of raw

14   wood where the print residue is actually absorbed into the

15   item, much like water going into a sponge.  With a porous

16   surface, that would normally be processed probably in a

17   laboratory environment with a liquid chemical that is also

18   absorbed into that item and reacts with that latent print

19   deposit that way.

20        With a non-porous item, which is where water tends to

21   not absorb into it much like the top of the witness stand

22   here -- with a non-porous surface the print residue resides

23   on top of the surface.  Normally, that type of surface could

24   be processed with either a powdering technique of some sort.

25   It could be processed with what we call a super glue process

1    which is where super glue is vaporized in a chamber along

2    with a evidence item in a chamber.  The fumes react with the

3    moisture content of the print residue, and then that can be

4    photographed, or it can be powdered, or you can apply a dye

5    stain to that glue deposit.  The third type of surface we

6    encounter has characteristic of both the porous and

7    non-porous.  Some examples of that would be some matchbook

8    covers, some magazines, reading magazines, the Kleenex box

9    up here on the counter.  What happens in those situations is

10   there can be a combination of the print residing on the

11   surface where that would be powdered or probably super glued

12   first, and then we would use a liquid chemical which would

13   be absorbed into the item so it would react with anything

14   that had been absorbed into that item.  So depending upon

15   the surface type, there's a vast array of different

16   procedures we can use.

17 Q  Now, based on your training and experience, would you agree

18    that a metal paint can would qualify as a non-porous type

19    surface?

20 A  Yes, I would agree with that.

21 Q  And as such, is the powdering technique an acceptable method

22    to lift latent prints?

23 A  Yes.  A powdering technique is acceptable for that type of

24    surface.

25 Q  Is it also a common method for pulling those type of

1        latents?

2    A    Probably.

3    Q    Now, what is the -- what are the basic factors in the use of

4        fingerprints as a means of identification?

5    A    There are two basic factors that we rely on in fingerprint

6        identification.  One is the uniqueness of that skin.  And as

7        the friction skin develops during pregnancy, the first

8        trimester through the biological differential growth

9        process, that skin breaks apart, grows together, fuses

10       together, and that forms the unique features that are unique

11       to each individual.  That growth process finishes about the

12       end of the first trimester, and at birth your fingerprints

13       are fully formed.

14           The second principle we rely on is persistence.  The

15       outer surface of the ridge detail is nothing but dead skin

16       cells.  They actually grow down further in the finger.  And

17       if you cut your finger or abrade that skin off, then the

18       ridge detail will grow back in the same configuration that

19       you were born with.  Now, two exceptions to that can be that

20       if you have an extremely deep cut then you have a scar form,

21       or you have something like a burn, then that will cause that

22       growth to change, but it will continue to grow back in that

23       new unique pattern.

24   Q    So is it fair to say that no two individuals have the same

25       fingerprint?

```
 1   A    That's correct.
 2   Q    Now, at some point were you asked to review latent prints
 3        that were lifted in connection with a Marana Police
 4        Department case?
 5   A    Yes, I was.
 6   Q    And do you recall what the case number was?
 7   A    May I refer to my report and notes?
 8   Q    I can have that marked, if you'd like.
 9            Let me show you what's been marked 219 --
10            MR. PIMSNER:  If I may?
11            THE COURT:  Yes.
12   BY MR. PIMSNER:
13   Q    It's a copy of your report.
14            And does that report help refresh your recollection as
15        to the case number for Marana?
16   A    Yes, the Marana case number is 08110017.
17   Q    And at what point were you asked to conduct a comparison of
18        those latent prints?
19   A    As I recall, I received those the first or second week of
20        October, 2009.
21   Q    And when you received those prints, you would have -- they
22        would have been transferred from Marana to the Department of
23        Public Safety?
24   A    Typically, that way it works with the Department of Public
25        Safety Crime Laboratory System, is one of the submitting
```

1          agencies will transport their evidence or their latent lifts

2          to the DPS crime lab property and evidence room.  Then the

3          case will be assigned to an examiner which will check them

4          out of the property room.  We will work the case.  So that's

5          basically how that works.

6     Q   And when you received that request to examine those prints,

7          were you asked to compare it to any specific individual?

8     A   Yes, I was.

9     Q   And who was that?

10    A   There were two names actually provided.  One was a Daniel

11         Jordan.  The other was Todd Russell Fries.

12    Q   And was there a date of birth provided for Todd Russell

13         Fries?

14    A   The date of birth is 3/16 of '63 -- or March 16th of 1963.

15    Q   Now, let me show you what's been admitted into evidence as

16         Exhibit 314.

17             MR. PIMSNER:  May I approach, your Honor?

18             THE COURT:  Yes.

19    BY MR. PIMSNER:

20    Q   Do you recognize that exhibit?

21    A   Yes, I do.

22    Q   Could you just tell us what it is?

23    A   Exhibit 314 consists of the three latent lift cards that

24         were submitted to our property room that I analyzed in this

25         case.  On each of the three cards on the report side, across

1        the top area I've written the DPS case number, the item

2        number, my initials, badge number, and the date that I

3        received them or marked them.

4            MR. PIMSNER:  Your Honor, may I --

5            THE WITNESS:  Also --

6            MR. PIMSNER:  I'm sorry.

7            May I display that to the jury?  This has been

8   admitted, just so they can follow along.

9            THE COURT:  Yes.  I'm sorry, what Exhibit Number is

10  that just for the record that you're showing?

11           THE WITNESS:  It's Exhibit 314.

12           THE COURT:  314.  All right.

13  BY MR. PIMSNER:

14  Q    Could you point on the screen to the information that you

15       just provided regarding your -- your notation on that

16       original card?

17  A    These three cards -- the top card is exhibit -- or is item

18       16.  The middle one is item 17.  The bottom one is item 18.

19       What I referred to, if you will look on the very top of the

20       top card to the right of that arrow is the DPS case number.

21       To the right of that is the number 16, which is the item

22       number.  To the right of that is my initials.  To the right

23       of that is my badge number.  To the right of that is the

24       date.  If you go down to the second and third ones, they are

25       similarly marked, other than the item numbers are 17 and 18.

1   Q     So the items that you were asked to -- the latents you were

2         asked to identify were identified by the Marana police

3         report as their evidence items 16, 17 and 18, correct?

4   A     I don't know what they referred to them in their report, but

5         they came into DPS as items 16, 17 and 18.

6   Q     And when DPS gets a request for a comparison, you also --

7               THE COURT:  Hold on.

8               All right, go ahead, counsel.

9   BY MR. PIMSNER:

10  Q     So when DPS receives a request to conduct an analysis,

11        they'll assign it a new case number pursuant to the DPS case

12        records, correct?

13  A     Correct.  When we receive a case from a submitting agency,

14        DPS will assign a new DPS case number.

15  Q     Now, those latent print cards -- that exhibit, there are

16        actually three individual ones, correct?

17  A     That's correct.

18  Q     And on the display they're all grouped together, is that

19        correct?

20  A     They appear to be, yes.

21  Q     Now, those -- what's on the back of those latent print

22        cards?

23  A     On the back side of each of the three cards is the actual

24        latent lift itself.  Referring to item 16, the lift is in

25        this area over here towards the right of the card.  It has

1          the -- the tape on it with the -- the impression that was

2          lifted in that.

3               Item 17 is similar to that.

4               Item 18 is a little bit larger piece of tape.

5     Q    And are those -- the use of the tape to transfer the latents

6          from an item to the latent print card, that's an acceptable

7          way of -- of preserving those latents, correct?

8     A    Yes, it is.

9     Q    Now, in those latents -- well, first of all, let me show you

10         the backs of those three exhibits.

11              Did you make any notations -- and sir, if you hit the

12         lower left corner, you can clear that screen.

13    A    I'm sorry?

14    Q    Lower left corner you can --

15              THE COURT:  If you just touch the screen.

16              There you go.

17              THE WITNESS:  Okay.

18    BY MR. PIMSNER:

19    Q    Are there any notations on the backs of those latent print

20         cards that identify that these were in fact the latents that

21         you examined?

22    A    Yes.  Similarly to the way I marked the front, each of these

23         three lift cards has the DPS, D R number in that upper

24         corner, item number, et cetera.  If you look at the bottom

25         card, which is number 18 -- can you raise it up just a bit?

```
 1              Good.  Thank you.
 2   Q    Yes.
 3   A    On the -- across the bottom edge of the card is --
 4   Q    Are you referring to this?
 5   A    -- that area there -- yes, those are the markings that I
 6        placed after I did my comparison.  The latent that I
 7        compared is the one immediately above that towards the right
 8        side of the card, and if you look above that to the top edge
 9        of the tape, there's the letter A, which is upside down,
10        that -- we individually number the latents that we compare,
11        so this became my latent number -- or latent letter A, and
12        that's the one I compared.
13   Q    So is it fair to say just because a latent was submitted to
14        your office doesn't mean it's necessarily a usable print for
15        identification?
16   A    That's correct.
17   Q    And upon reviewing item 16 and 17 of that exhibit, were
18        those usable prints for identification?
19   A    No, they do -- items 16 and 17 do not contain any
20        identifiable latents.
21   Q    And was that -- was that because they didn't have sufficient
22        detail to conduct a comparison?
23   A    Yes.
24   Q    Now, item 18 of that exhibit you -- you indicated you were
25        able to obtain a usable print for an examination, correct?
```

1    A    That's correct.

2    Q    And in fact, did you match that print to any known

3         individual?

4    A    Yes, I did.

5    Q    And who was that?

6    A    I identified that latent -- again, it's the one on the right

7         side of this one.  It was identified as being --

8              MR. BOCK:  Objection -- objection, your Honor, as to

9    foundation.

10             THE COURT:  No, overruled.

11             THE WITNESS:  That latent was identified as having been

12   made by the right middle finger of Todd Fries.

13   BY MR. PIMSNER:

14   Q    And those were based on a known -- or a -- a known

15        fingerprint of Mr. Fries that you had access to at that

16        time?

17   A    That's correct.

18   Q    Now -- and what was the date of birth on the person that you

19        identified on that from your original identification?

20   A    3/16 of '63.

21   Q    Now, prior to trial did you request a set of prints that

22        were taken in connection with this case be submitted for

23        review?

24   A    Yes, I did.

25             MR. PIMSNER:  And if I may approach, may I show the

1    witness what's been admitted Exhibit 71?

2              THE COURT:  Yes.

3    BY MR. PIMSNER:

4    Q    Do you recognize that, sir?

5    A    Yes, I do.

6    Q    And how do you recognize it?

7    A    Exhibit 71 is the fingerprint card that was submitted.  The

8         way I recognize it is in the top right corner it has the DPS

9         case number.  It also has the item number, which is B C N,

10        like boy, Charles, November, and the number one.

11   Q    Let me -- let me put this on the screen.

12            If you can maybe just clear your screen, and then also

13        point to those areas.

14   A    In the upper right area is the DPS case number, the item

15        number, my initials, badge number, and the date.

16   Q    And below I see some notations that are on one of the

17        fingerprints that were on that card?

18   A    That's correct.

19   Q    And could you tell us if you recognize those fingerprints or

20        those -- that -- those notations?  Excuse me.

21   A    The notations which are down towards the lower area are the

22        notations that I made when I did that recent comparison.

23   Q    And what -- what did you do with that -- that -- those known

24        prints from the -- this present case?

25   A    I compared the known prints on Exhibit 71 -- or that one

```
 1           right middle finger to the right middle finger on a
 2           previously used fingerprint card.
 3   Q   That -- that you made the original identification from?
 4   A   That's correct.
 5   Q   And in fact, did they -- did the -- did they match?
 6   A   Yes, they did.
 7   Q   And was the match to Todd Russell Fries?
 8   A   Yes, it is.
 9   Q   Now, once you reach a result, do you -- is there any type of
10           internal review process before the print identification is
11           final?
12   A   Yes, our policy and practice on the comparison phase is very
13           briefly, we analyze the prints to see if they're sufficient
14           for comparison.  We will do the comparison.  We will make
15           our determination, and then that is handed off to another
16           examiner in our laboratory in latent prints for an
17           independent review of my conclusion.
18   Q   And was that done in this case?
19   A   Yes, it was.
20           MR. PIMSNER:  I have no further questions, your Honor.
21           THE COURT:  Cross-examination?
22           MR. BOCK:  Thank you, your Honor.
23                          CROSS-EXAMINATION
24   BY MR. BOCK:
25   Q   Good morning, sir.
```

1    A    Good morning.

2    Q    The DPS crime lab has the ability to compare shoe prints,

3         does it not?

4    A    Shoe prints?

5    Q    Yes.

6    A    We do have shoe print examiners, yes.

7    Q    Have you ever -- that's not your field of expertise, though,

8         is it?

9    A    That is not my field of expertise, no.

10   Q    But that is a field of expertise, and the DPS certainly has

11        that asset available to law enforcement, does it not?

12   A    Yes, it does.

13   Q    Is there DNA that is associated with fingerprints?

14   A    Could you be more specific?

15   Q    The testimony in this case was that the person that lifted

16        the prints, the -- specifically, the three prints that you

17        were asked to testify to said that he also did DP -- DNA

18        swabs when he saw smudges or whatever near fingerprints.  So

19        do you have a familiarity with the presence of DNA

20        associated with prints?

21   A    From an evidence collection standpoint, it makes sense to me

22        if you have smudged fingerprints to perhaps do DNA swabs of

23        that area or the surrounding areas.  I know that in some

24        situations we can use the latent essentially as a screening

25        process to locate a place where somebody touched something,

1          and then that area can be swabbed.

2              Does that answer your question?

3  Q    Yes.

4              And is DNA usually associated or not usually associated

5          with the -- a situation that you've just described?

6  A    It depends on a number of factors.  Some of our cases we

7          have latent print only requests.  Some of our cases we have

8          DNA only requests.  Some of our cases we have both requests.

9          From a scene response standpoint, normally you can process

10         items for latent prints.  You can also process items for

11         DNA.

12  Q    The -- now, if -- if I touched some oil and I then touched

13         an object, obviously the print -- could you get a print off

14         of that if I touched a substance like paint, or oil, and

15         then, you know, touched something else?

16  A    That would depend on a very broad range of variables, what

17         kind of substance is it, how much is it in quantity, how was

18         the item handled or touched, and -- and things like that.

19         Initially, I would not expect to develop a latent print,

20         although in the paint scenario if you had wet paint on your

21         finger and you touched something, again much like a rubber

22         stamp, there could be a transfer of that ridge detail in the

23         paint to that item.

24  Q    Now, specifically you talked about submitted items 16, 17

25         and 18 during your direct testimony?

1    A    That's correct.

2    Q    You said 16 and 17 did not have sufficient detail?

3    A    That's correct.

4    Q    Did it have -- did they have any detail?

5    A    I believe there was some very fragmentary ridge detail

6         there.

7    Q    Okay.  Are there loops also -- what are ridges and loops?

8         What else is associated with -- with fingerprints?

9    A    It's a broad question.  Ridges are the individual ridges of

10        the fingerprints or palm prints.  Loops is one of -- is the

11        term we apply to one of the general shapes or overall

12        patterns of fingerprints.

13   Q    Did you see -- on 16 and 17 do you remember what you saw?

14   A    Not specifically, no, but they were not identifiable.

15   Q    Did you see loops?

16   A    I don't believe I saw any patterns.  I don't recall that.

17   Q    You saw ridges, though, correct?

18   A    I believe so, yes.

19   Q    Now, on 18 -- you said that 18 -- and you saw the diagram

20        that was submitted to you where the -- where the crime scene

21        specialist used the powdering technique to lift that print,

22        is that correct?

23   A    Yes.

24   Q    And you said that the government asked you if that was an

25        acceptable technique, and I believe your testimony was

1        probably.  Do you remember saying probably?

2  A    I remember saying probably.  I don't remember exactly what

3        it was for.  Are you talking about the diagram, or the --

4        the powdering and the lift was the question.

5  Q    And you said -- and they asked you about the technique, and

6        I thought you used the word probably?

7  A    As I -- as I recall, it was -- the question was something

8        along the lines of is that like an optimum technique, or is

9        that the best technique and/or something like that, probably

10       it is.  And the reason I used the word probably is because

11       since it's a porous surface or non-porous surface, you can

12       also use other techniques, specifically super glue.  So

13       probably it's a good -- good procedure.

14  Q   So you didn't mean to qualify the way that was done by the

15       use of the word probably?

16  A   Do I need to qualify it?

17  Q   Qualify the integrity of the technique.  You didn't mean to

18       --

19  A   No, the integrity of the technique works.  It's just one of

20       several that could have been used.

21  Q   Okay.  Now, you said 18 was a based upon your opinion was a

22       print from Mr. Fries, is that correct?

23  A   That's correct.

24  Q   Now, are you looking at this yourself, or are you using a

25       computer?  What -- what is the identification process that

1      you're doing?

2    A    The comparison and identification process for this specific

3         latent that I identified was with a fingerprint magnifier,

4         which is about a four and a half power magnifier that is

5         physically placed on top of the lift.  The lift card is

6         folded.  The reason that's folded is you can fold that so

7         that it can be physically placed -- physically be placed

8         next to the print that you're comparing.  The magnifier then

9         sits over that so you can visually examine the latent and

10        the known print to see if you have agreement or disagreement

11        in pattern types or general shapes.  Do you have matching

12        characteristics?  Do you have different characteristics

13        which will lead you either to an identification, or an

14        exclusion, or an inconclusive, if you just cannot make a

15        determination.

16   Q    And is there a threshold number as to matching

17        characteristics?

18   A    Actually, there's not a threshold number.  The number of

19        matching characteristics required for either an

20        identification or an exclusion depends on both the quality

21        of the latent, and the quantity of the latent.  If you have

22        a very clear, well recorded latent print that develops and

23        there's minimal smudging and things like that, then the

24        identification can normally be affected on a lower number of

25        matching ridge characteristics than if you had a fragmentary

1    latent that was very smudged.  In a fragmentary latent where

2    it was more difficult to see the ridge characteristics, you

3    would need more information in order to make any type of

4    determination on that.

5  Q    How many matching characteristics did you discern as to item

6    number 18 --

7  A    I believe in this one --

8  Q    -- do you believe, or do you know?

9  A    In this one in preparation for court I counted 15 matching

10    characteristics.

11 Q    Okay.  Now --

12         MR. BOCK:  May I approach the witness, your Honor?

13         THE COURT:  Yes.

14 BY MR. BOCK:

15 Q    I'm going to show you what's been marked as 411.

16         THE COURT:  Okay, marked for identification?

17         MR. BOCK:  Yes.

18         THE COURT:  And what is that, Mr. Bock?

19         MR. BOCK:  It's number 411.  It's the -- it's a

20 scientific report that was done by latent print examiner Jolly.

21 It has a date of January 29th, 2010.

22         THE COURT:  All right.  You may approach the witness.

23 BY MR. BOCK:

24 Q    I show you that, sir.  Are you familiar with those

25    documents?

1   A   Yes, I am.

2   Q   Okay.  This was some other items that were submitted to --

3       for latent print examination, is that correct?

4   A   That's correct.

5   Q   And do you remember from looking at your report what those

6       items were?

7   A   The items that were submitted were submitted as -- as

8       evidence item number 3, and they included a red colored

9       cloth wallet with a dried -- apparent white colored paint on

10      assorted exterior and interior areas.  The wallet contained

11      $8 in U.S. currency.  And 11 photographs, cards, drivers

12      license.  The contents were received, but not analyzed for

13      latent prints.

14  Q   Okay, were any -- what was analyzed for latent prints as to

15      what you've just described?

16  A   The wallet was processed for latent prints.

17  Q   Okay, and what was the result of that?

18  A   There were no latents on it.

19  Q   Okay.  This was a red wallet that there's been previous

20      testimony -- and that red wallet has been admitted into

21      evidence.  The -- and it had white paint on it, is that

22      correct?

23          Do you remember that?

24  A   I called it apparent white colored paint.

25  Q   Okay.

1    MR. BOCK:  I'll retrieve that from the witness?

2    THE COURT:  Yes, you may.

3    MR. BOCK:  Thank you, sir.

4    I don't have anything further, your Honor.

5    THE COURT:  All right.

6    Any redirect?

7    MR. PIMSNER:  Briefly, your Honor.

8                    REDIRECT EXAMINATION

9    BY MR. PIMSNER:

10   Q    Now, item 18, sir, was a match from -- of Todd Russell

11        Fries?

12   A    Yes, it was.

13   Q    And upon your analysis, there was nothing in the analysis of

14        his known fingerprint compared to the latent print number --

15        item 18 that would have excluded him from the being the

16        person that left that latent print, correct?

17   A    I'm sorry, your question again?

18   Q    Sorry.  Was there anything in your analysis of that latent

19        print, number 18, that would have excluded Mr. Fries from

20        identification based on the known prints?

21   A    No, there were -- there were no ridge characteristics in

22        there that would preclude that identification.

23   Q    And item 18, that print wasn't smudged, was it?

24   A    There's some smudging, but it's not excessive.

25   Q    But there was enough to make an identification, correct?

| | |
|---|---|
| 1 | A    Yes.  There's a sufficient number of ridge characteristics |
| 2 |      to make that identification. |
| 3 | Q    And so DNA touch analysis wouldn't have been necessary on |
| 4 |      that print to affect your identification of that |
| 5 |      fingerprint? |
| 6 | A    No.  DNA would -- does not enter into that identification. |
| 7 |           MR. PIMSNER:  Nothing further, your Honor. |
| 8 |           THE COURT:  All right. |
| 9 |           Any questions from the jury for this witness? |
| 10 |           All right, may this witness step down and be excused? |
| 11 |           MR. PIMSNER:  Yes, your Honor. |
| 12 |           THE COURT:  Thank you, sir.  You may step down and be |
| 13 | excused. |
| 14 |                 ------------------------- |
| 15 |           (Stephen Carpenter was duly sworn by the clerk.) |
| 16 |                    STEPHEN CARPENTER |
| 17 |                   DIRECT EXAMINATION |
| 18 | BY MR. PIMSNER: |
| 19 | Q    Mr. Carpenter, are you employed? |
| 20 | A    I am. |
| 21 | Q    And by whom? |
| 22 | A    The Pima County Sheriff's Department. |
| 23 | Q    And how long have you been with Pima County? |
| 24 | A    Since May of 1995. |
| 25 | Q    And what is your current rank with Pima County? |

| | | |
|---|---|---|
| 1 | A | Sergeant. |
| 2 | Q | And so what are your current duties as a sergeant? |
| 3 | A | In our agency a sergeant just means that I'm a first line |
| 4 | | supervisor.  Currently, I'm the first line supervisor of the |
| 5 | | canine unit.  I have nine canine handlers that work under |
| 6 | | me, and I'm also a canine handler. |
| 7 | Q | And what other type of assignments have you had while |
| 8 | | employed at the Pima County Sheriff's Department? |
| 9 | A | I've worked in patrol, special operations, training, special |
| 10 | | weapons and tactics, internal affairs, and now canine. |
| 11 | Q | And when did you become a sergeant? |
| 12 | A | I became a sergeant in 2005. |
| 13 | Q | So back on August 2nd of 2009, were you on duty that day? |
| 14 | A | Yes. |
| 15 | Q | What were your hours? |
| 16 | A | On that particular day my hours began the previous day at |
| 17 | | 10:00 p.m. and bled over into the morning of the 2nd, and I |
| 18 | | was supposed to get off at 6:00 a.m. |
| 19 | Q | Now, you were a sergeant at that time? |
| 20 | A | Yes. |
| 21 | Q | Were you over canines, or did you have a different |
| 22 | | responsibility area at that point? |
| 23 | A | I had a different responsibility at that time. |
| 24 | Q | And what was that? |
| 25 | A | During that time period I was working in the patrol |

1       division, and as a sergeant if you do that, you're a first

2       line supervisor of a patrol squad.  In this case I was

3       supervising the deputies that worked the midnight shift.

4   Q   And how many deputies would you have been supervising on

5       that shift approximately?

6   A   At any one time there's approximately I would say 7 to 10

7       deputies on patrol, but I believe my whole squad consisted

8       of 12.

9   Q   And so you're supervising the deputies that are out driving

10      around in the community ready to assist if necessary,

11      correct?

12  A   That's correct.

13  Q   Now, towards the end of that shift did you or your deputies

14      receive some kind of call from your dispatch regarding a

15      chemical odor?

16  A   Yes.

17  Q   And approximately when did that -- that call come in?

18  A   Just before 5:00 a.m.

19  Q   Okay.  And were you aware of that call when it came in?

20  A   I became aware of the call via the -- the mobile data

21      computer that was in my patrol car at the time, and also by

22      information that I heard the dispatcher say over the radio.

23  Q   And I'm sorry, what time did you say again?

24          MR. BOCK:  Objection, asked and answered.

25          THE COURT:  No, overruled.  Go ahead.

1          THE WITNESS:  It would -- I have in my report.  It was

2     approximately 0453 hours.

3  Q   So you would have as a -- as a sergeant/supervisor you would

4     have actually been out in the community driving yourself,

5     correct?

6  A   Yes, there's two places I could be, basically, as a patrol

7     sergeant.  Either in the office performing administrative

8     duties, or driving in a patrol car going to calls myself, or

9     going to calls to make sure the other deputies were doing

10    them correctly.

11 Q   Now, at some point did you direct deputies to go to that

12    vicinity to investigate the odor?

13 A   Well, initially what happened was the call came out and the

14    area of town that I was working in, there's -- they're

15    separated by two areas, really.  It's the northwest side of

16    Tucson, so there's the metropolitan area and then the same

17    deputies that patrol that area are also responsible for a

18    place called Catalina, which is several miles north of the

19    main metropolitan area.  So I had deputies working in the

20    Catalina area, but also in the metropolitan area of

21    northwest Tucson.  So what I had to do was make a

22    determination, and when this call came out there was --

23    there wasn't any deputies available to go to it because we

24    were just very busy with priority calls.  So I decided to

25    have two deputies that were working in the area of Catalina

```
 1            leave that area to come down to the metropolitan area,
 2            northwest Tucson, to go to that call.
 3   Q   And who were those deputies?
 4   A   I believe that was Deputy -- I think it was Deputy McCracken
 5            and Deputy Baird.  There were three deputies that ended up
 6            going to that call.  It was Atwell, McCracken, and Baird.
 7            I'm not sure which two were in the Town of Catalina, just
 8            off of my memory.
 9   Q   And in the Town of Catalina, that wasn't -- distance-wise,
10            it wasn't that far from the location of the call, was it?
11   A   I would say it would probably be a 10 to 15 minute drive.
12   Q   Depending on where you're located in Catalina, I take it?
13   A   Depending on where you're located, and depending on the
14            speed at which you drive.  The direct route to that location
15            is pretty standard, but --
16   Q   And did you also start traveling over to that area?
17   A   Not at that time, but eventually I did.
18   Q   And why -- what made you decide that you should go and
19            investigate that odor also?
20   A   When we're working, we get updated information as we're
21            responding to calls sometimes, and that information can come
22            over computer, or it can come over the radio.  It can come
23            from -- from fellow cops who are going to the call, or it
24            can come from the dispatcher who's receiving additional
25            information.  And what was happening was I was receiving
```

1       additional information that made it clear that the severity

2       of the situation was rising, and I felt like as the guy in

3       charge of the guys working, I should probably go over there.

4    Q  And approximately what time did you arrive in the area of

5       Jensen and Magee?

6    A  Again, I'll have to just estimate, because there's no time

7       stamp.  I did not write this time down.  But just by

8       refreshing myself from my report this morning and

9       remembering what time this whole thing started, I would say

10       that I arrived in that area approximately between 5:15 and

11       5:30 a.m.

12   Q  Let me show you what's been marked as Exhibits 292 and 293.

13            MR. PIMSNER:  May I approach, your Honor?  I'm sorry.

14            THE COURT:  Yes.

15   BY MR. PIMSNER:

16   Q  Without -- at this point could you just -- could you hold on

17       to those, and I'll get you the microphone, without showing

18       the jury at this point.

19            Do you recognize 293?

20   A  Yes, this just a scenario map of the area that we responded

21       to this call in.

22   Q  And that accurately depicts the -- the area in question?

23   A  Yes.

24   Q  And is there a designation for what you later learned was

25       the source of this call, or the --

1   A    Yes.

2   Q    What is that -- what location is that?

3   A    There's an address given, but it's designated as item 1.

4            MR. PIMSNER:  The government would move to admit this

5   exhibit, your Honor.

6            MR. BOCK:  No objection.

7            THE COURT:  The exhibit is admitted into evidence, and

8   may be shown to the jury.

9   BY MR. PIMSNER:

10  Q    Before you do that, could you look at the second poster.

11           Do you recognize that exhibit?

12  A    Yes, I do.

13  Q    What is that?

14  A    This is in the same area that the previous exhibit showed,

15       but it's a close-up aerial photo of the house, 2870 West

16       Magee, and the immediate surrounding area to include some

17       streets, and a portion of the golf course.

18  Q    And does that aerial view accurately reflect how it was laid

19       out back on August 2nd, 2009?

20  A    Yes.

21           MR. PIMSNER:  I'd move to admit this exhibit, your

22  Honor.

23           THE COURT:  Yes, it's admitted.

24           And what are the numbers, again?

25           THE WITNESS:  293 is the one I'm holding.  The previous

1    one was 292.

2           THE COURT:  Okay, 292 and 293 are admitted.

3           Thank you.

4    BY MR. PIMSNER:

5    Q    And maybe it could be best if you maybe can hold it where

6         the jury and the defense can see it right to your side.  And

7         actually, if you can go to the other exhibit first.

8           That's 293.  Correct?  Is that 293, sir?

9    A    This is 292.

10   Q    292.  Could you describe the location of the -- what you

11        later learned was the source of the chemical odor?

12          Can you describe where it is on the map?

13   A    Yes, it's on the far left side of -- I'm sorry, the right

14        side of the map as if you guys were looking at it over here.

15   Q    Would the pointer help?

16   A    Yeah.

17          It will be on the far side of the map, right here, 2870

18        West Magee is the physical address.

19   Q    And from what location -- or from what direction were you

20        arriving from?

21   A    Initially, I was responding to this area from the south, so

22        I was traveling north on a road called Shannon from Ina,

23        which would have been over here.  It's not visible on the

24        map.  But as I was approaching, I could see off to the north

25        and west, and had the clear view of this area overall.

1    Q    And that would have been near the Shannon and Ina area?

2    A    Just past that.  Just north of that.

3    Q    And is that an elevated area?

4    A    It is.

5    Q    And does that give you a view towards the -- the address in

6         question here?

7    A    It gives me a view toward the area that the address falls

8         within, right in here for sure.

9    Q    Did you notice anything unusual when you were at that

10        elevated spot near Ina and Shannon?

11   A    Yes.

12   Q    What was that?

13   A    There was a -- a cloud of an enormous proportion that

14        basically had enclosed and enveloped this whole area.  In my

15        report I identified it as the area of Magee and Jensen, but

16        it was basically encompassing both sides of the roadway.

17   Q    Both sides of Magee?

18   A    Both sides of Magee.

19   Q    And could you just point to where Magee is on that chart?

20   A    Magee Road is right here, so this side of the Magee Road was

21        definitely affected by this cloud, and it was starting to

22        move over to the other side of Magee Road over here.

23   Q    And what -- how would you describe that cloud from where you

24        first saw it on that elevated area?

25   A    The cloud was very enormous.  I'd never seen anything --

1          MR. BOCK:  Objection to -- objection to that, your

2     Honor.

3          THE COURT:  No, overruled.

4          You may proceed.  Go ahead.

5          THE WITNESS:  I'd never seen anything in this area like

6     that, and I've worked for -- worked for this agency for about 17

7     years.  The cloud was from ground level, and had began to cover

8     the treetops and the rooftops in this neighborhood.

9     BY MR. PIMSNER:

10    Q    And did that include the neighborhood on the opposite side

11         of Magee from the address in question?

12    A    It did.  Mainly, as I was arriving the majority of the

13         cloud -- the most -- the thickest part of it, the most

14         intense part of it was here, but I could tell that it was

15         starting to move across Magee Road.  The cloud was white.

16         It was milky.  It was heavy, staying close to the ground

17         meaning from the ground level to the -- the treetops and

18         roof tops, and it didn't seem to go any higher than that.

19    Q    And were you able to see through that cloud?

20    A    From the distance I was at, no.

21    Q    Now, did you travel to get closer to that area to try to

22         determine what was happening?

23    A    I -- I tried.  I traveled closer to the area and basically

24         took up a position on Magee Road a little bit east of Jensen

25         on the south side of the road.

1    Q    You would have pulled off the road?

2    A    I pulled off onto the south shoulder of the road.

3    Q    And what did you notice when you got to that proximity to

4         the event?

5    A    Everything that I had seen from my initial approach had --

6         at a more elevated position was just further confirmed.  The

7         cloud at this location where I was at seemed to be as I had

8         understood it from a distance.  It was from the ground level

9         over the treetops and rooftops.  It was still thick, but it

10        was moving a little bit to the south and beginning to move

11        into this neighborhood on the south side of Magee.

12   Q    And where -- was it moving quickly?

13   A    No.  It was moving slowly.

14   Q    And did it continue to hang near the ground?

15   A    It mainly stayed from the ground level to the -- up to the

16        level of the treetops and rooftops in this area.

17   Q    And as you got closer, was it still difficult to view or see

18        through that cloud?

19   A    Yes.

20   Q    When you first viewed the cloud from your elevated area off

21        of Shannon, did it continue to be -- continue to be being

22        created or produced, or it did look like it -- it was no

23        longer becoming larger?

24   A    It was still in the process of producing.

25   Q    Once you got closer to Magee and Jensen, were you able to

1       make that determination?

2   A   Make which determination?

3   Q   Whether or not the cloud was still producing, or -- or in

4       fact had -- had completed its production?

5   A   When I first arrived, it was clear to me that it was still

6       producing because it was -- it was continuing to grow what

7       seemed like from the ground level up and out, so up

8       vertically and out to the south.  It was -- it was growing

9       in size.  It was getting thicker.  It was getting more

10      dense, and my concern started to grow.

11  Q   What was the area that you believed that -- if you can

12      provide this based on your training experience, that -- the

13      area consumed by the cloud?  Could you tell a -- a width at

14      that point, or length, or was it -- were you not in a

15      position to be able to do that?

16  A   I don't think I was in a position to be able to do that.  In

17      hindsight, as I was -- when I was in this incident and

18      documenting my involvement the parameters that I tried to

19      give to kind of -- that relate to size were the treetops and

20      rooftops just because simply we don't have a way to

21      accurately measure something like that while it's in

22      progress.  So I wanted to give examples of fixed objects

23      that we could relate to even today that are still there,

24      such as the trees and houses.

25  Q   When you arrived at the area and you pulled off the road

1    near Jensen and Magee, did you start -- experience any type

2    of physical symptoms?

3  A   Yes.

4  Q   And what were those?

5  A   My throat started to burn, my eyes burned.  The skin on my

6    face burned, and I was having a little bit of difficulty

7    breathing.

8  Q   Did -- could you -- was there an odor to this cloud that you

9    were able to tell?

10  A   No.  Not that I remember.

11  Q   Okay.  But the symptoms that you felt increased as you got

12    closer?

13        MR. BOCK:  Objection, Judge.  That is leading.

14        THE COURT:  Yes, if you could rephrase it, please.

15  BY MR. PIMSNER:

16  Q   Did your symptoms change when you got closer to the cloud?

17  A   From the point where I started feeling the effects, I didn't

18    get any closer than that at the time, but while I was

19    responding I had no effect, because I was driving in my car.

20    But once I arrived on the southern shoulder of Magee Road

21    where I had described I had pulled off to the -- to the side

22    of the road, once I exited my car, it was there -- that's

23    when I started to feel different than I did when I was

24    driving.

25  Q   Okay, and -- and it affected not only your eyes, but your

1          throat and your breathing?

2    A    Yes, slightly.  I wasn't having a breathing attack or

3         anything like that, but my breathing was affected by it for

4         sure.  The skin on my face was burning, and I could feel it

5         in my throat.

6    Q    Now, did you encounter any civilians in that area when you

7         got out of your car?

8    A    I remember one man walking --

9              MR. BOCK:  Objection to this, your Honor.  This is

10   going to call for hearsay.

11             THE COURT:  Well, I guess that question calls for a yes

12   or no answer, so why don't you just re-ask the question.

13   BY MR. PIMSNER:

14   Q    Did you encounter any -- anybody when you exited your car?

15   A    Yes.

16   Q    And could you describe that person?

17   A    There was an elderly gentleman who was walking along the

18        southern shoulder of the road from the west to the east,

19        which is the same side of the road that I was on.

20   Q    And based on your observations of this individual, did he

21        appear to be experiencing any symptoms?

22             MR. BOCK:  Objection, your Honor.

23             THE COURT:  No, overruled.  And I think any statements

24   would be probably present sense impressions, or excited

25   utterances, so I don't know if that's coming, counsel.

1          MR. PIMSNER:  The question is what are the observations

2   at this point, your Honor.

3          THE COURT:  All right, so that objections overruled.

4          Go ahead.

5          THE WITNESS:  The observations that I made of that man

6   were that his eyes were burning, and that he was coughing.

7   BY MR. PIMSNER:

8   Q    And was that similar to the type of symptoms you were also

9        experiencing?

10         MR. BOCK:  Objection, your Honor.  This has been asked

11  and answered.

12         THE COURT:  No, overruled.

13         You may answer.

14         THE WITNESS:  Yes.

15  BY MR. PIMSNER:

16  Q    Did you provide any direction to that individual?

17  A    I did.

18  Q    What did you say?

19  A    I told him to keep moving to the east, and not go back to

20       the west.

21  Q    And the west was where the cloud was located at?

22  A    That was where the cloud was starting to move, across the

23       roadway into the neighborhood on the west side.

24  Q    Now, during the time that you arrived at the scene and

25       witnessed the cloud, were you aware from -- that your

1        deputies were already on scene and assisting people in that

2        general area?

3  A   I was aware that three of them had responded to the area and

4        had began -- had begun trying to figure the call out, and

5        I -- I was aware that three of them were there.

6  Q   And at some point did you direct, or were you -- did you

7        become aware of the fact that evacuations of that

8        neighborhood had to be conducted?

9  A   I did not direct any evacuations initially, but I was aware

10       that the three deputies had conducted an evacuation.

11  Q  And when you say three deputies, that would be Deputy

12       McCracken, Atwell, and Baird?

13  A  Yes.

14  Q  Did you learn that they located the -- the source of this

15       event during the course --

16  A  Yes.

17  Q  -- of the investigation.

18          And did you actually -- were you in communication with

19       them while they were evacuating individuals from the -- the

20       Magee area?

21  A  Yes.

22  Q  And did you notice anything unusual about the quality of

23       their -- their ability to speak to you over the radio?

24  A  Yeah, their voices sounded different over the radio at that

25       time than they normally did day-to-day.

1    Q    And now, at some point -- I think you can set that down,

2         sir.

3              If you turn to the other -- well, you -- you showed us

4         where you parked.  You started experiencing symptoms.  What

5         did you do after that?

6              Did you stay at that location?

7    A    No, I didn't.  At that point I moved a little bit to the

8         east.

9    Q    And that would have been towards Shannon, the road that you

10        came off?

11   A    Yes.

12   Q    Okay.  And did you encounter other first responders at that

13        location?

14   A    Yes, I did.

15   Q    And was that -- was that considered a -- I mean, what did

16        you do?  I mean, was that a temporary command center at that

17        location?

18   A    What I was trying to do when I initially arrived was figure

19        out a spot that we could put everybody who was going to be

20        responding.  I was the first one at the general area that I

21        just described for you.  One of my duties was to find a

22        place large enough and safe enough to -- to have basically a

23        command post or a command center established, because I knew

24        that there were a variety of other resources and agencies

25        and responders who were going to be coming to this.  So

1     initially I chose that -- that location on the southern

2     shoulder of Magee Road, but quickly realized that was too

3     close.  So the purpose for leaving that area and going to

4     the intersection of Shannon Road and Magee Road was to find

5     a better and safer place for this command center or command

6     post that I was trying to set up.

7  Q  And that location, that would not have been in the direction

8     of the wind -- that the wind from the Magee golf course area

9     would have been headed into the Ina/Shannon or the

10    Shannon/Magee area?

11  A  I'm sorry, can you repeat the question?

12  Q  Which -- the wind, which way was it blowing that morning?

13  A  The wind was blowing to the south at that time, because I

14    could see the cloud moving in that direction.

15  Q  So was that a safe area outside the path of the cloud over

16    at Shannon and Magee?

17  A  Yes.

18  Q  And did you coordinate with the fire department at that

19    location?

20  A  I began to, yes.

21  Q  How long did you witness that cloud before you saw that

22    it -- it began to break up or dissipate?

23  A  I -- I couldn't tell you a time.  The cloud was -- was

24    present and moving for over half an hour.

25  Q  Let me ask you to look at Exhibit 293, please.

1                You've identified this as a close-up aerial of the --

2       of the event in question.  Do you -- could you point out for

3       the jurors where 2870 West Magee, the address in question,

4       is -- if you could, please?

5    A  Yes, it's right here.

6    Q  And was that a middle unit of a tri -- like, a triplex?

7    A  Yes.

8    Q  Okay.  Now, at some point the -- did the cloud move away and

9       clear from that area?

10   A  Eventually, yes.

11   Q  And did HAZMAT units roll up to the scene to conduct further

12      testing and investigation?

13   A  Yes.

14   Q  And -- and did you then travel over to that location?

15   A  Yes.

16   Q  And where was the HAZMAT unit set up at?

17   A  In this area right here.

18   Q  Okay.  Now, that's -- that would be towards the back of that

19      residence?

20   A  Yeah, from where the truck was at that -- I actually went

21      inside of the HAZMAT truck, there was a view of the back of

22      the residence from an angle.

23   Q  Okay.  And by that point the cloud had -- had cleared the

24      area, correct?

25   A  Yes.

1   Q   Now, could you point to the road that goes out to Magee on

2       that diagram?

3   A   It's this street right here.

4   Q   And then Magee would be that road that's cutting diagonally

5       in the corner?  It would -- it would meet up with it there?

6   A   Yes.

7   Q   What if anything did you do -- well, first of all, did you

8       have any concerns that -- the fact that the cloud was moving

9       kind of in a south direction at that point?

10  A   Yes.

11  Q   What were your concerns?

12  A   At that time my concerns where would the residents in the

13      neighborhood to the south, which is around an elementary

14      school -- were they going to be affected by this cloud,

15      because I did not know what it was made of.

16  Q   And did you take any steps to try to determine the -- where

17      the cloud was moving?

18  A   I did.

19  Q   What -- what steps were those?

20  A   There was a deputy on scene named Deputy Connor, and I had

21      asked -- who didn't have an assignment at the time, so I had

22      asked him to basically watch the cloud and keep me updated

23      as to the direction it was going, and whether or not it was

24      dissipating.

25  Q   And did you also have other deputies kind of cordon off that

1           area to prevent members from the public arriving?

2    A     Yes.  We used patrol deputies to basically position

3           themselves at various points of the property of Tucson

4           National and the roadways that were related to the ingress

5           and egress to that facility, and we basically tried to

6           control access in and out.

7    Q     Now, during the evacuations and rescues conducted by

8           Deputies Baird, Atwell, and McCracken, based on your

9           experiences, your symptoms you experienced, did you have

10          concerns for their safety?

11   A     Yes.

12   Q     Did you do anything to be able to monitor them on a regular

13          basis?

14   A     Basically, other than just keep in contact with them and

15          watch them, and know that there were -- there were medical

16          personnel on scene from Northwest Fire that I could

17          basically refer them to if they -- if they needed immediate

18          care right there.

19   Q     Would your dispatch check in with them regularly?

20   A     I see.  Yes.

21   Q     And was that at your direction?

22   A     It was.

23   Q     And how often would dispatch check in with those three

24          deputies?

25   A     I asked them to do it every five minutes.

1    Q    And in the -- and the purpose of that was what?

2    A    The purpose of that was to make sure that they were still

3         alive.

4              MR. BOCK:  Objection to that, your Honor, and I -- I

5    reserve a motion at this time.

6              THE COURT:  Yes -- no, and the objection's overruled,

7    and you may reserve a motion.

8    BY MR. PIMSNER:

9    Q    You didn't know what you were dealing with at that time, is

10        that fair to say?

11             MR. BOCK:  Objection.  That's leading, your Honor.

12             THE COURT:  I'll allowed limited leading.

13             So you may answer that question.

14             THE WITNESS:  I did not know what the cloud contained.

15   That's what concerned me, for my deputies.

16   BY MR. PIMSNER:

17   Q    And you didn't have a line of sight on the deputies that

18        were involved in the evacuation?

19   A    No.

20             MR. PIMSNER:  Nothing further at this time, your Honor.

21             THE COURT:  All right.

22             Cross-examination?

23             MR. BOCK:  Thank you, your Honor.

24                           CROSS-EXAMINATION

25   BY MR. BOCK:

1    Q    Good morning, Sergeant.

2    A    Good morning.

3    Q    You have a report in front of you?

4    A    I do.

5    Q    Okay.  And is the report that you -- 8/2/09, is it

6         supplemental dictated by you on that date with your payroll

7         number of 1078, total dictation time 20 minutes and 29

8         seconds, narrative dictation time 19 minutes and 30 seconds?

9         Is that the same report?

10   A    Yes, sir.

11   Q    Okay.  Let me approach you with Exhibit 411 --

12             MR. BOCK:  If that's permitted by the Court?

13             THE COURT:  Yes.

14   BY MR. BOCK:

15   Q    Why don't you take a look at that.

16             Now, you have your report.  It's in a little bit

17        different format than what I have, but are they the same

18        reports?

19   A    It appears to be the same report, but in a different format.

20   Q    Okay.  It would be easier for me if I have one of the

21        reports, which is 411.  I'll take that back, and then you

22        can look at your report that you have.

23             Is that okay with you?

24   A    Sure.

25   Q    All right.

1           MR. PIMSNER:  Your Honor, I believe 411 was already

2    marked by --

3           MR. BOCK:  It should be 412?

4           MR. PIMSNER:  I believe so.

5           MR. BOCK:  412, then, your Honor.  I apologize.

6           THE COURT:  All right.

7    BY MR. BOCK:

8    Q    Okay, the -- the 4:53 -- you say at approximately 4:53.  So

9         five minutes either side, ten minutes either side?

10         What's -- what's your best guess as to approximately?

11   A    Well, it's not a guess.  The reason I use the word

12        approximately is because nothing can be exact.  The time

13        that I use is the time that is given by the dispatchers, or

14        what I see on the computer screen.

15   Q    So 4:53 is -- is the time?

16   A    4:53 is the timeframe, yes.

17   Q    Okay.  Now, when you -- you're on duty that evening, is

18        that -- or early morning hours, is that correct?

19   A    Yes.

20   Q    In a marked patrol car?

21   A    Yes.

22   Q    And -- and in a uniform, is that correct?

23   A    Yes.

24   Q    And you would be in the Pima County Sheriff's uniform?

25   A    Yes.

| | | |
|---|---|---|
| 1 | Q | No jacket on or anything, obviously?  It's August? |
| 2 | A | I had a short sleeved uniform on. |
| 3 | Q | Okay.  What time did you clear the scene? |
| 4 | A | At the end of the call. |
| 5 | Q | At the end of the call? |
| 6 | A | I don't recall. |
| 7 | Q | Okay.  Do you have -- would you have been there for 10 |
| 8 | | hours? |
| 9 | A | If you would like, I could look at the end of my report to |
| 10 | | see if I listed a time that I left. |
| 11 | Q | You can look at your whole report. |
| 12 | A | In the last paragraph of my report it states that I was |
| 13 | | replaced by another supervisor at 10:30 a.m. |
| 14 | Q | 10:30 a.m.  So would that have completed your shift? |
| 15 | A | Yes.  My shift was supposed to end at 6:00 a.m. |
| 16 | Q | Okay, and this would have been what day of the week, do you |
| 17 | | remember? |
| 18 | A | Sunday morning. |
| 19 | Q | Sunday morning.  So at 10:30 a.m. Sunday morning after that, |
| 20 | | did you go home then? |
| 21 | A | Yes. |
| 22 | Q | Okay.  And when would your next day of work have been? |
| 23 | A | I'm sorry? |
| 24 | Q | When would your next day of work have been? |
| 25 | A | The next time I would have reported for work would have been |

1              Tuesday night at 10:00 p.m.

2    Q    Okay.  So you had those -- you had that day and a half off,

3         is that correct?

4    A    Yeah, the -- the shift that I reported for duty was Saturday

5         night at 10:00 p.m., and that was what I refer to as my

6         Friday night.  So when I got off on Sunday morning, I was on

7         my scheduled days off.

8    Q    Now, the -- did your clothing ever have a odor associated

9         with the -- with what you described the cloud as?

10   A    I don't think so.

11   Q    Did you -- so you don't think your clothing had any odor

12        associated with the cloud?

13   A    Earlier I had described that I didn't smell an odor, so my

14        clothing -- I didn't notice it have an odor.

15   Q    Okay.  Did you ever see any black smoke?

16   A    No, just white.

17   Q    Okay.  If there was black smoke associated with that

18        property, is that something you think you would have seen?

19   A    Yes.

20   Q    Did the cloud -- was the cloud ever photographed?

21   A    I don't know.

22   Q    Now, you indicated that you sensed -- physically sensed the

23        presence of the cloud, is that correct?

24   A    Yes.

25   Q    And you -- when you wrote your report, you wrote that soon

1    after the event, is that correct?

2    A    I dictated my report approximately two hours after I had

3    gotten off from work.

4    Q    Okay.  Do you -- why don't you -- on Exhibit 412 that I have

5    in front of me, you have a duplicate of that, why don't you

6    turn to the page where you have described your presence with

7    the -- with the cloud.  It would be the paragraph that

8    starts as the white cloud continued to envelope.

9    Do you see that on your report?

10   A    Yes, I see that.

11   Q    Okay.  And in your report you went ahead and described your

12   sensations, is that correct?

13   A    Yes.

14   Q    And you said:  Additionally, I was able to feel the skin on

15   my face slightly burning.  Is that correct?

16   A    Yes.

17   Q    You used the word slightly?

18   A    It's what it says in the report.

19   Q    That's what you put in the report, though, right, sir?

20   A    Yes.

21   Q    And then you said:  I had a slight burning in my throat and

22   lungs.  Is that what you put in there?

23   A    Yes.

24   Q    You didn't say anything about any breathing problems

25   specifically in that paragraph describing your physical

```
 1          situation, did you?
 2    A     No.
 3              MR. BOCK:  May I have a second your Honor?
 4              THE COURT:  Yes.
 5              MR. BOCK:  Thank you.
 6              Nothing further of this witness, your Honor.
 7              THE COURT:  All right.
 8              Redirect?
 9              MR. PIMSNER:  Thank you, your Honor.
10                        REDIRECT EXAMINATION
11    BY MR. PIMSNER:
12    Q     Sir, would you -- is it fair to say that this was a very
13          fluid situation when you first responded?
14    A     Yes.
15    Q     This wouldn't be similar to a crime scene where you could
16          take your time and photograph different areas, is that
17          correct?
18    A     Not -- not at the time that it was initially developing.
19    Q     What was your number one priority at that point?
20    A     There were two priorities I had.  First, it was for the
21          people inside of 2870 West Magee, to try to get them out,
22          and -- to safety, and the second was to make sure that the
23          rest of the public in that area was not affected by it, and
24          the third was to monitor the deputies working under my
25          supervision to make sure they were okay.
```

```
 1              MR. PIMSNER:  Nothing further, your Honor.
 2              THE COURT:  Any questions from the jury for this
 3    witness?
 4              All right, may this witness step down and be excused?
 5              MR. PIMSNER:  Yes, your Honor.
 6              THE COURT:  Thank you, sir.  You may step down and be
 7    excused.
 8              ------------------------
 9              (Frank Walter, M.D., was duly sworn by the clerk.)
10                        FRANK WALTER
11                     DIRECT EXAMINATION
12    BY MS. ANDERSON:
13    Q    Sir.  Could you tell us what your occupation is?
14    A    Yes, I'm a physician.
15    Q    You're a medical doctor, correct?
16    A    Yes.
17    Q    I'll let you get your water before we proceed.
18    A    Sure.  Thank you.
19    Q    Do you live and work here in Tucson?
20    A    Yes, I do.
21    Q    Where do you work?
22    A    I work at the University of Arizona, University Medical
23         Center.
24    Q    And what do you do there?
25    A    I work as both an emergency medical physician, and as a
```

1  medical toxicologist.

2  Q  Okay.  We're going to get to your employment just a little

3  bit later, but before we do I'd like to talk about your

4  formal education.

5  First of all, where did you grow up, Dr. Walter?

6  A  I was born and raised in North Dakota.

7  Q  And did you go to school there?

8  A  I did, yes.

9  Q  You got your undergraduate degree in North Dakota?

10  A  Yes, I got my undergraduate degree from the University of

11  North Dakota.

12  Q  And did you ultimately go to medical school after that?

13  A  I did.  I went straight to medical school at the University

14  of North Dakota.

15  Q  And how long did you spend at that particular university

16  getting your medical degree?

17  A  I did my first two years of medical school there.  They're

18  the pre-clinical years, that which you spend in the

19  classroom and that sort of thing.

20  Q  Did you ultimately transfer to another school?

21  A  I did.  I transferred to Washington University in St. Louis

22  and got my M.D from there.  I did my two clinical years,

23  those in hospitals and clinics.

24  Q  What year did you obtain your medical degree?

25  A  I received my M.D. from Washington University in St. Louis

1          in 1984.

2     Q    Is that a notable school in terms of its quality of

3          education?

4     A    It is.  It's well-known.  It virtually always ranks in the

5          top ten medical schools in the country.

6     Q    Now, after you obtained your medical degree, did you obtain

7          any other further education after that?

8     A    I did.  I did a transitional internship, a one-year

9          internship at University of Minnesota, Hennepin County

10         Medical Center.  Thereafter, I did a two-year emergency

11         medicine residency at the rural branch of University of

12         California San Francisco, in Fresno.  After that I joined

13         the faculty there, and I did a three-year practice

14         preceptorship route to boarding in medical toxicology,

15         spending most of my time at the main campus.  I was working

16         full time in Fresno as a faculty member for the University

17         of California San Francisco at the county hospital, but then

18         on my vacation time I would go up and that would be the

19         preceptorship portion, and qualified to be boarded in

20         medical toxicology, at least sit for the boards after three

21         years in 1990.

22    Q    Now, you're actually board certified in toxicology, correct?

23    A    Yes, both in medical toxicology, and emergency medicine.

24    Q    So you have a dual board certification, correct?

25    A    I do.

1   Q   Is that unusual for doctors to have a dual certification

2       like that?

3   A   There are only about 500 board certified medical

4       toxicologists in the United States for this specialty.  It's

5       very unusual, yes.

6   Q   That was my next question.  Are there different kinds of

7       toxicology board certification, if you will?

8   A   There are different types of toxicologists.  I'm not sure if

9       that's what you're asking.  In terms of board certification

10      for physicians in the U.S., the American Board of Medical

11      Specialties is the major sort of overboard.  Within that

12      there are various primary specialties, such as emergency

13      medicine.  Within that medical toxicology is a sub-board of

14      the boards of emergency medicine, pediatrics, and

15      preventative medicine.

16   Q   Tell us what a medical toxicologist does.

17   A   Medical means that it's a physician, and toxicologist,

18      somebody who cares for patients exposed to or poisoned with

19      hazardous material, toxic material, medications, that sort

20      of thing.  And here in Arizona in venomization, snake bites,

21      scorpion stings, et cetera.

22   Q   Now, I understand that you got your board certification.

23      Are you required to do anything to maintain your board

24      certification?

25   A   Yes, for both my primary board in emergency medicine and

1          medical toxicology, recertification is required every ten

2          years.

3    Q    Are you required to take any sort of courses to maintain

4          your certification?

5    A    Yes.  You have to have a certain amount of continuing

6          education every year.

7    Q    How many hours?

8    A    I'd have to look exactly.  I exceed it by a lot, so I'm not

9          looking at that bare minimum.

10   Q    All right.  So we've talked about your formal education, and

11         now could you tell us where you -- what you do at the

12         University of Arizona Medical Center?

13   A    Sure.  I do a number of things.  I work shifts in the

14         emergency department.  I'm an emergency medicine physician.

15         I work both at the University Medical Center.  I work in the

16         adult side.  It's a level one trauma center, so we care for

17         all patients with all problems.  I also work in the

18         pediatric emergency department portion there.  I also do a

19         few shifts down at what we now call the south campus, and

20         what used to be called Kino Hospital.  I also take calls for

21         the Arizona Poison and Drug Information Center, which is

22         based at the University.

23   Q    Do you have any kind of teaching responsibilities at the

24         University of Arizona --

25   A    Yes.

1   Q    -- Medical School?

2   A    Yes, I teach medical students.  I teach residents, those

3        who've completed their M.D. and are on to specialized

4        training.  We also run an advanced HAZMAT life support

5        program.  We founded this program in 1999.  I was the

6        cofounder of that, and the editor for it.  And with that

7        program with regional directors throughout the U.S. and some

8        throughout the world we collectively have trained 13,513

9        people from 63 countries around the word.

10  Q    Now, what kind of folks attend that training that you just

11       described for us?

12  A    Of those 13,513 people, the largest single groups,

13       41 percent are paramedics; 23 percent are physicians; and

14       21 percent are nurses.  Then there are other smaller

15       percentages:  EMT basics, EMT intermediates; industrial

16       hygienists; pharmacists are 2 percent; respiratory

17       therapists; physician assistants are less than 1 percent.

18  Q    What are some of the things that are taught during that

19       course?

20  A    We taught -- we teach about the most common and most

21       dangerous hazardous materials, or toxic materials.

22  Q    Is chlorine one of those that is a topic of that discussion?

23  A    Yes, it is.  It is the prototypical moderately water soluble

24       irritant gas.

25  Q    Now, do you do any other training around the country, or

1          around the world for that matter?

2    A    I do.  With our advanced HAZMAT life support course I've had

3          the good fortune to teach around the country and around the

4          world.  I go back annually to Hong Kong.  The last four

5          years I've had the good fortune to go to teach in

6          Switzerland.  I teach both in the civilian setting and

7          military setting for special operators -- police special

8          operators.

9    Q    Now, do you have any expertise in the field of treating

10         patients who come to you who've been exposed to chlorine?

11              Have you had that occasion before?

12   A    Yes, occasionally we'll have these patients.

13   Q    Now, sometime back in 2011 I contacted you regarding this

14         case, did I not?

15   A    I believe you contacted me in 2010.  If my recollection is

16         correct, the letter that you sent me, I believe, is dated

17         December 20th 2010.

18   Q    And I --

19   A    I'd have to double check, but --

20   Q    I'm sorry, I didn't mean to interrupt.

21   A    But I believe it was 2010 that you contacted me.

22   Q    And I sent you some materials, did I not?

23   A    Yes.

24   Q    Now, let's talk a little bit about chlorine.  One of the

25         things that's in issue in this case is chlorine, and you --

1    you just told us that you have some training and experience

2    in the issues -- the medical issues in how chlorine may

3    affect the body of an individual, whether it be a patient

4    who -- who comes to see you in the emergency room, or a

5    patient that doesn't make it to the emergency room.  But

6    we're going to ask you some questions regarding chlorine.

7        And one of the questions that I have for you this

8    morning is in your opinion, does chlorine meet the

9    definition of a toxic chemical?

10  A    Yes.

11  Q    But before I ask you for your opinion, I want to read to you

12    the definition of a toxic chemical as Judge Jorgenson read

13    it to the jury when we first started this trial:

14        Toxic chemical means any chemical which through its

15    chemical action on life processes can cause death, temporary

16    incapacitation, or permanent harm to humans or animals.  The

17    term includes all such chemicals regardless of their origin

18    or of their method of production, and regardless of whether

19    they are produced in facilities, in munitions, or elsewhere.

20        So Dr. Walter, having now read that definition of toxic

21    chemical to you, in your opinion is chlorine a toxic

22    chemical?

23  A    Yes, it is.

24  Q    What's the basis for your opinion?

25  A    The basis would be my training, experience, knowledge of the

1    literature as a board certified medical toxicologist.

2  Q  What is some of that literature that you're talking about?

3  A  Well, there are many government databases that we as

4    individual citizens, not just as medical toxicologists, can

5    access through the National Library of Medicine here in the

6    United States.  There are others through the CDC, the EPA,

7    Agency for Toxic Substance and Disease Registry -- many

8    others.  U.S. National Library of Medicine.

9  Q  Have you referred to those in terms of your testimony here

10    today?

11  A  I have reviewed that material, yes.

12  Q  Now, the Centers for Disease Control and Prevention has

13    published numerous articles or publications on the issue of

14    chlorine, correct?

15  A  They have websites and government documents, yes.

16  Q  And does -- does that particular organization, the Centers

17    for Disease Control and Prevention, opine that chlorine is a

18    toxic chemical?

19  A  I believe they do, yes.

20  Q  Any other studies that you've -- that you've referenced in

21    order to come here and testify today?

22        You mentioned WISER.

23  A  Yes, in a -- a -- I've given you those all too long ago.

24    WISER is a National Library of Medicine Database.  It stands

25    for Wireless Information System for Emergency Responders.

```
 1        And this system is easily accessible.  You can search
 2        chlorine in it.  The key information says that it is toxic.
 3        It comes up initially.  You can look within that also and
 4        see the National Fire Protection Association Health Code.
 5        The National Fire Protection Association ranks hazards from
 6        0, no hazard, to 4, the highest level.  For chlorine its
 7        health hazard is 4.  That is the highest possible, or most
 8        dangerous level.  That is extreme.  And that means that
 9        it -- with very short exposure -- it is a material with very
10        short exposure that can cause death or major residual
11        injury.  That would be major lasting injury.
12   Q    Now, is chlorine also classified as a chemical warfare?
13   A    Yes, it has been used in chemical warfare.
14   Q    Could you --
15   A    Not only in Word War I, but also it was just recently in
16        Iraq, documented in 2007.
17            The other part of the WISER database too, they also
18        give acute exposure guideline levels.  These acute exposure
19        guideline levels are levels that are intended to address the
20        general public, or the general population including
21        individuals that may be more susceptible.  And so these
22        levels are for the general public, whereas other levels such
23        as Immediately Dangerous to Life and Health levels, IDLH
24        levels, would be occupational levels.
25   Q    Now, another issue that we -- that we'd like you to address
```

1    this morning is -- is what are some of the symptoms of

2    chlorine exposure in an individual?

3  A  The symptoms of chlorine exposure vary with the

4    concentration of the material in air, it is gas, and the

5    duration of contact.  So they can range from irritation of

6    the eyes, mouth, nose and throat, irritation of the skin.

7    Chlorine dissolves in the water of our eyes, mouth, nose and

8    throat, or our mucous membranes.  It can also dissolve in

9    the water of our perspiration, produces an acid which is

10   toxic to our tissues.  So our bodies are fearfully and

11   wonderfully made, so it might cause watering of the eyes as

12   we try to dilute it.  It might cause runny nose.  It will

13   cause burning and irritation of the eyes, mouth, nose and

14   throat which are moist.  Also, depending on the

15   concentration and duration of contact, it may burn lower

16   down.  As a moderately water soluble gas, it doesn't all

17   dissolve in our upper airway which is more moist.  It can

18   also go further down into our throat.  It can go down into

19   our windpipe.  And with continued exposure can go down into

20   the air spaces of our lungs and dissolve that two cellular

21   thick barrier between the air in our lungs and the blood

22   that circulates for our lungs.

23  Q  So if somebody would be experiencing breathing problems,

24   that could be consistent with chlorine exposure, correct?

25  A  Yes, depending on the concentration and duration of contact.

1    Q    Now, could the symptoms worsen if the person were closer to

2         the -- to the chlorine substance itself?

3    A    Yes.  If you have a point source, for example, the

4         concentration will be higher closer to the source of the

5         material, and it will get less further from the materials.

6         Also, because it is airborne, it will diffuse throughout the

7         air and dissipate with time.  If there's wind, it will tend

8         to blow away.

9    Q    Similarly, like concentration, duration of contact or

10        duration of exposure is another factor, correct?

11   A    Yes.

12   Q    So the longer that somebody might be exposed to the

13        chlorine, the more severe the symptoms, correct?

14   A    That is correct.

15   Q    Now, if somebody were more susceptible -- let's say that you

16        have somebody that's a little bit older and they have health

17        problems even before exposure to the chlorine, could that

18        affect them even more?

19   A    Yes.  You would -- again, that's why there are both general

20        population exposure levels, and workplace exposure levels.

21        In general -- in the general population we have young, we

22        have old, we have the sick, we have the infirm, we have

23        those with asthma, emphysema that may have more risk when

24        exposed to an irritant gas, that sort of thing.  And in the

25        workplace in general we have not the young and the old so

1    much, but more -- more healthier working age people, that

2    sort of thing.

3 Q  If -- if somebody were experiencing the skin on their face

4    slightly burning, could that be consistent with exposure to

5    chlorine?

6 A  Yes.

7 Q  If somebody were experiencing burning in the throat and

8    lungs, could that also be consistent with chlorine exposure?

9 A  Yes.

10 Q  Now, I want to talk to you a little bit about IDLH's.  And

11    you've touched on that a little bit but before I do that, I

12    want to go back and ask you about some information that we

13    received from the Northwest Fire Department.  Now, I sent

14    that information to you, did I not?

15 A  Yes, I believe that was the December 20th, 2010 -- yeah,

16    2010 letter.

17 Q  Now, those folks haven't testified yet, and -- and we're

18    taking you out of order because you've got some scheduling

19    conflicts, so we haven't heard from those folks yet.  They

20    haven't testified, but they provided information to us which

21    we passed on to you that they used a device called the

22    MultiRae in the garage of the Levine residence and

23    determined that the chlorine level was .5 parts per million

24    or above.  Is that correct?

25 A  I -- I might not have heard correctly.  My understanding and

1      my recollection was that in your initial letter you stated

2      that it was high, which meant greater than 5 parts per

3      million.  I may have misheard, but I thought you said 0.5.

4  Q   Well, actually, you're right.  They came up with a level on

5      their device that said high, but according to their -- where

6      they set their MultiRae device, that indicated a level of .5

7      parts per million or above, correct?

8  A   Not .5.  My understanding is 5 parts per million.

9  Q   Okay.  All right, I misspoke about that.

10  A   Not a half a part per million, which would be .5.

11  Q   Okay.  I apologize.  I misspoke about that.

12  A   There's nothing to apologize about.  There's lots of things

13      to keep straight.

14  Q   So 5 parts per million or above, correct?

15  A   Yes.  In the initial letter, my understanding and my

16      recollection was that you had stated greater than 5 parts

17      per million, and on further conversation with them you

18      clarified it was greater than or equal to 5 parts per

19      million.

20  Q   Okay.  So with that in mind, let's talk about the -- the

21      term called the IDLH.  Now, IDLH stands for Immediately

22      Dangerous to Life and Health, correct?

23  A   Correct.

24  Q   Could explain that to us?

25  A   I would like to refer to the materials that -- that I cited

1          in my initial letter to you regarding that, and also the

2          materials that Dr. Fox introduced.

3    Q     All right.

4               MS. ANDERSON:  May I approach the witness, your Honor?

5               THE COURT:  Yes.

6    BY MS. ANDERSON:

7    Q     Dr. Walter, I'm going to be handing you Government's Exhibit

8          Number 321, 322, and 323.

9    A     Thank you.  And the reason I ask for those is that different

10         government agencies define it differently, and they define

11         it differently at different times, so it can be confusing.

12         And when you asked me to respond to the questions in your

13         initial letter from 2010, you asked for clarity and brevity,

14         and so, again, there are multiple different definitions.  So

15         that's why I asked for these.

16              Thank you.  And thank you for taking me out of order

17         too.  I appreciate that.

18              Thank you all.

19              Would you like me to address these now, or respond to

20         specific questions?

21   Q     Sure.  Take a look at the material that you'd like to look

22         at before answering our question.

23   A     Sure.  I'll refer to it as I answer them too.

24              So in my initial letter to you -- in my only letter to

25         you I chose to use the OSHA, that is the Occupation Safety

1      and Health Administration, Field Safety and Health Manual,

2      and I chose that for three reasons.  Again, you'd asked me

3      to reply briefly to your inquiries, and so this is a very

4      brief definition.  It's also a very clear definition, and

5      it's a more recent definition.

6           It's dated May, 2011, and OSHA simply states -- and I

7      said that it was a simple definition in my letter to you.

8      OSHA simply states:

9           Immediately dangerous to life or health.  An atmosphere

10     that poses an immediate threat to life would cause

11     irreversible adverse health effects, or would impair an

12     individual's ability to escape from a dangerous atmosphere.

13          So again, that's probably the simplest, briefest

14     definition.

15  Q   Now, who is it that came up with this immediately dangerous

16     to life and health?  Was that OSHA?

17  A   It goes back, and is explained in this document.

18  Q   Which is Government's Exhibit Number?

19  A   323.

20  Q   Okay.

21  A   This is -- this is available -- it's currently available on

22     the Centers for Disease Control and Prevention website.  The

23     document is dated May, 1994, in contradistinction to the

24     other one that's dated May, 2011.  And it goes through at

25     length, and you can see it's quite long, and it goes through

1          the whole history of how it was derived, that sort of thing.

2                On the front page it gives two other OSHA definitions,

3          Occupational Safety and Health definitions.  Number one, an

4          atmospheric concentration of any toxic, corrosive, or

5          asphyxiant substance that poses an immediate threat to life,

6          or would cause irreversible or delayed adverse health

7          effects, or would interfere with an individual's ability to

8          escape from a dangerous atmosphere.  And again, that's on

9          the first page of this May, 1994, document.  And that's for

10         an IDLH value.

11               Right below that, the OSHA regulation defines an IDLH

12         condition.  So again, that's why there are multiple

13         definitions.  And this states:

14               Any condition that poses an immediate or delayed threat

15         to life, or that would cause irreversible adverse health

16         effects, or that would interfere with an individual's

17         ability to escape unaided from a permanent space.  So again,

18         permanent space, this reference to workplace exposures.

19    Q    And that's the IDLH, correct?

20    A    Yes, but there are other definitions within this document

21         that I think we should address.

22    Q    Sure.

23    A    So in 1974 you asked about how these were derived, and I'll

24         try to do it briefly.  I won't go through all these details,

25         but try to distill it.

1           The standard completion program in 1974, so 1974,

2    NIOSH, the National Institution for Occupational Safety and

3    Health and OSHA, Occupational Safety and Health

4    Administration, were asked to come up with these values.

5    And the purpose for establishing these back in 1974 -- the

6    initial purpose was to determine a concentration from which

7    a worker could escape without injury, or without

8    irreversible health effects in the event of respiratory

9    protection equipment failure.  In other words, they're on

10   the job site, they have respiratory protection, something

11   goes wrong.

12          Going down further, it states:  In determining these

13   IDLH values, the ability of the worker to escape without

14   loss of life or irreversible health effects was considered

15   along with severe eye or respiratory irritation and other

16   deleterious effect, for example disorientation or

17   incoordination that could prevent escape.  Although in most

18   cases egress from a particular work site could occur in much

19   less than 30 minutes as a safety margin, IDLH values were

20   based on the effects that might occur as a consequence of a

21   30 minute exposure.  However, the 30 minute period was not,

22   and they use capitalized letters, NOT, all capitalized,

23   meant to imply that workers should stay in the work

24   environment any longer than necessary following the failure

25   of respiratory protection equipment.  Again, they were

1      supposed to have respiratory protection equipment on

2      already.  In fact, and this is bold and all caps, bolded and

3      all caps -- in fact, every effort should be made to exit

4      immediately, exclamation mark.

5          So again, this is the history starting in 1974, as you

6      said.

7          Moving on, skipping lots of details, and you can see

8      why I went with clarity, brevity and recency in my choice

9      for the brief report that I gave you initially.  Now,

10     current NIOSH use, National Institution of Occupational

11     Safety and Health, current NIOSH use of IDLH values.  So

12     I'll read that to you:

13         Current NIOSH definition for an IDLH condition, again

14     we've heard of IDLH values, conditions, et cetera, is one

15     that poses a threat of exposure to airborne contaminants

16     when it's likely to cause death, or immediate or delayed

17     permanent, again immediate or delayed, permanent adverse

18     health effects, or prevent escape from such an environment.

19     And the purpose is to ensure that the worker can escape from

20     a given contaminated environment in the event of failure of

21     respiratory protection equipment which they should have been

22     wearing when they're in that environment to begin with.  And

23     it's the maximum level above which only a highly reliable

24     breathing apparatus providing maximum protection.  In

25     establishing the IDLH value, the following conditions must

1    be assured:

2         The ability to escape without loss of life, or

3    immediate or delayed irreversible -- so again, irreversible

4    applies to immediate or delayed health effects.  Thirty

5    minutes is considered the maximum time for escape so as to

6    provide some margin of safety in calculating IDLH.

7    That's -- that's the A portion.

8         The B portion, the prevention of severe eye or

9    respiratory irritation, or other reactions that would hinder

10   escape.

11   Q   Now, talking about the IDLH -- and that comes from OSHA

12       which is a workplace standard, correct?

13   A   Well, this -- this definition which I justed finished is

14       from NIOSH.  Both OSHA and NIOSH refer to workplace

15       standards.  Absolutely.

16   Q   Well, we're talking about a situation that wasn't a work

17       place, correct?

18   A   That's correct.

19   Q   Now --

20   A   It was for the -- for the first responders.

21   Q   For the first responders.

22   A   Yes, of course.  For the firefighters, and other first

23       responders.

24   Q   Are you familiar with AEGL?

25   A   Yes.

1  Q    And that stands for Acute Exposure Guideline Levels,

2       correct?

3  A    That is correct.

4  Q    And that's a little bit different than the IDLH?

5  A    That is.

6  Q    Could you briefly tell us what AEGL means, and what it

7       stands for?

8  A    Sure.  The AEGL is the Acute Exposure Guideline Level, and

9       that comes with three levels:  1, 2 and 3.  And not only is

10      there a level or concentration, and this level or

11      concentration, as I said, is for the general population,

12      including susceptible individuals.  And those susceptible

13      individuals could include the young, the old, the sick,

14      infirm, et cetera.  So that's an important distinction.

15          Also, not only are there three levels of that, but

16      there are five periods of time exposure, 10 minutes, because

17      again we said the toxicity depends on the concentration, and

18      there are three levels, 1, 2 and 3, and the time of

19      exposure.  Those five times of exposure are 10 minutes, 30

20      minutes, 1 hour, 4 hours, and 8 hours.

21  Q   And that goes into what you told us before, that there's two

22      factors that are important, which is the concentration and

23      the duration of the exposure, correct?

24  A   That's correct.  Do you want me to specifically address the

25      AEGL of chlorine?

1 Q Now, the AEGL of chlorine differs a little bit from the IDLH

2   of chlorine?

3 A That is correct.

4 Q Okay.  And could you tell us briefly what the differences

5   are?

6 A Yes.  So the Immediately Dangerous to Life and Health value

7   for chlorine is 10 parts per million.  The AEGL-2, that is

8   the mid level, for chlorine is 2.8 parts per million.  And

9   again, it makes sense that a work place exposure would have

10   higher concentrations and limits than an exposure for the

11   general population.  The AEGL-2 refers to the airborne

12   concentration of a material that could cause irreversible or

13   other serious long-lasting adverse health effects, or impair

14   the person's ability to leave that environment.  So that 2.8

15   parts per million occurs at both 10 minutes and 30 minutes

16   for chlorine.

17 Q At 2 -- at a level of 2.8?

18 A 2.8 parts per million for 10 minutes or 30 minutes for the

19   AEGL-2 for chlorine.

20 Q Level 2?

21 A Yes.

22 Q What is level 3 for the AEGL?

23 A I can't remember that off the top of my head, quite

24   honestly.

25 Q Okay.  I believe that it's in some of the literature that

1           you have there in front of you, is it not?

2     A     I could refer to it.  I have some materials in my bag.

3           Would you like me to do that, or not?

4     Q     Actually, I've got it here.  Let me -- let me provide it to

5           you.

6     A     I'd also -- from those materials I think it would be

7           important to include the definitions for AEGL-1 and 2 and 3.

8                MR. BOCK:  Judge, there's not -- objection, there's not

9     a question in front of him.

10               THE COURT:  No.

11               Go ahead, Ms. Anderson.

12               MS. ANDERSON:  May I approach the witness?

13               THE COURT:  Yes.

14               THE WITNESS:  Thank you.

15    BY MS. ANDERSON:

16    Q     Let's start first with AEGL level 1.  If we could briefly go

17          into that?

18    A     Sure.  And for that it -- it -- both AEGL-1 and AEGL-3 I

19          have not memorized.  Again, that -- those definitions are a

20          little longer.  I have memorized AEGL-2.

21    Q     Sure.

22    A     And that I shared with you, and that applies for any

23          chemical, and I also memorized the levels for chlorine.  So

24          if you'd like me to explain AEGL-1 and AEGL-3, on -- on this

25          document, it's briefly described as AEGL-1, non-disabling;

1       AEGL-2, disabling; and AEGL-3, lethal.  But again, there's

2       longer definitions, and I'd be happy to go through that to

3       help everybody's understanding.

4   Q   Well, AEGL-1 is -- is non-disabling, did you say?

5   A   Right.  It can still have health effects, such as irritation

6       and that sort of thing, which we talked about.

7   Q   And at what levels do we see that, and at what

8       concentrations?

9   A   For chlorine specifically, for 10 minutes, 30 minutes, 1

10      hour, 4 hours, and 8 hours it is 0.5.  That half a part per

11      million.  For AEGL-2, for which I gave you the very specific

12      definition, that is an airborne concentration that would be

13      predicted to affect the general population, including

14      susceptible people, to have irreversible or other serious

15      long-lasting adverse health effects, or impairing their

16      ability to leave that environment.  For chlorine at 10

17      minutes, that is 2.8, as I said.  At 30 minutes, it is 2.8

18      parts per million, as I said.  At 1 hour, it is 2 parts per

19      million.  At 4 hours, it is 1 part per million, and at 8

20      hours, it is 0.7 parts per million.

21  Q   How about AEGL level 3?

22  A   AEGL level 3, and again I haven't memorized the whole longer

23      and more detailed definition, but here the -- briefly, the

24      lethal, it is 50 parts per million at 10 minutes; 28 parts

25      per million at 30 minutes; 20 parts per million at 1 hour;

```
 1         10 parts per million at 4 hours; and 7.1 parts per million
 2         at 8 hours.
 3   Q     So we've talked about IDLH, and we've talked about AEGL's
 4         and what those are, just different levels -- different
 5         methods of describing levels and the kinds of signs and
 6         symptoms that one could expect to -- to incur or feel as a
 7         result, correct?
 8   A     Yes, different levels of exposure that produce different
 9         effects.
10   Q     But nonetheless, we're talking about chlorine which is in
11         your opinion a toxic chemical, correct?
12   A     Yes.
13             MS. ANDERSON:  Judge, may I have a moment?
14             THE COURT:  Yes.
15   BY MS. ANDERSON:
16   Q     Dr. Walter, chlorine is a gas, is it not?
17   A     Yes.
18   Q     And is it a --
19   A     At usual temperatures and pressures, yes.
20   Q     And does it have the ability to permeate into cracks and
21         crevices?
22   A     Well, a gas by definition will expand to fill any available
23         space.  So if that available space includes a small crack or
24         crevice, yes.
25   Q     Would you expect to see a higher concentration of chlorine
```

| | | |
|---|---|---|
| 1 | | in a closed -- in a closed environment? |
| 2 | A | Yes, if -- if you had a point source or a source for |
| 3 | | chlorine and that point source of chlorine were released in |
| 4 | | a confined space such as a room, a building, et cetera, that |
| 5 | | material will tend to stay there longer.  In other words, to |
| 6 | | get out of that confined space, it's going to have to go |
| 7 | | through, you know, the cracks under the doors, or in the |
| 8 | | walls, or that kind of thing.  If you have chlorine and it's |
| 9 | | released outside, obviously it's going -- you know, to |
| 10 | | diffuse to fill the available space.  The available space |
| 11 | | outside is not confined by walls, doors, windows.  That's |
| 12 | | what we call a confined space.  It's going to expand |
| 13 | | throughout the atmosphere that's available to it. |
| 14 | Q | And dissipate, correct? |
| 15 | A | Yes. |
| 16 | | MS. ANDERSON:  May I have just a moment? |
| 17 | | THE COURT:  Yes. |
| 18 | | MS. ANDERSON:  Judge, that's all we have. |
| 19 | | THE COURT:  All right. |
| 20 | | Cross-examination? |
| 21 | | MR. BOCK:  Judge, could we take our -- my |
| 22 | | cross-examination's going to be a little more lengthy than her |
| 23 | | direct, so could we take our break? |
| 24 | | THE COURT:  Well, why don't you get started, and then |
| 25 | | we'll break at noon and come back for the remainder of your |

```
 1   cross.
 2            MR. BOCK:  Okay.  Thank you, Judge.
 3                      CROSS-EXAMINATION
 4   BY MR. BOCK:
 5   Q    Good morning, Doctor.
 6   A    Good morning.
 7   Q    Now, first of all, have you testified before in criminal
 8        cases?
 9   A    I have testified as a witness to the facts, yes.
10   Q    So you were not a -- an expert witness?
11   A    I don't believe I've testified in court as an expert witness
12        regarding a crime, no.
13   Q    So you've never been qualified as an expert witness
14        regarding the type of testimony you gave today, is that
15        correct?
16   A    That would be a matter of law.  I'd leave that up to the
17        Court.
18   Q    Have you testified in civil cases?
19   A    I have testified in civil cases, yes.
20   Q    Civil cases involving money damages?
21   A    Yes.
22   Q    Now, are there any fees associated with your testimony
23        today?
24   A    Yes.
25   Q    Can you share with the jury what your fees are?
```

1    A    Sure.  It is $500 an hour.

2    Q    And how much time have you spent on this case?

3    A    I don't know.  Many hours.

4    Q    Many hours?  Do you -- have you submitted any type of

5         billing for your service to the government?

6    A    Yes, Ms. Anderson has all of that.

7    Q    Okay, and how much is that?

8    A    I'd have to refer to my documents to tell you exactly.  It's

9         many hours, and many dollars.

10   Q    Do you have any of those documents available?

11   A    Ms. Anderson has all those documents.  I believe I have some

12        of them with me.  I could refer to what's in my bag, yes.

13   Q    If you would be so kind.

14   A    I'd be happy to do that.

15             THE COURT:  Ms. Anderson, if you have that number

16   readily available, that might save some time.

17             MS. ANDERSON:  I don't have it readily available, your

18   Honor.

19             THE COURT:  All right.

20             THE WITNESS:  I don't have it here in a paper form.  I

21   sent those all electronically to Ms. Anderson.  She surely has

22   them, and I'm sure would be happy to provide them to you.

23   BY MR. BOCK:

24   Q    I would hope so.

25             Do you -- do you have any idea if you've exceeded

1          $30,000 in your -- in your preparation and testimony today?

2    A    I don't think it's $30,000, no.

3    Q    Okay, $30,000 would be 60 hours?

4    A    I don't think so.

5    Q    Okay.

6    A    Again, Ms. Anderson has all those details exactly.  Those

7          have been submitted.  And again, when she asked me to do

8          that, that's why I was brief initially.  I've tried to be

9          brief, and these are all our dollars that are being spent

10         here, all our taxpayer dollars.

11   Q    Now -- well, the taxpayer dollars do not go to the

12         University of Arizona, do they?

13   A    They do not.

14   Q    They go to you?

15   A    They go to me.  I'm taking a vacation day today, yes.

16   Q    Okay.  You also had a number of documents that were provided

17         to you by the government in preparation of your testimony

18         today, is that correct?

19   A    Yes.

20   Q    Can you go through the documents that you were provided --

21   A    Sure.

22   Q    -- by the government in preparation of your testimony?

23   A    Sure.  I can get them out and refer to them specifically.  I

24         can go from memory.

25              The important documents that Ms. Anderson sent

1      initially were the Pima County Sheriff's Department report,

2      the Northwest Fire Department report, and those were the

3      major documents that she applied -- or supplied to me

4      initially.

5           Let me refer to Exhibit 321.  And here I state:  Thank

6      you for your letter December 20th, 2010.  As requested, I

7      reviewed your letter and the following materials you sent

8      me.

9  Q    Could --

10 A    Northwest Fire incident report.

11 Q    Sir --

12 A    Pima County Sheriff's Department report, F.B.I. chemical

13     analysis report --

14 Q    Doctor --

15 A    -- and photographs from the scene.

16 Q    Doctor -- Doctor --

17 A    Yes, sir.

18 Q    Sir, if you could just read that to yourself, and then just

19     refresh your recollection --

20 A    Sure.

21 Q    -- and then just tell me what you reviewed.

22          THE COURT:  Well, we have the answer now on the record.

23 Can we move on, Mr. Bock?

24          MR. BOCK:  Yes, your Honor.

25          THE COURT:  Those are the documents he reviewed.

1            All right.

2   BY MR. BOCK:

3   Q    Did you review any documents from an F.B.I. agent by the

4        name of Rooney?

5   A    Ms. Anderson did send me other documents later, and I

6        could -- those were not used to prepare this written report,

7        Exhibit 321, and I could pull out what's been sent to me and

8        we can go through that in detail, if you'd like, sir.

9   Q    That's not necessary.

10           So you have a letter of January -- June 6th, 2011, that

11       you wrote to Ms. Anderson, is that correct?

12  A    Yes, sir.

13  Q    And is that a -- basically, the outline of your testimony

14       today, or are you augmenting your testimony through other

15       resources that you received from the government?

16  A    I'm just answering the questions both you and Ms. Anderson

17       have asked me today.

18  Q    Would you agree with me that a lot of chemicals are toxic?

19  A    Many chemicals are toxic.

20  Q    Is carbon monoxide from an auto exhaust toxic?

21  A    It is.

22  Q    And the toxicity of carbon monoxide would depend on the

23       concentration and the duration of exposure, would it not?

24  A    As we've said, for any material.

25  Q    Now, what is the color of chlorine gas if it makes a cloud?

1         What is the color?

2    A    Pure chlorine gas is a green or greenish yellow gas

3         depending -- different people see things differently, so

4         some people would say green, some people would say yellow,

5         some people would say greenish yellow.

6    Q    Do you know what color the clouds were that were reported at

7         the scene in this case?

8    A    Based on my recollection of the Northwest Fire Department

9         reports and the Pima County Sheriff's Department reports,

10        they state that it was a white cloud.

11   Q    What does that suggest to you?

12   A    That it is a mixture of chemicals.  And again, I carefully

13        said in my letter of June 6th, 2011:  Exposure to airborne

14        toxic chemicals, including chlorine, that was specifically

15        identified by Northwest Fire Department in a quote/unquote

16        high concentration in the garage.

17   Q    Sir, my question was as to the color of the cloud.

18   A    I specifically answered that it was white based on my

19        recollection of the Pima County Sheriff's Department

20        reports, and the Northwest Fire Department reports.

21   Q    What about a black cloud?  Would that be associated with

22        chlorine?

23   A    Well, again, the pure gas -- as I've stated, the pure

24        chlorine gas not mixed with other toxic chemicals, not mixed

25        with toxic products of combustion, or toxic products of

1      decompensation, pure chlorine gas, as I said, is either

2      green, or greenish yellow.  Different people would describe

3      it differently.

4  Q    So what could be mixed with a chlorine that could produce a

5      white cloud based on your training and experience?

6  A    Many things.

7  Q    Could something be mixed with chlorine that could produce a

8      black cloud?

9  A    Any -- any mixture -- again, mixtures are dependent on all

10     the components of a mixture.  And so again, the appearance

11     of a mixture of materials is dependent on all the materials

12     in that mixture.  It's not going to be determined

13     necessarily by a single compound.

14  Q    Do you think it's significant to have an airborne reading of

15     the cloud if a cloud is -- if a cloud is available?  Do you

16     think that's significant?

17         MS. ANDERSON:  Objection, form.

18         THE COURT:  Yes.  Could you restate that?  Significant

19  to who, Mr. Bock, and when?

20  BY MR. BOCK:

21  Q    Significant to a -- level determinations that you had

22     previously testified to as to parts per million?

23  A    It's always important to get the best data possible for any

24     measurement that is available.  The measuring equipment and

25     the measurements available are limited, so again, any

1         quantitative measurement possible is helpful.

2    Q    If someone were exposed to chlorine, would their clothing

3         necessarily have some chlorine residue to it, or would have

4         an odor associated with chlorine?

5    A    Not necessarily.  Again, it depends on the concentration,

6         and the duration of exposure.

7    Q    So would you say that the higher concentration, the more

8         likely someone's clothing would have some residue, or an

9         odor associated with the chlorine?

10   A    Potentially, yes.  Again, when we talk about residue, we

11        usually refer to solids or liquids.  Usually, gases are not

12        necessarily as apparent.  So for example, as I said,

13        chlorine can dissolve in the water of our eyes, mouth, nose

14        or throat, or perspiration on our skin, and then that would

15        undergo a chemical change to produce an acid, hydrochloric

16        acid and hypochlorous acid.  So those acids that were formed

17        from chlorine could be residual on skin, or the clothes if

18        the clothes were wet, but the chlorine gas itself, just like

19        any gas, tends to comes and go unless it undergoes some type

20        of change that makes it adherent.

21   Q    Well, if someone is tear gassed, doesn't that attach to

22        someone's clothing?

23   A    Tear gas is a misnomer.  Tear gas is not a gas.  There are

24        multiple different, quote/unquote, tear gases.  They are

25        what are called aerosols.  Aerosols are suspended solids or

1         liquids in air.  So when somebody is, quote/unquote, tear

2         gassed, they're not exposed to gas.  They're exposed to a

3         dust, or a mist that is adherent to their skin or clothes.

4    Q    Well, if there was testimony that it was a white cloud, and

5         there was testimony about a mist, would you then say that if

6         there was testimony that there was a mist associated with

7         the white cloud, that that might be something that the

8         chlorine cloud -- that might attach to someone's clothing?

9    A    I'm sorry.  I don't really understand your question.

10             MS. ANDERSON:  Objection, form, your Honor.

11             THE COURT:  Could you rephrase that, Mr. Bock?  And

12   then we'll -- after we get your new question and the answer,

13   we'll take a lunch break.

14             So go ahead.

15             MR. BOCK:  Thank you, Judge.

16   BY MR. BOCK:

17   Q    If there was testimony about the cloud, the observation of

18        the cloud, and it was being described as a cloud and mist?

19   A    Yes.

20   Q    And now my question to you is based on that description,

21        cloud and mist, would there be some residual odor, or

22        something attendant to a person's clothing if they came in

23        contact with that?

24   A    Anything is possible.  Again, a cloud is a mist.  It's a

25        liquid suspended in air, but that's a cloud that we think of

1    as water, water and -- and water is distilled water.  Cloud

2    is distilled water.  So again, we only have certain

3    measurements available to us, and so again, in terms of

4    toxic products of decomposition, or toxic products of

5    combustion, the smoke, a cloud, what have you, there can be

6    particulate matter, that could be solid liquid aerosols,

7    there can also be gases, such as in a fire.  When you have a

8    fire, you have smoke.  You have particulate matter, you have

9    carbon monoxide, you have carbon dioxide, and so -- so

10   again, I think here what you're describing is probably not a

11   pure single chemical or compound.

12        THE COURT:  All right, with that we'll take our lunch

13   recess.

14        Members of the jury, please continue to follow the

15   Court's admonition, and we'll see you back at 1:15.

16        So sir, you may step down.

17        THE WITNESS:  Thank you, very much.

18        (The jury left the courtroom.)

19        (The Court recessed at 12:03 p.m., and reconvened 1:24

20   p.m.)

21        THE COURT:  The record may reflect the presence of

22   counsel, the defendant.

23        And Jill, you can get the jury.

24        MR. BOCK:  Judge, Mr. Fries didn't get lunch, and he's

25   hungry.

1          THE COURT:  All right, did you want to have that

2    discussion before we bring out the jury?

3          MR. BOCK:  Well, if we could break a little early.

4          THE COURT:  Let me just see -- hold on a second, Jill.

5          (The marshal and the Court conferred at the bench off

6    the record.)

7          THE COURT:  All right, Mr. Bock, I consulted with the

8    marshal just off the record.  Would 2:30 be okay if we break at

9    that point, or we'll break right now -- is it available right

10   now?

11         THE MARSHAL:  I can work on that right now, Judge.

12         THE COURT:  We can do it right now, and take 15 more

13   minutes.

14         MR. BOCK:  We can wait until 2:30, your Honor.

15         THE COURT:  All right, let's do that, then.

16         All right, Jill, come on out.

17         (The jury entered the courtroom.)

18         THE COURT:  The record may reflect the presence of the

19   jury.  You may all be seated.

20         And Mr. Bock, you may continue with your questioning of

21   the witness.

22         MR. BOCK:  Thank you.

23   BY MR. BOCK:

24   Q    Now, Dr. Walter, I believe we established that you've read a

25        number of reports in preparation of your testimony, is that

```
 1              correct?
 2   A    Yes, sir.
 3   Q    And sir, you would agree with me that there was no report
 4        that stated there was a yellow green cloud associated with
 5        this situation?
 6   A    I would agree.
 7   Q    Now, does a white cloud in any way, shape, or form indicate
 8        to you what the concentration of chlorine might be?
 9   A    No.  Concentrations would need to be measured with a
10        measuring device.
11   Q    And a black cloud would not indicate to you what the
12        concentration of chlorine might be.  That would be the same
13        thing?
14   A    You need to measure the concentration.  If you want a
15        concentration, if you want a numerical value, you have to
16        measure.
17   Q    Now, chlorine has a odor associated with it, does it not?
18   A    It does.
19   Q    What is the odor threshold of chlorine?
20   A    You can see various things in various places.  I could look
21        at it specifically, if you wish.
22   Q    In your correspondence to the government on June 6th,
23        2011 -- do you have that with you?
24   A    I do, yes, sir.
25   Q    And has that been marked as an exhibit?
```

1  A  Yes, sir.  It's Exhibit 321.  321.

2  Q  Okay.  Would you look on page 2?

3  A  On there?

4  Q  Last paragraph.

5  A  Yes.

6  Q  Did you opine as to the detection of the chlorine's odor?

7  A  I did quote a source, yes.

8  Q  And what was the -- what was that source?

9  A  3.5 parts per million for this source.  And again, various

10    sources say various things.

11  Q  Okay.  If various sources said various things, you chose a

12    source that said 3.5, is that correct?

13  A  That's correct.  For this report, yes.

14  Q  And is there a reason why you chose that source over other

15    sources?

16  A  Let me think about that.  Let me look at it here in detail.

17        I chose it in reference to the question that

18    Ms. Anderson asked, what are some of the symptoms of

19    chlorine exposure in an individual, and symptoms are

20    described in this.  So that's why I chose this.  In that

21    paragraph not only does it give an odor threshold of 3.5

22    parts per million, the odor is pungent, suffocating, smells

23    like beach, chlorine can cause coughing, choking, throat

24    irritation, eye irritation --

25  Q  Sir -- sir --

1   A    -- tearing -- yes, sir.

2   Q    My question was confined to why you chose 3.5.  That was the

3        scope of my question.

4   A    My understanding was why I chose this reference, and that's

5        because it describes the symptoms that Ms. Anderson asked,

6        and 3.5 is in that paragraph.

7   Q    Okay.  Okay.  Chlorine's odor is detected at 3.5 parts per

8        million, is that --

9   A    For this source, yes.

10  Q    Okay.  Now, the -- you said that you had been provided with

11       Northwest Fire Department reports, is that correct?

12  A    Yes, sir.

13  Q    Did you read them?

14  A    Yes, sir.

15  Q    What is your recollection, sir, of how many chlorine

16       measurements were made?

17  A    I'd have to look specifically.  I have them highlighted, and

18       I have them with me.  There were multiple measurements made.

19  Q    If I told you there were nine that were made, would you

20       disagree with that?

21  A    I'd have to look and count specifically, but there are

22       multiple measurements, yes, sir.

23  Q    And how long would it take you to refresh your recollection

24       as to questions that I may cover with you regarding the

25       measurements that were made, and the results?

1   A    I could pull out the report right now.  Those are

2        highlighted --

3   Q    Okay.

4   A    -- for brevity and ease for everyone here to understand.

5             MR. BOCK:  Your Honor, I'd ask that the Court allow

6   that.

7             THE COURT:  Yes.

8             THE WITNESS:  Thank you.

9             THE COURT:  You can use your materials.

10            THE WITNESS:  I have that report here.

11  BY MR. BOCK:

12  Q    Okay, so how many chlorine measurements were made the day of

13       August the 2nd of 2009?

14  A    I'm looking on page 6 of the report.  One was made between

15       the entry time of 7:29 in the morning, and 7:58 -- I'm

16       sorry, 7:55 in the morning.  Another is documented on page 5

17       of that report at 10:35 in the morning.  Another at 12 in

18       the morning -- I'm sorry, 12 in the afternoon, noon

19       specifically.  One at 12:27, one at 12:43, and one at 1533.

20       Those are the ones that I have highlighted here.

21  Q    So how many are -- how many -- how many are those?

22  A    If I count those up, one, two, three, four, five -- six that

23       I have specifically for air measurements.

24  Q    Of the six that you have, how many results were 0?

25  A    Five of six.

1    Q    And what was the result inside the garage?

2    A    The result inside the garage is stated in the report as

3         high.

4    Q    Okay.  It doesn't state any type of number parts per

5         million, is that correct?

6    A    Not in their report, no, and that was the first measurement

7         made between 7:29 and 7:55 in the morning in the garage.

8    Q    And when was the time of the measurement in the house that

9         resulted in a zero reading?

10   A    That one, at least here that I have highlighted at 10:35 --

11        excuse me, let me look here.

12   Q    Do you not have one at 7:30 or 7:40 in the morning?

13   A    Let me look here.  If you'd like to direct me to it, I'd be

14        happy to look at it, and I'll see if I can find it quickly

15        too.

16   Q    I don't have that document in front of me.

17   A    Sorry.  That may be in the Pima County Sheriff's Department

18        report.  I'm happy to refer to that too.  There are -- there

19        are values in both those reports.  I'd be happy to refer to

20        them.

21   Q    I'd appreciate if you could do that too.

22             THE COURT:  You're going to have to provide those

23   reports to him.

24             THE WITNESS:  I do have them.

25             THE COURT:  Oh, you have those available.

1          THE WITNESS:  Yes.  I've tried to highlight those

2    quantitative values that I thought would be helpful to all.

3          So I'm now looking at the Pima County Sheriff's

4    Department report, and I'm looking at page 42 of their report.

5    The timeline, start time 0453 in the morning, so 4:53 a.m.  I've

6    got an air sample in the courtyard at 1243, air sample in the

7    garage at 1533, an air sample 11:15 in the command post

8    intersection of Casas and Magee at 11:15, and I don't seem to

9    find one -- I'd be happy to find one.  My recollection is that

10   there was a measurement in -- in the house, and that it too was

11   0.

12   BY MR. BOCK:

13   Q    Okay.  You just don't have the time, is that correct?

14   A    I just can't find the specific citation in the report --

15   Q    That's okay.  I can --

16   A    -- but my recollection is the same as yours.

17   Q    7 -- 70 something, right?

18   A    That I don't know.  That I don't know.

19   Q    We'll --

20   A    But my understanding was that there was a measurement within

21        the home that was 0 --

22   Q    We'll clear that up through other witnesses.

23   A    But the home is distinct from the garage.

24   Q    Now, you would agree that 6 parts per million is greater

25        than 5 parts per million, right?

| | | |
|---|---|---|
| 1 | A | 6 parts per million is greater than 5 parts per million, |
| 2 | | yes, sir. |
| 3 | Q | Now, you also talked about some symptoms that the government |
| 4 | | was asking you about with respect to the chlorine.  Do you |
| 5 | | remember that? |
| 6 | A | Yes, we've talked about the symptoms that anyone could |
| 7 | | experience when exposed to chlorine at various |
| 8 | | concentrations. |
| 9 | Q | And there could be other chemicals that cause the symptoms |
| 10 | | you describe, is that correct? |
| 11 | A | Yes. |
| 12 | Q | Oxides of nitrogen? |
| 13 | A | That is potential, yes. |
| 14 | Q | Now -- |
| 15 | A | They too are irritant gases. |
| 16 | Q | Now, chlorine has -- |
| 17 | A | And a toxic gas. |
| 18 | Q | Chlorine has commercial uses, does it not? |
| 19 | A | It does, yes, sir. |
| 20 | Q | And people use it for their pools? |
| 21 | A | Yes, sir. |
| 22 | Q | People use it for -- in bleach? |
| 23 | A | Yes, sir. |
| 24 | Q | What other -- |
| 25 | A | They can use it to bleach. |

1   Q    To bleach?

2   A    Yes.  The usual home bleach is usually sodium hypochlorite.

3   Q    And if you just have the chlorine tablet, it could

4        decompose, is that correct?

5   A    That is correct.

6   Q    And if it decomposes, it could give off any -- as high as,

7        what, 5 parts per -- 5 parts per million?

8   A    Again, concentrations could vary depending on the

9        circumstances of exposure, that sort of thing.  So I

10       wouldn't opine on a specific concentration that could be

11       released from pool tablets.

12  Q    Now, if one was in a 0 environment of chlorine gas, that

13       would have no effect, is that correct?

14  A    If no chlorine is present, chlorine can have no effect.

15  Q    And that would be measured as 0 parts per million, right?

16  A    That would be -- you could use 0 parts per million, yes.

17       You could use other concentration measurements too.  Yeah,

18       but regardless of the units, 0 is 0.

19            MR. BOCK:  Thank you.

20            THE COURT:  Are you done, Mr. Bock, or just returning

21  to your table?

22            MR. BOCK:  Oh, I'm sorry, your Honor.  I am done.  I

23  apologize.

24            THE COURT:  You are done.

25            MR. BOCK:  I'm done with my examination.

1           THE COURT:  Thank you.

2           Any redirect, Ms. Anderson?

3           MS. ANDERSON:  Just briefly, your Honor.

4                    REDIRECT EXAMINATION

5   BY MS. ANDERSON:

6   Q    Dr. Walter, over the lunch hour I had occasion to show you

7        bills that have been submitted to our accounting department,

8        correct?

9   A    Yes.

10  Q    And you'll agree with me that those bills total less than

11       7,000, correct?

12  A    That which you showed me, yes.

13  Q    And you believe that there's some additional bills, correct,

14       that are outstanding?

15  A    I believe there are.  When I looked at those dates, you

16       initially contacted me -- again, the date of your letter was

17       December 20th, 2010, and so that was near the end of that

18       time.  So I think there are at least 2011 dates, or 2010

19       dates that are missing there.

20  Q    So what's your best estimate?

21  A    My best estimate would be about $12,000 total.  That could

22       be wrong.  Again, I can go back and pull those files

23       electronically, and I'd be happy to do that.

24  Q    Let me ask you some -- let me ask you some questions that

25       Mr. Bock brought up on -- on cross-examination.  Now, you've

```
1            had occasion to review Dr. Fox's report, have you not?

2   A     You provided that to me, yes.

3   Q     And Dr. Fox is sitting here in the courtroom, correct,

4            throughout your -- your testimony?

5   A     I've never met him.  I don't know.

6   Q     All right.  Well, I can -- I'll tell you that before you

7            testified, Judge Jorgenson advised the jury that Dr. Fox

8            would be sitting throughout your testimony, and that --

9            that's common.

10               Now, Dr. Fox on page 4-2 of his report agrees that

11           chlorine is a toxic chemical, is that correct?

12               MR. BOCK:  Judge, I'm going to object to this --

13  A     That's correct.

14               MR. BOCK:  -- this line of inquiry.

15               THE COURT:  All right.  Can I see counsel at sidebar?

16                            BENCH CONFERENCE

17               THE COURT:  So your objection is?

18               MR. BOCK:  My objection is my doctor hasn't even

19       testified yet, and so if he's going to testify, then she can

20       impeach him, but this is improper at this point in time to have

21       this individual critique his report.  It's not in evidence.  He

22       hasn't even testified.

23               THE COURT:  Are you trying to save time, or are you

24       intending to bring him back possibly in rebuttal after Dr. Fox

25       testifies?
```

1          MS. ANDERSON:  I'm not sure he's going to be able to

2    because of his schedule, so we may not be able to call him back

3    in rebuttal.  But there was a lot of discussion and a lot of

4    cross-examination about whether or not chlorine is a toxic

5    chemical, and I wanted to bring out the point that defense

6    counsel's own expert in his report opines that chlorine is a

7    toxic chemical, and I think that's appropriate redirect.

8          THE COURT:  All right, but are you planning on covering

9    any other of --

10         MS. ANDERSON:  No.  No.

11         THE COURT:  -- his opinions, relating to Dr. Fox?

12         MS. ANDERSON:  I'm not.

13         MR. BOCK:  Judge, I just think that the way it's being

14   done is -- is not -- you know, they shouldn't be able to elicit

15   testimony from evidence that's not even in front of the Court.  I

16   gave him my report, and if they want to challenge anything they

17   can, or they can ask Dr. Fox when he testifies.  If he gives a

18   different answer, I don't have a problem with this guy testifying

19   by telephone.  You don't have to bring him back.

20         THE COURT:  As long as it's -- well, I think it might

21   be beyond the scope of cross if you were going to now have a

22   complete analysis of Dr. Fox's proposed testimony, but I'll allow

23   this limited -- you're not going to --

24         MS. ANDERSON:  I'm not.

25         THE COURT:  Because I do think it does relate to your

1   cross-examination about the nature of the substance, so -- and

2   you're not saying it's -- that this is untrue?

3          MR. BOCK:  No.

4          THE COURT:  No.  Okay.

5          MR. BOCK:  I'm not saying it's not true in this case.

6          THE COURT:  Right.

7          MS. ANDERSON:  And just one point for the record, and

8   that's as --

9          THE COURT:  I mean, it's not true that your expert did

10  say that?

11         MR. BOCK:  No.  Right.

12         MS. ANDERSON:  And as an expert witness, he can refer

13  to other things he relied upon.  That was one of the things he

14  looked at.

15         THE COURT:  Oh, he did.  That wasn't brought up in

16  direct?

17         MR. BOCK:  That's improper redirect too.

18         THE COURT:  Well, it's going to be fairly limited, so

19  your objection is overruled for this limited redirect

20  examination.

21         MR. BOCK:  I would object, and for the record I have

22  objected.

23         THE COURT:  Yes.

24          (The bench conference concluded.)

25         THE COURT:  All right, Ms. Anderson, you may proceed.

1          MS. ANDERSON:  Thank you, Judge.

2    BY MS. ANDERSON:

3    Q    Mr. Bock asked you about a reference in your article -- I'm

4         sorry, in your report that chlorine's odor is detected at

5         3.5 parts per million, correct?

6    A    That is correct.

7    Q    Do you recall that line of questioning?

8    A    Yes.

9    Q    Now, do you have any recollection of how close somebody

10        would have to be to the chlorine source at a level of 3.5 to

11        be able to detect the odor of pungent, suffocating, and

12        smelling like bleach?

13   A    Again, it's dependent not on a distance.  It's dependent on

14        the concentration of the material.  And again, each person

15        smells -- their ability to smell is different than other

16        people.  So again, this is a general number.  So that

17        concentration, if it is that concentration, it just

18        depends -- it's not a distance.  It's a concentration to the

19        material in the air.

20   Q    There's numerous variables that would enter in, is that

21        correct?

22   A    Yes.

23   Q    Mr. Bock took you through a series of --

24   A    I --

25   Q    Let me move on to the next question.

1   A    Sure.

2   Q    Mr. Bock took you through a series of -- of times, and a

3        series of -- of readings that he claimed were 0 for the

4        level of chlorine.

5             MR. BOCK:  Judge, that's --

6             MS. ANDERSON:  He --

7             MR. BOCK:  That's a misstatement, and I would object.

8             THE COURT:  Well, questions are not evidence, so I'll

9   have the jury rely on their memory of the testimony.

10            Go ahead, Ms. Anderson.

11  BY MS. ANDERSON:

12  Q    And you answered his questions regarding the various

13       measurements which were 0 and at various times.  However, we

14       didn't hear about where those measurements took place.  That

15       would be an important factor as well, correct?

16  A    That's correct.  And it relates to your previous question.

17       Depending on the source, that concentration of 3.5 parts per

18       million could be various distances from the source.

19            MR. BOCK:  I think that's unresponsive to her question,

20  Judge.

21            THE WITNESS:  Could you restate the question?  I'm

22  sorry.

23            THE COURT:  Well, no -- no.  I'll allow the answer to

24  stand.

25            Go ahead, Ms. Anderson.

```
 1              THE WITNESS:  I'm sorry.  Maybe I didn't understand.
 2   BY MS. ANDERSON:
 3   Q    My question was that when you're -- when you're taking
 4        levels -- chlorine measurement levels, it depends on where
 5        you are in terms of whether you're in a closed area, or
 6        whether or not you're in the open air, correct?
 7   A    Yes.
 8   Q    And it would be -- when you're evaluating a single
 9        measurement and a various time, it would be important to
10        know where those measurements are taken, correct?
11   A    Yes.  The location and the time, yes.
12              MS. ANDERSON:  May I have just a moment?
13              THE COURT:  Yes.
14   BY MS. ANDERSON:
15   Q    Along that same question, does the passage of time affect
16        chlorine concentrations?
17   A    Yes.
18   Q    How so?
19   A    As we said earlier, gas will expand to fill the available
20        space.  So if you have a certain amount of chlorine released
21        at a certain point, at a certain time, it is going to expand
22        to fill the available space.  So again, if you're in a
23        confined space, it will be confined to that space much
24        longer than if you're out in the open air.  Out of doors,
25        that available space is the whole outdoors.
```

1           MS. ANDERSON:  Thank you.  That's all I have.

2           MR. BOCK:  Judge, may I reopen my cross for three

3    questions?

4           THE COURT:  Yes, you may, and the government will have

5    a chance to respond on redirect if they'd like.

6           Go ahead, Mr. Bock.

7           MR. BOCK:  Thank you, your Honor.

8                         RECROSS EXAMINATION

9    BY MR. BOCK:

10   Q    Sir, are the -- there was an instrument that was used to

11        measure the chlorine gas, and it's called a MultiRae Plus 4.

12        Do you have any familiarity with that instrument?

13   A    As a physician, I interpret the data.  I don't generate the

14        data.

15   Q    Thank you.  So your answer is you don't know the ins and

16        outs of the --

17   A    I don't use that instrument, no, sir.

18           MR. BOCK:  Thank you, Judge.  I appreciate that.

19           Thank you.

20           THE COURT:  Any redirect on that issue with the

21   witness?

22           MS. ANDERSON:  No, your Honor.

23           THE COURT:  All right.

24           Members of the jury, any questions from the jury for

25   Dr. Walter?

1            All right, sir, if you could write it out, and hand it

2    to the clerk.

3            And Jill, one more.

4            And if I could see counsel at sidebar, please.

5                          BENCH CONFERENCE

6            THE COURT:  Okay, why don't we just all read them, and

7    then we'll talk about them on the record.

8            Any objection -- any objection to number 5?

9            MR. BOCK:  No objection, your Honor.

10           THE COURT:  Okay.  Why don't I have Ms. Anderson ask

11   this.  Is that okay?

12           MR. BOCK:  Sure.

13           THE COURT:  And you can follow-up -- and you can

14   certainly follow-up.

15           MS. ANDERSON:  Okay, your Honor.  Should I read this

16   one as it appears here?  It's a little --

17           MR. PIMSNER:  I don't think that's what it meant.  I

18   think it meant the readings of chlorine, the chlorine levels.

19           MR. BOCK:  Yeah, I think you should read it as its

20   written.

21           THE COURT:  Is a toxic reading weaker if taken as

22   toxic -- as the toxin -- let's see if he understands the

23   question.

24           (The bench conference was concluded.)

25           THE COURT:  All right, Ms. Anderson, you may ask the

1    questions from the jurors of the witness.

2              MS. ANDERSON:  All right.

3                          EXAMINATION

4    BY MS. ANDERSON:

5    Q    All right, I've got a -- I've got a couple of questions

6         here.

7              Is the toxin reading weaker if taken as the toxin cloud

8         is dissipating?

9    A    Yes.  As the material dissipates, that concentration will

10        grow less and less and less, ultimately to 0.

11   Q    If this courtroom was filled with a -- I'm sorry, it looks

12        like greater than or equal to 5 parts per million

13        concentration of chlorine gas, would it be hazardous to the

14        occupants?

15   A    Greater than or equal to 5 parts per million?

16   Q    Yes.

17   A    Yes, and that's based on the Acute Exposure Guideline Level

18        of 2.8 parts per million for either 10 minutes or 30

19        minutes.  So if we stayed in this room, we as members of the

20        general public, some of us may be susceptible individuals,

21        for 10 minutes at 5 parts per million, which is greater than

22        2.8 parts per million, the AEGL-2 for chlorine, we would be

23        at risk of irreversible or other serious or long-lasting

24        adverse health affects, or it may impair our ability to

25        leave this room probably based on tearing of the eye, that

```
 1        sort of thing, maybe potentially impairing vision.
 2             THE COURT:  Any follow-up questions from the government
 3   to those questions, Ms. Anderson?
 4             MS. ANDERSON:  May I have just a moment?
 5             THE COURT:  Yes.
 6             How about you, Mr. Bock?  All right, why don't you come
 7   on up and ask your question.
 8                            EXAMINATION
 9   BY MR. BOCK:
10   Q    The question about the cloud dissipating, again we
11        re-covered this, but the best evidence would be to try and
12        get a reading from the cloud itself, is that correct, to
13        capture some of the -- the cloud?
14   A    In terms of sampling, you'd like to sample where the
15        concentration would be highest, or most persistent before
16        the material has dissipated or left.
17   Q    Now, you talked -- there was another question from the jury
18        about the 5 parts per million within the context of the
19        courtroom, right?
20   A    Yes.
21   Q    Now, we've talked about this IDLH, right?
22   A    Yes.
23   Q    Does that concept talk about a timeframe?
24   A    Yes, just like the AEGL also, the timeframe -- again, and we
25        went through all those various specific definitions.
```

1    Q    And the IDLH would be a concept of 30 minutes to escape?

2    A    Based on the NIOSH definition, not the OSHA definition which

3         I read and supplied.

4    Q    Okay.  So which definition would be 30 minutes to escape?

5    A    That would be NIOSH, and that specifically -- that specific

6         wording would be the ability to escape without loss of life,

7         or immediate or delayed irreversible health effects.  Thirty

8         minutes is considered the maximum time for escape so as to

9         provide some margin of safety in calculating the IDLH value.

10        And it also relates to prevention of severe eye or

11        respiratory irritation, or other reactions that could hinder

12        escape.  That's NIOSH.

13   Q    And so what about the Center for Disease Control?  Do they

14        have a definition?

15   A    Pardon?

16   Q    The Center for Disease Control.

17   A    The Centers for Disease Control and Prevention in May of

18        1994 put out this summary sheet that we've introduced -- or

19        was introduced as Exhibit 323, and it goes through multiple

20        long definitions for both OSHA and NIOSH.

21   Q    So if the -- in the hypothetical that the -- the juror

22        asked, if there was 5 parts per million in this courtroom

23        and you left within 30 seconds to a minute, there would be

24        just no effect, is that correct?

25   A    Not necessarily, no.  When you say no effect, that means no

1  effect.  So we could have irritated eyes, mouth, nose and

2  throat.  When you refer to the IDLH concept -- again, I want

3  to be very clear about it, we're talking about loss of life,

4  or immediate or delayed irreversible health effects.  So

5  we're talking about irreversible health effects or death.

6  We're not talking about no health effects.  We're not

7  talking about irritation, burning eyes, mouth, nose or

8  throat, or that sort of thing --

9  Q  We're not talking about modest irritation, right?  We're

10  talking about something far more severe?

11  A  For the IDLH?

12  Q  Right.

13  A  Again, I've read that repeatedly.

14  Q  I understand.

15        MR. BOCK:  Okay, thank you.

16        THE COURT:  Any follow-up questions from the

17  government?

18        MS. ANDERSON:  No, your Honor.

19        THE COURT:  Any additional questions from the jury?

20        All right, may Dr. Walter step down and be excused?

21        THE WITNESS:  Thank you, all.

22        MS. ANDERSON:  Yes, your Honor.  Thank you.

23            ------------------------

24        (Christopher McCracken was duly sworn by the clerk.)

25            CHRISTOPHER MCCRACKEN

```
 1                          DIRECT EXAMINATION
 2    BY MR. PIMSNER:
 3    Q    And it's Deputy McCracken, correct?
 4    A    Yes, sir.
 5    Q    And who are you employed with?
 6    A    Pima County Sheriff's Department.
 7    Q    And how long have you been with the Pima County Sheriff's
 8         Department?
 9    A    Five years.
10    Q    And what are your duties as a deputy sheriff?
11    A    I'm a patrol officer, work out in the Tucson mountain area.
12    Q    And as a patrol officer, what are your typical type of
13         duties?
14    A    First response to 9-1-1 calls, on-site activities, and just
15         responses.
16    Q    And back on August 2nd of 2009, were you on duty that day?
17    A    Yes, sir.
18    Q    And what were your hours?
19    A    2200 to 0600, which is 10:00 p.m. to 6:00 a.m.
20    Q    And at some point -- where were you working at -- at that
21         time?  What -- what area of Tucson?
22    A    The Foothills District.
23    Q    And generally describe what area that covers?
24    A    It would be northwest Tucson from approximately Prince,
25         north to Oro Valley, west to I-10.
```

1   Q   Did you become aware at the time back on August 2nd that

2       there was a -- from dispatch that there was a call regarding

3       a chemical smell in a certain location?

4   A   Yes, sir.

5   Q   And when -- and approximately when did that call come in?

6   A   I responded approximately 0500 hours.  5:00 a.m.

7   Q   Now, were you one of the deputies that were actually

8       dispatched to go to that location?

9   A   No, sir.  I was a backup unit.

10  Q   And what was -- do you recall the address of that location

11      that was dispatched?

12  A   I know it was on West Magee, but I'm not sure of the

13      numbers.

14  Q   Okay.  Would it have been near Jensen Road?

15  A   Yes, sir.

16  Q   Now, who were the other deputies who responded before you?

17  A   That would be Deputy Atwell and Deputy Baird.

18  Q   And where were you coming from that morning at five -- you

19      said you responded approximately 5:00 a.m.?

20  A   I was coming back from the jail.  I just took someone to

21      jail, so I was on my way back to district.

22  Q   And how far were you from that area when you started to

23      respond to that call?

24  A   I believe I was on I-10 and approximately Miracle Mile.

25  Q   So it took you a few minutes to -- to get to that area?

1    A    Yes, sir.

2    Q    Now, when you were getting close to the area of -- of Magee

3         an Jensen, did you notice anything unusual?

4    A    When I pulled into the -- near the address, I saw a very

5         dark cloud start to come from the front of the house.

6    Q    And let me ask you to lift that up -- up, the -- maybe just

7         rest it on the edge behind you so the jury can see it.

8    A    Okay.

9    Q    Maybe right here.  I'm sorry.  And if you could use the

10        pointer.  If that would help.

11             THE COURT:  You can also pull the microphone over if

12   you'd like, sir, and just pull that over, talk into the

13   microphone while you're referring to the diagram.

14             Thank you.

15   BY MR. PIMSNER:

16   Q    Now, that exhibit has been admitted into evidence.

17             Do you recognize that aerial photograph?

18   A    Yes, this is the -- this is the house where the incident

19        occurred, and over there is 2870 West Magee.

20   Q    Okay, and so when you're responding, you're coming down

21        Magee Road at that point, is that correct?

22   A    Yes, sir.  I was coming down from Magee, so it would have

23        been eastbound on Magee.

24   Q    And where would you have turned to get into -- or did you

25        turn to get into that property?

1   A   I did.  There's an entrance.  It's not on the map -- well,

2       a -- it comes down approximately right here.  It then turns

3       into this road, which is Casas -- was it Media?  And there's

4       a guard tower or shack right here.

5   Q   So just below that picture there would have been a -- a

6       guard shack that would -- that was manned?

7   A   I don't -- I'm not sure at this moment.

8   Q   And did you bypass the guard shack?

9   A   I did.  I proceeded around and parked my patrol vehicle near

10      these -- this opening where the palm trees are.

11  Q   And at what point did you notice something unusual?

12  A   As I was pulling into -- like I said, as I was pulling

13      into -- around the guard shack I saw the smoke coming from

14      the -- where it's labeled A, the middle residence here,

15      coming from the front.

16  Q   So you actually saw it as you were turning off onto Magee

17      before you actually got in front of -- or closer to the

18      actual residence, correct?

19  A   Yes, sir.

20  Q   Okay.  And what did the cloud look like to you at that

21      point?

22  A   It was a very dark cloud.  From the source it was very dark

23      in color.  As it got away from the source, it turned into,

24      like, a white -- whitish gray.

25  Q   And when you first saw the cloud, did it appear that it was

```
 1        static, or was it changing?
 2   A    It was -- it was changing.  It was increasing in size
 3        dramatically.
 4   Q    Okay, and so you came around the corner towards the front of
 5        that -- the Magee residence?
 6   A    Yes, right here where the palm trees are.  I parked my
 7        patrol vehicle at that -- at that section right there.
 8   Q    And was the cloud still developing and producing at that
 9        point?
10   A    Very much so.
11   Q    How large of a cloud was it?
12   A    At this point it was a -- it was starting to consume this
13        entire -- I guess it would be a cul de sac, this triangle,
14        cul de sac here, and that's when the other deputy came
15        across the other side.
16   Q    Okay, and what deputy would that have been?
17   A    That would have been Deputy Baird.
18   Q    Now, you said it started out being kind of a blackish type
19        smoke?
20   A    Very dark, yes.
21   Q    And then as it expanded it lightened up?
22   A    Yes, sir.
23   Q    Now, did you get out of your car at that point?
24   A    I did, yes, sir.
25   Q    And did you notice any kind of odor?
```

1    A    It was very strong, chlorine smell.

2    Q    Are you familiar with chlorine smell?

3    A    I've -- yes, sir.

4    Q    And have you worked with chlorine, or even in a personal or

5         professional capacity?

6    A    I've visited community pools before.

7    Q    And when you -- when you pulled up and got out, you -- you

8         said you noticed -- noticed the odor.  Did you see at this

9         point -- was the cloud still expanding?

10   A    It was heavily expanding into this entire area, which was

11        starting to consume Deputy Baird and I who were trying to

12        get our gas masks on.

13   Q    And did Deputy Baird have a gas mask when he came up to you?

14   A    He did not.  He asked for one from me.

15   Q    And did you give him some form of protection for his

16        breathing?

17   A    I did.  It was a half mask which covers your nose down

18        around your mouth, and a paper filter.

19   Q    So it just has a filter.  It doesn't have an independent

20        oxygen source or anything?

21   A    No, sir.

22   Q    And did you don some breathing equipment on?

23   A    I did.  It's also a gas mask but it's a full face mask that

24        goes over your face and down to your chin, and that has also

25        just a cannister.

1  Q   So it has a filter like the air filter you described but is

2      it a more sophisticated filter?

3  A   It's used more for riot control.

4  Q   So it does act as a filter, but again, you don't have some

5      kind of independent oxygen?

6  A   No, I didn't not have -- no.

7  Q   Did you request backup when you saw the extent of the smoke

8      when you first pulled up?

9  A   Initially, when I came across I advised -- I believed it was

10     a house fire, to send more units to help with evacuation.

11  Q   Now, when you saw Detective Baird {sic} coming towards you,

12     did you also see Detective -- sorry, Deputy Atwell?

13  A   Yes, I did.

14  Q   And where was Deputy Atwell?

15  A   During my initial response I came across here.  Deputy

16     Atwell, Deputy Baird were escorting the victims out of the

17     house through the back yard.  That was when I parked my

18     vehicle, and Deputy Baird ran across -- was advised by

19     Atwell who was yelling at us that it was a chemical.

20  Q   And so Deputy Atwell would have stayed with the Levines?

21  A   I'm not sure.  After -- after seeing him with the Levines, I

22     did not see him again.  I'm not sure where he went.

23  Q   And -- but they -- was Deputy Atwell taking the Levines in

24     to an area away from the smoke?

25  A   Yes, he was escorting them -- it would have been, I believe,

1      north.

2   Q   Now, did you -- what did you do -- you and Deputy Baird do

3       after you donned your masks?

4   A   We began knocking on these units here to evacuate people.

5   Q   Now, could you see -- could you clearly see those units from

6       where you were at?

7   A   No.  At this point we were consumed by this -- this cloud

8       that extended pretty much into Fairview Way Circle and down

9       in these units to the south.

10  Q   And was that cloud low hanging?

11  A   Very.

12  Q   Would you describe it that it was ground level?

13  A   It was from the ground.  I couldn't see up.

14  Q   And how would you describe the thickness of the cloud?

15  A   We couldn't see -- we couldn't see beyond these units, and I

16      couldn't see across through this brick wall or this desert

17      area.

18  Q   Now, you -- you and Deputy Baird evacuated that -- those

19      front structures, correct?

20  A   Yes, sir.

21  Q   What about the -- the two homes on either side of the

22      Levine's residence?

23  A   We were advised -- I'm not sure exactly who told us, but we

24      were advised that these subjects had already moved out prior

25      to the incident.

1   Q   So they were vacant?

2   A   Yes, sir.

3   Q   And did you travel anywhere else through the cloud?

4   A   As I said earlier, I couldn't see through -- because I was

5       here and I couldn't see through this way, so I didn't know

6       if there was any other residents on this side, so I ran

7       through the cloud to the brick wall, looked over, saw the

8       desert area and saw these houses.  So this -- actually, this

9       road.  So I believed that there was other residents, asked

10      Deputy Baird to go evacuate that area.

11  Q   Now, when you were evacuating the -- the homes in the

12      neighborhood, I take it you still have your mask on

13      initially, correct?

14  A   Yes, sir.

15  Q   Were you required to take it off, or did you have to take it

16      off when you were communicating with the residents?

17  A   In order to allow the residents to understand what I was

18      saying, I had to take it off.

19  Q   And were you also giving reports over your radio as to what

20      was happening?

21  A   Yes.  Sergeant Carpenter requested what we call code 20,

22      check welfare status of the deputies every minute, so every

23      minute we were coming up over the radio advising that we

24      were okay, and still actively working.

25  Q   Now, each time you had to communicate, what did you have to

1      do?

2  A  I had to take my mask off in order to speak to the

3      residents, or over the radio.

4  Q  And would that expose you to the cloud?

5  A  Yes, it did.

6  Q  And did you experience any symptoms as a result of the

7      exposure to the cloud?

8  A  Irritation to the eyes, the nose, and throat.

9  Q  And were you coughing?

10  A  Yes, sir.

11  Q  And how would you describe your cough?

12  A  A burn, a -- it burned every time, and the cough would try

13      to remedy the -- the burning sensation, but it would -- just

14      wasn't effective.

15  Q  And when you were running by the front of the house of the

16      Levine's residence to see what was on the other side, did

17      you notice anything unusual at the front of the Levine's

18      house?

19  A  I noticed a -- there was a cannister with scorch marks,

20      and -- it appeared white pellets or something on the ground.

21  Q  And was it still smoking at the time that you ran by?

22  A  Yes, it was.

23  Q  Okay.  And after you finished evacuating that area, and --

24      did Deputy Baird go over to the other area and start

25      checking on those homes?

1    A    Yes, sir.

2    Q    And what did you do after that point?

3    A    Once we were assured people were out of the immediate area,

4         I briefed Sergeant Carpenter, and then was instructed by

5         Sergeant Carpenter to assist Deputy Atwell in interviewing

6         the Levines.

7    Q    So you would have gone to an area that -- that -- away from

8         the smoke at that point, or away from the cloud?

9    A    Yes.  The cloud was staying -- was staying in perfect form

10        for the cloud, and it would just basically migrate with the

11        wind across Magee.  So we had a staging area -- I'd say

12        approximately in this area here.

13    Q    And how long did you see the cloud in that area, do you

14        recall?

15    A    The cloud was there until -- or it was continuing down the

16        road until I left the scene.

17    Q    And so the cloud was actually drifting?

18    A    Yes, it was migrating to the south and west.

19    Q    And was it -- was it moving quickly?

20    A    No, sir.

21             MR. PIMSNER:  And may the witness be shown Exhibit 126?

22  BY MR. PIMSNER:

23    Q    Let me ask you to look at Exhibit 126.

24         Do you recognize that?

25    A    That would have been the front of the residence.

1    Q    And now, when you saw it, it wasn't as clear as it is in

2         this photograph, is that correct?

3    A    No, and the cannister that is melted or whatever was there,

4         but it wasn't that melted.

5    Q    So when you ran by, and -- but does that accurately reflect,

6         like, the white peanut foam balls that you were describing

7         earlier?

8    A    It was white pellets.

9    Q    White pellets?

10   A    Yes.

11   Q    And when you saw -- where was the bucket -- or the device

12        that you saw when it was still smoking?  Was it visible?

13   A    It was against the garage door.

14   Q    Where the scorch marks are?

15   A    Yes, sir.

16   Q    And that hole in the garage, that wasn't present, correct,

17        when you went by the garage?

18   A    No, sir.

19            MR. PIMSNER:  I'd move to admit Exhibit 126 and have it

20   published for the jury.

21            MR. BOCK:  Subject to my previous record, your Honor.

22            THE COURT:  All right, subject to that 126 is admitted.

23   BY MR. PIMSNER:

24   Q    So the device or cannister that you described it as, would

25        it have been -- point on the screen as to where you would

1         have seen it when it was still smoking.

2    A    Should I point to it on the screen?

3    Q    Yeah, it will leave a mark.

4    A    Okay.

5    Q    And so do you see that cannister in this photograph?

6    A    I do not.

7    Q    Did you recall as you were running through the area that

8         the -- do you recall seeing the -- the sludge or the -- the

9         aftermath from that reaction?

10   A    I saw the -- basically, bottom half of the cannister, and it

11        was -- it was just -- stuff was coming out of it.

12   Q    Red stuff?  Is it similar to what is in this photograph?

13   A    I just remember the cloud, like the -- the dark -- it was

14        dark at the base, and then it started getting light at the

15        top.

16   Q    And you described some of the symptoms that you experienced.

17        How did your eyes feel when it was exposed to that smoke?

18   A    Irritated.

19             MR. BOCK:  That's been asked and answered, Judge.

20   Objection.

21             THE COURT:  Well, I'll allow the answer to stand.

22   Q    I'm sorry?

23   A    Irritated.

24   Q    Irritated.  How would you -- in what way?

25   A    Burning.

1              MR. BOCK:  Objection, your Honor.

2              THE COURT:  No, overruled.

3              Go ahead.

4              THE WITNESS:  Sorry.  Burning, itchy.

5    BY MR. PIMSNER:

6    Q    And you also testified that you smelled a chlorine smell?

7    A    Yes, sir.

8    Q    How would you describe the strength of that smell?

9              MR. BOCK:  Objection, your Honor.  No foundation.

10             THE COURT:  No, overruled.

11             Go ahead.

12             THE WITNESS:  A community -- a community pool on

13   steroids.  It's an overwhelming odor.

14   BY MR. PIMSNER:

15   Q    Something that you would never have experienced --

16             MR. BOCK:  Objection to that, your Honor.

17             THE COURT:  Well, let him finish the question and then

18   you can -- go ahead, counsel.

19   BY MR. PIMSNER:

20   Q    Would it have been anything that you would have experienced

21        at a community pool, I guess?  What do you mean by on

22        steroids?

23   A    It was very intense, that if it was at a community pool I

24        wouldn't be going there.

25             MR. PIMSNER:  All right.  Nothing further, your Honor.

 1              THE COURT:  All right.

 2              Cross-examination?

 3              MR. BOCK:  Thank you, your Honor.

 4              Can this exhibit be removed, your Honor?

 5              THE COURT:  Pardon me?

 6              MR. BOCK:  Can this exhibit be removed from the screen?

 7              THE COURT:  Yes.

 8              MR. BOCK:  Thank you.

 9                        CROSS-EXAMINATION

10   BY MR. BOCK:

11   Q    Good afternoon, Deputy.

12   A    Good afternoon, sir.

13   Q    You wrote a report in this case, is that correct?

14   A    Yes, sir.

15   Q    Did you read it before you came to court today?

16   A    Yes, sir.

17   Q    I'm going to ask you some questions about your report.  Do

18        you think you need it in front of you?

19   A    If you have one available, I would like it, yes, sir.

20   Q    Okay.

21              MR. BOCK:  I have a Exhibit Number 413, and it's the

22   deputy's report, your Honor.  It was -- I'll show it to him, if I

23   may approach?

24              THE COURT:  Yes, you may.

25              MR. BOCK:  It was dictated by him.  He has a badge

1    number of 6548, the date is 8/4 of '09 at 0409 hours.

2            THE WITNESS:  Thank you, sir.

3    BY MR. BOCK:

4    Q    Does that exhibit which is marked as Number 413 look

5         familiar to you?

6    A    Yes, sir.

7    Q    So what time did you -- on August the 2nd of 2009 what time

8         were you -- was your duty assignment?

9    A    I was patrol.

10   Q    Okay, what time did you start your patrol?

11   A    2200 the night before.

12   Q    2200 is 11:00 o'clock?

13   A    It's 10:00, sir.

14   Q    10:00.  Long time since I've been in the military.  10:00.

15           And so what time would your total shift have been?

16   A    It would have been eight hours, which would have been over

17        at 6:00 a.m.

18   Q    And what time did you actually get off that day?

19   A    You know, I'm not sure without having my time sheet

20        available.

21   Q    Do you have any feel?

22   A    I'm sorry?

23   Q    Do you any feel for what time you might have gotten off?

24   A    It was late.  It was later than it should have been.

25   Q    Okay, was it still light out?

1    A    Yes, sir.  Actually, it was -- well, it's dark before so it

2         became light when I went home.

3    Q    Okay, so what were you -- what were the -- what were your

4         responsibilities?  Just give me a summary from -- you've

5         talked about arriving, and you've talked about putting the

6         gas mask on.  You talked about evacuating people.

7    A    Yes, sir.

8    Q    Tell me what you did up until the time -- in a summary, up

9         until the time that you went home?

10   A    From the incident to the time I went home?

11   Q    Yeah, just a quick timeline.

12   A    I arrived, donned gas masks, evacuated, debriefed, waited

13        for further instructions.

14   Q    Okay.  And when you say waited for further instructions, are

15        you seated someplace, or are you --

16   A    I was near the staging area waiting for Sergeant Carpenter

17        and Lieutenant Field.

18   Q    And so did you discuss things with them before you went

19        home?

20   A    Yes, sir.

21   Q    And you were in a uniform, is that correct?

22   A    Yes, sir.

23   Q    Did your uniform have any odor to it when you went home?

24   A    I don't recall.

25   Q    Okay.  So you went home on a -- that would have been a

1          Sunday, is that correct?

2     A    Yes.

3     Q    And when was your next work day?

4     A    It would have been that night.

5     Q    And did you go to work that night?

6     A    I believe so.

7     Q    And what would -- what would your responsibilities -- what

8          time would you have gone to work that night?

9     A    It would have been 2200.

10    Q    2200, 10:00?

11    A    Yes, sir.

12    Q    And so you probably were off maybe five or six hours before

13         you went back to work?

14    A    No, sir.  I left a few hours after.

15    Q    Okay.  I'm sorry.

16    A    So it would have been approximately 8:00.

17    Q    You went to work at 8:00 o'clock that Sunday night?

18    A    No I left the scene at approximately 8:00 o'clock.

19    Q    Okay, and then you worked until 10:00 the same night?

20    A    Yes, sir.

21    Q    So did you go home and change or -- did you do anything?

22    A    8:00 a.m.

23    Q    Oh, 8:00 a.m.  I'm sorry.  So you went -- had something to

24         eat maybe, went home, relaxed, and got up the next morning,

25         changed to go back to your 8:00 a.m. assignment?

1   A   I'm not sure exactly what happens.  Normally after a normal

2        day I go home, I go to sleep, wake up, do whatever until

3        10:00 when you go back to work.

4   Q   Okay.  That's what you did the next day, right?  You went

5        back to work the next day?

6   A   It was all the same day.

7   Q   Okay.  Did you miss any work?

8   A   I don't believe so.

9   Q   Now, when you got there, you said you -- at some point in

10       time you were evacuating people, is that correct?

11   A   Yes, sir.

12   Q   So were people walking out of their homes?

13   A   We had to go knock on the doors and make contact with those

14       subjects.

15   Q   And how many people's doors did you knock on?

16   A   I knocked on every available door, but I believe I made

17       contact with two residents.

18   Q   Okay, and those two people walked out of their homes?

19   A   Yes, sir.

20   Q   So you had a total of two people, or did the two residences

21       have multiple people in them?

22   A   That's all I had any contact with was two.

23   Q   Okay.  Did you put their names in your report?

24   A   I don't believe so, no.

25   Q   Now, when you put on -- when you put on your mask, you gave

1              Deputy Baird a mask also?

2    A     Yes, sir.

3    Q     Was yours more sophisticated than Deputy Baird's?

4    A     Yes, sir.

5    Q     Did you put on the mask in anticipation that this might have

6          been a fire also?

7    A     No, sir.

8    Q     So the mask was not donned because you thought the house

9          might have been on fire?

10   A     No, sir.

11   Q     Now, the government asked you some questions about some --

12         some symptoms that you associated with taking your mask off,

13         is that correct?

14   A     Yes, sir.

15   Q     You didn't describe those symptoms in your report, did you?

16   A     No, sir.

17   Q     And if I might just retrieve your report for a second.

18   A     Of course.

19   Q     And can you -- you've read this, right -- right now?

20   A     No, I wasn't reading it right now, no.

21              MR. BOCK:  I'm just going to show him this.

22              THE COURT:  Sure.

23              THE WITNESS:  Do you want me to read it, sir?

24   BY MR. BOCK:

25   Q     Just read it to yourself.

```
 1   A    Okay.  The circled part?

 2   Q    Yes.

 3   A    Okay.

 4   Q    Did you read it?

 5   A    Yes, sir.

 6   Q    Okay.  And in your report what you talk about with respect

 7        to the -- to the smoke is limited to as the gas mask was

 8        removed, a small amount of smoke was inhaled?

 9   A    Yes, sir.

10   Q    Is that correct?

11   A    Yes, sir.

12   Q    That's the entire description that you have about the smoke

13        and -- and yourself, right?

14   A    Yes, sir.

15            MR. BOCK:  Nothing further, your Honor.

16            THE COURT:  All right.

17            Redirect?

18                        REDIRECT EXAMINATION

19   BY MR. PIMSNER:

20   Q    When you first got out of the car, you noticed the odor,

21        correct?

22   A    Yes, sir.

23   Q    Did you experience any symptoms when you immediately got out

24        of the car?

25   A    No, sir.
```

1    Q   Did you learn that it may be something other than a fire

2         from the other deputies on the scene at that point when you

3         exited your car?

4    A   Yes, sir.  Deputy Atwell yelled over it's chemical, and

5         Deputy Baird ran over for a gas mask.

6    Q   So you didn't just put your mask on because you thought it

7         was a fire, is that accurate?

8    A   That is, sir.

9    Q   Now, you gave Deputy Baird a half mask that you called it?

10   A   Yes, sir.

11   Q   And did you get that mask back from him?

12   A   Yes, I did, sir.

13   Q   And at some point are you required to go through your

14        equipment and to verify that it's in working condition?

15   A   Yes, annually.

16   Q   And did you do that with that half mask after August 2nd,

17        2009?

18   A   Yes, sir.

19   Q   And what -- tell us what you did.

20   A   In order to --

21        MR. BOCK:  Well, Judge, this is -- this is improper

22  redirect.

23        MR. PIMSNER:  He was -- he was asking about the masks.

24        THE COURT:  No, overruled.

25        Go ahead.

1          THE WITNESS:  In order to test the mask, you place the

2    mask on and they put a chemical in there called bitrix, and it's

3    odorless but you can taste it.  It's a very bitter taste on your

4    tongue, and to see if the bitrix goes through the mask, they

5    spray it into a thing that goes over your head and you have the

6    mask on.  Once you did that, I could taste the bitrix even though

7    I had the mask on.

8    BY MR. PIMSNER:

9    Q    And that was the half mask that Baird used?

10   A    Yes, sir.

11   Q    And did you look at the filters that were on that mask after

12        that point?

13   A    Yes, I had to replace the filters.

14   Q    And what happened to the filters?

15   A    I went down to management --

16          MR. BOCK:  Objection to this, your Honor.

17          THE COURT:  Well on, foundational grounds, yes.

18          If you could lay some more foundation.

19   BY MR. PIMSNER:

20   Q    Did you examine the filters after you removed them?

21   A    Yes, sir.

22   Q    And did they appear to have any kind of damage or

23        deterioration?

24   A    None visual.

25   Q    No?  Okay.  But the mask no longer worked, correct?

```
 1   A    Is that correct, sir.
 2   Q    And was that the first time you tried that half mask after
 3        the event?
 4   A    That was the first time it was used, yes, sir.
 5   Q    So would it be fair to say that the filters were no longer
 6        working?
 7   A    That is correct, sir.
 8   Q    Now, Mr. Bock asked you questions about people walking away.
 9        Was this a calm situation?
10   A    No, sir.
11   Q    And were you treating this with utmost urgency?
12            MR. BOCK:  Objection.  This is again beyond the scope.
13            THE COURT:  No, overruled.
14            THE WITNESS:  Yes, sir.
15   BY MR. PIMSNER:
16   Q    And in fact, when you were -- tell -- describe how you
17        actually were going from house to house.
18            Were you doing it in a leisurely manner?
19   A    No, sir.  We were running, and knocking aloud -- running as
20        fast as we can, knocking as loud as we could.
21   Q    And did you -- when you made contact with residents, did you
22        tell them -- what did you tell them?
23   A    I told them there's a -- I can't remember exactly, but I
24        told them they needed to get their stuff and get out
25        immediately.
```

```
 1   Q    And you conveyed to them this was an immediate situation?

 2   A    I expressed the urgency, yes.

 3   Q    And did the residents comply with your direction?

 4   A    Yes, they did.

 5   Q    And did they get out quickly?

 6   A    Yes, they did.

 7             MR. PIMSNER:  Nothing further.

 8             THE COURT:  All right.

 9             Any questions from the jury for this witness?

10             All right, ma'am, if you could write it out.  It looks

11   like you have.

12             And if I could see counsel at sidebar.

13                           BENCH CONFERENCE

14             THE COURT:  All right, if you want to ask this -- any

15   objection?

16             MR. BOCK:  Objection.

17             THE COURT:  Do you have an objection?

18             THE DEFENSE ATTORNEY:  I do have an objection.

19             THE COURT:  And what is your objection.

20             MR. BOCK:  My objection is that the government should

21   have covered this if they wanted to.  And you know, I know you

22   let jurors ask questions, but -- they could follow-up obviously,

23   but -- no, I don't have an objection.

24             THE COURT:  All right, I'll let you follow-up if you'd

25   like.
```

1           MR. BOCK:  Okay.  Do they get to read the questions all
2    the time?
3           THE COURT:  Well, not all the time.  Do you want me to
4    read it?
5           MR. BOCK:  No, I'll let him read it, but maybe on a
6    couple of questions --
7           THE COURT:  I figured since it's the government's
8    witnesses, and with your witnesses -- that's the way I do it.
9    Does that make sense?
10          MR. BOCK:  Yes, it does.  Perfect.
11          THE COURT:  Okay.
12          (The bench conference was concluded.)
13          THE COURT:  All right.  Mr. Pimsner, you may ask the
14   juror's question.
15          MR. PIMSNER:  Thank you.
16                        EXAMINATION
17   BY MR. PIMSNER:
18   Q    Deputy McCracken, have you encountered any lasting health
19        effects from your exposure that day?
20   A    No, sir.
21          THE COURT:  And any follow-up questions from --
22          MR. PIMSNER:  I think either -- let me just kind of --
23   there's a second part to it.
24   BY MR. PIMSNER:
25   Q    Either that night, or longer?

```
 1   A     Well, it was during the day.  During the day and after I

 2         woke up, but after a few days it went away.

 3   Q     So initially --

 4               MR. PIMSNER:  If I may just --

 5               THE COURT:  Sure.  Go ahead.

 6   BY MR. PIMSNER:

 7   Q     Initially after this incident for a couple of days, you were

 8         experiencing symptoms?

 9   A     Yes, sir.  We were -- we were required to fill out an

10         exposure report due to the incident.

11   Q     And what kind of symptoms were you experiencing?

12   A     Just the irritation of the eyes, the nose, and the throat.

13               MR. PIMSNER:  Thank you.

14               THE COURT:  Any follow-up questions, Mr. Bock, from

15   your perspective?

16               MR. BOCK:  Yes.

17                         EXAMINATION

18   BY MR. BOCK:

19   Q     You never went to see a doctor, is that correct?

20   A     No, sir.

21   Q     And you talked a little bit about pools, so you're familiar

22         with pools?

23   A     When I was younger, yes, sir.

24   Q     Okay.  And when you were younger, did you ever get any

25         effects of chlorine from a pool?
```

1    A    When you open your eyes under water, you get that burning

2         sensation in your eyes.

3              MR. BOCK:  Okay, thank you.

4              THE COURT:  All right, any additional questions from

5    the jury for this witness?

6              MR. PIMSNER:  May I ask just one --

7              THE COURT:  May he step down -- oh, yes.  Go ahead.

8    Come on up.

9                        EXAMINATION

10   BY MR. PIMSNER:

11   Q    Let me ask you, Mr. Bock asked you when you were a kid if

12        you experienced some chlorine type symptoms.  Were the

13        symptoms that you experienced on the day of August 2nd and

14        after similar to those -- the experiences that you would

15        have as a child?

16   A    Similar, but they lasted longer.

17   Q    Were they the same degree of irritation?

18   A    No.

19   Q    Which was greater?

20   A    The incident in August.

21             MR. PIMSNER:  Thank you.

22             THE COURT:  All right.  May this witness step down then

23   and be excused?

24             MR. PIMSNER:  Yes, your Honor.

25             THE COURT:  Thank you, sir.  You may step down and be

```
 1   excused.

 2                        ********************

 3            (Ryan O'Connor was duly sworn by the clerk.)

 4                          RYAN O'CONNOR

 5                       DIRECT EXAMINATION

 6   BY MS. ANDERSON:

 7   Q    Sir, how are you employed?

 8   A    I'm employed as a deputy, now as a detective with the Pima

 9        County Sheriff's Department.

10   Q    How long have you been with the Pima County Sheriff's

11        Department?

12   A    Since 2007.

13   Q    What kind of assignments have you had over the years?

14   A    I've been a patrol deputy for about five years or so.  Then

15        I became a burglary detective.  And most recently for the

16        last -- about three months or so I've been a detective in

17        the robbery assault unit.

18   Q    Now, were you employed with the Pima County Sheriff's

19        Department and on duty on August 2nd, 2009?

20   A    Yes.

21   Q    Do you recall what your assignment was that day?

22   A    I was assigned to the patrol unit, patrol squad for the

23        Foothills District of Pima County for the midnight shift,

24        which is 10:00 p.m. until 6:00 a.m. the following morning.

25   Q    At some point in time were you -- at some point in time did
```

1       you respond to the area of Tucson National regarding an

2       incident that had taken place there?

3   A   Yes, I did.

4   Q   Do you recall what time it was that you responded to that

5       area?

6   A   It would have been about 5:30 a.m.

7   Q   Do you recall where you were when you -- well, let me back

8       up.

9           Did you get a call?  Were you dispatched to the area?

10  A   I'm not sure exactly how I became aware of it.  It would

11      have been over the radio in some fashion.  I don't believe I

12      was actually dispatched to the area.

13  Q   You just saw that a call was in that general area?

14  A   That's most likely how I became aware of it.

15  Q   What was the nature of the call, do you remember?

16  A   I don't recall the specifics, but I do remember that there

17      was some information to indicate perhaps some sort of a

18      chemical smell, something of that nature.

19  Q   Do you recall where you were when you -- when you began

20      driving towards that area?

21  A   I believe I was in the area of Oracle and Orange Grove,

22      which is within a couple miles or so of the incident

23      location.

24  Q   Did you head to the Omni National with your lights and siren

25      activated?

1   A    Yes, it was necessary to get there as quickly as possible

2        because we weren't sure what the nature of this incident

3        was.  There was potentially a very great danger to the

4        public.

5             MR. BOCK:  I have an objection to that, your Honor.

6             THE COURT:  I'll allow the answer to stand.

7             Go ahead.

8   BY MS. ANDERSON:

9   Q    When you got to -- at some point you caught up to Sergeant

10       Carpenter, correct?

11  A    That's correct, in the area of Magee and Jensen.  We both

12       pulled our patrol vehicles to the side of the road because

13       immediately ahead of me was a very large, dense white cloud

14       of smoke moving across Magee in a southwesterly direction

15       towards Jensen.

16  Q    Did Sergeant Carpenter tell you a particular assignment that

17       he wanted you to do?

18  A    He did.  He directed me to proceed to the intersection of

19       Club and Shannon to block off access to the Omni complex to

20       make sure that the danger to the public was limited as much

21       as we could arrange it to be.

22             MS. ANDERSON:  Your Honor, may I approach the witness?

23             THE COURT:  Yes.

24  BY MS. ANDERSON:

25  Q    Detective O'Connor, I'm going to show you Government's

1              Exhibit Number 292.  This has been admitted into evidence.

2      A      All right.

3      Q      Have you had a chance to take a look at this and get

4              oriented a bit?

5      A      Yes, I have.

6      Q      I'm going to ask you to show the jury -- we've got a pointer

7              up here, or you could use your finger, whatever you're most

8              comfortable with, and show us where you were when you first

9              got the call.

10             And I'm going to have to hand this to you so I can head

11             back to the podium.

12     A      All right.  When I first received the call, I would have

13             been in the area of Orange Grove and Oracle, which is a good

14             distance off to the east of this location.  This is Magee.

15             This is the direction that I approached from, sort of in a

16             northwesterly direction.  As we approached, I saw that there

17             was a very dense white smoke cloud proceeding across Magee,

18             sort of from the north -- oh, what do I call this?

19             Northeast to the southwest.

20     Q      Let's -- could you -- could you describe that cloud for us?

21     A      Yes.  The cloud was I would estimate -- and estimated at the

22             time, was very, very large, about 75 feet high.  Very dense

23             white smoke that was crossing the road.  I couldn't see

24             through it to the other side of it with any clarity at all.

25             I couldn't see what was going on on the other side, or

1    how -- how thick it was from east to west.

2  Q  Did you have concerns about driving through it?

3  A  I did.  I didn't know what it was at that time.  We had

4    some -- some manner of reports about some sort of a chemical

5    smell.  I didn't know what would happen if I drove through

6    it, what the result might be to my health, both immediate

7    and in the long-term.

8  Q  Did you consider driving around it?

9  A  I did, but I didn't know what the extent of it was.  I just

10    saw it originate on the one side.  There are very tall trees

11    here.  You can't tell really what's on the other side, where

12    it was coming from.  And then there was a large neighborhood

13    down to this side that you can't see very far.  I can't tell

14    how far I would have to drive to try to get around it.  As a

15    result because we wanted to limit the risk of exposure to

16    people as much as possible, I determined that the only real

17    option was to drive through it.

18  Q  Did you take any precautions as you drove through it?

19  A  I did.  I made sure that my windows were raised, as they had

20    been down when I was conversing with Sergeant Carpenter at

21    the side of the road.  I made sure that the external

22    circulation on the AC unit wasn't activated, because I was

23    concerned about, you know, the stuff getting inside the

24    vehicle.  And I drove through as quickly as I could, however

25    because of the density of smoke, I couldn't drive as quickly

1     as I might have wanted to, to try to limit my exposure that

2     way.  I had to be, you know, cognizant of the possibility

3     of, you know, there being people in the road, or other

4     vehicles, or who knows.

5  Q   You can go ahead and take a seat on the witness stand.

6        Did you hold your breath as you were driving through?

7  A   I did.

8  Q   At some point as you were driving through, did you -- or

9     when you got to the other side of the cloud, did you notice

10    any kind of an unusual smell?

11  A   I'm not sure exactly when I detected an odor, but I did

12    detect a -- a chemical odor that I recognized as out of the

13    ordinary, not a natural kind of a smell.  I'm not familiar

14    with different kinds of chemicals.  I couldn't identify what

15    type of chemical it might have been, but it was definitely

16    something that I recognized as very out of the ordinary.

17    And this concerned me both for my own safety, and more

18    importantly because I was aware that this very large cloud

19    was proceeding into a neighborhood, and we didn't know what

20    was in it.

21  Q   What area did you head to?

22  A   If I could use the map again?

23  Q   Sure.

24  A   As I pointed out before, this is the intersection of Jensen

25    and Magee where the cloud was crossing.  I proceeded to the

| | |
|---|---|
| 1 | northwest of Magee and made a right turn on Magee -- well, I |
| 2 | guess it's a little confusing.  Magee and Shannon kind of |
| 3 | inter -- interact with each other here at this intersection. |
| 4 | It actually turns into Shannon as you make a right on it |
| 5 | here.  I turned north onto Shannon, proceeded up to Club and |
| 6 | Shannon where there's a guard shack.  I parked my patrol |
| 7 | vehicle across the road here to keep traffic from going |
| 8 | through from Club -- or from Shannon into Omni, because a |
| 9 | lot of employees of Omni and other people were starting to |
| 10 | arrive for the day.  I parked my vehicle there.  I let |
| 11 | the -- the guard know, and interfaced with him, made sure |
| 12 | that I had -- was able to -- may I have a seat? |

Q   Sure.

A   Made sure that he was aware of what was going on so that he
could warn the other occupants of the Omni Resort, as again
I had no idea what the extent of this was.  I didn't know
exactly where it originated, if it could have been deeper
into the -- or exactly where -- where in fact it originated
on their facilities, or you know, what areas might be at
risk.

Q   Did you have a gas mask with you?

A   I did.  Once I got to that intersection, I immediately went
to my trunk and removed my gas mask, because I was aware
that we had deputies in the area, actually within the cloud,
trying to evacuate the -- the people who were in the area to

1      limit their exposure as much as we were able to do.  And I

2      anticipated that at any moment I could be called to assist

3      with that, or in fact to go to try to rescue them as -- you

4      know, based on the circumstances, it seemed, you know --

5            MR. BOCK:  Objection, speculation.

6            THE COURT:  No, overruled.

7  Q    You can finish.

8  A    I'm sorry?

9  Q    You can go ahead and finish your answer.

10 A    Based on the circumstances, I was very concerned that they

11     or other people in the area could be very seriously harmed,

12     incapacitated by this, and time could be of the essence to

13     get them out of there.

14           MS. ANDERSON:  May I have just a moment, your Honor?

15           THE COURT:  Yes.

16           MS. ANDERSON:  That's all I have, Judge.

17           THE COURT:  All right.

18           Cross-examination?

19           MR. BOCK:  No questions, your Honor.

20           THE COURT:  All right.

21           Any questions from the jury for this witness?

22           All right, may this witness step down and be excused?

23           MS. ANDERSON:  Yes, your Honor.

24           THE COURT:  All right.  Thank you, sir.  You may step

25 down.

```
1                    -------------------------
2           (Donald Anderson was duly sworn by the clerk.)
3                           DONALD ANDERSON
4                         DIRECT EXAMINATION
5    BY MS. ANDERSON:
6    Q    And sir, what do you do for a living?
7    A    I'm a civilian dispatch supervisor for Pima County Sheriff's
8         Department.
9    Q    How long have you been a dispatcher with the Pima County
10        Sheriff's Department?
11   A    As dispatcher, for four years starting in 1984, and promoted
12        to supervisor in May of 1989.
13   Q    So you've been involved in the dispatch area since 1984,
14        correct?
15   A    Right.
16   Q    Now, we're going to ask you to explain to us briefly how the
17        dispatch area works.  Could you explain to us what happens
18        when a -- when somebody picks up the phone and actually
19        calls 9-1-1?
20   A    Okay.  Any 9-1-1 call that's delivered to our center will
21        come in on a certain set of 9-1-1 lines that are
22        specifically designed for that.  Upon answering that phone
23        line, within a second or two we'll get a small display that
24        tells us -- for example with a landline, not a wireless
25        call -- with a landline what the address is of the caller,
```

1    and it will tell us who the police, fire, and medical

2    jurisdiction is that's associated with that particular

3    address.  If it's a -- during our initial questioning we

4    discover that it's a fire or medical call, we will pass that

5    call off to the appropriate fire/medical dispatch for the

6    area that the person needs the help at.  If it's a police

7    matter, we hold onto the caller, and then we'll ask more

8    questions to try to quickly define the issue that there

9    is -- that they're reporting to us, so we know how to

10    service them properly.

11  Q   Now, whenever a call is -- is made into 9-1-1 and dispatch

12    actually receives that call, is there a time noted for when

13    that call comes in?

14  A   The time that's -- yes, there is.  There's a time noted when

15    the call is received in the 9-1-1 system itself.

16  Q   And then how about later for dispatch?

17  A   Okay.  When we add a record for a call to be dispatched,

18    there are also time stamps all over those as well.

19  Q   What's the time between -- or how much time elapses from

20    when a call is made -- when a caller actually picks up

21    9-1-1, and the call is transferred to dispatch?

22  A   That is going to depend entirely on how quickly we're able

23    to gather enough information to make good decisions with.

24    Some callers are very to the point and they can tell you

25    exactly what's going on very quickly.  Others you might have

1      hysteria that you have to try to cut through.  So that can

2      vary pretty widely.

3   Q  But times, nonetheless, are recorded, is that right?

4   A  Yes, correct.

5   Q  Let's talk about how times are set in the 9-1-1 area and the

6      dispatch section for the sheriff's department.

7   A  Well, specifically for the computer records that we use in

8      our computer aided dispatch system, they pull their time

9      stamp from the sheriff's department computer network, which

10     the entire network is synchronized to a service with the

11     National Institute of Standards and Technology and they pull

12     it from a time server called at the time nist.gov.  And what

13     that server does is it establishes a delay between their

14     servers and where you're pulling the time from, and adds

15     that delay and -- figures the delay out, and then sets your

16     machines to the correct time.  And that's based off atomic

17     time.

18  Q  What is atomic time?

19  A  I think it's -- they use an element that is very stable and

20     determine the time without much variation, so it's very,

21     very accurate, and doesn't -- doesn't change much.

22  Q  So if I understand you correctly, the times are

23     automatically set on the computers, and those times are

24     automatically recorded, correct?

25  A  That's correct, throughout the department switches.

1   Q    So when a dispatcher -- or when times come across the -- the

2        computer that an individual deputy will have in his vehicle,

3        it's a time that's established through this atomic time, is

4        that right?

5   A    Correct.

6   Q    It's not a situation where a dispatcher looks at her watch

7        and says, well, its looks like it's about 3:15?

8   A    No, all the records here are pulling time from the sheriff's

9        department computer, which is set to that standard.

10  Q    Okay.  Now, if -- if deputies want to go back and look at

11       individual times when they're drafting their report, can

12       they do that?

13  A    Yes.  There's an abbreviated example of that in the very

14       back of this call record that I'm looking at.

15  Q    Okay, and --

16            MS. ANDERSON:  May I approach the witness, your Honor?

17            THE COURT:  Yes.

18            MS. ANDERSON:  May I approach again?

19            THE COURT:  Yes.

20  BY MS. ANDERSON:

21  Q    That's Government's Exhibit 327, correct?

22  A    It -- that's what it says, yes.

23  Q    So are -- again, we've established that the -- the times in

24       the sheriff's department -- in the computer aided dispatch

25       are set by the -- by the atomic time, correct?

1    A    Correct.

2    Q    And so if a deputy wants to go back and look at times when

3         they draft their reports, they can pull that time up and

4         prepare their reports, correct?

5    A    All significant events that we record are part of that

6         record and based on that time, right.

7    Q    Now, you told us about how calls are transferred from 9-1-1

8         to dispatch.  How is it that calls are dispatched out to the

9         field?  Could you explain that to us?

10   A    Okay.  In this particular exhibit there's a call --

11   Q    Well, how about generally.  Just generally, how is that

12        done?

13   A    Okay.  Generally, once we determine that it's going to be a

14        police matter and we're going to add a call for service,

15        they'll use a command on computer aided dispatch that begins

16        a record which then becomes used by dispatchers, by

17        deputies, and throughout the entire process of record

18        keeping.  We try to quickly determine the nature of the

19        issue that we're dealing with, and some basic information,

20        like with whom we're speaking, how do we contact them later

21        by phone.  With a priority call we're going to try to get a

22        very quick summary of what it is that we're dealing with so

23        that we can get that record completed and sent out to patrol

24        deputies, and then we add comments to it beyond that.  If

25        it's a more routine call, we won't rush it like that.  We'll

1    finish the call more -- we'll take longer to finish it,

2    because we're always prioritizing and sometimes we have to

3    enter one call to answer another, make sure it's not

4    another -- a higher priority.  So the priority calls go out

5    quickly with a short description.  Routine calls can take

6    longer to add, but it will be a more complete explanation of

7    what's going on.

8    Q    So does information regarding an incident pop-up on an

9    officer's computer before they're actually dispatched?

10   A    Yes, it will.  The way that that works is for the record to

11   show up on one of the mobile computers, we need to match an

12   address against a known set of addresses, and we have to put

13   in what we call a call nature, which is just a label, if you

14   will, that tells whoever's looking at it what kind of

15   incident it is that we're going to be describing.  So once

16   you have the call nature and an address, it assigns this

17   particular record as zone, and that zone makes it visible to

18   people who would be responding, and to a dispatcher.

19   Q    And so the deputies can begin responding right away,

20   correct?

21   A    They can respond based on what they're seeing there before

22   we actually finished adding the record, yes.

23        MS. ANDERSON:  May I have just a moment, your Honor?

24        THE COURT:  Yes.

25        MS. ANDERSON:  That's all I have.

```
 1              THE COURT:  Cross-examination?

 2              MR. BOCK:  Thank you, Judge.

 3                        CROSS-EXAMINATION

 4   BY MR. BOCK:

 5   Q    Mr. Anderson, 9-1-1 calls, you're -- this is your

 6        occupation, is that correct?

 7   A    Yes, sir.

 8   Q    So you're totally familiar with the process?

 9   A    I am.

10   Q    A 9-1-1 hangup call, a -- the 9-1-1 has the technical

11        ability even if there's a hangup to find out the phone

12        number, is that correct?

13   A    In almost all instances, yes.

14   Q    And to find a location?

15   A    Yes.

16   Q    So any time a 9-1-1 call is made, there is a physical

17        location associated with the 9-1-1 call, is that correct?

18   A    For a landline, yes.

19   Q    And cellphones?

20   A    Cellphones we can either get a location of a tower, or we

21        can get latitude/longitude with a circumference of

22        confidence in some number of meters that could range from 5

23        to, you know, 2,000.

24   Q    A meter's about a yard, is that correct?

25   A    Roughly.  A little more, yeah.
```

```
1              MR. BOCK:  Okay.  Nothing further.
2              THE COURT:  Okay.
3              Any redirect?
4              MS. ANDERSON:  No, your Honor.
5              THE COURT:  Any questions from the jury for this
6    witness?
7              All right.  Thank you, sir.  You may step down and be
8    excused.
9              -------------------------
10             (Bert Rucker was duly sworn by the clerk.)
11                        BERT RUCKER
12                     DIRECT EXAMINATION
13   BY MR. PIMSNER:
14   Q    Mr. Rucker, are you employed?
15   A    Yes, sir.  I work for the Northwest Fire District.
16   Q    Northwest Fire District?
17   A    Yes, sir.
18   Q    And how long have you been with the Northwest Fire District?
19   A    Approximately 22 years.
20   Q    And what are your current assignments?
21   A    I am currently stationed at Station 33 at Ina and Shannon
22        Road.  That's the Special Operations Station for Hazardous
23        Materials.
24   Q    Are you assigned to a hazardous material unit?
25   A    Yes, sir.
```

1    Q    And just generally, what kind of training do you need to

2         become a firefighter?

3    A    To become a firefighter, sir, or hazardous material --

4    Q    Firefighter, and then -- just briefly.

5    A    Briefly, the firefighter academies usually last anywhere

6         from 16 to 32 weeks where you undergo basic fire academy.

7         You also become an emergency medical technician, and that

8         takes approximately 16 weeks through Pima College.

9    Q    And you would have completed that as part of your work at

10        the Northwest Fire District?

11   A    Yeah.  My primary responsibilities are obviously fire

12        suppression.  My secondary responsibilities are to act as a

13        paramedic on ACL engines.  My Church area assignment is a

14        hazardous material technician at that station.

15   Q    Now, to be involved in hazardous material did you have to

16        receive any kind of training?

17   A    Yeah, there is a standard that NFPA has developed and OSHA

18        that we have to take a 60 hour course to become a hazardous

19        material technician.

20   Q    What kind of subjects do you cover during that course?

21   A    The first two weeks are basically basic chemistry to

22        understand the physical properties of hazardous materials.

23        The second portion of the course is to understand the

24        equipment related to responding to a hazardous material

25        call, the identification of hazardous materials, and the

1        equipment used to mitigate those responses.

2    Q   And when did you complete that training?

3    A   That was 1993.

4    Q   And did your hazardous material training include hazards

5        associated with chlorine?

6    A   It dealt with all aspects of chemistry, including chlorine

7        and many other toxic substances as well.

8    Q   Now, do you have to go through an annual certification or

9        annual education requirement to maintain that certification?

10   A   We have to do monthly training, and what we call trimester

11       training.  And there's a certain amount of hours per year

12       that NFPA requires us.  And we have to meet certain

13       requirements relating to certain parts of hazardous material

14       responses.  It could be chemistry, or to the equipment

15       related to the calls.

16   Q   Now, how long have you been out at your current location for

17       Northwest Fire?

18   A   Probably in excess of ten years.

19   Q   So you've been at the same station?

20   A   Yeah.  The station has changed location, but I've been with

21       that Station 33 for probably greater than ten years in my

22       career.

23   Q   And do you have any specific duties relating to equipment

24       that is kept at that station?

25   A   I do.  I'm designated one of three persons that's the HAZMAT

| | |
|---|---|
| 1 | supply officer at the station.  We basically maintain the |
| 2 | equipment, and research any future purchasing of that |
| 3 | equipment.  So we are required to maintain it as well as |
| 4 | research it. |
| 5 | Q    And in the course of your work, do you employ any type of |
| 6 | devices to help you test the atmosphere? |
| 7 | A    Yes. |
| 8 | Q    And are there multiple devices? |
| 9 | A    There are.  The basic standards that most hazardous material |
| 10 | teams carry are what we call four gas monitors that we use. |
| 11 | They basically test for the possibility of four types of |
| 12 | gases that may be apparent on any scene.  The ones we use |
| 13 | test for carbon monoxide, because that's one we come into |
| 14 | contact a lot. |
| 15 | Q    Before we get to that -- |
| 16 | MR. PIMSNER:  May the witness be shown Exhibit 55 on |
| 17 | the overhead?  I'm sorry. |
| 18 | THE COURT:  It should appear on your screen. |
| 19 | Has that been admitted yet? |
| 20 | MR. PIMSNER:  No, it has not. |
| 21 | THE COURT:  Can you turn that screen a little bit more |
| 22 | towards you? |
| 23 | There we go.  All right. |
| 24 | BY MR. PIMSNER: |
| 25 | Q    Do you recognize that picture? |

1    A    Yes, sir.

2    Q    And what is that a picture of?

3    A    That is a MultiRAE Plus gas monitor, sir.

4    Q    And do you employ that gas monitor at your fire station?

5    A    We have two located at our station, and two at one of the

6         Church area stations.

7    Q    And does that accurately depict what the monitor looks like?

8    A    Yes, sir.

9              MR. PIMSNER:  Move to admit Exhibit 325, which is a

10   picture of the MultiRAE monitor.

11             MR. BOCK:  No objection.

12             THE COURT:  325 is admitted.

13   BY MR. PIMSNER:

14   Q    Now, you were talking just a minute ago about a four gas

15        sensor.  Is this what you were talking about?

16   A    Yeah, these are small portable units about this big.

17        They're portable gas monitoring --

18   Q    Just for the record, because we can't see your description,

19        how big would you describe it in words?

20   A    Probably about 4 by 6 by 2.  It's extremely small, very

21        portable unit that we use to detect.  It contains sensors

22        inside the monitor, basically, that will pump the gas into

23        the monitor.  If you come into a room, it will start pumping

24        air into that monitor and it will react to whatever

25        particular sensors you have installed in that meter.  Like I

1      say, we -- currently in our meter we have installed a CO

2      sensor.

3  Q   What is CO?

4  A   CO stands for carbon monoxide.

5  Q   So this unit will have multi sensors installed at the same

6      time?

7  A   Yes, sir, up to four.

8  Q   Up to four?

9  A   In addition and also what they call photo-ionization

10     detector bulb in it as well.

11  Q  Okay, so you have a carbon monoxide sensor, correct?

12  A  Yes.

13  Q  What else?

14  A  One is an oxygen sensor, which detects oxygen deficiencies

15     or enrichments.  One is a flammable gas detector that's set

16     for methane, since we to do a lot of methane calls.  In this

17     particular unit we also incorporated what we call the toxic

18     sensor slot, which is set up -- we can put a variety of

19     different sensors in there that are toxic related.  This

20     particular model had a chlorine sensor installed in it.

21  Q  So you actually -- and was this unit -- or was this type of

22     unit utilized back on August 2nd, 2009 by your unit?

23  A  Yes, sir, it was.

24  Q  And prior to its utilization, is that -- well, first of all,

25     how long has your department or your station been utilizing

1           the MultiRAE device?

2    A    This particular model probably between eight and ten years.

3         We've been using similar models up to about 20 years, and we

4         do use other similar models as well.

5    Q    And based on your training and experience are these models

6         reliable?

7    A    They are extremely reliable.

8    Q    And are they used other than by Northwest Fire.

9    A    No, they're used by multiple fire departments around the

10        United States.  This particular model mostly here in Arizona

11        they're used by the mining industry and industry in general,

12        anyplace that needs to be monitored for toxic gases.

13   Q    Now, as far as the unit goes, you've indicated that it has a

14        level of reliability in the industry.  What about the

15        individual unit -- do you have to calibrate or check that

16        unit on a regular basis?

17   A    The industry recommends that it be calibrated on a regular

18        basis to maintain its accuracy.

19   Q    And does Northwest Fire in fact calibrate it on a regular

20        basis?

21   A    We have changed our policies as far as time interval goes,

22        but at the time we were doing it once a week.

23   Q    And so every week the monitor would be checked?

24   A    We'd bring it out and expose it to a gas -- a predetermined

25        amount of gas to see if it was reading correctly, yes.

1    Q    So let me understand, if I can, that in order to check if

2         it's calibrated correctly, you have samples of gas?

3    A    Yes, sir.  We carry cannisters of gas for each individual

4         sensor.  You hook that up to the monitor, put it in the

5         calibration mode, expose it to that known concentration

6         that's inside that --

7    Q    Okay.  You're getting ahead of me a little bit.  Sorry.  So

8         the canisters of gas that you use to test the calibration

9         have known quantities of the specific chemical in the can,

10        correct?

11   A    Yes.

12   Q    And then what do you do?

13   A    Actually, the unit does it itself.  It automatically adjusts

14        the readings inside the unit.

15   Q    And when you calibrate a machine, MultiRAE, do you calibrate

16        each of the -- the types of sensors that are installed?

17   A    Well, yes, and actually, the -- there are some sensors --

18        single sensors that use their own single gas.  There are

19        some gas containers that you can do multiple sensors at one

20        time.

21   Q    But all the sensors are tested every time you calibrate that

22        machine?

23   A    Yes, sir.

24   Q    And do you keep -- is it required that records be kept of

25        the calibration?

1   A    Our department requires it to be, yes, sir.

2   Q    And are those records kept in the regular course of

3        business?

4   A    Yes, sir.

5   Q    And are the entries on those records made at or near the

6        time of the calibration?

7   A    At the time, sir.

8            MR. PIMSNER:  May the witness see Exhibit 326, please?

9   BY MR. PIMSNER:

10  Q    Do you recognize that document?

11  A    Yes, sir.  That is the calibration log for that particular

12       unit.

13  Q    Now -- for the unit that was used on -- on August 2nd, 2009?

14  A    Yes, sir.  You can notice at the top there's a serial number

15       assigned to that particular sheet that's also assigned to

16       that particular unit.

17  Q    And so was that unit calibrated prior to August 2nd, 2009?

18  A    Yes, sir, it was.  It was calibrated the morning we came on

19       duty that -- the previous day.  We came on duty 8:00 o'clock

20       in the morning.  It got calibrated sometime during that day,

21       and that was prior to the incident.

22  Q    Was that on August 1st, 2009?

23  A    Yes, sir.

24  Q    And it shows a number at the end of the August 1st line.

25       What does that number represent, 1320?

1    A    1320 is a payroll number for the individual that calibrated

2         that monitor.

3    Q    And do you know who that individual is?

4    A    That's my number.

5    Q    So you would have calibrated that -- the MultiRAE that was

6         used on August 2nd the day before?

7    A    Yes, sir.

8    Q    And was it in proper working order at the time you

9         calibrated it?

10   A    Yes, sir.

11   Q    Now, that record is kept in the regular course of business,

12        correct?

13   A    Yes, sir.

14   Q    Now, was that calibrated again after the incident at some

15        point?

16   A    I believe it was.  I remember looking at one of the reports

17        that were in the system, and I believe it was -- it was

18        actually calibrated later that day on the 2nd.

19   Q    As far as the records -- the business records go of the

20        calibration, was it done the following week?

21   A    Normally, they're done every -- weekly, yes, sir.

22   Q    Is there an entry after your entry when the next time

23        pursuant to your normal course of business it was

24        calibrated?

25   A    There is.  It's kind of illegible from the -- what I'm

1          looking at at this point.

2     Q    And did -- can you tell whether or not that -- there was --

3          that the machine was in proper working order?

4     A    It says calibrate -- it says calibrate.  If there were any

5          discrepancies in that, it would have been noted if there

6          were -- there was a problem with the unit.

7     Q    If there was an issue with the machine, it would have been

8          taken out of service?

9     A    Yes.

10    Q    And it would have been noted on this record?

11    A    Yes, sir.

12    Q    So if the entry after the date that you calibrated it has no

13         such entries, does that mean it was in proper working order?

14    A    Yes, sir.  That's how we maintain whether or not it needs to

15         be repaired, or if we have done any repairs to it.

16    Q    Now, going back to the morning of August 2nd, 2009, when did

17         you start your duty, that day or the day before?

18    A    August 1st I came on at 0800.

19    Q    And so what are your normal shifts?

20    A    24 hour shift.

21    Q    And so you would have been anticipating getting off shift at

22         8:00 a.m. that morning, correct?

23    A    (No verbal response.)

24    Q    Okay.  And do you recall getting a call or a dispatch to go

25         to a certain location that early morning hours?

1  A    Yes, sir.

2  Q    And what was the nature of the call?  Do you recall?

3  A    I believe that it was dispatched at 5:29 that morning for an

4       odor in the area.

5  Q    For an odor?

6  A    Yes, sir.

7  Q    And at that point do you -- does your unit immediately

8       respond?

9  A    Since that's what we call our first do, it was a single

10      engine response.  We responded.  I was one of the

11      firefighter/paramedics.  I ride in the back of the unit of,

12      the engine -- the fire engine.

13 Q    Who else was with you?

14 A    It's a four person company that consists of a captain, which

15      is our supervisor, an engineer who drives the truck, and

16      then two firefighters in the back, which I'm one of two.

17 Q    Do you recall their names?

18 A    Yes, sir.

19 Q    And what were they?

20 A    My supervisor, Captain Brian Yard, Engineer Dillon Taylor,

21      and Firefighter Levi Cranford.

22 Q    And so you would have gone out towards that area in just a

23      normal fire truck, correct?

24 A    Yes.  We get a lot of calls for odors in the area or

25      something.  We just investigate.

1   Q    Now, as you were -- and what area were you responding to

2        generally?

3   A    For this particular call?

4   Q    Yes, this call.

5   A    I believe the actual address was -- 2780 {sic} West Magee

6        was the actual response.

7   Q    And prior to arriving at that location, did you travel down

8        Magee Road?

9   A    Yes.  We come off of Shannon Road, which is 2900 West, and

10       headed west, and was coming down the hill towards the Tucson

11       Oro Club. {sic}

12            MR. PIMSNER:  If I may approach the witness with

13   Exhibit 292, your Honor?

14            THE COURT:  Yes.

15            (Exhibit 292 was handed to the witness by Mr. Pimsner.)

16            THE WITNESS:  What I can tell you is it looks like this

17   was the actual nature of the call, was at 2870 West Magee.  We

18   responded from east of that location.  We came down the hill.

19   There's only one entrance, basically the main entrance into the

20   country club that we used, and I believe that is right here.  So

21   we were traveling westbound on Magee in this direction, and we

22   stopped approximately right here, and staged initially.

23   BY MR. PIMSNER:

24   Q    And why did you stop there?

25   A    Because of the unusual circumstances that unfolded.

1  Q    Did you -- what were those unusual circumstances?

2  A    There was what I can only describe as a fog bank that was

3       crossing the road from north to south emanating from the Oro

4       Valley -- or the Oro Country Club across the roadway that

5       looked like a fog bank.  It was approximately 30 feet high,

6       40 feet wide, and several hundred feet long, and hanging

7       close to the ground.

8  Q    And what was the density of that --

9  A    It was extremely dense, and white in color.

10 Q    Could you see clearly through it?

11 A    No.

12 Q    Could you tell -- did you notice anything unusual, or could

13      you tell what that was from at that point?

14 A    No.  At that point our first thought was that it was a house

15      fire.

16 Q    What was the color of that fog bank?

17 A    It was white.

18 Q    And if there was -- if there was a house fire based on your

19      training and experience is it normally white smoke

20      emanating?

21 A    No, sir.  It's usually black, or very dark gray, and usually

22      rising up into the air, not hugging low to the ground like

23      that.

24 Q    So a normal house fire wouldn't normally have a cloud

25      hanging to the ground, correct?

1    A    No, sir.

2    Q    So did that arouse your suspicion at that point?

3    A    Well, it certainly brought a red flag up for my supervisor,

4         who was the person in charge of the unit that morning.

5    Q    And what did you -- your truck and the other firefighters do

6         at that point?

7         Do you know how long you stayed at that area?

8    A    Very shortly, for a very short time because we were actually

9         able to drive up to the front entrance and make a right and

10        not actually be inside the cloud.  So we were actually able

11        to enter the neighborhood through the front gate, the

12        guard's gate, and stay away from the cloud.

13   Q    So you were able to skirt the edge of it?

14   A    And I think at that point as we entered, my supervisor -- I

15        think at that point met with some of the sheriff's

16        departments deputies who were on foot and ran up to the

17        truck and were telling him something about the nature of the

18        call.

19   Q    Okay.  And where -- where would you have staged at that

20        point?

21             MR. PIMSNER:  If I may show the witness this exhibit,

22   your Honor?

23             THE COURT:  Yes.

24             THE WITNESS:  Okay, this -- I'm sorry.  If this is the

25   house right here, this appears to be the main road that came in,

1    and it seems like we parked right here, which actually is just

2    north of the incident.  And since the wind was blowing this way

3    to the south, everything was moving from this structure that way,

4    this seemed like the safest spot for us to -- to stop and stage.

5    BY MR. PIMSNER:

6    Q    So you would have been upwind --

7    A    We were upwind of the incident, and this appeared to be

8         approximately anywhere from 150 to 300 feet away from the

9         structure.

10   Q    All right, thank you.

11        And just to clarify, the fog that you saw was actually

12        coming across Magee Road?

13   A    Yes, sir.

14        MR. PIMSNER:  Your Honor, I don't believe I moved to

15   admit Exhibit 326.  I would do so at this point.

16        MR. BOCK:  No objection.

17        THE COURT:  326 is admitted.

18   BY MR. PIMSNER:

19   Q    Now, once you -- once you got to that location -- and I take

20        it there were other deputy sheriffs that were already

21        present in that area?

22   A    Yes, sir.

23   Q    What did you do as a company?

24   A    My captain initially took command of the situation, and

25        assigned me and Firefighter Cranford to what they call

```
 1            reconnaissance detail.
 2   Q    And what is reconnaissance detail?
 3   A    Reconnaissance -- basically, what he wanted us to do, we
 4        were already in our structural firefighter clothing.  He
 5        wanted us to also do what we call don our self-contained
 6        breathing apparatus, which is what we use in fires, and get
 7        closer to the structure and see if we could determine the
 8        source of what was emanating that -- that cloud.
 9   Q    So when you would have driven into the development off of
10        Magee, was the cloud still developing and producing, or had
11        it quit by that point?
12   A    It had started dissipating at that point, sir.
13   Q    And do you recall approximately what time you arrived at
14        that location?
15   A    About 5:42, I believe, is what the --
16   Q    So once you staged upwind and were given directions to
17        perform reconnaissance, what did you do?
18   A    It only takes a couple minutes for us to don our air packs,
19        and then we got on our radios and started approaching the
20        affected area.
21   Q    And so the air packs would have -- you would have had your
22        own separate oxygen source?
23   A    Yes, sir.
24   Q    So you wouldn't have been exposed to the elements?
25   A    No, sir.
```

```
1    Q    But your skin may be, or your hands and face?

2    A    Yes, sir.

3    Q    Now --

4              MR. PIMSNER:  Let me ask the witness to look at Exhibit

5    78.

6    BY MR. PIMSNER:

7    Q    Do you recognize that --

8    A    Yes, sir.

9    Q    -- photograph?

10              What does that photograph depict?

11    A    That is the residence at which this incident took place.

12    Q    And would you have -- as part of your reconnaissance, would

13        you have approached that area first as part of your --

14    A    That was the area that we approached first, yes, sir.  It

15        was the back of the structure.

16    Q    Now, this was -- this photo was taken at a later time than

17        the time did you your reconnaissance, correct?

18    A    Yes, sir.

19              MR. PIMSNER:  Move to admit Exhibit 78.

20              MR. BOCK:  No objection.

21              THE COURT:  78 is admitted.

22    BY MR. PIMSNER:

23    Q    Now, it was you and Firefighter Cranford, correct?

24    A    Yes, sir.

25    Q    And you -- you guys go in teams when you're investigating --
```

1   A   Yes, sir.

2   Q   -- potential hazards?

3   A   Yes, sir.

4   Q   What -- tell me what you did after you approached the back

5       of the house?

6   A   Basically, we were just on the radio notifying our

7       supervisor what we saw at this point.

8   Q   And how close did you get to that back wall?

9   A   We actually made it all the way up to the back wall.

10  Q   Did you actually enter the property at that point?

11  A   No, sir.

12  Q   And what did you see when you looked over the back wall?

13  A   On the back porch just adjacent to where the doors were at

14      there was a large five-gallon bucket that was fuming.

15              MR. PIMSNER:  And may the witness be shown Exhibit 87?

16  BY MR. PIMSNER:

17  Q   Do you recognize that photograph?

18  A   Yes, sir, I do.

19  Q   And what does that depict?

20  A   Just to the right it depicts the five-gallon bucket.

21  Q   And is that the bucket that you saw when you first

22      approached the back yard?

23  A   Yes, sir.

24  Q   And does that accurately depict -- photograph accurately

25      depict where the bucket was located?

1   A    Yes, sir.

2            MR. PIMSNER:  Move to admit, your Honor.

3            THE COURT:  Any objection, Mr. Bock?

4            MR. BOCK:  No objection.

5            THE COURT:  All right, that's 87?

6            MR. PIMSNER:  87.

7            THE COURT:  87 is admitted.

8            MR. PIMSNER:  If it can please be published?

9            THE COURT:  Yes.

10  BY MR. PIMSNER:

11  Q    Now, when you first got to -- or walked up to that back

12       wall, what was the condition of that device?

13  A    It was unusual, really.  It was smoldering, and there was a

14       large -- you can see the brown chunks that are laying next

15       to it.  They were actually sloughing over the side of the

16       bucket.

17  Q    Was it still reacting when you arrived?

18  A    Just in a fuming sense.  There was a little bit of fumes

19       coming out of it.  It looked like the chemical reaction had

20       already taken place at this point.

21  Q    And the sludge and the material, the reddish material, that

22       was already located -- that had already been put out onto

23       the patio at the time?

24  A    It was there on the patio, and also hanging off of the

25       bucket as well.

1   Q   All right.  And what did you do after you observed this --

2   A   We reported that to our supervisor.

3   Q   Did you get instructions at that point?

4   A   Yeah.  He told us to return to the truck.

5   Q   And what did you do?

6   A   When we returned to the truck, we discussed what we had

7       talked about.  My captain initiated what we call a HAZMAT

8       alarm.  He decided this was not a house fire.  This was

9       actually hazardous material seen.  He initiated a HAZMAT

10      alarm.  He designated himself the IC commander and assigned

11      me to HAZMAT group supervisor.

12  Q   And when a HAZMAT incident is reported, does additional

13      equipment come out to assist at the scene?

14  A   Yes, sir.

15  Q   And what additional equipment?

16  A   We'll get probably two or three more fire engines.  We'll

17      get a battalion chief.  We'll get a safety officer, and

18      we'll also get the hazardous materials truck that responds

19      from our station.

20  Q   And when you respond to a hazardous material situation, is

21      there a procedure that the fire department goes through for

22      safety purposes and contamination purposes?

23  A   Yes, sir, there is.

24  Q   And what is that procedure?

25  A   As far as what we call an entry procedure, first we have to

1    develop a plan, you know, what our procedure -- why we're

2    doing it.  We knew at this point there was no life safety

3    involved, that mainly this was a -- to go up to confirm what

4    we saw, and to possibly gather samples.  That was our action

5    plan.  The truck had to be, obviously, a certain distance

6    away from the incident.  We had to have what we call a decon

7    corridor set up in case there was actual contamination to --

8    the guys that go in the entry area had to be decontaminated

9    on the way out.  There had to be medical teams in place, and

10   there had to be a research team in place as well prior to

11   the entry to research what type of clothing we would use, or

12   protective equipment we would use to -- to make that entry.

13  Q   So when -- when you conduct a HAZMAT entry, it's not just an

14      immediate response, correct?

15  A   No, sir.

16  Q   And I think you said you also set up decontamination

17      stations?

18  A   Decontamination corridors.

19  Q   And was that done in this matter?

20  A   Yes, sir.

21  Q   And was it based on the collective knowledge that was

22      gathered at the scene?

23          Was there a decision as to what type of protective

24      clothing would be needed at that point?

25  A   Yes, sir, there was.

1    Q    And what was that?

2    A    The level of clothing that we chose to make the entry was

3         the highest level of clothing that we have, called level A

4         protective clothing.

5    Q    And could you describe for us what a level A protective

6         clothing is?

7    A    It's basically -- looks like a space suit that's a

8         self-encapsulated clothing with our air tanks inside the

9         suit.  We wear it for the most highest level of protection

10        against any contaminants.

11   Q    And were any parts -- is your breathing apparatus actually

12        within -- inside the suit?

13   A    It's inside the suit.  It's not exposed to the outside.

14   Q    Are there any parts of your skin exposed?

15   A    No, sir.

16   Q    You're completely self-contained; is that accurate?

17   A    Yes, sir.

18   Q    And I'm sorry, I don't recall what you said as far as the

19        time that you believe you approximately arrived at that

20        location?

21   A    I think we got dispatched at 5:32, and I think we arrived at

22        5:42 to begin the recon or shortly after that, and then the

23        actual entry was made at a later time.

24   Q    Well, not the entry but the actual recon, how quickly after

25        you arrived do you think you would have started the recon?

1    A    Maybe two to three minutes.

2    Q    So pretty -- pretty quick after you arrived?

3    A    Yeah.

4    Q    But the -- the fact that they had the second recon or the

5         second investigation with the level A suits, that would have

6         been a substantial time later?

7    A    Yes, sir.

8         MR. PIMSNER:  I have nothing further at this time.

9         THE COURT:  All right.

10        Cross-examination?

11        MR. BOCK:  Thank you, your Honor.

12                        CROSS-EXAMINATION

13   BY MR. BOCK:

14   Q    Good afternoon.

15   A    Hi.

16   Q    Are you the custodian of records for the -- the MultiRAE

17        device?

18   A    I'm not the custodian.  They are left in the HAZMAT supply

19        room at the station.

20   Q    Is there a custodian of records?

21   A    No, sir.

22   Q    Now, the device -- you have familiarity with the device, is

23        that correct?

24   A    Yes, sir.

25   Q    Does the device have a margin of accuracy, like an

1              intoxilyzer?

2     A    During the calibration process there is a margin of error,

3          yes, sir.

4     Q    What is a margin of error?

5     A    It's based on the calibration gas that you're using for that

6          particular sensor.

7     Q    So if I asked you a specific gas, would you know or would

8          you not know?

9     A    I think for chlorine it probably would be about plus or

10         minus 10 percent for the actual calibration gas.

11    Q    So the machine when it goes out in the field could be plus

12         or minus 10 percent?

13    A    Yes, sir.

14    Q    Now, is there a monthly maintenance schedule for the

15         machine?

16    A    Well, not really.  I would say monthly, sir, but that's why

17         we calibrate them every week to see if they're operating

18         correctly, and if they need any attention at that time we do

19         it.

20    Q    Is there some standard maintenance that the machine has to

21         go through?  Is there, like, six months, a year the machine

22         should be -- someone should look at it?

23    A    Not unless there's any problems, sir.

24    Q    Did this device have a number to it, the one that was used

25         on the day in question?

1    A    You mean a serial number, sir.

2    Q    Right.

3    A    Yes, there's a serial number assigned to that unit.

4    Q    And how long had the department had this specific device?

5    A    Probably between five and eight years.

6    Q    Okay.  Is there such a thing called a MultiRAE Plus?

7    A    Yes, sir.

8    Q    Is that a -- is that more sophisticated, or --

9    A    That is that unit -- that is that particular unit.

10    Q    It's more sophisticated than the --

11    A    The reason it says plus on there is because it also contains

12        what we call a photoionization detector as well, which

13        checks for vault organic compounds.

14            MR. BOCK:  Okay can I approach the witness and show him

15    what's been marked as Exhibit 15?

16            THE COURT:  Yes.

17    BY MR. BOCK:

18    Q    Have you seen something similar or identical to what I've

19        just shown you, item 415 to the MultiRAE Plus?

20    A    Yes, sir.

21    Q    And is this a more -- this a more sophisticated measuring

22        device?

23    A    No, sir.  This is the device.

24    Q    Okay, so the MultiRAE Plus is the same as the MultiRAE?

25    A    Well, yes.  The MultiRAE is the brand name.  MultiRAE Plus

1         indicates -- this particular unit contains the

2         photoionization detector as well.

3    Q    So look at the second page of this exhibit.  See where it

4         has all those different compounds, and the sensitivity, and

5         things like that?

6    A    Are you talking about the sensor specification, sir?

7    Q    Yes.

8    A    Yes, sir.

9    Q    Does the MultiRAE -- does the machine that you use have the

10        same specifications?

11   A    Based on what I'm seeing here, not the exact same

12        specifications, sir.  I think these -- these are actually

13        sensor specifications that are more sensor specific and not

14        unit specific, sir.

15   Q    So what's a better device, then?  A sensor specific, or a

16        unit specific?

17   A    Well, you can adapt different sensors to your unit depending

18        on what those specifications are.  I noted this one here is

19        highlighted under chlorine.  It says it has a range from 0

20        to 10 parts per million, so it would be capable of measuring

21        a range from 0 to 10 parts per million of chlorine.

22   Q    It has a sensitivity of .01?

23   A    A resolution of 0.1, yes, sir, parts per million.

24   Q    Okay, so how does that differ from the machine that you

25        used?

1   A   The one that we use, the last time I looked at the records

2       the range was 0 to 20 parts per million, sir.

3   Q   Does it have a sensitivity of 0.1?

4   A   Yes, sir.

5   Q   Does it have alarms, any chlorine alarms?

6   A   All sensors have alarms, sir.

7   Q   And the alarms for the machine you used for chlorine would

8       be activated at what parts per million?

9   A   For which particular sensor, sir?  The chlorine sensor?

10  Q   Chlorine sensor, sir.

11  A   Our records indicate that the low alarm, I believe, was set

12      at -- I want to say 0.5 parts per million, and the high

13      alarm was set at -- at what they -- 5 parts per million.

14  Q   Is there an alarm between the lower part and the high part?

15  A   No, sir.

16  Q   There's not scan alarm at 1 part per million?

17  A   No, sir.  You can actually set your particular meter for how

18      many -- or what value you want those alarms to alarm at.

19  Q   Now, you were not involved with the entry team, is that

20      correct?

21  A   I was overseeing the entry team, sir.

22  Q   So the entry team when they testify, they would have the

23      times and the measurements in the house and the garage in

24      question, would they not?

25  A   Yes, sir.

```
 1   Q   Okay.  What -- do you know there was a measurement -- and if

 2       you don't know this I may ask other witnesses, then, the

 3       source of 30 per parts per million of VOC.  So first of all,

 4       what is the definition of VOC?

 5   A   Well, basically it stands for vault organic compounds, which

 6       we -- we tend to base that based on hydrocarbon materials,

 7       anything that has a carbon material in it.

 8   Q   What could be the source of that?

 9   A   Flammable liquids.

10   Q   What could be the -- what -- CO is carbon monoxide?

11   A   Yes, sir.

12   Q   And what would be the source of carbon monoxide?

13   A   Incomplete combustion.

14   Q   Okay.  Now, is -- you have a lot of expertise in this area,

15       do you not?

16   A   Yes, sir.

17   Q   And if I come into contact with chlorine, or -- would it --

18       is my clothing going to demonstrate that I came into contact

19       with chlorine?  Is it going to have an odor to it?

20   A   Your skin would be your first -- actually attacks your

21       mucous membranes, your eyes and nose.

22   Q   Could also get on clothing?

23   A   Yes, sir.

24   Q   Now, what time, if you remember, did you get to the back

25       porch of the property at -- you said Oro Valley, but it was
```

1           actually Tucson Omni.

2    A      Yes.

3    Q      It was -- what time did you get at the back porch when the

4           bucket was foaming?

5    A      During the recon.  The first recon, sir.

6    Q      Fuming, not foaming.

7    A      We arrived at 5:32.  I think we -- we got dispatched at

8           5:32.  I think we arrived at 5:42, which we were immediately

9           assigned to recon.  So we probably got to that back porch

10          within five minutes.

11   Q      Okay.  Did you notice anything in the front of the house?

12   A      We had not gone to the front of the house because we were

13          only in our structural firefighting gear, and due to the

14          large plume that occurred and the observations we made on

15          the back porch were sufficient enough for our supervisor to

16          determine that this was not a house fire, and was indeed a

17          hazardous materials incident.

18   Q      Can -- did other gases give a positive indication for

19          chlorine?

20   A      On this particular sensor?

21   Q      Yes.

22   A      They're very rare, and there are only two that I'm aware of

23          that could possibly give another reading on that sensor.

24   Q      What two gases could give a false positive?

25   A      I'd have to dig deep for that, but I think one is bromine or

1          bromide, and I can't remember what the other one is, but

2          they're very rare and based on evidence that was collected

3          later from the chlorine bucket that was on the back porch,

4          we had to assume that those were readings we were getting

5          were chlorine.

6     Q    And would you agree with me that a chlorine cloud is

7          greenish yellow in color?

8     A    Well, I haven't seen too many in my career but I've seen

9          videos of them on pure chlorine gas.  Pure chlorine gas

10         emitting from tankers does have a yellowish green tint to

11         it, but that is also pure chlorine gas.

12    Q    Can the chlorine tablet that is commonly used in the pool if

13         it's kept decompose?

14    A    Is if it's kept, sir?

15    Q    If it's maintained in some type of a --

16    A    I'm sure it could decompose over time, yes, sir.

17    Q    And if it decomposes, it could give off chlorine gas, is

18         that correct?

19    A    I'm sure that's possible.

20         MR. BOCK:  Now, Judge, this hasn't been admitted, so I

21    just want to --

22         THE COURT:  Sure.  We can just show it to the witness.

23         MR. BOCK:  Is that all I need to do?

24         THE COURT:  Well, let's see.  It's coming up but not on

25    his screen yet.

1              There we go.

2    BY MR. BOCK:

3    Q    Do you see that?

4    A    Yes, sir.

5    Q    It's Exhibit 198.

6         You talked about on direct the uniforms, is that

7         correct?

8    A    Are you referring to the level one ensemble that we used to

9         make the entry, sir?

10   Q    The blue ones that you said were --

11   A    Yes, sir.  Those are the fully encapsulated Level A suits.

12   Q    And do you know -- did you have one of those suits on?

13   A    I did not actually perform the entry.  Firefighter Taylor

14        and Firefighter Cranford made the first entry, and I'm not

15        sure those are them in that picture.

16   Q    Okay.

17             MR. BOCK:  Move to admit Exhibit 198, your Honor.

18             MR. PIMSNER:  No objection.

19             THE COURT:  198 is admitted, and may be published.

20   BY MR. BOCK:

21   Q    Do you know that gentleman that's --

22   A    To the left?

23   Q    Right.  Not right, but --

24   A    It is to the left.  It's kind of blurry.  I thought it was

25        Captain Martinez when I first saw it, but I'm not sure.

```
 1   Q   Would it help if I brought the -- just the photo to you?
 2   A   I'm not sure.  We actually looked at the photo earlier and I
 3       had trouble distinguishing exactly who that was.
 4   Q   Okay, but it's someone associated with the fire department?
 5   A   Yes, he has a Northwest Fire emblem on his shirt.
 6   Q   Okay.
 7           MR. BOCK:  Can I have that --
 8   BY MR. BOCK:
 9   Q   So does -- does Exhibit 415, this MultiRAE Plus brochure --
10       does this -- does this accurately depict what your machine
11       did too?  Does it -- does it --
12   A   Other than what I said as far as the sensor, not the
13       resolution but as far as the -- I forgot the word I'm
14       looking for.  Not the resolution but the -- the amount of
15       chlorine that it was capable of detecting.  It's not 1 to 10
16       parts per million.  It was actually 0 to 20 parts per
17       million.
18           MR. BOCK:  May I have a, second your Honor?
19           THE COURT:  Yes a.
20           MR. BOCK:  I don't have anything further.  Thank you,
21   your Honor.
22           THE COURT:  Yes.
23           Redirect?
24           MR. PIMSNER:  Yes, your Honor.
25                       REDIRECT EXAMINATION
```

```
1   BY MR. PIMSNER:
2   Q    Mr. Rucker, to be clear, when I was asking you and I showed
3        you the picture and was asking you questions about the
4        MultiRAE earlier, the device that you have and the one you
5        described on the calibration records, that is a MultiRAE
6        Plus, correct?
7   A    Yes, sir.
8   Q    It's one and the same?
9   A    Yes, sir.
10  Q    So we're not talking about two different pieces of
11       equipment?
12  A    No, sir.
13  Q    Now, there was discussion about possibly a bromine could
14       possibly alert on a chlorine sensor.
15  A    Yes, sir.  We call that interference.
16  Q    Interference?
17  A    Yes, sir.
18  Q    And are you able to determine the interference when it
19       occurs?
20  A    No, sir.
21  Q    Is bromine a chemical that's commonly found?
22  A    No, sir, and it's also toxic as well.
23  Q    It's toxic as well?  And is chlorine a -- a substance that's
24       commonly found?
25  A    Yes, sir.
```

1   Q   And are you aware of the volatility, the hazards associated

2       with chlorine?

3   A   Yes, sir.

4   Q   And what would those hazards be?

5   A   Mainly, again, it attacks your -- your glands and

6       respiratory system.

7        MR. BOCK:  Judge, I would object as to improper

8   redirect.

9        THE COURT:  Yes, sustained.

10   BY MR. PIMSNER:

11   Q   Did -- there was discussion about the -- the picture of the

12       Level A suit and who the captain was who was standing next

13       to the individuals in the Level A suit.  Do you recall those

14       questions?

15   A   Yes, sir.

16   Q   Now, that picture was not a picture of your unit, was it?

17   A   It may have been the secondary unit that was there, sir, but

18       it was in the -- what we call the cold zone.

19   Q   And the cold zone is what?

20   A   Is an area not affected immediately by the release of the

21       chemical.

22   Q   So the fact that the captain wasn't wearing any protective

23       gear is because he was in a safe area?

24   A   Yes, sir.

25   Q   And that's because you had staged a distance away upwind,

1              correct?

2     A    Approximately 300 feet, yes, sir.

3     Q    Now, you were asked can chlorine smell on the clothing, and

4          I believe your testimony was at first it would hit your skin

5          and your mucous membranes.  Do you recall something to that

6          effect?

7     A    Yes, sir.

8     Q    Now, chlorine -- does -- does it dissipate with time?

9     A    Yes, sir.

10    Q    And the longer the time, the more the chlorine would

11         dissipate; is that a fair statement?

12    A    Yes, sir.

13    Q    Now, there was some conversations about the color of the

14         chlorine cloud.  So a pure chlorine gas with nothing else

15         combined, no plastics, no other chemicals, gives what color

16         of a cloud?

17    A    From my recollection of looking at training videos, sir,

18         greenish yellow.

19    Q    And that is just a pure burning type chlorine, correct?

20    A    Yeah, that's a pure gas.

21    Q    And that is not the color that -- necessarily the color of

22         the cloud if it would have been combined with other

23         chemicals, or plastics, et cetera?

24    A    No, sir.

25    Q    Now, this MultiRAE Plus device that you were using may

1    have -- it comes from the manufacturer with set settings, is

2    that correct?

3  A    It's called default settings yes, sir.

4  Q    Default settings?  And do you recall as far as the chlorine

5    setting was concerned -- do you recall what the default

6    setting would be on the chlorine?

7  A    The normal default settings from what I looked at, the

8    records on the units, were 10 parts per million.  Pretty

9    high alarm reading.

10  Q    Pretty high reading?  That would be considered a high

11    reading?

12  A    Yes, sir, it would.

13  Q    And would people -- if someone is exposed to that reading,

14    could they -- could they -- could there be an issue with

15    their health?

16  A    Absolutely.

17  Q    Now, did you as your fire company, you in charge of that

18    unit, was there a discussion or a decision that that default

19    setting would be adjusted to -- for a -- to a lower level

20    for the alarm?

21  A    At that particular time, sir?

22  Q    Just -- when --

23  A    At any time?

24  Q    When it was -- when it was set.  I guess on that event do

25    you know what the -- what the setting was for that MultiRAE

1        device to alarm at the high level for chlorine?

2   A    At the time I didn't know until I actually pulled it up on

3        the computer to look at the settings.

4   Q    Okay.  And what was the setting back on August 2nd, 2009?

5   A    For the -- for the high alarm?

6            MR. BOCK:  Well, I'm going to object to that, your

7   Honor.

8            THE COURT:  On what grounds?

9            MR. BOCK:  Well -- may I approach?

10           THE COURT:  Yes.  Why don't you come up to sidebar.

11                         BENCH CONFERENCE

12           MR. BOCK:  I'm going to object on foundation grounds.

13  He's saying he looked on some computer to see what -- the

14  setting.  He didn't look at the machine.  I think there's a lack

15  of foundation here.

16           THE COURT:  If you could lay some more foundation.

17           MR. PIMSNER:  I can try, but --

18           THE COURT:  Is someone else going to testify?

19           MS. ANDERSON:  No, he was in charge of the machines.

20  He didn't know that day what it was set at, but he verified later

21  by computer that it was set at 5 parts per million.

22           MR. BOCK:  Is there a custodian of record?

23           MS. ANDERSON:  He said there isn't.

24           THE COURT:  Well, you used the word custodian --

25           MR. BOCK:  Well, there has to be some person that keeps

1    the records.

2              THE COURT:  So you're challenging -- well, it's already

3    been admitted though the calibration document.  Is that what

4    we're talking about, the information on that document?  It's

5    already admitted.

6              MR. BOCK:  Well, I didn't -- when was it admitted?

7              MR. PIMSNER:  When you said no objection.

8              MR. BOCK:  Well, I thought he was going to bring -- I

9    thought this was the custodian of records.

10             MR. PIMSNER:  No we established it was a business

11   record made at or near the time --

12             THE COURT:  Custodians -- that's the impression I get.

13             MR. BOCK:  So it is a business record?

14             THE COURT:  I think it is, and you didn't object and

15   it's in, so I assumed everybody --

16             MR. BOCK:  Right, but I would object to this type of

17   testimony, him looking at a computer and now saying --

18             THE COURT:  If you could just lay a little more

19   foundation on how that process works.

20             MR. PIMSNER:  And this is in response to Mr. Bock

21   asking him all these questions about the specification sheet he

22   was using on cross, so --

23             THE COURT:  Um-um.  All right.

24             (The bench conference was concluded.)

25             THE COURT:  All right, Mr. Pimsner, you may proceed.

1          MR. PIMSNER:  Thank you, your Honor.

2     BY MR. PIMSNER:

3     Q    Now, we're talking about whether or not the machine that was

4          used on August 2nd, 2009, had been -- whether the -- the

5          factory default setting of 10 parts per million for chlorine

6          in order to set off the high alarm was in fact adjusted.  At

7          the time of the incident, had you reviewed the records

8          before to determine what the default level was on that

9          specific machine on that day?

10    A    I don't recall, sir.

11    Q    Okay.  So at the time of the event you just weren't aware of

12         what the -- the default -- or the level for the alarm was

13         set, correct?

14    A    Yes, sir.

15    Q    Now, are those levels on -- the calibration levels as far as

16         when the alarms are set off, your company or your --

17         Northwest Fire, they're able to adjust those to -- not just

18         to conform to what the factory says, is that correct?

19    A    If need be, yes, sir.

20    Q    Okay.  And if they are adjusted, are -- are -- is there a

21         record kept of that adjustment?

22    A    Not normally.

23    Q    When you earlier testified about looking at a computer what

24         type of records were you looking at?

25    A    These individual units are equipped -- this particular unit

1      is equipped with what we call a data logging unit which

2      actually stores information over time, which will tell you

3      when the last calibrations were done, what alarm points are

4      set for particular sensors.

5  Q   Okay.  So when you say you looked at a computer, you were

6      actually looking at the data that was contained on that

7      machine that was used on August 2nd?

8  A   Yes, sir, it was downloaded from that particular machine.

9  Q   And that -- that data would show the alarm specifications

10     for the unit on that day, correct?

11 A   Yes, sir.

12 Q   And on that unit what was the -- I believe you testified

13     that it was set at -- the initial alarm was set at .5 parts

14     per million?

15 A   The low alarm, sir?

16 Q   The low alarm.

17 A   I believe the low alarm was set for 0.5 parts per million,

18     which is what my office recommends for what the call time

19     rate average.

20 Q   And is that because even that small amount of chlorine

21     can -- can affect an individual?

22 A   It can if you exceed that.

23 Q   Now, did you determine by looking at the data from the

24     actual machine on August 2nd what the high level was for the

25     alarm for chlorine?

```
 1          MR. BOCK:  Objection, your Honor.  Foundation.
 2          THE COURT:  No, overruled.  He can answer that yes or
 3    no.
 4          THE WITNESS:  Well, the actual time that we downloaded
 5    the information was sometime after the incident.  And obviously,
 6    that had never been changed since then because I'm the only one
 7    allowed to actually go in there and do that.
 8    BY MR. PIMSNER:
 9    Q    So you're the one responsible for if you're going to
10         change --
11    A    Yes, sir.
12    Q    -- the default settings to different types of settings.  You
13         just didn't recall that you did that before August 2nd?
14    A    Or if I ever have.  Correct, sir.
15    Q    But you were able to determine after August 2nd what the
16         default settlings were?
17    A    Yes, sir.
18    Q    And you hadn't changed it from August 2nd -- or before
19         August 2nd until the time that you checked it?
20    A    Yes, sir.
21    Q    And what was the default rating for the high level alarm?
22    A    The default rating that we used, sir, was at 5 parts per
23         million.
24    Q    That you adjusted?
25    A    Yes, it was adjusted at 5 parts per million.
```

1    Q    Thank you.

2         And why did you -- or why would the high level reading

3         be adjusted downward?

4    A    It could be based on a couple of things.  One, if the -- if

5         the low level reading was 0.5 percent, we may adjust the

6         high reading 10 times higher than that to give us what we

7         call a 10 percent rule so that the lower reading being

8         10 percent of that 5 parts per million would give us a red

9         flag to say at 0.5 there's something wrong here.  We need to

10        step back and take a look at the situation, and that 10

11        times that amount there's certainly something wrong here.

12        And normally, it would be defaulted at 10 parts per million

13        at the factory, which is set for what NIOSH recommends,

14        immediately dangerous to life and health.

15   Q    And that's -- that's -- and I believe we covered it, but

16        that has to do with workplace settings, correct?

17   A    Yes, sir.

18   Q    Okay.  It doesn't have to do with everyday life, or just

19        people in the community, correct?

20   A    I'm sorry --

21   Q    It doesn't take into account the population of the general

22        community.  It takes into account workplace environments?

23   A    Yes, sir.

24             MR. BOCK:  This is leading, Judge.

25             THE COURT:  Well, I'll allow the answer to stand.

1          Go ahead.

2          MR. PIMSNER:  Thank you, your Honor.

3     BY MR. PIMSNER:

4     Q    The -- there was some questioning about what does -- so when

5          a high reading of an alarm goes off, what does that mean?

6     A    It means that they report back that the monitor -- the

7          sensor for the chlorine was reading high.  That indicates

8          that the reading they were getting exceeded 5 parts per

9          million.

10    Q    Can you tell how that high reading was?

11    A    No, sir.

12    Q    Is that -- are those sensors set up to cover a certain

13         range, say from 0 to some number above 5?

14    A    Yes, sir.

15    Q    And what's the maximum number that the MultiRAE Plus device

16         that was used on August 2nd -- what was the maximum number

17         that chlorine reading could have -- could have been?

18    A    I think based on -- the records that I was looking at were

19         similar to what the defense approached me at the bench, that

20         the resolution was up to 0 to 50 parts per million was the

21         range.  I think the range for that particular sensor was 0

22         to 50 parts per million based on the data that I have.

23    Q    Now, when -- when you're discussing the 10 percent rule in

24         that, because they're at .5 there's a red flag, and at 5

25         there's certainly something that's unusual, why do you

1           set -- even have these alarm settings on these devices?

2    A      Well, that way if you are a member of the entry team and

3           you're not looking at the monitor and you're actually in an

4           area that's unsafe, it will -- it has an audible alarm,

5           which there's three beeps, in this particular instrument

6           there's a large beep that happens, it vibrates and flashes.

7           That's to indicate, obviously, if you're not looking at the

8           meter at that moment what those readings are, it will red

9           flag you so that you can look at the monitor.

10   Q      Is that to -- is that for safety reasons, or for what --

11   A      Absolutely.

12   Q      Okay.  And if you received a high alarm, does that concern

13          the firefighters that are involved?

14   A      It's a concern.  It may or may not change our action plan.

15          We have to base the risk of that particular reading based on

16          what we're trying to accomplish at the time.

17               MR. PIMSNER:  I have nothing further.

18               THE COURT:  Recross, Mr. Bock?

19               MR. BOCK:  Thank you, Judge.

20                          RECROSS EXAMINATION

21   BY MR. BOCK:

22   Q      Sir, you talked about looking at the computer, or the

23          default information, is that correct?

24   A      Yes, sir.

25   Q      Is there paperwork or a printout that's associated with that

```
 1        that's available?
 2   A    Yes, sir.
 3             MR. BOCK:  Thank you.
 4             THE COURT:  Given that I let defense counsel recross,
 5   any re-redirect?
 6             MR. PIMSNER:  I think I'll be done.  Thank you.
 7             THE COURT:  Okay.
 8             Any questions from the jury for this witness?
 9             All right, if the clerk could collect those, please,
10   the questions from the jury.
11                          BENCH CONFERENCE
12             MR. PIMSNER:  I don't have any objection to either one
13   of these.
14             MR. BOCK:  I don't either.
15             THE COURT:  All right.
16             MR. PIMSNER:  Want me to read it?
17             THE COURT:  Sure.  Go ahead.
18             (The bench conference was concluded.)
19             THE COURT:  All right, some questions from the jury for
20   you, sir.
21             THE WITNESS:  Sure.
22                          EXAMINATION
23   BY MR. PIMSNER:
24   Q    From your initial recon approach, were there any effects
25        from your initial exposure to the device in the back yard?
```

1   A    No, sir.

2   Q    So nothing -- nothing on your exposed skin?

3   A    As far as the initial recon, sir?

4   Q    Correct.

5   A    Well, we did have our structural firefighter gear on.  That

6        does provide some protection.  And we do wear our

7        self-contained breathing apparatus which fully protects us.

8        It's the highest type of respiratory protection you can wear

9        in the industry.

10  Q    And what -- what if any skin was exposed?

11  A    What if any skin might have been exposed?  Maybe around our

12       chin area.

13  Q    Second question, sir.  Based on the readings -- and you were

14       in charge of this HAZMAT entry.  You were kind of the person

15       in charge, correct?

16  A    I was in charge of the HAZMAT group initially until Captain

17       Garner was relieved from command.  He took over HAZMAT

18       group, and I took over what they call HAZMAT entry, which is

19       the actual entry into the area.

20  Q    So you're the supervisor?

21  A    I supervised that, yes, sir.

22  Q    And based on the readings that you were getting from inside

23       the structure, what was the actual plan, or --

24  A    Well, it certainly was a concern.  They were inside the

25       structure.  They were taking some readings.  They were

1      trying to obtain a sample of liquid that was on the floor.

2      From my recollection, we told them to be quick about it and

3      then to move to the front of house and take further samples

4      out there.

5  Q   Now, as far as the -- the part that was smoldering, was

6      there a plan of action put in place to let that burn out

7      before you would approach again?

8  A   It had pretty much ran its course.  It wasn't that much of a

9      concern for us.  It was obviously a source to get samples

10     from.  That was their primary directive, to get a sample

11     from that source as well prior to entering the house.

12 Q   Had the device been actively reacting, would you have sent

13     an entry team back into the house at that point, or would

14     you have --

15 A   Since there was no life safety issue, no.

16         THE COURT:  Any follow-up questions from counsel to the

17 jury questions, Mr. Bock?

18                         EXAMINATION

19 BY MR. BOCK:

20 Q   So when you were in the back yard, you did have some area of

21     skin exposed; is that your testimony?

22 A   My testimony is there's a possibility that we could have

23     some area exposed, because there's a firefighter's hood,

24     there's the actual mask that is around your face like this,

25     and we put a firefighter's hood that covers our ears and our

1          hair, that protects our hair and our neck.  There's always a

2          possibility that there could be a small opening or something

3          that could be there.

4   Q      You had -- you had no irritation, though?

5   A      Not to my recollection, no, sir.

6   Q      Could this -- could this bucket have been capped with

7          something?  Something could have been put on top of the

8          bucket to prevent it from -- the smoke going up?

9   A      I'm not sure I understand your question, sir.

10  Q      Well, like an oil well.  Sometimes they cap an oil well to

11         keep the oil from going up in the air.  Could something have

12         been -- the fire department have put some device, a lead

13         device or something and put it on top of the bucket and

14         capped the bucket?

15  A      If it had been fuming, possibly.  If it still been reacting,

16         even then I don't think so, sir.  No, sir.

17  Q      That never -- that was never a discussion, attempting to cap

18         the bucket?

19  A      No, sir.

20             MR. BOCK:  Okay, thank you.

21             THE COURT:  Any follow-up questions from the

22  government?

23             MR. PIMSNER:  No, your Honor.

24             THE COURT:  Any additional questions from the jury?

25             All right, may this witness step down and be excused?

```
 1            MR. PIMSNER:  Yes, your Honor.  Thank you.

 2            THE COURT:  All right.  Thank you, sir, you may step

 3   down and be excused.

 4                    -------------------------

 5            (Levi Cranford was duly sworn by the clerk.)

 6                         LEVI CRANFORD

 7                       DIRECT EXAMINATION

 8   BY MR. PIMSNER:

 9   Q    Mr. Cranford, are you employed?

10   A    Yes, sir.

11   Q    And what -- by whom?

12   A    The Northwest Fire District.

13   Q    And in what capacity?

14   A    I am a firefighter.

15   Q    And how long have you been a firefighter?

16   A    Seven years in January.

17   Q    And you would have gone through the -- the required fire

18        academy?

19   A    Yes, sir.

20   Q    Did you receive any additional training, firefighting

21        training as -- when it comes to hazardous materials?

22   A    Yes, sir.  I attended a course that was about five weeks

23        long for additional HAZMAT training.

24   Q    And what does that course consist of?

25   A    Basically, your basic HAZMAT monitoring, extensive -- we
```

```
 1         did, like, two weeks of chemistry class, air monitoring,
 2         Level A suits.  All the advance techniques for HAZMAT.
 3    Q    And by doing that training, do you become certified in
 4         HAZMAT handling, or HAZMAT response?
 5    A    Yes, sir.  We actually get a certification of -- you're
 6         above your basic first responder.  I'm a HAZMAT technician
 7         level.
 8    Q    And that's what you're certified as?
 9    A    Yes, sir.
10    Q    And when did you become certified?
11    A    2007.
12    Q    Okay.  And as a result, have you responded to a number of
13         HAZMAT incidents in the Tucson general area?
14    A    Yes.
15    Q    Okay.  Now, let me draw your attention back to August 2nd,
16         2009.  Were you on duty that day?
17    A    Yes, sir.
18    Q    And were you working with Bert Rucker also?
19    A    Yes, sir.
20    Q    When does your duty start?
21    A    My duty starts at 8:00 in the morning, and I'm relieved at
22         8:00 the following day.
23    Q    And on August 2nd -- had you started on the morning of
24         August 2nd, or was it August 1st that you started?
25    A    Let's see, I'm trying to recall.  I came on shift the
```

1          morning before the -- the incident.

2   Q   That would have been August 1st?

3   A   Yes, sir.

4   Q   Okay.  And do you recall having -- receiving a dispatch to

5          go to the general area of Magee and Jensen?

6   A   Yes, sir.

7   Q   And what was the -- do you recall the nature of that

8          dispatch?

9   A   The nature of the dispatch was for a smell of chemicals in

10         the area.

11  Q   And were you a member of a four man crew that responded?

12  A   Yes, sir.  I was on the engine that day, and that was a four

13         man crew.

14  Q   And so you would have been responding in a regular fire

15         truck, correct?

16  A   That's correct.

17  Q   And from where would you have been responding from?

18  A   We were responding from the fire station that was located at

19         Ina and Shannon.

20  Q   So would you have been headed -- I guess west on Magee

21         towards Jensen?

22  A   Correct.  We were -- from the station we were heading north

23         on Shannon, and then from there west on Magee.

24  Q   Okay.  And did you approach the area of Jensen and Magee?

25  A   That is correct.

| | | |
|---|---|---|
| 1 | Q | And did you notice anything unusual at that time? |
| 2 | A | Yeah.  Actually, heading north on Shannon we were coming |
| 3 | | down the hill, and even before we made the left turn on |
| 4 | | Magee we noticed a large cloud -- white cloud heading south |
| 5 | | across Magee. |
| 6 | Q | So you would have been on an elevated area of Shannon that |
| 7 | | gave you a view of the Jensen/Magee area? |
| 8 | A | Correct, there's Canyon del Oro wash that runs through that |
| 9 | | area, so we were actually above the wash and we had a clear |
| 10 | | view looking down into the small valley area below. |
| 11 | Q | And describe the cloud that you saw while you were still |
| 12 | | traveling on Shannon before you turned onto Magee. |
| 13 | A | The cloud itself was a very thick white cloud, so thick that |
| 14 | | we actually couldn't -- you couldn't see through it at all. |
| 15 | | And actually, it kind of -- it kind of threw us off a little |
| 16 | | bit because we weren't sure -- with the amount of smoke, |
| 17 | | that we possibly thought it might have been a possible house |
| 18 | | fire.  That's how much smoke there was. |
| 19 | Q | And was the color of the smoke unusual for a house fire at |
| 20 | | that point? |
| 21 | A | Yeah.  The typical house fire, the smoke is, like, a dark |
| 22 | | black, but in this instance it was definitely a very -- it |
| 23 | | was white, just white smoke. |
| 24 | Q | And was it a tall billowing cloud, or was it -- did it -- |
| 25 | | did it have other characteristics? |

1  A  No, the smoke itself was probably about 20 feet high or so,

2     and it stayed low, and it basically followed the topography

3     of the area.

4  Q  And so it -- are you saying that it clung to the lower areas

5     of that area?

6  A  That is correct.

7  Q  And what areas would those have been?

8  A  The area from its point of origin was heading south, went

9     through the neighborhood, and from there it was going into

10    the Canyon del Oro wash.

11 Q  So it would have been traveling into the wash?

12 A  Correct.

13 Q  Now, after you turned onto Jensen -- onto Magee, excuse me,

14    and you started approaching Jensen, did your truck stop at

15    some point?

16 A  Yeah, we stopped at Jensen and Magee --

17 Q  Why was that?

18 A  -- to get -- it was basically to kind of gather what was

19    going on because of the contradiction of what we were seeing

20    and the report.  Like I say, I was thinking it was a

21    possible house fire, but the smoke was throwing us off.

22 Q  And could you see the smoke when you stopped short of Jensen

23    on Magee, and -- you continued to see the smoke from the

24    fire truck?

25 A  That's correct, yes.

1  Q    And how would you describe the movement of the -- of the

2       cloud?

3  A    It was slow moving.  It was -- like I say, it was -- it was

4       a thick dense slow moving cloud of smoke, moving southbound

5       across Ina -- or I'm sorry, Magee.

6  Q    So would it actually have been crossing the road in front of

7       you?

8  A    That's correct.

9  Q    And was it hung low to the ground too?

10 A    Yes, sir.

11 Q    And could you see through that cloud?

12 A    No, sir.  There was cars coming down -- I could see coming

13      down Magee at the top of the hill, and as soon as they

14      dropped behind it, you -- you completely lose the vehicles.

15      That's how thick it was.

16 Q    And when you stopped, was it just for an initial -- you

17      know, just initial decision on how to react?

18 A    Yeah, it was basically just initial reaction of what was

19      going on, and kind of get a size-up of the incident.

20 Q    And did you then -- what -- what did your truck do at that

21      point?

22 A    After that we actually proceeded into the neighborhood, and

23      at that point once we pulled in -- whenever we noticed the

24      sheriffs with the gas masks and stuff on, one of them

25      actually approached the engine, told us what was going on,

1      and from that point we actually pulled past the house.

2 Q   And when you pulled -- well, first of all, can you lift up

3      the exhibit?  And I believe it's 2 -- 293.  I'd ask you to

4      use the pointer.

5          Do you recall where you would have entered that

6      complex?

7 A   Yeah, from the -- we entered the complex from right here,

8      from this road, and pulled into about -- once we -- we met

9      the sheriffs approximately right here, and from that point

10     we actually pulled up by the golf course, approximately

11     right here.

12 Q   And -- and you would have been upwind from the source?

13 A   That's correct.

14 Q   And when you drove by the -- I guess the side of the

15     residence, did you notice anything from the front of the

16     residence in question, the 2870 West Magee?

17 A   From where we came, you could see that there was -- the

18     smoke was coming down this way, but you could see that there

19     was smoke coming from the front of the house, but there's

20     also smoke from where we parked right here.  You could also

21     see that there's smoke coming from somewhere in the back as

22     well.

23 Q   So based on your observations, you were able to say -- see

24     two different points of origin for the smoke?

25 A   Yes, sir.

1    Q    And when you -- when you drove in and -- and staged upwind,

2         had you noticed any unusual odor?

3    A    From where we staged upwind, I personally didn't notice

4         anything upwind.  However, whenever we first pulled in

5         through this area right here, I definitely got a smell of

6         chlorine because I said the smoke itself was coming this --

7         right down here, and as we kind of passed that area that's

8         when I thought I smelled chlorine.

9    Q    And were you able to circumvent the cloud -- or skirt the

10        edge of the cloud while you were driving into that complex?

11   A    That's correct.  Yeah, the smoke itself never actually

12        crossed that road.  It did parallel it, however.

13   Q    Okay, but even though you didn't drive into the cloud, you

14        still noticed an odor of chlorine?

15   A    Yes, sir.

16   Q    And you have familiarity with that odor?

17   A    Yes, sir.  I actually used to work for Patio Pools and Spas

18        for about three years prior to this.

19   Q    So to you it was a distinct odor?

20   A    Yes, sir.

21   Q    Now, after you staged upwind, I take it out of the -- the

22        range of the cloud, what -- what next steps did you take?

23   A    From there my captain decided that he was going to assemble

24        a recon team, which consisted of Mr. Rucker and myself.

25   Q    And what kind of protective clothing did you wear at that

| | | |
|---|---|---|
| 1 | | point? |
| 2 | A | For the initial recon we just wore our structural |
| 3 | | firefighting gear along with our self-contained breathing |
| 4 | | apparatus, making sure not to at any point actually enter |
| 5 | | into any of the cloud at all.  We tried to stay north of the |
| 6 | | incident, out of -- upwind of it. |
| 7 | Q | And your initial protective clothing was a full fire -- |
| 8 | | firefighter's equipment, correct? |
| 9 | A | Yes, sir. |
| 10 | Q | So you didn't have much if any skin exposed? |
| 11 | A | No, sir. |
| 12 | Q | And did you have your own separate breathing source, oxygen |
| 13 | | source? |
| 14 | A | That is correct, yes.  We had our -- our SEVA on, and just |
| 15 | | our regular turnout gear. |
| 16 | Q | And please look at Exhibit 78, which has been admitted. |
| 17 | | Did you approach the -- what part of house did you |
| 18 | | approach initially? |
| 19 | | THE COURT:  Wait, it's still coming up on the screen. |
| 20 | | MR. PIMSNER:  It's just a foundational question. |
| 21 | | THE WITNESS:  Initially for our recon Bert and myself |
| 22 | | approached from the golf course area here, kind of came up north |
| 23 | | a little ways, and then came back south down to the back, to the |
| 24 | | back patio area. |
| 25 | Q | And could you look at Exhibit 78? |

```
 1              Do you recognize that?
 2   A   Yes, sir.
 3   Q   And what is that?
 4   A   That is the back of the -- the structure.  The rear of the
 5       structure.
 6   Q   How close to that back wall did you travel?
 7   A   Bert and myself basically came up to the back wall that's
 8       shown there, and that's as far as we went on our recon.
 9   Q   And if the witness could be shown Exhibit 87, which has been
10       admitted.
11              What did you observe when you looked over the small
12       wall?
13   A   Once we looked over the wall, we noticed a five-gallon
14       bucket that was -- at that point in our initial recon it was
15       still smoking.  It was -- it looked like it had done most of
16       its chemical reaction, but it still was smoking, and I
17       recognized it as what appeared to be a chlorine bucket.
18   Q   Did you actually read the -- the word chlorine on the bucket
19       at some point?
20   A   Yes, sir.
21   Q   Okay.  Now, once you -- you said it was still smoking.  How
22       much smoke would you -- was coming from that device at that
23       point?
24   A   I would say that from our immediate area you would see the
25       smoke, but I think at that point it wouldn't be enough to
```

1        really see it from any -- any distance.

2   Q    And did you report your find -- your initial findings back

3        to your captain?

4   A    Yes, sir.

5   Q    And what decision was made at that point?

6   A    At that point my captain decided to upgrade the incident

7        from just the smell of odor in the area to a full -- full

8        HAZMAT incident.

9   Q    Now, did -- were you ordered to evacuate that area at that

10       point?

11  A    Yeah.  At that point we decided that it was in our best

12       interest for Bert and myself to back out of the area.  From

13       that point on that we'd probably assemble an entry team to

14       go in with the proper PE.

15  Q    And we've heard from Firefighter Rucker the nature of a

16       general HAZMAT response and the different areas that need to

17       be accomplished before a HAZMAT entry can be affected.

18       Did -- were you present and assisting in that setup of the

19       HAZMAT response?

20  A    As far as determining, like, the proper protective equipment

21       stuff to wear to go in, I was not a part of that.  That was

22       determined by those in research.  I was -- because -- since

23       I was the entry team guy, I was basically getting other

24       stuff set up, and they were determining the proper

25       protective equipment to wear and what to take in.

1    Q    And the other equipment -- you were getting out the

2         equipment that you may need; is that accurate?

3    A    That is correct.  At that point we were probably pulling out

4         air monitors, stuff like that, getting them warmed up,

5         pulling out suits and stuff like that, the proper GPE.

6    Q    Was a decontamination station set up also?

7    A    Yes, there was.

8    Q    Now, at that point did you know what you were dealing with?

9    A    I think at that point we had a -- with the smell of the

10        chemical in the area and actually visually seeing the

11        five-gallon bucket of the chlorine in the back yard prior to

12        going in, we had a pretty good idea of what we were going to

13        be dealing with.

14   Q    But you weren't certain at all, is that --

15   A    We weren't certain.  That's correct.

16   Q    Now, you were designated after you did your initial recon --

17        or were you designated as one of the original individuals

18        that would be involved in the initial entry?

19   A    That's correct.

20   Q    And does that mean the initial entry actually into the home

21        of Mr. and Mrs. Levine?

22   A    That's correct.

23   Q    And at some point did your research people make a decision

24        what the appropriate level of protection would be in order

25        to enter that confined space?

1   A    That is correct.  They determined that the proper protective

2        equipment to be wearing was fully encapsulated Level A suit.

3   Q    In the Level A suit your breathing apparatus is also

4        encapsulated?

5   A    That is correct.

6   Q    And is there any exposure at all to the outside atmosphere?

7   A    None whatsoever.

8   Q    And the suit -- it's the color blue, correct?

9   A    Yes, sir.

10              MR. PIMSNER:  Could you pull up Exhibit 126 for the

11  witness, please?  Just for the witness -- excuse me, that's

12  wrong.  I apologize.  Okay, 198.

13  BY MR. PIMSNER:

14  Q    Do you -- actually, this has been admitted -- correct, so

15       the jury can see it.

16              Is that the type of suit that you used as part of your

17       initial entry?

18  A    That is correct.

19              MR. PIMSNER:  Could you show 197 to the witness,

20  please -- actually, 196.  I apologize again.

21  BY MR. PIMSNER:

22  Q    Do you recognize that photograph?

23  A    Yes, sir.

24  Q    And what does that photograph depict?

25  A    That is myself and also Dillon Taylor making entry into the

1           back of the property.

2     Q     So that would have been at the time of your initial entry

3           into the structure, correct?

4     A     That is correct.

5     Q     And -- and which one are you?  Can you tell?

6     A     To be honest with you, I don't remember.

7     Q     Okay.  Now, I see a bag in that photograph.  What's the

8           significance of that bag?

9     A     The bag is to carry all of our air monitoring equipment.  It

10          also carries any type of supplies to try to gather any -- I

11          guess, material, whatever it was in the buckets.  We

12          carried, I think, beakers.  I think we also carried some

13          syringes to try to take a sample of anything possible in the

14          back.

15    Q     Now, I see something on top of the white bucket colored

16          yellow.  Do you know what that is?

17    A     Yes, that is our MultiRAE air monitor.

18          THE COURT:  Excuse me, counsel.  Do you want to admit

19    the exhibit?

20          MR. PIMSNER:  I'm sorry.  I would move to admit Exhibit

21    196.  I apologize.

22          THE COURT:  To save some -- any objection?

23          MR. BOCK:  Judge, just subject to the previous record I

24    made.

25          THE COURT:  All right, so this is 196?

```
 1              MR. PIMSNER:  May it be published.

 2              THE COURT:  It is admitted, may be published.

 3              I'm sorry to interrupt you.

 4              MR. PIMSNER:  No, no.  I should have done that.

 5     BY MR. PIMSNER:

 6     Q    And could you point on the screen, because it will show a

 7          dot where you point, as to the -- the device that I just

 8          asked you about?

 9     A    Yes, sir.

10     Q    And that would have been your MultiRAE Plus air monitoring

11          device?

12     A    Yes, sir.

13     Q    Now, you were carrying it in a bucket.  Is that how you

14          carried it throughout the house?

15     A    No, that's the way that we carry it to get it to the --

16          initially where we're going, because there's so much stuff

17          in it we just put it in the bucket.  And once we get

18          actually up to the house is when we'll pull it out, actually

19          hold it in our hands.

20     Q    And we've heard a little bit about the device and how it's

21          set to warn you if there are the certain levels and

22          readings; is that accurate?

23     A    Yes, sir.

24     Q    And tell us the types of warnings that you receive when you

25          have this device in your hand?
```

1  A   The type of warnings that we would receive is that the

2      MultiRAE is actually designed to vibrate.  It also has an

3      audible alarm, and it also has lights on it that will flash.

4  Q   Okay.  And once you got into -- did you go through the gate

5      to get into that back yard, or did you climb over the wall?

6  A   I believe we actually just -- just went over the wall.  It

7      wasn't -- it wasn't too terribly high.

8  Q   Okay, and where did you start your entry?

9  A   We started our entry in the back there, and then we went

10     up -- I believe we went up to the chlorine bucket, and then

11     from there we went to the back door of the -- of the house.

12 Q   Now, when you looked at the chlorine bucket on the back

13     patio, did you take any samples at that time, or did you

14     just do a visual reconnaissance at that point?

15 A   No, sir, we did actually take some samples.

16 Q   Okay.  And then did you have your reading -- your MultiRAE

17     with you at that point in your hand?

18 A   Yes, sir.

19 Q   And were you getting any alarms?

20 A   We did not receive any alarms at that point, no.

21 Q   Okay.  And did you enter -- next enter the house?

22 A   Yes, sir.  After we collected samples, we proceeded to the

23     sliding glass door at the back of the house.

24 Q   Sliding door, or could it have been a French door?

25 A   Actually, it might -- to be honest with you, I don't know.

1  Q    But it would have been the back patio door?

2  A    It was the back -- it was the back door.

3  Q    And when you went in the house, you go in as a team,

4       correct?

5  A    Correct.

6  Q    And you're in constant radio contact with your captain and

7       other members of the team?

8  A    Yes, sir.

9  Q    And what's your intent once you get inside that house?

10  A    Our intent once we went inside the house was to air monitor

11       the structure.  We started off at the -- the back door

12       there, and originally went to the left, and then from there

13       we made a right and headed towards the kitchen area.

14  Q    Okay.  Now, what time did you actually begin your entry?

15  A    If I'm not mistaken, I think the time stamp was at 7:39.

16  Q    And was that approximately two hours after you would have

17       initially responded to the scene?

18  A    Yes, sir.

19  Q    And that -- and part of that was to set up for the HAZMAT

20       entry?

21  A    That is correct.  The reason why there's a little bit of

22       delay is to make sure that we have an understanding of

23       possibly what we're going into, the research that went into

24       determining the suits, and also setting up the decon area.

25  Q    And you also have emergency personnel nearby if needed?

1   A    Yes, sir.

2   Q    Now, when you entered the house, what -- how are you using

3        these meters?

4            You're just walking around with them waiting for them

5        to flash or beep, or is there a method that you use?

6   A    No, sir.  There's actually a method that we use, because we

7        weren't quite certain of what we were going into.  Certain

8        gases like to rise.  Certain gases like to hang down low.

9        So it's very methodical in what we did.  So the monitors

10       themselves normally take a few seconds, about 10 seconds or

11       so, to actually give you that initial reading.  So as we

12       went through the house, we methodically went through, tested

13       up high for several seconds, tested down low, move further

14       through the house, same thing, test up high, test down low,

15       test all -- you know, different levels in the house to see

16       if there's any gases.

17  Q    So you were systematically going through the various rooms

18       inside the house?

19  A    Yes, sir.

20  Q    And what was the last interior room that you would have

21       checked?

22  A    The last interior room that we checked was the kitchen.

23       That was the last actual -- in that part of the house.

24  Q    And this would have been after 7 -- I guess, how long had

25       you been in the house by the time you got to the kitchen

1      area, roughly?

2  A   I would say before we got to the kitchen area, probably

3      about ten minutes.

4  Q   And once you got -- and you continued to watch your device

5      and you weren't getting any -- or were you getting any

6      readings for chlorine?

7  A   No, sir.  Inside the house we got zero readings on our

8      monitors.

9  Q   Okay.  Now, did you notice an interior door from the house

10     that led into the garage?

11  A  Yes, sir.  It was located near -- if I'm not mistaken, the

12     kitchen area.

13  Q  And did you -- after the checked the kitchen area, did

14     you -- was that door shut, first of all?

15  A  Yes, sir.  The door leading from the kitchen to the garage

16     was shut.

17  Q  And did you make entry into the garage?

18  A  Yes, sir, we did.

19  Q  And did you notice anything unusual -- and this is both you

20     and -- and Mr. Taylor?

21  A  Correct.

22  Q  Did you notice anything unusual when you two entered the

23     garage?

24  A  Yes, sir.  Immediately once we opened up the door to the

25     garage there was a definite light haze inside the garage.

1  Q    Kind of a cloudy, a light cloud -- is that how you would

2       describe it?

3  A    Yeah, I would call it like a light cloud.  Definitely, a

4       light cloud inside the garage.

5  Q    And did you step into the garage?

6  A    Yes, sir.

7  Q    And did you have your meters with you?

8  A    Yes, sir.

9  Q    And did you receive any type of readings?

10 A    Yes, sir.  Five -- within five feet of making entry into the

11      garage, our MultiRAE immediately started alarming both --

12      with all three.

13 Q    Now, was the alarm just for the low level alarm, or was it a

14      higher alarm?

15 A    The alarm was -- the MultiRAE was alarming because of the

16      chlorine reading that it was getting.  Our -- the monitor

17      was set for 5 parts per million, and as soon as it hit the 5

18      parts per million, it started alarming.

19 Q    And when did you -- besides the haze and the light cloud,

20      did you notice anything else unusual about the garage?

21 A    Yes, sir.  Coming from the garage door itself, the roll-up

22      door, there was definitely a dark liquid of some sort that

23      had been coming from underneath the garage door.

24           MR. PIMSNER:  May this witness be shown Exhibit 165,

25 your Honor?

1          THE COURT:  Yes.

2    BY MR. PIMSNER:

3    Q    Sir, do you see Exhibit 165?

4    A    Yes, sir.

5    Q    Now, do you see the -- the brown liquid on the floor -- the

6         brown what appears to be liquid on the floor?

7    A    Yes, sir.

8    Q    Do you recognize just that portion of the photograph?

9    A    Yes, sir.

10   Q    Now, what -- and what do you recognize it as?

11   A    That was -- that -- I recognize that as the dark liquid that

12        we had noticed upon entry of the garage.

13   Q    Now, there appears to be white things that are on the floor,

14        and a hole in the garage door.  That wasn't the condition --

15        was that the condition when you entered?

16   A    No, sir.

17   Q    Okay.

18          MR. PIMSNER:  Now, may the --

19   BY MR. PIMSNER:

20   Q    And that accurately reflects the type of the oozing liquid

21        that you noticed upon entry in the garage, correct?

22   A    Yes, sir.

23          MR. PIMSNER:  Move to admit Exhibit 165, your Honor.

24          MR. BOCK:  No objection, your Honor.

25          THE COURT:  165 is admitted.

```
 1   BY MR. PIMSNER:

 2   Q    So on the wall to the right of the picture there appears to

 3        be damage to the wall.  Was that like that?

 4   A    No, sir.

 5   Q    And the white chunks of what appear to be garage door, was

 6        that present?

 7   A    No, sir.

 8   Q    Or the white items that are on the -- looks like the edge of

 9        a car over there?

10   A    No, sir.

11   Q    But you do recall seeing the liquid coming from underneath

12        the --

13   A    Yes, sir.

14   Q    -- door?

15             Let me ask the witness to look at Exhibit 172, please.

16             Now, is this -- is this a photograph of the other side

17        of the garage door?

18   A    That is correct.

19   Q    And did you notice that area after you entered?

20   A    Yes, sir.

21   Q    And did you notice the substance that's on the ground at the

22        time you entered, seeping underneath the garage door?

23   A    Yes, sir.

24   Q    And does that accurately reflect the substance that you

25        observed?
```

1    A    Yes, sir.

2           MR. PIMSNER:  And may this -- I move to admit and

3    publish 172, your Honor.

4           MR. BOCK:  No objection, your Honor.

5           THE COURT:  172 is admitted.

6    BY MR. PIMSNER:

7    Q    So in addition to the last exhibit that had what appears to

8         be liquids coming from under the right side of the garage

9         door, on the left side there was also liquid, correct?

10   A    That is correct.

11   Q    And did your alarm continue to go off while you were inside

12        the garage?

13   A    Yes, sir.

14   Q    And that would have been indicating to you -- and it was

15        alarm specific for chlorine?

16   A    Yes, sir.  The alarm was specifically going off because of

17        the chlorine.

18   Q    And that would have been -- and what did that mean to you?

19   A    That meant to me that the environment that we were in was

20        higher than the recommended level that any person should be

21        in outside of a Level A suit.

22   Q    Okay.  And how long did you remain in the garage?

23   A    After we walked in and the alarms went off, we attempted to

24        try to grab a sample of the fluid that was on the ground

25        using, like, a syringe.

1   Q    Now, would that have been the other sample closest -- closer

2        to the other side of the garage, or this side?  Do you

3        recall?

4   A    It was the one right next to the trash can.

5   Q    Okay.  Were you able to get a sample?

6   A    I was -- we were able to get a little bit, but I don't know

7        if it was any substantial amount that -- we were having a

8        hard time with the suction too because in the picture it

9        looks like it's fairly thick, but it wasn't thick enough for

10       our syringe to -- to really, you know, pull anything up.

11  Q    So the different colors within that substance doesn't

12       necessarily mean that it was thicker in those areas?

13  A    No, sir.

14  Q    Did you -- at that point did you retreat from the garage?

15  A    Yes, sir.

16  Q    And at all times that you were in the garage, did your

17       MultiRAE meter continue to alarm on the high level?

18  A    Yes, sir.

19  Q    And once you got out of the garage, did you shut the door

20       behind you?

21  A    Yes, we did.

22  Q    And once you cleared that area, did your alarms stop or --

23       or what --

24  A    To be -- to be honest with you, I don't necessarily recall

25       if the -- if the alarms ever re-set themselves after that or

1         not.

2    Q    Okay, what did you do next?

3    A    After we were done with the garage, we attempted to go out

4         the front door, recalling that there was smoke coming from

5         the front of the house.  We went to the front door and was

6         unable to actually physically open the front door of the

7         house.

8    Q    Why was that?

9    A    It wasn't until we actually made it around to the other side

10        that we noticed that there was -- it was somehow sealed.

11   Q    So you actually attempted to get out the front door

12        yourself, but it wouldn't move?

13   A    Correct.

14   Q    So what did you do at that point?

15   A    From that point on we -- Dillon Taylor and myself, we exited

16        out the rear of the structure, went south of it, and then

17        made our way around to the front yard.

18   Q    So you would have gone around -- that was like a triplex,

19        correct?  There was a unit on either side?

20   A    Yeah.  From the back yard we came out from where we entered,

21        made our way around this way, and then came around to the

22        front of the structure, just like that.

23   Q    And did you notice anything unusual at the front of the

24        structure?

25   A    Yes, sir, we did.

1    Q    What did you notice?

2    A    From the front of the structure there was still like a

3         smoldering -- what appeared to be like a five gallon bucket

4         at the front of the garage door that had some sort of a

5         reaction, because the garage door itself had char marks up

6         the front of it.  There also appeared to be that same dark

7         liquid all over the front yard with what appeared to be like

8         a packing material, like styrofoam peanuts or something.

9         And there's also a smaller bucket directly in front of the

10        front door.

11            MR. PIMSNER:  May the witness be shown Exhibit 126?

12   BY MR. PIMSNER:

13   Q    Do you recognize that?

14   A    Yes, sir.

15   Q    And what does that --

16            MR. PIMSNER:  Has that been admitted?

17            (No verbal response.)

18   BY MR. PIMSNER:

19   Q    What -- first of all, could you describe what -- what you

20        saw when you moved around to the front of the house?

21   A    As we moved around to the front, as you can see -- actually,

22        there's that same dark liquid poured on the front driveway.

23        There was also that -- that smoldering pile that was right

24        there directly in front of the garbage door, the packing

25        peanuts, and then also -- you can't really see it in the

1    photo, but there's also that smaller bucket at the front

2    entrance.

3  Q  Did the smaller bucket at the front entrance appear to have

4    been involved in some kind of chemical reaction?

5  A  To be honest with you, from where we were at we never really

6    made it up to the front entrance because we didn't want to

7    step on anything in the front.  From the curb, it didn't

8    appear that anything had really occurred.

9  Q  Now, there's a large hole on the left of the garage door.

10    Was that hole present when either you entered the garage

11    from the inside, or when you first walked around the

12    outside?

13  A  No, it was not present.

14  Q  And would that have been made at a later time after you did

15    your initial entry?

16  A  Yes, sir.

17  Q  And how long -- and I can't remember, don't know -- I can't

18    remember if you have answered this, but how long were you in

19    the garage before you exited and closed the door behind you?

20  A  Inside the garage?  We were probably in there for only a

21    matter of a couple minutes.

22  Q  And did the fact that the alarms were going off on the high

23    level -- did that factor into how long you would remain in

24    that area?

25  A  Yes, sir.  If we weren't getting any lower readings, or if

1        the MultiRAE had not been alarming, it's quite possible that

2        we would have attempted to maybe do more as far as

3        collecting a sample and stuff like that, but because the

4        alarm was going off we decided that it was best to try to

5        get a sample and get out as quick as possible.

6             MR. PIMSNER:  I have nothing further at this time, your

7   Honor.

8             THE COURT:  All right.

9             Mr. Bock, I'm assuming you have more than five minutes

10  of questioning -- or maybe not?

11            MR. BOCK:  Hard to say.  Do you want to go to 5:00?

12            THE COURT:  Well, why don't we go ahead.  Do you think

13  you might go longer than --

14            MR. BOCK:  Do you want me to try?

15            THE COURT:  All right, let's try.

16            Everybody okay?

17            If you need more time, we'll recess and have the

18  witness come back tomorrow.

19            MR. BOCK:  Well, what time do you want me to go to,

20  five after five, ten after five?

21            THE COURT:  5:00.

22            MR. BOCK:  Okay, thank you.

23                         CROSS-EXAMINATION

24  MR. BOCK:

25  Q    Did you ever determine how many buckets were in the -- the

1           front of the house?

2    A      In the front of the house?  The number of buckets was the

3           one that appeared to be at the garage door, and the one at

4           the front door.

5    Q      So there appeared to be two buckets in the front of the

6           house?

7    A      Yes, sir.

8    Q      Now, the -- you were shown pictures of the inside of the

9           garage, is that correct?

10   A      That is correct, sir.

11   Q      And the picture was from left to right on your screen,

12          right?

13   A      Correct.

14   Q      So on the right side, this was some substance that you tried

15          to capture with some type of suction device, correct?

16   A      That is correct.

17   Q      And did that appear to you, sir, to be a substance that

18          appeared like the oil that had the packing peanuts on it?

19   A      Yes, sir.

20   Q      Now, did you ever attempt to open the garage door?

21   A      No, sir.

22   Q      Did you know that there was a robot used at some point in

23          time to get into the garage door?

24   A      The robot was used, sir, after I had already cleared and

25          left the scene.

1  Q  Now, what was the other substance that you saw inside the
2     garage?
3  A  What was on it?  Oh, in that one particular picture I could
4     see that the -- that the hole that was in there was -- was
5     present, so the white substance --
6  Q  It had to do with the robot?
7  A  I don't -- to be honest with you, sir, I don't know.
8  Q  Okay, but there was a substance that you were shown a second
9     picture of the interior of the garage.  The one side was
10    this oily substance that you couldn't get the suction.  Then
11    there was another substance.  Do you remember that picture?
12 A  Are you referring to another liquid?
13 Q  Another liquid.  Is that your recollection?
14 A  Well, from my recollection I remember that there was
15    liquid -- if my back was to the door between the garage and
16    the kitchen facing the garage door, there was substance -- a
17    liquid, that dark liquid, coming from the bottom right of
18    the garage, and then there was also another -- another dark
19    substance coming from the bottom left where that picture of
20    the trash can was.
21 Q  All right.  Was that associated with the sludge from the
22    bucket, or was that just that dark liquid?
23 A  It appeared just to be the dark liquid.
24 Q  Okay, so none of the sludge from the bucket made its way
25    into the garage?

1   A    That I don't know.

2   Q    Did you notice if the garage door had any sealant on it?

3   A    Not from the inside, no, sir.

4   Q    Did you notice from the outside?

5   A    Yes, sir.

6   Q    Now, you -- you don't remember if you were carrying the

7        MultiRAE device or not, is that correct?

8             Was that your testimony?

9   A    No, sir.

10  Q    It was either you or--

11  A    It was either myself or Mr. Taylor.

12  Q    Okay, the -- so were there any vents associated with the

13       garage?  Did you see any vents?

14  A    Not that I recall.

15  Q    And the door -- you opened the door into the garage?

16  A    Yes, sir.

17  Q    Do you know how the -- did the chlorine get into the garage

18       from the house?

19            Do you have any idea how it got into the garage?

20  A    No, sir.  I have no idea how the chlorine made its way into

21       the garage.

22  Q    If there was chlorine in the garage, do you think there

23       should have still been some chlorine in the house?

24            Is that a logical conclusion?

25  A    I would say not necessarily.  I mean, if the door to the

1     garage -- between the actual structure of the garage and the
2     house itself was shut, I could see how the chlorine itself
3     could be maintained into the garage area.
4  Q  All of the chlorine from -- any chlorine in the house could
5     be into the garage area?
6  A  I'm not sure if all of it was contained in there, or if any
7     escaped the house.
8  Q  Did the door have a tight fit to it when it closed?
9  A  It appeared so, yes, sir.
10 Q  Did you see any other entry into the garage, or anything
11    where the cloud would have deposited the chlorine?
12 A  Not that I recall.
13 Q  We -- did you -- so how many readings specifically did you
14    note when you were -- at that point in time when you entered
15    the home with the device?
16 A  The only readings that we received was the time that we
17    entered the garage.  The thing with the -- with the meter is
18    that it's continuously reading, so it automatically adjusts
19    accordingly if the readings themselves get higher or lower.
20 Q  So when you were in the house, you were going room to room?
21 A  Yes, sir.
22 Q  And how many rooms did you go to in the house?
23 A  We hit every -- I'm pretty sure we hit every room inside the
24    house prior to entering the garage.
25            THE COURT:  Okay, we'll stop, Mr. Bock.  Thank you.

1                    C E R T I F I C A T E

2          I, Mary A. Riley, do hereby certify that I

3    stenographically reported the foregoing proceedings to the best

4    of my skill and ability, and that the same was transcribed by me

5    via computer-aided transcription, and that the foregoing pages of

6    typewritten matter are a true, correct and complete transcript of

7    all the proceedings had, as set forth in the title page hereto.

8          Dated this 15th day of April, 2013.

9

10                                      s/ Mary A. Riley

11                                United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25