1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF ARIZONA

3    ----------------------------)
                                 )
4                                )
     UNITED STATES OF AMERICA,   )
5                  Plaintiff,    ) No. CA 13-10116 9th Circuit
                                 )
6          vs.                   ) No. CR 11-01751 TUC-CKJ
                                 )
7                                )     Tucson, Arizona
     TODD FRIES,                 )     September 21, 2012
8                  Defendant.    )
                                 )
9    ----------------------------)

10                     TRANSCRIPT OF TESTIMONY
               JURY TRIAL DAY FOUR MORNING SESSION
11
                BEFORE THE HONORABLE CINDY K. JORGENSON
12                 UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15
     For the Plaintiff:    By:  Beverly K. Anderson, and
16                              David A. Pimsner
                                U.S. Attorney's Office
17                              405 W. Congress St., Suite 4800
                                Tucson, AZ   85701
18
     For the Defendant:    By:  Richard C. Bock
19                              100 N. Stone Ave., Suite 801
                                Tucson, AZ   85701
20

21
     Mary A. Riley, RMR, FCRR
22   United States Court Reporter
     U.S. District Court
23   405 W. Congress St.
     Tucson, AZ   85750
24

25        Proceedings produced by computer-aided transcription

1                              INDEX OF TESTIMONY

2

3

4

5       LEVI CRANFORD (Continued)

6       Cross-Examination by Mr. Bock              Page   4

7       Redirect Examination by Mr. Pimsner       Page  14

8       JURY QUESTION

9       Examination by Ms. Anderson               Page  17

10

11      CHRISTOPHER ROGERS

12      Direct Examination by Mr. Pimsner         Page  18

13      Cross-Examination by Mr. Bock             Page  69

14      Redirect Examination by Mr. Pimsner       Page  85

15      JURY QUESTION

16      Examination by Mr. Pimsner                Page  90, 91

17      Examination by Mr. Bock                   Page  92

18

19      JON EDWARDS

20      Direct Examination by Ms. Anderson        Page  94

21      Cross-Examination by Mr. Bock             Page 105

22      JURY QUESTION

23      Examination by Ms. Anderson               Page 114

24      Examination by Mr. Bock                   Page 115

25

1  ALEXANDER TISCH

2  Direct Examination by Ms. Anderson          Page 115

3  Cross-Examination by Mr. Bock               Page 122

4  JURY QUESTION

5  Examination by Ms. Anderson                 Page 124

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              TRANSCRIPT OF PROCEEDINGS

2        (Levi Cranford resumed the witness stand.)

3                    LEVI CRANFORD

4              CONTINUED CROSS-EXAMINATION

5    BY MR. BOCK:

6    Q    Good morning, sir.

7    A    Good morning.

8    Q    Now, we established that you were involved in the entry

9         team, is that correct?

10   A    That is correct.

11   Q    And I think we established the time you entered on August

12        the 2nd of 2009 was 7:29 in the morning?

13   A    That's correct, sir.

14   Q    And you exited at 7:55 in the morning, is that correct?

15   A    Yes, sir.

16   Q    And you also indicated that you had the MultiRae PLUS?

17   A    Yes, sir.

18   Q    Okay.  Now, there were other entry teams after you, is that

19        correct?

20   A    That's correct.

21   Q    And did they -- they used the same device, is that correct?

22   A    To be honest with you, sir, I'm not sure the entry teams

23        that went in after me -- I had left the scene at about 0900,

24        and they had left -- they had reentered after I had already

25        left the scene, and I'm not quite sure which -- which

1           monitor they would have used.

2    Q      What would you have done with your monitor after you left

3           the scene?

4    A      After the scene it would have gone to decon and been

5           decontaminated, and then after that point it would have been

6           re-set.

7    Q      Now, sir, again, let me just very briefly -- do you remember

8           the number of rooms in the house?

9    A      Not off the top of my head, sir, no.

10   Q      Does the fire department do a sketch of the home?

11   A      No, sir.  I don't recall anybody doing a sketch of the

12          house.

13   Q      So there was no cloud or mist when you were inside the

14          house, is that correct?

15   A      That is correct, sir.

16   Q      You could see clearly?

17   A      Yes, sir.

18   Q      And so you went through the back of the home, is that

19          correct?

20   A      Yes, sir.

21   Q      And the first thing you did, you monitored the back patio,

22          is that correct?

23   A      Yes, sir.

24   Q      And there was no -- there's no reading, is that correct?

25   A      Yes, sir.

1   Q   And then you would have went into the room immediately by

2       those French doors?

3   A   Yes, sir.

4   Q   And was it a living room?

5   A   I believe it was like a living room or a day room, yes.

6   Q   And the machine is being carried while you and your -- who

7       was the other officer with you?

8   A   Mr. Taylor.

9   Q   Okay.  So you went into the living room, and there was no

10      reading, is that correct?

11   A   That is correct, sir.

12   Q   And was there a fireplace in the living room?

13   A   That I do not recall.

14   Q   Do you recall if there was a fireplace in the home?

15   A   Not -- I don't recall any fireplace, sir.

16   Q   So you went to -- you went into the bathroom area?

17   A   I believe the first place we went to was to -- if I'm not

18      mistaken, maybe a bedroom that was on the left, or on the

19      south side of the structure.

20   Q   What -- what other areas did you go to?

21   A   From there we -- like I said, we entered in the back door,

22      immediately started monitoring within the day room area that

23      was right by the -- the rear door.  We started to the left

24      and did a search, like -- in firefighting we always kind of

25      do like a certain pattern where we tend to hug around, and

| | | |
|---|---|---|
| 1 | | we continue around a certain direction all the way around |
| 2 | | the house.  So we started with the left-hand search, and |
| 3 | | basically made our way around until we made it over to the |
| 4 | | kitchen area, which was on the right. |
| 5 | Q | And the -- it was a thorough search? |
| 6 | A | Yes, sir. |
| 7 | Q | It had to be? |
| 8 | A | Yes, sir. |
| 9 | Q | And as a result of the thorough search, there was no -- |
| 10 | | the -- the MultiRAE device did not alert at all, is that |
| 11 | | correct? |
| 12 | A | Not inside the house, sir, no. |
| 13 | Q | Which suggested there was nothing in the house? |
| 14 | A | It would suggest that whatever that -- whatever meters -- |
| 15 | | whatever sensors were in our meters, it was not picking up |
| 16 | | anything -- any of the sensors that was on our meter. |
| 17 | Q | And the machine is sensitive? |
| 18 | A | Yes, sir. |
| 19 | Q | It goes to .01? |
| 20 | A | That's right. |
| 21 | Q | For parts per million.  And if there was a fireplace in the |
| 22 | | residence, for my question, you would have gone near the |
| 23 | | fireplace, is that correct? |
| 24 | A | Yes, sir. |
| 25 | Q | Then you testified about the garage, is that correct? |

1    A    Yes, sir.

2    Q    Now, when you were arriving at the scene, you were in a fire

3         truck -- a red fire truck?

4    A    Yes.

5    Q    Big one?

6    A    Yes, sir.

7    Q    And you were going from -- where did -- where was your

8         station at that time?

9    A    Our station was at the intersection of Ina and Shannon.

10   Q    Okay.  So to get to the scene, you would go north on

11        Shannon, is that correct?

12   A    Yes, sir.

13   Q    And north on Shannon is how far to Magee, approximately?

14   A    I would say from the intersection of Ina to the intersection

15        of Magee is maybe a little over a quarter of a mile.

16        Quarter of a mile maybe.

17   Q    Okay.  And the intersection of Shannon and Ina is kind of

18        down -- a little bit down in a little valley; is that a fair

19        statement?

20   A    I would say that the intersection of Ina and Shannon is not

21        necessarily on the -- down in the valley.  It's kind of --

22        it's actually up -- on the upper end of -- of the valley, I

23        would say.

24   Q    Okay, but you would have to go -- you would agree with me

25        that you're going -- when -- to get to the turn -- well,

1          where did you enter the Tucson Omni?

2    A    We entered the Tucson Omni off of -- off of Magee.

3    Q    Where the gate was?

4    A    Yes, sir.

5    Q    Was there a guard there?

6    A    Yes, sir.

7    Q    And so the guard opened the gate for you?

8    A    The -- the guard is -- the guard that's on duty, or --

9         always has the gate open for us.

10   Q    Now -- and he was, what, in a uniform?

11   A    I don't recall.

12   Q    And this was approximately what time in the morning?

13   A    I believe it was around 530-ish.

14   Q    Now, did you see any civilian vehicles or any activity

15        coming in your direction when you were going on -- when you

16        got from Shannon to Magee?

17            Did you see any vehicles coming in the opposite

18        direction?

19   A    I did see some vehicles coming eastbound on Magee as we were

20        approaching the scene.

21   Q    Okay, and Magee runs east/west?

22   A    That is correct.

23   Q    And did you see any motorcycles?

24   A    That I don't remember, sir.

25   Q    Is it possible there might have been some motorcycles as

1        part of that group?

2   A    I guess it could be possible.

3            MR. BOCK:  Judge, I'm going to show the witness Exhibit

4   Number 414.

5            THE COURT:  All right, you may approach the witness.

6            MR. BOCK:  Thank you.

7   BY MR. BOCK:

8   Q    Sir, could you read the narrative that was done by Mr. Trap?

9   A    Yes, sir.

10           THE COURT:  You just want him to read it to himself?

11           MR. BOCK:  Please, your Honor.

12           THE COURT:  And that's his report, Mr. Bock?

13           MR. BOCK:  It's a fireman named Trap, T-R-A-P.

14           THE COURT:  Oh.

15           THE WITNESS:  Okay.

16  BY MR. BOCK:

17  Q    Now, you're familiar with the Northwest Fire Department

18       reports, is that correct?

19  A    Yes, sir.

20  Q    An who is K. Trap?

21  A    He was a captain, Captain Ken Trap, who was with the

22       Northwest Fire District.  He is now retired.

23  Q    And these reports are official reports, are they not?

24  A    Yes, sir.

25  Q    Now, you read the -- the captain's report.  It's not unusual

1      to continue to monitor the residence for any type of gas

2      content, is it?

3  A   No, sir.

4  Q   And you read the report that at 10:35 there was an air

5      monitor reading on the roof, is that correct?

6  A   Yes, sir.

7  Q   And do you remember what the levels were?

8  A   I believe the reports stated that they were all at zero.

9          THE COURT:  Well, wait, Mr. Bock.  You're trying to

10  refresh the memory of this witness with the report of somebody

11  else?

12          MR. BOCK:  The government had no objection to this.

13          THE COURT:  Oh, okay.

14          MR. PIMSNER:  Your Honor, I had no objection to the

15  witness establishing a certain part of the report.  We won't

16  require Mr. Bock to call another witness for that limited

17  purpose.

18          THE COURT:  All right.

19          All right, go ahead, Mr. Bock.

20  BY MR. BOCK:

21  Q   Then it shows the crew was off the roof at 10:40.  Is that

22      what the captain wrote?

23  A   Yes, sir.

24  Q   And then at 12:00 there was a robot that was equipped.  Is

25      that what the report states?

1    A    Yes.

2    Q    Are you familiar with this robot?  Have you seen this robot

3         before?

4    A    I've personally never seen the robots.

5    Q    And there was air monitoring in the middle of the street, is

6         that correct, at that time?

7    A    Yes, sir.

8    Q    And do you remember what the readings were?

9    A    I don't recall what they were in the street.  I think it

10        picked up something, I believe, when it said they went to

11        the garage.

12   Q    Why don't you take a look at that.

13   A    The readings in the street were all at zero.

14   Q    For chlorine and any other gases, right?

15   A    That's correct, sir.

16   Q    And then at 12:22 what do you see as to additional

17        monitoring?

18   A    At 12:22 it shows the crew was monitoring in the front of

19        the garage.  The readings were the same as the street, all

20        levels at zero.

21   Q    And at 12:27 was there additional monitoring according to

22        the captain's report?

23   A    Yes.  At 12:27 the captain reported that he was monitoring

24        in the middle of the courtyard, and all levels were -- all

25        levels were the same.  All levels were at zero.

1   Q    At 12:43 was there monitoring by the front door?

2          MR. PIMSNER:  That's beyond the scope that the

3   government agreed to.  That -- from 12:43 on will be covered by

4   the next witness.

5          THE COURT:  All right.

6          So do you agree, Mr. Bock?

7          MR. BOCK:  May I ask the Assistant U.S. Attorney one

8   question, then, your Honor?

9          THE COURT:  Yes.  Just go off the record and talk among

10  yourselves for a minute.

11          (Counsel conferred off the record.)

12          MR. BOCK:  Thank you, your Honor.

13          THE COURT:  All right.

14  BY MR. BOCK:

15  Q    So the -- and when you say it was monitored, again we're

16       confident that it was by the use of this sensitive MultiRAE

17       device, is that correct?

18  A    That is correct, sir.

19  Q    And again for purposes of the -- what is a VOC again?  What

20       is that?

21  A    VO stands -- VOC, sorry, stands for volatile organic

22       combustibles.  Basically, it's any type of a -- anything

23       that has a hydrocarbon in it, like fuels and stuff like that

24       are all hydrocarbon based.

25          MR. BOCK:  Thank you, your Honor.  I have nothing

1    further.

2            THE COURT:  Okay.

3            Any redirect?

4            MR. PIMSNER:  Yes, your Honor.

5                        REDIRECT EXAMINATION

6    BY MR. PIMSNER:

7    Q    So VOC has to do with items that could be flammable, that

8         could cause harm to the first responders?

9    A    Yes, sir.

10   Q    Now, there was -- you were asked yesterday about the buckets

11        at the front of the garage.  Did those buckets -- were they

12        completely consumed from the reaction?

13   A    The one in the -- in front of the garage was.

14   Q    And --

15   A    I don't recall if the one at the front door was or not.

16   Q    And were you aware that the door had been sealed shut?

17   A    Originally, whenever we made entry into the garage I was not

18        aware, but as soon as we came around the front you could

19        definitely see that there was some sort of sealant.

20   Q    Now, when you were in the garage, you actually saw -- did

21        you see certain things coming from outside into the garage

22        on the floor?

23   A    Yes, sir.

24           MR. BOCK:  Judge, I -- that's improper redirect as to

25   that area.

1          THE COURT:  Well, I'll allow you to reopen your direct

2     exam.  And Mr. Bock, you may follow-up if you'd like.

3          Go ahead.

4     BY MR. PIMSNER:

5     Q    So if liquids were coming from the outside to the inside,

6          would that have meant that the garage was completely sealed?

7     A    I would say that -- if liquid was coming from the bottom of

8          the garage, I would say that there was -- obviously, it

9          probably wasn't completely sealed along the bottom of the

10         garage.

11    Q    So if liquid could make it through, could gas make it

12         through?

13    A    Yes, sir.

14    Q    Now, the readings that Mr. Bock asked you about that were

15         performed by other firefighters, we're talking about up on

16         the roof, correct?

17    A    Yes, sir.

18    Q    And we're talking 10:35, so that would be over -- or

19         approximately five hours after the fire department

20         responded, is that correct?

21    A    Yes, sir.

22    Q    And the readings out in the street at noon would have been,

23         again, closer to seven hours from the initial 9-1-1 call?

24    A    Yes, sir.

25    Q    And the 12:22 in front of the garage that had a zero

| | | |
|---|---|---|
| 1 | | reading, that was on the outside of the garage, was it not? |
| 2 | A | Yes, it was. |
| 3 | Q | Okay.  So those readings weren't taken inside the garage? |
| 4 | A | No, sir. |
| 5 | Q | And the courtyard, is that the area in front of the French |
| 6 | | doors in the front? |
| 7 | | Are you aware of what they were referring to when they |
| 8 | | indicated the 12:27 reading of a courtyard? |
| 9 | A | As far as what they were considering the courtyard, I'm not |
| 10 | | sure exactly what they were considering the courtyard. |
| 11 | Q | So you don't know if they were referring to the front of the |
| 12 | | French doors at the house, or at the front door area? |
| 13 | A | Yeah, I'm not quite sure. |
| 14 | | MR. PIMSNER:  Nothing further, your Honor. |
| 15 | | THE COURT:  All right. |
| 16 | | Any questions from the jury for this witness? |
| 17 | | All right, sir. |
| 18 | | And if I could see counsel at sidebar. |
| 19 | | BENCH CONFERENCE |
| 20 | | THE COURT:  We can all read it to ourselves, and then |
| 21 | | we can talk about it. |
| 22 | | MR. PIMSNER:  No problem. |
| 23 | | THE COURT:  Any objection? |
| 24 | | MR. BOCK:  No objection. |
| 25 | | MR. PIMSNER:  Do you want me to read it? |

1          THE COURT:  That's fine.

2          (The bench conference was concluded.)

3          THE COURT:  All right, sir, some questions from the

4     jury for you.

5                           EXAMINATION

6     BY MR. PIMSNER:

7     Q    Sir, when you arrived in the back yard area that morning,

8          was there any visible cloud?

9     A    Whenever we first arrived, there was still smoke coming from

10         the -- from the -- when we first did our initial recon,

11         Mr. Rucker and myself went up there in our turnouts, there

12         was still visible smoke coming from the bucket at that time,

13         but it wasn't anything like it was when we first initially

14         were pulling up.

15    Q    When you were pulling -- driving down Magee?

16    A    Correct.

17    Q    But where you were staged in a cold zone, I think I heard

18         you say or maybe it was Firefighter Rucker, the cloud wasn't

19         over that area, correct?

20    A    No, sir.

21    Q    Now, what -- when you entered the house that morning on your

22         initial entry, was the air conditioning running as you moved

23         through the home?

24    A    To be honest with you, I don't know if the AC unit was on or

25         not.  In the Level A HAZMAT suits it would be difficult to

1      know if that was on or not.

2              THE COURT:  All right.

3              Any follow-up questions from counsel to the jury

4      questions?

5              Mr. Bock?

6              MR. BOCK:  No, your Honor.

7              THE COURT:  Mr. Pimsner?

8              MR. PIMSNER:  No, your Honor.

9              THE COURT:  All right.

10             Any additional questions from the jury?

11             All right.  Thank you, sir.  You may step down and be

12     excused.

13                     ------------------------

14             (Christopher Rogers was duly sworn by the clerk.)

15                         CHRISTOPHER ROGERS

16                         DIRECT EXAMINATION

17     BY MR. PIMSNER:

18     Q     And Mr. Rogers, are you employed?

19     A     I am.

20     Q     By whom?

21     A     I'm a sergeant with the Pima County Sheriff's Department.

22     Q     And how long have you been with the Pima County Sheriff's

23           Department?

24     A     Since 1998.

25     Q     And what kind of assignments have you had while you've been

1        at Pima County?

2   A    I've worked patrol.  I've worked a specialized patrol squad,

3        and I've been a bomb technician.

4   Q    And when did you become a bomb technician?

5   A    In 2002.

6   Q    And did you have to receive any special training to become a

7        bomb technician?

8   A    I did training as a bomb technician in the United States on

9        public safety bomb squads.  Begins with a six weeks course

10       in Huntsville, Alabama that's taught by the F.B.I. and the

11       United States Army at the Redstone Military Arsenal, and

12       then continues with advanced courses with the ATF such as

13       their advanced explosives destructive techniques, which is a

14       two-week course --

15            (The witness was interrupted by the court reporter.)

16            THE WITNESS:  ATF's homemade explosives recognition

17  Course, which is a one-week course; an F.B.I. large vehicle Bomb

18  post-class course, which is also a one-week course; F.B.I. basic

19  post-class; ATF basic post-class; interview and interrogation

20  courses; and several other advanced courses anywhere from a week

21  to two weeks long.

22  BY MR. PIMSNER:

23  Q    And what type of -- explosive type of objects or explosive

24       related objects do you receive training in?

25  A    We receive training on anything from high explosives, low

| | | |
|---|---|---|
| 1 | | explosives, energetic materials which include chemicals, |
| 2 | | incendiary devices, which are devices that cause fire rather |
| 3 | | than an explosion, mechanical devices that may disseminate a |
| 4 | | hazardous material, as well as just conventional commercial |
| 5 | | explosives, and the seizure and disposal of those items. |
| 6 | Q | And so that would include chemical reactions that could |
| 7 | | cause issues? |
| 8 | A | It would. |
| 9 | Q | Now, you're currently a sergeant.  What is the unit that |
| 10 | | you're in charge of as a sergeant? |
| 11 | A | I'm in charge of the Pima Regional Bomb Squad, which is a 16 |
| 12 | | person unit that responds to counter ID, counter explosive |
| 13 | | calls all around greater Tucson and Pima County. |
| 14 | Q | And back on August 2nd, 2009, were you also a sergeant? |
| 15 | A | I was.  I was a sergeant at the time.  It was just the |
| 16 | | sheriff's bomb squad and it was comprised of six of us that |
| 17 | | were sheriff's department certified bomb technicians. |
| 18 | Q | So since this event the agencies -- is it fair to say the |
| 19 | | agencies have joined together to create a regional bomb |
| 20 | | squad response? |
| 21 | A | That's correct. |
| 22 | Q | Now, back on August 2nd were you asked to respond to the |
| 23 | | scene off Magee Road? |
| 24 | A | I was. |
| 25 | Q | And what was the nature of the call? |

1   A   Just before 10:00 a.m. I received a telephone call from

2       Lieutenant David Theil, who is the foothills patrol district

3       commander, advising that they had responded to a chemical

4       incident off of Magee Road, and they requested bomb squad

5       response to utilize robotic platforms to assess the scene

6       and determine the chemical hazard that was present.

7   Q   Were you aware -- were made aware as part of your

8       investigation at approximately what time the original call

9       came in regarding that event?

10  A   I am.  In speaking to him I understand it was right

11      around -- just before 5:00 a.m., I believe.

12  Q   Now, prior to testifying on the stand today have you had --

13      or excuse me, let me back that up.

14          When you were at -- at the scene -- when you arrived on

15      the scene, were you in charge of -- or what were you in

16      charge of?

17  A   Upon -- when I arrived upon the scene, Lieutenant Theil was

18      the incident commander.  The incident commander's job is the

19      overall operations of the scene, which included the traffic

20      flow, and all of the resources that fall under the response.

21      When I arrived on scene there was a battalion chief from

22      Northwest Fire that was directing what we refer to as the

23      operations command, which was the actual ongoing activities

24      on the scene.  I took over that responsibility from the

25      chief, and I became the operations commander on the scene so

1          it was my responsibility to oversee all the deployment of

2          personnel and resources as it relates to basically making

3          the scene safe, the collection of evidence, and then on --

4          and then the ongoing operation, and I did that in

5          conjunction with Special Agent Brian Nowak as -- as -- in

6          the form of a joint leadership role.

7     Q    And you would have been supervising all the activity that

8          day?

9     A    Correct.

10    Q    And you were present on scene throughout?

11    A    I was.

12    Q    And did -- as -- at some point during the day did you have

13         an opportunity to walk the -- around and in the entire

14         property to examine -- to make an examination?

15    A    I did.  As the scene developed and it was eventually made

16         safe, then I did a walk-through of the interior and exterior

17         of where the events had occurred that day.

18    Q    And prior to coming into court today have you had a chance

19         to look at Exhibit 78, which were photographs -- all

20         photographs 79, 80, 81, 82, 85, 87, 91, 95, 103 and 106?

21    A    I did.

22    Q    And do you recall if those photographs related to scenes of

23         the back yard area?

24    A    Yes.

25    Q    And did all those photographs accurately depict the way the

1          yard looked at back on August 2nd 2009?

2     A    Yes, they did.

3              MR. PIMSNER:  I -- at this time I would move to admit

4     subject to Mr. Bock's continuing objection the exhibits I just

5     listed.

6              THE COURT:  All right.

7              Any additional objections, Mr. Bock?

8              MR. BOCK:  No, your Honor.

9              THE COURT:  All right, the exhibits are admitted, and

10    may be published.

11    BY MR. PIMSNER:

12    Q    And I'm sorry, one additional one from the back yard, which

13         was Exhibit 209.

14              Do you recall seeing that one also?

15    A    I do.

16    Q    Okay.  Now, did you also have an opportunity to look at

17         Exhibits 120, 126, 128, 129, 135, 143, 144, 145, 148, 151,

18         156, 158, 215, 299 and 300 before you took the stand this

19         morning?

20    A    I did.

21    Q    And did those -- were those all photographs?

22    A    Yes, they were.

23    Q    And did they relate to how the scene looked at the front of

24         the residence on -- the Levine's residence on Magee?

25    A    Yes, they did.

```
 1   Q    And were those photos -- did they accurately depict the way
 2        the scene looked back on August 2nd, 2009?
 3   A    Yes, they did.
 4             MR. PIMSNER:  Again, I'd move the admission of all
 5   these exhibits, your Honor, subject to Mr. Bock's continuing
 6   objection.
 7             THE COURT:  Any new objections, Mr. Bock?
 8             MR. BOCK:  No, your Honor.
 9             THE COURT:  All right, subject to the continuing
10   objection, the exhibits are admitted and may be published.
11   BY MR. PIMSNER:
12   Q    And as part of your inspection, did you actually go inside
13        the house?
14   A    I did.
15   Q    Did that include the garage?
16   A    It did.
17   Q    Did you have an opportunity to review Exhibits 164, 166,
18        170, 172, 174 and 176 --
19   A    Yes, I did.
20   Q    -- before court?
21             And those were all photographs?
22   A    Yes, they were.
23   Q    And were those photographs of the inside of the garage area?
24   A    Yes.
25   Q    And did they accurately depict the way the garage looked
```

1    back on August 2nd, 2009?

2    A    They did.

3        MR. PIMSNER:  Again, your Honor, with -- I'd move for

4    admission and be able to publish all of those exhibits to the

5    jury as we go through them subject to Mr. Bock's continuing

6    objection.

7        THE COURT:  All right, the exhibits are admitted, and

8    may be published.

9        MR. PIMSNER:  Thank you.

10   BY MR. PIMSNER:

11   Q    Now, sir, you prepared a report in connection with this

12        matter, correct?

13   A    Yes.

14   Q    And your report would have detailed specific times as to all

15        the different various acts that you and your unit took that

16        day?

17   A    Yes.

18   Q    And would that -- and that report was a report on -- from

19        the incident on August 2nd?

20   A    Correct.

21   Q    And would having that report in front of you help refresh

22        your recollections as to the specific times as to the

23        conduct involved?

24   A    It would.

25        MR. PIMSNER:  May I approach the witness, your Honor --

1          THE COURT:  Yes.

2          MR. PIMSNER:  -- and hand the witness what's been

3    marked as Exhibit 328.

4          THE WITNESS:  Thank you.

5    BY MR. PIMSNER:

6    Q    All right.  You indicate that you received a call shortly

7         before 10:00 a.m.  Is that accurate?

8    A    Yes.

9    Q    And when you received the call to respond, what did you do?

10   A    I spoke to Lieutenant Theil at some length about the details

11        at the scene, and then determined what resources I needed.

12        I then contacted four of the other bomb team assigned to the

13        squad and dispatched them to the location to meet me there,

14        and also requested that they bring resources that are

15        assigned to the bomb squad to assist us in our duties.

16   Q    And what about equipment?  Did you determine what equipment

17        you would need?

18   A    I did.

19   Q    And generally, what type of equipment did you bring out to

20        the scene?

21   A    On scenes of this size we have a large command vehicle.

22        That command vehicle's brought out.  At the time it was a

23        1994 Ford utility vehicle, about 35 feet long, contains

24        equipment such as robotic platforms, bomb suits, render-safe

25        tools, explosive magazines, x-ray equipment, radiological

1          detection equipment, and other equipment that we use in our

2          duties.  I also summoned two small response vehicles that

3          contained two smaller robotic platforms and some other

4          response gear, and I contacted the Tucson Police Department

5          Bomb Squad to requested a utilization of their total

6          containment vessel, which is a large explosion resistant

7          form that we can place items into and then evacuate them

8          through a populated community without exposing the public to

9          risk.  I also contacted Special Agent Brian Nowak and asked

10         him to respond.

11    Q    Now, you talked about robotic platforms.  Could you describe

12         to us, please, what you said?  There are three total that

13         were brought up from Pima County?

14    A    There -- there were three from Pima County, and two from the

15         City of Tucson that we brought out that day.

16    Q    And tell us what a robotic platform is?

17    A    Bomb squads use robot platforms, which are essentially based

18         on the premise of a remote controlled car but that also have

19         arms and -- and grippers, camera systems, audio systems, and

20         we use those to enter a scene without putting people at

21         jeopardy.  And it's used to allow us to conduct certain

22         tasks on a scene, such as open doors, move objects, look at

23         objects, lift objects.  Those robotic platforms can also

24         introduce tools into the scene for us, such as chemical

25         detection equipment, radiological detection equipment, x-ray

```
 1            systems, explosive tools, those type of things.
 2   Q   So -- so these robots have various arms that can hold other
 3        types of monitoring equipment?
 4   A   That's correct.
 5   Q   All right.  Now, what time did you first deploy a robot?
 6   A   May I refer to my report to get the exact time for the jury?
 7   Q   Yes.
 8   A   Thank you.
 9            The first robot was deployed at 11:30 in the morning.
10   Q   And what was the purpose of the initial robot deployment?
11   A   The initial robot was introduced in the scene strictly for
12        its camera systems.  The purpose was to determine access
13        points for the larger robot, to determine whether there are
14        any hazards on the scene that could damage the robots and
15        prevent their operation, to determine if -- whether or not
16        we observed any civilians that may have been missed in the
17        evacuation, and really to just kind of get a visual
18        assessment of everything that was going on in the scene, and
19        then a geographic outlay of the incident.
20   Q   In a review of your report was that at 11 or 11:30?
21   A   11:30.
22   Q   Now, I see a notation at 11 that talked about expanded
23        evacuations.  What's the significance of that?
24   A   When I arrived on scene and I was briefed by the fire
25        battalion chief, we were doing an environment assessment
```

1    which include wind speeds and -- and wind direction, and

2    based on my observations I felt that the initial setup area

3    where -- what we refer to as our incident command post or

4    the gathering of equipment and personnel was too close based

5    on the wind direction that I was observing, so we pushed the

6    resources from the street area adjacent to the incident onto

7    the greens of the golf course, and then assured that a few

8    additional private residences were also evacuated.

9  Q    So that would have been conducted at -- changing the -- or

10     changing the location of your command post prior to you

11     deploying the first robot, correct?

12 A    That's correct.

13 Q    And the first robot was purely for reconnaissance to

14     determine what you're dealing with?

15 A    Yes, sir.

16 Q    Now, at some point did you deploy either a second robot, or

17     re-deploy the original robot?

18 A    We deployed a second robot.

19 Q    And what -- what time was that?

20 A    12:00.

21 Q    And what was the purpose of deploying that robot?

22 A    We affixed radiation monitors and also chemical detection

23     equipment to the arm of that robot, and that was to get an

24     environmental assessment of air levels in the scene to see

25     if they were at a level where it would be inhabitable by

1        persons.

2   Q    And when you said an air monitoring, what type of air

3        monitoring was used, do you recall?

4   A    Yes.  It was a MultiRae Plus that was provided to us by the

5        Northwest Fire Department Hazardous Material Team.

6   Q    Now, did that robot actually enter into the affected area

7        and take readings?

8   A    It did.

9   Q    And was there any -- so the MultiRae -- first of all, it's a

10       visual meter, correct --

11  A    That's correct.

12  Q    -- with a visual digital readout?

13            How did -- were you able to read it if you were from a

14       remote location?

15  A    The robot that we affixed it to had several cameras on it.

16       We physically using duct tape taped the monitor to the arm

17       of the robot so it would be in view of the camera.  Then we

18       affixed a cardboard shade to the camera to prevent the sun

19       from washing out the digital readout, and then we were able

20       to look at the monitor with the robot camera and read the

21       physical readout on the MultiRae and radiological meter

22       itself.

23  Q    And that was from a safe area?

24  A    Yes.

25  Q    And you were watching it on monitors, correct?

1   A    That's correct.

2   Q    Now, was there -- where was that initial robot deployed?

3   A    That -- that robot deployed to the south side of the

4        residence, which would have been the area of the garage door

5        behind of exterior hallway that led to the primary entry of

6        the residence.

7   Q    So would the readings have been taken closer to the front

8        door as opposed to the French doors that were up at the

9        front of the residence?

10  A    That's correct.

11  Q    And was there a positive reading at that point?

12  A    There was.  We found a VOC of 12 -- 12.3, and we also

13       noticed that there were chlorine levels present.

14  Q    Were you able to note the chlorine -- the actual chlorine

15       levels?

16  A    No.  We utilized a hazardous material technician who

17       interpreted the -- the actual digital readout --

18            MR. BOCK:  Objection -- objection to that, your Honor.

19            THE COURT:  Well, he's not giving the readout, just

20  explaining the procedure, so overruled.

21            You can finish your answer.

22            THE WITNESS:  A hazardous material technician

23  interpreted the digital readout of the MultiRae, and then

24  informed me based on that there were chlorine levels present.

25  BY MR. PIMSNER:

1   Q   And that was at what time?

2   A   Again, in referring to my report it was at 12:43.

3   Q   And near the front door?

4   A   Correct.

5   Q   Now, based on the reconnaissance that was done by the robot

6       and by the first responders, were you aware of other

7       objects -- unusual objects that were associated with that

8       residence?

9   A   Yes.

10  Q   And did -- what were they?

11  A   There was an upside down, like, a three-gallon bucket that

12      was in proximity of the front door on the south side of the

13      residence.  There was large accumulation of reddish brown

14      sludge that was adjacent to the garage door, almost at the

15      center of the garage door on the south side of the

16      residence.  On the back patio there was a partially burned

17      five-gallon bucket with a brown reddish sludge present also.

18      There was also a mesh bag on the back patio with a white

19      powdery substance that was kind of exuding from the bag

20      itself and then cast upon the back patio area there.

21  Q   Now, did you deploy another robot in order to closer

22      examine, or -- or try to determine what these items are?

23  A   We deployed two additional robots.

24  Q   And tell us -- tell us about the first robot you deployed

25      after the -- after the positive reading that you had gotten

1           at the front door.

2    A      We then deployed a larger robot, about a 300-pound platform.

3           We refer to it as an Andros F6A.  And that robot drove up to

4           the front door and assisted the smaller robot that had the

5           diagnostic equipment on it.  And then a second exact model

6           robot that belonged to the City of Tucson was deployed onto

7           the back patio to get a closer look, and look around and

8           determine what was going on with the five-gallon bucket that

9           was on the back patio.

10   Q      Now, was there an attempt to determine what, if anything --

11          what involvement that upside down three-gallon bucket in the

12          front yard -- or the front area, how that was connected?

13   A      Yes.  The larger robot was also equipped with a remote x-ray

14          system, and we were able to conduct an x-ray of the bucket

15          thereby giving us a glance into the interior where we could

16          see --

17              (The witness was interrupted by the court reporter.)

18              THE WITNESS:  It's also equipped with a remote x-ray

19   system that gives us a glance in the interior of the bucket.  So

20   by looking at the different densities of items in the bucket, we

21   can kind of figure out what's inside it.

22   Q      Besides densities, are you looking for anything else when

23          you conduct an x-ray?

24   A      Yes.

25   Q      What?

1  A    We're looking for bomb components, is the purpose that we

2       x-ray.  Blasting caps, wires, batteries, circuit boards, raw

3       explosives.

4  Q    Now, during the course of your arrival and in your being

5       debriefed on the situation, were you -- did you become aware

6       that there was a high chlorine level reading in the garage?

7  A    Yes.

8  Q    And was it one of your priorities -- or could you tell us

9       what your reports were that day?

10 A    Yes.  We spoke as a team, and then I made the final

11      determination as to what our priorities were.  Robots are

12      good, but you can't replace the human factor.  So one of our

13      priorities was to reduce the hazardous chemical levels on

14      the scene so that eventually we could put personnel in the

15      scene to conduct a more thorough assessment.  We were also

16      concerned about the bucket that was intact in the front

17      patio.  We weren't sure if it was an additional device, or

18      if it was just a container.  We were also concerned about

19      the five-gallon bucket on the back patio because there were

20      chemicals exuding from it.  We wanted to make sure it was

21      done -- the process it was undergoing, and that it wasn't

22      going to be a further threat to personnel on the scene.  And

23      we were concerned about the mesh bag and the white powder

24      that was present in the -- with it.

25 Q    Now -- so you needed to -- did you need to look at those

1      items or make some kind of determination prior to attempting
2      to vent the garage?
3  A   Yes.
4  Q   And why was that?
5  A   We wanted to make sure that those items weren't going to be
6      hazardous to the robot.  If we damage a robot and it's taken
7      out of operation, then we have to send a person in.  So
8      our -- I divided our priorities into levels, and one being
9      the most important priority down to three or four being a
10     lesser important priority, and determining the -- what
11     existed inside that bucket on the front patio was -- was
12     very important, because we wanted to make sure it wasn't
13     some kind of object that was going to prevent us from
14     conducting robot operations.
15 Q   Now, did you then -- did you decide how you were going to
16     vent the garage?
17 A   We did.  We determined to use an explosive tool to cut a
18     hole in the garage door.
19 Q   And that would have been at the same area that you saw the
20     original damage, or at a different area?
21 A   Adjacent to the original damage, so to the west or left of
22     it.
23 Q   And did you use a robot to conduct the -- the breach or the
24     venting of the garage?
25 A   We did.

1  Q  And how was that done?

2  A  We have a preformed tool which uses detonating cord, and

3     it's placed in a form.  The form is filled with water, which

4     directs the energy of detonating cord when it detonates, and

5     that was placed simply on a broom handle.  The robot held

6     the broom handle and pushed that tool up against the

7     aluminum skin of the garage door.  We then initiated the

8     det. cord, which cut the hole in the garage.

9  Q  And that would have been on the -- as your facing the

10    garage, the far left side of the door?

11 A  That's correct.

12 Q  And what time did you actually breach the garage door?

13 A  Again, I'll refer to my report for an accurate time.

14        At 1515, which would be 3:15 p.m.

15 Q  In the afternoon?

16 A  Yes.

17 Q  And that's ten hours after the initial 9-1-1 call, correct?

18 A  Correct.

19 Q  Now, did -- what size hole did that charge place in the

20    garage?

21 A  I don't know the exact dimensions, but I would estimate

22    probably 25 inches by 12 to 14 inches.  It was a rectangle

23    shape.

24 Q  It was a fairly large hole?

25 A  Yes.

1  Q    Did that charge also cause another opening in the back of
2       the garage?
3  A    It did.
4  Q    And where would that have been?
5  A    In the -- the door that provides access from the interior of
6       the home to the garage itself.
7  Q    So airflow would have been able to come from throughout --
8       through the garage at that point?
9  A    Correct.
10 Q    After the breach was completed at 3:15, what decision did
11      you make at that point?
12 A    To introduce more air monitoring equipment to see if that
13      changed the environment of the scene at all.
14 Q    Okay.  And was that again with the robot?
15 A    Yes.
16 Q    And did you deploy a robot with a MultiRae device attached
17      to it like you described earlier?
18 A    We did.
19 Q    And the MultiRae was in front of a camera so it could be
20      read?
21 A    It was.
22 Q    And at what point -- at what time was that MultiRae deployed
23      in the garage -- or at the garage?
24 A    At 1533, which would be 3:30 p.m.
25 Q    And was a sample taken at that location?

1    A    A readout was observed.

2    Q    Okay, a readout.  Excuse me.

3         The -- was -- the robot had an arm, correct?

4    A    Correct.

5    Q    And could that arm be extended to enter into the hole in the

6         garage?

7    A    It can.

8    Q    And was that done in this case?

9    A    It was.

10   Q    And was the reading taken inside or outside of the garage?

11   A    Just inside the garage door, so about three inches in the

12        interior of the garage.

13   Q    Okay.  And what time was the reading taken?

14   A    At 3:33 p.m.

15   Q    Okay, and what was the result of that?

16   A    At this time no chlorine was observed, but we did get a --

17        what's called a VOC reading of 2.5.

18   Q    And VOC has to do with flammable gases?

19   A    Correct.

20   Q    And that's always of concern for responders, correct?

21   A    Correct.

22   Q    Now, at some point was there -- after all these diagnostics

23        had been done and review had been done, was there a decision

24        that it would be safe to deploy other deputies or police

25        officers into that location?

1   A   Yes.

2   Q   And was -- were those individuals working under your

3       direction?

4   A   They were.

5   Q   And were they required to don protective clothing?

6   A   Yes.

7   Q   And how many people were in that team?

8   A   There was two bomb technicians, one being a hazardous

9       material technician also, and then a rescue team consisting

10      of two hazardous material firemen.

11  Q   So the people that actually entered the scene area would

12      have been two bomb squad technicians?

13  A   Correct.

14  Q   And who were they?

15  A   Deputy Jeff Craven, and Officer Charles Pickard of the

16      Tucson Police Department Bomb Squad.

17  Q   And what was their purpose?

18  A   We utilized them to collect samples so that the samples were

19      collected by personnel that are trained in evidence

20      collection.

21  Q   Now, approximately what time was that two-man team deployed?

22  A   Again, I'll refer to my report for accuracy.

23  Q   Please.

24  A   4:15 p.m.

25  Q   Okay.  Now, after the samples were taken, did -- was the

1   scene determined to be safe at that point?

2   A   Yes.

3   Q   And as part of your responsibility supervising, or the

4       operations supervisor, did you then walk around the entire

5       property to determine the extent of the damage, and what you

6       were viewing?

7   A   Yes.

8   Q   Please take a look at Exhibit 78.

9           Do you recognize that?

10  A   I do.  That's a photograph of the north side of the

11      residence looking southbound, and it includes the back

12      patio, the rear French door, the wall, and then the stairway

13      leading up to the roof.

14  Q   And if you can look at 79, please.

15          What -- what is that?

16  A   That's a spray paint graffiti, the letters P-U-T-O.

17  Q   Could you look at Exhibit 80, please.

18          Was that an additional graffiti on that back wall that

19      you showed us initially?

20  A   Yes.

21  Q   And what are the letters in?

22  A   F-A-G.

23  Q   Please look at 81.

24          And was that also on the back wall?

25  A   It was.

1  Q    And what are those letters?

2  A    P-U-T-A.

3  Q    And are you aware what the -- what the -- that is?  Is PUTO,

4       PUTA slang terms?

5  A    Yes.

6  Q    Okay.  Are you aware of their meaning?

7  A    Yes.

8  Q    And what are their meanings?

9  A    It's a Spanish expletive for either the masculine or

10      feminine term for whore.

11 Q    Please look at Exhibit 82.

12          What's the significance of that picture?

13 A    It's a spray paint letter M on the back of a frog shaped

14      ceramic planter that was on top of the north wall of the

15      patio residence.

16 Q    Did that letter M have -- at that point have any meaning to

17      you?

18 A    It was consistent with some graffiti in the front of the

19      house.

20 Q    We'll talk about that shortly.

21          Exhibit 85, please.

22          Was that also in the back yard area?

23 A    It was.

24 Q    And what is -- what does that appear to be based on your

25      training and experience?

| | | |
|---|---|---|
| 1 | A | It's a carcass of a rat, or a rodent. |
| 2 | Q | And was that located on the patio area? |
| 3 | A | It was. |
| 4 | Q | And can you identify it by its elongated tail? |
| 5 | A | Yes. |
| 6 | Q | Exhibit 87, please. |
| 7 | | And did you view that bucket? |
| 8 | A | I did. |
| 9 | Q | And what did that -- what significance was that to you at |
| 10 | | that point? |
| 11 | A | That bucket -- at the time it had that brownish reddish |
| 12 | | sludge exuding from it.  It had a label on one side of it |
| 13 | | that indicated that it was designed to contain three-inch |
| 14 | | chlorinating tablets to a swimming pool, and I noticed the |
| 15 | | lid was affixed in several locations on the top of the |
| 16 | | bucket. |
| 17 | Q | Please look at Exhibit 91. |
| 18 | | Is that a closer -- or a different angle of that same |
| 19 | | bucket? |
| 20 | A | Yes. |
| 21 | Q | And what -- what do you see that's significant in that |
| 22 | | photo? |
| 23 | A | In that photo I can see that from approximately the |
| 24 | | 12:00 o'clock position to about the 6 -- well, to be more |
| 25 | | accurate, from about the 2:00 o'clock position to the 6:00 |

1      position the bucket lid was snapped on securely where from

2      2:00 to about 6:00 the bucket had ruptured, and that's also

3      indicated by the spray pattern of the sludge on the wall

4      that's on the right-hand side to the south of the bucket and

5      the adjacent ground where the brickwork is.

6  Q   Now, I see a clear area that's directly to the right of that

7      bucket in the photograph.

8         Do you see that?

9  A   Yes.

10  Q   That's partially clear?

11  A   Yes.

12  Q   Was the bucket moved?

13  A   It was.  That was the original placement of the bucket.  It

14      was moved via one of the robots so that we can get a full

15      360-degree assessment of the bucket and its exterior and its

16      placement, and to assure that there was nothing underneath

17      it that would be hazardous.

18  Q   Please look at Exhibit 95.

19         Now -- and is that a different angle showing the sludge

20      and the spray from that bucket?

21  A   It is.

22  Q   And where on that photograph on the green lid would you say

23      was breached and not a complete seal?

24  A   In this picture it will be right at about 6:00, just to the

25      left-hand side of the handle that's designed to allow you to

```
 1          manually remove the lid of the bucket.
 2    Q     Could you just touch it with your finger, because it will
 3          mark on the screen for the jurors.
 4                So is that -- that's the handle, or --
 5    A     That's --
 6    Q     -- that's the start of the --
 7    A     -- that's the beginning of where the lid ruptured.
 8    Q     Please look at Exhibit 103.
 9                What does the reaction from the bucket show you based
10          on your training and experience?
11    A     There's more significant melting and thermal effect on the
12          bottom of the bucket, which indicates that a liquid was
13          introduced because a liquid will flow to where gravity is
14          and liquid and certain liquids and chlorine will react what
15          we call exothermically.  Their contact with one another will
16          cause a fire.  So based on my training, you know, an
17          exothermic reaction occurred when the liquid was poured on
18          top of the chlorine causing a fire.  The gravity drew the
19          liquid to the bottom, which is why there's a more
20          significant thermal effect along the bottom of the bucket.
21    Q     And in order to have severe damage to the bucket, a
22          significant amount of heat had to have been generated?
23    A     Correct, yes.
24    Q     And let me ask you to look at Exhibit 106.
25                And that -- does that -- does that view show the -- the
```

1       fact that the bucket is labeled three-inch tablets

2       chlorinated?

3  A   It does.

4  Q   And Exhibit 209, please.

5          There's some response vans, but there's also a bucket

6       that's kind of on its own.  Do you see that in the

7       photograph?

8  A   Yes.

9  Q   And what's the significance of that bucket?

10  A   That is the bucket -- that's the three-gallon bucket that

11       was upside down adjacent to the front door that we x-rayed

12       and then removed robotically from the scene so we can

13       collect a sample.

14  Q   And were the contents of that -- what were the contents of

15       the -- that bucket as far as -- what did they appear to be

16       as far as substance-wise?

17  A   Like a plastic.

18  Q   And -- okay.  Now, Exhibit -- so that's not where that

19       three-gallon bucket was.  It would have been closer to the

20       home?

21  A   Correct.

22  Q   Now, please -- I'd like to draw your attention to the front

23       of the house.  Would you look at Exhibit 120?

24          And do you recognize that area?

25  A   I do.

1  Q    And how would you describe that area?

2  A    That's a double French door that's on the south side of the

3       house adjacent to the main entryway.  So through that

4       archway past that citrus tree if you turned right, you'd be

5       at the front door of the residence there.

6  Q    And so you weren't referring to this as the courtyard where

7       the readings came from, correct?

8  A    No, the -- the courtyard I'm referring to was beyond that

9       archway in the -- there's another courtyard, excuse me,

10      that's adjacent to the front door that has a trellis with

11      some plants and some planters.  That's the area that that

12      sample was from.

13 Q    We'll get to that shortly.

14           Can you tell us what you observed on the ground at this

15      location?

16 A    Viscous fluid consistent with motor oil, or black fluid, or

17      some kind of machine fluid, and then also styrofoam packing

18      peanuts, fecal matter, and several dead animals.

19 Q    Let me ask you to look at Exhibit 126.

20           Is that the front of the garage?

21 A    That is.  That's now to the left of the previous photograph

22      that we looked at looking northbound.  That is the garage

23      door, and then the archway to the right is the entryway

24      towards the front door.  You can see a partial view of the

25      second archway that I was referring to in the last

1        photograph.

2    Q    So the archway that you see -- I guess the area behind the

3        cactus in the right-hand corner of the photograph would have

4        been that -- that patio area in front of the French doors,

5        correct?

6    A    Correct.

7    Q    What is -- and sir, if you hit the bottom left portion of

8        your screen, it will erase that mark on there.

9    A    The bottom left-hand portion?

10        THE COURT:  Yes, inside on the screen itself.

11        There you go.

12        MR. PIMSNER:  Thank you.

13    BY MR. PIMSNER:

14    Q    Could you tell us what you observed painted on the house and

15        garage area?

16    A    I'll start right to left on the upper left-hand corner of

17        the garage door there.  There's some over-spray graffiti,

18        some letters, and the letter M that was written on the

19        garage door.  There's then a colon.  Then to the right of

20        that is a poorly drown swastika.  Then to the right of that

21        is either the number 9, or letter G.  Then there's a letter

22        W, the word Mexican.  Then there's the letter M, a hyphen,

23        number 13.  And then a couple other shapes, an arrow, the

24        word Mesa.  Just below the word Mesa --

25    Q    Just stopping there, what's the significance -- based on

1    your training and experience as a law enforcement officer,

2    did that have any meaning to you?

3  A    It appeared to me to be a reference to MS13, which is a

4    violent street gang that's pretty horrific to civilians when

5    they hear the term MS13.

6  Q    And the swastika, does that go with the MS13?  Is that

7    hand-in-hand?

8  A    Not normally.  Not normally.

9  Q    Okay.  Below that top, the -- whatever, the border I would

10    say, did you notice -- what was -- what was the graffiti

11    underneath?

12  A    It was again the word PUTO, the letters P-U-T-O.

13  Q    And that was on the garage door?

14  A    Yes.

15  Q    And then to the right of the garage?

16  A    There's some graffiti shapes, looked like testicles and a

17    male penis, and then the word PENA, P-E-N-A, just directly

18    below that.

19  Q    And what's the significance, if any, of the word PENA?

20  A    I don't know.

21  Q    And then to the left of the garage door, on the garage door?

22  A    To the left of the garage on the garage door itself is --

23    looked like another attempt to -- of a poorly drawn swastika

24    but larger, and that would be just the upper left of the

25    hole in the garage door.  You'll see the lower left-hand

1    stick, or sideways L coming down, and then again looks like

2    the letter M drawn much larger, though.

3  Q  And was there also some spray paint on the driveway?

4  A  Yes, there was.

5  Q  Now, let's talk about the hole on the left-hand side.  Do

6    you recognize that?

7  A  Yes.

8  Q  Would that have been the hole that was put inside -- put in

9    the garage based on your venting or breaching of the garage

10   door with the explosive device?

11 A  Yes.

12 Q  And the black material that -- maybe around the edge of that

13   opening, was that consistent with your explosive device?

14 A  Yes.

15 Q  And what type of explosive was used, again?

16 A  We used a strand of 70 grain det. cord, which means it has

17   70 grains of an explosive called PETN per foot.  So it's

18   approximately a six foot length of det. cord.

19 Q  Is that considered a high explosive?

20 A  It is a high explosive.

21 Q  And, now, compare that to the middle of the garage.  What

22   did you observe in the middle of the garage?

23 A  The middle of the garage on the ground I observed a large

24   pile of that sludge.  I also observed significant thermal

25   effect, and then some splattering or splashing from the

1       rupturing of the container with a far more significant heat

2       signature than that that was created by the detonating of

3       the high explosives.

4  Q   And what would you describe that was on the actual driveway

5       in addition to the sludge and the spray paint?

6  A   Just off to the -- approximately 4:00 position that dark

7       matter is a pile of feces.  It's fecal matter.  More of that

8       viscous fluid -- you know, either a brake fluid, or motor

9       oil, gear fluid.  And then more popcorn peanuts coming from

10      the -- where the fire occurred trailing all the way up

11      towards the front door.

12 Q   Now, do you see -- did you observe sealant on the garage

13      door?

14 A   I did.

15 Q   And could you -- could you describe --

16 A   Sure.

17 Q   -- where you observed it, and where it is in relationship to

18      this -- on this picture?

19 A   If you follow the outline of the garage door and then each

20      of the seams in the horizontal panels of the door, you'll

21      see an orange glue-like substance.  That is a hardened

22      adhesive that was -- that was squirted through an adhesive

23      gun of some type leaving a trail completely encompassing all

24      of the ventilation holes, or anywhere there was any airflow

25      in the garage door itself.

1  Q  Well, was every seam sprayed with that orange substance?

2  A  The -- just below the second one from -- I'm sorry, the

3     first seam from the bottom you'll notice that it's not fully

4     caulked, but all of the other seams were fully caulked from

5     left to right, and top to bottom.

6  Q  When you say fully caulked, are there any -- any gaps in

7     between some of the areas?

8  A  Very minimal ones, but hardly any.

9  Q  Now -- but the bottom panel did not -- was not -- did not

10    appear to have caulk?

11 A  Not -- not as much as the other ones.  There were some small

12    spots, but not straight across like you'll see in the third

13    and fourth, and then the perimeter of the garage door

14    itself.

15 Q  That's not a perfect airtight seal between those garage door

16    panels, is it?

17 A  Pretty close to it.

18 Q  I'm talking generally, without any foam added?

19 A  When the garage door is closed, it's pretty -- it's pretty

20    sealed.  It's pretty --

21 Q  Does that prevent gas from getting in through the seams?

22 A  It does.

23 Q  Just a normal garage door, not a sealed garage door?

24 A  Not as much as if it's sealed.  The sealed made it much more

25    airtight.

1  Q   And if liquid gets in from underneath the garage door, does
2      that mean there's not a perfect seal there?
3  A   Correct.
4  Q   And if liquid can get in, can gas get in?
5  A   Yes.
6  Q   And chlorine, is that a heavy or light gas?
7  A   I believe it's a permissible gas, which is a heavier gas.
8      It falls into low lying areas.
9  Q   Now, let me ask you to look at Exhibit 128.
10         Does that give an additional angle of the front
11     driveway?
12 A   It does.
13 Q   Now, in addition to the sludge in the front, does there
14     appear to be liquids that are also on the driveway on both
15     sides of this sludge pile?
16 A   Yes.
17 Q   Okay.  And these are the same peanuts that you previously
18     described, correct?
19 A   Yes.
20 Q   And 129.
21         Is this a different angle but a closer shot of the
22     fecal matter and the foam peanuts leading to the front area?
23 A   Yes.
24 Q   Now, I see there's a number within -- an item 6 in front of
25     it, one of the -- that's an evidence marker for a tent?

1    A    Yes.

2    Q    And do you know what that -- did -- do you know where that

3         item originally came from?

4    A    That was the contents of the three-gallon bucket.  That's

5         almost exactly where the three-gallon bucket was when we

6         found it, and those are the contents that we were able to

7         move robotically -- I'm sorry, remove robotically.

8    Q    So the robot would have dumped out the contents of the

9         three-gallon bucket at that location?

10   A    Yes.

11   Q    And does that mean that that's the location the original

12        three-gallon bucket was found?

13   A    Pretty close to it, yes.

14   Q    So near the front walkway?

15   A    Yes, within inches of where the original bucket sat.

16   Q    Okay.  Please look at Exhibit 135.

17            Is that a closer view of the -- of the contents of that

18        bucket?

19   A    Yes.

20   Q    And in your testimony you said you believed it was similar

21        to a type of plaster?

22   A    Correct.

23   Q    Were you able to determine that until you -- prior to

24        actually testing samples?

25            Were you able to make that determination just visually,

1      or by having to test --

2    A    That's a visual assumption.  I don't know what the final

3         testing results were of that substance.

4    Q    Exhibit 143, please.

5         Is that just a closer-up of the sludge or the

6         contamination left over from the device at the front?

7    A    Yes.

8    Q    Now, what's the significance of that photo based on your

9         training and experience?

10   A    I actually asked that this photograph be taken of the

11        forensic technician, because it shows the quantity of the --

12        the hazardous material that was used in this particular

13        incident, and you can see the shape of actually four

14        five-gallon pails in there.  If you look closely, two up

15        against the garage door, one -- shall I circle them on the

16        --

17   Q    Please.  I think that would be the best, if you can --

18   A    That doesn't work.

19   Q    Can you clear on the bottom left?

20   A    This last one should be a little bit up towards, like, 11:00

21        there.  You can see the ridge.  You can actually see the

22        ridge from where the bucket sat right -- oh, I have a fat

23        finger.  Right about there.  Just above that last red mark I

24        made you can see a matching curvature of what was a

25        five-gallon bucket.

```
 1   Q    If you can hit the left side of your screen to clear that so
 2        we know where you're talking about.
 3             So you have what appears to be remnants on the top of
 4        that sludge pile --
 5   A    Yes.
 6   Q    -- and the plastic?
 7             And then the bottom appear to be rings that -- that you
 8        believe the buckets -- other buckets would have been
 9        situated on?
10   A    Right.
11   Q    Was there any identifiable features that were at the front
12        of the garage?
13   A    I'll mark it on the photograph as well.  Up on the upper
14        left-hand corner here you can see the remnants of plastic
15        and the blue labeling that's consistent with the three-inch
16        chlorine tablet bucket that was on the back patio.
17   Q    It's consistent with, but you weren't able to tell for
18        certain?
19   A    It wasn't legible due to the thermal effect that it had
20        experienced.
21   Q    Exhibit 144, please.
22             Now, is this that archway looking into what you
23        described in your report as the courtyard?
24   A    Correct.  You'll see the trellis just to the left of the
25        front door there that I was describing when I spoke about
```

1              the courtyard in my previous testimony.

2    Q    So this would have been a -- there's a small window next to

3         the front door?

4    A    Correct.

5    Q    And what -- what does this scene depict leading up to the

6         front door?

7    A    This is the continuation of that viscous fluid trail that

8         led from the origin of the fire from the buckets leading

9         around the corner all the way up to the front door, and also

10        mixed in is the styrofoam peanuts.

11   Q    And please look at 145.

12             Is that a close-up of the front area?

13   A    It is.

14   Q    And are there some blotches -- some black blotchy areas on

15        the -- on the walkway leading up to the front door?

16   A    Yes.  Again, I'll mark it on the photograph itself.  There's

17        a piece of cardboard laying right here.  That was the shroud

18        that we used to protect the sun so that we could read the

19        digital readouts on the monitors on the robot.  We

20        robotically removed it as we ventured down this hallway

21        because it was an obstruction.  Just beyond that, right

22        here, you'll see a striped pattern on the ground.  Those are

23        the track patterns from the robot that we used with the air

24        monitors on it as it drove down the hallway and then made an

25        immediate left-hand turn at the end of this wall on the

|     |   |                                                                              |
|-----|---|------------------------------------------------------------------------------|
| 1   |   | left, and that's where that initial air sample was taken by                  |
| 2   |   | that robotic platform.                                                       |
| 3   | Q | It showed that there was some chlorine present -- still                       |
| 4   |   | present, correct?                                                            |
| 5   | A | Yes.                                                                         |
| 6   | Q | And this is a roofed area, and it only has one opening and                    |
| 7   |   | that's out towards the front?                                                |
| 8   | A | Yes.                                                                         |
| 9   | Q | And did you notice damage done to items on the left wall?                    |
| 10  | A | Yes.  The same adhesive that was on the garage door was also                 |
| 11  |   | squirted all around some decorative metal work that was                      |
| 12  |   | hanging on the wall on the left-hand -- the west side of                     |
| 13  |   | that hallway entry area.                                                     |
| 14  | Q | And was there also some graffiti or spray paint?                             |
| 15  | A | Yes.                                                                         |
| 16  | Q | And does it appear any kind of oils, or some type of similar                 |
| 17  |   | substance were placed on the wall?                                          |
| 18  | A | Yes.                                                                         |
| 19  | Q | And where would that be?                                                    |
| 20  | A | You'll see it dripping down, and then just past it on your                   |
| 21  |   | left-hand side there where that circular metal decorative                    |
| 22  |   | piece was.                                                                   |
| 23  | Q | And was that true for the decorative pieces in what appears                  |
| 24  |   | to be a wall socket on the right side -- on the right wall?                  |
| 25  | A | Yes.                                                                         |

1   Q   Please -- look at Exhibit 148, please.

2           And when the robot got closer, were you able to

3       determine what those black areas were?

4   A   The front black area that's kind of the larger mass are

5       several woodpecker carcasses, and then beyond that is a jack

6       rabbit carcass.

7   Q   Please look at 151.

8           Is that a close-up of the woodpecker carcasses you just

9       described?

10  A   Yes.

11  Q   And do they appear to be intact, or do they appear to have

12      been soaked in some type of substance?

13  A   They appear to be soaked in the same kind of viscous oily

14      liquid that was -- that was strewn all over the area there.

15  Q   Let me ask you to look at Exhibit 156, please.

16          And is that the rabbit that you described?

17  A   Yes.

18  Q   And would that have been closer to the front door?

19  A   Yes.

20  Q   And was that carcass also soaked in some type of fluid?

21  A   It was.

22  Q   158, please.

23          Now, is there spray paint on the front door?

24  A   Yes.

25  Q   Was there sealant on the front door?

1   A   Yes.

2   Q   And was there sealant on the front window?

3   A   Yes.

4   Q   And what was the spray paint on the front door?

5   A   Again, the letters P-U-T-A.

6   Q   And was there just some additional markings?

7   A   Yes, it was like a cloud-like marking above the letters

8       P-U-T-A, and then a line that was sprayed down onto the

9       ground from the lower of the letters to the bottom of the

10      door.

11  Q   And that's the feminine version that you described earlier,

12      correct?

13  A   Yes.

14  Q   Now, what about -- was there any other substance put on the

15      door that you could tell, besides the sealant and the paint?

16  A   You'll see also if you look closely those shiny areas are

17      more of that oil that was splashed upon the door.

18  Q   Please look at -- these may be slightly out of order, 215.

19          Now, is that again a close-up of the front yard or

20      front garage door?

21  A   Yes.  Yes.

22  Q   And basically, above the reaction -- the chemical reaction

23      were you able to get a better view of what was written in

24      the center of that garage?

25  A   Yes, just above where you see the kind of -- that flash or

1          spray pattern there's a number 1 and 3, or 13, and then

2          above it were the words Die PUTO, D-I-E.

3     Q    299, please.

4               Does this -- this photograph was taken a little farther

5          away than the previous one that you had taken.  Does that --

6          are those patterns consistent with your conclusion that

7          there may have been four buckets?

8               MR. BOCK:  Judge -- Judge, this is cumulative.

9               THE COURT:  Well, I'll allow him to answer.

10              Go ahead, sir, you may answer.

11              THE WITNESS:  Yes.

12    BY MR. PIMSNER:

13    Q    And finally, let me just ask you to look at 300.

14              And is this from the driveway?

15    A    Yes.

16    Q    And is this a clearer photograph of the fecal matter that

17         was found in the driveway?

18    A    Yes.

19    Q    Please now go back -- now go to Exhibit 164.

20              And were you able to view inside the garage after the

21         area was made safe?

22    A    Yes.

23    Q    And could you describe what that photograph is?

24    A    Yes.  This is the inside of the hole that we made, using the

25         explosive tool, of the garage.  What you're seeing is the

```
 1          garage door.  Just below it, that same viscous oily fluid
 2          that was in the driveway has leaked underneath the garage
 3          door.  That orange substance is the sealant that was sprayed
 4          along the seam of the garage door, and then the white
 5          particles are the styrofoam insulation that is a component
 6          of the door that was penetrated by the explosive.
 7     Q    So the damage you see to the door was caused by the
 8          breaching by law enforcement, correct?
 9     A    That's correct.
10     Q    And the damage in the foam to the wall to the right of that
11          photograph?
12     A    Same.
13     Q    Same?
14     A    Yes.
15     Q    170, please.
16               And was this taken from in front of the breach entry
17          towards the other half of the garage?
18     A    Yes.  This photograph was if you made an immediate left, or
19          you looked immediately to your left from that previous
20          photograph.
21     Q    172, please.
22               And what's the significance of that?
23     A    That's more of that oily viscous fluid that was on the front
24          patio that has leaked underneath the garage door and
25          accumulated underneath the trash can.
```

```
 1   Q   And also, did you notice where the device was positioned in
 2       the front of the garage?
 3           Was there any damage to the inside of the garage?
 4   A   Yes.
 5   Q   And let me show you Exhibit 174.
 6           And that's the inside of the garage?
 7   A   Yes.
 8   Q   And is that directly in front of the sludge pile that you
 9       described at the front of the garage?
10   A   Yes, the beginning of the thermal effects beginning to enter
11       the garage door via the garage door -- via the aluminum skin
12       and the styrofoam of the garage door.
13   Q   And that's actually -- does that appear to be melted?
14   A   Yes.
15   Q   And 176, please.
16           Is that a closer view of that area?
17   A   Yes.
18   Q   And does it also appear to have splatter from the -- that's
19       consistent with the sludge that was outside that door?
20   A   Yes.
21   Q   Now, when you were able to, you know, view these devices,
22       did they pose a -- different types of hazards by -- in and
23       of themselves?
24   A   Yes.
25   Q   And -- and how would you describe those hazards?
```

1  A    Devices such as these are designed to do three things.  One,

2       they cause a burning so you have a significant thermal

3       effect, fire and heat.  Because the lids on the containers

4       were snapped on, that fire and heat burning on the inside of

5       the container causes a pressure build-up, which then causes

6       a rupturing of the container, which then causes the violent

7       and kind of energetic spreading of the chemicals on the

8       inside of the container which you see via those spray marks

9       along the garage door and the patio there.  Then in addition

10      to that, the reactive burning causes the explosion of

11      chemicals via smoke and gas, which are then introduced into

12      the environment where -- where people are.  So you have

13      flame and heat, you have an over-pressure or a bursting, and

14      then you also have the dissemination of airborne chemicals.

15  Q   Now, you're familiar with pool tablet containers, correct?

16  A   Yes.

17  Q   And they have a -- a lid that snaps into place, is that

18      accurate?

19  A   Yes.

20  Q   And that's a pretty tight sealed lid?

21  A   Yes, it is.

22  Q   What would the significance be of leaving the lids on a

23      device that was having a chemical reaction?

24  A   Chemicals in confinement will behave more energetically so

25      you increase the power.  Kind of like a car engine, gas

| | | |
|---|---|---|
| 1 | | outside burns, gas inside a car engine in confinement |
| 2 | | explodes.  The snapping of the lid and the securing of that |
| 3 | | lid causes the fire in the chemicals on the inside to build |
| 4 | | up a pressure and then burst, rather than just burn and |
| 5 | | naturally off-gas at a rate that would more slowly |
| 6 | | disseminate the chemicals and the hazards in the container. |
| 7 | Q | So if there weren't lids on these devices, it would not have |
| 8 | | been as intense? |
| 9 | A | That's correct.  Minus the lids, it would have been a |
| 10 | | burning and it would have been a dissemination, but it would |
| 11 | | have removed one of the hazards which was the bursting and |
| 12 | | the spraying of the solid materials. |
| 13 | Q | Now, based on your training and experience have -- have you |
| 14 | | had an experience where chlorine has actually been used in |
| 15 | | different events in -- in a -- in attack, or a damage type |
| 16 | | manner? |
| 17 | A | Yes. |
| 18 | Q | On how many occasions?  Do you recall? |
| 19 | | MR. BOCK:  Objection, your Honor.  This is immaterial. |
| 20 | | THE COURT:  No, overruled. |
| 21 | | He may answer. |
| 22 | | THE WITNESS:  I would say two dozen. |
| 23 | BY MR. PIMSNER: | |
| 24 | Q | And -- and -- and was chlorine in these cases the primary |
| 25 | | chemical that was involved? |

1   A   In the ones you just referenced, yes.

2   Q   And did you have -- based on your training and experience

3       have you seen chemical -- other chemicals mixed with

4       chlorine that were used in various law enforcement responses

5       that you had to go out on?

6   A   Yes.

7   Q   What type of material have you seen used?

8   A   I've seen brake fluid and chlorine used.  I've seen alcohol

9       and chlorine.  There are several different components that

10      you can put in confinement that will cause a container to

11      burst.

12  Q   And will cause an explosion?

13  A   It will.

14  Q   And what type of containers have you normally seen on your

15      prior experience?

16  A   It's a common juvenile prank device.  They'll use a half

17      liter soda bottle -- water bottle or a Gatorade bottle.

18      They'll put, you know, chlorine and brake fluid in it, seal

19      the container.  As the gas builds up, the bottle will

20      rupture and cause a significant explosion.

21  Q   And what type of damage have you seen done?

22  A   I've seen everything from the complete destruction of metal

23      mailboxes, to damage to surfaces of driveways and roadways,

24      as well as in training and research on these types of items

25      significant physical injuries to individuals that were

```
 1              either holding the items, or in proximity of the items.
 2    Q    Based on your training and experience have you ever come
 3         across -- or what was the difference between this event and
 4         some of the events you just described?
 5    A    This one was significantly larger, so rather than the half
 6         to one liter bottles, we were looking at not just a
 7         five-gallon container but multiple five-gallon containers.
 8    Q    Now, would these devices necessarily be described as
 9         complex?
10    A    No.
11    Q    And does the complexity have any effect on their ability to
12         cause damage?
13    A    No.  The complexity of a device doesn't necessarily directly
14         relate to how dangerous it is, or its ability to cause
15         serious physical injury or death.  A well made pipe bomb can
16         kill as many people as a well designed suicide vest.  So the
17         fact that, you know, energetic chemicals in confinement, the
18         amount of energetic chemicals in confinement, it's a very
19         simple device but yet it still has the great potential to
20         cause serious physical injury or death.
21              MR. PIMSNER:  One moment, your Honor.
22    BY MR. PIMSNER:
23    Q    And -- and just to clarify, when you were talking about that
24         initial -- or there was still presence of chlorine by the
25         front doorway.  That -- that was near the front door under
```

1        the overhang, correct?

2   A    Yes.

3   Q    And it was not in front of the garage area that was not

4        enclosed?

5   A    That's correct.  If you look back at the photos -- actually,

6        I believe it's visible in the photo of the rabbit, you'll

7        see the track marks from the robot, and that will give you

8        an approximate placement of where the robot stopped and took

9        the analysis.

10              MR. PIMSNER:  I have nothing further, your Honor.

11              THE COURT:  All right.  Let's -- let's go ahead and

12   take a 15 minute morning break, and then we'll resume.

13              The jury left the courtroom.

14              (The Court recessed at 10:40 a.m., and reconvened at

15   11:00 a.m.)

16              THE COURT:  Be seated, please.

17              And Jill, you may get the jury.

18              MR. PIMSNER:  Your Honor, if I may ask permission to

19   reopen just to clarify on one topic.  I've informed Mr. Bock.

20              THE COURT:  Yes, you may.

21              MR. PIMSNER:  Thank you.

22              (The jury entered the courtroom.)

23              THE COURT:  All right, everyone may be seated.

24              The record may reflect the presence of the jury,

25   counsel, the defendant.

1           And Mr. Pimsner, you may reopen your direct exam and

2    ask some additional questions of the witness.

3    BY MR. PIMSNER:

4    Q    I wanted to clarify one matter with you, Sergeant.  Could

5         you please look at Exhibit 144?

6           And that's the front walkway into the front door,

7         correct?

8    A    Correct.

9    Q    And --

10          THE COURT:  Wait -- that's been admitted.  I'm sorry,

11   it's not in front of the jury.

12          All right, go ahead.  Sorry.

13   BY MR. PIMSNER:

14   Q    Now, the walkway towards the front door, that's all covered,

15        correct?

16   A    Correct.

17   Q    And -- and I think we covered that in our -- originally.

18        But to the left of the doorway is there any type of opening

19        that would lead up to the sky area?

20   A    Yes.  If you're standing directly in front of the door and

21        you take about a step and a half directly to your left and

22        you look up, there's an opening about the size of a

23        skylight.  If you look hard in this picture, you'll see

24        three kind of voids in the ceiling there.  There's one that

25        you can clearly see, a second you can clearly see.  Beyond

1          that and kind of tucked around the corner you can see the

2          corner of that small opening.  It's a little bit difficult

3          to see.

4    Q    So there's part of that area that isn't completely covered?

5    A    Yes.

6              MR. PIMSNER:  Nothing further.

7              THE COURT:  All right.

8              Mr. Bock, you may cross-examine.

9              MR. BOCK:  Thank you, your Honor.

10                         CROSS-EXAMINATION

11   BY MR. BOCK:

12   Q    Sergeant, the -- the breach entry to the garage --

13   A    Yes.

14   Q    -- how was that accomplished?

15   A    It's a premade tool that we carry that is then loaded with

16        high explosives, in this case the 70 grain det. cord.  It's

17        affixed to, like I said, a broom handle, and it's pushed up

18        against the door itself.  It's then initiated via a blasting

19        cap and a lead line that's affixed to the robot and fired

20        off the robot itself.

21   Q    Are there any gases associated with the explosion?

22   A    Yes.

23   Q    What type of gases?

24   A    It would be residual gases from the detonating of the PETN,

25        or pentaerythritol tetranitrate, which is the explosive

1            contained in the det. cord itself.

2    Q      And so those gases could be introduced into the garage?

3    A      They -- at very low levels they could be.

4    Q      I want to talk to you about the buckets.

5    A      Yes.

6    Q      You spent some time on those, is that correct?

7    A      Yes.

8    Q      One bucket in the back yard, correct?

9    A      Yes.

10   Q      No question about that?

11   A      None.

12   Q      You said four buckets in the front yard?

13   A      Yes.

14   Q      And again, that was based upon physical evidence --

15   A      Yes.

16   Q      -- that you feel fairly confident in giving that opinion?

17   A      I do.

18   Q      Any way to tell whether or not those buckets were joined

19          together --

20   A      No.

21   Q      -- or -- so they could have been joined together, is that

22          possible?

23   A      I -- I assume, yes.  I don't know.

24   Q      Or they could have been placed individually?

25   A      Correct.

1  Q    Now, you did a timeline in this case, is that correct?

2  A    I did.

3  Q    And you went ahead and memorialized that in a report, is

4       that correct?

5  A    I did.

6           MR. BOCK:  May I approach the witness, your Honor?

7           THE COURT:  Yes.

8  BY MR. BOCK:

9  Q    I'm going to show you what's been marked as Exhibit 416,

10      which is your timeline of August 2nd, 2009, and it's from

11      your detailed incident report.

12  A    Thank you.

13  Q    Do you have that -- you have a government document in front

14      of you which is the same, is that correct?

15  A    Yes.

16  Q    Okay, and what is the government document number?

17  A    The exhibit number?

18  Q    Yes.

19  A    It's 328.

20  Q    Okay.  Now, I also want to show you 414.

21  A    I'm just going to move some of these items out of the way.

22  Q    You've had a chance to look at that one too, is that

23      correct?

24  A    414?

25  Q    Yes.

1   A   Briefly, yes.

2   Q   Okay.  414 is a -- a report by the Northwest Fire

3       Department, is that correct?

4   A   Yes.

5   Q   You've seen reports like that before?

6   A   This actually is the first time I've seen a report from the

7       fire department, yes.

8   Q   Do you know people that work for the fire department?

9   A   I do.

10  Q   Do you know the name Trapp?

11  A   I don't.  Not familiar to me.

12  Q   Does it show that he's a captain on that report?

13  A   It does.

14  Q   So the information that -- that -- on your timeline -- and

15      you started with an initial briefing at 10:45, is that

16      correct?

17  A   Yes.

18  Q   And then you have the -- at 12:00 you have an event

19      occurring, is that correct?

20  A   Yes.

21  Q   And what is the event that is occurring at 12 o'clock?

22  A   The -- specifically, the wording is PackBot 510 ROV RECON

23      with RAD and air monitor.  That would be the smaller of the

24      70-pound robot that had the MultiRae and radiological meter

25      on it.

1    Q    Let me get -- let me retrieve this from you.

2    A    Yes.

3    Q    Now, is the -- is this the MultiRae device that the fire

4         department is using?

5    A    Yes.

6    Q    And the information regarding chlorine levels, who is giving

7         you -- who's providing you that information?

8    A    The hazardous material technician that is assigned as the

9         robotic liaison to the robot operator.

10   Q    And is that a Northwest Fire Department individual?

11   A    Yes.

12   Q    Now, at 12:00 there was air monitoring in the middle of the

13        street.  Do you remember that?

14   A    Yes.

15   Q    And do you remember that there was no chlorine?

16   A    I do.

17   Q    And you agree with that?

18   A    I do.

19   Q    Is that correct?

20   A    I do.

21   Q    And that was on this Northwest Fire Department report?

22   A    Yes.

23   Q    Prepared by the people that were giving you the information?

24   A    By one of the people.  There was several firemen there.

25   Q    At -- on your timeline you don't show any readings, though,

```
 1        is that correct -- any chlorine levels at 12:00 on your
 2        timeline?
 3   A    Correct.
 4   Q    Did you know at 12:22 that there was monitoring in front of
 5        the garage?
 6   A    Yes.
 7   Q    And did you know there was no chlorine level at that time?
 8   A    Yes.
 9   Q    You did not put that in your timeline, is that correct?
10   A    Correct.  That's correct.
11   Q    Now, at 12:27 did you know there was monitoring in the
12        middle courtyard?
13   A    Yes.
14   Q    And did you know that's where the bodies of the dead animals
15        were found?
16   A    Adjacent to the middle courtyard.
17   Q    And that was the rat and the two birds?
18   A    Correct.
19   Q    And did you know that there was no chlorine level found at
20        that point in time?
21   A    Yes.
22   Q    You did not put that on your timeline, is that correct?
23   A    Correct.
24   Q    However, you show on your timeline an air sample in the
25        courtyard, VOC 12.3, and chlorine present, is that correct?
```

1   A   Correct.

2   Q   Now -- and you received that information from the fire

3       department, right?

4   A   Yes, from the fire personnel assigned to the robotic -- the

5       robotic operations.

6   Q   Okay.  And what does their report show at -- at 12:43?

7   A   Captain Trapp's report says monitoring by front door, RAD

8       2602, 20.9, LEL 0, CL2 0, VOC 12.3.

9   Q   Okay, but that shows at 12:43 a different location?

10   A   Correct.

11   Q   Your location shows the courtyard, correct?

12   A   Correct -- well, let me correct that.  I don't believe it's

13       a different location.  I believe it's a different

14       description of where that occurred.

15   Q   Okay.  Let me have that report.  If I might retrieve that

16       again?

17   A   Which one, sir?

18   Q   The Northwest Fire report.

19       You don't show anything in your report at 12:27, right?

20   A   Correct.

21   Q   But at 12:40 -- at 12:43 you're showing the air sample in

22       the courtyard, and the fire department is showing the -- at

23       that time, that same time the monitoring by the front door?

24   A   Correct.

25   Q   There's a discrepancy there?

1   A   I believe there is.

2   Q   Okay.  And again, this is information that you're receiving

3       from the fire department?

4   A   It's not the same information.  One report is written by a

5       fire captain.  I don't know what he's describing in his

6       report, and how it compares with what I'm describing in my

7       report.

8   Q   But your information is not from you.  It's from somebody

9       else who's giving you this information?

10  A   While I'm standing watching the operation.

11  Q   Well, there was only one device, is that correct?

12  A   No, there are two devices on two robots.  There was a

13      MultiRae on the large robot, which is the MultiRae that was

14      in front of the garage door that we introduced into the hole

15      to check the interior.  Then there's a MultiRae on the

16      smaller PackBot robot, which is the one that I'm documenting

17      in my timeline.  I don't know which robot the captain's

18      referring to.

19  Q   Okay, you're saying -- you're saying two things are

20      happening simultaneously at 12:43?

21  A   It's a fluid scene, and the robots are mobile so they're

22      moving.  So we're watching the numbers move as the robots

23      move through an open air environment.  So wind is a factor,

24      breeze -- you know, breeze is a factor, where the robot is a

25      factor, what time you look at the screen is a factor, what

1           watch you're recording your timeline with is also a factor.

2           So I can't state to the accuracy of this report since I

3           didn't author it.

4    Q     But you certainly don't disagree with what's in his

5           report -- or in this report, is that correct?

6    A     No, I don't disagree with anything in the report.

7    Q     And in fact, again, in your timeline you don't show anything

8           at 12:22?

9    A     Correct.

10   Q     And at 12:27 you don't show anything, is that correct?

11   A     Correct.

12   Q     However, at 12:43 you're saying that there was an air sample

13          in the courtyard where CL2 was present --

14   A     Correct.

15   Q     -- and you're saying that was in the courtyard.  And the

16          report by the fire department says the middle courtyard was

17          at 12:27.  You --

18   A     Again, I don't know what he's referring to as the middle

19          courtyard.  If it's the courtyard that's in front of those

20          French doors out on the exterior of the residence, or if

21          it's the courtyard that I'm referring to, which is where the

22          trellis is just below that skylight area that I just

23          described.

24   Q     But you would know what he's referring because he qualifies

25          bodies of dead animals found at this time, rabbit and two

1          birds.

2     A    The bodies of dead animals were strewn from the one entryway

3          adjacent to the courtyard in front of the double French

4          doors by the bathroom -- I'm sorry, by the bedroom along

5          that walkway over to the courtyard.  So the bodies kind of,

6          you know, were made of -- kind of strewn along the way

7          between what he's describing as a courtyard and what I

8          believe I'm describing as a courtyard.

9     Q    Okay.  Also at 12:23 the monitoring that's done by the --

10         the fire department has a VOC -- has a VOC number, is that

11         correct?

12    A    I don't see -- I believe you said 12:23.  I don't see --

13    Q    I'm sorry.  Okay.

14              MR. BOCK:  May I approach, your Honor?

15              THE COURT:  Yes.

16    BY MR. BOCK:

17    Q    I misspoke.  I mean 12:43.

18    A    So 12:43?

19    Q    Yes.

20    A    There is a VOC recorded at 12:43.

21    Q    And what is that VOC number?

22    A    It's 12.3.  It's the same VOC that I noted when we made our

23         reading.

24    Q    Okay, and it's the -- and again, at the 12:43 reading the

25         fire department shows no presence of CL?

```
1    A    That's correct.

2    Q    And again, so we're straight on this, this is information

3         that you're receiving that you're putting on your timeline?

4              MR. PIMSNER:  Objection, asked and answered.

5              THE COURT:  No, I'll -- I'll allow the answer -- the

6    question to be asked.

7              Go ahead.  You can answer that.

8              THE WITNESS:  That's correct.

9    BY MR. BOCK:

10   Q    If I might retrieve that?

11   A    Thank you.

12   Q    And when all of this is occurring, are you -- are you in

13        some type of protective gear?

14   A    No, we're in the safe area standing behind the monitors for

15        the robots themselves.

16   Q    So how far are you from where the activity is actually

17        happening?

18   A    We're out of visual contact to where the robots are

19        operating, approximately 150, 200 yards away.

20   Q    And the information that's being given to you, is it given

21        to you at the -- when things are happening, or is it given

22        to you in the -- when -- when everything is done?

23             In other words, your timeline is based upon me saying

24        to you as a fireman this is what's happening, or is it an

25        accumulation of things that then you went ahead and
```

1        completed your timeline with?

2   A    It was an accumulation of things that were occurring in

3        which I noted what I believed to be significant events,

4        because noting every minute I didn't feel was pertinent,

5        just significant notification -- significant events and

6        significant readings were what was noted.

7   Q    And you took -- you took your notes?

8   A    I did.

9   Q    Now, you have -- at 12:43 in your timeline you say CL2

10       present, is that correct?

11  A    Correct.

12  Q    You don't note any parts per million, do you?

13  A    No, the instrument doesn't lock in, so those numbers are

14       continually moving, and they're going up and down.  So a lot

15       of it depends on when you're looking at the screen, and

16       where the numbers are, where the robot is, what the wind

17       direction is.  Because it's not an evidentiary system, it is

18       designed to determine whether or not it's appropriate for

19       occupancy, so it's moving.  And it's whether or not the

20       camera's looking at the system at the time also.

21  Q    Then how can you capture a VOC reading that looks like 12.3?

22  A    It could have done that consistently.  VOC's are different

23       types of gases.  It doesn't necessarily indicate chlorine.

24       So in other words, if it's a more permissible VOC, it may be

25       present at a longer period of time or across a greater

1           distance if it's heavier than chlorine would be where

2           chlorine may be more intermittent, or may be pushed away by

3           wind or even the movement of the robot.

4     Q     And it's possible, is it not, sir, that you may have

5           misstated the presence of chlorine at 12:43?

6     A     That's a fairly significant measure.  It is one thing that

7           we use to determine whether or not we could enter the scene.

8           I don't believe that I would make that error.

9     Q     Is it possible you could have misrepresented that based upon

10          what I showed you that was noted by the fire department?

11    A     I believe that that's highly unlikely.  I believe there's

12          other explanations for the discrepancy.

13    Q     And again, the information is not from you.  You're not

14          seeing the information.  You're not holding the device.

15          You're not next to the robot, is that correct?

16    A     That's not entirely accurate.  I was standing directly

17          behind the robot operator, so I did have the opportunity to

18          actually see the numbers on the MultiRae to see where the

19          camera was looking, to see where the robot was operating.  A

20          robot via a TV screen is very, very difficult, and if you're

21          not experienced at it, you're not paying complete attention,

22          you may not be familiar with the orientation of the robot,

23          what it's looking at, where it's looking.  It's kind of like

24          playing a video game.  Some people are better at it than

25          others.

1    Q    And certainly, people that are associated with the Northwest

2         Fire Department would have the same experience, if not more,

3         with respect to that machine, is that correct?

4    A    No, the fire department doesn't have access to robots, so

5         they have zero experience with robots so they -- it's easy

6         for them to not understand the orientation of the robot

7         itself, the direction that the camera's looking at, or

8         even -- they may not even know which robot they're looking

9         at, so --

10   Q    Well, the robot had the MultiRae device on it, did it not?

11   A    There were two robots with a MultiRae device on it.  There

12        was a larger robot, the F6A that introduced into the garage,

13        and then there was --

14             (The witness was interrupted by the court reporter.)

15             THE WITNESS:  The larger robot, which was the 300-pound

16   F6A which introduced the MultiRae into the garage, and then the

17   smaller 70-pound PackBot 510, which is the robot that I'm

18   referring to.  They both display an image on a screen at the

19   command post.  They were driven by separate operators.  Some of

20   the information contained in the screen is very similar.  You

21   need to know which screen you're looking at.

22   Q    So are you saying to me that the individual MultiRae devices

23        on -- were there ones on both robots?

24   A    Yes.

25   Q    So are you saying that the individual MultiRae devices could

1        contradict each other?  Is that a possibility?

2  A   No, they're in different environments, so they may be taking

3       different readings.  Again, the robots are both moving.

4       There's wind blowing.  One is out in front of the garage,

5       one is transitioning into the patio area.  It's a very, very

6       fluid scene.  And like I said, these numbers don't lock in

7       or capture.  They're constantly moving.

8  Q   But why on your timeline are you not showing any monitoring

9       by the front door?

10  A   I -- because I didn't describe the location as the front

11      door.  My description was the middle -- the interior

12      courtyard.

13  Q   Which has been described by the sheriff -- by the -- the

14      Northwest Fire Department as 12:27, as you've seen in that

15      report, is that correct?

16  A   Can I see it again, please?

17  Q   Yes.

18       MR. PIMSNER:  Again, I'm going to object to asked and

19 answered regarding asking this two or three times.

20       THE COURT:  Well, I'll let you finish up, Mr. Bock, and

21 move on to something else.

22       MR. BOCK:  This is the last area.

23       THE COURT:  So did you want the witness to keep the

24 report?

25       MR. BOCK:  Well, he wanted to look at the 12 --

1          THE COURT:  Okay, so you -- he can hold onto that while

2     you ask him the question.

3     BY MR. BOCK:

4     Q    Again, the fire department report shows the sample in the

5          courtyard at 12:27, is that correct?

6     A    He describes the middle courtyard, which I believe is that

7          courtyard in front of the French doors adjacent to the

8          bedroom, not what I'm describing as a courtyard which is

9          underneath that area that I testified about being a skylight

10         where the trellis area is.  So I think it's matter of

11         description.

12    Q    So the -- so your claim does not appear in the fire

13         department report, is that correct?

14    A    No, that -- he's not documenting the same numbers that I am.

15         I don't question that.

16    Q    And you first arrived at the scene at -- what time did you

17         arrive, do you remember?

18              Do you have your timeline?

19    A    I'm going to refer to my report.

20    Q    Sure, that's fine.

21    A    My specific arrival on scene is documented in the radio log,

22         which isn't attached to the documents that I have.  In my

23         timeline I'm documenting that EOD, which is Explosive

24         Ordinance Disposal, which is an acronym for the bomb squad,

25         arrived on scene at 10:45, but that would indicate that's

1    when I had my resources there and we were ready to start

2    briefing.  So if I can see the more thorough report, I can

3    give you the exact time that I arrived.

4  Q    That's --

5  A    I believe it was 10:27 based on my independent recollection.

6  Q    That's fair enough.

7        MR. BOCK:  Thank you, your Honor.

8        Thank you, sir.

9        THE COURT:  Thank you.

10       Redirect.

11                    REDIRECT EXAMINATION

12  BY MR. PIMSNER:

13  Q    Sir, you were asked the question of whether or not the use

14   of your det. cord, and I think you said PETN -- or is that

15   the correct acronym?

16  A    That's correct.

17  Q    Would introduce gases into the garage.  Do you recall that

18   question?

19  A    Yes.

20  Q    Would that have introduced gases into the garage seven

21   hours, six hours earlier when the firefighters first entered

22   the garage?

23  A    No.

24  Q    Now, would the PETN introduce chlorine gas into the garage?

25  A    No, it's not a component of pentaerythritol tetranitrate.

| | | |
|---|---|---|
| 1 | Q | Now, just to clarify with pictures so there's no |
| 2 | | misunderstanding, let me ask you to look at Exhibit 120. |
| 3 | | What would you describe that area as? |
| 4 | A | That's the courtyard adjacent to the French doors to the |
| 5 | | bedroom, just east of the front entryway corridor area. |
| 6 | Q | That you call a courtyard, correct? |
| 7 | A | Correct. |
| 8 | Q | And however, you didn't help prepare the firefighter's |
| 9 | | report, did you? |
| 10 | A | No. |
| 11 | Q | You didn't tell them what language to use to describe |
| 12 | | various areas, did you? |
| 13 | A | No, the -- both reports are written for different reasons. |
| 14 | Q | And the dead animals, where in connection with that picture |
| 15 | | would they have been found? |
| 16 | A | In between where you see the citrus tree, strewn from that |
| 17 | | area there.  In fact, you can see them in the right corner |
| 18 | | kind of where that other shrub is, and then down that |
| 19 | | hallway.  So it connected -- animals essentially connected |
| 20 | | both courtyard areas there. |
| 21 | Q | So you could see the animals from the front patio area? |
| 22 | A | Correct. |
| 23 | Q | Now, let me ask you to look at Exhibit 148. |
| 24 | | And this is a continuation down the hallway? |
| 25 | A | Correct, so at -- where this picture is taken is that |

1      archway opening where you can see kind of where the French

2      doors are there.  So if you turn immediately to your right,

3      that's --

4  Q   You would be -- you would -- if you turn to your right,

5      you'd be looking at those French doors in the last exhibit?

6  A   That's correct.

7  Q   Now, what do you describe this area as in your report?

8  A   The entryway leading to the courtyard.  Again, you can see

9      the positioning of the robot.  If you look just to the

10     right-hand side of where the -- the animal carcasses are,

11     that there -- this -- I'm going to draw on the picture

12     again, is that okay?

13  Q   Yes.

14  A   So this striping here, the robot tracks have a tread pattern

15     on it.  That striping is consistent with that tread pattern.

16     That shows where the robot traveled from that previous

17     picture of the French door courtyard area, around the bend,

18     and then down towards the front door there.  The monitor

19     equipment was operating the entire time, and it doesn't

20     capture.  So those numbers are changing and transitioning as

21     the robot struts.

22  Q   Now, using that same exhibit, were there just two

23     woodpeckers?  Mr. Bock asked you a question about the two

24     woodpeckers.

25  A   No, no, no.  There was -- as you can see, there are several

1           woodpeckers there.

2    Q      Substantially more than two?

3    A      I would say.

4    Q      Now, Mr. Bock was asking you about your entries in your

5           report.  Were you making an entry as to every 30 seconds, or

6           to every minute as to what the status was?

7    A      No.  Again, my report was designed to document significant

8           observations or significant events, not -- so if it's a

9           zero, there's no reason to document.  So I documented what I

10          felt was significant.

11   Q      And you're -- the firefighters that were on the scene, they

12          don't have their own robots, correct?

13   A      They do not.

14   Q      And the robot was being operated by your employees?

15   A      Yes.

16   Q      And you were standing and viewing the operation during the

17          entire time?

18   A      At one point in time I was the operator for the PackBot 510,

19          and drove it myself.

20   Q      And including viewing the screen and orienting, correct?

21   A      Correct.

22   Q      Now, you -- you indicated earlier that readings were

23          constantly -- could constantly change.  Could you explain

24          that a little better?

25   A      The MultiRae's designed for firemen.  It's simply designed

1     to make an assessment as to whether or not the environment

2     is safe.  It's not designed to capture or to lock in, like

3     police radar guns have the potential to lock in a speed.

4     That's not what this does.  So as the robot's moving, as the

5     wind is blowing, even the simple turning of the robot or the

6     turning could cause a difference in airflow, or a difference

7     in the way the tip of the MultiRae is drawing in the

8     environmental air.  So it's a very, very fluid situation.

9  Q    So if it's reading 2. -- 2 parts per million chlorine in

10     this direction, and if the robot turns to the right and

11     depending on the environment, that reading could be zero, is

12     that accurate?

13  A    That's correct.

14  Q    And is there -- what you put in your report, was that

15     accurate based on your observations?

16  A    Yes.

17  Q    And what somebody else put in another agency's report, you

18     had no -- you have no part in, is that correct?

19  A    That's correct.

20        MR. PIMSNER:  Nothing further, your Honor.

21        THE COURT:  Any questions from the jury for this

22 witness?

23        Okay, if you could go ahead and write them out -- as

24 you have, and Jill will collect them.

25                 BENCH CONFERENCE

1          THE COURT:  So let's see, I'll let you guys start will

2     11.  I'll read 12 and 13.

3          MR. PIMSNER:  That's a good question.

4          MR. BOCK:  No objection to number 11.

5          MR. PIMSNER:  Another good question.

6          THE COURT:  We're off the record now so that Mary's not

7     trying to take down all this.

8          Any objections to questions 11, 12 or 13?

9          MR. PIMSNER:  No, your Honor.

10          MR. BOCK:  No objection.

11          MS. ANDERSON:  I'm sorry.  I didn't read this one.

12     I'll make it quick.

13          Thank you.

14          THE COURT:  Okay, so why don't you go ahead and ask

15     those.

16          (The bench conference was concluded.)

17          THE COURT:  All right, some additional questions from

18     the jury, and perhaps follow-up questions from counsel.

19          So go ahead, Mr. Pimsner.

20                         EXAMINATION

21     BY MR. PIMSNER:

22     Q    Sir, referring to the known five-gallon bucket with the

23          sealed lid, would the chemical compounds inside have caused

24          a loud or noisy combustion or explosion?

25     A    There would have been an audible noise.

1    Q    Or would this produce a silent combustion -- so I think that

2         answers -- that you answered that question.

3              With the accessing of the garage using the explosive

4         tool, could this disperse any gases contained in the garage

5         area?

6    A    Can you read that -- read that again?

7    Q    With the -- when the garage was breached --

8    A    Yes.

9    Q    -- with your explosive tool, could this have dispersed any

10        gases contained in the garage area?

11   A    When -- when an explosion occurs, it's the expansion of

12        gases at such a rapid rate that it forms a vacuum, so gases

13        are pushed away.  They're then drawn back in, and then they

14        normalize.  So there is actually -- there is an airflow that

15        exists when an explosion occurs.

16   Q    And you said that you've encountered chlorine devices

17        smaller scale as pranks.  Are those -- are these usually

18        designed to make a lot of smoke, or to spark, or inflame, or

19        to make noise?

20   A    They're usually for destructive purposes to cause a --

21        what's a mechanical explosion or the expansion of gases

22        which will overcome the container causing the rupturing,

23        which is a mechanical explosion, and then destroying

24        objects.  Again, most of these are high school kids blowing

25        up mailboxes is what we see in how these things -- normally,

1          it's small.

2    Q    And the follow-up to that was what is the usual result of

3          these devices on a smaller scale, and I think you just

4          described that.

5          THE COURT:  All right, let's see, from the

6    government any follow-up questions?

7          MR. PIMSNER:  No, your Honor.

8          THE COURT:  All right.

9          Mr. Bock, follow-up -- go ahead.

10                         EXAMINATION

11   BY MR. BOCK:

12   Q    Sir, on your timeline -- do you still have that in front of

13        you?

14   A    Yes.

15        MR. PIMSNER:  Objection, outside the scope.

16        THE COURT:  Well, let me just see, is this -- this is

17   in response --

18        MR. BOCK:  Right.

19        THE COURT:  -- to the juror's questions?

20        MR. BOCK:  Right.

21        THE COURT:  Okay, go ahead.

22   BY MR. BOCK:

23   Q    At 1553, this was after the explosive device was activated,

24        was that -- is that correct?

25   A    Did you say 1553?

1    Q    Yes, 15 -- do you see on your -- excuse me, 1533.  Do you

2         see that?

3    A    Yes.

4    Q    That was after the explosive device was activated, is that

5         correct?

6    A    Yes.

7    Q    And you took a -- there was a chlorine reading at that time,

8         is that correct?

9    A    Yes.

10   Q    And what was the reading?

11   A    Zero.

12   Q    But there was a VOC reading, is that correct?

13   A    Yes.

14   Q    And what was that?

15   A    2.5.

16              MR. BOCK:  Thank you.

17              THE COURT:  And any --

18              MR. PIMSNER:  Just one last, if I may --

19              THE COURT:  Yes, go ahead.

20                        EXAMINATION

21   BY MR. PIMSNER:

22   Q    How long after the breach of the garage was your reading

23        taken?

24              I believe you described earlier a couple inches inside

25        the garage door.

1    A    10 minutes.

2    Q    And would the -- the -- the explosive charge, would that

3         have dispersed the liquids that were in the garage?

4    A    No.

5    Q    Just the gases?

6    A    Just the gases.

7         MR. PIMSNER:  Nothing further.

8         THE COURT:  All right.  Any additional questions from

9    the jury for this witness?

10        All right, sir, thank you.  You may step down and be

11   excused.

12                    ------------------------

13            (Jon Edwards was duly sworn by the clerk.)

14                         JON EDWARDS

15                      DIRECT EXAMINATION

16   BY MS. ANDERSON:

17   Q    Sir, what do you do for a living?

18   A    I'm an F.B.I. agent here in Tucson, Arizona.

19   Q    How long have you been so employed?

20   A    I've been an agent for a little over eight years.

21   Q    And what assignments have you held with the F.B.I. in those

22        eight years?

23   A    I have been an agent on the Indian Reservation in Montana

24        working violent crimes there, and then here in Tucson

25        working drugs, gangs, firearms violations, southwest border

1        violence, those kind of crimes.

2  Q    And that's your current assignment, is it not?

3  A    Yes.

4  Q    Now, were you employed with the F.B.I. and on duty on

5        August 4th of 2009?

6  A    Yes, I was.

7  Q    Do you remember what day of the week that was?

8  A    That was a Tuesday.

9  Q    Now, do you recall what your assignment was that day?

10  A    Yes, I do.

11  Q    And what was that?

12  A    I was the complaint duty agent that day for the Tucson

13        office.

14  Q    Could you explain what the complaint duty agent does?

15  A    The duty agent takes complaint calls from the public, either

16        from the telephone or walk-in complaints, or they handle

17        other various matters from outside agencies or from other

18        divisions within the F.B.I. that might have a question or a

19        task, and those taskings a lot of times will come right to

20        the duty agent.

21  Q    Do you receive calls from the public?

22  A    Yes.

23  Q    People could call in and report crimes, is that right?

24  A    Yes.

25  Q    Or if they have information regarding a crime, they would be

1       directed to the duty attorney -- I'm sorry, the duty agent,
2       correct?
3    A  Yes.
4    Q  Is the duty agent responsibility something that rotates
5       throughout the -- the entire resident agency?
6    A  Yes, it's on a rotational basis throughout the year based on
7       your last name, and however it falls in the alphabet that's
8       when -- that's the date you receive usually, unless you can
9       get someone to switch you -- switch the dates.
10   Q  And when you're on duty, so to speak, how long of a period
11      does that last?
12   A  It's a 24 hour period, for that day.
13   Q  Now -- so you were the duty agent on August 4th of 2009,
14      correct?
15   A  Correct.
16   Q  Now, sometime that day did you receive an unusual phone
17      call?
18   A  Yes, I did.
19   Q  Could tell us -- do you -- do you recall what time that --
20      that came in?
21   A  That was during the morning hours of August 4th, 2009.
22   Q  And could you go ahead and describe for us what happened
23      when the call came in?
24   A  Yeah.  The call came in initially.  It sounded like it was a
25      male trying to impersonate a female voice.

```
 1              MR. BOCK:  Judge, this -- it would be just subject to
 2    my previous record also.
 3              THE COURT:  Yes, it's noted.
 4              Go ahead.
 5    BY MS. ANDERSON:
 6    Q    Go ahead.  You can tell us.
 7    A    It sounded just like a male trying to imitate or impersonate
 8         a female voice.  And I initially thought that it was a joke,
 9         or a prank, or someone trying to -- to call in a prank to
10         the F.B.I. office.
11    Q    And what did this person tell you?
12    A    The person told me that -- the caller said that they were
13         Michelle Fuentes, and they had information regarding a
14         recent attempted attack on the Levine family.
15    Q    Did the name Michelle Fuentes mean anything to you at that
16         time?
17    A    No, it did not.
18    Q    And why is that?
19    A    I -- I did not have any history, or had no knowledge of --
20         of that -- of the case.
21    Q    All right.  And so this person identified him or herself as
22         Michelle Fuentes, correct?
23    A    Correct.
24    Q    What did this person tell you?
25    A    That her name was Michelle Fuentes.  That's what she had
```

1    indicated, or -- and that she had worked for the Levine

2    family, I think it was back in July, for two --

3    approximately two days at the residence.  And that at one

4    point I believe it was Mrs. Levine had -- had left the

5    residence, she said, and Mr. Levine had approached her,

6    and -- for a sexual manner, asking her to perform oral sex

7    on him.  She declined, and said that when Mrs. Levine

8    returned to the home she had told her about it.  She had

9    became upset, and basically told her to leave and threatened

10    to call Immigration on her because the caller had said that

11    she was an illegal immigrant from Mexico, and she was

12    currently staying in Nogales, Arizona, and she was there

13    illegally at the time.

14  Q    Now, did any of this add up to you?

15  A    No.  The voice -- like I said, the voice -- it was obviously

16    a male trying to impersonate a female.  The location she

17    said that she was from, originally in Mexico -- I think she

18    said it was Navaho or Oaxaca, Mexico, and the State of

19    Oaxaca and Navaho are different.  I think Navaho is actually

20    in the State of Sonora, and that didn't add up.  And the

21    telephone number that the caller was calling from did not

22    match up with the contact number that the caller provided to

23    me.

24  Q    Let's talk a little bit about that.  So when a call comes

25    in, are you able to look at a screen and determine what

1      phone number is actually making the call?

2  A   Yeah.  When a call comes in, you can see the call from and

3      it will give the phone number, like a regular caller ID.

4  Q   Does it come up on a screen?

5  A   Yeah.  It was our old phone system, but it came up in like

6      in a little LED display.

7  Q   Do you remember the phone number that came up on the screen?

8  A   It was -- I remember it was a 520 number, and the last ended

9      in 8300.  I can look at my report and get the whole number

10     if you'd like.

11  Q   Please do, and that's Government Exhibit Number 329, I

12     believe, correct?

13  A   Yes.

14        Yes, (520)546-3800 was the caller ID.

15  Q   Now, there was another number associated with that call, and

16     that was an 801 area code number, correct?

17  A   Yeah, the (801)299-8484 was the number that the caller

18     provided to me as -- as their number.  And I knew from

19     working before in Montana, it's the part of the Salt Lake

20     City division in the F.B.I.  That 801 is the area code for

21     Utah.

22  Q   All right, so the two didn't match, correct?

23  A   No, they did not match.

24  Q   Now, so you're -- you're on the phone.  You're talking to

25     this -- this individual who claims to be Michelle Fuentes,

1        correct?

2   A    Correct.

3   Q    And at about that same time did somebody come by the area

4        where you were -- where you were working?

5   A    Yes.  Our ASAC, who's basically the supervisor of the Tucson

6        office, Annette Bartlett, walked by and asked who was on the

7        phone, and I kind of said Michelle Fuentes.  I kind of

8        covered, Michelle Fuentes.  Didn't mean anything to me.  It

9        did mean something to our ASAC, and she kind of motioned to

10       pay attention to that phone call and attempt to record it if

11       I could.

12  Q    Okay, and did you try to do that?

13  A    Yes, I -- there's a recording next to the duty agent that --

14       it's already pre -- pre-staged to record.  You just release

15       the pause button, and it starts recording, which I did on

16       that date.  However, there's a recording volume button that

17       I know now about.  At the time I didn't.  The recording

18       volume was turned all the way off to zero, so the recording

19       was essentially ineffective.

20  Q    So we don't have a recording of that conversation, correct?

21  A    Correct.

22  Q    All right.  So let's continue with the conversation that you

23       had with this person named Michelle Fuentes.

24           Did you notice something unusual about -- about the

25       person that you were speaking to?

1  A   Yeah -- yes.  Ms. Fuentes, or the caller, was saying that

2      she was a Mexican national.  However, when -- during the

3      conversation it was, you know, strict English.  And when she

4      pronounced names that were Hispanic in nature, it had the

5      English accent on it as opposed to having more a Spanish

6      accent on the words.

7  Q   Throughout the conversation that you had with this person,

8      did you try to get him or her to come into the F.B.I.

9      office?

10 A   Yes.  Given all the factors of the phone call, it didn't

11     match up so I continually asked the caller to come into the

12     F.B.I. office to continue with the interview so we could get

13     more information, and the caller -- the caller declined.

14 Q   And why was it -- why was it that you wanted to try and

15     bring this person into the F.B.I. office?

16 A   So then at that point there would be no mistake on the

17     identity of the individual.  We could identify him.

18 Q   Now, let's talk a little more about the conversation you had

19     with this person who claimed to be Michelle Fuentes.  She

20     told you she was from a part in Mexico.  She told you she

21     had information regarding the -- the attack on the Levines,

22     correct?

23 A   Correct.

24 Q   And she also told you that she thought that she had some

25     information regarding who had done the attack, correct?

1   A   Correct.

2   Q   What did she tell you about that?

3   A   She said after that incident at the Levine residence she was

4       let go.  She felt like they didn't pay her for her money for

5       the work that was done at their house, which was

6       approximately $400.  She had made this known to -- I believe

7       it was her cousin, Joaquin Contreras-Navarrete, and Joaquin,

8       she indicated, was a very violent individual, and she had

9       feared that he was the person that was responsible for

10      the -- the attack on the Levines.  And she continued -- or

11      the caller continued to state that Joaquin had informed her

12      that he had purchased chlorine tablets -- or not purchased.

13      He had stolen a large amount of chlorine tablets, placed

14      those chlorine tablets in two buckets which were then placed

15      in the front and the rear of the Levine's residence, and

16      this is why she thought -- or the caller thought that

17      Joaquin was responsible for the incident.

18  Q   Now, it had appeared that the caller actually had some

19      specific information regarding the incident, correct?

20  A   Correct.

21  Q   When you -- well, did you continue the phone call with this

22      person?

23  A   Yes, we -- I tried to continue the phone call and go over --

24      keep him on the phone as long as I could to try to get a

25      good recording of the voice, because it was odd, and I -- go

1       over the information to make sure that I had it right.

2 Q   And let me talk -- let me ask you a couple more questions

3       regarding the phone numbers.

4          Now, she gave you a phone number that was from an area

5       code from outside the State of Arizona, correct?

6 A   Yes.

7 Q   And that was the 801 area code?

8 A   Correct, yes.

9 Q   However, you know that that was not correct because of the

10       caller ID which popped up gave a different phone number?

11 A   Correct.

12 Q   And did you write that number down?

13 A   Yes, I did.

14 Q   And later did you confirm through other means that that, in

15       fact, was the number where the call was being made?

16 A   Yes, the caller ID number was traced back to -- and I think

17       we looked up who the subscriber was of that number, and it

18       came back to a hospital in Tucson, Arizona.

19 Q   Was that Avalon?

20 A   Yes, it was.

21 Q   Avalon here in Tucson?

22 A   Yes.

23 Q   Do you recall the number that came up on the caller ID?

24 A   That was (520)546-3800.

25 Q   Did you hangup on this individual, or did she hangup?

| | | |
|---|---|---|
| 1 | A | I don't really recall for sure.  I think it was a mutual -- |
| 2 | | it was -- it ended in the caller was going to think about |
| 3 | | coming into the F.B.I. office for further interview, and |
| 4 | | that the caller would call back and let me know if that was |
| 5 | | something that the caller was interested in doing. |
| 6 | Q | Did the caller ever call you back? |
| 7 | A | No. |
| 8 | Q | How long was the conversation in total? |
| 9 | A | I would say it was approximately five minutes, probably on |
| 10 | | the longer side of five minutes. |
| 11 | Q | Now, after -- after you and the caller hung up, what did you |
| 12 | | do? |
| 13 | A | I then contacted the case agent, Brian Nowak, and provided |
| 14 | | the information that I had learned from this call to him. |
| 15 | Q | Did you also provide him the phone number that came up on |
| 16 | | caller ID? |
| 17 | A | Yes, I did. |
| 18 | Q | And did you also provide him with the exact business that |
| 19 | | was associated with that caller -- that -- that phone |
| 20 | | number? |
| 21 | A | I remember providing him with the name of the business that |
| 22 | | was associated with that phone number, yes. |
| 23 | | MS. ANDERSON:  May I have just a minute, your Honor? |
| 24 | | THE COURT:  Yes. |
| 25 | BY MS. ANDERSON: |

1    Q    Now, when the call came in, when you began speaking with

2         this person, did you identify yourself?

3    A    Yes.

4    Q    Did you identify yourself as -- as being with the F.B.I.?

5    A    Yeah, it's F.B.I., and the duty agent is how you identify

6         yourself.

7    Q    So you identified yourself as being with the F.B.I., is that

8         correct?

9    A    Yes.

10            MS. ANDERSON:  That's all I have, Judge.

11            THE COURT:  All right.

12            Cross-examination?

13                          CROSS-EXAMINATION

14   BY MR. BOCK:

15   Q    Good morning, Agent.

16   A    Good morning.

17   Q    Now, the -- the F.B.I. office on August 4th of '09, was that

18        still downtown?

19   A    Yes, it was.

20   Q    And you had the assignment, as you said, of receiving calls

21        from the public?

22   A    Yeah, you receive the duty calls or complaint calls that

23        come in.

24   Q    And are the calls regularly recorded and preserved?

25   A    Did you say regularly?

1   Q   Yes.

2   A   No, they are not.

3   Q   Okay.  Which calls are recorded and preserved?

4   A   From my experience, usually the calls that would be recorded

5       would be something that's going to be, you know, threatening

6       in nature, bomb threat, something along those lines, or if

7       it was deemed to be imperative to evidence of a case, that

8       there's approval and a requirement to have it recorded, then

9       it would be done.

10  Q   Suspect leads, and things like that?

11  A   I don't -- that wouldn't necessarily be during the regular

12      course of a recording.  You wouldn't do that.

13  Q   So what time did the call come in?

14  A   I don't recall exactly.  Based on looking at the report, I

15      think it was prior to 10:00 a.m.

16  Q   What time would have you gotten to the F.B.I. office to

17      start that assignment you had on that day?

18  A   I don't know the exact time, but the duty agent time starts

19      from 8:15 a.m. is when you're going to be there, so I'm

20      usually there five, ten minutes before that.  So 8:00

21      o'clock in the morning is when I would be there.

22  Q   So the -- the call was because of a mechanical failure?  Is

23      that why it was not recorded?

24  A   It was -- it wasn't recorded because the -- there's a

25      recording volume button.  It's kind of our old or antiquated

1          system, but that switch was just turned to zero or off,

2          which I didn't have any knowledge about that before.  It was

3          usually you just have it pre-staged, you take two button off

4          of pause and it starts the recording.  We do have a newer

5          system now that -- it's not quite that antiquated, but that

6          was the reason for the malfunction in the recording.

7    Q     And if the call started around 10:00, what was the length of

8          the call?

9    A     I don't remember if it started around 10:00.  I know it was

10         prior to that.  The length of the call, I thought it was

11         approximately five minutes.

12   Q     You got a lot of information in five minutes?

13   A     Sure.  It was --

14   Q     Were you asking any questions, or was the caller just

15         speaking in a narrative?

16   A     No, I was asking questions.

17   Q     And when did you discover that the call had not been

18         recorded?  Immediately thereafter, or sometime thereafter?

19   A     It was sometime after talking with the case agent when I had

20         indicated that I had recorded it and provided it to him, and

21         then, you know, there was -- when there was nothing on it,

22         we reviewed the machine, and that's what I had learned that

23         the recording volume was off.

24   Q     So when would you have written -- your report was -- when

25         would you have written your report regarding the call and

1       the details of the call?

2  A    I wrote my report that day.

3  Q    And you write a report irrespective of the fact that the

4       call is recorded or not, is that correct?

5  A    Correct.

6  Q    And if a call was recorded, would you have written it --

7       this report in as much detail as -- given the fact that the

8       call was not recorded?  In other words, would you have

9       written a report saying refer to recording?  What would be

10      your normal practice?

11  A    I'm not sure exactly.  I probably would have --

12      usually my -- my personal preference would be to usually

13      write some sort of summary so if someone did look at that --

14      want to look at it in the system, they could see something

15      on paper as if they didn't have the actual tape.  So from my

16      training, experience I usually like to write something down

17      so someone can view it on another computer if they did not,

18      in fact, have the tape.

19  Q    Were you writing -- or were you writing what was being told

20      to you contemporaneous with what was being told,

21      simultaneous, or did you write that sometime thereafter?

22  A    It was right after.

23  Q    And you had notes that you were taking, or was this just

24      from memory?

25  A    I think there were some notes.  I was jotting down a phone

1        number.  I remember writing the phone numbers and some other

2        numbers that the caller was providing.

3    Q   So you say the call was all of five minutes?

4    A   I said approximately five minutes.

5    Q   When did you contact -- do you see Agent Nowak here?

6    A   Yes, I do.

7    Q   Okay, that gentleman with the --

8    A   I'm familiar with Agent Nowak, yes.

9    Q   So we don't need to identify him, right?

10   A   I'm familiar with him, yes, sir.

11   Q   So when did you get a hold of Agent Nowak?

12   A   I don't know if I was the one that actually called him, but

13       I just remember that when -- when this was kind of going on,

14       the call, we were looking at the caller ID and information,

15       gathering -- gathering more information, Agent Nowak showed

16       up at the office.  I can't remember if I was the one that

17       called him, or somebody else that knew what was happening

18       had contacted Agent Nowak, and that resulted in him coming

19       by the duty agent desk.

20   Q   To speak with you?

21   A   I'm assuming, yeah, he -- that's why he came by, yes.

22   Q   And how much time had passed, do you think, approximately?

23   A   Not much time had passed that I remember.  It was -- he was

24       there fairly fast.  I can't remember the exact amount of

25       time.

1  Q  He's in the same building?

2  A  No, he's not.

3  Q  Okay, what building was he in?

4  A  There's a -- we have -- if I remember right, he was in a

5    different building.

6  Q  Okay, the old building you had two floors, right?  Am I

7    right on that, or wrong?

8  A  Yeah, we have two floors, and then we also have other remote

9    off-site F.B.I. offices.

10  Q  Okay, so he had to come from another site.  He wasn't in --

11  A  I believe so.

12  Q  Okay.  So how long did you sit down with Agent Nowak for?

13  A  Long enough to tell him the details I had gleaned from the

14    telephone conversation.

15  Q  And how long do you think that might have been?

16  A  I don't recall.  Didn't take long.  Five, ten minutes,

17    fifteen minutes at the most -- fifteen minutes would be on

18    the long end, but to get him all the information that we had

19    gotten it didn't take long.  I would say approximately five,

20    ten minutes.

21  Q  And the gist of the call -- and bear with me.  I'm not going

22    to try to put words in your mouth or anything.  But the gist

23    of the call is a person purporting to be Michelle Fuentes

24    claiming that something happened to her, and she

25    communicated this to a relative of her's named Mr. Joaquin

1        Navarrete, is that correct?

2    A   Correct.

3    Q   And Mr. Joaquin Navarrete as a result of receiving this

4        information reacted, or could have reacted violently, and

5        therefore she was claiming that he was a potential suspect

6        in the August 2nd situation.  Is that a -- is that a -- is

7        that --

8    A   It's close.  I would disagree on one point in that could

9        have -- the way it came across was that he did.  With the

10       information, that's the way I was understanding it was, you

11       know, that he's violent, and said he stole these chlorine

12       tablets and placed them in the front and the rear, so I was

13       kind of going that he was the person responsible, not may

14       have been.

15   Q   Okay.  And were you aware of -- having a law enforcement

16       presence, of an incident on August 2nd of 2009 at Tucson

17       Omni?

18   A   I was not aware of it.

19   Q   Did Agent Nowak -- and I don't want to go into necessarily

20       any lengthy conversations you had with him, but did he tell

21       you that he was investigating an incident?  Did you become

22       aware of that through Agent Nowak?

23   A   Well, when my ASAC told me that it was important, I was

24       assuming, you know, at that point that there was some sort

25       of investigation, or that this -- this caller was important.

1        And then, you know, after talking with Agent Nowak, I

2        realized that he was investigating this matter.

3   Q   And did he tell you it was a matter involving on August 2nd?

4   A   I don't remember that.

5   Q   When did you learn that?

6   A   I think it was sometime after -- I was having a

7        conversation.  I think it might have been with my ASAC, that

8        there had been a press release the day before regarding this

9        incident, and that's kind of when I had learned after all of

10       this had happened that then I knew that there would most

11       likely probably be more phone calls in relation to this due

12       to the press release.

13  Q   Did Agent Nowak tell you that he had any conversations with

14       Michelle Fuentes prior to this phone call?

15  A   No, I don't remember that.

16  Q   Did he share that with you?

17  A   No.

18  Q   You were not assigned the -- a case involving Mr. Joaquin

19       Navarrete, is that correct?

20  A   No, sir.

21  Q   And basically, you just -- you were a conduit of the

22       information that you received to Agent Nowak?

23  A   Correct.

24  Q   And not making any -- and again, not to demean you, please

25       don't take it -- but you were not making any decisions

1          whether or not Joaquin Navarrete should be arrested, or

2          detained, or anything, is that correct?

3     A    I was simply taking the information and providing -- you

4          know, trying to take what they had and do the -- probably

5          the minimal or the required amount of investigation given

6          the information I had to pass it along.

7     Q    And you knew Agent Nowak was the agent in charge of the --

8          or you learned of the August 2nd event?

9     A    Yeah, subsequent to this I did learn that information.

10    Q    Okay.

11              MR. BOCK:  Thank you, your Honor.  Nothing further.

12              THE COURT:  All right.

13              Redirect?

14              And if you need more than a few minutes, we can do it

15    after lunch.

16              MS. ANDERSON:  I don't have any redirect, your Honor.

17              THE COURT:  Okay.

18              MS. ANDERSON:  I do have another witness that will be

19    fairly quick, if the Court would allow us to put another witness

20    on the stand once we're done with this witness.

21              THE COURT:  Okay.

22              Any questions from the jury for this witness?

23              All right, and if I could see counsel at sidebar.

24                          BENCH CONFERENCE

25              MS. ANDERSON:  Sorry about that, Judge.  I was trying

1    to get this one witness on.

2              THE COURT:  Okay.  Is that a scheduling issue?  You

3    don't want to call --

4              MS. ANDERSON:  I'd like to call him if I could.

5              MR. BOCK:  Who is this?

6              MS. ANDERSON:  Tisch.  He's a chain of custody witness.

7              MR. PIMSNER:  He found the day planner, but -- he

8    pointed it out to the evidence technicians, so he'll be quick.

9              MR. BOCK:  I have no objection.

10             THE COURT:  Any objection to 14?

11             MS. ANDERSON:  (No verbal response.)

12             (The bench conference was concluded.)

13             THE COURT:  All right, Ms. Anderson, you may ask the

14   juror's question.

15                            EXAMINATION

16   BY MS. ANDERSON:

17   Q    Special Agent Edwards, is the caller ID stored in the F.B.I.

18        system to confirm that the call came in at the said date and

19        time?

20   A    Yes, it was.

21   Q    And did you go back and confirm that phone number that --

22        that popped up on your screen?

23   A    Yes.  Those records were pulled, and that was verified.

24   Q    And that's what you used to determine that the call was

25        being made from Avalon Health Center, correct?

1   A     Correct.

2              THE COURT:  Okay.

3              Any follow-up questions, Mr. Bock, from your

4   perspective to that jury question?

5                            EXAMINATION

6   BY MR. BOCK:

7   Q     And again, you don't know the -- we don't have an exact time

8         that the call came in, do we?

9   A     There could be an exact time on that report, but my memory

10        right now based off of my report, I don't have that

11        information right now.

12             MR. BOCK:  Okay, thank you.

13             THE COURT:  Any additional questions from the jury for

14  this witness?

15             All right, sir.  Thank you.  You may step down.

16             -------------------------

17             (Alexander Tisch was duly sworn by the clerk.)

18                        ALEXANDER TISCH

19                      DIRECT EXAMINATION

20  BY MS. ANDERSON:

21  Q     Sir, how are you so employed?

22  A     I'm a detective with the Pima County Sheriff's Department.

23  Q     And how long have you worked for the Pima County Sheriff's

24        Department?

25  A     Since February 23rd, 2003.

1  Q    What are the assignments that you've held over the years

2       with the sheriff's department?

3  A    When I first started, I was assigned to patrol division

4       responding to calls for service.  After that, I was

5       reassigned to the directed patrol unit which focuses the

6       efforts of plain clothes deputies and marked units in high

7       crime areas.  We saturate those areas and try to alleviate

8       some of the neighborhood problems.  In 2009 I was reassigned

9       to the criminal investigations division as a detective, and

10      I've worked there ever since.

11 Q    And so were you assigned as a detective on August 2nd of

12      2009?

13 A    Yes, I was.

14 Q    You were in the detective unit at that time?

15 A    Yes, I was.

16 Q    Now, on that date on August 2nd of 2009 did you respond to

17      the residence at 2870 West Magee Road here in Tucson to

18      search for items of any kind of evidentiary value?

19 A    Yes, I did.

20 Q    And that's one of the things that you do as a detective,

21      correct?

22 A    Yes, ma'am.

23 Q    Now, one of the items that was found was a black day

24      planner.  Do you recall that?

25 A    Yes, I do.

1  Q    I'm going to show you Government's Exhibit Number 177, have

2        you take a look at that.

3            Sir, do you recall what's depicted there in the

4        photograph?

5  A    Yes, I do.

6  Q    Do you recognize what's shown there in the photograph, I

7        should say?

8  A    Yes, I do.

9  Q    And what is that?

10 A    This is a small alleyway just to the side of the property

11       where this incident occurred.  There's a little wash off to

12       the right side, and this is the condition in which we found

13       it -- those items in the alleyway.

14           MS. ANDERSON:  Government moves for admission of

15  Exhibit 177.

16           MR. BOCK:  Subject to my previous record.

17           THE COURT:  All right, 177 is admitted.

18  BY MS. ANDERSON:

19 Q    We see off to the left there's a gate.  Do you see -- do you

20       see that there?

21 A    Yes.

22 Q    Now, if somebody were to go through that gate, what -- what

23       would be located on the other side of the gate?

24 A    The other side of the gate's a small roadway leading to --

25       eventually out to Magee Road, but it's -- it's the driveway

```
 1              of the incident location.
 2    Q    There are houses on the other side of the gate, correct?
 3    A    Yes, ma'am.
 4    Q    We can't really see them here in the photograph, right?
 5    A    Correct.
 6    Q    Take a look at Government's Exhibit Number 178.
 7              Is that a close-up of the day planner?
 8    A    Yes.
 9              MS. ANDERSON:  Government moves for admission of 178.
10              MR. BOCK:  Subject to my previous record.
11              THE COURT:  All right, 178 is admitted.
12   BY MS. ANDERSON:
13   Q    We see an envelope directly adjacent to the day planner,
14        correct?
15   A    Yes.
16   Q    And did you have occasion to look inside the envelope?
17   A    I don't recall looking inside the envelope.
18   Q    But you -- you and the others that were with you searching
19        found these items, correct?
20   A    Yes, ma'am.
21              MS. ANDERSON:  Government moves for admission of 178.
22              THE COURT:  I think you --
23              MS. ANDERSON:  Was that admitted?
24              THE COURT:  Didn't you just do that?
25              MS. ANDERSON:  Okay.
```

1            THE COURT:  178 is admitted, and the jury's looking at

2    it right now.

3            MS. ANDERSON:  Okay.  I apologize.

4    BY MS. ANDERSON:

5    Q    Let's take a look at 179.

6            Do you recognize that?

7    A    Yes.  This is a different angle of the same alleyway, slash,

8        wash.  If you were to take a few steps to the right from the

9        last photo, you'd be looking down this wash alleyway.

10   Q    We also see a white t-shirt in this photo, correct?

11   A    The item in the left corner?

12   Q    Yes.

13   A    I'm not sure what it is.  It is white, though, yes.

14           MS. ANDERSON:  Government moves for admission of 179.

15           MR. BOCK:  Same objection.

16           THE COURT:  All right, 179 is admitted.

17   BY MS. ANDERSON:

18   Q    Let's take a look at 180.

19           That's a different view of the day planner, correct?

20   A    Correct.  If you moved more to the right again, then you

21       could see through the gate.

22           MS. ANDERSON:  Government moves for the admission of

23   180.

24           MR. BOCK:  Same position, Judge.

25           THE COURT:  All right, 180 is admitted.

1    BY MS. ANDERSON:

2    Q    Let's take a look at 181.

3             That's another view of the day planner, the envelope,

4         and the other white item, correct?

5    A    Yes.

6             MS. ANDERSON:  Government moves for admission of

7    Exhibit 181.

8             MR. BOCK:  Same position as to my previous record, your

9    Honor.

10            THE COURT:  All right, 181 is admitted.

11   BY MS. ANDERSON:

12   Q    Let's take a look at 182.

13            That's a photograph, a close-up of the day planner,

14        correct?

15   A    Yes, ma'am.

16            MS. ANDERSON:  Government moves for the admission of

17   Exhibit 182.

18            THE COURT:  182 is admitted.

19   BY MS. ANDERSON:

20   Q    Take a look at 183.

21            That's the envelope that was directly adjacent to the

22        day planner, correct?

23   A    It looks like it, yes.

24            MS. ANDERSON:  Government moves for admission of

25   Exhibit 183.

1          MR. BOCK:  Same position as to all the exhibits I

2   imagine she's going to refer to.

3          THE COURT:  Okay, 183 is admitted.

4   BY MS. ANDERSON:

5   Q    And finally, Government's Exhibit 184.

6          Do you recognize -- do you recognize what's shown in

7      that photo?

8   A    This appears to be the contents of the day planner.

9          MS. ANDERSON:  Government moves for the admission of

10  184.

11         THE COURT:  184 is admitted.

12  BY MS. ANDERSON:

13  Q    Now, there's another item of evidence that you seized, is

14     that correct?

15  A    Correct.

16  Q    And that was a five-gallon bucket which was located on the

17     back porch, correct?

18  A    Correct.

19  Q    Now, what did you do with that bucket?

20  A    I never touched the bucket, it was moved into a large

21     55-gallon plastic container that was sealed by an unknown

22     F.B.I. agent, and then Sergeant Rogers directed me to

23     transport this item -- or go with the item down to the

24     evidence unit to maintain chain of custody of it.

25  Q    Let's take a look at government's Exhibit Number 93.

1            THE COURT:  Has that been admitted?

2            MS. ANDERSON:  No, it hasn't, your Honor.

3   BY MS. ANDERSON:

4   Q    On the far left portion of the photograph we see a -- a

5        bucket, correct?

6   A    Yes, ma'am.

7   Q    Is that the bucket that you assisted in putting in the drum

8        and I believe you said you followed it to the evidence

9        section, correct?

10  A    Yes, ma'am.  I didn't -- I didn't touch that.  It was placed

11       in a -- in a drum by unknown -- unknown other investigators,

12       and then I signed across the seals that it was inside this

13       larger plastic container, the 55-gallon drum, and then I

14       followed a -- I think it was a tow truck that moved that

15       container down to our evidence unit.

16           MS. ANDERSON:  Government moves for admission of

17  Exhibit 93.

18           THE COURT:  Objection's noted, and 93 is admitted.

19           MS. ANDERSON:  That's all I have, Judge.

20           THE COURT:  All right.

21           Any cross-examination of the witness, Mr. Bock?

22           MR. BOCK:  Very briefly, your Honor.

23           THE COURT:  Okay.

24                         CROSS-EXAMINATION

25  BY MR. BOCK:

```
 1   Q    Deputy, did you bag the -- the wallet and the envelope?
 2   A    I don't recall bagging the wallet and the envelope.  I do
 3        recall looking through that, though.
 4   Q    Okay, what about the shirt?  Did you -- did you bag that?
 5   A    I don't have it in my report that I did it, and I don't
 6        recall doing it either.
 7   Q    Did you look at the shirt?
 8   A    I don't recall looking at it, no.
 9   Q    Okay.
10             MR. BOCK:  Nothing further.
11             THE COURT:  All right.
12             Any redirect?
13             MS. ANDERSON:  No, your Honor.
14             THE COURT:  Any questions from the jury for this
15   witness?
16             All right, if you would write it out, please.
17                           BENCH CONFERENCE
18             THE COURT:  I don't know if this witness can answer
19   that question.  I guess we can ask it, and if he knows he can
20   answer, and if he doesn't he can say he doesn't know.
21             MR. PIMSNER:  Yes.
22             THE COURT:  Does that seem like a good way to handle
23   that?
24             MS. ANDERSON:  Yes.
25             THE COURT:  Okay.  So go ahead.
```

1          (The bench conference was concluded.)

2          THE COURT:  All right, Ms. Anderson, you may ask the

3     question from the juror.

4                          EXAMINATION

5     BY MS. ANDERSON:

6     Q    Deputy Tisch, I've got a question for you.  If a person is a

7          Mexican national, are they issued an Arizona drivers

8          license, if you know the answer?

9     A    I think -- I think the question is can they be issued a

10         drivers license?  From my understanding, you -- you have to

11         produce items that would make you a citizen to be able to

12         obtain a drivers license in the State of Arizona.  I have

13         never encountered an illegal entrant with a validly issued

14         Arizona drivers license.

15         MS. ANDERSON:  All right.  We don't have any questions

16    for follow-up, your Honor.

17         THE COURT:  All right.

18         Any additional questions from the jury for this

19    witness?

20         All right, sir, may step down and be excused.

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, Mary A. Riley, do hereby certify that I

3    stenographically reported the foregoing proceedings to the best

4    of my skill and ability, and that the same was transcribed by me

5    via computer-aided transcription, and that the foregoing pages of

6    typewritten matter are a true, correct and complete transcript of

7    all the proceedings had, as set forth in the title page hereto.

8          Dated this 15th day of April, 2013.

9

10                                    s/ Mary A. Riley

11                              United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25