1            UNITED STATES DISTRICT COURT

2               DISTRICT OF ARIZONA

3   ----------------------------)
                                )
4                               )
    UNITED STATES OF AMERICA,    )
5               Plaintiff,       ) No. CA 13-10116 9th Circuit
                                )
6         vs.                    ) No. CR 11-01751 TUC-CKJ
                                )
7                               )     Tucson, Arizona
    TODD FRIES,                  )     September 24, 2012
8               Defendant.       )
                                )
9   ----------------------------)

10             TRANSCRIPT OF TESTIMONY
                 JURY TRIAL DAY FIVE

11
        BEFORE THE HONORABLE CINDY K. JORGENSON
12           UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

    For the Plaintiff:    By:  Beverly K. Anderson, and
16                             David A. Pimsner
                               U.S. Attorney's Office
17                             405 W. Congress St., Suite 4800
                               Tucson, AZ   85701
18
    For the Defendant:    By:  Richard C. Bock
19                             100 N. Stone Ave., Suite 801
                               Tucson, AZ   85701
20

21
    Mary A. Riley, RMR, FCRR
22   United States Court Reporter
    U.S. District Court
23   405 W. Congress St.
    Tucson, AZ   85750
24

25       Proceedings produced by computer-aided transcription

1                           INDEX OF TESTIMONY

2

3    JENNIFER SKYLER

4    Direct Examination by Mr. Pimsner        Page   5

5    Cross-Examination by Mr. Bock            Page  11

6    Redirect Examination by Mr. Pimsner      Page  16

7    JURY QUESTION

8    Examination by Mr. Pimsner               Page  19

9    Examination by Mr. Bock                  Page  20

10

11   CHARLES PICKARD

12   Direct Examination by Mr. Pimsner        Page  21

13   Cross-Examination by Mr. Bock            Page  35

14

15   EDWARD CURTIN

16   Direct Examination by Ms. Anderson       Page  38

17   Cross-Examination by Mr. Bock            Page  43

18

19   SCOTT HUNTER

20   Direct Examination by Ms. Anderson       Page  44

21   Cross-Examination by Mr. Bock            Page  82

22   JURY QUESTION

23   Examination by Ms. Anderson              Page  89

24

25

```
 1   THOMAS GRANT
 2   Direct Examination by Mr. Pimsner        Page  90
 3   Cross-Examination by Mr. Bock            Page 103
 4
 5   JOHN SWARTZ
 6   Direct Examination by Mr. Pimsner        Page 105
 7   Cross-Examination by Mr. Bock            Page 114
 8
 9   BRIAN NOWAK
10   Direct Examination by Ms. Anderson       Page 116
11   Cross-Examination by Mr. Bock            Page 124
12
13   EARL SCOTT JONES
14   Direct Examination by Ms. Anderson       Page 125
15   Cross-Examination by Mr. Bock            Page 133
16   Redirect Examination by Ms. Anderson     Page 139
17
18   JEFFREY CLARK
19   Direct Examination by Mr. Pimsner        Page 140
20   Cross-Examination by Mr. Bock            Page 153
21   Redirect Examination by Mr. Pimsner      Page 170
22   JURY QUESTION
23   Examination by Mr. Pimsner               Page 180, 184
24   Examination by Mr. Bock                  Page 182, 185
25
```

1    CHRISTOPHER PAHL

2    Direct Examination by Ms. Anderson        Page 186

3    Cross-Examination by Mr. Bock              Page 205

4    Redirect Examination by Ms. Anderson      Page 209

5    Recross Examination by Mr. Bock           Page 212

6    JURY QUESTION

7    Examination by Ms. Anderson               Page 213

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIPT OF PROCEEDINGS

2              (Jennifer Leon Skyler was duly sworn by the clerk.)

3                 THE COURT:  You may proceed.

4                 MR. PIMSNER:  Thank you, your Honor.

5                         JENNIFER LEON SKYLER

6                         DIRECT EXAMINATION

7    BY MR. PIMSNER:

8    Q    Ms. Skyler, are you a resident of Tucson?

9    A    Yes.

10   Q    And how long have you been living in Tucson?

11   A    39 years.

12   Q    And are you currently employed?

13   A    No, I'm not.

14   Q    Were you previously employed?

15   A    Yes, I was.

16   Q    What was the name of your last employer?

17   A    It's called the Dasco Companies.

18   Q    And could you spell that just for the record?

19   A    It's D-A-S-C-O Company.

20   Q    Okay, and what type of work was Dasco involved with?

21   A    Medical property management.

22   Q    And did you work as a property manager?

23   A    I was a property manager.

24   Q    And did you work at a specific facility?

25   A    Yes.

1    Q    And what facility was that?

2    A    At El Dorado Hospital.

3    Q    And is that located at 1400 North Wilmot here in Tucson?

4    A    Yes.

5    Q    What was your exact title while you worked at that facility?

6    A    Property administrator.

7    Q    Property administrator?

8         And how long did you work at that facility?

9    A    Since 2003.

10    Q    And you worked there until it closed, that -- the facility

11         closed, or --

12    A    Temporarily was vacant, yes, until 2010.

13    Q    So you would have worked there between '03 and '10?

14    A    Yes.

15    Q    And was that facility undergoing renovations at the time

16         that you were employed there?

17    A    Yes.

18    Q    And as property administrator, what were your

19         responsibilities for that facility?

20    A    Coordinated all the construction, managed facilities,

21         security.  Basically, all the functions of the hospital,

22         anyone coming, going from the building.

23    Q    So you basically were in charge of the whole facility?

24    A    Entire facility.

25    Q    Okay.  Were you working there in August of '09?

1    A    Yes.

2    Q    And do you remember an incident back on August 4th, 2009

3         when the F.B.I. responded to your facility?

4    A    Yes.

5    Q    Now, going back to that day, August 4th, do you remember

6         what time you would have begun work that day?

7    A    About 5 until 8:00.  I was scheduled to work at 8, so I was

8         always there until about ten 'til.

9    Q    All right, and on that morning as property administrator --

10        or did you receive any kind of notice that a stairwell alarm

11        had been set off?

12   A    Yes.

13   Q    And do you recall approximately what time that alarm would

14        have gone off?

15   A    Between 9:10 and 9:15 a.m.

16   Q    And is that routine that you would receive notice if there

17        was an alarm or some other unusual activity in the facility?

18   A    Yes.

19   Q    Now, prior to the alarm going off, did you notice anyone who

20        was not on your staff that morning in the facility?

21   A    Yes.

22   Q    And when -- approximately when was that?

23   A    About 9 or 9:05 a.m.

24   Q    And where did you see this individual?

25   A    In the hallway corridor on the east end of the building.

```
 1   Q   On what floor?

 2   A   The first floor.

 3   Q   And how did you see him?  I mean, how -- what was the --

 4       could you describe your encounter with that individual?

 5   A   It was a quick, passing in the hallway.

 6   Q   Okay.  Did you make eye contact?

 7   A   Yes.

 8   Q   Did you have any kind of dialogue with that person as you

 9       passed him?

10   A   Just a good morning, in passing.

11   Q   And did you see which way that individual was headed?

12   A   Yes, he headed in the east hall to that east stairwell.

13   Q   And where did that east stairwell lead to?

14   A   At that time the east stairwell would -- it would go through

15       the first, second and third floor.

16   Q   And so if somebody entered on the first floor, could they

17       have either gotten off at the second or third floor?

18   A   No.

19   Q   Why not?

20   A   The second floor was under renovation.  It was completely

21       locked down and vacant.

22   Q   So there was no access to the second floor?

23   A   No.

24   Q   So if somebody entered the ground floor, where was the only

25       other exit?
```

1    A    The third floor.

2    Q    And the third floor, was that the same alarm door that you

3         received notice of that morning that went off?

4    A    Yes.

5    Q    And where does that third floor alarmed door lead to, the

6         door that went off -- alarmed?  Where does that door lead

7         to?

8    A    The third floor.  It leads to the entire third floor.

9    Q    Okay.  And who was -- what company was occupying the third

10        floor inside where that alarm door --

11    A    The third floor was Avalon Health Care.

12    Q    Avalon, is that --

13    A    It's called Avalon Rehabilitation.

14    Q    Okay.  Now, how long after you saw that individual walking

15        towards that first floor east stairwell before you received

16        notice that the alarm had gone off on the third floor?

17    A    I received notice about seven to ten minutes, but the alarm

18        had been going off and I had to reset the alarm.

19    Q    Now, how long after the alarm went off did the F.B.I. arrive

20        at your facility?

21    A    About 30 minutes.

22    Q    About 30 minutes?

23             And did you -- were -- did agents come and speak to you

24        that morning?

25    A    Yes.

1    Q    And did you describe your facility and what you saw that

2         morning?

3    A    Yes.

4    Q    Now, did your facility have any security cameras that were

5         focused on either the entryways or the entrances to the

6         stairwells?

7    A    No.

8    Q    So there was no -- no way that F.B.I. can obtain any type of

9         tape recordings of that -- of that time?

10   A    No.

11   Q    Now, as property administrator were you responsible for the

12        contractors that work at your facility?

13   A    Yes.

14   Q    And what was your role in dealing with contractors?

15   A    The contractors would come to me.  I would sign them in and

16        they would sign in with security, and I would badge them and

17        direct them, and take them to the areas where they needed to

18        work.

19   Q    So were you responsible for hiring the contractors that --

20   A    Yes.

21   Q    -- were working at the facility?

22   A    Um-um.

23   Q    And that was all contractors?

24   A    Every contractor.

25   Q    And then you were responsible for making sure that they had

1          the proper credentials, and -- and got to their designated

2          work areas, correct?

3     A    Yes.

4     Q    Now, as your role as property administrator, did you ever

5          contract or hire a company that's called Burns Power Wash?

6     A    No.

7     Q    And not to work -- not just a power washer, but possibly a

8          driveway refinisher?

9     A    No, we had our own contractor.

10    Q    You had your own contractor that did that type of work?

11    A    Uh-huh.

12    Q    And who was that?

13    A    Skytek Power Washing.

14    Q    And do you know if Skytek could have subcontracted?

15    A    No.  It wasn't allowed in the contract.

16    Q    So Skytek was your contractor for that type of work?

17    A    Yes.

18    Q    How about whether you either hired or contracted with an

19         individual by the name of Todd Fries, also possibly --

20         phonetically spelled Fries, F-R-I-E-S?

21    A    No.

22             MR. PIMSNER:  I have nothing further at this time, your

23    Honor.

24             THE COURT:  Cross-examination?

25                        CROSS-EXAMINATION

1   BY MR. BOCK:

2   Q    Now, Ms. Skyler, you indicated that you worked at the

3        facility for close to seven years, is that correct?

4   A    Yes.

5   Q    And the facility was a -- Avalon was part of the facility,

6        is that correct?

7   A    Yes.

8   Q    And Avalon was exclusively on the third floor?

9   A    Yes, they were the tenants that operated the third floor.

10  Q    Okay.  And how many people were associated with Avalon that

11       worked on the third floor?  Fifty people?  Sixty people?

12  A    Approximately.  Whoever they have on staff, and I'm not

13       sure.

14  Q    What was the phone number to Avalon?

15  A    I don't recall.

16  Q    The 546-3800, is that a phone number that's associated

17       with --

18  A    Yes, that is Avalon's phone number.

19  Q    And they would have had a number of phones in their

20       facility, is that correct?

21  A    Correct.

22  Q    So if I called 546-3800, it could have gone to any number of

23       one of their phones?

24  A    It would have went to a -- an operator phone.

25  Q    Just -- there was just one phone that answered that number?

1   A    Yes.

2   Q    But if someone used one of the other phones and made a phone

3        call, they could -- they would be using a phone that would

4        be associated with that number, is that correct?

5   A    I don't recall if the -- if it came up that way.  I don't

6        know.  We had different extensions on every phone.

7   Q    Well, you would agree with me there was more than one phone

8        on the third floor that Avalon had at their disposal?

9   A    Yes.

10  Q    And if someone wanted to use that phone, one of many phones

11       and they would make a call, that phone would be associated

12       with -- it might have an extension number, but it would be

13       associated with the main number of 546-3800, is that

14       correct?

15  A    I don't know.

16  Q    Now, the second floor, you said, was under construction --

17  A    Yes.

18  Q    -- the day you were interviewed by the F.B.I.?

19  A    Yes.

20  Q    Now, no activity -- no business activity, is that correct?

21  A    Correct.

22  Q    And the first floor would have been what?

23  A    Temporarily occupied by Tucson Medical Center.

24  Q    A different phone number than Avalon?

25  A    Yes.

1   Q   There were a number of computers that would have been -- did

2       you have a -- for this timeframe that you were interviewed

3       by the F.B.I., would there have been more than one computer

4       in the -- in Avalon?

5   A   Yes.

6   Q   And would more than one computer have been associated with a

7       phone next to it?

8   A   Yes.

9   Q   Now, when you made contact with an individual that the

10      F.B.I. had asked you about, you made some observations and

11      some -- shared with the F.B.I. of what your recollection was

12      of the person, is that correct?

13  A   Yes.

14  Q   Do you remember what the person was wearing?

15  A   He was wearing a tan colored shirt, and some light pants.

16  Q   Did he have on a logo on his shirt?

17  A   I don't recall.

18  Q   Do you remember if he had anything on his shirt?

19  A   I don't recall.

20  Q   The -- did you ever do work with Groundskeeper?

21  A   No.

22  Q   Are you certain of that?

23  A   Yes.

24  Q   Do you know what Groundskeeper is?

25  A   Yes, I do.

1    Q    Tell me what your understanding of Groundskeeper is.

2    A    It's a landscaping company.

3    Q    Did you ever have any landscaping, or any -- any business

4         with landscapers?

5    A    Yes.

6    Q    And who did you contract with to do your landscaping?

7    A    Complete Landscaping.

8    Q    Do you know if they ever contracted with Groundskeeper?

9    A    They did not.

10   Q    Did you ever see anybody on the premises that had -- where

11        there was a Groundskeeper truck or had -- someone had a

12        shirt on that was -- had a Groundskeeper logo?

13   A    Yes.

14   Q    Now, to get to the first floor -- from the first floor to

15        the third floor, a person would take the elevator.  That was

16        one method, is that correct?

17   A    Yes.

18   Q    Or a person would take the stairwell?

19   A    Yes.

20   Q    A person -- the entrance from the stairwell to the second

21        floor was -- was locked, I guess; is that fair?  Is that

22        right?

23   A    Yes.

24   Q    And then the entrance to the third floor, you said when a

25        person would have gone and opened that door, it would have

1         activated the alarm.  Is that your testimony?

2    A    Yes.

3    Q    And that was the only stairwell that led from the ground

4         floor to the third floor, is that correct?

5    A    No.

6    Q    There was another stairwell?

7    A    There's three stairwells.

8    Q    Did all stairwells have alarms associated with them?

9    A    Yes.

10            MR. BOCK:  Nothing further, your Honor.

11            THE COURT:  Redirect?

12                         REDIRECT EXAMINATION

13   BY MR. PIMSNER:

14   Q    Ms. Skyler, as part of your duties as a property

15        administrator, was -- did you also hire and contract with

16        the grounds -- the landscaping people for that facility?

17   A    I'm sorry.  I didn't understand.

18   Q    As part of your -- your responsibilities hiring contractors,

19        did that also include the landscapers?

20   A    Yes.

21   Q    And you testified, and I just wanted to clarify, that you

22        did not hire a -- a company by the name of Groundskeeper?

23   A    No.

24   Q    But you may have seen somebody by the name -- with that

25        logo?  I wasn't sure what your testimony --

1   A    I've seen the vehicle on the property.

2   Q    And do you have any idea what the vehicle was doing there?

3   A    Probably bidding a job.

4   Q    I'm sorry?

5   A    Probably bidding a job.

6   Q    Okay.  Now, is there -- are there other buildings at that

7        location?

8   A    Yes.

9   Q    So could -- but was Groundskeeper, or this -- bidding a --

10       bidding for your facility?

11  A    No.  They could have been bidding for a different building

12       on the property.

13  Q    Okay.  But nobody with Groundskeeper was affiliated with

14       your facility?

15  A    Correct.

16  Q    Nor had the authority to subcontract or work at your

17       facility, is that correct?

18  A    Right.

19  Q    And the telephones -- the multiple telephones that Avalon

20       had, they all had independent extensions?

21  A    Most of them.

22  Q    So if there was just a general number, that would go I take

23       it a main line?

24  A    Yes.

25  Q    And every other phone would have a number even though it may

```
1          not be the exact number?

2   A      Each telephone had an extension.

3   Q      Now, do you recall this Groundskeeper contractor -- or

4          Groundskeeper Company, did you recall seeing anybody from

5          the Groundskeeper Company at that facility on August 4th,

6          2009?

7   A      I don't recall the date I seen them.

8   Q      And that would have been the day the F.B.I. responded?

9   A      Yes.

10  Q      Okay.  Do you recall if they were there that day?

11  A      The Groundskeepers?

12  Q      Yeah.  Anybody affiliated with that company?

13  A      I don't recall that day outside.

14  Q      I'm sorry?

15  A      I don't recall that day outside.

16  Q      Okay.

17             MR. PIMSNER:  Thank you.

18             THE COURT:  Any -- well, any questions from the jury

19  for this witness?

20             All right, and I'll see counsel at sidebar, please.

21                          BENCH CONFERENCE

22             THE COURT:  19.  You can all look at it, and then we'll

23  talk about it.

24             MR. BOCK:  No objection.

25             MR. PIMSNER:  Yeah, she told us before court she can't
```

1    recognize anybody.  It's been too long.

2            THE COURT:  So do you want to ask that?

3            MR. PIMSNER:  Okay.

4            MR. BOCK:  Judge, can I ask one question of her,

5    because she said the other buildings -- can I just establish what

6    the other buildings might be?

7            THE COURT:  Sure.  I'll let you re-recross.  I'll let

8    you open your cross.

9            MR. BOCK:  Thank you.

10            (The bench conference was concluded.)

11            THE COURT:  All right, Mr. Pimsner, if you want to ask

12    that question of the jury.

13            And then, Mr. Bock, you have another question to ask

14    the witness, which you certainly may.

15                           EXAMINATION

16    BY MR. PIMSNER:

17    Q    And ma'am, this has to do with whether you can identify that

18         person today that you saw in the hallway that morning.

19         Could you see that person in the courtroom today?

20            Would you be able to recognize him?

21    A    Possibly.

22    Q    Okay.  Could you look around the courtroom and see if

23         there's any --

24    A    Can I stand up?

25    Q    Yes, please.  And look -- anybody look familiar to you?

1    A    Not from this angle, no.  I'm sorry.

2    Q    Okay.

3              THE COURT:  All right.

4              Mr -- any follow-up questions from counsel to that

5    question?

6              MR. PIMSNER:  No.

7              THE COURT:  From the government?

8              And Mr. Bock -- Mr. Pimsner, did you have a follow-up?

9              MR. PIMSNER:  No.

10             THE COURT:  All right.

11             Mr. Bock, did you have another question of the witness?

12   Go ahead.

13                         EXAMINATION

14   BY MR. BOCK:

15   Q    You said that people came sometimes, and -- to make -- to

16        bid on other buildings?

17   A    Um-um.

18   Q    Could you just share with the jury where your building was

19        located, and what some of the other buildings were?

20   A    My building's the main hospital, and off to the side there

21        were separate structures on the property.  I did not manage

22        those buildings.  There was one in the front, and one on the

23        side, and then my building.  So what they did if they didn't

24        want to pay my fees, they could bid their own jobs, but then

25        I would have to write the contract for them to hire.

1    Q    Were those all buildings associated with health care?

2    A    Yes.

3              MR. BOCK:  Thank you.

4              THE COURT:  All right.

5              Any additional questions from the jury?

6              All right, may this witness down and be excused?

7              MR. PIMSNER:  Yes, your Honor.

8              THE COURT:  Thank you, ma'am, you may step down and be

9    excused.

10                   ------------------------

11              (Charles Pickard was duly sworn by the clerk.)

12                        CHARLES PICKARD

13                      DIRECT EXAMINATION

14   BY MR. PIMSNER:

15   Q    Mr. Pickard, could you please state what your occupation is?

16   A    I am a police hazardous device -- excuse me, police

17        hazardous device technician for the Tucson Police

18        Department.

19   Q    And how long have you worked for the Tucson Police

20        Department?

21   A    I've been employed as a law enforcement officer with the

22        Tucson Police Department for 11 and a half years.

23   Q    And what type of duties have you held as Tucson police

24        officer?

25   A    I was a uniformed patrol officer for approximately five and

1          a half, six years.  I also served in a plain clothes

2          pseudo-undercover role for approximately a year in the

3          midtown patrol division.  I also served as a field training

4          officer, police instructor, and tactical flight officer with

5          our air unit prior to entering the bomb squad.

6     Q    At what point did you enter the bomb squad?

7     A    I entered the bomb squad in January, 2008, full time, and

8          I've been so employed since.

9     Q    Now, prior to entering the bomb squad, did you -- did you

10         have to receive additional trainings?

11    A    I did.  I trained with my unit full time for a year, after

12         which I attended the F.B.I. U.S. Army Hazardous Devices

13         School, which is the single school for bomb technicians in

14         the United States.

15    Q    And did you continue to receive training throughout since

16         you've been in the bomb squad regarding hazardous materials

17         and potential destructive devices?

18    A    Yes, I am.  I'm the unit's specialist in weapons of mass

19         destruction and hazardous materials.  And actually, prior to

20         becoming certified as a bomb technician, while on the bomb

21         squad I attended several Department of Homeland Security

22         courses giving me training in chemical, biological, and

23         nuclear weapons.

24    Q    And is -- as one of those courses did you also -- were you

25         taught on how to -- proper sampling techniques when you're

1          dealing with these various different types of chemicals, or

2          other compounds?

3   A      Yes.  In addition to becoming a certified hazardous

4          materials technician with the Tucson Fire Department I

5          attended courses in how to properly sample things downrange

6          during incidents.

7   Q      And so you would have also attended the firefighter school

8          regarding HAZMAT responses?

9   A      I did.  I'm a fully certified hazardous materials technician

10         and was taught that by the Tucson Fire Department.

11  Q      And is that common that all bomb squad members are -- also

12         have the HAZMAT certification through the fire academy?

13  A      No.  At the time I was the only member of my unit that had

14         attended that -- that training.

15  Q      And I wanted to bring your attention back to August 2nd,

16         2009.  Were you dispatched to a scene at that -- on that

17         date?

18  A      I was.  On August 2nd, 2009, I was off duty at home.  I was

19         called by my -- my immediate supervisor and told that the

20         sheriff's department needed assistance with a potential

21         weapon of mass destruction incident --

22              MR. BOCK:  Objection to that, your Honor.

23              THE COURT:  No, overruled.

24              THE WITNESS:  That occurred within Pima County.

25  BY MR. PIMSNER:

1   Q   And were you directed, then, to report to the scene?

2   A   I was.  I was told the -- the address of where the scene was

3       located.  I used my response truck, which I keep at home

4       with me while I'm off duty, and responded straight to the

5       scene using emergency equipment.

6   Q   And where -- where did you -- where was the incident at?

7   A   The incident was located -- I believe the address was 2870

8       West Magee, just north of Magee Road near Shannon.

9   Q   Now, who did you report to when you arrived?

10   A   I reported -- well, I was told by my supervisor when I was

11       dispatched to report to Sergeant Chris Rogers of the Pima

12       County Sheriff's Department Bomb Squad.

13   Q   Okay.  And once you arrived, did you report to Sergeant

14       Rogers?

15   A   I did.

16   Q   And approximately what time do you think you arrived?

17   A   I believe I received the call around 10:00.  I think I

18       arrived somewhere in the neighborhood of 10:30, 10:40.

19       Somewhere around there.

20   Q   And were you given direction and assignments by Sergeant

21       Rogers?

22   A   I was.  Sergeant Rogers knew that I was the only bomb

23       technician in Pima County at that time that had advanced

24       training in chemical and HAZMAT scenes, and he assigned me

25       as the HAZMAT liaison between the fire department HAZMAT

1   team and the bomb technicians who were on scene.

2 Q Now, at some point during your -- during your deployment

3   that morning, was -- was there a decision to use robots to

4   further investigate the scene?

5 A There was.  The sheriff's department had several robot

6   platforms that were already on the scene.  My coworkers were

7   also bringing additional robot platforms to the scene, and

8   we made the decision to use some small robots to go in

9   initially to survey the scene, and then to also take

10   readings from the scene.

11 Q And did you help set up those robots?

12 A I did.

13 Q Did at least one or more of the robots -- were there

14   monitoring devices attached to those robots so to -- to

15   sample air quality?

16 A There was.  The -- the initial robot that I drove downrange

17   was kind of our first look at the scene, and then we

18   outfitted -- I assisted in outfitting a second smaller robot

19   with air monitoring equipment that was then taken downrange

20   to be able to take readings at the scene.

21 Q And did you actually operate the robot that would have

22   traveled downrange for the initial recon?

23 A I operated the initial robot that went downrange to survey

24   the scene.  The second robot carrying the air monitoring

25   equipment I did not operate.

1  Q    And approximately what time did you operate the first recon

2       robot?

3  A    The first robot that I operated was at 11:30.

4  Q    Okay.  And -- and how long was that robot deployed?

5  A    I believe according to the log that we kept it was -- it was

6       downrange for approximately 25 minutes.

7  Q    And did you utilize a second robot that day?

8  A    We did.  There was a second smaller robot platform outfitted

9       with the air monitoring equipment that was sent down, and

10      then there was a third larger robot platform that I operated

11      in order to take diagnostics on a -- on a --

12 Q    So you didn't operate the second smaller robot with the air

13      equipment -- the air monitoring, correct?

14 A    I didn't, no.

15 Q    So you operated the first small robot, and then a second --

16      a third robot that was deployed?

17 A    Right, the third larger robot that was deployed.

18 Q    And did that robot have any special diagnostic equipment

19      attached to it?

20 A    That robot we had outfitted with a portable x-ray machine so

21      that we could take and view x-rays of things downrange.

22 Q    And did you -- was there any suspicious items that you felt

23      necessary to x-ray at that point?

24 A    There was.  We were concerned about an overturned plastic

25      bucket in the front yard, and that was what I was directed

1                to go down and take an x-ray of.

2       Q    And did you in fact drive the large robot into the area of

3            that bucket out front, the upside down bucket out front?

4       A    I did.

5       Q    And did you x-ray it?

6       A    I did.  We used the equipment outfitted on the robot to take

7            an x-ray.  We were able to see a real time image on the

8            screen of what was being x-rayed.

9       Q    And what were you looking for?

10      A    My training teaches me to look for components having to do

11           with improvised explosive devices, chemical dispersion

12           devices, anything that is hazardous in nature.

13      Q    And did you see anything when you x-rayed -- anything

14           unusual when you x-rayed that bucket?

15      A    The only thing that was visible to us on the x-ray was a

16           solid mass in the bottom portion of the bucket.

17      Q    At that point was there -- what decision was made regarding

18           how -- how to treat that bucket?

19      A    Because all we saw in the x-ray was a solid mass of a

20           consistent density, it appeared to be just a single

21           substance inside the bucket, it didn't appear to be

22           mechanically hazardous, we decided to overturn the bucket

23           with a smaller robot while I observed with the larger robot.

24      Q    And -- and what happened as a result of overturning that

25           bucket?

1  A    When the smaller robot overturned the bucket, I was able to

2       see, as was the operator of the smaller robot, that there

3       was a -- a white powdery like cake that had come out of the

4       bottom of the bucket.

5  Q    And did -- and where that -- where that white powdery cake

6       came out, is that where it remained until a later time?

7  A    Yes.

8  Q    Now, at some point were all the robots brought back from the

9       analysis and the -- the surveillance of the -- of the

10      reconnaissance of the scene?

11  A   They were.  All robots were eventuality brought back, and as

12      they were brought back they were decontaminated through the

13      decon line that the fire department had set up for us.

14  Q   Now, what was your next assignment in connection with this

15      investigation?

16  A   Later that afternoon I was assigned with Deputy Jeff Craven

17      to put on a HAZMAT suit and go downrange and actually take

18      samples of the things in the front and the back yard.

19  Q   Now, we've heard -- the jury and I have heard testimony

20      regarding the Level A HAZMAT suits.  What kind of HAZMAT

21      suit did you deploy that day?

22  A   We talked over whether or not we should wear either a Level

23      A or a Level B suit.  Typically in an incident involving

24      where we've received levels of chlorine, we want to stay

25      with a Level A suit.  We made the decision that -- because

1    many hours had passed since they had gotten readings and we

2    were going to be staying outside, not going inside, we made

3    the decision to don Level B HAZMAT suits.

4  Q  And why was there concern about the chlorine that you just

5    mentioned?

6  A  They -- the fire department had received readings earlier in

7    the day indicating chlorine levels.

8  Q  Why -- why would you be concerned about a level of chlorine

9    based on your training and experience?

10 A  Because chlorine is extremely hazardous at low levels, and

11   it requires the highest level of HAZMAT protection,

12   typically a Level A suit which is the most protection you

13   can get from a HAZMAT suit.  It needs to be vapor tight.

14 Q  And what's the difference between a Level A and a Level B

15   HAZMAT suit?

16 A  A Level B is very similar to a Level A, especially the ones

17   that we use on real incidents.  There are training suits

18   that are not as substantial, but on real incidents the Level

19   B is not technically vapor tight, but very similar to the

20   Level A.  The Level A is a fully encapsulated vapor tight

21   suit that you wear an air pack underneath the suit.  Level B

22   typically is still a very substantial suit, but is not

23   technically vapor tight.  And typically your air pack is

24   worn over the top of the suit.  You still have multiple

25   layers of gloves, boots, and things like that, an air mask,

1        an air pack on the outside, and everything is taped so that

2        nothing is getting in.

3    Q   So you still seal up every opening that skin can be exposed

4        to, correct?

5    A   Absolutely.

6    Q   Now, at what point were you sent into the -- the evidence

7        zone to begin the process of sample collection?

8    A   Let me refer to my -- my schedule outline here.

9            It looks like we made entry into the scene in HAZMAT

10       suits at 4:15 in the afternoon.

11   Q   So 4:15, afternoon, and you were aware that the initial

12       response came in at near 5:00 a.m. that morning?

13   A   Yes, I was told that shortly before 5:00 a.m. is when the

14       scene started, and 4 -- 4:15 was when I went in.

15   Q   And what type of equipment did you have with you to collect

16       and preserve the samples?

17   A   I had a kit that we made up composed basically of -- of a

18       container with several small sampling containers inside

19       consisting of evidence grade small glass jars, baggies,

20       marking equipment, things that I could seal evidentiary

21       samples into.

22   Q   And both you and Deputy Craven entered the -- the scene?

23   A   We did.  We entered the scene.  We had two HAZMAT

24       firefighters that were trailing behind us as safety in case

25       one of us went down for any kind of a medical reason.  It

1  was extremely hot that day, and we were concerned about

2  people being heat casualties.

3 Q And tell us what was the method that you used to collect the

4  samples?

5 A The method is consistent with the training from the

6  Department of Homeland Security in WMD sampling.  And what

7  it involves is two people.  The first person they refer to

8  as the dirty man actually scoops the sample, turns and hands

9  it in a horizontal direction to what they call the clean man

10  who is holding the open jar.  The sample goes into the jar,

11  and then the clean man, which was my function, seals,

12  labels, and packages the jar.  That way you have one person

13  who's interacting with the substance, and the second person

14  who's actually taking it, collecting it, labeling it, and

15  keeping it until it goes out of the hot zone.

16 Q And Deputy Craven would have been the one that actually

17  would have been retrieving the samples and handing them to

18  you horizontally for you to secure in the clean zone?

19 A Correct.  That's correct.

20 Q And after you secured a sample, what would you do next?

21 A Once we secure a sample, we change gloves.  Typically, we'll

22  put on several layers of gloves so as we go we'll strip off

23  one layer of gloves so that we have a clean layer of gloves

24  to take the next sample.

25 Q And is that what you did in this case?

1   A    Yes.

2   Q    Now, could you tell us what was the first item that you

3        would have sampled and retrieved a sample from that day?

4   A    Deputy Craven and I went to the back yard area first,

5        entered the back yard area, and I believe the very first

6        sample we took -- or the first piece of evidence we

7        collected was a white mesh bag.

8   Q    Okay.  And what was significant about that mesh bag?

9   A    The white mesh bag was laying on the back patio area, and it

10       had a white powder inside of it and -- and spread around the

11       outside of it.

12  Q    Did you also attempt to sample the -- the powder that was

13       either inside the mesh bag, or around that area?

14  A    We did.  We took -- we took the mesh bag itself.  We also

15       took a sample of the white powder that looked like it had

16       come from the mesh bag that was laying immediately adjacent

17       to it on the patio.  And then we also took a sample of the

18       sort of sludgy material that was near the partially melted

19       bucket on the back patio.

20  Q    And these would have been three different -- you would have

21       secured these in three different evidence containers?

22  A    Yes.

23  Q    Did you then move -- and so you said the third sample would

24       have been -- describe the sludge area a little more for us,

25       please.

1  A    On the back porch was a bucket we later identified as a
2       chlorine tab bucket that was partially melted, and it had
3       kind of an orange sludge that had come out of it and was
4       laying around the outside of it.
5  Q    And you would have sampled the actual sludge part of that
6       the orangish sludge area?
7  A    Yes.
8  Q    And again, you would have sealed that in an evidentiary type
9       container?
10 A    Each sample we sealed in -- in the glass container, and then
11      I overpacked it in a plastic bag.
12 Q    Now, did you move around front at that point?
13 A    We did.  Once we were finished with the sampling in the
14      back, we moved around to the front yard and proceeded to
15      sample from things in the front yard.
16 Q    And what was the first thing that you sampled up front?
17 A    I believe that the first thing we sampled out front was
18      the -- may have been the orange sludge from the -- the same
19      type of thing in the front yard.
20 Q    And where was that located?
21 A    That was right up against the garage door.
22 Q    And again, it was the same procedure.  Deputy Craven was in
23      the hot zone, and you were collecting the sample in the cold
24      zone?
25 A    Well, we're both in the -- we're both in the hot zone,

1   because until you cross decon at the edge of the scene,

2   you're still in the hot zone technically.  But Deputy Craven

3   was actually doing the scooping and handing it over to me so

4   that I wasn't actually getting dirty, and I was sealing the

5   samples.

6  Q   And what else did you sample in the front area?

7  A   We also sampled -- we took a sample of -- there were

8   styrofoam packing peanuts spread throughout the front yard.

9   Most of them were coated in like an oily viscous fluid.  We

10  took a sample of that, one of the packing peanuts covered

11  with the fluid.  And then we also took a sample of the white

12  powdery cake that had come from the bucket that I x-rayed

13  earlier.

14 Q   And did that constitute the chemical related samples that

15  you took that day?

16 A   Yes.

17 Q   And once you took those samples, what did you do with them?

18 A   Once the samples were sealed, like I indicated in the glass

19  jars and then each one in its own bag, they were put back

20  into the bucket that I had.  We carried them through the

21  decon line, decontamination line that the fire department

22  had set up.  This involves going through several pools where

23  we're washed of hazardous materials.  I had the bucket with

24  me, set it off to the side, and it was turned over to Agent

25  Nowak with the F.B.I.

1   Q    So the F.B.I. would have taken control of those samples at

2        that point?

3   A    Yes.

4        MR. PIMSNER:  I have nothing further at this time, your

5   Honor.

6        THE COURT:  Cross-examination?

7                           CROSS-EXAMINATION

8   BY MR. BOCK:

9   Q    Officer Pickard, you say that you were there for the robot

10       activity, is that correct?

11  A    Yes, sir.

12  Q    And the length of the robot activity was roughly from when

13       to when?

14  A    I believe the robots were deployed somewhere after the time

15       the bomb technicians arrived, around 10:30 or so, and we had

16       robots going downrange all day long for various different

17       purposes.  At one point I think we had three or four robots

18       deployed into the hot zone at once.

19  Q    And was Sergeant Rogers there the whole time?

20  A    Sergeant Rogers was on scene with us the entire time.

21  Q    What was his responsibility?

22  A    Sergeant Rogers was the incident commander for the bomb

23       technician portion of the operation.

24  Q    Was he running any of the robots?

25  A    He may have been.  I don't recall.

1    Q    So of the three robots, how many of the three robots had a
2         device that would measure what -- what might be present in
3         the air?
4    A    I remember specifically helping to outfit one small robot
5         towards the beginning of when we responded with those
6         instruments for air monitoring, and I believe they may have
7         put some -- some devices on some other robots also, but I
8         only recall the one that I had direct contact with.
9    Q    And the device was the MultiRAE device?
10   A    One of the instruments that was put on the robot that I
11        assisted with was a MultiRAE, yes, sir.
12   Q    Were there instruments other than the MultiRAE device?
13   A    There was also a radiation monitor that we put on the robot
14        that I helped with.
15   Q    Now, the fire department -- did they have their own MultiRAE
16        devices with --
17   A    Yes.
18   Q    Okay.  Did you see the fire department using MultiRAE
19        devices also?
20   A    I know they had MultiRAEs on scene.  I'm not sure whether it
21        was the fire department or the sheriff's department
22        MultiRAEs that were --
23   Q    And the fire department was sharing their information
24        with -- with Sergeant Rogers and with you too, is that
25        correct?

1    A    That's correct.  We had everybody together so we could share

2         information between the agencies.

3    Q    Now, you didn't field test -- did you field test the -- the

4         contents of the bucket, or the sludge?

5    A    I didn't field test anything, no, sir.

6    Q    And you're familiar that sometimes when officers make

7         purchases of narcotics in an undercover capacity, they can

8         do a field test to see if in fact it's marijuana, or

9         cocaine, or whatever, is that correct?

10   A    Yes, sir, I'm familiar with the narcotics tests.

11   Q    Okay, but we didn't have any type of those tests available

12        for purposes of your participation?

13   A    No, sir.  I didn't use any type of field test.

14   Q    Are there any type of field tests -- excuse my ignorance,

15        but are there any type of field tests that are available?

16   A    Outside of using an actual electronic meter, I don't know of

17        any specifically.

18   Q    Okay.

19             MR. BOCK:  Thank you, Judge.

20             THE COURT:  Yes.

21             Any redirect?

22             MR. PIMSNER:  One moment, your Honor, please?

23             THE COURT:  Yes.

24             MR. PIMSNER:  Nothing further, your Honor.  Thank you.

25             THE COURT:  All right.

1              Any questions from the jury for this witness?

2              All right.  Thank you, sir, you may step down.

3                      ------------------------

4              (Edward Curtin was duly sworn by the clerk.)

5                           EDWARD CURTIN

6                        DIRECT EXAMINATION

7   BY MS. ANDERSON:

8   Q    Sir, are you employed?

9   A    I'm a deputy sheriff with the Pima County Sheriff's

10       Department.

11  Q    How long have you been so employed?

12  A    For 16 years.

13  Q    What are some of the various assignments that you've had

14       over the years?

15  A    My first assignment after the academy and field training

16       program was patrol, where I was basically responding to

17       calls for service, 9-1-1 calls.  I did that for about four

18       and a half years, and then since July of 2001 I've been a

19       member of the department's traffic unit, still a member of

20       that unit now.  Our main function is the investigation of

21       serious and fatal vehicle collisions, as well as DUI and

22       traffic enforcement.

23  Q    Were you employed by the Pima County Sheriff's Department

24       and on duty on August 4th of 2009?

25  A    Yes.

1  Q  I'm sorry.  I meant August 2nd, 2009?

2  A  Yes.

3  Q  Now, you were assigned to the traffic unit that particular

4     day, were you not?

5  A  Yes, I was.

6  Q  On that day were you dispatched to the Levine residence

7     on -- on Magee?

8  A  Yes, I was.

9  Q  Do you recalling the exact address?

10 A  I don't.  I do not.  It was 2000 something West Magee.

11 Q  2870, correct?

12 A  Yes.

13 Q  Now, when you arrived at that location, who did you talk to

14    to get your assignment?

15 A  I first made contact with one of our sergeants, Sergeant

16    Chris Rogers.

17 Q  And did he tell you what your assignment was?

18 A  Yes.

19 Q  What was that?

20 A  He requested me to create a scaled diagram of the scene.

21 Q  Could you explain to us how it is that you create a scale

22    diagram?

23 A  There's a couple different ways.  The easiest way is using a

24    global positioning system.  The sheriff's department has

25    purchased one.  It's mainly used for our collision scenes,

1        however it's available to any detective unit for us to go

2        and map a crime scene for them.  In this particular case

3        that system was not working, so I had -- had to do it the

4        old fashioned way, which basically is using tape measures.

5        If you can remember back to high school geometry class your

6        X and Y access is basically a system similar to that that

7        we're able to take measurements to create the diagram.

8   Q    Did you have another deputy assisting you?

9   A    Yes Deputy Dixon.

10            MS. ANDERSON:  Could we take a look at Government's

11   Exhibit Number 265?

12            Can we rotate that document?

13            Thank you.

14   BY MS. ANDERSON:

15   Q    Sir, do you recognize Government's Exhibit 265?

16   A    Yes, I do.

17   Q    What is that?

18   A    That is the scaled diagram that I created from the

19        measurements I took in this case.

20            MS. ANDERSON:  Government moves for admission of

21   Exhibit 265.

22            MR. BOCK:  No objection.

23            THE COURT:  265 is admitted.

24   BY MS. ANDERSON:

25   Q    Let's take a look at it, Deputy Curtin.

1            Now, do you use a particular reference point when

2       you're taking measurements?

3   A   Yes, we do.

4   Q   What did you use as the reference point?

5   A   The corner of the wall, which is located on the -- kind of

6       the lower left of the diagram.

7   Q   Where we see the word wall?

8   A   Yes.  Where that intersects with the driveway, basically.

9   Q   Now, how did you know what items to diagram, or to place on

10      your diagram?

11  A   When I had first arrived there and spoke with Sergeant

12      Rogers, he had stated that evidence placards, which are

13      basically just yellow either numbers or letters that are

14      placed out, would be there.  The evidence itself had been

15      collected by the time I had already gone over to take the

16      measurements, but the placards were still there.  So I was

17      told to measure -- or take measurements for those evidence

18      items, as well as the structure of the residence itself.

19  Q   What time did you arrive at the scene, do you recall?

20  A   I believe it was about 5:15 p.m. I got called out to go

21      there, so probably quarter to 6 or 6:00 p.m.

22  Q   So you were in the front and the back of the house, is that

23      correct?

24  A   Yes.

25  Q   When you were in the back of the house, did you notice

1       something unusual?

2   A   Yes, I did.

3   Q   What did you notice?

4   A   It was a very strong smell that to me smelled like chlorine

5       from, like, say an over-chlorinated pool.  It was just very

6       strong, and -- and almost to point of overwhelming.

7   Q   Did you have to use any kind of protection to assist you in

8       breathing?

9   A   No.  No, Sergeant Rogers had explained prior to me going

10      there that that smell would be there.  However, prior --

11      prior to that time the area had been deemed safe.

12          MS. ANDERSON:  All right.  May I have a moment, your

13  Honor?

14          THE COURT:  Yes.

15  BY MS. ANDERSON:

16  Q   Would there have been a corresponding sheet that explains

17      what each piece of evidence would be?

18  A   You mean what each thing is?

19  Q   Exactly.

20  A   Not that I'm aware of.  I was not provided that information.

21      I just -- when I took my measurements, I just labeled what

22      the placard said, 1, 2, 3, A, B, C.  Whatever it said.

23  Q   So you would have measured from the reference point to item

24      A, B, C or D, is that correct?

25  A   Yes.

1          MS. ANDERSON:  That's all I have.

2          THE COURT:  Cross-examination?

3                    CROSS-EXAMINATION

4     BY MR. BOCK:

5     Q    Deputy, did you go inside the house at all?

6     A    No, I did not.

7     Q    Did you see -- you went -- you had contact with the -- the

8          entry walk, did you not?

9     A    In the front?

10    Q    Yes.

11    A    Yes.

12    Q    Was there -- and you knew where the garage was, obviously

13         you saw that?

14    A    Yes, I did.

15    Q    Was there any passage from the entry walk into the garage?

16    A    I don't recall if there was or not.

17         MR. BOCK:  Thank you, Judge.

18         THE COURT:  All right.

19         Any redirect?

20         MS. ANDERSON:  No, your Honor.

21         THE COURT:  Any questions from the jury for this

22    witness.

23         All right.  Thank you, sir.  You may step down.

24              -------------------------

25         (Scott Hunter was duly sworn by the clerk.)

```
1                            SCOTT HUNTER

2                          DIRECT EXAMINATION

3    BY MS. ANDERSON:

4    Q    Sir, are you employed?

5    A    Yes.

6    Q    Who do you work for?

7    A    I work for the Federal Bureau of Investigation.

8    Q    You're a special agent, correct?

9    A    Yes.

10   Q    How long have you been so employed?

11   A    Over 13 years.

12            THE COURT:  Ms. Anderson, just a minute.  Mr. Bock

13   needs new headsets.  Hold on just a minute.

14            All right, you may proceed, Ms. Anderson.

15   BY MS. ANDERSON:

16   Q    I'm sorry, how long have you been employed with the F.B.I.?

17   A    Over 13 years.

18   Q    Could you explain to us what some of the assignments are

19        that you've held over the years?

20   A    Primarily, it's working Indian Country, Indian Country agent

21        as a violent crime major offense squad member.  That is

22        essentially what I've done.

23   Q    Is that the unit that you're currently assigned to?

24   A    Yes.

25   Q    Do you have any other additional responsibilities with the
```

1        F.B.I.?

2    A   Yes, I do.

3    Q   And could you explain to us what those are?

4    A   I'm the team leader for the evidence response team.

5    Q   Could you explain to us what the evidence response team is?

6    A   The evidence response team is a team of individuals who are

7        trained to systematically enter a scene, location, and

8        systematically document it, and identify and collect

9        potential items of evidence.

10   Q   Now, what do you do as the team leader for that unit?

11   A   I organize the process.

12   Q   So if I understand correctly, every time there's any kind of

13       a search, or any kind of evidence that's being gathered by

14       the F.B.I., that's done by the evidence response team, is

15       that correct?

16   A   In -- in most cases.

17   Q   And you yourself as the leader is somebody that organizes it

18       and gives out various assignments, is that correct?

19   A   Yes.

20   Q   Now, let's talk about this particular case.  Let's talk

21       about August 2nd of 2009.

22           Were you called to the Levine residence at 2870 West

23       Magee Road here in Tucson?

24   A   Yes.

25   Q   Do you recall what time you got to the scene?

```
 1   A      It was about 4:00 p.m.
 2   Q      Now, by the time you got there, the sheriff's department and
 3          other agencies had collected a lot of the various items of
 4          evidence, is that correct?
 5   A      Yes.
 6   Q      And they turned it over to you or other members of the
 7          F.B.I., is that right?
 8   A      Yes.
 9   Q      Now, let's go through some of those items.
10              I'm going to show you --
11              MS. ANDERSON:  And may we use the ELMO for this?
12              (No verbal response.)
13              MS. ANDERSON:  Thank you.
14   BY MS. ANDERSON:
15   Q      Special Agent Hunter, this is Government's Exhibit Number
16          600.  Do you recognize this?
17   A      Yes.
18   Q      And what do you recognize that as being?
19   A      It is a report that I generated based upon a response on
20          August 2nd of '09.
21   Q      All right.  Now, you made a log of the various items of
22          evidence, did you not?
23   A      Yes, I did.
24   Q      And that's the second page of Government's Exhibit Number
25          600, and I apologize that it's rotated but you recognize
```

1       that, correct?

2    A    Yes.

3    Q    Now, did you make this -- this document yourself?

4    A    Yes, I did.

5    Q    And what's the purpose of making this document?

6    A    The purpose is to identify the items that we've recovered as

7         potential items of evidence, where they were found, who

8         found them, how we packaged them, and other methods to

9         identify those things.

10   Q    Now, in going through the items of evidence that were seized

11        on August 2nd 2009, would it assist you if you had your

12        report in front of you?

13   A    Yes.

14            MS. ANDERSON:  Your Honor, may I approach?

15            THE COURT:  Yes.

16   BY MS. ANDERSON:

17   Q    Let's through Government's Exhibit 600 and talk about the

18        various items that were seized and turned over to the F.B.I.

19            Item 1 is a mesh bag, is that correct?

20   A    Yes.

21   Q    And do you recall where that mesh bag was when it was

22        seized?

23   A    It was found on the back porch.

24   Q    What did that mesh bag contain?

25   A    A white powder.

1    Q    How about item number 2?  What was that?

2    A    Item 2 is white powder as well, recovered from the back

3         porch.

4    Q    And item number 3?

5    A    Foam peanuts.

6    Q    Do you recall the condition of those foam peanuts when they

7         were taken into evidence?

8    A    Other than the fact that -- no, I don't.  No, I don't

9         recall.

10   Q    How about item number 4?  What was that?

11   A    Sludge.

12   Q    From what area on the property, do you recall?

13   A    Front yard.

14   Q    And were these items taken in by Officer Charles Pickard

15        from TPD?

16   A    Yes.

17   Q    Item number 5 was -- was what?  Could you describe that for

18        us?

19   A    A brownish residue.

20   Q    Item number 6?

21   A    White cake.

22   Q    In what location?

23   A    Front yard.  The side of the front yard.

24   Q    Item number 7?

25   A    It's a white five-gallon plastic bucket.

1  Q    From what location?

2  A    From a sidewalk of the residence.

3  Q    How about item number 8?

4  A    Orange five-gallon with white residue, bucket lid.

5  Q    That was the bucket lid, correct?

6  A    Yes.

7  Q    And item number 9?

8  A    It's orange expanding foam.

9  Q    From what location?

10 A    Outside the garage door.

11 Q    Okay.  And item number 10?

12 A    Orange expanding foam.

13 Q    From what location?

14 A    Outside the front door.

15 Q    And number 11?

16 A    A spray nozzle tip.

17 Q    Number 12?

18 A    A screw bottle cap.

19 Q    Item 13?

20 A    Tinfoil.

21 Q    Item 14?

22 A    White t-shirt.

23 Q    And item 15?

24 A    A white envelope, documents with the name Michelle Fuentes

25      and Caesar Fuero.

1   Q   Item number 16?

2   A   Black day planner with the name of Michelle Fuentes.

3   Q   And item number 17?

4   A   A five-gallon bucket.

5   Q   Now, these items were -- were taken into F.B.I. custody by

6       either you or another agent and secured, were they not?

7   A   Yes.

8   Q   And some of these items were ultimately sent off to the

9       F.B.I. Lab for analysis, is that --

10  A   Yes.

11  Q   -- true?

12          Now, on August 21st, 2009, you and other members of the

13      evidence response team responded back to the Levine

14      residence, is that correct?

15  A   Yes.

16  Q   Do you recall what the -- what your purpose was in

17      responding back to the Levine residence?

18  A   To take a look at some control boxes.

19  Q   What are control boxes?

20  A   Big metal boxes with electrical wires going into them.

21  Q   Okay.  And why was -- why was it that you wanted to take a

22      look at those?

23  A   To see if there was anything that we could find that would

24      represent tampering.

25  Q   Did you find any evidence of tampering?

1  A    No.  No latent prints of value were found.

2  Q    So you were looking for latent prints, correct, and none

3       were found, is that true?

4  A    True.

5  Q    Next, on October 27th of 2009 you and again other members of

6       the evidence response team went to the Pima County evidence

7       control to assist F.B.I. latent print examiner Drew Sites in

8       examining a five-gallon bucket, is that correct?

9  A    Yes.

10 Q    And do you know which five-gallon bucket that was?

11 A    That was item 17.

12 Q    Which according to your list was found where?

13 A    It was found on the back porch of the residence.

14 Q    Now, were there any latents of value found on item 17?

15 A    To my knowledge, from that -- from that bucket, no.

16 Q    Now, on May 13th of 2011 you responded to the defendant's

17      residence located at 5560 West El Camino Del Cerro here in

18      Tucson, is that correct?

19 A    Yes.

20 Q    And again, you were acting in your capacity as the team

21      leader for the evidence response team?

22 A    Yes.

23 Q    Now, is that when the search warrant was executed on the

24      defendant's house?

25 A    Yes.

1    Q    The search was conducted by the F.B.I. and other law

2         enforcement members, is that correct?

3    A    Yes.

4    Q    Can you tell us approximately how many law enforcement

5         agents were on the scene?

6    A    I think we had over 20 in the end.

7    Q    How is it that you organize a search warrant execution?

8    A    Generally, when we arrive on scene -- in this particular

9         instance the house had already been entered I believe by

10        SWAT and hazardous materials team.  They went ahead and

11        cleared the scene for us to make sure that it's safe for us

12        to actually go -- go into.  One of the first things that I

13        will do is go ahead and do a preliminary walk-through and

14        get an idea of what the scene consists of, what -- the

15        nature of -- of the scene, and -- so I can get an idea of

16        how to assign the personnel to -- to accomplish the task.

17        Once that is done, I'll brief the team and the photographer

18        will take over all photos of the scene before we actually go

19        in and begin searching the residence for potential evidence.

20   Q    Did you have a specialized agent ready to assist in the

21        event that there were any computers that were found?

22   A    Yes.

23   Q    And who was that?

24   A    That's a CART examiner, Christopher Pahl.

25   Q    Okay, and so I take it that you did the briefing as you've

```
 1            described for us, correct?
 2    A       Yes.
 3    Q       And then do you systematically go through the house
 4            one-by-one, or do you assign various agents to various rooms
 5            and they simultaneously search?
 6    A       Well, we go by one-by-one, but I'll send a team of agents
 7            into each location, each room, send two into the kitchen,
 8            two into a living room, two into -- depending on how many
 9            bodies and resources I have available.  In this particular
10            location I was actually having individuals search the
11            vehicles at the same time, so there was a lot to do.
12    Q       I'm going to show you Government's Exhibit Number 601, and
13            I'm going to ask you to take a look at it.
14                 Do you recognize that?
15    A       Yes, I do.
16    Q       What is that?
17    A       That's a sketch of the residence.
18    Q       And that's the -- the residence of 5560 West El Camino Del
19            Cerro in Tucson, correct?
20    A       Yes.
21    Q       Let me show you the second page.
22                 Do you recognize that?
23    A       It looks like the overall area surrounding the residence.
24    Q       Who would have drawn this diagram?
25    A       The person I assigned to that task is Theo Calamenes.
```

1  Q    And he's a member of the F.B.I., correct?

2  A    Yes.

3          MS. ANDERSON:  At this time the government moves for

4  admission of Exhibit 601.

5          MR. BOCK:  No objection, your Honor.

6          THE COURT:  All right, 601 is admitted.

7  BY MS. ANDERSON:

8  Q    Are you familiar with the individual bedrooms in

9       Government's Exhibit 601, and the individual rooms

10      themselves?

11 A    Yes.

12 Q    Now, what's been marked as Room A, could you describe for us

13      what that is?

14 A    Room A is the large semi-detached garage where there were a

15      bunch of workshop power washers, that kind of thing, and

16      other supplies for running a business.

17 Q    Next to it is another room that looks like it says cabinet,

18      correct?

19 A    That's carport.

20 Q    Oh, carport.  Okay.

21          And then we have Room B.  What kind of a room was that?

22 A    That's the garage.

23 Q    Okay.  And Room C?

24 A    That is the kitchen.

25 Q    Room D and Room E?

1  A    If I recall correctly, that was the living room and kind of

2       a den.

3  Q    Room F?

4  A    A lanai.  Kind of covered patio, enclosed patio.

5  Q    Okay, and next is H?

6  A    If I remember correctly, that was a bedroom.  It had a safe

7       in it.

8  Q    Room I?

9  A    Master bedroom.

10 Q    J?

11 A    I think that might be a walk-in closet.

12 Q    And K?

13 A    And I think that is the computer room.

14 Q    Okay.  Now, let's talk about the various items that were

15      seized.  First of all, there are some computer items that

16      were seized, correct?

17 A    Yes.

18 Q    And once again, you have Special Agent Christopher Pahl,

19      who's a computer forensic expert who was there to assist in

20      seizing the computer related items, is that correct?

21 A    Yes.

22 Q    Let's take a look at some of these.

23          This is Government's Exhibit Number 331, which hasn't

24      yet been admitted.

25          Do you recognize that?

1    A    It's item 1, medium range shot.

2    Q    And we see a placard card on what particular item?

3    A    Laptop computer.

4    Q    And which laptop is that?

5    A    It would be the Compaq Presario 2100.

6    Q    And that's item 1 on your evidence sheet, isn't that

7         correct?

8    A    Yes.

9    Q    Okay.  And according to your evidence sheet, where was that

10        particular piece of evidence found?

11   A    Room K on the floor.

12            MS. ANDERSON:  Government moves for admission of

13   Exhibit 331.

14            THE COURT:  Any objection, Mr. Bock, or do you need a

15   minute?

16            MR. BOCK:  May I approach, your Honor?

17            THE COURT:  Yes.

18                         BENCH CONFERENCE

19            MR. BOCK:  Judge, you know, I got this -- the witness

20   has testified, but I don't have copies of these photos and it's

21   not on their exhibit list.  I didn't see copies in my book.

22            MS. ANDERSON:  They're not in the exhibit book, your

23   Honor.

24            THE COURT:  Oh, they're not?

25            MS. ANDERSON:  No.  We're adding them.  But these were

 1  disclosed.  These were the search warrant photos.  These were

 2  disclosed to you a long time ago.

 3           MR. BOCK:  On a disk?

 4           MS. ANDERSON:  Yeah, on a disk.

 5           THE COURT:  This is 231?

 6           MS. ANDERSON:  331.  Actually, I think we have copies

 7  for you, but these were disclosed a long time ago.

 8           MR. BOCK:  Well, if they were on the disk, can I get a

 9  copy while we're --

10           MS. ANDERSON:  Yeah.

11           THE COURT:  Okay, great.  Thank you.

12           (The bench conference was concluded.)

13           THE COURT:  All right, and Ms. Anderson you may

14  proceed.  This was Exhibit 331, and let's see, Mr. Bock, if you

15  want to take look and let me know if you have any objection.

16           MR. BOCK:  No objection, your Honor.

17           THE COURT:  All right, 331 is admitted.

18  BY MS. ANDERSON:

19  Q    This is a close-up of Government's -- this is Government's

20       Exhibit 332, which is a close-up of item number 1, correct?

21  A    Correct.

22  Q    And that, again, is the Compaq Presario laptop?

23  A    Yes.

24           MS. ANDERSON:  Government moves for admission of 332.

25           MR. BOCK:  Judge, as to the photos -- but this is all

1    subject to my previous record.

2              THE COURT:  Sure.  All right, so you have a continuing

3    objection, and I'll go ahead and -- if I don't hear from you,

4    I'll go ahead and admit the exhibit.

5              So 332 is admitted subject to Mr. Bock's continuing

6    objection.

7    BY MS. ANDERSON:

8    Q    This is Government's Exhibit 333, and Government's Exhibit

9         334.

10             Do you recognize those items?

11   A    Yes, it's medium range and close-up of the Hewlet Packard

12        laptop.

13   Q    And that's item number 2, correct?

14   A    Yes.

15   Q    And where was that item found?

16   A    That was listed as Room K on desk.

17             MS. ANDERSON:  Government moves for admission of

18   Exhibits 333 and 334.

19             THE COURT:  333 and 334 are admitted.

20             MS. ANDERSON:  May I publish them, your Honor?

21             THE COURT:  Yes.

22             MS. ANDERSON:  333 and 334.

23   BY MS. ANDERSON:

24   Q    Next I'm going to show you Government's Exhibit Number 335

25        and 336, and I'm going to ask you if you recognize these.

```
 1                    That's 335, and that's 336.

 2                    Do you recognize those?

 3   A     Yes.

 4   Q     And what are those?

 5   A     It's a medium range and close-up shot of a generic computer.

 6   Q     And that's a -- an Aspire desktop computer, correct?

 7   A     Yes.

 8   Q     And that was item number 3 on your list, correct?

 9   A     Yes.

10   Q     And where was item number 3 found?

11   A     Room K under desk.

12               MS. ANDERSON:  Government moves for admission of

13   Exhibits 335 and 336.

14               THE COURT:  335 and 336 are admitted.

15               MS. ANDERSON:  May I publish them, your Honor?

16               THE COURT:  Absolutely.

17               MS. ANDERSON:  335, and that's 336.

18   BY MS. ANDERSON:

19   Q     Next let's take a look at Government's Exhibit 337 and 338.

20                    This is 337.

21                    Do you recognize what's shown in this photo here?

22   A     Yes.

23   Q     And what is that?

24               MR. BOCK:  Judge -- your Honor, I have a more specific

25   objection as to this one.
```

1    THE COURT:  All right, why don't you come up to

2  sidebar.

3    Can you bring the photo with you, please?

4    BENCH CONFERENCE

5    MR. BOCK:  Judge, because of this, think that's pretty

6  inflammatory.  I don't think there's any evidence he's used a

7  badge, and so I think that -- I'm asking that this photo not be

8  into evidence because --

9    THE COURT:  Just so the record's clear, you object to

10  the badge -- the portion of the badge?

11    MS. ANDERSON:  Judge, I have no problems not using that

12  exhibit and using 338 instead.

13    THE COURT:  Okay.  Okay, so you're going to withdraw

14  330 -- I'm sorry, I don't have the numbers.

15    MS. ANDERSON:  337.

16    MR. BOCK:  Could I have one more minute of your time to

17  show these --

18    THE COURT:  You can have as much time as you need.

19    MR. BOCK:  Let me just show you a couple others.

20    THE COURT:  Yours aren't numbered?

21    MR. BOCK:  The government probably -- should I just

22  wait until the government --

23    THE COURT:  Are yours numbered at all?

24    MS. ANDERSON:  We ran out of stickers, and we're

25  getting new ones at the break.

1              THE COURT:  You have your copies, Ms. Anderson, so

2     we'll know the numbers -- oh, yeah, that one can't go in, the one

3     that has the cover of the book.

4              MS. ANDERSON:  Okay.

5              THE COURT:  And what are those?

6              MR. BOCK:  Bullets and money.

7              THE COURT:  Bullets and money?

8              MS. ANDERSON:  Okay.

9              THE COURT:  Oh, that's a title to a book, Mr. Bock?  Is

10    that what your concern is on this one?

11             MR. BOCK:  (No verbal response.)

12             MS. ANDERSON:  This one can't come in.

13             MR. PIMSNER:  We're not using that book.  A bunch of

14    those books were found on those shelves.  We're just trying to

15    show the relationship of where the books were found in the room.

16             THE COURT:  Okay, these two --

17             MR. PIMSNER:  And the original of this that shows where

18    it was in the house.

19             MS. ANDERSON:  That's relevant, your Honor.

20             MR. PIMSNER:  We agree not to show these.

21             THE COURT:  Can we find the numbers for these five?

22    Let's see, one is 356.  You agree not to use that one.

23             And this is 353.  Yes, that one's Mr. Bock's copy.

24             And then 354, which has --

25             MS. ANDERSON:  We won't use.

1          THE COURT:  You won't use that one.

2          Now, what about the woodpecker picture?

3          MS. ANDERSON:  The government believes that's relevant,

4    your Honor.  The jury's hearing testimony about how the defendant

5    didn't --

6          THE COURT:  Please don't -- oh, that's your writing or

7    something?

8          MS. ANDERSON:  No, I don't think so.

9          THE COURT:  Oh, that's part of the exhibit?

10          MS. ANDERSON:  Yeah.  I didn't write on that.

11          THE COURT:  Okay.

12          MS. ANDERSON:  The jury's heard evidence about how

13    there were woodpeckers at each of the scenes, and that the

14    defendant does not like woodpeckers.

15          THE COURT:  Okay, I'll let -- I'll let those two in.

16    It's consistent with the pictures of the woodpeckers.

17          MR. BOCK:  This is not coming in, is it?

18          THE COURT:  No, that is not, which is the pink book

19    cover, and also this one with the badge.

20          MS. ANDERSON:  Correct.

21          THE COURT:  Okay.

22          MR. BOCK:  Thank you, Judge.

23          THE COURT:  All right.  And let's see, these two are

24    yours, Mr. Bock.

25          MR. PIMSNER:  There's a photo of five.  That's four, if

```
 1   I'm understanding correctly.
 2               THE COURT:  I don't know how many there are.
 3               MR. BOCK:  Can I just say something?
 4               THE COURT:  Yes, go ahead.
 5               MR. BOCK:  It looks like these -- someone's keeping a
 6   tally as to the woodpeckers.
 7               THE COURT:  And how many do we have?
 8               MS. ANDERSON:  He was --
 9               MR. BOCK:  I don't think this is -- you know, they're
10   claiming that he's killed 507 woodpeckers.  You know, there's
11   certainly evidence of woodpeckers --
12               THE COURT:  Why don't we just go ahead and use this
13   other one, which is a little --
14               MS. ANDERSON:  Okay.
15               THE COURT:  Yes.
16               MR. PIMSNER:  We have the original photo.
17               MS. ANDERSON:  We do.  We've got the original.
18               THE COURT:  In doing my 403 balancing analysis,
19   obviously you're going to be able to establish there's
20   woodpeckers in the back yard, dead ones, but I think this one --
21   in doing the probative value versus unfair prejudice, I think
22   this does show some additional information that's really
23   inflammatory that the government doesn't need given the Court's
24   previous rulings.  And of course, if you want to have the agent
25   describe this as actually being a live woodpecker in the picture,
```

1    since they won't have a close-up, or if you want to somehow

2    otherwise do a close-up of this one, but take out that extra

3    language.

4              MS. ANDERSON:  Okay.

5              THE COURT:  And I'm not saying this may not be

6    admissible in rebuttal or cross-examination, but just for

7    purposes of the government's case in chief.

8              MS. ANDERSON:  All right, thank you.

9              (The bench conference was concluded.)

10              THE COURT:  All right, Ms. Anderson, you may proceed.

11              MS. ANDERSON:  Thank you, Judge.

12              Your Honor, the government would withdraw Exhibit 337.

13    BY MS. ANDERSON:

14    Q    Let's move to 338.

15              Agent Hunter, do you recognize what's shown in 338?

16    A    Yes.

17    Q    What is that?

18    A    It's listed as an Arizona driver's license for Linda Motta,

19         car insurance card for Motta, BCBS insurance card for Motta,

20         Costco card for Motta, Safeway card, and a black pouch.

21    Q    And all of those items were marked as item -- item number 4A

22         on your inventory list, is that correct?

23    A    That's correct.

24              MS. ANDERSON:  Government moves for admission of

25    Exhibit 338.

1          THE COURT:  338 is admitted.

2              MS. ANDERSON:  May we publish, your Honor?

3              THE COURT:  Yes.

4    BY MS. ANDERSON:

5    Q    There is one other computer that was found -- let me show

6         you.  This is Government's Exhibit Number 339.

7              Do you recognize this particular item?

8    A    Yes, item 9, a Dell PP08L laptop.

9    Q    And where was this computer found?

10   A    It was found in Room C on the.

11             MS. ANDERSON:  The government moves --

12   A    -- cabinet by the TV.

13             MS. ANDERSON:  I'm sorry.  I didn't mean to interrupt.

14             The government moves for admission of Exhibit 339.

15             THE COURT:  339 is admitted.

16             MS. ANDERSON:  May we publish, your Honor?

17             THE COURT:  Yes.

18   BY MS. ANDERSON:

19   Q    This is another close-up of item number 9, correct?

20   A    Yes.

21             MS. ANDERSON:  Government moves for admission of

22   Exhibit 340.

23             THE COURT:  340 is admitted, and anything that's

24   admitted may be published.

25   BY MS. ANDERSON:

```
 1   Q    This is Government's Exhibit 347, which reflects the serial

 2        number for item 9, correct?

 3   A    Yes.

 4   Q    And again, this is the Dell computer?

 5   A    Yes.

 6             MS. ANDERSON:  Government moves for admission of

 7   Exhibit 347.

 8             THE COURT:  347 is admitted.

 9             MS. ANDERSON:  May we publish.?

10             THE COURT:  Yes.  Whenever I admit something, you may

11   publish.

12   BY MS. ANDERSON:

13   Q    And finally, Government's Exhibit Number 346.  That's

14        additional identifying marks for the Dell computer, correct?

15   A    Yes.

16             MS. ANDERSON:  Government moves for admission of

17   Exhibit 346.

18             THE COURT:  346 is admitted.

19   BY MS. ANDERSON:

20   Q    Let's talk about evidence item number 11.  What is evidence

21        item number 11?

22   A    On the recovery log it's listed as a spoof card.

23   Q    Are you familiar with a spoof card?

24   A    Not -- not really familiar, no.

25   Q    Well, let's -- let's take a look.  This is 348.  Can you
```

```
 1          tell us what's shown in that picture?
 2     A    Below the telephone, it looks like the item in question, the
 3          spoof card.
 4     Q    And the spoof card is right in front of the telephone, is
 5          that correct?
 6     A    Yes.
 7     Q    Similarly, let's look at Government's Exhibit 349.  That's a
 8          close-up of the spoof card; isn't that correct?
 9     A    Yes.
10          MS. ANDERSON:  Government moves for admission of
11     Exhibits 348 and 349.
12          THE COURT:  348 and 349 is are admitted.
13     BY MS. ANDERSON:
14     Q    This is 349 which is on the screen right now, and this is
15          348.
16          Now, what room were these spoof cards found in?
17     A    That spoof card was found in Room K on the desk.
18     Q    Speaking of spoof cards, this is Government's Exhibit Number
19          355.  Do you recognize that?
20     A    Item 18.
21     Q    Okay, and what's that?  What's shown in that photo?
22     A    16 spoof cards.
23     Q    Okay, and where were these cards found?
24     A    These were found in Room H in the safe.
25          MS. ANDERSON:  Government moves for admission of
```

1    Exhibit 355.

2              THE COURT:  355 is admitted.

3    BY MS. ANDERSON:

4    Q    And again, keeping along the -- the line of spoof cards,

5         this is Government's Exhibit 363.

6              You recognize that, do you not?

7    A    It's item 39.

8    Q    I'm sorry?

9    A    Item 39?

10   Q    And what is item 39.

11   A    A spoof card.

12   Q    And where was that found?

13   A    Found in the driveway of the residence.

14   Q    This is Government's Exhibit 364.  What's shown in that

15        photo?

16   A    That's a spoof card, item 39.

17             MS. ANDERSON:  Government moves for admission of

18   Exhibits 363 and 364.

19             THE COURT:  363 and 364 are admitted.

20   BY MS. ANDERSON:

21   Q    This is 363.  Is that the front yard of the defendant's

22        residence?

23   A    I would have to see the map, but I think that's the front

24        area where the driveway comes around.

25   Q    And this is 364.

1          Showing you Government's Exhibit Number 350, do you
2      recognize that?
3   A   Item 12?
4   Q   Yes.
5   A   It's a false voice transformer listed on the evidence
6      recovery log as YT-1 {sic} with headset and AC adapter.
7   Q   And where was that item found?
8   A   Room K on desk.
9   Q   And this is Government's Exhibit 351.  That's a close-up of
10      the -- of the voice transformer, correct?
11   A   Yes.
12          MS. ANDERSON:  Government moves for admission of
13   Exhibits 350 and 351.
14          THE COURT:  350 and 351 are admitted.
15   BY MS. ANDERSON:
16   Q   There's 350, and 351.
17          And you're referring to this orange box, is that
18      correct?
19   A   Yes, and the headset.
20   Q   Next is item number 16 on your list.  This is Government's
21      Exhibit 352.  And could you tell us what items that is?
22   A   Item 16 Encyclopedia of Revenge.
23          MR. BOCK:  I'm going to object to that, your Honor.
24   That introduction of that book.
25          THE COURT:  Well, let me -- can you bring the photo up

1    to sidebar, please?

2                           BENCH CONFERENCE

3              MS. ANDERSON:  Your Honor, I apologize.  We missed that

4    one.

5              THE COURT:  Well, that doesn't really show the title.

6    It just shows where the book was located.  So I don't see any --

7    is that your concern?

8              MR. BOCK:  Yeah, this is the --

9              THE COURT:  Yes, but you can't really see the details

10   of the cover page.  Do you agree?  I mean --

11             MS. ANDERSON:  I agree, yeah.

12             THE COURT:  So I don't see the -- it just shows where

13   it's located in the house -- the nightstand next to his bed?

14             MS. ANDERSON:  Right.

15             THE COURT:  So is that your objection, that you can

16   maybe see the cover?

17             MR. BOCK:  Well, I'm just concerned about the cover.

18   That's my objection.

19             MR. PIMSNER:  That was the most benign cover of all of

20   them.

21             THE COURT:  Yes.  And you really can't see anything

22   except the red and white, and lettering.

23             MR. BOCK:  But then they're going to wonder if we have

24   something called Encyclopedia of Revenge, and they might wonder

25   why they don't have the cover.

1          THE COURT:  Well, if somebody wonders, I can tell them
2     it's not relevant or admissible at this trial.  Do you want to
3     cover that now?
4          MR. BOCK:  No, I don't.
5          THE COURT:  All right, so I'm going to overrule your
6     objection as to number 352.
7          MR. BOCK:  Okay.
8          (The bench conference was concluded.)
9          THE COURT:  Let's see, Ms. Anderson, did you admit 352?
10         MS. ANDERSON:  I don't know if I did or not, but the
11    government so moves, your Honor.
12         THE COURT:  All right, and 352 is admitted.
13    BY MS. ANDERSON:
14    Q    What room was item 16 found in?
15    A    Room I on the nightstand.
16    Q    This is Government's Exhibit Number 357, and that's a
17         bookshelf with various books, correct?
18    A    Yes.
19         MS. ANDERSON:  Government moves for admission of
20    Exhibit 357.
21         THE COURT:  357 is admitted.
22    BY MS. ANDERSON:
23    Q    And could you tell us what room item 25 was found in?
24    A    Room A on book shelf near the doorway.
25    Q    This is Government's Exhibit Number 358.  Do you recognize

1          that?

2    A    Yes, a photo of area in the workshop in Room A, I think it

3          was.

4              MS. ANDERSON:   Government moves for admission of

5    Exhibit 358.

6              THE COURT:   358 is admitted.

7    BY MS. ANDERSON:

8    Q    This is Government's Exhibit 362.   Is that part of the

9          workshop?

10   A    Yes.

11             MS. ANDERSON:   Government moves information admission

12   of Exhibit 362.

13             THE COURT:   362 is admitted.

14   BY MS. ANDERSON:

15   Q    Here's Exhibit 361.   What's shown in that photograph?

16   A    Looks like the entryway to -- looks like -- I believe that's

17         Room K.

18             MS. ANDERSON:   Government moves for admission of

19   Exhibit 361.

20             THE COURT:   361 is admitted.

21   BY MS. ANDERSON:

22   Q    This is Government's Exhibit 359.   Do you recognize that?

23   A    Yes.

24   Q    Now, item number 37 was a -- a drawing of a woodpecker, was

25         it not?

1  A     Yes.

2  Q     And in the middle of the photograph was a -- another

3        photograph of a woodpecker, is that correct?

4  A     Yes.

5             MS. ANDERSON:  Government moves for admission of

6  Exhibit 359.

7             THE COURT:  359 is admitted.

8             A JUROR:  We're not seeing that picture.

9             THE COURT:  Well, the government's prosecutor -- she's

10 taking it off the screen.  So I don't know, Ms. Anderson, if you

11 want to let the exhibit linger for a minute as it's admitted so

12 the jury can see it, or take it off the screen.

13            MS. ANDERSON:  Oh, I apologize, your Honor.

14            Government moves for admission of Exhibit 359.

15            THE COURT:  It's already been admitted.  By the time

16 it's admitted, you're taking it from the screen so the jury can't

17 see it.

18            MS. ANDERSON:  Oh, I apologize.

19 BY MS. ANDERSON:

20 Q     I'm going to show you Government's Exhibit Number 602, ask

21       you to take a look at it.

22            MS. ANDERSON:  May I approach?

23            THE COURT:  Yes.

24 BY MS. ANDERSON:

25 Q     That's Government's Exhibit 602, a photograph of which has

```
 1        already been admitted.
 2             Do you recognize the markings on -- on the envelope?
 3   A    Yes, I do.
 4   Q    And how do you recognize the markings?
 5   A    There's the case file number, and the title of the case on
 6        the top -- on the tag on the bag.  I recognize that case
 7        file number.  It's also listed as item 12, description, box
 8        voice transformer, VT-1, with headset and AC adapter.
 9   Q    And that was sealed by the F.B.I., was it not?
10   A    Yes.
11   Q    And placed into evidence, correct?
12   A    Yes.
13   Q    After it was seized from the defendant's house with the
14        search warrant, correct?
15   A    Yes.
16             MS. ANDERSON:  Government moves for admission of
17   Exhibit 602.
18             THE COURT:  Any objection -- okay, 602 is admitted.
19             MR. BOCK:  Subject to.
20             THE COURT:  Yes.
21   BY MS. ANDERSON:
22   Q    You can go ahead and take it out of the bag.
23   A    Do we have any gloves, and maybe a pair of scissors?
24             THE COURT:  Yes, do you want to approach the clerk,
25   Ms. Anderson, and get those items and bring it to the witness.
```

1          And do you have gloves -- we don't have gloves.  Do you

2     have gloves?

3               MS. ANDERSON:  I don't have gloves.

4               THE COURT:  Okay.  Do we need to take a recess to get

5     those?

6               MS. ANDERSON:  If we could, your Honor.

7               THE COURT:  All right.  How much time do you think you

8     need to get the gloves?

9               MS. ANDERSON:  Maybe five minutes.

10              THE COURT:  All right, let's take a five minute break.

11              The jury can go ahead and step out.

12              (The jury left the courtroom.)

13                   ------------------------

14    BY MS. ANDERSON:

15    Q    Special Agent Hunter, is it standard procedure to use gloves

16         whenever you're handling evidence?

17    A    Yes, it is.

18    Q    Why is that?

19    A    Well, I don't want to put myself on the evidence.  I don't

20         want to put my fingerprints, I don't want to put my DNA.  At

21         the same time, depending on the type of evidence I don't

22         want to get that stuff on me.

23    Q    All right, let's -- go ahead and open up that exhibit for

24         us, if you would.

25              I believe that's 602, is that correct?

1    A    Yes.

2    Q    That's the voice changer.

3              And could you hold it up to the jury?

4              All right, thank you.

5              And that's -- again, it's item number 12, which was

6         found in Room K on the desk, correct?

7    A    Correct.

8    Q    Let's go back to Government's Exhibit Number 338.

9              MR. BOCK:  Judge, may I approach for one second again?

10   I'm sorry.

11             THE COURT:  Yes, if you can bring that photo -- is it

12   about this photo, this exhibit?

13             MR. BOCK:  Yes.

14             THE COURT:  Yes, so bring it up, please.

15                        BENCH CONFERENCE

16             MR. BOCK:  Judge, I made pretrial motions regarding

17   this, but the problem I have with this exhibit is the exhibit is

18   suggestive of something after the two events that the government

19   was allowed to get into and question.  So here's an event

20   involving something that occurred after August 2nd of 2009.  So

21   it's like another subsequent bad act they're trying to get in --

22             THE COURT:  What event?  Where's the event --

23             MR. BOCK:  Possession of these items, because these

24   items could --

25             MR. PIMSNER:  These items show he -- these were

1    materials used for the attacks, including other people's

2    identification.

3              MR. BOCK:  Again, I just want to make a record on this.

4              THE COURT:  And these are all Ms. Motta's

5    identification?

6              MS. ANDERSON:  I believe so.  Also, it's not another

7    event.  There's no indication about when these -- these

8    identification documents came into his possession.

9              MR. BOCK:  It had to come into his possession.  Here's

10   one that says March, 2011 to September 4th, 2011.  So obviously

11   this document with this 8 on it couldn't have come into his

12   possession prior to March 2011.

13             MS. ANDERSON:  It doesn't indicate -- it's not another

14   event.  We've already admitted --

15             THE COURT:  I just thought it was something else I

16   hadn't already heard.

17             MR. BOCK:  I just wanted to make a more complete

18   argument on that.

19             THE COURT:  And I know during the argument you

20   indicated this woman was the housekeeper of the defendant.  Could

21   you tell me more about that -- or the actual ID, that she gave

22   him permission or anything like that?

23             MR. PIMSNER:  And you won't.  And we have Linda Motta

24   available as a witness, your Honor.

25             MR. BOCK:  That was --

1          MS. ANDERSON:  She's not the housekeeper.

2          THE COURT:  In any event, so if you'd followed up on

3   that -- and if I thought there were -- somehow he had permission

4   or something like that, certainly I maybe would have

5   reconsidered, but certainly I haven't heard that.

6          So -- all right, so thank you.

7          (The bench conference was concluded.)

8          THE COURT:  All right, let's see, Ms. Anderson, you may

9   proceed.

10  BY MS. ANDERSON:

11  Q    This is Government's Exhibit Number 338, which is the

12       identification belonging to Linda Motta, correct?

13  A    Correct.

14  Q    And where were these items found?  In which room?

15  A    They were found in Room C, the kitchen, in the drawer.

16  Q    This is Government's Exhibit Number 347, and I believe we're

17       talking about the -- the computer, the Dell computer, which

18       is item -- evidence item number 9, correct?

19  A    Yes.

20  Q    That's the Dell computer.  And which room was the Dell

21       computer found in?

22  A    That was found in Room C on shelf, a cabinet by TV.

23  Q    And going back, this is Government's Exhibit Number 348,

24       which is the spoof card right in front of the phone,

25       correct?

1   A     Yes.

2   Q     And which -- which room was this found in?

3   A     That's Room K on the desk.

4   Q     I'm going to show you some more items of evidence.

5           MS. ANDERSON:  May I approach, your Honor?

6           THE COURT:  Yes.

7   BY MS. ANDERSON:

8   Q     That's Government's Exhibit Number 603.  Do you recognize

9         the contents of the envelope?

10  A     Item 4E.

11  Q     And those items are what?

12  A     Listed as Bank of America Visa debit card for Linda Motta,

13        and Intelligent Laundry Systems cash card.

14  Q     And those were found in what room?

15  A     Room C, kitchen drawer.

16          MS. ANDERSON:  Government moves for admission of

17  Exhibit 603.

18          THE COURT:  603 is admitted.

19  BY MS. ANDERSON:

20  Q     This is Government's Exhibit 604?

21          MS. ANDERSON:  May I approach, your Honor?

22          THE COURT:  Yes.

23  BY MS. ANDERSON:

24  Q     Could you tell us what Government's Exhibit 604 is?

25  A     Looks like it might be a combination of two items.

1    Q    Which are?

2    A    Maybe three items.

3    Q    I'm sorry.

4    A    Spoof cards.

5    Q    The spoof cards?

6    A    Yes.

7    Q    And is that item 18?

8    A    Item 18, item 11, and item 39.

9    Q    Those were all the spoof cards that were found at the

10        defendant's house, correct?

11   A    Yes.

12            MS. ANDERSON:  Government moves for admission of

13   Exhibit 604.

14            THE COURT:  604 is admitted.

15   BY MS. ANDERSON:

16   Q    Could you unseal that for us, please?

17   A    There are times when gloves are not handy.

18   Q    All right, and just hold them up so the jury can see them.

19            So that's a total of 18 spoof cards, correct?

20   A    Yes.

21   Q    All right.  Thank you.  You can go ahead and put them back

22        in the envelope.

23            Next is Government's Exhibit 605.

24            MS. ANDERSON:  May I approach, your Honor?

25            THE COURT:  Yes.

 1  BY MS. ANDERSON:

 2  Q     Could you tell us what Government's Exhibit 605 is?

 3  A     This is listed as item 4A, Arizona drivers license for Linda

 4        Motta, car insurance card for Motta, BCBS insurance card for

 5        Motta, Costco card, Safeway card, a black pouch.

 6  Q     And those were found in Room C, correct, the kitchen drawer?

 7  A     Yes, Room C, the kitchen drawer.

 8             MS. ANDERSON:  Government moves for admission of

 9  Exhibit -- I'm sorry, which one is it?

10             THE WITNESS:  605.

11             MS. ANDERSON:  605.

12             THE COURT:  605 is admitted.

13  BY MS. ANDERSON:

14  Q     One final exhibit.

15             MS. ANDERSON:  May I approach, your Honor?

16             THE COURT:  Yes.

17  BY MS. ANDERSON:

18  Q     That's Government's Exhibit 606, correct?

19  A     Yes, it is.

20  Q     And do you recognize any kind of markings on the bag?

21  A     Yes, I do, the case file number.

22  Q     Any signatures, or any initials on the bag?

23  A     Yes, there's initials -- kind of hard to make out.  B -- B

24        N.  Also, names on the bag, listed as a black day planner,

25        collector's listed as PCSO Jeff Craven with PCSO Amy

```
 1          Trueblood.
 2   Q    Now, that was a piece of evidence that was seized from the
 3        Levine residence on August 2nd of 2009, correct?
 4   A    Yes.
 5          MS. ANDERSON:  Government moves for admission of
 6   sentence 606.
 7          THE COURT:  606 is admitted.
 8   BY MS. ANDERSON:
 9   Q    You can go ahead and open it.
10          What is the white item along with the day planner?
11   A    It looks like a money purse, change purse.
12   Q    A coin purse?
13   A    ID.  ID purse.
14          MS. ANDERSON:  Judge, may I have just a moment?
15          THE COURT:  Yes.
16          MS. ANDERSON:  That's all I have, Judge.
17          THE COURT:  All right.
18          Cross-examination?
19                    CROSS-EXAMINATION
20   BY MR. BOCK:
21   Q    Now, Agent, you testified you were at the August 2nd, 2009
22        property, is that correct?
23   A    Yes.
24   Q    And did you ever go into the house?
25   A    No, I did not.
```

1    Q    You testified that there was an item, and I think it was

2         marked 13, it was a white t-shirt.  Do you remember that?

3    A    I would have to see a picture of it to remember it visually,

4         but yes, there was an item 13 -- actually, item 14, white

5         t-shirt.

6    Q    Okay, and that's an item that you gathered at the -- that

7         was associated with the Levine's property, is that correct?

8    A    I did not gather it.

9    Q    Did you look at it?

10   A    Like I said, I would have to see an image of it.

11   Q    Well, let's assume that there's testimony, and that there

12        was a white t-shirt that was found at a the scene of the

13        Levine's home.  You saw the -- you saw the Levine's home, is

14        that correct?

15   A    Yes.

16   Q    And you saw the garage, and you saw sludge and things like

17        that.  Did you not see that too when you were there?

18   A    I saw the exterior of the building.

19   Q    Okay.  What evidentiary value might a white t-shirt have?

20   A    It could carry --

21             MS. ANDERSON:  Objection, foundation.

22             THE COURT:  Well, I'll -- I don't -- I'll allow him to

23   answer it.  It seems --

24   BY MR. BOCK:

25   Q    You're an F.B.I. agent, is that correct?

```
 1   A    Yes, I am.

 2   Q    And how long have you been an agent for?

 3   A    Over 13 years.

 4   Q    And you're taught this as part -- and you have experience

 5        that certain items of evidence may have evidentiary value

 6        for law enforcement, is that correct?

 7   A    Yes.

 8   Q    Clothing, is that correct?

 9   A    Yes.

10   Q    Tires?  Tire tracks?

11   A    Yes.

12   Q    Shoe prints?

13   A    Yes.

14   Q    Okay, so what type of evidentiary value might a white

15        t-shirt have that's found at the scene of a crime?

16   A    It could provide identification on identity.  If somebody

17        sees someone at the crime with a t-shirt that looks similar,

18        it could provide DNA verification.

19   Q    It could have the potential of some trace evidence, is that

20        correct?

21   A    Yes.

22   Q    Could have a hair on it, could it not?

23   A    Possibly.

24   Q    The -- you indicated, now, that you went to the -- when the

25        search warrant was served on my client's residence, that
```

|   |   |   |
|---|---|---|
| 1 |   | you -- you were present along with a number of different |
| 2 |   | agents, is that correct? |
| 3 | A | Yes. |
| 4 | Q | And you mentioned on direct that a SWAT team was there, is |
| 5 |   | that correct? |
| 6 | A | If I remember correctly -- I'm not quite sure.  I know there |
| 7 |   | were people who were in there in advance of me.  I remember |
| 8 |   | seeing the HMRT team. |
| 9 | Q | So when you answered about -- when the U.S. Attorney asked |
| 10 |   | you about a SWAT team.  I thought you acknowledged that? |
| 11 | A | I thought there may have been in this instance -- |
| 12 | Q | Well, you -- |
| 13 | A | -- but I don't know for sure. |
| 14 | Q | You would agree with me that it was 100 percent safe to go |
| 15 |   | into that residence once you were in there? |
| 16 | A | Once the HMRT team indicated that it was safe for us to go |
| 17 |   | in there, then we felt confident it was okay to go in there. |
| 18 | Q | And there was nothing to shake that confidence, is that |
| 19 |   | correct? |
| 20 | A | During the course of the search? |
| 21 | Q | Right. |
| 22 | A | Yes, there was. |
| 23 | Q | Well, were there any individuals in there? |
| 24 | A | No. |
| 25 | Q | And you went into -- you knew that this was the -- what the |

1       occupation was of Mr. Fries, did you not?

2   A   I did not know going into the search.

3   Q   Well, when did you learn that out -- when did you learn

4       that?

5   A   Shortly after arrival.

6   Q   Okay.  Then what did you learn when you were at -- shortly

7       after arrival as to what his occupation was?

8   A   It appeared that he was an owner of a power washing

9       business.

10  Q   And did you also learn that as part of that business that he

11      would clean driveways?

12  A   He may in the course of his duties, but it wasn't something

13      that was told to me.

14  Q   And did you -- the materials that you looked at in his --

15      where the materials were stored -- and you took pictures of

16      those, did you not, and those are in evidence?

17  A   There were pictures taken.

18  Q   Right, and there was paint thinner.

19  A   There may have been paint thinner yes.

20  Q   There was muriatic acid?

21  A   Yes.

22  Q   And did you know that that was used to clean driveways?

23  A   No, I didn't.

24  Q   Now, it's not against the law to have a spoof card, is it?

25  A   I do not know.

1    Q    Well, you're with the F.B.I., is that correct?

2    A    Yes, but I do not know.

3    Q    Well, did it look like that you could purchase this for $10?

4    A    There was a price number on there for $10.

5    Q    Did you determine whether or not this voice changer, which

6         is -- which you claim is a voice changer that was on item

7         number 12 on your list, did you -- did you attempt to see if

8         it worked or not?

9    A    No, I did not.  It's not my role.

10   Q    So you don't know if it worked -- if it was in working

11        order; is that your testimony?

12   A    That is.

13   Q    How long did the search take?

14   A    At the house?  We were there from about 10:15 until about

15        7:30.

16             MR. BOCK:  I don't have anything further.

17             THE COURT:  All right.

18             Any redirect?

19             MS. ANDERSON:  No, your Honor.

20             THE COURT:  Any questions from the jury for this

21   witness?

22             All right, we have a question.

23             And if I could see counsel at sidebar.

24                              BENCH CONFERENCE

25             THE COURT:  If you all want to read this together, and

1    we can talk about it.

2              MR. PIMSNER:  That looks okay.

3              THE COURT:  Exhibit 348.

4              Any objection, Mr. Bock?

5              MR. BOCK:  The title's coming in, right?

6              THE COURT:  Right.

7              MR. BOCK:  So subject to my --

8              THE COURT:  Subject to your previous objections to this

9    whole subject matter.

10             MR. BOCK:  (No verbal response.)

11             THE COURT:  Okay, so Ms. Anderson, you may ask the

12   questions of the witness.

13             MS. ANDERSON:  Okay.

14             THE COURT:  Do you need a minute to --

15             MS. ANDERSON:  I'm looking at my notes.  I completely

16   forgot to ask about all the woodpeckers in the back.

17             THE COURT:  You did.

18             MS. ANDERSON:  I did.  Could I reopen and ask about --

19             THE COURT:  Yes, you don't have to recall -- and I'll

20   certainly let you ask about that, Mr. Bock.  So I'll allow you to

21   reopen, and then you can also can ask these questions of the

22   juror.

23             MS. ANDERSON:  Okay, thanks.

24             (The bench conference was concluded.)

25             MS. ANDERSON:  Judge, let me find the exhibits, if I

1    could, that the question pertains to.

2            If I could have just a second?

3            THE COURT:  Yes, take your time.

4                        EXAMINATION

5    BY MS. ANDERSON:

6    Q    Sir, I'm going to show you Government's Exhibit Number 352.

7        This pertains to item number 16 on your evidence log.

8            What was the title of the book in Exhibit Number 352?

9    A    The title listed on 352, item 16, is listed on the evidence

10       log as Encyclopedia of Revenge.

11   Q    All right.  Next is Government's Exhibit Number 348.  And I

12       have a question.  Was there a second spoof card in Exhibit

13       348 near the fax machine?  And I'm going to move it down a

14       bit, and I think the question might be in reference to this

15       item there.

16           Do you see that?

17   A    Yeah, I see that.

18   Q    Does that appear to be a spoof card?

19   A    It's possibly one.

20           MR. BOCK:  Objection, then, what it possibly could be,

21   Judge.

22           THE COURT:  All right, I'll allow the answer to stand.

23           MS. ANDERSON:  Finally, your Honor, may I go back and

24   ask about an item that I forgot to ask?

25           THE COURT:  Yes, you may reopen your direct, and I'll

```
 1    allow Mr. Bock to ask any questions on cross if he'd like.
 2              Go ahead.
 3    BY MS. ANDERSON:
 4    Q    Let's talk about item 6 that's on your list, woodpeckers.
 5         Were there any woodpeckers found at the defendant's
 6         residence?
 7    A    Yes, there were woodpecker carcasses found outside.
 8    Q    And those -- those were outside in the back yard, is that
 9         correct?
10    A    Yes.
11    Q    And they were in various stages of decomposition, correct?
12    A    Yes.
13              MS. ANDERSON:  That's all I have, your Honor.
14              THE COURT:  All right.
15              Did you have any follow up questions, Mr. Bock, to that
16    particular subject?
17              MR. BOCK:  No, no follow-up, your Honor.
18              THE COURT:  Okay.
19              Any additional questions from the jury for this
20    witness?
21              All right.  Thank you, sir.  You may step down.
22              THE WITNESS:  Thank you.
23              ------------------------
24                   THOMAS N. GRANT, II
25                    DIRECT EXAMINATION
```

```
 1   BY MR. PIMSNER:
 2   Q    And sir, are you employed?
 3   A    Yes, I am.
 4   Q    By whom?
 5   A    The Tucson Police Department.
 6   Q    And in what capacity?
 7   A    I'm a crime scene specialist supervisor.
 8   Q    And how long have you been with the Tucson Police
 9        Department?
10   A    I've been with the Tucson Police Department for 14 years.
11   Q    And of those 14 years, how long have you been a crime scene
12        specialist?
13   A    I've been a crime scene specialist for all 14 years.  I was
14        promoted to crime scene specialist supervisor just shy of
15        three -- three years ago.
16   Q    And what are your official duties as a crime scene
17        specialist?
18   A    We mainly respond to crime scenes, document the scene, and
19        collect any evidence that may be present at the scene.
20   Q    Does that include photographing the scene?
21   A    Yes.
22   Q    How about lifting latent prints?
23   A    Yes.
24   Q    And would it also entail actually collecting physical items
25        of evidence?
```

1    A    Sometimes.

2    Q    And what training have you received, let's say in the area

3         of lifting fingerprints?

4    A    I went through two academies, one with the Pima County

5         Sheriff's Department -- oh, I guess I didn't mention that.

6         I was employed for two years with Pima County Sheriff's

7         Department prior to my employment with the Tucson Police

8         Department.  While at the Pima County Sheriff's Department,

9         I went through their basic crime scene specialist training

10        where I rode along with a senior member of the department

11        and learned the day-to-day operations, how to photograph a

12        crime scene, how to process for latent prints, how to

13        collect evidence.  Then when I went to the Tucson Police

14        Department, I went through a similar training program

15        through them.  And I've also been through trainings with the

16        F.B.I. in latent -- latent fingerprint processing, as well

17        as police photography and blood evidence collection, hair,

18        fibers, all -- all those different areas.

19   Q    And as a crime scene specialist with the Tucson Police

20        Department, have you had occasions to lift latent prints

21        from various items of potential evidence?

22   A    Yes.

23   Q    And on numerous occasions?

24   A    Yes.

25   Q    And drawing your attention back to August 4th, 2009, were

1          you called out as a crime scene specialist to the Avalon

2          Health and Rehabilitation Center?

3    A    Yes.

4    Q    And where was that located?

5    A    1400 North Wilmot.

6    Q    And when you arrived, who did you contact?

7    A    Can I refer to my supplement so that I'm --

8    Q    Sure.

9    A    Make sure I have it right?

10   Q    I actually have a copy of your supplement here.  Would it

11         actually help to refresh your recollection if you had a copy

12         of it in front of you?

13   A    Yes, it would.

14              MR. PIMSNER:  May I approach the witness with what's

15   been marked as Exhibit 607, your Honor?

16              THE COURT:  Yes.

17   BY MR. PIMSNER:

18   Q    And who did you contact when you arrived at Avalon?

19   A    F.B.I. Special Agent Nowak.

20   Q    And did you receive instruction from Agent Nowak once you

21         arrived at Avalon?

22   A    Yes.

23   Q    And what specific instruction did you receive?

24   A    He instructed me to photograph the charting room, which is a

25         room on the third floor there at 1400 North Wilmot, and I --

1           specifically, he wanted photographs of a telephone that was

2           in that room, and some photographs -- he wanted some

3           detailed photographs of some phone numbers on the readout of

4           the phone.

5      Q    And did you -- I'm sorry, go ahead.

6      A    Sorry.  As well as views of the third floor stairway.

7                MR. BOCK:  Judge, may I approach for one second?

8                THE COURT:  Yes.

9                          BENCH CONFERENCE

10               MR. BOCK:  There were actually two phone calls.  We're

11     not getting into the 88 crime call, is that correct?

12               MR. PIMSNER:  We're not going to talk about it.  Now,

13     the exhibit may show the phone number, but I wasn't planning on

14     talking about the 88 --

15               MR. BOCK:  Then I need to object to that, because there

16     was an 88 crime call that was in conjunction with the call to the

17     F.B.I. on the same day, purportedly from this phone number.  The

18     government said they weren't going to introduce that.

19               THE COURT:  Right.

20               MR. BOCK:  So I really don't want that number in there.

21     Someone can see 88 and maybe figure out that the numbers spelled

22     crime.

23               THE COURT:  Well, did an employee call later?

24               MR. PIMSNER:  No, the defendant called both 88 crime

25     and the F.B.I.

1            MR. BOCK:  Well, that's their claim.

2            THE COURT:  Okay, so is there any way to excise that

3    part from the --

4            MR. PIMSNER:  If I can.

5            THE COURT:  You can show it to him.  We can admit it

6    later, maybe.

7            MR. PIMSNER:  The only number we're going to discuss is

8    the number that's on the display that shows he called the F.B.I.

9            MS. ANDERSON:  I'm not sure it's necessary to redact

10   the exhibit, because theoretically somebody else could have

11   called the 88 crime number later.

12           MR. PIMSNER:  And we're not bringing it up in any

13   manner.  We're not going to introduce the 88 crime records, or

14   anything else.

15           MS. ANDERSON:  There's going to be no witness.

16           THE COURT:  But there's a photograph that shows --

17           MR. PIMSNER:  If I may?

18           THE COURT:  Okay, yeah.

19           MR. PIMSNER:  There's that photograph.

20           THE COURT:  Um-um.

21           MR. PIMSNER:  And -- so we can --

22           THE COURT:  Why do you need --

23           MR. PIMSNER:  We don't -- we can just use this one.

24   We'll do just 199.  I thought they were showing on the same

25   screen.  I apologize.

1          THE COURT:  All right, great.  Thank you.

2          (The bench conference was concluded.)

3          THE COURT:  All right, Mr. Pimsner, you may proceed.

4          MR. PIMSNER:  Thank you.

5    BY MR. PIMSNER:

6    Q    So you received some instruction from Agent Nowak.  What did

7         you proceed to do first in your -- your crime scene

8         analysis?

9    A    The first thing that we generally do, and what I did in this

10        case is photograph the areas that I was instructed to

11        photograph.

12   Q    And where did you start?  What -- what part did you start

13        at?

14   A    We started with some -- just kind of views of the third

15        floor office area, the -- what they call the charting room

16        in that -- in that building.

17   Q    And let me show you what's been marked, I believe is

18        admitted, Exhibit 201 -- well, first of all, let's go to

19        204, which has been admitted into evidence.

20            Do you recognize that photograph?

21   A    Yes.

22   Q    And what is that photograph?

23   A    Those are work stations in that third floor charting room.

24   Q    And you took that photograph?

25   A    Yes, I did.

1    Q    Back on August 4th?

2    A    Yes.

3    Q    And 20 -- please look at 203.

4         Is that another scene from that same area?

5    A    Yes.

6    Q    And ask you to look at Exhibit 202.

7         And is that the telephone in question that you were

8         asked to photograph and process?

9    A    Yes.

10    Q    Did you take any exterior shots of that -- that room?

11    A    Of the -- of the room?

12    Q    Yes.

13    A    Yes.

14    Q    Let me ask you to look at Exhibit 205.

15         Does that represent a copy -- or the way the exterior

16         of that charting room looked on the day that you processed

17         that scene?

18    A    Yes.

19    Q    Now -- now, let me ask you to look at Exhibit 199.  That has

20         not yet been admitted into evidence.

21         Do you recognize that photograph?

22    A    Yes.

23    Q    And does that -- what does that photograph represent?

24    A    That is a -- that's the readout of the telephone in the

25         previous photographs.

```
 1   Q    And that was the phone that Agent Nowak directed you to
 2        photograph, correct?
 3   A    Correct.
 4             MR. PIMSNER:  And move for the admission of Exhibit
 5   199, your Honor.
 6             MR. BOCK:  Subject to my previous record, your Honor.
 7             THE COURT:  All right, 199 is admitted.
 8   BY MR. PIMSNER:
 9   Q    Now, did you also take a picture of the doorway leading into
10        the stairwell?
11   A    Yes.
12   Q    Okay.  And all those pictures, would those have been put
13        into evidence?
14   A    Yeah -- yes.
15   Q    All right.  Now, after you would have photographed the
16        scene, what would have been your next course of action?
17   A    I would then process the telephone for latent fingerprints.
18   Q    And what method did you use to do that?
19   A    I used what we call magnetic fingerprint powder.
20   Q    Could you explain what process you used?
21   A    Sure.  Magnetic fingerprint powder is powder that consists
22        of very, very fine metal shavings combined with a black
23        powder that would be similar to volcanic ash that's ground
24        up very, very finely.  And those components are mixed
25        together.  And you use a brush, which actually has a magnet
```

1    in the tip of it, and you dip the tip of the brush into the

2    powder, and the magnet then -- the -- the powder then

3    adheres to or holds onto the brush, and then you brush that

4    over the surface of anywhere where you think that there may

5    be fingerprints on -- on an object.  The black powder in

6    that -- in that powder then sticks to any moisture that is

7    left behind on an object.

8  Q    And would that moisture possibly show ridge detail and other

9    characteristics from a fingerprint?

10 A    Yes.

11 Q    Now, once you have dusted the powder on an item that you're

12    examining, do you then look closely at that item to

13    determine whether there may be any kind of latent prints of

14    potential value?

15 A    Yes.

16 Q    And did you do that in this case --

17 A    I did.

18 Q    -- on the phone?

19        And did you identify any potential latent prints of

20    value on the telephone?

21 A    I did.  I found areas with what's known as ridge detail on

22    the -- on the phone.

23 Q    Now, just because you would have found ridge detail, would

24    that have meant that that was a usable print for the basis

25    of an identification comparison at a later date?

```
 1   A    When I process an item for fingerprints, all I do is look
 2        and see if there is any ridge detail present.  If there is
 3        ridge detail present, then I secure that, or -- or lift that
 4        ridge detail so that it can be compared by a person who does
 5        that kind of work.
 6   Q    And let me show you --
 7             MR. PIMSNER:  If I may approach the witness, your
 8   Honor?
 9             THE COURT:  Yes.
10   BY MR. PIMSNER:
11   Q    What's been marked as Exhibit 369.
12             Do you recognize that exhibit?
13   A    Yes.
14   Q    Could you describe it?
15   A    These are the latent lift cards and the envelope that the
16        latent lift cards are submitted to evidence in.
17   Q    So you identified some potential ridge detail on the handset
18        of the telephone, correct?
19   A    Correct.
20   Q    And what did you do to preserve those areas?
21   A    What I do is take a clear tape that is similar to but not
22        the same as packaging tape, like you would use on a -- on a
23        package that you would send through the -- through the mail,
24        and I stretched that out over the object, smooth out any air
25        that would be there, and then when you lift the tape off of
```

1    the object, the powder then sticks to the tape instead of

2    the object.  So then you take the tape, and then secure the

3    tape onto a card.

4         I then diagram where on the -- the item the print came

5    from.  I make a -- a little diagram, a little picture, to

6    show where the print came from off of the object.

7  Q  So that exhibit, I believe it's 369, that -- are those your

8    original lift cards that you took that day?

9  A  Yes.

10 Q  And how many lifts did you pull from the handset of the

11   phone?

12 A  Six.

13 Q  And how do we know that -- and those are the original cards

14   with the original lifts in front of you?

15 A  Yes.

16 Q  And do you mark your -- some kind of identification on those

17   cards so you can tell that those were the original from that

18   day?

19 A  On -- on the card itself I place a label which I initial as

20   my department employee number, the date that I process the

21   item, the case number, and then I label each lift one

22   through -- in this case eight, because there were eight

23   lifts in total from the scene.

24 Q  And where did the other two lifts come from?

25 A  They came from the interior door handle to the stairwell --

1              to the stairs on the third floor.

2      Q    And you did the same process, transferring what you observed

3              for the latents onto the back of the card in identifying

4              where you found those cards?

5      A    Correct.

6      Q    Specifically, are you aware that a -- an identification was

7              made to one of your latent lifts?

8      A    Yes.

9      Q    And what number was that?

10     A    That's lift number three.

11     Q    And where was lift number three found?

12     A    It was found near the mouthpiece on the handset to the

13             telephone.

14                MR. PIMSNER:  At this time I would move to admit

15     Exhibit 369, your Honor.

16                MR. BOCK:  Subject --

17                THE COURT:  To previous -- 369 is admitted.

18     BY MR. PIMSNER:

19     Q    And once you obtain the various potential latent prints,

20             what do you do with those items?

21     A    I label them, like I described earlier, and then I submit

22             them to our evidence section.

23     Q    Okay.  So they get impounded at the Tucson Police

24             Department?

25     A    Correct.

1  Q    And does the -- the fingerprint lab then have access to that

2       evidence at a later date?

3  A    Yes.

4            MR. PIMSNER:  I have nothing further, your Honor.

5            THE COURT:  All right, cross-examination?

6                        CROSS-EXAMINATION

7  BY MR. BOCK:

8  Q    You -- you have a recollection, obviously, when you look at

9       those photographs that you took, right?

10 A    Yes.

11 Q    And you remember that there was a computer associated with

12      the -- with the phone in question?

13 A    I have no recollection of a computer.

14 Q    You didn't -- did you photograph a computer in one -- in one

15      of those rooms that was on the third floor?

16 A    I was -- I don't recall being instructed specifically to

17      document a computer.

18 Q    The lifts that you were -- you were unable to determine had

19      evidentiary value, there were a group of those lifts, were

20      there not?

21 A    What I do is look for ridge detail, and then secure the

22      ridge detail.  A latent print examiner then looks at what I

23      lifted and makes the determination as to whether or not the

24      quality is good enough to identify someone.

25 Q    Okay.  Based upon your experience and training, when you

| | | |
|---|---|---|
| 1 | | make a lift do you have a -- do you have an instinct as to |
| 2 | | whether or not that lift is going to be fruitful or not? |
| 3 | A | Based on training and experience, I know that the more |
| 4 | | detail that's present, the better the opportunity for an |
| 5 | | identification. |
| 6 | Q | So do you remember where you took -- took lifts from on the |
| 7 | | property in question? |
| 8 | A | They're all detailed on the lifts themselves.  The -- the |
| 9 | | diagrams show specifically where the lifts came from. |
| 10 | Q | Well, just -- did you -- did you take lifts -- how many |
| 11 | | lifts did you take from the telephone? |
| 12 | A | Six. |
| 13 | Q | Did you take lifts from any of the -- of the doors, or the |
| 14 | | knobs, or the stairwell, or anything? |
| 15 | A | Two from the interior door to the stairwell. |
| 16 | Q | So that would -- so you took a total of? |
| 17 | A | Total of eight. |
| 18 | Q | Total of eight.  Six of those from the phone? |
| 19 | A | Correct. |
| 20 | Q | Now, if there was a computer, just for argument sake, is |
| 21 | | that a surface -- a computer surface, keys or touching a |
| 22 | | computer, is that a surface that could capture prints? |
| 23 | A | Like the keyboard keys themselves? |
| 24 | Q | Let me ask you a better question. |
| 25 | A | Okay. |

1  Q    Have you ever lifted prints from a computer?

2  A    Yes.

3  Q    From computer use?

4  A    Yes.

5  Q    Okay.  And then you would submit those to see -- to the --

6       to the other -- to the examiner, the latent print examiner

7       to see if there's enough there to perhaps compare those to a

8       known print, is that correct?

9  A    Correct.

10 Q    Okay.

11          MR. BOCK:  Thank you.

12          THE COURT:  Any redirect?

13          MR. PIMSNER:  Nothing further, your Honor.

14          THE COURT:  All right.

15          Any questions from the jury for this witness?

16          All right.  Thank you, sir.  You may step down.

17               -------------------------

18                      JOHN SWARTZ

19                  DIRECT EXAMINATION

20 BY MR. PIMSNER:

21 Q    Mr. Swartz, where are you employed?

22 A    I'm employed with the Tucson Police Department in the crime

23       lab.

24 Q    And in what capacity?

25 A    I'm a latent print examiner.

1   Q   And how long have you been with the Tucson Police

2       Department?

3   A   It will be 30 years in October.

4   Q   And of those 30 years, have they all been in the crime lab?

5   A   No, they have not.

6   Q   And what type of assignments have you had over the years?

7   A   So for the first 13 years I was a -- what we called back

8       then identification technician.  Now they're referred to as

9       crime scene specialist.  And then in 1996 I was promoted to

10      a latent print examiner, and then in 2000 the latent print

11      unit was moved under the umbrella of the crime lab.

12  Q   And what are your official duties as a latent print

13      examiner?

14  A   Well, my duties include fingerprint comparisons, which

15      include both latent or crime scene impressions to -- to

16      known or inked impressions.  I also do ink to ink, or known

17      to known impressions.  I will conduct searches in the

18      Arizona Automated Fingerprint Identification System in an

19      attempt to identify unknown latent impressions, and also

20      court testimony.

21  Q   And so is it fair to say that nearly the 30 years that you

22      have been at Tucson Police Department you have been involved

23      in some type of fingerprint work?

24  A   That's correct.

25  Q   And just generally, what kind of training do you have in

1           that area?

2    A    So I've had training that has covered the -- from simple

3         fingerprint classification, all the way up through analysis

4         and -- and comparison.  And some of those involved more

5         keyed in on like palm prints, others are just the end joint

6         of the finger, and just those -- the philosophy and

7         methodologies that go behind doing a fingerprint comparison.

8    Q    Now, we've heard already from another fingerprint examiner,

9         but could you just briefly describe the difference between a

10        known inked print and latent print?

11   A    Sure.  If you just think of a rubber stamp, so a rubber

12        stamp, you know, might have an address on it, and you can

13        take that rubber stamp and place it on ink, and then

14        transfer it to an envelope, and you're able to read that

15        information.  And that rubber stamp has raised and lowered

16        portions.  Well, fingerprints are sometimes referred to as

17        friction ridge skin.  It is a lot like that rubber stamp

18        where it has raised and lowered portions.  So if I'm going

19        to do an inked print, I would take that under a controlled

20        situation and put a thin layer of ink on that finger, and

21        then transfer it to a card where I can read that

22        information.  And it's referred to as a known, because, one,

23        it's under a controlled situation, and also there's usually

24        a name that's associated with that fingerprint.

25             So for a latent print, latent -- the term means hidden,

1    and it's a chance impression, so it's not -- you're not

2    usually intentionally leaving a print behind.  And it may or

3    may not -- the surface may or may not be receptive to the

4    information, but instead of ink it's either going to be

5    perspiration, or maybe basic oils from your face or maybe

6    the food you ate for lunch that day, and you can transfer it

7    to a surface.  Usually, it will require some type of method

8    in order to make that print visible.

9  Q    And there are various sophistications to the types of

10    methods to draw a print, correct?

11 A    Correct.

12 Q    What methodology do you use once you are comparing known

13    prints to latent prints in your analysis?

14 A    So when I perform a fingerprint comparison, I go into the

15    methodology -- the acronym is ACE-V, which is analysis,

16    comparison, evaluation, and then verification.  So when I'm

17    looking at a latent print, I'm going to try to determine if

18    it has value, and if it does then I will evaluate what I see

19    there, and then begin to do the comparison, or actually

20    compare and then evaluate what I'm seeing from one

21    impression to the next.

22 Q    And what -- why are fingerprints used as a means of

23    identification?

24 A    Fingerprints are persistent in the sense that they are

25    formed in our mother's womb before we're born.  It starts

1       about the first -- towards the end of the first trimester,

2       and ends at about week 23.  And then that's -- once they --

3       they are stopped forming, they'll be like that throughout

4       our natural lifetime.  So they're persistent, and also

5       they're unique in the sense that no two people have ever

6       been found to have the same fingerprint.

7    Q   Now, were you asked to examine some latent prints that were

8       lifted from the Avalon Health and Rehabilitation Center on

9       August 4th, 2009?

10   A   I'm not sure exactly where they came from, but I was asked

11       to conduct a fingerprint comparison.

12   Q   And where would you get the latents from for -- in order for

13       you to conduct your analysis?

14   A   As far as would I find them in the evidence section --

15   Q   Right.  I mean, are they delivered to you by the crime scene

16       specialist, or are they put into evidence and then checked

17       out by the -- by the lab?

18   A   Yeah, they would have gone through the evidence section, and

19       then assigned to the -- to the latent print unit.

20   Q   And then you or somebody at your direction would have

21       checked those out of the lab for analysis -- or excuse me,

22       out of evidence for analysis?

23   A   Right, myself or somebody else would have obtained those

24       from the evidence section.

25   Q   Now, let me ask you to look at Exhibit 369, which was

1          admitted into evidence.  It's in front of you.

2               Do you recognize that exhibit?

3    A    Yes, I do.

4    Q    And what is that exhibit?

5    A    These are -- or what was known to me as item number TG-1.

6         They were eight latent lift cards that were lifted by

7         Mr. Tom Grant, that I was asked to compare.

8    Q    And how do you recognize those cards?

9    A    On the lists themselves I have my initials in the corner,

10        and also some additional writing on the lifts.

11   Q    And just because you're submitted lifts to compare, does

12        that mean that you will automatically find sufficient detail

13        to make an identification?

14   A    No.

15   Q    And did you in fact examine those eight lifts?

16   A    Yes, I did.

17   Q    And of those eight lifts, were -- how many had sufficient

18        detail to conduct an identification?

19   A    One.

20   Q    And so the other seven lifts just were not sufficient to --

21        to meet your standards, correct?

22   A    Right.  There were some that were -- that I was able to

23        compare, but not necessarily identifying, because when I'm

24        looking at a print to determine its value, we operate under

25        the -- the parameter of is there enough in this that I could

1        possibly eliminate an individual, not necessarily identify

2        but could I eliminate somebody.  So just because I could

3        eliminate doesn't mean that that print's going to be able to

4        be identified.  But the first level -- the first threshold

5        that I'm looking for is, is there enough here that I can

6        eliminate somebody?  And then maybe I can't, but then also

7        maybe there'll be prints that I can identify.  In this case

8        there was just the one.

9    Q   And so your elimination process, you're looking for, I take

10       it, characteristics that are -- are incompatible to the

11       known prints, correct?

12   A   Correct.

13   Q   And -- and in this case there was only one -- one print that

14       was of sufficient quality to actually determine whether or

15       not there was an identification, correct?

16   A   Correct.

17   Q   And were you able to eliminate the known print from your

18       examination of that one latent?

19   A   Of that one latent?

20   Q   Of -- and so we're talking -- is that latent number three

21       that would have -- you made your identification from?

22   A   Correct.

23   Q   And so that latent didn't eliminate the known print that

24       you're examining, correct?  I know it's kind of a double

25       negative there.

1   A   That's correct.

2   Q   Were you -- was there sufficient detail on that print to

3       make a positive identification?

4   A   Yes.

5   Q   And were you basing it on known prints that you had

6       available to you at the time?

7   A   Yes.

8   Q   And who was the individual that you positively identified?

9   A   I identified that impression to a Todd R. Fries -- is it

10      Fries or Fries?

11  Q   I've heard it both ways.

12  A   Okay.

13  Q   And that's F-R-I-E-S?

14  A   Yes.

15  Q   Were you able to tell from that latent where that -- what

16      finger that latent was associated with?

17  A   Yes, I identified it as -- as being the right index finger

18      of Mr. Fries.

19  Q   Now, were you aware that a fingerprint card -- a known

20      fingerprint card of Mr. Fries was taken at or near the time

21      he was charged in connection with this offense?

22          Were you -- did you review a known fingerprint card

23      from him?

24  A   At some date, yes, I did.

25  Q   At a later date?

1   A    Yes.

2   Q    Okay.  And let me show you what's been admitted as Exhibit

3        71.

4             Do you recognize that exhibit?

5   A    I do.

6   Q    How do you recognize it?

7   A    That has a date and my initials on -- on the -- near one of

8        the fingers on the card.

9   Q    So would you have used these more recent known prints to

10       verify your identification -- your earlier identification?

11  A    Yeah, I -- I used these and compared them to the lift that

12       appeared on -- the impression that appeared on lift number

13       three.

14  Q    And were you able to come to a conclusion based on the --

15       your analysis of the prints from the latent print number

16       three and the prints -- the more recent set of prints set

17       forth in Exhibit -- I believe I said 71?

18  A    Correct, 71.  Yes, I did the comparison, and I determined

19       that the impression that was in 3A was the -- the right

20       index finger that appeared on Exhibit 71 belonging to Todd

21       Russell Fries.

22  Q    And the date of birth of Mr. Fries on that exhibit?

23  A    According to the card, it's 3/16/1963.

24  Q    And does the card reflect the individual that would have

25       lifted -- or would have printed Mr. Fries that day?

1    A    Yes, on the -- on the back there's a writing as to the

2         official taking the fingerprints, SA Chavan Dollard.

3    Q    Would that be Chavar Dollard?

4    A    Chavar Dollard, yes.

5              MR. PIMSNER:  I have nothing further, your Honor.

6              THE COURT:  Cross-examination?

7                          CROSS-EXAMINATION

8    BY MR. BOCK:

9    Q    Good afternoon.

10   A    Good afternoon.

11   Q    Now, you said -- you used the phrase sufficient detail?

12   A    Pardon?

13   Q    I said you used the phrase sufficient detail?

14   A    To come to my conclusion?

15   Q    Yes.

16   A    Yes.

17   Q    Tell me what you mean by sufficient detail.

18   A    So in doing a comparison, it's a qualitative/quantitative

19        analysis.  So if I have a -- a good quality print that not

20        only can I see the points, but also possibly I can see the

21        pores and the ridge shapes, I can take that into account.

22        So if I have a high quality print, I'm going to need fewer

23        of those points to come to that conclusion of sufficiency.

24        So obviously, if I have a poor quality print, I'm going to

25        need more of those points to help me come to that area -- to

1       the point where I say yes, there's sufficient amount of

2       information here to declare this print belongs to any

3       person.

4   Q   Is there a threshold for the points of comparison?

5   A   There is not.  There is no magic number, simply because

6       of -- like I said, the quality and the quantity can vary

7       from one latent print to the next.

8   Q   Now, have you ever received lifts that were labeled from a

9       computer for your analysis -- that were lifted from a

10      computer?

11  A   On -- on this case?

12  Q   No, on any case.

13  A   Oh, from a computer.  Yes, I believe I have had prints from

14      a computer.

15  Q   And were you able to analyze those lifts with sufficient

16      detail from computers?

17  A   Yes, I believe I have.

18  Q   Okay.

19          MR. BOCK:  Thank you.

20          THE COURT:  Any redirect?

21          MR. PIMSNER:  No, your Honor.  Thank you.

22          THE COURT:  Any questions from the jury for this

23  witness?

24          All right.  Thank you, sir.  You may step down.

25          --------------------------

1         (Brian Nowak was duly sworn by the clerk.)

2                        BRIAN NOWAK

3                    DIRECT EXAMINATION

4    BY MS. ANDERSON:

5    Q    Sir, are you employed by the F.B.I.?

6    A    I am.

7    Q    How long have you been so employed?

8    A    10 years.

9    Q    Did you have any previous law enforcement before you joined

10        the F.B.I.?

11   A    I was a police officer in Western New York --

12   Q    For how long?

13   A    -- prior to -- about seven years.

14   Q    Now, what assignments have you held with the F.B.I. over the

15        years?

16   A    I have and currently do -- I am one of the WMD Coordinators,

17        or Weapons of Mass Destruction Coordinators, and therefore

18        I'm tasked with investigating WMD or weapons of mass

19        destruction crimes, which involve anything chemical,

20        biological, radiological, or nuclear.

21   Q    What unit are you currently assigned to?

22   A    I currently work with the Violent Crime Major Offenders

23        Squad, and I'm also Assistant Team Leader for our HAZMAT

24        Response Team for Phoenix.

25   Q    Now, before you joined the violent crime squad you were with

1       a different squad, correct?

2   A   I was with the Joint Terrorism Task Force, or JTTF.

3   Q   And how long did you sit on the Joint Terrorism Task Force?

4   A   About 7 years.

5   Q   Now, you're the case agent in this case, are you not?

6   A   I am.

7   Q   And you responded to the Levine's residence on August 2nd,

8       2009, correct?

9   A   Correct.

10  Q   And you assisted at the scene in a lot of different ways,

11      everything from advising other officers what tasks they

12      should do, all the way up to seizing evidence, is that

13      correct?

14  A   Correct.

15  Q   And since that time you've been deeply involved in the

16      investigation, correct?

17  A   I have.

18  Q   Now, on August 14th of 2009, you had occasion to -- to chat

19      with Mr -- Mr. Fries, did you not?

20  A   I did.

21  Q   And that was about the facts of the case, correct?

22  A   Correct.

23  Q   That's Todd Russell Fries, correct?

24  A   Yes.

25  Q   Do you see him here in the courtroom?

```
 1   A    I do.

 2   Q    Could you point to him, and tell us what he's wearing?

 3   A    He's over there.  He's in a blue sport coat, white shirt,

 4        and tie.

 5             MS. ANDERSON:  May the record reflect the

 6   identification of the defendant, your Honor?

 7             THE COURT:  Yes, the record may so reflect.

 8   BY MS. ANDERSON:

 9   Q    Now, why is it that you went to chat with Mr. Fries on

10        August 14th of 2009?

11   A    We wanted to just do an initial interview, and see what

12        Mr. Fries had to say.

13   Q    Now, he told you numerous things, and one thing was that --

14        you had told him about the facts of the case, a limited

15        number of facts of the case, correct?

16   A    Correct.

17   Q    And he responded regarding some toxic fumes, isn't that

18        right?

19   A    He did.

20   Q    Let's talk about that.  Could you tell us what he said?

21   A    According to my report, on 8/14/2009 he stated "I heard that

22        there were toxic fumes in the attack."  He then exclaimed:

23        "That shit.  Those sons of bitches should go to jail.  If I

24        were you, I'd follow-up every lead possible."

25   Q    And then you asked him about the Levines, correct, and where
```

1        they lived?

2    A    I did.

3    Q    And what did he say?

4    A    "They live on that Magee/Shannon area, right?"  And then he

5         continued on to say that "Funny you should say that.  Wow,

6         what a coincidence.  It's weird.  On Sunday, August 2nd, I

7         happened to be with JB, who works for Thoroughbred Nissan,

8         that morning.  We were going for a ride on our Harleys.  I

9         got to his home between 4:30 a.m. and 4:45 a.m."

10   Q    And then you asked him about who he had been riding with,

11        and the path that they took, is that correct?

12   A    I did.

13   Q    And what did he say?

14   A    Fries described JB as a big redneck --

15            MR. BOCK:  Objection to that, your Honor.

16            THE COURT:  Well, I don't know what's to come, so let

17   me see counsel at sidebar, please.

18                          BENCH CONFERENCE

19            THE COURT:  Okay, so where are we going?

20            MR. BOCK:  She wants to get into -- this is one of the

21   motorcycle riders, and this is how he described him.  What

22   materiality is that?

23            MS. ANDERSON:  That's not -- it -- it's -- it is the

24   defendant's words, and it's not necessarily derogatory.

25            THE COURT:  And is that person going to be a witness?

1          MS. ANDERSON:  Not next, but then the next one.

2          THE COURT:  Okay.

3          Mr. Bock, I'm going to let her -- you know, this is his

4     actual statement.  I don't think it's unduly prejudicial using

5     the word redneck, so I'm going to overrule your objection.

6          MR. BOCK:  Can I show you one other thing?

7          THE COURT:  Oh, absolutely, while we're here.

8          MR. BOCK:  Can I ask my client this, then, on --

9          THE COURT:  What does that have to do with the

10    redneck -- oh, you just want -- it's not related to that.

11         MR. BOCK:  This is part of his statement.

12         MS. ANDERSON:  What is that?  Something --

13         MR. BOCK:  Can I ask him that?

14         MS. ANDERSON:  Your Honor, we're going to stop it right

15    here.

16         MR. PIMSNER:  We would object to that.

17         MS. ANDERSON:  We're going to stop.

18         MR. BOCK:  Where they stop I don't have to stop, do I?

19         THE COURT:  Well -- so that's what we were talking

20    about.  That sounds like self-serving hearsay to me, the part you

21    want to get in, the second page.

22         MR. BOCK:  So I can't get that in?

23         THE COURT:  Not through this witness.

24         MR. BOCK:  Isn't there a rule where if they put the

25    statement -- part of the statement in, I can get the rest of the

```
 1   statement --
 2              THE COURT:  No, the rule of completeness does not
 3   apply.
 4              MR. BOCK:  106?
 5              THE COURT:  Right.  No, that doesn't -- not the
 6   self-serving portions from your client.  That would be hearsay.
 7              MS. ANDERSON:  I've got a case to cite to the Court.
 8   It's U.S. v. Mitchell.  It's a 2007 Ninth Circuit case.  I left
 9   it at my desk.  May I go get it and get the citation?
10              THE COURT:  No, that -- we can supplement the record
11   later.
12              No, you can't get into that last --
13              MR. BOCK:  So I can only get into what they get in?
14              THE COURT:  Right, unless you want to put your client
15   on the stand and bring out the fact -- those facts.
16              MR. BOCK:  Okay.
17              (The bench conference was concluded.)
18              THE COURT:  All right, Ms. Anderson, you may proceed.
19              MS. ANDERSON:  Thank you, Judge.
20   BY MS. ANDERSON:
21   Q    Special Agent Nowak, you can go ahead and proceed.  Fries
22        was telling you that he had been with an individual named
23        JB, correct?
24   A    Correct.
25   Q    What did he tell you?
```

| | | |
|---|---|---|
| 1 | A | He described JB as a big redneck that lives on Thornydale |
| 2 | | near the Quick Mart off of Cortaro. |
| 3 | Q | Did he describe the route that they had taken that day? |
| 4 | A | He did. |
| 5 | Q | What did he say? |
| 6 | A | He had stated that "We left his house with some friends of |
| 7 | | his that went down the valley near Cortaro, then past |
| 8 | | Nanini, on Shannon, then to Ina, Oracle, and Florence, then |
| 9 | | finally came down to I-10 and had lunch at Cracker Barrel." |
| 10 | Q | Did he tell you anything else about their ride? |
| 11 | A | He did.  He mentioned about when they rode down Cortaro |
| 12 | | there was an awful white cloud of chlorine.  "I was on my |
| 13 | | bike, and we rode through it.  It smelled like a pool, and |
| 14 | | made my eyes water, and chest burn. |
| 15 | Q | Did you ask him at some later point about the route that |
| 16 | | they had taken? |
| 17 | A | I did. |
| 18 | Q | And what did he say? |
| 19 | A | And the second time he changed the route a little bit and |
| 20 | | stated that they went from Cortaro to La Cholla, instead of |
| 21 | | Nanini. |
| 22 | | MS. ANDERSON:  That's all I have, Judge. |
| 23 | | THE COURT:  And your case agent will be recalled at a |
| 24 | | later time, Ms. Anderson? |
| 25 | | MS. ANDERSON:  Judge, could we have a moment? |

1            THE COURT:  Yes.

2    BY MS. ANDERSON:

3    Q    Let's -- let's back up just a little bit.  He told you that

4         the Levines live on Magee and Shannon area, right?  "Funny

5         you say that."  And he -- he told you that on August 2nd he

6         happened to be with JB, correct?

7    A    Correct.

8    Q    Who works where?

9    A    At Thoroughbred Nissan.

10   Q    Did he tell you what time they were going for a ride?

11   A    "Going for a ride on our Harleys.  I got to his home between

12        4:30 a.m. and 4:45 a.m."

13           MS. ANDERSON:  That's all I have, Judge.

14           THE COURT:  All right.  And this witness is going to be

15   recalled for other matters, I would imagine?

16           MS. ANDERSON:  Correct.

17           THE COURT:  Okay.

18           So Mr. Bock, would you like to question the --

19   cross-examination on what he's testified to?

20           MR. BOCK:  I can cross-examine him when he's recalled

21   on this?

22           THE COURT:  On this?

23           MR. BOCK:  Yes, on this.  Can I cross-examine him on

24   this when he's recalled, or should I be doing that now?

25           THE COURT:  I would suggest you do it now since he's on

1    the stand while -- I think that's easier for the jury to absorb,

2    not that you can't ask him questions later about this if you'd

3    like.

4                    MR. BOCK:  All right.

5                           CROSS-EXAMINATION

6    BY MR. BOCK:

7    Q    So where did you -- Agent, where did you go and meet with my

8         client?

9    A    At his residence.

10   Q    Okay.  And did you announce that you were coming?

11   A    We did.

12   Q    Okay.  And how -- and did you talk with him inside the

13        residence, or outside the residence?

14   A    We started talking inside the residence, then continued our

15        conversation outside the residence.

16   Q    And he was -- he answered your questions, is that correct?

17   A    He did.

18   Q    Had a dialogue with you?

19   A    He did.

20   Q    He was cordial?

21   A    Yes.

22   Q    But this -- and this report that you've testified to, the

23        F.B.I. does not as a protocol record the conversations, is

24        that correct?

25   A    Correct.

1  Q    So what you would have done is you would have taken notes,

2       and then at some point in time incorporated them into the

3       report that you have in front of you regarding this contact

4       with my client, is that correct?

5  A    Correct.

6            MR. BOCK:  Nothing further.

7            THE COURT:  All right.

8            Any redirect?

9            MS. ANDERSON:  No, your Honor.

10           THE COURT:  All right, may this -- any questions from

11  the jury for this witness on this particular subject?  He will be

12  back to testify about other things.

13           All right.  Thank you, sir.  You may step down.

14           -------------------------

15           (Earl Scott Jones was duly sworn by the clerk.)

16                    EARL SCOTT JONES

17                  DIRECT EXAMINATION

18  BY MS. ANDERSON:

19  Q    And sir, do you live here in Tucson?

20  A    I'm sorry?

21  Q    Do you live here in Tucson?

22  A    I sure do, ma'am, yes.

23  Q    What area of town do you live in?

24  A    I live on northwest.  I live out near Cotaro Farms.

25  Q    How long have you lived in that location?

1   A   Probably about 14, 15 years.

2   Q   Now, do you work?

3   A   Yes, I do.

4   Q   Where do you work?

5   A   I'm the service director at Holmes Tuttle Ford.

6   Q   How long have you been in that position?

7   A   I've been the service director there for about four years.

8       I've been with the Click organization for 25.

9   Q   What do you do in your current position?

10  A   Oversee the parts and service department, technicians,

11      service advisors, and -- and day-to-day business and

12      service.

13  Q   And I'm -- I'm sorry, what -- what's the name of the

14      business that you currently work at?

15  A   Holmes Tuttle Ford.

16  Q   And before there where did you work?

17  A   Jim Click Nissan.

18  Q   Okay, and what did do for Jim Click Nissan?

19  A   I was the service manager there at Jim Click Nissan also for

20      about six years before moving over to Holmes Tuttle Ford.

21  Q   Now, do you -- do you know an individual by the name of Todd

22      Fries?

23  A   Yes, I do.

24  Q   Do you see him here in the courtroom today?

25  A   Well, I can't really, but -- yes.

1          THE COURT:  You can stand up if you need to, sir.

2          THE WITNESS:  Yeah, it's just that thing's in the way.

3          Yes, I do see him.

4    BY MS. ANDERSON:

5    Q    Okay, could you point to him and tell us what he's wearing?

6    A    A suit and a tie, and -- I'm color blind so I'm not real

7         good on colors, so I can't tell you.

8    Q    Is he sitting here next to --

9    A    Next to the gentleman with the glasses, to the right.

10   Q    Okay, he's sitting next to the gentleman with the glasses?

11   A    Correct.

12         MS. ANDERSON:  May the record reflect identification of

13   the defendant, your Honor?

14         THE COURT:  Yes, the record may so reflect.

15   BY MS. ANDERSON:

16   Q    Now, Mr. Jones, how is it that you know the defendant?

17   A    When I worked at Nissan, Mr. Fries bought a couple of Titan

18        trucks from us -- from the sales department, and I know him

19        from that transaction.

20   Q    What is your best estimate about when he purchased those

21        vehicles?

22   A    You know, I'm -- it's a guess, but I'm going to say probably

23        2004, 2005, maybe 2006.  Somewhere in that area.

24   Q    Now, have you ever socialized with the defendant?

25   A    I have not, no.

1    Q    However, you saw him on the morning of August 2nd, 2009,

2         correct?

3    A    Yes, ma'am, I did.

4    Q    Tell us what you were doing that morning, and how it is that

5         you -- you saw the defendant that morning?

6    A    One of the -- a friend of mine, JB Clark, is a -- and I are

7         both motorcycle riders.  And JB and I had agreed to go on a

8         bike ride that morning.  So I met JB at his house somewhere

9         between 6:30 and 7:00 o'clock that morning to go bike

10        riding, motorcycle riding.

11   Q    Now, had you and Mr. Clark ridden bikes -- motorcycles

12        together in the past?

13   A    Oh, yes, ma'am.  A lot.  For years.

14   Q    I'm -- for three years, did you --

15   A    For years.  Probably two to three years, I would say,

16        easily.

17   Q    How often did the two of you get together and ride

18        motorcycles?

19   A    You know what?  Twice a month, at least.  We -- we both work

20        Saturday, so when we had alternate Saturdays we'd -- you

21        know, once or twice a month at least.

22   Q    Did Mr -- did Mr. Clark also work with you at Jim Click?

23   A    He did.  When I was a service manager there, JB was one of

24        the service advisors at that dealership.

25   Q    He goes by JB, is that --

1   A    I call him JB.  It's Jeff Clark, but I've always called him

2        JB.

3   Q    Okay.  So what's your best estimate of the number of times

4        that the two of you have actually ridden motorcycles

5        together?

6   A    Oh, 50, 60 times, easily.

7   Q    Did your wife go with you?

8   A    Yes, she did.

9   Q    Does she have her own motorcycle, or does she ride on the

10       back of yours?

11  A    No.  No, she rode behind me.

12  Q    Would you always meet at roughly the same time?

13  A    Yeah.  Usually, we try to ride early in the morning, you

14       know, kind of before the day got started, before the sun got

15       up, before it gets too hot.

16  Q    So was that roughly between 6:30 and 7:00?

17  A    Yes, I think it was.

18  Q    Now, you told us where you live.  Where does -- back on

19       August 2nd of 2009, where did JB Clark live?

20  A    You know, I don't know his physical address, but he -- it's

21       about a quarter of a mile from the -- what would be the

22       intersection of Cortaro and Thornydale.  It would be -- I

23       guess it would be north -- or actually southeast of

24       Thornydale.

25  Q    Can you estimate for us how much time it would take you and

1        your wife to -- to ride your motorcycle from your house down

2        to JB Clark's house?

3  A   You know, maybe 10 -- 10, 15 minutes, maybe.

4  Q   So on August 2nd, 2009 if you had to be at JB's between 6:30

5        and 7:00, when would you expect that you would have left

6        your house?

7  A   We -- we probably left -- I -- I want to -- because I

8        usually fuel up before I go.  I don't know if I did that

9        morning, but I probably left home about 6:15, somewhere

10      around that.

11  Q   6:15?  Is that right?

12  A   Yes, ma'am.

13  Q   Okay.  All right.  So as you and your wife were heading over

14      to -- to Mr. Clark's house on August 2nd, that morning, did

15      you notice anything unusual?

16  A   Well, there were a lot of emergency vehicles that morning

17      for some reason.  We didn't know why, but we -- we made a

18      comment when we got down to Cortaro to stop that from our

19      house to there, we'd probably heard three different times

20      sirens that morning.  So it just was an unusual morning

21      for -- for that kind of activity that early.

22  Q   When you got to Mr. Clark's home, was he outside?

23  A   I think he -- I think he was coming out of the garage when

24      we got there that morning, yes, ma'am.

25  Q   What's your best estimate about the time that you got to

1        Mr. Clark's house on August 2nd of '09?

2   A    I'm just guessing, but it was probably about either twenty

3        to seven or quarter to seven.  Somewhere around that, I

4        would think.

5   Q    Was there somebody there at Mr. Clark's house in addition

6        to -- somebody else that you weren't necessarily expecting

7        at his house?

8   A    Yeah, Mr. Fries was there with his motorcycle that -- that

9        morning.

10  Q    Did you subsequently learn that he was going to join you on

11       your ride?

12  A    I did.  JB told me that he was going to be riding with us

13       that day.

14  Q    What time did you leave JB's house, if you recall?

15  A    Almost right after we got there, so it was probably pretty

16       close to -- to a quarter of seven, maybe 7:00 o'clock.

17  Q    And another individual joined you, did he not?

18  A    He did, yes.  It was also --

19  Q    Do you remember the name of that other individual?

20  A    I don't remember his name.  It was the first time I'd ever

21       seen him.  He was a friend of JB's also.

22  Q    Do you recall where you went that morning?

23  A    I don't exactly recall where we went.  We rode for a couple

24       of hours.  I think we rode north of where we were, up I-10

25       towards -- I'm trying to think of the name of the place up

1          there.

2   Q      Red Rock?

3   A      Red Rock.  There you go.  Up towards Red Rock, but I really

4          don't remember our whole track that morning.  It was not

5          a -- we never drove standard bike places or standard rides

6          all the time.  We just went to different places, and I don't

7          remember our -- our track that day.

8   Q      So that was my next question.  Do you remember the route

9          that you took?

10  A      I really don't.  I remember bits and pieces of it.  I

11         remember coming back, because we came back down I-10 across

12         the railroad track, I think, up next to Red Rock.  We came

13         back down I-10, and we had breakfast at the restaurant right

14         there at Cortaro.

15  Q      Okay.  What time did you get back to Mr. Clark's house?

16  A      We didn't go back to his house.  We -- the restaurant was

17         the last place we all were together, and I think we got back

18         to the restaurant around maybe 9:30, 10:00-ish.

19  Q      Okay.  Now, during the time that you were with Mr. Fries

20         that day, did you notice him using the phone, his cellphone?

21  A      I did.  One time we -- we were coming down a long stretch of

22         road heading back towards I-10, and Mr. Fries took off ahead

23         of us kind of fast, and -- and left the three of us back

24         there.  He went out of sight of where we were.  When we

25         caught up, he was at the end of the street.  His

1          motorcycle -- he just pulled off on the side with his

2          motorcycle, and he was leaning against his motorcycle

3          talking on the phone.

4              MS. ANDERSON:  May I have just a second?

5              THE COURT:  Yes.

6              MS. ANDERSON:  That's all we have, Judge.

7              THE COURT:  Cross-examination?

8                          CROSS-EXAMINATION

9     BY MR. BOCK:

10    Q    Mr. Jones, is this the -- on the day of the bike ride that

11         you just testified to, was this the first time that you met

12         Todd Fries?

13    A    No.  I'd met him at the Nissan store when he purchased a

14         vehicle there.

15    Q    Okay, and did you have contact with him yourself?

16    A    You know what?  It was kind of indirect.  It -- he'd

17         purchased a vehicle, and I think we were doing some add ons

18         to the vehicle that didn't necessarily go right, so I think

19         I probably spoke to him for two or three minutes doing

20         that -- doing that purchase time in order to help get that

21         expedited.

22    Q    And did you know that he owned the Burns Power Supply?

23    A    I did, yes.

24    Q    And the vehicles that he purchased, you put a timeframe of

25         anywhere between 2004 and 2006?

1    A    Yes, I -- that's what I think it was, because I left over

2         there in late 2007, and I was still there when he purchased

3         them.

4    Q    So there was that purchase, so would it have been one

5         contact, one isolated contact with him at the --

6    A    I think that's it, yeah.  That's all I remember.

7    Q    So the next time you see him, then, is on August of 2009, is

8         that correct?

9    A    Correct, yes, sir.

10    Q    So you hadn't seen him in perhaps three years or more?

11    A    Could -- could be that, yes, sir.

12    Q    Now, you said that -- do you normally go -- what type of a

13         motorcycle do you have?

14    A    I had a 2005 Harley Electra Glide.

15    Q    And your wife, did she go with you?

16    A    She rode with me, yes, sir.

17    Q    She's a witness in this case?

18    A    I think so, yes, sir.

19    Q    And what's her first name?

20    A    Pamela.

21    Q    And what type of bike did your wife have?

22    A    She rode with me.  She didn't have her own.

23    Q    And what type of -- did Mr. Clark have?  What type of bike

24         did he have?

25    A    I believe he had a 2006 Road King, I think, Harley.

1   Q   And then there was an unknown individual with Ms. Fries, is

2       that correct?

3   A   Correct.  Yeah, he was riding a Honda.

4   Q   And he was associated with Mr. Clark?

5   A   Correct.

6   Q   Mr. Clark seemed to know him?

7   A   Yeah.  JB told me he was a customer at the Nissan store.

8   Q   And what type of bike did Mr. Fries have?

9   A   He had a Harley Davidson also.

10  Q   What color was it?

11  A   You know, as I stated earlier, I'm color blind.

12  Q   Oh, that's right.

13  A   But if I had to guess, I would say maybe a blue or

14      something, but I'm not good at colors.

15  Q   It wasn't a trick question.  I forgot what you stated.

16          Okay.  Now, you mentioned -- do you usually go bike

17      riding in the summer?

18  A   Yes.

19  Q   And you want to go bike riding in the early morning hours,

20      is that correct, so it's --

21  A   Correct.

22  Q   -- not too hot?

23  A   Yes, sir.

24  Q   Like, just around sunrise?

25  A   Yes, sir.

1   Q   Do you think on August 2nd it's much more possible that you

2       went bike riding around sunrise, which might have been at

3       5:15 or 5:30 in the morning, rather than 6:30 or 7:00?

4   A   You know, I don't think it was, because that's a little

5       early for weekends.  That would have been fine with me, but

6       JB was not a guy that liked to ride that early.  My wife and

7       I did, but he usually didn't want to be a 5:00 or 5:30 guy.

8   Q   Would you agree with me that you're not confident on the

9       times, are you?

10  A   I would say that I -- I'm sure it wasn't 5:00 or 5:30, I'm

11      sure of that, but that's -- beyond that I would say I'm not

12      confident of the time, yes, sir.

13  Q   And when you spoke with -- you spoke with Agent Nowak, is

14      that correct, this gentleman?

15  A   Correct, yes.

16  Q   And he's got the green shirt on -- darker green shirt and a

17      tie on?

18  A   Yes, sir.

19  Q   And did you give him -- did you see your report of your

20      conversation with him?

21  A   Yes.

22  Q   Would you agree with me in your report there was -- there's

23      nothing about any times?

24          THE COURT:  Well, wait, Mr. Bock.  Could you clarify --

25  that's not his report.  That's the agents report.

1           MR. BOCK:  That's what I meant to say.

2           THE COURT:  All right, could you rephrase that?

3    BY MR. BOCK:

4    Q    Did you see the agent's report?

5    A    Briefly.

6    Q    Did you read the agent's report?

7    A    Briefly, yes.

8    Q    And the agent's report had to do with him having a

9         conversation with you, looks like on February the 16th?

10   A    Correct.

11   Q    And would you agree with me that in the agent's -- well, let

12        me rephrase that.

13           Do you remember talking to the agent specifically about

14        a timeframe?

15   A    No.  What I would say is the time in my mind has always

16        been -- I wasn't 100 percent sure of the time, because of

17        how long ago it had been, but I thought it to be around

18        6:00.  Somewhere between 6:00, 6:30, 7:00 o'clock.

19   Q    But you agree with me it might have been a little earlier?

20   A    It's possible.

21   Q    The -- the destination you went to is a little sketchy in

22        your mind?

23   A    Yes, sir.

24   Q    Now, how was Mr. Fries -- do you have helmets on the when

25        you drive?

1    A    No, I don't.

2    Q    Did Mr. Fries have a helmet on?

3    A    I don't believe he did, no.

4    Q    Just the windshield of the motorcycle?

5    A    You know what?  I don't remember whether he had a

6         windshield.  Mine had a windshield, but I can't remember his

7         had a windshield or not.

8    Q    Eye guards, or anything that you wear?

9    A    Sunglasses.

10   Q    The jacket, do you wear a --

11   A    I usually don't.  I don't remember that day, because I don't

12        remember if it was cold or not, but I usually don't.  No.

13   Q    You do remember, though, it was August -- August 2nd?

14   A    Yes.

15   Q    The -- did you -- did you come close to Mr. Fries at the

16        restaurant?  Did you sit next to him?

17   A    Yeah, we sat -- I think my wife and I sat across from him,

18        if I remember right.

19   Q    Anything unusual about Mr. Fries?  Anything strike you

20        unusual?

21   A    No.  I would have --

22   Q    Just out for a -- just out for a social ride together, is

23        that correct?

24   A    Correct.

25             MR. BOCK:  May I have a second, your Honor?

1          THE COURT:  Yes.

2          MR. BOCK:  Nothing further, your Honor.

3          THE COURT:  All right.

4          Any redirect?

5          MS. ANDERSON:  Just very briefly.

6                    REDIRECT EXAMINATION

7   BY MS. ANDERSON:

8   Q    Mr. Jones, how many years have you and your wife and JB been

9        riding motorcycles together?

10  A    Oh, I want to say probably four, five years.

11  Q    And I think you said it's typically twice a month, correct?

12  A    Correct.

13  Q    And do you always start at the same time?  Do you always

14       meet at the same time?

15  A    Usually about the same time, yes, ma'am.

16  Q    Which is between 6:30 and 7:00?

17          MR. BOCK:  Judge, she shouldn't lead -- it's leading.

18          THE COURT:  Yes, sustained.

19  BY MS. ANDERSON:

20  Q    Between what times would you meet at JB's house?

21  A    Usually between 6:30 and 7:00 o'clock.

22          MS. ANDERSON:  That's all I have.

23          THE COURT:  All right.

24          Any questions from the jury for this witness?

25          All right.  Thank you, sir.  You may step down.

```
 1                        ------------------------
 2              (Jeffrey B. Clark was duly sworn by the clerk.)
 3                        JEFFREY B. CLARK
 4                        DIRECT EXAMINATION
 5   BY MR. PIMSNER:
 6   Q    Mr. Clark, where do you currently reside?
 7   A    I'm -- Kentucky.
 8   Q    And how long have you been living in Kentucky?
 9   A    Moved back on February the 21st of this year.
10   Q    And do you go by any other names, or nicknames?
11   A    Yes.
12   Q    And what is that?
13   A    JB.
14   Q    Okay.  People know you as JB?
15   A    Mostly from my employer.
16   Q    Okay.  And are you currently employed in Kentucky?
17   A    Yes.
18   Q    What type of work?
19   A    Same thing I was doing here.  I'm a service advisor for a
20        Nissan dealership.
21   Q    And prior to living in Kentucky, you lived in Arizona?
22   A    Yes, sir.
23   Q    Between what dates, roughly?
24   A    I moved here in March of 2002, and I moved away in February
25        of 2012.
```

1    Q    So approximately ten years?

2    A    Yes, sir.

3    Q    And where did you -- generally, where did you have live when

4         you -- what part of town did you live at when you lived in

5         Arizona?

6    A    When I first moved to town, I lived on Old Father at a place

7         called Trevier Place Apartments, and then I moved to a house

8         that my wife and I purchased on Rancho Escondido, which was

9         the northwest side of town.

10   Q    All right.  And you said you were doing the same thing --

11        you're doing the same thing in Kentucky that you did here.

12        Who were you employed by in Arizona?

13   A    Jim Click Nissan.

14   Q    Okay.  And was that the entire time that you were here?

15   A    Yes, sir.

16   Q    Okay.  And what were your -- what was your responsibilities

17        or title, I guess I should say, at Jim Click?

18   A    Was a service advisor.

19   Q    And as a service advisor, do you interact with customers

20        bringing their vehicles in?

21   A    Very much so.

22   Q    Okay.  And do you know an individual by the name of Todd

23        Fries?

24   A    Yes, sir.

25   Q    And how do you know him?

1    A    He's a customer of mine.

2    Q    And how long had he been a customer of yours?

3    A    I think since '06 until I moved.

4    Q    And how often would you see him?

5    A    Periodically three, four months, sometimes sooner if he had

6         a problem.

7    Q    And how would you describe your relationship as a customer,

8         your -- your -- your professional relationship with him

9         mainly?

10   A    My job was to basically make people feel comfortable and

11        reassure them that their vehicle would be fine, and -- and

12        he and I got along good.  It's -- you know, we had some

13        things in common, mostly motorcycles.

14   Q    Okay.  And do you see Mr. Fries in the courtroom today?

15   A    Yes.

16   Q    Could you point to where he's sitting, and just describe

17        what he's wearing?

18   A    He's right over there wearing a tie.

19   Q    Is he to the right of the two people sitting at the counsel

20        table?

21   A    Yes, to the right of the projector.

22            MR. PIMSNER:  May the record reflect the identification

23   of the defendant, your Honor?

24            THE COURT:  Yes, the record may so reflect.

25   BY MR. PIMSNER:

1    Q    And you mentioned -- so you have a motorcycle, correct?

2    A    Yes, sir.

3    Q    You ride for recreation?

4    A    All the time.

5    Q    And back in August of 2000 -- well, did you -- did you ever

6         ride a motorcycle -- or ride with Mr. Fries on a motorcycle?

7    A    Not until the -- the day that he and I rode with Mr. Jones

8         and Mrs. Jones.  That's the first time, and the only time.

9    Q    Okay, so from the time that you met him in 2006 to -- and

10        would that have been on or about August 2nd, 2009?

11   A    I don't remember the exact date, but I do know it was in

12        August, because it was hot.

13   Q    And so from the time you first met Mr. Fries until August

14        when you rode with him, you had never had any -- you never

15        rode motorcycles with Mr. Fries?

16   A    No, but we talked about it quite often.

17   Q    Okay.  And how did that come about that Mr. Fries rode with

18        you on that day?

19   A    I mentioned that we were going, and I invited him because

20        everybody was welcome.  It was whomever wanted to come was

21        welcome to go.

22   Q    Okay.  And you already had it planned with, you said, Scott

23        Jones and Pam Jones?

24   A    Yeah.

25   Q    And who's Scott Jones?

```
 1   A   Scott was my manager.

 2   Q   Okay, so he supervised you?

 3   A   Yes, sir.

 4   Q   And did you guys -- would you frequently go riding

 5       recreationally on your --

 6   A   Quite often.

 7   Q   And on August -- do you recall when you told Mr. Fries that

 8       everyone was welcome to join you on the bike ride?

 9   A   I think he was in for some service, and I think it was

10       towards the end of the week, and I mentioned that we were

11       planning a ride and he was welcome to go.

12   Q   And what day of the week did you actually conduct your ride?

13   A   Sunday.

14   Q   Okay.  And you had discussed with Mr. Jones or set a time

15       with Mr. Jones prior when you first set up your ride as to

16       what time you -- you would head out?

17   A   We -- we pretty much has a set time.  Most of the time that

18       we rode, it was always early enough to ride before it got

19       too hot.

20   Q   Okay.  And on that date, that Sunday in August, do you

21       recall what time you had set?

22   A   We were to meet at 7:00 a.m.

23   Q   Okay, and you're certain about the time?

24   A   Yes, sir.

25   Q   It wasn't at 4:30, 5:00 in the morning?
```

1    A    No, sir.  We did this frequently.

2    Q    Now, did you provide your -- your home address to Mr. Fries?

3    A    Yes, I did.

4    Q    And after the time you have told him everyone was welcome

5        until the time of your ride, did you have any further

6        conversation with Mr. Fries from the time --

7    A    Not to my knowledge.

8    Q    Okay.  When was the next time that you saw Mr. Fries after

9        you had invited him on the ride?

10   A    The Sunday morning that we rode.

11   Q    Okay.  Do you recall what time you first saw Mr. Fries?

12   A    That morning he was at my house a little earlier than I

13       expected.  It was around 6:00 a.m.  I did hear his

14       motorcycle outside, and I got up and went outside and told

15       him to quiet down because it was a neighborhood, and -- it

16       was kind of a joke, but it was -- you know, I was just

17       trying to keep my neighbors from being annoyed.

18   Q    Now, prior when you invited Mr. Fries, did you tell him --

19       did you give him 7:00 o'clock as the time?

20   A    To the best of my knowledge.

21   Q    And when he arrived at 6:00 a.m., what were you doing at

22       that point?

23   A    I was still in bed.

24   Q    You're still sleeping?

25   A    Yes, sir.

1   Q    So what woke you?

2   A    His motorcycle.

3   Q    What was he doing to his motorcycle?

4   A    Sounded like he was starting it up, and then revved the

5        motor up.

6   Q    Okay, and that caused you some concern with your neighbors?

7   A    Little bit.

8   Q    Because that's -- why?  Was that earlier than you would

9        normally go out?

10  A    Well, not always.  I would go sometimes earlier, but I was a

11       little more, you know, concerned of -- I didn't want my

12       neighbors mad at me because of my loud motorcycle.

13  Q    When you heard the motorcycle revving in your driveway, what

14       did you do?

15  A    Got up and went outside and saw that it was Todd, and told

16       him I wasn't ready yet and to, you know, keep it down, and

17       went back in and started getting ready.

18  Q    Did you notice anything else when you went outside?

19  A    He had gotten it out of a trailer.  There was an enclosed

20       trailer hooked to a vehicle of his, and I questioned him

21       about it, and he said his motorcycle had been in his

22       trailer, and I didn't really think anything about it.

23  Q    And you said it was his vehicle.  Did you recognize his

24       vehicle?

25  A    Yeah, I recognized it.  It was one of the trucks that I

1    worked on at Clicks.

2    Q    Did you notice anybody with him?

3    A    Yes, there was another person with him that was evidently

4    driving the truck.

5    Q    And did Mr. Fries introduce you to that person?

6    A    No.

7    Q    Now, after you told him kind of knock it off a little bit,

8    or lower the noise, you know, your neighbors, what did you

9    do?

10    A    Went back inside and I started getting ready.  And once I

11    was ready, I -- I normally open my garage and roll my bike

12    back down off of the driveway onto the sidewalk, and started

13    getting my gear on, and getting ready to go.

14    Q    Okay.  And do you recall what time it was that you actually

15    went outside to get your bike to roll it down the driveway?

16    A    You know, it was -- it was somewhere between 6:30 and

17    quarter until 7:00.  I can't tell you exactly for sure, but

18    it took me a little bit to get ready.

19    Q    Okay.  And did Mr. Fries stay outside during this timeframe?

20    A    Yeah, he did.

21    Q    Now, where were you supposed to meet the Joneses for your

22    ride?

23    A    Right at the beginning of -- of the road that I lived on.

24    It runs into Cortaro Farms, and we met there frequently.

25    Q    So they weren't coming directly to your home?

| | | |
|---|---|---|
| 1 | A | No, they didn't come to my home.  They met us out on the |
| 2 | | road. |
| 3 | Q | And who went -- and I take it did you then drive to that |
| 4 | | intersection you just described? |
| 5 | A | Yeah, Todd and I -- when I got ready, we rode up to the |
| 6 | | intersection and sat and waited on them to get there. |
| 7 | Q | And so you -- it was just you and Todd riding at that point? |
| 8 | A | Yes, sir. |
| 9 | Q | And did his -- what happened to the -- his truck with |
| 10 | | pulling the vehicle -- or pulling the trailer?  Excuse me. |
| 11 | | I'm sorry. |
| 12 | A | I assume the fellow that was with him took off with the |
| 13 | | truck, because it was gone by the time we went to leave. |
| 14 | Q | Now -- and at no time did Mr. Fries introduce you or tell |
| 15 | | you who that other person was? |
| 16 | A | No.  I was actually getting ready, and I never walked over |
| 17 | | actually to meet anybody.  I just was getting ready to go to |
| 18 | | get on the motorcycle. |
| 19 | Q | Now, when you got to the end of your street on your |
| 20 | | motorcycle with Mr. Fries, did you get there before the |
| 21 | | anticipated meeting time with the Joneses? |
| 22 | A | We did. |
| 23 | Q | And how do you know that? |
| 24 | A | Well, it was before 7:00, and the Joneses weren't there yet, |
| 25 | | and they were -- usually he was pretty prompt about being |

1       there.

2   Q    Okay.  And what did you do at that point?

3   A    We just kind of talked about motorcycles, talked about each

4       other's bikes.

5   Q    Did you shut your bikes down while you waited?

6   A    Oh, yes.  We did.

7   Q    And do you recall how long you waited before the Joneses

8       showed up?

9   A    10, 15 minutes.  Something like that.  It wasn't that long.

10  Q    Let me show you --

11       MR. PIMSNER:  If I may approach the witness, your

12  Honor, and we can also put it up on the screen for the jurors.

13  It may be a little more clear than our chart, what's been marked

14  Exhibit 370.

15  BY MR. PIMSNER:

16  Q    I'm going to probably have you mark on this.

17       Can you hold that, please?

18       THE COURT:  Sir, can you just pull the microphones a

19  little -- over to you.  There you go.  One or both of them so

20  that you can talk and look at the same time.

21       Thank you.

22       And you want -- see, the idea is that the jury will be

23  seeing that when you're seeing it?  Are we ready for that yet?

24       Is there any objection to admitting this, Mr. Bock?

25       MR. BOCK:  No objection.

1          THE COURT:  Okay, so that's Exhibit Number what?

2          MS. ANDERSON:  360, I believe, your Honor -- 370.  I

3     apologize.

4          THE COURT:  370 is admitted.

5     BY MR. PIMSNER:

6     Q    Now, sir, could you -- I handed you a pen.  Could you put a

7          letter A to the location of your home back on August -- in

8          August, 2009?

9               And using your pen, can you point out that same

10         location on the screen also for the jury?

11              Can you read that, or do you want to use the larger

12         version?

13    A    I can't see it very well, no.

14    Q    Okay.  Could you point with your pen as to where your home

15         was at that point?

16    A    My home was right here.

17    Q    Okay, and what were -- what's the main road intersecting

18         your home?

19    A    It was close to Cortaro and Thornydale.

20    Q    Okay.  And that's where you would have -- nearby where you

21         would have waited for the Joneses?

22    A    Yes, sir.

23    Q    And when the Joneses arrived, where did you go?

24    A    We drove -- we drove down Cortaro Road and took a right on

25         La Cholla, down to Ina, and rode out to Oracle Road.  There

1         was a Shell gas station there at one time, on the corner of

2         Oracle and Ina, and we -- we stopped there to get gas and

3         also met another person that was riding with us.

4    Q    And could you mark a B where you stopped at that point?

5              And who was the individual that you met there?

6    A    His name is Pamon Otod.  He was one of my customers also.

7    Q    So the total amount of people on the ride were you,

8         Mr. Fries, the Joneses, and Mr. Otod, so five of you?

9    A    There was four motorcycles, five people.

10   Q    Okay, five people?

11   A    Um-um.

12   Q    And did you have any conversation with Mr. Fries at the gas

13        station?

14   A    Yes.  He had mentioned something about the fire truck coming

15        down Shannon.  Had -- question if I had seen it, and I

16        didn't see the fire truck but I did see some emergency

17        vehicles at the golf resort.

18   Q    Did you smell anything unusual on your ride?

19   A    No.

20   Q    Did you -- did Mr. Fries tell you that he smelled anything

21        unusual when you were talking to him at the Shell station?

22   A    No, sir.

23   Q    Now, just generally, could you describe the route that you

24        took after you guys -- you all gassed up?

25   A    Once we got gasoline, we rode up Oracle Road all the way to

1          Oracle Junction, and we took Highway 79 towards Florence,
2          about 18 miles.  And there's a road that turns to the left.
3          It's called Park Link Road, and it's about 18 or 20 miles.
4          It cuts over to I-10 frontage road right below Red Rock,
5          and -- very pretty road, and nice scenery.  Then we got --
6          after we made that ride, we came back out and got on the
7          interstate again, and drove back towards Cortaro Farms Road.
8          And there is a Cracker Barrel right there at I-10 and
9          Cortaro, and we stopped for breakfast.
10   Q     And did Mr. Fries stop for breakfast with you?
11   A     Yes.
12   Q     And did you all sit together?
13   A     Yeah, we did.
14   Q     And I take it everybody was talking freely, correct?
15   A     Yeah, we were all kind of cutting up, and just having a good
16          time, you know, being social.
17   Q     And at any time did -- did Mr. Fries mention anything about
18          a chlorine smell, or burning his eyes, or anything like
19          that?
20   A     Nothing at all.
21   Q     And did anybody else at the table mention about chlorine?
22   A     No, sir.
23   Q     And so after breakfast, what happened?
24   A     Everybody went home.
25   Q     Did you all go your separate ways at that location?

1    A    We all went our separate ways, yes, sir.

2    Q    And in which direction did you see Mr. Fries leave?

3    A    Last I saw him, he was going down I-10 headed south -- or

4         east, whatever you call it.

5    Q    He didn't come back to your house with you?

6    A    No, sir.

7    Q    And at any time after that occasion had you ever ridden a --

8         gone riding with Mr. Fries --

9    A    No, sir.

10   Q    -- on any other occasion?

11   A    No, sir.  That was the only time.

12            MR. PIMSNER:  I have nothing further, your Honor.

13            THE COURT:  All right.

14            Cross-examination?

15            Can you just -- if you want to just set that down, sir,

16   somewhere near you.  There you go.

17            MR. BOCK:  Am I up to Exhibit 419?

18            THE CLERK:  418.

19            MR. BOCK:  418.  Thank you.

20                         CROSS-EXAMINATION

21   BY MR. BOCK:

22   Q    Afternoon, Mr. Clark.

23   A    Good afternoon.

24   Q    Mr. Clark, in preparation of your testimony today, did you

25        have a chance to look at two F.B.I. reports that were

1       authored by Agent Nowak?

2    A    Concerning my comments, yes.

3         MR. BOCK:  May I approach the witness and show him

4    Exhibit 418, Judge, which is the F.B.I. report of August 14th,

5    and also show him 419, which is the F.B.I. report of February 16,

6    2011?

7         THE COURT:  Well, let me see counsel at sidebar,

8    please.

9                          BENCH CONFERENCE

10        THE COURT:  So are you going to try to question the

11   witness about a document that he didn't prepare?

12        MR. BOCK:  Well, I'm going ask him if he -- this is

13   information that he gave to the agent.

14        THE COURT:  Well, are you trying to --

15        MR. PIMSNER:  I don't -- he can ask him the questions,

16   and the witness can answer.

17        MR. BOCK:  And I can then show him the report and ask

18   if he asked the agent that.

19        THE COURT:  Well, wait.  I just don't think you should

20   use a report prepared by someone else and have another witness

21   review it.  You can just ask him did you tell the agent, and then

22   you can call the agent if it's not in the report, or is in there.

23        MR. BOCK:  I'll do that.

24        THE COURT:  Okay.

25        (The bench conference was concluded.)

1          THE COURT:  All right, Mr. Bock, you may proceed.

2          MR. BOCK:  Thank you, your Honor.

3    BY MR. BOCK:

4    Q    Now, Mr. Clark, just a little background information.  Not

5         to be repetitive, but Mr. Fries was a customer of Jim Click,

6         is that correct?

7    A    Correct.

8    Q    And your capacity was from the service portion of the -- of

9         the dealership?

10   A    Yes, sir.  I was the service advisor.  I would write the

11        paperwork up to give the technicians based on what the

12        customers had -- had difficulties with, something with their

13        vehicle or if they just had an oil change.  I would meet the

14        customer, great them, get all their information, and then I

15        would present the repair orders to the service technicians,

16        and get the repairs made, or the oil changed, whatever it

17        was.

18   Q    Mr. Fries had some oil changes done?

19   A    Yes, sir.

20   Q    The -- the vehicles -- did they have a Burns Power Washing

21        logo on them?

22   A    I -- I believe they all did at one time.  I know that -- I

23        can't remember exactly which ones had it, but they -- I

24        think they did have the Burns Power Washing on it.

25   Q    How big was his fleet of vehicles, approximately?

1    A    I know of two that he had.

2    Q    Now, the -- and your conversations with him were always

3         cordial during the business aspect, is that correct?

4    A    Yes, sir.  Part of my job was, you know, to be cordial, and

5         make friends with the customers.

6    Q    Well, you can have customers that have a chip on their

7         shoulder too, right?

8    A    Well, some of them sometimes would have that, but I never

9         experienced that with Todd.

10   Q    That's what I meant.

11   A    Yeah.  No, he was always easy to get along with.

12   Q    Was this the first time you went to -- on a motorcycle

13        outing with Todd?

14   A    Yes, sir.

15   Q    And the topic came up when in -- in -- keeping in mind that

16        the -- that the -- the ride took place on August the 2nd,

17        how many days before did the topic come up, about?

18   A    Just a couple or a few days before.

19   Q    And where was -- where was Mr. Fries when the topic between

20        he and you came up?

21   A    It was at my service drive.

22   Q    Did you know what type of motorcycle he had at that point in

23        time?  Had he discussed that with you?

24   A    We discussed the fact that he had a Harley Davidson.

25   Q    And you had what type of --

1  A    A Harley Davidson.

2  Q    Now, I want to take you now to August the -- the 2nd.  Did

3       you -- you gave him directions to your home?

4  A    Yes, I basically gave him my address.

5  Q    And your address was in the vicinity of Cortaro and

6       Thornydale?

7  A    Yes, sir.

8  Q    Now, you said on direct that you felt that he was at your

9       house at 6:00 a.m.?

10 A    That's -- after I had some time to think about it, yes, sir.

11 Q    You've qualified that answer, so I don't know what you meant

12      about after you had some time to think about it.

13 A    Well, I think originally on the report when I first spoke to

14      the F.B.I. agent on the phone I mentioned it might have been

15      as early as 5:30, but I was quite shocked that I was even

16      being asked these questions.

17 Q    Well, you were being asked these questions on August the

18      14th of 2009, is that correct?

19 A    Yes, on the telephone.

20 Q    And so August the 14th of 2009 was fairly close to the

21      morning of the ride on August 2nd, just -- August -- excuse

22      me, you were asked on August the 14th of 2009 on the

23      telephone, is that --

24 A    I'm not exactly sure of the dates.  I know it was right

25      after our ride sometime.

1   Q   Okay, but I guess the point I'm trying to make is that when

2       you spoke to the F.B.I. agent over the phone, it was a short

3       period of time from the time of the ride, is that correct?

4   A   Yes.

5   Q   And you gave -- you don't dispute the fact that you told him

6       it was at -- that Todd arrived at 5:30?

7   A   I -- I don't dispute it, that I told him that, no, sir.

8   Q   Okay.  And on -- he -- you spoke to the agent a second time

9       on February the 16th of 2011.  Do you remember that?

10  A   Yes, sir.

11  Q   And the agent actually came to your place of work?

12  A   Yes, he did.

13  Q   Is that the first time you had physically met the agent?

14  A   Yes, sir.

15  Q   What time did he come to your place of work?

16  A   It was prior to lunch, I do believe.

17  Q   And did you go -- did you have a private setting?

18  A   Yes.  We went into a cubicle that was -- that had a door

19      that we could close.

20  Q   Did you feel more relaxed than when you had spoken to the

21      agent over the phone some months earlier?

22  A   Yeah, I wasn't quite as shocked as I was originally.

23  Q   You -- do you remember telling the agent that it was about

24      5:30 a.m. when -- when Fries arrived at your home?

25  A   I remember that question being asked, and I remember stating

1       it 5:30, but I do remember I was kind of under pressure to

2       remember something that I did not think I would ever have to

3       remember again.

4   Q   Okay, so is -- you would agree with me that both times that

5       you were -- that you discussed this with law enforcement,

6       your -- your thoughts about the time were at 5:30 a.m.?

7   A   It seemed very early.

8   Q   Okay.  And did you remember -- was it -- when Todd Fries

9       came to your home, you say you were awakened by the noise of

10      the motorcycle?

11  A   Yes, sir.

12  Q   And your home -- would you have gone out the door to see

13      him, or what would you have done?

14  A   When I first saw -- when I first looked out, I went out --

15      because my bedroom was closest to the garage, and I had

16      windows in my garage door.  I looked out the window and saw

17      him, and then I proceeded to put some clothes on and go out

18      front to ask him to quiet down until I got ready.

19  Q   And would you agree with me that it was still dark out?

20  A   It was -- it was not completely dark, no.

21  Q   It was not sunrise yet, though, was it?

22  A   No, sir.  It was very close.

23  Q   Do you remember actually seeing the sunrise with Todd on

24      August the 2nd of 2009?

25  A   No, sir.

```
 1   Q   Now, you said that -- did you notice the other individual
 2       and this trailer when you first came out of the -- of your
 3       residence?
 4   A   When I came out of the house, yes, sir.
 5   Q   Okay.  Now, can you -- do you have a mental impression of
 6       the trailer?
 7   A   It was a black enclosed trailer.
 8   Q   Okay.  And it was being -- it was being hauled by something?
 9   A   Excuse me?
10   Q   The trailer, was it -- was it being attached -- was it
11       attached --
12   A   It was hooked to one of Todd's trucks.
13   Q   It was hooked to one of Todd's trucks.  And you saw Todd go
14       into the trailer?
15   A   No, sir.
16   Q   What did you -- what did you see of the trailer?
17   A   The trailer was setting there in the street with his truck.
18   Q   Okay.
19   A   I assumed that he had removed his motorcycle from the
20       trailer, because I asked him that and he had told me it was
21       in his trailer.
22   Q   Well, you had heard the bike rev?
23   A   Yes.  So I'm assuming he pulled it out of his trailer.
24   Q   So the bike had to be apart from the trailer like you just
25       said, right?
```

1   A    It was out of the trailer when I went outside.

2   Q    And the truck you described as a Power Burns supply truck?

3   A    Burns Power Washing.  I remember the colors of the truck,

4        yes, sir.

5   Q    Burns Power Washing.  Now, did you have some porch lights on

6        or some front lights on?

7   A    It wasn't that dark yet.

8   Q    You said it was close to sunrise?

9   A    Right, but I -- I don't have an opinion of sunrise other

10       than if I get to see the sun come up.  I know it was light

11       enough for me to see Todd standing there, and for me to walk

12       out my door without worrying about it being -- it was not

13       dark.

14   Q    Well, were there any lights on the truck -- any headlights

15       on the truck?

16   A    No, sir.

17   Q    Any headlights on the motorcycle?

18   A    No, sir.  It wasn't running when I came back out.

19   Q    Now, when you came back out, how long do you think you were

20       in the house for before you came back out?

21   A    Probably 30, 35 minutes.

22   Q    And when you came back out of the house, was the truck

23       there?

24   A    Yes, sir.

25   Q    Was the trailer there?

1  A    Yes, sir.

2  Q    And you say there was a -- a third person -- there was a

3       person associated with the truck and the trailer, is that

4       correct?

5  A    Yes, sir.

6  Q    Did you ever share that with Agent Nowak when you had spoke

7       to him on either August the 14th, or February the 16th?

8  A    No, sir.

9  Q    Did you get an opportunity to view the person associated

10      with the truck?

11 A    From -- from far away.

12 Q    Was it a male or a female?

13 A    It was a male.

14 Q    Was it -- was he Anglo?  Did you --

15 A    He was Anglo.

16 Q    Did he have a hat on, or did he have any type of --

17 A    I don't recall if he had a hat.  I don't think he did.

18 Q    Any idea of what his age might have been?

19 A    It looked like, you know, he could be at least in his late

20      30s, early 40s, somewhere in that area.

21 Q    Did he have glasses on?

22 A    I don't recall.

23 Q    Do you remember the color of his hair?

24 A    It was dark colored.

25 Q    Long sleeve shirt, short?

1   A   I don't recall.

2   Q   He never got out of the truck so you couldn't tell if --

3   A   No, he was standing out on -- between the truck and the

4       trailer when I saw him.

5   Q   Weight and height?

6   A   Slender, tall.  Taller person.

7   Q   Did you hear him -- did you hear him talk at all?

8   A   No, sir.

9   Q   And this is when you're out there initially, or is this --

10      you're out their initially.  You go back in your home for --

11      to get ready to go.  You come out again about 30 minutes

12      later, and the individual is still there, is that correct?

13  A   Yes, sir.

14  Q   The truck is still there.  The trailer is still there.  And

15      the -- Todd is out with the motorcycle?

16  A   Todd's out with the motorcycle, and when I came back out it

17      wasn't very long after I came back out this gentleman left.

18  Q   Did you see Todd interacting with this individual that you

19      say was there.

20  A   I think when I first came out he was talking with him.

21  Q   Did Todd seem disturbed to you, or did he seem agitated, or

22      did he seem calm?

23  A   He seemed calm.

24  Q   Was he perspiring at all?

25  A   I didn't -- I don't know.

1  Q   Well, did you see --

2  A   No, I didn't see him physically perspiring, no.

3  Q   How was he dressed?

4  A   He had shorts on.

5  Q   What type of shirt did he have on?

6  A   I think it was a button down shirt, I think.  I don't

7      recall.

8  Q   Did the button down shirt look like it was wet from

9      perspiration?

10 A   No, but I actually wasn't paying attention to that.

11 Q   Did -- did -- so when -- what time is your best estimate

12     that you left your residence, which is at Cortaro and

13     Thornydale, to go meet up with the other -- the other

14     cyclists?

15 A   It was -- it was before 7:00.  I know that we were early,

16     because he had gotten there early and we went down to sit

17     down at the end of the street, primarily because I didn't

18     want to set there and rouse my -- rouse my neighbors any --

19     any further than I already had.  We started up the bikes,

20     and we left that -- my house.

21 Q   And when you started up the bikes and you left your house,

22     was the truck and the trailer that you say was previously

23     there, was that still --

24 A   Nope.  It was gone.

25 Q   Now, where exactly did you meet the Joneses and your other

1        customer, Mr Otod?

2   A    I met the Joneses right out at the beginning of my road and

3        the corner -- or the -- junction there where it came

4        into Cortaro Road.  That's where they came to, and that's

5        where they always met me.

6   Q    So how far would that have been from your -- from where you

7        were --

8   A    From where I live?  Maybe less than half a mile.

9   Q    And they were -- you said you were early?

10  A    We were early, so we were there waiting on them.

11  Q    And how long before they arrived?

12  A    Approximately 10 to 15 minutes.

13  Q    And were you having conversations with Todd over that 10 or

14       15 minute period of time?

15  A    Yeah.  We talked about our motorcycles.

16  Q    Now, then you would have -- they were -- Mr. Clark had his

17       wife on the back of the motorcycle, is that correct?

18  A    Mr. Jones?

19  Q    Mr. Jones, I'm sorry.

20  A    Yes, he did.

21  Q    And so the next destination would be to get your -- your

22       other customer, meet with him, is that --

23  A    We met at a gas station so those who needed gas could get

24       gas, and we met him at that Shell station.  That's where

25       he -- that was kind of a landmark.  He knew where it was.

1   Q   Do you know -- can you tell me where it was?

2   A   Yeah, it's on the corner of Ina and Oracle.

3   Q   Ina and Oracle.  And then from Ina and Oracle you were going

4       to go north on Oracle?

5   A   We went north on Oracle.  We actually had no predetermined

6       destination other than we were going to ride until it got

7       too hot, and we were going to have breakfast.

8   Q   And then you had breakfast at the Cracker Barrel, I think --

9   A   Yes, sir.

10  Q   And then from the Cracker Barrel everybody went their own

11      way?

12  A   Yes, sir.

13  Q   And the time that everyone went their own way was?

14  A   Was after 10:00, before 11:00.  Somewhere in that area.  I

15      don't know.  I wasn't -- I don't wear a watch when I ride a

16      motorcycle.

17  Q   So when you first -- when Mr. Todd Fries first came to your

18      home, you didn't have a watch on either then, did you?

19  A   No, but there's an alarm clock sitting right next to my bed,

20      real brightly tells you the time.

21  Q   Okay.  Anyone wear helmets on the -- on the ride?

22  A   Pamon did.

23  Q   Did you sit next to -- or the table that you had at the

24      Cracker Barrel, people all sat together, I would imagine?

25  A   We sat at one table, yes.

1   Q   And where was -- were you close to Todd?

2   A   I have no idea.  I don't know.

3   Q   Did you ever smell anything -- have you ever smelled

4       chlorine gas before, or chlorine from a pool?

5   A   Oh, chlorine from a pool before.

6   Q   Did Todd smell like chlorine when you were sitting at the --

7       at the Cracker Barrel?

8   A   Not to my knowledge.  I wasn't smelling Todd.

9   Q   Well, you know the odor of chlorine, though, don't you?

10  A   I do.

11  Q   And if there was a chlorine odor at the Cracker Barrel,

12      that's something that you would have been aware of?

13  A   Would have been noticeable, I'm sure.

14  Q   Now, how far, sir, do you live from Shannon and Magee?

15  A   I lived about -- roughly, from Shannon and Magee to where my

16      house was, almost a mile.

17  Q   And you heard emergency equipment, is that correct?

18  A   I don't remember -- I did hear some stuff, but I always hear

19      stuff, emergency equipment, and I never think about it.  But

20      when we passed the Omni Tucson entrance that was down close

21      to the Shannon Road traffic light, I did notice some

22      emergency vehicles there, but I didn't stop to look around.

23  Q   Did vehicles actually pass you?

24  A   No, sir.  I don't recall any of them passing us.

25  Q   Did you ever hear any sirens from the vehicles?

1   A   Early on we did.

2   Q   Sir, you said that Scott and Pamela Jones arrived sometime

3       around 7:00 o'clock?

4   A   Yes, sir.

5   Q   Did you tell Agent Nowak on February 16th, 2011 that Scott

6       and Pamela Jones arrived sometime around 6:00 a.m.?

7   A   According to what I read yesterday, yes, I did, but I don't

8       recall.

9   Q   You don't recall what you said to Agent Nowak, or you don't

10      recall the times?

11  A   I don't recall the exact times I gave him, because like I

12      said, when I was originally first questioned, I was rather

13      shocked, and I wasn't quite sure of everything, and I felt

14      like I was a little under some pressure to respond.

15  Q   Well, the statement about the Clarks arriving sometime

16      around 6:00 a.m. was on February 16th, 2011 when you

17      testified you were more relaxed when you were speaking with

18      Agent Nowak.

19  A   Could have been, yes, sir, but I actually had more time to

20      think about it when I was told I was going to be sitting

21      here on this witness stand.

22  Q   So you think your -- your memory gets better with age, is

23      that what you're saying?

24  A   No, sir.  I thought quite a bit about it.  I was concerned

25      and wanted to make sure that I was complete, and I was asked

1      questions early on and I was in shock that I was being asked

2      those questions, and I responded the best that I knew how at

3      the time.

4  Q   Well, your response to me that it was close to sunrise when

5      Todd Fries came to your home, you had an opportunity to

6      think about that before you responded to me, is that

7      correct?

8  A   Yes, sir.

9  Q   And that -- that's your best recollection of when Todd Fries

10     came to your home, close to sunrise?

11  A   Yes, sir.

12        MR. BOCK:  May I have a second, your Honor?

13        THE COURT:  Yes.

14        MR. BOCK:  I just have --

15        THE COURT:  Yes, take your time.

16  BY MR. BOCK:

17  Q   Now, the -- the extent of ride was a couple hours, is that a

18      fair statement?

19  A   About maybe a little more than that.  We -- it took us some

20      time to get gas, and we were in no hurry, and I wasn't

21      timing the ride.

22  Q   Now, when you have -- you've been on these rides before.  I

23      don't own a motorcycle.  So you've been on these rides

24      before, and when you have yourself and three other people,

25      is there some -- do you ride in tandem -- sometimes I see,

1       you know, people on bikes they ride next to each other?

2   A   Some people do that, but that's not really legal.  You're

3       supposed to be riding staggered, and that's generally how we

4       rode.

5   Q   Did you ever see Todd race away, or race away from the

6       group?

7   A   A couple times we kind of gunned it and played around a

8       little bit.

9   Q   Okay.  That's not unusual?

10  A   No.

11          MR. BOCK:  That's all I have.

12          THE COURT:  Any redirect?

13          MR. PIMSNER:  Yes, your Honor.

14                      REDIRECT EXAMINATION

15  BY MR. PIMSNER:

16  Q   Now, sir, the first time you were interviewed, you just

17      received a phone call from somebody who says hi, I'm the

18      F.B.I., I need to talk to you, is that --

19  A   Yes, I did.

20  Q   And did you --

21  A   I thought it was practical joke.

22  Q   And when you were interviewed, was it a long interview?

23  A   I can't recall that it was that long.  It was -- it

24      didn't -- it didn't seem like it was, but -- it was

25      basically pretty short and sweet and to the point, you

1          know --

2    Q     Were you expecting that call?

3    A     Not at all.

4    Q     And so it shocked you?  You hadn't thought about the day in

5          question?

6               MR. BOCK:  Objection.

7    A     It caught me completely offguard.

8               THE COURT:  Wait.  Mr. Bock, go ahead.

9               MR. BOCK:  The nature of the question is leading.

10              THE COURT:  Yes, sustained.

11              Go ahead, counsel.

12   BY MR. PIMSNER:

13   Q     You testified you weren't expecting it?

14   A     Yes, sir.

15   Q     How did that catch you?

16   A     Caught me completely offguard.

17   Q     Now, did -- and you were interviewed -- so on that day you

18         gave some times, but had you thought about those times

19         before you gave them?

20   A     I -- at the time, I -- I do realize that it was earlier than

21         what we had planned, and I may have been a little irritated

22         about that fact that it was earlier than what we had

23         planned.  I wasn't specific on the times.  I gave him what I

24         thought was the times.

25   Q     Okay.  Now, when you say it was earlier than the planned --

| 1 | | not the time that you left as a group -- |
|---|---|---|
| 2 | A | No. |
| 3 | Q | -- but -- are you referring to that, or are you referring to |
| 4 | | the time that -- |
| 5 | A | Todd arrived at my home earlier than what we -- I did not |
| 6 | | know he was going to be there so early to be able to leave |
| 7 | | at 7:00 a.m. |
| 8 | Q | And you said you had an alarm clock next to you with big |
| 9 | | bright time displayed? |
| 10 | A | (No verbal response.) |
| 11 | Q | And did you look at that alarm clock that morning? |
| 12 | A | I may have glanced at it, and it may be what helped me |
| 13 | | remember the time, but as a rule I wouldn't stop and just |
| 14 | | look at it before I went outside so I would know.  I think I |
| 15 | | glanced at it and saw the time. |
| 16 | Q | And so you went outside, and was it light out or dark out? |
| 17 | A | It was not dark, but the sun was not shining in the sky yet. |
| 18 | | You could see yourself.  You could see -- I could see all |
| 19 | | the way across to where Todd's truck was. |
| 20 | Q | Did you know if the sun had broken in the horizon at that |
| 21 | | point? |
| 22 | A | Where I lived the Catalina mountains were behind me, and the |
| 23 | | sun could come up and I wouldn't see the sun until 8:00 or |
| 24 | | 9:00 o'clock.  I just -- I don't know exactly what time, |
| 25 | | but -- it would light up the sky, but I did not see the |

1       sunrise because behind me was the Catalina Mountains and the

2       Rincons, and that's --

3   Q   So if you're just verifying when the sun has risen, you

4       don't have that verification yourself for hours after the

5       actual sunrise, is that --

6   A   Maybe if I was over in Vail, I could see it.

7           MR. BOCK:  Judge, he continues to lead.  Could I have a

8   continuing objection as to the leading nature of the examination.

9           THE COURT:  All right, Mr. Bock, that's sustained.

10          So Mr. Pimsner, go ahead.  Ask another question.

11  BY MR. PIMSNER:

12  Q   Would you be able to see the actual sun more than -- how

13      long after it would normally rise would you be able to see

14      the sun?

15  A   I'll use, for example, when I would go to work.  I would

16      drive to work at 6:30 a.m.  It would be daylight, but the

17      sun was not over the horizon yet.  I could see.  I did not

18      have my headlights on.  I mean, it was -- but the sun had

19      not come up over the horizon because of where I was at in

20      relationship to the mountain ranges.

21  Q   From your home, that's different?

22  A   From my home it was very similar to that, because I'm going

23      north and south to work, and looking to the sunrise to the

24      east, it was still that way at my house.

25  Q   All right.  So when Mr. Bock asked you that it was close to

1    sunrise that the defendant showed up at your house, do you

2    know if it was after the sunrise, or before sunrise?

3  A    The sun was up, but I just couldn't see it because the

4    mountain range had been blocking it.

5  Q    Okay.  So would that mean that -- when he asked you

6    repeatedly whether it was close to sunrise, that would have

7    been after sunrise?

8  A    Well, technically I didn't see the sun, but the sun -- the

9    sky was lit up, and you could see just fine.

10  Q    You said you rode until -- between -- you departed ways

11    between 10:00 and 11:00 a.m.  Do you recall that?  How do

12    you -- how do you recall that time?

13  A    Well, I'm judging by the route that we took.  And -- and

14    again, I do not wear a watch when I ride a motorcycle.

15    Judging by the length of the route we took and the speed

16    that we rode most of the route, and we finally got on the

17    interstate, and it was a short ride back from where we got

18    on the interstate past Pima Air Park, and -- and I can't

19    remember the name of the town there you come through before

20    you get to Cortaro Farm, but there's a high school there

21    and -- Marana, I guess, is the name of the town.

22  Q    Now -- okay, I'm sorry.

23  A    That was just judging by the -- the length of the ride we

24    took, I've frequented that road a lot, and did that ride a

25    lot just by myself.

1    Q    And that would have been leaving at what point to have

2         accomplished that route and be done between 10:00 and

3         11:00 p.m.?

4    A    You know, I'm going to guesstimate by the time that we met

5         Scott, and we met Pamon, and everybody got gas, we probably

6         pulled out of the Shell station twenty after 7:00, 7:30,

7         somewhere in that area.

8    Q    And driving that route and going back to the Cracker Barrel

9         and having breakfast would have given you sufficient time to

10        have departed between 10:00 and 11:00, correct?

11   A    Yes, sir.

12            MR. BOCK:  This is still leading, Judge.

13

14            THE COURT:  Well, I'll allow that limited question and

15   answer.

16   BY MR. PIMSNER:

17   Q    Now, you indicated that you were asked how did the topic

18        come up, or you were asked about how Todd was invited.  Did

19        you seek out the defendant to invite him specifically on the

20        bike ride that day?

21   A    No, everybody was welcome all the time.

22   Q    All right.

23   A    It was just after --

24   Q    But how did the topic come up with Mr. Fries?

25   A    I do believe he overheard me talking with Mr. Jones about

1          it.

2     Q    So everybody's welcome, but you didn't specifically seek out

3          Mr. Fries to invite him that day?

4     A    That day that he was there I specifically invited him to go,

5          yes.

6     Q    But it was after he brought the topic up, or you brought the

7          topic up?

8     A    I can't recall.  I think I was talking with Mr. Jones about

9          when we were going, and the subject came up with Todd and I,

10         and I invited him.

11    Q    Okay.  And at -- as far as you -- you were interviewed, and

12         you said you weren't expecting the call?

13    A    No.  Not at all.

14    Q    And it -- I believe you testified it took you by surprise?

15              MR. BOCK:  This has been -- this has been asked and

16    answered, Judge.

17              THE COURT:  Well, go ahead and rephrase your question.

18    BY MR. PIMSNER:

19    Q    That was the beginning -- just the preface of the question.

20              Now, you -- you don't dispute you had given an earlier

21         time to --

22    A    No.

23    Q    -- the agent, do you?

24              Okay, and the -- upon reflection, did anybody try to

25         get you to change your times that you had --

1  A    Nope.  They did not.

2  Q    And is this upon your independent recollection, the times --

3          MR. BOCK:  This is improper redirect.

4          THE COURT:  No, overruled.

5          Go ahead.

6          THE WITNESS:  As I had stated, I had time to think

7  about it.  After I was told I was going to have to come and

8  testify, I thought long and hard about it.  And the more I

9  thought about it, everything came together in my head, and that's

10  how I recalled the truck and the trailer being there, and more

11  precisely the times that we left based upon when we met Pamon,

12  and how long it took me to get ready based on when we left the

13  house to wait on Scott and Pam.

14  BY MR. PIMSNER:

15  Q    And so what you -- so was what you originally told the

16       F.B.I. inaccurate as far as times?

17  A    I do believe it was, because I was -- like I said, I was

18       kind of -- I felt a little pressured to answer questions

19       that I wasn't expecting to answer.

20  Q    And so as you sit here today, what time do you believe you

21       left your house with Mr. Fries that morning?

22  A    When we pulled away from my house, it was about quarter to

23       7:00 or thereabouts.

24  Q    What time did Mr. Fries arrive?

25  A    He arrived around 6:00 a.m., and I think the reason I was

1        maybe a little bit early on the time when I was first

2        questioned is because I was a little irritated that he had

3        gotten there that early.

4              MR. PIMSNER:  Nothing further, your Honor -- well,

5    actually, I do.

6              THE COURT:  Go ahead.

7    BY MR. PIMSNER:

8    Q    Let me show you, sir, what's been marked and admitted as

9         Exhibit 292.  There's a number 1 on that chart.  Do you

10        recognize that chart, or do you recognize that aerial view?

11   A    Yeah, that's a picture of my house.

12   Q    And which route would you have -- where would you have met

13        the Joneses on that chart?

14   A    We always met right up here.  There was a little bench, park

15        bench setting here by the entrance to our subdivision, and

16        it showed that that was where -- the name of the

17        subdivision.  It was Rancho Escobido.

18   Q    And which direction would have you headed from there?

19   A    From there we turned right down Cortaro, just like I said.

20   Q    Okay.  And would you have passed in front of the Omni

21        entrance at the bottom corner of that --

22   A    Yes, we went right by there.

23   Q    And Mr. Bock had asked you questions about what you noticed

24        as far as responding emergency personnel or anything.  Did

25        you notice anything unusual at the front of the Omni?

|   |   |   |
|---|---|---|
| 1 | A | I did notice a couple of emergency vehicles, and the only |
| 2 |   | thing Todd said to me was did you see the fire truck coming |
| 3 |   | down Shannon Road, which I did not see that fire truck. |
| 4 | Q | And that was later at the gas station? |
| 5 | A | That was at the gas station. |
| 6 | Q | Now, did the police stop you from taking your route at the |
| 7 |   | time that you have traveled? |
| 8 | A | No, sir, we went right on through.  No problem. |
| 9 | Q | Okay, there were no roadblocks set up? |
| 10 | A | No, sir. |
| 11 |   | MR. PIMSNER:  Nothing further, your Honor. |
| 12 |   | THE COURT:  All right. |
| 13 |   | Any questions from the jury for witness? |
| 14 |   | All right, we'll have Jill collect those. |
| 15 |   | And I'll meet with counsel. |
| 16 |   | BENCH CONFERENCE |
| 17 |   | THE COURT:  Okay, 22 and 23. |
| 18 |   | MR. PIMSNER:  I'm not -- they're not relevant.  The |
| 19 | third one is, but -- |
| 20 |   | MS. ANDERSON:  No objection. |
| 21 |   | THE COURT:  Okay.  Let's see, any objection to 21 |
| 22 | through 23? |
| 23 |   | MR. BOCK:  No. |
| 24 |   | THE COURT:  Okay. |
| 25 |   | MR. BOCK:  Judge, is the government -- because I think |

1    there's been a little dispute now in the testimony of this

2    individual, Mr. Clark, so I would -- I'm going to ask the Court

3    to take judicial notice, and I'll provide the Court with the time

4    of sunrise on August the 9th of -- August the 2nd -- August the

5    2nd.  I'll just get the newspaper.

6              THE COURT:  Well, we can talk about that at a later --

7              MR. BOCK:  Okay.

8              THE COURT:  -- time.  If you want me to take judicial

9    notice of that, maybe we can have a stipulation or something, and

10   maybe not.

11             MR. PIMSNER:  That's not hard to find out.  It's well

12   documented, so --

13             THE COURT:  Okay, that's fine.

14             MR. PIMSNER:  As I'm reading this, if I have a

15   follow-up can I ask it at the time of that question?

16             THE COURT:  Sure.  And I'll let Mr. Bock follow-up as

17   well.

18             (The bench conference was concluded.)

19             THE COURT:  All right, sir.  A few questions from the

20   jury.  Counsel will ask them.

21             Go ahead.

22                             EXAMINATION

23   BY MR. PIMSNER:

24   Q    Did Mr. Fries' truck at the time he met you at your home

25        have the Burns logo on it?

1    A    I cannot recall.

2    Q    Did Mr. Fries state why he trailered his motorcycle to your

3         place rather than ride his motorcycle there?

4    A    His bike was in his trailer.  That's what -- when I

5         questioned him he told me that his bike was in his trailer.

6    Q    In your motorcycle riding experience, have you ever had

7         anybody trailer a motorcycle to your starting point driven

8         by another person?

9    A    Well, that's a loaded question because depending on where

10        we're starting and where we're coming from.  Yes, I've had

11        people trailer their motorcycles if they're coming far away,

12        but I kind of questioned Todd, and when he said that it was

13        in his trailer, then I figured that's where he kept his

14        motorcycle.  I -- I just -- it's a little bit of a joke if

15        you have a trailer queen, a motorcycle that rides in a

16        trailer instead of being driven by the owner.

17    Q   And knowing that -- is the reason that you questioned him

18        about the trailer, was it because you -- you kind of knew

19        that he was from the area?

20    A   Yeah.  And I was kind of giving him a hard time about, you

21        know, trailering his motorcycle to my house.

22    Q   And has a customer ever requested their used motor oil back

23        in your employment at Click Nissan?

24    A   Customers have requested empty bottles that they had brought

25        us to put in their car of oil, but as far as requesting --

1  Q    The actual used oil?

2  A    The actual oil, no.  We dispose of the oil.  We charge them

3       to dispose of the oil, and that was the way it was supposed

4       to be.  We were supposed to get rid of the oil.

5  Q    And did Mr. Fries have oil changes done at your service

6       center for the Nissan vehicles?

7  A    Several.

8  Q    And would that have been for his vehicles, or would that

9       have been for other equipment that he may have used in

10      connection with his business?

11 A    It would have been for his vehicle.

12 Q    So it would have been the Nissan vehicles that he purchased

13      through your company?

14 A    The Nissan trucks that we serviced, yes.

15 Q    You didn't work on other equipment that he used in his power

16      washing business, did you?

17 A    Not that I know of.  I didn't.

18 Q    You never serviced that equipment?

19 A    No, sir.

20         MR. PIMSNER:  Nothing further.

21         THE COURT:  Follow-up questions, Mr. Bock?

22         MR. BOCK:  It's about the black trailer.

23         THE COURT:  I'm sorry?

24         MR. BOCK:  It's about the black trailer.

25         THE COURT:  Go ahead.

1                          EXAMINATION

2    BY MR. BOCK:

3    Q    Did the black trailer have a license plate associated with

4         it?

5    A    I didn't look.

6    Q    Have you -- you said that it's -- it's not within the --

7         it's kind of a joke, your words --

8    A    Right.

9    Q    -- if a person puts the bike in the trailer, and then comes

10        to the -- and takes the bike out, right?

11   A    Yes.

12   Q    They -- they're subject to being ribbed?

13   A    Pretty much, yes.

14   Q    Now, so -- so have you seen people do that before with

15        trailers?

16   A    I've been to hundreds of rallies before where I rode my

17        motorcycle 5, 6, 700 miles to the rally where other people

18        had trailered their's.

19   Q    Now, again, I'm at a disadvantage, but -- because of the

20        trailer too, but is there a license plate that would be

21        associated with the trailer if it's being pulled by a

22        vehicle?

23   A    To my understanding, in the State of Arizona all trailers

24        have license plates.

25   Q    Okay.  Thank you.

1          THE COURT:  Thank you.

2          And any additional questions from the jury for this

3   witness?

4          All right, Jill, the first lady there in the back.

5          And I'll see counsel at sidebar.

6                         BENCH CONFERENCE

7          THE COURT:  Any objection, Mr. Bock?

8          MR. BOCK:  (No verbal response.)

9          MR. PIMSNER:  That's fine.

10          THE COURT:  There we go.

11          (The bench conference was concluded.)

12          THE COURT:  All right, Mr. Pimsner, you may ask the

13   question.

14          MR. PIMSNER:  Yes, your Honor.

15                           EXAMINATION

16   BY MS. PIMSNER:

17   Q    Sir, was the trailer that you saw outside your house that

18        morning of August 2nd attached to the truck, was that -- was

19        it open when you saw it?

20   A    No.

21   Q    Okay, so you couldn't see inside it?

22   A    No.

23   Q    Was the trailer big enough for other belongings besides a

24        motorcycle?

25   A    I don't remember the exact size, but it was big enough for a

1          motorcycle.

2    Q     Okay, so you don't -- the answer is you're not certain?

3    A     I'm not certain, but I do know I owned myself a motorcycle

4          trailer, and it was similar in size to an enclosed trailer

5          that I owned.

6    Q     And were you able to keep any other type of items inside

7          that trailer other than just the motorcycle?

8    A     Yeah, there's room on either side for whatever you want.

9          You know, there's just not enough room to put two

10         motorcycles in the one I had.  I don't recall if his was big

11         enough for two motorcycles, but it was along the same line

12         as what I had.

13              MR. PIMSNER:  Thank you.

14              THE COURT:  Any follow-up questions, Mr. Bock?

15                              EXAMINATION

16   BY MR. BOCK:

17   Q     Now, if someone wanted to try to track down this trailer

18         like you described that would carry a motorcycle, is -- is

19         it sold through the motorcycle dealership, or -- how did you

20         get your trailer for your motorcycle?

21   A     I bought mine in a trailer place that sold trailers.

22   Q     So it would be just a regular trailer, right?

23   A     Exactly.

24   Q     And you bought yours in town?

25   A     I bought mine in town, yes, sir.

1    Q    What was the name of the vendor that you bought yours from,

2         do you remember?

3    A    Big Tex.

4             MR. BOCK:  Thank you.

5             THE COURT:  All right, any additional questions from

6    the jury for this witness?

7             All right, sir, you may step down.

8             ------------------------

9             (Christopher L. Pahl was duly sworn by the clerk.)

10                      CHRISTOPHER L. PAHL

11                      DIRECT EXAMINATION

12   BY MS. ANDERSON:

13   Q    Sir, how are you employed?

14   A    I'm a special agent with the F.B.I.

15   Q    How long have you been so employed?

16   A    About 16 years.

17   Q    And has your entire time been here in Tucson?

18   A    It has.

19   Q    Could you tell us some of the assignments that you've held

20        with the F.B.I. over the 16 years?

21   A    For a short time when I got here I was on a drug squad

22        working drug cases.  I then moved to drug related public

23        corruption, from there went to violent crimes, major

24        offenders squad.  I worked sex assault cases out on the

25        Indian Reservation.  Then I got into doing the online

1       undercover sex assault stuff, the program's called Innocent

2       Images, where I would act as a little girl or a little boy

3       online and people would come to Tucson to try to meet me to

4       engage in sexual activity.  From there I got into computer

5       forensics, and have been doing that full time since about

6       September of 2002.

7   Q   Now, are you a computer forensic examiner?

8   A   Yes.

9   Q   Are you the only one here in the Tucson area?

10  A   I'm the only certified one in Tucson, Arizona that works for

11      the F.B.I. currently, yes.

12  Q   Now, could you describe for us what kind of training that

13      you've had that enables you to work as a certified forensic

14      examiner?

15  A   Initially, my training consisted of I think three or four,

16      maybe five different classes approximately one to two weeks

17      long, as well as being mentored by a certified examiner who

18      was then in Tucson, but who has since retired.  He oversaw

19      pretty much everything I did.  I dedicated about 15 months

20      to the process before I was certified myself from the time

21      that I went in initially as an on-the-job trainee.

22  Q   What do you have to do to get certified?

23  A   Well, you have to take these classes, pass them with a

24      certain minimum level.  You have to attend a moot court,

25      time away where you work on a mock case and then are asked

1          about it in a court setting, and then you have to conduct a

2          number of exams and searches under the eye of a certified

3          examiner.

4    Q    So do you have to maintain your certification every so

5          often?  Is it -- is it a situation where you have to take an

6          exam, or do you have to take continuing education courses to

7          maintain your certification?

8    A    We are required to take continuing education classes

9          mostly -- well, sometimes put on by the Bureau, not

10         necessarily mostly.  We also have to take and pass a

11         proficiency test annually.

12   Q    And I imagine that you've done all that, correct?

13   A    Yes.

14   Q    And you've been actually certified, did you say, since 2002?

15   A    Yes, September of 2002, fully certified.

16   Q    How many forensic examinations would you estimate that

17         you've done over the years since 2002 when you became

18         certified?

19   A    I don't know the exact count.  I think it's been

20         approximately 200.  I think I've looked at about 2300

21         different items of evidence, everything from CD's, thumb

22         drives, hard drives, phones, each of those comprising one

23         item of evidence.

24   Q    How many hours of continuing education are you required to

25         take per year?

```
 1   A   It's not an hours thing.  It's a -- it's a number, how many
 2       different classes.  So we're required to take one outside of
 3       the F.B.I., and then there is required training from within
 4       the F.B.I. as well from within my unit, essentially, that's
 5       mandatory as well every year.  And then if you want other
 6       certifications -- because we're just talking right now about
 7       the basic certification, but if you want other
 8       certifications such as cellphone, or Mac computers, Apples,
 9       whatever, those are additional training classes as well.
10   Q   Well, now that we know that you're a certified forensic
11       examiner, could you tell us what you do as a certified
12       forensic examiner?
13   A   Well, basically it's my job to tell case agents what is on
14       digital media that is seized or brought to me, or what's not
15       on it.  Usually, obviously, they're running the case.  They
16       know what the case is about, so they'll come to me and say,
17       well, you know, I'm looking for images, or I have child
18       pornogaphy, or I need to know if there are specific text
19       terms on these computers.  You know, it's all case agent
20       driven, and it's just my job to simply tell them, well, this
21       is what's on this computer, or what's not on the computer.
22   Q   What procedures do you follow in order to do your
23       examination?
24   A   When I start off, I ensure that the hardware -- I look at
25       the condition of it, make sure that it's operating properly
```

1    or at least properly enough that I can do my exam.

2    Sometimes things will come to me with a broken screen,

3    especially a cellphone with a broken screen that's a touch

4    screen and there aren't any keys.  It makes it very

5    difficult to do an exam if it's even possible.  But I'll

6    look at the physical condition of it.  I will survey --

7    conduct a drive survey, kind of look at the device with

8    software to ascertain what it is that I'm looking at

9    exactly.  So for example, I might have a 250 gigabyte hard

10    drive in my hand, but what exactly -- how much space is on

11    that hard drive that's being used, is there a part of that

12    hard drive that is being used to secret information?  This

13    is before I even really technically start my exam, just sort

14    of pre-exam procedures.  I'll then make a forensic duplicate

15    of a hard drive.  It's a little different for cellphones.

16    Often they don't allow making a forensic duplicate very

17    easily, because there are so many different operating

18    systems and so many different proprietary software systems

19    in place with cellphones.  But with hard drives I make a

20    forensic duplicate, which is essentially an exact copy --

21    for data purposes an exact copy of what is on the subject's

22    hard drive.  I will then run my exam from that exact copy so

23    that I know I'm not going to compromise the subject's hard

24    drive, which I don't know anything about.  It might fail in

25    the next use, so I try to preserve that original evidence.

1      I conduct an exam on that forensic copy using special

2      software, and then at the end of my exam I go back and I

3      apply additional software to that forensic copy to make sure

4      that nothing on it has changed, that I haven't changed

5      anything on it at all, and that my exam has been a true

6      picture, if you will, of what is on that hard drive.

7 Q   Now, in this particular case you were actually present at

8      the search warrant at the defendant's home on -- on May 13th

9      of 2011, is that right?

10 A   Yes.

11 Q   Now, what was your purpose in being there?

12 A   My purpose was to seize the computers, any digital media

13      that we might find, ensure that if computers were on, or

14      there was some -- some issue going on with the computers,

15      that they were seized properly in order to make sure that

16      there was not going to be any destruction of evidence.

17 Q   So when you actually seized the computers, there was four

18      computers in the defendant's home, is that correct?

19 A   Correct.

20 Q   When you seized those four computers, did you note any kind

21      of issues that could have compromised your results when you

22      did the subsequent exam?

23 A   No.

24 Q   So there were four computers, and there were a number of

25      cellphones at defendant's house, is that correct?

1    A    Yes, I believe there were nine of them.

2    Q    Nine or -- or eight?

3    A    I think there were nine.

4    Q    Okay.  Nine different cellphones.  And let's talk about

5         the -- let's talk about the computers -- well, let's talk

6         about the cellphones first.  Did you find -- well, first of

7         all, you told us that your procedure was to talk to the case

8         agent and get some specific information that was case

9         related for you to look for on the devices, correct?

10   A    Correct.

11   Q    And Special Agent Brian Nowak gave you that information, did

12        he not?

13   A    Yes.

14   Q    And then you in turn applied that to the -- to the nine

15        phones and to the four computers at the defendant's house,

16        correct?

17   A    Yes.

18   Q    Now, what kind of -- what kind of items did you find on the

19        cellphones, do you recall?

20   A    I found typical things that one might find on a cellphone,

21        simply phone books, call histories, missed calls, sent

22        calls, received.  You know, each of the cellphones were --

23        you know, they were each a little different.  I think most

24        of them were Motorolas, as I recall.  There were one or two

25        LG phones, I think a Sanyo phone.  Again, all with their own

1    operating systems, their own proprietary connections, their

2    own setup in terms of what they offered the end user.  The

3    menus are different, and so the capabilities of the phone

4    are different as are the results from looking at the phones.

5    Some phones I can pull off SMS text messaging, other phones

6    might contain those messages but I can't pull them off using

7    the same procedure just because of differences in the

8    software and the hardware.

9  Q    All right.  Now, would it assist you in your testimony today

10        if you had your report in front of you?

11  A    Sure.  Yes.

12        MS. ANDERSON:  May I approach the witness, your Honor?

13        THE COURT:  Yes.

14  BY MS. ANDERSON:

15  Q    That's Government's Exhibit 371, correct?

16  A    Yes.

17  Q    And that's -- that's the report that you authored in this

18        case, isn't that correct?

19  A    Yes, it's a working copy of it.

20  Q    All right.  Let's go through the computers one-by-one.  The

21        first was a Compaq Presario laptop, is that correct?

22  A    Yes.

23  Q    And that's -- that was evidence item number 1.  Let's take a

24        look at this.

25        MS. ANDERSON:  If -- if we could show it on that -- on

1   the ELMO?

2        THE COURT:  And has this been previously admitted?

3        MS. ANDERSON:  Yes, your Honor.

4        THE COURT:  All right, so everybody can see it.

5   BY MS. ANDERSON:

6   Q    Could you describe this computer for us?

7   A    It's just a laptop computer that has -- in conducting my

8        exam what I found to be an 80 gigabyte hard drive inside of

9        it.

10  Q    Okay.  And -- and using the -- using the items that Special

11       Agent Nowak gave you, were you able to examine this

12       particular computer and find any items that were case

13       related, or had any kind of bearing, or any -- any --

14       anything related to what Special Agent Nowak told you to

15       look for?

16  A    I -- I did not find anything that I felt was evidentiary on

17       that computer given the confines of Agent Nowak's request of

18       things that I look for.

19  Q    Next I'm going to ask you about the Dell Inspiron laptop,

20       which is evidence item number 9, and this is previously been

21       admitted -- this photograph.  Do you recall where that was

22       found?

23  A    I do not recall.

24  Q    Could you tell us about this laptop?

25  A    It's a Dell Inspiron 1150 laptop computer.  It is an older

1           laptop, and had a 30 gigabyte hard drive in it.

2   Q    This is another photograph of the same laptop.  Now, before

3           we get to what you found on this laptop, I want to go

4           through some of the items that Brian Nowak -- Special Agent

5           Nowak asked you to look for, all right?

6               These were images, videos, documents, spreadsheets,

7           databases, and internet related items, e-mails, or files

8           related to -- to killing of -- of birds, spoofing, revenge,

9           chlorine, Xylene, chemical bomb, explosives ball bearings --

10              MR. BOCK:  Objection, your Honor.  I would reserve a

11  motion, and ask for a bench conference at this time.

12              THE COURT:  Yes, just -- let you finish your

13  question -- are you done with your question?

14  BY MS. ANDERSON:

15  Q    Chemical recipes, and books, any information regarding Myles

16          or Karen Levine -- and I believe that's it.

17              THE COURT:  All right.  Let me see counsel at sidebar.

18                          BENCH CONFERENCE

19              THE COURT:  So your question is whether the case agent

20  asked him to look for these particular categories of items?

21              MS. ANDERSON:  Right.

22              MR. BOCK:  Okay.  And the -- one of the things that

23  came out is explosives and ball bearings, and so we had a

24  specific order from Judge Pyle that we were not to go into

25  anything about explosive devices.  That was not to be mentioned

1    at this trial.  Those counts were severed.  And so we've got

2    explosives in front of the jury, and ball bearings.

3              MS. ANDERSON:  I didn't ask for explosives.  I asked

4    for ball bearings, and that was a mistake, and he's not going to

5    get into any of this.  He's going to testify he found something

6    on his computer regarding chemical bomb, but that's relevant and

7    that's fair game.

8              THE COURT:  All right.  Did you make a motion for

9    mistrial, or what did you --

10             MR. BOCK:  On the ball bearings, that --

11             THE COURT:  All right, I'm going to deny that motion.

12   Ms. Anderson is not going to get into that, and that was a

13   mistake to mention the ball bearings.  It's only a question.

14   Questions are not evidence.

15             If you want me to give the jury a cautionary

16   instruction right now, or we can just move on.

17             MR. BOCK:  Maybe we should just move on, but they think

18   I'm coming up here for a purpose.

19             MS. ANDERSON:  A ball bearing is a pretty innocuous

20   reference.  It has no connection with bombs.

21             MR. BOCK:  So why is it the product of some F.B.I.

22   investigation if it's supposedly so generic and so innocent?

23             MS. ANDERSON:  But that's when it's connected with

24   other terms.

25             MR. BOCK:  And it shouldn't be connected to any of

```
 1   this.
 2             THE COURT:  And Ms. Anderson did indicated it was a
 3   mistake, so I'm going deny your motion for mistrial.
 4             MR. BOCK:  I understand.
 5             THE COURT:  And we'll move on.
 6             (The bench conference was concluded.)
 7             THE COURT:  All right, and Ms. Anderson, you may
 8   continue.
 9             MS. ANDERSON:  Thank you, Judge.
10   BY MS. ANDERSON:
11   Q    So we're talking about the Dell laptop, correct?
12   A    Yes.
13   Q    And looking at your report, did you find any kind of special
14        items that Special Agent Nowak asked you to look for on this
15        particular laptop?
16   A    Nothing -- nothing specific along the lines that you
17        mentioned.  One thing he did ask for was internet history,
18        and I did find internet history on that computer, as I did
19        all -- all four computers, but I don't recall if it was
20        anything relevant.
21   Q    Now, when you say you found internet history, what does that
22        mean?  Does that mean anything from Google to e-mails?  What
23        does that mean?
24   A    Yes, everything -- you know, browsing history, cookies,
25        cache, anything that somebody might go out and see on the
```

1          internet or do on the internet.  Essentially, showing that

2          the computers at one point did touch the internet, in fact.

3     Q    All right.  Next is the Hewlett Packard mini laptop, and

4          that was item number 2.  Let me show that to you.

5               Could you describe this computer for us?

6     A    It's a mini laptop with a 160 gigabyte hard drive in it --

7          one hard drive.

8     Q    Here's another photograph of item number 2.  This is

9          Government's Exhibit Number 334.  Upon searching this

10         computer, did you find anything that was relevant to this

11         case?

12    A    Not that I recall, no.  I did find internet history.

13    Q    The last computer that you would have searched would have

14         been the Aspire desktop computer, correct?

15    A    Yes.

16    Q    Let me show that to you.  This is Government's Exhibit

17         Number 335, which was item number 3.  And that's slipped

18         underneath the table there that we see, correct?

19    A    Yes.

20    Q    And up above on the table is a keyboard?

21    A    Yes.

22    Q    Here's a another view of it.  That's actually the tower,

23         correct?

24    A    Yes.

25    Q    Could you describe what kind of computer this was?

1  A    It's just a desktop computer, and that particular computer

2       had two hard drives in it.  One was a 120 gigabyte hard

3       drive, the other was a 320 gigabyte hard drive.

4  Q    All right, and what did you find on this particular

5       computer?  Let's go through them one-by-one.

6  A    I found -- let's see here, I found instances of the term

7       Jacqueline Stanich on there.  I was asked to look for that

8       name.  I found them on that computer.  And actually, I'm

9       going to correct something I said before, which was I found

10      that also on the hard drive of the very first computer, the

11      Compaq Presario computer.  I did find some instances of

12      Jacqueline Stanich on that as well.  I found internet

13      related items on the desktop computer.  I found --

14 Q    Let's back up.  When you say internet related items, again,

15      what does that mean?

16 A    Again, a search history, a browsing history, possibly

17      e-mails, cache, thumbnails -- you know, any artifacts, any

18      evidence that a computer touched the internet on -- on that

19      hard drive -- on those hard drives.  I found an amount of

20      it.

21 Q    Okay.  The next item that you found was an item related to

22      bomb, B-O-M-B, is that correct?

23 A    Yes.  Yes.

24 Q    Okay.  Could you tell us a little bit more about that?

25 A    I was asked to search for the text string of bomb, B-O-M-B,

```
 1         and I found it on both hard drives in that computer.  I did
 2         not find it on any of the hard drives in any of the other
 3         computers in any way that was relevant to the case at hand.
 4   Q     Now, were there any other words associated with bomb, such
 5         as chemical bomb, anything such as that when you did your
 6         search?
 7   A     I don't recall.
 8              MR. BOCK:  I'm going to object to this, your Honor, and
 9   ask that all this be stricken.
10              THE COURT:  No, overruled.
11   BY MS. ANDERSON:
12   Q     So can you explain to us, was this on a Google search?  Are
13         you able to give us any more specificity about where this
14         word bomb came up?
15   A     Well, it probably would have come up from --
16              MR. BOCK:  Objection to what it could have come up
17   from, Judge.  It's speculative, and conjecture.
18              THE COURT:  Sustained.
19              Go ahead, Ms. Anderson.
20   BY MS. ANDERSON:
21   Q     Well, where did you find the word bomb come up on the
22         computer?
23   A     What I do is I take my forensic software, and my forensic
24         software has all of the data from all the hard drives at one
25         time.  I tell the computer my -- my forensic computer to
```

1      search on a specific search string, whatever that is.  There

2      were a number of search strings in this case.  The computer

3      will then go through and look for that sequence of letters,

4      and then provide that sequence of letters to me in a

5      positive hit, if there are in fact any positive hits.  In

6      this instance there were numerous positive hits on the

7      sequence of letters B-O-M-B.  I don't recall what the

8      specific nature of the hits were, only that I thought that

9      they were significant such that I would provide them to the

10     case agent.

11 Q  Are you able to determine any kind of timeframe where that

12     word would have come up in the context of the user bringing

13     up information on the computer pertaining to B-O-M-B?

14 A  No.

15 Q  The next thing that you found was items relating to Dove

16     Mountain, is that correct?

17 A  That is one of the things I found, yes.

18 Q  Okay.  And where did you find that?  Was that on this

19     computer -- the Aspire desktop?

20 A  Yes, it was on the second hard drive in the Aspire desktop.

21     It was on one of the hard drives only.

22 Q  Going down the list, another item that you found on this

23     same hard drive was items related to spoofing, correct?

24 A  Yes.

25 Q  Okay.  And again, are you able to determine in what context

1          the word spoofing came up on the computer?

2  A    I don't recall the specific context.  I do recall listening

3       to audio files of recorded conversations where a voice is --

4          THE DEFENSE ATTORNEY:  I'm going to object to that

5  testimony, your Honor.

6          THE COURT:  Yes, sustained.

7          Could I see counsel at sidebar, please?

8                          BENCH CONFERENCE

9          THE COURT:  So are these conversations of the

10 defendant, or just somebody talking, or --

11         MS. ANDERSON:  It's -- it's on the nine disks that we

12 disclosed to you, and it's a conversation that the defendant was

13 having with a friend where he's actually spoofing and he's

14 calling his friend and saying -- pretending to be somebody else,

15 and the person is saying Todd, is that you?  Is that you?

16         THE COURT:  Are you going to play that tape?

17         MS. ANDERSON:  I wasn't planning to.

18         THE COURT:  You don't have adequate foundation with

19 this person, though?

20         MS. ANDERSON:  Well, he definitely heard the

21 conversation that's on the computer itself.

22         THE COURT:  But can he say who was present -- I mean,

23 who was involved in the conversation when it took place?

24         MS. ANDERSON:  He can say that it's the defendant.  The

25 defendant identified himself on the tape.  Judge, I'll move on.

1          THE COURT:  I'm just concerned -- I just don't know

2    where you're going.  I'm concerned.

3          MS. ANDERSON:  All right.

4          THE COURT:  And if you want to get into more -- but you

5    weren't planning on playing this tape?

6          MS. ANDERSON:  I wasn't planning on playing it.

7          MR. BOCK:  Then it shouldn't come in.

8          THE COURT:  What?

9          MR. BOCK:  I'm sorry, then it shouldn't come in.  So

10   we're just moving on.

11         MS. ANDERSON:  Actually, I thought he was going to

12   describe spoof cards.  I didn't know he was going to launch into

13   the tape.

14         MR. BOCK:  There's a lot of possible dangerous stuff

15   as -- Judge, as you know.

16         THE COURT:  And I don't want anything dangerous --

17         MR. BOCK:  I objected a lot about leading -- why don't

18   you just lead him?  I have no objection to that.

19         THE COURT:  Thank you, Mr. Bock.  If you need to do

20   that just to focus in on what you're trying to get out of him --

21         MS. ANDERSON:  Okay.

22         THE COURT:  All right.

23         (The bench conference was concluded.)

24         THE COURT:  All right, Ms. Anderson, you may proceed.

25   BY MS. ANDERSON:

1    Q    Was there anything on that particular computer regarding

2         spoof cards?

3    A    I believe that there was, according to my recollection.  I

4         believe there was, yes.

5    Q    Also, were there any items on this computer regarding Myles

6         Levine?

7    A    Yes, there were.

8    Q    Do you recall those specifically?

9    A    Only that there were lot of them.

10   Q    Also, you saw images on the defendant's computer of -- of

11        birds, isn't that correct?

12   A    Yes.

13   Q    And they appeared to be dead birds, is that right?  Yes?

14   A    Yes.

15             MS. ANDERSON:  May I have a moment?

16             THE COURT:  Yes.

17   BY MS. ANDERSON:

18   Q    Now, why is it that you're able to tell times on the

19        computers, like for instance when searches would have been

20        conducted on the -- on -- say for -- on Google, for

21        instance?

22   A    Well, there's not a time that's necessarily captured when

23        you conduct a Google search, and oftentimes the search

24        itself may not necessarily be captured.  It really kind of

25        depends on what the user's doing with the computer, and what

1    the computer's doing at the time that the search occurs.

2    When I conduct a search on, say, Myles Levine and it pops

3    up, I can see the context around which the term Myles Levine

4    appears, and it appears to be a search on the internet.

5    Indeed, it might be internet cache that the search term

6    appears in, and I can see that that's how Myles Levine came

7    to be on the computer, but there's not a time and date stamp

8    associated with that.  Time and date stamps are generally

9    associated with files or folders on computers, but not

10    necessarily searching activity that isn't logged when you're

11    on a computer doing a search.

12        MS. ANDERSON:  All right.  That's all I have.

13        THE COURT:  Cross-examination?

14                    CROSS-EXAMINATION

15    BY MR. BOCK:

16    Q    So you didn't look for files or folders?

17    A    I didn't look for files or folders in what context?  The

18        computer is files and folders.

19    Q    Well, did you do -- did you go ahead and do a mirror image

20        of the hard drive on these -- on these items?

21    A    A mirror image is a colloquial way of saying it, but yes,

22        essentially that's exactly what was done.

23    Q    And you used End Case?

24    A    No.

25    Q    What did you use?

1   A    Forensic Toolkit.

2   Q    Does not Forensic Toolkit have a time stamp as to the --

3         whatever is on the hard drive?

4   A    It has time stamps.  It shows time stamps and date stamps

5         for files and folders, deleted items possibly.  There are

6         several things, but the -- whether there's a -- whether

7         there's a time and date associated with a particular search

8         is more a function of the software that is used to conduct

9         the search than it is the operating system or the computer.

10   Q    If I look at something and then I go ahead and delete it,

11         does not -- it goes into the default -- does it go into a

12         default file?

13   A    It goes into a folder called the recycle bin.

14   Q    Okay.  And did you go through the recycle bin?

15   A    I don't recall specifically going through the recycle bin,

16         but I was pretty thorough in looking around on the

17         computers.

18   Q    So if I was interested in buying a spoofing card, or if I

19         went on and just typed in the word spoofing, that was

20         something that you would find based upon your analysis, and

21         that's what you have testified to?

22   A    It's something I might find.  Again, if you typed in the

23         term spoofing, you did it one time and your computer was

24         relatively activity free at that point, it wasn't doing a

25         bunch of other things, that term might not appear on your

1      hard drive anywhere.  And if it did, it might be overwritten

2      with another search.  It's really operating system

3      dependent.

4  Q   So if I wanted to buy a Ted Williams card on Ebay and I

5      typed in Ted Williams a number of times, that's something

6      you would -- if you were asked to type in Ted Williams, you

7      would see Ted Williams, is that correct?

8  A   Yes.  As a casual user, I would likely see that.

9  Q   Now, you went to his home the day the search warrant was

10     executed, is that correct?

11  A   I was there, yes.

12  Q   And did you see the whole home itself, or were you just --

13     what I mean by the whole home, did you look at the -- where

14     the work products were stored, where vehicles were, things

15     like that, or did you just go into the house to look for

16     this -- the electronic equipment?

17  A   I don't know that I saw the whole home.  I saw several parts

18     of it.  I'm happy to any questions relating to any

19     particular part.

20  Q   Did you ever see a black trailer associated with the

21     property?

22  A   I don't recall seeing a black trailer, no.

23  Q   Did -- and you knew that the name of the business was Burns

24     Power Washing, is that correct?

25  A   Yes.

1  Q  And there were certainly items that were on the computer

2     that had do with power washing?

3  A  Yes.

4  Q  And did you know that the Levine's had been a customer of

5     Burns Power Washing?  Were you aware of that?

6  A  At the time that I did my exam, that's my understanding,

7     yes.

8  Q  Not unusual for people to have their customers on their

9     computer if that's how they run their business, correct?

10 A  Correct.

11 Q  Now, in your experience you've come across computers that

12    have been encrypted, is that correct?

13 A  Yes.

14 Q  And this may be pretty basic, so I hope no one -- but could

15    you just tell what your understanding is of an encrypted

16    computer?

17 A  Basically, an encrypted -- well, an encrypted drive or an

18    encrypted partition is a part of a hard drive that is

19    encoded in such a way that it's not readable to anybody who

20    doesn't have the code to decode it and make it readable.

21 Q  You didn't see that in any of the computers you've testified

22    about, did you?

23 A  No.

24          MR. BOCK:  Thank you.

25          THE COURT:  Any redirect?

1                          REDIRECT EXAMINATION

2     BY MS. ANDERSON:

3     Q    Did you find a folder or file of customer names and

4          addresses?

5     A    I don't recall specifically, but I don't think so.

6     Q    And you knew that Mr. Fries was a businessman here in town,

7          correct?

8     A    Yes.

9     Q    And business people would maintain customer files on their

10         computer, doesn't that make sense?

11    A    Yes, either there or on paper.

12    Q    Now, you said that with -- with folders and files there can

13         be date stamps, is that right?

14    A    Yes.  Yes.

15    Q    Okay.  Now, you've talked about the searches, perhaps the

16         internet searches, the Google searches, but you can't

17         ascribe any kind of time period to, did you find any

18         relevant folders or files that would have any kind of time

19         stamps or date stamp associated with them?

20    A    In regards to a particular search term, or --

21    Q    The terms that Special Agent Brian Nowak gave you.

22    A    I -- I -- in conducting my exam and searching on the terms

23         that he requested, I was not provided nor did I look to any

24         time and date stamps.  I wasn't -- I don't believe that I

25         was told that they might be relevant, so I didn't look for

1          them.

2                  MS. ANDERSON:  May I have just a moment?

3                  THE COURT:  Yes.

4     BY MS. ANDERSON:

5     Q    Now, you said that you -- you found the name Myles Levine,

6          correct?

7     A    Yes.

8     Q    And that was in a computer search, correct?

9     A    Yes.

10    Q    An internet search?

11    A    Yes.

12    Q    Was it in a folder or file?

13    A    It was in a number of places on the hard drive.  It was --

14         there were several -- as I recall, several hundred instances

15         of the hit.  And again, what the computer does when you

16         search on the term Myles Levine even in Google, the computer

17         might take that search term and put it out in a number of

18         places on the hard drive for all sorts of reasons.  And

19         those were the hits that I found.  I found them -- I found

20         those hits on the one desktop computer.  I did not find the

21         name Myles Levine on either -- well, any of the other three

22         computers.

23    Q    But again -- maybe I misunderstood your answer.  Did it --

24         did that name Myles Levine come up in any folders or files,

25         or was it an internet search?

1    A    Well, it might have come up in --

2              MR. BOCK:  Objection to what it might have come up,

3    Judge.

4              THE COURT:  No, overruled.

5              You may answer.

6              THE WITNESS:  It might have come up in a file called,

7    for example, the pagefile.sys.  It's a virtual memory file that

8    the computer uses while you're out on the internet to temporarily

9    store information so that if it needs to be retrieved again, it

10   can be done so quickly, and in doing that it enhances the user

11   experience.  There were a number of hits on Myles Levine.  I did

12   not look to see where every hit was, but I recall that some of

13   them were internet related.  That being the case, it would not

14   surprise me if there were several hits -- or several instance of

15   that.

16             MR. BOCK:  Objection to what might not surprise him.

17   Again, that's --

18             THE COURT:  Yes, sustained.

19   BY MS. ANDERSON:

20   Q    You were finishing your answer about the Myles Levine, and

21        the name came up in several places, correct?

22   A    Yes.  Yes.

23   Q    Okay.  To reflect an internet search, correct?

24   A    Yes.

25             MS. ANDERSON:  All right, thank you.  That's all I

```
 1   have.
 2              MR. BOCK:  I have one.
 3              THE COURT:  Yes, on recross.  Go ahead.
 4                    RECROSS EXAMINATION
 5   BY MR. BOCK:
 6   Q    Agent, the report that you have looked at is your report of
 7        September 23rd, 2011?  Is that the one?
 8   A    It's the report of examination.
 9              MR. BOCK:  Can I approach and --
10              THE COURT:  Yes.
11   BY MR. BOCK:
12   Q    Let me ask you, the -- when you say there were hits, you
13        didn't put a numerical -- a numerical value to the hits,
14        like 5 or 10 or 25, did you?
15   A    The software does that.
16   Q    Okay.  But you don't have that?
17   A    I don't have a recollection of it, but I -- when I got the
18        positive hits, those positive hits were exported to
19        essentially a spreadsheet that depicts each hit in a single
20        row, so --
21   Q    Do you have that in front of you?
22   A    No, I don't.
23              MR. BOCK:  Okay, thank you.
24              THE COURT:  All right.
25              Any questions from the jury for this witness?
```

1          All right, go ahead and write it out -- and you've done

2    so.

3          All right, if I could see counsel at sidebar, please.

4                          BENCH CONFERENCE

5          THE COURT:  25.

6          MR. BOCK:  I have no objection.

7          MS. ANDERSON:  I have no objection.

8          THE COURT:  Okay.  Go ahead and ask it.

9          (The bench conference was concluded.)

10         THE COURT:  All right, Ms. Anderson, you may answer the

11   question of the witness.

12                          EXAMINATION

13   BY MS. ANDERSON:

14   Q    Special Agent Pahl, when you were at the defendant's

15        residence on -- on May 13th, 2013, did you see a motorcycle

16        on the property?

17   A    I do recall seeing a motorcycle, but I couldn't be more

18        specific than that.

19         THE COURT:  Any follow-up questions from either side to

20   that question?

21         MR. BOCK:  No, your Honor.

22         MS. ANDERSON:  No, your Honor.

23         THE COURT:  Any additional questions from the jury for

24   this witness?

25         All right.  Thank you, sir.  You may step down.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                        C E R T I F I C A T E

2              I, Mary A. Riley, do hereby certify that I

3    stenographically reported the foregoing proceedings to the best

4    of my skill and ability, and that the same was transcribed by me

5    via computer-aided transcription, and that the foregoing pages of

6    typewritten matter are a true, correct and complete transcript of

7    all the proceedings had, as set forth in the title page hereto.

8              Dated this 17th day of April, 2013.

9

10                                       s/ Mary A. Riley

11                                 United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25