1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF ARIZONA

3   ----------------------------)
                                )
4                               )
    UNITED STATES OF AMERICA,    )
5                    Plaintiff,  ) No. CA 13-10116 9th Circuit
                                )
6            vs.                 ) No. CR 11-01751 TUC-CKJ
                                )
7                               )    Tucson, Arizona
    TODD FRIES,                  )    September 25, 2012
8                  Defendant.    )
                                )
9   ----------------------------)

10                 TRANSCRIPT OF TESTIMONY
             JURY TRIAL DAY SIX AFTERNOON SESSION
11
            BEFORE THE HONORABLE CINDY K. JORGENSON
12                UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15
    For the Plaintiff:    By:  Beverly K. Anderson, and
16                             David A. Pimsner
                               U.S. Attorney's Office
17                             405 W. Congress St., Suite 4800
                               Tucson, AZ   85701
18
    For the Defendant:    By:  Richard C. Bock
19                             100 N. Stone Ave., Suite 801
                               Tucson, AZ   85701
20

21
    Mary A. Riley, RMR, FCRR
22  United States Court Reporter
    U.S. District Court
23  405 W. Congress St.
    Tucson, AZ   85750
24

25      Proceedings produced by computer-aided transcription

1                          INDEX OF TESTIMONY

2

3    HEATH EVANS

4    Direct Examination by Ms. Anderson      Page  3

5    Cross-Examination by Mr. Bock           Page 12

6    Redirect Examination by Ms. Anderson    Page 15

7

8    LINDA MOTTA PERINO

9    Direct Examination by Ms. Anderson      Page 16

10   Cross-Examination by Mr. Bock           Page 23

11

12   KYLE YOKOM

13   Direct Examination by Mr. Pimsner       Page 28

14

15   ANDREW SITES

16   Direct Examination by Mr. Pimsner       Page 32

17   Cross-Examination by Mr. Bock           Page 52

18   Redirect Examination by Mr. Pimsner     Page 59

19

20

21

22

23

24

25

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2              (Heath Evans was duly sworn by the clerk.)

 3                           HEATH EVANS

 4                        DIRECT EXAMINATION

 5    BY MS. ANDERSON:

 6    Q     Sir, are you employed?

 7    A     Yes, ma'am.

 8    Q     Where do you work?

 9    A     Northwest Fire District.

10    Q     How long have you worked for Northwest Fire District?

11    A     Just over 16 years.

12    Q     And could you explain to us what various positions you've

13          held over the year?

14    A     Been everything from a seasonal firefighter, to a paramedic,

15          an engineer operating a ladder truck, captain in charge of

16          an engine, and now battalion chief running five stations.

17    Q     Now, you were unavailable last week, is that right?

18    A     Yes, ma'am.

19    Q     So we're calling you as a witness this week to accommodate

20          your schedule of sorts, correct?

21    A     Yes, ma'am.

22    Q     And you were actually fighting a fire out of state, is that

23          right?

24    A     Yes, I was up in Idaho.

25    Q     All right.  Now, what is your -- your currently a battalion
```

| | | |
|---|---|---|
| 1 | | chief, correct? |
| 2 | A | Yes, ma'am. |
| 3 | Q | Could you explain to us what a battalion chief does? |
| 4 | A | Battalion chief is essentially the shift commander, and |
| 5 | | responds to any significant incident that happens within the |
| 6 | | district, also does the daily managing, payroll, staffing |
| 7 | | for the five stations that we're responsible for. |
| 8 | Q | Now, on August 4th, 2009 were you employed as a battalion |
| 9 | | chief? |
| 10 | A | No, ma'am.  I was a captain on a fire engine. |
| 11 | Q | And what particular fire station were you serving as a |
| 12 | | captain of? |
| 13 | A | Station 331, in charge of ladder and engine company. |
| 14 | Q | 331 -- where is that located? |
| 15 | A | Ruthroff and La Cholla. |
| 16 | Q | What shift were you working -- or what shift were you the |
| 17 | | captain of? |
| 18 | A | C shift. |
| 19 | Q | C shift?  Do the shifts go A, B and C, and then start all |
| 20 | | over again? |
| 21 | A | Yes, ma'am. |
| 22 | Q | Okay.  Now, what time did you come on duty that day, |
| 23 | | August 2nd, 2009? |
| 24 | A | I came on duty the previous morning at 8:00 a.m. |
| 25 | Q | And when were you scheduled to -- to enter your duty that |

1           day?

2    A     I was scheduled for 8:00 a.m. that morning.

3    Q     So you were -- you came on on August 1st, 2009 at 8:00 a.m.

4          You were scheduled to get off duty on August 2nd, 2009,

5          correct?

6    A     Correct.

7    Q     All right.  While you were on duty that day, did -- did

8          Station 331 get a call regarding a cloud and a smell,

9          a chemical chlorine smell?

10   A     Yes, ma'am.  The follow morning before we were coming off

11         shift we got the call for it, and responded with basically a

12         first alarm HAZMAT response to respond to that area.

13   Q     And you were the captain over that particular shift, is that

14         right?

15   A     Yes, ma'am.

16   Q     How many engines responded to that scene?

17   A     I'd have to look to double check.  We had at least five

18         engines that were there.

19   Q     And you were on one of the engines, correct?

20   A     Correct.

21   Q     How many men did you have on your particular engine?

22   A     Four, including myself.

23   Q     Now, you and the other men on your engine were given a

24         particular task, is that correct?

25   A     Yes, ma'am.

1  Q   What task was that?

2  A   We were assigned to follow the vapor cloud that was coming

3      up from the area, and track it until we could figure out if

4      it had dissipated or not.

5  Q   Now, were you given that task before you responded to the

6      staging area, or was that afterwards?

7  A   That was after we got to the staging area.

8  Q   Do you recall what time it was that you were dispatched to

9      the staging area?

10  A   Would have been about quarter to six in the morning.

11  Q   Now, before that time had the staging area been designated,

12      or was that something that you did -- that the rest of

13      you -- you and your crew members did as you were responding

14      to the -- to the scene?

15  A   It was actually one of our other captains that was in route

16      designated the staging area, because he kind of knew the

17      area a little bit better than I did at that time, and we all

18      went to that same area and waited for our next order.

19  Q   Now, what was the staging area?

20  A   The staging areas was in the YMCA parking low between the

21      YMCA and the Pima Community College Northwest Campus at

22      Ina -- between Ina and Cortaro on Shannon.

23  Q   On Shannon, correct?

24  A   Yes.

25  Q   Now, who was it that told you what your assignment was,

```
 1         which was to follow the cloud?
 2    A    That would have been the incident commander, which was
 3         Battalion Chief Mark Miller.
 4    Q    Did you see the cloud when you arrived at the staging area?
 5    A    Yes, we actually saw it before that.  As we were coming down
 6         the hill on Magee Road we saw it basically above the horizon
 7         as we were coming down the hill and saw it.
 8    Q    Could you describe for us what you saw?
 9    A    Essentially looked like a very dense, white cloud.  Couldn't
10         really tell what it was.  It didn't look like it was any of
11         the fires we normally go to.  About 1,000 feet long, 100
12         feet high, and roughly 200 feet deep.
13    Q    And you said it was a dense cloud, is that right?
14    A    Yes, ma'am.
15    Q    Could see through the cloud to the other side of the cloud?
16    A    No, we couldn't see the houses that were on the other side
17         of that small canyon there on the CDO wash.  We couldn't see
18         the other side of it.  We could see the houses in the
19         forefront, and then it slowly got thick enough where we
20         couldn't see anything past it.
21    Q    Now, when you first saw the cloud, how far away from the
22         cloud were you.
23    A    When we first saw it, we were a quarter to a half mile away.
24    Q    When you saw the cloud, did it -- did it look different?
25         Did it look unusual to you?
```

```
 1   A   It was very different.  It just had one big solid mass, and
 2       it wasn't really going anywhere.  It just seemed like it was
 3       just kind of hanging over the neighborhood.
 4   Q   And so you -- it was your assignment to watch the cloud,
 5       correct?
 6   A   Yes, ma'am.
 7   Q   Now, why was it so important to watch the cloud?
 8   A   Based on the reports we were getting from our HAZMAT team,
 9       they weren't sure what was actually in the cloud, but knew
10       that it probably wasn't a good thing if it was that dense of
11       a mass that it wasn't dissipating.  So we were trying to
12       make sure that if it affected other neighborhoods, we knew
13       we needed to evacuate, or we knew where to stage resources.
14   Q   How fast was the cloud moving, do you recall?
15   A   Not very fast.  It took us roughly an hour from the time we
16       got assigned to watch it and tracked it so it ended up in
17       the Santa Cruz River about three and a half miles away.
18   Q   I'm going to show you an exhibit --
19           MS. ANDERSON:  If I could, your Honor, may I approach
20   the witness?
21           THE COURT:  Yes.
22           MS. ANDERSON:  This is Government's Exhibit 382.  This
23   has not been admitted.
24           MR. BOCK:  No objection, your Honor.
25           THE COURT:  All right, 382 is admitted.
```

1   BY MS. ANDERSON:

2   Q    I'm going to ask you to step down, if you would.  Let me get

3        the microphone for you.

4             Sir, I'm going to -- I'm going to hold this, and let's

5        step out here in the middle of the jury so that they can all

6        see.  I'm going to hold this, and I'm going to hand you the

7        microphone and have you describe the -- the path of the

8        cloud for us.

9   A    Okay.  Essentially, as we came -- trying to get my bearings

10       here on the map.  We responded up La Cholla to Cortaro, up

11       here, came down the road, saw it, and when we got to about

12       this point here, roughly just past where the Walmart is now,

13       and saw the vapor cloud that was down here off Shannon Road,

14       staged in the area down here off of Shannon Road, right in

15       this area, saw the cloud essentially extending from Magee

16       Road to the end of this neighborhood right here.  And as we

17       got the assignment to follow it, we followed the vapor cloud

18       and kept watching as it dispersed a little bit more heavily,

19       tracked it down to Ina Road until we ended up in the Santa

20       Cruz River where we couldn't find any more trace of it.

21  Q    So the Santa Cruz River -- could you point to that on the

22       map, if you would?

23            So that's beyond I-10, correct?

24  A    Yes, ma'am.

25  Q    Thank you.  Go ahead and take a seat.

1        Now, Chief Evans, were -- were you actually driving
2    your truck as you were following this cloud?
3  A  My engineer was driving the truck.  I was sitting in the
4    officer's seat and keeping an eye on it with binoculars and
5    just trying to keep an eye on where the edges of the cloud
6    were.
7  Q  And as you were following the cloud, were you reporting back
8    to your supervisor the path of the cloud?
9  A  Yes, ma'am.  We were reporting back to the incident
10    commander, letting him know where we were at, how far away
11    roughly we were from the cloud, and letting him know that we
12    were still kind of in a safe zone, and just reporting that
13    it was slowly dispersing as we were following it down that
14    path.
15  Q  What's your best estimate from where the cloud began, which
16    was at 2870 West Magee all the way to where it ultimately
17    dissipated?
18  A  My best guess would have to be approximately three and a
19    half to four miles of travel.
20  Q  As the crow flies?
21  A  Yes, ma'am.
22  Q  And what's your best estimate of how long it took the cloud
23    to -- to dissipate?
24  A  Best estimate I got is just shy of an hour, and just based
25    on the amount of time we spent on scene, and we also

1        returned to the scene after it had dissipated.

2   Q   Did you at any time ever smell chlorine or any other any

3        other unusual smell?

4   A   No, ma'am, and had myself or any of the crew done that, we

5        would have moved further back.

6   Q   Now, did -- did the fire department in conjunction with law

7        enforcement make a decision not to evacuate people?

8   A   The decision was made to leave everybody in place, and that

9        was based on our hazardous materials team and what they were

10      already getting from their initial reconnaissance, and

11      telling us essentially if nobody was coming forward, the

12      best place they could possibly be was inside their homes and

13      not going out with the cloud in the air.

14   Q   Is it safe to say that it's a good thing that this occurred

15      on a Sunday morning?

16        MR. BOCK:  Objection, your Honor.  It's leading.

17        THE COURT:  No, overruled.  It is leading, but you can

18 answer.

19        Go ahead.

20        THE WITNESS:  Yes, ma'am, it was a very good thing.

21 There weren't a whole lot of people moving at the time of the

22 morning, and being on a weekend, there weren't a lot of people

23 going to work either.

24        MS. ANDERSON:  May I have a moment your Honor?

25        THE COURT:  Yes.

1       MS. ANDERSON:  That's all we have, Judge.

2       THE COURT:  Cross-examination?

3                   CROSS-EXAMINATION

4    BY MR. BOCK:

5    Q    Afternoon, Captain.

6    A    Hi.

7    Q    The -- you did a very short narrative in this case,

8         remember?

9    A    Yes, sir, I do.

10   Q    And on your narrative you have some -- you have some times.

11        Let me tell you, you have four times.  Let me give them to

12        you, okay?  Do you have your report in front of you?

13   A    I do not.

14   Q    Okay.  The first time I have is 5:48 and 26 seconds.  What

15        would that be?

16   A    My best recollection would be dispatch time.  If I had the

17        report, I could tell you a little more accurately.

18            MR. BOCK:  Am I number 4 -- 420?

19            THE CLERK:  Yes.

20            MR. BOCK:  Thank you.

21        Okay to approach?

22            THE COURT:  Yes.

23   BY MR. BOCK:

24   Q    Let me show you Defense Exhibit 420.  Does that look

25        familiar to you?

```
 1   A    Yes, sir, it does.

 2   Q    Okay.  That's the report you dictated, is that correct?

 3   A    Yes.

 4   Q    That's the format I got.  I don't know if you had it in a

 5        separate report, but this has a lot of reports all running

 6        together.

 7   A    That is correct.

 8   Q    All right, so just go through with the jury the four times,

 9        and tell the jury what those times represent, if you don't

10        mind?

11   A    The first time on there, the 0548 would be our dispatch

12        time.  The second time, 0550, is our time that we actually

13        went in route, came up on the radio and said we were

14        responding.  The third time on there, 0557, would be the

15        time we reported being on scene.  And the fourth time, 0749,

16        that was the time that we were released from the scene.

17   Q    Okay.  And the cloud dissipated prior to 7:49?

18   A    Correct.

19   Q    And when you say it was about an hour, is it about an hour

20        from 5:52 that it dissipated?

21   A    About an hour from the time that we were assigned to watch

22        the cloud.

23   Q    What time were you assigned to watch the cloud?

24   A    Approximately 6:30.  It was right before Engine 336 got

25        there.
```

1    Q    So 7:30 is when the cloud dissipated?

2    A    Approximately, yes, sir.

3    Q    Now, are you -- you're a captain, and are you in a captain's

4         car, or are you in a big fire truck?  What -- what's --

5    A    For this call in particular I was the captain on a fire

6         engine and essentially riding in a fire engine with four

7         other firefighters.

8    Q    Okay, and do you sit in front?

9    A    Yes, sir, sit in the front right seat.

10   Q    And then there's the driver.  Where do the other people two

11        people sit?

12   A    Sitting in the back seat, directly behind myself and the

13        driver.

14   Q    Facing forward?

15   A    On that truck they were facing backwards.

16   Q    Facing backwards.  This is a big truck, has a ladder on it

17        and hoses and things that you see normally on the street?

18   A    Yes, sir, about 35 feet long total length.

19   Q    Did you go up -- did you go up Magee Road?

20   A    We did not go up Magee Road.  We went up Shannon Road,

21        staged at the MVD and then proceeded down towards Ina Road

22        near the Chinese restaurant at -- right there at Ina and

23        Shannon, and then proceeded down Ina Road.

24   Q    So you never were at the intersection of Shannon and Magee?

25   A    Only when we initially got on the scene, and then from there

1        we continued past and followed the cloud.

2    Q    Did you see any traffic on Magee going -- Magee runs

3        east/west?

4    A    Correct.

5    Q    Did you see any westbound traffic when you were in that

6        location on Magee?

7    A    By the time we arrived on scene, the sheriff's department

8        had already shut down the road.

9    Q    Now, you said the cloud dissipated.  Were there any soil

10        samples taken to see what the -- what the strength of the

11        cloud might have been as it touched the ground?

12    A    I -- I do not know that question -- I don't know the answer.

13    Q    You wouldn't have directed that?

14    A    No, I would not have.

15            MR. BOCK:  May I retrieve the report from him for a

16    second?

17            THE COURT:  Yes.

18            MR. BOCK:  Nothing further, your Honor.

19            THE COURT:  All right.

20            Redirect?

21                    REDIRECT EXAMINATION

22    BY MS. ANDERSON:

23    Q    I believe you said that Magee was shut down, is that

24        correct?

25    A    Yes, ma'am.

1  Q    By the sheriff's department, is that right?

2  A    Yes, ma'am.

3  Q    Was it shut down before you arrived at the staging area?

4  A    I'm a little fuzzy on that one.  I do know it was shut down

5       prior to us tracking the cloud, and I do know we had one

6       fire engine that had to cross through the roadblock to get

7       to the scene.  That would have been Engine 36, which was

8       about the time that we were leaving to track the cloud.

9            MS. ANDERSON:  All right, thank you.  That's all I

10  have.

11            THE COURT:  All right.

12            Any questions from the jury for this witness?

13   All right.  Thank you, sir.  You may step down and be excused.

14                 --------------------------

15            (Linda Motta Perino was duly sworn by the clerk.)

16                   LINDA MOTTA PERINO

17                   DIRECT EXAMINATION

18  BY MS. ANDERSON:

19  Q    And did you previously go by Linda Motta?

20  A    Yes, ma'am.

21  Q    And when did you change your name?

22  A    Last September.  I went through a divorce and took back my

23       maiden name.

24  Q    Okay.  So your married name is Motta, correct?

25  A    Yes, ma'am.

1  Q   And at some point in time you had some identification
2      documents in your married name, Linda Motta, is that right?
3  A   That is correct.
4  Q   Do you work here in Tucson?
5  A   Yes, ma'am.
6  Q   Where do you work?
7  A   I work with MEB Management Services.  I'm a property manager
8      at Sunrise Ridge Apartments.
9  Q   How long have you been employed by -- by that organization?
10 A   Let's see, since 2004, minus about 14 months when I moved to
11     Colorado for a little bit.
12 Q   When did you move to Colorado?
13 A   Let's see, April of 2009.
14 Q   Okay.  And you subsequently moved back here, did you not?
15 A   Yes, ma'am.
16 Q   When did you move back?
17 A   Let's see, it was the end of June, about June 20th of 2010.
18 Q   Okay.  And could tell us what area of town you live in?
19 A   Yes, ma'am.  The foothills, Sunrise and Swan.
20 Q   Okay.  Now, at some point in time was your purse stolen?
21 A   Yes, ma'am.
22 Q   And do you remember when it was that your purse was stolen?
23 A   Not exact dates, I don't, but I would say -- I would say
24     March through my May.
25 Q   Of what year?

1    A    March through May, 2011.

2    Q    Okay.  Now, could you describe your purse for us?

3    A    Yes, ma'am.  It was a small coin purse.  It was a small

4         vintage Gucci that a resident had given me.  It had a

5         metal -- a gold metal clasp of a hand that held down the

6         trifold -- or the bifold, and it was brown leather.

7    Q    Did you have any -- any identification or other kind of

8         documents within your purse?

9    A    Yes, ma'am.

10   Q    I'm going to show you what's already been admitted as

11        Government's Exhibit Number 603, and 605.

12            MS. ANDERSON:  May I approach, your Honor?

13            THE COURT:  Yes.

14   BY MS. ANDERSON:

15   Q    First of all, this is Government's Exhibit Number 603.  Do

16        you recognize the contents of the envelope?

17   A    Yes, ma'am.

18   Q    And -- and let's pull the microphone over so we can hear

19        you.

20   A    Yes, ma'am.

21   Q    Okay.  And what do you recognize in Government's Exhibit

22        Number 603 in the envelope?

23   A    My debit card from Bank of America, and my laundry card to

24        the laundry room at the community where I live and manage.

25   Q    Okay.  And those are the only two items in this particular

| | | |
|---|---|---|
| 1 | | pouch, correct? |
| 2 | A | Yes, ma'am. |
| 3 | Q | Let's look at Government's Exhibit Number 605.  Do you |
| 4 | | recognize any of the documents or any of the identification |
| 5 | | documents in that exhibit? |
| 6 | A | Yes, ma'am.  I recognize my Arizona insurance card from |
| 7 | | State Farm, my Arizona drivers license, my Safeway Club |
| 8 | | card.  I do see my insurance card, and I'm hoping my -- let |
| 9 | | me see -- may I touch? |
| 10 | Q | Sure.  Please. |
| 11 | A | Okay. |
| 12 | Q | In fact, let's open up these exhibits. |
| 13 | A | Oh, Costco card. |
| 14 | Q | The first one is -- and again, this is Government's Exhibit |
| 15 | | Number 603, which are the cards which you previously |
| 16 | | identified, your laundry card and your Bank of America card, |
| 17 | | correct? |
| 18 | A | Yes, ma'am. |
| 19 | Q | And then let's open up this other bag.  This is Exhibit |
| 20 | | number 605, which has already been admitted.  We'll keep |
| 21 | | them separate.  And do you recognize the contents of -- of |
| 22 | | that exhibit? |
| 23 | A | Yes, I do.  Again, Illinois drivers license, my Costco card, |
| 24 | | Safeway Club card, my Blue Cross Blue Shield Arizona Health |
| 25 | | card, and my Arizona insurance card from State Farm. |

1   Q   Now, all of those identification cards were in your purse

2       when -- when it was stolen, correct?

3   A   Yes, ma'am.

4   Q   Now, when was the last time you recall seeing your purse?

5   A   I can't remember the exact dates, but again, it was those

6       days that I already -- I think it may have been March

7       through May of 2011.

8   Q   Were you at the store when you -- when your purse was

9       stolen?  Do you remember where you were when it was stolen?

10  A   I remember that day -- yes, I did go to Safeway to buy some

11      laundry detergent that day, and that's the only time I

12      remember being off the property.  It was a work day.  It was

13      a Monday through Friday, one of those work days.  And I did

14      backtrack.  I couldn't find my wallet, so I went to the

15      laundry room, went home, went to my car, looked in the

16      office, went back to Safeway.

17  Q   And you couldn't find it, correct?

18  A   Correct.  That is correct.

19  Q   Now, do you know an individual by the name of Todd Fries?

20  A   No, ma'am.

21  Q   I'm going to ask you to -- to stand up, if you would, and

22      look at the individual that's seated at defense table to

23      the -- furthest to the right, the individual in the blue

24      suit, the blue jacket.  Do you recognize that individual?

25  A   No, ma'am.

1    Q    No.  All right.  Thank you, you can go ahead and sit down.

2              MS. ANDERSON:  Judge, may I have a moment?

3              THE COURT:  Yes.

4              MS. ANDERSON:  Just one more -- one more moment, your

5    Honor.

6              THE COURT:  Yes, take your time.

7    BY MS. ANDERSON:

8    Q    Just a couple more questions.  Ma'am, have you ever been to

9         the residence at 5560 West El Camino Del Cerro here in

10        Tucson?

11   A    No, ma'am.

12   Q    Have you ever been to the home of Todd Fries?

13   A    No, ma'am.

14             MS. ANDERSON:  Judge, that's all we have.  May -- may

15   we approach the bench quickly?

16             THE COURT:  Yes.

17                          BENCH CONFERENCE

18             MR. PIMSNER:  I understand the report is being faxed

19   over from the F.B.I.

20             MS. ANDERSON:  Yes, the agent contacted -- we did not

21   have a copy of it in our file.

22             THE COURT:  So would you like to see it before you

23   cross-examine the witness?

24             MR. BOCK:  I would.

25             THE COURT:  All right, so let's -- how much time do you

```
 1    think it would take?
 2              MR. PIMSNER:  I think within minutes, so five minutes
 3    maybe.
 4              THE COURT:  So why don't we take a ten minute break.
 5    That will give you time to get it, and hopefully get it to
 6    Mr. Bock.
 7              MS. ANDERSON:  Okay.
 8              THE COURT:  Okay, thank you.
 9              (The bench conference was concluded.)
10              --------------------------
11              THE COURT:  And Ms. Anderson, you had some additional
12    questions of the witness?
13              MS. ANDERSON:  I did.
14              THE COURT:  Go ahead.
15              MS. ANDERSON:  Thank you, Judge.
16    BY MS. ANDERSON:
17    Q    Just a couple of questions.  Now, I asked you if you've ever
18         heard or if you know Todd Fries, and you said you did not,
19         is that correct?
20    A    That is correct.
21    Q    And you don't recognize this gentleman sitting here at
22         defense table in the blue suit, correct?
23    A    That is correct.
24    Q    Have you ever heard of Burns Power Washing?
25    A    No, I have not.
```

1    Q    Do you have any idea why your identification would be found

2         at the home of Todd Fries at 5560 West El Camino Del Cerro

3         here in Tucson?

4    A    Not at all.  I have no idea.

5              MS. ANDERSON:  That's all I have.  Thank you.

6              THE COURT:  All right.

7              Cross-examination?

8                        CROSS-EXAMINATION

9    BY MR. BOCK:

10   Q    Good afternoon.  The F.B.I. spoke to you on May the 26th,

11        2011.

12             THE COURT:  Is that a question or a statement?

13             MR. BOCK:  A question.

14   BY MR. BOCK:

15   Q    Did the F.B.I. speak to you on May the 26th of 2011?

16   A    That could be.  I don't remember dates.

17   Q    Do you remember -- I was looking for Agent Nowak.

18             Do you remember the name Agent Nowak?

19   A    Yes, sir.

20   Q    Did you see him today, or just before you testified?

21   A    Yes, sir.

22   Q    And he's the one that spoke to you, is that correct?

23   A    That is correct.

24   Q    And where did he -- where did he speak to you at?  Where

25        were you?

1    A    I believe at Sunrise Ridge Apartments in my office.

2    Q    Now -- and how long did he speak with you for?

3    A    I don't remember.  I would assume -- I don't remember.  I

4         would think a half hour, an hour?  I'm not sure.

5    Q    Did he show you the -- your identification?  Did he show you

6         any -- any of your identification that you had -- was

7         taken -- was lost or taken from you?

8    A    No, sir.

9    Q    He described it -- did he describe things for you, though?

10   A    I don't remember.  I -- I -- I believe I may have described

11        to him what was in my wallet -- my purse.  I'm not -- I'm

12        not sure.  I don't remember that far back.

13   Q    So the conversation wouldn't have been I'm Agent Nowak and

14        I'm here to tell you that we found your debit card, and we

15        found this, and we found that?

16   A    I don't recall.

17   Q    Now, of the items that were taken from you, your debit card

18        could have caused you a financial problem, isn't that a fair

19        statement?

20   A    Yes, sir.

21   Q    And when you recognized that your debit card was not in your

22        possession, did you call the bank?

23   A    Yes, sir.

24   Q    So the bank would have some record of when you actually

25        reported the loss of the debit card?

1   A   Absolutely.  I actually went into my neighborhood Bank of

2       America, yes.

3   Q   And you think you did that anywhere between March and May of

4       2011?

5   A   I probably would have done that the same day, if not within

6       a week of identifying that my wallet was gone.  Probably

7       within a few days, knowing me and being thorough with that.

8   Q   So the timeframe that you gave us was between March and May

9       that you may have lost this item, right?

10   A   Correct.

11   Q   But the most definite date, you would agree with me, was you

12       going to the bank and telling them that I don't have this in

13       my possession anymore, right?

14   A   Yes, sir.

15   Q   Which you wouldn't have delayed, because once you would have

16       recognized you didn't have this in your possession anymore,

17       you would have gone to the bank for --

18   A   Absolutely.

19   Q   What about your drivers license?  Do you remember when you

20       got your duplicate drivers license?

21   A   It would have been within that same period of time.  A

22       couple of days to a week, I would assume.  I don't remember

23       exactly.

24   Q   Your identity was never compromised, was it?  No -- you

25       didn't get any claims from anybody that someone was using

1           your debit card?

2    A    That is correct.

3    Q    And when you went to the bank, the bank certainly would have

4           shared that with you if -- right, if someone attempted to

5           use your credit card and got some money off it -- your debit

6           card, I should say?

7    A    I canceled that debit card, like I said, pretty immediately.

8           So if the old one would have been used, I don't know if they

9           would have contacted me or not.  I -- they were prompt in

10          stopping that old one and giving me a new one the same day I

11          went in.

12   Q    And your recollection is that the item that contained

13          this -- the property that we have been discussing, drivers

14          license, debit card, Costco -- I think you said, right,

15          proof of insurance, this was --

16   A    Yes, sir.

17   Q    -- in a -- in a Gucci type of wallet?

18   A    Yes, sir.

19   Q    Not in a purse?

20   A    Correct.

21   Q    And you think that you may have left this at the Safeway at

22          Sunrise and Swan?

23   A    No, I -- I don't think I would have left it there, but I did

24          go back and check with the staff to see if I did.

25   Q    Okay.  Do you think it was taken -- do you have an office at

1        the -- at the property that you manage?

2    A   Yes, sir.

3    Q   And so do you have a -- a sense that it could have been

4        taken from the property you managed?

5    A   I do have a sense, yes, sir.  I remember going to Safeway

6        and buying laundry detergent that day, and during lunch I

7        was doing my laundry, so I remember having my -- during that

8        day I was out and about the community.  It would have been

9        probably not taken from our office.  I do close my office

10       door and it is automatically locked, so I believe -- I

11       believe it may have been taken from my car in the midst of

12       driving laundry back and forth, or -- I don't know.  I'm

13       just suspecting right now, but --

14   Q   So you think you might have left it in your car, and the car

15       might not have been locked?

16   A   That is correct.

17   Q   Is it possible it could have gotten in your laundry and when

18       you were transporting your laundry, it may have dropped?

19   A   Doubtful, but that could have been a possibility.

20   Q   And it's still possible that you could have left it at

21       Safeway?

22   A   That is a possibility.

23   Q   Now, was there any reason that you didn't make a police

24       report to the -- this would have been county.  Is there any

25       reason --

```
 1   A     Yes.
 2   Q     -- that you didn't make a police report to the sheriff's
 3         department?
 4   A     I -- I didn't think of that.  I don't know why.
 5              MR. BOCK:  May I have one minute, your Honor?
 6              THE COURT:  Yes.
 7              MR. BOCK:  I have nothing further your Honor.
 8              THE COURT:  All right.
 9              Any redirect?
10              MS. ANDERSON:  No, your Honor.
11              THE COURT:  Any questions from the jury for this
12   witness.
13              All right.  Thank you, ma'am.  You may step down.
14              -------------------------
15              (Kyle Yocom was duly sworn by the clerk.)
16                         KYLE YOCOM
17                      DIRECT EXAMINATION
18   BY MR. PIMSNER:
19   Q     Mr. Yocom, are you employed?
20   A     I'm employed with the U.S. Marshal Service.
21   Q     And in what capacity?
22   A     I'm a supervisory DEO, detention enforcement officer.
23   Q     And how long have you been with the U.S. Marshal Service?
24   A     About five years.
25   Q     And generally what are your current duties?
```

```
 1   A    I supervise the cell block.
 2   Q    Now, do part of your duties include taking fingerprints from
 3        individuals?
 4   A    Yes, it does.
 5   Q    And as part of your training to become a marshal, did you
 6        receive instruction on how to take fingerprints?
 7   A    Yes.
 8   Q    And did you have an occasion to take a fingerprint -- a
 9        known fingerprint from an individual identified as Todd
10        Fries, F-R-I-E-S?
11   A    Yes.
12   Q    And do you recall the date of birth on Mr. Fries off the top
13        of your head?
14   A    No, I don't.
15   Q    Okay.  Would you have recorded that date of birth in
16        connection with the fingerprints that you would have taken?
17   A    Yes.
18   Q    Okay.  Do you recall approximately when you took the
19        fingerprints from Mr. Fries?
20   A    I don't know the exact date.  It was sometime in August.
21   Q    2000?
22   A    12.
23   Q    Okay.
24            MR. PIMSNER:  If I may approach the witness, your
25   Honor?
```

1              THE COURT:  Yes.

2   BY MR. PIMSNER:

3   Q    Let me show you what's been marked as Exhibit 383.  Do you

4        recognize that exhibit?

5   A    Yes.

6   Q    How do you recognize it?

7   A    I processed these prints.

8   Q    Okay.  What do you mean by processing the prints?

9   A    I took the prints in our JATS machine.

10  Q    And how do you know that you took them?  Is your name on

11       that document?

12  A    Yes, it is.

13  Q    Did you actually sign that document?

14  A    Yes, I do.

15  Q    And is that on the back of the print card?

16  A    Yes, sir.

17  Q    And was that Todd Fries?

18  A    Yes.

19  Q    And date of birth -- what's the date of birth?

20  A    1963, 3/16.

21  Q    March 16th, 1963?

22  A    Yes.

23  Q    And so you would have been the one that actually took the

24       prints of Mr. Fries?

25  A    Yes.

1  Q    And do you see the individual you took the prints from in

2       the courtroom today?

3  A    Yes, sir.

4  Q    And could you describe where he's seated and what he's

5       wearing?

6  A    He's right over there in the suit, sir.

7            MR. PIMSNER:  May the record reflect the identification

8  of the defendant, your Honor?

9            THE COURT:  Let's see, with the red tie or the

10 gentleman with the other tie?

11           THE WITNESS:  The blue tie.  Right there.

12           THE COURT:  All right, the record may reflect that the

13 witness has identified the defendant.

14 BY MR. PIMSNER:

15 Q    And you would have then signed -- once you completed that

16      card, you would have signed that you were the person that

17      processed it, correct?

18 A    Yes, sir.

19           MR. PIMSNER:  I would move to admit -- is it 383?

20           MR. BOCK:  I'd like to see the exhibit before it's

21 admitted.

22           THE COURT:  All right, do you want to approach the

23 witness and take a look, Mr. Bock?

24           I'm sorry, it's 383?

25           MR. PIMSNER:  Yes.

```
 1              MR. BOCK:  No objection, your Honor.

 2              THE COURT:  All right, 383 is admitted.

 3              (Counsel conferred off the record.)

 4              MR. PIMSNER:  I have nothing further at this time, your

 5    Honor.

 6              THE COURT:  All right.

 7              Cross-examination?

 8              MR. BOCK:  I have no questions, your Honor.

 9              THE COURT:  No questions.

10              All right, any questions from the jury for this

11    witness.

12              All right, sir, thank you.  You may step down.

13              -------------------------

14              (Andrew Sites was duly sworn by the clerk.)

15                         ANDREW SITES

16                       DIRECT EXAMINATION

17    BY MR. PIMSNER:

18    Q    Sir, are you employed?

19    A    Yes, I am.

20    Q    By whom?

21    A    The F.B.I. Laboratory.

22    Q    And in what capacity?

23    A    I'm a latent examiner.

24    Q    And how long have you been a latent examiner?

25    A    I've been a latent examiner for approximately 16 years.
```

1   Q   And that entire 16 years, has that been with the Bureau --
2       the F.B.I.?
3   A   Yes.
4   Q   And what type of education do you have, sir?
5   A   I have a high school -- high school degree.
6   Q   Okay.  And did you receive training in the area of
7       fingerprints?
8   A   Yes, I -- I entered into a two year training program with
9       the F.B.I. Laboratory, and passed all the requirements.
10  Q   Now, the two year training, what does that entail?
11  A   It entailed learning how to develop latents by processing
12      items, learning how to record those by either photographing
13      or scanning them, getting additional training in comparing
14      those prints, writing reports, taking comparison tests, and
15      practical exercises.
16  Q   And do you have a mentoring program as part of the training?
17  A   Yes.
18  Q   And do you work with more -- when you first started, more
19      senior fingerprint examiners?
20  A   Yes.
21  Q   And do you receive some -- any kind of certification to be
22      able to do fingerprint identifications?
23  A   Yes, I've received a qualification from the F.B.I.
24  Q   Okay.  And what's required to obtain your certification?
25  A   Well, again, the two year training program that I entered

1    into, and I had to pass all of the requirements to receive

2    that qualification.  And in addition, I'm tested yearly -- a

3    proficiency test yearly that I have to pass at 100 percent.

4  Q  Okay.  Let me ask if you were -- well, first of all, have

5    you -- have you -- as your -- in the 16 years that you've

6    been a fingerprint examiner, have you had occasions to

7    testify in federal court before?

8  A  Yes, sir, I have.

9  Q  On how many occasions?

10  A  This is my 18th testimony.

11  Q  And -- and your testimony is always regarding fingerprint

12    analysis?

13  A  Yes.

14  Q  And that's what you specialize in at the F.B.I.?

15  A  Yes.  And let me clarify, briefly.  I've been a fingerprint

16    examiner for 23 years.  I've been in latent work for 16

17    years.

18  Q  And what was your prior experience before you were the

19    latent examiner?

20  A  Also with the F.B.I., but I was in the main fingerprint

21    files in Division 1, or the identification division.

22  Q  Now, were you asked to examine some items of evidence from

23    the Phoenix -- or the -- excuse me, the Tucson, Arizona

24    F.B.I. office back in August of -- that were seized back in

25    August of 2009?

1    A    Yes.

2    Q    Okay.  And -- and there were a number of items you -- you

3         would have examined?

4    A    Yes.

5    Q    Okay.  And now, when items are submitted to the F.B.I. Lab,

6         are latents already pulled from those items?  Are they

7         already lifted -- have latents already been lifted prior to

8         items coming to the F.B.I. lab?

9    A    Not usually, no.

10   Q    And why is that?  What's the normal process?

11   A    Well, usually I -- because I'm in a laboratory setting, it's

12        easier for me to attempt to lift latents or record latents

13        off of those items, and I can use a couple of different

14        processes, depending on the item itself.  There's generally

15        two different types of items, porous and non-porous.  Porous

16        is just like it sounds.  It's like a sponge, where a latent

17        will kind of soak into it.  Think paper, or cardboard, or

18        checks.  A non-porous item would be anything that's hard,

19        like metal, or plastic, or glass.  Essentially, the

20        non-porous items I look at them visually and with forensic

21        light sources, and then I heat super glue, which makes it

22        fume, and that attaches to fingerprint residue.  I then

23        stain the super glue, and then put powder on them.  After

24        any one of those process, I can have those latent prints

25        photographed or scan them digitally to -- to keep a record

1    of them.

2         For porous items, again such as paper, or money, or

3    cardboard, I will again visually examine those and shine a

4    forensic light source on those, and then I use chemicals

5    that will react to latent residue and either stain the

6    latent residue a color so that I can visualize it, or shine

7    a forensic light source on it and make it fluoresce, or it

8    will adhere to the latent residue and again turn a color

9    that I can visualize and then have recorded.

10   Q   Okay.  So depending on -- so when an item is submitted to

11   the lab, it's for you to try to process that item in order

12   to see if you can develop latents off of that item, correct?

13   A   Generally, yes.

14   Q   Okay.  And in connection -- and as you just testified,

15   depending on -- the type of surface will depend on how --

16   what techniques you use.  Is that a fair statement?

17   A   Yes.

18   Q   Now, back in connection with the F.B.I. investigation out of

19   Tucson, were you submitted a white bucket to determine if

20   you can find any latents on it?

21   A   Yes.

22   Q   And was that white bucket given a lab number by you or by

23   your agency?

24   A   By our laboratory, yes.

25   Q   And that would have been Q-7?

1    A    Yes.

2    Q    And was it an empty white bucket?

3    A    I believe so, yes.

4    Q    Didn't have any kind of substances that you recall?

5    A    Not that I recall, no.

6    Q    And were you also submitted a lid -- a lid to a five-gallon

7         bucket to examine?

8    A    Yes.

9    Q    And was that a -- just a lid by itself?

10   A    I believe so, yes.

11   Q    Do you recall the color of the lid?

12   A    No, not -- not at this time.

13   Q    Now, did you prepare reports in -- and notes in connection

14        with your process?

15   A    Yes.

16   Q    And do you have those with you?

17   A    I do.

18   Q    Would it help refresh your recollection if you had an

19        opportunity to -- to review those?

20   A    Yes.

21   Q    Let me -- sir, let me just show you what's been marked as

22        Exhibits 377 to 380.  Would you take a moment to look at

23        those?

24            Have you had a chance to look at those?

25   A    Yes, I have.

1    Q    Are those the notes and the reports that you prepared in

2         connection with this investigation?

3    A    Yes.

4    Q    Now, were you able to determine from your notes whether or

5         not the lid that you were submitted -- was it submitted in

6         connection with a -- with any other type of evidence?

7    A    Yes, the lid was designated as Q-8, and it was submitted

8         with a paint sprayer nozzle or trigger that was designated

9         Q-9.

10   Q    And so that lid wasn't submitted with a -- with a bucket?

11        It was a separate submission?

12   A    Yes, that's correct.  It was just the -- just the lid.

13   Q    Now, as to Q-7, the white bucket, and then Q-8 and Q-9,

14        which were submitted together, would those be considered

15        porous or non-porous surfaces?

16   A    Those would be considered non-porous surfaces.  They were

17        essentially either hard plastic, or metal surfaces.

18   Q    And what was -- and did you actually go through a process to

19        try to determine whether you can lift any prints -- latents

20        off of those items?  And is it -- is that a yes?

21   A    Yes, I did.

22   Q    And just -- without a lot of details, what was the order of

23        your process that you accomplished?

24   A    Again, I looked at them visually.  I used a forensic light

25        source, or various forensic light sources to perhaps get the

|||
|---|---|
| 1 | latent residue to fluoresce or be able to visualize.  I |
| 2 | fumed those items with super glue fumes, which is just like |
| 3 | it sounds.  I took super glue, heated it, caused a fume that |
| 4 | adheres to latent print residue, and then applied a stain |
| 5 | that adheres to super glue that again would help visualize |
| 6 | the super glue itself.  And lastly, I would put powder in a |
| 7 | contrasting color on those items. |

Q   And you did that with Q-7, the white bucket; Q-8, the lid;
    and Q-9, the sprayer?

A   Yes.

Q   And were you successful in identifying sufficient latent
    detail to cause an identification?

A   No, there were no latents of value on those items.

Q   Now, staying on the line of the non-porous items, were you
    actually asked to come out to Phoenix -- travel to Phoenix
    to view an item that was in evidence to see if you can
    determine whether there were latents on that item?

A   Yes.

Q   And do you recall what that item was?

A   It was a five-gallon bucket.

Q   And -- and do you recall approximately when you came out to
    Phoenix to examine that bucket?

A   Yes, October 27th of 2009.

Q   And when you came to Phoenix, where was that bucket
    located -- or was it Phoenix or Tucson, I'm sorry?

1   A    It was Tucson.

2   Q    All right.  When you came to Tucson, where was that bucket

3        located?

4   A    I believe that bucket was being held at the Pima County

5        Sheriff's Office in a facility that they had, kind of an

6        off-site facility that they could store that -- that item.

7   Q    And when you -- did you go to that facility?

8   A    Yes, I did.

9   Q    And what kind of container was that bucket stored in?

10  A    It was stored in a large plastic bag that was inside of a

11       55-gallon drum, and the drum itself was sealed.

12  Q    And was the -- that drum unsealed so you could examine the

13       bucket inside?

14  A    Yes, several agents unsealed that so I could examine the

15       bucket.

16  Q    How would you describe that bucket that you saw out at the

17       sheriff's department?

18  A    I have recorded in my notes that it was partially burned.

19       It was basically partially melted.

20            MR. PIMSNER:  And may this witness be shown Exhibit 90,

21  which is not -- it hasn't been admitted, your Honor.  I

22  apologize.

23            THE WITNESS:  It was there briefly.

24            MR. PIMSNER:  Okay.

25            THE COURT:  It's not on the witness' screen?

```
 1            THE WITNESS:  Oh, I have it now.
 2            THE COURT:  There you go.
 3  BY MR. PIMSNER:
 4  Q    Does that bucket look familiar to you?
 5  A    Yes, it does.
 6  Q    And is that bucket in Exhibit 90 consistent with the bucket
 7       that you would have examined at the sheriff's department in
 8       '09?
 9  A    Yes, I believe so.
10            MR. PIMSNER:  I move to admit Exhibit 90.
11            MR. BOCK:  Subject to my previous record.
12            THE COURT:  All right, 90 is admitted.
13  BY MR. PIMSNER:
14  Q    Now, you described earlier when you were dealing with the
15       non-porous surfaces of the other three items the process
16       that you went through to pull latents.  Did you try a
17       similar process with this -- with this item?
18  A    Yes, I would have used most of those same processes.
19  Q    And were you successful in identifying any type of latent
20       detail?
21  A    No, I was -- no latent prints of value were detected on that
22       item.
23  Q    Now, sir, were you also asked to examine a check in
24       connection with this investigation?
25  A    Yes.
```

1   Q    And let me show you what's been admitted as -- excuse me --
2        let me show you what's been marked as Exhibit 384.  Do you
3        recognize that exhibit?
4   A    Yes, I do.
5   Q    And what is it?
6   A    It is a check, number 0110, bearing the name Michelle L.
7        Fuentes.
8   Q    And is there a date on that check?
9   A    Yes, July 3 of 2009.
10  Q    And who is that check made payable to?
11  A    Karen Levine.
12  Q    All right.  Any other identifying features on that check?
13  A    The -- the dollar amount is, I believe, $450 and no cents,
14       and in the memo line -- it's hard to read.  I believe it
15       says Obal Debbie's Cleaning Service, refund, customer
16       unhappy.
17  Q    And how do you know that -- how do you recognize that check?
18  A    This check has a number designation in the -- in the lower
19       corner that says Q-6.  Again, that's a laboratory
20       designation that we use.  And also inside this same package
21       is an identification -- laboratory identification tag that I
22       filled out with my writing, and my initials again
23       designating Q-6 and check number 110.
24            MR. PIMSNER:  At this time we would move to admit -- is
25  it, sir, 380 -- what's the number, sir?

```
 1              THE WITNESS:  I'm sorry.  384.

 2              MR. PIMSNER:  384.

 3              MR. BOCK:  Subject to my previous record, your Honor.

 4              THE COURT:  All right, 384 is admitted.

 5   BY MR. PIMSNER:

 6   Q    Now, when you received that check, Exhibit 384, had it been

 7        at all processed for any type of latents?

 8   A    No.

 9   Q    So you would have just got the -- the -- the original check,

10        correct?

11   A    Yes.

12   Q    And what's -- did you take steps to try to determine whether

13        or not any latents could be extracted from that check?

14   A    Yes, I processed -- processed the check.

15   Q    Now, this would be considered a porous surface, paper?

16   A    Yes, that's correct.

17   Q    So was it a different process than you utilized with the

18        buckets?

19   A    Yes.

20   Q    Could tell the jury what the first process is in your

21        analysis of that item?

22   A    Sure.  Again, essentially I just look at the item under

23        normal lighting, bright lighting to see if I can see any

24        latent prints.

25   Q    Okay.  And were you successful doing that on this check?
```

| | | |
|---|---|---|
| 1 | A | No, not with that process.  I didn't detect any latent |
| 2 | | prints with just examining them visually. |
| 3 | Q | And when did you conduct that visual process? |
| 4 | A | September 2nd of 2009. |
| 5 | Q | And what would your next step have been? |
| 6 | A | The next step would have been using the forensic light |
| 7 | | sources, laser and an ultra violent light. |
| 8 | Q | And did you do that in this matter? |
| 9 | A | Yes. |
| 10 | Q | And was that also on September 2nd, 2009? |
| 11 | A | It was, yes. |
| 12 | Q | And were you able to detect any latents at that point? |
| 13 | A | No. |
| 14 | Q | Now, once you conducted your visual examination, do you move |
| 15 | | to a different type of process? |
| 16 | A | Yes, I moved onto a chemical process. |
| 17 | Q | And what's the first -- or what's the chemical process that |
| 18 | | you would have utilized? |
| 19 | A | The chemical is known as DFO, that's a shortened version of |
| 20 | | the longer chemical name, but DFO.  It's essentially an |
| 21 | | amino acid stain.  I spray that chemical onto the item |
| 22 | | itself, and if it reacts to any amino acids it will stain |
| 23 | | them and then be able to fluoresce and visualize under laser |
| 24 | | light. |
| 25 | Q | And -- and you did that in this case? |

1   A    I did.

2   Q    And were you successful in identifying any potential

3        latents?

4   A    No, I did not detect any latent prints of value at that

5        point.

6   Q    Now, the DFO process, has that been around for a while in

7        the area of fingerprint technology?

8   A    Yes, it's been around since approximately the mid 80's,

9        1980's.

10  Q    And is that a process that's commonly used by -- in the

11       laboratory setting when you're trying to identify whether

12       latents exist on an item?

13  A    Yes.

14  Q    Now, when you didn't receive any prints of value at that --

15       at that time, latent prints, did you continue on with an

16       additional process?

17  A    Yes, I did.

18  Q    And what was that?

19  A    That process is known as ninhydrin.  Again, that's a -- it's

20       an amino acid stain, but it reacts to different amino acids,

21       and again stains them a color this time in a visual range

22       that I don't need an additional forensic light source.  I

23       can visualize them.

24  Q    And you did that in this case?

25  A    Yes, I did.

```
 1   Q    Was that also on September 2nd, 2009?

 2   A    Yes, I processed the item on September 2nd of 2009.

 3   Q    So all your activity would have been on that date?

 4   A    Yes.

 5   Q    As far as your processing?

 6   A    Yes.

 7   Q    Okay.  And as a -- and as a result of that ninhydrin --

 8        could spell that for the court reporter and my benefit,

 9        please?

10   A    Sure, the abbreviation that we commonly use is nin, N-I-N,

11        but the longer word is N-I-N-H-Y-D-R-I-N.

12   Q    You said it's -- it's slightly different than the -- the DFO

13        process that you would have used?

14   A    Yes, they -- it's generally considered that they react to

15        different amino acids.

16   Q    Same concept, but reacting to a different process --

17        different acids, is that accurate?

18   A    Yes, that's accurate.

19   Q    Now, were you successful when you processed this check with

20        ninhydrin?

21   A    Yes.

22   Q    And what did you discover when you did that?

23   A    I determined that there was one latent fingerprint of value

24        on the check at that point.

25   Q    And could you tell from your examination where that print
```

1          was located?

2    A    Yes, I could visualize the print at that point.

3    Q    And where was that?

4    A    Because the latent was of value, I sent that to our

5         photographic unit and had that photographed, and I have --

6         have a copy of the photograph here.

7    Q    And is that part of your notes that were marked as an

8         exhibit?

9    A    Yes.

10   Q    What exhibit, sir, just so we're clear?  It would be on the

11        back of that -- the back of that clipped area?

12   A    That is Exhibit 377.

13   Q    Okay.  Now, once you identified a latent of value, why do

14        you send it for photography?  Tell us that step.

15   A    To -- to preserve it, to -- to record it so that I will be

16        able to compare it later.

17   Q    And does the photography that's used by the F.B.I. Lab

18        provide sufficient detail that will allow you to conduct

19        a -- a fingerprint examination at a later date?

20   A    Yes.

21   Q    Is -- would you consider it a high quality resolution on

22        that -- on the lab's photographs?

23   A    Yes.  Our standard operating procedures require at least

24        1,000 pixels per inch.

25   Q    And you use that in every examination where you pull prints

```
 1              or latents from an item?
 2    A    Yes, any -- any latents that are determined to be of value,
 3         they are recorded at at least 1,000 pixels per inch.
 4    Q    And were you able -- are you able to -- by the definition
 5         involved in those type of photographs, able to compare those
 6         to known prints?
 7    A    Yes.
 8    Q    Okay.  Now, once the latent that you developed using the
 9         ninhydrin method was photographed, did you conduct a
10         comparison of that fingerprint?
11    A    Yes, subsequently to that.  Actually, I would have done one
12         more process on the -- on the check.
13    Q    Okay, what would have been the final process?
14    A    The final process is known as physical developer.  It is a
15         process that stains waxes and fats and oils that are present
16         in latent residue.
17    Q    And the first two processes identified different types of
18         amino acids.  Does the final process then identify waxes,
19         fats, and oils that could be found in a fingerprints?
20    A    Essentially, yes.  It adheres to those fats and waxes in
21         latent print residue.
22    Q    And did you conduct that physical processing in this case?
23    A    Yes, I did, on September 8th of 2009.
24    Q    And did it provide either any enhancement, or any additional
25         latents that you didn't identify from the ninhydrin effort?
```

1  A    No, there were no additional latents beyond the one with

2       ninhydrin.

3  Q    Okay.  Now, by that point the -- the latent had already been

4       photographed by September 8th, correct?

5  A    Yes.

6  Q    Now, did you have -- did you make a comparison of the latent

7       that was pulled off the check to known fingerprints of Todd

8       Fries, spelled F-R-I-E-S?

9  A    Yes, I did.

10 Q    And when did you do that?

11 A    On September 8th of 2009.

12 Q    And how -- how did you conduct that examination, just

13      generally?

14 A    Generally, I took the -- the photograph that I had that

15      preserved the -- the image of the latent, and I crease it

16      and fold it, and put it right down next to the fingerprint

17      card, and compare each finger and make a determination if it

18      is from the same source or not.

19 Q    And did you make a positive identification based on that

20      examination?

21 A    Yes, I did.

22 Q    And what was your conclusion?

23 A    My conclusion was that the latent fingerprint that I

24      detected on Q-6, check number 110, Exhibit Number 384, was

25      identified as the number 2 finger of Todd Russell Fries.

1    Q    And did you -- what -- what's the number 2 finger, just so
2         we're aware?
3    A    Oh, I'm sorry.  The fingers are numbered when they're
4         recorded on a fingerprint card.  And they're recorded in
5         order starting with the right thumb, so that's number 1, and
6         then the continuation of the right hand is 2, 3, 4, and 5.
7         The left-hand starts with 6, 7, 8, 9.  So number 2 would be
8         the right index finger.
9    Q    Now, as we got closer to trial were you asked to review some
10        more recent known fingerprints belonging to Todd Fries?
11   A    Yes.
12   Q    And let me show you what's been admitted as Exhibit 383.  Do
13        you recognize 383?
14   A    Yes, I do.
15   Q    What is it?
16   A    383 -- Exhibit 383 is a known 10 print fingerprint card
17        bearing the name Todd Fries.
18   Q    Does it have a date of birth?
19   A    Yes, March 16th, 1963.
20   Q    And does that -- how do you know that that was the card that
21        you would have examined?
22   A    I would have designated this -- or the laboratory designated
23        this as K-4 -- a known item, K-4.  So I wrote that
24        designation number here along with my initials and the
25        laboratory number that was given to it when it came into the

1          laboratory.

2    Q     And did you also -- would you have also placed that

3          fingerprint card in that sealed envelope and sealed it?

4    A     Yes, I did.  This tamper evident tape here I placed on there

5          and put my initials across the tape.

6    Q     And when did you review those known fingerprints of Todd

7          Fries?

8    A     On August 27th of 2012.

9    Q     And what did you compare those -- the prints that you

10         have -- those known prints in that exhibit with -- at the --

11         at -- on that date?  What was your comparison?

12   A     I compared K-4 that was submitted to me to the prints that

13         the F.B.I. has on file for the individual with that same

14         name.

15   Q     Okay.  So the original prints that you would have used to

16         identify the latent from the check, you -- back in '09, you

17         compared those prints with the prints that you received in

18         2012?

19   A     Yes, that's correct.

20   Q     And was there a match -- identical -- identification that

21         both sets of fingerprints belonged to Todd Fries?

22   A     Yes, both sets of those recorded prints were made by the

23         same person.

24   Q     And that fingerprint on -- that you've identified belonging

25         to Mr. Fries was located on the actual paper check that was

1       submitted for your analysis, correct?

2    A    Yes, that's correct.

3    Q    And that would have been check 110 in the name of Michelle

4        Fuentes, correct?

5    A    Yes, and designated Exhibit 384.

6           MR. PIMSNER:  All right.  Nothing further at this time.

7           THE COURT:  Cross-examination?

8           MR. BOCK:  Thank you, your Honor.

9                        CROSS-EXAMINATION

10   BY MR. BOCK:

11   Q    Good afternoon, Agent.

12   A    Good afternoon.

13   Q    Could -- I'm going to ask you to do me a favor.

14          MR. BOCK:  Could I use the easel?

15          THE COURT:  Yes.

16          MR. BOCK:  I'm going to mark this as 420, this exhibit,

17   your Honor.

18          THE COURT:  And we need you to grab the microphone, and

19   it's -- what are we going to call 420?  Diagram of --

20          MR. BOCK:  I'm going to ask him to draw the -- do you

21   want me to get the microphone?

22          THE COURT:  Yes, just so the clerk can write down what

23   the exhibit is.

24          MR. BOCK:  I'm going to ask the agent to just draw a

25   rectangular box that would represent the check, and to show where

```
 1   the fingerprint was.
 2              THE COURT:  All right.
 3              And you can approach the easel if you'd like, and maybe
 4   you can share the microphone.
 5   BY MR. BOCK:
 6   Q    So what I'm going ask you to do --
 7              THE WITNESS:  Your Honor, I'm going to step down?
 8              THE COURT:  Yes.
 9   BY MR. BOCK:
10   Q    What I'm going to ask you to do on Exhibit 420, and I'll
11        just write 420 there, is with whatever color pen you want,
12        to just draw -- the print was on the front of the check?
13   A    No, the print was on the back of the check.
14   Q    Okay.  Then just -- just draw a box and say front of check,
15        and then draw another box say back of check, and just show
16        me where the -- where the print was, if that's okay.
17              And here's the microphone.
18              THE COURT:  And I believe that it's 421 for our
19   records.  Is that possible, Mr. Bock?
20              MR. BOCK:  Yes.
21              THE COURT:  All right, so this is 421, the diagram.
22              MR. BOCK:  421, your Honor.
23              And I'll give him the microphone.
24              THE COURT:  All right, do you want him to talk and draw
25   at the same time, or draw first --
```

1          THE WITNESS:  I think I can do it, your Honor.

2          THE COURT:  All right, go for it.

3          THE WITNESS:  I just want to make sure the jury can

4     see.

5     BY MR. BOCK:

6     Q    Now, Agent, on the front of check -- which you've marked at

7          the top of the exhibit, is that correct?

8     A    Yes, that's correct.

9     Q    Just put, like, where the signature line would be so we can

10         just kind of --

11              And then where did Ms. Fuentes or the person that --

12         Mrs. Fuentes' name appear that signed -- you can just on the

13         front of the check.

14              And of course, this is not to scale.

15    A    Signature line is down in this right-hand corner.

16    Q    And the document you're holding in your right hand is --

17         what's that document number?

18    A    Again, this is Exhibit 384, the check numbered 110.

19    Q    Okay.  Were there any latents -- you've used the word when

20         you were testifying that -- you said there was one of value.

21         Were there any on the front of the check that were not of

22         value through those multi processes that you went through as

23         an F.B.I. agent?

24    A    I don't record latents that are not of value.  I don't make

25         note of those.  I don't take photographs of those.  If I

1  determine them to not be of value for identification

2  purposes, I don't record those.

3 Q But that doesn't mean that they -- that they -- that someone

4  might have touched the front of the check, but there were

5  prints that were not of value.  Is that an accurate

6  statement on my part?

7 A That's possible, yes.

8 Q All right.  So let's go to the back of the check, then.

9 A Okay.  If this is the front of the check and we flip it

10  directly down to show the back --

11 Q So if we flip it directly down to show the back, the

12  signature line -- where would the signature line be if it

13  was flipped over?

14 A The signature line would be up here.

15 Q Thank you.  That's -- go ahead.

16 A And as we're looking at the back of the check, it has a

17  preprinted stamp on it from the banking institution on this

18  side of the check.

19 Q Could you just scribble that on where that appears?

20 A That essentially takes up that lower side corner of the

21  check, and the latent that I detected would have been

22  approximately that area.

23 Q So someone -- someone touching that check may not

24  necessarily have ever seen the front of the check?

25 A It's possible.  I don't know the circumstances under which

1         the check was touched.

2    Q    Okay.  Now, were there any other prints that were not of

3         value that appeared on the back of the check?

4    A    Again, I don't record any latents that are not of value, so

5         I do not known.

6    Q    You can be seated, sir.  Thank you.

7              Again, what were the -- I don't know what the correct

8         terms would be, but you described different techniques in

9         attempting to analyze the print, is that -- is that question

10        an accurate question?

11   A    I'm sorry.  I don't understand.

12   Q    Well, you said you used one that started with an M, and you

13        said there was other methods?  What --

14   A    Yes, the chemical processes that I used?

15   Q    Right.  So the F.B.I. uses how many chemical processes when

16        they analyze fingerprints?

17   A    The F.B.I. uses numerous chemical processes depending on the

18        item itself, again whether it's porous or non-porous.

19   Q    And are they -- this is considered a porous analysis?

20   A    Actually, it's considered a porous process.  The word is

21        process.

22   Q    A porous process.  And does the porous process have the same

23        number of different examinations?

24   A    Generally speaking, yes.  We -- we generally use the same

25        number of processes.  However, depending on -- on the item,

| | | |
|---|---|---|
| 1 | | some processes might potentially be more valuable, or -- the |
| 2 | | word I'm looking for is -- might be more useful to try to |
| 3 | | determine if latents are present. |
| 4 | Q | Is there a difference in the degree of specificity used by |
| 5 | | the F.B.I. in determining latents to known prints than there |
| 6 | | might be at a local law enforcement level? |
| 7 | A | I'm -- I'm not sure I understand your question. |
| 8 | Q | Well, there are other agencies that go ahead and analyze |
| 9 | | prints other than the F.B.I.? |
| 10 | A | Yes.  Again, are you talking about chemical processes, or |
| 11 | | are you -- are you now talking about looking at latents? |
| 12 | Q | Looking at latent prints.  The F.B.I. is the most |
| 13 | | sophisticated in terms of looking at latent prints, |
| 14 | | comparing latent prints? |
| 15 | A | I don't know if we're the most sophisticated, but we've been |
| 16 | | doing it for a long time. |
| 17 | Q | You have the most resources available to you? |
| 18 | A | Perhaps.  I wouldn't want to say that that's necessarily |
| 19 | | true, though. |
| 20 | Q | Let's say that I have had a Coke can and I touched the |
| 21 | | bottom of the can and I discarded the can, how -- my print |
| 22 | | could stay on that can for months? |
| 23 | A | Yes. |
| 24 | Q | Six months? |
| 25 | A | Absolutely. |

```
 1   Q    And of the items that you looked at, this -- the government
 2        went over with you there was the bucket, is that correct?
 3   A    Yes.
 4   Q    And that was Q-7.  There was a Q-8 lid, is that correct?
 5   A    Yes, that's correct.
 6   Q    There was a Q-9 paint sprayer?
 7   A    Yes, paint sprayer nozzle.
 8   Q    A nozzle?
 9   A    Yeah, or a trigger.
10   Q    There was that five-gallon bucket that was partially melted?
11   A    That's Q-10.
12   Q    And there was a check that -- that you just testified to, is
13        that correct?
14   A    Yes, that's correct.
15   Q    Was there a day planner or anything like that?  Do you
16        remember?
17   A    No, there wasn't.
18   Q    Okay.  And the -- do they -- is there still a points of
19        comparison?  Is that still in vogue, or is that not in vogue
20        anymore as to how many points of comparison an unknown might
21        have to a known?
22   A    No, there's no minimum number of points that are required
23        to -- to be compared to come to a determination or a
24        conclusion.
25   Q    Is there a threshold number?
```

1    A    No, there isn't.

2              MR. BOCK:  Okay.  Thank you, Judge.  Nothing further.

3              I'd move to admit the diagram, which is Defense Exhibit

4    421.

5              MR. PIMSNER:  I'd object, your Honor.  It's not

6    evidence of any kind.  It's demonstrative.

7              THE COURT:  I think it's just for demonstrative

8    purposes, Mr. Bock, so I'll sustain the objection.

9              MR. BOCK:  Okay.

10             THE COURT:  And any redirect?

11             MR. PIMSNER:  Just briefly, your Honor.

12                        REDIRECT EXAMINATION

13   BY MR. PIMSNER:

14   Q    You were asked about -- well, first of all, you were asked

15        about if a print was on a Coke can, could it last a long

16        period of time, correct?

17   A    It could, yes.  There's numerous factors that cause latent

18        prints to remain on an item if -- if it has been touched.

19   Q    And could -- could certain factors also cause the latent to

20        degrade?

21   A    Absolutely.

22   Q    Like what?

23   A    Well, generally there's -- there's three general factors

24        that cause a latent print to be left on an item and then

25        cause it to be able to be visualized.  The surface itself

1      has to be receptive to receiving a latent print.  So again,

2      the -- the non-porous item if it's smooth and hard, if I

3      touched this I could leave a latent print on that.  Second,

4      the -- the environmental conditions, such as weather, or

5      moisture, or lack of moisture.  Again, how much time has

6      passed in any of those elements, and if the latent print has

7      actually been destroyed by being wiped off, or being rubbed

8      against something else, or something else has touched the

9      item on top of that.

10  Q   Now, you talk about environment.  Would exposure to high

11      heats -- would that -- would -- could that cause a print to

12      degrade?

13  A   It could not only cause a print to degrade, but it could

14      cause a print not to be left in the first place.

15  Q   Okay.  Now, you were asked about -- briefly about some of

16      the chemical processes that you used, specifically

17      ninhydrin.  How long has the use of ninhydrin in the -- in

18      the processing of latent prints been in -- been in -- how

19      long has it been used by law enforcement?

20  A   It's known that law enforcement -- at least the F.B.I.

21      Laboratory, has been using ninhydrin since 1954.

22  Q   And that's considered a -- a reliable process?

23  A   Absolutely.  Actually, it's -- we consider it to be the --

24      the work horse process for -- for porous items.

25  Q   And lastly, once you make an identification, is there any

```
 1              type of verification process in your agency?
 2    A    Yes.
 3    Q    And what is that?
 4    A    All identifications have to be verified by another qualified
 5         examiner.  And in addition to that, if -- if we come to a
 6         single conclusion, either an identification or a
 7         non-identification, that has to be verified by a third
 8         examiner who is -- who would be unaware of the result.  So
 9         the original verifier knows the result of the first
10         examiners' conclusion.  The blind verifier is blind to that
11         result.  When they conduct their own analysis, they do not
12         know the original conclusion.
13    Q    And your examination, your conclusion is -- is of record
14         with the F.B.I.?  I mean, is -- your conclusion with the --
15         that you made stands in this matter on the check, correct?
16    A    Yes, because this was a single identification.  It was
17         verified and blind verified by one additional examiner each,
18         for each of those, the verification and the blind
19         verification.
20              MR. PIMSNER:  I have nothing further, your Honor.
21              THE COURT:  Any questions from the jury for this
22    witness?
23              All right.  Thank you, sir.  You may step down.
24
25
```

1          C E R T I F I C A T E

2          I, Mary A. Riley, do hereby certify that I

3     stenographically reported the foregoing proceedings to the best

4     of my skill and ability, and that the same was transcribed by me

5     via computer-aided transcription, and that the foregoing pages of

6     typewritten matter are a true, correct and complete transcript of

7     all the proceedings had, as set forth in the title page hereto.

8          Dated this 18th day of April, 2013.

9

10                              s/ Mary A. Riley

11                         United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25