1          UNITED STATES DISTRICT COURT

2             DISTRICT OF ARIZONA

3   ----------------------------)
                                )
4                               )
    UNITED STATES OF AMERICA,   )
5               Plaintiff,      ) No. CA 13-10116 9th Circuit
                                )
6          vs.                  ) No. CR 11-01751 TUC-CKJ
                                )
7                               )    Tucson, Arizona
    TODD FRIES,                 )    September 27, 2012
8               Defendant.      )
                                )
9   ----------------------------)

10              TRANSCRIPT OF TESTIMONY
        JURY TRIAL DAY SEVEN MORNING SESSION
11
        BEFORE THE HONORABLE CINDY K. JORGENSON
12          UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

    For the Plaintiff:    By:  Beverly K. Anderson, and
16                             David A. Pimsner
                               U.S. Attorney's Office
17                             405 W. Congress St., Suite 4800
                               Tucson, AZ   85701
18
    For the Defendant:    By:  Richard C. Bock
19                             100 N. Stone Ave., Suite 801
                               Tucson, AZ   85701
20

21
    Mary A. Riley, RMR, FCRR
22  United States Court Reporter
    U.S. District Court
23  405 W. Congress St.
    Tucson, AZ   85750
24

25      Proceedings produced by computer-aided transcription

1                           INDEX OF TESTIMONY

2

3     MARLENE MILLER

4     Direct Examination by Mr. Pimsner        Page   3

5     Cross-Examination by Mr. Bock            Page   9

6     Redirect Examination by Mr. Pimsner      Page  17

7

8     JEREMY O'KELLY

9     Direct Examination by Ms. Anderson       Page  20

10    Cross-Examination by Mr. Bock            Page  54

11    Redirect Examination by Ms. Anderson     Page  63

12    JURY QUESTION

13    Examination by Ms. Anderson              Page  67

14

15    ANTHONY EVANS

16    Direct Examination by Ms. Anderson       Page  68

17    Cross-Examination by Mr. Bock            Page  80

18

19    EDWARD TRUJILLO

20    Direct Examination by Mr. Pimsner        Page  83

21

22

23

24

25

1                    TRANSCRIPT OF PROCEEDINGS

2              (Marlene Miller was duly sworn by the clerk.)

3                         MARLENE MILLER

4    BY MR. PIMSNER:

5    Q    Ms. Miller, do you currently reside in Tucson?

6    A    Yes.

7    Q    And how long have you been living in Tucson?

8    A    Since 1986.

9    Q    And are you presently employed?

10   A    Yes.

11   Q    And what type of work do you do?

12   A    CNA, which is certified nursing assistant.

13   Q    And is that involved with patient care?

14   A    Yes.

15   Q    Now, back in 2000 -- August of 2009, were you employed at a

16        different location?

17   A    Yes.

18   Q    And who were you employed with at that time?

19   A    The same name, certified nursing assistant, patient care.

20   Q    Okay, what company were you employed by?

21   A    Avalon Health Care Center.

22   Q    And where was Avalon located at?

23   A    Third floor in El Dorado Hospital.

24   Q    And is that over off Wilmot?

25   A    Yes, Wilmot.  1400 North Wilmot.

1    Q    Thank you.

2          And you were involved with patient care at that

3          facility?

4    A    Yes.

5    Q    Now, were you working back on August 4th, 2009?

6    A    Yes.

7    Q    Do you recall that day that F.B.I. agents showed up to your

8          work?

9    A    Yes.

10   Q    Now, do you recall what shift you had that day?

11   A    Morning shift, 6 -- 6 to 2.

12   Q    Now, that morning did something unusual happen with an alarm

13         that went off --

14   A    Yes.

15   Q    -- at your facility?

16   A    Yes.

17   Q    And what was the alarm from?

18   A    It's an emergency alarm door.

19   Q    Okay.  And was it to a stairwell exit?

20   A    Yes.

21   Q    And -- and when the alarm went off, did it -- did it draw

22         your attention over to that the area where the alarm was

23         sounding?

24   A    Yes, everyone.

25   Q    And how far were you away from the alarmed door?

```
 1   A    Oh, about five step.

 2   Q    Pretty close, then?

 3   A    Pretty close.

 4   Q    And did you see an individual come out of that alarmed door?

 5   A    Yes.

 6   Q    And what did that individual do?

 7   A    Just running, and looked back left and right looking for

 8        something -- the alarm going off, or --

 9            MR. BOCK:  Objection.  Objection.

10            THE COURT:  No, I'll allow the answer to stand.

11            Go ahead, ma'am.

12   BY MR. PIMSNER:

13   Q    And did that individual walk by you?

14   A    Yes.

15   Q    Now, at some point I take it the alarm was -- was ultimately

16        just shut off, correct?

17   A    Yes.

18   Q    At some point did you see that same individual again that

19        morning?

20   A    Yes.

21   Q    And where did you see that individual?

22   A    In the charting room.

23   Q    And what's the charting room?

24   A    The charting room, when we chart the patient care throughout

25        the day.
```

1    Q    Now, what's located in that charting room?

2    A    A computer and a telephone.  A couple of telephone, and a

3         couple of computers.

4    Q    Okay.  Now, where were you when you saw that individual in

5         the charting room?

6    A    Outside the door.  Outside the hallway.

7    Q    And are there big mirrors or windows in front of the

8         charting room?

9    A    Yes.

10   Q    Could you see clearly in the charting room?

11   A    Yes.

12   Q    And what were you doing in the hallway at that point?

13   A    Waiting for a patient to give me a signal.

14   Q    Did you step out of the room on behalf -- because the

15        patient asked you to?

16   A    Yes.

17   Q    And so were you waiting in the hallway?

18   A    Yes.

19   Q    And what was the individual doing in the charting room that

20        you saw?

21   A    Moving his chair, like this.  Picking up a phone.  Trying to

22        pretend on the computer.

23   Q    It looked like he was pretending to be on a computer to you?

24   A    Yes.

25             MR. BOCK:  Objection to leading, Judge.

1          THE COURT:  Well, I think -- it was already answered,

2     so go ahead.  Ask another question.

3          MR. PIMSNER:  I'm just trying to clarify the answer,

4     your Honor.

5     BY MR. PIMSNER:

6     Q    And did -- at some -- did you see that individual more than

7          once in the charting room?

8     A    I saw him twice.

9     Q    Okay.  And at some point did you have -- make eye contact

10         with that individual?

11    A    Yes.

12    Q    And describe what happened with that?  How did that come

13         about?

14    A    He waved.  I smiled.  He smiled.

15    Q    And did you get a good look at his face at the time?

16    A    Yes.

17    Q    Now, do you recall that the F.B.I. came to the facility,

18         and -- and at some point did they interview you regarding

19         the individual that you saw that morning?

20    A    Yes.

21    Q    And when did the interview take place, do you recall -- or I

22         guess, where -- where were you interviewed by the F.B.I.?

23    A    By the -- in the hallway.

24    Q    Okay.  And were you asked if you had seen anyone unusual on

25         the floor that morning?

1    A    Yes.

2    Q    Were you asked to provide a description of that individual?

3    A    Yes.

4    Q    And do you recall what -- today what that individual looked

5         like?

6    A    To me, he looks big and tall, 40 to 50 years old, dark black

7         hair, mustache.  Big guy.

8    Q    A big guy?  Okay.  And after you provided your description

9         to the F.B.I., were you shown any photographs?

10   A    Yes.

11   Q    And did you recognize the individual in the photograph?

12   A    Yes.

13   Q    And was the individual in the photograph the same person you

14        saw that morning set off the alarm?

15   A    Yes.

16   Q    Let me show you what's been admitted in -- as Exhibit 343

17        and 344.

18             MR. PIMSNER:  If I may, your Honor?

19             THE COURT:  Yes.

20   BY MR. PIMSNER:

21   Q    Just asking you to look at just the pictures and not any of

22        the -- of the writing on that -- those documents, do you

23        recognize those photographs?

24   A    Yes, this one.

25   Q    And how do you recognize that photograph?

1  A    With his smile, and his nose.

2  Q    And are you saying that's the same person you saw at Avalon

3       in August, 2009?

4  A    Yes, this one.

5            THE COURT:  Could you tell us what number is on the one

6  you're referring to, ma'am?

7            THE WITNESS:  343.

8            THE COURT:  All right.  Thank you.

9            MR. PIMSNER:  Thank you, your Honor.  I have nothing

10  further, your Honor.

11            THE COURT:  All right.

12            Cross-examination?

13                        CROSS-EXAMINATION

14  BY MR. BOCK:

15  Q    Good morning.

16            Now, the -- you've worked at Avalon for what period of

17       time up until August the --

18  A    16th.

19  Q    You were interviewed on August the 4th, is that correct?

20  A    Yes.

21  Q    And so as of 2009, how long had you been at Avalon?

22  A    Two years.

23  Q    Two years.  You indicated that you were on the third floor,

24       is that correct?

25  A    Yes.

1  Q    And how many -- how many staff would have been on the third

2       floor at -- during that shift?

3  A    Well, there's 4 CNA, and four nurses, but 8 or 10 people.

4  Q    How many different phones would have been on the -- would

5       have been on the third floor, approximately?

6  A    Let's say 15 to 20 people, including the management.

7  Q    Do you remember the phone number?

8  A    No.

9  Q    Every phone would have the -- if you were dialing out on

10      that phone, every phone would have the same number except

11      there might be an extension that's attached to the phone, is

12      that correct?

13 A    Yes.

14 Q    Now, the -- you were alerted by the alarm, is that your

15      testimony?

16 A    Yes.

17 Q    And you were in -- are you in an Avalon uniform?

18 A    Yes.

19 Q    And you see the individual come from the sound of where the

20      alarm was?

21 A    Yes.

22 Q    And that would have been a door leading to a stairwell, is

23      that correct?

24 A    Yes.

25 Q    What time do you -- did you associate with the alarm?

1    A    Lunch time, between 11:00 and 12:30.

2    Q    Okay.  Confident as to that?

3    A    Yes.

4    Q    The individual, did he have any conversation with you

5         when -- when you first noticed his presence?

6    A    No.

7    Q    Did you tell any other people on the floor of his

8         presence -- people -- let me strike that.  Let me re-ask

9         that question.

10        Other people were aware of his presence, were they not?

11   A    My coworker, yes.

12   Q    Because they heard the alarm?

13   A    I'm sorry?

14   Q    I say the alarm -- the alarm goes off.  It's not low in

15        volume, right?

16   A    Oh, it's loud.

17   Q    Right, so people would have heard the alarm?

18   A    Everybody, yes.

19   Q    Okay.  So do you go about your business, or do you watch him

20        actually -- the individual that you said came in about 11:00

21        to 12:30, do you watch him actually go into that charting

22        room?

23   A    No, sir.

24   Q    So are you separate from him for a period of time?

25   A    Yes.

1    Q    How -- how long a period of time before you realize that

2         he -- this person is in the charting room?

3    A    Like, a half an hour.

4    Q    So you don't really know what time he -- he got in the

5         charting room?

6    A    Well, the alarm was set almost at 11:00 o'clock, and then he

7         just looked back and forth and walked down there, so --

8    Q    Does the alarm have a set time that it's set?

9    A    No, sir.

10   Q    So when you heard the alarm and you saw the individual, you

11        went about your responsibilities, right?

12   A    Yes.

13   Q    Okay.  And then about a half hour later, I believe your

14        testimony is, that's when you observed that same individual

15        in the charting room, is that --

16   A    Yes.

17   Q    Now -- and you're doing other -- you have other

18        responsibilities, or you're moving back and the forth,

19        right?

20   A    Yes.

21   Q    And during that period of time you still see the individual

22        in the charting room?

23   A    Yes.

24   Q    And he's in the charting room while you're doing -- well,

25        you first notice him in the charting room until he emerges

|    |   |                                                                          |
|----|---|--------------------------------------------------------------------------|
| 1  |   | from the charting room for approximately how long?                       |
| 2  | A | A half an hour.                                                          |
| 3  | Q | Now, for that half hour period of time you looked in there,             |
| 4  |   | what, half a dozen times or less?                                        |
| 5  | A | Yes.  I kept looking.  It's just across from me.                         |
| 6  | Q | And you saw a computer use?                                              |
| 7  | A | Yes.                                                                     |
| 8  | Q | Did you see the screen actually on?                                      |
| 9  | A | No, sir.                                                                 |
| 10 | Q | Do you know if the screen was on or not?                                 |
| 11 | A | I think so, yes.                                                         |
| 12 | Q | Could you use the computer without the screen being on?                  |
| 13 | A | Yes.                                                                     |
| 14 | Q | And you actually saw him physically touching the --                      |
| 15 | A | Touching the keyboard, moving the mouse.                                  |
| 16 | Q | Did you tell the F.B.I. that when they talked to you, that               |
| 17 |   | this individual's fingers came in contact with the computer              |
| 18 |   | and the mouse?                                                           |
| 19 | A | Yes.                                                                     |
| 20 | Q | And did you see people from the Tucson Police Department,               |
| 21 |   | people with blue uniforms or people associated with                      |
| 22 |   | analyzing a scene -- did you see people doing that, looking              |
| 23 |   | for fingerprints and things like that?                                   |
| 24 | A | No, sir.                                                                 |
| 25 | Q | Now, was the individual that was in the charting room, was               |

```
 1          that individual also on the phone?
 2   A      Yes.
 3   Q      And when he was using -- or when that individual was using
 4          the computer, where was the phone?
 5   A      In his right hand.  He was more -- he's more on the phone
 6          than on the computer.
 7   Q      Okay.  You couldn't hear any conversations?
 8   A      No, sir.
 9   Q      Could you see the phone itself?
10   A      Yes.
11   Q      Did you see anything associated with the phone, like an
12          orange box?
13   A      No, sir.
14   Q      Did you see any cards associated with the phone that might
15          have looked like a credit card or anything?
16   A      No, sir.
17   Q      And do you think if there was something that was like the
18          size of a credit card that was next to the base of the
19          phone, is that something you think you might have been able
20          to see?
21   A      No, sir.
22   Q      I'm sorry, you don't think you could have seen a credit card
23          if it was out near the bottom of the phone?
24   A      No.
25   Q      But you did see the bottom of the phone distinctly, right?
```

1    A    The bottom of the phone, yes.

2    Q    Right, because the phone can be removed from the --

3    A    Oh, the phone, yeah.  It has a cord.

4    Q    Okay.

5    A    It's not a cordless.

6    Q    It's not a cordless.  But again, you can see the whole

7         phone?

8    A    Yes.

9    Q    Now, the -- the individual then leaves the -- the charting

10        room, is that correct?

11   A    Yes.

12   Q    And you again get a -- a good view of that individual?

13   A    Yes.

14   Q    And you've described what your recollection is of that

15        individual today, is that correct?

16   A    Yes.

17   Q    But you also gave the F.B.I. a description when they spoke

18        to you the day that that individual was there, is that

19        correct?

20   A    Yes.

21   Q    Now, did you have any conversations with that individual

22        after he emerged from the charting room?

23   A    No, sir.

24   Q    He didn't say hi to you, or good-bye, or anything?

25   A    He said hi.

1   Q   Now, you described his clothing, and the description that
2       you gave on August the 4th to the F.B.I. was a white shirt
3       with a collar?
4   A   Yes, it was a white shirt.  There was a pocket in here on
5       the left, and he's wearing light beige shorts.
6   Q   But it had a color on it?
7   A   Yes.
8   Q   Clearly, not a t-shirt?
9   A   No.
10  Q   And the -- the -- did the shirt have buttons associated with
11      it?  Do you remember?
12  A   Yes, in the middle.
13  Q   And did -- you said it had a red symbol on the pocket?
14  A   Yeah.
15  Q   Like a writing?
16  A   No, like a -- a sport.  A basketball.
17  Q   Like a Nike shirt with a --
18  A   Yes.
19  Q   Okay.  So you associated the red symbol -- you know the Nike
20      logo?
21  A   Um-um.
22  Q   You've seen that on TV, yes?
23  A   Yes.
24  Q   So you associate the red symbol as, like, a basketball
25      player, or a Nike symbol?

```
 1   A    (No verbal response.)

 2   Q    You don't think he had writing on his shirt as --

 3   A    No.

 4   Q    Are you confident of that, that there was no writing on the

 5        shirt?

 6   A    No, sir.

 7   Q    And the individual smiled at you, is that correct?

 8   A    Yes.

 9   Q    And the F.B.I. showed you just -- how many photos did they

10        show you of that individual?  You -- you mentioned a number

11        of the exhibit that you were shown this morning.  That was

12        the same photo you were shown back --

13   A    Yes.

14   Q    And that number, again, for purposes of the record?

15   A    343.

16   Q    Is that the -- were you shown just that one photo?

17   A    They show me two or three.

18   Q    Two or three, but it was the same person?

19   A    Yes.

20   Q    Okay.

21            MR. BOCK:  Nothing further, your Honor.

22            THE COURT:  All right.

23            Redirect?

24                        REDIRECT EXAMINATION

25   BY MR. PIMSNER:
```

```
 1   Q   Ma'am, you indicated you thought that the alarm would have
 2       been set off around 11:00 o'clock-ish, is that -- is that
 3       your testimony?
 4   A   Yes.
 5   Q   And at some point when the -- when you thought -- or at the
 6       time that the alarm went off, did you actually make a
 7       written notation anywhere in any chart or anything about
 8       the -- the alarm?
 9   A   No.  The management came down and fixed the alarm, set the
10       alarm.
11   Q   So it wasn't your job to kind of --
12   A   No.
13   Q   -- make a report that the alarm went off, or anything of
14       that effect?
15   A   No.
16   Q   So the time is what you recall it to be as you sit here
17       today, correct?
18   A   Yes.
19   Q   Now, you testified that you saw him appear -- the individual
20       appeared to be holding the phone, right?  So you saw the
21       phone in his right hand -- the handset?
22   A   Yes.
23   Q   And could you set the base of the phone clearly?
24   A   Yes.
25   Q   Could you see the entire base, or were there walls on those
```

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | cubbies in that room?                                                 |
| 2  | A | It's a black phone that you pick up the receiver, and it has          |
| 3  |   | a cord.                                                               |
| 4  | Q | Okay, but can you see the base of the phone clearly from              |
| 5  |   | outside the room?                                                     |
| 6  | A | Oh, no.                                                               |
| 7  | Q | But you could see the handset in his hand?                            |
| 8  | A | Yes.                                                                  |
| 9  | Q | When you were looking at this individual, were you paying             |
| 10 |   | more attention to his clothing or to his face?                       |
| 11 | A | I wasn't really paying attention, just keep on looking.              |
| 12 | Q | And you kept looking because -- had you ever seen that                |
| 13 |   | individual there before?                                             |
| 14 | A | No.                                                                  |
| 15 | Q | Did you think it was unusual that the individual was there           |
| 16 |   | using the charting room?                                             |
| 17 | A | Yes.                                                                  |
| 18 | Q | And did you actually see him type things on the computer, or         |
| 19 |   | did you -- did it appear that he may have been pretending?           |
| 20 | A | Just pretending, moving -- moving.  But it's more in the            |
| 21 |   | phone.                                                               |
| 22 |   | MR. PIMSNER:  I have nothing further, your Honor.                    |
| 23 |   | THE COURT:  All right.                                               |
| 24 |   | Any questions from the jury for this witness?                        |
| 25 |   | All right.  Thank you, ma'am.  You may step down.                    |

```
 1                    -------------------------
 2           (Jeremy O'Kelly was duly sworn by the clerk.)
 3                         JEREMY O'KELLY
 4                        DIRECT EXAMINATION
 5   BY MS. ANDERSON:
 6   Q    Sir, could you tell us what your occupation is?
 7   A    I'm a chemist for the Federal Bureau of Investigation.
 8   Q    And how long have you been a chemist with the F.B.I.?
 9   A    Four years.
10   Q    Are you assigned to any unit in particular?
11   A    Yes I'm assigned to the Hazardous Materials Science Response
12        Unit in the laboratory division.
13   Q    Now, could you tell us what your duties are as a chemist
14        with the Hazardous Materials Response Center with the
15        F.B.I.?
16   A    Hazardous Materials Response Unit's primary responsibilities
17        are to provide field scientific support to the F.B.I. field
18        division.  So we go out to the field rather than conducting
19        most of our activity at the laboratory.
20   Q    So when you say the field, are you talking about, like, here
21        in Tucson?
22   A    That's correct.
23   Q    Okay.  Now, before you began as a chemist with the F.B.I.,
24        did you have any previous experience as a chemist?
25   A    I did.  I was employed for two years immediately prior to
```

1      coming to the F.B.I. with the Environmental Protection

2      Agency in Boston.  Prior to that I worked for seven years as

3      an air quality chemist at the South Coast Air Quality

4      Management District in Southern California.  And my first

5      job as a chemist was with Scott's Specialty Gas.  It's a

6      chemical manufacturing company in Southern California where

7      I worked for approximately four and a half years.

8  Q    So how many years total have been employed as a chemist?

9  A    Approximately 17 years.

10  Q    And the last four have been with the F.B.I., is that

11      correct?

12  A    That's correct.

13  Q    Now, could tell us what kind of educational background you

14      have that enables you to work as a chemist?

15  A    Certainly.  I have a bachelors degree from the California

16      University -- California State University, San Bernadino,

17      bachelors of arts in chemistry.

18  Q    Okay.  And then did you get any kind of specialized training

19      after that?

20  A    I've continued my education by getting a masters degree in

21      homeland security from the American Military University in

22      West Virginia.  I'm currently enrolled in a toxicology

23      course with the Michigan State University, and I've had

24      several hundred hours at the F.B.I. and with other federal

25      agencies that I've worked at over the course of my career.

1  Q  Now, let's talk about the master's degree that you got.

2     That was in homeland security?

3  A  That's correct.

4  Q  Could you tell us what that's about?

5  A  The majority of the course work involved in that masters

6     degree program centered around emergency planning,

7     terrorism, and the use of weapons of mass destruction in a

8     criminal or terrorist event.

9  Q  Now, we're here this morning to talk about a couple of

10    different gases, compounds, chemicals, one of which is

11    chlorine and another of which is called trichlor.  Are you

12    familiar with both of those substances?

13 A  I am.

14 Q  Now, before we talk about them specifically, let's talk

15    about how you got involved in this case.  Could tell us a

16    little bit about that?

17 A  Certainly.  In May of 2011 a request was forwarded to my

18    unit chief from the field division requesting that we

19    examine the reaction that could occur between trichlor, or

20    trichloroisocyanuric acid, and three other chemicals,

21    hydrochloric acid, brake fluid, and xylene.

22 Q  So you were asked to do some case studies, is that correct?

23 A  That's correct, so research and demonstration.

24 Q  Is that something that you do within the hazardous materials

25    unit you described for us?

1    A    Something that is commonly done in the laboratory by the

2         explosives unit and now by the Hazardous Materials Response

3         Unit.

4    Q    Now, before you did your demonstrations or your studies as

5         you've described, could you tell us did you receive any

6         information from the field regarding the nature of the

7         investigation that was involved?

8    A    A brief sketch, background sketch of the investigation, and

9         the identification of the trichloroisocyanuric acid product

10        named Pool Time three inch chlorinating tablets.

11   Q    Did the case agent request that you use any kind of certain

12        compounds in your studies?

13   A    The Pool Time tablets, hydrochloric, or also referred to as

14        muriatic acid, brake fluid, and xylene.

15   Q    Now, are you familiar with the Pool Time tablets?

16   A    I am.

17   Q    Could you tell us a little bit about them?

18   A    Certainly.  They are three inch round tablets that look

19        somewhat like hockey pucks.  They consist of over 99 percent

20        trichloroisocyanuric acid, which we refer to colloquially as

21        trichlor.  Their intended use is to put them in your pool

22        and generate antibacterial activity over time and

23        antimicrobial activity over time to keep things from growing

24        in your pool.

25   Q    Is trichlor a toxic chemical?

1    A    It is.

2    Q    Now, trichlor contains chlorine, is that correct?

3    A    Trichlor contains chlorine.  Those chlorine atoms are

4         attached to the trichlor molecule.

5    Q    Is chlorine a toxic chemical?

6    A    Yes, it is.

7    Q    Similarly, is muriatic acid a toxic chemical?

8    A    Yes, it is.

9    Q    And xylene, is that a toxic chemical as well?

10   A    Yes.

11        MR. BOCK:  Judge, I have an objection.  May I approach

12   for a second?

13                    BENCH CONFERENCE

14        THE COURT:  Yes.

15        MR. BOCK:  Judge, there's no evidence that brake fluid

16   or xylene, I believe that the government is going to present, was

17   the -- was involved in this event.  In fact, Dr. Rooney when he

18   testifies does not know what the other compound was.  So I think

19   any evidence regarding xylene, brake fluid is speculative, and

20   it's inappropriate since there's no evidence of that.

21        MS. ANDERSON:  Well, the evidence might be coming in

22   later through some other witnesses, particularly the cooperators

23   who will testify that they gathered fluid such as this.  Not only

24   that, but that goes to the -- it doesn't go to the admissibility,

25   your Honor.  It goes to the weight.

1          THE COURT:  So there is going to be some testimony

2    presented by the government that either brake fluid -- or what's

3    the other substance?

4          MR. BOCK:  It was brake fluid and xylene.

5          THE COURT:  And xylene were actually just --

6          MS. ANDERSON:  Well, there's a big box of xylene in one

7    of the photographs that was admitted into evidence.  A big box of

8    xylene in the defendant's garage.

9          THE COURT:  But there's no evidence that that was used

10   in either of the incidents?

11         MR. PIMSNER:  We have one cooperator this Court's aware

12   of that reentered his change of plea because of an inaccurate

13   factual basis.  We don't intend to call him for our case in

14   chief, but reserve him for rebuttal.  He is the only witness that

15   actually identified the defendant using the xylene bucket and

16   pouring it into the chlorine tablets.  The other people were not

17   present during the actual event, but were workers at the shop and

18   can talk about multiple chemicals that were present.

19         MS. ANDERSON:  This witness will also describe that if

20   these particular components were not used, similar components

21   could react similarly because of the alcohol that is typically

22   present in some of the other compounds.

23         MR. PIMSNER:  I'm sorry, I should probably --

24         THE COURT:  You should -- usually, we just let one

25   attorney -- go ahead.  You both want to argue.  Go ahead.  So

1   there may be no evidence of the xylene.  There won't be in the

2   government's case in chief, but possibly in rebuttal?

3          MR. PIMSNER:  Correct, that the defendant was seen

4   pouring it into one of the chlorine buckets.

5          THE COURT:  Before the incident?

6          MR. PIMSNER:  Before the second incident.

7          THE COURT:  And then the other substance, the

8   battery -- brake fluid, is there any evidence of the brake fluid?

9          MS. ANDERSON:  Well, the witnesses have testified

10  that -- there's been ample testimony that there was some sort of

11  motor oil or brake fluid.

12         THE COURT:  Was that used as part of a chemical weapon?

13  Is it the government's theory that was part of the weapon?

14         MS. ANDERSON:  We certainly do, your Honor.  That's a

15  possibility.

16         MR. PIMSNER:  There's an inference based on the

17  demonstrations.  And your Honor, the last thing I want to say is

18  Mr. Bock has seen these demonstrations and he's had them for

19  months -- or a year.  And to wait until the witness is testifying

20  instead of making some pretrial motion moving to suppress at this

21  time, I believe, is untimely and inappropriate.

22         MR. BOCK:  Well, it's not a motion to suppress.  It's

23  an issue of foundation.

24         THE COURT:  Mr. Bock, I'll let the witness testify.

25  I'll let him testify as to the nature of these substance, but if

1    it turns out that there's no evidence that the substances were

2    used in this particular case, then certainly I can give the jury

3    a cautionary instruction to disregard it.  But I think at this

4    point there's no -- certainly no prejudice to the defense, and

5    certainly it's not inconsistent with the evidence that the

6    government has presented so far.

7           MS. ANDERSON:  Similarly, we're not going to point to a

8    certain reaction and say that was it.  We're not going to say

9    that -- that the defendant used certain components based on what

10   these witnesses are going to describe in the video.  We're not

11   going to do that.

12          THE COURT:  All right.  And you haven't brought out yet

13   the fact that the one box was found at the defendant's home.

14          MS. ANDERSON:  There -- it's a photograph that's been

15   admitted into evidence.

16          THE COURT:  Has it been identified yet by anybody?

17          MS. ANDERSON:  As muriatic acid?

18          THE COURT:  Yes.

19          MS. ANDERSON:  I'm not sure if Scott Hunter did or not.

20          THE COURT:  Because if that ends up not being testified

21   to during the trial, I don't think the jury would be -- well, I

22   don't know if they're going to alert to that or not, or wonder

23   how that's relevant to this case, or -- I don't know.

24          MR. PIMSNER:  Those are all points that the defense can

25   make, that it goes towards weight as opposed to admissibility.

1        MR. BOCK:  I just wanted to make a record on that, your

2    Honor.

3        THE COURT:  All right, so I'm going to overrule the

4    objection.

5        MR. BOCK:  Okay.

6        (The bench conference was concluded.)

7        THE COURT:  All right, Ms. Anderson, you may proceed.

8    BY MS. ANDERSON:

9    Q    So we talked about trichlor is a toxic chemical as is

10        chlorine, correct?

11   A    That is correct.

12   Q    As is xylene, correct?

13   A    Yes.

14   Q    Now, you participated in each of the -- each of the

15        different demonstrations, correct?

16   A    That's correct.

17   Q    And there's a total of four of them --

18   A    Yes.

19   Q    -- is that right?

20        And they took place on two different days, correct?

21   A    Yes.

22   Q    One was on June 15th of 2011, and the next was on

23        August 3rd, 2011?

24   A    That's correct.

25   Q    So before you did these demonstrations, did you consider any

1            kind of safety precautions?

2     A     Absolutely.  We -- before conducting any sort of

3            demonstration, we'll conduct a hazard risk assessment.  That

4            begins with identifying the chemicals that will be used, and

5            then accessing the material safety data sheets to determine

6            the hazards associated with those chemicals.

7     Q     What is a material safety data sheet?

8     A     A material safety data sheet is a standard form that's put

9            out by manufacturers of any chemical, required by law, that

10           provides certain information about the chemical to consumers

11           and to people who will use it.  It includes things such as

12           the manufacturer's name and how they can be contacted, how

13           it should be properly handled, what hazards are associated

14           with the chemical, and what to do in different types of

15           emergency circumstances.

16               MS. ANDERSON:  Your Honor, may I approach the witness?

17               THE COURT:  Yes.

18    BY MS. ANDERSON:

19    Q     That's Government's Exhibit 385.  Do you -- do you recognize

20           that?

21    A     I do.

22    Q     And what is that?

23    A     This is the material safety data sheet for the Pool Time

24           stabilized chlorinator three inch tablets.

25    Q     Now, before you conducted these demonstrations, you -- you

1          referred to Government's Exhibit 385, correct?

2    A    That's correct.

3    Q    And it had some important information for you before you did

4         the demonstrations, correct?

5    A    It does.

6              MS. ANDERSON:  Government moves for admission of

7    Exhibit 385.

8              MR. BOCK:  May I see the exhibit for a second, your

9    Honor?

10             THE COURT:  Yes, you may.  Do you have a copy there

11   with you?

12             MR. BOCK:  Not in my book.

13             THE COURT:  All right.  If you could show that to

14   defense counsel.

15             MR. BOCK:  Thank you, Judge.

16             THE COURT:  Sure.

17             MR. BOCK:  I would object to this, your Honor.

18             THE COURT:  You would object?

19             MR. BOCK:  I would object.

20             THE COURT:  All right.  Can I see counsel at sidebar,

21   please?

22                        BENCH CONFERENCE

23             THE COURT:  Okay, what is it and why do you object?

24             MR. BOCK:  Well, Judge, it lists a number of different

25   things that can happen with -- as a result of the -- the tablets,

1    and I don't think it's appropriate to list something that

2    basically analyzes everything that -- they've had that testimony

3    from Dr. Walter.  They can have testimony from Dr. Rooney.  But I

4    just don't feel it's appropriate to just let them have this memo

5    come in.

6           MS. ANDERSON:  The defense expert is going to criticize

7    this witness and the next witness for some safety precautions

8    that they did or did not take, and prior to doing any kind of

9    demonstration they always -- F.B.I. protocol is that they're

10   required to consult with various pieces of literature to look at

11   the material safety information, and this is what they consulted

12   before they did these particular demonstrations.  It's relevant.

13   It's -- it talks about Pool Time, and it talks about the hazards

14   associated with Pool Time chlorine, and it has direct bearing on

15   how they did the demonstrations.

16          THE COURT:  And who prepared this?

17          MS. ANDERSON:  It's -- it's the -- I'm not sure who

18   prepared it.  I can certainly ask the witness that.  But it's --

19   I believe it might be the manufacturer of -- of Pool Time

20   tablets.  Dr. Fox makes reference to the material safety data

21   sheets in his reports.  It's not like this is something that's

22   unusual.

23          THE COURT:  Were Pool Time tablets used in this case?

24          MS. ANDERSON:  I'm sorry?

25          THE COURT:  Were Pool Time tablets used in this case?

1          MS. ANDERSON:  We believe so.

2          THE COURT:  Why do you believe so?

3          MS. ANDERSON:  Because on the back -- the device in the

4     back was a five-gallon bucket of Pool Time chlorinated tablets,

5     three inch.

6          THE COURT:  The bucket said that?

7          MS. ANDERSON:  Yes.

8          THE COURT:  But do you know what was inside the bucket?

9          MS. ANDERSON:  Well, we don't, but Bob Rooney, who's

10    going to testify, will say that based on his opinion, based on

11    all the circumstances he believes Pool Time chlorine was used as

12    a component in these devices, and he knows that because of the

13    presence of the trichloroisocyanuric acid which was a product

14    left over at the scene, based on the experiences of the witnesses

15    who experienced the chlorine symptoms.

16         THE COURT:  All right.  I'll take this under

17    advisement.  I haven't seen it.  The objection has just been

18    made.

19         So this is something prepared by Pool Time?

20         MS. ANDERSON:  I believe so.

21         THE COURT:  That this agent -- that he relied on in

22    determining the appropriate safety measures to take?

23         MS. ANDERSON:  Exactly.  And material safety data

24    sheets are something that's widely used in the industry.  And

25    again, Dr. Fox makes reference to the material safety data

1    sheets.

2         MR. BOCK:  Well, I think it's a jump of faith by the

3    government to say they know that the tablets were -- the

4    experiment obviously can't duplicate whatever happened at the --

5    allegedly happened at the scene.  I don't have an objection to

6    him saying that this is what I used, but I do have an objection

7    to the whole document coming in.

8         MS. ANDERSON:  The government doesn't have to prove

9    what components were used, your Honor.  The government only has

10   to prove that a chemical weapon was generated.

11        THE COURT:  Right.  Right.

12        MS. ANDERSON:  And we -- we have strong beliefs that

13   the Pool Time chlorinated tablets were used based on the fact

14   that the remaining device in the back, which didn't melt

15   completely, was a Pool Time bucket.

16        THE COURT:  Well, I'm going to -- I haven't had a

17   chance to even read this yet, so I'm going to go ahead and take

18   the matter under advisement.  Can you move on with the witness --

19        MS. ANDERSON:  Sure.  Sure.

20        THE COURT:  -- before you --

21        MS. ANDERSON:  I can move on.

22        THE COURT:  You can certainly ask him what precautions

23   he took.  And what other sorts of questions -- are there any

24   other exhibits like this that you're going to be objecting to or

25   the government's going to be admitting so I can at least look at

```
 1    them so we don't --

 2              MS. ANDERSON:  The videos which have been disclosed a

 3    long time ago.

 4              MR. BOCK:  The videos -- I'm not objecting to the

 5    videos.

 6              THE COURT:  Of the individual demonstrations?

 7              MS. ANDERSON:  Right.

 8              THE COURT:  All right.  Anything else you can think of?

 9              MR. BOCK:  No.

10              MS. ANDERSON:  And this was disclosed a long time ago.

11              MR. BOCK:  I can make objections, though.

12              (The bench conference was concluded.)

13              THE COURT:  All right, Ms. Anderson, you may proceed.

14    BY MS. ANDERSON:

15    Q    In addition to the -- is it called material safety data

16         sheet for short?

17    A    Yes.

18    Q    And who makes the material safety data sheet?  Who makes

19         that literature?

20    A    The manufacturer of the chemical.

21    Q    And what's the purpose of the material safety data sheet, do

22         you know?

23    A    The purpose is to provide information to consumers, users,

24         and emergency responders if necessary to inform them of the

25         hazards and properties of the chemical in question.
```

1    Q    So that was something that you consulted before you did

2         these demonstrations, correct?

3    A    I did.

4    Q    Now, once you saw some of the material in the material

5         safety data sheet, what did you do?

6    A    I -- well, the second step in conducting this demonstration

7         was to predict based on information in the material safety

8         data sheet if there were any likely incompatibilities or

9         reactions between chemicals that might occur to create new

10        substances which I needed to be aware of.  Information in

11        the material safety data sheet indicated that that was the

12        case.

13   Q    Okay.  And when you saw that, what did you do?  Did you

14        consult other sources?

15   A    I did.

16   Q    What other sources did you consult?

17   A    I consulted the National Institute for Occupational Safety

18        and Health pocket guide to chemical hazards.  I consulted

19        the Environmental Protection Agency's website to obtain

20        acute exposure guideline limit values for the chemicals that

21        might be produced.

22   Q    So let's -- let's go back a little bit.  You talked about

23        the NIOSH pocket guide?

24   A    Yes.

25   Q    And what is the NIOSH pocket guide?

1   A   It's a set of information that is published by NIOSH which

2       contains some similar information that might be found in

3       similar safety data sheets.  So if a responder does not have

4       the safety data sheet, it's a widely accepted resource to go

5       to for information on the chemical.  In addition, it

6       contains information on exposure limits applicable to the

7       workplace that you cannot exceed if you're going to be

8       working with the chemical.

9   Q   Now, what particular -- what particular documents, or what

10      particular information that was published by NIOSH did you

11      reference?

12  A   The entry for chlorine in the NIOSH pocket guide.

13  Q   And did it give you information regarding what's called the

14      immediately dangerous to life and health levels?

15  A   It does.

16  Q   Now, is that also known as IDLH?

17  A   It is.

18  Q   Could you explain to us what IDLH means, immediately

19      dangerous to life and health?

20  A   Yes.  Immediately dangerous to life and health means an

21      atmosphere which would pose the threat of irreversible

22      negative health effects, or the impaired ability to escape

23      from a -- from the hazardous environment.

24  Q   Do those particular guidelines assume certain facts?

25  A   They do.

1  Q    What -- what facts do they assume?

2  A    The NIOSH pocket guide states that the purpose for

3       establishing IDLH guidelines is to ensure that the worker

4       can escape from a contaminated environment in the event that

5       his respiratory protection equipment were to fail.

6  Q    So if I understand you correctly, the IDLH, the immediately

7       dangerous to life and health levels assume, number one, a

8       person in the workplace, correct?

9  A    Yes.

10 Q    And also a person using a -- respiratory protection

11      equipment, is that correct?

12 A    Either using or determining if it is required to be used --

13 Q    Okay.

14 A    -- in the environment, yes.

15 Q    And that's one of the things that you were looking at is

16      whether or not you needed any kind of respiratory

17      protection?

18 A    That's correct.

19 Q    Now, there's also another set of guidelines that are used

20      other than the IDLH guidelines, correct?

21 A    There are many others, yes.

22 Q    And are you familiar with the Acute Exposure Guideline

23      Levels?

24 A    I am.

25 Q    And that's also AEGL?

```
 1   A   AEGL, or many people use the term EGL.
 2   Q   Okay.  And could you tell us what those guidelines discuss?
 3   A   Those guidelines discuss effects that could be experienced
 4       at different concentrations or different times to chemicals
 5       for the general population, including susceptible
 6       individuals, like the young or the elderly.
 7   Q   Now, let me ask you one question about IDLH.  Who is it that
 8       actually establishes the IDLH's?
 9   A   There is a committee for acute exposure guideline limits for
10       hazardous substances which was established in approximately
11       1995 at the behest of the National Research Council, part of
12       the National Academy of Sciences.
13   Q   And is that the National Institute for Occupational Safety
14       and Health?
15   A   It is not.
16   Q   Well, that's -- that's NIOSH, correct?
17   A   Yes.
18   Q   That's what NIOSH stands for?
19   A   Right.
20   Q   Was the organization that establishes the IDLH's something
21       similar to OSHA?
22   A   No, it is a -- oh, the IDLH's?
23   Q   Yes.
24   A   I'm sorry.  IDLH's are referenced by OSHA in their standards
25       for respiratory protection, but NIOSH is part of, I believe,
```

1      the Department of Health and Human Services, and affiliated

2      with the Centers for Disease Control and Prevention.

3  Q    But clearly, IDLH pertains to the workplace?

4  A    It does.

5  Q    I switched back on you.  We were talking about AEGL, and

6      then I switched back to IDLH.  But let's go back to AEGL.

7      And these are acute exposure levels?

8  A    They are.

9  Q    Could you explain what those are?

10  A    Again, it's values, concentrations of chemicals in the

11      atmosphere laid out for different timelines that predict

12      what a person in the general population, including

13      susceptible individuals such as children or the -- and the

14      elderly, may experience.

15  Q    What's the main difference between the IDLH and the AEGL?

16      MR. BOCK:  I'm going to object to this, your Honor.

17      THE COURT:  No, overruled.

18      Go ahead.

19      THE WITNESS:  Well, one difference is that the IDLH's

20  apply to occupational exposures, whereas the EGL values are

21  designed to predict the effects on the general population.

22  Q    Now, with the AEGLs or the EGLs, as you refer to them,

23      are -- how many levels are there?

24  A    There are three levels.

25  Q    Could you explain those levels to us?

1   A   I'm paraphrasing.  EGL-1 limits describe health effects that

2       are transient or reversible upon removal from the

3       contaminated area.  So an effect that an individual may

4       feel, but which will go away when they are away from the

5       hazard.  An EGL-2 value is the airborne concentration of a

6       substance, that it is predicted an individual from the

7       general public or a susceptible population may experience

8       irreversible or other severe long-lasting health effects,

9       including the potential for inhibition of the ability to

10      escape from the environment.

11  Q   Now, what is the AEGL value for chlorine for a ten minute

12      exposure?

13  A   The AEGL-2 value, which is the one that I just defined for

14      you, is 2.8 parts per million.

15  Q   As a minimum, correct?

16  A   That is the level at which the effects are predicted to

17      begin asserting themselves.  So if you go above 2.8, you

18      would expect a member of the general population to begin

19      exhibiting those symptoms.

20  Q   Now, let's go back to the demonstrations that you talked

21      about.  What was the purpose of the demonstrations that you

22      did?

23  A   The purpose of the demonstrations was to introduce the

24      concept of chemical reactivity to the jury because -- and to

25      the Court because chemical reactivity is a -- is a feature

1       that trichloroisocyanuric acid exhibits, as is evidence in
2       this material safety data sheet.
3   Q   Were you intending to replicate the chemical reaction that
4       occurred in our case?
5   A   We were not.
6   Q   What -- what were you attempting to show?
7   A   To show the types of reactions, the incompatibilities that
8       trichlor can exhibit.
9           MS. ANDERSON:  May I approach the witness, your Honor?
10          THE COURT:  Yes.
11  BY MS. ANDERSON:
12  Q   Sir, that's Government's Exhibit Number 272.  Do you
13      recognize that?
14  A   I do.
15  Q   And what is that?
16  A   That is a CD that contains the video of the demonstrations
17      that were performed on June 16th, 2011.
18  Q   And you participated in those demonstrations, correct?
19  A   I did.
20  Q   Were you assisted by somebody else?
21  A   I was.
22  Q   Who was that?
23  A   I was assisted by chemist Hope Copeland, and a videographer
24      from the laboratory.
25  Q   Now --

1          MS. ANDERSON:  Government moves for admission of

2   Exhibit 272.

3          THE COURT:  Mr. Bock, the government moves to admit

4   Exhibit 272.  Is that the video?

5          MS. ANDERSON:  Yes, your Honor.

6          THE COURT:  Any objection?

7          MR. BOCK:  No.  No, your Honor.

8          THE COURT:  272 is admitted.

9   BY MS. ANDERSON:

10  Q    Now, I don't want to play it right just yet.  Let me ask

11       you, what kind of precautions did you take before you

12       engaged in these demonstrations?

13  A    Well, we completed our hazardous risk assessment.  We

14       selected a safe location, a location near the F.B.I.

15       laboratory that is generally used for these purposes.  We

16       chose the site that we would actually -- at the location the

17       site where we would perform the demonstration, and the area

18       at which we would remove ourselves to -- to protect

19       ourselves.  So the demonstration is conducted, as you'll see

20       on the video, on a cement pad which is bordered by a cinder

21       block wall.  There are several hundred yards of open ground

22       beyond that location.  And from that location towards where

23       we were standing was both uphill and about 75 feet away.

24  Q    Did you determine which way the wind was blowing?

25  A    We did.

```
1   Q    And what did you -- what did you determine -- did that

2        affect where you decided to -- to -- to observe the

3        demonstration?

4   A    The criteria for beginning the demonstrations was that the

5        wind was blowing in the direction of the hundreds of yards

6        of open space beyond the demonstration area.

7   Q    In other words, it was blowing away from you?

8   A    It was blowing away from us.

9   Q    All right.  Now, on this particular exhibit, 272, there's

10       three different demonstrations, is that correct?

11  A    Yes.

12            MR. BOCK:  Judge, 272 should be subject to my record.

13            THE COURT:  Well, I don't know what that means,

14  Mr. Bock.  Could I see you at sidebar?

15                          BENCH CONFERENCE

16            MR. BOCK:  Judge, all --

17            THE COURT:  Just wait until --

18            MR. BOCK:  I'm sorry.

19            THE COURT:  Subject to what record?

20            MR. BOCK:  The record that I made about the xylene and

21  the brake fluid and things like that, because they're going to

22  have --

23            THE COURT:  I have no idea what these demonstrations

24  show.  Do they involved brake fluid and xylene?

25            MS. ANDERSON:  Yes.
```

1          THE COURT:  What are the demonstrations?

2          MS. ANDERSON:  There's three different demonstrations

3    on this particular video.  They use trichlor with various

4    components to see what the reaction would be.  And like he said,

5    the purpose was not to replicate what happened in our case.  The

6    purpose was to demonstrate the incompatibilities of trichlor with

7    other substances.

8          THE COURT:  In this case we don't have any evidence

9    that trichlor was used with these other substances?

10          MS. ANDERSON:  We do.

11          THE COURT:  Does the video show an explosion of some

12    sort?

13          MS. ANDERSON:  No, it shows smoke.  It shows smoke

14    coming out.

15          THE COURT:  Okay.

16          MS. ANDERSON:  It shows -- what we have, your Honor, is

17    a beaker where they put the trichlor tablets, and then you'll see

18    a device or something being poured into the beaker, and then

19    depending upon what the components are you'll see various

20    reactions.

21          THE COURT:  Is anyone going to testify that these

22    demonstrations are consistent with what happened at either of

23    these scenes, or either scene, at the Tucson National -- I mean,

24    what's the relevance unless somebody can link the demonstration

25    to what happened?

1    MS. ANDERSON:  Well, the relevance is -- is it goes to
2    the chemistry of what occurred.  We have --
3    THE COURT:  Was anybody going to say that that's the
4    chemistry that occurred in this case?
5    MS. ANDERSON:  Exactly.  Bob Rooney is going to testify
6    in his opinion this was Pool Time based on everything --
7    THE COURT:  Okay, that this -- that this demonstration
8    is what happened in our case?  You're going to have expert
9    testimony --
10    MS. ANDERSON:  Bob Rooney is going to testify that it's
11    his opinion that Pool Time chlorine tablets were used with some
12    other component that was incompatible to Pool Time, and it
13    created a reaction, that gases wafted over the neighborhood.
14    THE COURT:  And it's consistent with the combination of
15    the chlorine tablets with the motor oil?
16    MS. ANDERSON:  He's not going to point to any one
17    reaction and say that was it.
18    THE COURT:  But it's consistent with it?
19    MS. ANDERSON:  Exactly.  The evidence is similar to
20    what witnesses described.  Deputy Atwell said that when he
21    approached the house, he saw the front yard device that was
22    billowing --
23    THE COURT:  Right.
24    MS. ANDERSON:  -- white smoke.
25    THE COURT:  So it was chlorine and something.  He

```
 1   doesn't know what?

 2              MS. ANDERSON:  Exactly.

 3              THE COURT:  But it's consistent with this?

 4              MS. ANDERSON:  Right.  It was something incompatible

 5   with Pool Time chlorine, chlorine tablets.

 6              THE COURT:  All right.  Given the anticipated expert

 7   opinion, I don't -- I think it's relevant.

 8              MR. BOCK:  The only thing for purposes of the record is

 9   that I did not object to the admission of that, and so that's

10   what I started thinking about, that I said, you know, if there's

11   going to be an issue on that at another time, I don't want -- you

12   know, so that's why I wanted to show that, because of the

13   previous record that I made regarding the other -- the prior

14   bench discussion that we had regarding the xylene and the brake

15   fluid.  I didn't want to waive that objection by admitting this

16   exhibit, by showing -- so can we show that?  Can I withdraw my no

17   objection and just show an objection for purposes of the record?

18              THE COURT:  Yes, I think that's what you were trying to

19   do.

20              MR. BOCK:  Can I do that?

21              THE COURT:  Well, you've done it.  The record so

22   reflects.

23              MR. BOCK:  I appreciate that.  Thank you.

24              THE COURT:  All right.

25              (The bench conference was concluded.)
```

```
 1          THE COURT:  All right, Ms. Anderson, you may proceed.
 2   BY MS. ANDERSON:
 3   Q    All right, let's talk about the first demonstration -- or
 4        the day of the first demonstration.  There were actually
 5        three demonstrations which were done on the video, correct?
 6   A    That's correct.
 7   Q    Let's talk about them one-by-one before we take a look at
 8        them.  Now, the very first demonstration you used which
 9        components?
10   A    We used the trichlor and the muriatic or hydrochloric acid.
11   Q    Just those two, correct?
12   A    That's correct.
13   Q    How much trichlor did you use?
14   A    One tablet.
15   Q    Do you know the dimensions of that tablet?
16   A    Three inches.
17   Q    And did you break up the tablet, or did you just pour it
18        into -- just place it into the beaker?
19   A    We broke up the tablet.
20   Q    Why did you do that?
21   A    This demonstration was minimized in size for safety
22        purposes.  However, we were exploring -- or wanting to
23        demonstrate the effect of what a larger container containing
24        several tablets might exhibit, rather than a larger
25        container with just one tablet.  So we broke up the tablet
```

1    to symbolize many tablets.

2  Q    Okay.  And how much muriatic acid did you use?

3  A    Approximately four ounces.

4  Q    Okay.  Now, that was the first test.  Let's talk about the

5    second test.  What did you use?  What components?

6  A    Again, we used the trichlor three inch tablet, and we used

7    DOT 3 brake fluid.

8  Q    Now, what is it in brake fluid that makes it incompatible,

9    if you will, with trichlor?

10  A    One of the primary components are glycols, which are a type

11    of alcohol.

12  Q    How much brake fluid did you use?

13  A    Approximately four ounces.

14  Q    The last test that -- or the last demonstration on June 15th

15    involved what components?

16  A    The final test was the three inch tablet with xylene, four

17    ounces.

18  Q    All right.  Now, let's take a look at the video.

19    (Video played.)

20    MS. ANDERSON:  And if we could stop it after each test.

21  BY MS. ANDERSON:

22  Q    This is the first test, correct?

23  A    That is correct.

24  Q    We can see the muriatic acid and the trichlor tablets, is

25    that right?

1   A    Yes.  Single tablet.

2   Q    Now, first of all, we heard some talking on the video, is

3        that correct?

4   A    That's correct.

5   Q    Was that you and your colleague talking?

6   A    It was likely in that case chemist Hope Copeland and myself.

7        However, there were other people present at the location.

8   Q    How far away were they from this test, this demonstration?

9   A    Everyone else that was not involved in the demonstration

10       with the exception of one other person, which was a chemist

11       from the explosives unit who we were consulting with, was at

12       least 20 feet or further behind us from the -- from the

13       test.

14   Q    And how far away from the demonstration were you and Hope

15       Copeland?

16   A    We were, again, approximately 75 feet away, and up about

17       10 feet in elevation.

18   Q    Now, could you describe what -- what was on the video?  I

19       know that we can see it ourselves, but from your standpoint

20       could you describe what was significant about some of the

21       things that -- that -- that were viewable on the video

22       itself?

23   A    I think the primary interesting feature there is that when

24       you pour a liquid chemical onto the solid trichlor, a

25       reaction occurs without any input of heat or energy, such as

1          cooking or anything like that.  That sort of typifies what

2          is called chemical incompatibility when things come together

3          and spontaneously create something.

4    Q    So in other words, you don't need a match?

5    A    That's correct.

6    Q    Now, describe the smoke.  Did you see the smoke that was

7          emitted?

8    A    I did.

9    Q    And what color was it?

10   A    It was primarily a yellowish green, and at times also a sort

11         of whitish tinge to it as well.

12   Q    And the reaction was immediate, correct?

13   A    It began immediately, but it proceeded over a period of

14         time.

15   Q    And towards the end of the demonstration we saw smoke, is

16         that right?

17   A    We saw some vapor.  I can't identify it as smoke, or

18         anything else.

19   Q    Now, pure chlorine gas is what color?

20   A    According to its material safety data sheet, it's a greenish

21         yellow gas.

22   Q    Let's take a look at the second demonstration, which again

23         is the use of brake fluid and the trichlor, correct?

24   A    That's correct.

25   Q    All right, let's take a look.

1                    (Video played.)

2     BY MS. ANDERSON:

3     Q    Was that your colleague speaking?

4     A    It is.

5     Q    We can hear voices on the video.  Is that you and your

6          colleague?

7     A    No, it is not.

8     Q    Who were -- whose voices are those?

9     A    There are bomb technicians and people from the explosives

10         unit who had this location immediately following our time,

11         and were preparing their activities back behind us.

12              MS. ANDERSON:  Could we stop it?  Thank you.

13    BY MS. ANDERSON:

14    Q    Now, from a chemist's standpoint, what is significant about

15         this demonstration?

16    A    This demonstration, again, shows the chemical

17         incompatibility, and it's also significant in that it

18         produces enough heat to cause fire as well as giving off

19         gases.

20    Q    And again, the brake fluid has alcohol in it, correct?

21    A    It has glycols, which are a type of alcohol, yeah.

22    Q    Let's look at the third test.

23                    (Video played.)

24    BY MS. ANDERSON:

25    Q    All right, so there is no reaction between the xylene and

```
 1            the trichlor, correct?
 2   A   Not that could be visibly observed.
 3   Q   And so from a chemist's standpoint, what's the significance
 4       of that?
 5   A   According to the material safety data sheet and other
 6       references that I looked at in preparing for these
 7       demonstrations, they did mention that trichlor was
 8       incompatible -- incompatible with Xylene, so I had
 9       anticipated observing something in that case, but did not.
10   Q   Now, is trichlor incompatible with numerous other compounds?
11   A   Yes.
12   Q   Could you tell us a little bit about that?
13   A   If you refer to information published by the chemical
14       compounders that make trichlor, there's a long list of
15       different sorts of chemicals that are incompatible and each
16       of them may result in a different type of reaction.  So here
17       we saw the generation of a vapor, we saw fire, and we saw
18       nothing, but you could see a range of effects.
19   Q   Now, when trichlor is combined with other components that
20       are -- that it's incompatible with, there's some kind of a
21       chemical reaction, is that correct?
22   A   That's essentially the definition of chemical
23       incompatibility.
24   Q   And whenever we have chemical incompatibility with trichlor,
25       is chlorine gas given off?
```

1   A    The material safety data sheets and other references say

2        chlorine containing gases, so chlorine is typically involved

3        with many of those incompatible reactions.

4             MS. ANDERSON:  May I have just a moment, your Honor?

5             THE COURT:  Yes.

6             MS. ANDERSON:  If I could just check my notes briefly?

7             THE COURT:  Yes, sure.

8   BY MS. ANDERSON:

9   Q    Now, sir, you and -- and -- and Hope Copeland didn't test

10       the vapor that was released from these demonstrations to see

11       if there was any kind of chlorine gas or any kind of gases

12       containing chlorine that would have been given off, is that

13       correct?

14  A    No, we did not.

15  Q    Why didn't you do that?

16  A    Again, these were meant to be demonstrations of the concept

17       of chemical incompatibility as it applies to trichlor, and

18       we weren't trying to recreate any specific incident, so

19       didn't feel it was necessary to analyze the byproducts.

20  Q    Now, the -- in the literature that you've consulted --

21       again, whenever we have chemical incompatibility with the

22       trichlor, it would produce gases containing chlorine,

23       correct?

24  A    The material safety data sheet says may produce gases

25       containing chlorine, but again, the -- the wide variety of

1          chemicals that are incompatible with trichlor may -- may

2          produce other reactions as well.

3                    MS. ANDERSON:  That's all I have.

4                    THE COURT:  Cross-examination?

5                    MR. BOCK:  Thank you, your Honor.

6                              CROSS-EXAMINATION

7     BY MR. BOCK:

8     Q    Good morning, Agent.

9               Have you -- you've testified before in criminal cases?

10    A    I have not.

11    Q    Have you ever been -- have you ever -- this is the first

12         time you've ever testified in a criminal case?

13    A    I've been with the F.B.I. Laboratory for four years, but

14         this is the first time I've had the opportunity to testify,

15         and I'm pleased to be here.

16    Q    So you've never been acknowledged as an expert in the --

17         regarding acute exposure guideline levels or NIOSH levels

18         because you've never testified before in a criminal matter?

19    A    That's correct.  Every time a scientist comes to court, it

20         is up to the Court to certify them as an expert for that

21         case.

22    Q    Now, tell me, sir, we -- there's been a couple terms that

23         have been interchangeable.  One is chlorine, and one is

24         trichlor chloride, right?

25    A    I don't recall when they were used interchangeably.

1  Q    Well, during the course of the trial the word chlorine has
2       come up?
3  A    Okay.
4  Q    Okay.  Is chlorine different than this trichloride is -- is
5       the molecule different, or is there a difference?  Is it the
6       same thing, or are we using different languages?
7  A    Which two things?
8  Q    Chlorine.
9  A    And?
10 Q    And trichloride.
11 A    Those are different -- those are different things.
12 Q    How are they different?
13 A    I don't -- trichloride is not the name of a -- of a chemical
14      on its own.  That's a -- I believe you're probably referring
15      to trichlor in this case.
16 Q    Trichlor, yes.
17 A    Okay.  Trichlor is a -- is a -- it's a molecule that
18      consists of different types of atoms.  It has some carbon in
19      it, and some nitrogen, and some oxygen, and some chlorine.
20      When we talk about chlorine gas, the pure chemical, it
21      consists of solely two atoms of chlorine stuck together.
22 Q    Okay.  Let me spell this word out for you.
23 A    Okay.
24 Q    So I don't pronounce it incorrectly.  C-Y-A-N-U-R-I-C,
25      cyanuric?

1    A    Yes.

2    Q    So what is cyanuric acid?

3    A    Cyanuric acid is trichlor without the chlorines on it.  So

4         if you were to have pictures of the two side-by-side, they

5         would appear very similar except for the trichlor, it would

6         have chlorines attached, and for the cyanuric acid there

7         would be no chlorines, but there would be hydrogen attached

8         where those chlorines were before.

9    Q    So how does trichloride -- trichlor -- whatever, trichlor

10        get to cyanuric acid?

11   A    That is beyond my training, and education, and expertise.

12   Q    How does chlorine get to cyanuric acid?

13   A    How does chlorine get to -- again, that's beyond my

14        expertise.

15   Q    Are you familiar with the Center for -- CDC?  Are you

16        familiar with that term?

17   A    Yes, I am.

18   Q    And what is that term?

19   A    That's the colloquial term just for the Centers for Disease

20        Control and Prevention.

21   Q    And do they also have levels regarding chlorine, to the best

22        of your knowledge?

23   A    They through NIOSH publish the IDLH levels for chlorine.

24   Q    Now, we saw the three demonstrations that you did, is that

25        correct?

1    A    Yes.

2    Q    And the first one was -- which was the first one

3         hydrochloric acid and one --

4    A    And one Pool Time three inch tablet.

5    Q    Trichlor?

6    A    Trichlor tablet.

7    Q    Was there any residue associated with that?

8    A    At the end of that reaction there was -- the cup was still

9         intact, there was fluid in the cup, and there was actually

10        some white substance taken to be trichlor that had not

11        reacted elsewhere in the cup.

12   Q    Was the residue ever analyzed by you?

13   A    It was not.

14   Q    Did you have the ability to have some device to measure what

15        the gases were that were coming off the mixture of the H --

16        of the hydrochloric acid and the trichlor?

17   A    We have the ability, but did not choose to do that for this

18        experiment -- or demonstration.

19   Q    And what ability would that have been?

20   A    There are a variety of instruments that are amenable to

21        chlorine measurement.  They include color tests that fire

22        departments typically use called Draeger tubes.  There are

23        chemical sensors, such as a MultiRae, which is something

24        that a lot of first response agencies use.  A variety of

25        other tools that are sold specifically for the detection of

1          chlorine.

2     Q    Did you have that MultiRae device available at your

3          disposal?

4     A    I did.

5     Q    Were you given specific instructions as to measuring, or was

6          that your call?

7     A    That was my call.

8     Q    Now, the second one was brake fluid, is that correct?

9     A    That's correct.

10    Q    And you used four ounces of -- of brake fluid?

11    A    Yes, approximately.

12    Q    And approximately you would have, what, weighed it out, I

13         guess, or do you have a cup or something?

14    A    We have a cup that we knew was eight ounces, and we filed it

15         half full.

16    Q    And you used the four ounces for the hydrochloric acid, is

17         that correct?

18    A    That's correct.

19    Q    And you used four ounces for the xylene?

20    A    We did.

21    Q    And the four ounces -- how was that amount or that

22         measurement established by you?

23    A    In constructing the demonstrations, we evaluated what

24         chemicals might be given off and minimized the volume of the

25         acid, the brake fluid, and the xylene that we added as a

| | | |
|---|---|---|
| 1 | | safety measure, kept it at a small amount, four ounces for |
| 2 | | each. |
| 3 | Q | What was the timeframe for the hydrochloric acid before |
| 4 | | there was -- I know it was on the screen, but roughly what |
| 5 | | was the timeframe before the smoke started, before there was |
| 6 | | the incompatibility? |
| 7 | A | Again, the reaction began nearly immediately. |
| 8 | Q | And the same with the brake fluid, right? |
| 9 | A | That's not correct.  The reaction may have begun |
| 10 | | immediately, but visible effects of the reaction were not |
| 11 | | observed for approximately three minutes and 25 seconds. |
| 12 | Q | Now, it may seem like a silly question, but it doesn't make |
| 13 | | any difference what kind of brake fluid you use.  It's the |
| 14 | | alcohol in the fluid, is that correct? |
| 15 | A | It does matter which brake fluid you use, because some brake |
| 16 | | fluids don't contain glycols. |
| 17 | Q | If a brake fluid did not contain that term you used, there |
| 18 | | would be no reaction? |
| 19 | A | There would not be that exact reaction because there's not a |
| 20 | | glycol present, but if there were other components in that |
| 21 | | brake fluid which were also incompatible, a different |
| 22 | | reaction could result. |
| 23 | Q | Was there any residue associated with the demonstration that |
| 24 | | had to do with the brake fluid? |
| 25 | A | There was. |

1   Q   Was that residue tested?

2   A   It was not.

3   Q   And the xylene -- again, what was your impression of that

4       demonstration?

5   A   There was no visible indication of a -- of a reaction

6       occurring.

7   Q   So the tablets were not -- remained without being dissolved

8       or reacting with the other --

9   A   They did dissolve somewhat, but we didn't see any evidence

10      that they had converted to any other chemical.

11  Q   And there was no gas, or no heat associated with that?

12  A   Not that was observed.

13  Q   So you -- you -- in your professional opinion, you could

14      omit xylene, is that correct?

15  A   That's not correct.  In the cases that we presented here we

16      constructed the demonstrations so that we could safely

17      illustrate incompatible reactions.  However, incompatibility

18      is generally the result of uncontrolled reaction, so as

19      opposed to in a laboratory where you carefully control the

20      heat and the temperature and the amounts of things you're

21      adding and can predict what will happen, with chemical

22      incompatibilities that arise from hazardous chemicals it's

23      harder to be sure what will occur, and in fact something as

24      simple as adding a little more xylene or perhaps using a

25      bigger or smaller cup may have brought those chemicals close

1      enough together so they would react.  So I can't rule it

2      out.  I can only say in this circumstance it did not produce

3      a visible reaction.

4  Q   Is there any reason that you didn't want to do what you just

5      suggested to in fact see if there might be some reaction?

6  A   We did explore one other demonstration on August 3rd, but --

7  Q   No, I mean -- I mean, did you -- on June -- June 15th, why

8      didn't you try to do demonstration number three -- why

9      didn't you try to do that over with -- with different

10     amounts?

11 A   Well, again, trichlor is incompatible with a wide variety of

12     chemicals, and there's no way that we could thoroughly

13     explore all the different combinations.  We were limited in

14     time.  And as you heard, we had to release our location to

15     the next group that would utilize it at some point.  So we

16     took what was observed, and left it at that.

17 Q   Now, are there other gases that give false positives for

18     chlorine?

19 A   In what circumstance?

20 Q   In other words, can a -- can something react to another gas

21     and identify it as chlorine?

22 A   Those -- that -- I think that the hypothetical -- the

23     hypothetical you're posing doesn't have enough specific

24     information for me to be able to answer that.

25 Q   Can carbon monoxide give a false positive as to chlorine?

1    A    Under what conditions?  Using what instrument, to who, when
2         the measurement --
3    Q    You're trying to tie me down here.
4    A    I'm trying to answer your question.
5    Q    And as to the -- as to the last two of the three
6         demonstrations, you did -- again, not to be repetitive, but
7         you didn't have any device to see if chlorine was in fact
8         coming off of those -- of the smoke or whatever, or --
9    A    We did not utilize one of those instruments, no.
10   Q    And with the xylene, there wouldn't even -- there was no
11        residue whatsoever, as you said, right?  The tablets were
12        pretty much intact that you had broken up, the chlorine
13        tablets, or the trichlor tablets?
14   A    They appeared so.
15   Q    Okay.  Did you -- did you assist on the August 3rd
16        demonstration?
17   A    I did.
18   Q    Now, did you make all your findings known to Agent Nowak?
19   A    I did.
20   Q    Did you talk to him over the phone, or did you meet with
21        him?
22   A    We provided a copy of the video to the agent, and I spoke
23        with him about it.
24   Q    Did you -- do you know an individual by the name of
25        Mr. Rooney?

1    A    I do.

2    Q    Did you talk to Mr. Rooney about this also?

3    A    Not at this time.

4    Q    Have you talked to him about this?

5    A    Since that time, I have.

6    Q    Okay.  When do you think you talked to Mr. Rooney?

7    A    Oh, I've talked to him several times over the last six

8         months or so.

9             MR. BOCK:  Nothing further, your Honor.

10            THE COURT:  All right.

11            Redirect?

12            MS. ANDERSON:  Just a moment.

13                          REDIRECT EXAMINATION

14   BY MS. ANDERSON:

15   Q    Mr. O'Kelly, according to the MSDS, trichlor is -- the MSDS

16        indicates that trichlor is incompatible with xylene, is that

17        correct?

18   A    The MSDS and other reference sources indicate that it is --

19   Q    That's true?

20   A    -- incompatible with xylene.

21   Q    Bob Rooney works in the same lab as you do, is that correct?

22   A    That's correct.

23   Q    Now, is -- Mr. Bock asked you about cyanuric acid, and

24        cyanuric acid is a byproduct of trichlor, is that correct?

25   A    I would leave that discussion to someone with background in

```
 1              organic or analytical chemistry.
 2    Q    Do you know Dr. Tony Evans?
 3    A    I do.
 4    Q    He's a colleague of yours, is he not?
 5    A    He is.
 6    Q    And he has expertise when it pertains to trichlor, is that
 7         correct?
 8    A    He does.
 9    Q    And he participated in the next set of demonstrations with
10         you, is that right?
11    A    He did.
12              MS. ANDERSON:  That's all I have.
13              THE COURT:  All right.
14              Any questions from the jury for this witness?
15              All right, Jill, if you could retrieve the question.
16              There's another one Jill.
17              And if I could see counsel at sidebar.
18                         BENCH CONFERENCE
19              MS. ANDERSON:  I have no objection to that.
20              MR. BOCK:  I object to that.
21              MR. PIMSNER:  We don't.
22              THE COURT:  To 30?
23              MR. BOCK:  Yeah, we have no objection.
24              THE COURT:  You have no objection to 30?
25              MR. BOCK:  I object.
```

1           THE COURT:  You object on what grounds?

2           MR. BOCK:  I don't like the question, but legally I

3    think that, you know, it's assuming facts not in evidence.

4           MS. ANDERSON:  I can't hear you.  Sorry.

5           MR. BOCK:  It's assuming facts not in evidence.  And

6    there was some information of a chemical bomb that was introduced

7    in this trial, as you know, but there was no information how to

8    make a chemical bomb.  So I think it's a prejudicial area.

9           THE COURT:  Is there any evidence in this case that the

10   defendant consulted with the internet or used the internet to

11   figure out how to engage in the activities alleged in the

12   indictment?

13          MS. ANDERSON:  Well, you heard Chris Pahl testify, and

14   what he said is that it's clear that there was some internet use,

15   but he's not able to say exactly.

16          THE COURT:  That he went to a site, for example?

17          MS. ANDERSON:  Exactly.

18          THE COURT:  All right.  So I'm going to sustain the

19   objection to number 30.  I don't think it's relevant to this

20   case.

21          But 31 -- there's no objection to 31?

22          MR. BOCK:  No objection, your Honor.

23          MR. PIMSNER:  Will you tell the jury that --

24          THE COURT:  I will remind them sometimes for legal

25   reasons certain questions can't be answered, and just give them

1    that very general -- and then do you want to ask -- go ahead and

2    ask number 31?

3                    MS. ANDERSON:  Sure.

4                    THE COURT:  Okay.  And I'll let counsel follow-up if

5    you need to.

6                    MS. ANDERSON:  And Judge, have you made a decision

7    regarding the MSDS?

8                    THE COURT:  This -- now, who prepared that?

9                    MS. ANDERSON:  That's prepared by Pool Time itself.

10                    THE COURT:  So is it a business record?  He doesn't

11    work for Pool Time.

12                    MS. ANDERSON:  He doesn't work for Pool Time, but it's

13    material that he relied upon when conducting his business.

14                    THE COURT:  So why is that relevant to this case?

15                    MS. ANDERSON:  Because it talks about the various

16    safety precautions that could be --

17                    THE COURT:  So he took safety precautions and the

18    experiments went fine.

19                    MS. ANDERSON:  He relied on the MSDS in deciding what

20    safety precautions to take.

21                    THE COURT:  So why would the safety precautions need to

22    come in with the big bold danger and exclamation point at the end

23    of the page?

24                    MS. ANDERSON:  Well, the government feels that's

25    relevant.

1      THE COURT:  I just don't see right now how it's

2  relevant.  He relied on safety precautions.  We heard about

3  those.  So why -- we don't know -- I just don't see why it's

4  relevant.  It's clear whoever did these acts didn't rely on these

5  safety precautions.

6      MS. ANDERSON:  So can I point out a couple of things?

7      THE COURT:  Can we do that later -- unless you're

8  afraid to have the witness excused.

9      MS. ANDERSON:  Well, he's going to stick around.  I

10  asked him to stick around.

11      THE COURT:  Okay.  We can talk about it during the

12  break.

13      MS. ANDERSON:  Okay, thank you.

14      (The bench conference was concluded.)

15      THE COURT:  All right, I just want to remind the jury,

16  as I told you initially, sometimes for legal reasons questions

17  from the jury can't be asked.  And I don't want you to speculate

18  about those reasons, but one of the two questions can be asked.

19      So go ahead, Ms. Anderson, if you want to ask that

20  question.

21                          EXAMINATION

22  BY MS. ANDERSON:

23  Q    Mr. O'Kelly, I've got a question for you.  There was no lid

24      on the tests, the demonstrations that you did.  If there had

25      been a lid, what difference in reaction would occur?

1    A    Putting a lid onto that reaction would likely contain the

2         heat inside of the cup, not allowing it to escape as rapidly

3         without a lid on it.  Adding heat to the reaction speeds

4         them up, makes them occur faster and more violently, so I

5         would expect a more rapid and violent reaction if there was

6         a lid on the cup.

7    Q    One more question.  Was there a reason no lid was used?

8    A    There was no discussion of using a lid when the original

9         request was made from the field office, so we did not

10        consider using a lid.

11             MS. ANDERSON:  Thank you.  The government has no

12   follow-up questions.

13             THE COURT:  No follow-up.

14             Mr. Bock, any follow up questions?

15             MR. BOCK:  No.

16             THE COURT:  Any additional questions from the jury for

17   this witness?

18             All right.  Thank you, sir.  You may step down.

19             -------------------------

20             (Anthony Evans was duly sworn by the clerk.)

21                         ANTHONY EVANS

22                      DIRECT EXAMINATION

23   BY MS. ANDERSON:

24   Q    Sir, what's your occupation?

25   A    I am a chemist with the F.B.I.'s Hazardous Materials Science

1    Response Unit.

2 Q How long have you held that position?

3 A Approximately two years.

4 Q And what positions did you hold previous to being a chemist

5    with the F.B.I.?

6 A I was a graduate student prior to joining the bureau.

7 Q And where did you work at as a graduate student?

8 A At John Hopkins University.

9 Q Let's talk about your formal education.  Could you tell us

10   about that?

11 A I did my undergraduate work at a small private college in

12   Illinois.  I moved on to Texas A&M University and got my

13   master's degree in chemistry there, and then I got my Ph.D

14   at John Hopkins studying organic chemistry.

15 Q All right.  And you've been -- like you said, you've been a

16   chemist in the Hazardous Materials Department with the

17   F.B.I. for the last two years, correct?

18 A Approximately, yes.

19 Q Could you tell us what your duties are as a chemist in the

20   Hazardous Materials Department?

21 A We have a -- a number of -- of duties including responding

22   to crime scenes in which Hazardous Materials have been used

23   in the conduction of a crime, or where they may be present

24   where we assist in evidence collection, and providing site

25   safety, and in addition to that we provide assessments to

1      F.B.I. agents in the field who may have questions on various

2      chemicals or hazardous materials that they may encounter

3      either through intelligence, or directly encounter in the

4      field.

5    Q  Now, you were asked to participate in -- in demonstrations

6      with Jeremy O'Kelly, is that right?

7    A  Yes, ma'am.

8    Q  And do you recall when it was that you got involved in this

9      case?

10   A  What, or when?

11   Q  When.

12   A  When?  It was about a year ago.  I believe he asked me to

13     help him around July or August of -- about a year ago.

14   Q  Of 2011, is that correct?

15   A  Yes.  Yes.

16   Q  All right, and are the two of you colleagues?

17   A  Yes.

18   Q  Now, you have some -- some previous experience with the

19     compound known as trichlor, is that right?

20   A  Yes, ma'am.

21   Q  And you did some controlled -- controlled work in the lab

22     with trichlor, is that right?

23   A  Yes, I did.

24   Q  Could you tell us a little bit about the substance called

25     trichlor?

1    A   So the substance trichlor as it pertains to the work that I

2          was doing is we used it as an oxidant and as a chlorinating

3          agent to both oxidize and put chlorines onto other compounds

4          that we were interested in synthesizing as part of the

5          research that I was doing.

6    Q   Do you have a working knowledge of the chemical reactions

7          that result when various compounds are included or added to

8          trichlor?

9    A   Yes, ma'am.

10   Q   Is trichlor a substance which is incompatible with many

11         other compounds?

12   A   Yes.

13   Q   Is trichlor a precursor?

14   A   It can be a precursor to -- yes, in many different things.

15   Q   Is trichlor a toxic chemical?

16   A   Yes.

17   Q   Now, talking about the demonstrations, before you got

18         involved, Mr. O'Kelly had already done some background work

19         regarding what kind of precautions should be taken when

20         dealing with trichlor, is that right?

21   A   Yes, ma'am.  He did the hazard evaluation for the

22         experiments that he had done previously.

23   Q   You were familiar with the hazards of dealing with trichlor

24         because you had done some work with trichlor in a controlled

25         setting, correct?

1   A    Yes, a combination of that, and speaking with Jeremy

2        previous to the experiments we had done.  But my working

3        knowledge of trichlor -- it was pretty extensive.  I used it

4        fairly regularly.

5   Q    Now, are you familiar with the risks in dealing with

6        trichlor?

7   A    Yes.

8   Q    Could tell us about some of those risks?

9   A    Well, if -- if trichlor is mixed with incompatible

10       materials, of which there's a long list of those, and it's

11       not done in a controlled setting, toxic byproducts can

12       result, including chlorine gas and other chlorine containing

13       gases.  So that's -- that's the primary hazard is the

14       production of both chlorine and other chlorine containing

15       gases, as well as other hazardous gases that could result

16       from the process of trichlor reacting with incompatible

17       materials.

18  Q    Are there any other risks associated with trichlor other

19       than the chlorine containing gases?

20  A    I believe trichlor itself is considered a toxic chemical.  I

21       believe there's -- or I know that if you were to look at the

22       material safety data sheet, you can see the toxicity that is

23       associated with that chemical alone, aside from its

24       incompatibility with a whole variety of other chemicals.

25  Q    Now, when you and -- and Mr. O'Kelly were doing this

1       demonstration, did you consider some of these precautions

2       and the risks that you've just described for us?

3   A   Yes, ma'am.

4   Q   And do you recall when it was that you did this

5       demonstration?

6   A   I believe the demonstration was in August of 2011.

7       Thereabouts.  It was about a year ago.

8   Q   Was it just the two of you that did this demonstration?

9   A   Yes.  The two of us, and there was a videographer with a

10      video.

11              MS. ANDERSON:  Your Honor, may I approach the witness?

12              THE COURT:  Yes.

13  BY MS. ANDERSON:

14  Q   That's Government's Exhibit Number 274, correct?

15  A   Yes.

16  Q   Do you recognize that?

17  A   Yes, ma'am.

18  Q   What do you recognize that as -- as being?

19  A   This appears to be a DVD -- or CD that -- that we typically

20      have in our office that we use for -- for files, and it

21      appears to have written on it the contents that it came

22      from, our unit, the date that it was copied onto this disk,

23      and that it is a video of pool tablets, and xylene, and

24      brake fluid -- a copy of that video.

25  Q   Is that -- does the video contain a video of the

1      demonstration that -- that you and Mr. O'Kelly did on

2      August 3rd, 2011?

3  A    Yes, ma'am.

4  Q    You've had the chance to review that, have you not?

5  A    Yes.

6           MS. ANDERSON:  Government moves for admission of

7  Exhibit -- I'm sorry what is it?

8           THE WITNESS:  274.

9           MS. ANDERSON:  274.

10          MR. BOCK:  Your Honor, my objection would be based on

11 the previous record I made as to the other video.

12          THE COURT:  All right, the objection's overruled.  274

13 is admitted.

14 BY MS. ANDERSON:

15 Q    Now, before we play it, let me ask you some questions.

16      Could you tell us what components were added to the

17      trichlor?

18 A    There was brake fluid -- four ounces of brake fluid, and

19      four ounces of xylene were added to the -- to the pool

20      tablets.

21 Q    To the trichlor?

22 A    Yeah, to the trichlor pool tablets.

23 Q    Now, Mr. O'Kelly testified previously when you were putting

24      the trichlor tablet in the cup or the container, you

25      actually broke up the tablet, is that correct?

1    A    Yes.

2    Q    Could you explain to us why you broke it up?

3    A    To increase the surface area of the tablet.  And we did it

4         for a couple of reasons.  One, it would help facilitated the

5         reaction to occur in a more timely manner.  And two, it

6         would better demonstrate what would happen if the

7         demonstration were scaled up to a larger size where you had

8         multiple tablets in a bucket versus smaller pieces in a

9         smaller container.

10   Q    Now, let's talk about the brake fluid.  Is brake fluid an

11        incompatible compound with trichlor?

12   A    Yes.

13   Q    Tell us why that is.

14             MR. BOCK:  This has been asked and answered, Judge.

15             THE COURT:  No, overruled.

16             Go ahead.

17             THE WITNESS:  Brake fluid is incompatible with trichlor

18   because of constituents of the substance.  It contains alcohols,

19   and alcohols typically are incompatible with not only trichlor,

20   but many other chlorinating and oxidizing reagents.  So when you

21   mix the two together, you'll get the chlorine atoms from the

22   trichlor attaching themselves to the brake fluid, and then that

23   byproduct will further decompose, and that process generates a

24   lot of heat, and both chlorine gas and other chlorine containing

25   hazardous gases as well, and gases that don't contain chlorine

1    that are hazardous, similar to combustion products.

2  Q    How much brake fluid was added?

3  A    In the experiment, or the demonstration we did?

4  Q    Yes.  Yes.

5  A    Four ounces, or approximately four ounces.

6  Q    And the next substance was xylene, correct?

7  A    Yes, ma'am.

8  Q    Now, is xylene incompatible with trichlor?

9  A    Yes, it is.

10  Q    How much xylene was added to this whole mix?

11  A    Four ounces, or approximately four ounces.

12  Q    Does it matter the order in which you add the products?

13  A    The order isn't particularly important.  We decided to add

14       the xylene first, because it's less reactive with trichlor.

15       So we added the xylene and then the brake fluid so that we

16       had -- had more time to remove ourselves from -- a safe

17       distance away from the -- the demonstration before the

18       reaction occurred.

19  Q    Speaking of the distance, how far away were you from the

20       actual site where you were adding the components?

21  A    We were approximately 75 feet away, and we were up in

22       elevation approximately 10 feet on a hill away from the

23       demonstration.

24  Q    Did you determine which way the wind was blowing?

25  A    Yes, ma'am.

1    Q    Why's that?

2    A    We knew that the reaction of trichlor and brake fluid

3         generated a vapor of some sort, and we were familiar with

4         the hazards associated with that vapor, and we wanted to not

5         be in the direct path of that cloud of vapor whenever it was

6         dispersed from the demonstration.  So we chose an area that

7         we knew would be out of that vapor cloud whenever it was,

8         you know, reacting.

9    Q    Why is it that you wanted to be away from it?

10   A    The -- the cloud likely contained chlorine and other

11        hazardous gases, and we didn't want to be exposed to those.

12   Q    All right.  Now, in the video that we saw before, we just

13        see, like, some kind of a -- a vessel or a container just

14        slowly being turned to its side, and a liquid pouring into

15        the cup.  How is it that you were able to combine the two --

16        or the various substances at such a far off distance?

17   A    Can you clarify that, please?

18   Q    Sure.  On the video you guys were 75 feet away?

19   A    Right.

20   Q    How is it that you were able to pour the stuff into the cup

21        and combine it all if you're 75 feet away?

22   A    Well, we knew the reaction wasn't an immediate reaction,

23        that there would be an amount of time between when we mixed

24        the liquid with the trichlor so that we would have time to

25        remove ourselves from where the demonstration was occurring

```
 1           once we mixed the liquid into the, you know, plastic
 2           container.
 3    Q    How long was the stick that you used to pour -- or to
 4           combine the substances?
 5    A    It was maybe three feet long.  I believe it was -- it was
 6           like a window scraper stick, is what we actually had used.
 7           So you know, approximately two, three feet long.
 8    Q    All right.  If we could look at the video.
 9                THE COURT:  Yes, 274 may be played.
10                (Video played.)
11   BY MS. ANDERSON:
12    Q    What was that, that you just poured in?
13    A    That was xylene.
14    Q    And that's brake fluid, correct?
15    A    Yes, ma'am.
16    Q    Could you describe the -- the amount of smoke for us that
17           you're seeing?
18    A    I can't give you an exact amount.  I mean, we didn't measure
19           that.  This was more just a demonstration of trichlor's
20           chemical incompatibility.
21    Q    How much time elapsed before we saw the -- the smoke?
22    A    It was approximately two minutes.
23    Q    And what are we looking at there?
24    A    That is the residue that is left after the reaction has
25           completed.
```

1  Q    Now, did you test that -- that substance or that blob of
2       material that remained?
3  A    No, ma'am.
4  Q    Why not?
5  A    Again, this -- this video was a demonstration of -- of
6       chemical incompatibilities as it relates to trichlor and
7       other substances that -- that could come in contact with
8       trichlor, or that -- you know, that were selected to, you
9       know, demonstrate this.
10 Q    But you have firsthand experience in dealing with trichlor,
11      is that correct?
12 A    Yes, ma'am.
13 Q    And are you able to say what a byproduct of a -- of a
14      combination of trichlor with an incompatible compound would
15      be?
16 A    Yes.
17 Q    And what is that byproduct?
18 A    So typically when trichlor is mixed with a chemical that it
19      will react with, the chemical that it is mixed with will
20      take one of the chlorines from trichlor and that chemical
21      that is formed often is not a stable compound, and it will
22      decompose and release chlorine hydrochloric acid and other
23      hazardous gases, some of which may contain chlorine.
24      Hydrochloric acid can also then react with trichlor that
25      hasn't reacted with what was mixed with it, and that will

1          produce more chlorine gas.  So it's reasonable to expect

2          that trichlor mixed with any number of incompatible

3          materials will product chlorine gas as well as other

4          chlorine containing gases, most of which would reasonably be

5          expected to be hazardous.

6    Q     And is there a byproduct of what's left over in that

7          chemical reaction that you just described for us?

8    A     Typically, when trichlor is -- reacts with any -- anything

9          that -- that is reacted with trichlor, cyanuric acid is a

10         primary byproduct of that reaction.  So regardless of what

11         is mixed with trichlor, you'll see cyanuric acid as a

12         byproduct as well as either the -- if it's in a controlled

13         setting, the compound you're attempting to make, or if it's

14         in an uncontrolled setting, these decomposition products

15         that -- some of which are gases, and some of which can be

16         any manner of things.

17   Q     Chlorine containing gases, correct?

18   A     Yes, typically.

19              MS. ANDERSON:  May I have just a moment?

20              THE COURT:  Yes.

21              MS. ANDERSON:  That's all we have, Judge.

22              THE COURT:  All right.

23              Cross-examination?

24              MR. BOCK:  Thank you, Judge.

25                        CROSS-EXAMINATION

```
 1   BY MR. BOCK:
 2   Q    Good morning, Agent.
 3             Now, have you testified before in a criminal case?
 4   A    No, sir.
 5   Q    You've never been -- since you've never testified before in
 6        a criminal case, you've never been acknowledged as an expert
 7        in your testimony in a criminal case, right?
 8   A    No, sir.
 9   Q    Now, what are some of the uses of trichlor in the
10        marketplace?
11   A    In the marketplace it's typically used as a pool chemical to
12        chlorinate water.
13   Q    Does it have any market -- other marketplace uses?
14   A    It's -- I'm not sure of its industrial chemical uses, but I
15        know it's used in chemical research, which is the capacity
16        in which I used it as an oxidizer and a chlorinating agent.
17   Q    Now, on the August 2011 demonstration, I think the date was
18        August the 3rd that you just viewed -- you just viewed that,
19        is that correct, sir?
20   A    Yes, sir.
21   Q    And you also were present for the June 15th, 2011
22        demonstration with Agent O'Kelly, is that correct, sir?
23   A    I was not present with that demonstration.
24   Q    Did you talk to him about that?
25   A    Yes.
```

1   Q   Now, on this demonstration was there any residue that was
2       collected and preserved?
3   A   No.
4   Q   Was there a MultiRae device or any device used to measure
5       what might have comprised the smoke that was coming out of
6       the bucket?
7   A   No, sir.
8   Q   Do you remember that there was a sodium chloride residue in
9       one of the experiments?
10  A   In one of the experiments conducted by me or Mr. O'Kelly?
11  Q   Yes.  Was there ever a sodium chloride residue?
12  A   We did not test the residue.
13  Q   And you're saying xylene is incompatible with the trichlor?
14  A   Yes, it is.
15  Q   And this whole experiment from -- from beginning to end took
16      how long to put this experiment together?
17  A   Mr. O'Kelly had been working on it for several months.  He
18      did the experiment in June, and I'm not -- I'm not familiar
19      with how long he worked putting that experiment together.
20      He came to me sometime in the interim and asked me to
21      participate in the demonstration that we did in August, and
22      you know, that took --
23  Q   An hour?
24  A   To put the experiment itself together, or to -- put the
25      preparations --

```
 1    Q    Just to do what we -- just do what we've seen?
 2    A    Yeah, it took maybe an hour.
 3              MR. BOCK:  Thank you, Judge.
 4              THE COURT:  All right.
 5              Any redirect?
 6              MS. ANDERSON:  We have nothing further, your Honor.
 7              THE COURT:  Any questions from the jury for this
 8    witness?
 9              All right.  Thank you, sir.  You may step down.
10              ------------------------
11              (Edward Trujillo was duly sworn by the clerk.)
12                        EDWARD TRUJILLO
13                      DIRECT EXAMINATION
14    BY MR. PIMSNER:
15    Q    Mr. Trujillo, do you reside here in Tucson?
16    A    Yes.
17    Q    How long have you resided in Tucson?
18    A    All my life.
19    Q    And how old are you?
20    A    36.
21    Q    And sir, what's your educational background?
22    A    Graduated from high school, also some college.
23    Q    And are you currently in any type of educational program?
24    A    Yes, I go to Pima Community College.
25    Q    Community college?
```

1    A    Um-um.

2    Q    Do you have any vocational skills?

3    A    Yes, also.  I'm an electrician.

4    Q    Are you studying to be an electrician, or are you actually

5         employed as an electrician?

6    A    I'm employed as an electrician.

7    Q    Now, you're currently employed?

8    A    Yes.

9    Q    And how long have you been at your current position?

10   A    A month and a week.

11   Q    And it's as a -- as an electrician for a company?

12   A    Yes.

13   Q    And are you familiar with an individual by the name of Todd

14        Fries, spelled F-R-I-E-S?

15   A    Yes.

16   Q    And how do you know that individual?

17   A    I was employed by Todd in -- from 2006 to 2008.

18   Q    And do you see him in the courtroom today?

19   A    Yes.

20   Q    Could you please identify him, and tell us where he's seated

21        and what he's wearing?

22   A    It's the gentleman to the right of me with the dark suit.

23             MR. PIMSNER:  May the record reflect the identification

24   of the defendant, your Honor?

25             THE COURT:  Yes, the record may so reflect.

```
 1   BY MR. PIMSNER:
 2   Q    Has it been a while since you've seen Mr. Fries?
 3   A    Yes, since 2008.
 4   Q    Does his appearance appear different than it was back in
 5        2008?
 6             MR. BOCK:  I'm going to object to the materiality of
 7   that, your Honor.
 8             THE COURT:  No, overruled.
 9             Go ahead.
10             THE WITNESS:  He looks the same, I guess.
11   BY MR. PIMSNER:
12   Q    No changes in his -- in his build, or his -- anything else?
13   A    No.
14   Q    And do you -- any changes in any type of facial features?
15   A    No.
16   Q    Facial hair?
17   A    He used to have a goatee.
18   Q    So how did you first meet Mr. Fries?
19   A    I called him seeking employment.
20   Q    And were you hired?
21   A    Not right away.
22   Q    And at some point were you hired by Mr. Fries?
23   A    Yes.
24   Q    And was that to work in Burns Power Wash?
25   A    Yes.
```

1   Q   And what were you going -- what were you hired to do at

2       Burns Power Wash?

3   A   Window cleaning.

4   Q   Sorry?

5   A   Window cleaning.

6   Q   Now, how big of a company was Burns Power Wash at the time

7       you were hired?

8   A   I assumed it was pretty big, since they had commercials.

9   Q   Okay.  Do you know how many people -- once you started --

10      when did you start, first of all?

11  A   March, 2006.

12  Q   And how many other employees did you see of -- relating or

13      as part of Burns Power Wash?

14  A   From what I remember, four.  Four other employees.

15  Q   And -- and who was the boss?

16  A   A guy named Rudy.

17  Q   And when you -- when I say boss, does that mean -- are you

18      referring to a supervisor, or the owner of the company?

19  A   Supervisor.

20  Q   Okay, who owned the company?

21  A   Todd did.

22  Q   Who -- who provided direction as to what jobs you would go

23      out on?

24  A   Todd.

25  Q   Mr. Fries?

1   A   Yeah.

2   Q   Now, at some point after you began employment with Burns

3       Power Wash, were you ever directed -- so you started in

4       March, correct, of '06?

5   A   (No verbal response.)

6   Q   Were you ever directed to complete a job at 5372 West Tear

7       Blanket Place in Marana, Arizona?

8   A   Yes.

9   Q   And do you recall approximately when you would have been

10      sent to that location?

11  A   It was in 2007.

12  Q   And that's an area up by Dove Mountain, is that --

13  A   Yes.

14  Q   -- accurate?

15          And who gave you the job assignment to go up there?

16  A   Todd.

17  Q   And did you know the name of the people -- the customers

18      that resided at that residence?

19  A   Yes, the Levines.

20  Q   And do you recall their first names?

21  A   I remember Karen.  I think Myles was her husband's name.

22  Q   I'm sorry?

23  A   Myles was her husband's name.

24  Q   Now, prior to 2007 when you went out there, had you been out

25      to that residence at any other time?

1  A    No.

2  Q    Did you learn during the course -- through your

3       conversations with Mr. Fries that they had been out to that

4       residence on prior occasions and completed some work?

5  A    Yes.

6  Q    And this was from -- you learned -- you learned this

7       directly from Mr. Fries?

8  A    Yes.

9  Q    And what was the understanding of the type of work you were

10      to perform at the Levines when you went out there in 2007?

11 A    We were to resurface the driveway, because it was slippery

12      so we had to put a slip guard and a new coating.

13 Q    Now, you learned that Burns Power Wash had already been out

14      there at some point in the past.  Was it before or after the

15      time you started at Burns Power Wash in 2006?

16 A    It was before I started.

17 Q    So they had already completed work after you started --

18 A    Yes.

19 Q    -- or before you started.  Excuse me.

20 A    Um-um.

21 Q    Now, did you have a conversation with Mr. Fries at some

22      point prior to completing the -- the work that you did at

23      the Levines regarding why you were going up there, besides

24      that you were going to fix the slip issue -- slippery issue?

25 A    Yes.

```
 1   Q   And did Mr. Fries tell you why he wanted you to go up there,
 2       or why he wanted to -- to work on that driveway?
 3   A   Yes, he stated that Karen had slipped.
 4   Q   Was he concerned about that?  Did he express any concern to
 5       you?
 6   A   Yes.
 7   Q   What did he tell you?
 8   A   He just stated that we had to re-do it, and to avoid another
 9       slipping issue.
10   Q   Okay.  Was there any discussion about concerns about any
11       kind of lawsuit?
12   A   Yes.
13   Q   What did he say about that?
14           MR. BOCK:  I'm going to ask that the foundation be
15   established.
16           THE COURT:  Yes, if you could lay some more foundation.
17   BY MR. PIMSNER:
18   Q   When did this conversation take place?
19   A   It was in 2007.
20   Q   Before you went to the Levines?
21   A   Yes, it was before.
22   Q   And where did it take place?
23   A   In the shop.
24   Q   And is the shop located as part of the defendant's home?
25   A   Yes.
```

1    Q    And who was present?

2    A    I believe Rudy was present, and Todd, and Glen.

3    Q    And you had this conversation directly with Mr. Fries?

4    A    Yes.

5    Q    And again, did he express concern about a lawsuit?

6    A    Yes, he did.

7    Q    Did he advise you and the crew as to how much was going to

8         be charged for you to go up to fix the -- the slipping

9         problem?

10   A    No.

11   Q    Now, did you understand that the original coating may have

12        been -- may not have been up to -- to par?

13   A    I wasn't aware of the first coating.  I just knew that we

14        had to re-do it.

15   Q    But specifically, what was your purpose of re-doing -- what

16        process were your going to do in the re-coating that would

17        take care of the slipping problem?

18   A    We were going to make it slip proof.

19   Q    And how would you do that?

20   A    Adding -- adding a certain different chemical to the coating

21        itself.

22   Q    There's water in that container, if you need some.

23             So you were going to add some kind of substance to the

24        coating?

25   A    Yes.

1  Q    And do you recall when in 2007 you would have gone up to the

2       Levines residence?

3  A    It was around spring or summer.  I don't know exactly.

4  Q    And tell us -- and did you actually perform work there?

5  A    Yes.

6  Q    And what did you do?

7  A    We grinded the surface down, resurfaced it, power washed,

8       acid etch it, put a new base coat and a new top coat.

9  Q    So just to understand you first had to grind the original

10      coating off?

11 A    Yes.  You sand it down.

12 Q    And what did you use for that?

13 A    We used hand grinders.

14 Q    And was that a big job?

15 A    Yeah, it -- it's a pretty big driveway.

16 Q    And after you had ground the original surface down, what

17      would you have done?

18 A    We would have power washed it, acid etched it, and then put

19      a base coat down.

20 Q    And the base coat, would that be considered the coloring,

21      the paint?

22 A    Not on the base coat.  On the top coat is the -- is the

23      color.

24 Q    Okay.  So after the base coat is put on, you then put some

25      kind of coloring and a sealant on top?

1   A   Yes.

2   Q   And were you changing the color on that first occasion?

3   A   No.

4   Q   And then you would have -- you would have added the -- the

5       material to prevent slipping at what stage?

6   A   During the -- while you're putting the top coat.

7   Q   Is that the sealant -- or that's different than the sealant?

8   A   No, it's kind of a -- it's a silica that you throw on top

9       after you roll the top coat out.

10  Q   Okay.  And do you recall on that first job how long that

11      whole process took?

12  A   A day.

13  Q   And once its completed, is there a period of time that a

14      customer is not permitted to drive on the driveway?

15  A   Usually 7 to 10 days.

16  Q   And why is that?

17  A   Because it will peel up with the tires driving over it.

18  Q   Now, at -- so you testified you believe it was, and -- and

19      if I'm inaccurate, please correct me, either spring or

20      summer of 2007 that would have been done?

21  A   Yes.

22  Q   Now, at some point after that job was completed, did you

23      learn that Burns Power Wash was going return to the Levines

24      residence on Tear Blanket and conduct additional work?

25  A   Yes.

1   Q   And who did you learn that from?

2   A   From Todd.

3   Q   And where -- and did you have a conversation with him?

4   A   Yes.

5   Q   And again, was that -- where was -- where did the

6       conversation take place?

7   A   He just stated that we -- she wanted -- Karen Levine wanted

8       a different color.

9   Q   And did he tell you this at the shop?

10  A   Yes.

11  Q   And this would have -- and so did you actually travel out on

12      another occasion?

13  A   Yes.

14  Q   And did you have this conversation with him prior to

15      traveling out to the Levines on a second occasion?

16  A   Yes.

17  Q   And specifically, what -- what did he say about the color?

18  A   That she wasn't happy with the color, and she wanted to

19      change it.

20  Q   Did -- during your conversation with Mr. Fries, did he tell

21      you what the terms of the new contract -- or the new

22      agreement that he had with the Levines?

23  A   Yes.

24  Q   What did he tell you?

25  A   He just stated that we were going to resurface it and change

1           the color.

2    Q      Okay.  Did he tell you the financial terms or anything

3           specific about how that contract was going to work?

4    A      He said we would do it for $500.

5    Q      Okay.  And at the time that you went out on the second

6           occasion to change the color, do you recall approximately

7           when that was?

8    A      I -- I believe it was the spring of 2008.

9    Q      '08?

10   A      Yeah.

11   Q      Now, at the time that you went out on the second occasion,

12          had your job description changed?

13   A      Yes.

14   Q      And what did it change to?

15   A      I was a supervisor then.

16   Q      So as a supervisor, what were your responsibilities?

17   A      To make sure that we finish the job in a timely fashion.

18   Q      Okay.  And as a supervisor, did you go out -- on any

19          specific day would you cover a number of job sites, or would

20          you just cover one job site?

21   A      Usually, I was updated -- if we were doing more than one

22          job, I was updated on the progress of each job.

23   Q      And would you travel sometimes from job site to job site?

24   A      Yes.

25   Q      And on that second occasion when you were changing the

1       color, you -- you believe it was in '08 -- the spring of

2       '08?

3  A   Yes.

4  Q   And again, what kind of process was done on the driveway

5       that day?

6  A   We sanded it, power washed it, acid etched it, put a base

7       coat down, and then put a top coat on.

8  Q   And in that top coat you would have changed the color?

9  A   Yes.

10  Q   And then, again, the sealant on top of that?

11  A   That had -- there was no sealant.  It was just the top coat.

12  Q   And did you take precautions on -- to address the slip --

13       slip issue --

14  A   Yes.

15  Q   -- with the driveway?

16         And again, do you recall how long that job took to

17       complete?

18  A   One day.

19  Q   Now, after the -- and just to be consistent, is -- did --

20       the time that you corrected the driveway or changed the

21       color, did it also require that a customer not drive on the

22       driveway for a period of time?

23  A   Yes.

24  Q   And would that have been a similar 7 to 10 days?

25  A   Yes.

```
 1   Q   Now, after the work was completed, changing the color at the
 2       Levines in the spring of '08, were you involved in
 3       collecting the payment from the Levines?
 4   A   Yes.
 5   Q   And when in connection with the time that you did the job
 6       did you collect the payment?
 7   A   At the end of the day.
 8   Q   And who did you contact when you attempted to collect -- or
 9       when you collected the payment?
10   A   I spoke to the Levines, both of them.
11   Q   Both Mr. and Mrs. Levine?
12   A   Yes.
13   Q   And tell us what happened when you interacted with the
14       Levines when you were collecting payment?
15   A   They stated that they couldn't pay --
16           MR. BOCK:  Objection to statements from the Levines.
17   Hearsay.
18           THE COURT:  Well, can I see counsel at sidebar?
19                         BENCH CONFERENCE
20           THE COURT:  Okay, so are these being offered for the
21   truth --
22           MR. PIMSNER:  No, not for the truth of the matter
23   asserted.  It's to show that they said they wanted to give him
24   two checks.  He called Todd, Todd approved, and what he did from
25   there.
```

1      THE COURT:  I don't think it's for the truth of the

2  matter.

3      MR. PIMSNER:  It goes to his follow up conduct.

4      MR. BOCK:  Sounds like it's for the truth of the matter

5  to me if it's about two checks, and so I don't --

6      THE COURT:  What did he have to do with the two checks?

7      MR. PIMSNER:  He collected them.  He's the one who they

8  said to we can't cover these, can we give you two postdated

9  checks?  He said I'll have to check.  He then got on the phone

10  with the defendant.  The defendant approved collecting those

11  checks.  He then took those checks and put them in a bag until

12  Mr. Fries returned from a -- he was out of town at the time.

13      THE COURT:  All right.  I'm going to overrule the

14  objection.

15      MR. BOCK:  All right.

16      (The bench conference was concluded.)

17      THE COURT:  All right, Mr. Pimsner, you may proceed.

18      MR. PIMSNER:  Thank you, your Honor.

19  BY MR. PIMSNER:

20  Q    Now, when you met with the Levines to collect the payment

21       for that job, did you have a discussion with them about the

22       payment?

23  A    I did.

24  Q    What did they tell you?

25  A    They stated that they couldn't pay the whole $500 up-front.

```
 1   Q   Did they propose an alternative way to pay?
 2   A   Yes, they said that they would give us a postdated check for
 3       the 1st of the next month, and the 1st of the month after
 4       for 250, and then 250.
 5   Q   So were two checks actually written out in your presence?
 6   A   Yes.
 7   Q   And they were postdated?
 8   A   Postdated.
 9   Q   And they were each for $250?
10   A   Yes.
11   Q   Now, before you agreed to that, did you do anything based on
12       their statements?
13   A   Yes, I called Todd to let him know what was going on.
14   Q   You called Mr. Fries?
15   A   Yes.
16   Q   And did you explain the circumstance to Mr. Fries?
17   A   Yes.
18   Q   And this was over the telephone on the day you completed the
19       work?
20   A   Yes.
21   Q   And did Mr. Fries agree to accept payment in that manner?
22   A   Yes, he did.
23   Q   Is that when the Levines wrote out the two checks?
24   A   Yes.
25   Q   And were you provided those two checks?
```

1    A    Yes.

2    Q    What did you do with those two checks?

3    A    I put them in a bank bag, and put them back in the vehicle

4         we were leaving in.

5    Q    Now, at the time you did that work, was Mr. Fries in town?

6    A    No.  He was out of town.

7    Q    And did he get back soon, or do you know how long after that

8         job was completed that he returned?

9    A    Within a week or so.

10   Q    And you would have just maintained -- would you have

11        maintained those checks until he returned?

12   A    Yes.

13   Q    You wouldn't have tried to cash them, would you?

14   A    No.

15   Q    So you provided him those checks upon his return?

16   A    Yes.

17            THE COURT:  All right, Mr. Pimsner, is now a good time

18   to break?

19            MR. PIMSNER:  Sure.

20            THE COURT:  All right.

21               --------------------------

22

23

24

25

1                        C E R T I F I C A T E

2              I, Mary A. Riley, do hereby certify that I

3    stenographically reported the foregoing proceedings to the best

4    of my skill and ability, and that the same was transcribed by me

5    via computer-aided transcription, and that the foregoing pages of

6    typewritten matter are a true, correct and complete transcript of

7    all the proceedings had, as set forth in the title page hereto.

8              Dated this 21st day of April, 2013.

9

10                                    s/ Mary A. Riley

11                              United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25