1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

3     ----------------------------)
                                  )
4                                 )
      UNITED STATES OF AMERICA,    )
5                    Plaintiff,    )  No. CA 13-10116 9th Circuit
                                  )
6          vs.                    )  No. CR 11-01751 TUC-CKJ
                                  )
7                                 )     Tucson, Arizona
      TODD FRIES,                 )     September 28, 2012
8                   Defendant.    )
                                  )
9     ----------------------------)

10                    TRANSCRIPT OF TESTIMONY
                      JURY TRIAL DAY EIGHT
11
                BEFORE THE HONORABLE CINDY K. JORGENSON
12                 UNITED STATES DISTRICT JUDGE

13

14    APPEARANCES:

15
      For the Plaintiff:    By:  Beverly K. Anderson, and
16                               David A. Pimsner
                                 U.S. Attorney's Office
17                               405 W. Congress St., Suite 4800
                                 Tucson, AZ   85701
18
      For the Defendant:    By:  Richard C. Bock
19                               100 N. Stone Ave., Suite 801
                                 Tucson, AZ   85701
20

21
      Mary A. Riley, RMR, FCRR
22    United States Court Reporter
      U.S. District Court
23    405 W. Congress St.
      Tucson, AZ   85750
24

25        Proceedings produced by computer-aided transcription

1                           INDEX OF TESTIMONY

2

3

4    AUSTREBERTO MONTEIL  (Continued)

5    Direct Examination by Mr. Pimsner        Page   4

6    Cross-Examination by Mr. Bock            Page  49

7    Redirect Examination by Mr. Pimsner      Page  65

8    JURY QUESTION

9    Examination by Mr. Pimsner               Page  70

10

11   BRIAN NOWAK  (Recalled)

12   Direct Examination by Ms. Anderson       Page  71

13   Cross-Examination by Mr. Bock            Page  99

14   JURY QUESTION

15   Examination by Ms. Anderson              Page 117, 118

16   Examination by Mr. Bock                  Page 118, 119

17

18   MICHAEL G. FOX, Ph.D

19   Direct Examination by Mr. Bock           Page 120

20   Cross-Examination by Ms. Anderson        Page 164

21   Redirect Examination by Mr. Bock         Page 195

22   JURY QUESTION

23   Examination by Mr. Bock                  Page 207

24   Examination by Ms. Anderson              Page 213

25

1    JAMES WHITE

2    Direct Examination by Mr. Bock          Page 161

3    Cross-Examination by Ms. Anderson       Page 163

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2          (Austreberto Monteil resumed the witness stand.)

 3                       AUSTREBERTO MONTEIL

 4                    CONTINUED DIRECT EXAMINATION

 5   BY MR. PIMSNER:

 6   Q    Mr. Monteil, you worked at Burns Power Wash for how long?

 7   A    Two and a half to three years.

 8   Q    And you were at the shop located on Mr. Fries' residence on

 9        a regular basis?

10   A    Yes.

11   Q    And let me show you what's been -- and first of all, during

12        the course of your employment would Burns Power Wash use a

13        large variety of chemicals in -- in their business?

14   A    Yes.

15   Q    Let me show you what's been admitted as Exhibit 358 on the

16        overhead.

17             Sir, do you recognize that photograph?

18   A    Sure.  It's inside the shop.

19   Q    And are those some of the chemicals that were possessed by

20        Burns Power Wash?

21   A    Yes.  Yes, they are.

22   Q    What kind of chemicals do you see in that photograph?

23   A    The ones that catch my eye are the muriatic acid in the

24        box -- the blue box.  The cans to the left of it looks like

25        the stripper cans, to strip paint off of concrete.
```

1   Q    Would those be considered like a solvent?

2   A    Yeah, I would.  They're real potent.

3   Q    And were there other chemicals possessed other than just

4        those two that are prominent in this display?

5   A    In this display I don't see them, but yes, there's other

6        chemicals.

7   Q    What other type of chemicals were commonly used at the

8        business?

9   A    Degreasers.  There was -- there was also brake fluid, all

10       kinds of automotive chemicals stored there for the trucks as

11       well.

12  Q    Okay, and including oils?

13  A    Yes.

14  Q    And now let me show you what's been admitted as Exhibit 362.

15       Do you recognize that photograph?

16  A    Yes, I do.  It's inside the shop.

17  Q    Okay.  And you described buckets being used during the

18       course of the business, is that -- does that show the type

19       of buckets that were commonly used?

20  A    Yes, they're the five-gallon buckets with tops to them.

21       Those are exactly what we used, yes.

22  Q    And they don't look like they're all uniform buckets.  Do

23       they come from different locations?

24  A    Yeah, they do.  We would purchase them brand new or used

25       ones that were still available to use again, just -- it

1        depends where -- where --

2   Q    Were buckets obtained from a variety of sources?

3   A    Yes.

4   Q    So would you -- would you have gone through many buckets

5        during the course of your employment?

6   A    Yes, many.

7   Q    Does that photograph also show some additional chemicals

8        that were present at that location?

9   A    Yes, the -- the bigger containers, sort of like in the

10       middle of the picture.

11  Q    You can touch the screen.  It will show --

12  A    This one here, and this one.  Those were degreasers, if I

13       remember correctly.  And the black bucket here, I believe,

14       was used for the two-part epoxies that we would cover

15       concrete with.

16  Q    Okay.  And when we left off on yesterday, the -- we were

17       talking about Mr. Fries directing employees to start

18       collecting items.  Do you recall that line of questioning?

19  A    Yes.

20  Q    And do you recall approximately when Mr. Fries would have

21       directed his employees to start collecting items?

22  A    I would say a couple months before.

23  Q    Before what?

24  A    Before the first incident.

25  Q    Okay.  And do you recall when the first incident occurred?

1   A   That would be Halloween night, '08.

2   Q   2008?

3   A   Yes.

4   Q   Now, how long after the time that you -- you testified

5       yesterday that Mr. Fries told you that he was upset with the

6       Levines.  How long after the first time that Mr. Levine --

7       Mr. Fries told you he was upset with the Levines did

8       Mr. Fries start directing the employees to start collecting

9       items?

10  A   I would say probably immediately after that.

11  Q   Okay.  So -- but the actual date that -- that he told you

12      that he was upset with the Levines, do you have a

13      recollection as to what time of year, or when that would

14      have occurred?

15  A   The exact date, I do not, but it was spoken freely.

16  Q   Now, you talked about that -- yesterday, that items were

17      placed in buckets.  Are -- are they similar to the type of

18      buckets that are pictured in Exhibit 362?

19  A   Yes.

20  Q   Now, when Mr. Fries first started directing employees to

21      start collecting the items, the road kill, the oils, et

22      cetera, did -- did you know what he was intending to do

23      at -- when he first started requesting that those items be

24      saved?

25  A   Yes.

```
 1   Q    Okay.  And how did you know that?

 2   A    Because Todd would explain it.

 3   Q    Mr. Fries explained it?

 4   A    Yes.

 5   Q    To you?

 6   A    Yes.

 7   Q    And to the other employees?

 8   A    Yes.

 9   Q    And again, who were the other employees?

10   A    Dan and Robert.

11   Q    Jordan, and Mr. Getsch?

12   A    Correct.

13   Q    And the -- those conversations, they were held in the shop

14        that's pictured here?

15   A    Yes.

16   Q    And what did Mr. Fries say he intended to do with the items

17        that were being collected?

18   A    He said that he wanted to take them to their -- their house

19        and dump them on their property.

20   Q    Now, one of the items you said was collected was oil.  Do

21        you know where that oil came from?

22   A    I believe it was from the --

23             MR. BOCK:  Objection -- objection to what he believes,

24   your Honor.

25             THE COURT:  You can answer that yes or no, the
```

1    question.

2    BY MR. PIMSNER:

3    Q    Do you -- did you see oil being collected?

4    A    Yes.

5    Q    And did you see the source of the oil?

6    A    Yes.

7    Q    And what was the source of the oil?

8    A    The power washing machines.

9    Q    Now, the power washing machines, they have their own

10       separate motors, is that accurate?

11   A    Correct.

12   Q    And would those motors have to be changed on a regular

13       basis?

14   A    Yes.

15   Q    And do you recall how often those motors were changed?

16   A    I don't recall, but they were changed regularly.

17   Q    And would those oil changes be done at Mr. Fries' shop?

18   A    Yes.

19   Q    They didn't -- you didn't have to take the machinery

20       someplace special, did you?

21   A    No.

22   Q    And do you know how much oil would be recycled or would be

23       collected each time one of the machines were changed?

24   A    I'd say about a gallon or two.

25   Q    Of oil?

```
1   A    A quart or two.

2   Q    A quart or two of oil?

3   A    Yeah.

4   Q    Okay.  And prior to the oil collected at Mr. Fries'

5        direction, do you know what happened -- what used to happen

6        to the oil that would have been drained from the power wash

7        machines?

8   A    My understanding, it was recycled.

9   Q    So in addition to the oil, what else was collected at that

10       time during that timeframe?

11  A    Road kill.

12  Q    And did you yourself collect any road kill?

13  A    No.

14  Q    Did you refuse to do that?

15  A    Yes.

16  Q    Did you observe other employees collect road kill?

17  A    I did not observe, but I was told that they did.

18  Q    And who told you?

19  A    Dan.

20            MR. BOCK:  Objection to that.

21            THE COURT:  Yes, sustained.

22  BY MR. PIMSNER:

23  Q    When did this occur?

24            MR. PIMSNER:  Your Honor, I don't know the basis of the

25  objection, whether it's hearsay, or --
```

1           THE COURT:  All right.

2           MR. PIMSNER:  -- some other reason, so --

3           THE COURT:  Well, I've already ruled on the

4    co-conspirator's statement.

5           Is that the theory, Mr. Bock, for the objection?

6           MR. BOCK:  Yes, your Honor.

7           THE COURT:  All right, then overruled.

8    BY MR. PIMSNER:

9    Q    Now, did you have a conversation with one of the employees

10        about collecting road kill?

11   A    Yes.

12   Q    And who was that employee?

13   A    Dan.

14   Q    And where did that take place?

15   A    That took place in -- outside the shop at that location

16        there.

17   Q    And do you recall approximately when that was?

18   A    I'm not too sure.

19   Q    And did -- would it have been during the time these items

20        were being collected?

21   A    Correct.

22   Q    Prior to Halloween of 2008?

23   A    Correct.

24   Q    And did -- what did Dan tell you about road kill?

25   A    That they ran across a dead coyote, and that they stopped

|   |   |   |
|---|---|---|
| 1 |   | and they scooped it up, put it in a plastic bag. |
| 2 | Q | Okay.  And other -- were there -- was there any other road |
| 3 |   | kill that you observed? |
| 4 | A | I believe there was a -- a dead rabbit as well. |
| 5 | Q | Do you know where that rabbit came from? |
| 6 | A | No, I do not. |
| 7 | Q | Now, in addition to the road kill, did Mr. Fries direct the |
| 8 |   | employees to start collecting any other items? |
| 9 | A | Yes. |
| 10 | Q | And -- and -- such as what? |
| 11 | A | Such as dead woodpeckers. |
| 12 | Q | Okay.  Before we get to the woodpeckers, were there any |
| 13 |   | other type of substances that were -- that were maintained |
| 14 |   | in those buckets? |
| 15 | A | There was old paint besides the oil. |
| 16 | Q | Let's talk about the paint.  Was there paint at the shop? |
| 17 | A | Yes. |
| 18 | Q | And would it be brand new cans of paint, or remnants of |
| 19 |   | paint? |
| 20 | A | I do remember brand new cans of paint, but what I remember |
| 21 |   | more is the -- on a few jobs that we would go out and do, |
| 22 |   | the excess paint that we would strip off the concrete was |
| 23 |   | saved and thrown in those buckets. |
| 24 | Q | Okay, so you -- during the course of your normal work when |
| 25 |   | you would be resurfacing a driveway, you'd have to scrape |

```
 1        off or somehow remove with chemicals the original paint?
 2   A    Yes.
 3   Q    And what would be left after you removed the original paint?
 4   A    Well, the old paint that was --
 5   Q    And what kind of condition was it in?
 6   A    It was soupy, sticky, really runny.
 7   Q    And was that also maintained in these buckets along --
 8   A    Yes.
 9   Q    -- with the oil and the road kill?
10   A    Yes, that is correct.
11   Q    And where were the buckets that were placed after -- where
12        were the buckets when they were being accumulated prior to
13        the Halloween attack?
14   A    Along this same wall here, but farther to my left, this way.
15   Q    Okay.  And were those -- describe the -- the -- the row of
16        buckets or the wall of buckets.  How would you describe
17        that?
18   A    It would look similar to these, but there was a row and then
19        another row on top, sort of just like stacked alongside this
20        wall here.
21   Q    Do you recall how many buckets you saw that were stacked
22        with items that would be collected?
23   A    There must have been I would guess probably 30, just by
24        looking.  I didn't count them, but that's what it looked
25        like to me.
```

1   Q    Okay.  And the paint that you -- the paint that you saw, was

2        there also partially used paint cans at that location?

3   A    Yes, there was.

4   Q    And did that include both five-gallon and one-gallon?

5   A    Yes.

6   Q    And did that include one-gallon standard metal type paint

7        cans?

8   A    Yes, that's correct.

9   Q    And were those items also accumulated with the other oils

10       and road kill?

11  A    Right along next to -- right there on that wall there.

12  Q    What about feces?  Did you have -- learn during the course

13       of your employment that feces were being collected?

14  A    Yes.

15  Q    And whose idea was it to collect feces?

16  A    I believe Todd.

17  Q    And why do you believe it was Todd?

18  A    Because Dan told me that he asked him to defecate in them.

19  Q    Defecate where?

20  A    In the bucket.

21  Q    Did you ever have a conversation with Mr. Fries at the shop

22       where he asked you to defecate in the bucket?

23  A    I don't recall.

24  Q    And at some point did you ever see feces at the shop in one

25       of those buckets?

| | | |
|---|---|---|
| 1 | A | I glanced, yeah.  I didn't want to get too close. |
| 2 | Q | Okay.  And did you know where that -- where the feces came |
| 3 | | from? |
| 4 | A | My understanding, it was Dan. |
| 5 | Q | Was there any animal feces collected to your knowledge? |
| 6 | A | I believe so. |
| 7 | Q | Do you know how it would have gotten there? |
| 8 | A | I have no idea. |
| 9 | Q | Now, sir, you mentioned earlier woodpeckers were also being |
| 10 | | collected, dead woodpeckers, correct? |
| 11 | A | Yes. |
| 12 | Q | And did you witness where these woodpeckers would come from? |
| 13 | A | In some instances, yeah. |
| 14 | Q | And where did you see the woodpeckers come from? |
| 15 | A | From around the shop area.  Todd would take out his pellet |
| 16 | | gun, and if there was one on a tree or something, he'd shoot |
| 17 | | it and go -- store it. |
| 18 | Q | And you saw Mr. Fries actually shoot woodpeckers at his |
| 19 | | residence? |
| 20 | A | Yes. |
| 21 | Q | And he would collect those woodpeckers that he shot? |
| 22 | A | Yes. |
| 23 | Q | Did you see what he did with those as far as the buckets |
| 24 | | were concerned? |
| 25 | A | They were stored in a bucket, sometimes inside where the oil |

1       was, sometimes where -- it didn't matter what bucket, but

2       they were stored there in the buckets.

3  Q   And you saw Mr. Fries actually put the woodpeckers in the

4       buckets?

5  A   Yes.

6  Q   Did you see him shoot woodpeckers at any other locations?

7  A   I did one time, yes.

8  Q   And where was that?

9  A   That was at a customer's house.

10  Q   And did Mr. Fries collect that woodpecker also?

11  A   I believe so.  I believe he threw it in the back of his

12       truck.

13  Q   Now, as these things were accumulating in the -- in the shop

14       area, did you kind of notice any type of unusual smell

15       developing over time?

16  A   Sure.  Oh, yeah.

17  Q   What did you notice?

18  A   That smell was -- you'd start smelling some of the stuff

19       inside the buckets.

20  Q   And I mean, what type of a smell?  Was it -- was it a

21       pleasant smell?

22  A   No.  No, it sure wasn't.

23  Q   Now, you described I believe yesterday that the --

24       Mr. Getsch and Mr. Jordan were in their 20's?

25  A   Correct.

1    Q    And they were employed by Mr. Fries, correct?

2    A    Correct.

3    Q    And there was a significant age difference at the time back

4         in 2009 between -- in 2008 between Jordan, and Getsch, and

5         Mr. Fries, would you agree?

6    A    Yes, I would agree.

7    Q    And between Mr. Fries, and Mr. Getsch, and Jordan, who would

8         be the one that would -- would be calling the shots based on

9         your observations?

10   A    Todd.

11   Q    Mr. Fries?

12   A    Yes.

13   Q    How would you -- based on your observations working there --

14        and I take it you worked on a daily basis?

15   A    Yes.

16   Q    And how would you describe Jordan's relationship with

17        Mr. Fries?

18   A    They had a good relationship.

19   Q    Okay.  How would you describe Jordan's conduct around

20        Mr. Fries?

21             MR. BOCK:  Object as to foundation.

22             THE COURT:  No, overruled.

23   BY MR. PIMSNER:

24   Q    You may answer.

25   A    As far as a boss to an employee, they had a good

1        relationship.  Sometimes at odds, but I believe it was a

2        good relationship.

3    Q   Okay.  And would Mr. Jordan do whatever Mr. Fries asked him?

4    A   Oh, yeah.  Most of the time, yes.

5    Q   Did you find some of the things that Mr. Jordan was asked

6        unusual?

7    A   Sometimes.

8    Q   Now, as the collection process continued, did Mr. Fries

9        continue to talk about the Levines?

10   A   Yes.

11   Q   And how frequently would he talk about them?

12   A   It was frequent.  Every now and then.

13   Q   Multiple times a week?  Multiple times a day?

14   A   Multiple times a week.

15   Q   Did -- did others participate in those conversations about

16       the Levines?

17   A   Yes.

18   Q   And who were the others, primarily?

19   A   Primarily, just Dan and Robert.

20   Q   Jordan and Getsch?

21   A   Yes.

22   Q   And did -- in your presence did Jordan and Getsch agree to

23       assist Mr. Fries with his plan against the Levines --

24   A   Yes.

25   Q   -- in 2008?

1   A    Um—um.

2   Q    So the three of them would talk about it openly?

3   A    Yes.

4   Q    And they would talk about the plans they had?

5   A    Yes.

6   Q    Now, at any time before the 2008 Halloween attack were you

7        asked to participate in the attack?

8   A    Yes.

9   Q    By whom?

10  A    By Todd.

11  Q    Mr. Fries?

12  A    Yes.

13  Q    And do you recall when that was?

14  A    I'm thinking probably about a month before.

15  Q    So a month before Halloween?

16  A    Yes.

17  Q    And did he offer to pay you to assist in the attack?

18  A    Yes.

19  Q    How much did he offer you?

20  A    $100.

21  Q    Did he tell you specifically what you wanted to do -- what

22       he wanted you to do?

23  A    Yes.

24  Q    What did he say?

25  A    To go stage the buckets, and then go later on that night and

```
 1        empty the buckets on their property.
 2    Q   And what was your response to Mr. Fries' request?
 3    A   I immediately said no.
 4    Q   Why?
 5    A   Because I didn't agree with it, and I told him he shouldn't
 6        do it.  He should have known better.  And I just didn't
 7        agree with it.
 8    Q   Now, did that cause you any concern about continuing to work
 9        there?
10    A   A little, yeah.
11    Q   But at that point nothing had -- had happened by way of
12        attack, correct?
13    A   Correct.
14    Q   Now, at some point did you learn that there was a date
15        designated to conduct the attack on the Levines?
16    A   Correct.
17    Q   And how did you learn that information?
18    A   From Todd, Dan, and Robert.
19    Q   And was that during a conversation that occurred between the
20        four of you?
21    A   Yes.
22    Q   And did that conversation again take place at -- in the
23        shop?
24    A   Yes.
25    Q   And how long prior to the -- the attack did the plan date --
```

|   |   |   |
|---|---|---|
| 1 |   | was the plan date discussed? |
| 2 | A | A week or two before.  I can't recall, but that's what I |
| 3 |   | recall. |
| 4 | Q | And did -- do you know whose idea it was to pick Halloween? |
| 5 | A | Not too sure. |
| 6 | Q | Okay.  Was there a conversation between Jordan, Getsch and |
| 7 |   | Mr. Fries about why they would do it on Halloween night? |
| 8 | A | I'm not sure. |
| 9 | Q | Now, you talked a little bit about a coyote before.  When |
| 10 |   | was the first time that you heard about the coyote?  Who was |
| 11 |   | it from? |
| 12 | A | It was from Dan. |
| 13 | Q | Okay.  And did you learn that something unusual happened |
| 14 |   | with that coyote with -- and Dan, and Mr. Jordan? |
| 15 | A | Yeah. |
| 16 | Q | And was this from Mr. Jordan telling you? |
| 17 | A | Yes. |
| 18 | Q | And where did that conversation occur? |
| 19 | A | At the shop. |
| 20 | Q | And do you recall when that occurred in relationship to |
| 21 |   | Halloween, 2008? |
| 22 | A | Two or three weeks before. |
| 23 | Q | And what did Mr. Jordan tell you about the coyote? |
| 24 | A | Explain it? |
| 25 | Q | Did Mr. Jordan tell you where the coyote came from? |

1    A    Yes.

2    Q    Did he -- did he explain how it died?

3    A    Yes.

4    Q    What did Mr. Jordan tell you?

5    A    That it was road kill.

6    Q    Did Mr. Jordan ever talk about Mr. Fries shooting the

7         coyote?

8           MR. BOCK:  Objection.  Leading, Judge.

9           THE COURT:  Yes, sustained.

10  BY MR. PIMSNER:

11  Q    Did Mr. Jordan ever tell you any other reason or any other

12       time that -- that Mr. Fries was involved with a coyote?

13  A    No, just that he was instructed to pick it up off the road.

14  Q    Instructed by whom?

15  A    By Todd.

16  Q    Did Robert or Mr. Jordan tell you what happened when he

17       attempted to -- to pick up the coyote?

18  A    Yes.

19  Q    And what did he say?

20  A    That he got bit.

21  Q    And did Mr. Jordan tell you what he did with the coyote?

22  A    He put it in a black trash bag.

23  Q    And did you see that black trash bag?

24  A    Yes.

25  Q    And did you -- did Mr. Jordan show you the -- the coyote?

1    A    Yes.

2    Q    And do you know what happened to that coyote?

3    A    Yeah.

4    Q    And how do you know?

5    A    Because I seen it with my -- yeah.

6    Q    Okay, but do you know what happened after you saw it in

7         the -- do you know what happened to the coyote in the black

8         bag?  Where did it go from there?

9    A    It went into the neighbor's refrigerator.

10   Q    And was that a refrigerator that was located outside?

11   A    Outside on the back porch.

12   Q    And at some point do you -- do you -- did you become aware

13        that the coyote was moved from that refrigerator?

14   A    Yes.

15   Q    And did you see it after it was removed?

16   A    I did not see it.  Dan said it was in one of the buckets.

17   Q    Okay.  And did -- and as a result of the coyote being in

18        that refrigerator, did Mr. Fries or anybody else associated

19        with Burns Power Wash have to take some kind of action with

20        the neighbor's refrigerator?

21   A    Yes.

22   Q    And did you actually see that happen?

23   A    Yes.

24   Q    And tell us what you saw?

25   A    I seen Dan power washing that refrigerator -- that same

1      refrigerator in the neighbors, because you could see over

2      the wall -- from the front of the shop you could see the

3      neighbor's back porch, and he was back there power washing

4      it, and cleaning it up.

5  Q   Did Dan -- did Mr. Jordan say anything about what he was

6      doing?

7  A   Oh, yeah.

8  Q   And what did he say?

9  A   He was saying how disgusting it was, and he couldn't believe

10     he was trying to clean it up.

11 Q   Did you hear who directed Mr. Jordan to conduct the cleaning

12     of the refrigerator?

13 A   Yes.

14 Q   And who was that?

15 A   Todd.

16 Q   Mr. Fries?

17 A   (No verbal response.)

18 Q   Now, other than that one time approximately a month before

19     Halloween, did Mr. Fries ask you again to participate in the

20     Halloween attack?

21 A   No.

22 Q   Now, as you're leading up until Halloween, you knew from

23     prior conversations with Mr. Fries that he was wanting you

24     to help dump the buckets with the various items that were

25     collected, and spread them around.  Was there any

1       discussions in front of you regarding what other type of

2       conduct they wanted to do on Halloween night, what other

3       acts they wanted to do other than spreading out the buckets?

4   A    They wanted to go stage the buckets beforehand.

5   Q    Okay.  Now -- and -- and then after -- when the attack

6       occurred, was there any discussion between Mr. Fries,

7       Mr. Getsch, and Mr. Jordan in front of you as to other

8       things that they were going to do to the house?

9   A    They were going to spread the -- the stuff in the buckets,

10      spray paint the side of the house, empty all the buckets,

11      basically.

12   Q   And did they -- did Mr. Fries tell you where they were going

13      to empty the buckets?

14   A   As a matter of fact, Dan told me.

15   Q   What did he tell you?

16   A   He said that he spread the --

17   Q   I'm not talking about what he said he did.  I'm saying,

18      did -- leading up to the attack, did Mr. Fries ever tell you

19      what -- where he was going to spread the buckets?

20   A   Yes.

21   Q   And where did he say?

22   A   At the -- at their location.  At the Levine's location.

23   Q   In the yard, the home?  Where?

24   A   Driveway.  Front of the house.

25   Q   And the driveway would have been the driveway that Burns

1              Power Wash had completed work on, correct?

2    A    I believe so.

3    Q    Now, you said that -- was there anything about -- you said

4         there was something about spray painting the house.  Did

5         Mr. Fries tell you or have a discussion in your presence as

6         to what was going to be spray painted?

7    A    After the fact.

8    Q    Okay.  But before, did -- was there any discussion about

9         what type of graffiti would be placed on the home?

10   A    After the fact, yeah.

11   Q    Just after?  Okay, not before.  You just knew that there was

12        going to be paint before?

13   A    Yeah.

14   Q    Now, what about sealings.  Was there any discussion about

15        sealing any items at the Levines in the '08 attack?

16   A    Not that I recall.

17   Q    Nothing about the garage?

18   A    No.

19   Q    Did you have any conversation with Mr. Levine about leaving

20        identification -- Mr -- excuse, me Mr. Fries about leaving

21        identification at the Levine's residence on the night of the

22        attack?

23   A    After the fact.

24   Q    After the fact.  Okay.  And now, if Halloween in 2008

25        occurred on a Saturday night, when would have been the --

1       when was the next time that you saw Mr. Fries, Jordan, and

2       Getsch?

3   A   The following Monday.

4   Q   And where would that have been?

5   A   There at the shop.

6   Q   And who else was present at that time?

7   A   Dan and Robert.

8   Q   And that's it?  And pretty much were there any other

9       employees at that time?

10  A   Not that I recall.

11  Q   At that point, Mr. Trujillo would have already quit?

12  A   I believe so.

13  Q   And did -- did -- were you present for a discussion with

14      Mr. Fries, Mr. Jordan, Mr. Getsch about the attack that

15      occurred on Halloween night?

16  A   Yes.

17  Q   And were all three participating in the discussion?

18  A   Yes.

19  Q   And did they tell you what they did?

20          MR. BOCK:  I'm going to object --

21  A   Yes.

22          MR. BOCK:  -- I'm going to object, your Honor.

23          THE COURT:  Can I see counsel at sidebar, please?

24                      BENCH CONFERENCE

25          THE COURT:  So wouldn't these be statements after the

1    act, and beyond the hearsay exception?

2         MR. PIMSNER:  Well, the conspiracy continued because

3    then they immediately started collecting items again for the

4    second attack.  So it's -- you know, I can't say that it wasn't a

5    continuing conspiracy, and it's the same conduct, the same --

6    same planned attack with the same type of substances, animals.

7         THE COURT:  Well, in this conversation are they going

8    to talk about doing it again, or they're just --

9         MR. PIMSNER:  Right, thereafter.  Not during this

10   conversation, but it's a statement against interest from the

11   defendant.  I can establish the defendant made statements, and

12   what he did.

13        THE COURT:  Okay, I'll let you bring out the

14   defendant's statements, and you're going to bring out that this

15   witness knew about the second attack?

16        MR. PIMSNER:  He continued to work and saw things

17   happening, planning for the second attack.

18        THE COURT:  Okay.

19        MS. ANDERSON:  Also discussion about concealing.

20        THE COURT:  You're going to have to --

21        MS. ANDERSON:  Also discussions about the concealing

22   the first attack, correct, to some extent?

23        MR. PIMSNER:  Well, it has to go -- it is concealment.

24   When they were talking about leaving the ID to -- to -- you know,

25   so it is a --

1          THE COURT:  Continuing conspiracy?

2          MR. PIMSNER:  -- continuing conspiracy in an effort to

3    thwart law enforcement.  I think the statements are admissible

4    regarding the ID that was left, but I -- you know, I can

5    establish as much as I can through Mr. Fries' actual statements,

6    but you know --

7          THE COURT:  All right.  And this is other act evidence,

8    so we don't want this trial to be hundreds of hours relating to

9    other acts as opposed to the charged conduct.  But I think -- how

10   much longer do you have with the witness?

11         MR. PIMSNER:  Well, I have to cover the next event, but

12   it's going to be shorter.

13         THE COURT:  Okay.

14         Mr. Bock?

15         MR. BOCK:  My only position is that it seems to me he

16   was going to get into statements after the Halloween event

17   between three people, and that's why I object.

18         THE COURT:  But wouldn't it be a continuing conspiracy?

19   Nobody's arrested, and the conspiracy continues on until the

20   second event -- or the allegations are the same three people were

21   involved in the second event.

22         MR. PIMSNER:  Well, in the planning, but the actual

23   execution Mr. Getsch did not participate, but Jordan and -- and

24   Fries did.

25         MR. BOCK:  Well, I understand your position.

```
 1              THE COURT:  All right.  So you may proceed.
 2              (The bench conference was concluded.)
 3              THE COURT:  All right, counsel, you may proceed.
 4              MR. PIMSNER:  Thank you, your Honor.
 5    BY MR. PIMSNER:
 6    Q    Now, sir, you indicated that there was a discussion that
 7         took place in your presence at the shop the Monday after
 8         Halloween, 2008, correct?
 9    A    Correct.
10    Q    And did that discussion include Mr. Fries?
11    A    Yes.
12    Q    And did Mr. Fries tell you what they spray painted on the
13         Levine's home?
14    A    Yes.
15    Q    And what did he tell you?
16    A    That they spray painted swastikas, and that they spelled out
17         Jews.  Something about Jews.
18    Q    Did Mr. Fries tell you that day why he did that?
19    A    To make it seem like a hate crime.
20    Q    And why would he want it to seem like a hate crime?  Did he
21         tell you why?
22    A    To divert the attention -- or divert the investigation.
23    Q    Now, did you have a discussion that day with Mr. Fries about
24         an identification that was left at the Levine's home during
25         the attack?
```

1    A    Yes.

2    Q    And what did Mr. Fries tell you?

3    A    That it was dropped at the scene to throw off the

4         investigation.

5    Q    Did he say where he got the ID?

6    A    No.

7    Q    Did you know -- had you ever seen that ID?

8    A    No.

9    Q    Did you know whose ID it was?

10   A    I have no idea.

11   Q    But the purpose, according to Mr. Fries, was to divert the

12        police?

13   A    Correct.

14            MR. BOCK:  Objection.  Asked and answered, Judge.

15            THE COURT:  Yes, sustained.

16   BY MR. PIMSNER:

17   Q    Now, after the Halloween attack, did discussions continue

18        about the Levines?

19   A    Yes.

20   Q    And how often would those discussions occur?

21   A    Every -- every so often.

22   Q    Describe so often.

23   A    Maybe once or twice every couple weeks.

24   Q    Okay.  And who participated in those discussions?

25   A    Todd, Dan and Robert.

1   Q    And those were in your presence?

2   A    Yes.

3   Q    And what was being said by Mr. Fries about the Levines at

4        that time?

5   A    I -- about still doing it again.

6   Q    Doing it again, meaning an attack on the Levines?

7   A    Correct.

8   Q    And was Mr. Fries still angry over the money?

9   A    I believe so.

10  Q    Did he express that anger to you?

11  A    Yes.

12  Q    How did he express it, do you recall?

13  A    Just conversation.

14  Q    Now, at some point after the Halloween attack, did you

15       notice that items were being collected again?

16  A    Yes.

17  Q    Do you recall how long after Halloween that you saw items

18       collected?

19  A    Probably -- after the Halloween attack?

20  Q    Yes.

21  A    I would say almost immediately.  Maybe a couple months

22       after.

23  Q    Okay.  And were there -- did you -- were you present when

24       the issue of collecting items again was discussed?

25  A    Yes.

```
1   Q   And again, who was present for that?

2   A   The same people, Dan, Robert, Todd.

3   Q   Okay.  And who directed -- who was providing the direction

4       to start collecting various items?

5   A   Todd.

6   Q   Did Mr. Fries advise you and Mr. Jordan, Mr. Getsch what

7       type of items to collect?

8   A   Yes.

9   Q   What did he say?

10  A   The same materials.  Along the same lines.  Oil, road kill,

11      and the old paint.

12  Q   And did you see where these items were being stored?

13  A   Yes.

14  Q   And where were they being stored?

15  A   In the same location, along that west wall of the shop.

16  Q   And were they again stored in buckets?

17  A   Yes.

18  Q   And were they again -- these buckets then sealed?

19  A   They were -- they all had lids on them, yes.

20  Q   Now, how long -- how long a period of time did the

21      collection process take during the -- for the second attack?

22  A   For the second attack?

23  Q   Was it a long period of time?

24  A   It was -- I wouldn't say long, but it was a few months.

25  Q   And did you actually see items being put into the buckets?
```

1   A    Yes.

2   Q    And did that include road kill?

3   A    Yes.

4   Q    Did it include feces?

5   A    Yes.

6   Q    Include oil?

7   A    Yes.

8   Q    And old paint?

9   A    Yes.

10  Q    Did it include woodpeckers?

11  A    Yes.

12  Q    And during that timeframe, did you observe Mr. Fries kill

13       additional woodpeckers?

14  A    Yes.

15  Q    And did you see him place those woodpeckers in the buckets

16       that were being used for the '09 attack?

17  A    Yes.

18  Q    Now, again, would the discussions about the Levines -- would

19       they have kind of become more frequent than they were at the

20       very -- right after the attack of '08?

21  A    I would say that, yeah.

22  Q    Now, did Mr. Fries use any type of term to describe his plan

23       in 2009?

24  A    There was a slogan.  It was Levine '09.

25  Q    Levine '09?

1   A   Um—um.

2   Q   And who came up with that slogan?

3   A   Todd.

4   Q   What was your understanding of what that slogan meant?

5   A   My understanding that was that they were going to go back

6       and do it again.

7   Q   Now, did the defendant, Mr. Fries, ask you to participate in

8       this second attack?

9   A   Yes.

10  Q   Do you recall when that occurred?

11  A   About a month before.

12  Q   And again, would that have been at the shop?

13  A   Yes.

14  Q   And did he specifically tell you what he wanted you to do?

15  A   Yes.

16  Q   What did he say?

17  A   To help move the buckets, and to go dump them on the

18      property.

19  Q   Now, at -- at some point at around the time that he asked

20      you to participate, did he tell you anything about the

21      Levine's new home?

22  A   Other than that he -- he knew where they lived.  That was

23      it.

24  Q   He knew where their new home was?

25  A   Yes.

```
 1   Q    And do you recall when he told you that?
 2   A    I'm not sure.
 3   Q    Did he give you any more details at that time?
 4   A    Just -- not about the location, but he did say he used the
 5        internet to locate it.
 6   Q    Did he offer -- Mr. Fries offer to pay you for the second --
 7   A    Yes.
 8   Q    And did he offer you a specific amount of money?
 9   A    $100.
10   Q    And what was your response?
11   A    Again, no.  I didn't want to do it.
12   Q    And at that point -- did he ask you again after you turned
13        him down?
14   A    No.  Just that once.
15   Q    And did you observe from that -- the point that you were
16        asked until -- you said about a month before the attack
17        until the time of the attack, did you observe Mr. Jordan and
18        Mr. Getsch collecting items and putting them in buckets?
19   A    Yes.
20   Q    Did you also observe Mr. Fries putting items in buckets?
21   A    Yes.
22   Q    Now, at some point prior to the attack in August of '09,
23        were you in the area of the Tucson Omni Golf Course?
24   A    Yes.
25   Q    And who were you with?
```

1    A    Todd and Dan.

2    Q    And what vehicle were you in?

3    A    We were in Todd's Titan, the -- it was just a regular

4         looking pickup truck.

5    Q    And who was driving?

6    A    Todd.

7    Q    And where were you seated?

8    A    I was in the back seat.

9    Q    There's a second row in that cab?

10   A    Yes.

11   Q    And do you recall where you were -- in what area, or

12        approximately where you were at that time?

13   A    Yes.

14   Q    Do you recall the general street area?

15   A    It was Shannon.

16   Q    And what happened when you were in that area?

17   A    We came to a stop, and they said they wanted to go see

18        something, so they got out.  We pulled over to the side --

19        the right side --

20   Q    When you say they, who is that?

21   A    Todd and Dan.

22   Q    Okay.

23   A    Pulled over to the right side, and they got out of the

24        truck.  I stayed inside the truck.  They walked down

25        Shannon, crossed over, and walked alongside the -- I guess

1          it would be the north side of Shannon, down to a little area

2          where there was a gate.

3    Q    Okay.  And sir, if I were to show you an aerial map of that

4          area, would you be able to identify approximately where

5          you --

6    A    Yeah.

7    Q    Let me show you what's been admitted as Exhibit 292.  If I

8          can ask you to maybe hold it with your one hand, and I'll

9          ask you to point.

10              Drawing your attention to the lower right area, do you

11         see the Omni Golf Course?

12   A    Yes, I do.

13   Q    And do you -- can you identify where you would have pulled

14         off the road with Mr. Fries and Dan Jordan?

15   A    Let's see.  It's a little -- it's all -- it all looks flat,

16         but yeah, I could.  I believe it was right in here.  In this

17         area here.

18   Q    Can you kind of point the -- the map to the jury so they can

19         see it, please?

20              Okay, and that's where you would have stopped,

21         somewhere in that area?

22   A    Yes.

23   Q    And is there a name on that road?

24   A    Yeah.

25   Q    What is it?

| 1  | A | It's Magee. |
|----|---|-------------|
| 2  | Q | And where did you see Mr. Jordan and Mr. Fries walk to? |
| 3  | A | Pulled over here, and they walked down and across the road, |
| 4  |   | and down this direction here.  Right in here. |
| 5  | Q | And could you see where they went from where you were seated |
| 6  |   | in the truck? |
| 7  | A | Yeah.  The truck was just right in here. |
| 8  | Q | Okay.  And could you describe the area that you saw? |
| 9  |   | You can put that down, sir. |
| 10 | A | It's -- the road goes down, Omni Golf Course, and the |
| 11 |   | subdivision is right there to the left.  So they were right |
| 12 |   | outside the wall. |
| 13 | Q | Now, describe what -- what part of that area that you saw |
| 14 |   | them walk up to.  What was there? |
| 15 | A | There was a gate there. |
| 16 | Q | What kind of a gate? |
| 17 | A | A chain linked fence gate. |
| 18 | Q | And did you notice anything else besides the gate? |
| 19 | A | Well, when we drove past I looked, and beyond that gate was |
| 20 |   | the neighborhood. |
| 21 | Q | Was it a street beyond the gate, or was it -- |
| 22 | A | I could see a street -- you could see a street from the |
| 23 |   | outside, yes. |
| 24 | Q | And was the chain linked fence -- did it have a lock on it? |
| 25 | A | I think it had a chain and a lock, yes. |

```
 1   Q    And let me show you what's been marked as Exhibit 390 and
 2        391.
 3             Starting with 390, do you recognize that area?
 4   A    Yes.
 5   Q    And what does that -- what do you recognize that area to be?
 6   A    That's the gate.  That's the gate where they walked up to.
 7             MR. PIMSNER:  At this time I would move for admission
 8   of Exhibit 390, your Honor.
 9             MR. BOCK:  Judge, I'd like to have some foundation as
10   to when the photo was taken.
11             THE COURT:  Well, no.
12   BY MR. PIMSNER:
13   Q    This photograph looks --
14             THE COURT:  Do you want to lay some more foundation?
15   I'm going overrule the objection, but --
16             MR. PIMSNER:  Okay.
17             THE COURT:  So 390 can be admitted.
18   BY MR. PIMSNER:
19   Q    I'm going to show you --
20             THE COURT:  And sir, can you clear the screen/just
21   touch the left corner of that screen.
22             THE WITNESS:  Right here?
23             THE COURT:  Yes.  On the screen itself.  A little bit
24   lower.  Go down a little bit, lower -- there you go.
25             Thank you.  All right.
```

```
 1   BY MR. PIMSNER:
 2   Q    Is that the gate that you would have seen from the pickup
 3        truck?
 4   A    Yes.
 5   Q    And that's the gate that you would have seen Mr. Fries and
 6        Mr. Jordan walk to?
 7   A    Yes.
 8   Q    Let me ask you to look at 391.  Is that the same gate?
 9   A    It looks like it.
10   Q    Is that just a closer -- close-up of that area?
11   A    Yes.
12            MR. PIMSNER:  Move to admit Exhibit 391.
13            MR. BOCK:  It's cumulative.
14            THE COURT:  No, overruled.  391 is admitted.
15   BY MR. PIMSNER:
16   Q    Now, sir -- now, prior to the August, 2009 attack, did you
17        see anything at the shop that was unusual involving
18        Mr. Fries, Mr. Jordan, and Mr. Fries' blue truck?
19   A    Unusual?
20   Q    Yes.
21   A    Yeah.
22   Q    And do you recall approximately how long prior to the August
23        attack that you saw the unusual event?
24   A    Gee, a couple weeks before.
25   Q    And what were you doing at the time?
```

1  A    At the time, I was -- I had one of the work trucks out in

2       front of the shop, and I was power washing.  I was cleaning

3       it.  And as I was doing that, I happened to look over and --

4            MR. BOCK:  Judge, I'm going to object.  And if I might

5  have just a short bench conference?

6            THE COURT:  Yes.

7                       BENCH CONFERENCE

8            MR. BOCK:  Judge, I just need to make a very short

9  record.  I believe what they're going to do is the next line of

10  testimony is going to be that there was some production of some

11  type of chemical event with the cloud.  So to -- I just want to

12  preserve that objection based on the previous record, the motion

13  in limine, and the other act evidence.

14            THE COURT:  Okay.

15            MR. PIMSNER:  The testimony is going to be he saw a big

16  plume of smoke coming from the back of the truck, and those two

17  running away.  He doesn't know what it was, so he's not going to

18  say it's a chemical, but a kind of white cloud that plumed out.

19            THE COURT:  And this happened when?

20            MR. PIMSNER:  Two weeks -- he said two weeks before the

21  event.

22            THE COURT:  All right.  Your objection's noted.

23            MR. BOCK:  I think it's a little tenuous, since we

24  don't know what it was either.

25            MR. PIMSNER:  It goes to the weight.

1          MR. BOCK:  It obviously goes to the weight, but the

2    argument is that it has something do with some production or

3    preplanning of a chemical event, and I think this is too tenuous

4    to show that.

5          THE COURT:  No.  Given the evidence that's been

6    presented so far, I think it is relevant and admissible.  And I

7    agree with the government.  It goes to the weight rather than

8    admissibility.  So the objection's overruled.

9          (The bench conference was concluded.)

10          THE COURT:  Mr. Pimsner, you may proceed.

11          MR. PIMSNER:  Thank you.

12    BY MR. PIMSNER:

13    Q    Sir, you were explaining that you were power watching the

14         truck and you looked over.  And what direction did you look

15         over?

16    A    As I was power washing, the truck was sitting out in front

17         of the shop directly in front.

18    Q    And when you say the truck?

19    A    One of the work trucks.

20    Q    Okay.

21    A    For some reason I happened to look over, and that would have

22         been to my right, to the west side of the shop.  I see Dan

23         and Robert -- I mean, excuse me, Dan and Todd running away

24         from the back of the blue -- older pickup.

25    Q    And did -- were they running in opposite directions?

1  A    Yes.  Todd was running to the left, Dan was running towards

2       me, this way.

3  Q    And what did you see at that point?

4  A    As they were running, something out of the bed of the pickup

5       truck -- a plume of smoke came out.

6  Q    Want color was the smoke?

7  A    A whitish grayish.

8  Q    And did you ever learn what caused that smoke?

9  A    I have no idea.

10 Q    And that was a couple of weeks before the August attack?

11 A    Yes.

12 Q    Did you ever learn that there was a specific date set for

13      the attack?

14 A    No.

15 Q    When would have been the first time you learned there was a

16      second attack on the Levines?

17 A    That was the following Monday.

18 Q    And so if the attack took place on August 2nd, that would

19      have been August 4th?

20 A    I -- I can't recall the dates, but I know that it was -- I

21      believe it was my following work day when I arrived at -- at

22      work.

23 Q    Okay, so the next time you were at work --

24 A    Yeah.

25 Q    -- you learned about the attack on the Levine?

```
 1    A    Correct.
 2    Q    And describe the circumstances on how you learned about the
 3         attack.
 4    A    We were already at a job site --
 5    Q    When you say we, who is we?
 6    A    Dan, and Robert, and myself.
 7    Q    Jordan and Getsch?
 8    A    Correct.
 9    Q    All right.
10    A    And our first break I had bought the paper that morning and
11         all three of us were sitting inside the truck, and I opened
12         up the newspaper and it was all over --
13              MR. BOCK:  Objection -- objection to all this, your
14    Honor.
15              THE COURT:  No, overruled.
16              Go ahead.
17    BY MR. PIMSNER:
18    Q    Go ahead, sir.
19    A    It was all over the front page.
20    Q    What was all over the front page?
21    A    The second attack.
22    Q    On the Levines?
23    A    Yes.
24    Q    And you looked at that article?
25    A    Yes.
```

1    Q    And what did you do at that point?

2    A    In disbelief -- I couldn't believe it, and -- you know, that

3         it happened.  And then so I showed it to them, because they

4         were both in the front -- front seats, and they kind of

5         looked at each other, and --

6              MR. BOCK:  Objection to this, your Honor.

7    BY MR. PIMSNER:

8    Q    Did they say anything when you provided the paper to

9         Mr. Getsch and Mr. Jordan?

10   A    I told them take a look at this, and they both looked at

11        each other and smirked.

12             MR. BOCK:  Objection to that, your Honor.

13             THE COURT:  No, overruled.

14   BY MR. PIMSNER:

15   Q    Okay, you can tell your answer again.

16             THE COURT:  He already said it.  He said the answer.

17             MR. PIMSNER:  Oh, I'm sorry.  I didn't hear it.

18             THE COURT:  Looked at it and smirked.

19             MR. PIMSNER:  Okay.

20   BY MR. PIMSNER:

21   Q    And then what was done?

22   A    They both got out of the vehicle and walked away -- away

23        from the vehicle, and they were talking amongst themselves.

24   Q    How would you describe their reaction to each other at that

25        time?

1    A    Nervous.  Worried.

2                 MR. BOCK:  Now, objection to that, your Honor.

3                 THE COURT:  Well, I'll let the answer stand.

4                 Go ahead, counsel.

5    BY MR. PIMSNER:

6    Q    Now, at any time did -- after the attack, did Mr. Jordan or

7         Mr. Getsch admit to you they committed the attack?

8                 MR. BOCK:  Objection to that, your Honor.

9                 THE COURT:  Well, let me see counsel at sidebar,

10   please.

11                          BENCH CONFERENCE

12                 MR. PIMSNER:  I was trying to establish that Getsch

13   was -- you know, his concern was -- there may be an undue

14   influence that Getsch did the attack.  We don't believe Getsch

15   did it, but we believe what happened -- happened is that Jordan

16   did it.  And there was a reaction.  We know Getsch helped plan

17   it, and then there was a reaction between Jordan and Getsch.

18                 THE COURT:  So is it your theory, then, that these

19   statements would be admissible, and the conspiracy continues

20   until the arrest of the individuals?

21                 MR. PIMSNER:  No.  At that point -- I mean, we don't

22   have to get into that, your Honor.  I was just trying to

23   establish, but Mr. Bock doesn't want me to go there, that there

24   was no admission that they actually had done the act.

25                 THE COURT:  So the anticipated answer is no?

```
 1              MR. PIMSNER:  Correct, but I won't go there.
 2              MR. BOCK:  I'd be glad --
 3              THE COURT:  Well, wait a minute.  Do you want him --
 4              MR. BOCK:  I -- I'll withdraw --
 5              MR. PIMSNER:  He immediately quit after this after.  He
 6    saw what happened.
 7              THE COURT:  All right.  I'll go ahead -- why don't you
 8    go ahead and ask another question.
 9              MR. PIMSNER:  All right.
10              (The bench conference was concluded.)
11              THE COURT:  All right, Mr. Pimsner, you may ask another
12    question.
13              MR. PIMSNER:  Yes, your Honor.
14    BY MR. PIMSNER:
15    Q    Now, did that -- once you saw what happened in the paper to
16         the Levines, did it cause you concern?
17    A    Yes.
18    Q    And did you decide to -- to do something at that point?
19    A    Yes.
20    Q    And what did you do?
21    A    Well, for -- to start, I quit.
22    Q    Okay, so you -- let's stop there.  How soon after that did
23         you quit?
24    A    The next -- the following week.  A few days.
25    Q    A few days?
```

1    A    (No verbal response.)

2    Q    Did you put your notice in right away?

3    A    Yes.

4    Q    Did you have any conversations with Mr. Fries after the

5         attack about the Levines attack on August 2nd?

6    A    Very minimal, but I did say that to him that I didn't want

7         to be a part of this company anymore.  I needed to move on.

8              MR. PIMSNER:  I have nothing further at this time, your

9    Honor.

10             THE COURT:  All right.

11             Cross-examination?

12             MR. BOCK:  Thank you, your Honor.

13                          CROSS-EXAMINATION

14   BY MR. BOCK:

15   Q    Mr. Monteil?

16   A    Yes.

17   Q    Now, in preparation of your testimony today, did you review

18        a statement that you made to Agent Nowak on August the 6th

19        of 2010?

20   A    Yes.

21   Q    And did you further -- did you further review the statement

22        that you made to Agent Nowak on November the 23rd of 2010?

23   A    Yes.

24   Q    Did you review your grand jury testimony of November 3rd --

25        excuse me, November 23rd, 2010?

1   A   Yes.

2   Q   Is November 23rd, 2010 the only time you testified in front

3       of the grand jury?

4   A   Yes.

5   Q   Now, did you receive a target letter?

6   A   Yes.

7   Q   And when did you receive a target letter?

8   A   I'm not exactly too sure on the date.

9   Q   And a -- what was your understanding of what a target letter

10      is?

11  A   That I might be a target of an investigation.

12  Q   Okay.  And did you also get a grant of immunity?

13  A   Yes.

14  Q   Okay.  And I'm going to show you what's been marked as

15      Exhibit 295.

16          Do you see that letter?

17  A   Yes.

18  Q   Have you looked at that letter?

19  A   Yes.

20  Q   And in fact, you have -- you had an attorney represent you,

21      is that correct?

22  A   Correct.

23  Q   And your attorney is here today, is that correct?

24  A   Correct.

25          MR. BOCK:  I move to admit Exhibit 295.

1          MR. PIMSNER:  No objection, your Honor.

2          THE COURT:  29 -- 295 is admitted.

3    BY MR. BOCK:

4    Q    Now, let me talk to you a little bit about Todd Fries and

5         the business.

6              When did you start to work for Mr. Fries?

7    A    I believe it was in 2006.

8    Q    And you indicated you worked for him from 2006 until

9         sometime after August the 2nd of 2009, is that correct?

10   A    Correct.

11   Q    And in -- he had a -- a good business, did he not?

12   A    Yes.

13   Q    He had a lot of jobs?

14   A    Yes.

15   Q    He had a lot of equipment?

16   A    Yes.

17   Q    He had a good income?

18   A    I wouldn't know.

19   Q    Did you ever collect checks for him when you were on job

20        sites?

21   A    Yes.

22   Q    And what would be some of the larger amounts that you

23        collected on his behalf?

24             In other words, would you have collected a check for

25        2,000 or $2,500?

1    A    Oh, yeah.  Um-um.

2    Q    That was not unusual, was it?

3    A    No.

4    Q    What were some of the businesses that were contracting with

5         the Burns Power Washing?

6    A    Name-wise?

7    Q    Yes, if you remember.

8    A    We had a few restaurants.  Park Mall.  Lots of companies.

9    Q    Did you have the University of Arizona?

10   A    Yes.

11   Q    Did you have hospitals?

12   A    Yes.

13   Q    You had other types of businesses?

14   A    Yes.

15   Q    And you had a lot of residential businesses -- residential

16        homes, is that correct?

17   A    Correct.

18   Q    And Mr. Fries was active in his advertising, was he not?

19   A    Yes, he was.

20   Q    You're aware of the ads in the phone book?

21   A    Yes.

22   Q    You're aware of ads on TV?

23   A    Yes.

24   Q    And give and take, how many employees would be working for

25        him from the time you were there, 2006 to 2009?

```
 1   A   When I started, there was around ten employees.  By the time
 2       I left, there was only three of us.
 3   Q   Sometimes business has cycles?
 4   A   Sure.
 5   Q   Economy's good, economy's bad?
 6   A   Correct.
 7   Q   So you indicated also that you were familiar with the -- the
 8       area in which the trucks were parked and products were
 9       stored for his business?
10   A   Correct.
11   Q   And that would have been on his property?
12   A   Yes.
13   Q   And you're familiar with his property?
14   A   Yes.
15   Q   Now, he -- you never saw a black trailer in his property,
16       did you?
17   A   Black trailer?
18   Q   Yeah, an enclosed black trailer.
19   A   No.
20   Q   The -- the whole situation involving the Levines, did you
21       know the -- what the dynamics was of the situation involving
22       the Levines, about the -- the two checks?
23   A   No.
24   Q   You had no knowledge that there was a -- two checks that
25       were postdated, and one -- there was a stop payment on one
```

1           of them -- you have no knowledge of that whatsoever?

2    A     I have no idea.

3    Q     Now, you say that Mr. Fries became focused on the Levine --

4           Levines after -- because of some event, is that -- is that

5           what in your mind -- you're testifying as to your

6           impressions of -- of Mr. Fries and the Levines, is that

7           correct?

8    A     Correct.

9    Q     And so your impression -- or did someone tell you it was

10          over money?  Did Mr. Fries tell you it was over money?

11   A     Yes.

12   Q     Okay, did he tell you how much money, or what -- what it

13          was?

14   A     I have no idea.

15   Q     And you've gone and testified at length regarding what you

16          claim were preparations by Mr. Fries to, I guess, get back

17          at the Levines.  Right?  That's what the purpose of your

18          testimony was?

19   A     Correct.

20   Q     And you talked about all of this road kill --

21   A     Correct.

22   Q     -- is that correct?

23          Did you ever go out and pick up road kill?

24   A     No.

25   Q     Did you ever see Mr. Fries pick road kill up?

1   A    No.

2   Q    You talked about oil, is that correct?

3   A    Yes.

4   Q    Did you ever see Mr. Fries empty any oil out of the -- the

5        trucks?

6   A    Into the buckets?

7   Q    Yes.

8   A    Yes.

9   Q    You never told Agent Nowak that when you spoke to him on two

10       occasions.  Would you agree with me?

11  A    I can't recall.

12  Q    Okay.  And you never testified to that in front of the grand

13       jury, is that correct?

14  A    That's correct.

15  Q    Now, you also talked about the -- you -- some other -- paint

16       and some other things in preparation of what you claim

17       Mr. Fries was up to, is that correct?

18  A    Correct.

19  Q    And you claim that there was a -- some coyote was involved?

20  A    Yes.

21  Q    That was something that was told to you, is that correct?

22  A    Correct.

23  Q    And in fact, a lot of the information involving the

24       October 31st situation according to your testimony was what

25       was told to you by Daniel Jordan.  Is that a fair statement?

1    A    That's a fair statement.

2    Q    So Daniel Jordan is claiming these things, and he's telling

3         you about them, right?

4    A    Correct.

5    Q    Now -- and Edward Trujillo, he's not telling you anything

6         about anything, is he?

7    A    I don't think he was there.  I didn't have conversations

8         with him.

9    Q    So Edward had nothing to do, according to you -- or you

10        had -- had no conversations with Edward Trujillo about

11        anything to do with the -- with the October event, is that

12        correct?  That's a fair statement, isn't it?

13   A    Yes.

14   Q    Now, you said there was some unfortunate slogan attached to

15        the Levines in 2009, is that correct?

16   A    Yes.

17   Q    You never told Agent Nowak that, did you?

18   A    I don't recall.

19   Q    You never testified to that in front of the grand jury

20        either, did you?

21   A    I don't recall.

22   Q    And there was nothing -- no slogan whatsoever involving the

23        Levines prior to the 2009 slogan.  Is that a fair statement?

24   A    Yes.

25   Q    So -- and you would agree with me that the products that

1          were shown to you by the government, a lot of -- all of

2          those were associated with -- with the work that needed to

3          be done, is that correct?

4    A     Yes.

5    Q     Paint stripper?

6    A     Yes.

7    Q     Muriatic acid?

8    A     Yes.

9    Q     Because work is done not only at -- windows, and cleaning

10         things, right?

11   A     Correct.

12   Q     But it's also done for, like, driveways and things like

13         that?

14   A     Yeah.

15   Q     So just -- we're moving forward, but just give me a very

16         quick summary of the type of different jobs that Burns Power

17         Supply -- Burns Power Washing was doing that you were aware

18         of.

19             We talked about windows, cleaning homes, correct?

20   A     Yes.

21   Q     Driveways, correct?

22   A     Driveways.

23   Q     Anything else that I haven't covered that the company did?

24   A     Power washing garages, back patios, power washing buildings.

25   Q     Okay.  So I think we probably covered everything, right?

1    A    Sure.

2    Q    Do you have an independent idea of what the job was for the

3         university?

4    A    The university?

5    Q    Yes.

6    A    Power washing sidewalks, and concrete.

7    Q    Did you do one of the athletic buildings for the university?

8    A    They might have.  I wasn't part of that.

9    Q    Okay.  Now, you said in the claimed preparation of the event

10        of Halloween that there was a lot of activity that was

11        taking place in the -- in the -- in the area where the

12        trucks were and the paint was, whatever, is that correct?

13   A    Correct.

14   Q    Was there ever any spillage associated with all of these

15        things that you -- you -- that people were telling you

16        about?

17   A    I can't recall.

18   Q    Okay.  It's possible -- there should be some spillage,

19        though, right?

20   A    Sure, I guess.

21   Q    You didn't put anything in any buckets, did you?

22   A    Not that I recall.

23   Q    And again, all of this is being told to you by Daniel

24        Jordan?

25   A    Correct.

```
 1   Q    Now, there was -- you testified about identification that
 2        was left at the Halloween scene.  Do you remember your
 3        testimony about that?
 4   A    Yes.
 5   Q    Now, that was told to you by Daniel Jordan also, is that
 6        correct?
 7   A    Yes.
 8   Q    Did Daniel Jordan specifically tell you that he handled that
 9        identification?
10   A    No.  That was told to me by Todd.
11   Q    So Todd told you that he handled the identification and left
12        it at the scene?
13   A    Yes.
14   Q    So he's telling you he had his hands on this identification
15        when it was left at the scene --
16   A    That he had it, yes.
17   Q    -- on Halloween?
18   A    Yes.
19   Q    Okay.  Now, this coyote that you've talked about that
20        apparently arose from the dead to bite Daniel Jordan, this
21        was --
22             MR. PIMSNER:  Objection, your Honor.
23   BY MR. BOCK:
24   Q    -- this was associated --
25             MR. PIMSNER:  Argumentative.
```

1              THE COURT:  No, overruled -- well --

2    BY MR. BOCK:

3    Q    -- this was associated with the Halloween episode?

4    A    Yes.

5    Q    And so the Halloween episode, then, was taking a coyote from

6         a neighbor's locker -- a freezer, I guess, is that correct?

7    A    Um-um.

8    Q    And this was told to you by somebody too, is that correct?

9    A    I seen it, yeah.

10   Q    Well, did you go over there and see it come out of the --

11   A    No --

12   Q    I'm sorry?

13   A    -- Dan was cleaning it out, and he took it out and put it in

14        a -- in a bucket.

15   Q    So you were over at the neighbor's home?

16   A    No.

17   Q    Okay, so you didn't see Dan take it from the neighbor's

18        freezer.  That's what my question was.

19   A    Oh, no.

20   Q    Okay.  And then did you see the freezer being power washed?

21   A    Yes.

22   Q    Did you participate in that?

23   A    No.

24   Q    I imagine the neighbor would be aware of that, is that

25        correct?

1  A    I would imagine.

2  Q    Now, the -- the -- so you were not present at the

3       October 31st incident, is that correct, the 2008 incident?

4  A    Correct.

5  Q    And Mr. Fries never told you he was present, did he?

6  A    He told me?

7  Q    He never told you that I was there, did he?

8  A    Yes.

9  Q    He did tell you he was there?

10 A    Yes.

11 Q    That's your testimony?

12 A    Yes.

13 Q    Okay.  Now, let's move on to the -- to the August 2nd, 2009

14      incident.  Again, your testimony is pretty much the -- about

15      the road kill, and the oil, your testimony pretty much would

16      be a repetition of the Halloween planning, according to you?

17 A    Yes.

18 Q    So I don't need to go into that inch-by-inch, do I?

19 A    It's up to you.

20 Q    Did you -- you didn't do anything with any oil, did you?

21 A    No.

22 Q    You didn't do anything with any road kill, is that correct?

23 A    Correct.

24 Q    You didn't do anything with any feces, whether it was human

25      or animal, is that correct?

1   A   Correct.

2   Q   And again, most of the information, if not all of it, is

3       coming from Daniel Jordan, is that correct?

4   A   That, and me physically seeing it, yeah.

5   Q   Okay, and you physically saw some buckets that were in

6       the -- in the area where the trucks are?

7   A   Yes.

8   Q   Okay.  You didn't -- did you see them being filled?

9   A   Sometimes.

10  Q   Okay, and what does sometimes mean?  One bucket?  Two

11      buckets?  A hundred buckets?

12  A   Well, for example, if I may, when some jobs that we would

13      have the old paint, we were instructed to put them -- it was

14      already in the bucket, because we were instructed to save

15      it.  So we would get to the shop, and we were told to put it

16      over there on the wall, and that's what we did.

17  Q   Okay.  All right.  Now, on the October -- excuse me, on the

18      November 2nd situation, you claim that --

19  A   November 2nd?

20  Q   Excuse me.  Did I say November?  I meant August 2nd.  Excuse

21      me.  Sir.  Thank you for correcting me.  August 2nd.  On the

22      August 2nd, 2009 situation your claim is that you went and

23      drove to the area where the Levines had moved to, is that

24      correct?

25  A   Correct.

1    Q    Okay, and you were the driver?

2    A    No.

3    Q    You were the passenger?

4    A    Yes.

5    Q    And do you have any feel for the -- the timeframe?

6    A    Timeframe?

7    Q    Yeah.  You quit -- your testimony was you quit after the --

8         sometime after August the 2nd of '09, is that correct?

9    A    Correct.

10   Q    So how many weeks prior to August the 2nd of '09 according

11        to you, sir, were you at the -- the new residence of the

12        Levines?

13   A    I can't recall.

14   Q    And you testified that you stayed in the truck?

15   A    Yes.

16   Q    As the passenger?

17   A    I believe I was in the back seat.

18   Q    So you stayed in the truck, and it's your testimony that

19        Mr. Fries and who else got out of the truck?

20   A    Dan.

21   Q    You were on the phone to your wife, is that correct?

22   A    Correct.

23   Q    So a lot of your attention really wasn't directed to what

24        you claim Dan and Mr. Fries were doing, is that a fair

25        statement?

1    A    Well, I seen where they walked to, yeah.

2    Q    Did they -- did they go over any walls?

3    A    No.

4    Q    How long were they out for, according to you?

5    A    Three or four minutes.

6    Q    Three or four minutes?

7    A    (No verbal response.)

8    Q    Now, you said on your testimony on direct that Mr. Fries,

9         according to you, had internet activity that located the

10        Levines.  Is that the substance of that testimony?

11   A    Yes.

12   Q    And you never told the agent about that internet activity --

13        that so-called internet activity when you spoke to him on

14        two occasions, is that correct?

15   A    I can't recall.

16   Q    And you never testified to that in front of the grand jury

17        either, did you?

18   A    I do not think so.

19   Q    Okay.

20            MR. BOCK:  May I have a minute, your Honor?

21            THE COURT:  Yes, take your time.

22            MR. BOCK:  Judge, I'm done with my cross-examination.

23            THE COURT:  All right.

24            Redirect?

25            MR. PIMSNER:  Yes, your Honor.

1                        REDIRECT EXAMINATION

2   BY MR. PIMSNER:

3   Q    Now, Mr. Monteil, Mr. Bock asked you questions about your

4        appearance before the grand jury.  Do you recall those

5        questions?

6   A    Yes.

7   Q    And were you subpoenaed to appear before the grand jury?

8   A    Yes, I was.

9   Q    And did the court appoint you an attorney --

10  A    Yes.

11  Q    -- for your appearance?

12           And were you provided a letter outlining what the

13       agreement was between you and the United States for your

14       testimony?

15  A    Yes.

16  Q    And let me show you what's been admitted as Exhibit 295.

17           And is that the letter that you received?

18  A    I believe so, yes.

19  Q    It was addressed to your attorney?

20  A    Yes.

21  Q    And was the only promise that you received that any

22       information that -- that -- that your statements will not be

23       used against you in any kind of -- any kind of proceeding in

24       the future?

25  A    Yes.

1    Q    This letter did not say you would not be prosecuted for --

2         if you had been involved in any crimes, does it?

3    A    Right.

4    Q    And this letter also placed forth that if you provide

5         information, the government could -- any information or

6         evidence that derived from your statements could then be

7         used, correct?

8    A    Correct.

9    Q    Now, did this agreement specifically tell you that -- that

10        you are not immune from any kind of prosecution for perjury,

11        that you could still be -- if you were to perjure yourself,

12        you could be prosecuted?

13   A    Yes.

14   Q    And that if you provide false statements or obstruct

15        justice, you could also be prosecuted?

16   A    Yes.

17   Q    So other than the use of your -- your actual statements in

18        a -- in front of the grand jury, that's the only promise

19        that you received?

20   A    Yes.

21   Q    Now, there were a number of questions asked by Mr. Bock

22        saying you didn't tell the grand jury that information, did

23        you?  Now, did you answer all the questions that you were

24        asked in front of the grand jury?

25   A    Yes.

1  Q    Were you asked about those areas in front of the grand jury

2       such as internet usage, or the slogan that was used in the

3       2009 attack?

4  A    No.

5  Q    So when Mr. Bock made a point of implying that you withheld

6       that information, is it -- did you withhold it

7       intentionally?

8            MR. BOCK:  Judge, again, it's leading.  It's a leading

9  question, Judge, and I object.

10           THE COURT:  No, overruled.

11           You may answer.

12 BY MR. PIMSNER:

13 Q    Did you withhold information from the grand jury?

14 A    No, sir.

15 Q    Did you withhold information from Special Agent Nowak?

16 A    No, sir.

17 Q    Did you answer all the questions that you were asked?

18 A    Yes, sir.

19 Q    So if an area wasn't covered, is it fair to say you weren't

20      asked about that area?

21 A    That is correct.

22 Q    Mr. Bock also asked you, and in his follow-up questions

23      would say and you learned most of that information regarding

24      the two attacks from Mr. Jordan.  Is that accurate that

25      all -- the information that you learned was primarily from

1     Mr. Jordan about, say -- start with the August of 2008

2     attack.

3  A  It was from everybody.

4  Q  Okay.  Including Mr. Fries?

5  A  Yes.

6  Q  And who was the -- who called the shots on what was going to

7     be -- whose idea was it to --

8        MR. BOCK:  Objection.  Objection, as to this.  That's

9  improper redirect.

10        THE COURT:  No, overruled.

11        Go ahead.

12        THE WITNESS:  Todd.

13  BY MR. PIMSNER:

14  Q  Todd -- Todd came up with the plan?

15  A  Yes.

16  Q  What about when -- the 2009 attack?  Whose idea was the 2009

17     attack?

18  A  Todd.

19  Q  At any time did you either see Getsch or Jordan come up with

20     an idea, or decide that let's attack the Levines?

21  A  No, sir.

22  Q  Would Jordan and Getsch follow what Mr. Fries directed them

23     to do?

24  A  Oh, yeah.

25  Q  And what you saw, the items being collected and what you saw

```
 1            Getsch and Jordan were doing and Mr. Fries was doing, was
 2            all consistent with what the defendant told you?
 3   A     Yes.
 4   Q     And the identification that was left at the first scene,
 5            that was in August -- or Halloween of 2008, that was told to
 6            you by Mr. Fries?
 7   A     Correct.
 8   Q     And Mr. Fries told you what was graffitied on the house,
 9            correct?
10   A     Correct.
11            MR. BOCK:  Objection as to that.  That's beyond the
12   scope.
13            THE COURT:  No, overruled.
14   BY MR. PIMSNER:
15   Q     Did Mr. Fries tell you that they spread the dead animals and
16            the oils around the -- and the paints around the driveway?
17   A     Yes.
18            MR. PIMSNER:  One moment, your Honor?
19            THE COURT:  Yes.
20            MR. PIMSNER:  I have nothing further at this time, your
21   Honor.
22            THE COURT:  All right.
23            Any questions from the jury for this witness?
24            If you could write it out, please.
25                              BENCH CONFERENCE
```

```
 1              THE COURT:  Any objection to either of these questions?
 2         The juror's reading your mind, Mr. Bock.
 3         Okay, so we'll --
 4         MR. PIMSNER:  No.
 5         MR. BOCK:  No.
 6              THE COURT:  -- so we'll have government counsel ask the
 7    questions.  Okay.
 8              (The bench conference was concluded.)
 9              THE COURT:  All right, a couple of questions from the
10    jury.
11                          EXAMINATION
12    BY MR. PIMSNER:
13    Q    Now, when you saw Mr. Jordan, Mr. Fries running from the
14         back of the blue truck that day with the smoke, did you
15         smell anything unusual at that time?
16    A    No, I did not.
17    Q    And approximately how much smoke was there?
18    A    I believe it was a plume of smoke, about this big, going up.
19    Q    How -- how high did it rise?
20    A    10, 15 feet.
21    Q    And when you described the width, could you give us feet,
22         because it's -- we need to take a record of that?
23    A    I would say three and half feet long, maybe four feet.
24    Q    And how far away from you at the time that you saw the --
25         the smoke?
```

```
 1   A     I was about -- I would say 30, 40 yards away.
 2   Q     And sir, another area.  Did you ever see Mr. Fries pick up a
 3         dead woodpecker while you were at the shop?
 4   A     Yes.
 5   Q     And on more than one occasion?
 6   A     Yes.
 7   Q     And did you see him -- what he did with those woodpeckers in
 8         relationship to the buckets?
 9   A     Yes.
10   Q     What did he do?
11   A     Put them in a bucket.
12               THE COURT:  Any follow up questions from defense
13   counsel?
14               MR. BOCK:  No, your Honor.
15               THE COURT:  All right.
16               Any additional questions from the jury for this
17   witness?
18               All right, sir, you may step down and be excused.
19                      -------------------------
20               (Brian Nowak, having been previously sworn, recalled on
21   behalf of the government, resumed the witness stand.)
22                             BRIAN NOWAK
23                         DIRECT EXAMINATION
24   BY MS. ANDERSON:
25   Q     Special Agent Nowak, I'm going to ask you about a couple
```

|  |  |  |
|---|---|---|
| 1 |  | different areas that have come up during the trial.  First |
| 2 |  | of all, let's talk about Michelle Fuentes.  Now, after the |
| 3 |  | items belonging to Michelle Fuentes were found at the Levine |
| 4 |  | residence on August 2nd, 2009, the F.B.I. went to talk to |
| 5 |  | her, is that correct? |
| 6 | A | Correct. |
| 7 | Q | Do you recall when it was that you went to talk to her? |
| 8 | A | We went to talk to her the next day.  We actually attempted |
| 9 |  | to try to talk to her the day of the incident.  I had |
| 10 |  | Special Agent Luna along with one of the sheriff's deputies |
| 11 |  | respond to her residence. |
| 12 | Q | So you actually made contact with her on August 3rd, 2009, |
| 13 |  | correct? |
| 14 | A | Correct. |
| 15 | Q | And she told you she had nothing to do with the incident, |
| 16 |  | correct? |
| 17 | A | Correct. |
| 18 | Q | Now, after she told you that, did your investigation |
| 19 |  | continue? |
| 20 | A | Yes, it did. |
| 21 | Q | Tell us, how did the investigation continue?  What did you |
| 22 |  | do? |
| 23 | A | Well, she was not ruled out as a suspect immediately.  One |
| 24 |  | of the things that we did do is that after we made contact |
| 25 |  | with her, we wanted to verify her story, make sure that what |

1       she was saying was the truth.  We had to pull employee

2       records, make sure that she was, in fact, at work at the

3       time of the incident.  We pulled her bank account records to

4       verify that that account had been closed, as well as the

5       checking account had been closed, and that she did not write

6       that check.  We had -- when we were initially at the

7       interview site, we showed her the check, a copy of the

8       check.  She had stated specifically that was not her

9       writing, that was not her signature.  We verified by looking

10      at other components of the writing she had around the house

11      to show us a signature to say, look, this is not the way I

12      write my F on the check.  We went ahead and looked at her

13      cellphone while we were at the place.  We looked at her --

14      talked with her mother who didn't speak very good English,

15      but we were able to get some information from her.  Then we

16      went ahead and pulled, obviously, all the kind of checks

17      that we normally run, criminal history check, going ahead

18      and running all the database checks, immigration checks,

19      when she crossed the border.  I had pulled the DES records,

20      Department of Economic Security, to determine where she's

21      been working, and how long she had been working.

22  Q   So the investigation didn't stop when she told you she

23      wasn't involved, is that correct?

24  A   It did not.

25          MS. ANDERSON:  May I approach, your Honor?

```
 1              THE COURT:  Yes.
 2   BY MS. ANDERSON:
 3   Q    Agent Nowak, that's Government's Exhibit Number 393,
 4        correct?
 5   A    Correct.
 6   Q    And what's -- what's contained within -- in the brown
 7        envelope?
 8   A    It was the white envelope, including documents for Michelle
 9        Fuentes, found at the scene of the 2009 incident.
10   Q    Now, we've seen photographs of those documents, have we not?
11   A    We have.
12   Q    And Michelle Fuentes identified the documents through
13        photographs, correct?
14   A    Correct.
15              MS. ANDERSON:  Government moves for admission of
16   Exhibit 393.
17              MR. BOCK:  No objection, your Honor.
18              THE COURT:  393 is admitted.
19   BY MS. ANDERSON:
20   Q    I'm going to ask you to -- if you would, there are some
21        scissors up there.  I'm going ask you to open up the
22        exhibit, the paper bag, and pull out the contents.
23              THE COURT:  Do you want gloves to wear, or --
24              MS. ANDERSON:  There are gloves up there, Judge.
25              THE WITNESS:  Thank you.
```

1         THE COURT:  Okay, great.

2    BY MS. ANDERSON:

3    Q    And you've got the documents there, do you not?

4    A    I do.

5    Q    And those were the identification documents pertaining to

6         her children and also herself, correct?

7    A    Correct.

8    Q    And she identified those documents and photographs?

9    A    She did.

10   Q    Okay.  Moving along, you and Agent Luna had occasion to

11        speak with Mr -- Mr. Fries -- I believe it was on

12        August 14th, is that correct?

13   A    Correct.

14   Q    And one of the things that you discussed with Mr. Fries is

15        his dealings with the Levines, correct?

16   A    Yes.

17   Q    Now, would it assist you if you had your report in front of

18        you?

19   A    It would.

20        MS. ANDERSON:  May I approach your Honor?

21        THE COURT:  Yes.

22   BY MS. ANDERSON:

23   Q    That's Government's Exhibit 392, correct?

24   A    Correct.

25   Q    And what is that?

1    A    It's a FD-302 form.  It's the F.B.I. form which we use to

2          document interviews.

3    Q    That's a report that was prepared to memorialize the

4          defendant's interview, correct?

5    A    Correct.

6    Q    Now, on August 14th you spoke with the defendant, and you

7          asked about -- you asked him about his dealing with the

8          Levines, correct?

9    A    Yes.

10   Q    And the defendant seemed initially to not know who the

11         Levines were, is that correct?

12   A    Correct.

13   Q    And what did he say?

14   A    Give me a second.  I have to rack my brain quite a bit.

15   Q    And then at some point later did the defendant refer to the

16         Levines by their first names?

17   A    He did.

18   Q    Now, also that same date you didn't tell the defendant that

19         the Levines had moved from Dove Mountain, correct?

20   A    Correct.

21   Q    And you didn't tell them what their new address was, is that

22         correct?

23   A    Correct.

24   Q    And did the defendant know where the Levines had moved to?

25   A    Yes, he did.

1   Q   What did he say?

2   A   He stated they live on that Magee/Shannon area, right?

3   Q   Which is where the Levines lived, correct?

4   A   In 2009, yes.

5   Q   Now, we've -- moving along, we've asked several witnesses in

6       this case whether or not the defendant's appearance has

7       changed over time.  Now, you've -- you are the case agent.

8       You've been -- since the -- since the event -- since the

9       2009 event.  In your opinion, since that time has the

10      defendant's appearance changed?

11  A   Yes, it has.

12  Q   How has it changed?

13  A   His hair is pretty short.  He doesn't have his mustache any

14      longer.  And he's probably dropped -- estimating, maybe

15      30 pounds.

16  Q   30 pounds?

17  A   30 or 40 pounds for weight.

18  Q   Lighter?

19  A   Lighter, yes.

20  Q   I'm going to show you Government's Exhibits 43 and 44.

21          MS. ANDERSON:  May I approach, your Honor?

22          THE COURT:  Yes.

23  BY MS. ANDERSON:

24  Q   Do you recognize those photographs?

25  A   I do.

1    Q    And those have been admitted.  Those are photographs of

2         whom?

3    A    Those are Arizona D L photos of Todd Russell Fries.

4    Q    Of Todd Fries, the defendant in this case, correct?

5    A    Yes.

6    Q    And those are the photographs that the folks from Avalon

7         identified?

8              MR. BOCK:  I'm going to object to that form of the

9    question, your Honor.

10             THE COURT:  Yes, sustained.

11             Go ahead.

12   BY MS. ANDERSON:

13   Q    Well, those -- those photographs were shown to the folks at

14        Avalon, correct?

15   A    They were.

16   Q    And it's the defendant, correct, Mr. Fries?

17   A    Yes, it is.

18   Q    I'm going to show you --

19             MS. ANDERSON:  May I approach, your Honor?

20             THE COURT:  Yes.

21   BY MS. ANDERSON:

22   Q    That's Government's Exhibit 390 and 391, which have already

23        been admitted, correct?

24   A    Yes.

25   Q    And those depict what?

```
 1   A      Those depict views of the -- from the roadway on Magee of

 2          the entrance into the -- by the wash area, the wash area

 3          that ran behind the 2009 residence of Myles and Karen

 4          Levine.

 5                 MS. ANDERSON:  May I approach, your Honor?

 6                 THE COURT:  Yes.

 7   BY MS. ANDERSON:

 8   Q      That's Government's Exhibit Number 292, which has already

 9          been admitted.

10                 Now, Special Agent Nowak, do you recognize that aerial

11          view?

12   A      I do.

13   Q      And what is that?  What area is that?

14   A      It's showing the location of the 2009 incident, 2870 West

15          Magee.

16   Q      Now, could you point to that aerial view and point to us

17          where that gate would be that -- that you've just previously

18          identified in the two photographs?

19   A      The wash area would be -- this would be the entrance into

20          the Levine's residence, and the wash area would be right

21          here, which would then kind of go behind.

22                 THE COURT:  We need the microphone.  The court reporter

23   can't get that down.

24                 So if you could repeat your answer, Agent, with the

25   microphone.  Thank you.
```

```
 1              THE WITNESS:  The --
 2   BY MS. ANDERSON:
 3   Q    Let's move down so --
 4   A    2870 West Magee would be right here, and there would be a
 5        wash area that would be running along, which would then come
 6        up behind the house.  The entrance to that -- or the gate
 7        was right about here.
 8   Q    Let me ask you a question.  Is that gate accessible from
 9        Magee Road?
10   A    Yes, it is.  There is some dirt path and stuff and
11        everything else, but you could access it from the road.
12   Q    Is that wash -- was that wash adjacent to the Levine
13        residence in 2009?
14   A    It runs right up behind -- by their driveway to where you'd
15        run up to the gate, and then gain access into the area where
16        the Levines lived.
17   Q    All right, thank you.  You can go ahead and take a seat.
18            So if I understand your -- your testimony, it's --
19        folks would be able to access the Levine's residence --
20            MR. BOCK:  Objection -- objection to the form of the
21   question, Judge.
22            THE COURT:  No, overruled.
23            Go ahead.
24   BY MS. ANDERSON:
25   Q    So folks would be able to access the Levine's residence from
```

1       Magee Road, is that correct?

2   A   Correct.

3   Q   By using that gate?

4   A   They would be able to access the gate, and then walk up the

5       wash.

6   Q   Now, did you have occasion to discover something unusual

7       regarding the lighting at the Levine residence at the

8       August 2nd, 2009 incident?

9   A   The date of the incident we found that the flood lights that

10      were illuminating the area in front of the Levine's

11      residence and also the two additional houses on either side

12      were not working, and they had been working, according to

13      the victims, the day before, but they were not on.  So when

14      we had checked the lights, we noticed that they were

15      slightly unscrewed.

16  Q   Did you check them for fingerprints?

17  A   Yes, we had Pima County Sheriff's Office evidence team come

18      out and retrieve the flood lights for dusting of

19      fingerprints, and then we had the F.B.I. evidence response

20      team come out and actually dust the junction boxes and some

21      of the lines along that to determine if anybody had tampered

22      with anything.

23  Q   Now, moving along to another area, Special Agent Nowak,

24      you've been involved in domestic terrorism.  You were on the

25      domestic terrorism squad, is that correct?

1  A    I was.

2  Q    And you've worked numerous cases involving explosives, and

3       so on and so-forth, correct?

4  A    Correct.

5  Q    In fact, you're the WMD Coordinator for the F.B.I. here in

6       Tucson, correct?

7  A    Correct.

8  Q    Now, have you had occasion to search the internet for

9       recipes, or any kind of instructional material on how to

10      make a chemical weapon, or a chemical device?

11  A    I have.

12  Q    And did you find any kind of instructional recipes

13      pertaining to chemical weapons, or chemical devices?

14  A    Yes.

15  Q    Were you able to find on the internet any kind of recipes or

16      instructional material on making devices -- chemical weapon

17      or devices involving chlorine?

18  A    Yes.

19         MR. BOCK:  Objection to all of this, your Honor.

20         THE COURT:  Well, let me see counsel at sidebar.

21                BENCH CONFERENCE

22         THE COURT:  So were you going to go any further with

23  this?

24         MS. ANDERSON:  No.

25         MR. BOCK:  That's it?

1          MS. ANDERSON:  That's it.

2          MR. BOCK:  All right.

3          THE COURT:  All right, forge ahead.

4          (The bench conference was concluded.)

5          THE COURT:  You may proceed.

6    BY MS. ANDERSON:

7    Q    Special Agent Nowak, moving along, you -- again, you were at

8         the scene of the '09 incident, correct?

9    A    I was.

10   Q    And we've seen numerous photographs regarding the bucket

11        that was in the back yard, correct?

12   A    Yes.

13   Q    And was that a Pool Time bucket?

14   A    The writing on the bucket showed that it was Pool Time

15        three-inch chlorinating tablets, and in the five-gallon

16        bucket there were 37.5 pounds worth of these three-inch

17        chlorinating tablets.

18   Q    Now you have looked here in Tucson to see if that product is

19        sold?

20   A    I did.

21   Q    And where is it sold?

22   A    It's sold pretty much exclusively at Home Depot.

23   Q    I want to talk to you about the phone call that the F.B.I.

24        received after the August 2nd, 2009 incident.  You're

25        familiar with that?

1  A    I am.

2  Q    And again, this was a phone call from an individual who

3       claimed to be Michelle Fuentes, is that correct?

4  A    Yes.

5  Q    Now, after that phone call was received, I know that you and

6       Special Agent Luna went out to Avalon, correct?

7  A    We did.

8  Q    At some point later in time did you request all F.B.I. call

9       information pertaining to incoming calls that -- that could

10      possibly be retrieved?

11  A   Yes.

12  Q   And you narrowed that down to a certain timeframe, correct?

13  A   Correct.

14  Q   What timeframe did you narrow that down to?

15  A   Well, as part of the initial investigation we had them pull

16      all of the phone call records from 5:45 a.m. to 10:45 a.m.

17      for that date that were incoming into the main line of the

18      F.B.I. office, which was the same number that the individual

19      claimed to be Michelle Fuentes called in on.

20  Q   Now, did you do that -- did you have any particular reason

21      why you chose that timeframe?

22  A   Because the call was received at the F.B.I. office during

23      that timeframe.

24  Q   Speaking of -- of the phone call, this is Government's

25      Exhibit Number 199.

| | |
|---|---|
| 1 | MS. ANDERSON:  May I approach? |
| 2 | THE COURT:  Yes. |
| 3 | BY MS. ANDERSON: |
| 4 | Q    I believe that's already been admitted into evidence. |
| 5 | Special Agent Nowak, do you recognize the number that |
| 6 | popped up on the caller ID there? |
| 7 | A    I do. |
| 8 | Q    And what -- could you read to us what the number is? |
| 9 | A    It's 623-4306. |
| 10 | Q    And are you familiar with that number? |
| 11 | A    That's the main number for the F.B.I. office in Tucson. |
| 12 | Q    That's where you work, correct? |
| 13 | A    (No verbal response.) |
| 14 | Q    Now, did you -- are you the one that actually pressed the |
| 15 | buttons that brought up that information at the Avalon? |
| 16 | A    Yes.  I had put some gloves on.  I had then pressed the |
| 17 | redial button on the phone, showing up on the digital screen |
| 18 | the number that had come up. |
| 19 | MS. ANDERSON:  May we -- may I approach the witness |
| 20 | again? |
| 21 | THE COURT:  Yes. |
| 22 | MS. ANDERSON:  Your Honor, may I publish this exhibit? |
| 23 | THE COURT:  Yes.  It's already been admitted? |
| 24 | MS. ANDERSON:  Yes. |
| 25 | THE COURT:  You've got it upside down. |

1              MS. ANDERSON:  Oops.

2    BY MR. PIMSNER:

3    Q    And again, that's the number for the F.B.I., correct?

4    A    Yes.

5    Q    Now, I want to talk to you about the search warrant that was

6         executed on the defendant's home, and this was on May 13th

7         of 2011, correct?

8    A    Correct.

9    Q    Now, let's go back just a little bit and bring up a map of

10        the defendant's house.  This has already been admitted.

11             Now, are you familiar with the various rooms in -- in

12        the defendant's house here?

13   A    I am familiar with them, yes.

14   Q    Okay.  Could you talk us through the various rooms?

15   A    Well, if you're approaching the house, you notice Room --

16        the area labeled Room A would be the workshop, or the work

17        trucks and where his work area was.

18             Then you have the carport that was in between that.

19             And then you have the house to the right of that.

20             B was a garage where he had some vehicles in.

21             And then as you walk into the house, you'll walk into

22        C, which is the kitchen.

23             Then D and E would be the living room area.

24             F would be an external type porch.

25             And then as you walk down to the hallway, to your right

1          you would come into Room H, which was a -- a room with a

2          large safe in it.

3                 You would go to Room K, which is an office.

4                 And then Room I, which is the master bedroom.

5    Q    All right.  I'm going to show you some additional

6          photographs.

7                 MS. ANDERSON:  May I approach, your Honor?

8                 THE COURT:  Yes.

9    BY MS. ANDERSON:

10   Q    Those are Government's Exhibits 394 to 400, correct?

11   A    Correct.

12   Q    Okay.  And take a look at those photographs, and I'm going

13         to ask you if you recognize what's shown in those photos?

14   A    Okay.

15   Q    And do those photographs show the defendant's home at 5560

16         West El Camino Del Cerro?

17   A    Yes, it does.

18   Q    And those photographs show the contents of the defendant's

19         home on May 13th, 2011, is that correct?

20   A    Yes.

21                MS. ANDERSON:  Government moves for admission of

22   Exhibits 394 to 400.

23                MR. BOCK:  No objection, your Honor.

24                THE COURT:  All right, 394 to 400 are admitted.

25                MS. ANDERSON:  May I approach and --

```
 1              THE COURT:  Yes.
 2    BY MS. ANDERSON:
 3    Q    Let's take a look at these.  First of all, this is 394.  Do
 4         you recognize that?
 5    A    Yes.  That's the outside of the approach as you're coming up
 6         to the house.
 7    Q    And does that -- what direction does that face?
 8    A    I wouldn't know off the top of my head.
 9    Q    And that -- well, all right.  But that's the outside of the
10         defendant's home?
11    A    That's the front of the home, yes.
12    Q    This is 395.
13    A    That shows the front of the house, and part of the garage
14         attached to the house.
15    Q    And does that face El Camino Del Cerro?
16    A    Yes, it does.  It has a circular driveway that comes in and
17         comes back out onto El Camino Del Cerro.
18    Q    This is 396.
19    A    That's the rear of the home.
20    Q    This is 397?
21    A    That shows the garage attached to the house, and then part
22         of the carport which goes between the main residence and the
23         work area.
24    Q    And the defendant used his home as -- as his business, is
25         that correct?
```

1   A     Correct.

2   Q     This is 398.

3   A     That's the kitchen of the residence.

4   Q     Now, in -- in one of the drawers, I think we found Linda

5         Motta's ID, is that correct?

6   A     Yes, it is.

7   Q     This is 399.

8   A     That's one of the -- the master closet.

9   Q     Is that off of the defendant's bedroom?

10  A     Yes, it is.

11  Q     And this is 400?

12  A     That's one of the other bedrooms.

13  Q     One of the bedrooms?

14  A     Yes.

15            MS. ANDERSON:  May I approach, your Honor?

16            THE COURT:  Yes.

17  BY MS. ANDERSON:

18  Q     That's Government's Exhibit 604.  Do you recognize those?

19  A     I do.

20  Q     What are those?

21  A     These are referred to as spoof cards.

22  Q     Could you explain to us was a spoof card is?

23  A     A spoof card is basically almost like a prepaid long

24        distance card which you would purchase the card in a certain

25        amount of money for each card.  Then what it would allow you

1    to do would be for basically to spoof your number.  And you

2    can either do this via the internet, or have what they call

3    individual cards to use at your leisure.  By spoofing your

4    number, you're able to basically disguise your outgoing

5    number to a caller ID.  So if, for instance, an example, I

6    wanted to call my friend John, and I would call on the -- I

7    would dial the 1-800 number on the spoof card.  I would

8    then -- the spoof card would prompt me to go ahead and enter

9    the pin number on the card to be able to use the credits on

10   the amount.  I would enter the pin number, and then it would

11   then prompt me, do I want to -- what is the outgoing number

12   that you want to appear?  I could put in 555-1212.  So when

13   I place the call, that's the number that's going to show up

14   on John's phone when he answers it.  After you punch in the

15   number, it would then ask you do you want to disguise your

16   voice as a male voice, a female voice, or your own voice?

17   You would choose 1, 2 or 3.  After that you can choose

18   whether to record the call or not record the call.  And then

19   it says if you're completed, you press the number and it

20   initiates the call through.  And then it would either

21   sound -- if you just chose to use as woman, or a man, or

22   yourself, and display the number that you put in.  So if you

23   wanted to put in 800-555-2122, you could do that, and that's

24   what's going to come up on the caller ID of the person

25   receiving the call.

1   Q    So you're able to disguise your voice by using --

2   A    You can disguise your number, and disguise your voice.

3   Q    Did you actually try a spoof card?

4   A    Actually, I did.

5   Q    Was it the same kind of card that was found at the

6        defendant's house?

7   A    It was.  And it did sound -- the person that I had called

8        said that it did sound --

9            MR. BOCK:  Objection to the person -- that's hearsay.

10           THE COURT:  Yes, I'll sustain the objection to that

11   part of the answer.

12   BY MS. ANDERSON:

13   Q    The spoof cards were found in several locations throughout

14        the house, correct?

15   A    Yes, they were.

16   Q    Do you remember what rooms they were found in?

17   A    I believe one was -- numerous ones were found in what's

18        referred to as the room with the big safe in it, which was

19        one of the additional bedrooms.  There were also cards found

20        in the office of Mr. Fries' residence, and there was one

21        found in the driveway of Mr. Fries' residence.

22   Q    There was a spoof card found directly by the phone, correct?

23   A    Yes.

24           MS. ANDERSON:  May I approach, your Honor?

25           THE COURT:  Yes.

```
 1   BY MS. ANDERSON:
 2   Q    That's Government's 602, which is the voice changing device
 3        that was seized from the defendant's home, correct?
 4   A    Correct.
 5   Q    Did you have occasion to try that device to see if it
 6        worked?
 7   A    Yes, we had plugged it in to make sure that the device was
 8        actually being able to function.
 9   Q    And was it?
10   A    And it did, yes.
11   Q    Were you able to disguise your voice?
12   A    Yes, we were able to plug it into the phone, and you can
13        change the tone or frequency of your voice, and I believe
14        there's 15 or 16 different settings that you can choose to
15        either raise your voice, lower your voice, extend your --
16        your kind of vocal range a little bit.  And you'd basically
17        just kind of plug that into the phone.  You would manipulate
18        these buttons to be able to change the different tones and
19        frequencies, and you'd be using this handset with a
20        microphone attached to it which you would plug into the
21        phone which you were using to be able to then alter your
22        voice.
23   Q    I'm going to show you Government's Exhibits 365 through 368.
24             MS. ANDERSON:  May I approach, your Honor?
25             THE COURT:  Yes.
```

1  BY MS. ANDERSON:

2  Q    I'd have you take a look at those.

3            Do you recognize those?

4  A    I do.

5  Q    These are various -- what we could call revenge books that

6       were found at the defendant's house.

7            MR. BOCK:  Well, I'm going to object to what the U.S.

8  Attorney thinks they are, Judge.

9            THE COURT:  All right, yes, I'll -- well, questions

10  aren't evidence, but I'll sustain the objection.

11            Go ahead.  They're books found at the residence.  Go

12  ahead, Ms. Anderson.

13  BY MS. ANDERSON:

14  Q    They're books found at the defendant's residence during the

15       search warrant execution, correct?

16  A    Yes, they were.

17  Q    Let's first talk about Government's Exhibit Number 365.

18  A    Okay.

19  Q    Now, where was that book found?

20  A    That was found on the book shelf in what was identified as

21       Room K on the search warrant.

22  Q    And what is Room K?

23  A    I believe Room K is the office.

24  Q    Okay.  Are we looking at it here in Government's Exhibit

25       400?

```
 1   A     I believe so.
 2   Q     Now, let's look at the title.  What is the title of the
 3         book?
 4   A     Revenge Tactics From the Master.
 5   Q     And all of these exhibits were found at the defendant's
 6         home, correct?
 7   A     Correct.
 8             MS. ANDERSON:  Government moves for admission of
 9   Exhibits 365 through 638.
10             MR. BOCK:  This would be subject to my previous record,
11   your Honor.
12             THE COURT:  Yes, subject to that 365 through 368 are
13   admitted.
14   BY MS. ANDERSON:
15   Q     Let's talk about the first one.  This is Government's
16         Exhibit Number 365.  What's the title?
17   A     Revenge Tactics From the Master.
18   Q     And flip the page, and it contains a -- a -- a snippet from
19         the book correct?
20   A     Correct.
21   Q     Okay, and that's on page 143, and that's included, is that
22         right?
23   A     Yes.
24   Q     And could you read that to us?
25   A     The title on the page is called Paint.  And the paragraph on
```

1    it states:  Here today, die tomorrow could be Saint Dan's

2    battle cry as he used paint paranoia to have fun with a

3    mark.  Saint Dan suggests finding a wall, car window, or

4    whatever you -- whatever that you marked, considers to be

5    sacred.  Spray paint, master graffiti on it, meaning satanic

6    or Nazi art, obscenities, et cetera.

7  Q  Okay.  Let's look at the next one.  This is Government's

8    Exhibit Number 366.  And what's the title?

9  A  Encyclopedia of Revenge.

10 Q  Okay.  And I'm going ask you to flip the page, and there's

11   various portions included, correct?

12 A  Correct.

13 Q  And could you read those to us?

14 A  On page 19, number 7, it states:  When using any phone, keep

15   in mind that many places routinely record their phone calls

16   so disguising your voice may be in order.  Also remember

17   that no matter how much money you spend on debugging

18   equipment, there is no 100 percent reliable method to be

19   sure your phone is not tapped somewhere along the line.

20 Q  Let's turn the page.  There's another one.  Could you read

21   that to us?

22 A  Page 19, number 13 says:  Let time pass.  There is no better

23   insulation than time.  The longer amount of time you let

24   pass before you take your revenge, the more bewildered the

25   target will be.  The chances are he will be screwed over by

1    many more people, and won't have a clue as to who's getting

2    back at him.

3  Q   And the next page?

4  A   Page 26, item number 53:  Pour old motor oil on driveway, or

5    anywhere it will do damage.

6  Q   The next page?

7  A   Item 45 will be:  Scare target by leaving dead animals

8    around his home, office, or car along with pictures of his

9    family.  You can also nail the animals to a cross with weird

10    symbols on it, and leave it where the target will be sure to

11    find it.

12  Q   Next page.

13  A   Page 40, item 257:  Put super foam anywhere you can.  It

14    comes in spray cans and expands to many times its original

15    size.

16  Q   And the last page?

17  A   Page 57, item 498:  Spray paint outside of target's house.

18  Q   Let's look at the next exhibit, which is 367.  And could you

19    read us the title?

20  A   It says Take No Prisoners, Destroying Enemies with Dirty and

21    Malicious tricks?

22  Q   Okay.  And if you could, turn the page and read us the

23    passage.

24  A   Page 16 has a heading of Alibi:  If possible, have an alibi

25    for the approximate time that the damage occurs.  This may

1       not always be possible, and in many case it won't protect

2       from you investigation.  For example, if any delayed action

3       occurs, it doesn't matter exactly where you are when it

4       happens.

5   Q   Let's look at the next one -- let me back up a bit.  Where

6       was Government's 366 found, the Encyclopedia of Revenge?  Do

7       you recall?

8   A   Encyclopedia of Revenge was found on the night stand in the

9       master bedroom.

10  Q   Next to the bed?

11  A   Yes.

12  Q   How about Government's Exhibit Number 367?

13  A   Was in Room K, the office, on the book shelf.

14  Q   And then let's look at Government's Exhibit Number 368.

15      What's the title of this one?

16  A   21st Century Revenge.

17  Q   And turn the page, and if you could read us the passage.

18  A   It's under Chapter 5, Modern Telephone Techniques, page 37,

19      subtitled Voice Changers, stating:  Certain electronic

20      devices change the frequencies in your voice, and make it

21      less recognizable.  The more sophisticated models include a

22      built-in telephone and controls to change your voice

23      digitally, offering 16 different masking levels.  You can

24      set the pitch of your reprocessed voice high or low

25      depending on the effect you desire.

1    Q    And where was Government's Exhibit Number 368 found?

2    A    It was found on the bookshelf of Room K, which was the

3         office.

4              MS. ANDERSON:  Your Honor, may I have just a moment?

5              THE COURT:  Yes.

6    BY MS. ANDERSON:

7    Q    This is Government's Exhibit -- wait, I'm getting dizzy

8         here.

9              This is Government's Exhibit Number -- I'm not sure

10        which one this is.  I believe this has been admitted,

11        correct?

12             MR. PIMSNER:  (Nods head.)

13             MS. ANDERSON:  This has been admitted.

14   BY MS. ANDERSON:

15   Q    This shows the gate, correct?

16   A    It shows a gate, an access gate which can lead to the wash

17        of the Levine's residence.

18   Q    And was it the wash area where Michelle Fuentes' day planner

19        and documents were found?

20   A    At the end of the wash near the residence of the Levines it

21        was, yes.

22   Q    And the photographs --

23             MS. ANDERSON:  May I approach, your Honor?

24             THE COURT:  Yes.

25   BY MS. ANDERSON:

```
 1   Q    Government's Exhibits 343 and 344, those are drivers license
 2        photographs of the defendant, correct?
 3   A    Correct.
 4   Q    Now, do those photographs resemble what the defendant looked
 5        like closer in time to August 2nd, 2009?
 6   A    Yes.
 7             MS. ANDERSON:  Judge, that's all we have.
 8             THE COURT:  All right.
 9             Cross-examination?
10                         CROSS-EXAMINATION
11   BY MR. BOCK:
12   Q    Now, Agent Nowak, you are the case agent in this case, is
13        that correct?
14   A    I am.
15   Q    You sat through the whole full case, is that correct?
16   A    Yes.
17   Q    The -- you had nothing to do in terms of an investigation of
18        the October 31st, 2008 incident, did you?
19             You were not physically there?
20   A    I was not.
21   Q    You did not -- may have had some dealings after the fact, is
22        that correct?
23   A    Yes.
24   Q    But processing the scene, talking to people, nothing that
25        you were involved in?
```

1   A   Correct.

2   Q   Now, the -- let me just jump to the identification that was

3       found in the -- on the August 2nd, 2009 situation, okay?

4   A   Okay.

5   Q   And you're obviously very familiar with -- with that

6       evidence, is that correct?

7   A   Yes, I am.

8   Q   And that evidence involved documents from a Michelle

9       Fuentes?

10  A   Yes.

11  Q   And it also involved a document from Mr. Joaquin Navarrete,

12      is that correct?

13  A   Correct.

14  Q   So you would agree with me, sir, because there was a phone

15      call that was made to Avalon on August the 4th -- is that

16      correct?

17  A   Yes.

18  Q   You would agree with me that irrespective of that phone

19      call, you would have done an investigation involving

20      Michelle Fuentes, right?

21  A   We would have done an investigation pertaining to all the

22      suspects that we had at the time.

23  Q   Well, you would have done an investigation as to Michelle

24      Fuentes because of her identification being found at the

25      scene of the August 2nd, 2009 situation, correct?

1   A    Correct.

2   Q    Whether or not there was a phone call, 50 phone calls, or no

3        phone calls?

4   A    Correct.

5   Q    Okay.  And you would have done the same thing with Joaquin

6        Navarrete, is that correct?

7   A    Yes.

8   Q    Whether or not there was one phone call 20 days later, or 50

9        phone calls claiming Mr. Navarrete may have done terrible

10       things, he still would have been looked at because of his

11       identification at the scene, is that correct?

12  A    Correct.

13  Q    And so -- and in fact, Michelle Fuentes was talked -- or

14       sorry about that use of that word.  She was interviewed by

15       you on August the 4th in Nogales?

16  A    I believe it was August the 3rd.

17  Q    August the 3rd.  Excuse me.

18  A    Yes.

19  Q    In Nogales.  And that was -- Agent Luna was also with you?

20  A    He was.

21  Q    And Mr. Navarrete -- you were here for his testimony,

22       correct?

23  A    Yes.

24  Q    And you were the one that spoke to him at the -- his place

25       of work, is that correct?

1   A    I did.

2   Q    And I don't have that report in front of me, a lot of

3        reports in this case, but was that on August 20th of 2009?

4        Does that sound about right?

5   A    Sounds right.  I can't be sure.

6   Q    Give or take?

7   A    Yes.

8   Q    And it was at the restaurant at the -- we'll plug the

9        restaurant.  Again, what was the name of the restaurant?

10  A    Olive Garden.

11  Q    Olive Garden at Tucson Mall, right?

12  A    Actually, it was the Olive Garden on Broadway.

13  Q    Oh, on Broadway.  All right.  Also as part of your

14       investigation you had an opportunity to speak with Jeffrey

15       Clark, is that correct?

16  A    I did.

17  Q    And you remember his testimony?

18  A    I do.

19  Q    And you spoke with him on August the 14th of 2009, is that

20       correct?

21  A    I don't have my report in front of me, but that sounds about

22       right.

23           MR. BOCK:  Can I just show him these reports?

24           THE COURT:  Sure.

25  BY MR. BOCK:

1    Q    Do those look familiar to you?

2    A    Yes, it does.

3    Q    Okay.  So the August 14th report, is that the first time you

4         talked to him?

5    A    Yes, it was.

6    Q    And that was on that date -- is that the date -- I'm giving

7         you the right date?

8    A    Yes.

9    Q    And was this a telephonic -- do you remember he testified --

10   A    The first interview was telephonic, yes.

11   Q    Okay.  And again, it's not the protocol of the F.B.I. to

12        tape record interviews, is it?

13   A    It is not.

14   Q    Okay.  And so there's nothing wrong with -- I'm not saying

15        there's anything wrong.  That's just the way you do things,

16        right?

17   A    That's the Department of Justice policy.

18   Q    Okay.  Now, did he tell you -- did he give you a time that

19        he remembered on that date that you interviewed him when

20        he -- Todd Fries came to his home on August the 2nd of 2009?

21             MS. ANDERSON:  Judge, I'm going to object.  This is

22   improper impeachment.  The witness has already testified, and

23   he's already answered the questions.  This is improper

24   impeachment.

25             THE COURT:  No, overruled.

1              Go ahead, Mr. Bock.

2     BY MR. BOCK:

3     Q    So did Mr. Clark tell you on August the 4th -- what's the

4          date of that 2000 -- what was the date of your phone call

5          with him?

6     A    8/14 of 2009.

7     Q    Okay.  And so did he tell you a time when he and

8          Mr. Fries -- when Mr. Fries came to his home on August the

9          2nd, two days earlier, in 2009?

10    A    On 8/14 he had told me that Fries came to his house at 5:30

11         a.m. on August 2nd, 2009.

12    Q    You had an opportunity to speak to him another time, is that

13         correct?

14    A    I did.

15    Q    You've got a second report there?

16    A    I do.

17    Q    And what was the date of -- what's the date you spoke to him

18         the second time?

19    A    2/16 of 2011.

20    Q    And where did you speak to him on 2/16 of 2011?

21    A    At his place of employment.

22    Q    Now, that was, what, Holmes Tuttle, or --

23    A    It was Jim Click Nissan at the --

24    Q    I'm sorry, go ahead.

25    A    At the Auto Mall in Tucson.

```
 1   Q    And how long was that conversation for?
 2   A    I don't recall the length.  It probably was in the
 3        neighborhood of 20 to 30 minutes.
 4   Q    Did he also give you a time --
 5             THE COURT:  Well, Mr. Bock, can I see you at sidebar,
 6   please?
 7                        BENCH CONFERENCE
 8             THE COURT:  So are you going to delve into the content
 9   of this conversation?
10             MR. BOCK:  I think that is proper impeachment.
11             THE COURT:  Why isn't it hearsay?
12             MR. BOCK:  It's impeachment.
13             THE COURT:  Of who?
14             MR. BOCK:  Of Mr. Clark.  He got up there and said my
15   memory of the time is different now, in so many words.
16             MR. PIMSNER:  He didn't deny making that statement.  He
17   told the agent 5:30.  So this is improper impeachment, because he
18   never denied saying 5:30.  What he said was upon further
19   reflection it was closer to 6:00 o'clock, because he woke me up.
20   So this is hearsay.
21             MS. ANDERSON:  He never denied it when he testified.
22             MR. BOCK:  Well, two people, again, are --
23             MR. PIMSNER:  Oh, I'm sorry.  I apologize.
24             THE COURT:  I know Mr. Pimsner can't help himself.
25             MR. BOCK:  You know --
```

1          THE COURT:  So -- yes, just make sure it's proper

2    impeachment.

3          MR. BOCK:  You don't think this is proper impeachment?

4          THE COURT:  Well, I think it's been covered.  I think

5    the witness said he did --

6          MR. BOCK:  But can I cover with this witness that he

7    didn't say anything about the black trailer?

8          THE COURT:  So you're saying that he -- was he ever

9    asked by -- well, he never told the F.B.I. agent anything about a

10   black trailer?

11         MR. BOCK:  Is that okay, then?

12         THE COURT:  Yes.

13         MR. BOCK:  Okay.

14         THE COURT:  Now, you have -- it's 12:00.  I don't want

15   you to rush.  Do you want to break now?

16         MR. BOCK:  We can break, because then I have -- we

17   don't have very long for this gentleman.  Then we'll do the Rule

18   --

19         THE COURT:  The Rule 29.

20         MR. BOCK:  And we'll have Dr. Fox, and I'll get

21   everybody going.

22         THE COURT:  All right, so let's take a lunch break.

23         (The bench conference was concluded.)

24              --------------------------

25   BY MR. BOCK:

1    Q    Just a very limited area, again with respect to Mr. Clark.

2         Do you still have those two reports with you?

3    A    I do.

4    Q    Now, Agent, Mr. Clark -- well, let me just -- the second

5         interview you had with Mr. Clark, are you asking him

6         questions or is he speaking to you in a narrative, if you

7         remember?

8    A    It was both.

9    Q    And he never shared with you anything about a black trailer,

10        and seeing a black trailer when Mr. Fries and he met up to

11        go motorcycling on that day, did he?

12   A    At the time of the interview, no.

13   Q    Now, did these trailers have -- any trailer that carries a

14        motorcycle or carries anything, is it -- are they to be --

15        have license plates on them?

16   A    Trailers should be plated, yes.

17   Q    You have no evidence whatsoever that Mr. Fries owned a black

18        enclosed trailer, do you?

19   A    No, I do not.

20   Q    Now, I want to call your attention to your interview with

21        Mr. Trujillo?

22             MR. BOCK:  And if I may approach to show him that page,

23   your Honor?

24             THE COURT:  Yes.

25             MR. BOCK:  Page 656, Bates.

```
 1   BY MR. BOCK:
 2   Q    Do you see that area that I have lined -- put a line around?
 3   A    I do.
 4   Q    Okay, could you just read that to yourself?
 5   A    Okay.
 6   Q    Okay.  Are you comfortable answering a question if I
 7        retrieve the report from you?
 8   A    I -- sure.
 9   Q    Okay, because if you need the report, I'll bring it back to
10        you.
11   A    Okay.
12   Q    Okay.  When do you -- when do you remember interviewing
13        Edward David Trujillo?
14   A    The date I would have to see on the report again.
15   Q    Okay.  August 3rd, 2010.  Top right corner?
16   A    Okay.
17   Q    And again, protocol, you do not -- not recorded.  We've
18        established that, correct?
19   A    Correct.
20   Q    You do have notes, is that correct?
21   A    Correct.
22   Q    Your notes would be incorporated into your report?
23   A    Correct.
24   Q    And you would be writing the report sequentially from what
25        the person is telling you, the topics and things like that?
```

1    A    Correct.

2    Q    Now -- and you heard me question Mr. Trujillo, did you not?

3    A    I did.

4    Q    And one of the things he said was a couple weeks went by

5         when Fries called Trujillo on his work cell, and stated that

6         so and so canceled the checks.  Do you remember him saying

7         to you and in his testimony what he purported Mr. Fries said

8         about the canceled checks?

9    A    I recall something about it.  I don't know precisely what he

10        had said.

11            MS. ANDERSON:  Judge, I'm going to object.  This is

12   improper impeachment.

13            THE COURT:  Yes, Mr. Bock.  We just spoke -- well,

14   could I see counsel at sidebar?

15                        BENCH CONFERENCE

16            MR. BOCK:  Judge, it's really not improper impeachment.

17   I'm just trying to set up the context, because the next question

18   is Trujillo overheard a conversation between Fries and Karen

19   Levine on the phone that took place a short time thereafter.  So

20   I want to establish with this witness that that's what Trujillo

21   said to him on the phone, because Trujillo denied that.

22            THE COURT:  That was telephonic as opposed to in

23   person?

24            MR. BOCK:  Right.

25            MS. ANDERSON:  But the business -- the way to set it up

1    is to say you heard the testimony of Mr. Trujillo.  He testified

2    to X, and then launch into the question.  This is completely

3    improper, the way --

4            MR. PIMSNER:  If he tells you something different --

5            MR. BOCK:  Again, we have two people on my -- you know,

6    I appreciate it, but --

7            THE COURT:  All right, so -- I mean, the impeachment

8    would be he's denied what happened on the telephone?

9            MR. BOCK:  Okay, I'll go --

10           THE COURT:  Did you even ask him -- did you tell the

11   agent that it was on the telephone?  Did you ask the witness

12   that?

13           MR. BOCK:  Well, that was the next thing I was going to

14   ask him.

15           THE COURT:  But did you ask the witness that?

16           MR. BOCK:  The witness Trujillo?

17           THE COURT:  Yes.

18           MR. BOCK:  Yeah.

19           MS. ANDERSON:  And he addressed it.

20           MR. BOCK:  Right.  I asked him.

21           MS. ANDERSON:  He asked it and he said no, it wasn't on

22   the telephone, I believe, is that correct?  He -- the witness --

23           MR. PIMSNER:  He -- if I may?

24           THE COURT:  Sure.

25           MR. BOCK:  No problem.

1          MR. PIMSNER:  He said that he didn't -- that he

2     didn't -- I don't think he said he heard the conversation with

3     Mrs. Levine, is my recollection; that the conversation -- the

4     next line was with the defendant, not with overhearing the

5     defendant on the phone with Mrs. Levine.

6          THE COURT:  All right, well --

7          MR. PIMSNER:  That's my recollection.

8          THE COURT:  Who's the little boy in the front row?

9          MR. BOCK:  Sorry?

10         THE COURT:  The little boy in the front row?

11         MR. BOCK:  That's the -- he's the grandchild of a

12    witness that we have.

13         THE COURT:  Okay.

14         MR. BOCK:  Do you want him to --

15         THE COURT:  No.  It just -- he appears to be

16    unaccompanied.

17         MR. BOCK:  His mother's in the room.  I could send

18    him --

19         THE COURT:  Whatever you want to do.

20         All right, so --

21         MR. BOCK:  I'll clear it up.

22         THE COURT:  But just try to -- yes, focus a little more

23    on the actual impeachment.

24         MR. BOCK:  Okay.

25         THE COURT:  All right, thank you.

1          (The bench conference was concluded.)

2          THE COURT:  All right, Mr. Bock, you may proceed.

3     BY MR. BOCK:

4     Q    Now, there was a line of questioning that I had with

5          Mr. Trujillo regarding whether or not he overheard a

6          conversation between Todd Fries and Karen Levine on the

7          phone that took a short bit -- took place a short time

8          later.  Do you remember me asking him about that?

9     A    I remember the question, yes.

10    Q    And do you remember me trying to search with his memory that

11         his -- whether or not he stated to you that Fries said this

12         is F'ing ridiculous.  You need to pay me for the work.  Do

13         you remember that?  Do you remember me asking him that?

14    A    I do.

15    Q    Do you remember him saying that he didn't make that -- he

16         didn't hear anything on the phone, or he didn't make that

17         statement?  Do you remember that.

18         MS. ANDERSON:  Judge, I'm going to object.  This is

19    impeaching another witness through the testimony of -- a witness

20    that testified previously through a case agent who's now on the

21    stand.

22         MR. BOCK:  I'll -- let me --

23         THE COURT:  Go ahead, Mr. Bock.  Rephrase that.

24         MR. BOCK:  Okay.

25    BY MR. BOCK:

1  Q   Let me ask you, did Mr. Trujillo say to you the following:

2      Fries said this is F'ing ridiculous.  You need to pay me for

3      the work?

4  A   If that's what's contained in my report, then that's what he

5      said to me.

6  Q   Is that what's contained in your report?

7  A   Yes.  Trujillo overheard the conversation on the phone that

8      took place a short time later.  Fries said this is fucking

9      ridiculous.  You need to pay me for the work.

10 Q   All right.  So the question -- the witness is telling you

11     about what he heard over the phone, is that correct?

12 A   It appears to be so, yes.

13 Q   Okay.  Thank you.

14         Now, did you ever check to see if Mr. Fries has

15     purchased chlorine or trichlor from Pool Time?

16 A   We checked at Home Depot, and we did not find any receipts

17     for that, but that -- we were only able to check one store.

18 Q   Are these books that were -- the government read that were

19     seized pursuant to the search warrant, the search warrant

20     would have been served on May the 13th of 2009, is that

21     correct, sir?

22 A   The initial search warrant?

23 Q   That got the books.

24 A   I would have to refer back to my notes.

25 Q   Okay.  You don't know how long Mr. Fries had those books,

1           when he purchased those books, whatever?

2    A     I do not.

3    Q     Was there some publicity -- news publicity generated by the

4           situation that occurred with the Levines on August 2nd of

5           2009?

6    A     There was some.  It was in the news.

7    Q     Was it in the newspaper also?

8    A     I believe so.

9    Q     Did it talk about a location?

10   A     I don't recall the specific facts of what was in the news.

11   Q     Let me show you what's been marked as Exhibit 169.

12               Do you see that?

13   A     I do.

14   Q     And are you familiar with that?

15   A     Yes, I am.

16   Q     And that was taken on August the 2nd of 2009, is that

17          correct, sir?

18   A     Yes, I believe so.

19   Q     And that was a photo of the interior of the Levine's garage

20          on August the 2nd of 2009, is that correct?

21   A     Yes.

22   Q     Now, did you -- you -- how many vehicles were in the garage?

23   A     Two.

24   Q     What were the makes and types of vehicles?

25   A     One was a BMW SUV, which you see closest to me, and towards

1          the far end of the picture is a Chevrolet Corvette.

2    Q    Okay.

3              MR. BOCK:  Judge, I would move to admit Exhibit 169,

4    and ask that it be published to the jury.

5              MS. ANDERSON:  Judge, I -- I -- I'm not sure what the

6    relevance is.

7              THE COURT:  Well, overruled.  I'll admit -- 169?

8              MS. ANDERSON:  169.

9              THE COURT:  169 is admitted, may be published.

10   BY MR. BOCK:

11   Q    As the case agent, did you direct the photos?  Were you

12        directing some of the photos?

13   A    No.  Most of the photos were taken -- standard evidence.

14   Q    And as the case agent, what time did you arrive at the

15        scene -- the Tucson Omni scene on August the 2nd of 2009?

16   A    At the scene?  I probably arrived right around 10:00 a.m.

17   Q    10:00 a.m.

18            You went into the -- to the area that I imagine you --

19        you would have labeled the work area where the work trucks

20        were and things like that on the -- when you visited the

21        property?

22   A    Are you talking about the Fries residence?

23   Q    Fries residence, yes.

24   A    Yes.

25   Q    And did you spend some time in the area where the -- where

```
 1          the trucks were and the supplies were for his business?

 2   A    A short period of time.

 3   Q    Did you see any spillage or anything that -- on the concrete

 4        in -- in that area?

 5   A    I don't recall.

 6             MR. BOCK:  Judge, if you'd just allow me a minute or

 7   so, then I'll --

 8             THE COURT:  Yes.

 9             MR. BOCK:  Okay.

10             No further questions of this witness, your Honor.

11             THE COURT:  All right.

12             Redirect?

13             MS. ANDERSON:  The government has no questions, your

14   Honor.

15             THE COURT:  All right.

16             Any questions from the jury for this witness?

17             If you could write it out, sir.

18                        BENCH CONFERENCE

19             MS. ANDERSON:  No objection.

20             MR. BOCK:  Objection.

21             MR. PIMSNER:  No objection.

22             THE COURT:  This is about the newspaper article, what

23   was in it.  I think he said he could recall at least part of the

24   article.

25             MR. PIMSNER:  This is about the call.
```

1          THE COURT:  I'm sorry.  Okay.  Let's see -- well, I
2   guess you object on what grounds?  This agent may not know.  He
3   may know.
4          MR. BOCK:  He may not know, and it calls for a hearsay
5   response whether or not the public was made known.  Goes to the
6   trust of whether or not the public was made known, so --
7          THE COURT:  It's a fact, not a statement.  Okay, is
8   that your only objection?
9          MR. BOCK:  That wasn't a very good one, was it?
10          THE COURT:  I'm going to overrule it.
11          Okay.  There's no objection to 38?
12          MR. BOCK:  Yes, but I can follow-up?
13          THE COURT:  Yes, you can follow-up.
14          (The bench conference was concluded.)
15          THE COURT:  All right, Ms. Anderson, you may ask the
16   jury questions.
17          MS. ANDERSON:  Thank you, Judge.
18                         EXAMINATION
19   BY MS. ANDERSON:
20   Q    Special Agent Nowak, I'm going to ask you about Government's
21        Exhibit Number 199.
22          Okay, calling your attention to Government's Exhibit
23        Number 199, why does it say, quote, Redial 02, end of quote,
24        on the Avalon phone?
25   A    We had -- when we had checked the phone, there were two

1     numbers that were dialed from the phone, and the F.B.I.

2     number was the second number.

3          MS. ANDERSON:  We have no follow-up regarding that

4     question, your Honor.

5          THE COURT:  All right.

6          Any follow-up regarding that question?

7          Go ahead, Mr. Bock.

8                         EXAMINATION

9     BY MR. BOCK:

10    Q    You heard testimony from the Avalon workers that there were

11         a number of phones on the third floor, is that correct?

12    A    Correct.

13    Q    And so if a number was made with that common number, the

14         F.B.I. would -- no matter what phone it came from, the

15         F.B.I. would see that number, is that correct?

16    A    Possibility, yes.

17         MR. BOCK:  Thank you.

18         THE COURT:  All right.

19         Ms. Anderson?

20                         EXAMINATION

21    BY MS. ANDERSON:

22    Q    The second question is the person who took the call at the

23         F.B.I. on August 4th said the caller mentioned that there

24         were two devices that generated the gas, one in front of the

25         house and one in the back.  Were these details made public

1     at that time, meaning two devices, one in the front and one

2     in the back?

3  A   They weren't made to the general public, no.  When we had --

4     were notified of the devices, that was for our internal

5     investigative purposes.  So we were told it was a chlorine

6     bucket.  Chlorine buckets were placed -- one was placed at

7     the front, one was placed at the rear of the house, that the

8     alleged caller had given us the information.

9  Q   And those details were not made to the public.

10  A   They were not made to the public.  In fact, it's F.B.I.

11     policy that we do not make any comments to the press.

12     Everything has to go through our press information officer,

13     and if it is under investigation we do not release details.

14  Q   And if there was any information that was -- would be

15     released, you as the case agent would be consulted, is that

16     correct?

17  A   I would be consulted, and it would have to be cleared with

18     the higher-ups in the F.B.I. supervisory chain, and then

19     released through our press information officer.

20  Q   And that was not done in this --

21  A   That was not done.

22     THE COURT:  Any follow-up questions on that question,

23 Mr. Bock?

24     Go ahead.

25              EXAMINATION

```
 1   BY MR. BOCK:
 2   Q    But as we -- as we discuss that question today, you don't
 3        have an independent recollection of what was in the article
 4        that may have been -- that may have appeared about this case
 5        on August the 2nd of '09, do you?
 6   A    I do not recall the information that was in the press at the
 7        time, no.
 8             THE COURT:  All right, thank you.
 9             Any additional questions from the jury for this
10   witness?
11             Thank you, sir.  You may step down.
12             -------------------------
13             (Michael G. Fox, Ph.D., was duly sworn by the clerk.)
14                       MICHAEL G. FOX, Ph.D.
15                       DIRECT EXAMINATION
16   BY MR. BOCK:
17   Q    Would state your name, sir?
18   A    Michael Gene Fox.
19   Q    And where are you from?
20   A    Raised and went to high school in the south side of Chicago.
21   Q    And did you serve our country?
22   A    Yes.  Right after high school I enlisted in the service.  I
23        was 17 years old.
24   Q    And what branch of the service were you in?
25   A    I was in the Army, and I served in the 82nd Airborne.
```

1    Q    And what was the nature of your discharge?

2    A    Honorable.

3    Q    Now, what is your formal education?

4    A    Bachelors degree in chemistry from Southern Illinois

5         University, minor in mathematics, and Ph.D in physical

6         chemistry from the University of Hawaii.

7    Q    Now, can you share with the jury your employment background?

8    A    I worked for a small company -- chemical company in Hawaii

9         for about a year.  I helped them start an industrial water

10        treatment business.  From there I went to General Electric

11        Corporate Research and Development in Schenectady, New York,

12        and I was there for five years working primarily in

13        corrosion, metallurgy problems having to do with GE's

14        nuclear reactors.  And from there I went to California to

15        the Electric Power Research Institute where I was still

16        involved in the same issues, but this time managing research

17        instead of being a bench scientist.

18   Q    And what years would those have encompassed?

19   A    I think I was at -- started at GE in, like -- I think it was

20        '72, and went to the Electric Power Research Institute,

21        like, '78, and then became a consultant in 1983 after

22        leaving what's called EPRI -- it's called EPRI Electric

23        Power Research Institute.

24   Q    And then where did you go?

25   A    Well, I had started -- kind of like started consulting,

1    and -- just a little bit of background, while I was at EPRI

2    managing corrosion and nuclear reactors, my specialty was

3    water chemistry of the reactor, and how water chemistry

4    would affect corrosion in the reactor.  And as it turned

5    out, that in the reactors that -- the guys working on -- in

6    the reactor would pour chemicals down floor drains.  And a

7    floor drain in a nuclear reactor isn't what you normally

8    consider a floor drain.  It can actually find -- this

9    chemical can actually find its way back into the primary

10   circuit of the reactor.  And when that happened, it would be

11   like instant corrosion, and instant shut down.  So when you

12   shut down a nuclear power plant, I mean just the shut down

13   costs are million dollars a day, let alone repairing the

14   damage.  So one of the things that I did as a consultant was

15   to develop a program, I called it Chemical Risk Assessment

16   and Prevention, or CHEMRAP for short, to manage and control

17   chemicals.  And my primary focus and client base was the

18   nuclear power industry.  And my first client was Tennessee

19   Valley Authority.  They had three nuclear reactors in

20   Alabama, and two in Tennessee.  And of course, they're a

21   federally owned nuclear facility.

22 Q  Was your program included in OSHA Hazard Communication

23   Standards?

24 A  Well, what happened is -- is that at this time while I'm

25   implementing this CHEMRAP program, it was about the same

1     time that OSHA came out with a new standard called the

2     Hazard Communication Standard.  Some people might know it as

3     a right to know law, so that if you're working at a place

4     and you're exposed to chemicals, basically you have the

5     right to know what you're exposed to, and what the hazards

6     are, and how you protect yourself from those hazards.  So

7     Tennessee Valley Authority asked me that since you're doing

8     this, why don't you bring in -- why don't you also help us

9     comply with this new standard?  So it also then began to

10    encompass the OSHA Hazard Communication Standard.

11  Q  And how long were you with the TVA, Tennessee Valley

12    Authority?

13  A  Well, I was a consultant with them.  I was probably there a

14    year and a half or so, something like that.

15  Q  And can you now quickly take us from CHEMRAP, which you

16    talked about, and the TVA to how you got where are you

17    today?

18  A  Well, I had continued to do -- I was developing that a great

19    deal, but then also I was continuing to do my consulting

20    with the nuclear power industry.  So when I went back to

21    California, I affiliated with a consulting company there

22    that I knew well and they knew me well, and continued to do

23    the same sorts of things, consulting in the nuclear power

24    industry, the CHEMRAP program, but out of the blue a rocket

25    fuel plant exploded outside of Las Vegas in Henderson,

1    Nevada.  They made ammonium perchlorate, and it was one of

2    the largest industrial explosions probably ever -- maybe not

3    the largest, but certainly one of the largest.  And I was

4    brought in as part of a team because of my background in

5    hazard chemicals.  This plant blew up with a mushroom cloud,

6    and it was actually picked up on the Richter scale in

7    California.  That's how large it was.  So you can imagine

8    all the chemicals that were strewn about on this site.  So

9    they brought me in for my background in chemical safety and

10   chemical hazards, and while it wasn't intended it just kind

11   of evolved.  What I did while I was working on that project

12   is I did the cause and origin of the explosion.  I just

13   ended up kind of folding into it just naturally where what's

14   known in the fire and explosion industries is cause and

15   origin, so I kind of determined, you know, why this happened

16   at the same time I was doing, you know, these -- playing my

17   other role in there.  Now, from there I -- I stayed with

18   this consulting company for about five years in California.

19   In 1991 I moved to Tucson and continued to work with a

20   company in California on a -- on a semi-consulting basis

21   where I continued to work with them, only get paid for what

22   I did.  So it wasn't on a salary anymore.  But at the same

23   time I could take on independent work.  And it's through

24   that independent work that I gradually decided to evolve

25   into what I eventually called the name of my company, which

1          is Chemical Accident Reconstruction.  I'd get involved in

2          big and small chemical accidents of all kinds, and basically

3          try to figure out, you know, what happened, how -- how did

4          it -- how did it come about, and how did it happen.

5     Q    Do you have continued training and education?

6     A    Yeah, during -- during all this time -- I mean, one of

7          the -- I had taken courses on the Hazard Communication

8          Standard, I became a certified fire and explosion

9          investigator.  I took training on what's known as HAZWOPER.

10         It's a course for responders who respond to superfund sites

11         so that you'd go in and clean up a superfund site.  You had

12         to have this HAZWOPER training.  Also, there's another OSHA

13         standard that came out called Process Hazard Analysis where

14         it -- and I got trained in that and became certified as a

15         team leader.  And that's to try to prevent accidents.  I

16         don't know if you -- some may remember the terrible chemical

17         accident in India, Bhopal India, where a couple thousand

18         people were killed.  And it was after that, that they

19         developed this -- or the standard where you have to go in

20         and if you have certain hazards present, you've got to

21         figure out basically what can go wrong, you know, and how do

22         you stop it from going wrong?  And if it does go wrong, how

23         do you respond to it?  So I think that kind of -- also, the

24         Department of Transportation certified in the shipment of

25         hazard materials as well.

1  Q  And how many -- how many different chemical accidents have

2     you been involved in in the last 20 years?

3  A  I'd say over 100.  I wouldn't be able to count them.

4  Q  Any involved in a chlorine, or pool chemicals?

5  A  Several did, yes.

6  Q  Could you share those with the jury?

7  A  One -- well, actually, one is here -- was here in Tucson.

8     It was on the northwest side of Tucson at Gold's Gym near

9     Ina and Oracle.  And there was a indoor swimming pool and

10    spa, and the chemicals evidently got out of control.  They

11    were being automatically fed into the pool and spa, and so

12    it raised the level of chlorine in the gym, and it had to be

13    evacuated.  So my role in there was, you know, what

14    happened?  Why did -- why did the chlorine level rise in the

15    gym?  And what was the course behind that?

16        There was a case in California, again involving a

17    swimming pool that was sterilized with chlorine gas.  So

18    chlorine comes in this large cylinder, and they would feed

19    the chlorine to the pool.  It was at a university and the

20    gentleman that was changing the tanks out thought this tank

21    was empty.  It obviously wasn't.  So the valve was cracked,

22    and he was exposed to chlorine inhalation.  And my primary

23    role in that was to determine was the valve defective or not

24    on this particular cylinder?

25        There have been smaller incidents where one gentleman

1      in his home decided to use a -- a drain opener on his

2      toilet, and the first drain opener he used was sodium

3      hypochlorite, which is like concentrated bleach, and then he

4      thought if one drain opener was good, maybe two would be

5      better, and he added another one.  But this time he used one

6      made with hydrochloric acid.  And so this generates chlorine

7      fumes and hydrochloric acid fumes, and in that instance I

8      estimated the small room that he was in, the chlorine

9      probably shot up to a couple thousand parts per million,

10     throughout that house a couple hundred, and I think he was

11     pronounced dead when the first responders got there.

12  Q  Have you done cases involving trichlor?

13  A  There have been several cases involving trichlor when --

14     here's another -- another good example of just how common

15     knowledge goes -- goes wrong, is that in one instance

16     somebody was, like, pre-mixing trichlor in a bucket, so they

17     have trichlor for their swimming pool and they put it in a

18     bucket, and then they add water and they try to dissolve it

19     before they put it in the pool.  You're not supposed to do

20     that, but nevertheless he did it.  Then thinking he could

21     add some more -- some more chemical to the bucket and

22     dissolve that as well too, but it wasn't trichlor it was

23     calcium hypochlorite.  Now, it's common knowledge that pool

24     chlorine is pool chlorine, so he mixes these two forms of

25     pool chlorine together and after a short time it erupts and

1    explodes in his face.

2    On another --

3    THE COURT:  Dr. Fox, if you could just respond to

4    Mr. Bock's questions.  I think he asked you if you had any

5    experiences, but then he'll ask you if he wants you to explain

6    those.

7    So go ahead, Mr. Bock, you can ask another question.

8    BY MR. BOCK:

9    Q    Was there another incident involving chlorine that you were

10       involved in?

11   A    Trichlorine.

12   Q    Trichlorine, yes.

13   A    Yes.

14   Q    Could you explain that to the jury?

15   A    Yes, it's a case that happened in Oregon where a couple in

16       their SUV they had -- I think it was calcium -- I'm sorry,

17       it wasn't trichlor.  It was calcium hypochlorite, so it

18       wouldn't apply.

19   Q    Okay.  You're not a medical doctor, are you?

20   A    No, sir.

21   Q    And you're -- so you don't have a medical degree?

22   A    That's correct, I do not.

23   Q    And you're not a Ph.D in toxicology, are you?

24   A    No, sir.

25   Q    But you do specialize in what?

1    A    In chemical accident reconstruction.

2    Q    And have you worked on cases involving inhalation --

3         inhaling toxicity?

4    A    Yes, sir.

5    Q    You've worked on cases involving chlorine before?

6    A    Yes, sir.

7    Q    Now, if you're not an M.D. or a Ph.D toxicologist, what's

8         your contribution to cases involving inhalation?

9    A    My -- my contribution is to determine -- to determine the --

10        the level of exposure, and this is basically physical

11        chemistry.  It's like what would have been present in the

12        air when the person would have inhaled it or not?  And then

13        also, then, there's the -- you know, the how did that

14        happen?  You know, what events transpired to make that

15        happen, to create that exposure?  And then using that -- and

16        also what -- the time of exposure.  Then using that I can go

17        to well known limit values, like -- we'd be talking, you

18        know, IDLH or threshold limit values.  There are -- there

19        are all kinds of -- chemicals basically have all of these

20        characteristics that are pretty well known and documented,

21        so I can say -- based on the exposure, the time of exposure,

22        and all of these well known exposure limits, say something

23        about what was likely or not likely to happen in terms of

24        the health effects.

25    Q    Now, were you retained by the defense to assist in this

```
 1        case?
 2   A    Yes, sir.
 3   Q    And you've been compensated, is that correct?
 4   A    Yes.
 5   Q    And what was your rate of compensation?
 6   A    200 an hour.
 7   Q    And how much have you received?
 8   A    $26,000.
 9   Q    And how many hours have you put into this case?
10   A    I'm pushing 190.
11   Q    Now, have you been qualified as an expert in the areas that
12        you have shared with the jury?
13   A    Yes, sir.
14   Q    And where have you been qualified?
15   A    In both federal courts and state courts all the way
16        throughout the -- the United States.  That one case
17        involving the chlorine cylinder in California, I testified
18        in court in California.  I testified --
19   Q    That was a civil case, is that correct?
20   A    They're civil cases, yes, sir.
21   Q    And have you been qualified as an expert in depositions?
22   A    Yes.
23   Q    And how many depositions have you participated in?
24   A    I'd say 70 or so.
25   Q    Now, have you also published in your field?
```

1  A    Yes.

2  Q    Okay, and do you -- you published the types of information

3       that you've shared with the jury, is that correct?

4  A    Most of my publications involve, you know, the corrosion,

5       metallurgy, and failure analysis, and chemical accident

6       reconstruction.  I've done a lot of publications in the --

7       in the area of just aerosol products, like aerosol spray

8       paints and hair sprays.

9  Q    Now, you were given information -- or provided information

10      for your review regarding this case, is that correct?

11 A    Yes.

12 Q    And very briefly, what was the -- what was the information

13      that was provided to you by me?

14 A    Yeah, the -- the reports by the Northwest Fire Department,

15      the Pima County Sheriff Office reports.  There were some

16      F.B.I. memos written.  There were lab notes from the F.B.I.

17      Lab.  It's --

18 Q    Do you have photos that were provided?

19 A    Sorry, yes, there were photographs also provided.  And also,

20      I received -- eventually received copies of videos that were

21      taken by the robots that were on the site, and then some

22      videos of simulations that the F.B.I. Lab performed.

23 Q    Now, you were present when Dr. Walter testified last week,

24      is that correct?

25 A    Yes.

```
 1   Q    And my understanding is you have areas of agreement with the
 2        testimony of Dr. Walter, is that correct?
 3   A    I do.
 4   Q    Now, for purposes of your testimony, I have gone ahead for
 5        demonstrative purposes and provided some charts.
 6             MR. BOCK:  That would be Exhibit 423, Judge, and it
 7   would encompass the whole poster presentation.
 8             Is that okay with you?
 9             THE COURT:  Yes.
10             MR. BOCK:  Okay.  All right.
11             THE COURT:  You'll need to get the microphone.
12             MR. BOCK:  I will.
13             THE COURT:  All right.
14             MR. BOCK:  And Judge, I may be walking back and forth.
15             THE COURT:  That's fine.
16             MR. BOCK:  Okay.
17   BY MR. BOCK:
18   Q    All right, sir, why don't you take a look at Exhibit 423,
19        the first poster, and could you -- could you tell the jury
20        what your agreements are with Dr. Walter?
21   A    Well, beginning -- beginning at the top of the list, of
22        course, is the symptoms and health effects are a combination
23        of, you know, the concentration of the chemical.  If it's
24        a -- if it's a gas, it's the concentration in the air, and
25        the time of exposure, the length of the time of exposure.
```

1          And this was testified to by Dr. Walters (sic) in court, but

2          it was not in his report.  So I was very pleased to see him

3          cover that in court.

4     Q    And you had his report, is that correct?

5     A    I do.  Yes.

6     Q    Okay.  Go ahead.

7     A    He also did discuss somewhat about the IDLH, the bullet

8          number two right over there of 10 parts per million.  That

9          was primarily in his report.  I mean, it was the sole focus

10         of his report.

11              He also testified that nitrogen oxide, symbolized as

12         NOx, it's either NO or NO2, could provide the same symptoms

13         as chlorine, and I agree with him on that.

14              The next three things I thought I agreed with him the

15         most on is that you always get the best data available, and

16         any quantitative data is helpful.

17              And probably the most agreement that I have with is

18         that concentrations must be measured.

19    Q    Now --

20    A    And --

21    Q    I'm sorry.  Go ahead.

22    A    And then, of course, there was -- he acknowledged that all

23         of the clouds that were seen were white, and he also

24         acknowledged that there were no reports of, you know,

25         greenish yellow clouds or gas.

1    Q    Now, sir, can you give some background to the jury about

2         exactly what trichlor is, and how it is used as a pool

3         chemical?

4    A    Sure.  Okay, what's drawn here is the molecular structure of

5         trichlor chlorine on the left, and basically -- and this is

6         how it's used as a pool chemical.  So when you put it in

7         your swimming pool in water, assuming your swimming pool is

8         alkaline, you're supposed to keep the pH on the alkaline

9         side of your swimming pool a little bit, what it does is it

10        produces bleach, basically, sodium hypochlorite.  And then

11        also the other chemical, which is labeled as CYA, cyanuric

12        acid -- I have a hard time pronouncing that.  I'm just going

13        to call it CYA, if I can.  And then, of course, as you

14        are -- you know, are using your pool and if you're using

15        trichlor as the method to chlorinate your pool, you

16        eventually build up a great deal of this CYA in your pool.

17        And actually, CYA is sold separately as a chlorine

18        inhibitor.  It's meant to inhibit that reaction so that you

19        don't use up your trichlor quite so fast.

20   Q    And what about chlorine itself?

21   A    And -- and by the way, you can buy these separately.

22             And chlorine itself would be shown on the next visual.

23             Chlorine is two chlorine atoms stuck together.  So the

24        formula is CL2.  So you may see that occasionally, CL2

25        meaning chlorine.  And it's a greenish yellow gas.

1  Q    Now, you went ahead and -- as you indicated, reviewed

2       reports from the Pima County Sheriff's Department, is that

3       correct?

4  A    That's correct.

5  Q    Is your recollection of there being any greenish yellow

6       clouds witnessed on the day of the incident?

7  A    No.  As a matter of fact, there were a number of -- a number

8       of sightings and comments in the -- particularly in the

9       sheriff report about what they saw, and they mostly saw, you

10      know, white clouds, sometimes dark cloud but mostly it was a

11      white cloud -- or I'm not saying dark, but gray.  I think in

12      one instance they called it gray.  So most of the reports

13      from the sheriff's department as they were arriving, they

14      were reporting white clouds --

15 Q    Now, you also --

16 A    -- not greenish yellow.  Sorry.

17 Q    I'm sorry.

18          Now, you also did a report in this case, isn't that

19      correct?

20 A    Yes.

21 Q    And in your report you state "No one can argue that chlorine

22      is not a toxic gas."  Is that correct?

23 A    Yes.

24 Q    And you also put that into context?

25 A    Yes.

1  Q    So can you explain the context for the jury?

2  A    Let me just read the first couple of sentences that follow

3       that.

4            MS. ANDERSON:  Judge, I'm going to object.  That's

5  non-responsive to the question.

6            THE COURT:  Well, I'm not sure what the sentences are,

7  so I guess I'll overrule -- is that responsive to the question,

8  sir?

9            THE WITNESS:  Yes, I believe so.

10           THE COURT:  All right, go ahead.

11           THE WITNESS:  Yeah.  Yeah, I say "No one -- page 42 of

12  my report I say "No one can argue that chlorine is not a toxic

13  gas.  However, another important parameter that determines

14  chlorine's toxicity is a concentration of the chlorine gas.

15  Lower concentrations might be characterized as a nuisance or

16  annoyance, while higher concentrations could be characterized as

17  a serious threat to life and health.  Which one it actually is

18  depends on the concentration and the length of time an individual

19  is exposed."

20           And that's, you know, very consistent with my

21  agreements with Dr. Walter who -- we both agree on the same

22  thing.

23  Q    So I think we're now transitioning into IDLH, is that

24       correct?

25  A    Yes.

1    Q    All right.  So -- and you -- what is the -- what is the
2         definition of IDLH?
3    A    Well, IDLH is basically an acronym, and it stands for, you
4         know, Immediately Dangerous to -- to Life and Health.  And
5         that is a very frightening statement, and it was actually
6         used in some of the reports that I read.  It says the IDLH
7         is 10 parts per million, therefore it's lethal.  And that's
8         not at all what it means.  The IDLH doesn't mean that if you
9         are exposed to an IDLH concentration, that you're going to,
10        you know, lose your life immediately, or come anywhere near
11        that.
12   Q    And what different -- what different agencies use the term
13        IDLH?
14   A    Oh, on -- just numerous agencies.  There's a Center for
15        Disease Control.  There's -- you know, OSHA has its own
16        definition.  There's the Association of Industrial
17        Hygienists.  There are textbooks written on hazard
18        chemicals.  You know, pretty consistently, you know, IDLH
19        is -- is discussed in the same context.
20   Q    Is -- is it also discussed in Acute Exposure Guideline
21        Levels?
22   A    No, it doesn't.
23   Q    Okay.  All right, the -- various chemicals have -- are --
24        have an IDLH, do they not, associated with them?
25   A    Right, all -- all chemicals --

1   Q   And let me just move to the next chart.

2   A   So most chemicals have an IDLH, so it's not uncommon for a

3       chemical to have an IDLH, like we've got nitrogen dioxide

4       with 20 parts per million, chlorine with 10 parts per

5       million.  Even common things that come out of our exhaust

6       pipe, like carbon monoxide and carbon dioxide have an IDLH

7       associated with them.  So just because we're exposed to

8       these, which can all be toxic chemicals, doesn't mean that

9       we're in any danger.  It really depends on the

10      concentration, and the time of exposure.

11  Q   Now, you talked about the CDC, so let me get to the next

12      demonstrative poster on that.

13          Could you go over that?

14  A   Sure.  Now, for -- for anybody who's in the -- you know, the

15      chemical safety business, you know, the IDLH means no matter

16      what chemical you're talking about, when you know the

17      concentration of the IDLH what it instantly tells you is you

18      have 30 minutes.  Thirty minutes to escape, you know,

19      without loss of life, without immediate health effects, and

20      without delayed health effects.  That's -- that's the

21      instant recognition of IDLH.  You've got 30 minutes.

22  Q   And there is a -- a purpose associated with IDLH that is

23      outlined in the next poster, is that correct?

24  A   Right, and this is from both the Center for Disease Control

25      and Department of Health and Human Services, and these are

1        all federal agencies.  They don't necessarily focus on only

2        the workplace.  They have a much broader responsibility to

3        the population at large.  And you know, the reason that I

4        wanted to have this brought up is the first two words, "The

5        purpose."  Because this began a long time ago -- the

6        development of IDLH's began around, I guess, 1974.  The

7        purpose is, again, to go back to the definition, you know,

8        what's the concentration in which somebody can escape, not

9        leave -- not have any permanent harm, and for -- they say

10        for a safety margin, they assigned it 30 minutes.  So again,

11        it's what you can -- you can effectively escape from in 30

12        minutes and not have any permanent harm.

13   Q   Now, you also summarized -- or did you tabulate the air

14        monitoring done by the Northwest Fire Department?

15   A   Yes.

16   Q   And did you summarize those measurements in a -- on a poster

17        for your testimony?

18   A   Yes.  And again, this goes back to one of my agreements with

19        Dr. Walters, and that, you know, you always want to get the

20        best data available.  Any quantitative data is helpful, but

21        most importantly concentrations must be measured.  And this

22        is what was measured.  This is the actual data.  This is the

23        only data I was given to work with to analyze the

24        concentrations of chlorine gas and the other gases.  And --

25        and it starts with in the morning, on the top left of the

1    table there, the first measurements are made between 7:29

2    and I think 7:55 in the morning.  So it's roughly 7:30 to 8

3    in the morning they make two measurements.  This is the

4    Northwest Fire Department.  So the -- the first

5    measurement -- I believe they enter through the house.  So

6    the first measurement they make is there's 0 chlorine in the

7    house.  And next they go into the garage, and they find

8    greater than 5.  Now, my understanding of that is that the

9    way they have this instrument set if it goes over 5, it

10    probably buzzes at them or something like that, or gives

11    them a warning.  So then later they continue to make

12    measurements which are all 0 for chlorine.  So all the

13    way -- all the way through the day 0 for chlorine.  And down

14    here I put this entry in here too at 1:45, because at the

15    time this was all -- this is the only information I had

16    available about when the hole was put into the garage door.

17    I later learned, I got a another report just the other day,

18    that the hole was put into the garage door at 3:15, and then

19    they measured -- through the hole in the garage door they

20    measured the chlorine less than 20 minutes later and it's 0.

21    So the purpose of the hole is to vent out the garage, and in

22    less than 20 minutes chlorine is 0, but the other chemicals

23    are not 0.  The CO is for carbon monoxide, and the VOC

24    stands for volatile organic chemicals.  Both CO and volatile

25    organic chemicals would be present in the exhaust system of

1       a car.  So if there were cars -- there were cars parked in

2       the garage.  I know there were one, possibly two.  So when

3       you pull a car into a garage, these gases just -- your --

4       your exhaust system is full of exhaust gases and these

5       chemicals, and then they gradually diffuse out into the

6       space in the garage.

7  Q   Now, let me -- let me look at the -- the next poster.  Let

8       me stay on that for one second.  Did I also later provide

9       you with a timeline that was done by a Pima County sheriff

10      called Sergeant Rogers?

11  A   Yes.

12  Q   Do you remember the -- do you remember that information?

13  A   Yes.

14  Q   How did -- what -- how did that information play into the

15      fire department measurements?

16  A   Okay.  Well, again, I just got this the other day, and I

17      understand it was at -- was it 12:43?  The measurements I

18      just got the other day were also made at 12:43, so that's

19      right here.  And the measurement on the fire department

20      logs, they're saying at 12:43 they're measuring these at the

21      front door at 0, and 0, and then 12.3 for volatile organic

22      chemicals.  Now, on this other report that I just received

23      he's saying at 12:43 they measured in the courtyard, and

24      it's been explained to me -- I didn't always know what the

25      courtyard -- exactly what they were referring to, but the

1    courtyard I believe they're referring to, and correct me if

2    I'm wrong on this, but the courtyard that goes to the front

3    door, okay?  So he is saying that in his record that he

4    recorded for chlorine was present, no numbers, just the word

5    present, and his VOC reading is exactly the same as the VOC

6    reading here that the fire department recorded in specific

7    numbers.

8        So the other thing -- the other thing that I look at

9    when I look at this data of present rather than having a

10   specific number there is that back here at 12:22 they're

11   measuring the chlorine concentration right there at the

12   front of the garage.  Now, that's where the pile of the big

13   blob is of everything that reacted.  You know, one of the

14   things Dr. Walter said that I also agree with is that, you

15   know, the farther you go away from the source, the less the

16   concentration is going to be.  So how can it be 0 at the

17   blob 20 minutes earlier, and then suddenly be present in the

18   courtyard when it's not at the front door?  Now, one of

19   the -- I -- what I heard is that he believes that the

20   chlorine rose up and was somehow up high in the ceiling of

21   the courtyard.  The chlorine is almost two and a half times

22   heavier than air.  Chlorine is not going to rise up like

23   that.  Chlorine if anything is going to go down to the

24   ground.  So this other reading that's been introduced as

25   present, I find it highly questionable and most likely

1        confused in some way with the measurement that was made at

2        12:43 at the front door.

3   Q    And again, you didn't hear him testify, and if I misstated

4        and it might have been lower, that still would be

5        inconsistent with the fire department, would it not?

6   A    Yes, it is.

7   Q    All right.  Now, let me just -- I'm going to show you a -- a

8        couple of exhibits which I will reference that have already

9        been admitted.  The purpose of showing you these exhibits is

10       to see if you have an explanation as to how the chlorine got

11       into the garage.

12            First, before I give you that explanation, I'm going to

13       show you the exhibits.

14            MR. BOCK:  Judge, this is Exhibit 125 that has been

15   admitted.

16   BY MR. BOCK:

17   Q    And can you see that?

18   A    Yes.

19   Q    And there's --

20            MR. BOCK:  Is it being published?

21            THE COURT:  Yes, everybody can -- everybody sees it.

22   BY MR. BOCK:

23   Q    Now, in terms of chlorine getting into the garage, what do

24       you think -- do you see anything significant as to that

25       photo?

1   A    Well, as I -- as I mentioned many times in my report and I

2        raised the question many times in my report, you know, if

3        the garage door is sealed, and if we look around the garage

4        door we see the orange sealant, and it looks like even some

5        of the seams are sealed as well too, the horizontal seams,

6        is that my question that I repeated several times is how did

7        the chlorine get into the garage?  You know, then there's

8        also a -- through the robot videos I found a close-up of the

9        blob in the middle.  I thought, well, maybe the blob in the

10       middle burned a hole in the door.

11  Q    Let me show you --

12            MR. BOCK:  Has Exhibit 143 been admitted?

13            THE CLERK:  Yes.

14  BY MR. BOCK:

15  Q    143 has been admitted, so let me show you.

16            Is this the -- is that the blob?

17  A    That's the blob.

18  Q    And so did that have any impact on chlorine getting into the

19       garage?

20  A    Well, what I was looking for was some kind of breach in the

21       garage door where the chlorine could get into the garage,

22       and I don't see it.

23  Q    So let me now talk to you about the -- was this chlorine?

24  A    In the garage?

25  Q    Yes.

1  A    I don't believe it was chlorine.

2  Q    And what is -- what is your belief based on?

3  A    Well, we've kind of got to talk a little bit about the

4       instrument in order to -- well, let me -- let me point out

5       one other thing too.  It's also -- also, the fact that at

6       the very same time there's no chlorine measured in the

7       house, and -- and you know, if -- I think somebody somewhere

8       in one of the things I read suggested vents on the garage

9       and the chlorine got in through the vents.  The house has

10      got more vents than anything, because they've got vents in

11      the laundry room, the bathrooms, the kitchen.  You know,

12      there are a lot of vents in a home like that.  And if

13      chlorine's going to get in through vents, it's going to get

14      into both the home and the garage through vents.  I don't

15      see how it's going to be that selective.  So that was one of

16      the -- one of the points that, again, questioned how did it

17      get into the garage, and I came -- finally arrived at the

18      conclusion that it's not -- probably not -- more likely than

19      not, it's not chlorine.

20  Q    Now, I want to direct your attention now to the -- the

21      testing device, the MultiRae device.

22  A    Yes.

23  Q    And where did you receive information about this device?

24  A    Both from the Northwest Fire Department, and also from the

25      company that makes it.  It's called Rae Systems, R-A-E

1           Systems.

2   Q    And are there specifications that -- or associated with the

3        MultiRae device?

4   A    Yes, there are.

5   Q    Okay.  And we have a demonstrative poster?

6   A    Yes.  Uh-huh.

7   Q    Okay.  Would you go over the specifications, and what the

8        significance is?

9   A    Sure.  One -- one of the other things I'd like to mention

10       about the MultiRae before I address this right here --

11  Q    Okay.

12  A    -- if I could, please --

13  Q    Okay.

14  A    -- is that these instruments according to my --

15          MS. ANDERSON:  I'm going to object.  There's no

16  question in front of the witness.

17  BY MR. BOCK:

18  Q    Could you direct -- do you have another area with the

19       MultiRae device that you would like to discuss?

20  A    Yes.

21  Q    Okay.  Could you -- what is that area?

22  A    According to my discussions with the company that makes this

23       is that these instruments have a built-in recorder, and it's

24       like a digital recorder so that all of the data -- you don't

25       have to just look at the numbers on the screen of that --

1    that instrument to -- to get the data, that the data is

2    constantly being logged into memory, just like it's got a

3    small computer in it.  You know, I do experiments all the

4    time with data loggers.  I write down notes while the

5    experiment is going on.  I may even videotape the display.

6    But the first thing I do after the experiment's over with

7    one of those loggers, I download all the data to my

8    computer.  So one of the things I don't understand is why

9    we're just getting spot information, and why we're just not

10   getting a continual spectrum link -- you know, data points,

11   like, every ten seconds wherever this instrument went.

12 Q  So what share of the specifications -- and the significance

13   of this?

14 A  Now, these are -- these are the specs of the instrument and

15   the sensors that are used, and the kind of sensors that are

16   used.  And if we look at -- for example, one of the things

17   they did measure was oxygen, and you've got VOC's in here.

18   We know they measured VOC's.  We know they measured carbon

19   monoxide.  And down here we have chlorine.  And one of the

20   things that was of interest to me is the fact that the range

21   of chlorine is 0 to 10.  This was confirmed by the Northwest

22   Fire Department's calibration records.  And the sensitivity

23   is .1 parts per million.  So the sensitivity on the chlorine

24   over here at, you know, 1 PPM, which is, you know, a pretty

25   small number relative to what has actually been reported for

```
1         chlorine other than the zeros.  The zeros were always --
2         when I looked at the videos of the recorder, the zeros were
3         always 0.0.  So I don't understand why there has to be
4         greater than 5, or present, and why there can't be, you
5         know, specific numbers to one decimal point.
6    Q    Now, there is a demonstrative poster regarding false
7         positives for chlorine, is that --
8    A    Yes.
9    Q    And I'm going change that poster, and I'm going to ask you
10        to explain that to the jury.
11   A    Okay, these -- this is information done directly from the
12        company that makes the instrument and the sensors, and was
13        part of my ongoing question that I -- I couldn't answer was,
14        you know, how did chlorine get in the garage?  Well, what if
15        it's not chlorine?  Is there something else that the sensor
16        would respond to and pretend that it's chlorine?  In other
17        words, you'd think it's chlorine, but it's not really.  And
18        there were three things on here.  One was bromine gas, up
19        here, but bromine's not likely to be present in this
20        incident.  None of the chemicals had bromine that I'm aware
21        of.  There's -- but the one that I was very interested in
22        was -- down here, was nitrogen dioxide, because nitrogen
23        dioxide is present in the exhaust system of an automobile.
24        There are automobiles parked in there.  The exhaust system
25        is full of exhaust, and gradually diffuses into the garage.
```

1      And the -- you know, 10 parts per million of nitrogen

2      dioxide will result in 12 parts per million chlorine.  So if

3      you were in an environment that had 10 parts per million

4      nitrogen dioxide and you didn't have a sensor for nitrogen

5      dioxide, you'd say, oh, I've got 12 parts per million

6      chlorine here, and you really wouldn't.

7  Q   Now, are there -- is there a demonstrative poster as to

8      chemicals in auto exhaust?

9  A   Yes, uh-huh.

10         Now, the -- the -- the point about the nitrogen dioxide

11     is it's not going to take much nitrogen dioxide to give you

12     a reading over 5 chlorine, because if you've got 5 parts per

13     million nitrogen dioxide, that's going to tell you on your

14     instrument falsely so that you've got six PPM chloride --

15     chlorine, rather, and then that means you're greater than 5.

16         Now, the thing about exhaust systems in cars, they

17     actually don't measure it in parts per million and

18     percentages, but you can have as much as 2,500 parts per

19     million nitrogen dioxide in the exhaust system of a car.  So

20     you can imagine, you pull this car in and even though you

21     turn off your engine, you're still -- your exhaust system is

22     full of exhaust fumes.  You leave it there overnight or how

23     long, and it gradually diffuses out and gets into the space

24     of the garage.  And to me, this makes more sense than trying

25     to find some explanation for how did chlorine get into the

1        garage when it's completely sealed?

2    Q   Now, I want to move on to a different topic, and those would

3        be F.B.I. lab reports regarding five different examinations.

4            You've reviewed those, is that correct?

5    A   Okay.  Yes.

6    Q   You've reviewed the bench notes of Agent Rooney, is that

7        correct?

8    A   Yes.

9    Q   You've reviewed his report, is that correct?

10   A   Yes.

11   Q   Okay.  So let me go to the next demonstrative poster.

12           I skipped something.  I apologize.  Did you cover this?

13   A   Well, this is -- this is actually from a report by one of

14       the automobile companies about what's in the exhaust system

15       of -- of cars, you know.  So you know, and I -- and the

16       point was -- is that when you -- you know, when you go to

17       nitrogen dioxide, things like that, they report it in

18       percentage.  Now, 1 -- 1 percent -- when you convert

19       1 percent to parts per million, it's 10,000.  So 1 percent

20       is 10,000.  So .25 is 2,500 parts per million.  So you can

21       have a lot of nitrogen dioxide in the exhaust system of a

22       car as well as carbon monoxide.  You have carbon monoxide,

23       and you also have -- right here.  This is just for VOC's.

24       That's just the hydrocarbon, the volatile hydrocarbon.  So

25       in the garage we see VOC's, we see carbon monoxide, and we

1        see chlorine, which most likely is really nitrogen dioxide.
2    Q    Okay.  The next area that we -- we've discussed and
3        testimony was presented, was the testimony of Agent Rooney
4        regarding certain physical evidence.  And you familiarized
5        yourself with that, is that correct?
6    A    Yes.
7    Q    So tell me what your opinion is of -- of that demonstrative
8        information that -- which appears on that -- that
9        information which appears on that demonstrative poster.
10            MS. ANDERSON:  Objection, form of the question.
11            THE COURT:  Overruled.
12            Go ahead.
13            THE WITNESS:  This is just a summary.  The -- the --
14    of -- five samples were collected, you know, at the site.  Solid
15    samples.  This is the sludge and stuff, and powders and things
16    that were laying around.  And they were packaged up, and they
17    were sent to the F.B.I. Lab for analysis.  And so the bottom line
18    of their analysis was -- is that, you know, everything that they
19    found there was basically relatively non-toxic, so no real
20    physical -- and let me add -- go ahead.  We'll go to the next
21    line.  It will be better.  Thank you.
22            And -- can I continue?
23    BY MR. BOCK:
24    Q    Please.
25    A    Okay.  And -- and by the way, the F.B.I. Lab did not report

1    finding any trichlor.  They didn't report, that I knew of,

2    that I saw in any reports, even finding the chlorine

3    element.  So it's that -- CYA is the primary thing that they

4    found.

5         Anyway, this is -- this was handwritten notes, I

6    believe by Dr. Rooney from the F.B.I. Lab, and he's called

7    by a special agent and asked certain questions.  And the

8    important part of his answer is down here in the end, right

9    down in here where he identified that CYA, this cyanuric

10   acid, but nothing -- no chemical -- not any chemical that

11   reacted with trichlor.  Now, before we move on from this

12   point, you know, this is strange, very, very strange,

13   because in the back yard there was a bucket there that was

14   allegedly only one third reacted, and is allegedly, as far

15   as I understand, a combination of trichlor and some other

16   unknown chemical.  And if it's only one third reacted, why

17   are you not finding these other things that are not

18   reacting?

19 Q  Is an explanation that because it -- even though it was one

20   third reacted, that because of the heat that it consumed

21   that one third?

22        Is that an explanation as to why no trace other

23   compound or whatever is -- is -- might not be present?

24        MS. ANDERSON:  Objection, speculation.

25        THE COURT:  No, overruled.

1          Go ahead.

2          THE WITNESS:  Here -- here's my answer to that.  You

3    know, we -- there are, you know, fire investigators they

4    investigate arson all the time.  That's an intentionally set

5    fire.  They can find -- you know, they can find evidence of

6    gasoline, which is really volatile and evaporates.  You just pour

7    some gasoline on, it will evaporate just sitting there.  They can

8    still find evidence of gasoline after a house has burnt down.

9    There is absolutely no reason why they could not find the

10   chemicals that didn't react, or that other substance that

11   allegedly reacted with trichlor, or trichlor.  If it's only one

12   third reacted and it was -- it was -- you know, if it was all

13   trichlor, there ought to be two thirds of a bucket of trichlor

14   left there.

15   Q    Let me go to the next demonstrative poster.

16        Now, this poster represents garage measurements versus

17        time, is that correct?

18   A    Yes.

19   Q    Can you share that with the jury, please?

20   A    Sure.  This was on the timeline of measurements earlier, but

21        now I'm just looking at the garage measurements and looking

22        at the three chemicals that are found, carbon monoxide,

23        you've got your volatile organic chemicals, and chlorine.

24        And we see from -- the early one was the one that was done

25        at between 7:30 and 8 in the morning, and the later one is

1      the one that was formed after they blew the hole in the

2      garage door.  Now, the hole's only been there for 20 minutes

3      anyway, but what I'm really interested in is this comparing,

4      you know, each of these to each other.  And we see that

5      the -- the carbon monoxide there is 29 percent left of what

6      was there in the morning, and then when we look at the

7      volatile organic chemicals here, there's 8 percent left.

8      But when we come down here and we look at the chlorine,

9      there's nothing left.  And the only point is whether it's

10     chlorine, or whether it's nitrogen dioxide.  And the only

11     point that -- that I can arrive at from this is that

12     whatever the chlorine or the nitrogen dioxide was earlier,

13     it wasn't very great, because gases -- when you have a

14     mixture of gases in a room and they're going to diffuse out,

15     they all ought to diffuse out at roughly the same rate.

16     There ought to be if you -- for example, I think -- I don't

17     know -- I think on the next slide I actually may have some

18     calculations to show more specifically what I'm talking

19     about here.

20          Thank you.  Can I continue?

21  Q   Yes.  That's the next demonstrative poster that is --

22     transitions your testimony regarding more specificity, is

23     that correct?

24  A   Yes.  Yeah.  Now, let's assume for the sake of argument --

25     they said greater than 5 parts per million, but let's assume

1     it's 10, because 10 is greater than 5.  Okay.  So if we take

2     the percentage of carbon monoxide that was left, you'd

3     expect to have, you know, 2.9 parts per million chlorine

4     levels.  If you base it on the VOC's, you would expect to

5     have .8 parts per million left, and don't forget that the

6     MultiRae instrument for chlorine it can detect up to .1

7     parts per million.  So -- even if it's like .5 or something

8     like that.  So the conclusion that I came to is that whether

9     it's nitrogen oxide or chlorine, it probably wasn't much

10     greater than 5, maybe 6 because otherwise I'd expect to see

11     some chlorine left over at this point, because we've got

12     other chemicals left over as well.

13  Q   Now, there was testimony by Dr. Walter, which you were

14     present at, regarding the odor threshold of chlorine.  Do

15     you remember that?

16  A   Yes.

17  Q   Do you remember what -- what percentage parts per million

18     that he coupled with the odor of chlorine?

19  A   3.5 parts per million.

20  Q   Let me show you the next demonstrative poster.

21         Is that -- is that an area of disagreement that you

22     have with Dr. Walter?

23  A   Yes.

24  Q   Okay.  And what does the next demonstrative poster contain?

25  A   The odor thresholds have been studied very extensively.  I

1    mean, there are handbooks on odor thresholds, and they test

2    many people, and what they find and what they come up with

3    is a mean value.  So a mean value for the odor threshold,

4    and that's the odor -- that's the concentration at which you

5    can detect chlorine, okay?  And median value means half of

6    the people are already detecting it, the other half of the

7    people haven't quite detected it yet.  But -- and this is

8    the overall range.  So some people can detect it down at a

9    very, very low level, and maybe if you're -- really have bad

10   sensory perception, you know, it can be as high as 3.4,

11   which I think is where Dr. Walters took the extreme value

12   instead of the median or the average value of odor

13   threshold.

14  Q    Now, you were present at the end of Dr. Walter's testimony

15       when he -- when there was a question from the jury and he

16       responded to that question, were you not?

17  A    Yes.

18  Q    And rather than me attempting to rephrase the question or

19       using our memory, did I provide you with a transcript of

20       that question and the responses and the dialogue?

21  A    Yes.

22  Q    And that was a transcript from the court reporter --

23  A    Yes.

24  Q    -- is that correct?

25  A    Yes.

1    Q    And so what do you -- what was the -- do you remember what

2         the question was asked, and if you have any disagreement

3         with the way that Dr. Walter answered that question?

4    A    Without pulling out the transcript and reading it, you know,

5         I think the question from the jury, and it was an excellent

6         question, was that what -- if this courtroom had 5 parts per

7         million chlorine in it, would it be hazardous -- I think

8         that's the way the question was phrased, would it be

9         hazardous, and he said yes.

10   Q    And how would you have responded to that question?

11   A    I -- I would say nobody is in any immediate danger

12        whatsoever on that question.  First of all -- and you know,

13        for chlorine to build up to 5 parts per million in this --

14        in this courtroom, it's going to be detected long before it

15        gets to 5 parts per million.  I mean, even the worst

16        among -- the worst nose amongst us is going to probably

17        detect it at around 3.4 parts per million.  So it's not even

18        going to get to 5.  The chances are you're going to be aware

19        of a problem and be leaving, you know, before it even gets

20        to 5.  But let's just suppose for the sake of argument that

21        suddenly somebody dropped a bottle of chlorine, and suddenly

22        the room had 5 parts per million chlorine.  You have more

23        than 30 minutes, according to the IDLH from the Center of

24        Disease Control and the Department of Health and Human

25        Services, according to these federal agencies, you know,

1     you've got more than 30 minutes to leave without any

2     permanent harm.  That doesn't mean you might not have eye

3     irritation, or you're going to smell something bitter and

4     you're going to know that it's there, but you're going to be

5     able to leave, and you're not going to have any permanent

6     harm.

7  Q   And that's according to who?

8  A   That's the IDLH, according to the Center for Disease

9     Control, and I think it's the Department of Health and Human

10    Services, and even -- you know, even agencies like the --

11    you know, the Chlorine Institute who their entire business

12    is chlorine and they write an entire pamphlet on health

13    hazards of chlorine.

14  Q   Now, Dr. Walter also talked about AEGL's?

15  A   Yes.

16  Q   And what is that an acronym for?

17  A   I think that's the Accepted Environmental Limits --

18  Q   Is it Acute Exposure Guideline Levels?

19  A   That's right, acute -- it's AEGL, yes.  Acute Exposure

20    Guideline Levels, right.

21  Q   And tell me a little bit about that.

22  A   Okay.  Well, this is -- appears to be primarily being done

23    by the Environmental Protection Agency, and they are

24    evaluating, you know, a whole range of chemicals as far

25    as -- for the general population as far as exposure levels

1    for the general population, and what would be, you know,

2    safe and not safe in various degrees, various times of

3    exposure, and various concentrations.  And they go from --

4    as far as I can understand, you know, it could be a baby

5    infant that was born 10 minutes ago, all the way to an

6    elderly person on his death bed and maybe has ten minutes

7    left to live.  So they are much more conservative in their

8    values, and what they come up with.  But I have read their

9    entire report on chlorine, which is -- it's over 70 pages

10   long in their report, and I have real issues with the way

11   that they come up with their values.

12   Q    Now --

13        MR. BOCK:  We're concluding now, your Honor.

14        THE COURT:  Pardon me?

15        MR. BOCK:  I say we're almost concluding.  We're almost

16   done now.

17   BY MR. BOCK:

18   Q    So tell me what the -- the purpose of this last

19   demonstrative poster is in terms of your presentation?

20   A    As I understand it, this is the F.B.I.'s theory, and it's --

21   it's a reasonable theory.  It's done on face value.  It's a

22   reasonable theory.

23        Okay, they're theorizing that trichlor was mixed with

24   some unknown chemical, and then produced a chlorine cloud.

25   Now, once you start looking at, you know, the evidence to

1    support this theory, then you start running into problems.

2         Okay.  First -- one of the first things we talked about

3    earlier was the clouds that were seen were white clouds.

4    They are not greenish yellow clouds.

5         Secondly, and perhaps more importantly, every

6    measurement for chlorine gas that was made outside of the

7    garage, including in the home, was 0.  Chances are the

8    chlorine that was in the garage or measured in the garage

9    was probably nitrogen dioxide giving a false reading.

10        Another problem is right here at the very beginning.

11   The F.B.I. Lab never found -- or reported in any of the

12   reports that they found trichlor.

13        The next thing was we've got this unknown material

14   here, and they never found any evidence of what this unknown

15   material is.

16        And again, we've got a bucket that's only one third

17   reacted.  I don't understand why you're not finding these --

18   trichlor and these unknown chemicals.

19        The other issue about, you know, the sludge that was --

20   that's left behind over here, and when it was analyzed, you

21   know, it's all relatively non-toxic.  So we have no evidence

22   of a chlorine cloud.  We have no evidence of toxic chemicals

23   here.  We don't know what it was mixed with, and there's not

24   even any evidence of trichlor.  So like I say, on its face

25   value -- I mean, it's a simple theory, and it -- it -- but

1        it's a little too simple, and it's not supported by the

2        actual evidence.  I haven't found any evidence that supports

3        this theory.  Every piece of data contradicts it.

4            MR. BOCK:  Thank you, Doctor.

5            ------------------------

6            (James White was duly sworn by the clerk.)

7                        JAMES WHITE

8                     DIRECT EXAMINATION

9    BY MR. BOCK:

10   Q    Mr. White, do you live here in Tucson?

11   A    Yes, I do.

12   Q    And what part of the community do you live in?

13   A    Star Pass.

14   Q    Now, what is your educational background?

15   A    I have a bachelor of science in chemical engineering from

16       the University of Delaware, a master of science in chemical

17       engineering from the University of Wisconsin, and a

18       doctorate from that University.

19   Q    And do you own your own business?

20   A    I started my business in 1989.

21   Q    What is the name of your business?

22   A    Modular Mining Systems.

23   Q    Now, was there a period of time that you made some inquiries

24       about having some work done at your home?

25   A    That is correct.

1  Q    And who did you make inquiries to?

2  A    I used an online site called Service Magic.  They submitted

3       four potential vendors for my consideration.

4  Q    And what was the consideration that you were researching?

5       What type of work did you want done?

6  A    I needed a complete stripping of a very large triple garage

7       floor, and then deposition of a two coat epoxy.

8  Q    And did you -- did you interview the -- the four potential

9       vendors?

10 A    Three of them.  The record of one was not worthy of further

11      pursuit.

12 Q    And did you -- did there come a time when you hired a vendor

13      to do that work?

14 A    I hired one of the three, yes.

15 Q    And who was that?

16 A    The man at the table.

17 Q    Okay.

18 A    Known to me as Todd Burns.

19 Q    Okay.  And what was the name of his business?

20 A    The name of?

21 Q    His business.

22 A    Burns Power Washing.

23 Q    And when was the work -- when was the work begun?

24 A    Oh, I can't recall.  A couple of years ago.

25 Q    And what -- what month of the year was it, do you remember?

1   A      No.

2   Q      How long did the -- did the job take?

3   A      As I recall, two days.

4   Q      How many men were on-the-job?

5   A      Mr. Fries himself, plus two foremen, plus two laborers.

6   Q      Were you satisfied with the work?

7   A      Very satisfied.  And indeed, I wrote an extremely strong

8          positive recommendation for him when requested by Service

9          Magic to do.

10              MR. BOCK:  Thank you, sir.  I have nothing further.

11              THE COURT:  All right.

12              Any cross-examination?

13              MS. ANDERSON:  Just briefly.

14                          CROSS-EXAMINATION

15   BY MS. ANDERSON:

16   Q      Mr. White, you hired the defendant one time to do work for

17          you, is that correct?

18   A      Just one time.

19   Q      And on that one time he did a good job, correct?

20   A      Excellent.

21              MS. ANDERSON:  That's all I have.

22              THE COURT:  Any redirect?

23              MR. BOCK:  No, your Honor.

24              THE COURT:  Any questions from the jury for this

25   witness?

1              All right.  Thank you, sir.  You may step down.

2              ------------------------

3              (Dr. Fox resumed the witness stand.)

4                          CROSS-EXAMINATION

5    BY MS. ANDERSON:

6    Q    Dr. Fox, your -- your experience in litigation has been

7         predominantly in the civil arena, is that correct?

8    A    Yes.

9    Q    And that's where one party is suing another for money,

10        correct?

11   A    And other things, yes.

12   Q    And you'll agree with me, will you not, that most of your

13        experience has been in situations where there has been an

14        accidental leak, or some kind of an accidental exposure, is

15        that correct?

16   A    Yes.

17   Q    Now, this one was completely different in that in this case

18        we had -- we had two devices that were intentionally set,

19        correct?

20             You're aware of that, are you not?

21   A    Yes.

22   Q    This is a criminal case, correct?

23   A    Yes.

24   Q    And in this particular case we had two devices that were

25        intentionally set, right?

1    A    My understanding, yes.

2    Q    This was not a controlled setting, correct, where we have

3         lab personnel who are mixing known quantities of products

4         together, correct?

5    A    At what point?  Are you talking about, the -- the setting of

6         it?

7    Q    Exactly.  When the -- when the components were mixed

8         together, it was not done in a controlled or a laboratory

9         setting, correct?

10   A    It was not a laboratory.  I can't speak to anything else --

11        I mean, certainly it wasn't laboratory.

12   Q    Well, in this case we had somebody who was intentionally

13        mixing components, right?

14   A    Yes.

15   Q    In a non-controlled setting?

16   A    Yes.

17   Q    Now, one of the -- one of the first things that you talked

18        about is the -- the IDLH's, and we've heard some witnesses

19        talk about IDLH's, and I'd like to -- to ask you about those

20        as well.

21            May I approach, your Honor?

22            THE COURT:  Yes.

23   BY MS. ANDERSON:

24   Q    That's Government's Exhibit Number 609, correct?

25   A    Yes.

1   Q   And what that is, is that's the NIOSH pocket guide to

2       chemical hazards, correct?

3   A   Yes.

4   Q   Surely, you've seen that before?

5   A   Yes.

6   Q   And that's the document that talks about the IDLH's, is that

7       correct?

8   A   It's one of the documents that talk about IDLH.

9   Q   Well, let's talk about the IDLH.  Now, in -- and in

10      evaluating this case, you're talking about, and you're

11      applying the IDLH's, correct?

12  A   That's everything that everybody else applied in all the

13      reports I got.  I mean, when I got reports from Dr. Walter,

14      it was IDLH.  There was nothing anybody mentioned other than

15      IDLH.

16  Q   Well, you'll agree that Dr. Walter when he answered the

17      juror's question pertained to something other than the IDLH.

18      It pertained to the AEGL, correct?

19  A   The juror's question about 5 parts per million?

20  Q   Yes.

21  A   Yes, he answered that in that context, correct.

22  Q   But my question was a little different.  My question was in

23      this case you are applying the IDLH, correct?

24  A   I don't look at it that way.  That's what was applied to all

25      the documents that I received.  Even Dr. Walter in his

1        report, the only thing he mentioned was IDLH.  The very

2        first time anybody that I'm aware of mentioned anything

3        other than that was in this courtroom.

4   Q    Well, when you testified on direct just a few minutes ago,

5        the majority of your testimony was focused on the IDLH,

6        correct.

7              MR. BOCK:  Judge -- I think that's a misstatement,

8   Judge.

9              THE COURT:  Well, can you answer that, sir, or -- one

10  way or the other?

11             THE WITNESS:  I think -- yes -- yes and no.  Yes,

12  because that is everything that I was provided.  That was exactly

13  the way the case was presented to me.  I can't -- I can't change

14  the evidence that comes to me, and I can't change the reasoning

15  and rationale that comes to me that is the basis for, you know,

16  the argument that -- the hypothesis that's being made.  So

17  everything that I was aware of was being used in this case was

18  IDLH, and so in my research leading up to this trial, I focused

19  on the same things that the -- the other parties did, like Dr.

20  Walters, and there was another -- I forget whether it was F.B.I

21  or fire department even said it was lethal.

22  Q    So it's your testimony here today that the AEGL's are just

23       as applicable as the IDLH?

24  A    No, my -- my testimony about the AEGL's is I've got a real

25       problem with those, and in particularly the specific one

1      that Dr. Walters responded to about 5 --

2   Q    My question -- I'm sorry, I didn't mean to interrupt you,

3        but my --

4             MR. BOCK:  She didn't let him answer the question,

5   Judge.

6             MS. ANDERSON:  -- my --

7             THE COURT:  No, overruled.

8             Go ahead, Ms. Anderson.

9   BY MS. ANDERSON:

10  Q    My question was a little bit different.  My question was so

11       you have no problem with the application of the Acute

12       Exposure Guideline Levels, isn't that correct?

13  A    No, that's not correct.  I do have a problem with that.

14  Q    Well, let's talk about if you don't -- if you don't believe

15       the AEGL's are appropriate, then you must believe the IDLH's

16       are appropriate, is that right?

17  A    I think the IDLH is appropriate.  And again, it's everything

18       that was presented to me.  All of the arguments, and logic,

19       and reasoning that was given to me to investigate this

20       matter was in terms of IDLH.

21  Q    Well, let's talk about the IDLH.  And you're familiar with

22       this, are you not?

23  A    Yes.

24  Q    And I've given you a copy, Government's Exhibit 609,

25       correct?

```
 1   A    Yes.

 2   Q    And this is the NIOSH Pocket Guide to Chemical Hazards by

 3        the CDC, correct?

 4   A    Yes.

 5   Q    And let's look at the first -- let's look at the second

 6        page.  Isn't it true, Dr. Fox, that the purpose -- according

 7        to the -- the guide itself, the purpose for establishing an

 8        IDLH value in the standard's completion program was to

 9        determine the airborne concentration from which a worker --

10        do you see that word worker?

11   A    Yes.

12   Q    Could escape without injury or irreversible health -- health

13        effects from an IDLH exposure in the event of the failure of

14        respiratory protection equipment.

15             Now, did I read that correctly?

16   A    Yes, you did.

17   Q    So the IDLH contemplates two things.  Number one, a

18        workplace, correct?

19   A    Only in this document.  In other documents it's not that

20        specific.

21   Q    Well, did I read that correctly.

22             MR. BOCK:  She's arguing.  Objection.  Argumentative,

23   Judge.

24             THE COURT:  No, overruled.

25
```

1    BY MS. ANDERSON:

2    Q    Did I read that correctly where it says a worker?

3    A    Yes, you did.

4    Q    Okay.  And then it says the failure of respiratory

5         protection equipment.  So again, my question is that the

6         IDLH contemplates two things, a worker, and failure of

7         respiratory protection equipment, according to this

8         document, correct?

9    A    It includes much more than those two things that you have

10        just mentioned.

11   Q    You also mentioned that the IDLH says that somebody has 30

12        minutes to escape from a building or some other chlorine

13        containing structure.  However -- let's read it together.

14        Let's read it.  This is the NIOSH guide.  It says however --

15             MR. BOCK:  I'm going to object to the form of the

16   question, Judge.

17             THE COURT:  Well, the let's read it together part?

18             MS. ANDERSON:  No.

19             THE COURT:  What?

20             MS. ANDERSON:  The fact that it's being read.  You

21   know, there should be a question.

22             THE COURT:  Well, I think a question's coming after the

23   reading.

24             Ms. Anderson?

25             MS. ANDERSON:  Correct.

1          THE COURT:  All right, go ahead.

2          THE WITNESS:  Ma'am, where are you reading from.

3          THE COURT:  The Doctor -- does he have a copy of what

4    you have?

5          MS. ANDERSON:  Yes.  And that's Government's Exhibit

6    Number 609.

7    BY MS. ANDERSON:

8    Q    I'm in the same paragraph where it talks about the purpose

9         of the IDLH, the very last sentence where it says --

10   A    Yes.

11   Q    -- however, the 30 minute period was not meant to imply that

12        workers should stay in the work environment any longer than

13        necessary.  In fact, in capital letters, every effort should

14        be made to exit immediately, correct?

15   A    Yes.

16   Q    And that's what it says, correct?

17   A    Yes.

18   Q    All right.  So it doesn't say that you're safe for 30

19        minutes, isn't that correct Dr. Fox?

20   A    I disagree with that.  I -- the IDLH is very clear.  You

21        have 30 minutes to escape without harm.  Nevertheless, given

22        that -- and they even say with a safety margin we're going

23        to allow 30 minutes, which means it probably could have been

24        more than 30 minutes, but they cut it down to a safety

25        margin of 30 minutes.  And just because they say, look, even

1          though you've got 30 minutes, you're not going to dillydally

2          around.  Let's get out of there.  And that makes common --

3          that's just common sense --

4    Q     But --

5    A     -- but it doesn't say that if you don't leave immediately,

6          you're going to have permanent harm, or you're going to die,

7          or anything like that.  What it says is you have 30 minutes

8          to escape safely, but let's not dillydally around.  Let's

9          get out of there.

10   Q     And let's look at the next full paragraph where it begins

11         with the NIOSH respirator selection logic.  Do you see that?

12   A     Yes.

13   Q     Let's look at the second sentence.  It says the purpose of

14         establishing an IDLH exposure concentration is to ensure

15         that the worker can escape from a given contaminated

16         environment in the event of failure of the respiratory

17         protection equipment, correct?

18   A     Yes.

19   Q     Now, you're -- you read some reports in this case.  You read

20         the Pima County Sheriff's Department reports, correct?

21   A     Yes.

22   Q     So you know that people were evacuated from the scene --

23   A     Yes.

24   Q     -- right?

25             We had civilians on the scene, correct?

1    A    Yes.

2    Q    You know that the Levines were -- the homeowners were

3         evacuated from the scene, correct?

4    A    Yes.

5    Q    You know that there were other people in the neighborhood

6         that were evacuated, correct?

7    A    Yes.

8    Q    And none of those people have any kind of protection --

9         respiratory protection, isn't that correct?

10   A    Yes.  And they got out safely.

11   Q    Now, let's next talk about another barometer by which safety

12        guidelines are established, and that's the AEGL's, correct?

13   A    I don't fully agree with that.  I think that their

14        parameters are -- are different than the IDLH.

15   Q    Well -- well, I agree they are different.  Let's talk about

16        them.

17   A    I'd love to.

18   Q    Now, you didn't even know the title.  You called it the

19        Accepted -- and then Mr. Bock jumped in and had to provide

20        you with the name Acute Exposure Guideline Levels?

21   A    I stumbled on the word, right, yes.

22   Q    Well, let's talk about them.

23             AEGL's don't pertain to the workplace, correct?

24   A    And neither does IDLH, but yes, that's correct.

25   Q    And certainly, this was not a workplace for the Levines,

1          correct?

2    A     Correct.

3    Q     It wasn't the work place for the folks that were also

4          evacuated from their -- their homes, correct?

5    A     Correct.

6    Q     So let's look at the AEGL's.

7                Isn't it true that according to the AEGL's, that they

8          represent the threshold exposure limits or the exposure

9          limits below which adverse health effects are not likely to

10         occur for the general public, and are applicable to

11         emergency exposures ranging from 10 minutes to 8 hours, is

12         that right?

13   A     Could you restate that again, please?

14   Q     AEGL's represent threshold exposure limits, exposure levels

15         below which adverse health effects are not likely to occur

16         for the general public, and are applicable to emergency

17         exposures ranging from 10 minutes to 8 hours, correct?

18   A     That's -- I believe that's what they say, yes.

19   Q     And there are three levels, correct, Dr. Fox?

20   A     Yes.

21   Q     And why don't you tell us what those three levels are?

22   A     Level 1, and Level 2, and Level 3.  And Level 1 is a level

23         of time and concentration at which according to this

24         standard you're not going to have any lasting effects.  I

25         think in Level 2, again, it's time and concentrations.  And

1        I think what they're looking for in a Level 2 is some form

2        of tissue damage.  When I read the AEL-2 criteria for

3        chlorine, they're specifically looking for tissue damage.

4        So that's a level at which tissue damage would occur, or

5        some form of permanent effect.

6    Q   Disabling, correct?

7    A   I'd have to --

8    Q   That's how they categorize it, correct?

9    A   Probably, yes.  You're probably correct, yes.

10   Q   So AEGL Level 1 is non-disabling, correct?

11   A   Yes.

12   Q   AEGL Level 2 is disabling, correct?

13   A   Somewhat disabling, yes.

14   Q   Well, they classify it as disabling, right?

15   A   Okay.

16   Q   I mean, I don't want to put words in your mouth.  They say

17       disabling, right?

18   A   Yes.

19   Q   And AEGL Level 3 is lethal, correct?

20   A   It says they could experience life threatening health

21       effects or death.

22   Q   And that's lethal, is that -- is that correct?

23   A   Well, life threatening doesn't necessarily mean death, but

24       certainly, they've got the word death in there so I guess

25       you could -- if you want to characterize it as lethal, you

1     could.

2           MS. ANDERSON:  May I approach the witness, your Honor?

3           THE COURT:  Yes.

4  BY MS. ANDERSON:

5  Q    That's Government's Exhibit Number 608, and those are the

6      chlorine results under the AEGL program, correct?

7  A    Yes.

8  Q    And how we read this is that it has a chart which shows AEGL

9      levels 1, 2 and 3 for different time parameters, correct?

10  A    Yes.

11  Q    One is 10 minutes, one is 30 minutes, and one is 60 minutes,

12      four hours, and eight hours, is that correct?

13  A    Yes.

14  Q    And the AEGL level for chlorine at 10 minutes at AEG Level 2

15      is 2.8 parts per million, correct?

16  A    According to them, yes.

17  Q    And so what that means is that if somebody is exposed to

18      chlorine levels at greater than 2.8 for 10 minutes, we could

19      expect that they would experience disabling -- experience

20      irreversible or other serious long-lasting adverse health

21      effects, or an impaired ability to escape?

22  A    I have --

23  Q    Correct?

24  A    -- to respectfully disagree with that.

25           MS. ANDERSON:  May I approach the witness, your Honor?

1              THE COURT:  Yes.

2    BY MS. ANDERSON:

3    Q    This is Government's Exhibit Number 611 -- if I could get

4         the microphone.

5              Dr. Fox, this is acute exposure guideline levels for

6         selected airborne chemicals.

7              Did I read that correctly?

8    A    Yes.  I have the same volume here.

9    Q    Okay, you have the same thing yourself?

10   A    Yes.

11   Q    So this is Government's Exhibit 611.  So I'm going to call

12        your attention to how they define AEGL Level 2.  And on my

13        document it's on page 3 of the introduction.  So I'm going

14        to ask you to turn to that.

15   A    Okay.

16   Q    Okay.  Now, isn't it true that it says that AEGL-2 is the

17        airborne concentration expressed as parts per million of a

18        substance above which it is predicted that the general

19        population, including susceptible individuals, could

20        experience irreversible or other serious long-lasting

21        adverse health effects, or an impaired ability to escape.

22             Did I read that correctly, Dr. Fox?

23   A    You read it correctly, but in the context of chlorine I -- I

24        have to respectfully disagree with that for your Level 1,

25        and Level 2, and even Level 4 -- I'm sorry -- I'm sorry, the

1      four -- the four hour exposure.  And in order to -- to

2      explain that, I've -- you've got to look at how they

3      determine these --

4   Q  Excuse me, Dr. Fox.  Your attorney can -- can let you

5      explain it, but my question was did I read that correctly?

6   A  You read it correctly, yes, ma'am.

7   Q  All right.  Okay.  Thank you.

8          So what this means is that at 2.8 parts per million

9      after 10 minutes according to AEGL-2 an individual could

10     expect -- according to the AEGL's, a person could expect to

11     suffer the irreversible or other serious long-lasting

12     adverse health effects, or an impaired ability to escape?

13  A  According to AEGL, that's correct.

14  Q  All right.  Thank you.

15         Now, it's your testimony that a pure chlorine cloud is

16     greenish yellow, correct?

17  A  It's the way it's described in all the literature.

18  Q  A pure chlorine cloud, correct?

19  A  Well, chlorine gas.  It just says chlorine gas has the color

20     greenish yellow.  It doesn't necessarily say pure.

21  Q  But you'll agree with me, will you not, that chlorine can be

22     mixed with other compounds?

23  A  It could, yes.

24  Q  In fact, a cloud containing chlorine could be mixed with

25     other compounds, is that correct?

```
 1    A    It could be, yes.
 2    Q    And those chlorine compounds if mixed with other compounds
 3         that are different colored could also take on the color of
 4         the other compounds, correct?
 5    A    And vice-versa as well too.
 6    Q    So just because a cloud that may contain some chlorine isn't
 7         yellowish or green doesn't necessarily mean that there's not
 8         chlorine in it, correct?
 9    A    Yes and no.
10    Q    Now, you told us that you have questions about whether or
11         not there is even chlorine in the garage, correct?
12    A    Yes.
13    Q    And isn't it -- isn't it just as likely that there was
14         chlorine in the garage?
15    A    I don't believe so.
16    Q    Well, you said that -- one thing you said on direct is that
17         you don't know how the chlorine gas would have gotten in the
18         garage, correct?
19    A    That's correct.
20    Q    Let's take a look at Government's Exhibit Number 170.
21         That's an interior photograph -- and this has already been
22         admitted.  This is an interior photograph of the garage.
23              Do you see that?
24    A    Yes, I do.
25    Q    And you'll agree with me, would you not, that you can see
```

1   some white particles that are there on the ground, correct?

2 A Spread out on the concrete to the left, you mean?

3 Q Yes.

4 A Well, I wouldn't call them particles.  I think -- to me it

5   looks like the explosive device has already been used, and

6   these are fragments from the garage door.

7 Q Okay, so there would have been some kind of a breach in the

8   garage door, correct?

9 A Well, not some kind of a breach.  It was an intentional

10   explosive breach by the bomb squad.

11 Q So you think this breach was before -- or you think this was

12   after the bomb squad breached the garage door?

13 A Yes, and if -- and if I may, I've looked at other pictures

14   taken with the robot as it entered the garage, and there's

15   debris all over the hood of the car and everywhere from the

16   breach.  It was obviously an explosive breach.  It created a

17   lot of fragments, and they're literally everywhere.

18 Q Well, let's take a look at this exhibit.  This is

19   Government's Exhibit 171.

20    Do you recognize that, do you not?

21 A I've never seen that before.

22 Q Well, this has already been admitted, and you can agree with

23   me that this looks like it's some kind of a brown liquid

24   that is surrounding the garbage can, correct?

25    THE COURT:  Let me make sure --

1    A    Yes.

2              THE COURT:  -- do the jurors have that on your

3    screen -- no.

4              THE CLERK:  I don't have it marked as being admitted.

5              THE COURT:  You don't have it marked as being admitted?

6              THE CLERK:  No.

7              MS. ANDERSON:  I apologize, your Honor.

8              THE COURT:  I know there's one similar to that.

9              MS. ANDERSON:  I'll use a different one.

10   BY MS. ANDERSON:

11   Q    This is Government's Exhibit 165, which I think has already

12        been admitted.  And you'll agree with me, would you not,

13        that that's some brown liquid that has permeated or oozed

14        underneath the garage door, correct?

15   A    I see the brown liquid, but to me it wasn't visible or

16        evident from the outside.  To me it looks like it was

17        something that was on the inside.

18   Q    Well, that's my point is that it's on the inside of the

19        garage, correct?

20   A    Right.

21   Q    Okay, and --

22   A    And again, the door has already been explosively breached.

23   Q    So you're saying this brown liquid was a result from the

24        breach?

25   A    I don't know what it's from.

```
1   Q   Well, it's coming from underneath the door, correct?
2   A   I can't say that.  I can't say -- because when I looked at
3       photographs from the outside, I would expect to see clear
4       evidence of it and I didn't really see that from the
5       outside.
6   Q   Well, let's look at -- this -- let's look at this exhibit,
7       and I'm -- this actually came from some material that you
8       have presented.
9           Do you recognize that?
10  A   Yes, I do.
11  Q   And that shows the -- that shows the brown ooze in front of
12      the garage, does it not?
13  A   Yes.
14  Q   And that's directly in front of the garage door, correct?
15  A   Yes.
16  Q   In fact, if we look at that photograph and then we look at
17      this photograph which shows the interior of the garage, we
18      can see some brown ooze that's -- that looks pretty similar,
19      correct?
20  A   Similar to the -- which part, ma'am?  Sorry.
21  Q   It looks similar to the brown ooze that was directly in
22      front of the garage, correct?
23  A   But I think the other slide you put up was on the other side
24      of the garage door.
25  Q   Exactly my point.
```

1   A     Oh, okay.

2   Q     We've got brown ooze in front of the garage on the

3         outside --

4   A     Okay.

5   Q     -- right?

6   A     Yes.

7   Q     We've got brown ooze on the inside of the garage, correct?

8   A     Okay.  Again, but on the first photograph you're on -- if

9         I'm facing the garage door -- the first photograph you're on

10        the right side if I'm facing it.  This one would be on the

11        left side.

12  Q     Okay.  Well, I've moved on to these photos now, okay?

13             So we see brown ooze in front of the garage, right?

14  A     Yes.

15  Q     And then we see brown ooze in the garage right by the door,

16        correct?

17  A     Yes.

18  Q     So it's safe to believe that the ooze, the liquid might have

19        come underneath the garage door, correct?

20  A     I suppose you could assume that, but I think rather than

21        assume it I'd rather, you know, see a close-up of the

22        outside of -- of that side of the garage door, and also

23        before it was explosively breached, because I don't know

24        what the -- what was in -- I don't have -- I did ask several

25        times how was the breach made in the garage door?  What kind

1       of explosive was used, if any?  What time was it made?  And

2       how was it -- how exactly was it made, and what chemical

3       explosives were used?  And I never got anything.

4 Q   So you believe that this brown ooze from underneath the

5       garage door may have come from the intentional breach by the

6       Pima County Sheriff's Department?

7 A   I don't know.

8 Q   Well, here, look at this orange substance which also appears

9       to have oozed from underneath.  Do you see that?

10 A   Yes.

11 Q   And you're aware, were you not, that the garage door was

12       sealed?

13 A   Yes.

14 Q   You'll agree with -- with me, would you not, that chlorine

15       gases can seep into various places if the places are not

16       sealed adequately or completely --

17 A   It's possible.

18 Q   -- right?  Correct?

19 A   It's possible.

20 Q   And also, are you aware of the fact that many garages are

21       vented so carbon monoxide and carbon dioxide can escape from

22       the garage?

23 A   Some are, and some are not.

24 Q   And were you provided information that the seams in the

25       garage door were not sealed?

```
 1              Were you provided with that information?
 2   A    The horizontal seams?
 3   Q    Yes.
 4   A    Just from the photos it looked like it had the orange
 5        sealant in it.  I wasn't provided any information one way or
 6        the other, but just looking at the photos it looked like it
 7        had the orange stuff in it.
 8   Q    So when you testified that you question whether or not there
 9        is even any chlorine in the garage, you're assuming that the
10        garage door was completely sealed, is that correct?
11   A    No, that's not necessarily the total logic of it.  If I may?
12   Q    No, that's -- that's one of your -- one of your theories,
13        correct, that there wasn't chlorine gas inside the garage
14        because the garage door was sealed, correct?
15   A    That's not the entire argument, though.
16   Q    Your next theory, Dr. Fox, is that this was actually a false
17        positive for chlorine, is that right?
18   A    Yes.
19   Q    And you base that theory on -- on the sensor specifications
20        and cross-sensitivities for the MultiRae, is that correct?
21   A    In particular the cross-sensitivity, the gases that give a
22        false positive for chlorine.
23   Q    And those gases that you say could present as a false
24        positive for chlorine, one of which is -- you're saying
25        nitrogen dioxide, is that correct?
```

```
1    A    Yes.

2    Q    Does nitrogen -- you'll agree with me, would you not, that

3         nitrogen dioxide does not smell like chlorine?

4    A    No, actually they have a very similar smell.  Nitrogen

5         dioxide has a very pungent odor, could easily be confused

6         with chlorine.

7    Q    If others were to disagree with you and say that nitrogen

8         dioxide does not smell like chlorine, you're saying that you

9         would disagree with them, is that correct.

10             MR. BOCK:  I'm going to object to the form of that --

11   the form of that question.

12             THE COURT:  No, overruled.

13             THE WITNESS:  The -- they'd be disagreeing with the

14   material safety data sheet for nitrogen dioxide, not with me,

15   because that's where I got it from.  That's what I was curious

16   about.  And even when Dr. Walters testified and he was asked a

17   question about, you know, would nitrous oxides give the same

18   symptoms as chlorine, and he said yes.

19   Q    Now, is it -- is it reasonable to believe that if nitrogen

20        dioxide were created in the reaction, that the chlorine had

21        already been released into the atmosphere?

22   A    You're talking about nitrogen dioxide being created in the

23        reaction in the chemicals in the bucket?

24   Q    Correct.

25   A    That's not where I believe the nitrogen dioxide came from.
```

1    Q    You think it was a false positive in the MultiRae?

2    A    And in the garage.  It came from the exhaust system of the

3         automobiles, along with carbon monoxide and VOC's.

4    Q    Now, you're saying that the VOC's -- you would have expected

5         that those would have gone down just like the chlorine did,

6         correct?

7    A    No, it's the other way around.  I was thinking the chlorine

8         ought to not go down further and farther than the VOC's or

9         the carbon monoxide, and it did.  It went down -- it went

10        down to, like, 0 left --

11   Q    Well, you --

12   A    -- whereas there was still VOC and there was still carbon

13        monoxide in the garage.

14   Q    Well, you would agree with me, would you not, that there

15        were some other compounds in the garage that stayed,

16        correct?

17            For instance, in Government's Exhibit 165 we can see

18        the brown liquid, correct?

19   A    Right, we can.

20   Q    And that could have caused the volatile compounds to remain

21        at an increased level, correct?

22   A    Depends on what it is.  You can't just say that

23        automatically, and I would not contribute carbon monoxide at

24        all.  And besides, if that was there, I would -- if that

25        puddle was there and that was the source of the VOC's, I

1      wouldn't expect the VOC's to go down at all, because you've

2      got this constant source of these VOC's evaporating into the

3      garage.  So it shouldn't go down at all if that's the

4      source.  Plus, this isn't going to contribute carbon

5      monoxide at all.

6  Q   Well, there was no result of carbon monoxide in the garage,

7      correct?

8  A   No, there was.

9  Q   There -- there was -- that's part of -- that's one of the

10     volatile compounds, correct?

11 A   It's one of the things the fire department measured inside

12     the garage both early, and then later.

13 Q   But that could have come from the ooze that's underneath the

14     garage door?

15 A   No, carbon monoxide would not come from an organic chemical

16     like that.

17 Q   Nonetheless, you'll agree with me, would you not, that the

18     firefighters obtained a reading of 5 parts per million or

19     greater on their MultiRae, correct?

20 A   I agree with that.

21 Q   And the -- we don't know how much above the 5 parts per

22     million it truly was, correct?

23 A   No, actually I thought I went to some trouble to explain

24     that by looking at the time difference.  We start with -- I

25     assumed we started with 10 parts per million.  It's greater

1    than 5, but -- and then comparing it to the decrease in

2    volatile organic chemicals and the decrease in carbon

3    monoxide, and all these gases should diffuse out the same,

4    at the same rate --

5  Q   No -- I'm sorry, I don't mean to interrupt but my question

6    was that at 7:30 when they obtained a reading, you will

7    agree with me, would you not, that the MultiRae indicated a

8    reading of 5 parts per million or greater, correct?  I know

9    what your theory is.  We've heard your theory.

10  A   Of what?  Of chlorine?

11        MR. BOCK:  This is argument now, Judge.

12        THE COURT:  No.  No, overruled.

13  BY MS. ANDERSON:

14  Q   We know what your theory is, but you'll agree with me, would

15    you not, that they obtained that reading?

16  A   I do, but that -- I'm sorry, but with all due respect that

17    wasn't your previous question.

18  Q   Well, my question is that you'll agree with me, would you

19    not, that the Northwest Fire Department personnel when they

20    went into the garage, their MultiRae device registered

21    greater than or equal to 5 parts per million, correct?

22  A   That's what -- that's what's reported, yes.

23  Q   Okay.  And at that same time they had an audible alarm

24    for -- because of that reading, correct?

25  A   I did not read anything that said they had an audible alarm.

1       All I read was that it was greater than 5.

2   Q   But you don't dispute that, correct?

3   A   I have no reason to dispute it.

4   Q   You'll agree with me, don't you, Dr. Fox, that the reading

5       could have been 10 parts per million, it could have been 30

6       parts per million, correct?  We understand your theory.

7           MR. BOCK:  Well, wait a second.  Let -- it's a compound

8   question, and he needs to answer.

9           THE COURT:  Well -- wait.  Let Ms. Anderson finish the

10  question.

11  BY MS. ANDERSON:

12  Q   We understand what your theory is, but isn't it true that

13      the reading, which was greater than 5 parts per million,

14      could have been all the way up to 50 parts per million

15      because that's what their device is capable of reading?

16  A   Absolutely not, and I went to some length to try to explain

17      why that was.  So -- and if anything -- if anything, if it

18      was chlorine, or whatever it was --

19          THE COURT:  Dr. Fox, if you could say no -- if it's no,

20  just say no, and then if Mr. Bock wants you to explain that, he

21  can ask you to do that.

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  Okay.

24  BY MS. ANDERSON:

25  Q   You'll agree with me, would you not, that when you mix

| | | |
|---|---|---|
| 1 | | trichlor and an incompatible compound, the reaction is going |
| 2 | | to be cyanuric acid, correct? |
| 3 | A | Not necessarily.  It's not necessarily always going to |
| 4 | | produce one -- one product, and it depends on what it's |
| 5 | | mixed with. |
| 6 | Q | So you believe that something other than cyanuric acid could |
| 7 | | be produced, is that what you're telling us today? |
| 8 | A | Depending on what it's mixed with, absolutely. |
| 9 | Q | I'm talking about trichlor and an incompatible compound |
| 10 | | which is added, and it's going to result in cyanuric acid, |
| 11 | | correct? |
| 12 | A | It depends on what the compound is that it's reacting with. |
| 13 | | I can, you know -- |
| 14 | Q | I think your answer is no, is that correct? |
| 15 | | MR. BOCK:  Well, wait a second, Judge.  Can he not |
| 16 | | respond without being cut off and not badgered? |
| 17 | | THE COURT:  No -- Mr. Bock, this is cross-examination. |
| 18 | | So go ahead, Ms. Anderson. |
| 19 | | MS. ANDERSON:  May I have just a moment, your Honor? |
| 20 | | THE COURT:  Yes. |
| 21 | | BY MS. ANDERSON: |
| 22 | Q | Could we look at Government's Exhibit 125? |
| 23 | A | I'm sorry, which one is 125. |
| 24 | Q | I'm sorry, they're bringing it up. |
| 25 | | THE COURT:  Has that been admitted? |

1        MR. PIMSNER:  She needs to turn --

2        MS. ANDERSON:  Oh, I apologize.

3    BY MS. ANDERSON:

4    Q    Could we zoom in on the ooze?

5         This has already been admitted.  You see that, do you

6         not, Dr. Fox?

7    A    Yes.

8    Q    Okay.  And that's the pile of -- of the cyanuric acid which

9         is left over from the chemical reaction, correct?

10   A    Well, I would expect that it's cyanuric acid plus other

11        stuff.

12   Q    So my answer -- your answer is yes, correct?

13   A    Yes, with a qualification.

14   Q    And you'll see, would you not, that the -- the breach is off

15        on the left?

16   A    The explosive breach, yes.

17   Q    All right, the hole.

18        Now, if you look further to the right where the --

19        where the cyanuric acid is, you can see that it seems to be

20        going underneath the garage, correct?

21   A    I don't see it going underneath the garage.  I have,

22        actually, a better photograph taken by one of the robots --

23        I'm sorry.  I shouldn't be explaining anything.  Sorry.  I

24        don't see it that way.

25   Q    Now, you -- you take issue with the AEGL's, correct?

1    A     Yes, ma'am.

2              MR. BOCK:  This has been asked and answered.

3              THE COURT:  Well, I'll let that answer stand.

4              Go ahead -- I'm sure Ms. Anderson is not going to --

5    BY MS. ANDERSON:

6    Q     Let's talk about the various organizations that participate

7          in the AEGL's, and actually produce these documents, or

8          produce these standards.  You've got that in front of you,

9          do you not?

10   A     Yes, I do.

11   Q     And the folks that actually come up with -- with the AEGL's

12         is a Committee on Acute Exposure Guideline Levels, correct?

13   A     Yes.

14   Q     And we've got members that are listed there on page 5,

15         correct?

16   A     In Roman numeral V?

17   Q     Yes.

18   A     Yes.

19   Q     We've got toxicologists, isn't that correct?

20   A     Yes.

21   Q     We have members who -- members of the committee who are from

22         various universities, correct?

23   A     Yes.

24   Q     We've got folks from medical centers across the country,

25         isn't that right?

1    A    Yes.

2    Q    On the next page we have Board of Environmental Studies and

3         toxicologists who participate in coming up with these

4         standards, is that correct?

5    A    Yes.

6    Q    We have various reports that were studied in order to come

7         up with these guidelines, is that correct?

8    A    Yes.

9    Q    So a lot of thought, and expertise, and science goes into

10        the AEGL's, correct?

11   A    Well, the --

12   Q    Yes or no?

13             MR. BOCK:  Well, maybe the question can't be answered

14   yes or no, your Honor.

15             THE COURT:  Well, Dr. Fox if he can't answer yes or

16   know, he'll let us know.

17             Can you answer that yes or no?

18             THE WITNESS:  It's both yes and no.  I mean, I really

19   would have to go look at what they did to determine the exposure

20   levels for chlorine, and it just defies common sense.

21             MS. ANDERSON:  Could I have a moment just a moment?

22             THE COURT:  Yes.

23             MS. ANDERSON:  That's all I have.

24             THE COURT:  All right.

25             Redirect, Mr. Bock?

1                           REDIRECT EXAMINATION

2    BY MR. BOCK:

3    Q    The government spent a lot of time with you, Doctor, on this

4         AEGL.

5    A    Yes.

6    Q    So first of all, you said that you had some real problems

7         with the AEGL, is that correct?

8    A    Yes.

9    Q    You also said it defies common sense, is that correct?

10   A    To me it does, yes.

11   Q    And specifically, I want you to focus on chlorine.  So tell

12        me what -- the real problems that you feel based upon your

13        experience and your expertise that the A -- that you feel is

14        demonstrated by the AEGL, and then I'll have a second part

15        question which I'll ask you about how you feel it defies

16        common sense?

17   A    Let me say -- let me say two things, first of all --

18   Q    Okay.

19   A    -- this is a matrix of time and concentration for three

20        levels, and it has numbers in it for the concentration of

21        chlorine gas.  But if we were to apply this to this

22        particular incident and the values of chlorine that were

23        actually measured, all of those would be zeros.

24   Q    Okay.

25   A    So the other -- the other -- let me -- I can -- I can go to

1    the actual page here in the document that explains what they

2    did -- let's talk about Level 2, which is where you start --

3    they say you start to get the tissue damage.  So there's

4    some permanent leftovers from the Level 2.  The way they

5    determine Level 2 is -- let's say 30 minutes, no test on

6    anybody.  At ten minutes no test on anybody.  At 60 minutes

7    no tests on anyone.  What they did was they did a four hour

8    test at 1 part per million of chlorine.  So they have a guy

9    who -- by the way, they select these -- these -- these guys

10    who -- or these -- these subjects who are more or less prone

11    to things like asthma either through hereditary or some

12    other means.

13  Q    And that's in the documentation?

14  A    And that's in the documentation.  It's in this report right

15    here.  Actually, it's right on page 15.

16  Q    Okay.  You can go forward, then.

17  A    So -- so they -- they -- and he's exercising.  I think that

18    they're exercising, like, at least 15 minutes of every hour.

19    And they do this for four hours in an environment of 1 part

20    per million chlorine.  So what do they find at the end of

21    the first four hour test?  Basically, nothing.  Nothing.  No

22    real -- nothing really serious.  So what do they do?  They

23    give him another four hour test in 1 part per million

24    chlorine, again presumably, I believe, they're exercising

25    for, like, 15 minutes, an hour during this four hours.  So

1    he's got two four hour exposures at 1 part per million

2    chlorine.  And at the end they find he's wheezing, but they

3    can't find any tissue damage.  They do not document tissue

4    damage, which is a criteria for Level 2.  What they say is

5    we assume there's got to be tissue damage, and that's how

6    they assigned that level.  Now, the way they go back -- what

7    they do when I said they don't -- on these other -- on -- on

8    these shorter time periods, there's no tests.  What they do

9    is they've got a formula from that four hour test, at 1 part

10    per million they use a formula to go back and calculate

11    these for shorter periods of time.  To me, that defies

12    common sense, and it ain't good science.  I mean, I don't

13    care -- I appreciate that they've got a lot of great people

14    on this committee.  I don't know why they would do something

15    like that, and I don't know if they did that for other

16    chemicals.  This is the entire thing on what they did on

17    chlorine.

18  Q    So the genesis of this is this four hour period of time, and

19    it's repeated, right?

20  A    It's a four hour test at 1 part per million chlorine, and

21    then it's repeated again because they didn't find anything

22    in the first four hour test.  They didn't find anything --

23    they didn't find anything that they could really pin down.

24  Q    And is that the genesis of all of their level computations?

25  A    That -- all their Level 2 -- they did that for the four hour

1    one, and all of their level -- all of their Level 2's where

2    30 minutes and 10 minutes, and I just -- you know, and on

3    top of that, if I may --

4    Q    Go ahead.

5    A    -- on top of that when they --

6         MS. ANDERSON:  I'm going to object.

7         THE COURT:  Well, Mr. Bock will ask another question.

8         Go ahead, Mr. Bock.

9    BY MR. BOCK:

10   Q    Is there -- is there another aspect of this that you would

11        like to discuss with the jury?

12   A    Well, this report is full -- full of stuff.  Actually, they

13        document an accident -- because they get a lot of

14        information about exposure to hazard chemicals from actual

15        accidents in industry.  So they document an accident, which

16        there was 30 parts per million of chloride, 30.  Remember,

17        now, the IDLH is 10.  Here's an accident with a bunch of

18        workers, 30 parts per million.  After two weeks they were

19        completely clear of any symptoms.  So yeah, they came out,

20        they were probably wheezing, and they're coughing, or

21        whatever, or watery eyes, but after two weeks completely

22        cleared.  No -- no leftover symptoms.  And then they examine

23        them again, I think, like, four weeks later or so, and

24        they're still good.  You know, there's experiments with

25        animals at hundreds of parts per million, and longer periods

1       of time.  And it just doesn't jive with what they're putting

2       down here for 10 minutes, and 30 minutes, and these low

3       concentrations.

4    Q    Are you -- are there other people -- well, do you know if

5       there are other people that are taking exception to this

6       AEGL?

7    A    Like I said --

8            MS. ANDERSON:  I'm going to object, your Honor.  This

9    is improper.

10            THE COURT:  Well, you can answer that yes or no.  Do

11    you know?

12            THE WITNESS:  No, I don't know.

13    BY MR. BOCK:

14    Q    Okay.  And the -- the term AEGL was first introduced in this

15       case through who?

16    A    Dr. Walter.

17    Q    Now, you indicated -- the government wanted you to answer

18       yes or no as to the question about the fact that in the

19       garage the reading of 5 parts per million could be 15, 20,

20       30 -- do you remember that question?

21    A    I do.

22    Q    Okay.  Do you want to -- can you -- you have now an

23       opportunity to comment on that --

24    A    Can we put back up that slide about that?

25            THE COURT:  Well, rather than comment, could you put it

1    in the form of a question, Mr. Bock?

2              MR. BOCK:  Okay.

3    BY MR. BOCK:

4    Q    Could it be 10 parts per million that was in the garage?

5    A    No.

6    Q    Could it be 15 parts per million?

7    A    Absolutely not.

8    Q    What could it be based upon the -- the information that you

9         were presented with?

10   A    As I discussed before, and we had a visual on it, it can't

11        be much more than 5.  I would doubt that it's more than 6

12        parts per million.

13   Q    I'm going to --

14   A    Keep going.

15             Keep going.

16             Keep going.

17             Keep going.

18             Keep going.

19             Keep going.

20             THE COURT:  Dr. Fox, maybe you can step down and help

21   Mr. Bock find it.

22             MR. BOCK:  That's it.

23             THE COURT:  There we go.

24   BY MR. BOCK:

25   Q    Let me get it situated.  Okay.  So we're on the subject of

1           whether or not the 5 parts per million is a low number, or

2           it could be exceeded.  And can you comment on that?

3   A       Right.  As you know, again, these are measurements made

4           early in the morning, and then later after that breach is

5           created in the -- in the garage door.  And so these are,

6           like, at 7:30 to 8:00 o'clock in the morning.  And down here

7           it's more like 3:30 in the afternoon, but it's only

8           roughly -- it's only actually less than 20 minutes after the

9           breach is made.  And so we look at, you know, what happens

10          to each of these measurements.  You know, the carbon

11          monoxide, which in that environment can really only come

12          from -- from the automobile exhaust, and we look at the

13          amount that it has decreased.  And then we look at the

14          volatile organic carbons, again something that comes from an

15          exhaust system.  And then we look at -- it's not really how

16          much it decreased, it's how much is left.  So this is the

17          amount that's left over.  So then we look at the chlorine.

18          So you would think all the gases are diffusing the same way,

19          which they do, then you're going to have, you know,

20          either -- you know, at least 8 percent of the chlorine ought

21          to be left over, and it's actually 0.  If it were 10 parts

22          per million --

23              MS. ANDERSON:  I'm going to object.  This is beyond the

24   scope of --

25   BY MR. BOCK:

```
 1   Q    If it were 10 parts per million, what would be left over?
 2   A    If you were on the next slide over, you know, if it were
 3        like -- if we had 8 percent of 10 parts per million, you
 4        would expect to get point -- I think it's .8 parts per
 5        million measured at this time, at the later time.
 6   Q    So there's an equation that can be used to determine -- or
 7        to look at perhaps what the parts per million were?
 8   A    Yes.
 9   Q    And that's what you're doing here?
10   A    Yes.
11   Q    So what is your -- what is your -- what is your opinion as
12        to the -- the number of parts per million in the garage?
13   A    Whether -- whether it was chlorine or nitrogen dioxide, it
14        was not very high in the beginning because if it was high,
15        like 10 parts per million or maybe even 8 parts per million,
16        you would expect that when they go in to measure it, they
17        would find some left over, but it's so low in the beginning,
18        it's probably just barely over 5 so they get their high
19        alarm, but then -- you know, it diffuse -- everything is
20        diffusing out, as we see by the VOC's and the carbon
21        monoxides, and the chlorine's all gone.  So if we start
22        with -- you know, as the -- as the hypothetical question was
23        it could have been 50 parts per million.  Well, 50 is
24        greater than anything else that was measured here.
25        Certainly, you'd expect to find leftover chlorine after the
```

1    breach was made.

2         MS. ANDERSON:  Judge, I'd object.  He's going beyond

3    the scope of the question.

4         THE COURT:  All right.  Well, Mr. Bock, you can ask

5    another question.

6         MR. BOCK:  Okay.

7    BY MR. BOCK:

8    Q    Let me talk to you a little bit about the robotic device.

9         Did you see videos -- did I provide you videos regarding the

10        robotic device and the garage door?

11   A    I received videos of the robots, yes.

12   Q    Did you see --

13        MS. ANDERSON:  Judge, I object.  This goes beyond the

14   scope of the cross-examination.

15        THE COURT:  No, overruled.

16        Go ahead.

17   BY MR. BOCK:

18   Q    And did you see the actual explosion?  Was that on the

19        video?

20   A    No, that was not -- that was not presented.  That was not

21        part of the videos I received.

22   Q    Did you have pictures of the garage door that appeared to

23        have sealant on it?

24   A    Yes.

25   Q    And the -- the pictures that you were shown by the

1     government were pictures with some type of substance within

2     the garage post-robotic explosion -- or post-explosion, is

3     that correct?

4  A   Yes.

5  Q   Now, the -- the cloud itself, the cloud, whenever -- this

6     cloud -- could this cloud have been measured?

7  A   Yes.  And measured for what?

8  Q   For -- for gas.  For whatever gas.

9  A   It could have been measured for a number of things.

10         MS. ANDERSON:  Judge, I'm going object.  This goes

11  beyond the scope of cross-examination.

12         THE COURT:  No, overruled.  I'll allow the answer to

13  stand.

14  BY MR. BOCK:

15  Q   So if the cloud is close to the ground, someone could have

16     used a MultiRae device to determine the consistency of the

17     cloud.  Is that a possibility?

18  A   Yes.

19         MR. BOCK:  I don't think I have anything further.

20         THE COURT:  Any questions from the jury for this

21  witness?

22         All right, just write it out, please.

23                     BENCH CONFERENCE

24         THE COURT:  All right, and we've numbered these.  Let's

25  read all of them, and then we'll discuss them.  We can just pass

1    them around.

2              Okay, you need to pass those along.

3              MR. BOCK:  Well, I object to some of the questions.

4    For instance, this one says yes or no.  I don't see -- you know

5    --

6              THE COURT:  They've adopted the term.  We can ask him

7    without the yes or no.

8              MR. BOCK:  Okay.

9              THE COURT:  They're trying to cross-examine.

10             MR. BOCK:  That's fine.

11             41 I don't have an objection to.

12             So this one we don't say yes or no, and I have no

13   objection.

14             THE COURT:  Any objection to the others?

15             MR. BOCK:  Yeah, I have an objection about the garage

16   door.  It talks about a lot of stuff that's not in evidence.  You

17   know, I just don't rubber seal this, that, and the other.

18             MR. PIMSNER:  Assuming facts not in evidence.

19             THE COURT:  Okay.  Why don't we ask about the garage

20   door seal, maybe a flexible rubber seal, or there may be an

21   expansion to the joint --

22             MR. BOCK:  That's kind of -- I don't like the question

23   so I object to it.  I just think there's too many -- too many

24   different variables here.

25             THE COURT:  Okay.

1              MR. BOCK:  I think it's -- I think it's an appropriate

2    question, and I think that we can -- we can make it so that it

3    might not include all of these items that the juror is pointing

4    out.

5              THE COURT:  Right, that -- assuming -- I mean, we don't

6    know if the garage door -- we don't know that the seal was a

7    flexible rubber seal or not.  We don't know.

8              MR. BOCK:  Are we going to ask this question, then, or

9    --

10             THE COURT:  It may or may not have been, so --

11             MR. BOCK:  How does he know what it is?

12             MS. ANDERSON:  I'm going -- you can ask him.

13             THE COURT:  All right.  I guess I'll decline to ask

14   that.

15             The other thing, the expansion joint -- there's usually

16   an expansion joint.

17             MR. PIMSNER:  And he also talked about underneath.

18             THE COURT:  I don't know if that's a follow-up --

19   viscous -- that's how you pronounce it.  Maybe just the bottom

20   half without the presumption.

21             MR. BOCK:  Okay.

22             THE COURT:  Now, wait -- Mr. Bock, you are the lucky

23   one since it's your witness.  You get to ask --

24             MR. BOCK:  It was easier when the others were doing it.

25   Just tell me what I'm asking.

1          THE COURT:  On this one, just this part.

2          MR. BOCK:  Okay, what's this?

3          THE COURT:  Viscous solution.

4          MR. BOCK:  Viscous solution.

5          THE COURT:  All right.

6          MR. BOCK:  Okay.

7          (The bench conference was concluded.)

8          THE COURT:  All right, Mr. Bock, you may ask the

9     questions from the jury.

10         MR. BOCK:  Okay.

11                          EXAMINATION

12    BY MR. BOCK:

13    Q    There's some questions from the jury, Doctor, so let me ask

14         them to you, okay?

15              Would a viscous solution might be expected to run in

16         the channel to both sides of the garage, right and left?

17              That's the question.

18    A    From a viscous -- as I understand it, would a viscous

19         solution run from one side of the garage to the other, and I

20         think the answer would probably depend on, you know, how

21         much liquid is there in this viscous solution, and also

22         what's the -- you know, is there any -- any degree of tilt

23         to the garage floor?  Is it perfectly flat, or does it slope

24         at all?  But -- and it also would depend on how viscous.  I

25         mean, you can get things that are very viscous that don't

1          flow at all, and others that just flow slowly.

2                MR. BOCK:  Now, can I ask a follow-up question, or do I

3     wait -- do you want me to wait until all the --

4                THE COURT:  Why don't you do it now since we have so

5     many questions.

6                MR. BOCK:  Okay.

7                THE COURT:  And then I'll let the government follow-up

8     right now.

9     BY MR. BOCK:

10    Q    So the question that I have from this question is could the

11         fact that the garage door -- there was an explosive device,

12         could that affect how this solution could channel itself?

13    A    I -- honestly, I don't know.

14    Q    In other words, could the explosive device compromise the

15         sealant that may have been placed at the bottom of the door?

16    A    Oh, it definitely did.  There is no question that it

17         compromised the sealant, and you can actually see it when

18         you -- when the robot went into the garage and was taking a

19         photograph on the inside towards the breach, you could

20         actually see that the -- and the garage door is really

21         physically -- very physically damaged.  So -- and the

22         physical damage, it did raise the garage door right there at

23         that point a little bit.  You could see light underneath it.

24    Q    Could a non-compatible chemical reaction flow into this void

25         carrying active chemical reaction with it, the lowest point

1           in the garage?

2    A      I'm assuming you're meaning, like, is the -- is the bucket,

3           like, bubbling over with reactant and flowing out onto the

4           ground, could it seep under the garage door and go into the

5           garage door?  I suppose if there was an opening there and if

6           it hadn't been sealed, it might be able to do that.

7           However, it was sealed, and when the -- we look at the

8           photographs from the inside, you didn't really see the

9           reactant mixture coming in.  There was what appeared to be

10          oil, and clearly oil was on both sides of the garage.  It

11          looked like some type of hydrocarbon oil, but I didn't see

12          anything that looked like that reddish brown residue that

13          comes out of the bucket.

14   Q      Okay.  Another question from a juror.  In an unknown

15          chemical situation do you expect or advise initial

16          responders to take the time to measure the levels of an

17          undetermined chemical, in parens, regardless of what it

18          looked or smelled like, end of parens?

19   A      Certainly, the first responders -- you have to consider

20          their safety and the safety of other people first.  The --

21          the actual -- talking about measuring the actual cloud or --

22          or the vapors, you know, you wouldn't necessarily have to go

23          right on top of the blob and measure it there where you

24          don't really know what's going to happen.  You could measure

25          the cloud or the vapors at some distance away, which is what

1          they -- what they ultimately did.  Just -- if I may add to

2          that a little bit?

3   Q      Go ahead.

4   A      You know, it talked about the built-in computer that's in

5          this -- this instrument is that at 7:30 in the morning when

6          the first responders are walking to the house to measure

7          inside the house and then the garage, that thing should have

8          been logging, and they're -- as they're walking past -- I

9          believe they would have to go past the garage door down the

10         side of the house into the back patio, all of that data

11         should be available, and for whatever reason it's not.

12  Q      The next question from a juror is as follows:  If the doors

13         are sealed with adhesive foam, and if a five-gallon bucket

14         of trichlor tablets were placed upon the table in front of

15         you and a can of brake fluid was poured into the bucket,

16         would you consider that to be a hazard?

17  A      Yes.

18  Q      Here's a two-part question -- or that's part one, I'm sorry.

19         A chlorine smell would indicate chlorine in the cloud,

20         especially if nitric oxide was sealed in garage with the

21         cars.  All right, so I guess the juror's asking if the smell

22         would indicate chlorine in the cloud, and especially if the

23         nitric oxide was sealed in the garage with the cars?

24  A      That's a really good question, and -- and as even Dr.

25         Walters testified, is that a lot of other, you know,

1        chemical species can give you the same, you know, smell as

2        chlorine.  But what is really good about the question is

3        that because you smell it, remember, the odor threshold

4        level is down around, you know, .08 parts per million.  That

5        is so low that -- that it's -- just because you smell

6        chlorine doesn't mean it's a dangerous hazardous cloud that

7        you would expect, like, a dangerous hazardous cloud might

8        sweep the countryside and kill all the animals and the birds

9        and the lizards and everything.  That's not going to happen

10       just because you smell chlorine.  It's real important.  Just

11       because you detect it doesn't mean it's at a level that's

12       going to cause serious harm.

13    Q   And here is -- here is part two of the question.  And if

14       smelled, it would mean a chlorine component would be part of

15       the initial substance used, question mark?

16    A   Again, if you actually smelled chlorine and if it actually

17       was chlorine, then yes, it would be -- it would be coming

18       from the bucket of reactants.

19    Q   Here's a question regarding chlorine.  At what PPM level

20       would a person experience a symptom, i.e., itchy, burning

21       eyes, trouble breathing, strong smell?

22    A   Chlorine Institute has a -- has a list of symptoms like

23       that, and it's probably around 15 parts per million.

24    Q   And here's --

25    A   So you would definitely -- if you were in that kind of

1      environment, you would definitely know it, but it doesn't

2      necessarily mean irreversible harm.

3   Q   And here's the last question.  Could other gases, in parens,

4      9-29 -- looks like the remain under CO -- 29 percent remain

5      under CO, could other gases, CO in parens above that,

6      29 percent remain and VOC above that 8 percent remain, in

7      parens, escape quicker than chlorine since chlorine is lower

8      to the ground, in parens, chlorine 2.5 X heavier than air,

9      end of parens?

10  A   If you had a mixture of the VOC's and carbon monoxide and

11     chlorine, chlorine is a heavier gas.  So if it had a

12     tendency to do anything, it would be not to rise but to go

13     to a lower level.  At lower concentrations, it's -- when you

14     get into normal atmospheric concentrations and parts per

15     million, it's really hard to get these huge graduations in

16     concentration because the gases have got such kinetic energy

17     as they move around, they just tend to mix.   In

18     thermodynamics it's called entropy.  Everything likes to mix

19     itself up as much as it possibly can.

20         MR. BOCK:  And I don't have any further follow-up to

21  those questions, Judge.

22         THE COURT:  All right.

23         Any follow-up questions from government counsel to the

24  jury questions?

25         MS. ANDERSON:  Yes, your Honor.  If I could have just a

1    second?

2                                    EXAMINATION

3    BY MS. ANDERSON:

4    Q    You were asked the question about if you had the garage with

5         the slab and the viscous solution, could it be expected to

6         run in this channel to both sides of the garage.  Do you

7         remember that question?

8    A    Yes.

9    Q    And I believe you said it depends on the whether there's any

10        kind of tilt to the garage itself, correct?

11   A    Part of my answer, yes.

12   Q    Now, the firefighters who went into the garage with the

13        MultiRae testified, and this was before the garage door was

14        breached, they testified that they saw ooze underneath the

15        door.  Would that change your opinion?

16   A    It depends on what they're actually talking about.  It would

17        be great if they had a picture, but I would expect that you

18        would see the ooze from the orange sealant, because it was

19        sealed all the way along the bottom and the sides.  I would

20        certainly expect them to see orange sealant down there.

21   Q    So that wouldn't change your opinion if the firefighters

22        testified before the garage was breached they actually saw

23        ooze underneath?  That doesn't change your opinion?

24   A    You've got to define -- you've got to tell me what ooze is.

25             MS. ANDERSON:  That's all I have.

1                 THE COURT:  All right.

2                 Mr. Bock, may this witness step down, then?

3                 MR. BOCK:  Yes, your Honor.

4                 THE COURT:  All right.  Thank you, sir.  You may step

5      down, and be excused.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2          I, Mary A. Riley, do hereby certify that I

3    stenographically reported the foregoing proceedings to the best

4    of my skill and ability, and that the same was transcribed by me

5    via computer-aided transcription, and that the foregoing pages of

6    typewritten matter are a true, correct and complete transcript of

7    all the proceedings had, as set forth in the title page hereto.

8          Dated this 18th day of April, 2013.

9

10                              s/ Mary A. Riley

11                         United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25