1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3   ----------------------------)
                                )
4                               )
    UNITED STATES OF AMERICA,    )
5              Plaintiff,       ) No. CA 13-10116 9th Circuit
                                )
6         vs.                   ) No. CR 11-01751 TUC-CKJ
                                )
7                               )     Tucson, Arizona
    TODD FRIES,                 )     October 4, 2012
8              Defendant.       )
                                )
9   ----------------------------)

10                 TRANSCRIPT OF TESTIMONY
                   JURY TRIAL DAY NINE
11
            BEFORE THE HONORABLE CINDY K. JORGENSON
12             UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15
    For the Plaintiff:   By:  Beverly K. Anderson, and
16                            David A. Pimsner
                              U.S. Attorney's Office
17                            405 W. Congress St., Suite 4800
                              Tucson, AZ   85701
18
    For the Defendant:   By:  Richard C. Bock
19                            100 N. Stone Ave., Suite 801
                              Tucson, AZ   85701
20

21
    Mary A. Riley, RMR, FCRR
22  United States Court Reporter
    U.S. District Court
23  405 W. Congress St.
    Tucson, AZ   85750
24

25       Proceedings produced by computer-aided transcription

2

1                    INDEX OF TESTIMONY

2

3    MARTY WEINSTEIN

4    Direct Examination by Mr. Bock          Page  3

5    Cross-Examination by Mr. Pimsner        Page  6

6

7    MICHAEL WEIGARD

8    Direct Examination by Mr. Bock          Page  6

9    Cross-Examination by Mr. Pimsner        Page  8

10   Redirect Examination by Mr. Bock        Page  9

11

12   CARMEN PATTY MARIE WILSON

13   Direct Examination by Mr. Bock          Page 10

14   Cross-Examination by Ms. Anderson       Page 21

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIPT OF PROCEEDINGS

2              (Marty Weinstein was duly sworn by the clerk.)

3                         MARTY WEINSTEIN

4                       DIRECT EXAMINATION

5    BY MR. BOCK:

6    Q    Sir, do you know Todd Fries?

7    A    Yes, I do.

8    Q    And how long have you known Todd?

9    A    About 12 years.

10   Q    Do you see him here in the courtroom?

11   A    Yes, I do.

12   Q    Can you point him out --

13   A    Yes.  That's Todd right over there.

14   Q    Okay.  You've got to say what he's wearing.

15   A    I'm sorry?

16   Q    You have to describe what he's wearing.

17   A    He's wearing -- looks like a blue suit with a striped tie,

18        white shirt, gray pants.

19            MR. BOCK:  May the record reflect he's identified

20   Mr. Fries?

21            THE COURT:  Yes, the record may so reflect.

22   BY MR. BOCK:

23   Q    Sir, what type of business do you own?

24   A    I own a cleaning business.  I sell equipment to clean

25        large -- large equipment.  I sell equipment.

1  Q    What is the name of your business?

2  A    Hotsy Industrial Systems.

3  Q    And how long have you owned that business for?

4  A    18 years.

5  Q    When did you first make the acquaintance of Todd Fries?

6  A    '98 or '99, I believe.

7  Q    And over the course of that period time did he purchase

8       equipment from you?

9  A    Yes.  He purchased quite a bit of equipment from me.

10  Q    What type of equipment did he purchase?

11  A    Pressure washers.  What I sell is large hot water pressure

12       washers.  They're manufactured on hot water.

13  Q    And did you know what business he was in?

14  A    Yes, he was in the cleaning business.

15  Q    Did you know the name of his business?

16  A    Burns Power Washing.

17  Q    And how many pieces of equipment did he purchase from you

18       over the years?

19  A    Seven or eight.

20  Q    And were the -- were these pieces of equipment also serviced

21       by you?

22  A    Yes.

23  Q    What type of services would you do?

24  A    We would rebuild the pumps, rebuild the engines, change

25       hoses out, and stuff like that, oil changes.

1    Q    Did you have discussions with him about -- about how his
2         business was doing?
3    A    Yes.  Always.
4    Q    Now, you also have an interest in motorcycles?
5    A    Yes, I do.
6    Q    Did you ever ride with him?
7    A    Yes, I did.
8    Q    Did you ever see him have a black trailer associated -- an
9         enclosed black trailer, enclosed -- associated with any of
10        his motorcycles?
11   A    No, I've never seen that.
12   Q    And how long did you ride with him?  How many -- how many
13        years ago did you start riding with him?
14   A    Oh, that's a good question.  I -- eight, nine years -- eight
15        years, seven years.
16   Q    Do you know my client to be anti-Semitic?
17   A    No.  Absolutely not.  I am Jewish.
18   Q    And how -- how do you know that he's not anti-Semitic?
19   A    Well, to tell you the truth -- interesting enough, he knows
20        I'm Jewish, and every year, Rosh Hashanah, Yom Kippur, he
21        would call me up on the phone, and -- if he doesn't show up
22        at the door himself, and he would wish me a Happy New Year
23        and Good Holidays.  Every year he did that.
24   Q    Thank you.  Thank you, sir.
25             THE COURT:  Cross-examination?

1                              CROSS-EXAMINATION

2    BY MR. PIMSNER:

3    Q    Sir, do you know that -- whether Mr. Fries actually owns a

4         trailer that he would use to pull bikes?

5    A    I -- I -- that I do not know.  I don't know that.

6    Q    Okay.  And is it your testimony that he has never been

7         anti-Semitic towards you, correct?

8    A    No, never.

9    Q    Are you aware that Mr. Fries when he had a dispute with a

10        customer of Jewish faith referred to her to his employee as

11        an F'ing Jew?

12   A    No, I've never heard that.  He's never said that to me.

13             MR. PIMSNER:  I have nothing further.

14             THE COURT:  All right.

15             Any redirect, Mr. Bock?

16             MR. BOCK:  Nothing further, your Honor.

17             THE COURT:  Any questions from the jury for this

18   witness?

19             All right.  Thank you, sir.  You may step down and be

20   excused.

21                      ------------------------

22             (Michael Weigard was duly sworn by the clerk.)

23                          MICHAEL WEIGARD

24                         DIRECT EXAMINATION

25   BY MR. BOCK:

1    Q    Sir, do you know Todd Fries?

2    A    Yes, sir.

3    Q    And can you point him out, and --

4    A    Right there.

5    Q    -- can you describe what he's wearing?

6    A    Suit and tie.

7    Q    What kind of --

8    A    Striped tie.

9            MR. BOCK:  May the record reflect he's --

10            THE WITNESS:  Looks like a brown suit.  My eyes aren't

11    that great.

12            THE COURT:  The record may reflect that he has

13    identified the defendant.

14    BY MR. BOCK:

15    Q    And how long have you known Todd for?

16    A    Since about 2007, 2006.

17    Q    And what business do you have, sir?

18    A    I have a commercial truck dealership.  We do sales and

19         service, and we sold Mr. Fries a couple of trucks for his

20         business.

21    Q    What type of trucks did you sell him?

22    A    Mitsubishi Fusos.  Commercial trucks.  Medium duty trucks.

23    Q    And did you service those trucks?

24    A    Yes, sir.

25    Q    And what type of service did you perform on those trucks?

1  A    Warranty work.  Preventative maintenance.  Any repairs that
2       were necessary.
3  Q    Did you change the oil?
4  A    Yes.
5  Q    Mr. Fries ever ask you for changed oil?  Did he ever ask you
6       if he could have the changed oil?
7  A    No.
8  Q    And has he -- he sent people to you, is that correct?
9  A    Yes.  He's referred people to us.
10 Q    Yes.  And did you write a -- a recommendation regarding his
11      business?
12 A    As far as -- yes, I have, as a matter of fact.
13 Q    Okay.
14           MR. BOCK:  All right.  Thank you, nothing further.
15           THE COURT:  All right.
16           Cross-examination?
17                        CROSS-EXAMINATION
18 BY MR. PIMSNER:
19 Q    Sir, is it fair to say that you have a business relationship
20      with Mr. Fries?
21 A    Yes, that would be correct.
22 Q    You don't have a personal relationship with him?
23 A    Not really.
24 Q    And you know him because he's a customer of yours, correct?
25 A    Yes.

```
1    Q    Now, he would bring his trucks that you sold him for
2         service.  Do you know if he had any equipment on the back of
3         those trucks that he used for his business?
4    A    Well, yes.  He had power washing equipment.  That's why he
5         bought the trucks.
6    Q    And when you would change the oil, you would change the oil
7         just on the actual truck and not on the power wash
8         equipment, correct?
9    A    Yes.  Right.
10   Q    So that was not done by you it would have been done
11        elsewhere or by Mr. Fries, correct?
12   A    Presumably, yes.
13   Q    And when you change oil on a vehicle, you recycle that oil,
14        correct?
15   A    Right.
16   Q    And you're aware that the power washing machines on the back
17        of the truck do require oil, correct?
18   A    I hadn't really considered it.  Never -- never been asked to
19        do anything with the machines.  He had different people that
20        serviced that.  It wasn't in our area of expertise.
21             MR. PIMSNER:  Thank you.  Nothing further.
22             THE COURT:  All right.
23             Any redirect?
24                        REDIRECT EXAMINATION
25   BY MR. BOCK:
```

1  Q    You said at the very end to the Assistant U.S. Attorney
2       other people did this.  Do you know Mr. Marty Weinstein?
3  A    Pardon me?
4  Q    Do you know Marty Weinstein?
5  A    I met him, yes.
6  Q    Do you know Hotsy?
7  A    Yeah.  Actually, we bought a used piece of equipment from
8       him.  I wasn't involved in that directly, but we did.
9  Q    Okay.
10             MR. BOCK:  Thank you.
11             THE COURT:  All right any questions from the jury for
12 this witness?
13             All right.  Thank you, sir.  You may be excused.
14             -------------------------
15             (Carmen Patty Marie Wilson was duly sworn by the
16 clerk.)
17                    CARMEN PATTY MARIE WILSON
18                       DIRECT EXAMINATION
19 BY MR. BOCK:
20 Q    You're -- you go by Patty, is that correct?
21 A    Yes.  Thank you.
22 Q    Now, Ms. Wilson, do you know Todd Fries?
23 A    Yes, I do.
24 Q    And how long have you known Todd for?
25 A    Since 2000.

```
 1   Q    And was there a time that you were involved in a
 2        relationship with Todd?
 3   A    Yes.
 4   Q    For how long a period of time?
 5   A    Oh, for three or four years.
 6   Q    Did you work for Todd, or did you assist Todd in his
 7        business?
 8   A    I assisted him in his business, yes.
 9   Q    And what business was that?
10   A    Burns Power Washing Service.
11   Q    Now, do you see Todd in the courtroom?
12   A    Yes, I do.
13   Q    Could you just describe what he's wearing?
14   A    He's wearing a blue suit, white shirt, nice tie.
15             MR. BOCK:  Can the record reflect that she's identified
16   Mr. Fries?
17             THE COURT:  Yes, the record may so reflect.
18   BY MR. BOCK:
19   Q    So tell -- can you tell the jury what you did with respect
20        to the business?
21   A    Oh, of course.  Of course.  Todd had asked that I help him
22        keep track of his books, pay bills for him several years
23        ago, which I did.  And I bought a little software package
24        called QuickBooks that helps to do that.  And he would bring
25        his bills to me, and I would pay them.  And he would tell me
```

|    |   |                                                                              |
|----|---|------------------------------------------------------------------------------|
| 1  |   | what they were for, and so I'd categorize them into those --                  |
| 2  |   | those processes.  And then I would give him that information                  |
| 3  |   | so that he could fill out his taxes, or send his tax                          |
| 4  |   | information to his accountant, because that's who did his                     |
| 5  |   | taxes.                                                                        |
| 6  | Q | Now, you worked for the business for a number of years, is                    |
| 7  |   | that correct?                                                                 |
| 8  | A | That is correct.                                                             |
| 9  | Q | How many people would he have that were associated --                         |
| 10 |   | workers with the business over the years?                                     |
| 11 | A | Oh, at one time he had -- I think six was the maximum number                  |
| 12 |   | of associates, and he'd have as few as one or two.                           |
| 13 | Q | Was he advertising?                                                           |
| 14 | A | Oh, yes.                                                                      |
| 15 | Q | And were you paying the advertising bills too?                                |
| 16 | A | I would submit those checks, yes.                                             |
| 17 | Q | And he had a number of vehicles associated with the                          |
| 18 |   | business, is -- is that correct?                                             |
| 19 | A | That's correct.                                                              |
| 20 | Q | Burns power --                                                               |
| 21 | A | Burns Power Washing Service, LLC.                                             |
| 22 | Q | And he had to buy products to do --                                          |
| 23 | A | Oh, to do the power washing?  Absolutely.  He had lots of                     |
| 24 |   | products.                                                                     |
| 25 | Q | What were -- are you familiar with some of the jobs, or                       |

|     |   |                                                                         |
|-----|---|-------------------------------------------------------------------------|
| 1   |   | what -- what the customers were asking for, or what he was              |
| 2   |   | doing?                                                                   |
| 3   | A | Yes.                                                                    |
| 4   | Q | What -- what type of jobs was Burns Power Washing being                 |
| 5   |   | hired to do?                                                            |
| 6   | A | To clean garage floors, and driveways, and sidewalks, and               |
| 7   |   | walls.  Also to do coating, to put down paint, so to speak,             |
| 8   |   | on -- or to remove it if they had done -- been done                     |
| 9   |   | previously, to remove it and re-do it.  He did artistry work            |
| 10  |   | on some of the garage floors at the customer's request.                 |
| 11  | Q | Were you familiar with some of the products that he needed              |
| 12  |   | to purchase to -- to run the business?                                  |
| 13  | A | Yes.                                                                    |
| 14  | Q | What would some of the products be?                                     |
| 15  | A | Well, different kinds of paints from different stores.  He               |
| 16  |   | used Behr products from Home Depot for a long period of                 |
| 17  |   | time, and that product didn't prove to be as reliable, so he            |
| 18  |   | moved on to two or three other products.  And recently --               |
| 19  |   | his most recent was Sherwin Williams paints.  He also used              |
| 20  |   | chlorine, liquid chlorine, muriatic acid to etch the                    |
| 21  |   | concrete, to make it ready to put down paint.  He used                  |
| 22  |   | Fabuloso, Mr. Clean.  You know, he'd buy it by the gallons              |
| 23  |   | from Costco.  And different kinds of cleaning products.  He              |
| 24  |   | used silica sand to take certain information -- or graffiti             |
| 25  |   | off of walls when he'd get called for that.                            |

1   Q   How many -- how many jobs -- how many jobs might be

2       scheduled in a -- in a day's period of time?

3   A   Oh, he could have as many as three or four if they were

4       small jobs, or one that would last several days or weeks if

5       it was large jobs.

6   Q   You were familiar with what his overhead was?

7   A   Yeah.  He had a tremendous overhead, because he did spend a

8       lot of money on advertising, almost $100,000 a year just on

9       advertising.  He was a strong believer in that, and I did --

10      I did go with him to a small business counselor and they did

11      advise him that advertising was one of the best things that

12      he could do to help his business.  So he was a strong

13      believer in that.  So --

14   Q   What was his -- what was his monthly amount, if you know.

15          MS. ANDERSON:  Objection, your Honor, relevancy.

16          THE COURT:  No overruled.

17          Go ahead.

18          THE WITNESS:  On a monthly basis, he would probably

19 spend at least $30,000 on expenses.

20 BY MR. BOCK:

21   Q   And how much was the business grossing, if you know?

22   A   Annually around 300 to 350,000.

23   Q   Now, there's been some discussions about woodpeckers.  Do

24      you know if he has a dislike of woodpeckers?

25   A   Yes, I know he has a dislike for woodpeckers, as do I.

1    Q    And do you know why?

2    A    They destroy your home.  They peck at the stucco, and make

3         holes, and it causes water to seep in, and ruins the walls,

4         and they're very -- they're a very destructive animal -- or

5         bird.  They chase away the hummingbirds, which are

6         beautiful.

7    Q    And did he have -- did the vehicles have to have -- were you

8         responsible for making sure the vehicles -- the insurance

9         was paid on the vehicles?

10   A    That's correct.  He would bring me that -- that envelope,

11        and I would pay those -- write checks for those.

12   Q    License fees on vehicles?

13   A    Correct.

14   Q    Taxes for payrolls?

15   A    Yes.  The QuickBooks helped me to determine that for the

16        deductions out of the employee checks as well as it

17        automatically did the W-3 and the W-2's at the end of the

18        year.

19   Q    Do you know if there's been -- you know, there's been some

20        testimony about spoof cards.  Do you know anything about

21        that?

22   A    Part of Todd's advertising campaign included participating

23        in the home shows once or twice a year.  And I remember one

24        year some -- neighboring person at the home show, another

25        vendor, introduced spoof cards, and gave Todd a few of them,

1        and he was showing them to me.  I'm not too sure what they

2        do, but the word spoof cards takes me back to some time at

3        the home show.

4   Q    Now, do you -- you were working for him when he was -- he

5        was contracted by the Levines, is that correct -- Mr. and

6        Mrs. Levine.  Do you remember that?

7   A    I don't remember the name.

8   Q    Okay.  Did he have -- would you remember the name if he ever

9        said anything uncomplimentary about them, and used their

10       name?

11  A    Certainly I would, but he was never uncomplimentary.

12  Q    Okay.  Now I'm going to --

13            MR. BOCK:  May I approach, your Honor?

14            THE COURT:  Yes.

15            MR. BOCK:  423.

16  BY MR. BOCK:

17  Q    I'm going to show you a packet of documents having to do

18       with Burns Power Washing.  It's Exhibit 423, and ask you if

19       you can -- if you recognize those?

20  A    Oh, yes, I do.

21  Q    Okay.  And how do you recognize those, without indicating

22       what they are?

23  A    They're documents that I had, and I provided them for you.

24  Q    Okay.  And these documents that you came across in your

25       capacity as the business manager?

1  A    As the bookkeeper, yes.

2  Q    And what are the documents?

3  A    They're in different formats.  One is an e-mail, and another

4       is just a copy of a check.  But all of them are -- have to

5       do with refunds to customers, or checks the payment had been

6       stopped on by customers throughout the -- a few years.

7  Q    So there have been instances when refunds have been made to

8       customers by Burns Power Washing, correct?

9  A    Yes.

10 Q    And there have been instances when Burns Power Washing has

11      received an insufficient check or stop payment?

12 A    Correct.

13 Q    And you've seen those?

14 A    Yes, I have.

15 Q    And this demonstrates some of those instance, is that

16      correct?

17 A    Yes, it does.

18           MR. BOCK:  Move to admit 423, your Honor.

19           MS. ANDERSON:  Government objects, your Honor.

20           THE COURT:  All right, could I see the exhibit at

21 sidebar, please?

22                        BENCH CONFERENCE

23           THE COURT:  Let's see, so why is this relevant -- well,

24 let me hear your objection first.

25           MS. ANDERSON:  It's inadmissible hearsay, your Honor.

1    It contains a lot of superfluous information that has no bearing

2    on any of the issues in the case.  I think -- and -- and he's

3    trying to smuggle in character evidence by means of specific

4    conduct.

5            THE COURT:  All right.  These are letters from --

6    they're from Todd Burns to Pat Wilson.

7            MR. BOCK:  It's not smuggling.

8            MS. ANDERSON:  Smuggle.

9            MR. BOCK:  That's artful, and that's not meant to --

10           MS. ANDERSON:  With all due respect.

11           THE COURT:  So Mr. Bock, these are all letters that --

12   people who got refunds who were unhappy?

13           MR. BOCK:  To show people got refunds, and that -- you

14   know, here's a stop payment check.  It's just to -- you know, to

15   show that these things happened in the course of his business.

16   It's -- and I gave the government these.

17           THE COURT:  This one is a letter from your client.

18           MR. BOCK:  I can pull the letter if you want.

19           MS. ANDERSON:  It's -- your Honor, it's essentially --

20   he's not putting his client on the stand, but he's getting in all

21   of this evidence through another witness by means of letters.

22           THE COURT:  Well --

23           MS. ANDERSON:  It's all hearsay.

24           THE COURT:  Well, these are -- this is the records

25   exception to the hearsay rule.  This woman is his bookkeeper.

1    You're not saying they're inaccurate records, or -- are you?  I

2    mean, these are business records.

3              MS. ANDERSON:  I'm not -- right.

4              THE COURT:  I'm going to overrule the objection, except

5    at to this Dear Linda, which is a letter from your client to

6    Linda.

7              MR. BOCK:  That's fine.

8              THE COURT:  And I don't know if this document goes with

9    that, or --

10             MR. BOCK:  This just says a refund for -- I think it

11   does go with that.  It's an overcharge.  Does that go with that

12   document?  These support these.

13             THE COURT:  So let me see -- let me just look closely

14   at these others.

15             So did she say that she dealt with all of these

16   individuals?

17             MR. BOCK:  I'll ask the question again, if you --

18             THE COURT:  If you could just establish under the

19   business records exception that she's aware of these documents,

20   and --

21             MR. BOCK:  Do you want me to ask her specifically --

22             THE COURT:  Of course.  These aren't records -- well,

23   here's a record of the business.  Who's Yvette Castro?

24             MR. BOCK:  I don't know.

25             THE COURT:  Oh, this is just her signing that she got

```
 1    the money, but it came from Burns Power Washing.
 2              MR. BOCK:  Right.
 3              THE COURT:  Refund to customer.
 4              MR. PIMSNER:  It's from the defendant.  It looks like
 5    he signed it.
 6              THE COURT:  All right.  I'm going to overrule the
 7    objection as to the records, except for that longer letter from
 8    your client to the former customer, the Dear Linda letter.
 9              MR. BOCK:  Yeah, just these three papers, then?
10              THE COURT:  Right.
11              MR. BOCK:  Okay.
12              THE COURT:  All right.
13              (The bench conference was concluded.)
14              THE COURT:  All right, Mr. Bock, you may proceed.
15    BY MR. BOCK:
16    Q    This document, 473, has been admitted, and --
17              MR. BOCK:  May I approach again, your Honor?
18              THE COURT:  Yes.
19    BY MR. BOCK:
20    Q    And those documents, which you're familiar with and you've
21         reviewed, show on one occasion -- at least one occasion
22         there was a -- a bad check, is that correct?
23    A    Correct.
24    Q    And on other occasions there were refunds that were made by
25         the company, is that correct?
```

```
 1   A    That's correct.

 2   Q    And you know Mr. Fries' residence, is that correct?

 3   A    Yes.

 4   Q    And you're familiar with his vehicles, where he lives, and

 5        things like that, is that correct?

 6   A    Correct.

 7   Q    Familiar that he owned motorcycles?

 8   A    Yes.

 9   Q    Did you ever see a black enclosed trailer on -- in his

10        property or on his property at any point in time?

11   A    Never a black enclosed trailer, no.

12              MR. BOCK:  May I have a second, your Honor?

13              THE COURT:  Yes.

14              MR. BOCK:  No further questions, your Honor.

15              THE COURT:  Cross-examination?

16                          CROSS-EXAMINATION

17   BY MS. ANDERSON:

18   Q    Ma'am, you were once engaged to the defendant, correct?

19   A    Correct.

20   Q    Engaged to be married, correct?

21   A    Correct.

22   Q    Do you recall when that was?

23   A    Approximately five years or six years ago.

24   Q    And you were engaged for how long?

25   A    Oh, three or four years.
```

```
 1   Q    So you still have feelings for Mr. Fries, correct?

 2   A    He's a very good friend.

 3   Q    You still have feelings for him, correct?

 4   A    A very good friendship.

 5   Q    You maintain contact with him, correct?

 6   A    Yes.

 7   Q    You're not intimately familiar with each of the transactions

 8        that he engages in, correct?

 9   A    Could you -- I'm sorry, I don't understand the question.

10   Q    You have another job, isn't that right?

11   A    Oh, yes, I do.

12   Q    You -- tell us what you do?

13   A    I'm a director with a large multi facility health care

14        system.

15   Q    I imagine that takes a lot of your time --

16   A    Absolutely.

17   Q    -- correct?

18            You probably work more than 40 hours, is that right?

19   A    Yes, ma'am.

20   Q    So this is a favor that you do for Mr. Fries, correct?

21   A    That's -- yes, it's a favor.

22   Q    And you're certainly not present when he does -- or his

23        workers do all of the work that they do, correct?

24   A    No, I'm not.  I have been at several of the jobs in the

25        past.  I've gone with him.  I've helped him.  I've helped
```

1           him and his workers many, many, many times.

2   Q       So when you described for the jury the kind of jobs that

3           he -- that he's done, you're not -- you're not necessarily

4           present or intimately familiar with each of his jobs,

5           correct?

6   A       Not with each of them, no.  By intimate -- could I ask you

7           to please clarify what you mean by intimately involved?

8   Q       Well, you certainly don't know all of the details of each --

9           each of the jobs that he performs, correct?

10  A       But I do know the details of many of the jobs.  I don't

11          understand the word intimately involved.

12  Q       Well, you've got -- you've got your own job?

13  A       Of course.

14  Q       And you work 40 hours a week?

15  A       More than -- we've already established more than 40 hours a

16          week.  Absolutely.

17  Q       So when you talk about the jobs that he might do on a daily

18          basis, you have no specific information about the kinds of

19          jobs that he's doing, correct?

20  A       I'm not physically present at all of the jobs that he does,

21          but I do know what he's doing, and what kind of jobs, and

22          what it takes to get it done.

23  Q       You see the receipts and the checks, correct?

24  A       Yes.

25  Q       Now, I think you said that you've never heard Mr. Fries say

1         anything derogatory about any of his customers, correct?

2    A    That is correct.

3    Q    Are you aware of the fact that he called one of his

4         customers an F'ing Jew?  Are you aware of that?

5    A    No.  He's got several Jewish friends that I'm familiar with

6         myself.

7              MS. ANDERSON:  That's all I have.

8              THE COURT:  All right.

9              Any redirect, Mr. Bock?

10             MR. BOCK:  No redirect, your Honor.

11             THE COURT:  All right.

12             Any questions from the jury for this witness?

13             All right.  Thank you, ma'am.  You may step down and be

14   excused.

15

16

17

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T E

2              I, Mary A. Riley, do hereby certify that I

3    stenographically reported the foregoing proceedings to the best

4    of my skill and ability, and that the same was transcribed by me

5    via computer-aided transcription, and that the foregoing pages of

6    typewritten matter are a true, correct and complete transcript of

7    all the proceedings had, as set forth in the title page hereto.

8              Dated this 11th day of April, 2013.

9

10                                        s/ Mary A. Riley

11                               United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25