1               UNITED STATES DISTRICT COURT

2                   DISTRICT OF ARIZONA

3    ----------------------------)
                                 )
4                                )
     UNITED STATES OF AMERICA,   )
5                   Plaintiff,   ) No. CA 13-10116 9th Circuit
                                 )
6            vs.                 ) No. CR 11-01751 TUC-CKJ
                                 )
7                                )      Tucson, Arizona
     TODD FRIES,                 )      March 1, 2013
8                   Defendant.   )
                                 )
9    ----------------------------)

10

11                  TRANSCRIPT OF SENTENCING

12

13        BEFORE THE HONORABLE CINDY K. JORGENSON
                UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16
     For the Plaintiff:    By:  Beverly K. Anderson, and
17                              David A. Pimsner
                               U.S. Attorney's Office
18                             405 W. Congress St., Suite 4800
                               Tucson, AZ   85701
19
     For the Defendant:    By:  Richard C. Bock
20                             100 N. Stone Ave., Suite 801
                               Tucson, AZ   85701
21

22   Mary A. Riley, RMR, FCRR
     United States Court Reporter
23   U.S. District Court
     405 W. Congress St.
24   Tucson, AZ   85750

25        Proceedings produced by computer-aided transcription

<pre>
 1                    TRANSCRIPT OF PROCEEDINGS

 2   (2:03 p.m.)

 3              MS. ANDERSON:  Beverly Anderson and David Pimsner for

 4   the United States.  Good afternoon.

 5              THE COURT:  Good afternoon.

 6              MR. BOCK:  Afternoon, your Honor.  Richard Bock on

 7   behalf of Mr. Fries, present and prepared to be sentenced.

 8              THE COURT:  Good afternoon.

 9              And before I have Mr. Fries approach the podium, why

10   don't I have each side discuss with the Court the advisory

11   guidelines and the application of those guidelines.  As one of

12   the statutory factors of sentencing the Court needs to calculate

13   the guidelines, and make findings on those.

14              So let's see, Mr. Bock, you have objected to the

15   advisory guideline calculations contained in the presentence

16   report, your Document 244.  So if you want to approach the podium

17   and be heard further on those issues.

18              MR. BOCK:  Judge, with respect to the -- the

19   objections, I also had an argument on disparity.  Would you wish

20   me to save that when we -- when I argue further on behalf of

21   Mr. Fries?

22              THE COURT:  Right.  Why don't we -- you can talk about

23   that, and perhaps you'll be arguing that the advisory guidelines

24   maybe shouldn't even apply to this case, and talking about the

25   other statutory factors of sentencing.  So if you just want to
</pre>

1  cover at this point the objections that you raised to the

2  calculations in the presentence report.  The first one would

3  be -- let's see, I don't think you have any objection to the base

4  offense level of 28?

5          MR. BOCK:  No, we did not object to that, your Honor.

6          THE COURT:  Right, but the plus four, which is

7  paragraph 31, under 2M6.1(b)(3), did you want to be heard further

8  on that objection?

9          MR. BOCK:  Yes.

10          Judge, I looked at the guidelines and the four level

11  adjustment, and I respectfully disagree with the presentence

12  report author regarding the fact that he felt that that was

13  applicable in this case.

14          First of all, I would say that the burden is on the

15  government to -- as the proponent, or -- it's not my burden on

16  these level offense computations.

17          Secondly, I would also say as to the -- the

18  adjustments, there were no special interrogatories that the jury

19  found reference the four level adjustment or the two level

20  adjustment for obstruction.  So I'd like to just to make that

21  also part of the record.  As --

22          THE COURT:  But would you agree the jury doesn't have

23  to make findings unless it increases the statutory maximum,

24  right?

25          MR. BOCK:  I would agree to that, but I would just like

1    to make that part of the record.

2          THE COURT:  All right.  Go ahead.

3          MR. BOCK:  Now, my interpretation of the four level

4    adjustment, which is substantial disruption of public,

5    governmental, or business functions or services, and substantial

6    expenditure of funds to clean up decontaminated or otherwise

7    respond to the offenses, I think that that is tied to a

8    definition of a weapon of mass destruction.  I think you have to

9    find that -- in order for that level to be applicable, that there

10   has to be a specific finding that the event that my client stood

11   convicted of, the chemical event, was a weapon of mass

12   destruction.  I think that -- I don't see anything that suggests

13   otherwise.  There's the definition of weapon of mass destruction,

14   and the mass destruction -- that definition is in the -- it's in

15   that guideline under that -- under that section.

16         And what I would say to you, Judge, is if you look at

17   this case, this whole case involved a -- the claim that he was

18   convicted of, of a chlorine cloud.  The cloud was never measured.

19   I'm not here to retry the whole case, but the -- the reading of

20   five -- of five parts per million, whatever the reading was, was

21   confined to the garage.  The cloud was never measured.  There

22   were some people that had shortness of breath.

23         Again, I'm not here to try the whole case, but I do not

24   think that the facts support that what was involved here is a

25   weapon of mass destruction, and I do think you have to find a

1    weapon of mass destruction in order to apply this four level

2    adjustment.

3         I don't think it's any different than if someone -- if

4    someone is put in a garage and they're kept against their will

5    and a car is running and there's carbon monoxide and that person

6    is affected by that carbon monoxide within that garage, is that a

7    weapon of mass destruction?  Is that what the -- the intent was

8    to -- to use any type of event and claim it's a weapon of mass

9    destruction?  If that's the case, I think that provision, then,

10   is unconstitutionally overbroad.

11        And I do think, Judge, that this weapon of mass

12   destruction is connected to this four level adjustment, and does

13   not exist in this case.

14        THE COURT:  All right.  Thank you, Mr. Bock.

15        MR. BOCK:  And --

16        THE COURT:  So that's on that particular issue.  And

17   I'll hear from the government after I hear from you on your next

18   objection, which is the obstruction of justice, 3C1.1, objection.

19   And let me just tell you that in this case the defendant was

20   convicted of two counts, prohibition against chemical weapons,

21   and false statements.  And the Court does intend to give

22   concurrent sentences for those two counts.  So I just want to

23   tell you that in advance, because I think one of your arguments

24   would be that this would be double counting, which I agree with

25   the probation office is allowed in any event, but you might

1    refocus your arguments given the fact that the Court is inclined

2    to give concurrent sentences for these two counts as opposed to

3    consecutive sentences.

4              MR. BOCK:  Judge, the -- the -- neither the -- the

5    author of the presentence report or the government filed, in my

6    opinion, any controlling authority in support of their position,

7    and the Court, obviously, with the vast amount of experience that

8    the Court has, knows heartland cases that talk about obstructing

9    justice, and of course, the lying at trial, absconding from

10   Pretrial Services, fleeing during or after trial, lying during a

11   presentence interview, threatening a witness, or false testimony

12   in a prior civil trial.  The conduct here that they're claiming

13   supports this obstruction of justice is the exact conduct that

14   was in the charged event.

15             And there's a case that came out, United States versus

16   Manning, that says -- which is November 21st, 2012.  It was a

17   Ninth Circuit case with Judge Kozinski as one of the panelists,

18   was a per curium opinion, that said that the obstruction can also

19   extend to another offense charged in -- in another case.

20             But the government sets forth in their objection

21   actions -- three actions which they felt were set forth at trial

22   that -- in their case in chief which support an obstruction of

23   justice, and I -- I would respectfully suggest that that was

24   direct proof from the government to -- with respect to the -- the

25   false statement.  And --

1          THE COURT:  Didn't that directly impact the

2    investigation, though, or attempt to impact the investigation?

3          MR. BOCK:  Well, I would say to you, Judge, that the

4    behavior has to be in addition to the crime.  It has to be in

5    addition to the crime.  It can't be ancillary to the crime.  It

6    can't be the crime itself.  And when they say the -- the -- the

7    documentation that led to the -- the F.B.I. to look at

8    Mrs. Fuentes and the other witness, that was the basis of the

9    phone call that said those things, the basis of evidence they had

10   that led to the charge of that crime.  And I -- I don't think

11   that there was anything outside of the conviction of that offense

12   that constitutes obstruction of justice.

13          And I would say that the obstruction of justice is

14   committed in relation to the count of the conviction, which means

15   that it is -- it's ancillary.  There was no outside -- there's

16   nothing outside -- excuse me, there's nothing that was done

17   outside other than conduct, Judge, which -- which the defense

18   feels -- and again is the burden of proof of the -- of the

19   proponent, which the defense feels was any -- anything other than

20   what was the basis of the conviction.  The jury heard all of the

21   facts.

22          THE COURT:  So you're saying that if the government had

23   elected not to file Count 2, the false statement charge, that

24   then this enhancement might be appropriate?

25          MR. BOCK:  I'm saying that -- right, because he was

1    convicted of -- he was convicted of something, and they're

2    claiming that the conviction was based upon, you know, conduct

3    which -- which supported the -- the -- the material misstatement

4    to the -- to the F.B.I., and I just don't feel that that is

5    warranted under the -- under the facts.

6            You heard the facts.  It was a ten day jury trial.  You

7    had motions on this case that you -- that you heard.  You

8    reviewed motions that were argued in front of the -- in front of

9    the magistrate.  And you know -- you know the case, Judge, in and

10   out, just like I do and just like the government does.  And this

11   obstruction of justice, you know, is not warranted.  This two

12   level increase for obstruction of justice is not warranted in

13   this case.

14           THE COURT:  All right.  Thank you, Mr. Bock.

15           MR. BOCK:  Thank you, Judge.

16           THE COURT:  And relating to the restitution issues, I

17   think both sides agree that the Court will need to set an

18   additional hearing on a different day?

19           MR. PIMSNER:  That's correct, your Honor.

20           THE COURT:  All right, so I don't need to hear from

21   either side on those issues.

22           All right, so now if the government wants to respond.

23   I have reviewed your written response as well as the probation

24   officer's response to the objections, but go ahead.

25           MR. PIMSNER:  Good afternoon, your Honor.

1            First of all, as to -- as the four level enhancement

2   under 2M6.1, I'd like to point out that the defendant in his own

3   objection in his pleading when we're talking about a substantial

4   disruption or expenditure to clean up or decontaminate, he

5   specifically states that this factor is not in dispute and is not

6   the basis for the objection.

7            His whole basis -- so when he says it's our burden, he

8   has conceded that we have met our burden on that issue.  So the

9   issue becomes whether or not under the -- the guidelines, whether

10  or not it has to be a weapon of mass destruction to apply.

11           He's referring to -- specifically, in the latest

12  guideline book, your Honor, under the first paragraph which --

13  under commentary, which sets forth a list of statutory sections

14  that apply to this guideline.

15           THE COURT:  So the question is whether those

16  parenthesis -- what do those mean?

17           MR. PIMSNER:  Well, clearly it applies only to

18  842(p)(2) because it gives -- it gives a list of six or seven

19  statutes, then -- comma, then 842(p)(2), parenthesis, weapons of

20  mass destruction, coma, end of parenthesis, coma, and then it

21  continues with additional statutes, another seven or eight

22  statutes.  That clearly shows that it only applies to the statute

23  of -- involving 842(p)(2), and it doesn't apply to every one of

24  the statutes that 2M6.1 applies to.

25           Notwithstanding that, you know, it's clearly the charge

1    that he's been convicted, the 18 U.S.C. 229, is a charge that

2    fits this guideline and the enhancements.  Even -- and I don't

3    think we ever have to get to the WMD definition, but if it still

4    also has to comply with that, it fits that definition.  If the

5    Court looks at that statute, it talks about -- it talks about a

6    weapon that is designed or intended to cause death or serious

7    injury through the release, dissemination, or impact of toxic or

8    poisonous chemicals or their precursors.  That's clearly what

9    happened here.  The Court heard days worth of testimony from

10   chemists, from WMD experts -- material experts, excuse me, that

11   that's what occurred in this case when he chose to combine those

12   various ingredients to produce this massive chlorine cloud.  So

13   in any event, this four level enhancement clearly applies to this

14   situation.

15            As far as the obstruction under 3C1.1, first of all,

16   factually we disagree that it's more than just -- we assert that

17   it's more than just the phone call.  We disagree -- that you look

18   at the case in its entirety.  You have the day planner, the check

19   that was prepared, the notations that were prepared on the check,

20   the various forms of graffiti that tried to make it look like a

21   hate crime.  All of these were efforts to throw off law

22   enforcement to dispel their belief that it was Mr. Fries, that it

23   was some other person responsible.  The phone call was part and

24   parcel so that.

25            But that doesn't really matter, because if -- if you

1    look at 3D1.2(c), which the presentence report lays out, the

2    false statement charge was grouped together with the -- the

3    chemical weapon charge, and it specifically states in 3D1.2(c)

4    that that is appropriate -- excuse me, I'm sorry.  I've got too

5    many papers in front of me.  That it's appropriately grouped, so

6    it's not given any additional credit, no additional type

7    enhancement in and of itself because it's grouped because it had

8    substantially the same harm as the specific -- and that -- and as

9    3D1.2(c) says, and it's also treated as a specific offense

10    characteristic to the other counts.  And that's exactly what

11    happened here.  It's treated as a separate offense characteristic

12    to Count 1, the chemical weapon charge.

13          And if you look at the notes that come under 3C1.2

14    those also clearly state at the very end of the notes section

15    that this adjustment applies to any other obstructive conduct in

16    respect to the official investigation, prosecution, or sentencing

17    of the instant offense where there is a separate count of

18    conviction for such conduct.  The guidelines specifically say

19    there can be a separate count of conviction, and that would

20    warrant this enhancement applying.  So under those two -- the

21    bases, we believe that it is appropriate to grant both

22    enhancements.

23          And also -- we've also suggested under 5K2.0 that there

24    are circumstances not adequately taken into -- in connection with

25    this case that could warrant the Court even departing higher.

1    And specifically, those were the -- the harm that wasn't

2    contemplated by the guidelines, or the harm to the multiple

3    victims involved here.  We had not only the Levines that were

4    adversely affected, but we had the community, the first

5    responders.  Many of those individuals suffered the ill effects

6    of the chlorine gas that this defendant created.  Based on those

7    under comment note 3(b)(2), the fact that it doesn't adequately

8    take into account the multiple people that were affected by his

9    unlawful conduct, we believe the Court could even enhance --

10    enhance his sentence, and go above the current recommended

11    guidelines.

12            And that's it, I think, at this point for the

13    objections.

14            THE COURT:  All right.  Thank you, Mr. Pimsner.

15            All right, so I will make some findings as to the

16    guidelines.

17            It is ordered the presentence report is made a part of

18    the record.  The Court finds that the report accurately describes

19    the offense conduct.  The Court adopts those facts as well as,

20    obviously, the facts that were brought out during the trial from

21    the various witnesses and exhibits.

22            So we have a base offense level of 28.  The Court

23    overrules the defense objection as to paragraph 31, which is the

24    2M6.1(b)(3).  The Court finds that that four level enhancement is

25    appropriate for the reasons stated in the government's argument

1    and in the probation officer's response to the defense

2    objections.  I read it the same way that the government and

3    probation department does.  I think that that section clearly

4    applies to -- to this particular base offense level under 2M6.1.

5           So -- and in any event, even if it didn't apply, an

6    enhancement would be appropriate because there was a substantial

7    expenditure of funds to clean up, to decontaminate or otherwise

8    respond to the offense, and substantial disruption of public,

9    governmental, or business functions or services.  So even if it

10   technically for some reason did not apply, the Court finds that

11   under 5K2.0 that would be an applicable enhancement, but the

12   Court does find that 2M6.1(b)(3) does apply, and the four level

13   enhancement is appropriate.

14          Further, the Court overrules the defense objection as

15   to the adjustment for obstruction of justice.  We all have

16   traditional ideas maybe of what obstruction of justice is, and

17   that's clearly covered in this guideline, but it also clearly

18   covers obstruction of justice during the investigation of a crime

19   under 3C1.1.  And further, the guideline clearly tells us that it

20   doesn't matter if there is a count of conviction relating to that

21   activity.  It still can be applied.

22          So in my discretion the Court finds that the government

23   has met its burden of proof as to both of these guideline

24   enhancements, and I will apply the two level enhancement under

25   3C1.1.

1          The guidelines are obviously advisory, but the Court

2   needs to calculate them.

3          The statute calls for a sentence of up to life

4   imprisonment for the -- Count 1, and up to 5 years for the false

5   statement charge.

6          So we have an adjusted offense level of 34, a criminal

7   history category of one, for a range under the Advisory

8   Sentencing Guidelines of 151 to 188 months in custody, and a 60

9   month guideline sentence as to Count 2.  The statute would be

10  anywhere from 0 to 5 years.

11         So that's the relevant guideline finding from the

12  Court, 151 to 188 months.

13         So now, the Court has calculated preliminarily the

14  advisory guidelines.  I understand there may be additional

15  arguments requesting either a departure -- departure, a variance,

16  or discussions as to where within that range the Court should

17  sentence.

18         At this point unless counsel want to proceed otherwise,

19  I would suggest that the victims are present and do want to be

20  heard.  They could come up and be heard at this time.

21         I do have the impact letter that they -- it's not

22  dated, but I do have that.  It's a three page document.

23         Mr. Bock, have you seen that?

24         MR. BOCK:  Yes, your Honor.

25         THE COURT:  Further, just for the record, I have the

1  numerous letters, Mr. Bock, that you've submitted on your

2  client's behalf, and the objections to the presentence report

3  which we've been discussing, and the responses that counsel have

4  filed.

5         So -- let's see, so how do counsel want -- are you

6  ready to proceed with that portion of the sentencing, then?

7         MS. ANDERSON:  Yes, your Honor.  And the Levines are

8  here, and they would like to address the Court.

9         THE COURT:  All right.

10         Let's see, Mrs. Levine first, you're standing.  Come on

11  up, ma'am.  If you could come up to the podium, and talk right

12  into the microphone for us, please.

13         And I do have the letter that you and your husband

14  wrote, and I've reviewed that.

15         MRS. LEVINE:  Okay.

16         THE COURT:  Okay.  Mr. Levine, is here also.

17         All right.  Go ahead, ma'am.

18         MRS. LEVINE:  Good afternoon, your Honor.

19         I've had -- I've had -- have had several months to

20  rethink on what I wanted to say, and I feel in this paragraph it

21  says it all.

22         There is no justification for these horrific acts that

23  you have done to us.  You have made my life a living hell for the

24  last five years.  The first attack I knew it was you, and you got

25  away with it.  You were not satisfied, and you had to attack us

1    again, but with chlorinated bombs.  Thank God for the F.B.I.

2    They put two and two together, and arrested you.

3             You have been found guilty, and I hope you will get the

4    maximum years in prison, and that you will sit there and be

5    miserable every day.

6             Myles and I will never forget what has been done to us,

7    but in time I hope we can resume a normal life.

8             THE COURT:  All right.  Thank you, ma'am.

9             And Mr. Levine?

10            MR. LEVINE:  Thank you, your Honor.

11            Again, I would also like to thank the Court for this

12   opportunity speak, and I think it's very hard for somebody else

13   to understand the impact on our lives that this has put us

14   through.  It's not only the financial losses incurred, but also

15   the emotional and physical problems that were created by

16   Mr. Fries.

17            It all started in Marana in 2008 when our neighbor

18   called us in the morning and said look outside your door to see

19   what happened to your house.  I opened the door and saw a dead

20   animal that I thought was my dog sitting right in front.

21   Everything -- my life went downhill from there, and Mr. Fries is

22   totally responsible for it.

23            My physical health functions were extremely escalated

24   due to the stress I had been put through.  My renal function had

25   been under check for years, became total renal function.  I had

1   to go on kidney dialysis, and I don't wish that on anybody,

2   including Mr. Fries.

3           The hardest aspect that we've had to deal with has been

4   the emotional toll to our lives.  I was a very happy individual

5   before.  I was enjoying my retirement.  We enjoyed doing things

6   with our friends.  We did a lot of traveling.  We saw everything

7   we could see in the southwest, and we just were having a

8   wonderful life before this event happened.

9           We've been forced to abandon our home, have no contact

10  with any of our friends.  We had to become total ghosts in our

11  own community, and we had no identities of our own.  We had to

12  move three times, and living behind ten-foot walls and gated

13  locked doors everywhere, and honestly carrying concealed weapons

14  because of fear of retaliation all the time.  We didn't know what

15  was going to happen.

16          I don't think either of us will ever be mentally or

17  emotionally the same.  We've both been diagnosed with

18  post-traumatic stress disorder.  We both see a trauma counselor.

19  I know there's a lot more visits we'll have to do, and possibly

20  forever.

21          My wife and I rarely talk anymore.  We just argue and

22  shout at each other.  We've been at each other's throats since

23  this all began, just not knowing what's been going on.  And even

24  my dog runs away when he sees us getting together.  It's just

25  purely fear.  I'm surprised, actually, that we have not been

1    divorced by this time over all of this.

2            And I finally stopped having some fears of retaliation

3    after the guilty verdict came in.  I did have some relief.

4            And when it comes to sentencing, we recommend actually

5    that he be put away forever.  And I know that's not really going

6    to happen, but I -- I believe, as the magistrate said in the

7    first hearing, that he is a definite menace to not only us, but

8    the community.

9            I'd like to say one thing to Mr. Fries, but I'm not

10   going to.

11           And I thank you again, your Honor.

12           THE COURT:  All right.  Thank you for your remarks,

13   both of you.

14           All right, so Mr. Bock why don't you approach the

15   podium now with your client.

16           MR. BOCK:  Thank you, your Honor.

17           THE COURT:  And Mr. Bock, have you reviewed the

18   presentence report including the recommendation section and the

19   addendum to the report with your client?

20           MR. BOCK:  The addendum to the report was received

21   fairly late, and I went ahead and reviewed the -- the addendum,

22   which talked about my objections --

23           THE COURT:  Um-um.

24           MR. BOCK:  -- and went over those with him at the

25   marshal's office this afternoon before we came to court.  But he

1    has reviewed the draft presentence report in it entirety.

2              THE COURT:  All right, and the recommendation

3    section --

4              MR. BOCK:  Yes.

5              THE COURT:  -- right?

6              And do you feel that your client has had -- that you've

7    had enough time to review the addendum with him, because that is

8    part of the report?

9              MR. BOCK:  Yes, he understood it.

10             THE COURT:  It relates to the legal objections to the

11   advisory guideline calculations.

12             MR. BOCK:  I have.

13             THE COURT:  All right.

14             And Mr. Fries, sir, have you been satisfied with the

15   services of your attorney in your case?

16             Mr. Bock, can you get that microphone.

17             All right, there we go.

18             MR. FRIES:  Will you repeat that question, please?

19             THE COURT:  Yes, have you been satisfied with the

20   services of your attorney in your case?

21             MR. FRIES:  So far, yes, I have.

22             THE COURT:  Has Mr. Bock been able to answer any

23   questions that you may have had about your case?

24             MR. FRIES:  Yes.

25             THE COURT:  And has he discussed the presentence report

1    including the recommendation section and the addendum to the

2    report with you?

3              MR. FRIES:  He went over it thoroughly, yes, ma'am.

4              THE COURT:  And have you had a chance to review the

5    report, to actually read the report yourself?

6              MR. FRIES:  Yes.

7              THE COURT:  All right.  You were found guilty by a jury

8    after a jury trial.  This was on October 5th of 2012, following a

9    ten day trial, guilty of Counts 1 and 2 of the superseding

10   indictment.

11             Based on that verdict, it is the judgment of the Court

12   that you are guilty of the following charges:

13             Count 1, prohibition against chemical weapons in

14   violation of Title 18, United States Code, Section 229(a), and

15   229(A)(a)(1), a Class A felony.

16             And Count 2, making false statements in violation of

17   Title 18, United States Code, Section 1001(a)(2), a Class D

18   felony.

19             As I've said previously, it is ordered that the

20   presentence report is made a part of the record.  The Court finds

21   that the report accurately describes the offense conduct, and the

22   Court adopts those facts as well as adopting all the facts that

23   were elicited at the jury trial.  And the Court has adopted the

24   advisory guideline calculations in the report, and ruled on the

25   objections.

1            And as I said, Mr. Bock, I do have the numerous letters

2   that have been submitted on your client's behalf, including the

3   letter that he has written to the Court.

4            And is there any statement that you would like to make

5   on your client's behalf at this time?

6            MR. BOCK:  Yes, your Honor.

7            First of all, as to the restitution, we're going to

8   preserve that for another day with respect to the Northwest Fire

9   Department also, is that correct?

10           THE COURT:  Yes.  Yes, because -- well, I need

11  additional documentation, I think both sides understand that,

12  before I can enter a specific restitution amount.  So you don't

13  need to talk about restitution as to the victims in the case, or

14  the first responders.

15           MR. BOCK:  Okay.  Then first of all, I'd like all the

16  people on behalf of Mr. Fries to stand up, your Honor, and

17  acknowledge their presence.

18           THE COURT:  All right, thank you.  You may be seated.

19           MR. BOCK:  Judge, first of all, they're not many

20  reported cases regarding a conviction under 229, and I raised a

21  disparity argument by citing the Bond case in my -- my

22  objections.  And if the Court is -- has reviewed that case, it's

23  a situation where Mrs. Bond, who had a great degree of expertise,

24  highly trained, highly educated, working in the pharmaceutical

25  industry, made 24 attempts to poison her rival.  The government

1   seeks to dismiss any comparison to the Bond case saying, well,

2   she pled guilty, so there's really no comparison.  Well,

3   apparently she was captured on videotape committing several

4   attempts, and her special knowledge, training, and education, and

5   persistence in the pursuit of her pretty really make it hard to

6   say that the use of these two readily available industrial

7   cleaning supplies that the government felt were used in this

8   case, chlorine and muriatic acid or whatever, far exceed that

9   woman's determined efforts.

10          And so -- and in that case I believe that the sentence

11   that she faced -- or the sentence she was given is in the -- my

12   objection, but I think it was somewhere between 5 and 6 years

13   based upon a pharmaceutical product that if it was put on the

14   door knob and it was touched by somebody, it could prove not only

15   very toxic, but perhaps fatal, and all of the facts are outlined

16   in that -- in that Bond case.

17          Now, I've represented Todd Fries on this case since May

18   the 13th of 2011.  I have visited with Todd numerous times at FCC

19   and CCA.  I'd like to say on his behalf he's always been a

20   perfect gentleman in my presence to me.  He's always been

21   respectful.  And what I would like to say on behalf of Todd is as

22   follows.

23          First of all, a guideline range of 151 to 188 months

24   calculates out to 15 and two-thirds years.  In state court,

25   Judge, if you commit a second degree murder, it's -- 16 years is

1    the presumptive, and it can be mitigated or aggravated 6 years.

2    So a 15 and two-thirds year sentence has a functional equivalent

3    in state court to second degree murder.

4                He has a criminal history one.

5                You reviewed his letters of support.

6                He did work.  As I indicate, when he was first arrested

7    he was isolated at FCI.  Then he went to FCC for a number of

8    months.

9                MR. FRIES:  CCA.

10               MR. BOCK:  Excuse me, CCA.  He went to CCA for a number

11   of months.  He worked at CCA.  Now he is at FCC.

12               He's had no write-ups.

13               He's never been in a -- he's been with other people.

14   He's never been segregated.

15               And he attempted to put some of his energies and some

16   of his skills to work, and he'll share those with you when he

17   was -- has -- during the course of his incarceration.

18               Judge, he basically built a successful business from

19   the ground up obtaining contracts, which he'll talk to you about,

20   from the University of Arizona, from government entities, from

21   industrial -- private industrial companies, and of course, a

22   number of private residences throughout the community.

23               He has a contractor's license through the State of

24   Arizona, had that contractor's license and it was in full force

25   and effect at the time of his arrest.

1          He is a man that has significant support in the

2     community.

3          And also, I'd like to just approach the bench.  I did

4     give a copy of this to the government.  He did have an honorable

5     discharge.  His paperwork was provided to me by his mother from

6     the Army.  If I might approach?

7          MR. FRIES:  Marine Corps.

8          MR. BOCK:  Marine Corps.

9          THE COURT:  Marine Corps.

10         MR. BOCK:  Yes.  I'm sorry.

11         THE COURT:  All right.  Yes, you may.

12         MR. BOCK:  He -- he has job skills, certainly can be --

13    certainly was employed and is employable.

14         He is a man that can be rehabilitated.

15         And he's a man, Judge, that does not deserve to be

16    incarcerated for close to the 188 months that's been recommended,

17    or over and above the 188 months which I'm anticipating that the

18    government will -- will argue for.

19         You saw his conduct during the trial.  You've seen him

20    in court.

21         And I would like to just read very briefly a couple

22    things that people said about him.  When you heard the appeal

23    from the detention hearing and he had a witness by the name of

24    Michael Weigard, and I took these directly out of the

25    transcripts, and Michael Weigard -- here was the question that I

```
1   asked him during the detention appeal in front of your Honor:

2            Did you ever hear of people talk about him that might

3   have come into your business, or about the type of work he did,

4   or the quality of work?

5            The witness responded:  Yes, he referred a number of

6   people to my business, and they spoke highly of him, said he did

7   a good job.  He was engaged and involved in making sure that the

8   job was done right.

9            Patty Wilson, who's present on his behalf today, worked

10  as his accountant, assisted him in the business.  Questions that

11  were asked of her at the -- at the -- the hearing in front of

12  your Honor:

13           Do you know him to be vindictive at all?

14           Answer by her:  Never.

15           Do you know him to be revengeful?

16           Answer:  Never.

17           Do you know him to be retaliatory in any way?

18           Answer:  No.

19           And then Mr. White.  You remember Mr. White.  He also

20  testified at trial.  Mr. White, question again at the detention

21  appeal:

22           Did Mr. Fries -- was your interaction with Mr. Fries

23  clearly professional?

24           Not purely, no.  He did an excellent job, and after it

25  was over I invited him to go with me to Primo, and we had a very
```

1    enjoyable conversation.  Then he invited me to visit the home,

2    which I did, and had, you know, some food and drinks.  And he

3    showed me -- showed me around.  He basically helped me correct a

4    major defect in the golf cart that we were using, which frankly I

5    think saved my life.  So I was pretty impressed.

6                Judge, this man does not need to go to prison for 10

7    years, 15 and two-thirds years or whatever the government is

8    going to ask for.

9                I ask you, Judge, to give this man a much more modest

10    sentence in this case.

11                Thank you.

12                THE COURT:  Thank you, Mr. Bock.

13                And Mr. Fries, I did read your letter that you wrote to

14    me.  Is there any statement that you would like to make on your

15    own behalf at this time?

16                MR. FRIES:  Yes, ma'am.

17                THE COURT:  All right, go ahead.

18                MR. FRIES:  Well, first off, I want to thank you for

19    letting me speak.  I haven't really said a whole lot during the

20    whole course of the trial, and I really appreciate it.

21                A couple things I wanted to touch base on was first

22    off, there was a lot of misconceptions of my service in the

23    Marine Corps.  I did serve in the Marine Corps.  I went through

24    boot camp, went to FST school.  Half of my boot camp platoon went

25    to MAW, First Marine Assault Unit, Camp Lejeune, the other half

went to First Marine Aircraft Wing, Iwakuni, Japan, which is where I was stationed.  There was a bombing on October 23rd and it rattled me because my fellow Marines in the Marine Aircraft -- or Marine Assault Unit, Amphibious Unit, were sleeping in their barracks and a truck had crashed through the gate.  The Marines at the gate were armed but didn't have any ammo in their M16. The truck driver drove into the barracks and killed 243 Marines. A lot of the Marines I knew were in that blast, and they were killed while they slept.  Basically, I didn't know how to deal with it, and I turned to a very bad alcoholic binge, which is not like me but I didn't know what to do.  So that kind of hampered my Marine Corps career as far as that went.

When I got out, I came back to Tucson, and I had various jobs.  I mostly drove truck, and I did quite well at that.  In October of 1999 I started Burns Power Washing Service myself from the ground up.  I had a pickup truck.  I had $5,000, and a lot of endeavor and ardor to make this company work. Failure wasn't an option for me.  I wanted to do the best that I could.

The first job that I got, I actually made $900 in one day.  I said this is for me.  I'm going to do this.

From that point on I worked, strived, endeavored to grow the company.  And by 2003 I actually was grossing probably 150-200,000 a year.  By 2004/2005 it was a little better than that.  And without the help of my awesome friend, Patty Wilson, I

couldn't have done it.  She was an inspiration to me, and also
helped me keep track of my expenditures, my accounts payables,
receivables -- just was my right-hand person.

I hired people, fired people -- mostly hired people.  I
gave people a lot of chances.

I had numerous contracts, one of which was the Evo
DeConcini building that I'm in right now.  I was across -- right
next door at Carlos Murphy's.  I'm sure you remember next door.
It used to be restaurant next door.  And I was power washing and
a few construction people ran over to me and said, hey, we
spilled some EIFS on this giant circle in the front yard.  We
need to get it taken out.  Can you get it out?  And I said sure,
let me take a look at it.  I went over there, checked it out.
And I asked them, I said, if I get this stain out of here, would
you give me the contract to do all your power washing at the
building?  And he was like, oh, well, okay.  And I did it.  And
this was my first big job.  This was the job that actually bought
me my first brand new pickup truck.

In addition to the Evo DeConcini building I had a
contract with the government, Davis Monthan Air Force Base,
University of Arizona, the Veterans Administration building over
on 6th Avenue, V A Hospital, Tucson Mall, along with numerous,
numerous, numerous private individuals, like Mr. White and many,
many more because of my TV and ad campaign through radio, TV,
yellow pages, internet.  So I wasn't a slouch.  I really worked

1    hard at my company.  And I think that tells something, because

2    not only was I licensed by the registrar of contractors, but I

3    had a lot of responsibility to myself, to my workers, and to

4    upholding a -- a good reputation, and to me that's everything.

5         In addition to that, I think it's important to note

6    that when a person works very hard at becoming a home owner, a

7    property owner, and doing the best that they can, that separates

8    them from the people that are doing illegal things, such as drug

9    dealing, stealing, numerous things which I'm sure you come across

10   every day.  I'm not involved with any dope, drugs, anything like

11   that.  Matter of fact, I'm -- I'm drug free.  I had that small

12   problem in the Marines.  I dealt with it.  I don't even drink

13   anymore, period, or do drugs.

14        In conclusion, I want to say that every day when I get

15   up and I'm incarcerated, I make the best day out of it that I can

16   under the circumstances.  For instance, this is kind of odd but

17   the people that I'm around are mostly Mexican nationals, probably

18   95 percent.  I'm the minority.  Not only have I helped a lot of

19   the Mexican nationals learn a second language, ESL, English as a

20   second language, but I've taken on jobs in maintenance, being a

21   porter.  Right now I'm a laundry porter at FCC.  I've had the job

22   for as long as I've been there, and never had a problem with any

23   write-ups, any fights.  And people -- some people here try to

24   portray me as a menace to society.  I think if I were a menace to

25   society, I'd be in trouble all the time in where I'm at.

1          Every day the Lord tells me, hey, you don't have to

2   worry about anything.  I'm going to handle all your problems

3   today.  Make it a good day.  And I do, every single day.  There's

4   not a day that goes by that I don't forget each day and each

5   minute that goes by in this courtroom, and the long day every day

6   that when I'm coming to court, you're woken up at 11:00 p.m. and

7   you're up for 22 hours.

8          But I want to thank everybody for coming down here, all

9   of my support people.

10          And I want to thank you for your time for letting me

11   speak, because I have been quiet during this whole trial and I've

12   done the best that I could to let everybody know by my actions

13   that I'm not some crazed individual, and I'm not some menace to

14   society, or someone that's out to hurt people.

15          Thank you.

16          THE COURT:  All right, thank you.

17          Yes, Mr. Bock?

18          MR. BOCK:  Judge, very briefly.  At a later date the

19   prosecutor and I are going to revisit a date for the destructive

20   device case, so what I would request is if Mr. Fries could be

21   allowed to remain at FCC?

22          THE COURT:  Yes.  Thank you.

23          MR. BOCK:  Thank you, Judge.

24          THE COURT:  So why don't I just have you both step

25   back, and I'll hear from the government -- the government's

1    recommendation regarding sentence.

2            MS. ANDERSON:   Thank you, Judge.

3            First of all, I'd like to address the Bond case.

4    Mr. Bock argues that the Bond case should somehow be used as a --

5    as a gauge for the sentence that Mr. Fries receives in this case.

6    And your Honor, comparing the Bond case and comparing this case

7    is like comparing apples and oranges.   They are completely --

8    completely different.

9            For instance, Mr. Fries was given a plea offer.   He

10   rejected it.   He chose to go to trial.   The Bond -- the defendant

11   in the Bond case pled guilty.

12           And Mr. Fries in the present case was assessed the four

13   level enhancement, which the Court just agreed with, due to his

14   conduct.   There were no enhancements whatsoever assessed in the

15   Bond case.

16           Also, Mr. Fries was assessed a two level enhancement

17   for obstruction of justice, which again was -- nothing was --

18   such as that, no enhancements were imposed in the Bond case.

19           So it's completely improper to compare the Bond case

20   and the present case.

21           Your Honor, first of all, I'd like to point out that --

22   that the defendant has been convicted of a violation of 229 -- 18

23   U.S.C. 229, and the federal code lists 18 U.S.C. 229 as a federal

24   crime of terrorism.   And that description is completely

25   appropriate in this case, and that's what Mr. Fries did to the

1    Levines in this case.  He struck terror into their lives for

2    years.  And the -- the term terrorist certainly applies to

3    Mr. Fries based on his conduct, his conduct that began shortly

4    after the Levines and Mr. Fries had their fee dispute, and it

5    ended at the time of Mr. Fries' arrest in 2011.

6            Mr. Fries committed these crimes, your Honor, out of

7    revenge.  Just pure revenge.  And if there's any word to describe

8    or to sum up Mr. Fries, it would be revengeful.  And when you

9    look at his actions beginning -- the '08 incident and the '09

10   incident, it was all over revenge.

11           If you look at the books that he kept in his home, they

12   were revenge books.  They were books on how to get even, how

13   to -- how to sabotage other people's lives, how to get even and

14   exactly what to do.  And that's what he did in this case.  He

15   followed some of the recipes that were in the books that he was

16   reading.  The most important one was the one that was right by

17   his bedside.  Most other people have, you know, novels or

18   something like that by their bedside, but not Mr. Fries, he had a

19   revenge book.

20           One witness described -- one of the witnesses that

21   testified was actually a former employee of Mr. Fries, and what

22   he described is that Mr. Fries would refer to the '08 incident as

23   the Levine Project.  And that's exactly what it was to him.  It

24   was a -- a project, a revengeful plot that he was planning to get

25   even with the Levines.

1            And if he had stopped at the '08 incident, your Honor,
2   he probably would have gotten away with it.  But that wasn't
3   enough for Mr. Fries.  Shortly after the '08 incident, which was
4   awful enough with motor oil and dead animals strewn all over the
5   Levines' property and the anti-Semitic graffiti that was sprayed
6   on the garage door, what happened next, Mr. Fries shortly
7   thereafter began plotting for the next incident.  And he termed
8   that as Levine '09.  And shortly after the '08 incident he began
9   collecting motor oil all over again.  He began collecting feces
10  all over again.  He asked his employees to defecate in a bucket.
11  He collected the dead animals, and the motor oil, and then in '09
12  he did it again.  Levine '09.

13           And the '09 incident, your Honor, was sinister.  It was
14  completely sinister.  It was similar to the '08 incident, but it
15  was different because what he did this time is he sealed the
16  front door shut, and he sealed the windows shut.  There's no way
17  that the Levines could escape through the front door.  They
18  tried.  They tried to open the door, and they couldn't get out.
19  So they were forced to go out the back way.

20           And Mr. Fries had the device in the front, but he also
21  strategically placed the device in the back yard right by the
22  gate so that if any -- so that the Levines when they escaped
23  through the back way, in order to get over the wall, which was
24  too high for them to step over by themselves, they would have to
25  go right by the device which was by the door, by the gate back

1    into the -- the golf course behind their home.

2              So by his actions he was directing the Levines to -- to

3    escape right by that device, the device that was oozing this

4    chlorine containing cloud.  That would have been enough -- that

5    would have been serious enough for anybody, your Honor, anybody

6    to escape that situation, but the Levines were even more

7    vulnerable.  They were more vulnerable because they're an older

8    couple.  They needed help to get over the wall.  Myles Levine had

9    just had surgery.  He was in a weakened condition.  So it made it

10   even more serious and more dangerous for them to try and escape.

11             What's compelling about this, your Honor, is that

12   Mr. Fries struck fear and terror in the Levines' lives for years,

13   because after the '09 incident the Levines had no idea when he

14   was going to strike again.  After the '08 incident they knew it

15   was him.  They told law even enforcement that it was him.  But

16   after the '09 incident they had to continue to look over their

17   shoulders, because they didn't know when it was going to happen

18   again.

19             And not only did Mr. Fries endanger the lives of the

20   Levines in the '09 incident based on the chlorine cloud, the

21   chlorine containing cloud, but he also endangered the rest of the

22   community, because the two devices, as you heard, your Honor,

23   when they were activated, they set up a chlorine cloud, a

24   chlorine containing cloud that was about the size of a football

25   field.  And that cloud wafted for about three miles off to the

southwest portion of town until it dissipated.  And you heard the

first responders as they were going to the scene.  They looked at

the cloud and they said this isn't going to be good.  This is not

good.  And these are first responders who have dealt with serious

chemical instances before, and they knew that it wasn't good.

They immediately recognized the danger.

This occurred on a Sunday morning.  Thankfully, it

occurred on a Sunday morning when there weren't very many people

in the community.  Most people were -- were still asleep.  They

were still in bed, and -- and that's good, because if it had

occurred sometime during the week, there could have been school

children that could have been seriously injured, there could have

been more people in the neighborhood that were seriously injured

as well.

As this Court heard, the first responders had to go

through the neighborhood and evacuate the neighborhood in order

to keep people safe.  So not only did Mr. Fries endanger the

Levines, he endangered the community, but he also endangered the

first responders.

We heard testimony from a lot of first responders who

came to the scene.  Now, the public, your Honor, we -- we flee

from danger.  We run away from it.  First responders, they run to

it.  They run to it to help other people, to get other people out

of harms way and to evacuate others.  And repeatedly, the first

responders described for us how they experienced the symptoms of

1    the chlorine exposure.  They said it's -- one officer said it

2    smelled like a chlorine pool on steroids.  They experienced

3    difficult breathing.  Their eyes were watering, their throats

4    were burning.

5            So Mr. Fries' actions not only jeopardized the Levines,

6    the community, and the first responders -- and your Honor, you

7    just heard Mr. Fries give a statement to the Court, and one thing

8    that -- that hit us as we were sitting there listening is that

9    you didn't hear any remorse whatsoever.

10           MR. BOCK:  I object to this, your Honor.

11           THE COURT:  No.  It's argument, Mr. Bock.

12           Go ahead.

13           MS. ANDERSON:  There was no remorse whatsoever on

14   behalf of Mr. Fries, and that's -- that's important for the Court

15   to -- to keep in mind.

16           And Mr. Fries said that somebody said that he was a

17   menace to society.  That was Judge Estrada who presided over the

18   detention hearing, your Honor.

19           And after -- your Honor, after listening to the

20   evidence in the case, as you did for -- for three weeks, after

21   looking at all of the documents, and -- and argument of counsel,

22   and statements by the victims, your Honor, the government

23   believes that an upward departure is appropriate in this case

24   based on -- on conduct of the defendant that's unaccounted for in

25   the sentencing guidelines.  And your Honor, we're confident that

1    the Court will impose an appropriate sentence.

2         Thank you.

3         THE COURT:  All right.  Thank you, Ms. Anderson.

4         And Mr. Bock, if you could approach the podium.

5         Mr. Fries, you can also come on up.

6         All right, the Court has considered all of the

7    statutory factors of sentencing.  The Court is to impose a

8    sentence that's no greater than necessary to achieve those

9    statutory factors.  The sentence must be reasonable.  I have

10   calculated the advisory guidelines, which calls for a range of

11   151 to 188 months in custody.

12        It is interesting, Mr. Fries, to see two very

13   drastically different pictures of you.  I have all the letters

14   from family, friends telling me you're a successful businessman,

15   you have community and family support, no serious criminal

16   history.  You've served in the military.  So a very positive

17   picture there.

18        And then I have a very negative presentation when I

19   look at the details of this crime.

20        There are several aggravating factors here above and

21   beyond the counts of conviction.  This was -- this was

22   systematically planned.  It wasn't a spur of the moment response,

23   angry response to something, or being overly upset or emotional

24   about something.

25        This was very systematic.  It was planned for a lengthy

1    period of time.

2            You recruited your employees to assist you in this.

3            You used very inflammatory graffiti, dead animals,

4    human feces to terrorize these victims.

5            You targeted two vulnerable people.  I'm still not sure

6    why you targeted these people, if it was for financial reasons.

7    I know they had a business relationship with you.  You had done

8    some work for them, but I'm still not clear when I look at the

9    incredible time and energy and the way you attacked these people

10   if there was something more that led you to start down this path.

11   I don't know.  But in any event, these people were vulnerable

12   people, former customers, elderly people, and you chose to target

13   them for whatever reason.

14           There's -- there's no question that both of the victims

15   have been traumatized by your activities.

16           Again, it wasn't an isolated incident, but there was a

17   previous incident that the Court is aware of, and then the

18   incident for which you were actually convicted.

19           So that's an aggravating factor that their lives have

20   really been turned upside down, and they've been greatly impacted

21   by your behavior.

22           Further, not just the Levines but all the other people

23   that were involved.  These first responders, they were all called

24   away from whatever there other job duties were.  They all had to

25   respond to the scene.  They were at risk.  Any time first

1    responders have to respond to a scene -- they were at risk.  They

2    took their time, and energy, and expertise to respond to --

3    because of your activities, to respond to the scene, and took

4    them away from their other duties.

5         Further, the neighbors.  We heard some testimony from

6    at least one of the neighbors who was negatively impacted, and

7    just -- not so much the physical impact, but just the emotional

8    impact of all of these other people that suffered as a result of

9    your behavior.

10        And it's really very stunning to see the lengths at

11   which you went to engage in this conduct, and cover up -- try to

12   cover your tracks, apparently, because you had stolen

13   identification from other people in your possession, and these

14   people testified about how their ID was stolen, so they were kind

15   of collateral victims.  And how this identification was left at

16   the scene of -- of the crime.  So those -- that's an aggravating

17   factor that is really not covered by the count of conviction,

18   including the stolen identification from the woman who was in the

19   car accident close to your residence.  That identification

20   somehow ended up in your possession.

21        Then the phone calls, which is Count 2, two days later

22   you calling the F.B.I. attempting to disguise your voice as a

23   woman.  And the testimony at trial was that there were items

24   found at your house that could be put on your phone to disguise

25   your voice when you made phone calls, and that call that was made

1    attempting to subvert the law enforcement investigation and

2    attempting to blame these incidents on an innocent person,

3    another person who was not at all involved in the incident.

4            So these are just some of the factors the Court sees in

5    aggravation in this case that it is above and beyond just the

6    counts of conviction.

7            So the Court is to look at your history and

8    characteristics.  I have the history related to this incident.  I

9    also have your prior history, which is mitigating, the prior

10   history.

11           This sentence should promote respect for the law, deter

12   you and others from engaging in this kind of conduct, and the

13   sentence needs to reflect the nature of the incident.

14           So I have considered all of the statutory factors of

15   sentencing, and in my discretion I am going to follow the

16   advisory guidelines.  It is one of the factors of sentencing.

17   The range is 151 to 188 months, and in my discretion I'm going to

18   sentence you at the low end of the advisory guideline range.

19           So it is the order of the Court that you be committed

20   to the custody of the Bureau of Prisons for a period of 151

21   months.

22           You will receive credit for all the time that you

23   served so far relating to these offenses.

24           It's going to be 151 months on Count 1, and 60 months

25   on Count 2 to run concurrently.

1    You'll need to pay a special assessment of $200, that's

2    $100 for each count, at a rate of not less than $25 per quarter

3    through the Bureau of Prisons Inmate Financial Responsibility

4    Program.

5    Given the Court's anticipated restitution order, the

6    Court finds that you do not have the ability to pay a fine.  It

7    is ordered that the fine is waived.

8    Once you serve this custody sentence, you will be

9    placed on supervised release to this Court for a period of five

10   years.  Within 72 hours of release from the custody of the Bureau

11   of Prisons, you'll need to report in person to the probation

12   office where you are released, comply with the standard

13   conditions of supervision, you'll receive a copy of those

14   conditions, and you'll need to follow the following special

15   conditions:

16   You shall participate in a mental health program as

17   directed by your probation officer, which may include taking

18   prescribed medication.

19   You shall contribute to the cost of treatment in an

20   amount to be determined by your probation officer.

21   I think it will be really important for there to be an

22   evaluation once you start under supervision to determine why --

23   given your otherwise very stable life, why you -- why you became

24   engaged in these activities, and to ensure that you -- for

25   protecting the community, that you not -- whatever those trigger

1    points are, whatever caused you to do this, that you not engage

2    in this activity in the future.  So I'm going to order a mental

3    health program, and testing to evaluate your mental health

4    status.

5              You are prohibited from making major purchases,

6    incurring new financial obligations, or entering into any

7    financial contracts without the prior approval of your probation

8    officer.

9              You shall provide all financial documentation requested

10   by your probation officer.

11             You shall not contact the victims in this case, and the

12   probation officer will verify compliance.

13             You shall submit your person, property, residence,

14   vehicle, papers, computers as defined in the statute to searches

15   to be conducted by your probation officer.  Failure to submit to

16   a search may be grounds for revocation of release.

17             You shall warn any other occupants that the premises

18   may be subject to searches pursuant to this condition.

19             And further, the probation officer does not need a

20   search warrant to search either you or these locations while

21   you're under this Court's supervision.

22             And further, the Court finds that the sentence that the

23   Court has imposed is a reasonable sentence above and beyond the

24   advisory guidelines.  So even if the guidelines for some reason

25   should have been calculated in a different way, the Court in any

1    event finds that the sentence is an appropriate sentence given

2    all of the statutory factors of sentencing.

3            Further, Mr. Fries, you have the right to appeal from

4    the judgment and sentence of the Court.  If you want to file an

5    appeal, you must do so in writing within 14 days of today's date

6    or you would lose the right to file an appeal.

7            And if you could not -- well, Mr. Bock, are you going

8    to represent your client on appeal?

9            MR. BOCK:  I'm going to give notice to the government,

10    and I'm going to ask the Court if we can revisit to see if I

11    can -- if he qualifies.  I'm not on the appeal panel, but I would

12    be willing if -- I'll file pro hac vice to see -- and I'd be

13    willing to do the appeal on an appointed basis.

14            MR. FRIES:  And I approve that.

15            THE COURT:  All right.  Well, let me just go ahead and

16    I'll just tell Mr. Fries he has the right to appeal.  It has to

17    be done in writing, the notice, within 14 days of today's date.

18    So you'll be filing that notice.

19            MR. BOCK:  Of course.

20            THE COURT:  And then anything you need to file relating

21    to whether you'll become CJA counsel or you're going to continue

22    to represent Mr. Fries on appeal, you can certainly file whatever

23    you need to file.

24            So do you understand your appellate rights, Mr. Fries?

25            MR. FRIES:  Yes.

1          THE COURT:  All right.

2          Further, I will make a judicial recommendation that you

3  be housed -- you're housed in Tucson right now?

4          MR. BOCK:  Florence.  FCC Florence.

5          THE COURT:  Oh, FCC Florence.  That you be housed at

6  FCC Florence.

7          You should understand that although the Bureau of

8  Prisons considers the Court's recommendation, the final decision

9  based on many different factors as to where you serve your

10  sentence will be made by Bureau of Prisons officials.

11          MR. BOCK:  Judge --

12          THE COURT:  Yes.

13          MR. BOCK:  -- there may have been a bit of a

14  misunderstanding.  Since the claimed destructive device case is

15  going to be tried -- we have April 17th.  We may move that for a

16  month or two.  I wanted him to stay at FCC so I can have

17  interaction with him.  That's what I meant about that.  In terms

18  of serving his sentence, I would ask that perhaps there could be

19  a recommendation to the BOP that he be sentenced at FCI Tucson.

20          THE COURT:  All right, so -- well, you'd rather have

21  him at FCI right now, right?

22          MR. FRIES:  Say that again, ma'am?

23          THE COURT:  Let me ask Mr. Bock.

24          (Mr. Bock and Mr. Fries conferred off the record.)

25          MR. BOCK:  Okay.  Yes, if he could go to FCI, that

1    would be --

2             THE COURT:  I will make a recommendation to FCI here in

3    Tucson, for placement -- for purposes of this conviction.

4             MR. FRIES:  Thank you, your Honor.

5             THE COURT:  Yes.

6             So let's see, Mr. Bock, is there anything further at

7    this time?

8             MR. BOCK:  Just I imagine there'll be some date for the

9    restitution hearing?

10            THE COURT:  Yes.  We need to set that.

11            And let me just make an additional record that the

12   argument that you made relating to the other case where this

13   particular statute was the basis for a conviction, the Court

14   finds that analyzing that case does not really --

15            MR. BOCK:  The Bond case?

16            THE COURT:  Right, does not really inform the Court as

17   to the disparity in sentencing issue.  I think that the -- your

18   client and that defendant are not similarly situated, even though

19   they were convicted under the same statute.  So that -- you know,

20   I know that you've encouraged the Court to look at that case as a

21   similar type of case, but although each defendant was convicted

22   under that statute, the cases were in this Court's mind very,

23   very different, both factually and procedurally.  So I'm going to

24   decline to rely on that case for the sentencing in this case.  I

25   just don't think they're -- it's helpful for that disparity

```
 1    analysis.
 2              So let's see, we need to set a restitution hearing
 3    date, and both sides are --
 4              MR. BOCK:  May I have a second with the government?
 5              THE COURT:  -- familiar with the case law -- yes.
 6              (Counsel conferred off the record.)
 7              MR. BOCK:  Judge, the government and I would ask with
 8    your permission that we call you, perhaps your chambers, next
 9    week and just pick some dates that might work with the Court's
10    calendar?
11              THE COURT:  All right.  And do you agree, Mr. Bock,
12    that the case cited by the probation department, De La Fuente,
13    that that case is --
14              MR. BOCK:  Well, for purposes of my argument -- I don't
15    want to take up much more court time, but I do not agree
16    necessarily that -- the specific issue of whether or not a person
17    has been properly held on appeal, so I do have a difference
18    with -- with Mr. Hoffman's interpretation.
19              THE COURT:  All right, and this is the restitution
20    issue.  The De La Fuente case is 353 F.3d 756.
21              MR. BOCK:  I know.
22              THE COURT:  It says that first responders can be seen
23    as victims.
24              MR. BOCK:  I have a problem with the case.
25              THE COURT:  Okay, so let's try to set this within the
```

1    next few weeks.

2            MR. BOCK:  All right.

3            THE COURT:  And I do have the list from the victims,

4    but I need more documentation, and I have nothing related to the

5    first responders other than a final number.  So if folks want

6    restitution, they're going to need to give the Court more

7    information.

8            So why don't I go ahead and set a -- how much time

9    would the government need to submit that information to the

10    Court, and then we'll give Mr. Bock a chance to respond?

11            MS. ANDERSON:  If we could have two weeks, your Honor.

12            THE COURT:  All right, so I'll order the government to

13    file a written memo relating to restitution issues by no later

14    than March 15th at noon, and Mr. Bock, if you could respond to

15    that by -- how much time do you need?

16            MR. BOCK:  Whatever you want to give me.  Seven working

17    days, or --

18            THE COURT:  All right, why don't I give you until

19    March 27th to respond.  And no reply is needed.

20            So we'll set a date after that March 27th date for the

21    restitution hearing.  And if counsel could let me know how long

22    that hearing's going to take, if you anticipate testimony, and

23    what it will entail so we can block that time on the calendar.

24    And you can contact chambers to schedule that.  The statute does

25    provide for restitution hearings to take place after sentencing.

1          And then you don't anticipate, Mr. Bock, that the

2    second trial will proceed as scheduled?

3          MR. BOCK:  The government and I have talked about that.

4    We're probably, with the Court's permission, looking at perhaps

5    doing it in May.

6          THE COURT:  All right.  Well, you can go ahead and file

7    your motion and I'll consider it.  When is that set for right

8    now?

9          MR. BOCK:  April the 17th.

10         THE COURT:  April 17th.  All right, you can go ahead

11   and file your motion to continue, and I'll consider it at that

12   time.

13         MR. BOCK:  Okay.

14         THE COURT:  All right.  So Mr. Bock, anything further

15   from your perspective?

16         MR. BOCK:  No.

17         THE COURT:  Anything further from the government?

18         MS. ANDERSON:  No, your Honor.

19         THE COURT:  All right, then we'll stand at recess on

20   this matter.

21   (3:15 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2          I, Mary A. Riley, do hereby certify that I

3   stenographically reported the foregoing proceedings to the best

4   of my skill and ability, and that the same was transcribed by me

5   via computer-aided transcription, and that the foregoing pages of

6   typewritten matter are a true, correct and complete transcript of

7   all the proceedings had, as set forth in the title page hereto.

8          Dated this 21st day of April, 2013.

9

10                                     s/ Mary A. Riley

11                               United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25