1

2

3                    IN THE UNITED STATES DISTRICT COURT

4                         DISTRICT OF ARIZONA

5

6   UNITED STATES OF AMERICA,        )
                                     )    CR 11-1751-TUC-CKJ
                 Plaintiff,          )
7   vs.                              )
                                     )    September 21, 2012 - P.M.
8   TODD RUSSELL FRIES,              )    Tucson, Arizona
                                     )
9                Defendant.          )

10                          JURY TRIAL - DAY 5

11

12          BEFORE:  HONORABLE CINDY K. JORGENSON
                     UNITED STATES DISTRICT JUDGE
13                          405 W. CONGRESS
                       TUCSON, ARIZONA 85701
14

15                    A P P E A R A N C E S

16      FOR THE GOVERNMENT:  MR. DAVID PIMSNER and MS. BEVERLY
    ANDERSON, ASSISTANT UNITED STATES ATTORNEYS.
17
        FOR THE DEFENDANT:  MR. RICHARD BOCK, ATTORNEY AT LAW.
18

19

20                      Dianne Davenport
                    405 W. Congress, Suite 1500
21                    Tucson, Arizona 85701
                         (520)205-4266
22

23      Proceedings prepared by computerized realtime translation

24

25

WITNESS INDEX

WITNESS                                                    PAGE

CARLY RIGGS

Direct Examination by Ms. Anderson                          4
Cross-Examination by Mr. Bock                              15
Jurors' Questions                                          23

LINDA RIGGS

Direct Examination by Ms. Anderson                         24
Cross-Examination by Mr. Bock                              29
Jurors' Questions                                          32
Redirect Examination by Ms. Anderson                       33

DANIEL ROBLEDO

Direct Examination by Mr. Pimsner                          34

MICHELLE FUENTES

Direct Examination by Ms. Anderson                         36
Cross-Examination by Mr. Bock                              56
Redirect Examination by Ms. Anderson                       62

JOAQUIN NAVARRETE

Direct Examination by Mr. Pimsner                          63

JEFF LUNA

Direct Examination by Mr. Pimsner                          68

JOAQUIN NAVARRETE

Direct Examination by Mr. Pimsner                          76
Cross-Examination by Mr. Bock                              78
Redirect Examination by Mr. Pimsner                        86

JEFF LUNA

Direct Examination by Mr. Pimsner                          89

1                          WITNESS INDEX

2    WITNESS                                    PAGE

3    CHARLOTTE DUNCKLEE-TOTTEN

4    Direct Examination by Mr. Pimsner              95
     Cross-Examination by Mr. Bock                 109
5    Jurors' Questions                            114

6                          EXHIBIT INDEX

7    EXHIBIT                         OFFERED ADMITTED

8    182                                41       41
     184                                43       43
9    185                                42       42
     186                                44       45
10   187                                46       46
     188                                46       46
11   189                                47       47
     190                                47       47
12   191                                47       47
     192                                47       48
13   193                                48       48
     202                               104      104
14   203                               104      104
     204                               103      103
15   205                               102      102
     256                                55       55
16   341                                52       52
     342                                53       53
17   343                                92       92
     344                                93       93
18   345                                98       98

19

20

21

22

23

24

25

1      P R O C E E D I N G S

2           (Call to order of court, 1:40 p.m.)

3           THE COURT:  The record will reflect the presence of

4    counsel, the defendant, and are we ready for the jury?

5           MS. ANDERSON:  We are ready.

6           THE COURT:  If you want to have your next witness

7    available in the courtroom, that would fine.

8           MS. ANDERSON:  Sure.

9           THE COURT:  Everyone may be seated.  The record will

10    reflect the presence of the jury.

11           The government may call its next witness.

12           MS. ANDERSON:  The government calls Carly Riggs.

13           THE COURT:  Sir, if you could approach the clerk, the

14    lady right in front of me, give her your full name and she will swear

15    you in as a witness.

16           CARLY RIGGS, GOVERNMENT WITNESS, SWORN

17           THE CLERK:  Could you please state your full name for

18    the record and spell your last name.

19           THE WITNESS:  Carly Joe Riggs.  R-i-g-g-s.

20           DIRECT EXAMINATION

21    BY MS. ANDERSON:

22    Q.    Sir, could you tell us what you do for a living?

23    A.    I'm retired at the time.

24    Q.    When you were working, what did you do?

25    A.    I was a welder.

1    Q.    Okay.  And could you tell us when it was that you retired?

2    A.    '97.

3    Q.    Now, you live in the northwest side of town, do you not?

4    A.    Yes, ma'am.

5    Q.    Could you tell the general area where you live?

6    A.    Jensen Street and Magee.

7    Q.    I'm going to show you a map and have you point to your house

8    on the map.

9              MS. ANDERSON:  May I approach, Your Honor?

10             THE COURT:  Yes.

11   BY MS. ANDERSON:

12   Q.    Mr. Riggs, this is Government Exhibit 292.  This is an aerial map

13   of a portion in northwest Tucson.  Do you recognize generally that

14   area?

15   A.    Yes, ma'am.

16   Q.    I'm going to have you turn the diagram -- I'm sorry -- the map

17   to the jury.  And if you could -- Mr. Riggs, I'm going to have you -- in

18   fact why don't you step down here in front of the jury if you don't

19   mind.  And let's give some orientation to the map.

20             This is West Magee Road.  Is that correct?

21   A.    Yes, ma'am.

22             THE COURT:  You are going to have to share the

23   microphone then.  You pass that microphone and then have him

24   answer, if you could, Ms. Anderson.

25   BY MS. ANDERSON:

1   Q.    This is West Magee Road that is up there.  And this is Jensen.  Is

2   that correct, sir?

3   A.    Yes, it is.

4   Q.    Now, do you see your home on this aerial map?

5   A.    Yes, ma'am.

6            THE COURT:  Ms. Anderson, if you can move to the

7   center here of the jury.  I think then everybody can see.

8            Mr. Bock, if you want to get up, you can move as well to

9   go see the diagram if you would like.

10  BY MS. ANDERSON:

11  Q.    Mr. Riggs, I'm going to have you point to your home where you

12  and your wife live on our aerial map.

13  A.    Okay.

14  Q.    I'll hold the map while you point.

15  A.    This is it right here.  7993 North Jensen Drive.

16  Q.    And for the record you're pointing to a home that's not directly

17  on Jensen Drive but it's further back a bit.  Is that correct?

18  A.    It's right on Jensen Drive.

19  Q.    Thank you.  Go ahead and take a seat.

20            Mr. Riggs, I'm going to call your attention to the

21  morning of August 2, 2009.  Do you remember that day?

22  A.    Yes, ma'am.

23  Q.    Did something unusual happen at that early morning hours?

24  A.    Yes, ma'am.

25  Q.    Could you tell us about that?

1    A.    Well, I had gone up to a Circle K to get a cup of coffee.

2    Q.    Which one, which Circle K?

3    A.    It's on Thornydale and Cortaro Farms Road which is a half mile

4    up the hill from my house.  I got the coffee, went back the other way

5    to another Circle K.  When I passed my house, I saw a cloud of what I

6    thought was dust at the time because in front of my house there's an

7    open field.

8    Q.    Do you recall what time that was that you saw that cloud?

9    A.    About 4:25.

10   Q.    4:25 in the morning?

11   A.    Yes, ma'am.

12   Q.    Is it a habit of yours to go to the Circle K you just described to

13   us?

14   A.    Every day since I've been retired.

15   Q.    What do you do at the Circle Ks?

16   A.    I get a cup of coffee and talk to people.

17   Q.    So as you were headed back home, you saw a cloud.  Is that

18   right?

19   A.    Yes, ma'am.

20   Q.    Could you describe that cloud for us?

21   A.    Well, like I said, I thought it was just dust at the time because

22   there's a lot of kids that would come in there with four-wheelers and

23   whatnot.  But I went on to the Circle K.  When I came back, it was all

24   clear.

25   Q.    The cloud was clear?

1    A.    Yes, ma'am.  So I went on in the house.  And I started looking
2    up my e-mails and whatnot on the computer.
3    Q.    About what time was it that you got back home?
4    A.    Approximately 4:30.
5    Q.    Now, what I'm going to have you do is describe the cloud for us
6    that you saw.
7    A.    When I came past the house?
8    Q.    Right.
9    A.    It looked like dust to be honest with you at that time.  Of course
10   that's early in the morning.  And it was high.  I did not run through
11   any gas or anything at that time.  It was much higher.
12   Q.    When you say "higher," you mean it was higher --
13   A.    Above the vehicle, yes.
14   Q.    And was it thick?
15   A.    Well, I can't say it was thick.  It looked like dust to me.
16   Q.    Was it white?
17   A.    Cloudy-ish like looking, grayish white.
18   Q.    Could you see through it?
19   A.    Well, it was higher, like I said.  So I couldn't say about seeing
20   through it.
21   Q.    You didn't drive through it?
22   A.    No, ma'am.
23   Q.    Because it was higher?
24   A.    Yes.
25   Q.    So then you went back home.  And by about this time it was

1    4:30?

2    A.    When I got to the house, yes.

3    Q.    What did you do when you got to your house?

4    A.    I left the screen door open and went in.  And, like I say, I

5    started checking my e-mails out on the computer.  About 15, 20

6    minutes after 5:00, I got a whiff of something that burned my lungs

7    pretty bad.

8         So I got up, not knowing what it was, ran outside, pulled

9    the door behind me shut.  And when I got on the driveway in front of

10   my house, I looked back.  And it was like a fog on top of my house

11   and just scattered out across there.

12        So I went back in because my wife and my

13   mother-in-law was there.  I woke my wife up and told her that there

14   was something wrong.  I didn't know what but I would be back.

15        So I went back out and that's when I saw the law

16   officers out in the middle of the street out there.

17   Q.    In the middle of Magee?

18   A.    Magee, yes, ma'am.

19   Q.    And what did you do then?

20   A.    Well, I went up to talk to the officer, but he would not let me get

21   close to him because I guess I came out of this fog and they didn't

22   know what it was.  So that's the only thing I can think of.

23   Q.    Now, when you were walking through this fog and approaching

24   the police officer, did you feel anything unusual?  Were you having any

25   kind of problems breathing at that time?

1    A.    Problems breathing and the chest was burning bad.  The lungs

2    was burning.  So I was doing a lot of coughing.

3    Q.    Now had you experienced those same kind of physical

4    manifestations when you originally smelled that odor in your house?

5    A.    Instantly, yes.

6    Q.    Let's talk about that.  After you checked your e-mail, you said

7    you smelled something unusual in your house, correct?

8    A.    Yes, ma'am.

9    Q.    What did that smell like to you?

10   A.    Chlorine.  I don't really know.  It was --

11   Q.    Have you smelled chlorine in the past?

12   A.    Oh, yes, sure.

13   Q.    Did that smell like chlorine to you?

14   A.    Yes, yes.

15   Q.    In fact I think you said that it took you back to your Army days.

16   Is that right?

17   A.    When I was in basic training, yes, going through gas chambers.

18   Q.    When you were in your home, what room was it that specifically

19   smelled?  Was it one room in particular?

20   A.    Yes.  The dining room right off of the kitchen is where I was at.

21   Q.    Was there any other room in your home that you recall that you

22   smelled this same kind of smell?

23   A.    At the time, no, because I had just opened the door a couple

24   times and, you know, it had came in.  But I wasn't in there long

25   enough to know.  But then once I left, I wasn't back for a while.

1   Q.     So I think you said that this was about sometime around 5:15 or

2   so?

3   A.     I'm sorry?

4   Q.     I believe you said this was about 15 or 20 minutes after 5:00.

5   Is that correct?

6   A.     Yes, ma'am, yes.

7   Q.     Is that when you left the house and went to find out what was

8   going on?

9   A.     After I woke my wife up and told her something was wrong, I

10  left then.  And when I saw the deputy sheriff, he would not let me go

11  back to the house.

12  Q.     Now, you mentioned a fog.  When you walked outside, you

13  mentioned a fog, correct?

14  A.     Yes, ma'am.

15  Q.     Could you describe that fog for us?

16  A.     If you have ever seen fog on top of a mountain when it's cold,

17  like a cloud basically.  It was just lying there like.

18  Q.     How high was it?

19  A.     It was on top of my house.  I know that.  Because I was standing

20  in front of the house.  I saw it on top of the house.  Plus, on the end

21  and behind my house, further than beyond my house.  I don't know

22  how far it went.

23  Q.     What color was the fog?  Do you recall?

24  A.     It was, like I say, whitish gray.  I'm not real sure.

25  Q.     Was it moving?

1    A.    It seemed to be, yes.

2    Q.    With what speed?

3    A.    Well, I don't know how to describe it.  It was kind of like -- it

4    was kind of rolling like a cloud would I guess.

5    Q.    Did you stand and watch it for a period of time?

6    A.    No.  I left because I saw these people over there with hazmat

7    trucks and ambulances and all this and I wanted to find out what was

8    going on.

9    Q.    Okay.  And that's when you approached the police officer,

10    correct?

11    A.    Yes, ma'am.

12    Q.    Did you have a conversation with him?

13    A.    He asked me where I had come from.  And I told him.  I told him

14    my wife and my mother-in-law was in the house and I needed to get

15    back over there and see them, make sure if they were okay.

16    Q.    Did he let you go home?

17    A.    No, ma'am.

18    Q.    Why not?

19    A.    I guess at the time they had no idea what it was.

20    Q.    And did you relay to him that you were experiencing some

21    physical problems?

22    A.    I didn't, but I'm sure he knew it because I was coughing very

23    bad.

24    Q.    And so let me understand this.  You were coughing badly,

25    correct?

1    A.    Yes, ma'am.

2    Q.    How else -- what other feelings did you have?  What other kinds

3    of symptoms did you have?

4    A.    Well, it was a little bit on the hard side to breathe.  Mostly the

5    burning in my lungs.

6    Q.    How about your eyes or your throat?

7    A.    Probably both of them was running, eyes and nose.

8    Q.    Were you having problems breathing?

9    A.    Now or then?

10   Q.    No, then.

11   A.    I can't say.  That's been four years ago.  I don't remember about

12   that part.  I was excited, upset and --

13   Q.    You didn't know what was going on, did you?

14   A.    I didn't.  I had no idea.

15   Q.    Now, at some point were you taken to the hospital?

16   A.    Yes, ma'am.

17   Q.    Which hospital was that?

18   A.    Northwest.

19   Q.    Now, did you tell the police officers that you were experiencing

20   problems?  Did you ask to be transported to the hospital?

21   A.    No, no, I didn't.

22   Q.    They did that despite the fact that you had requested to go --

23              MR. BOCK:  Judge, this is --

24              THE COURT:  Could you rephrase that?  Ms. Anderson,

25   could you rephrase that question?

1                MS. ANDERSON:  Sure.

2    BY MS. ANDERSON:

3    Q.    You didn't request to go to the hospital, correct?

4    A.    No, ma'am.

5    Q.    But nonetheless you were transported to the hospital?

6    A.    I was.

7    Q.    Did any of the officers ask you if you needed to go to the

8    hospital?

9    A.    No.

10    Q.    So you were put in an ambulance and you were transported to --

11    which hospital was that?

12    A.    The Northwest Hospital on Orange Grove and La Canada is all I

13    can tell you.

14    Q.    What happened at the hospital?

15    A.    They put some wires -- attached wires to my chest, I guess for

16    my heart, and put oxygen on me.  I sat there until 2:00 in the

17    afternoon.

18    Q.    Did they ask you if you had -- if you were experiencing any kind

19    of signs and symptoms while you were at the hospital?

20    A.    Yes.  The nurses would come in occasionally and ask if my lungs

21    was still burning.

22    Q.    And were they?

23    A.    Not as much, no.

24    Q.    Did you find that your symptoms got better after you were at the

25    hospital?

1    A.    Well, after a period of oxygen, yes.

2    Q.    Now, at some point did you go back to your house?

3    A.    At 2:00 in the afternoon, yes, when they let me out of the

4    hospital.

5    Q.    And your wife and your mother-in-law were there at the house,

6    correct?

7    A.    Yes.

8    Q.    When you went inside the house -- when you went inside your

9    house, did you smell anything unusual in your house?

10    A.    In the room I was in where the computer was, yes.  I could

11    smell the same smell, chlorine.

12    Q.    Could you describe that smell for us?

13    A.    I can't because I don't know how to describe it other than

14    chlorine.

15    Q.    All right.

16                    MS. ANDERSON:  May I have just a moment?

17                    THE COURT:  Yes.

18                    MS. ANDERSON:  That's all we have, Judge.

19                    THE COURT:  Cross-examination.

20                    MR. BOCK:  Thank you, Your Honor.

21                                CROSS-EXAMINATION

22    BY MR. BOCK:

23    Q.    Good afternoon, Mr. Riggs.

24    A.    Good afternoon, sir.

25    Q.    Sir, how long had you lived at that home prior to August 2 of

1    2009?

2    A.    Approximately 13, maybe 14 years.

3    Q.    And do you have a pool in that home?

4    A.    No.

5    Q.    Are you a swimmer?

6    A.    I used to be in my younger days.

7    Q.    Do you ever get affected by chlorine in a pool?

8    A.    I have swallowed my share of it.

9    Q.    And you were in the Army and go through the gas chamber.

10    They make you take your gas mask off, right?

11    A.    They start you out without one.  You have to put it on, yes.

12    Q.    This is basic training?

13    A.    Yes, sir.

14    Q.    Now, sir, how old were you on August 2 of 2009?

15    A.    67.

16    Q.    What's your date of birth?

17    A.    Sir?

18    Q.    What was your date of birth?  What is your date of birth?

19    A.    July 3, 1941.

20    Q.    And were you -- do you remember August 1, the day before the

21    situation?

22    A.    Nothing exciting happened.

23    Q.    Do you remember telling people at the Northwest Hospital that

24    you had been cutting wood the day before?

25    A.    I don't remember that, no, sir.

1    Q.    Let me show you what's been marked as Exhibit 417.

2              MR. BOCK:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MR. BOCK:

5    Q.    Mr. Riggs, I'm going to show you a medical report and it has a

6    notation at 0830.  I don't know if you can read it or not.  It would be,

7    sir, this -- these two lines that are in bolder writing.  Do you see that?

8    A.    Yes.  You're right.  I can't read it.

9    Q.    Do you want me to read it to you?

10   A.    I see the part where it says, "He was cutting wood yesterday."

11   Who made that statement?  I don't have a wood burning stove.  Why

12   would I need to be cutting wood?

13   Q.    Do you have a fireplace?

14   A.    I'm sorry?

15   Q.    Do you have a fireplace, sir?

16   A.    A what?

17   Q.    A fireplace.

18   A.    No.

19   Q.    So it says on your medical report, "Chest pain, 4 out of 10.

20   Patient states that his chest is sore because he was cutting wood

21   yesterday."

22             MS. ANDERSON:  Objection, Your Honor.  Asked and

23   answered.  He's already denied making that statement.

24             THE COURT:  Yes.  Can I see counsel at sidebar with the

25   record, please?  Could you bring them with you, Mr. Bock?

1     (At sidebar.)

2          THE COURT:  Aren't we getting very far afield?  The

3     statute doesn't require any proof of any injury to anybody.  Isn't this

4     just really far afield from this case?  And, plus, can you impeach him

5     with somebody else's records?

6          MR. BOCK:  I can ask him if he said this.

7          THE COURT:  You already did.

8          MS. ANDERSON:  He said he didn't.

9          THE COURT:  So aren't we done?  How can you impeach

10    him with this record which he didn't make.  You hear what I'm saying?

11         MR. BOCK:  I know what you are saying.

12         THE COURT:  I think it's really collateral.  How is it

13    relevant?

14         MR. BOCK:  It's relevant because he claimed he had a

15    heart problem or they looked at his heart.  They brought that up on

16    direct.

17         MS. ANDERSON:  He said that they strapped him up to

18    the EKG.  I didn't elicit that.

19         THE COURT:  We are not saying the heart problem was

20    caused by the chlorine gas, are we?  I don't think anybody is saying

21    that.

22         MR. BOCK:  It came out about --

23         THE COURT:  In any event I don't think you can impeach

24    him with this document.  If you want to keep asking him about it, I'll

25    allow a further limited --

1    MR. PIMSNER:  I know it wasn't my witness.  I didn't

2  think it was appropriate we get into personal identifiers on the record

3  like the DOB.  He could have asked him the month and year, but

4  starting with the DOB, I thought it was inappropriate for part of the

5  public record.  It didn't have any relevance.

6    THE COURT:  I'm sure the court reporter will have to

7  excise that.  That's only for children.  I don't know.  That's a whole

8  other issue.  In any event -- okay.

9    (In open court.)

10    THE COURT:  You may proceed, Mr. Bock.

11  BY MR. BOCK:

12  Q.    Sir, so you were transported to the hospital.  Do you remember

13  that?

14  A.    Yes.

15  Q.    Do you remember what time you were transported?

16  A.    I think I reached the hospital somewhere around 10 after 7:00.

17  Q.    And you were discharged.  Do you remember what time you

18  were discharged?

19  A.    Not the exact, but somewhere around 2:00.

20  Q.    Could it have been 1:00?

21  A.    Could have been, but it was 2:00.

22  Q.    Who picked you up at the hospital?

23  A.    My wife.

24  Q.    And when you left the hospital, did you walk out to the car?

25  A.    Well, I wasn't carried out or I didn't go in a wheelchair so I must

1    have.

2    Q.    Then the next day you did your regular routine?

3    A.    Yes.

4    Q.    Now, you indicated that you had -- would you agree with me

5    your chief complaint was shortness of breath?

6    A.    Right.

7    Q.    You had no nausea?

8    A.    No.

9    Q.    No dizziness?

10   A.    Not that I know of, sir.

11   Q.    And you don't find my questions offensive, do you, sir?

12   A.    You're an attorney.

13   Q.    You didn't lose consciousness, did you?

14   A.    No, I didn't.

15   Q.    And the shortness of breath, you had not been -- when was the

16   last -- strike that.  Your breathing pattern resumed within, what, an

17   hour or two?

18   A.    Sometime after I got to the hospital.  I couldn't say if it was an

19   hour or three.

20   Q.    Okay.  And your coughing subsided fairly quickly too?

21   A.    I'm sorry?

22   Q.    Your coughing subsided fairly quickly too?

23   A.    Yes.  Probably after an hour or so.

24   Q.    They looked at your throat and tongue.  Do you remember?

25   A.    They what?

1   Q.    The doctors looked at your throat and your tongue.  Do you

2   remember that?

3   A.    Possibly.  I don't remember that.

4   Q.    Now, did you have any pets?

5   A.    I'm sorry.

6               MS. ANDERSON:  Objection, relevance.

7               THE COURT:  Well, I don't know if it is relevant or not.

8               You can answer that, sir.

9               You need to repeat the question, Mr. Bock.

10   BY MR. BOCK:

11   Q.    Do you have any pets?

12   A.    Pets?

13   Q.    Like a dog or a cat.

14   A.    Just my wife.

15   Q.    Your wife -- when you went back to the house and you woke

16   your wife up, where did she go with you to, what part of the house?

17   A.    We walked into the room where the -- where my computer is at

18   where the gas was at which is right off the kitchen.

19   Q.    Did people from law enforcement ever come into your home to

20   make measurements of the air quality in your home?

21   A.    Not that I know of, sir.

22   Q.    They took an x-ray of your lungs too at the hospital.  Is that

23   correct?  Do you remember that or not?

24   A.    Sure they did.

25   Q.    But you were released, you said, at about 1:00.  You got home.

1    Is that correct?

2    A.    I believe I said 2:00.

3    Q.    Then you went about your normal routine when you got home.

4    Is that correct?

5    A.    I'm retired, yes, sir.

6                    MR. BOCK:  Can I have a second, Your Honor?

7                    THE COURT:  Yes.

8                    MR. BOCK:  I don't have anything further.  Thank you,

9    Your Honor.

10                   THE COURT:  Yes.  Redirect.

11                   MS. ANDERSON:  We don't have anything, Your Honor.

12                   THE COURT:  Any questions from the jury for this

13   witness?

14                   THE COURT:  All right.  We have questions.

15                   Jill, if you could retrieve that.

16                   Hold on just a minute, sir.  We may have some more

17   questions for you.

18                   If I can see counsel at sidebar.

19                   (At sidebar.)

20                   THE COURT:  16.  Any objection, Mr. Bock?

21                   MR. BOCK:  No, Your Honor.

22                   MS. ANDERSON:  He was at the hospital.  I'll ask him.

23   But he doesn't know because he was at the hospital.  His wife is going

24   to be a witness next.  She'll probably know.

25                   THE COURT:  Okay.

1    JUROR QUESTIONS BY MS. ANDERSON:

2    Q.    Mr. Riggs, was your home evacuated?

3    A.    No, ma'am.

4              MS. ANDERSON:  Thank you.

5              THE COURT:  Thank you, sir.  You may step down.

6              The government may call its next witness.  May this

7    witness remain in the courtroom?  His wife is testifying next?

8              MS. ANDERSON:  His wife is testifying next.

9              THE COURT:  Is that okay, Mr. Bock?

10             MR. BOCK:  That's fine.

11             THE COURT:  Sir, if you would like to stay in the

12   courtroom, you can, or if you want to step out, whatever you would

13   like to do, Mr. Riggs.

14             MS. ANDERSON:  Government calls Linda Riggs.

15             MR. BOCK:  Could I approach, Your Honor?

16             THE COURT:  Yes.

17             (At sidebar.)

18             THE COURT:  Never ask a question you don't know the

19   answer to.  Isn't that the famous training?

20             MR. BOCK:  Can I ask his wife if he was chopping wood

21   the day before?

22             THE COURT:  Yes.  We will allow the one question.  Now

23   we are also curious.

24             (In open court.)

25             THE COURT:  Ma'am, I'm going to have you sworn in by

1   the clerk.

2                   LINDA RIGGS, GOVERNMENT WITNESS, SWORN

3                        THE CLERK:  Could you please state your full name for

4   the record and spell your last name.

5                        THE WITNESS:  My name is Linda Riggs.  R-i-g-g-s.

6                              DIRECT EXAMINATION

7   BY MS. ANDERSON:

8   Q.     Mrs. Riggs, you live with your husband, Carly.  Is that right?

9   A.     Yes.

10  Q.     I'm going to call your attention to the events that occurred back

11  on August 2 of 2009.  Do you remember that day?

12  A.     Yes, I do.

13  Q.     And at the time there was somebody else living at your home

14  other than you and your husband, correct?

15  A.     Yes.

16  Q.     Who was that?

17  A.     That was my mother.

18  Q.     How old was your mother at the time?

19  A.     86.

20  Q.     Do you recall some unusual events that occurred early morning

21  August 2, 2009?

22  A.     Yes.

23  Q.     Could you tell us what you remember?

24  A.     Okay.  My husband woke me up and told me that there was

25  something going on outside and he just wanted to forewarn me there

1   was something going on.  So I got up and everything was fine.  I

2   mean, for me, in the house, I was okay.  So I just went back to bed.

3   He had left.

4              After a little while after I got up, you know, started

5   getting breakfast and doing some things, when I walked into the

6   kitchen and family room, I could smell chlorine gas.  And so we took a

7   fan and we put it at the kitchen door and we just kind of blocked off

8   that part of the house.  We were able to stay -- you know, we were

9   able to stay in the house.  And they did send an ambulance over to

10  take my mom, but really there was no place for us to go.  So we just

11  stayed there at the house.

12  Q.    Let me ask you some more questions.  Your husband woke you

13  up and told you he was going to go check out something that was

14  taking place, correct?

15  A.    Yes.

16  Q.    So you went back to sleep.  Is that right?

17  A.    Yeah, I just stayed in bed.  I wasn't -- you know -- when he first

18  told me, he said that there was a cloud of something out there that he

19  had driven through and he said, "I don't know what it was."  He said,

20  "First I thought it was dust."  He said, "But there's something else

21  going on."  So he said he was going to go out and check on it.

22              MR. BOCK:  Judge, may I just interrupt for one second?

23              THE COURT:  Yes.  Your battery went dead there.

24              Go ahead, Ms. Anderson.

25  BY MS. ANDERSON:

1   Q.    So at a later point, you got up and you went into, I think you

2   said, the kitchen and the family room?

3   A.    Correct.  It's a combined room.

4   Q.    That's when you smelled the chlorine.  Is that right?

5   A.    Yes.

6   Q.    What time would you estimate that was?

7   A.    Oh, probably about 6:30.

8   Q.    You hadn't smelled that smell before when you got up initially.

9   Is that right?

10   A.    No.  I was in the back part of the house.  I didn't smell it until I

11   walked into the kitchen area, but it was strong.  I mean, it was really

12   strong.  You couldn't hardly breathe in there.

13   Q.    So when you smelled the strong smell of chlorine, I believe you

14   said you got some fans?

15   A.    Yes.  We put a fan in the kitchen door and blew it toward the

16   family room so it would keep it from coming into the rest of the house

17   if it did, you know.  I just thought I don't want to get it in the rest of

18   the house.  So I put the fan up.

19   Q.    You said "we."  Was your husband -- was it you and your

20   husband that put up the fans or was it just you?

21   A.    I say "we."  I'm the one that got the fan and put it there because

22   he didn't come back.  Carly never came back home after he left and

23   went across the street.  He said, "I'm going across the street to see

24   what is happening."  He had told me later that he had seen the police

25   officer over there.  So he went over there and talked to him.  They

1    wouldn't let him come back home.

2    Q.    What time would you estimate it was that you smelled the

3    strong chlorine smell?

4    A.    I'm thinking around 6:30.

5    Q.    So you put up the fans so the smell wouldn't go to the rest of

6    the house.  What did you do next?

7    A.    That's correct.  Well, I just went in and took care of my mom.

8    And then a lady came to the door and she said that she had an

9    ambulance if we wanted to leave.

10                I told her at that point, you know, because there wasn't

11    anyplace for them to put my mom, we didn't know when we could

12    come back or what we could do, I said at that point, you know, let us

13    just stay here.  If it gets worse, if it comes in through the house, then,

14    you know, then I could get back with them.

15                At that time I asked about my husband.  They said that

16    he was sitting over there in an ambulance with oxygen on.  And that's

17    basically, you know, all that I knew there.

18    Q.    So when you were smelling this smell of chlorine, this strong

19    smell, were you suffering any kind of ill effects as a result of that

20    smell?

21    A.    Well, it was hard to breathe.  You couldn't stay there breathing

22    it.  That's why I got the fan right away and blew it back the other

23    direction because, you know, I felt like if it comes into the house --

24    after I realized what all was going on, I just got a big fan.  It was

25    summertime.  We had a fan sitting there.  I turned it toward the

1  kitchen.

2  Q.     So did you have any kind of difficulties breathing?

3  A.     I didn't.  Only in that room.  When I was in that room, I couldn't

4  breathe.  You could not stay in there and breathe.  I couldn't stay in

5  that room and breathe the air.

6  Q.     But were -- when you were in that room, did you have problems

7  breathing physically?

8  A.     Well, yeah, because, I mean -- I would have if I didn't get right

9  out of there.  I couldn't stay in the room.  When I did breathe, I could

10  smell the strong smell of chlorine.  I couldn't -- I mean, I couldn't tie it

11  all together because I didn't understand what was happening at that

12  moment.

13  Q.     When you were in that room and it was difficult to breathe, was

14  there any other physical manifestations from the odor of the chlorine

15  that you recall?

16  A.     Nothing that I recall.  Just taking short breaths and, you know,

17  wanted to get away.

18  Q.     How long did the smell last in your house?  Do you recall?

19  A.     Oh, yeah.  It was late up in the evening, about 5:30, 6:00.

20  Q.     The strong odor of chlorine?

21  A.     Yeah.  We could still smell the chlorine.  Not as strong as the day

22  went on but you could still smell it.  We didn't go back in that room

23  that day except, you know, just to go there and see what was

24  happening.  We never did go back in there to stay.

25                    MS. ANDERSON:  May I have just a moment, Your

1    Honor?

2                    THE COURT:  Yes.

3                    MS. ANDERSON:  That's all we have, Your Honor.

4                    THE COURT:  Cross-examination.

5                         CROSS-EXAMINATION

6    BY MR. BOCK:

7    Q.    Good afternoon.  So you think 6:30 might have been the time?

8    A.    I think 6:30 was the time that I got up out of bed.  My husband

9    was up early, but I didn't get out of bed.  I usually would get up

10   around 6:30, quarter to 7:00.

11   Q.    Did you see any clouds when you were up at 6:30, anything that

12   looked unusual?

13   A.    I didn't go look for anything.  I already knew that there was

14   something going on outside because my husband came and told me,

15   but I didn't go out there and look for anything because my mom

16   needed a lot of attention.  And so, you know, I was focused on going

17   in there and getting her changed and getting ready.

18   Q.    When your husband came back to talk to you, you could

19   understand what he was saying, correct?

20   A.    Well, but he hadn't been -- he had just walked out the door and

21   he came back in and he said, "There's something going on out here."

22   And then he left.  So that's all he told me.

23   Q.    You went ahead and picked him up at Northwest Hospital, 1:00,

24   2:00?

25   A.    I'm thinking it was about 5:00 in the afternoon.

1  Q.    Do you know what time he was discharged from the hospital?

2  A.    I don't know for sure.  I can't remember.  But whenever he was

3  discharged is when I went and picked him up.  I think it was 5:00.

4  Q.    So this room -- what does this room face where you first noticed

5  the chlorine smell?

6  A.    There's sliding glass doors that goes to our backyard.

7  Q.    Is your backyard a fenced backyard?

8  A.    Yes.  We have a fenced-in backyard.

9  Q.    And you have a screen obviously with the sliding glass doors?

10  A.    We have a sliding glass door and sliding screen, yes.

11  Q.    So once you smelled that odor, then you just got out of that

12  room.  Is that correct?

13  A.    That's correct.

14  Q.    And in fact I think you even said it was -- the chlorine seemed to

15  you to be as if someone overchlorinated their pool.  Do you remember

16  saying that?

17  A.    Right.  I might have said that.  It just seemed like if you took a

18  whole bottle of Chlorox and dumped it in a bathtub and you are stuck

19  in that bathroom.  It was very strong.

20  Q.    Have you been to a pool where you have exhibited that strong

21  chlorine smell?

22  A.    I have.  Especially indoor pools.

23  Q.    Let me ask you one thing.  Was your husband the day before --

24  does he chop wood or do anything with wood?

25  A.    No.

1  Q.    Never any wood chopping or anything like that?

2  A.    Well, not at our house because we don't -- unless he was out

3  there, you know, cutting down a tree or doing something.  I'm not

4  always aware of what, you know, he's doing.  As far as --

5  Q.    Does he cut down trees sometimes?

6  A.    It's been years ago.  When we used to have a fireplace, we used

7  to go out and cut wood.

8  Q.    You don't specifically know whether or not he cut wood the day

9  before this situation?

10                MS. ANDERSON:  Objection, Your Honor.  Asked and

11  answered.  I believe it has gone beyond the scope of the court's

12  ruling.

13                THE COURT:  You can answer that last question, ma'am.

14                THE WITNESS:  Could you ask me again, please?

15  BY MR. BOCK:

16  Q.    You don't know whether or not he may have chopped wood the

17  day before?

18  A.    I don't know that.

19                MR. BOCK:  Thank you.

20                Thank you, Judge.

21                THE COURT:  Yes.  Any redirect?

22                MS. ANDERSON:  We don't have anything, Your Honor.

23                THE COURT:  Any questions from the jury for this

24  witness?

25                (At sidebar.)

1        THE COURT:  17.  You all see that?

2        MR. BOCK:  The second one I would think there is a

3  hearsay exception as to the second one.  I know -- I guess she would

4  be asking her mother.

5        THE COURT:  If she could see the physical signs.

6        MR. BOCK:  That would be a hearsay exception.

7        THE COURT:  Right.  Any objection to 17, Ms. Anderson?

8  Mr. Bock, no objection.  Okay.  If you could ask this.

9        MS. ANDERSON:  Sure.

10        (In open court.)

11        THE COURT:  Just a couple more questions.  Ms.

12  Anderson will ask them.

13  JUROR QUESTIONS BY MS. ANDERSON:

14  Q.    Mrs. Riggs, since you did not leave your home, what part of the

15  house did you stay in?

16  A.    Most of the time we stayed back in my mom's bedroom.  I

17  stayed back there with her.  Or in my bedroom in the back far part of

18  the house.

19  Q.    Was your mom affected by the smell?

20  A.    She didn't seem to be.  She was never out of her bedroom.  It

21  was completely the opposite side of the house.

22        MS. ANDERSON:  I have a couple of follow-up.

23        THE COURT:  Yes, go ahead.

24                    / / /

25                    / / /

REDIRECT EXAMINATION

BY MS. ANDERSON:

Q.    Did your mom have any kind of -- what condition was your mom
suffering from at the time?

A.    She was wheelchair and bedbound.  I want to say -- I don't want
to say senile but dementia.  She was starting with dementia.  She
didn't understand and I never shared with her.

Q.    Was she suffering from any kind of respiratory ailments at the
time?

A.    No.

            MS. ANDERSON:  That's all we have.

            THE COURT:  Any additional questions from the jury for
this witness?

            All right.  Thank you, ma'am.  You may step down and
be excused.

            The government may call its next witness.

            MR. PIMSNER:  Thank you, Your Honor.  The
government is going to call Officer Robledo.

            THE COURT:  Sir, if you could come forward to the clerk,
walk right up here, and she will swear you in as a witness.

DANIEL ROBLEDO, GOVERNMENT WITNESS, SWORN

            THE CLERK:  Could you please state your full name for
the record and spell your last name.

            THE WITNESS:  Daniel Christopher Robledo.
R-o-b-l-e-d-o is how I spell my last name.

1          DIRECT EXAMINATION

2     BY MR. PIMSNER:

3     Q.      Mr. Robledo, are you employed?

4     A.      Yes, I am.

5     Q.      By whom?

6     A.      Pima Animal Care Center.

7     Q.      How long have you been with Pima Animal Control?

8     A.      Five and a half years for Pima County.

9     Q.      And what are your general duties as an animal control officer?

10    A.      We maintain regulations and violations of laws as well as capture

11    animals.

12    Q.      Were you asked to respond to the area of 2870 West Magee

13    Road in Tucson, Arizona back on August 2, 2009?

14    A.      Yes.

15    Q.      Do you remember that incident?

16    A.      Yes.

17    Q.      And why were you asked to respond to that location?

18    A.      To impound animals that were deceased and take them to my

19    veterinarian to have them looked at.

20    Q.      Did you in fact respond to that location?

21    A.      Yes, I did.

22    Q.      Did you impound animals that were at that location?

23    A.      Yes, I did.

24    Q.      Were these obviously animals that were dead?

25    A.      Yes, they were.

1   Q.   Were they recently dead or dead for what appeared to be a long

2   time?

3   A.   It was really hard to say.  They were deceased before then.

4   Q.   So it didn't look like they recently died, correct?

5   A.   Yes.

6   Q.   And did you -- when you impounded those animals, did you

7   actually try to keep track of what time -- or what type of and quantity

8   that you impounded?

9   A.   Yes.

10  Q.   And do you recall what that was?

11  A.   Offhand I believe it was a rabbit, a squirrel and about five to six

12  birds.

13  Q.   If we were to show you your report, would that help refresh your

14  recollection?

15  A.   Yes, it would.

16          MR. PIMSNER:  Let me show the exhibit, Your Honor,

17  that has been marked Exhibit 330, report of Officer Robledo dated

18  August 2, 2009.

19  BY MR. PIMSNER:

20  Q.   Sir, is that in fact your report?

21  A.   Yes, it is.

22  Q.   Please take a brief look.  Does that help refresh your recollection

23  on the animals that you impounded?

24  A.   Yes, it does.

25  Q.   Could you tell us what those were?

1   A.      I impounded two rabbits, a squirrel and about five to six birds.

2   Q.      Did you note the shape that the bodies were in?

3   A.      They were badly decomposed.

4               MR. PIMSNER:  Nothing further, Your Honor.

5               THE COURT:  Cross-examination?

6               MR. BOCK:  No, Your Honor.  No questions.

7               THE COURT:  Any questions from the jury for this

8   witness?

9               Thank you, sir.  You may step down.  You can hand that

10  exhibit to the attorney.

11              The government may call its next witness.

12              MS. ANDERSON:  Government calls Michele Fuentes.

13          MICHELE FUENTES, GOVERNMENT WITNESS, SWORN

14              THE CLERK:  Could you please state your full name for

15  the record and spell your last name.

16              THE WITNESS:  Michele Fuentes.  That's M-i-c-h-e-l-e,

17  F-u-e-n-t-e-s.

18                          DIRECT EXAMINATION

19  BY MS. ANDERSON:

20  Q.      Ms. Fuentes, are you employed?

21  A.      Yes, I am.

22  Q.      Where do you work?

23  A.      C3, a call center.

24  Q.      Is that call center here in Tucson?

25  A.      Yes.  It's located on Drexel and Santa Cruz.

1   Q.    How long have you worked there?

2   A.    Going to be a year in October.

3   Q.    And what do you do for them?

4   A.    I'm a billing enrollment pharmaceutical for Humana Insurance.

5   Q.    Billing for Humana Insurance?

6   A.    Yes.

7   Q.    So you're involved in some kind of office work there?

8   A.    Yes.

9   Q.    Now, where were you born, Ms. Fuentes?

10  A.    Nogales, Arizona.

11  Q.    You are a U.S. citizen, correct?

12  A.    Yes.

13  Q.    And I'm going to call your attention to sometime back in

14  September of 2007.  Now, during that time period, were you attending

15  a school called Apollo College?

16  A.    Yes, I was.

17  Q.    Can you explain to us what Apollo College is?

18  A.    It's a college, school that allows you to get a degree under a

19  year.  I was studying for medical assisting which only takes nine

20  months.

21  Q.    When did you begin that program?

22  A.    I began in September.

23  Q.    September of?

24  A.    2007.

25  Q.    Okay.  And how long is that program?

1    A.    It's nine months.

2    Q.    So you would have finished it in, what, June of 2008 or so?

3    A.    Yes.

4    Q.    All right.  So you completed -- and you completed the course in

5    its entirety, correct?

6    A.    Yes.

7    Q.    Now, sometime while you were going to Apollo College, was your

8    purse stolen?

9    A.    Yes, it was.

10   Q.    Do you remember when your purse was stolen?

11   A.    I don't remember exactly the month.  It was between October

12   and November.  And it was from a desk or a table in our classroom.

13   Q.    So sometime between October and November, I think you said,

14   of 2007.  Is that right?

15   A.    Yes.

16   Q.    Could you describe your purse for us?

17   A.    It was like a backpack.

18   Q.    What did you -- I'm sorry.  Go ahead.

19   A.    No, no.  That's it.

20   Q.    What did you have in your purse when it was stolen?

21   A.    I had my Social Security, my kids' Social Security.  I have two

22   boys.  Both of them were in there.  Plus, I had their birth certificates,

23   my birth certificate.  We traveled to Mexico a lot.  So I always carried

24   every information.  I also had their AHCCCS cards.  My AHCCCS card.

25   And just -- we had pictures.  We had a planner.

1    Q.    A day planner?

2    A.    A day planner.  It was a day planner with an address book and

3    everything included.  I also had checks in the purse.  I also had

4    pictures.

5    Q.    You had a lot --

6    A.    Driver's license, everything.

7    Q.    You had a lot of personal information?

8    A.    Yes.

9    Q.    A lot of important information too it sounds like, correct?

10   A.    Yes.

11   Q.    In your purse was your wallet.  Is that right?

12   A.    Yes.

13   Q.    And in your wallet was all of the -- you had a checkbook?

14   A.    Yes.

15   Q.    And a debit card, correct?

16   A.    Correct.

17   Q.    And you said it was on a desk or some kind of a table, correct?

18   A.    Yes.  They were considered our desks, but it was just a few long

19   tables in the classroom.

20   Q.    Did you make a report to Apollo that you had your purse stolen?

21   A.    I told it to the school that I couldn't find my purse.  They didn't

22   tell me to go to the police or anything.  So I didn't know what to do.  I

23   just went the next -- got all the information again, the driver's license,

24   Social Security, birth certificates.

25   Q.    Did you make a report with the police about your purse?

1   A.      I did not.

2   Q.      At some point your checking account was closed.  Is that right?

3   A.      Yes.

4   Q.      Actually, your checking account had been closed before you lost

5   your purse?

6   A.      Yes.

7   Q.      Right.  Could you tell us a little bit about that?

8   A.      My dad had gotten sick.  We had gotten a payday loan.  I didn't

9   have a job back then.  But I used the check from -- that they give you

10  for school, the grant.  I used that to be able to get a payday loan.  I

11  never paid it back.  So when I went into the bank, it just closed

12  automatically.

13  Q.      They closed your account?

14  A.      Yes.

15  Q.      That was before your purse was stolen, right?

16  A.      Yes.

17              MS. ANDERSON:  Your Honor, may I approach the

18  witness?

19  BY MS. ANDERSON:

20  Q.      I'm showing you Government's Exhibit 256.  That's a banking

21  document.  Is it not?

22  A.      Yes.

23  Q.      And it's for an account -- a checking account that was in your

24  name, correct?

25  A.      Yes, Bank of America, Michele L. Fuentes.

1    Q.    That's who you were banking with.  Isn't that right?

2    A.    Yes.

3    Q.    It indicates that you had closed that account on September 29,

4    2008, correct?

5    A.    Yes.

6    Q.    Now, could you describe for us the kind of checks that you had?

7    Was there something unique about your checks?

8    A.    They were Shrek checks.

9    Q.    Why did you choose Shrek?

10    A.    My son was very infatuated, my older son, with Shrek.  That's

11    the only movie he wanted and only animal he loved.  They just came

12    up when I was ordering and opening the bank and I decided to get

13    Shrek.

14    Q.    I'm going to show you some documents.  I'm going to ask you if

15    you recognize these.  First of all is Government's Exhibit Number 182.

16    It's going to come up on the screen there in front of you.

17              Do you recognize that, Ms. Fuentes?

18    A.    Yes.  That's my planner.

19              MS. ANDERSON:  And the government moves for

20    admission of Exhibit 182.

21              MR. BOCK:  As to all the exhibits the government is

22    going to move into admission, I would just have --

23              THE COURT:  Your continuing objection.  All right.  182

24    is admitted.

25    BY MS. ANDERSON:

1    Q.    Next let's look at Government's Exhibit 185.

2    A.    My Shrek check.

3    Q.    That's a check that in the upper left-hand corner is your name,

4    correct?

5    A.    Yes.

6    Q.    And your address.  Is that right?

7    A.    Yes.

8              MS. ANDERSON:  Government moves for admission of

9    185.

10             THE COURT:  185 is admitted.

11   BY MS. ANDERSON:

12   Q.    Now, let me you ask, Ms. Fuentes, is that your signature on the

13   lower right-hand corner?

14   A.    No, it's not.

15   Q.    That's not your signature.  Look in the "Memo" section where it

16   says, "DBA Debbie's Cleaning Service, returned customer refund,

17   customer unhappy."  Is that your writing?

18   A.    None of that is my writing.

19   Q.    None of it is your writing?

20   A.    No.  I have very unique Rs.  They go into cursive because I do

21   them regularly.

22   Q.    You didn't write that check, did you?

23   A.    No.  Also, the F in the signature is different when I write it.

24   Q.    Let's look at Government's Exhibit 184.  Do you recognize any of

25   the documents in that photo?

1    A.    Yes.  It's my planner and my license.

2    Q.    The license is in -- on the right-hand portion of the planner?

3    A.    Yes.

4              MS. ANDERSON:  Government moves for admission of

5    Exhibit 184.

6              THE COURT:  184 is admitted.

7    BY MS. ANDERSON:

8    Q.    So that's your driver's license, correct?

9    A.    Yes.

10   Q.    You recognize your photo?

11   A.    Yes.  I still have that picture.

12   Q.    Now, on the left side of your planner, we see another

13   identification document.  I believe it's for an individual by the name of

14   Joaquin Contreras-Navarette.  Do you see that?

15   A.    Yes.

16   Q.    Do you recognize that individual?

17   A.    No.  I've never seen him.

18   Q.    You don't know who he is?

19   A.    No.

20   Q.    You don't know a Joaquin Navarette, do you?

21   A.    No.

22   Q.    Let's look at the rest of the documents here on your day planner.

23   We see business cards for Debbie's Cleaning Service.  Do you know

24   who Debbie is?

25   A.    No.

1    Q.    Have you ever done any kind of maid work or cleaning service?

2    A.    No, I have not.

3    Q.    Did you have those cards in your day planner or in your purse

4    when it was stolen?

5    A.    No, I didn't.

6    Q.    Let's look at Government's Exhibit Number 183.  Do you

7    recognize that?

8    A.    Yes.  That's the envelope where I would keep all the birth

9    certificates of me and my two boys.

10   Q.    And is that your handwriting in the upper right-hand corner?

11   A.    No, it's not.  It was given to me by a hospital.  They give you the

12   information when you -- they release you after giving birth.

13   Q.    But the envelope -- that envelope came from your purse,

14   correct?

15   A.    Yes.

16   Q.    And it had your name written on it just like that, correct?

17   A.    Yes.

18   Q.    Next is Government's Exhibit Number 186.  And do you

19   recognize those identification cards in Government's Exhibit 186?

20   A.    Yes.  It's my Social Security, my AHCCCS card, with my kids'

21   AHCCCS cards, and the health care provider, that's the CPR, and first

22   aid cards that I needed for work.  Also, I'm assuming the Blockbuster

23   card and Fry's card are mine.  I don't know what the tattoo card is or

24   that white wallet.

25            MS. ANDERSON:  Government moves for admission of

1    Exhibit 186.

2                        THE COURT:  186 is admitted.

3    BY MS. ANDERSON:

4    Q.    So you explained to us about the AHCCCS cards up in the top

5    corner.  We have one for Cesar Fierro, correct?

6    A.    Yes.

7    Q.    Is that your son?

8    A.    Yes.  That's my oldest, Cesar Fernando Fierro.  My youngest is

9    Diego Giovanni Fierro.

10   Q.    His card is in the lower left-hand portion, correct?

11   A.    Yes.

12   Q.    And that's your AHCCCS card in the right side of the day

13   planner, correct?

14   A.    Yes.

15   Q.    You told us about the health care provider card.  That's in your

16   name, right?

17   A.    Yes.

18   Q.    And you believe the Fry's VIP card and the Blockbuster card are

19   both yours, right?

20   A.    Yes.

21   Q.    You had those kind of cards in your wallet at the time?

22   A.    Yes.

23   Q.    And there's your Social Security card, correct?

24   A.    Correct.

25   Q.    Now, what about the tattoo card.  Is that yours?

1    A.    No.

2    Q.    That wasn't in your purse at the time it was stolen?

3    A.    No.  I wasn't thinking of getting a tattoo at that time.

4    Q.    Let's look at Government's Exhibit Number 187.

5              MS. ANDERSON:  Government moves for admission of

6    187.

7              THE COURT:  187 is admitted.

8    BY MS. ANDERSON:

9    Q.    In the lower left-hand corner, we see what appears to be a coin

10   purse.  Do you see that?

11   A.    Yes.

12   Q.    Was that yours?

13   A.    No.

14   Q.    Let's look at Government's Exhibit Number 188.  Do you

15   recognize that?

16   A.    Yes.  That's my son's, Diego Giovanni Fierro, the youngest.

17   That's what they gave me right after I had him before we can actually

18   get his Social Security card.

19   Q.    Okay.  We see the date is February 20, 2007, correct?

20   A.    Yes.

21              MS. ANDERSON:  Government moves for admission of

22   Exhibit 188.

23              THE COURT:  188 is admitted.

24   BY MS. ANDERSON:

25   Q.    189, let's take a look at that.  Is that your son's birth certificate?

1    A.    Yes.

2    Q.    That's for Diego, correct?

3    A.    Yes.

4    Q.    That was in your purse at the time?

5    A.    Yes.

6              MS. ANDERSON:  Government moves for admission of

7    189.

8              THE COURT:  189 is admitted.

9              MS. ANDERSON:  Let's look at Number 190.  That's your

10   birth certificate, correct?

11   A.    Yes, it is.

12             MS. ANDERSON:  Government moves for admission of

13   Exhibit 190.

14             THE COURT:  190 is admitted.

15   BY MS. ANDERSON:

16   Q.    Let's look at 191.  That's your other son's birth certificate,

17   correct?

18   A.    Yes.  That's my oldest.

19             MS. ANDERSON:  Government moves for admission of

20   191.

21             THE COURT:  191 is admitted.

22   BY MS. ANDERSON:

23   Q.    Let's look at 192.

24   A.    That's my youngest son's vaccination shots.

25             MS. ANDERSON:  Government moves for admission of

1    Exhibit 192.

2                    THE COURT:  192 is admitted.

3    BY MS. ANDERSON:

4    Q.    Government's Exhibit Number 193, take a look at that.

5    A.    That's my oldest.

6                    MS. ANDERSON:  Government moves for admission of

7    Exhibit 193.

8                    THE COURT:  193 is admitted.

9    BY MS. ANDERSON:

10   Q.    Do you recall which wallet you had at the time?

11   A.    I believe it was either red or purple.  I'm a little superstitious.

12   Q.    Tell us about that.

13   A.    I was always told if you carry a red wallet you will always have

14   money or anything to do with money in a red wallet and you will never

15   be without it.

16   Q.    Without money?

17   A.    Yes.

18   Q.    Do you have a red wallet now?

19   A.    Yes, I do.  Both wallet and a money purse.

20                    MS. ANDERSON:  May I have just a moment?

21                    THE COURT:  Yes.

22                    MS. ANDERSON:  May I approach the witness?

23                    THE COURT:  Yes.

24   BY MS. ANDERSON:

25   Q.    This is Government's Exhibit Number 317.

1    A.    This is my wallet.

2              THE COURT:  Hold on a second, ma'am.  I guess

3    everybody heard that.

4    BY MS. ANDERSON:

5    Q.    Do you recognize Government's Exhibit 317?

6    A.    Yes.

7    Q.    What is it?

8    A.    My wallet.

9    Q.    You recognize it, right?

10   A.    Yes.

11             MS. ANDERSON:  May I approach, Your Honor?

12             THE COURT:  Yes.

13   BY MS. ANDERSON:

14   Q.    Ms. Fuentes, I'm showing you -- I believe it's Government's

15   Exhibit 316 which are some identification and some other cards that

16   were in a wallet that was found.

17             Do you recognize any of the items that were found?

18   A.    Yes, the pictures.

19   Q.    I see that you are holding up -- let's bring that microphone over

20   if we could.  Now, you're holding a picture.  Which picture is that?

21   A.    My dad.

22   Q.    That's your dad's picture?

23   A.    Yes.

24   Q.    And do you recognize anything else?

25   A.    Yes.  This one is my mom.

1    Q.    That's your mom's picture?

2    A.    Yes.

3    Q.    Did you have both of those photographs in your wallet when it

4    was stolen?

5    A.    Yes.

6    Q.    You recognize anything else?

7    A.    Yes.  This is my -- me and my oldest son.  I was pregnant in this

8    picture.

9    Q.    Anything else?

10   A.    I don't know what this is.  No.

11   Q.    All right.

12   A.    Can I keep these?

13   Q.    You can't keep them right now because they are marked and

14   admitted into evidence, but we can make sure that you get them back.

15   How's that?

16              MS. ANDERSON:  Your Honor, may I publish these to the

17   jury?

18              THE COURT:  Yes, you may.

19   BY MS. ANDERSON:

20   Q.    Ms. Fuentes, that's the picture of your dad, correct?

21   A.    Yes.

22              MS. ANDERSON:  Could we publish them to the jury?

23              THE COURT:  Yes.  They have all been admitted.  Right,

24   Ms. Anderson?

25              MS. ANDERSON:  Right.

BY MS. ANDERSON:

Q.    This is a picture of your dad, right?

A.    Yes.

Q.    This is a picture of your mom, correct?

A.    Yes.

Q.    Here's a picture of you and your oldest son, right?

A.    Yes.

Q.    Ms. Fuentes, back in August of 2009, do you remember where you were working?

A.    Yes.  It's called Tucson Meadows.  It's taking care of adults with disabilities.

Q.    And there are several different shifts that you would have worked at that time, correct?

A.    Correct.

Q.    And what were those shifts?

A.    Mostly night and during the weekend.  Because of the commute from Tucson to Nogales, they would allow me to work from 2:00 in the afternoon to 6:00 in the morning.  Or if they needed me extra time, I would work from 10:00 to 6:00 in the morning.  That's what I needed the Medicare CPR card for.

            MS. ANDERSON:  May I approach the witness, Your Honor?

            THE COURT:  Yes.

BY MS. ANDERSON:

Q.    Ms. Fuentes, that's Government's Exhibit Number 341.  Do you

1   recognize that?

2   A.     Yes.  This is my time card from work.

3   Q.     Does it reflect what hours you were working on the evening of

4   August 1, 2009 and into the morning of August 2, 2009?

5   A.     Yes.  I worked from 2:00 p.m. to 10:00 p.m. and 10:00 p.m. to

6   6:00 a.m.  16 hours.

7   Q.     August 1, 2009 you would have gone to work at 10:00 p.m.?

8   A.     August 1st I would have gone in at 2:00 p.m.

9   Q.     2:00 p.m.  And got -- August 1st?

10  A.     No.  August 2nd.  I apologize.

11  Q.     But let's talk about August 1st.  You would have gone to work at

12  10:00 p.m., correct?

13  A.     10:00 p.m. and would have gotten out at 6:00 in the morning.

14  Q.     6:00 a.m.  And then --

15  A.     And then been back in at 2:00 to 6:00 a.m.  The job was very

16  understanding with me because they would let me sleep in an extra

17  room that they had.  So I wouldn't have to travel all the way back to

18  Nogales and then come back up for work.

19              MS. ANDERSON:  Government moves for admission of

20  Exhibit 341.

21              MR. BOCK:  No objection.

22              THE COURT:  341 is admitted.

23              MS. ANDERSON:  May I approach again, Your Honor?

24              THE COURT:  Yes.

25  BY MS. ANDERSON:

1    Q.    That's Government's Exhibit 342.  That's actually a Xerox copy of
2    one of the pages from your day planner.
3    A.    Yes.
4    Q.    Do you recognize the page?
5    A.    Yes, I do.
6    Q.    On the right side there's some writing that says, "Karen LeVine."
7    Do you see that?
8    A.    Yes, I do.
9    Q.    Is that your handwriting?
10   A.    No, it's not.  And if I would have written it, it wouldn't have been
11   on that day.  It would have been on July the 3rd instead of -- I'm
12   assuming it's the 13th.
13   Q.    What do you mean you would have written it on a different day?
14   A.    It says here the check was written July 3rd, and this is the week
15   of 7-13.
16   Q.    Okay.  So you would have written it on a different day?
17   A.    Yes, but that's not my handwriting.
18   Q.    You didn't make that entry in your planner, correct?
19   A.    No.
20                MS. ANDERSON:  Government moves for admission of
21   Exhibit 342.
22                MR. BOCK:  May I see that exhibit for a second?
23                THE COURT:  Yes.  Do you want to approach?
24                Ms. Anderson, is this part of the planner, the larger
25   exhibit?

1          MS. ANDERSON:  Yes, Your Honor.

2          THE COURT:  All right.  Which has already been

3     admitted.  So this is a page from that exhibit?

4          MS. ANDERSON:  Correct.

5          MR. BOCK:  I think I have already stated my position.

6          THE COURT:  I think you have.

7          MR. BOCK:  Thank you, Judge.

8          THE COURT:  Go ahead, Ms. Anderson.

9     BY MS. ANDERSON:

10    Q.    Ms. Fuentes, have you ever been to the LeVine residence at

11    2870 West Magee Road?

12    A.    No.  I don't know where that is.

13    Q.    Have you ever -- in fact what is the furthest north in Tucson that

14    you have ever been?

15    A.    Besides Apollo College, it would have been -- there is two ways

16    to get to what used to be my old job.  There's River and Craycroft or

17    there's Cloud and Tanque Verde.

18    Q.    Where was Apollo College?

19    A.    It was on Oracle and I believe Prince.

20    Q.    I'm going to ask you the names of some people and ask you if

21    you know these people.  Do you know Karen LeVine?

22    A.    No.

23    Q.    Myles LeVine?

24    A.    No.

25    Q.    Joaquin Contreras-Navarette?

1    A.    No.

2    Q.    Todd Fries?

3    A.    No.

4    Q.    Todd Burns?

5    A.    No.

6    Q.    Have you ever heard of Burns Power Washing?

7    A.    No.

8    Q.    Have you -- well, did you make a call to the FBI to report

9    information regarding an attack on the LeVine residence on August 2,

10   2009?

11   A.    No.  The only time I've heard of the FBI is when they went over

12   to my house.  FBI Nowak and FBI Luna.

13   Q.    And that was sometime after your ID was recovered, correct?

14   A.    Yes.

15   Q.    That's the first time you have ever talked to anybody from the

16   FBI?

17   A.    Yes.

18              MS. ANDERSON:  May I have just a moment, Your

19   Honor?

20              THE COURT:  Yes.

21              MS. ANDERSON:  Your Honor, the government moves for

22   admission of Exhibit 256 which is the bank record.

23              MR. BOCK:  I have no objection to the bank record, Your

24   Honor.

25              THE COURT:  256 is admitted.  Did you want that

1     published to the jury at this time?

2                    MS. ANDERSON:  Yes.  Yes, please.

3                    Then could we have Government's Exhibit 184 back up.

4     BY MS. ANDERSON:

5     Q.     Ms. Fuentes, you told us that you don't recognize the business

6     cards for Debbie's Cleaning Service.  Do you recognize that phone

7     number?

8     A.     No, I don't.

9                    MS. ANDERSON:  Thank you.  That's all I have, Judge.

10                   THE COURT:  All right.  Cross-examination.

11                           CROSS-EXAMINATION

12    BY MR. BOCK:

13    Q.     Good afternoon.

14    A.     Hello.

15    Q.     Now, the government showed you documents that were

16    recovered.  When did the FBI first come to talk to you?

17    A.     I don't remember the exact date.

18    Q.     Do you think it might have been August 3rd?

19    A.     Probably.  I really don't remember the exact day.  I was actually

20    surprised when they arrived.

21    Q.     Where did they arrive?  Where did they come to see you?

22    A.     My mom's house in Nogales, Arizona.

23    Q.     So you were off work then?

24    A.     Yes.

25    Q.     And so when you looked at your work records, you worked the

1    1st and the 2nd?

2    A.    Correct.

3    Q.    The 3rd would have been what day of the week?  Do you have

4    any idea?

5    A.    I have it here.  The 3rd would have been Monday.

6    Q.    Is it possible they came to see you Monday, the 3rd?

7    A.    Yes.  I was in pajamas.

8    Q.    What time did they come?

9    A.    It was early in the morning.  I'm guessing around 10:00.

10   Q.    And you had no advanced notice of what they were going to

11   discuss with you, did you?

12   A.    No.

13   Q.    And Agent Nowak is -- you see him there?

14   A.    Yes.

15   Q.    Another agent by the name of Luna also spoke with you?

16   A.    Yes.

17   Q.    Now, before I go into a little bit of that with you, your

18   identification was in that wallet.  Is that correct?

19   A.    Correct.

20   Q.    It was taken from Apollo you said in what month and what year?

21   A.    It was taken in 2007.  I'm guessing around October or

22   November.

23   Q.    Where did you last remember leaving your purse or seeing your

24   purse before you knew it was missing?

25   A.    I used to sit right in the corner when you walked into the

1    classroom.  There were tables.  But they were supposedly our desk

2    area.  I had mine right on the corner.

3    Q.    Then so this is an area where you are also being taught.  Is that

4    correct?  Like a classroom?

5    A.    Yes.

6    Q.    So did you go to lunch or did you go to another part of the

7    building?

8    A.    We were barely getting to know the building.  So they had

9    tooken (sic) us around to look at where the computer area was going

10   to be and all the other places because they also do massage therapy

11   and they also have another lab thing there.  I can't remember the

12   name of it.

13   Q.    How many people would have been in that classroom where your

14   purse was left while class was being attended?

15   A.    No one was in the classroom.

16   Q.    So you left your purse in a classroom where no one was in?

17   A.    Yes.  We had to all get up and go.  I'm not one of the people that

18   remembers to take her purse everywhere.

19   Q.    So my question to you is:  When you got up to go, before that,

20   how many people were in that classroom that you were with?

21   A.    I'm guessing around 22.

22   Q.    And how long were you gone before you came back to the

23   classroom?

24   A.    Would have been half an hour I think at the most.

25   Q.    You noticed your purse gone right away?

1    A.    No.  I noticed it gone at the end of the day.

2    Q.    Your best guess would be that your purse was taken when you

3    were out of the classroom and the classroom was unattended?

4    A.    Yes.

5    Q.    Now, certainly the identification that was shown to you by the

6    government that you recognized, that's identification that you would

7    have handled.  Is that correct?  I mean, you would have touched the

8    Social Security card?

9    A.    Yes.

10    Q.    In all likelihood your fingerprints would be on your own

11    documents, right?

12    A.    Yes.

13    Q.    There were other documents in there that you didn't have -- you

14    had no knowledge of whatsoever when the government was asking

15    you questions, right?

16    A.    Correct.

17    Q.    So certainly never seeing those documents before, cards,

18    whatever, you would have never handled those, right?

19    A.    Correct.

20    Q.    But somebody put those in with your documents?

21    A.    It would seem so.

22    Q.    Now, on August 3rd when the FBI came down to speak with you,

23    do you remember the topic that they were talking to you about?

24    A.    Yes.  If I ever had my purse stolen and I explained them the

25    Apollo situation.  They asked me if I remembered any of the

1    documents.  They showed me the planner.  And they showed me the

2    pictures.  And they showed me the checks.

3                    They asked me if I had a bank account.  I told them yes.

4    They asked me if I remember what was on the check and I couldn't

5    remember at the time.  When he showed it to me, then it came to my

6    head, oh, yeah, Shrek.

7    Q.    Did the FBI tell you where they found the identification?

8    A.    They told me they were found at the scene of a crime.

9    Q.    Did they go into the nature of the crime with you?

10   A.    No, they didn't.

11   Q.    Did you ask about when it was found or what type of crime it

12   was found at?

13   A.    No, I didn't ask.

14   Q.    You knew you had nothing to do with any crime or any crime

15   scene?

16   A.    Yes.

17   Q.    So even though they were telling you things like that, you would

18   have been calm, collected, because you had nothing to do with any of

19   this?

20   A.    Correct.

21   Q.    Now, they also asked you about a name of Joaquin Navarette.  Is

22   that correct?

23   A.    Yes.

24   Q.    And you told them under no uncertain terms -- this is -- and you

25   correct me, but you told them that you have no idea who this

1    individual is.  You don't know this individual.

2    A.    Correct.

3    Q.    Did you ask the FBI what their purpose was in asking you about

4    a Mr. Navarette?

5    A.    They said that it was just in the wallet.

6    Q.    So they told you that there was identification of Mr. Navarette

7    that was associated with the identification of yours that was seized at

8    a crime scene.  Is that correct?

9    A.    Correct.

10   Q.    Now, had the FBI come and talked to you after August the 4th?

11   A.    I remember them telling me that they were going to contact me

12   if they needed me for any other reasons.  They contacted me to tell

13   me that they were going to need me for court and to tell me that I

14   needed -- that they were going to give me a subpoena.

15   Q.    This court?

16   A.    Yes.

17   Q.    Did the FBI ever share with you that there was a call made to

18   the FBI by a person purporting to be you?

19   A.    No.

20   Q.    Is this complete news to you?

21   A.    Yes, it is.

22   Q.    Did the -- so you know nothing -- the FBI never shared with you

23   a call to the FBI that someone used your name?

24   A.    No.

25   Q.    The FBI was -- did they seem to be completely satisfied that you

1    did not know Mr. Navarette based upon your assertion?

2    A.     They never said anything to me that they didn't believe.

3    Q.     They never challenged you on that?

4    A.     No.

5    Q.     They never interrogated you on that.  It was a very calm

6    discussion.  Is that correct?

7    A.     Yes.

8    Q.     You were a witness about your identification and were giving

9    them information about when you lost your identification and then

10   they showed you identification to confirm that this was yours?

11   A.     Yes.

12                    MR. BOCK:  Thank you, Your Honor.

13                    THE COURT:  Redirect.

14                            REDIRECT EXAMINATION

15   BY MS. ANDERSON:

16   Q.     Ms. Fuentes, did you ever call the FBI on August 4 of 2009 to

17   report that you had information regarding the attack on the LeVine

18   residence?

19   A.     No.

20                    MS. ANDERSON:  That's all I have.

21                    THE COURT:  Any questions from the jury for this

22   witness?

23                    Thank you, ma'am.  You may step down and be excused.

24                    Let's go ahead and take a 15-minute afternoon break.

25                    (A recess was taken.)

1           THE COURT:  The record may reflect the presence of

2    counsel and the defendant.

3           Jill, if you can get the jury.

4           (The jury was seated.)

5           THE COURT:  The record may reflect the jury is present.

6    And, Counsel, you may call your next witness.

7           MR. PIMSNER:  Thank you, Your Honor.  The

8    government calls Joaquin Navarrete.

9        JOAQUIN NAVARRETE, GOVERNMENT WITNESS, SWORN

10          THE CLERK:  Would you please state your full name for

11   the record and spell your last name.

12          THE WITNESS:  I don't know how to spell, right.

13          THE COURT:  Go ahead.  So what's your full name, sir?

14          THE WITNESS:  Joaquin Contreras.

15          THE COURT:  And is Navarrete part of --

16          THE WITNESS:  Yes, Navarrete.

17          THE COURT:  Go ahead, sir.

18                       DIRECT EXAMINATION

19   BY MR. PIMSNER:

20   Q.    So your name is Joaquin Contreras-Navarrete?

21   A.    Yes.

22   Q.    How old are you?

23   A.    43.

24   Q.    And do you live in the Tucson area?

25   A.    Uh-huh.

1    Q.    Is that a yes?

2    A.    Yes.

3    Q.    You have to say yes or no.

4              THE COURT:  They have a court reporter here who is

5    taking down everything that is being said.

6    BY MR. PIMSNER:

7    Q.    Are you employed sir?

8    A.    I'm a chef for the Olive Garden.

9    Q.    For Olive Garden?

10   A.    Yes.

11   Q.    How long have you been a chef at Olive Garden?

12   A.    11 years.

13   Q.    I'm sorry?

14   A.    11 years.

15   Q.    11 years.  At some point do you remember being contacted by

16   the FBI?

17   A.    Yes.

18   Q.    And did they -- were they asking you questions about one of

19   your identification cards?

20   A.    Yes.

21   Q.    And when the FBI met with you, did they actually show you a

22   copy of the identification card?

23   A.    Yes.

24              MR. PIMSNER:  May the witness be shown what has

25   been admitted as Exhibit 184?

1          THE COURT:  Yes.

2          Sir, that's going to show up on your screen right there.

3   There you go.

4          THE WITNESS:  Yeah, that's my ID.

5   BY MR. PIMSNER:

6   Q.    Sir, that is your ID?

7   A.    Excuse me?

8   Q.    Is that your identification?

9   A.    Yes.

10  Q.    And do you recall when the last time you saw that identification?

11  A.    Well, the ID was stolen from my house in like 2008.

12  Q.    2008 it was stolen from your house?

13  A.    Yes.

14  Q.    Did you ever recover that ID?  Did you ever get it back?

15  A.    No.

16         MR. PIMSNER:  If the witness can be shown the entire

17  exhibit.  Then zoom in on the other identification.

18  BY MR. PIMSNER:

19  Q.    Now, sir, your ID was found in a day planner that also had an

20  identification belonging to a Michele Fuentes.  Do you see her picture

21  on the bottom?

22  A.    Yes.

23  Q.    Do you recognize --

24  A.    No.

25  Q.    -- her?

1    A.    No.

2    Q.    Do you know a Michele Fuentes?

3    A.    No.

4              MR. PIMSNER:  And if the witness can be shown the

5    whole page.

6    BY MR. PIMSNER:

7    Q.    There are business cards for Debbie's Cleaning Service.  Have

8    you ever heard of that company?

9    A.    No.

10   Q.    Now, the FBI was investigating a chemical device that was at a

11   home off of West Magee and Shannon Road.  Have you ever been to a

12   home in that location?

13   A.    Where exactly?

14   Q.    West Magee and Shannon Road or Jensen Road?

15   A.    Yeah.  1608 Sunridge.  I was living right there.

16   Q.    You live close nearby?

17   A.    Yes.

18   Q.    And so you know the general area?

19   A.    Yeah.  I saw the truck because the truck because it was in side

20   street, but I never seen the guy I know how he looked like.

21   Q.    No, no, no.  What I'm talking about, sir, is have you been to the

22   home that was located at 2870 West Magee Road?  Have you ever

23   been to a home there?

24   A.    Yeah.

25   Q.    You have personally visited a home at that location?  If I were to

1   show you a picture of the home, would that help with your

2   recollection?

3   A.    No.

4                    UNIDENTIFIED SPEAKER:  An interpreter would be

5   helpful.

6                    THE COURT:  Hold on.  Sir, would you feel more

7   comfortable with an interpreter?

8                    THE WITNESS:  Yeah, I would understand more.

9                    THE COURT:  You seem to be doing okay, but would you

10  like to have an interpreter?

11                   THE WITNESS:  Yeah, please, because I am missing

12  some words.

13                   THE COURT:  Hold on a second.  This lady in the

14  audience, is she with you, the lady that just made that comment?

15                   UNIDENTIFIED SPEAKER:  I'm his wife.

16                   THE WITNESS:  She's my wife.

17                   THE COURT:  You're his wife.  All right.  The record can

18  reflect the witness' wife had indicated that an interpreter would be

19  helpful.

20                   Does the government have another witness you can call

21  while we attempt to locate an interpreter?

22                   MR. PIMSNER:  Yes, Your Honor.

23                   THE COURT:  Sir, if you wouldn't mind stepping down.

24  We will get back to you.  We will attempt to find an interpreter to

25  assist you.  You can go ahead and have a seat outside of the

1    courtroom.  We'll try to find an interpreter who is available to assist

2    us.

3                    The government may call another witness in the

4    meantime.

5                    MR. PIMSNER:  Thank you.  The government would call

6    Jeff Luna.

7             JEFF LUNA, GOVERNMENT WITNESS, SWORN

8                    THE CLERK:  Would you please state your full name and

9    spell your last name for the record.

10                    THE WITNESS:  Jeffrey J. Luna.  L-u-n-a.

11                    DIRECT EXAMINATION

12    BY MR. PIMSNER:

13    Q.    Mr. Luna, are you currently employed?

14    A.    No.

15    Q.    Are you going to school?

16    A.    Yes.

17    Q.    And where are you going to school?

18    A.    I study at the Phoenix Seminary.

19    Q.    And are you going for a specific degree?

20    A.    Yes, masters in divinity.

21    Q.    Divinity?

22    A.    Yes.

23    Q.    When did you start your master in divinity?

24    A.    At the Phoenix Seminary, I started this past summer.

25    Q.    Summer of 2012?

1    A.    Yes.

2    Q.    And what about your undergrad?  Do you have undergrad --

3    A.    Yes.  I did my undergrad with Excelsior College while I was

4    active duty in the Navy.

5    Q.    So you have a background in the Navy?

6    A.    Yes.

7    Q.    And how long were you in the Navy?

8    A.    I was in the Navy for five and a half years.

9    Q.    And what was your duty as -- what were your main duties when

10    you were in the Navy?

11    A.    I was a naval linguist.

12    Q.    A linguist?

13    A.    Yes.

14    Q.    What are you hoping to do once you obtain your masters

15    degree?

16    A.    I hope to rejoin the Navy as a chaplain.  It's my goal.

17    Q.    At some point after the time you left the Navy, did you attempt

18    to get -- or did you get a job with the federal government?

19    A.    Yes, I did.

20    Q.    When was that?

21    A.    That was December 9 of 2007.

22    Q.    What agency did you start working for?

23    A.    The Federal Bureau of Investigation.

24    Q.    In what capacity?

25    A.    I was a special agent.

1    Q.    How long were you a special agent?

2    A.    For four and a half years, just under four and a half years.

3    Q.    That would have been up until near the time that you started

4    your masters program?

5    A.    Yes, that's correct.

6    Q.    And I want to draw your attention back to August of 2009.  Were

7    you acting as a special agent at that time?

8    A.    Yes.  I was a special agent at the time.

9    Q.    And were you called upon to assist Special Agent Brian Nowak on

10   an investigation of a chemical device?

11   A.    Yes.

12   Q.    That is Agent Nowak that is sitting at our table?

13   A.    Yes, that's Agent Nowak.

14   Q.    Were there various things that you would assist him with during

15   the course of that case?

16   A.    Yes, there were various things I assisted him with.

17   Q.    Drawing your attention specifically to August 4, 2009, were you

18   asked by Agent Nowak to assist him in part of the investigation?

19   A.    Yes.

20   Q.    And tell us what happened that morning and how it came about

21   that you were assisting Agent Nowak.

22   A.    On August 4 of 2009, Agent Brian Nowak and myself went to El

23   Dorado Medical Center.

24   Q.    Before we get there, did Agent Nowak approach you and say,

25   "Hey" -- ask you to assist him or to go out to a certain location?

1    A.    Yes.  We received some suspicious phone calls at the FBI office

2    at the main duty desk.  There's always an agent manning the FBI duty

3    desk.  We received a phone call.  And since Brian and I were

4    investigating the case, we went -- proceeded with the information and

5    went to El Dorado Medical Center.

6    Q.    Was that information basically the suspicious call that you just

7    described was coming from that facility?

8    A.    Yes.

9    Q.    Now, El Dorado, is that a hospital?

10   A.    Yes, it's a hospital.

11   Q.    Where is that located at in Tucson?

12   A.    The vicinity of Broadway and Wilmot.

13   Q.    And where was your FBI -- roughly FBI office at the time?

14   A.    It was here downtown in Tucson, 1 South Church Avenue.

15   Q.    Now, did you and Agent Nowak travel to that hospital?

16   A.    Yes, we did.

17   Q.    And do you know how long after that suspicious call came in that

18   you went out there?

19   A.    It was within the hour.

20   Q.    Now, that hospital, did it have another company that was

21   operating inside that hospital?

22   A.    Yes.  On the third floor, there was the Avalon Rehabilitation

23   Center I believe may be the name.

24   Q.    That was -- even though in the same structure, it was a separate

25   company than the El Dorado Hospital?

1   A.     Yes, it was.

2   Q.     Did they occupy a certain floor?

3   A.     It was the third floor.

4   Q.     And what was the reason that you were going out to Avalon

5   Rehabilitation Center?

6   A.     The reason is that the suspicious phone call that we received on

7   that morning was traced back to the third floor of the El Dorado

8   Medical Center.  Specifically the Avalon Rehabilitation Center.

9   Q.     And it was just you and Agent Nowak together initially?

10  A.     Yes.

11  Q.     And what did you do when you arrived?

12  A.     When we arrived we spoke to the receptionist and we asked to

13  see if there was a check-in or sign-in log and verified anybody that

14  may have signed in between the hours of 8:30 and 9:30.

15  Q.     And did that verification, did it draw anybody suspicious that you

16  recall?

17  A.     No, it did not.

18  Q.     And did you conduct further investigation at that scene?

19  A.     Yes.  We spoke with the director of -- or administrator of the

20  Avalon center.  And I believe his first name was Steve.  Maybe

21  Anderson his last name.  And we set up a meeting with his staff

22  regarding our -- we expressed to him part of the reason that we were

23  there and he called a staff meeting.

24  Q.     And initially who was present at the staff meeting?

25  A.     It was him, I believe there was another administrator and

1    Mrs. Charlotte Duncklee I believe is her last name.

2    Q.    Duncklee?

3    A.    Duncklee.

4    Q.    And was Agent Nowak also present?

5    A.    Yes, he was.

6    Q.    And what was -- did you discuss with the administrator and --

7    first of all, did you learn what Ms. Duncklee's position was at that

8    hospital?

9    A.    Yes.  She was the charge nurse or the director of nursing.

10    Q.    And so did you and Agent Nowak question Ms. Duncklee as to

11    whether or not anything suspicious occurred that morning?

12    A.    Yes.  What we did was we explained to everybody who was -- to

13    the group that was meeting at the time the reason why we were there,

14    there was a suspicious phone call that came into our office.  And we

15    asked if there was -- if anything had happened throughout that

16    morning and that's when Ms. Duncklee spoke up.

17                    MR. BOCK:  Objection, Your Honor.

18                    THE COURT:  Well, we'll just have your answer stop

19    there.

20                    Go ahead, Counsel, ask the next question.

21    BY MR. PIMSNER:

22    Q.    And so at that point, did you learn that somebody that didn't

23    belong on that floor was noticed on that floor?

24    A.    Yes, at that point we did.

25    Q.    And did you ask for a description of the individual that was seen

1    on that floor?

2    A.    Yes.

3    Q.    And did the description match the description of a known

4    individual that you were -- that you were investigating?

5    A.    Yes.  The description reminded me of a photograph that I had

6    within my papers that I had brought to the place.

7         MR. PIMSNER:  If I may -- first of all, Your Honor, I don't

8    know if a sidebar would be appropriate.

9         THE COURT:  Yes.  Come on up.  We have an interpreter

10   here.

11        (At sidebar.)

12        MR. PIMSNER:  I didn't want to get into a lengthy

13   explanation.

14        I think he can go into he asked her and she said, "The

15   alarm went off, there was somebody suspicious, I looked and saw

16   him."  And then it explains why he took the following acts which would

17   be to show the photograph.

18        So it's not for the truth of the matter asserted but to

19   show how he acted.

20        THE COURT:  How the investigation unfolded?

21        MR. BOCK:  Can't he just say, "Based upon the

22   information that you received, what did you do next?" rather than get

23   particular with statements that she was --

24        MR. PIMSNER:  I'm not going to get into the actual

25   physical description that was given.  I'm just going into she noticed

1  something unusual because there was an alarm.  She contacted that

2  person.  And as a result, he showed her a photograph.

3                THE COURT:  Are you calling this person as a witness?

4                MR. PIMSNER:  Next, after Mr. Joaquin.

5                THE COURT:  Now, is he going to be much longer?  We

6  have the interpreter here.

7                MR. PIMSNER:  Yeah.

8                MR. BOCK:  I don't have an objection if you want to

9  obtain his testimony.

10                THE COURT:  Should we do that?

11                MR. PIMSNER:  That's fine.

12                THE COURT:  I don't know if Mr. Navaratte has wandered

13  off or not.

14                MR. PIMSNER:  He's in the back room.

15                THE COURT:  Okay.  So we'll have this agent step down

16  if that is okay.

17                MR. PIMSNER:  That's fine.

18                (In open court.)

19                THE COURT:  Sir, we were in the middle of the last

20  witness who needed an interpreter.  The interpreter is now here.  I'm

21  sorry to do this to you.  We're going to have you step down and we

22  will continue with you when we are finished with the other witness.

23  So we'll let you know when we need you to come back.

24                Derek, thank you for joining us on this Friday afternoon

25  at 4:00.  We have a witness that would like your assistance.

1          Mr. Sully is one of our certified court interpreters.  How

2    many do we have in the building now?

3                    THE INTERPRETER:  Eight.

4                    THE COURT:  Eight full-time Spanish speaking

5    interpreters.

6                    Mr. Navarrete, if you can come back up and have a seat.

7    We have an interpreter for you now.

8                    Thank you.

9                    THE INTERPRETER:  Your Honor, would you like the

10   witness closer to the jury?

11                   THE COURT:  Sir -- that would be great.  Sir, if you

12   wouldn't mind sitting a little closer to the jury.

13                   This is Mr. Sully.  He will assist you.

14                   Counsel, I don't know if you want to just continue from

15   where you were.  It appeared that the witness was understanding your

16   questions.  Would that be fair to say, sir?

17                   I'll let you interpret, Mr. Sully, to him.

18                   THE WITNESS:  The first ones yes.  But the last one, no,

19   I did not understand.

20                   THE COURT:  If you want to start with the last few

21   questions or that subject you were in, Mr. Pimsner.

22                          DIRECT EXAMINATION

23   BY MR. PIMSNER:

24   Q.    When the FBI agents interviewed you, did they ask you if you

25   were involved in a chemical attack over on Magee Road in Jensen?

1    A.    No.

2    Q.    Sir, you said earlier that you lived in the -- kind of the general

3    area.  Back in August of 2009, do you recall seeing or hearing about a

4    chemical cloud in the neighborhood?

5    A.    No.

6    Q.    Sir, at any time did you purchase chlorine or steal chlorine

7    tablets and place them at the front and back of somebody's home to

8    cause a chemical reaction?

9    A.    No.

10   Q.    Thank you.  Do you know a Mr. or Mrs.  -- or Mrs. Karen LeVine

11   or Mr. Myles LeVine?

12   A.    (In English)  No.

13   Q.    You understood that question in English, correct?

14   A.    (In English)  Yes.

15   Q.    And do you know a Michele Fuentes?

16   A.    (In English)  No.

17   Q.    And had you seen your driver's license after it was stolen from

18   your home -- or not your driver's license -- your identification card?

19   A.    That if I had seen it?

20   Q.    Have you seen it since your identification was stolen from your

21   home?

22   A.    No.  I never saw it after they stole it from me.

23              MR. PIMSNER:  If I may have one moment?

24              I have nothing further at this time, Your Honor

25              THE COURT:  All right.  Cross-examination, Mr. Bock.

1                          CROSS-EXAMINATION

2     BY MR. BOCK:

3     Q.     Good afternoon, Mr. Navarrete.

4     A.     Good afternoon.

5     Q.     Mr. Navarrete, was your identification in your Toyota Tercel

6     when it was stolen from the Fry's supermarket on 1st Avenue in

7     Tucson?

8     A.     (In English)  No, that was from the house.  That was stolen from

9     the house.

10    Q.     So the situation involving the Toyota was before the house or

11    after the house?

12    A.     (In English)  That was before.

13    Q.     So not -- what area of town were you living in when your home

14    was burglarized?

15    A.     (In English)  Liberty Avenue, 3675 Liberty Avenue.

16    Q.     And is that still your residence?

17    A.     (In English)  Yeah.

18    Q.     And the identification that was taken from you, did that

19    identification have that address on it?

20    A.     (In English)  I don't remember, but the address on the ID --

21                        THE COURT:  Could you talk right into the microphone,

22    sir?  Go ahead.

23                        THE WITNESS:  I don't remember the address on the ID

24    exactly, because that was old ID.

25    BY MR. BOCK:

1    Q.    What exactly was the ID that was taken from you?

2    A.    (In English)  From the house, 3675 Liberty.

3    Q.    What was the nature of the ID?  I'm sorry.  I didn't ask a very

4    good question.

5    A.    That was from the health department because I was working at a

6    restaurant.

7    Q.    And the health department -- it would have been the Olive

8    Garden you were working at.  Is that correct?

9    A.    (In English)  Yeah.

10   Q.    So it would be fairly easy if someone had that health department

11   card to find out where you were working.  Is that a fair statement?

12   A.    No.

13   Q.    Well, did you -- was there any identification that you lost that

14   could have helped someone realize that you were working at the Olive

15   Garden or helped them to realize where you were living?

16   A.    No.

17   Q.    When did the FBI come to speak with you?

18   A.    I don't recall exactly.  They went to the restaurant to speak to

19   me.

20   Q.    I have a report that is dated August 20, 2009.  Do you think that

21   might have been around the time?

22   A.    Yes, probably.

23   Q.    And they came to your place of employment.  Is that correct?

24   A.    Yes.

25   Q.    The restaurant is at the -- it's at the Tucson Mall?

1   A.      (In English)  Yeah.

2   Q.      What hours do you normally work?  Or what hours were you

3   working on August 20th, assuming that's the date they came to talk to

4   you?

5   A.      (In English)  I work 7:00 to 3:00, 7:00 to 4:00.  So it was like

6   10:00, 10:30, something like that.  I'm not sure.

7   Q.      You never had the FBI come speak to you before obviously,

8   right?

9   A.      (In English)  Yeah.

10  Q.      Were your interests heightened as to why they wanted to speak

11  with you?

12  A.      Yeah.

13  Q.      And did they talk to you in the restaurant or did they ask you to

14  come outside?  Do you remember where the conversation took place?

15  A.      (In English)  Yeah.  He told me to come outside because we

16  talked outside.

17  Q.      Did you sit in a patrol car at all or were you just standing with

18  the officer?

19  A.      (In English)  I was standing with him outside.

20  Q.      Was it this gentleman?

21  A.      (In English)  Yes.

22  Q.      Was there another agent there also or just this gentleman?

23  A.      (In English)  It was that guy.

24  Q.      Did you ever ask this gentleman -- you were speaking with him

25  in English?

1    A.    (In English)  Yes.

2    Q.    You had no difficulty speaking with him?

3    A.    (In English)  Well, no.

4    Q.    Did you ever ask him how the FBI learned where you were

5    working?  Did he ever tell you how he found out where you were

6    employed?

7    A.    No.  I just did ask him what was happening.

8    Q.    If an individual wanted to know where you were working or

9    where you lived, how do you think they might obtain that information?

10   A.    No.  I don't understand why.

11   Q.    Okay.  You have an Arizona driver's license?

12   A.    (In English)  Yes.

13   Q.    And the Arizona driver's license is under Joaquin

14   Contreras-Navarrete?

15   A.    (In English)  Yes.

16   Q.    Did it have the Liberty address on it?

17   A.    (In English)  Yes.

18   Q.    So if law enforcement wanted to speak with you, they certainly

19   could have access to an MVD license?  You don't know that.  That's a

20   possibility, right?

21   A.    How is that?  I don't understand.

22   Q.    In other words, if someone from law enforcement wanted to find

23   out where you might live, they could get that information off a driver's

24   license.

25              MR. PIMSNER:  Object as to relevance, Your Honor.

1      THE COURT:  Overruled.

2      THE WITNESS:  Yes.

3   BY MR. BOCK:

4   Q.    Did you have any advance warning that the FBI, the gentleman,

5   Agent Nowak, was going to come see you on the 20th?

6   A.    No, not the first time.

7   Q.    Now, the first time he asked you about your identification.  Is

8   that correct?

9   A.    Yes.

10  Q.    And he also shared with you the fact that your identification had

11  been found at a crime scene.  Is that correct?

12  A.    (In English)  Yes.

13  Q.    You told him in no uncertain terms that you had nothing to do

14  with that crime scene.  Is that correct?

15  A.    (In English)  Yes.

16  Q.    That's because you had nothing to do with the crime scene?

17  A.    (In English)  That's right.

18  Q.    You had no idea how your identification, which was taken from

19  your home, right, without your permission, right?

20  A.    (In English)  Yeah.

21  Q.    It was a burglary.  Someone broke into your home without your

22  permission.  Is that correct?

23  A.    (In English)  I don't know that, but when this guy showed up at

24  my work, I told my wife, "Oh, that's the ID they stoled from my

25  house."

1  Q.     And did you report the burglary to the Tucson police?

2  A.     (In English)  Yeah, I report it, but I don't remember what they --

3  that was exactly that report.

4  Q.     Did they come to the house and process the house?

5  A.     (In English)  Yeah.  She checked everything and we showed

6  everything because it was a big mess.

7  Q.     Where was the point of entry?  Where did someone come into

8  the house?

9                    MR. PIMSNER:  Object to relevance.

10                   THE COURT:  Overruled.

11                   THE WITNESS:  The police?

12  BY MR. BOCK:

13  Q.     No.  When you noticed that your home was burglarized, was a

14  window broken or door broken?

15  A.     (In English)  The back of the house, two windows.

16  Q.     Windows were actually broken?

17  A.     (In English)  Yeah.

18  Q.     Windows large enough to have someone come into the house?

19  A.     Yes, uh-huh.

20  Q.     Now, I have to ask a couple of questions.  And, again, please

21  don't take exception to them and they are not met to embarrass you

22  or harass you in any way, shape or form.

23                   So did Agent Nowak, when he first met you, did he ever

24  read you Miranda warnings?

25  A.     Yes.

1    Q.    Did he read you warnings that you have the right to remain

2    silent, anything you say can be used against you?

3    A.    Yes.

4    Q.    Did he read those from a rights card or did he just read those

5    from his memory?

6    A.    Yes.  I remember that he took some papers out and he told me

7    everything.

8    Q.    Papers about the incident or papers about telling you what your

9    rights are?

10   A.    About my rights, yeah.

11   Q.    And did he ask you if you would be willing to talk with him?

12   A.    Yes.

13   Q.    Did you tell him that you would be willing to talk with him?

14   A.    Yeah.

15   Q.    That's because you had nothing to hide whatsoever, right?

16   A.    (In English)  Exactly.

17   Q.    Then you had a dialogue with him about the -- what we have

18   just talked about.  Is that correct?  How you lost your identification

19   and where your identification was ultimately recovered on August the

20   2nd of '09?

21   A.    Yes, he told me all that.

22   Q.    And you cooperated with him fully?

23   A.    Yeah.

24   Q.    Did he ever tell you when he was leaving that you were still a

25   suspect in the event of August 2, 2009, where your identification was

1    found?

2    A.    Yes, but he said that he had already checked my record and that

3    I had a clean record and I didn't have anything to do with that.  So I

4    said yes and I agreed that there was nothing.  I didn't have anything

5    to do with it.

6    Q.    So he was completely satisfied when he spoke with you on

7    August 20th that you had nothing to do with the August 2nd incident?

8    A.    Yeah.

9    Q.    And you never needed to hire a lawyer regarding that because

10    you didn't do anything wrong?

11    A.    Yes, because I never had any need to get a lawyer because he

12    knew that I hadn't done anything wrong and I didn't have any need for

13    a lawyer.

14    Q.    You knew you weren't going to be charged with anything, right?

15    A.    Yes, exactly.

16    Q.    And so you never even needed to call a lawyer on the phone or

17    meet with a lawyer.  Is that correct?

18    A.    Never, never.

19    Q.    And what was the length of the conversation when you were

20    outside with Agent Nowak?  How long did that conversation take?

21    A.    About 20 minutes, around there.

22    Q.    He never asked you to come with him after that?

23    A.    Never.

24    Q.    He never produced any type of weapon or threatened you or told

25    you that he was going to arrest you.  Is that correct?

1    A.    (In English)  No, nothing like that.

2    Q.    Never produced any handcuffs.  Is that correct?

3              Now, when is the next time that you had some contact

4    regarding your testimony today?  When did someone contact you from

5    either the U.S. Attorney's office or law enforcement, FBI?

6    A.    "Alguien" went to speak with me last week and deliver me the

7    sheet of paper.

8    Q.    A subpoena?

9    A.    Yes.  It was like two sheets of paper.  Last Friday.

10   Q.    So from August 20, 2009, when you spoke with Agent Nowak,

11   nothing has happened until you got the paper last week?

12   A.    No, nothing, not until last Friday.

13   Q.    You never got any type of letter that you were the target of any

14   criminal investigation, did you?

15   A.    No, nothing.

16   Q.    Not from the U.S. Attorney or the FBI, right?

17   A.    No, nothing.

18              MR. BOCK:  Thank you, Your Honor.

19              THE COURT:  Yes.  Any redirect?

20                        REDIRECT EXAMINATION

21   BY MR. PIMSNER:

22   Q.    Sir, when your house was burglarized and you lost some

23   identifications, you lost more than just one piece of paper that was

24   relevant to your identification, correct?

25   A.    It was just one ID and the rest were things -- household items.

1        MR. PIMSNER:  Can the witness be shown 184 which has

2    been admitted?

3    BY MR. PIMSNER:

4    Q.    You talked about on direct exam -- or on cross-examination

5    about a health card that allows you to work in -- some kind of health

6    card.  Do you recall that testimony?

7    A.    Yeah.  I know -- I didn't know what type it was exactly.  I knew

8    it was my ID.  Because it was so old, I didn't recall exactly what kind.

9    Q.    Now, is this the identification that would have been stolen from

10   your home?

11   A.    Yes, that's it.

12   Q.    And you had not seen that identification -- you never got that

13   identification back in your possession, correct?

14   A.    No.

15   Q.    Does that identification show your picture?

16   A.    Yes.

17   Q.    Is that a consular card?

18   A.    That's my photo when I had long hair.

19   Q.    Is that a consular card?

20   A.    Yes.

21   Q.    And do you have any idea how that identification would be found

22   in a day planner with an ID belonging to a Michele Fuentes or business

23   cards for Debbie's Cleaning Service?

24   A.    No.  I have no idea how that ID got there.

25   Q.    And do you have any knowledge of people by the names of

1    Karen Levine or Myles Levine?

2    A.    No.  I have never seen those people.

3                    MR. PIMSNER:  Nothing further.

4                    THE COURT:  Any questions from the jury for this

5    witness?

6                    Sir, thank you.  You may step down.

7                    May he be excused, Counsel?

8                    Counsel, may he be excused at this time or is he --

9    Counsel --

10                   MR. PIMSNER:  No, Your Honor.  He's fine.  He can

11   leave.

12                   THE COURT:  Thank you, sir.  You may step down.

13                   Thank you, gentlemen.

14                   We may call back the previous witness, Mr. Luna.

15                   MR. PIMSNER:  Your Honor, may we have a sidebar

16   before we resume?

17                   THE COURT:  Yes.

18                   (At sidebar.)

19                   MR. PIMSNER:  I'm bringing Agent Luna in to talk about

20   the photograph that he showed to the various employees.  We have

21   two employees from Avalon that are here that will say they saw the

22   picture and they are outside.  They identified that picture as the

23   person they saw that day.  One woman, she has been here since noon

24   on oxygen tanks.

25                   THE COURT:  You want to call them now?

1          MR. PIMSNER:  I'd like to get the foundation for the

2   photograph.

3          THE COURT:  Then let him step down.

4          MR. PIMSNER:  And bring them on.  She has a two-hour

5   tank and she's on her second tank.

6          MR. BOCK:  I can cross-examine him at a later time.

7          THE COURT:  Right.  We'll bring him back.

8          MR. PIMSNER:  I will have more follow-up to ask him.

9          MR. BOCK:  That's fine.  We are going to 5:00, right?

10         THE COURT:  Yes, we are.  Who do you think I am?

11         (In open court.)

12         THE COURT:  Mr. Luna, you can come back up.  We will

13   resume his questioning.

14         Mr. Pimsner.

15                    DIRECT EXAMINATION

16   BY MR. PIMSNER:

17   Q.    Agent Luna, when we left off, you indicated that you were

18   meeting with some administrators for Avalon Healthcare and that

19   Charlotte Duncklee was brought into the room.  Is that correct?

20   A.    Yes.

21   Q.    Now, did you and Agent Nowak describe why you were present

22   at that location?

23   A.    Yes, we did.

24   Q.    And that was regarding the phone call that came in from

25   Avalon -- came into the FBI from Avalon?

1    A.    Yes.

2    Q.    And did you ask Ms. Duncklee if she had noticed anything

3    unusual?

4    A.    Yes, we did.

5    Q.    Did she tell you she had noticed anything unusual that morning?

6    A.    Yes, she did.

7    Q.    Just generally what did she say?

8    A.    She said that she was working with a patient on the floor and

9    suddenly an alarm to one of the doors that is not normally accessed

10   went off.  And when she went out to investigate, she saw an individual

11   that she did not recognize.

12   Q.    And based on that information that she provided you, did you

13   ask her for a follow-up, more information regarding that incident?

14   A.    Yes.

15   Q.    Did you ask Ms. Duncklee for a general description of the

16   individual that she saw that morning?

17   A.    Yes.

18   Q.    And did she provide that?

19   A.    She did.

20   Q.    And her description, did that ring a bell to you at that time?

21   A.    Yes, it did.

22   Q.    And did you have photos of various individuals in your

23   possession with you in your -- I take it you had a notebook of some

24   kind?

25   A.    Yes.  I had sort of a portfolio that I had with me.

1    Q.    At the time that -- after she provided you the description of this

2    individual, what did you do?

3    A.    Her description reminded me of a picture that I had among the

4    background checks that I had within my portfolio.  And the individual

5    that her description reminded me of, I pulled it out, without her seeing

6    the paper, and I folded -- because it was a driver's license photo, an

7    AZ driver's license photo that will normally have descriptions of the

8    person in the picture.  So any description of the person in the picture,

9    I folded back where it was not visible other than the picture, a small

10   square, and I showed her the picture.

11   Q.    Now, so you would have folded the paper so there were

12   absolutely no words on that page?

13   A.    Yes, I folded the paper.  There was no words on the page.

14   Q.    And no signature of any kind?

15   A.    No.

16              MR. PIMSNER:  May I approach the witness, Your Honor?

17              THE COURT:  Yes.

18   BY MR. PIMSNER:

19   Q.    Sir, let me show you what has been marked as Exhibits 343 and

20   344.  Starting with 343, do you recognize that exhibit?

21   A.    Yes, I do.

22   Q.    What is that exhibit?

23   A.    That is a driver's license photo for Todd R. Fries.

24   Q.    Do you see Mr. Fries in the courtroom today?

25   A.    Yes, I do.

1    Q.    Where is he seated and what is he wearing?

2    A.    He's the individual sitting on -- at the defense's desk wearing a

3    blue shirt with a blue and green tie.

4                    MR. PIMSNER:  May the record reflect the identification

5    of the defendant?

6                    THE COURT:  Yes.  The record may so reflect.

7    BY MR. PIMSNER:

8    Q.    Do you recognize that to be the photograph -- driver's license

9    photograph that you would have showed Ms. Duncklee back on August

10   4, 2009?

11   A.    Yes.

12   Q.    And that's a true and accurate representation of that

13   photograph?

14   A.    Yes.

15                   MR. PIMSNER:  I move to admit 243.

16                   MR. BOCK:  No objection, Your Honor.

17                   THE COURT:  243 is admitted.

18                   MR. PIMSNER:  If I may publish it to the jury.

19                   THE COURT:  Yes.

20   BY MR. PIMSNER:

21   Q.    Sir, this -- was this the first photograph that you showed Ms.

22   Duncklee?

23   A.    Yes.  To my recollection, yes.

24   Q.    And do you recall that because of anything specific in the

25   photograph?

1    A.    The orange shirt and the blue background.

2    Q.    And did you show her a second photo at that point or possibly a

3    later time?

4    A.    Yes, I did.  I had the second --

5    Q.    And take a look at Exhibit 244.  Do you recognize that?

6    A.    Yes, I do.

7    Q.    What does that photograph represent?

8    A.    It's another picture of Todd R. Fries.

9    Q.    The one that you would have used on August 4, 2009?

10   A.    Yes.

11   Q.    And that accurately reflects the photograph that you used that

12   day?

13   A.    Yes.

14   Q.    Again, you would have covered everything up from writing to

15   signatures?

16   A.    Yes, I did.

17          MR. PIMSNER:  May Exhibit 244 be admitted?

18          MR. BOCK:  No objection.

19          THE COURT:  244 is admitted.

20          MR. PIMSNER:  May it be published to the jury, Your

21   Honor.

22          THE COURT:  Yes.

23   BY MR. PIMSNER:

24   Q.    That is the second photograph you would have cropped just to

25   show the defendant's face?

1    A.    Yes.

2    Q.    Did you use those two photographs when you were interviewing

3    other employees?

4    A.    Yes.  They were subsequently used, yes.

5              MR. PIMSNER:  Your Honor, at this point, based on some

6    witness issues we have, we would like to recess with this witness and

7    start with our next one with the court's permission.

8              THE COURT:  Yes.  Mr. Bock, you can cross-examine at a

9    later time.  Is that acceptable?

10              MR. BOCK:  Thank you, Your Honor.

11              THE COURT:  So if he would just step down for a

12    minute.

13              THE COURT:  You just mentioned 244 as an exhibit the

14    clerk informed me.

15              MR. PIMSNER:  Did I have the wrong number?

16              THE COURT:  That would be incorrect.

17              MR. PIMSNER:  It was 343 and 344.

18              THE COURT:  343 and 344.

19              MR. PIMSNER:  The second photo is 344.

20              THE COURT:  The government would like to call a

21    witness slightly out of order, and who is that?

22              MR. PIMSNER:  Charlotte Duncklee-Totten.

23      CHARLOTTE DUNCKLEE-TOTTEN, GOVERNMENT WITNESS, SWORN

24              THE CLERK:  Would you please state your full name and

25    spell your last name for the record.

1      THE WITNESS:  Charlotte Duncklee-Totten.

2    D-u-n-c-k-l-e-e-T-o-t-t-e-n.

3                  DIRECT EXAMINATION

4    BY MR. PIMSNER:

5    Q.    Shall I call you Ms. Duncklee?

6    A.    Duncklee-Totten.

7    Q.    Ma'am, I apologize.  I know you had to wait a little bit today.

8          First of all, are you currently employed?

9    A.    No.

10   Q.    And I see you are on oxygen.  Did you stop being employed

11   because of some medical issue?

12   A.    Yes.

13   Q.    And prior to the medical issue, were you employed?

14   A.    Yes.

15   Q.    With whom?

16   A.    Avalon Health and Rehab.

17   Q.    And Avalon Health and Rehab, do they have a number of

18   facilities?

19   A.    They had two up until the end of 2009.  Then they went to one

20   facility.

21   Q.    Now, what is your education background in?

22   A.    Associate in science, nursing degree.

23   Q.    Nursing degree.  Did you go into nursing after you received your

24   degree?

25   A.    Yes.

1    Q.    When did you start nursing?

2    A.    1992.

3    Q.    And how long were you in the nursing?

4    A.    Up until May of this year.

5    Q.    That's when you would have -- the medical issue would have

6    arose.  Now, you said you worked at Avalon.  Was there an Avalon

7    Health and Rehabilitation Center over on 1400 North Wilmot?

8    A.    Yes.

9    Q.    And did you work at that facility?

10    A.    I was the director of nursing.

11    Q.    And is that facility located inside the El Dorado Hospital?

12    A.    Yes, it is, third floor.

13    Q.    Is Avalon Rehabilitation a separate entity than El Dorado?

14    A.    Yes.

15    Q.    And do you recall, did Avalon Rehabilitation have their own part

16    of the building that they occupied?

17    A.    We rented the third floor.

18    Q.    So was the entire third floor part of Avalon?

19    A.    Yes.

20    Q.    As such did you have stairwell access to the third floor?

21    A.    It was alarmed.

22    Q.    And, first of all, before we get to that, what is the function of

23    Avalon Rehabilitation?

24    A.    It's a subacute care.  It was a subacute care facility.  More like a

25    step down from a hospital.  So if patients required continued IV

1  therapy, wound therapy, whatever, they would come to us for four to

2  eight weeks.

3          Because due to the DRGs, the hospitals had to discharge

4  these patients even though they really weren't ready for discharge.  So

5  they would come to us.  It would be a step down.  They would stay

6  with us until they were rehabbed enough where they could go back

7  home.

8  Q.    You were the director of nursing for that facility?

9  A.    Correct.

10  Q.    What were your duties?  What did that require being the

11  director?

12  A.    I was responsible for all 42 patients.  I was responsible for the

13  medical director of our facility and the licensed staff, licensed nursing

14  staff.

15  Q.    And did you also provide patient care?

16  A.    Yes.

17  Q.    And did -- were you employed there on August 4, 2009?

18  A.    Yes.

19  Q.    And were you on duty that day?

20  A.    Yes.

21  Q.    Do you recall the hours of your shift?

22  A.    I would go in around 5:00 in the morning and work to 6:00 at

23  night.

24  Q.    If I may just, first of all, show you what's been marked as

25  Exhibit 345.

1   A.     Uh-huh.

2   Q.     Do you recognize that exhibit?

3   A.     That's the rear stairwell.

4   Q.     May I have that back?

5   A.     Yeah.

6   Q.     And that stairwell was connected to the third floor of your

7   facility?

8   A.     Correct.

9   Q.     On the third floor.

10                  MR. PIMSNER:  Move to admit Exhibit 345, Your Honor.

11                  MR. BOCK:  No objection.

12                  THE COURT:  345 is admitted.

13                  MR. PIMSNER:  Can it be published, please?

14                  THE COURT:  Yes.

15   BY MR. PIMSNER:

16   Q.     You indicated that is one of your stairwell doors.  You indicated

17   it's alarmed.  Can you point to the alarm on the screen.  It will show a

18   little red dot where you point.

19   A.     Point to the alarm?

20   Q.     Yeah, on the screen.

21                  THE COURT:  You can actually touch the screen.

22   BY MR. PIMSNER:

23   Q.     What's the purpose of the alarm?

24   A.     The purpose for the alarm is so that we don't have patients who

25   may be demented wander off the unit.

1    Q.    So it's a patient safety alarm?

2    A.    Yes.

3    Q.    It looks like it has buttons on top?

4    A.    The key code.

5    Q.    Do the employees of Avalon Health Center have access to the

6    key code?

7    A.    Yes.

8    Q.    So employees are free to use the stairwell.  Is that correct?

9    A.    Yes.

10    Q.    Now, back on August -- let me just establish a few more

11    pictures.  I'll get to that in a second.  Sorry.

12              Back on August 4, 2009, that morning did you notice

13    anything unusual?

14    A.    Yes.

15    Q.    Or hear something unusual?

16    A.    Yes.

17    Q.    What were you doing at that time?  Do you recall?

18    A.    We were done with morning meeting and I was in a patient's

19    room doing an IV.

20    Q.    And what unusual thing happened at that point?

21    A.    The door alarmed.

22    Q.    Is it the alarm in this photograph?

23    A.    Yes.  The reason it's unusual is because even though people had

24    access no one ever uses the stairwell door.  It was always the

25    elevator.  So it was unusual to hear that go off.  So I ran out

1    immediately thinking a patient was going down the stairwell.

2    Q.     So you ran out to check to see if there was a patient in need.

3    Okay.  And did you notice anything when you ran out?

4    A.     A man.

5    Q.     How close were you -- how close was the patient's room to that

6    stairwell?

7    A.     Right across the hall.

8    Q.     And what did you notice when you exited the patient's room?

9    A.     I went to the door.  A man came through the door.  He was now

10   on our unit.  And I was turning off the alarm.

11   Q.     Where was this man while you were turning off the alarm?

12   A.     Right next to me standing near the alarm.

13   Q.     And did you have contact with that individual?

14   A.     I spoke with him.

15   Q.     And what was the nature of that contact?

16   A.     I asked if I could help him.  He said that he was asked to come

17   in and survey and inspect the facility.

18   Q.     And what was he wearing?

19   A.     Like a work uniform, like tan, a tan shirt.

20   Q.     So kind of like a worker's uniform as opposed to like Army --

21   A.     Not street clothes.

22   Q.     -- or police uniform?

23   A.     Right.

24   Q.     So you had a brief conversation with him?

25   A.     Uh-huh.

1  Q.   Were you face to face with him?

2  A.   Yes.

3  Q.   And when he indicated that he was there to -- you say survey?

4  A.   Survey.  He said survey and inspect the unit.

5  Q.   And did you challenge him at that point?

6  A.   No, I didn't.

7  Q.   What did you do?

8  A.   I shut off the alarm.  I was walking with him until we got to the

9  room I was in.  Then I took a left into the room and he kept walking

10  down.

11  Q.   And in which direction was he headed, towards what part of the

12  facility?

13  A.   Towards the back.

14  Q.   Are there any kind of rooms that were in that area?

15  A.   There was a conference room, then a nurses' station, then

16  another conference room.  Then if you go further, you can go through

17  two double doors.  That's the mechanical room where we kept all our

18  supplies and equipment and maintenance.

19  Q.   Did you lose sight of him at that point after you entered the

20  patient's room?

21  A.   Yes, I lost sight of him.

22       MR. PIMSNER:  Let me ask this witness to look at Exhibit

23  205.  It has not yet been admitted.

24  BY MR. PIMSNER:

25  A.   Ma'am, do you recognize that photograph?

1    Q.    Yup.

2    Q.    What is that photograph?

3    A.    It's the conference room.  It's hard to explain.  Before this

4    conference room is the elevators that we use to go up and down, then

5    the reception desk and the other conference room.  It's the furthest

6    conference room.  It's located at the end towards the double doors

7    where all the supplies and maintenance equipment's in back.

8    Q.    Was that the direction that individual you observed that day was

9    heading?

10   A.    Yes.

11   Q.    Now, have you used this room before?

12   A.    I've used it, yeah.

13            MR. PIMSNER:  First I'll move to admit Exhibit 205.

14            MR. BOCK:  No objection.

15            THE COURT:  205 is admitted and may be published.

16   BY MR. PIMSNER:

17   Q.    Now, that's the exterior -- photo of the exterior of room.  What's

18   the room commonly used for?

19   A.    Conferences, consultations, charting.

20   Q.    What's inside that room?

21   A.    A computer and a telephone.

22            MR. PIMSNER:  May the witness be shown Exhibit 204,

23   please?

24   BY MR. PIMSNER:

25   Q.    Do you recognize that exhibit?

1   A.   Uh-huh.

2   Q.   Does that represent the interior of that room?

3   A.   Yes, except I don't see the computer.

4   Q.   But at least a portion of the interior of the room?

5   A.   Yes.

6   Q.   There's a telephone there?

7   A.   Yes.

8              MR. PIMSNER:  Move to admit Exhibit 204.

9              MR. BOCK:  One question on voir dire.

10             THE COURT:  Yes, go ahead.

11  BY MR. BOCK:

12  Q.   Ma'am, where would the computer have been?

13  A.   To the left.

14  Q.   Could you just point your finger?

15  A.   Sure.  It would be over there.

16             MR. BOCK:  I think the government is prepared for that.

17  Go ahead.

18             MR. PIMSNER:  Move to admit 204, Your Honor.

19             THE COURT:  204 is admitted.

20             MR. BOCK:  No objection.

21             MR. PIMSNER:  May this witness look at 203.

22  BY MR. PIMSNER:

23  Q.   Is this the same room but with a picture of the computer next to

24  it?

25  A.   Yes.

1   Q.    In the area you were indicating?

2   A.    Yes.

3               MR. PIMSNER:  Then move to admit 203.

4               MR. BOCK:  No objection.

5               THE COURT:  203 is admitted.

6   BY MR. PIMSNER:

7   Q.    Lastly 202.  Is that a closeup of the phone that was located on

8   that section of cubicles?

9   A.    Yes, it is.

10              MR. PIMSNER:  Move move to admit 202, please.

11              MR. BOCK:  No objection.

12              THE COURT:  202 is admitted.

13  BY MR. PIMSNER:

14  Q.    Now, did you -- after this encounter, at some point did you learn

15  that the FBI was at the facility?

16  A.    Within half an hour.

17  Q.    Within a half hour?

18  A.    Yes.

19  Q.    Were you asked to come speak with anyone?

20  A.    Yes.  They came into the conference room I was sitting in.  They

21  followed -- there were two FBI agents behind my administrator and he

22  was bringing them into the conference room that I was in where I was

23  doing charting.

24  Q.    Did the FBI agents at that point interview you?

25  A.    Yes.

1    Q.    Did they ask you if anything unusual happened that morning?

2    A.    Yes.

3    Q.    And what was your response?

4    A.    I explained the situation.

5              MR. BOCK:  This is cumulative, Judge.

6              THE COURT:  No.  Overruled.  Go ahead.

7              THE COURT:  "I explained the situation."  Why don't you

8    ask another question.

9    BY MR. PIMSNER:

10   Q.    They asked you if anything unusual happened.  What did you

11   tell them?

12   A.    I had explained what happened half an hour prior to.  And I felt

13   that that was unusual because no one uses the stairwell door.  We all

14   use the elevator on the first floor.  There's a guard station where the

15   elevators are.  Everyone uses the elevator.  The only time that

16   alarmed door ever goes off is when a patient is trying to go out that

17   door.  No one has ever come up the stairwell.  That was unusual.  And

18   that's what I mentioned to them.

19   Q.    And the maintenance people at your facility, they don't usually

20   use that door?

21   A.    No.

22   Q.    Now, were you asked to provide a description of the individual

23   that you observed that morning?

24   A.    Yes.

25   Q.    And did you provide a description?

1    A.     Yes, I did.

2    Q.     Do you recall the description that you provided?

3    A.     Not well.

4    Q.     Now, if -- at that point -- during the course of the interview,

5    were you shown anything by the agents?

6    A.     After I explained exactly what this person looked like, then the

7    FBI -- one of the FBI agents showed me a picture, and it was the exact

8    same person that I had just described to them.

9    Q.     Let me ask you to look at what has been admitted into evidence

10   as Exhibit 343 on the overhead.

11          Now, ma'am, the picture that you observed did not

12   have -- did it have any writing on it?

13   A.     No.

14   Q.     It was just the plain picture?

15   A.     Uh-huh.

16   Q.     Do you recognize --

17          THE COURT:  It's not showing up on her screen.  Hold on

18   just a minute, ma'am.  We should get that to you.  There you go.

19          THE WITNESS:  Uh-huh.  It's there now.

20   BY MR. PIMSNER:

21   Q.     Do you recognize Exhibit 243?

22   A.     Yes.

23   Q.     How do you recognize that exhibit?

24   A.     Because that was the man that came through the door.

25   Q.     That was the same photograph that you made your identification

1    from?

2    A.    I'm not sure to be honest with you if that was the same

3    photograph because I don't remember it being colored.

4    Q.    But as far as the person depicted in the photograph, was that the

5    same person?

6    A.    Oh, yes.

7    Q.    Were you shown a second photograph at that point?

8    A.    No.

9    Q.    No.  Okay.  And what was your response when you saw that

10   picture?  What was your response to the FBI agents?

11   A.    Well, my first response was, wow, that was pretty good because

12   that's exactly what I had just told them.

13   Q.    That is what you had seen?

14   A.    Yes.  I was surprised.  Then I felt bad for not asking for ID.  I

15   felt like I was putting my patients at risk for not.

16                    MR. BOCK:  I object to this, Your Honor.

17                    THE COURT:  I'll allow the answer to stand.  Go ahead

18   and ask another question.

19   BY MR. PIMSNER:

20   Q.    Now, you weren't talking about ID from the agents, correct?

21   A.    (Indicating).

22   Q.    Did you respond as to whether or not that was the person that

23   you saw coming out of the alarmed stairwell?

24   A.    I told them it was.

25                    MR. BOCK:  This has been asked and answered.

| | |
|---|---|
| 1 | THE COURT:  Yes.  Sustained. |
| 2 | BY MR. PIMSNER: |
| 3 | Q.    And at some point at a later time, were you -- were you |
| 4 | interviewed by the FBI or did you speak to them at another time or |
| 5 | was it just later that day? |
| 6 | A.    I think it was just later that day. |
| 7 | Q.    And do you see the person that you saw in the stairwell in the |
| 8 | courtroom today? |
| 9 | A.    I really can't tell.  Honestly I can't tell. |
| 10 | Q.    But the photograph that you picked out was the person that you |
| 11 | saw that morning.  Is that a yes? |
| 12 | A.    I said I can't -- |
| 13 | Q.    No, I know. |
| 14 | MS. ANDERSON:  You were nodding your head. |
| 15 | MR. PIMSNER:  On my last question. |
| 16 | THE WITNESS:  Yes, it was the picture. |
| 17 | MR. PIMSNER:  Nothing further at this time. |
| 18 | THE COURT:  All right.  Now it's ten to 5:00. |
| 19 | MR. BOCK:  I'll be done by 5:00 |
| 20 | THE COURT:  I promised I would adjourn at 5:00 today. |
| 21 | We can either recess now if you need more time. |
| 22 | MR. BOCK:  I have a quarter to 5:00.  I'll go by the |
| 23 | court's time. |
| 24 | THE COURT:  Go ahead. |
| 25 | MR. BOCK:  I'll be done by 5:00, Judge. |

1    THE COURT:  If you need more time, that's fine.

2  Because then we have redirect.  Go ahead.

3    CROSS-EXAMINATION

4  BY MR. BOCK:

5  Q.    Are you okay?

6  A.    Thank you for asking.

7  Q.    Just a couple areas I want to go over with you.  The hospital is

8  actually on Wilmot?

9  A.    Yes.

10  Q.    Is it not a hospital anymore?  Is it still there?

11  A.    The building is still there.

12  Q.    But it's not El Dorado anymore, is it?

13  A.    No.

14  Q.    And you worked there -- keeping in mind August 4 of 2009, how

15  long had you been there?

16  A.    A year and a month.

17  Q.    The building has people that are hired to maintain the building.

18  Is that correct?

19  A.    Correct.

20  Q.    Outside people?

21  A.    Correct.

22  Q.    Did the individual that has been the product of your testimony

23  for the last 15 minutes or so, did that individual have -- you described

24  his shirt as tan in color.  Is that correct?

25  A.    Correct.

1    Q.    Did the shirt have any type of logo on it?

2    A.    No, it did not.

3    Q.    You are confident about that?

4    A.    What I remember is a white tag hanging off the pocket.

5    Q.    You know what the white tag said?

6    A.    No.

7    Q.    Do you remember the stairwell -- you are on the second floor.

8    Was that your testimony?  You said there is a stairwell.  If I were to

9    take the stairs up, how many floors?

10   A.    It was the second floor, not the third floor.

11   Q.    Stairwells are there because some people just would rather walk

12   up than take an elevator.  Is that correct?

13   A.    I guess.

14   Q.    You have seen people in your course just for some -- any

15   number of different reasons are just resistant to get in elevators?

16   A.    Okay.  The only time --

17                THE COURT:  I think we all know most buildings have

18   stairwells if they have an elevator.

19                Go ahead, Mr. Bock.

20   BY MR. BOCK:

21   Q.    How many floors did the building have?

22   A.    Three.  Total of three.

23   Q.    Now, how many people would have been on the support staff

24   like yourself, or whatever is the proper term, how many people would

25   have been on the second floor at that time?

1    A.    About 23 employees.

2    Q.    Did the individual that you have identified, did he tell you that

3    he had been sent by Groundskeeper?  Do you remember that person

4    telling you about Groundskeeper for any type of maintenance?

5    A.    No.

6    Q.    Is it possible he could have told you that?

7    A.    I didn't hear that.

8    Q.    Did you see the Tucson Police Department come and process the

9    second floor after that individual had left?

10   A.    Yes.

11   Q.    Were they -- they were -- their direction -- their attention was

12   directed towards the phone.  Is that correct?

13   A.    Correct.

14   Q.    And towards the doorknob or to the door itself?

15   A.    Correct.

16   Q.    You saw them doing that?

17   A.    Yes.

18   Q.    Now, you also stated that you had -- you saw that person go to

19   the computer.  Is that correct?  Did you say the person was using the

20   computer?

21   A.    No, I didn't say that.

22              MR. BOCK:  Now, I do need a second, Your Honor.

23              THE COURT:  Take your time.

24   BY MR. BOCK:

25   Q.    Did you ever see that individual use the phone?

1    A.    No.

2    Q.    Did you see him go into that room?

3    A.    No.

4    Q.    But did the individual when you came into contact with him, did

5    he seem startled or did he seem --

6    A.    No.  He seemed calm.

7    Q.    Okay.  And how long was the individual at the premises for?

8    A.    I don't know because I went back into the patient's room.

9    Q.    And so you don't know when he left?

10    A.    No, I don't.

11    Q.    Do you know if he left through the stairwell again or --

12    A.    I didn't hear any alarms go off again.  So I know you are not

13    supposed to assume.  I would assume he didn't go through the

14    stairwell.

15    Q.    You would assume the person used the elevator?

16    A.    Yes.

17    Q.    Now, when you were shown his photo, you were just shown one

18    photograph.  Is that correct?

19    A.    Correct.

20    Q.    And the Tucson Police Department obviously saw that computer

21    in the -- in that room because that was there on that date as we have

22    seen by that photo?

23    A.    Yes.

24                    MR. BOCK:  Thank you, Judge.

25                    THE COURT:  Any redirect?

1      MR. PIMSNER:  No, Your Honor.  Thank you.

2      THE COURT:  Any questions for the witness from the

3 jury?

4      Go ahead and write it out, ma'am.  You already have.

5 Hand it to the clerk.

6      (At sidebar.)

7      THE COURT:  18.

8      MR. BOCK:  I had one more question on cross.

9      THE COURT:  We don't mean to rush.  She can always

10 come back --

11      MR. PIMSNER:  Sure.

12      THE COURT:  -- you know.  Good questions.

13      MR. BOCK:  That is a good question.

14      THE COURT:  Any objection?

15      MR. BOCK:  No.

16      THE COURT:  Sure.  Go ahead.  You go ask your one.

17 Then we will get the jury questions.

18      (In open court.)

19      THE COURT:  Mr. Bock, you have one additional

20 question.  Then we'll have the jury questions asked of the witness.

21      MR. BOCK:  Thank you.

22 BY MR. BOCK:

23 Q.     Did the individual that we have talked about for the last half

24 hour or 20 minutes, did he ever tell you that he was there to inspect

25 the grounds for an estimate?

1    A.    Yes.

2                MR. BOCK:  Thank you.

3                THE COURT:  Now the jury questions.

4    JUROR QUESTIONS BY MR. PIMSNER:

5    Q.    Did you believe the man was from a certifying agency that

6    covers licensure of the rehabilitation facility?

7    A.    I guess I don't understand the question.  Are you asking if he's

8    an Avalon employee?

9    Q.    No.  Do you think he may have been from a certifying agency

10   that licenses rehabilitation facilities?

11   A.    Could have been.

12   Q.    You didn't know where he was from?

13   A.    I wouldn't know.

14   Q.    Didn't identify a company, did he?

15   A.    No.

16   Q.    Now, were there surveillance cameras at that facility or in the

17   stairwell or on the floor back on August 4, 2009?

18   A.    Not that I'm aware of.

19               THE COURT:  Any follow-up questions from the

20   government?

21               MR. PIMSNER:  No, Your Honor.

22               THE COURT:  From you, Mr. Bock?

23               MR. BOCK:  No.

24               THE COURT:  Any additional questions from the jury for

25   this witness?

1              All right.  Thank you, ma'am.  You may step down and

2     be excused.

3              And, Counsel, can I see you at sidebar?

4              (At sidebar.)

5              THE COURT:  So I suggest we recess.

6              MR. PIMSNER:  I have another Avalon employee, but she

7     doesn't have a disability so I can bring her back.  I may not be able to

8     bring her back on Monday.  It may be later in the week.  I have to

9     check with her schedule.

10             THE COURT:  Okay.  So we'll recess.

11             MS. ANDERSON:  Monday at 9:00.

12             MR. PIMSNER:  Monday, Tuesday, Thursday, Friday.

13             THE COURT:  Right.

14             (In open court.)

15             THE COURT:  All right.  Members of the jury, we'll take

16    our evening and weekend recess.  I want to tell you all to have a

17    wonderful weekend.

18             Please, it's very important, I'm sure you will probably

19    have -- if you haven't already had people asking you what is this case

20    about, tell me about it, please tell them that you are not able to talk

21    about the case at this point.

22             Once the case is completed, you can talk about it or not

23    talk about it as much as you would like.

24             Please continue to follow the court's admonition.  This,

25    of course, includes not doing any research or investigation on your

1  own of anything that has anything to do with the case.  I really

2  appreciate you all following the court's admonition.

3  Have a good weekend.  We'll see you back Monday at

4  9:00.  Again, next week we will go Monday and Tuesday.  We are

5  going to recess on Wednesday.  Then go Thursday and Friday.  That is

6  next week's schedule.

7  Have a great weekend.  We will see you back Monday at

8  9:00.

9  (The jury was excused at 4:58 p.m.)

10  THE COURT:  Can I just see counsel at sidebar just off

11  the record for a minute.

12  (Discussion off the record.)

13  THE COURT:  I received a note from Juror Number 56.

14  Both sides have had a chance to see it.

15  Ma'am, hi, come on in and have a seat.  We'll get you

16  the microphone.  I just read your note.  So we have read your note.

17  You want to give me more information about your request?

18  JUROR 56:  I can't stay awake.

19  THE COURT:  Do you work at night?

20  JUROR 56:  No.

21  THE COURT:  All right.  Is there any particular reason

22  why or just -- I don't want to put words in your mouth.  I know we

23  talked a few days ago about it looked like you were dozing off.  You

24  said, "Yes, I was and I'll try to do better."  You have been unable to

25  stay alert or listen to all of the testimony?

 1              JUROR 56:  Well, I find myself dozing.

 2              THE COURT:  Okay.  That's been happening after we had

 3     our conversation last time?

 4              JUROR 56:  Yes.

 5              THE COURT:  All right.  I appreciate your candor.  Do

 6     you feel like you are just -- I mean, from your note you say, "I must

 7     excuse myself from the jury."  Do you feel like this is going to

 8     continue to be a problem and you are just unable to pay attention?

 9              JUROR 56:  I feel like it's going to continue to be a

10     problem.

11              THE COURT:  All right.  I'm going to have you step out

12     for just a minute.  If you could just remain, ma'am, in the jury room

13     for just a minute.

14              The record can reflect the absence of Juror Number 56.

15     I didn't offer counsel the opportunity to speak with Juror Number 56.  I

16     think it's clear that she needs to be excused because she's not --

17     whatever.

18              Yes, Mr. Bock.

19              MR. BOCK:  Judge, I just would like to know for

20     purposes of the record, if she has, you know, missed testimony.  I

21     know she said she has snoozed.

22              For purposes of the record, if she has not heard portions

23     of testimony, then I have no objection.  If we can put that on the

24     record.

25              THE COURT:  Do government counsel have any objection

1    to excusing Juror 56?

2              MR. PIMSNER:  No, Your Honor, as long as the defense

3    doesn't object.

4              THE COURT:  Let's bring her back out.  I'll ask her that

5    additional question.

6              Ma'am, would it be fair to say that because you have

7    been dozing off that you have missed some of the testimony that has

8    been presented this week?

9              JUROR 56:  No.  I mean, of course I have missed some

10   of the testimony because I have dozed off, but it hasn't been that

11   much.

12             THE COURT:  You think you have missed parts of the

13   trial so far?

14             JUROR 56:  Yes.

15             THE COURT:  All right.  Thank you, ma'am.

16             Ma'am, we are going to excuse you from the case.  So

17   you are excused at this time.

18             JUROR 56:  Okay.

19             THE COURT:  All right.  Any additional record that either

20   side wants to make on that issue?

21             MR. BOCK:  Not from the defense, Your Honor.

22             MR. PIMSNER:  No, Your Honor.  Thank you.

23             THE COURT:  Based on the current information we have

24   from the juror -- so the record is clear, Mr. Bock, you have no

25   objection to Juror 56 being excused?

1          MR. BOCK:  That's correct, Your Honor.

2          THE COURT:  So now we will stand at recess and we will

3     see everybody back at 9:00.  At some point Monday we will discuss

4     the handwriting expert's report.  You have seen that Mr. Bock?

5          MR. BOCK:  Yes, I have.

6          THE COURT:  So we can discuss that at some point.

7     When would you plan on calling this person?

8          MR. PIMSNER:  We tentatively had her pencilled in for

9     Tuesday.  We may be able to work around that and switch to Thursday

10    so the court has time to make an informed decision.

11         THE COURT:  Hopefully we can talk about that on

12    Monday.  All right.  Great.  Everybody have a good weekend.  We'll see

13    you back Monday at 9:00.

14              (The proceedings recessed at 5:05 p.m.)

15

16

17

18

19

20

21

22

23

24

25

120

1

2

3

4

5

6

7                          C E R T I F I C A T E

8

9

10

11          I, Dianne Davenport, certify that the foregoing is a correct

12    transcript from the record of proceedings in the above-entitled matter.

13

14

15

16

17    /s/  Dianne Davenport                    April 29, 2013

18

19

20

21

22

23

24

25