UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

```
------------------------------)
                              )
                              )
UNITED STATES OF AMERICA,     )
              Plaintiff,      )  No. CA 13-10654 9th Circuit
                              )
        vs.                   )  No. CR 11-01751 TUC-CKJ
                              )
                              )     Tucson, Arizona
TODD FRIES,                   )     August 6, 2013
              Defendant.      )
                              )
------------------------------)
```

TRANSCRIPT OF JURY TRIAL DAY ONE


BEFORE THE HONORABLE CINDY K. JORGENSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:    By:  Beverly K. Anderson
                           U.S. Attorney's Office
                           405 W. Congress St., Suite 4800
                           Tucson, AZ   85701

For the Defendant:    By:  Richard C. Bock
                           100 N. Stone Ave., Suite 801
                           Tucson, AZ   85701


Mary A. Riley, RMR, FCRR
United States Court Reporter
U.S. District Court
405 W. Congress St.
Tucson, AZ   85750


Proceedings produced by computer-aided transcription

UNITED STATES DISTRICT COURT

1                               INDEX

2

3   OPENING STATEMENTS

4   By Ms. Anderson                            Page 28

5   By Mr. Bock                                Page 37

6

7

8

9                         INDEX OF TESTIMONY

10

11

12  BRIAN C. NOWAK

13  Direct Examination by Ms. Anderson         Page 41

14  Cross Examination by Mr. Bock              Page 57

15

16  WILLIAM URBAN

17  Direct Examination by Ms. Anderson         Page 63

18  Cross Examination by Mr. Bock              Page 68

19

20  JAY HENZE

21  Direct Examination by Ms. Anderson         Page 73

22  Cross Examination by Mr. Bock              Page 126

23

24

25

                    UNITED STATES DISTRICT COURT

1                    INDEX OF ADMITTED EXHIBITS

2

3

4    Exhibit Number 1-14                    Page 27

5    Exhibit Number 15                      Page 52

6    Exhibit Number 16-30                   Page 27, 54

7    Exhibit Number 32                      Page 27

8    Exhibit Number 35-43                   Page 27

9    Exhibit Number 44                      Page 106

10   Exhibit Number 45                      Page 109

11   Exhibit Number 46                      Page 110

12   Exhibit Number 47                      Page 110

13   Exhibit Number 48                      Page 110

14   Exhibit Number 55                      Page 92

15   Exhibit Number 56                      Page 97

16   Exhibit Number 57                      Page 111

17   Exhibit Number 58                      Page 112

18   Exhibit Number 100                     Page 121

19   Exhibit Number 101                     Page 122

20   Exhibit Number 107                     Page 124

21

22

23

24

25

                     UNITED STATES DISTRICT COURT

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2   (9:05 a.m.)
 3           MS. ANDERSON:  Beverly Anderson for the United States.
 4   Good morning.
 5           THE COURT:  Good morning.
 6           MR. BOCK:  Good morning, your Honor.  Richard Bock on
 7   behalf of Mr. Fries, standing acknowledging his presence.
 8           THE COURT:  Good morning.
 9           And let's see, I need an exhibit and witness list.
10           I have, Mr. Bock, your witness list, which is two
11   people, right?
12           MR. BOCK:  Yes, your Honor.
13           THE COURT:  Okay.
14           MS. ANDERSON:  Judge, yesterday we filed an amended --
15           THE COURT:  I have a copy here -- oh, I'm sorry.  I
16   just wanted the witness list so I can let the jurors know who the
17   witnesses are.  So I've got that here.  Thank you.
18           THE CLERK:  I don't know that that's the amended --
19           MS. ANDERSON:  The witness list isn't amend.  The
20   exhibit list is.
21           And while I'm up here, we added an exhibit to go to the
22   back, to -- this needs to go to the back of your book.
23           THE COURT:  Oh, thank you, very much.
24           So now, the preliminary -- while we're waiting -- so
25   Candy's bringing up the jurors, Jill?
                    UNITED STATES DISTRICT COURT
```

1              THE CLERK:  Yes.

2              THE COURT:  The preliminaries, I made -- I changed them

3    again.  I don't know -- probably neither side has had a chance to

4    look at those, but I just -- I'm trying to tailor them more to

5    our particular case.  So -- so if you want to compare the two.

6    And then we don't have to talk about that right now, but I think

7    that it -- Mike mentioned to you both that I did make a few more

8    changes.

9              MR. BOCK:  Yes, your Honor.

10             THE COURT:  I tailored them to this particular case.

11   And obviously, if counsel disagree, we can talk about that.

12             MR. BOCK:  May I put something on the record?

13             THE COURT:  Sure.  Absolutely.

14             MR. BOCK:  Judge, Mr. Fries was at FCI yesterday, but

15   he informed me that they put him in isolation, or what's known as

16   the hold.  And I don't understand, and neither does Mr. Fries

17   understand why he got such severe placement.  So he couldn't make

18   any calls, and said people were yelling all night, and -- I don't

19   understand why he has to be treated that way.

20             THE COURT:  All right.  Well, I can talk to -- or have

21   my staff talk to the member of the marshal service who deals with

22   inmate issues, and we'll try to get some information back to you

23   on that.

24             MR. BOCK:  Thank you, Judge.

25             THE COURT:  Unless either of the -- any of the marshals

UNITED STATES DISTRICT COURT

```
 1   here in the courtroom know anything.
 2              A MARSHAL:  I'm going to send an e-mail, Judge.
 3              THE COURT:  To Teresa.  All right, so we'll try to
 4   found out more information.
 5              (The prospective jurors entered the courtroom, and the
 6   jury selection proceeded at 9:12 a.m.)
 7              (The Court recessed at 10:51 a.m., and reconvened at
 8   11:11 a.m.)
 9              THE COURT:  Let's see, the record may reflect the
10   presence of counsel, the defendant.
11              Any objections to the preliminary jury instructions?
12              MS. ANDERSON:  No, your Honor.
13              MR. BOCK:  Judge, I just had one question, and it's
14   really not an objection, but the comment to the -- the comment to
15   the -- Count 1 of the Ninth Circuit model jury instruction
16   indicates the government must prove that the defendant knew of
17   those features which brought the firearms within the scope of the
18   statute.  So I just -- I would just like to make sure that, you
19   know, I'm able to argue that in my -- or in my opening
20   statements, and also that -- that I -- I've requested that in --
21   as my proposed instruction.
22              THE COURT:  All right.  And you know, oftentimes at the
23   end I give more detailed instructions.  So you don't disagree
24   that the two elements for Count 1 are first, the defendant
25   knowingly possessed the destructive devices; and second, that
```

UNITED STATES DISTRICT COURT

1    they were not registered?

2            MR. BOCK:  No.

3            THE COURT:  Okay, so you're okay with that for purposes

4    of -- for the preliminaries?

5            MR. BOCK:  Yes.

6            THE COURT:  Okay.

7            MS. ANDERSON:  Judge, I -- I do have a problem with

8    defense counsel arguing that in his opening.  I don't think

9    that's what the law is, and that was part of the nature of the

10   government's trial memorandum --

11           THE COURT:  Um-um.

12           MS. ANDERSON:  -- is that he argued that the government

13   has to prove that the defendant knows about the -- the legal

14   nature of the -- of the item.  However --

15           THE COURT:  Okay, well, let -- all right, that's an

16   issue.  Let's talk about that after we get the jury selected and

17   after I read the preliminary instructions, but before you give

18   opening statements.

19           MS. ANDERSON:  Okay.

20           THE COURT:  How about that?

21           MS. ANDERSON:  Thank you.

22           THE COURT:  Okay, just since we have all these people

23   outside waiting.

24           So if you could bring them in -- or James, if you could

25   bring in the jurors.

                    UNITED STATES DISTRICT COURT

1               (The jury panel entered the courtroom.)

2               THE COURT:  All right, I think that's everyone.

3    Welcome back.

4               The record can reflect the presence of the jury panel.

5               Members of the jury, I'm going to call the numbers of

6    the folks selected to hear this case -- hear and decide this

7    case.  As your number is called, if you could go ahead and come

8    up to the jury box, and you'll be directed where to sit.  We're

9    going to start with juror number -- the first juror in the back

10   row, and use the first seven seats, and then use the first row.

11              So if we could have jury number 1 come up and have a

12   seat in seat number 1.

13              Juror number 2 in seat number 2.

14              Juror number 33 in seat number 3.

15              Juror number 6 in seat number 4.

16              Juror number 9 in seat number 5.

17              Juror number 10 in seat number 6.

18              Juror number 12 in seat number 7.

19              Juror number 14 in seat number 8, which is right in the

20   front row here.

21              Juror number 35 in seat number 9.

22              Juror number 20 in seat number 10.

23              Juror number 21 in seat number 11.

24              Juror number 32 in seat number 12.

25              And juror number 29 in seat number 13.

                     UNITED STATES DISTRICT COURT

1          And those of you who were not selected, I want to again

2    thank you so much for the time that you've spent with us this

3    morning, and you're excused at this time.

4          Thank you, very much.

5          (The remaining jury panel members left the courtroom.)

6          And if the jury could please stand and be sworn in by

7    the clerk.

8          (The jury was duly sworn by the clerk.)

9          THE COURT:  You may be seated.

10          I'm going to read the preliminary jury instructions to

11    you, and then we'll go ahead and take a break for lunch.

12          So you have a copy.  You can either follow along with

13    me with your written copy, or just listen as I read these to you.

14          (The preliminary jury instructions were read to the

15    jury by the Court.)

16          THE COURT:  Now, I'm going to let you go to lunch, and

17    Jill will show you the jury room where -- which will be your home

18    away from home for the next few days.  It's right through that

19    door.

20          So please remember to wear your jury badge in and

21    around the courthouse so everybody will know you're on a jury.

22    And we'll see you back at 1:00, and then you'll hear the opening

23    statements from the lawyers.

24          So have a good lunch.  We'll see you back at 1:00.

25          (The jury left the courtroom.)

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Okay, counsel, just briefly.  The jury's
 2    absent.  Now, what's the issue about -- that we were -- Mr. Bock,
 3    that you wanted to -- let me tell you first of all, the pack rat
 4    defense, what I'm thinking.  Now, this may change depending on
 5    how the trial develops, but given particularly the nature of what
 6    we've renumbered as Count 2 as I just read in the preliminary
 7    jury instructions, Count 2 requires that the defendant intended
 8    to use the components as a weapon.
 9              Now, there is some case law that talks about, for
10    example, commercial explosives, that they -- it must be shown
11    that those items were intended to be used as a weapon, for
12    example commercial blasting components.  So given the fact that
13    that intent element is required after that second count, I will
14    allow, Mr. Bock, for you to present evidence -- obviously, it has
15    to be otherwise admissible evidence, the defendant's intent.
16    So -- but that -- you know, I'm not going to hamstring the
17    government.
18              I don't think the book should be admitted, Ms.
19    Anderson, just because I think the probative value -- although it
20    does have probative value on this issue, it just appears to me to
21    be outweighed by unfair prejudice at this time given the -- and I
22    can't think of a way to redact that book without -- to limit that
23    prejudice.  So although I agree with the government it does have
24    some relevance, especially if we're going to get into the
25    defendant's intent to use the components as a weapon in the
```

UNITED STATES DISTRICT COURT

1    second count, but I think the government can address the intent

2    issue.  And I'm not, obviously, telling the government how to try

3    its case, but I know you're going to have expert witnesses

4    testify about what these materials consist of, what they're

5    capable of, and that sort of thing.

6            So I may change my mind as we go through the trial, but

7    at this point I don't think allowing the defense to argue or

8    present evidence that these items were to be used to -- for pack

9    rat eradication opens the door to the government to get into the

10   books that were found in the defendant's residence, that

11   particular portion of the book that the government wanted to use

12   as other act evidence.

13           But -- but it may open the door for the government to

14   through its experts further discuss the nature of these devices,

15   which perhaps the government could do anyway without the pack rat

16   issue even being admitted at trial.

17           But I think Count 1, which we have labeled Count 1,

18   clearly the only elements there is that he knowingly possessed a

19   destructive device, and that they were not registered.

20           I don't think you can argue, Mr. Bock, that --

21   ignorance of the law in the sense that the defendant didn't know

22   he had to register these items.  I think that's pretty clear.

23   This isn't a tax case.  This isn't a failing to fill out an IRS

24   form, or something of that sort.

25           MR. BOCK:  No, this is a tax case.  It's under Title

                    UNITED STATES DISTRICT COURT

1    26.

2              THE COURT:  Well, but it's not that kind of a tax case.

3              MR. BOCK:  But I have the comment to the proposed jury

4    instruction, which is 28 U.S.C. Section 5861(d), Ninth Circuit

5    Model Criminal Jury Instruction, and under the comment it says:

6    *The government must prove the defendant knew of those features*

7    *which brought the firearm within the scope of the statute,* citing

8    Staples versus United States, in parens, *to obtain a conviction*

9    *the government should have been required to prove the -- that*

10   *petitioner knew of the features of his AR-15 that brought it*

11   *within the scope of the act.*

12             Another case, United States versus Gergen, which again

13   is in the comment of this jury instruction: *Mens rea requirement*

14   *that defendant knew of the particular characteristics of the*

15   *firearm which bring it within the scope of the statute.*

16             THE COURT:  Okay.  Those involve firearms, and I'm

17   familiar with those cases where, for example, if you have a sawed

18   off shotgun and it's under a blanket, the government would have

19   to prove the defendant knew it was a sawed off shotgun as opposed

20   to a shotgun.  I mean, I'm just kind of very informally talking

21   about that issue.  On the other spectrum, if someone has a

22   grenade the government doesn't have to prove that the defendant

23   knew the components of a grenade.  So are you saying that this

24   case follows somewhere between those two --

25             MR. BOCK:  Well, I think it's -- I think the case is --

                    UNITED STATES DISTRICT COURT

1  it's a little different case, Judge, because the -- the

2  components -- the components in the 21 counts are a -- like, they

3  look like a big firecracker.  And the components in the first

4  three counts that have the rubber glove and the -- and the BB's

5  that are adhered to them, those were, I believe, one cyndrical

6  and two spherical devices that again were not homemade devices,

7  Judge.

8          So these are -- he didn't -- there's no evidence that

9  he made any of these explosive devices, that he went ahead and

10  manufactured these explosive devices.  At the best what they're

11  going to be able to say is that this device was modified in Count

12  1.  It was modified by the rubber glove and the BB's being put on

13  it.

14          And so I do think -- and he's charged -- under the

15  indictment it says firearm.  And the destructive devices is

16  defined under all of these firearm definitions.  And so I do

17  think that someone has to -- there has to be some mens rea that

18  he would have to know that if you have something, it's needs

19  to -- you need to fill out a tax form.  Because that's what this

20  case is about, Judge.  It's about him not paying $200 to get

21  these things registered, each and every one of these devices.

22  That's what he's being --

23          THE COURT:  So you want to argue that he didn't know he

24  had to register the devices?

25          MR. BOCK:  Well, I think that the government -- the

UNITED STATES DISTRICT COURT

1   burden is on the government.  He should have been required to

2   prove petitioner knew that the features -- or brought it within

3   the scope of the act.  I think that's a -- a burden, an element

4   that the government has to prove.  I'm not saying it's an

5   ignorance of the law argument.  This is -- it's a feature.

6           THE COURT:  It sounds like you're saying that --

7   because he didn't know he had to fill out a form, he's not

8   guilty.

9           MR. BOCK:  Well, he's -- but that's what he's charged

10  with.  He's charged with the violation of not filing the form

11  with the -- with the National -- the registry requirement.

12  That's what he's -- the National Firearm Registration and

13  Transfer Record.  That's what -- that's what he's being charged

14  with.

15          THE COURT:  But I think -- do you have any case law

16  that says that --

17          MR. BOCK:  I have -- I have the --

18          THE COURT:  Well, let me -- I know, but that's -- okay.

19  Do those talk about registering the -- okay, what --

20          MR. BOCK:  Can I -- it's Ninth Circuit Model Jury

21  Instruction 9.34.

22          THE COURT:  Okay.  And I think I have that back in

23  chambers.  All right.

24          MR. BOCK:  And I have a --

25          THE COURT:  And I've read these cases.  I don't -- I

                    UNITED STATES DISTRICT COURT

1    don't think those cases say that the government has to prove that
2    he knew that he had to fill out the form.  Is that what you're
3    telling me?
4            MR. BOCK:  Well, it says that -- it says mens rea
5    requirement, the defendant know of the particular characteristics
6    of the firearm which bring it in -- within the scope of the
7    statute.  The statute requires the person to register the -- the
8    firearm with the National Firearms Registration and Transfer
9    Record.
10           THE COURT:  Okay.
11           MR. BOCK:  So this device had to be -- if this device
12   were registered and he paid the $200, then he wouldn't be
13   prosecuted.  He wouldn't be prosecuted for this, because it would
14   have been in compliance with the statute.
15           THE COURT:  Right, and I doubt that the government
16   would have -- you know, just saying I don't think the government
17   would have said, yeah, that's fine, Mr. Fries.  You can possess
18   these devices.  Give us your $200.
19           But in any event, let me just hear from the government
20   on that issue.
21           MS. ANDERSON:  Your Honor, this is part of the subject
22   of my trial memorandum that I filed over the weekend.  The -- the
23   Court was exactly right when you were talking about knowledge
24   regarding the features of the weapon.  That pertains to firearms.
25   And if you look at all of the cases that defense counsel cited in

                       UNITED STATES DISTRICT COURT

1    his memorandum, <u>Staples versus United States</u>, <u>United States</u>
2    <u>versus Gergen</u>, <u>United States versus Summers</u>, Judge, those are all
3    firearms cases.  And what those cases hold is that the defendant
4    has to be aware of the features of the gun that makes it illegal,
5    like for instance -- I didn't bring my material, because I didn't
6    think we were going to be arguing this, but one case pertains to
7    a sawed off shotgun.  That case stood for the fact that the
8    defendant needs to be aware of the fact that the shotgun was --
9    was sawed off.

10           Another one pertains to the automatic features -- the
11   fully automatic features of the weapon.  The government needs to
12   prove in that case that the defendant was aware of the particular
13   characteristics of the firearm, meaning that it was fully
14   automatic, which brings it within the scope of the statute.

15           Not -- in this case the government does not have to
16   prove that the defendant knew he had to register this firearm.
17   The Court is exactly right.  Ignorance of the law is not an
18   excuse in this case, and that's very, very clear, and the topic
19   of my memorandum is that this case is different.  This case is
20   different because it's an explosive device that's inherently
21   dangerous in and of itself.

22           The cases that Mr. Bock cited all pertain to guns,
23   different kinds of firearms.  And if you look at the case that I
24   cited in my memorandum, one is a Ninth Circuit case which is *U.S.*
25   *v. Ruiz* which talks about what the government needs to prove.  In

UNITED STATES DISTRICT COURT

1    that case the defendant supplied grenades to a co-defendant who

2    sold them to an ATF agent acting in an undercover capacity.  Ruiz

3    was convicted of conspiring to transfer the destructive devices

4    without obtaining a transfer tax stamp as required under Title

5    26.  The defendant claimed there is insufficient evidence that he

6    intended to use the grenades as the weapons, and the Ninth

7    Circuit without using the same kind of analysis that Mr. Bock

8    does looked at the two factors that we're focusing on that are in

9    the Ninth Circuit jury instruction, and -- and held that when we

10   have fully completed devices, the government only has to show

11   that the defendant possessed them, and that they weren't

12   registered.  So what Mr. Bock is arguing is completely different

13   than what's applicable in this case.

14            MR. BOCK:  Judge, may I -- are you done?

15            MS. ANDERSON:  Yeah.

16            THE COURT:  Go ahead.

17            MR. BOCK:  Judge, this is one of my exhibits, and it

18   was extracted from the ATF government/firearms.  And it's under

19   M.  It says:  *The types of firearms that must be registered in*

20   *the National Firearm Registration and Transfer Record are defined*

21   *in the NFA and 27 C.F.R. part 479.*  What are some examples?  And

22   then they say:  *Machineguns, the frames or receivers of*

23   *machineguns, short barreled rifles, short barreled shotguns,*

24   *destructive devices.*  And then they say:  A few examples of

25   destructive devices are *Molotov cocktails, anti-tank guns,*

UNITED STATES DISTRICT COURT

1    *bazookas, and mortars.*  So they use the word destructive devices
2    right here as something that is supposed to be registered.

3              So I don't necessarily think that it's just confined to
4    a weapon.  Otherwise what -- Molotov cocktail, mortars?  It's a
5    destructive device.  That's just an example.

6              THE COURT:  Right.

7              MR. BOCK:  So I think, Judge, again, this is how they
8    chose to charge the case, that there was not a registration under
9    this act.  And in order to register under this act, they say what
10   is the tax on making an NFA firearm?  The tax is $200.  How is
11   the tax paid?  And so there are these horns.

12             And so I do think that there is a mens rea element
13   to -- to the charge, Count 1.

14             THE COURT:  And what about Count 2?

15             MR. BOCK:  Well, Count 2 is they were unassembled.

16             THE COURT:  Right.

17             MR. BOCK:  So Count 2 I think the argument would be
18   that -- well, the argument is too that there wasn't a -- that
19   they weren't registered, then that's -- so $200 for Count 2, puts
20   him in violation of the National Firearms Act.  And so I do think
21   that that certainly could embrace an argument as to Count 2.
22   Again, he didn't manufacture -- there's not going to be any
23   evidence that he manufactured the -- the -- the devices that had
24   the powder in them as to Count 2.  He had latex gloves in a box.
25   He had BB's in -- in the same area, and then he had these

                     UNITED STATES DISTRICT COURT

1    cylinders that had powder in them.  And so the -- that's what the

2    government is claiming were the unconstructed or the unassembled

3    devices that make up Count 2.

4            And so I -- you know, again, he didn't make these

5    things.  He's not the manufacturer.  And so it comes down to the

6    registration, the amount of the registration, and of course they

7    have to prove that they were destructive devices.  But there's a

8    second portion to each of these counts, and I do think that they

9    have to show that there's some knowledge on his part that he

10   should have done this.

11           THE COURT:  So you're saying it's not just saying

12   knowingly possess the device, but also knowing something about

13   the device?

14           MR. BOCK:  Knowing something about the device that

15   would require this -- the -- the extra step to do what wasn't

16   done, which is a claimed element of the offense, that it wasn't

17   registered with the National Firearms Act.  So --

18           THE COURT:  All right.

19           Well, what do you think?  I mean, Ms. Anderson, you

20   think it's more akin to -- I mean, I see this spectrum.  I see

21   cases where materials for construction jobs, dynamite, those

22   kinds of cases, where affirmatively a defendant could say it

23   wasn't for that purpose, which is a different issue.  It wasn't

24   for the purpose of the statute as a weapon -- to be used as a

25   weapon, those kinds of cases versus the gun cases.  I mean, the

                        UNITED STATES DISTRICT COURT

1    cases and the notes clearly talk about guns.  But do you think
2    it's -- it's not limited to firearms, but -- but to other types
3    of devices such as this?  I mean, the one case you cite, United
4    States versus Ruiz, is a grenade.
5               MS. ANDERSON:  Right.  Right.  And grenade is
6    inherently dangerous in and of itself.
7               THE COURT:  Um-um.
8               MS. ANDERSON:  There's no -- there's nothing -- there's
9    nothing about a grenade that you need to educate a person about
10   that it's dangerous.
11              THE COURT:  Right.
12              MS. ANDERSON:  Dynamite -- there is a legitimate
13   purpose for dynamite.  My experts are going to say there's no
14   legitimate purpose -- no legal purpose for these devices.
15              THE COURT:  So you're saying they're more like grenades
16   than firearms, for example?
17              MS. ANDERSON:  Oh, absolutely.  These are -- these are
18   explosive devices.  They're IED's.  There's no legitimate purpose
19   for them.  They had -- they had 40 -- some of the IEDs that he
20   possessed had 20 times the amount of flash powder in it that's
21   allowable by law.  Some of the other devices had 40 times the
22   amount of flash powder allowed by law.  There's no legitimate
23   purpose for these devices, and my experts are going to say
24   those -- say that, I'm sorry.
25              THE COURT:  All right.

                    UNITED STATES DISTRICT COURT

1          All right.  Well, what -- Mr. Bock, I'm not going to
2     preclude you from talking about it in opening statement, but I
3     may very well instruct the jury that -- you know, what the
4     elements are, and affirmatively tell them as we go through the
5     case what the necessary elements are.  So I'll let you -- I'll
6     consider it as argument.  I think it's clear that this is not a
7     typical tax case where it has to be a willful violation, which is
8     different.  This is knowingly possessing.  So I think that makes
9     a difference in the tax arena, although it is under the tax code,
10    these kinds of charges.  How much your client needs to know to
11    knowingly possess -- I think it's somewhere within that spectrum.
12    We have cases.  We obviously don't have anything on point to this
13    case.
14          So I'll -- at this point I'll let you go ahead and
15    argue that to the jury, but I'm not saying -- you know, in
16    opening statement if you want to do that, but it very well may be
17    that in the final instructions I'm going to tell them that --
18    affirmatively tell them what the elements are, and you're not
19    going to be able -- and I may preclude you in closing argument
20    from arguing that kind of a defense.  So I'm just telling you
21    that, but you can -- I'll treat it as argument at this point.
22          So we'll stand at recess, then, until 1:00.
23          (The Court recessed at 12:07 p.m., and reconvened at
24    1:06 p.m.)
25          MS. ANDERSON:  I apologize for bringing you out before

UNITED STATES DISTRICT COURT

1   the jury, but I would ask the --

2              THE COURT:  Actually, I came out on my own.

3              MS. ANDERSON:  Oh, okay.

4              THE COURT:  Completely unassisted by your request.

5              But go ahead.

6              MS. ANDERSON:  I would ask the Court to reconsider its

7   decision allowing Mr. Bock to raise some of these issues in his

8   opening.  I took a look at some of the exhibits which he intends

9   to introduce, and I believe they're hearsay, but what's

10  interesting is that they say as follows:  *The NFA permits only*

11  *manufacturers, makers, and importers to register firearms.  Mere*

12  *possessors may not register firearms.  An unregistered NFA*

13  *firearm is a contraband firearm, and it is unlawful to possess*

14  *the weapon.  The possessor should contact the nearest ATF office*

15  *to arrange for its disposition.*

16             So your Honor, this isn't just a matter of Mr. Fries

17  had just filled out the form and paid the 200 bucks, that we

18  wouldn't -- we wouldn't all be here today, because he doesn't fit

19  under the definition of a manufacturer, maker, or importer.

20  Therefore, they're contraband.

21             And I would just ask the Court to preclude Mr. Bock

22  from arguing this in his opening so that, again, we can -- we can

23  flesh this out, and at the time of closing we can have --

24             THE COURT:  All right -- well, yes, the -- what I -- I

25  haven't looked at the exhibits, but I think Mr. Bock is correct.

                      UNITED STATES DISTRICT COURT

1    In looking at the <u>Staples</u> case again, which is the United States
2    Supreme Court case that's in the note to the jury instruction, it
3    says -- you know, the note just says:   *The government must prove*
4    *that the defendant knew of those features which brought the*
5    *firearm within the scope of the statute.*   I've read the <u>Staples</u>
6    case again as well as some other cases relating to that, and I --
7    given the nature of the item in this case, I think that the --
8    that general idea does apply.   In other words, this isn't a
9    strict liability statute, where if he possessed the item, he
10   didn't register it, you're guilty.   I think there has to be some
11   mens rea.

12        So -- but that doesn't really get to the issue as to
13   these exhibits.   But it is also clear that the defense can't
14   argue that the -- that the defendant knew the government need
15   not -- in other words, the same note says *the government need not*
16   *prove that the defendant knew that possessing the firearm was*
17   *illegal, or that he knew he had to register it.*   Those are things
18   the government doesn't have to prove.   But the government still
19   has to prove some sort of mens rea, that he knew of the features
20   that brought the -- we call it a firearm, but it's actually
21   within that firearm statute, within the scope of the statute.

22        So Mr. Bock, does that make sense that you can argue
23   about that mens rea issue related to that particular element as
24   to the features of the items that were seized?

25        MR. BOCK:  Yes.

                    UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  And then as to whether the exhibits

2     are going to be admissible, I guess that's another issue,

3     Ms. Anderson, that maybe we can discuss -- do you want to do that

4     at the end of today maybe?  Let the jury go home a little early?

5     Is that your main concern, the exhibits, that you those support

6     --

7          MS. ANDERSON:  Well, my concerns are that he's arguing

8     something that is akin to jury nullification, and that is that

9     this is just a tax case, which it isn't.  It's not a tax case.

10    It's a criminal case.

11         THE COURT:  Right.

12         MS. ANDERSON:  And I'm just concerned about the fact

13    that he's going to be arguing that to the jury, and including

14    these forms.  He's going to argue that if -- if he had just

15    filled out these forms, then it would -- everything would be

16    okay, and we wouldn't even be here today.  But that's not --

17    that's not the case.

18         THE COURT:  All right.  Well, we can address that issue

19    maybe at a later time today.

20         Mr. Bock, were you going to argue that in your opening

21    statement?

22         MR. BOCK:  I was going to tell the jury that he's

23    charged under the income tax -- he's charged under the IRS

24    statute.

25         THE COURT:  Well, no.  That doesn't -- the charge is

                    UNITED STATES DISTRICT COURT

1   not evidence of anything.  You're saying that it's -- because

2   it's not Title 18, it's not a crime?  It's a criminal offense.

3           MR. BOCK:  I'm saying -- I'm saying that the government

4   is going to talk about that -- these devices ad nauseum.  They're

5   going to have videos of these devices.  They're going to have

6   people come in and say how much powder were in them.  Everything

7   about the devices.  Yet he's charged with as part of each of

8   these counts failing to register these devices with the National

9   Firearms Registration.  It's right here in the indictment.

10          THE COURT:  That's one of the elements, that they were

11  not registered.

12          MR. BOCK:  Right.

13          THE COURT:  But why -- why tell the jury that this is

14  Title 26, a tax statute?  These are criminal statutes.

15          MR. BOCK:  So I cannot say it's a criminal tax case?

16          THE COURT:  No, I don't think it is a criminal tax

17  case, because it's in Title 26 -- this doesn't involve the

18  payment of taxes to the -- this doesn't involve the IRS at all.

19  The F.B.I.'s investigating.  The C.F.R.'s are -- you know, by

20  calling it a tax case, I think that's argumentative.  I don't

21  think it's relevant.  I think it's misleading to the jury.  I

22  think it is an attempt to -- for jury nullification, saying oh,

23  this is just one of those pesky tax -- tax laws.  We all know

24  that nobody understands them, and so we don't need to follow

25  them.  I mean, that's the indirect message I'm getting when you

UNITED STATES DISTRICT COURT

1    say that this is a tax case.

2              So I'm going to direct that you not tell the jury that

3    this is, quote, a tax case, or a Title 26 case, because I think

4    that's misleading.  And it's clearly a violation of federal

5    criminal law, and I think to call it, quote, a tax case makes it

6    look like it's just some technical regulatory requirement.

7              MR. BOCK:  So I can't say he didn't pay $200 to get

8    these things registered?

9              THE COURT:  You can say that, that he didn't pay $200

10   to get them registered.  That's admitting that they were not

11   registered in the National Firearms Registration and Transfer

12   Record.  You can certainly say that.  But to call it a tax case,

13   I think, is misleading.

14             MR. BOCK:  Okay.

15             THE COURT:  Has nothing to do with whether or not

16   Mr. Fries filed any income taxes -- federal income taxes, or

17   complied with the tax laws, although it is within Title 26.

18             So -- all right, so can we go ahead with opening

19   statements and forge ahead, Mr. Bock and Ms. Anderson?

20             MS. ANDERSON:  Thank you, Judge, yes.

21             THE COURT:  Okay.

22             (The jury entered the courtroom.)

23             THE COURT:  Good afternoon.  The record may reflect the

24   presence of the jury, counsel, the defendant.

25             And Ms. Anderson, you may make your opening remarks to

                        UNITED STATES DISTRICT COURT

1    the jury.

2              And everyone may be seated.

3              MS. ANDERSON:  Thank you, Judge.

4              Your Honor, just one housekeeping matter, if we could.

5    We have a stipulation to admit some exhibits in this case that

6    I'll be using during my opening, and these are Exhibits 1 through

7    14, 16 through 30, 32, and 35 through 43.

8              THE COURT:  All right, so based on stipulation the

9    following exhibits are admitted:  1 through 14, 16 through 30,

10   32, and 35 through 43.

11             And members of the jury, let me just tell you a little

12   bit about our electronic equipment here and the exhibits.  The

13   lawyers will probably use the equipment to show you some of these

14   exhibits on your screen as they're looking at the exhibits and

15   showing them to witnesses.  The witnesses -- the witness also has

16   a screen.  When these exhibits are admitted into evidence, such

17   as the ones that Ms. Anderson just spoke of, you will have hard

18   copies of those exhibits in the jury room when you start your

19   deliberations.  So you won't just get to see them on the screen,

20   but you'll also have a hard copy later, just so you know that.

21             And these are just for exhibits that are admitted.

22   Sometimes they're just marked for identification and they're not

23   yet admitted, so the lawyers can see them, I can see them, and

24   the witness can see them but you can't see them because they're

25   not admitted into evidence.  So there might be some situations

UNITED STATES DISTRICT COURT

1    where exhibits are being discussed, but they're not admitted into

2    evidence so that's why you're not seeing them on your screen.

3              So all right, Ms. Anderson, then you may proceed.

4              MS. ANDERSON:   Thank you, Judge.

5              Your Honor, opposing counsel, Mr. Fries, ladies and

6    gentlemen of the jury.  Now, some explosive devices are more

7    dangerous than others.  Explosive devices are inherently

8    dangerous because of their nature, but there's some explosive

9    devices because of how they're manufactured are more dangerous

10   than others.

11             The ones that are the most serious and the most

12   dangerous are ones that can maim people, cause serious physical

13   injury, or even death.

14             Now, the defendant in this case, and the evidence that

15   you're going to hear, is that the defendant, Mr. Fries, was in

16   possession of different kinds of explosive devices, those that

17   are dangerous because they are explosive devices but some that

18   were manufactured and made to the point that they were inherently

19   and extremely dangerous.

20             On May 13th of 2011 federal agents went to the

21   defendant's home to execute a search warrant.  They entered the

22   home, and they were searching in one of the dressers in one of

23   the defendant's bedrooms, and they found 24 explosive devices.

24   24.  Three of these devices had BB's affixed to them, which

25   you're going to hear testimony of that this is one of the most

UNITED STATES DISTRICT COURT

1    lethal kinds of explosive devices that you can have, because that
2    added metal, that added shrapnel increases the lethality of the
3    devices.
4         These 24 homemade IED's, destructive devices, homemade
5    bombs, you're going to hear it referred to all of those terms
6    throughout this trial, were found in the defendant's dresser.
7         Three of these bombs were completely -- completely
8    assembled in that they had -- they were sealed at both ends.
9    They contained flash powder, and they had a fuse.  And plus, they
10   had the added shrapnel of the BB's on the outside.  These were
11   copper plated metal balls that were affixed to the devices as
12   added fragmentation.  The remaining 24 devices were also sealed
13   at both end ends, contained what's called flash powder or the
14   explosive powder that's necessary, and they had a common hobby
15   fuse for each of these devices.
16        These 21 devices, however, did not have the metal like
17   copper balls on them.  These 24 homemade bombs were found in a
18   box probably about 2 feet long, cardboard box about 2 feet long,
19   and in the box along with these 24 homemade bombs was a container
20   of copper plated metal balls, or BB's.  Next to the box was a --
21   a box, a smaller box of latex gloves, and there was also -- in
22   the same box was a little container of rubber cement glue.
23        Agents began executing the search warrant between 10:30
24   and 11:00 on May 13th of 2011.  It was a Friday.  They began, and
25   Jay Henze, who's a bomb technician with F.B.I., went into the

UNITED STATES DISTRICT COURT

1   house first to clear the house and to make sure that there

2   weren't any obvious signs of -- of any people, or anything else

3   that would create a danger for his -- for the search team.

4          Sometime at about 1:00 one of the F.B.I. agents that

5   was searching pulled open the drawer, the drawer of this dresser,

6   and he looked in the dresser, and what he found was Government's

7   Exhibit Number 36.

8          And if we could see that.

9          This is Number 36.  And what you can see in front of

10  you is a -- a cardboard box about 2 feet long.  In front of you,

11  you can see these round spherical devices.  Those are -- are --

12  those were IED's.  Up in the middle of the box you can see rubber

13  gloves.  You can see the BB's also in the box, and there's a

14  plastic black menacing looking spider at the top of the box.

15          Let's have Government's Exhibit 37.

16          There's another view.  You can see on the bottom of the

17  box there's just a bunch of BB's spread out.  At the top of the

18  box in the middle you can see that inside one of these latex

19  gloves is a round spherical device similar to what's in the bag

20  off to the right there.

21          If we could have Government's Exhibit 38.

22          This is one of the cylindrical devices, and you can see

23  the added fragmentation.  You've got the copper plated metal

24  balls there with the latex glove wrapped around to keep the BB's

25  affixed to the device.  Now, that's one of three devices that had

UNITED STATES DISTRICT COURT

1  the shrapnel or the added fragmentation that I just described to

2  you.

3           And if we could see Government's Exhibit 39.

4           Here's a view of the right portion of the box, and you

5  can see in this plastic bag all of these spherical -- these

6  spherical devices.  And again, they each had powder in them.

7  They each were fused, and they did not have the added

8  fragmentation, but you can tell by looking at the contents of the

9  box that that was the intention, was to add --

10          MR. BOCK:  Objection to this.  This is argument, Judge.

11          THE COURT:  No, overruled.

12          Go ahead.

13          MS. ANDERSON:  You can tell by looking in the contents

14  of the box what the intent was.

15          Now, Bill Urban, who's the F.B.I. agent that found

16  these devices, immediately recognized these as something that was

17  very serious, very dangerous.  So he went outside and he advised

18  Jay Henze, who again is a bomb technician, what he had found.  So

19  Jay Henze immediately cleared everybody from the house.  He went

20  inside.  He looked.  And he's going to tell you that he -- that

21  he immediately recognized that this is something extremely

22  serious.  Throughout his -- his employment, throughout his

23  experience as a bomb technician he's had the opportunity to see a

24  lot of bombs.  And when he saw these, he was nervous.  He cleared

25  the house.  He got everybody far away from the house.  And he

UNITED STATES DISTRICT COURT

1  called the Pima Regional Bomb Squad to come out here -- to come

2  out to the defendant's house, and to help them, to assist them in

3  removing these devices.

4          Now, the Pima Regional Bomb Squad is a bomb squad here

5  in Tucson that's made up of different law enforcement agencies.

6  There's probably about 17 bomb technicians on this squad, and

7  they respond to all sorts of bomb or explosive calls within the

8  county.  They train together.  They work together.

9          So Agent Henze called them to respond and come and help

10  him, which they did.  And when they showed up, Agent Henze put on

11  his bomb -- his bomb suit, his full bomb suit, and he went into

12  the house.

13          And what he did when he went into the house is he took

14  these photographs.  These photographs that -- that you've been

15  looking at over the course of the past few minutes are all

16  photographs that Agent Henze took when he went into the house.

17  He took photographs, and he also took x-rays of the box so that

18  they could look at the devices and see what they had.  They're

19  looking for any kind of booby traps.  They're looking for any

20  kind of particular hazards that would prevent them from removing

21  the box.

22          So Agent Henze went back outside after taking

23  photographs and x-rays, and the bomb technicians looked at what

24  they had.  They looked at the x-rays, and they could see that on

25  these 24 devices that there were powder in each of these devices.

UNITED STATES DISTRICT COURT

1   They could also see that each of these 24 devices were fused, and
2   they could also see the copper plated metal balls.  So that told
3   them that they were dealing with something very serious here.

4          So Special Agent Henze went back into the house, and
5   because of the nature of these devices he used what's called
6   pickup sticks.  These are sticks that you actually use to pick up
7   the devices.  You can't just pick them up with your hands.  You
8   have to -- number one, you have to be very delicate in how you
9   deal with these things, because any kind of vibration, any kind
10  of heat, anything like that can set these things off.  So Agent
11  Henze used these pickup sticks to pick up the devices, and he put
12  them in what's called a fragmentation bag.  And this is a bag
13  that will hold these kinds of explosive devices, and it
14  protects -- it protects the person that's carrying the bag from
15  any kind of heat, any kind of shrapnel should these devices go
16  off.

17         They took these 24 devices out to the Pima County Bomb
18  Range, and this is an area in South Tucson.  It's far away from
19  everybody.  It's fenced.  It's protected.  It's quite a large
20  area.  And it was there at that bomb range that the law
21  enforcement officers rendered safe these 24 devices.

22         Now, what they did, they had -- they had 24 devices.
23  They knew that they wanted to destroy some of these -- some of
24  these bombs, because you can't store bombs in evidence, or in
25  property.  You just can't do that.  They're so inherently

1    dangerous that they had to destroy them.  However, they also
2    wanted to gather the components or what was inside these bombs so
3    that they could send them off to a lab for some kind of a
4    chemical analysis.
5              So they randomly selected five devices, and they
6    selected one of the devices that had the copper plated metal
7    balls.  So a total of six devices were sent off to the F.B.I. Lab
8    in Quantico, Virginia.  They also functioned -- what they did is
9    they functioned as design, one of the devices.  They took one of
10   the cylindrical devices that had the copper plated metal balls on
11   them, and they set it off to see what it would do, to see if
12   their suspicions were correct.  They believed based on their
13   training and experience that this was a very serious and
14   dangerous device because of the powder, because of the -- of the
15   fuse, because of the metal balls on it.
16             And so what they did is they were safely able to put a
17   box with foam over it and they ignited the device, and it what's
18   called functioned as designed.  It blew up, and the shrapnel was
19   spread from the -- away from the device but it was captured
20   within that foam.  So they could see that that device functioned
21   as designed.
22             Seventeen of the devices were destroyed, and the reason
23   why they destroyed them is, again, you can't put these in
24   evidence.  You can't save them.  They're too dangerous.  But in
25   looking at all of the devices, they could tell that each device

1   was about the same size, about the same length.  Each of the

2   devices had -- appeared to have the powder, appeared to have the

3   fuse.  And so they felt safe -- they felt safe in randomly

4   selecting five different devices.

5           Now, the contents of these six IED's or homemade bombs

6   were sent to the F.B.I. Lab in Quantico, Virginia.  And a couple

7   of people back in -- in the F.B.I. Lab analyzed these devices.

8   You're going to hear from one of the chemists that works at the

9   F.B.I. Lab, and his name is Ron Kelly.  He is -- he has since

10  retired and he works for the Navy now, but back at the time when

11  he analyzed these he was a chemist for the F.B.I.  And he looked

12  at all of these devices that were sent back.  He tested all of

13  the powder that was in each of these devices, and he concluded

14  that each of these devices contained what's called flash powder.

15  Flash powder is the powder that is used in these devices.  It's

16  the pyrotechnic powder that helps with the explosion.

17          Not only did they have this explosive powder, but they

18  also contained fuses, and they were also sealed at each end.  And

19  those are the hallmarks of a -- of a homemade bomb or an IED.

20  They're fused at one end.  They've got the explosive powder

21  inside, and they've got the fuse.

22          Next you're going to hear from a firearms and

23  explosives expert named Christopher Rigopoulos.  He's a forensic

24  bomb examiner with the F.B.I.  And he looked at these devices.

25  He looked at these six devices that were submitted to the F.B.I.

UNITED STATES DISTRICT COURT

1     for his analysis.  And it's his opinion that these IED's

2     consisted of disassembled parts of six IED's, or destructive

3     devices, or homemade bombs.  According to Special Agent

4     Rigopoulos, the metal balls were added as a fragmentation

5     enhancement, and that these devices when ignited could result in

6     personal property damage, injury to people, and even death.

7          Now, federal law makes it a crime to not only possess

8     fully assembled IED's, which were the three that Mr. Fries had in

9     the box, but it's also a crime to possess IED's that are not

10    complete but are readily assembled into completed devices, and

11    that's the 21 devices, the 21 devices that did not have the

12    copper plated metal balls on them.

13         Federal law also makes it a crime to not register these

14    devices with the National Firearms Registration and Transfer

15    Record.  The federal law requires manufacturers, makers and

16    importers of these devices to register.  Now, you're going to

17    hear evidence in this case that the defendant did not register

18    his 24 devices, and that's one of the elements that the

19    government has to prove.

20         Count 1 pertains to the three devices that had the

21    metal balls on them.

22         Count 2 pertains to the 21 other devices that did not

23    yet have the copper plated metal balls on them, but were sitting

24    in the box along with the rubber cement glue, all of the copper

25    balls, and the latex gloves.

UNITED STATES DISTRICT COURT

1          Now, you're also going to hear the witnesses testify

2   that the Code of Federal Regulations limit -- limits the amount

3   of explosive powder in a firecracker to 50 milligrams.  The

4   devices that the defendant possessed in this case had 20 times

5   that amount.  Some of the devices that the defendant possessed

6   had 40 times that amount, well over the 50 milligram legal limit.

7          After hearing all of the evidence, after seeing all of

8   the -- the exhibits and hearing all of the testimony in this

9   case, the only just verdict in this case is that the defendant is

10  guilty of both counts.

11         Thank you.

12         THE COURT:  Thank you, Ms. Anderson.

13         Mr. Bock?

14         MR. BOCK:  Thank you.

15         May it please the Court, Ms. Anderson, ladies and

16  gentlemen of the jury, the government has spoken to you for

17  probably about 15 or 20 minutes, and has framed their case in the

18  aura of a destructive bomb, a destructive IED, whatever

19  description the government favors the evidence in this case.

20         However, first of all, the two charged counts are red

21  spheres.  One spherical device, which looks like a cherry bomb --

22  a cherry bomb that you would buy from a -- a firearms -- a

23  firecracker -- a person that sells these types of devices.  And

24  the government will not tell you that Mr. Fries in any way,

25  shape, or form manufactured, constructed, or made the red spheres

UNITED STATES DISTRICT COURT

1    that are in this case, or the cylindrical -- the cylindrical
2    devices that look like M80 firecrackers.  Now, I don't know how
3    many of you have any -- used firecrackers or see firecrackers,
4    but you take a look at these things when you deliberate, and they
5    are -- they look like cherry bombs, and they look like
6    firecrackers.
7              Now, he had a claim that there were the two of these
8    devices, the ones that were cylindrical and one that was round,
9    had a latex glove and some -- some BB's.  Now, the government
10   says they're copper coated, this, that or the other.  These
11   are -- they're BB's.  And so you're going to hear from -- when we
12   present our case the fact that my client was plagued with a
13   rodent problem in his back yard.  Big piece of property.  And
14   these devices -- the three devices that the government claims
15   were going to be used for all of this -- these terrible things
16   were directed towards eradicating a pack rat problem.  Now, if
17   you have a beehive and you knock it down, you don't call the
18   F.B.I. and the ATF to get involved.
19             So -- and I want you to keep in mind the principles and
20   the ethos of our criminal justice system, and that is presumption
21   of innocence, and proof beyond a reasonable doubt.  There's no
22   stronger burden in any court on any type of case, any type of
23   hearing than proof beyond a reasonable doubt.  It's not
24   speculation.  It's not the flip of a coin.  It's not conjecture.
25   You have to be convinced beyond a reasonable doubt, the highest

1    burden that any party has, and that's the government's burden,
2    and it doesn't change.  It doesn't shift.  That's the
3    government's burden.
4          Now, again -- and then, now, the government talks about
5    these 21 unassembled devices.  First of all, the government wants
6    you to make a quantum leap that these unassembled devices are
7    going to be assembled.  So the government wants you to assume
8    that.  That's proof beyond reasonable doubt? Assumption?  The
9    government is saying, well, we have these M80 -- or these --
10   these firecrackers.  We've got some BB's next to them.  We've got
11   some latex gloves, so imagine these things are going to be -- are
12   going to be made too.  Well, there's not going to be any evidence
13   of that, that they were assembled.  They're unassembled.  And
14   again, you look at these things.  Six of them were circular, red
15   like a cherry bomb, and the 15 other ones are like big
16   firecrackers.  Now the government says oh, my goodness, 20
17   times -- 20 times the amount.  Gee, what are you thinking about,
18   someone having a charger and blowing up something?  Do you know
19   what 20 times means?  When the government went ahead and had
20   these -- these devices -- the powder weighed?  One gram.  One
21   gram.  One gram of -- in the indictment.  The indictment that
22   is -- was read to you, one gram containing low explosive main
23   charge.
24         Now, what the government doesn't talk to you about
25   is -- in any detail, because the government wants to, again,

                        UNITED STATES DISTRICT COURT

posture this whole case on these –– on this weapon –– these
weapons, these fragmentation weapons.  What the government really
doesn't talk to you about is the other element of this offense is
that the firearms were not registered to the defendant in the
National Firearms Registration and Transfer Record.  So that
violation was because there was not a $200 fee that was paid to
register these firecrackers, a $200 fee as to each of those.
That's what we're here for, $200 as to each of these devices.
There was a play by Shakespeare, Much to Do About Nothing.  And
that's what the government's case is, much to do about nothing.

Mr. Fries never, ever had any powder in his –– in his
home, any loose powder.  They're going to put witnesses on that
are –– went up and down his house.  Fuses.  Did they find any
fuses other than what was already attached to these devices?  He
didn't even –– there's no evidence that he manufactured these
devices, other than the claim that there was a latex glove with
the BB's on three devices, again directed towards a pack rat
problem, and that's what we're here in federal court on.

Ladies and gentlemen, this case is going to take a lot
of twists and turns.  This is not just pictures of something
exploding, like the government would like you to see and say,
game, set and match.  That's not going to be the situation here.

I know you'll keep an open mind.  I know you'll keep in
mind that it's proof beyond a reasonable doubt.  And I'm
confident that at the end of this case you will come back with a

UNITED STATES DISTRICT COURT

1   verdict of not guilty, because the government has not proved and

2   will not be able to prove each of these counts beyond a

3   reasonable doubt.

4           Thank you for your attention.

5           THE COURT:  Thank you, Mr. Bock.

6           And Ms. Anderson, you may call your first witness.

7           MS. ANDERSON:  The government calls Special Agent Brian

8   Nowak.

9           (Brian C. Nowak was duly sworn by the clerk.)

10          THE COURT:  And you may proceed.

11          MS. ANDERSON:  Thank you, Judge.

12                      BRIAN C. NOWAK

13                    DIRECT EXAMINATION

14  BY MS. ANDERSON:

15  Q    Sir, could you tell us your name, please?

16  A    Brian Nowak.

17  Q    What do you do for a living?

18  A    I'm a special agent with the F.B.I.

19  Q    How long have you been so employed?

20  A    A little over 10 years.

21  Q    Now, what unit are you assigned to currently?

22  A    Currently work the violent crime/major offender squad, and I

23  also am responsible for all the weapons of mass destruction, or

24  WMD crimes.

25          MR. BOCK:  I would object to this, your Honor.  Reserve

                    UNITED STATES DISTRICT COURT

1    a motion at this time.

2              THE COURT:  All right --

3    BY MS. ANDERSON:

4    Q    Now --

5              THE COURT:  -- well, why don't -- the objection's

6    overruled.

7              Do you want to reserve it, or do you want to make it

8    now?

9              MR. BOCK:  I'd like to make it now.

10             THE COURT:  Yes, come on up to sidebar.

11                        BENCH CONFERENCE

12             MR. BOCK:  Judge, every time the government does --

13   they do the same thing.  They get to -- they have to say violent

14   crime.  They have to say major offender, which suggests a repeat

15   offender, that Mr. Fries -- this or that, whatever.  So the

16   inference is not -- you know, there's a state case on point that

17   you can't have an officer come in and say I'm in the major

18   offender or repeat offender unit with respect to testifying

19   against a defendant.  I don't think it's right that they do that,

20   and I think it's prejudicial to get in the fact that -- weapons

21   of mass destruction.  Now, he said -- you know that's not what it

22   is, Judge.

23             THE COURT:  Is that why this case got assigned to him?

24             MS. ANDERSON:  Absolutely.

25             THE COURT:  Because of this, or the other incident?

                    UNITED STATES DISTRICT COURT

1            MS. ANDERSON:  The chemical weapon.  Because of the

2     chemical weapon.  We, of course, didn't know about the IED's when

3     we went into the house, but --

4            THE COURT:  Oh, the other --

5            MS. ANDERSON:  -- he was assigned to this because of

6     the chemical weapon.

7            THE COURT:  The other incident?

8            MS. ANDERSON:  Right.

9            MR. BOCK:  Well, they shouldn't be going into anything

10    to do with a chemical weapon, or weapon of mass destruction.

11           MS. ANDERSON:  We're not getting into that.

12           MR. BOCK:  Well, you just said that's what he was

13    assigned to.

14           THE COURT:  Okay.  How can we correct this, now,

15    because it makes it look like this case is in one of those

16    categories.  In other words, he's the case agent because he's in

17    violent offenders -- this was a weapon of mass destruction -- I

18    forget the other -- how can we -- your next question, how can we

19    --

20           MS. ANDERSON:  Well, I think they are weapons of mass

21    destruction.  I think that they're explosive devices.

22           THE COURT:  Oh, I thought you said the chemical bombs

23    were the weapons of --

24           MS. ANDERSON:  That's why he was the case agent, but

25    he's -- I think these devices are -- they're explosives.

                         UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  Why don't you ask him the next

2     question, were you assigned to this case due to the nature --

3     because these devices were found in his home?  Something like

4     that.  I don't want the jury to infer that because he's in

5     violent offenders or weapons of mass destruction, that that's

6     why -- in other words, acts that are not charged in this case.

7          MS. ANDERSON:  Okay.

8          MR. BOCK:  And there's no -- you know, this is her

9     theory now, that these -- these devices are weapons of mass

10    destruction, that --

11         MS. ANDERSON:  I'm not going to argue that.

12         MR. BOCK:  Well, I thought you just said that.

13         MS. ANDERSON:  The judge asked me --

14         MR. BOCK:  Your thoughts were --

15         THE COURT:  Okay, why don't you ask a follow up

16    question, and don't describe the items as weapons of mass

17    destruction, just the fact that there were the items -- the bombs

18    at the residence.  That's why he was assigned the case.

19         MR. BOCK:  The damage was done.

20         THE COURT:  What do you want me to do?

21         MR. BOCK:  I want you to declare a mistrial.

22         THE COURT:  That's denied.

23         Do you want a cautionary instruction?

24         MR. BOCK:  Yes.

25         THE COURT:  What do you want me to tell them?

                    UNITED STATES DISTRICT COURT

1           MR. BOCK:  Whatever his assignment is, is irrespective
2    of what the charge is in the case.  Whatever he was formally
3    assigned to is -- you know, something to kind of deflate the fact
4    that -- she got this out.  I didn't.
5           THE COURT:  Okay.  Well, I'm going to ask you to ask a
6    leading question that will deflate those issues, and I'll deny
7    the motion for mistrial.
8           MS. ANDERSON:  Judge, he would have been assigned to
9    this case if he were investigating the bombs -- the IED's.
10          THE COURT:  Right, just the IED's.
11          MS. ANDERSON:  Right, he would have been assigned to
12   it.
13          THE COURT:  So if you can narrow it that way so the
14   jury's not --
15          MR. BOCK:  Can we just say based upon the counts of the
16   indictment, this is a case that he --
17          THE COURT:  Would have normally worked.
18          MR. BOCK:  -- would have been assigned to?
19          THE COURT:  Something like that.
20          MS. ANDERSON:  Let me ask you -- my next question is
21   going to be what was your assignment at the time of the search
22   warrant, and he's going to say that he was also, you know, the
23   WMD person.
24          THE COURT:  Why does that matter what his assignment
25   was?

UNITED STATES DISTRICT COURT

```
 1              MS. ANDERSON:  Okay.
 2              THE COURT:  I don't think it matters.
 3              MS. ANDERSON:  Okay.
 4              (The bench conference was concluded.)
 5              THE COURT:  All right, Ms. Anderson, you may proceed.
 6   BY MS. ANDERSON:
 7   Q    Special Agent Nowak, you have expertise that is relevant to
 8   this indictment, correct?
 9   A    I do.
10   Q    Okay.  Now, you're the case agent in this case, are you not?
11   A    I am.
12   Q    Back on May 13th of 2011 the F.B.I. executed a search
13   warrant at the defendant's house, is that correct?
14   A    We did.
15   Q    Do you recall the address of the defendant's house?
16   A    5560 West El Camino Del Cerro.
17   Q    And approximately where is that here in Tucson?
18   A    It's towards the west side.
19   Q    Northwest side?
20   A    Northwest side.
21   Q    Okay.  Are you familiar with the layout of the defendant's
22   home and his property?
23   A    I am.
24   Q    Now, what I want to do is I want to take you through some of
25   the exhibits that have been admitted, and have you explain the
```

UNITED STATES DISTRICT COURT

1    layout of the house to us.  Take a look at Government's Exhibit
2    Number 1.  Do you recognize that?
3    A     Yes.  That was a sketch that was made during the execution
4    of the search warrant.
5    Q     Now, I'm going to ask that you briefly describe for us the
6    layout of the house starting with A -- capital A?
7    A     A is the -- a large garage area that housed a lot of
8    vehicles that was part of Burns Power Washing, the business end
9    of it.  It had supplies, and tools, and things in it.  As you
10   proceed across you have a carport, which separated the business
11   garage from the private residence of Mr. Fries.  Room B was a
12   garage which housed Mr. Fries' vehicles.  Room C was the
13   kitchen/dining area of the home.  D and E were the living room in
14   the home.  Attached to the living room was a kind of Arizona
15   room, which was Room F.  And at the end of Room F you had a
16   closet area that was in there.  If you proceeded back down and
17   went through the hallway, you came up to Room H, which is the
18   first room on the right there.  That was a bedroom sized room
19   which was used for storage of items.  There was a safe in there,
20   a dresser, some various things.  If you went down the hallway
21   further to Room K, that was another bedroom that was being
22   utilized as an office with computers, and some desks.  And then
23   if you went across the hallway to Room I, that was the master
24   bedroom, and Room J was the master bathroom.
25   Q     Now, were there two different aspects of this property here?

                    UNITED STATES DISTRICT COURT

1   A      It was a common –– the property was used in the combination

2   as both the private residence of Mr. Fries, and for the business

3   of Burns Power Washing.

4   Q      Let's take a look at Exhibit Number 2.  Go ahead and explain

5   that to us briefly, if you could.

6   A      Exhibit 2 is just an overlay of the property of 5560 West El

7   Camino Del Cerro, kind of shows the circular driveway.  It shows,

8   again, the business garage for the business, and then the private

9   residence, and the vehicles that were on location at the time of

10  the search warrant.

11  Q      Let's look at Government's Exhibit 3.  Is that the outside

12  of the defendant's residence?

13  A      Yes, that's the front of the home.

14  Q      Number 4?

15  A      That's just a side view of the residence.

16  Q      5?

17  A      Shows another different side of the residence which shows

18  the private garage for the residence, and then the carport which

19  connects through to the workspace area, which is on the left.

20  Q      6?

21  A      And then a view of the carport that separates the business

22  from the residence.

23  Q      7?

24  A      A side view of the side entrance door to the business

25  garage.  You can also see the Coke machine in the rear.  You can

UNITED STATES DISTRICT COURT

```
 1  see the roll-up door in the front.
 2  Q     8?
 3  A     Just a view of the business garage, again, in front.
 4  Q     And 9?
 5  A     9 is the rear of the business garage.  You can see the Coke
 6  machine on the left.
 7  Q     Now, on Government's Exhibit Number 9 we see a patio back
 8  there where the Coke machine is?
 9  A     Um-um.
10  Q     Is that on the business side of the -- of the property?
11  A     On the business side of the carport, yes.
12  Q     Okay.  Let's look at Government's Exhibit 10.
13  A     That's more of a close-up view of that, the patio.
14  Q     Okay, and 11?
15  A     Shows a close-up view of the entrance to the business garage
16  area.
17  Q     12?
18  A     Inside of the business garage showing one of the power
19  washing trucks, and some of the tools and things there.
20  Q     13?
21  A     Another viewpoint of the garage showing some of the work
22  bench area, the tools.
23  Q     14?
24  A     Different viewpoint of the business garage again.  You see
25  the -- at the end of the hall -- at the end of the shop you see
```

UNITED STATES DISTRICT COURT

1    the bathroom that's attached to the business garage.

2    Q      And I would ask that we not show Exhibit Number 15.  The

3    defendant objects to this, but if we could show 15 to the

4    witness.  Do you recognize that?

5    A      I do.

6    Q      And what is that?

7    A      It's just a close-up of the bathroom that was present in the

8    business garage.

9    Q      Now --

10            MR. BOCK:  Judge, may I approach just for one second?

11            THE COURT:  Yes.

12                          BENCH CONFERENCE

13            MR. BOCK:  The government asked me to agree to a number

14    of photos.  I said I did -- I had certain objections, but I don't

15    think they should be able to say in front of the jury that I

16    objected to photo number 15, you know.

17            THE COURT:  Right.  Are you going to move to admit it?

18            MS. ANDERSON:  (No verbal response.)

19            THE COURT:  Okay, so why don't we wait and let him --

20    just because he doesn't stipulate doesn't mean --

21            MS. ANDERSON:  I didn't mean to disparage you by saying

22    you objected.  I apologize.

23            THE COURT:  You're just an obstructionist.

24            MR. BOCK:  I just don't -- you know, it looks like I --

25            THE COURT:  Yes, I agree with Mr. Bock.

                          UNITED STATES DISTRICT COURT

1              Now, are you going to move to admit this?

2              Do you object to this exhibit?

3              MR. BOCK:  Well, this is an exhibit I do have an

4    objection to.

5              THE COURT:  What's your objection?

6              MR. BOCK:  There's a poster there.  I don't think --

7              THE COURT:  How is it relevant, a picture of the

8    bathroom?

9              MS. ANDERSON:  Because it shows that there's a separate

10   bathroom for the workers, and they don't have to go into

11   Mr. Fries' house to use the bathroom.  When I was picking the

12   exhibits I have to show Mr. Fries placed them, or planted -- no

13   one planted them there.

14             MR. BOCK:  That's not the theory of our case, that

15   anyone planted these things.

16             THE COURT:  Is there something bad about the posters in

17   the bathroom?

18             MR. BOCK:  Sorry?

19             THE COURT:  Is there something bad about posters in the

20   bathroom?

21             MR. BOCK:  No.  If you want the poster in, that's fine.

22   I don't --

23             THE COURT:  All right -- well, okay.

24             (The bench conference was concluded.)

25             THE COURT:  All right, Ms. Anderson, you may proceed.

                     UNITED STATES DISTRICT COURT

```
 1   BY MS. ANDERSON:
 2   Q    So the -- did the workers have their own bathroom there
 3   within the -- within the shop?
 4   A    Yes.
 5          MS. ANDERSON:  Government moves for admission of
 6   Exhibit 15.
 7          MR. BOCK:  No objection.
 8          THE COURT:  15 is admitted.
 9   BY MS. ANDERSON:
10   Q    Let's take a look at Government's Exhibit 16, which has been
11   admitted -- if we could publish 15.
12        And this is 16.
13   A    16 is the front entrance to the private residence.
14   Q    Exhibit 18 -- I'm sorry, 17?
15   A    The back yard of the residence.
16   Q    Government's Exhibit 18?
17   A    The back of the residence.
18   Q    19?
19   A    The private garage of the residence.
20   Q    And we see a door there, correct?
21   A    Yes.  That leads into the kitchen area of the home.
22   Q    Of the residence?
23   A    Yes.
24   Q    Exhibit 20?
25   A    That was a shelving unit that was in the closet off of the
```

UNITED STATES DISTRICT COURT

1   Arizona room.

2   Q      Exhibit 21?

3   A      The living room area on the residence.

4   Q      Going back to Exhibit 20, if we could, did you have occasion

5   to look at some of these objects that were on the shelf?

6   A      I did.

7   Q      And what kind of devices were those?

8   A      Look like fireworks.

9   Q      Exhibit 21?

10  A      Again, living room area.

11  Q      22?

12  A      The Arizona room off of the living room in the residence.

13  Q      Exhibit 23?

14  A      That was the office room in the residence.

15  Q      Exhibit 24?

16  A      Again, another viewpoint of the office room in the

17  residence.

18  Q      Exhibit 25?

19  A      Another view of the office room of the residence.

20  Q      Exhibit 26?

21  A      That's the master bedroom of the residence.

22  Q      Exhibit 27?

23  A      That's the hallway in the residence leading to the rooms.

24  Q      Exhibit 28?

25  A      The entrance to one of the extra bedrooms which was used for

UNITED STATES DISTRICT COURT

1  storage of items.

2  Q     Exhibit 29?

3  A     The same extra bedroom, just a different angle showing the

4  closet with a dresser inside of the closet.

5  Q     And if we could show Exhibit 30 just to the witness.  Just

6  the witness.

7              THE CLERK:  It's admitted.

8              MS. ANDERSON:  Exhibit 30.

9              THE COURT:  So Jill, just to the witness, Exhibit 30.

10             THE CLERK:  It's admitted.  She admitted that.

11             THE COURT:  Is 30 admitted?

12             MS. ANDERSON:  I didn't think it was.

13             THE COURT:  Well, according to the clerk it is.  Do you

14  have any objection to Exhibit 30, Mr. Bock?

15             MR. BOCK:  No.

16             THE COURT:  30 can -- did you want it admitted?

17             MS. ANDERSON:  I did.  I apologize, your Honor, I --

18             THE COURT:  That's fine.  So 30 is admitted, and may be

19  shown to the jury.

20  BY MS. ANDERSON:

21  Q     And Exhibit 31 without showing it to the jury.  Do you

22  recognize that?

23  A     31 is the safe that was present in the extra bedroom.

24             MS. ANDERSON:  Government moves for admission of

25  Exhibit 31.

UNITED STATES DISTRICT COURT

1          MR. BOCK:  Judge, I would object to 31.  I don't think

2     it's relevant.

3          THE COURT:  All right, could I see counsel at sidebar,

4     please?

5                        BENCH CONFERENCE

6          THE COURT:  Okay, so I have 31 here.  Why is that

7     relevant?

8          MS. ANDERSON:  Because it shows -- once again, your

9     Honor, the government -- I was prepared to prove possession, and

10    I felt it important to show the contents of the room to show that

11    these are Mr. Fries' things, there's not anybody else living

12    in -- I'm not going to get into the money.  There's no one else

13    living in this room.  It's Mr. Fries' personal --

14         THE COURT:  The contents, right.  Is there anything in

15    particular here?

16         MR. BOCK:  The combination to the safe, obviously, was

17    provided by Mr. Fries, right?  Isn't that how the safe got open?

18         THE COURT:  Yes, but is there anything in this picture

19    that's prejudicial or inflammable?

20         MS. ANDERSON:  Well, he's got some ammunition -- I see

21    that he's got some ammunition, so --

22         THE COURT:  Okay.

23         MR. BOCK:  And I don't know -- it's hard for me to see

24    what that looks like.

25         THE COURT:  32 does show a gun.  Are you going to admit

                        UNITED STATES DISTRICT COURT

1    32?

2           MR. BOCK:  Right.  There's something here, but he's

3    got -- like, this is clearly ammunition that he's got, and here's

4    the money.  There's money in the safe.  So it's not really that

5    relevant.

6           MS. ANDERSON:  I'm not going to get in the guns or the

7    close-up shots of the money.

8           MR. BOCK:  Well, if you want the exhibit in, that's

9    what it has.

10          MS. ANDERSON:  Well, I don't think this can be -- shows

11    the close-up of the money.

12          MR. BOCK:  I've seen $100 bill before.

13          THE COURT:  I'll sustain the objection to Exhibit 31

14    because it shows a pile of money, it shows ammunition.  I think

15    the probative value is outweighed by unfair prejudice.

16          MR. BOCK:  Are you going to try to get 32 in also?

17          MS. ANDERSON:  No.

18          MR. BOCK:  Okay.  And this you're not getting in,

19    right, with the money?

20          MS. ANDERSON:  I won't put that in.

21          THE COURT:  Okay.

22          (The bench conference was concluded.)

23          THE COURT:  All right, Ms. Anderson, you may proceed.

24    BY MS. ANDERSON:

25    Q    Let's take a look at Government's Exhibit Number 35.

                    UNITED STATES DISTRICT COURT

1    A    That is another shot of the extra bedroom.

2    Q    Now, was this the room where the explosive devices were

3    found?

4    A    Yes, it was.

5    Q    What room number is this?

6    A    I believe it was H.

7    Q    Okay.  And could you just describe for us generally where

8    Room H was when you entered the house?

9    A    It was down the hallway, the first room on the -- the right,

10   next to the office and across the hallway from the master

11   bedroom.

12           MS. ANDERSON:  Judge, that's all the questions I have

13   of this witness.

14           THE COURT:  All right.

15           Cross examination?

16           MR. BOCK:  Thank you, your Honor.

17                         CROSS EXAMINATION

18   BY MR. BOCK:

19   Q    Afternoon, Agent Nowak.

20   A    Afternoon.

21   Q    Now, what time of day did you get to the -- my client's

22   residence on May the 13th of 2011?

23   A    I would have to refer to my notes.  It was probably early

24   afternoon.

25   Q    And you would agree with me -- you've been assigned to the

                    UNITED STATES DISTRICT COURT

1    Tucson Sector for a period of time, is that correct?

2    A    Correct.

3    Q    Okay, so you would agree with me that where he lived was --

4    what would be the main streets, do you know?

5    A    Silverbell and El Camino Del Cerro.

6    Q    I'm sorry?

7    A    Silverbell and El Camino Del Cerro.

8    Q    West side?

9    A    West side, yes.

10   Q    And he lives in a desert area?

11   A    Well, residential area.

12   Q    Do you know how big his lot was?

13   A    Not off the top of my head, no.

14   Q    Did you look at his lot?  Did you walk around his lot?

15   A    Yes.

16   Q    Would you say it was about an acre?

17   A    Give or take a little bit.  It's about that.

18   Q    That would easily have been -- you could have gone to the

19   Recorder's Office if you anticipated this question, could you not

20   have?

21   A    Probably, yes.

22   Q    Okay.  So give or take close to an acre.  That's a fair

23   statement on my part?

24   A    Fair.

25   Q    Back yard walled?

UNITED STATES DISTRICT COURT

1    A    I believe so, yes.

2    Q    And then other property that was unwalled, correct?

3    A    Yes.

4    Q    Now, do you know how many vehicles were associated with this

5    property in May of 2011?

6    A    I believe it was maybe four -- four vehicles, an additional

7    possibly three private vehicles, and then at the time there were

8    a couple of employee vehicles there.

9    Q    You would agree with me that not all of those vehicles could

10   be enclosed in the garage, is that correct?

11   A    Correct.

12   Q    Some of them would have to be outside of the residence?

13   A    Yes.

14   Q    Okay.  Now, you had item number -- Exhibit Number 20, which

15   was a picture of fireworks.  Do you remember that exhibit?

16   A    Yes, I --

17   Q    Can we see that exhibit again?

18        MR. BOCK:  Is that okay if I ask her to --

19        THE COURT:  Yes, go ahead.  Do you know what the number

20   is?

21        MR. BOCK:  20.

22        THE COURT:  20, all right.

23   BY MR. BOCK:

24   Q    Okay, so you've got pictures of -- you took this picture,

25   and there's some fireworks, is that correct?

UNITED STATES DISTRICT COURT

```
 1   A    Correct.
 2   Q    And did you ever make an effort to find out where these
 3   fireworks may have been purchased?
 4   A    No, I did not.
 5   Q    They -- these fireworks -- you could have found that out if
 6   you wanted to, is that correct?
 7   A    Well, they were general fireworks, so unless there's some
 8   type of a tag on them --
 9   Q    But you work for the F.B.I., right?
10   A    Correct.
11   Q    And the F.B.I. has a lot of resources, is that right?
12   A    We do.
13   Q    So you're not here to tell me if you took one of these and
14   sent it back someplace, that there certainly could have been some
15   resource to find out that it might have been purchased in New
16   Mexico, or North Carolina, or someplace like that, is that
17   correct?
18   A    If it's a general firework unless it has a specific serial
19   number assigned to that firework, which generally one like this
20   did not, it could have been bought at Walmart, it could have been
21   bought in New Mexico, or anyplace.
22   Q    And did these have powder associated within them?
23   A    I don't know.  I didn't examine them.
24   Q    But you didn't take them into evidence?
25   A    No.
```

UNITED STATES DISTRICT COURT

1   Q     But you did look at some of the cylinders that were
2   ultimately taken into evidence, and some of the spheres that were
3   ultimately taken into evidence.  That's the basis of why we're
4   here, correct?
5   A     Yes.
6   Q     And were any efforts ever made to find out who manufactured
7   those, or where they came from through the F.B.I.?
8   A     That would have been the job of the bomb technician.
9   Q     Okay.  So when you say the bomb technician, are you saying
10  the Pima County bomb technician, or are you saying the ATF?
11  A     It would have been our bomb technician, or in joint
12  correlation with Pima County Sheriff's Office personnel.
13  Q     So ATF would have had nothing to do with attempting to find
14  the genesis of the cylinders or the spheres that are part and
15  parcel of the claims in this case, is that correct?
16  A     I don't know what the bomb technician did, so I can't answer
17  that.
18  Q     That's important to find out where these things might have
19  come from, is it not?
20  A     Yes.
21  Q     And that was not done in this case, is that correct?
22  A     Unless the bomb technician did, no.
23  Q     Did you -- did you consult with the bomb technician at all?
24  A     I did.
25  Q     Did you give him directions, or some suggestions that I just

                         UNITED STATES DISTRICT COURT

1   have suggested?

2   A    We talked about the case, and then he's the expert on the

3   issues of the fireworks and any explosive type devices, so --

4   Q    Did you see any loose powder when you were conducting your

5   search of Mr. Fries' residence?

6   A    I did not.

7   Q    Did you see any red plastic that looked like it was about to

8   be manufactured into a sphere?

9   A    I did not.

10  Q    Did you see anything that looked like a -- that was loose

11  that was to manufacture cylinders that were taken in this case?

12  A    No.

13  Q    Now, BB's -- you saw those BB's, is that correct?

14  A    Correct.

15  Q    Not illegal to have BB's, is it?

16  A    Pardon?

17  Q    It's not illegal to have BB's, is it?

18  A    No.

19  Q    Not illegal to have a BB gun, is it?

20  A    No.

21  Q    Latex gloves.  Not illegal to have those, is that correct?

22  A    Correct.

23  Q    You knew what type of employment Mr. Fries was in, did you

24  not?

25  A    I did.

                    UNITED STATES DISTRICT COURT

1   Q    Burns Power Washing?

2   A    Yes.

3   Q    You knew that had to do with using certain chemicals on

4   driveways and things like that, is that correct?

5   A    Correct.

6   Q    Not unusual for people to perhaps use gloves, protect their

7   hands.  Is that a fair statement?

8   A    Correct.  Yes.

9            MR. BOCK:  May I have a second, your Honor?

10           THE COURT:  Yes.

11           MR. BOCK:  I have nothing further.

12           Thank you, your Honor.

13           THE COURT:  Redirect?

14           MS. ANDERSON:  No, your Honor.

15           THE COURT:  All right.

16           Thank you, sir.  You may step down.

17           And the government may call its next witness.

18           MS. ANDERSON:  The government calls Bill Urban.

19           THE COURT:  Sir, if you could come forward to the

20  clerk, the lady right in front of me here, give her your full

21  name, and she will swear you in as a witness.

22           (William Urban was duly sworn by the clerk.)

23                      WILLIAM URBAN

24                   DIRECT EXAMINATION

25  BY MS. ANDERSON:

                    UNITED STATES DISTRICT COURT

1    Q    Sir, what do you do for a living?

2    A    I'm an F.B.I. agent in the Phoenix Division, Tucson Resident

3    Agency.

4    Q    How long have you been so employed?

5    A    Approximately eight years.

6    Q    Now, on May 13th of 2011 did you participate in the

7    execution of a search warrant at the home of Todd Fries located

8    at 5560 West Camino Del Cerro here in Tucson?

9    A    Yes, I did.

10   Q    What was your role?

11   A    Perimeter security and search.

12   Q    Do you recall what area you searched?

13   A    Yes.

14   Q    You said you started with the outside perimeter, is that

15   right?

16   A    That was more for security purposes.

17   Q    Take a look at Government's Exhibit Number 3.  Is that the

18   home that you -- that you participated in the search?

19   A    Yes, it is.

20   Q    Now, after you -- you did the perimeter for security, what

21   areas within the house did you search?

22   A    We started -- or I started with the kitchen, and then moved

23   to the family room.  And of course, there was other agents with

24   me as I was doing this.  And then the final room that I searched

25   was a secondary bedroom.  I believe it was titled Room H.

UNITED STATES DISTRICT COURT

1  Q    And could you describe where that room was off of the -- the
2  main -- off of the main entrance?
3  A    If -- from the main entrance it would be to the right.  It
4  was across the hall from the master bedroom.
5  Q    Could you describe the contents of the room?
6  A    Sure.  When you walk into the room, you open the door.
7  From -- on the left-hand side there was a closet.  Then directly
8  in front facing the opposite side of the room was the window to
9  the outside.  And there was -- I could not tell exactly if it was
10 a bed, or a couch, but that was directly under the window.  And
11 in the corner was a tall safe, and to the right was a book shelf,
12 and against the wall that bordered the hallway was a dresser.
13 Q    Let's look at Government's Exhibit Number 30.  Do you
14 recognize the -- the contents of that room?
15 A    Yes, that's the inside of Room H with the -- the couch or
16 bed with the safe.
17 Q    Now, when you began your search of the dresser, did you open
18 one of the drawers and find something unusual?
19 A    Yes.  The second drawer that I opened was the middle top
20 drawer of the dresser, and that contained -- when I opened it, I
21 immediately noticed on the right-hand side of that drawer were
22 red -- kind of like balls with wicks or fuses protruding from
23 them.
24 Q    Take a look at Government's Exhibit Number 36.  Do you
25 recognize that?

UNITED STATES DISTRICT COURT

1   A    Yes, that's the drawer I opened.

2   Q    And -- and the contents of the drawer as well?

3   A    Yes.

4   Q    Okay.  And this is what you saw when you opened the drawer,

5   correct?

6   A    Correct.

7   Q    And did you immediately notice that there was an issue here?

8           MR. BOCK:  Objection to that, your Honor.

9           THE COURT:  Well, no, overruled.

10          Go ahead.

11          THE WITNESS:  Okay.  Yeah, I mean, when I -- when I

12  looked at the red balls with the wick or fuse coming out, that

13  was an immediate alarm in my head that it's something that --

14  when I think back to days growing up and you think of the

15  cartoons with the picture of the -- of a bomb, or something like

16  that.  It's round, and has a fuse coming out of it.

17          MR. BOCK:  Your Honor, I object to this testimony.

18          THE COURT:  No, overruled.  You can -- ask another

19  question, though.

20          MS. ANDERSON:  Okay.

21          THE WITNESS:  So I thought it was suspicious.

22  BY MS. ANDERSON:

23  Q    You thought it was suspicious, is that what you said?

24  A    Yeah.

25  Q    Okay.  All right, and Government's Exhibit Number 37, take a

                    UNITED STATES DISTRICT COURT

1  look at that, if you would.  That's another view of the box --

2  the contents of the box, correct?

3  A     Right.  What was suspicious about this --

4          MR. BOCK:  Objection -- objection, there's no --

5          THE COURT:  Right.

6          MR. BOCK:  -- question in front of him.

7          THE COURT:  Ask the next question, Ms. Anderson.

8          MS. ANDERSON:  Okay.

9  BY MS. ANDERSON:

10 Q     And was there something unusual at this angle that you

11 noticed?

12 A     Yes, on the -- this is more towards the center of the -- the

13 drawer, and the item that is kind of on the far back, which is

14 white with the BB's on it, where the curser is there -- yeah,

15 that -- that item to me was very suspicious.  It looked like --

16 it was a cylindrical object, again with the fuse or a wick, and

17 it was wrapped in BB's.  And over the BB's was what appeared to

18 be a surgical glove appendage.

19 Q     Now, in the drawer next to the box did you find some latex

20 gloves?

21 A     Yes.

22 Q     When you saw the contents of this drawer, what did you do?

23 A     Immediately backed off.  I notified the people in the room

24 that we had suspicious objects here, and then I went and got a

25 hold of our special agent bomb tech, Jay Henze, who then had us

UNITED STATES DISTRICT COURT

1   all exit the room.

2   Q    And the house?

3   A    And the house.

4   Q    Now, do you have any kind of specialized training in

5   explosives?

6   A    No.  I just have cursory experience, and just a few hours

7   of -- you know, what explosives are, and -- and what to look for.

8   Q    Now, what else did you find in the drawer in addition to

9   this box, do you recall?

10  A    There was -- the -- the other thing that I remember seeing

11  were the BB's, the glue, the box of surgical gloves, and there

12  were also magazines regarding aviation.

13              MS. ANDERSON:  Judge, may I have just a moment?

14              THE COURT:  Yes.

15              MS. ANDERSON:  That's all we have, Judge.

16              THE COURT:  All right.

17              Cross examination?

18              MR. BOCK:  Thank you.

19                         CROSS EXAMINATION

20  BY MR. BOCK:

21  Q    And you're Agent Urban?

22  A    Yes, sir.

23  Q    Good afternoon.

24  A    Good afternoon.

25  Q    So what time did you enter Mr. Fries' home on the 13th of

                      UNITED STATES DISTRICT COURT

1    May in 2011?

2    A     I'd have to guess.  Approximately 10:00 or 11:00.

3    Q     And your testimony regarding the -- the room where the red

4    objects were found in the drawer, what time did you -- what time

5    do you think you discovered those?

6    A     Approximately between 12:30 and 1:30.

7    Q     Did you notice whether or not Mr. Fries had owned any BB

8    guns that were in his home?

9    A     I personally did not see any.

10   Q     Okay.  Doesn't mean he didn't own any, though, right?

11   A     Correct.

12   Q     Now, the -- so the drawer was flush to the dresser, I guess.

13   It was a dresser drawer, is that a correct description?

14   A     Yes, and it was flush.

15   Q     Okay, and you opened it?

16   A     Correct.

17   Q     Okay.  And that's when you saw these things that you just

18   testified to?

19   A     Correct.

20   Q     You don't know how long they were there?

21   A     No.

22   Q     And they were with other objects that you just testified to,

23   like books, is that correct?

24   A     Yes.

25   Q     So these things were flammable.  The books would be --

UNITED STATES DISTRICT COURT

1   A    Yes, I imagine.

2   Q    So that whole room could be up in -- up in fire if these

3   things were, in fact, flammable, is that correct?

4   A    He would have to have an ignition source to light them.

5   Q    So in and of themselves, you weren't concerned about them

6   being flammable, is that correct?

7   A    It's not that -- no, it's not the flammability I was

8   concerned about.

9   Q    You opened the drawer, and nothing happened obviously,

10  right?

11  A    Correct.

12  Q    So these things were -- within your mind were these things

13  somewhat stable?

14          MS. ANDERSON:  Objection, foundation.

15          THE COURT:  Well, if you -- if you know.

16          Go ahead.  You can answer.

17          THE WITNESS:  I -- I had no way of knowing what their

18  stability was.

19  BY MR. BOCK:

20  Q    Okay.  They had a wick to them, though, is that correct?

21  A    Correct.

22  Q    So that would suggest to you to ignite them, you would have

23  to at least ignite the wick?

24          MS. ANDERSON:  Objection.

25  BY MR. BOCK:

                    UNITED STATES DISTRICT COURT

1   Q     Right?

2               MS. ANDERSON:   Foundation.

3               THE COURT:   Sustained.  He doesn't -- I don't think he

4   has the expertise, Mr. Bock.

5   BY MR. BOCK:

6   Q     Did you have the expertise or not?

7   A     No.

8   Q     Okay.  Then we'll move on.  The -- you didn't see any loose

9   wicks in that -- in that area, is that correct?

10  A     Correct.

11  Q     You saw gloves in a box, and loose BB's, and then that --

12  that other cyndrical, is that what you --

13  A     Yes.

14  Q     That's pretty much what you did, is that correct?

15  A     Yes.

16  Q     Okay.  And you wrote a short report in this case, did you

17  not?

18  A     I wrote notes, but I was never asked to write a report.

19              MR. BOCK:  Can I approach the witness for a second?

20              THE COURT:  Yes.

21              MR. BOCK:  Shall I mark this?

22              THE COURT:  Well, I don't know what this is.

23              MR. BOCK:  I just want to show it to him.

24              THE COURT:  Yes, that's fine.

25  BY MR. BOCK:

                    UNITED STATES DISTRICT COURT

1    Q    Let me just show you this.  This is something that was

2    typed.  Does that look like you -- your notes?  Would that have

3    been your notes that were typed?

4    A    Yes.  Yes.

5    Q    Okay.

6    A    But I never formalized that in a report.

7    Q    Okay.  And this is what you testified to?

8    A    Yes.

9    Q    Okay.

10            MR. BOCK:  Thank you, Judge.

11            THE COURT:  All right.

12            Any redirect?

13            MS. ANDERSON:  No, your Honor.

14            THE COURT:  All right.

15            Thank you, sir.  You may step down.

16            THE WITNESS:  Thank you.

17            THE COURT:  And the government may call its next

18    witness.

19            MS. ANDERSON:  The government calls Jay Henze.

20            THE COURT:  Sir, if you could come forward to the

21    clerk, the lady right in front of me, and be sworn in as a

22    witness, please.

23            (Jay Henze was duly sworn by the clerk.)

24                        JAY HENZE

25                   DIRECT EXAMINATION

                UNITED STATES DISTRICT COURT

1    BY MS. ANDERSON:

2    Q     Sir, what do you do for a living?

3    A     I am a special agent bomb technician with the Federal Bureau

4    of Investigation.

5    Q     How long have you been with the F.B.I.?

6    A     I've been employed with them for 10 years.

7    Q     Now, you said that you're a special agent bomb technician.

8    I take it that that's a specialized area within the F.B.I., is

9    that correct?

10   A     Yes, that's correct.

11   Q     How long have you been a -- a bomb technician with the

12   F.B.I.?

13   A     I've been a certified bomb technician for 12 years.

14   Q     So before you joined the F.B.I., you were a bomb technician,

15   correct?

16   A     Yes, that's correct.

17   Q     Do you have previous law enforcement experience?

18   A     Yes, I do.

19   Q     Could you describe that for us?

20   A     Yes, I was employed prior to the F.B.I. with the Tucson

21   Police Department as an officer and as a bomb squad member.

22   Q     How long were you with TPD?

23   A     I was with the Tucson Police Department for eight years.

24   Q     And I take it during that time you did other things besides

25   working as a bomb technician.  You had other assignments,

UNITED STATES DISTRICT COURT

1   correct?

2   A    Yes, I did.

3   Q    What were some of your other assignments that you held with

4   TPD?

5   A    I worked patrol for several years.  I also worked DUI

6   enforcement.  I was a SWAT team member full time during that time

7   as well.

8   Q    Now, back to your duties with the F.B.I., could you tell us

9   what your duties are as a special agent bomb technician with the

10  F.B.I.?

11  A    Yes, currently I am the senior team leader for the F.B.I.'s

12  bomb technician program in the State of Arizona.  I have four

13  additional special agent bomb technicians that I oversee

14  throughout the state, as well as I coordinate and work

15  hand-in-hand with our state and local partners.  We have 13 bomb

16  squads as well as military units in the state, so I will work

17  with them on bomb response calls, to training.  It's also my

18  responsibility to make sure that their squads are accredited

19  through the F.B.I. hazardous devices school, so I'll go through

20  the accreditations process with them, make sure that they have

21  the proper equipment that they're supposed to have as well as

22  training that they're supposed to accomplish every month.  We

23  also -- I'm also a part of certifying them through HDS, so I work

24  that administrative process as well.

25  Q    Now, it sounds like you're the -- the main bomb technician

UNITED STATES DISTRICT COURT

1   for the F.B.I. in the State of Arizona, is that correct?

2   A    That's correct.

3   Q    So let's get into some of your training and experience that

4   you have in the area of explosives, bombs and being a bomb

5   technician.

6   A    In 2000 I tested and was selected for the Tucson Police

7   Department Bomb Squad.  Once I entered on duty there I did

8   on-the-job training.  I did in-house training with them until

9   2001 where I was accepted into the F.B.I/United States Army

10  Hazardous Devices School, which is in Huntsville, Alabama.  It's

11  a five week basic course that teaches basic bomb technician

12  skills, how to handle explosives, how to render safe potential

13  IED's that we might, you know, deal with in our regular law

14  enforcement area that we work in, how to handle explosives, and

15  how to work in that explosive environment.  So from that

16  training -- that was a five week training course.  That was in

17  2001.  In 2002 I went on to attend the advanced explosive

18  destructive techniques course, which is an ATF course, and that

19  is a two week course that teaches us how to handle and dispose of

20  properly and to store properly commercial explosives, military

21  explosives, fireworks, illegal items, also improvised explosives

22  that we could recover in the state that we work in.  In 2008 I

23  attended the F.B.I. basic post-blast course, and was certified

24  and instructed on how to conduct post-blast investigations.  That

25  same year I attended the basic post-blast instructor course where

UNITED STATES DISTRICT COURT

1    I was taught how to instruct a basic post-blast course itself.
2    From there I -- over the last few years I have taught basic
3    post-blast courses in Africa, Canada, and other parts of the
4    country.  In 2009 I did a -- a deployment to Iraq with the F.B.I.
5    I was with the Combined Explosive Exploitation Cell, which is a
6    collaborative effort between the U.S. Military, British Military,
7    and Australian Military.  And our job was to do post-blast
8    investigations on coalition forces, service members that were
9    injured or killed in theater as well as dealing with any
10   explosive IED devices that were recovered.  We would work on
11   exploding those, and dealing with those as well.  And that was a
12   four month tour that I did over there.  In 2011 I attended the
13   National Improvised Explosive Familiarization course, which is an
14   F.B.I. led course, and that training consisted of dealing with
15   improvised explosives.  We're starting to see more of a trend in
16   that area, so we were -- we were taught on how to deal with
17   those, how those items were mixed, what they can do.  And I have
18   taught in roughly seven of those courses throughout the country.
19   Q    Now, were you involved in the execution of a search warrant
20   at the residence of Todd Fries on May 13th of 2011?
21   A    Yes.
22   Q    And that residence was located at 5560 West El Camino Del
23   Cerro in Tucson, correct?
24   A    That is correct.
25   Q    Take a look at Government's Exhibit Number 3.  Do you

UNITED STATES DISTRICT COURT

1   recognize that photo?

2   A     Yes, I do.

3   Q     And how do you recognize that?

4   A     I recognize that from being there on the search warrant at

5   Mr. Fries' home.

6   Q     What was your role in the execution of the search warrant?

7   A     My initial role was the entry team leader.  I was there to

8   make sure that the house was cleared of any human threats.  I was

9   --

10               MR. BOCK:  Objection to that, Judge.

11               THE COURT:  No, overruled.

12               Go ahead.

13               THE WITNESS:  I was there to make sure the house was

14   cleared of any human threats that could be in the house, guiding

15   other team members through the house safely, and I was also there

16   to make sure that there wasn't any in plain view explosive

17   threats that could be in the house.

18   BY MS. ANDERSON:

19   Q     What time did you make entry, do you recall?

20   A     I believe it was 9:50 a.m.

21   Q     And so you did a -- a check -- a cursory check, correct?

22   A     That's correct, yes.

23   Q     And what time did you turn it over to the search team?

24   A     The home was turned over approximately 10:40 a.m.

25   Q     Now, after you initially cleared the residence, what did you

                     UNITED STATES DISTRICT COURT

1   do?  When the search team went in, what did you do?

2   A    After the house was turned over to the search team, I let

3   them start to do their search process.  They have a process of

4   doing that with homes.  And so my job at that point was to stay

5   out at the street and make sure that no one who wasn't supposed

6   to be there didn't enter the property.

7   Q    At some point in time were you asked to reenter the

8   residence to examine some items that had been found?

9   A    I was.  Close to 1:00, I believe, I was asked to come back

10  in and look at some items that were found.

11  Q    Do you recall what room you were asked to go into?

12  A    It was the -- down the main hallway, the first room on the

13  right, which I believe is Room H.  It's a small bedroom.

14  Q    And what were your initial observations when you returned to

15  the room?

16  A    When I went to the room and saw these items that were, you

17  know, told to me outside, I immediately recognized them as a

18  potential explosive threat.

19  Q    Let me show you -- this is Government's Exhibit Number 36.

20  Actually, let's -- I'm sorry, let's look at 37.  It's a little

21  bit clearer.  And do you recognize what's shown in this photo

22  here?

23  A    Yes, I do.

24  Q    And what do you recognize that as?

25  A    This was the box that had these items in the dresser drawer.

UNITED STATES DISTRICT COURT

1   Q    And -- and again, did this cause you alarm when you saw

2   this?

3   A    Yes, it did.

4   Q    Explain to us why.

5   A    Well, my initial observation I noticed -- you can see at the

6   top left corner above the black spider, as well as to the right

7   of that -- that -- that's the first item.  I noticed that that

8   item had a -- if you can pan over a little bit.  That item had a

9   fuse coming out of the top of it.  It also had copper BB's

10  affixed to it, and it was an item that I had -- with all the

11  hundreds of explosive items I've seen over the years, it is an

12  item that I had recognized as something that could be an

13  explosive threat to me and the people in the dwelling.  If you

14  want to look over to the right, I observed another item, a

15  spherical item that had the same type of fragmentation attached

16  to it, the BB's.  And just under that to the left there's another

17  cylindrical tube that was consistent with the first one that I

18  had pointed out.

19  Q    Now, the cylindrical tube that you described off to the

20  right of the -- of the cylindrical one, that's the cylindrical

21  one that the arrow is on just to the right, was that a

22  cylindrical --

23  A    That's a spherical one, the round one, yes.

24  Q    Okay.  And just directly below it is another cylindrical

25  one?

UNITED STATES DISTRICT COURT

1    A    That's correct, yes.

2    Q    Okay.  Now, how long did you spend looking at this box when

3    you made a decision about what to do next?

4    A    A very short period of time, maybe a minute or two.  I knew

5    that I wasn't going to do anything at that point, that some --

6    another process had to start, and so I left the room and I

7    started the evacuation process of the house, because there were

8    searchers in the house, other agents.  So immediately I

9    instructed everybody to leave the house, and move out to the

10   street.  From there I also made sure that the search team leader

11   had accounted for all their team leaders so no one was left in

12   the house.

13   Q    Why was it important for you to evacuate the house?

14   A    My biggest concern was that these items had fragmentation,

15   which if something were to happen -- if these were truly an

16   explosive device, if had they exploded they could throw that

17   frag, which could be a lethal combination.  So my intention was

18   to remove everybody from the house, and start the process of

19   dealing with those items in question.

20   Q    Would they -- would the wick or the fuse necessarily have to

21   be lit in order to detonate these devices?

22   A    These items -- now that we know, yes.  At the time I

23   couldn't tell what was under them.  I didn't know if there was

24   any -- any other item under them.  I didn't know if they were

25   booby trapped.  I didn't know what was in the drawer.  So they

UNITED STATES DISTRICT COURT

1  weren't touched.  They weren't moved at that point.  We waited,
2  and again got everybody out of the house.
3  Q    Now, you -- you also saw that there were copper metal balls
4  adhered to the devices, correct?
5  A    Yes.
6  Q    And did that raise your concern?
7  A    Yes, it did.
8  Q    Why's that?
9  A    Again, the added fragmentation adds to the lethality of
10 these items.  If these were truly an explosive device and they
11 exploded, they could propel that fragmentation out with high
12 speed, and that's not anything I wanted to be a part of.
13 Q    What about the devices that didn't have the copper metal
14 balls or the BB's attached?  Could they be dangerous as well?
15 A    Yes, they could.
16 Q    Now, after you cleared the residence and you took a head
17 count to make sure everybody made it out, what were your next
18 steps that you took?
19 A    As a bomb technician we're trained to work in pairs.  We try
20 to have a standard in that, so that if I start to do something
21 because I'm tired or I'm not thinking properly, my other bomb
22 technician will maybe see that and we can make a decision
23 together to not do something that could lead us down a path of
24 getting hurt.  So at that point I called the Pima Regional Bomb
25 Squad, who I work with all the time.  I was -- at this point when

UNITED STATES DISTRICT COURT

1   I lived down here, I was actually attached to their squad.  So I
2   called the sergeant and asked him to come out and support me on
3   dealing with these items.
4   Q       And what kind of support could they provide you with?
5   A       The -- the bomb squad, they responded.  They have a response
6   truck.  In that truck we have radiography capability, taking
7   x-rays.  We have robotics capability.  We have equipment, bomb
8   suits, that sort of thing that helps us do our job.  It's a
9   standard equipment that they carry, and they respond with.
10  Q       How many Pima Regional Bomb Squad members are there?
11  A       Currently there's seven.  At the time I think three or four
12  showed up at the scene to assist.
13  Q       Could you describe for us what agencies or departments
14  participate in the Pima Regional Bomb Squad?
15  A       Sure.  The Pima Regional Bomb Squad is a collaborative
16  effort between federal, state, and local partners.  The Pima
17  County Sheriff's Department -- initially, this was their squad,
18  and they thought that force multiplier would be getting everybody
19  together from different agencies, to include the federal
20  government, working together in dealing with explosive threats
21  throughout the state, especially the territory that they're
22  responsible for, which is 900 square miles.  So on that team
23  consists of F.B.I. bomb technicians, Pima Regional bomb
24  technicians.  We have investigators from Marana, Oro Valley,
25  Sahuarita.  We also have an investigator from the ATF on the

UNITED STATES DISTRICT COURT

1  team, and there's also a canine handlers -- explosive canine
2  handlers that we have from the airport and Oro Valley that are on
3  this team, that make up the team.
4  Q    How many members showed up to assist you?
5  A    I believe there was four, with one investigator.  So that
6  was the sergeant, two others, and an investigator as well as
7  myself were out there.
8  Q    So after they arrived, did you all discuss the issue and
9  decide how best to proceed?
10 A    Yes, we did.
11 Q    And what was your plan?
12 A    When the sergeant got there, Sergeant Chris Rogers, we -- we
13 talked about the items that I had seen, and we decided that I
14 would go -- I would don a bomb suit, full coverage bomb suit,
15 that I would go back down into the house, and that I would take
16 photographs of the items that you see here, and that I would also
17 take x-rays to determine if there was anything else under those
18 bags, if there was anything else in the drawer that we needed to
19 be concerned with.  So once that decision was made, I donned an
20 EOD-9 bomb suit, full coverage bomb suit, took the camera down
21 and the x-ray system down to take x-rays.
22 Q    Could you explain to us or describe this bomb suit for us?
23 A    Yes.  The bomb suit is a -- it's manufactured from Med-Eng,
24 which is a Canadian company.  They've pretty much standardized a
25 bomb suit that most civilian bomb agencies use in the country, to

UNITED STATES DISTRICT COURT

1    include the military.  The EOD-9 is the ninth iteration of this

2    suit.  It weighs approximately 70 pounds, plus the helmet which

3    is about 15 pounds.  And the suit is constructed of kevlar and

4    fire retardant material plates throughout the suit, as well as

5    the helmet is designed with a hardened kevlar base.  The face

6    plate is a very large -- sort of like a plexiglass, really thick

7    face plate so you can see through it.  This suit, it is -- is

8    cumbersome.  It's very hot.  But it's designed to protect against

9    fragmentation.  It's designed to protect against blast pressures,

10   thermal effects.  So that's -- that's pretty much what that suit

11   is.

12   Q    Now, why did you feel the need to put a suit on in this

13   case?

14   A    Again, I was dealing with items that had fragmentation on

15   it, and that was the best coverage that I have to use to go down

16   on these things.  So that's what we chose.

17   Q    And so you put on your -- your suit.  How long does it take

18   you to put on your bomb suit?

19   A    Usually, we have somebody suiting you up, so I might have

20   one or two individuals.  They'll help put the pants system on,

21   the helmet, and then the coat.  So a minute or two.

22   Q    What was your plan on entering the house?

23   A    My plan was since we already knew the way to that room, we

24   would -- I would take that same route.  I would take a camera, a

25   bag with some equipment to include my x-ray generator.  So I

UNITED STATES DISTRICT COURT

1  would go back the same way we went into the house right to the
2  room and start to work.
3  Q    Now, let's take a look at some of these photos.  And you
4  actually took these photos, did you not?
5  A    Yes.
6  Q    We've seen 36.  We looked at 37.  Let's look at 38.  That's
7  another view of the same box, correct?
8  A    That's correct.
9  Q    Is that where the spider was -- was located when you saw it,
10 or --
11 A    Yes, the spider was just as you see it there.
12 Q    And let's take a look at 39.  That's a view of the contents
13 of the box on the right side, correct?
14 A    Yes.
15 Q    Could you describe what we're looking at there?
16 A    Yes, in the plastic wrapping or bag you can see six
17 spherical items.  They all have fuse -- hobby fuse is what we
18 call it.  It's an igniferous material that burns.  One of those
19 items is black in color, the rest are red.  To the top of that on
20 the outside of the bag is a plastic container, which is a BB
21 container which houses the BB's that you see in the bottom of the
22 box.  To the left of the bag the orange, white, and blue jar is a
23 glue jar.  And then as well you can see the BB's at the bottom of
24 the box, as well as the other items that I described earlier.
25 Q    Now, you -- you took the photographs, and then what did you

UNITED STATES DISTRICT COURT

1  do after you took the photographs?

2  A    Once the photographs were taken and I felt comfortable with

3  that, I started the process of taking x-rays of the box itself.

4  Q    Why was it important to x-ray the box?

5  A    Again, I wanted to make sure that there was nothing in the

6  box that may have been booby trapped, or something if I had moved

7  it could cause any of these items to explode.  I wanted to make

8  sure there was no other items that could be a potential danger to

9  me.  So I started my x-ray process, as you can see, where the BB

10 container is.  My first film went on the side of that box, and I

11 shot the x-rays from the side where the spherical items are to

12 the side of the glue items.  So I was able to see a side view of

13 the box.  Once that was done I took an x-ray under the shelf over

14 the top of the box so I could see all the contents that were in

15 the box as well, and those were the two x-rays that I took.

16 Q    Let's take -- well, first of all, what did -- I think you

17 just explained to us what the x-rays showed, correct?

18 A    The x-rays -- they showed, obviously, these items, the

19 internal parts of some of these items as you'll be able to see in

20 some of the x-ray photos.

21 Q    Let's take a look.  Let's look at Government's Exhibit

22 Number 40.  Is that one of the x-rays that you took?

23 A    Yes, that's the side angle of the x-ray, so you can see

24 where the spider is there to the left.  It -- it's also depicted

25 in the last photo that it was sitting on those items.  So I was

UNITED STATES DISTRICT COURT

1  able to get a side view of the spherical items, of the jar, of

2  the spherical item with the fragmentation as, well as the -- to

3  the left there under the spider was another 15 cylindrical tubes

4  with fusees.

5  Q    Now, I think you can touch the screen and actually leave a

6  mark.

7  A    Oh, okay.

8  Q    Let's try it and see if it works.

9  A    So right there were the 15 other devices.  This is the

10  spider.  You can see this item right there is the spherical

11  device with the fragmentation on that, as well as the powder

12  inside.  You can tell just by looking at the outside that this is

13  another spherical item with the -- with the fuse right there

14  coming off of that.  On this -- what's great about this x-ray is

15  you can see the powder line in here.

16  Q    What's a powder line?

17  A    This powder line tells us that this item, this spherical

18  item is partially filed with powder, some type of powder.  As you

19  can tell, the rest of it doesn't have anything in it.  You can

20  also tell that there's a powder line in this one here.  This

21  container, as you can see from the x-ray, is that same container

22  that was cut open that housed the BB's.

23  Q    Okay.  So you could tell -- you could see the fuse, you

24  could see the powder line, and you could see the BB's, correct?

25  A    That's correct.

UNITED STATES DISTRICT COURT

1    Q    Was your -- were your concerns increasing as you saw this?

2    A    They were the same.  I mean, we were still concerned with

3    these items.  We were just ruling out potential booby traps or

4    any other thing that we couldn't see based on our visual

5    inspection and photographs.

6    Q    Let's look at Exhibit 41.  What angle was this taken from?

7    A    This was taken -- the generator itself was placed on the

8    ground, and the drawer was up here.  So here's my x-ray

9    generator, the drawer is up here, and the film was put on top.

10   So I was shooting on the bottom of the drawer up to the film so I

11   could get a whole photo or x-ray of the box itself.

12   Q    Now, could you describe for us what you're looking at on

13   this -- on this x-ray?

14   A    This photo isn't the best, because a lot of it's got a lot

15   of white to it, but you can tell that the box is lined with BB's.

16   Those are metal objects.  X-rays -- when you take x-rays, metal

17   objects are very dense material and those photo electrons when

18   they hit dense material, they don't typically go through them so

19   you don't -- you can't see through them.  It absorbs that energy.

20   So that's why you will see metal fragmentation or metal objects,

21   they'll be more darker in color -- more dense.  So in this

22   photograph you can see there's hundreds of BB's in this box.

23   Q    Were you able to collect the items in the box?

24   A    Yes.

25   Q    Well, let me back up.  After you took the photographs and

UNITED STATES DISTRICT COURT

1   the x-rays, what did you do next?

2   A      From here once the -- the x-rays were done, those were two

3   x-rays in the photographs, I exited the -- the bedroom.  Went

4   back out, and we developed the x-rays digitally.  These are all

5   done on a computer digitally.  And from there we were able to,

6   you know, inspect and interrogate these items to make sure there

7   wasn't anything in there that was of concern.  So I was able to

8   get with the other bomb technicians on scene, and we were able

9   to, you know, make a game plan of how we were going to deal with

10  these items based on the photographs, and based on the x-rays

11  that we had.

12  Q      And what was that game plan?

13  A      We decided that I would get back in the bomb suit, that I

14  would go back downrange, that the three items -- the explosive

15  device items that had the fragmentation would be placed in a

16  fragmentation bag, and then the rest of the items, the explosive

17  items, would be placed in another fragmentation bag.  Those would

18  be loaded onto a bomb truck, and taken out to an explosive range

19  where we could exploit those further, and render them safe, and

20  collect them as evidence.

21  Q      Could you describe for us how you actually pick up the

22  items?

23  A      Yes.  When I go down I'm in a suit.  I have a fragmentation

24  bag.  A fragmentation bag is a kevlar lined container that is

25  designed by Kinetic Industry.  It's designed to withstand a

UNITED STATES DISTRICT COURT

1    certain amount of pressure and fragmentation if a device that's
2    placed in there goes off.  So it protects the bomb technician.
3    The items themselves, the three items, were picked up with a
4    pickup stick.  So I was able to put myself with some distance --
5    with the bomb suit, with the pickup stick I had some distance as
6    I picked those items up and placed them in the fragmentation bag.
7    That bag was sealed up and taken out to the bomb truck.  I
8    retrieved another fragmentation bag, brought that in.  I was able
9    to pick up the other items that were in the bag and place those
10   in the fragmentation bag as well.  That was taken out to the bomb
11   truck, and at that point we were able to, you know, start putting
12   our gear away, and make our -- move out to the -- the range.
13   Q    Now, before we -- before we move on to what occurred at the
14   range, I want to show you just a couple of more photographs.
15   Government's Exhibit 42.  Take a look at that.  I think if you
16   tap the screen one more time, it will clear the --
17              THE COURT:  On the left-hand corner there.
18              THE WITNESS:  Just exit?
19              THE CLERK:  No.
20              THE COURT:  Right on the corner of the screen -- Jill,
21   can you show the witness?
22   BY MS. ANDERSON:
23   Q    That's Exhibit 42.  Do you recognize what's there in that
24   photo?
25   A    Yes, that's the exact box that those items were in.

                      UNITED STATES DISTRICT COURT

1    Q    And we can also see a box -- I'm sorry, a container with

2    BB's and some rubber cement, correct?

3    A    That is correct.

4    Q    And likewise, take a look at Government's Exhibit 43.  Was

5    that the container of BB's?

6    A    Yes, it is.

7    Q    Now, you had a video camera on your bomb suit, is that

8    right?

9    A    It's a helmet camera, yes.

10   Q    Okay.  And what's the purpose of the helmet cam?

11   A    The helmet camera is there for -- well, one, for recording

12   what I did, but also for the sergeant downrange to observe what I

13   was doing inside to make sure I wasn't missing something, or if

14   they saw something.  Because once you start getting in the bomb

15   suit, your vision is limited, and your movement's limited, and

16   after a while you start to get really hot and you can start

17   losing focus.  So having other eyes downrange wirelessly is an

18   added benefit to that.

19   Q    Now, have you previously reviewed Government's Exhibit 55,

20   which is one of the helmet camera videos taken from when you went

21   into the Fries residence?

22   A    Yes.

23   Q    And does that accurately represent the actions that you took

24   inside?

25   A    It sure does.

                        UNITED STATES DISTRICT COURT

1          MS. ANDERSON:  Government moves for admission of
2     Exhibit 55.
3          MR. BOCK:  Judge, I think all these -- this video's
4     going to be cumulative.  He's already testified to what he did.
5          THE COURT:  All right.  Any other objection, Mr. Bock?
6          MR. BOCK:  No, your Honor.
7          THE COURT:  All right, Exhibit 55 is admitted.  And you
8     wanted to play that to the jury?
9          MS. ANDERSON:  Yes, your Honor.
10          THE COURT:  All right, that can be played to the jury.
11     How long is the video?
12          MS. ANDERSON:  Nine minutes, your Honor.
13          THE COURT:  Okay.
14          MS. ANDERSON:  We have two videos.
15          THE COURT:  All right, why don't we play one video, and
16     then we'll take a break.
17          So go ahead and play Exhibit 55.
18     BY MS. ANDERSON:
19     Q    And Agent Henze, I'm going to ask you some questions while
20     the video is rolling.
21     A    Yes.
22          (Exhibit 55 was played.)
23     BY MS. ANDERSON:
24     Q    What's happening here?
25     A    Right now I'm in the suit.  The sergeant is adjusting my

                    UNITED STATES DISTRICT COURT

1    helmet.  You can see that's his hand.

2          The vehicle behind me was my bomb vehicle with equipment.

3          That's Sergeant Rogers.

4          Right now Agent Clark is doing the screen, the wireless

5    screen so they can make sure it's working properly.

6          From there I'm taking my tools, and I'm walking up to the

7    residence.

8          This is the garage, the access to the kitchen.

9          So that's Agent Clark handing me my equipment.

10         At this point I'm by myself in the residence.

11   Q    And that's Room H, correct?

12   A    Correct.  Room H.

13         So during this process I'll look around, make sure I didn't

14   miss something.  Again, I have limited vision and movement, so I

15   have to really watch where I step, where I put my foot so I don't

16   trip and fall.

17         As you can see, the digital camera there.  I'll take photos.

18         During this process of taking photos I'll also do a retake

19   of the drawer itself to make sure, again, that I didn't miss

20   something, or I wasn't too quick on the initial approach.  Again,

21   to make sure that there's nothing in there that I don't know

22   about, or that I missed on the first approach.

23         You can see in the mirror me in the bomb suit itself.

24         This is the side -- where I'm on the side of it taking a

25   photograph.

                    UNITED STATES DISTRICT COURT

1    All right, so once the digital photographs were taken, my
2    initial -- you can see me standing there in the mirror.  My
3    initial item placed was a digital film flue, which captures
4    radiographs.  And you can see I set that on the side there.
5    And the x-ray generator is this -- this black piece of
6    equipment here I'll pick up shortly.
7    Right now I'm deciding how I'm going to shoot x-rays into
8    that so I find a chair or a table, and I use that to put the
9    generator on itself.  Typically, with these x-ray systems you
10   need to be -- we try to be straight on to the object that we're
11   shooting x-rays into, and so I didn't have anything else other
12   than the table.  We -- we have to improvise when it comes to
13   things like that, because we don't -- we're limited on what kind
14   of gear we can bring downrange.
15   So the x-rays you can see sitting on the table there
16   generates radiographs.  It makes x-rays, and those x-rays come
17   out of the end there.  They go through the items of concern, and
18   they put a -- basically kind of like a shadow image onto the flue
19   or that black panel, and we're able to digitally scan that flue
20   and see the item in question.
21   That's the generator sitting on that small table.
22   All right, so once I start the -- the generator, it -- it
23   has a delay, either a minute or 15 seconds, and we -- we like to
24   use 15 seconds because typically here we're out in the heat and
25   it's hot.  We want to facilitate getting out of the suit as

UNITED STATES DISTRICT COURT

1  quickly as we can.  So I made it —— generated x-rays for 15
2  seconds.  I stepped out of the room while it was generating
3  x-rays, and now as you can see I'm stepping back into the room
4  and I'm going to remove that x-ray panel.
5       The next panel was placed on top.  These are very light
6  panels.  They weigh ounces.  They're moldable, so you can put
7  them behind things.  They're not a thick solid object.
8       From there I put the generator —— my only other position I
9  could do was put it under the box, as you can see there, and I
10 shot x-rays through the drawer itself, through the objects onto
11 the panel.
12      Again, once I started that x-ray process I had 15 seconds to
13 move out of the area.  I went to this back bedroom and stood
14 there.  The x-ray itself will click off and it will give a verbal
15 sound when the x-ray is firing the x-ray, and then when it's
16 done.
17      I go back to the room, remove the panel.  Those panels were
18 taken along with the digital camera, and I went back out to the
19 bomb truck where I met up with other bomb squad members, and we
20 developed those panels to see what the x-ray revealed.  You can
21 see behind Sergeant Rogers is the Pima Regional Bomb Squad
22 response truck.  Other members of the search team are back where
23 I had them staged.
24      And that's it for that video.
25           THE COURT:  All right, then let's go ahead and take a

                     UNITED STATES DISTRICT COURT

1    15 minute afternoon recess, members of the jury.  You can leave

2    your things on your chairs, or take them back to the jury room

3    with you.

4              So we'll stand at recess for 15 minutes.

5              Sir, you may step down.

6              (The Court recessed at 3:05 p.m., and reconvened at

7    3:24 p.m.)

8              THE COURT:  The record may reflect the presence of

9    counsel, the defendant.

10             And Jill, if you can get the jury.

11             (The jury entered the courtroom.)

12             THE COURT:  All right, everyone may be seated.

13             And the record may reflect the presence of the jury.

14             And Ms. Anderson, you may continue with your direct

15   examination.

16             MS. ANDERSON:  Thank you.

17   BY MS. ANDERSON:

18   Q    Special Agent Henze, let's talk about Government's Exhibit

19   Number 56.  This is also a helmet camera video taken at the Fries

20   residence, correct?

21   A    Yes.

22   Q    And have you had a chance to examine Government's Exhibit

23   56?

24   A    Yes, I have.

25   Q    And this is you picking up the evidence, is that right?

                         UNITED STATES DISTRICT COURT

1   A      That's correct, yes.

2               MS. ANDERSON:  Government moves for admission of

3   Exhibit 56.

4               MR. BOCK:  Judge, again, I really think picking up

5   evidence --

6               THE COURT:  You think it's cumulative?

7               MR. BOCK:  I do, your Honor.

8               THE COURT:  All right, overruled.  And Exhibit 56 is

9   admitted.

10              So you'd like to play that to the jury?

11              MS. ANDERSON:  Yes.  I apologize.

12              THE COURT:  No -- go ahead.

13              MS. ANDERSON:  If we could play it for the jury.

14              THE COURT:  Yes, go ahead.

15              (Exhibit 56 was played for the jury.)

16              THE WITNESS:  You can see the deputy -- female deputy

17  was holding a pickup stick.  She gave that to me.  That's the

18  item or the tool that I used to give me some distance from my

19  body, my hand to the item themselves.  The -- what I attempted to

20  do was get in the back of the truck where the fragmentation bags

21  were, but they forgot to unlock that so I had to go back and tell

22  them to unlock the back of the truck.  The black bag that you saw

23  there, you'll see it better as the video progresses is the

24  fragmentation bag.

25  BY MS. ANDERSON:

                        UNITED STATES DISTRICT COURT

```
1    Q     How big is that bag?
2    A     It's maybe 2 feet in -- in-depth, and about a foot and a
3    half in width.
4    Q     Is that the frag bag?
5    A     That's the fragmentation bag.  That's the outer portion of
6    that.  That bag that I lifted up had the 15 cylindrical explosive
7    items in there.  So initially, I put all the non-fragmented or
8    items that didn't have fragmentation in this bag, as you can see
9    me picking them up and placing them in the bag.
10         During the process of our explosive work we try to adhere to
11   time, distance, and shielding so that time would be our time on
12   target, how much time we spend downrange, how much time I might
13   spend over the device when I'm working on it.  That distance
14   could be me standing behind a wall, or having a pickup stick with
15   some distance between myself, my body, to the actual device I'm
16   dealing with.  And shielding could be anywhere from my bomb suit
17   to standing behind a structure, those kind of things.  So we try
18   to adhere to that as much as possible.
19              MR. BOCK:  Judge, with all due respect to the agent, I
20   would ask that a question be posed to him if he's going to
21   testify.
22              THE COURT:  Well, you want Ms. Anderson -- all right,
23   Ms. Anderson, if you want him to comment on the video, go ahead
24   and ask a question.
25              MS. ANDERSON:  Sure.
                    UNITED STATES DISTRICT COURT
```

1    BY MS. ANDERSON:

2    Q    So you put the fragmentation bag into the vehicle, is that

3    correct?

4    A    That's correct.

5    Q    And what was in the frag bag the -- the bag of the spherical

6    items, correct, and the cylindrical?

7    A    The first bag, as you saw in the video, was the items that

8    did not have the fragmentation added to it.

9    Q    And why did you separate them like that?

10   A    Well, we -- I wanted to separate those items that had

11   fragmentation.  One was to lower the explosive weight with those

12   items, because they did have fragmentation on them.  As opposed

13   to putting them all in one container, I wanted just three in one

14   container because they had frag.  The other ones did not, and so

15   I wanted to separate those.

16   Q    What's that that you just pulled out?

17   A    That's just a piece of paper that was in there.

18   Q    So that was the cylindrical -- one cylindrical with frag,

19   correct?

20   A    That's correct.

21   Q    Here comes a spherical with frag, correct?

22   A    That's correct.

23   Q    And what's covering that one?

24   A    That is a medical latex glove.

25   Q    And there's the third.  What are you doing there?

                     UNITED STATES DISTRICT COURT

1    A    I'm checking to see if there's anything in that glue

2    container.

3    Q    Did you find anything in there?

4    A    It appeared like it was the normal contents for that

5    container.

6    Q    If you need to have some kind of ignition on the -- on the

7    devices to cause them to explode, why is it that you have to be

8    so careful in how you handle them?

9    A    Some of these items can be sensitive to heat, shock, and

10   friction, so we had tried to avoid introducing that onto these

11   items.

12   Q    Are you familiar with flash powder?

13   A    Yes, I am.

14   Q    Describe flash powder for us.

15   A    Flash powder is typically two to three chemicals.  We

16   actually make it for our school.  We're allowed to make certain

17   small amounts.  We're precluded from using certain chemicals.

18   The main chemical that is found in flash powder is potassium

19   chlorate and aluminum.  There might be added sulphur in there as

20   well.  It depends.  What we're allowed to make is potassium

21   perchlorate and aluminum, which is not as sensitive for our

22   schools.  So I have mixed those items, but we are precluded from

23   mixing potassium chlorate and aluminum as opposed to potassium

24   perchlorate and aluminum because of the sensitivities.

25   Q    Is flash powder sensitive?

                        UNITED STATES DISTRICT COURT

1    A    It's very, very sensitive to heat, shock, and friction, and
2    it's very volatile.
3    Q    Could it ignite without, like, lighting the wick or the
4    fuse?
5    A    It could.  It could ignite based upon static electricity.
6    Q    Is that the end of the video?
7    A    Yes.
8    Q    All right.  Now, once you safely put these devices in
9    your -- in the vehicle, what did you do with them?
10   A    The items in the fragmentation bags were transported out to
11   the Pima Regional Bomb Squad range.
12   Q    And what's -- once you were at the bomb range -- well, first
13   of all, where is this bomb range?
14   A    The bomb range is located at 10001 South Sahuarita, I think
15   it is, or Rita Road, excuse me.  So it's I-10 to Rita Road, and
16   you'll get off and go south on Rita Road.
17   Q    Do you know how many acres of land this is, or how big it
18   is?
19   A    It's fairly large.  I'm -- I'm not sure on the acreage.
20   Q    Now, once you were at the bomb range, did you have an
21   opportunity to inspect all of the devices that you had ultimately
22   found?
23   A    Yes.
24   Q    I'm going to ask you to describe the devices that you found,
25   but first before I do that, I'm going to ask you how is it that

UNITED STATES DISTRICT COURT

1   you inspected these?  Were you -- did you have to get a certain
2   distance away from the devices before you could inspect them?
3   Could you explain that to us?
4   A    Yes.  As I mentioned before, time, distance, and shielding,
5   we take that into account when we're dealing with any of these
6   items.  So our initial decision was where are we going to, one,
7   render these things safe, and where are we going to collect
8   evidence?  With the -- the bomb technicians on scene, we had
9   evidence recovery people on scene, so the starting point would be
10  300 feet away is where we typically try to be far enough away to
11  deal with any of these items.  We also have cover out there.
12  It's a covered patio area that everybody was under.  So
13  initially, as we decided on where we were going to render these
14  items safe -- and that was, again, like I said, 300 feet away.
15  Q    And in order to -- to handle the devices, did you -- you
16  used a robot, did you not?
17  A    That's correct.  We decided to use remote procedures
18  utilizing a bomb robot during the render safe portion of this, as
19  well as the collection portion of this.
20  Q    Now, could you describe what you -- could you describe for
21  us the devices -- the 24 devices that were found at the
22  defendant's home, and what I'm -- what -- specifically what I'm
23  getting at is the shapes, and whether or not they had the
24  fragmentation on them?
25  A    The -- there was 15 cylindrical tubes with a fuse.  They

                    UNITED STATES DISTRICT COURT

1  were pink in color, as you saw in the video, and as you saw in

2  photos.  Those did not have fragmentation.  Those were in a

3  plastic bag.  To the right of that was another plastic bag

4  containing spherical devices, round in nature with a fuse.  One

5  of --

6  Q    Let's go -- I'm sorry, finish this answer.  Then I'm going

7  to take you back to the previous answer.

8  A    One of those spherical items was black in color.

9  Q    Let's go back to the 15 cylindrical.  Were they tied, or

10  were they secured at both ends?

11  A    They were sealed at both ends, the tubes themselves.

12  Q    Were they fused?

13  A    Yes.

14  Q    And a fuse -- describe the fuse.

15  A    A fuse is a -- is a item that's manufactured.  We call it

16  hobby fuse.  It typically could be made up of potassium chlorate,

17  various igniferous, or meaning it could burn, materials.  So

18  those items if you light it, that fuse will burn emitting a flame

19  inside of it.  That's what the fuse does.

20  Q    How long were the fuses?

21  A    They were very short.  I don't know the exact length of

22  them, but maybe an inch or so, or less.

23  Q    Now, of the 15 cylindrical -- 15 cylindrical had no

24  fragmentation, correct?

25  A    That's correct.

                         UNITED STATES DISTRICT COURT

1   Q    Okay.  Then I think you were telling us about the spherical?

2   A    Yes.

3   Q    And go ahead and finish your answer.

4   A    The spherical items appeared to be a hard plastic with the

5   same type of fusing, hobby fuse, green in color.  One of them was

6   black.  The rest were red.  And those were in that plastic bag as

7   you saw in the picture.

8   Q    How big were those -- the spherical devices?

9   A    They were approximately in between a golf ball to a tennis

10  ball size, round in shape.

11  Q    Okay.  What else did you find?

12  A    The other items that I found in that box were two

13  cylindrical tubes with fusing with added fragmentation, and they

14  were also in a rubber surgical latex type glove, white in color.

15  The other item that was in that same box was a spherical device

16  that had fragmentation added to it that also had a fuse, and that

17  was also in a latex rubber glove.

18  Q    So 24 devices total, correct?

19  A    Yes, 24.

20  Q    And what did you do with them?

21  A    Out at the range?

22  Q    Yes.

23  A    Out at the range we made an area that was tarped, a clean

24  tarp with clean paper.  We separated those devices, as you'll see

25  in pictures to follow.  We separated those out on paper so they

UNITED STATES DISTRICT COURT

1  were out of the plastic bag so, one, we could visually inspect

2  them, we could take photographs of them, and we could decide on

3  how we wanted to handle them.  The other items that had

4  fragmentation were also placed on this large tarp on separate

5  pieces of paper, and were waiting for us to determine how we

6  wanted to go about rendering those safe as well as collect them.

7  Q    You -- now, you talk about render safe.  What does that

8  mean?

9  A    Render safe is utilizing a tool to take an item, an

10  explosive item, and either -- either cut it, or open it somehow

11  with a tool to keep it from exploding.  So we're taking the

12  contents apart to where they can't do what they were designed to

13  do.  Once we render that safe, we're able to collect it as

14  evidence, we're able to sample it, we'll be able to do a more

15  closer inspection of it.

16  Q    Let's take a look at Government's Exhibit Number 44.  Do you

17  recognize what's shown in the photo?

18  A    Yes.

19  Q    And what is that?

20  A    That's a large blue tarp, and on the tarp are paint cans,

21  evidence collection cans.  And on that are cardboard evidence

22  bags that are cut open and taped on the tarp, and on that are the

23  15 cylindrical explosive devices that we recovered.

24        MS. ANDERSON:  Government moves for admission of

25  Exhibit 44.

UNITED STATES DISTRICT COURT

```
 1                MR. BOCK:  No objection.
 2                THE COURT:  44 is admitted.
 3   BY MS. ANDERSON:
 4   Q    Now, we see paint cans there on the blue tarp.  Did you use
 5   a separate paint can for each device?
 6   A    That's correct.
 7   Q    Now, what did you do with the 15 cylindrical?  Did you --
 8   did you render them all safe and collect evidence from each of
 9   these devices, or what did you decide to do?
10   A    We decided based on the -- the -- the amount of time we had
11   been working this problem with 15 of them, we decided to randomly
12   choose five out of the 15.  Out of those five we would
13   robotically cut them open over each individual paint can.  We --
14   with cutting, we would open them up which would allow them to
15   build up pressure inside and explode, but it would also allow us
16   to collect the powder and the tube itself, and that's what we did
17   with five of those.
18   Q    Now, why did you choose five?  Why didn't you collect the
19   powder from each of these 15 devices?
20   A    At some point tech fatigue starts to come into the picture,
21   and being there hours in the heat you start to lose focus, you
22   start to maybe make decisions that can get you injured or killed.
23   So we decided to randomly choose five out of these items.  Based
24   on our training and experience looking at these items, they all
25   appeared to be in similar construction.  Based on our experience
```

1  over the years with dealing with explosive devices, we concluded

2  that the five items if they had powder in it and we collected

3  them, the other ones are going to be manufactured the same way.

4          MR. BOCK:  I object to that conclusion, your Honor, ask

5  that that be stricken.

6          THE COURT:  No, overruled.  You can cross-examine the

7  witness.

8  BY MS. ANDERSON:

9  Q    Were each of the 15 fused?

10 A    Yes, they were.

11 Q    Were each of the 15 sealed?

12 A    Yes, on both ends.

13 Q    Okay.  And you -- you and the other agents randomly chose

14 five, correct?

15 A    That's correct.

16 Q    And what were you intending to do with the five?

17 A    Our intention was to remotely pick up the five items, to --

18 with a robot, put them over one of the paint cans that you see

19 here in the photo, and cut one of those devices each, allowing

20 the capture -- if there was powder inside, to capture the powder,

21 and also to capture the container itself.

22 Q    The container, meaning the tube?

23 A    The tube itself.

24 Q    All right.  And you used separate cans, correct?

25 A    A separate can for each device, yes.

                    UNITED STATES DISTRICT COURT

1    Q      Okay, so those were the cylindrical ones.  What did you do

2    with the remainder of the devices?

3    A      The -- the remaining 10 devices towards the end of the

4    evening were disposed of with explosives.  We counter-charged

5    those.

6    Q      What does counter-charge mean?

7    A      Counter-charge or disposal means we took those remaining

8    items, we placed them in a hole.  We utilized our explosives,

9    placed those explosives in or near or on those items, and

10   exploded those, getting rid of them.  So in essence safely

11   destroying them so we didn't have to deal with them.

12   Q      Now, why can't you just stick them in evidence, or property?

13   A      Well, again, these are explosive devices, and they still

14   potentially have powder in them, as we learned later that the

15   five did that we choose, but they're still a fuse, they are still

16   a hazard, so that's not anything that we can put into evidence.

17   Q      You also put -- you also took one that had the -- the added

18   fragmentation, which was cylindrical in shape, and you tested it

19   to see if it would function as designed, is that correct?

20   A      That's correct.

21   Q      Could you explain that to us?

22   A      Sure.  One of the cylindrical tubes that had fragmentation

23   had the fuse, and it was in the rubber glove.  We wanted to see

24   if there was actual powder in it, and see if it would actually

25   function as designed, which is by lighting that fuse, that

UNITED STATES DISTRICT COURT

1    burning of the fuse into the tube would ignite any type of filler

2    or powder in the tube causing it to build up pressure, and that

3    pressure would overcome the container, therefore exploding.  We

4    wanted to see if that -- one of those devices would actually do

5    that.  So we decided to remotely function one of these as

6    designed, and I can get into that process.

7    Q    Let me back you up just a little bit.  Take a look at

8    Government's Exhibit 45.  Do you recognize that?

9    A    Yes.

10   Q    And what's -- what's shown in Exhibit 45?

11   A    Those are the spherical explosive devices that we found in

12   the home that were in the box.  They all, as you can see, have

13   fuse, green fuse.  One is black in color.

14          MS. ANDERSON:  Government moves for admission of

15   Exhibit 45.

16          MR. BOCK:  No objection.

17          THE COURT:  45 is admitted.

18   BY MS. ANDERSON:

19   Q    Take a look at Exhibit 46.  Do you recognize that?

20   A    Yes.

21   Q    What's that?

22   A    That is the spherical container or device that has a fuse,

23   has added fragmentation, and is also in a -- the latex glove.

24          MS. ANDERSON:  Government moves for admission of

25   Exhibit 46.

                    UNITED STATES DISTRICT COURT

```
 1              MR. BOCK:  No objection.
 2              THE COURT:  46 is admitted.
 3   BY MS. ANDERSON:
 4   Q    Take a look at 47.  Do you recognize that?
 5   A    Yes, that was one of the cylindrical tubes, explosive
 6   devices that was found in the residence with the fuse you can see
 7   sticking out of the top, the fragmentation added, and that is
 8   also in a latex glove.
 9              MS. ANDERSON:  Move for admission of Exhibit 47.
10              MR. BOCK:  No objection.
11              THE COURT:  47 is admitted.
12   BY MS. ANDERSON:
13   Q    And then 48, do you recognize that?
14   A    Yes.
15   Q    And what is that?
16   A    That is the third device -- explosive device.  That's a
17   cylindrical tube that has fragmentation added as well as the
18   fuse, and it is in a latex rubber glove.
19              MS. ANDERSON:  Government moves for admission of
20   Exhibit 48.
21              MR. BOCK:  No objection.
22              THE COURT:  48 is admitted.
23   BY MS. ANDERSON:
24   Q    Now, at some point in time a second search warrant was
25   executed on -- on the defendant's house, is that right?
```

                         UNITED STATES DISTRICT COURT

```
 1    A     That's correct.

 2    Q     And why is that?

 3    A     The box that the items were found in along with some of the

 4    BB's, the spider, and the latex gloves were not collected

 5    initially by the evidence response team on the -- on May 13th.

 6    Q     So folks went back into the house to look for those items,

 7    correct?

 8    A     That's correct.

 9    Q     Take a look at Government's Exhibit 57.  Do you recognize

10    what's shown there?

11    A     Yes, I do.

12    Q     And what is that?

13    A     In the middle is the black plastic spider.  Above that to

14    the left -- there's the spider right here.  Above that to the

15    left are the latex gloves, or the rubber gloves, surgical gloves.

16    Q     And those were --

17          MS. ANDERSON:  Well, government moves for admission of

18    Exhibit 57.

19          MR. BOCK:  No objection.

20          THE COURT:  57 is admitted.

21    BY MS. ANDERSON:

22    Q     And those were in the home and in the drawer on May 13th of

23    2011 when you went in and removed the items, correct?

24    A     That's correct.

25    Q     And were these two items seized, meaning the latex gloves
```

UNITED STATES DISTRICT COURT

1    and spider?

2    A     Yes.

3    Q     Similarly, Government's Exhibit 58.  Take a look at that, if

4    you would.  Do you recognize what's shown there in that

5    photograph?

6    A     Yes, I do.

7    Q     And what is that?

8    A     That is the dresser drawer of the defendant in Room H.

9              MS. ANDERSON:  Government moves for admission of

10   Exhibit 58.

11             MR. BOCK:  This is as of May the 27th, is that correct?

12             MS. ANDERSON:  Correct.

13             MR. BOCK:  Okay, no objection.

14             THE COURT:  58 is admitted.

15   BY MS. ANDERSON:

16   Q     And these items were in the drawer -- at least some of the

17   items were in the drawer on May 13th, 2011 when you went in and

18   removed the device, correct?

19   A     Yes, that's correct.

20   Q     Now, going back to the devices that were seized on May 13th

21   of 2011, let me ask you some questions based on your training and

22   experience regarding these devices.  Now, over your career you've

23   had the opportunity not only here in the United States but it

24   sounds like in Iraq to deal with explosive devices, is that

25   correct?

                      UNITED STATES DISTRICT COURT

1    A    Yes, it is.

2    Q    And certainly -- and you've taught other bomb technicians on

3    the dangers of some of these devices, is that right?

4    A    Yes, I have.

5    Q    Now, in your opinion, are these just firecrackers?

6    A    No, they're not.

7    Q    Explain to us why they're not firecrackers.

8    A    There's several reasons.  One, the Consumer Product Safety

9    Commission regulates what kind of powder and how much powder,

10   explosive powder or pyrotechnic powder, can be placed in a

11   firework.  Those regulations are enforced through the Federal

12   Hazardous Substances Act.  And based on the C.F.R.'s or the

13   Consumer Product Safety Commission the amount of powder can only

14   be 50 milligrams or less.  So if you look at 1 gram is 1,000

15   milligrams, so any regulated item that's legally manufactured in

16   this country and legally sold and legally transported across

17   highways, those items -- if it's a ground firework that would

18   have an audible report, a loud sound, can only have 50 milligrams

19   or less.  The container, if it's regulated, has to have a warning

20   label on it, and it could have -- you know, telling what it is

21   and what it does.  There's other DOT regulation numbers that

22   could be on that item as well.  The fuse has to be a certain

23   length.  It has to be able to support its weight.  And the powder

24   itself cannot contain a chlorate.  So -- and other items can't be

25   in that -- that filler.  So that's what separates a commercially

UNITED STATES DISTRICT COURT

1    manufactured regulated firework as opposed to an explosive banned

2    device.

3    Q    Now -- so by law a firecracker's limited to 50 grams --

4    50 grams -- or milligrams, I'm sorry, of pyrotechnic powder or

5    flash powder, is that right?

6    A    50 milligrams of pyrotechnic powder, not necessarily flash

7    powder.

8    Q    Is flash powder something completely different?

9    A    Flash powder is.  It's a low explosive powder that contains

10   as I mentioned earlier, potassium chlorate.

11   Q    Now, you said low explosive.  What does low explosive mean?

12   A    Low explosive means it's not a high explosive.  And a high

13   explosive can be commercially manufactured for the mining

14   industry.  It can be manufactured for military purposes.  High

15   explosives, they actually will detonate.  They will actually

16   explode at higher velocities.  And how we determine that is a

17   high explosive can explode or detonate at 3,300 feet per second

18   or greater, and a low explosive would be 3,300 feet per second or

19   lower.  In this case this type of powder is considered a low

20   explosive power.

21   Q    Now, you had occasion to weigh the powder that you had

22   retrieved from these devices, is that correct?

23   A    That's correct.

24   Q    Now, first of all, you retrieved the powder, and you

25   described how you did that.  You cut the devices, and you -- the

UNITED STATES DISTRICT COURT

1   contents were poured into a bucket, is that right?

2   A     Yes.

3   Q     And then what did you do with the powder?

4   A     The powders were -- the tubes themselves were separated from

5   the powders, so they were by themselves.  Those items were

6   sealed, both of the items.  One of the items themselves and later

7   items -- as we might get into, they were sub-sampled, a sample

8   was taken of those items, and that sub-sample was sent back to

9   the F.B.I. Laboratory for a forensic examination to determine

10  what kind of powder it was.  The remaining powders were locked up

11  in the Pima Regional explosive magazine -- evidence explosive

12  magazine.

13  Q     And you had a chance to weigh those powders that you cut and

14  retrieved the powders from, correct?

15  A     Yes, I did.

16  Q     Let's go over those weights.  Do you recall Q 24?

17  A     I do.

18  Q     Now, these samples are given a Q number, is that right?

19  A     The laboratory gives them a Q number when they receive them.

20  Q     The F.B.I. Laboratory?

21  A     That's correct.

22  Q     Okay.  And you've had occasion to look at those and to --

23  and to figure out which Q number connects up with which sample,

24  correct?

25  A     That's correct.

UNITED STATES DISTRICT COURT

```
 1  Q    Okay.  Now, let's go through those.  So the device that is
 2  designated as Q 24, how much powder was in that device?
 3           MR. BOCK:  I'm going to object.  We need some
 4  foundation as to the device that is weighing the powder, and if
 5  it's accurate, if there's a margin of accuracy.  So at this point
 6  I'm going to object as to foundation.
 7           THE COURT:  Go ahead.  Lay some more foundation.
 8           MS. ANDERSON:  Yeah, I sure will, your Honor.
 9  BY MS. ANDERSON:
10  Q    Now, you said some of the powder was kept here and some of
11  it was sent back to the F.B.I. Lab, correct?
12  A    Yes, a sub-sample of each item was taken, and it was
13  packaged and sent back to the F.B.I. Laboratory.
14  Q    So the weights that you're about to give us pertain to the
15  weight that was left here in the -- in Tucson, and the weight --
16  it doesn't include what was sent back to the F.B.I. Lab, correct?
17  A    That's correct.
18  Q    Okay.  Now, tell us where you weighed the samples, and how
19  you -- how you weighed them?
20  A    The samples were retrieved from the Pima Regional explosive
21  storage bunker magazine.  They were removed from that, placed on
22  a wood table, and they were opened up by me.  I had an observer
23  there, and I'd have to refer to my notes on the exact weights but
24  the observer was a Pima Regional bomb squad member who opened up
25  the magazine for me.  The process consisted of me opening up the
```

1   container, putting on rubber gloves before I did that.  I have
2   a -- as I mentioned in my report, a Dymo postal scale which
3   weighs in the gram amounts and ounce amounts.  And that scale
4   before and after each weighing was zeroized, or what is called
5   tared so the scale comes out to be zero when it starts.  The
6   powder was placed on the scale and weighed, and I observed the
7   number on the scale, and I also observed visually the amount.
8   And then that amount was recorded, and the amount was put back
9   into the container that it came in, and resealed and documented
10  and signed off on.
11  Q    Now, do you know if this scale is calibrated, or what other
12  use is made of this scale?
13  A    This scale is a typical scale that you would use for
14  weighing postal mail, again, in the gram and the ounce.
15              MS. ANDERSON:  May I have just a moment, Judge?
16              THE COURT:  Yes.
17              MS. ANDERSON:  May I approach the witness, your Honor?
18              THE COURT:  Yes.
19  BY MS. ANDERSON:
20  Q    That's Government's Exhibit 106.  Do you recognize that?
21  A    Yes.
22  Q    And what do you recognize that as being?
23  A    This is my F.B.I. FD-302 report, which is what we use to
24  document what we did in a call, or a search warrant, or some type
25  of incident that we're involved in.

                    UNITED STATES DISTRICT COURT

1  Q     And in this particular issue you memorialized the weights of

2  these samples in that report, Government's Exhibit 106, is that

3  correct?

4  A     That's correct.

5  Q     Let's start with Q 29.  When did you weigh sample Q 29?

6  A     I initially started weighing these items at 6:11 p.m.

7  Q     All right.  So what was the weight that you got for Q 29?

8  A     Q 29, which is our 1B90 was -- with a bar code, that was

9  approximately 2 grams, and that is without the sub-sample which

10  was at the lab.

11  Q     And that's, what, 2,000 milligrams, if my math is correct?

12  A     That's correct.

13  Q     So that would be over 40 times the allowable amount of --

14           MR. BOCK:  This is leading, Judge.  She's leading.

15           THE COURT:  Well, no.  I'll allow some limited leading

16  on these math issues.

17           Go ahead, Ms. Anderson.

18  BY MS. ANDERSON:

19  Q     So according to my calculations, which may not be accurate,

20  that's over 40 times the allowable amount of powder in a device,

21  correct?

22  A     That's correct.

23  Q     Okay.  Now, Q 30, how much did that sample way?

24  A     Q 30, which is our 1B91 had approximately 2 grams as well.

25  Q     Again, 2,000 milligrams, correct?

                    UNITED STATES DISTRICT COURT

1   A     Correct.  Correct.

2   Q     Okay.  How about Q 31?

3   A     Q 31 is our 1B92.  Again, that was approximately 2 grams.

4   Q     2,000 milligrams?

5   A     That's correct.

6   Q     Q 32?

7   A     Which is our 1B93, and that had approximately 1 gram.

8   Q     Which is 1,000 milligrams, correct?

9   A     That's correct.

10  Q     And according to my calculations, that's over 20 times the

11  allowable amount of pyrotechnic material that's allowed?

12  A     That's correct.

13  Q     Okay.  Q 33, how much did that weigh?

14  A     That's 1B94, and that was approximately 1 gram as well.

15  Q     Or again, 1,000 milligrams, is that right?

16  A     That's correct.

17  Q     And finally, based on -- based on your memory Q 24, how much

18  did that weigh?

19  A     That was approximately 1 to 2 grams.  The scale

20  was fluctuating within that range.

21  Q     So that's 1,000 milligrams to 2000 milligrams?

22  A     Correct.

23         MS. ANDERSON:  May I have just a moment, Judge?

24         THE COURT:  Yes.

25  BY MS. ANDERSON:

                    UNITED STATES DISTRICT COURT

1   Q    Now, can you commercially or legitimately purchase any of

2   the devices that were in Mr. Fries' residence on May 13th?

3   A    No, you cannot.

4   Q    Any legitimate purpose to possess or use such a device?

5   A    No.

6   Q    Based on your training and experience, are the devices with

7   the added fragmentation inherently dangerous?

8   A    Yes, they are.

9   Q    Now, Special Agent Henze, on May 27th when -- when the

10  second search warrant was executed, you had occasion to walk

11  across Mr. Fries' property, did you not?

12  A    Yes, I did.

13  Q    And at that time did you happen to see any kind of devices

14  on the ground that appeared as if they were directed towards

15  eradicating any kind of gophers, moles, woodchucks, rats, skunks

16  or ground squirrels?

17  A    That's what the items appeared to be.

18          MS. ANDERSON:  Your Honor, may I approach the witness?

19          THE COURT:  Yes.

20  BY MS. ANDERSON:

21  Q    This is Government's Exhibit Number 107.  Before I -- I --

22  before I ask you to identify that, let me -- let me call your

23  attention to another exhibit.  Take a look at Government's

24  Exhibit 101 -- I'm sorry, 100.  Do you recognize that?

25  A    Yes.

                    UNITED STATES DISTRICT COURT

1    Q    What do you recognize that as being?

2    A    That is one of the items that I saw on the defendant's

3    property.

4    Q    On May 27th?

5    A    Yes.

6              MS. ANDERSON:  Government moves for admission of

7    Exhibit 100.

8              MR. BOCK:  No objection.

9              THE COURT:  100 is admitted.

10   BY MS. ANDERSON:

11   Q    Take a look at 99.  Do you recognize that?

12   A    Yes.

13   Q    And again, is that a different view of the same device?

14   A    It looks like it's the same device.

15   Q    Okay.  And then 101.  Take a look at that, if you would.  Do

16   you recognize that?

17   A    Yes.

18   Q    And again, what is that?

19   A    That's the same device that I saw on the defendant's

20   property.

21   Q    Okay.

22             MS. ANDERSON:  Government moves for admission of

23   Exhibit 101.

24             MR. BOCK:  It's cumulative, Judge.  It's three photos

25   of the same thing.

                    UNITED STATES DISTRICT COURT

```
1              THE COURT:  No, overruled.  101 is admitted.
2  BY MS. ANDERSON:
3  Q     Special Agent Henze, does Government's Exhibit 107, which is
4  the package that I handed you previously, does that appear to be
5  the same device as what's found in Exhibit 99?
6              MR. BOCK:  Judge, I have an objection.  May I approach
7  for a second?
8              THE COURT:  Yes.
9                        BENCH CONFERENCE
10             MR. BOCK:  It's not on the exhibit list, your Honor.
11             THE COURT:  What number are you on now?
12             MS. ANDERSON:  107.
13             THE COURT:  Have you shown -- does Mr. Bock know what
14 it is?
15             MR. BOCK:  It's the package of the Destroyer, but she
16 didn't put -- she's supposed to tell me what her exhibits were,
17 right?
18             MS. ANDERSON:  Well, I added two exhibits.
19             MR. BOCK:  How come I don't have a list with them on
20 there?
21             THE COURT:  Have you seen the exhibits, though, before?
22             MR. BOCK:  What?
23             THE COURT:  Have you seen them before?
24             MR. BOCK:  Have I seen -- that I've never seen that
25 before.
                        UNITED STATES DISTRICT COURT
```

 1            MS. ANDERSON:  I need to show him that.

 2            THE COURT:  Okay, so let's -- shall we take a short

 3    recess to -- or do you want to ask him -- is he going to be

 4    coming back tomorrow in any event?

 5            MS. ANDERSON:  If we don't finish today, he will be,

 6    but I'm almost done with him.

 7            THE COURT:  Okay, why don't we take a 5, 10 minute

 8    recess.

 9            MR. BOCK:  If you want to show them to me here, I can

10    look at them for two seconds.

11            THE COURT:  Okay, do you want to go get them?

12            MS. ANDERSON:  Sure.

13            MR. BOCK:  If I can just talk to my client?

14            THE COURT:  Sure.

15            MR. BOCK:  Judge, I have no objection.  I'm sorry.

16            THE COURT:  All right, so we can -- well, just come up.

17    Take a quick look.

18            Okay, so this is, what, 10 --

19            MS. ANDERSON:  This is 107.  What I will do, Judge, is

20    take it out of the package so that all of this information won't

21    be coming in.  I'm going to have my chemist talk about this too.

22            THE COURT:  It doesn't say anything about pack rats.

23    It does say rats, though.  Are there two exhibits?

24            MS. ANDERSON:  This was to refresh his memory, because

25    he couldn't remember the way --

                        UNITED STATES DISTRICT COURT

1            THE COURT:  Okay, so no objection?

2            MR. BOCK:  My client has no objection, so I have no

3    objection.

4            THE COURT:  Okay.

5            (The bench conference was concluded.)

6            THE COURT:  All right, so let's see, Ms. Anderson, you

7    want to move to admit the -- was it Exhibit 107?

8            MS. ANDERSON:  Right.  107, your Honor.  The government

9    moves to admit Exhibit 107.

10           THE COURT:  All right, 107 is admitted.

11   BY MS. ANDERSON:

12   Q    Special Agent Henze, 107 is these Giant Destroyers which are

13   the devices that you found out at the defendant's property, is

14   that right?

15           MR. BOCK:  I'm going to object to the word devices,

16   Judge.

17           THE COURT:  No, overruled.  That word sounds fairly

18   innocuous, but --

19           THE WITNESS:  Yes.

20           THE COURT:  -- go ahead.  I'll overrule the objection.

21           MS. ANDERSON:  May I have just a moment, your Honor?

22           THE COURT:  Yes.

23           MS. ANDERSON:  May I use the ELMO, your Honor, and

24   publish 107?

25           THE COURT:  Sure.

                    UNITED STATES DISTRICT COURT

1          MS. ANDERSON:  I'm thinking I need to press a button.

2          THE CLERK:  No, you don't have to do anything.  Which

3   exhibit is this?

4          THE COURT:  There we go -- oh, wait.  It's still not up

5   on the jurors' screens.

6   BY MS. ANDERSON:

7   Q    And again, these are the devices that you found -- or that

8   you saw at the defendant's property, correct?

9   A    That's correct.

10  Q    Are these devices different than the 24 devices that you

11  found in his dresser?

12  A    Yes, they are.

13  Q    How so?

14  A    One, they're commercially manufactured.  They are regulated.

15  They have DOT numbers.  They have warning labels.  The type of

16  powder or filler that's in these items are not the same as the

17  other items recovered, and these are not intended to explode.

18  They're intended as -- to put out a gas.

19          MS. ANDERSON:  May I have just a moment again, your

20  Honor?

21          THE COURT:  Yes.

22          MS. ANDERSON:  That's all we have, your Honor.

23          THE COURT:  All right.

24          Cross examination?

25                    CROSS EXAMINATION

                  UNITED STATES DISTRICT COURT

1    BY MR. BOCK:

2    Q    So Agent Henze, you went ahead on Friday the -- Friday the

3    13th, right?  It was Friday the 13th of 2011.  Is that when you

4    executed the -- you were part of the -- of the search of my

5    client's residence, is that correct?

6    A    It was May 13th, yes.

7    Q    Did I say May 13th?

8    A    You said Friday.  I'm not sure if it was Friday or not.

9    Q    Okay.  Now, so you went into his -- that one room.

10            MR. BOCK:  And so can we see diagram number -- Exhibit

11   Number 50?

12            Maybe it's 58.  Is it 58?  58.

13   BY MR. BOCK:

14   Q    Okay, so 58 was a picture that was taken on May the 27th, is

15   that correct?

16   A    Correct.

17   Q    And then there was a picture that was taken prior to that

18   time when you actually recovered those items, is that correct?

19   A    Correct.

20   Q    And you would agree with me that these items were in a fully

21   furnished room?

22   A    There was furniture in there, yes.

23   Q    Sorry?

24   A    There was furniture in there, yes.

25   Q    And there was -- there was a safe in the room, is that

                         UNITED STATES DISTRICT COURT

1  correct?

2  A    That's correct.

3  Q    And there were items of value on top of the -- the chest

4  that had these items in a drawer, is that correct?

5  A    There's items on there, yes.

6  Q    Okay.  You see headsets.  You see a stereo, do you not?

7  A    I'm -- if that's what that is.  I'm not sure.

8  Q    Well, you went in Room 58, did you not -- I mean, you went

9  in the room that is depicted by Exhibit 58?

10  A    Correct, but I wasn't dealing with that item there, so --

11  Q    Okay.  Well, who took these pictures?

12  A    Maybe someone on the evidence response team.

13  Q    Well, you don't deny that there was a -- a number of

14  valuable personal belongings that were associated with that room?

15  A    There are, yes.

16  Q    Okay.  Now, then you indicated that you opened the drawer,

17  and that's --

18        MR. BOCK:  I think that would be 44?  I'm sorry, I have

19  all these numbers.  Let me take -- why don't we try 36.

20  BY MR. BOCK:

21  Q    Okay.  So this is what you find when you -- when you open

22  the drawer, is that correct?

23  A    I did not open the drawer.  This is what I found when I

24  walked into the room.

25  Q    And then you indicated that you -- and we saw that exhibit

                    UNITED STATES DISTRICT COURT

1   and we saw that video, there was a —— an x-ray device, is that

2   correct, that was placed on top of these?

3   A     There was a cassette or a fluer film that was placed over

4   the top of the drawer.

5   Q     Okay, so did it touch any of these items?

6   A     It may have.

7   Q     Did you see any timing device ever associated with any of

8   these items?

9   A     No, I did not.

10  Q     Now, you told me you had a lot of experience.  You testified

11  to that.  So have you had experience in people making homemade

12  devices?

13  A     Yes.

14  Q     Have you investigated those cases?

15  A     I have.

16  Q     Okay.  So take a look in that sphere that is red in color.

17  Do you see —— any one of those.

18  A     Yes.

19  Q     Okay.  So how would someone make that if they wanted to make

20  it a homemade device?

21  A     Well, they would have to purchase, or make, or construct the

22  container.

23  Q     How —— so how would they —— so they'd have to purchase

24  plastic?

25  A     They might be able to purchase these plastic containers.

UNITED STATES DISTRICT COURT

1  Q    You mean the balls?

2  A    The -- the container -- yes, the round spherical items.

3  Q    Okay.  Where would they purchase those?

4  A    I don't know.

5  Q    Okay.  And so they would put the -- have you seen these

6  purchased before?

7  A    I have not.

8  Q    Okay.  Is there any indication whatsoever that Mr. Fries

9  purchased these?

10 A    I don't have any documentation that would -- told me that he

11 purchased those.

12 Q    Okay.  There's no information whatsoever that those were

13 purchased -- these spheres were purchased by Mr. Fries, is that

14 correct?

15 A    No.

16 Q    So then someone -- so the sphere itself can be -- can be

17 purchased already made, is that what you're saying?  Can a sphere

18 that's already manufactured be purchased that is -- is what's

19 depicted here?

20 A    I'm sure you can probably buy the container itself just like

21 that.

22 Q    And you don't know -- you've been in -- how long have you

23 been in this -- this field where you're investigating all types

24 of explosive devices?

25 A    12 years.

UNITED STATES DISTRICT COURT

1    Q     Okay.  And you can't tell me where you might be able -- I'm
2    not arguing with you.  Don't take it the wrong way.  You can't
3    tell me where you could purchase something that looks exactly
4    like this?
5    A     Well, these are not a regulated item, so you're not going to
6    be able to purchase them at a commercial manufacturing firework
7    facility, or a commercial fire workplace that sells them on the
8    street.  So wherever they're made, I do not know.
9    Q     So how would these be made?  Do you know what the -- holds
10   the powder?  Is it a plastic?
11   A     It appeared to be a plastic material to me.
12   Q     Okay.  And did you find any marks on the plastic material?
13   Did you try to analyze the plastic material to see where it might
14   be manufactured?
15   A     We visually inspected it.  I x-rayed, like I said, and we
16   tried to manipulate these with a robot to open them.  There was
17   no indication based on the photograph, visual inspection, and the
18   photographs depicted on -- at the bomb range that there was any
19   licensing, or warning sign, or DOT information on these items
20   whatsoever.
21   Q     Did you ever try to F.B.I -- the vast resources of the
22   F.B.I. to see if any other devices looked exactly like this, and
23   if they were, where they might have come from?
24   A     There's nothing to document these items to any numbers, so
25   there's no way for me to trace these to anything.

                    UNITED STATES DISTRICT COURT

1   Q     And if someone were to actually make this ball, they would

2   have to have some plastic and they would have to have some

3   molding -- some type of mold to put the plastic in to make this.

4   Does that sound fair to you?

5   A     I've never made plastic balls like this, so I wouldn't know.

6   Q     You've never seen anything like this in all of your --

7   A     I've seen items like this in illegal manufacturing

8   facilities, and homes, yes.

9   Q     Okay.  So -- and they have fuses attached to them, is that

10  correct?

11  A     These do, yes.

12  Q     Are these fuses -- can they be purchased?

13  A     Hobby fuse can be purchased, yes.

14  Q     Is that what these were, hobby fuses?

15  A     It appeared based on my experience that it's green hobby

16  fuse.

17  Q     And these spheres had powder in them, is that correct?

18  A     Based on the x-ray interpretation, yes.

19  Q     And so how would the powder get into the sphere?

20  A     They could be loaded into the sphere.

21  Q     And how could they be loaded specifically into these

22  spheres?

23  A     I don't know.

24  Q     You don't know how the powder got in there?

25  A     I didn't load them.  I don't know.

UNITED STATES DISTRICT COURT

1   Q    Well, based upon your experience and training -- and you

2   went ahead and freely discussed that with the U.S. Attorney.

3   Based upon that, how do you feel these spheres could have been

4   loaded with powder?

5   A    The inside container could have been filled with powder, and

6   that container could have been put into these plastic items.

7   Q    Okay, what --

8   A    They could have loaded -- where the fuse is, they could have

9   loaded the powder in there.

10  Q    Okay.  So the inside container, what would that have looked

11  like?

12  A    It could be cardboard, it could be paper mache, it could be

13  some type of thinner plastic material.

14  Q    And you didn't see any of that in Mr. Fries' home, is that

15  correct?

16  A    No.

17  Q    And to load the powder as you indicated, I imagine it would

18  have to be loaded into the top of the sphere, is that correct?

19  A    You asked me which ways I could load it, and I gave you two

20  examples.  Whether it was loaded on the top, I don't know.

21  Q    If it was loaded on the top, is there an instrument to get

22  the powder in?

23  A    I'm sure if somebody had a straw and they -- they utilized

24  that, they could have.

25  Q    Did you see any straws associated with this?

UNITED STATES DISTRICT COURT

1    A     Not in this box, no.

2    Q     You didn't see any straws with any powder on them either,

3    did you?

4    A     No, I did not.

5    Q     Now, I want to talk to you, then, a little bit about the --

6    the cyndrical, which is number 44.  Now, these cyndrical -- you

7    called them tubes?

8    A     Cylindrical tubes, yes.

9    Q     What was the -- what is the material that looks like it has

10   a reddish tint to it or a rouge color?  What was that made of?

11   A     Well, I don't know what the lab report come back to.  I

12   would have to look at that.  But it appeared to be some type of

13   cardboard material.

14   Q     And did these appear to be all of the same size?

15   A     They appeared to be similar in size, yes, and shape.

16   Q     And width, and length?

17   A     That's what it appeared to be, yes.

18   Q     And did these appear to be a homemade to you?

19   A     Yes.

20   Q     And so how would someone make these if they were to be

21   homemade?

22   A     They could utilize some type of hardened cardboard tube

23   material.  They could purchase that maybe on line.  That

24   cardboard tube material from what I've seen over the years is

25   either wrapped again.  And then the white plugs, as you see

UNITED STATES DISTRICT COURT

1    there, could be paper mache.  They could be some type of cement

2    product.  And those items are typically glued into the sides.

3    The fusing mechanism, the fuse that's sticking out there, could

4    be hot glued in there, could be placed in there and covered up

5    with more paper.  That's ways that these things could be

6    manufactured.

7    Q    And these could also be purchased, could they not?

8    A    Those items cannot be purchased legally, no.

9    Q    But they could be purchased, was my question, though, is

10   that correct?

11   A    They could be purchased.

12   Q    And those spheres could be purchased, is that right?

13   A    Sure.

14   Q    You didn't see anything to suggest in any way, shape, or

15   form that Mr. Fries made these devices, is that correct?

16   A    No.

17   Q    No, he didn't make -- you didn't see anything that would

18   suggest he made these devices.  Your response was --

19   A    No.

20   Q    No.  Now, the amount of powder that you have discerned

21   was -- came from the -- I guess, what, there were five devices?

22   Is that my recollection?  Is that what you testified to?

23   A    There were five cylindrical items that were tested, yes, or

24   weighed.

25   Q    And --

                    UNITED STATES DISTRICT COURT

1   A    That did not have fragmentation.

2   Q    Five that did not have fragmentation.  Did you take any

3   powder out of any of the spheres?

4   A    No, we did not.

5   Q    So we don't know how much powder was in the spheres?

6   A    No, I do not.

7   Q    So the powder in the spheres could have been -- we don't

8   know what it was, right, so we have no -- so all we know is out

9   of -- let's see, we had 21 items, and then we had three that had

10  the BB's on it, right, for a total of 24?

11  A    That's correct.

12  Q    So out of 24 we took powder -- or you took powder, excuse

13  me, out of five of the cylindrical which we just saw in that

14  exhibit, is that correct?

15  A    That's correct.

16  Q    And how many grams are there in an ounce?

17  A    How many grams are in an ounce?

18  Q    Do you know?

19  A    I don't recall off the top of my --

20  Q    26 sound right?  26 grams to an ounce?

21  A    That could be.

22  Q    And in your report you have approximately.  You've qualified

23  the weight by the use of the word approximately?

24  A    Correct.

25  Q    So what does approximately mean, plus or minus 10 percent,

UNITED STATES DISTRICT COURT

1   5 percent, 1 percent?

2   A    According to the scale if it showed me 2 grams, then to me

3   it's an approximate amount of 2 grams.

4   Q    Now, the -- you also testified as to the last exhibit of the

5   government, which was some -- a device called the Destroyer, is

6   that correct?

7   A    That's correct.

8   Q    And the government kept asking you and using the word

9   devices, and there was only one -- there was a picture of one of

10  these, is that correct?

11  A    There was a picture of one of those items, yes.

12  Q    Okay, so there weren't multiple items.  There was just one?

13  A    I don't recall if there was multiple items.

14  Q    But you said the picture was of the same one?

15  A    I said it was a picture of one of the items that I saw out

16  there at the scene, yes.

17  Q    Okay, but do you remember seeing more than one of those

18  items?

19  A    I don't recall if I saw more than one or not.

20  Q    Do you know if Mr. Fries has a pack rat problem?

21  A    I wouldn't know that.

22  Q    You saw his property, did you not?

23  A    I did.

24  Q    Saw that it's a desert area property?

25  A    Yes.

UNITED STATES DISTRICT COURT

1   Q      You saw that he's not very close to neighbors, is that

2   correct?

3   A      There's a distance between him and neighbors, yes.

4   Q      You saw that he has a piece of property that's not enclosed

5   by a wall, is that correct?

6   A      The front of the property, correct.

7   Q      And did you go ahead and take a look or view the entire

8   property?  I know you had another function, but did you take a

9   look at the whole property?

10  A      No, I was busy dealing with the devices that I found.

11  Q      Did you know there were some fireworks that the government

12  had a picture of, like a rocket and things like that that were in

13  the garage?  Do you remember that?

14  A      There were items recovered there, yes.

15  Q      And did you ever make any attempt to see with the recovered

16  items that might have had a manufacturer's name on them, or might

17  have had some information, if you could have traced the origin of

18  the spheres or the cylinders based upon the other -- the other

19  fireworks?

20  A      No, because those DOT regulated or warning signs are

21  specific to that item, so it wouldn't have told me about these

22  illegally manufactured items.

23  Q      Is it legal to buy fireworks in New Mexico?

24  A      Is it legal?

25  Q      Yes.

                        UNITED STATES DISTRICT COURT

1   A      I believe so.

2   Q      Is it legal to buy fireworks in Arizona?

3   A      Some fireworks are regulated, some are not.

4   Q      Is it legal to buy fireworks in many states in the United

5   States?

6   A      Yes.

7   Q      There were no -- you talked about situations where devices

8   could be booby trapped.  Do you remember talking about that being

9   a concern?

10  A      Yes.

11  Q      Obviously, it was a concern if you were in Iraq, right?

12  A      Yes.

13  Q      There's nothing here that would suggest any type of booby

14  trap or any of that, is that correct?

15  A      No, there was not.

16  Q      Now, you also put in your report -- and do you have your --

17  your May 30th report in front of you?

18  A      I do not, sir.

19         MR. BOCK:  Is it okay if I just show it to him, Judge?

20         THE COURT:  Yes, that's fine.

21  BY MR. BOCK:

22  Q      I'm going to ask you about this.

23  A      Okay.

24  Q      Tell me when you're --

25  A      I've read it.

UNITED STATES DISTRICT COURT

1   Q     Okay.  In that report you talk about an M80.  Do you see
2   that?
3   A     Correct.
4   Q     What's an M80?
5   A     An M80 could be anything.  As I mention in here, the street
6   name, an M80, M100, an M1000 --
7   Q     Is an M80 like a big firecracker?
8   A     It could be.  It's depending upon the person who has them,
9   and what they call them.
10  Q     People sell M80's, don't they?
11  A     If -- commercially available ones, yes.  If they have a
12  name, then maybe, yes.
13  Q     And so you thought these devices -- is that what you used,
14  this M80, M100, M1000, is that some description you were applying
15  to these cylindrical devices?
16  A     That was a reference to street name that I've heard them
17  called.
18  Q     You've seen cherry bombs before, have you not?
19  A     I've seen items that were called cherry bombs.
20         MR. BOCK:  Let me retrieve that report from you.
21         Could I have a second your Honor?
22         THE COURT:  Yes.
23  BY MR. BOCK:
24  Q     Oh, one other thing I forgot to ask you.  The weighing of
25  the -- of the five cylindrical devices, right, the weighing of

                    UNITED STATES DISTRICT COURT

1    the powder in those, that didn't occur until July 25th of 2013,

2    is that correct?

3    A     Those ones, yes.

4    Q     Sorry?

5    A     On the items you describe, yes.

6    Q     Okay.  So -- and so it was -- on July the 25th, 2013 you

7    weighed these at about 6:11 p.m.?

8    A     Yes.

9    Q     Right?

10   A     That's what I have indicated in my report, yes.

11   Q     Do you want to see the report just to make --

12   A     That's fine.

13   Q     Believe me?

14   A     Yes.

15            MR. BOCK:  I don't think I have anything further.

16            THE COURT:  All right.

17            Any redirect?

18            MS. ANDERSON:  No, your Honor.

19            THE COURT:  All right.

20            Any questions from the jury for this witness?

21            All right, Ms. Anderson, may this witness step down and

22   be excused?

23            MS. ANDERSON:  Yes, subject to recall.

24            THE COURT:  All right.

25            Thank you, sir.  You may be excused.

                    UNITED STATES DISTRICT COURT

1          MS. ANDERSON:  May we approach the bench, your Honor?

2          THE COURT:  Yes.

3                         BENCH CONFERENCE

4          THE COURT:  Have you had enough?

5          MS. ANDERSON:  Yeah, I've had enough, Judge.  Two

6     things.  I'm out of witnesses for the day, and then also I think

7     Mr. Bock opened the door to get the revenge book in, because the

8     question he asked --

9          THE COURT:  Okay, let me have the jury go and we can

10    talk about that.

11         MS. ANDERSON:  Okay.

12         (The bench conference was concluded.)

13         THE COURT:  All right, members of the jury, I'm going

14    to let you go for the evening.  Please continue to follow the

15    Court's admonition.

16         Again, you can either leave your things on your chairs

17    or take them back to the jury room with you.

18         And if you can come back tomorrow at 9:15, we'll get

19    started then.

20         So have a good evening.  We'll see you tomorrow at

21    9:15.

22         (The jury left the courtroom.)

23         THE COURT:  All right, the record may reflect the

24    absence of the jury, presence of counsel, the defendant.

25         So go ahead, Ms. Anderson.

                     UNITED STATES DISTRICT COURT

1          MS. ANDERSON:  Judge, Mr. Bock asked Special Agent

2    Henze a couple of different times you didn't see anything to

3    suggest he made these devices?  And Special Agent Henze said no.

4    But in fact, there was something to suggest that the defendant

5    did make these devices, and that's the revenge book that's the

6    subject of -- of the Government's 404(b) notice.

7          And clearly, the -- the revenge book that we are

8    seeking to introduce, the -- the little snippet from the revenge

9    book is indeed a recipe book for how to make these devices --

10   it's Exhibit Number 96, and the page which is attached entitled

11   The World of Hurt:  *You may want to hit your target with an*

12   *especially nasty surprise, such as a cherry bomb or ash can.*

13   *These are king sized firecrackers that are very unpleasant when*

14   *they go off in a closed room.  It becomes even more unpleasant if*

15   *you first roll the cherry bomb or ash can into glue and then roll*

16   *it in BB's.  If your target is in the mens room alone, for*

17   *example, and you keep a lit cigarette in your mouth, open the*

18   *door a crack, light the fuse from your cigarette and toss it in.*

19   *If your target's in a stall with his pants down, roll it under*

20   *the partition.*

21          THE COURT:  So you're renewing your motion to allow

22   that other act evidence to be introduced in the government's case

23   in chief?

24          MS. ANDERSON:  Right, because I think defense counsel

25   opened the door.

                    UNITED STATES DISTRICT COURT

1           THE COURT:  All right.

2           Mr. Bock?

3           MR. BOCK:  Well, Judge, clearly I didn't open the door,

4    because you didn't hear me ask any questions about the devices

5    that had the BB's attached to them.  You didn't hear me ask any

6    questions about the glove over the devices, over the cylindrical

7    device or the sphere that had the BB's that were glued to it with

8    the glove.  My questions went solely to the devices that were

9    not -- had any claimed BB's on them, to see whether or not there

10   was any powder or anything to suggest that he made those.

11          THE COURT:  You're talking about the red --

12          MR. BOCK:  Yeah, the round ones.  That's all I asked

13   him was the round ones and those -- the pictures of those -- of

14   those cylinders that didn't have BB's or gloves on them.

15          So I don't see how I opened the door by asking him that

16   he didn't have materials consistent with making these.  So

17   there's no way I opened the door, Judge.

18          THE COURT:  All right.  I'll take a look at it and

19   review the Livenote as to whether -- how expansive your question

20   was, Mr. Bock.

21          All right, and just one thing that counsel may want to

22   take a look at relating to jury instructions is a case in this

23   district which was a memorandum decision, but it was Judge

24   Carroll's case, United States versus Hughes.  There are some jury

25   instructions attached to that case.  It's 273 Federal Appendix

                    UNITED STATES DISTRICT COURT

1  587, 2007 case.

2           MS. ANDERSON:  587?

3           THE COURT:  Right.  United States versus Hughes.

4           MS. ANDERSON:  F.2d did you say?

5           THE COURT:  It's a Federal Appendix case 273 Federal

6  Appendix 587, 2007 Westlaw 4553331.  So it wasn't a published

7  case, but it does have the -- it was affirmed on appeal and in a

8  non-published decision it does have some jury instructions in the

9  docket.  So just something to look at when thinking about jury

10  instructions.

11           MR. BOCK:  Judge, does it have a jury instruction as to

12  mens rea?

13           THE COURT:  Well, come on up after -- we'll stand at

14  recess if there's nothing else, and I'll show it to you.

15           MR. BOCK:  Can I look at it then?

16           THE COURT:  Yes.

17           Anything further, Ms. Anderson, before we recess?

18           MS. ANDERSON:  No, your Honor.

19           THE COURT:  All right.

20           MR. BOCK:  Judge, can I leave my exhibit book here over

21  night?

22           THE COURT:  I think it's probably safe.  I can't

23  imagine -- yes, you can.

24           All right, we'll stand at recess.

25  (4:43 p.m.)

                     UNITED STATES DISTRICT COURT

1                    C E R T I F I C A T E

2          I, Mary A. Riley, do hereby certify that I

3     stenographically reported the foregoing proceedings to the best

4     of my skill and ability, and that the same was transcribed by me

5     via computer-aided transcription, and that the foregoing pages of

6     typewritten matter are a true, correct and complete transcript of

7     all the proceedings had, as set forth in the title page hereto.

8          Dated this 2nd day of February, 2014.

9

10                                   s/ Mary A. Riley

11                              United States Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         UNITED STATES DISTRICT COURT